**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| **ASHOOR RASHO, PATRICE DANIELS, GERRODO FORREST, LYNDA SMITH, LATERIAL STINSON, and KEITH WALKER,** | ) ) ) ) ) | |
| | ) | **No. 1:07-CV-1298-HAB-JAG** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Judge Harold A. Baker** |
| | ) | **Magistrate Judge John A. Gorman** |
| **DIRECTOR ROGER E. WALKER, JR., DEPUTY DIRECTOR ROBERTA FEWS, DR. WENDY NAVARRO, DR. SYLVIA MAHONE, EDDIE JONES, DR. WILLARD ELYEA, DR. JOHN GARLIC, DR. MICHAEL F. MASSA, MELODY FORD, and WEXFORD HEALTH SOURCES, INC.** | ) ) ) ) ) ) | |
| **Defendants** | | |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs Ashoor Rasho, Patrice Daniels, Gerrodo Forrest, Lynda Smith, Laterial Stinson, and Keith Walker, prisoners currently incarcerated in various adult correctional centers of the Illinois Department of Corrections (the "IDOC"), on their own behalf and on behalf of all mentally ill inmates who are now or will be incarcerated in IDOC adult correctional centers, hereby complain against Defendants Roger E. Walker, Jr., Director of the IDOC; Roberta Fews, Deputy Director of the IDOC Office of Programs and Support Services; Dr. Wendy Navarro, Chief of Mental Health and Psychiatric Services for the IDOC; Dr. Sylvia Mahone; Eddie Jones; Dr. Willard Elyea; Dr. John Garlic; Dr. Michael F. Massa; Melody Ford, and Wexford Health Sources, Inc., as follows:

1.     This is a class action lawsuit brought pursuant to 42 U.S.C. § 1983 to redress violations of Plaintiffs' and the class members' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free of cruel and unusual punishment while they are incarcerated in IDOC facilities, to redress violations of their liberty interests under the Due Process Clause of the Fourteenth Amendment, and, pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131 et seq., and the Rehabilitation Act (the "Rehab Act"), 29 U.S.C. § 794, to be free of discrimination on account of their disabilities.

2.     Plaintiffs seek a judgment declaring the Defendants' conduct unconstitutional and violative of the ADA and the Rehab Act, and an injunction against Defendants' unlawful conduct as set forth below on pages 19-21.

3.     America's prisons have become the new mental institutions.  Fifty years ago, half a million mentally ill Americans lived in public mental health hospitals.  In 2002, fewer than eighty thousand did.  At the same time these mentally ill persons were being deinstitutionalized and released to treatment – or lack of treatment – by chronically underfunded programs, the U.S. rate of incarceration soared.

4.     The Bureau of Justice Statistics Special Report:  Mental Health Problems of Prison and Jail Inmates, authors D. James and L. Glaze, dated September, 2006, revised December 14, 2006, stated that "At midyear 2005 more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons . . . . These estimates represented 56% of State prisoners . . . ." (Id. p. 1.)  "State prisoners were most likely to report a recent history of a mental health problem [].  About 24% of

State prisoners had a recent history of a mental health problem . . . ." (Id. p. 2.)
However, approximately "3 in 10 State [] prisoners were found to have symptoms of a
mental disorder without a recent history." (Id. p. 3.) Based upon a modified structured
clinical interview for the DSM-IV (the Diagnostic and Statistical Manual of Mental
Disorders of the American Psychiatric Association), the report found that over 15% of
State prisoners reported at least one symptom of a psychotic disorder; over 70% reported
at least one symptom of a major depressive disorder, and almost 74% reported at least
one symptom of a mania disorder. (Id. p. 2.) This compares to 3.1% of the general US
population reporting at least one symptom of a psychotic disorder; 7.9% reporting at least
one symptom of a major depressive disorder; and 1.8% reporting a symptom of a mania
disorder. (Id. p. 3.)

5.      The IDOC and its third-party contractor for medical and mental health
services, Wexford, have utterly failed to deal with this devastating problem. Defendants'
policies and procedures – or lack thereof – create cruel and inhuman conditions for those
inmates who are mentally ill. The treatment of mentally ill inmates throughout the
IDOC's adult correctional facilities - grossly inadequate treatment, erratic and
inconsistent treatment, punitive treatment, or no treatment at all - continually violates the
constitutional and legal rights of Plaintiffs and the class members.

6.      The court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331 and
1343(a)(3) and (4). Venue is proper in the Central District of Illinois under 28 U.S.C. §
1391(b) because at least one of the Defendants resides in the District and a substantial
part of the events and omissions giving rise to Plaintiffs' claims occurred in the District.

7.      This action is brought by the named Plaintiffs on behalf of all mentally ill prisoners, or prisoners who may become mentally ill while incarcerated, who are now or will in the future be incarcerated in the IDOC's adult correctional facilities.  A class action is proper pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure.

8.      Members of the class on whose behalf Plaintiffs sue are so numerous that joinder of all members is impractical.  According to the IDOC's website, as of May 2007, there were more than 45,000 adult prisoners in the IDOC's correctional facilities, of whom more than half likely suffer, or will suffer, from mental illness.  (See paragraph 4 above.)

9.      There are questions of law or fact common to all class members.  The failure of Defendants to implement policies and procedures – including policies and procedures they already have in place – to identify and care for the large number of mentally ill inmates currently in custody, to help prevent inmates from developing mental illness while incarcerated, or to limit the extent to which mental illness results in extra punishment for inmates, is a violation of Plaintiffs' and the class members' constitutional and legal rights.

10.     Plaintiffs' claims are typical of the claims of the class, and Plaintiffs can fairly and adequately represent and protect the interests of the class members.

11.     Separate injunctive and declaratory actions maintained by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, thereby establishing incompatible standards of

conduct for Defendants. Adjudication regarding individual class members would, as a practical matter, be dispositive of or impair the interests of other members not parties to the adjudication or substantially impair their ability to protect their interests.

12.     Defendants have acted or refused to act on grounds generally applicable to the class that Plaintiffs represent, thereby making final injunctive or corresponding declaratory relief appropriate for the class as a whole.

13.     Plaintiff Ashoor Rasho is currently incarcerated at Pontiac Correctional Center; he was previously incarcerated at Tamms Correctional Center. He has a history of auditory hallucinations, suicide attempts, and self-mutilation. Despite Mr. Rasho's serious mental illness, he has been taken on or off medication, put into and then taken out of the Pontiac Mental Health Unit, and told by correctional officers when he was on crisis watch to call them "when [he] hit an artery." Mr. Rasho's 1996 incarceration for burglary has been greatly prolonged by punishment for infractions related to his mental illness, so that his current release date is now 2018.

14.     Plaintiff Patrice Daniels is currently incarcerated at Pontiac Correctional Center. Despite his mental illness, he has been placed in segregation for extended periods; he has repeatedly caused injury to himself and received medical attention for these injuries, but did not receive mental health screening or mental health care. He has requested transfer to a Mental Health Unit but been denied.

15.     Plaintiff Gerrodo Forrest is currently incarcerated at Pontiac Correctional Center. He has a history of mental illness including auditory hallucinations, delusions, and repeated suicide attempts, compounded by limited intellectual and cognitive abilities.

He has spent most of his time in prison in segregation due to acting out triggered by his psychological illness and impairments.

16.     Plaintiff Laterial Stinson is currently incarcerated at Pontiac Correctional Center.   He has a long history of diagnoses and treatment for mental illness, but his diagnoses and medications have constantly changed as he has been shifted from doctor to doctor.

17.     Plaintiff Lynda Smith is currently incarcerated at Dwight Correctional Center.  She has a history of treatment for mental illness, and has also had surgery for a brain tumor.  She has been in custody since November 1989 and has spent a total of ten years since then in segregation.  She was not originally placed in the Mental Health Unit at Dwight, and she is not currently there despite her repeated requests that she be transferred there.  She believes that her grievances have been destroyed by the doctor at Dwight.  Her incarceration has been prolonged due to disciplinary infractions and her current release date is 2032.

18.     Plaintiff Keith Walker is currently incarcerated at Pontiac Correctional Center.  Despite suffering from mental illness, Mr. Walker has been removed from the Mental Health Unit and has had his medication discontinued.  Mr. Walker has spent months upon months in segregation for disciplinary infractions related to his mental illness, and has had his incarceration prolonged due to disciplinary infractions related to his mental illness.

19.     Defendant Roger E. Walker, Jr. is the Director of the IDOC; as such, he has overall responsibility for the administration of all correctional facilities in the State. He resides in Springfield, Illinois.

20.     Defendant Roberta Fews is the Deputy Director of the IDOC Office of Programs and Support Services.  She has responsibility for the office of the Chief of Mental Health and Psychiatric Services for the IDOC, which is within her department rather than under the authority of the Medical Director of the IDOC.

21.     Defendant Dr. Wendy Navarro is the Chief of Mental Health and Psychiatric Services for the IDOC, and as such, has immediate responsibility for the mental health and psychiatric care of inmates in the custody of the IDOC.

22.     Defendant Dr. Sylvia Mahone is the medical director of Pontiac Correctional Center.

23.     Defendant Eddie Jones is the former warden of Pontiac Correctional Center.

24.     Defendant Dr. Willard Elyea is the former Medical Director of the IDOC.

25.     Defendant Dr. John Garlic is the supervising clinical psychologist at Pontiac Correctional Center.

26.     Defendant Dr. Michael F. Massa is the psychiatrist assigned to the South Medical Unit at Pontiac Correctional Center.

27.     Defendant Melody Ford is the chairperson of the IDOC Administrative Review Board.

28.     Defendant Wexford Health Sources, Inc., is a corporation headquartered in Pittsburgh, Pennsylvania which provides health services, including mental health services, throughout the IDOC by contract with the State of Illinois.

29.     Defendants are sued in their official and individual capacities.

30.     Mental illness is grossly undertreated in the IDOC's facilities.  One measure of the deficiency is how few of its adult correctional centers provide any sort of specialized mental health services at all:  The State of Illinois currently has only four adult correctional facilities (out of a total of 28) which offer some form of specialized mental health services to inmates:  Dixon Correctional Center, Pontiac Correctional Center, Tamms Correctional Center (the state's "super-max" facility); and Dwight Correctional Center.  The available spaces for specialized mental health treatment are minuscule compared to the need:  according to the IDOC's Annual Report for Fiscal Year 2007 (the most recent report available), as of June 2007, Pontiac's Mental Health Unit housed 69 inmates, and Dixon's Psychiatric Unit housed 183 inmates.

31.     Defendants avoid treating inmates with mental illness by failing to identify inmates with mental illness.  Despite an Administrative Directive which requires that "All offenders [] transferring into a facility shall be screened and, when appropriate, referred to a mental health professional," the mental health screening at IDOC adult correctional centers is arbitrary, haphazard, and riddled with gaps.  Most inmates do not receive such screening.

32.     Even for those prisoners identified as needing mental health care, the care is grossly substandard.  The IDOC's contracts with Wexford, signed year after year by

Defendant Walker, contain no performance standards; thus it is no surprise that the State of Illinois pays hundreds of millions of dollars, year after year, for care that violates constitutional standards and established legal norms.

33.     Access to the limited number of specialty mental health units is limited and difficult.  The standards for transfer to a facility with a specialty mental health unit are unclear; prisoners with obvious mental health needs may not be transferred to such facilities at all.  Even at facilities with specialty mental health units, prisoners are refused assignment to the mental health unit despite requesting it and despite being on, or having been on, potent psychiatric medications.

34.     Prisoners who ask to be transferred to mental health units are refused for reasons that have nothing to do with mental health treatment considerations (e.g., too much segregation time).  Grievances by inmates as to the quality of care provided in the mental health units are treated not as complaints about care, but as challenges to being assigned there.  Prisoners are transferred out of mental health units in retaliation for filing a grievance, assisting other inmates in grieving, or other reasons having nothing to do with psychiatric care.

35.     What limited and erratic care there is, is provided chiefly by medication. A prisoner with paranoid schizophrenia may see a psychiatrist once a month, to "re-up" his medications, and a social worker once a month.  It can be very easy to get off medications:  just ask, or stop taking the medications.  There are no adequate mechanisms in place to monitor whether mentally ill inmates are really taking the medications they are

prescribed, or to encourage them, through therapeutic contact, to stick with their medication regimes.

36. Prisoners who are transferred from one correctional facility to another may receive radically different qualities of care, or no care; different medications, or no medications at all. Inmates who are transferred from one facility to another may be left without their medications because of delay in assessing them or delay in transfer of their medical records, putting them in serious, perhaps life-threatening danger.

37. The diagnosis of – or failure to diagnose – inmates' mental health problems by mental health professionals in IDOC facilities, and the day-to-day treatment of mentally ill prisoners by staff, is routinely poisoned by the notion of "offender manipulation," and mentally ill inmates are routinely categorized as uncooperative malingerers. Both regular staff and supposed mental health "professionals" fail to recognize the "uncooperative" and "manipulative" conduct as the symptoms of mental illness which they are.

38. Correctional staff are not trained to deal with the mentally ill. Staff often do not respond to prisoners' threats to harm themselves, and use unnecessary force on mentally ill prisoners. Prisoners on suicide watch are neglected, abused, or both. They can be stripped naked; placed in a cell with no mattress or blankets; put in four-point restraints. In winter, staff in some facilities will open the windows, and then sit and laugh.

39.     Inmates who engage in conduct due to their mental illnesses are punished in absurd and irrational ways - for instance, being given a ticket and segregation time for "damage to state property" for destroying a jumpsuit in a suicide attempt.

40.     Mentally ill inmates accumulate large amounts of segregation time for disciplinary infractions caused by their mental illness, but their mental illness is not taken into account in the hearings about their infractions.  Prisoners are housed in segregation, and given little or no mental health care, despite having, for instance, passionate beliefs that they are subjects of "mind-control" technology experiments by the IDOC.   Mentally ill prisoners are sent to Tamms Correctional Center, the "super-max" facility, without regard for the damage the severe social and sensory deprivations of Tamms are likely to have on their psychological state.  It is well-known that placing mentally ill inmates in segregation or isolation is highly likely to exacerbate their mental illness.   Even without mental illness, many prisoners in isolation experience mental deterioration; isolation is especially dangerous to those who are already mentally ill.  Studies have found that the effects of isolation include:  paranoid psychosis and uncontrolled rage, including increased homicidal and suicidal impulses; frequent schizophrenia; and impairment of the ability to socially reconnect with others once released.  Yet mentally ill prisoners still accumulate years upon years of "seg" time in the IDOC, or are sent to Tamms.

41.     Likewise, prisoners who were originally incarcerated for comparatively minor offenses (e.g., burglary) can end up spending more time in prison due only to their mental illness than those convicted of much more serious offenses.

42.     The units in which mentally ill prisoners are housed - both the mental health units themselves and other locations where they may be placed - are often filthy, vermin-ridden and filled with human waste.  This is true of individual cells and of common areas, such as showers.  Staff do not clean them, and inmates are not able to clean them.  In the Pontiac "North Segregation" Unit, for instance, inmates are given a half cup of green soap once a week to clean their cells.  In the beginning, they are also given a sponge, but once the sponge wears out they are not given a new one.

43.     The careless, inconsistent, and indifferent care Plaintiffs have received for their mental illness is emblematic of Defendants' violations of the constitutional and legal rights of inmates and their deliberate indifference to them.  Plaintiffs and the class members have suffered and will continue to suffer greatly and unnecessarily as a result.

## <u>COUNT I</u>

**(Violation of Eighth and Fourteenth Amendment Rights Under 42 U.S.C. § 1983 Based Upon Failure to Diagnose And Treat Serious Mental Health Needs)**

44.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 43 as if alleged herein.

45.     Plaintiffs and the class members have a serious medical need or condition, namely mental illness or mental health conditions, which require treatment.

46.     Defendants' policies, practices, and customs are designed to intentionally fail to diagnose or treat large numbers of mentally ill prisoners.  Defendants have displayed and continue to display deliberate indifference to Plaintiffs' and the class members' mental health needs.

47.     Defendants' acts and omissions constitute cruel and unusual punishment of Plaintiffs and the class members and violate the Eighth and Fourteenth Amendments to the United States Constitution.

48.     Defendants' policies, practices, customs, acts, and omissions place Plaintiffs and the class members at unreasonable, continuing, and foreseeable risk of developing or exacerbating serious medical and mental health problems.

49.     Defendants' violations of Plaintiffs' and the class members' constitutional rights has inflicted both physical and mental harm and injury, including by causing avoidable pain, mental suffering, and deterioration of their health.  Upon information and belief, in some cases it has resulted in premature death.

50.     As a proximate result of Defendants' unconstitutional policies, practices, customs, acts, omissions, and deliberate indifference, Plaintiffs and the class members have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury and the risk of death.  Plaintiffs and the class members have no plain, adequate or complete remedy at law to address the wrongs described herein.

## COUNT II

### (Violation of Eighth and Fourteenth Amendment Rights Under 42 U.S.C. § 1983 Based Upon Failure To Train Or Supervise)

51.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 50 as if alleged herein.

52. Defendants fail to adequately train or supervise individuals in their employ or under their control and supervision as to how to properly respond to and interact with prisoners with serious mental health needs.

53. Defendants' failure to adequately train or supervise violates Plaintiffs' and the class members' constitutional rights.

54. As a proximate result of Defendants' failure to train, Plaintiffs and the class members have suffered, and will continue to suffer, deprivation of the rights secured under the Constitution and laws of the United States. Such deprivations are causing and will continue to cause immediate and irreparable injury, including physical, psychological, and emotional injury and the risk of death. Plaintiffs and the class members have no plain, adequate or complete remedy at law to address the wrongs described herein.

## **COUNT III**

### **(Violation of Liberty Interest Under The Due Process Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983)**

55. Plaintiffs reallege and incorporate by reference Paragraphs 1 to 54 as if alleged herein.

56. Defendants' policies and procedures and acts or omissions which cause Plaintiffs and the class members to be placed in isolated environments for extended periods impose an atypical and significant hardship on Plaintiffs and the class members in relation to the ordinary incidents of prison life.

57. Defendants' policies and procedures and acts or omissions which fail to take into account Plaintiffs' and the class members' mental illness in imposing additional

punishment violate Plaintiffs' and the class members' liberty interests and due process rights secured under the Fourteenth Amendment of the U.S. Constitution.

58.     As a proximate result of Defendants' conduct, Plaintiffs and the class members have suffered, and will continue to suffer, deprivation of the rights secured under the Constitution and laws of the United States.  Such deprivations are causing and will continue to cause immediate and irreparable injury.  Plaintiffs and the class members have no plain, adequate or complete remedy at law to address the wrongs described herein.

## COUNT IV

### (Title II Of The Americans With Disabilities Act)

59.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 58 as if alleged herein.

60.     Each of the IDOC facilities housing Plaintiffs and the class members are public entities as that term is defined in 42 U.S.C. § 12131.  All Defendants at all relevant times acted in their official capacities as representatives of at least one of these public entities.

61.     Plaintiffs and class members are otherwise qualified individuals with a disability as defined under the ADA and its implementing regulations, including 42 U.S.C. § 12131(2) and § 12102(2).  Plaintiffs and the class members have mental and/or physical impairments that substantially limit one or more major life activities; or they have records of having such impairments; or they are regarded as having such impairments.

62.     Plaintiffs and the class members meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.

63.     Defendants have discriminated against the Plaintiffs and class members on the basis of their disabilities in the following ways:

a)      Refusing to provide Plaintiffs and the class members with proper treatment for their serious mental illness despite knowledge of such serious mental illness;

b)      Failing to reasonably accommodate the Plaintiffs' and class members' disabilities and instead discriminating against them in ways that increase the severity of their illness by such methods as placing them in administrative segregation or other isolated environments as punishment;

c)      Failing to reasonably accommodate the Plaintiffs' and class members' disabilities and instead discriminating against them in ways that increase the severity of their illness by such methods as depriving them of clothes, heat, or sanitary surroundings;

d)      Failing to reasonably accommodate the Plaintiffs' and class members' disabilities by refusing to transfer Plaintiffs and some class members to mental health units and housing them in elevated security divisions or tiers, or general population divisions, which are especially chaotic, noisy, isolated and offer less or no mental health treatment, and also increase the likelihood of serious physical and mental harm due to the fact that the staff

and guards in such divisions are not trained to interact with seriously mentally ill detainees.

64.     In acting in the manner alleged above, Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the ADA.

65.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury, including the risk of death. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## COUNT V

### (Violation of Section 504 Of The Rehabilitation Act)

66.     Plaintiffs reallege and incorporate by reference Paragraphs 1 to 65 as if alleged herein.

67.     Upon information and belief, the IDOC receives federal financial assistance, thus making it subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and § 705(20).

68.     Each Plaintiff and each class member is an otherwise qualified individual with a disability as defined in the Rehabilitation Act and implementing regulations. Plaintiffs and the class members have mental and/or physical impairments that substantially limit one or more major life activities; or they have records of having such impairments; or they are regarded as having such impairments.

69.     Plaintiffs and the class members meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.

70.     Defendants have discriminated against the Plaintiffs and class members based upon their disabilities in the following ways:

a)     Refusing to provide Plaintiffs and the class members with proper treatment for their serious mental illness despite knowledge of such serious mental illness;

b)     Failing to reasonably accommodate the Plaintiffs' and class members' disabilities and instead discriminating against them in ways that increase the severity of their illness by such methods as placing them in administrative segregation or other isolated environments as punishment;

c)     Failing to reasonably accommodate the Plaintiffs' and class members' disabilities and instead discriminating against them in ways that increase the severity of their illness by such methods as depriving them of clothes, heat, or sanitary surroundings;

d)     Failing to reasonably accommodate the Plaintiffs' and class members' disabilities by refusing to transfer Plaintiffs and some class members to mental health units and housing them in elevated security divisions or tiers, or general population divisions, which are especially chaotic, noisy, isolated and offer less or no mental health treatment, and also increase the likelihood of serious physical and mental harm due to the fact that the staff

and guards in such divisions are not trained to interact with seriously mentally ill detainees.

71.     In acting in the manner alleged above, the Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the Rehabilitation Act.

72.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury, including the risk of death. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## REQUEST FOR RELIEF:

Wherefore, Plaintiffs and the class members request that this Court:

(a)     Declare that Defendants' actions and inactions are unlawful and unconstitutional for the reasons specified above;

(b)     Enter a preliminary and permanent injunction directing Defendants to provide:

1.  Mental health training for correctional staff as part of their initial training and as a required element of their annual training, including training on: signs of mental illness; treatments for mental illnesses; side-effects of medications used for the treatment of mental illness; effective interaction with mentally ill prisoners and defusing potentially escalating situations; suicide prevention training; safe use of physical and mechanical restraints for mentally ill offenders; how to distinguish between conduct that reflects a serious mental illness and conduct that deliberately breaks prison rules; and compassion for the mentally ill.

2.  That all inmates shall receive (1) an initial mental health screening upon admission to an IDOC facility; (2) a detailed mental health screening by a mental health professional within two weeks of arrival at any IDOC facility (unless such

inmate is already on the mental health caseload as a result of screenings at a prior facility); and (3) an appropriate mental health classification.

3.     That initial and detailed mental health screenings must become part of an inmate's permanent file.

4.     That inmates identified as in need of evaluation through the screening process will receive a complete mental health evaluation by a mental health professional within 14 days.

5.     That any institution employee may also refer an inmate for a mental health evaluation based upon observation of the inmate's behavior.

6.     That every inmate on the mental health caseload will receive an evaluation update at least once annually.

7.     That each inmate with a mental illness classification shall have a written treatment plan, updated annually.

8.     For any inmate with known/reported history of mental health treatment who is transferred, procedures to ensure that inmate's complete mental health records are transferred to the new institution within 48 hours.

9.     Procedures for removal from mental health caseload.

10.    That inmates in segregation units or other isolation environments will be reviewed at least once per week by mental health professional.

11.    That inmates entering segregation or other isolation environments will be promptly screened for suicide potential.

12.    That no inmate with a mental illness classification shall be incarcerated at Tamms or placed in segregation for longer than 20 consecutive days and no more than 40 days total per year.

13.    Procedures for identifying, monitoring and treating inmates with suicide potential, including provision of suicide-resistant gowns and blankets for inmates on suicide watch.

14.    Protocols for administration and monitoring inmates on psychotropic medications, including protocols for involuntary administration.

15.    Protocols for inmates on suicide watch.

16.    Moving the supervision of mental health treatment from the director of programs to the medical director of the IDOC.

17.     A qualified expert to supervise and report to Court on implementation of the procedures and programs included herein.

18.     A documented external peer review program for mental health professionals.

19.     A quality improvement program for inmate mental health care as part of any contract with a third-party contractor.

20.     Regular performance evaluations of mental health services by independent qualified professionals.

21.     Internal quality review mechanisms including independent reviews of any third-party contractors.

22.     Requirements that independent contractors providing mental health services pay workers at levels comparable to community mental health settings.

23.     Increased numbers of hospital beds and acute-care facilities for treatment of mental illness.

24.     Increased numbers of intermediate care facilities for mental illness.

25.     A presumption in any disciplinary hearing involving an inmate with a mental illness classification that the disciplinary incident was caused by mental illness.

        (c)     Award Plaintiffs and the class members their costs and reasonable

attorneys' fees pursuant to 28 U.S.C. § 1988 and 42 U.S.C. § 12205.

        (d)     Award the named Plaintiffs compensatory and punitive damages for the

violations of their constitutional and legal rights;

        (e)     Award any such further relief as the Court may deem just.


May 4, 2009                                    _____s/ Marc Kadish_____
                                              One of the Attorneys for Plaintiffs

Harold C. Hirshman (ARDC #1226290)
Camille E. Bennett (ARDC #6224457)
Sonnenschein Nath & Rosenthal LLP
233 S. Wacker Dr., Ste. 7800
Chicago, IL  60606
(312) 876-8000 (phone)
(312) 876-7934 (fax)
*hhirshman@sonnenschein.com*
*cbennett@sonnenschein.com*

Alan Mills
Uptown People's Law Center
4413 N Sheridan
Chicago, IL  60640
(773) 769-1410 (phone)
*Alanmill@aol.com*

Barry G. Lowy (ARDC #6196719)
Equip for Equality
235 S. Fifth St.
Springfield, IL  62705
(800) 758-0464 (phone)
(217) 523-0720 (fax)
*contactus@equipforequality.org*

Marc R. Kadish
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL  60606
(312) 701-8747 (phone)
(312) 706-8774 (fax)
*mkadish@mayerbrown.com*

14750697