IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| **ASHOOR RASHO et al.,** ) | **No. 1:07-CV-1298-MMM-JEH** |
| ) | |
| **Plaintiffs,** ) | **Judge Michael M. Mihm** |
| ) | |
| **v.** ) | **Magistrate Judge Jonathan E.** |
| ) | **Hawley** |
| **DIRECTOR JOHN R. BALDWIN,** ) | |
| **et al.,** ) | |
| **Defendants** ) | |
| ) | |

AMENDED SETTLEMENT AGREEMENT

## I.  INTRODUCTION

a)     This is a class action brought under the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. §§ 12101 *et seq.* (the Americans with Disabilities Act or "ADA"), and 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act) seeking declaratory and injunctive relief. The Defendants are John Baldwin, Acting Director of the Illinois Department of Corrections ("IDOC") and Dr. Melvin Hinton, Chief of Mental Health Services for IDOC.[1]

b)     The Plaintiff class challenges the adequacy of the delivery of mental health services to mentally ill adult offenders in the physical custody and control of the IDOC. Defendants expressly deny that they have violated any such constitutional or statutory rights.

c)     On August 14, 2015, this Court certified this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  The representative Plaintiffs are Ashoor Rasho, Patrice Daniels, Gerrodo Forrest, Keith Walker, Otis Arrington, Donald Collins, Joseph Herman, Henry Hersman, Rasheed McGee, Fredricka Lyles, Clara Plair, Desiree Hollis, and Crystal Stoneburner

d)     Plaintiffs, through class counsel, have conducted a thorough investigation of the conditions of confinement for such mentally ill offenders and have obtained many policies, directives, offender   medical and disciplinary records, and other pertinent materials.

---

[1]     Substituted automatically for the original defendants pursuant to Fed. R. Civ. P. 25(d).

e) Defendants, through counsel, have provided numerous documents in response to requests by Plaintiffs, produced relevant witnesses for depositions, and afforded opportunities for Plaintiffs' experts to conduct on-site tours of several IDOC correctional facilities and interview offenders about their treatment and care. The parties have used this information to reach this agreement regarding the definition of "serious mental illness," appropriate staffing ratios, bed and treatment space needs, therapeutic programming, policies governing segregation and discipline of mentally ill offenders, and other relevant factors for establishing a constitutionally adequate system for mentally ill IDOC offenders. Since the initiation of the litigation, the IDOC has commenced significant initiatives to enhance the delivery of mental health services. To date, those include the following: implementation of a definition of serious mental illness (SMI); development of an evaluation and referral process; increased staffing of licensed mental health professionals and behavioral technicians; construction and space retrofits to create four (4) residential treatment units; revised mental health protocols and policies including incorporation of clinical mental health input into the disciplinary system; central committee review of SMI inmates who are segregated more than sixty (60) days; and enhanced clinical contacts, programming and out-of-cell time for the most seriously mentally ill offenders.

f) Without conceding any infirmity in their claims or defenses, after extensive discovery, the parties have engaged in arms length settlement negotiations to resolve the claims raised by this action as set forth in Plaintiffs' Third Amended Complaint. Plaintiffs and Defendants have reached an agreement for settling this litigation that the parties believe is fair, reasonable, and adequate to protect the interests of all parties. The parties believe that this Settlement Agreement will benefit mentally ill offenders who are confined in correctional facilities under Defendants' control.

g) The terms of this Settlement Agreement shall be applicable to and binding upon the Plaintiff class as certified by the Court and the Defendants in their official capacities, and their officers, agents, employees, assigns, and successors. This Settlement Agreement applies to all of IDOC's existing correctional facilities housing adult male and female offenders, as well as any new facilities where adult offenders are confined during the life of this Settlement Agreement.

h) By entering into this Settlement Agreement, the Defendants do not admit to any liability regarding the allegations made in this action. Moreover, this Settlement Agreement may not be used as evidence of liability or lack of liability in any other legal proceeding.

i) The parties will file this Settlement Agreement with the Court, and ask that the Court approve it, which approval is a condition precedent to the Agreement's effectiveness.

## II.  DEFINITIONS

a)  *Administrative Detention:* A non-disciplinary status of confinement which removes an offender from general population or restricts the individual's access to general population.

b)  *Approval Date*: The date on which the Court approves the terms of this Settlement Agreement, except for the specific obligations designated as "budget contingent."

c)  *Approved Remedial Plan*: The remedial plan submitted by the Defendants on April 17, 2014, as conditionally approved by Dr. Raymond Patterson on July 28, 2014.

d)  *Budget Contingent Approval Date:* The date on which the Court approves the terms of this Settlement Agreement or the date the State of Illinois passes a budget, whichever is later.

e)  *Crisis Beds*:  Beds that are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting, as required by IDOC Administrative Directive 04.04.102, § II(F)(2). Crisis placement should not take place in a segregation setting, absent exigent circumstances and only on a case-by-case basis for a period not to exceed seventy-two (72) hours.  Examples of circumstances in which crisis placement is permissible include when a facility lacks non-segregation crisis beds in either its infirmary or general population and when a transfer is not possible (*e.g.*, after business hours, weather emergency).

f)  *Crisis Intervention Services*:  Prompt and adequate response to any mental health emergency with access to a full range of mental health services, as required by IDOC Administrative Directive 04.04.100, § II(E)(3) and IDOC Administrative Directive 04.04.102 .

g)  *Control (or segregation) Unit*:  An area within a correctional facility for housing offenders on segregation status.  Segregation status includes temporary confinement pending a disciplinary hearing or investigation, disciplinary segregation resulting from a hearing or investigation, and Administrative Detention.  Segregation status does not include offenders in protective custody.  Segregation areas include the segregation unit or any cell, living area, or other area designated by the Chief Administrative Officer to house offenders who are in segregation status.

h)  *Disciplinary Segregation*: Offenders housed in a Control Unit as a result of a disciplinary hearing.

i)  *Inpatient Mental Health Services*:  Intensive, inpatient care and treatment at an appropriate facility, one equivalent to an inpatient  accredited mental health treatment

3

facility, during the period of an offender's acute crisis, in order to return the offender to a less intensive treatment environment at the earliest clinically appropriate time, as required by IDOC Administrative Directive 04.04.100, § II(E)(4).

j)    *Medication Non-Compliance*:   An offender will be deemed to be in medication non-compliance with his or her medication when he or she (i) misses three (3) consecutive days of medication rounds; (ii) misses 50% of the medication distributed within a seven (7) day period; or (iii) exhibits a clinically significant pattern of missing medication, as determined by an MHP.

k)    *Mental Health Professional ("MHP")*:   A mental health professional is: a physician who is licensed to practice medicine and is board-certified in psychiatry by the American Board of Psychiatry and Neurology ("ABPN") or the American Osteopathic Board of Psychiatry and Neurology ("AOBPN"), or has completed four (4) years of an accredited post-graduate training program in psychiatry; a psychologist with a Ph.D/ Psy.D and licensed as a clinical psychologist; a licensed psychiatric nurse (*i.e.*, a nurse licensed as an R.N. and certified in psychiatric-mental health); a licensed clinical social worker; or an individual licensed to provide mental health services with a Ph.D/Psy.D or Master's degree in Psychology, Counseling, Social Work or similar degree program. "Licensed" means currently licensed by the State of Illinois.

l)    *Mentally Ill Offenders:*   Persons now or in the future in the custody of IDOC who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism, drug addiction, developmental disorders, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purposes of this class definition.

m)    *Monitor:*   The individual identified in Section XXVII, *below,* together with the Monitor's staff to the extent the Monitor designates his staff to perform any monitoring function in this Settlement Agreement, and any successor(s) to the Monitor.

n)    *Outpatient Mental Health Services*:   The provision of appropriate mental health care and supportive services for those offenders with mental illness who are able to be housed and function in the general prison population, as required by IDOC Administrative Directive 04.04.100.

o)    *Protective Custody:*   A status requested by the offender and approved by IDOC aimed at preventing the offender from coming into contact or intermingling with offenders in general population or disciplinary segregation. Units designated for use as protective custody are not physically located on the same gallery as disciplinary segregation facilities. Neither general population nor disciplinary segregation individuals are permitted to have access to these areas except as approved by the Chief Administrative Officers. Housing accommodations and essential services in protective custody are comparable to those provided for the general population.

p)  *Residential Treatment Unit ("RTU")*:  A housing unit within the prison system for offenders with mental illness who do not need inpatient treatment (*see* subsection (g), *below*) but who do require the therapeutic milieu and full range of services and variable security available in the RTU, as required by IDOC Administrative Directive 04.04.100, § II(E)(2) and "IDOC Mental Health Units," in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)).

q)  *Segregation Rounds:*  Weekly screenings, done by a mental health professional, to identify those offenders who may be experiencing the onset of and/or ongoing mental health symptons/concerns for the purpose of addressing those symptons/concerns.

r)  *Serious Mental Illness*:  As used herein, an IDOC offender is "seriously mentally ill" ("SMI") if he or she, as a result of a mental disorder as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") of the American Psychiatric Association, exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with his or her ability to function adequately except with supportive treatment or services.  These individuals also must either currently have, or have had within the past year, a diagnosed mental disorder, or must currently exhibit significant signs and symptoms of a mental disorder.  A diagnosis of alcoholism or drug addiction, of developmental disorders, or of any form of sexual disorder shall not, by itself, render an individual seriously mentally ill.  The combination of either a diagnosis or significant signs and symptoms of a mental disorder and an impaired level of functioning, as outlined above, is necessary for one to be considered seriously mentally ill.  Whether a person meets the criteria of seriously mentally ill is initially determined by a comprehensive, professional clinical assessment by an IDOC Mental Health Professional in order to 1) determine if the individual has a diagnosable mental disorder as defined by the current DSM and 2) to establish the person's overall level of functioning.  The appropriate threshold to establish level of functioning that equates to a serious mental illness includes serious impairments in capacity to recognize reality, in work environments, school or learning environments, frequent problems with the authority/rules, occasional combative behavior, serious impairments in relationships with friends and family, serious impairments in judgment, thinking, and mood, and serious impairment due to anxiety. These aforementioned disturbances must be observed in at least one of the areas listed above.

s)  *Specialized treatment setting:*  Housing in a crisis bed, residential treatment unit, or inpatient mental health setting.

t)  *Substantial Compliance*:  The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious.  Substantial compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities.

u) *Temporary Confinement/Investigative Status:* Offenders housed in segregation pending a disciplinary hearing or investigation.

### III.  GENERAL PROVISIONS

a) References in this Settlement Agreement to IDOC's Administrative Directives, the IDOC Mental Health Protocol Manual ("Manual"), and forms are to the specific versions of those Administrative Directives, the Manual, and forms that have been finalized and adopted by IDOC by the approval date of this Settlement Agreement. IDOC's creation and promulgation of any subsequent versions of those Administrative Directives, manual, and forms will not change or void any provision of this Settlement Agreement unless the parties specifically agree in writing to a modification of the Settlement Agreement's terms incorporating the changed or new Administrative Directive, Manual, and/or forms.

b) Wherever IDOC has agreed to adopt new policies, procedures, or Administrative Directives in this Settlement Agreement, unless otherwise specified, the time frame for the submission of such proposed policies, procedures, or Administrative Directives to counsel for Plaintiffs and the Monitor shall not exceed six (6) months from the approval date. The adoption of new, or revision to existing, Administrative Directives which are not anticipated by this Settlement Agreement but serve to effectuate the terms of this Settlement Agreement shall occur within a "reasonable time" as agreed to by the parties.

c) IDOC agrees to provide counsel for Plaintiffs and the Monitor with the proposed new or revised items specified in Sections III(a)-(b) *above* sufficiently in advance of the various target dates established here (including those subject to subsection (a), *above*) to allow for study and comment, but in no event less than thirty (30) days before a specific target date. Counsel shall comment in writing to the Monitor within seven (7) days of the receipt of this material.

d) Where a particular time frame or deadline is specified in the various paragraphs of this Settlement Agreement, those provisions are not subject to subsections (a) and (b), *above.*

e) Whenever a specific time for the achievement of a particular goal is not specified, the time to achieve that particular goal shall be a "reasonable time" as agreed to by the parties.

f) Any dispute which may arise under this section shall be resolved in accordance with Section XXIX governing Dispute Resolution.

### IV.  INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING

a) All persons sentenced to the custody of IDOC shall receive mental health screening upon admission to the prison system. Absent an emergency which requires

acting sooner, this screening will ordinarily take place within twenty-four (24) hours of reception (see "Components of Mental Health Services" at p. 5 in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101,§ II(E)(2)), but in any event no later than forty-eight (48) hours after reception, as required by IDOC Administrative Directive 04.04.100, § II(G)(2)(b) (see also IDOC Administrative Directive 05.07.101).

b)     As required by IDOC Administrative Directive 04.04.100, § II(G)(2)(b), such screening shall be conducted by a Mental Health Professional and shall use IDOC Form 0372 (Mental Health Screening). In those instances where a mental health screening is performed by an unlicensed mental health employee, said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this settlement.

c)     As required by IDOC Administrative Directive 04.04.100, § II(G)(2)(b), offenders transferred from a receiving and classification facility who have been screened and referred for further mental health services shall be administered the Evaluation of Suicide Potential, IDOC Form 0379, but need not be administered the mental health screening form again.

d)     In order to encourage full and frank disclosure from offenders being screened, mental health screening shall take place in the most private space available at the receiving and classification facilities.  Within two (2) years of the approval of this Settlement Agreement, IDOC will ensure that mental health screening at all receiving and classification facilities takes place only in spaces that ensure sound confidentiality.

e)     IDOC shall develop policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

f)     Following transfer to IDOC custody, an offender's prescription for psychotropic medication shall be reviewed by a licensed physician or psychiatrist, and modified only if deemed clinically appropriate. Any change in psychotropic medication, along with the reason for the change, shall be documented in the offender's medical record. The psychiatrist or other physician, or nurse practitioner acting within the scope of their license, must also document on the offender's chart the date and time at which they discussed with the offender the reason for the change, what the new medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the new medication, and answered any questions the offender had before starting the medication.

g)     As required by IDOC Administrative Directive 04.04.100, § II(G)(2)(a), screening will include identifying neurodevelopmental disabilities, suicidal ideation or intent, current or past self-injurious behavior, the presence or history of symptoms of mental illness, current or past use of psychotropic medications, or the presence of conditions that require immediate intervention, in addition to the information required to

be documented on IDOC Form 0372 (Mental Health Screening). The screening process shall also include review of the records which accompany the offender.

## V.    MENTAL HEALTH EVALUATION AND REFERRALS

a)   Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

b)   Referral may be made by staff and documented on IDOC Forms 0387 and 0434 or by self-referral by the offender.

c)   IDOC shall ensure that the referral procedures contained in IDOC Administrative Directive 04.04.100, § II(G)(4)(a) and (b) for offender self-referral are created and implemented in a timely fashion in each facility.

d)   In addition to those persons identified by the screening process described in Section IV, *above*, any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

e)   IDOC shall develop a policy and procedure by which other sources with credible information (including other offenders or family members) may refer an offender for a mental health evaluation. The policy and procedure shall include a record-keeping mechanism for requests which shall record who made the request and the result of the referral.

f)   Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (*see* IDOC Administrative Directives 04.04.100 § II(G)(2)(b) and 04.04.101 §II(F)(2)(c)).

g)   As required by IDOC Administrative Directive 04.04.100, § II(G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

h)   The results of a mental health evaluation shall be recorded on IDOC Form 0374 (Mental Health Evaluation). These documents shall be included as part of the offender's mental health record as required by IDOC Administrative Directive 04.04.100, § II(G)(3).

i)   Mental health evaluations shall be performed only by Mental Health Professionals. In those instances where an evaluation is performed by an unlicensed mental health employee, said mental health employee will have obtained at least a Master's degree in Psychology, Counseling, Social Work or similar degree program or have a Ph.D/Psy. D. and said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees

applies only to those mental health employees currently working in IDOC and grandfathered in prior to this settlement. Further, a licensed MHP will review, and if the evaluation is satisfactory, sign off on any evaluation performed by an unlicensed mental health employee within seven (7) days after the evaluation has been completed. If the evaluation is not satisfactory, it shall be redone by a licensed MHP.

j)    The provisions of this Section shall be fully implemented no later than eighteen (18) months after the approval of this Settlement Agreement.

## VI.    MENTAL HEALTH SERVICES ORIENTATION

a)    In addition to information regarding self-referrals to be included in the offender handbook as required by IDOC Administrative Directive 04.04.100, § II(G)(4)(b), information regarding access to mental health care shall be incorporated as part of every offender's initial reception and orientation to IDOC facilities. The basic objective of such orientation is to describe the available mental health services and how an offender may obtain access to such services.

b)    IDOC shall develop and implement a written policy and procedure concerning such orientation no later than one (1) year after the approval of this Settlement Agreement.

## VII.    TREATMENT PLAN AND CONTINUING REVIEW

a)    As required by IDOC Administrative Directive 04.04.101, § II(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

b)    The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), or its equivalent, and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on Form 0284 or its equivalent.

c)    Treatment plans shall be reviewed and updated for offenders designated as receiving outpatient level of care services annually, or sooner when clinically indicated (e.g., when level of care changes). Where the IDOC provides crisis or inpatient care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge. For those offenders receiving RTU care, treatment plans shall be reviewed and updated upon entrance and thereafter no less than once every two (2) months, or more frequently if clinically indicated, and upon discharge. For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated. Reviews shall assess the progress of the documented treatment goals and be documented

on the DOC 0284 or its equivalent and shall include the date of the review and the date on which the next review will be performed.

d)    Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)    For offenders at an outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)    For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)    Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days, with no extension of the follow-up appointments.

e)    Upon each clinical contact with an SMI offender, the MHP shall record a progress note in that offender's mental health records reflecting future steps to be taken as to that offender based on the MHP's observations and clinical judgment during the clinical contact.

## VIII.    TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

a)    SMI offenders shall only be returned to general population from a specialized treatment setting with the approval of either the treating MHP or, once established, with the approval of the multidisciplinary treatment team.

b)    The following shall also apply to offenders transitioning from specialized treatment settings:

i)    For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form which will be specifically designed for this purpose by IDOC and approved by the Monitor. This five-day assessment process will be in addition to IDOC's current procedure for Crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from Crisis Watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

ii) Offenders returned to general population or to an outpatient level of care setting from a specialized/residential treatment facility shall be reviewed by an MHP within thirty (30) days to assess the progress of the treatment goals. The IDOC Form 0284 shall be reviewed annually thereafter, unless otherwise clinically indicated (*e.g.*, change in level of care) as required by IDOC Administrative Directive 04.04.101, §(F)(2)(c)(4)(c).

## IX.    ADDITIONAL MENTAL HEALTH STAFF

a)    The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates:

i)    Dixon Correctional Center ("CC") – 6 months from the budget contingent approval date;

ii)    Pontiac CC – 12 months from the budget contingent approval date;

iii)    Logan CC – 6 months from the budget contingent approval date.

b)    The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

c)    Defendants will have three (3) months from the approval of the Settlement Agreement to propose an amendment to the staffing plan. The Monitor and Plaintiffs shall have forty-five (45) days following the submission of the revised staffing plan to state whether they have an objection to the proposed revisions and provide data to support the objections. Following receipt of any objection and supporting data, the parties will either accept the Monitor's and/or Plaintiffs' suggestions or the issue will be resolved through the dispute resolution process.

d)    To the extent the positions listed on Exhibits A and B of the Approved Remedial Plan are to be filled by Mental Health Professionals, these positions shall be allocated solely to the provision of the mental health services mandated by this Settlement Agreement.

e)    In accordance with its obligations in Section XXVIII, *infra*, IDOC will include quarterly hiring progress reports related to the additional mental health staff identified in the Approved Remedial Plan. Where a target may not have been met, the Monitor will review the reasons for failure to meet the target and, if necessary, propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized.

11

f) In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX, *below*.

## X.     BED/TREATMENT SPACE

a) The Approved Remedial Plan identified four facilities at which IDOC would perform renovations, upgrades, and retrofits to create bed/treatment space for SMI offenders requiring residential levels of care: (i) Dixon Correctional Center (male offenders only); (ii) Pontiac Correctional Center (male offenders only); (iii) Logan Correctional Center (female offenders only); and (iv) the former IYC Joliet facility (male offenders only). The necessary funding to complete this construction is dependent upon additional appropriations.

b) RTU beds for male offenders:

i) Approximately 1,150 units of RTU bed space for male offenders have been identified.

ii) IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

A) RTU beds and programming space for approximately 625 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;

B) RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and

C) RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

c) RTU beds for female offenders:

i) IDOC has identified RTU bed and programming space for 108 female -offenders at Logan CC.

ii) IDOC will perform the necessary construction to make these 108 RTU beds available on the following schedule:

        A)     RTU beds and programming space for 80 female offenders no later than six (6) months after the budget contingent approval date; and

        B)     RTU beds and programming space for an additional 28 female offenders no later than twelve (12) months after the budget contingent approval date.

d)    The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains a RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

e)    Inpatient beds: Within three (3) months of the approval date of this Settlement Agreement, IDOC shall enter into an intergovernmental agreement ("IGA") with the Illinois Department of Human Services ("DHS") to secure at least 22 beds for female offenders and at least 22 beds for male offenders in an existing DHS-owned mental health facility. The necessary funding to complete this construction is dependent upon additional appropriations. Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget contingent approval date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date. Within thirty (30) months of the approval of this Settlement Agreement, IDOC will transition to assuming control or ownership of said facility and provide approximately sixty (60) additional beds and programming space for separate housing of male and female offenders in need of an inpatient level of care. During that transition period, IDOC shall consult closely with the Monitor and IDOC's own retained mental health expert to develop any additional policies and procedures and design programming and treatment space that is appropriate for a forensic hospital. After the IGA is signed, IDOC will continue to develop plans for inpatient care that can be implemented after necessary appropriations.

f)    IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of this Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

g) IDOC shall also ensure that each RTU facility has adequate space for group therapy sessions; private clinical meetings between offenders and Mental Health Professionals; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own Administrative Directives, forms, and policies and procedures. IDOC shall also ensure that each RTU facility has adequate office space for the administrative and mental health staff required by this Settlement Agreement.

h) The treatment and other space required by subsections (d) – (g), *above*, shall be completely available no later than six (6) months after the work completion dates identified in subsection (a), *above*, for the four facilities identified there, and for any other residential treatment or outpatient facilities at which it is determined that modifications are needed no later than December 2017.

i) Within forty-five (45) days of the selection of the Monitor, IDOC will submit to the Monitor descriptions and architectural plans, if being used, in sufficient detail to enable the Monitor to determine whether construction undertaken pursuant to this section complies with the previously approved Remedial Plan. If, having reviewed these descriptions and plans, the Monitor concludes that the space allocations in any or all facilities under this Settlement Agreement are not consistent with the Remedial Plan, the Monitor shall so inform IDOC and Plaintiffs' counsel, and IDOC shall have thirty (30) days to propose additional measures that address the Monitor's concerns.

## XI.     ADMINISTRATIVE STAFFING

a) Within thirty (30) days after the approval of this Settlement Agreement, to the extent it has not already done so, IDOC will hire two regional directors who are licensed psychologists or psychiatrists to assist the IDOC Chief of Mental Health Services.

b) IDOC will also create a position for a statewide Quality Improvement Manager (the QI Manager). In addition to the other responsibilities assigned to the QI Manager in this Settlement Agreement, the QI Manager or one or more qualified designees shall have the responsibility for monitoring the provision of mental health services performed within IDOC by state or vendor employees and the performance of any vendor(s) under the vendor contract(s). This position shall be filled only by a State, not vendor, employee, and shall be filled no later than nine (9) months after the approval of the Settlement Agreement.

c) Within thirty (30) days after the approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

d)    IDOC shall hire ten (10) central office staff (*i.e.*, non-facility-specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. These positions will be filled no later than eighteen (18) months after the approval of this Settlement Agreement.

## XII.    MEDICATION

a)    In accordance with the provisions of IDOC Administrative Directive 04.03.100 § II(E)(4)(d)(1), no later than ninety (90) days after the approval of this Settlement Agreement, medical staff shall record contemporaneously on offender medical records all medications administered and all offender contacts with medical staff as to medications. With respect to offenders taking psychotropic medications, "contemporaneously" means that the medication, the amount of the medication, and whether the offender took it or refused it will be recorded at the time the medication is delivered, either on a temporary record from which information is subsequently transferred to a permanent record located elsewhere, or in the permanent record at the time of delivery.

b)    Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC Administrative Directive 04.04.101, § II(F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

c)    In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

i)    The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

ii)    The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskenesia, high blood pressure, and liver function decline;

iii)    Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood pressure monitoring, and neurological evaluation;

iv)    The timely performance of lab work for these side effects and timely reporting on results;

v)    That offenders for whom psychotropic drugs are prescribed receive timely explanations from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are

15

the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

vi) That offenders, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by a MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

## XIII.   OFFENDER FORCED MEDICATION

IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70.

## XIV.   HOUSING ASSIGNMENTS

a) Cell assignments for SMI offenders shall be based on the recommendations of the appropriate security staff. However, notice shall be made to members of the SMI offender's mental health treatment team within twenty-four (24) hours of a new or changed cell assignment. It is expected that MHPs will monitor the location of each SMI offender on their caseload. IDOC will require MHPs to alert security staff of their concerns regarding SMI offender housing assignments and related contraindications. In all instances, an SMI offender's housing assignment shall serve both the security needs of the respective facility and the treatment needs of the offender.

b) For those offenders who have served fifteen (15) days or longer in Administrative Detention or Disciplinary Segregation, an MHP who is a member of the SMI offender's mental health treatment team shall be consulted regarding post-segregation housing recommendations pursuant to Section XVIII(a)(v)(F), *below*.

c) If security staff rejects a housing recommendation made by an MHP as to an SMI offender, the security staff representative shall state in writing the recommendation made by the MHP and the factual basis for rejection of the MHP recommendation.

## XV.   SEGREGATION

a) As to mentally ill offenders in Administrative Detention and Disciplinary Segregation:

i) Prior to housing two offenders in a cell, the respective Lieutenant or above shall comply with Administrative Directive 05.03.107 which requires an offender review that shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues; and significant negative life changes, such as additional time to serve, loss of spouse or children, etc. The respective security staff shall consult with the mentally

16

ill offender's treatment team regarding the appropriateness of such placement in accordance with Section XVII of this Settlement Agreement.

ii)    Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670.

iii)    Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

iv)    An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

v)    As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

vi)    IDOC will ensure that mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A)    Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.

B)    Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by a MHP, documented on IDOC Form 0380);

C)    Pharmacological treatment (if applicable);

D)    Supportive counseling by an MHP as indicated in the ITP;

E)    Participation in multidisciplinary team meetings once teams have been established;

F)    MHP or mental health treatment team recommendation for post-segregation housing;

G)    Documentation of clinical contacts in the medical record; and

H)  Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

vi)  IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above*, mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below*.

vii)  If, at any time, it is determined by a MHP that a mentally ill offender in Administrative Detention or Disciplinary Segregation requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the mentally ill offender shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

b)  As to SMI offenders in Disciplinary Segregation:

i)  IDOC will organize Review Committees ("Committees") to review the segregation terms of all SMI offenders in segregation with at least 60 days of remaining segregation time as of the approval date of this settlement agreement. These Committees will be comprised of attorneys, security professionals, and MHPs.

ii)  The Committees shall eliminate any and all 300 and 400 level tickets and the accompanying segregation time from each SMI offender's disciplinary record.

iii)  With regard to all remaining tickets, the Committees shall examine: (1) the seriousness of the offenses; (2) the safety and security of the facility or any person (including the offender at issue); (3) the offender's behavioral, medical, mental health and disciplinary history; (4) reports and recommendations concerning the offender; (5) the offender's current mental health; and (6) other legitimate penological interests.

iv)  The Committees shall have the authority to recommend to the Chief Administrative Officer that an SMI offender's remaining

segregation time be reduced or eliminated altogether based on the factors outlined in XV(b)(iii).

v) The decision for reduction or elimination of an SMI offender's segregation term (excluding the elimination and reductions relative to 300 and 400 level tickets) ultimately rests with the CAO who, absent overriding concerns documented in writing, shall adopt the Committees' recommendations to reduce or eliminate an SMI offender's segregation term.

vi) These reviews shall be completed within nine (9) months after approval of the Settlement Agreement.

c) Mentally ill offenders in Investigative Status/Temporary Confinement:

i) With regard to offenders in Investigatory Status/Temporary Confinement, IDOC shall comply with the procedures outlined in 20 Ill. Admin. Code 504 and Administrative Directive 05.12.103.

ii) An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

iii) IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP;

B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380;

C) Pharmacological treatment (if applicable);

D) Supportive counseling by an MHP as indicated in the ITP;

E) Participation in multidisciplinary team meetings, once teams have been established;

F) MHP or mental health treatment team recommendation for post-segregation housing;

19

G) Documentation of clinical contacts in the medical record; and

H) Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

iv) IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above*, mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below*.

v) If, at any time, it is determined by an MHP that a mentally ill offender in Investigatory Status/Temporary Confinement requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the SMI offender shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

c) Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i) For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii) For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii) For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv) For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

d)     The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

## XVI.     SUICIDE PREVENTION

a)     IDOC shall comply with its policies and procedures for identifying and responding to suicidal offenders as set out in Administrative Directive 04.04.102 and the section titled "Identification, Treatment, and Supervision of Suicidal Offenders" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)). IDOC shall also ensure that Forms 0379 ("Evaluation of Suicide Potential"); 0377 ("Crisis Watch Record"); and 0378 ("Crisis Watch Observation Log") are used in conjunction with these policies and procedures.

b)     IDOC shall ensure that the policies, procedures, and record-keeping requirements identified in (a), *above*, are implemented and followed in each adult correctional facility no later than one (1) year after the approval of this Settlement Agreement.

## XVII.     PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

a)     IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC Administrative Directive 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall· be made contemporaneously with the use of restraints.

b)     IDOC will continue to comply with 20 Ill. Admin. Code §§ 501.30, 501.40 and 501.60; and Administrative Directive 05.01.126.

c)     Physical restraints shall never be used to punish offenders on the mental health caseload.

d)     The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

## XVIII.     MEDICAL RECORDS

a)     In recognition of the importance of adequate records to treatment and continuity of care, no later than sixty (60) days after the approval of this Settlement Agreement, IDOC shall fully implement the use of the standardized forms it has developed to record offender mental health information and to constitute an offender's mental health file, including IDOC Forms 0372 (Mental Health Screening); 0374 (Mental Health Evaluation); 0284 (Mental Health Treatment Plan); 0282 (Mental Health Progress Note); 0387 (Mental Health Services Referral); 0380 (Mental Health Segregation Rounds); 0376 (Order for Use of Therapeutic Restraints for Mental Health Purposes); 0379 (Evaluation of

Suicide Potential); 0378 (Crisis Watch Observation Log); 0377 (Crisis Watch Record); 0371 (Refusal of Mental Health Services); and 0375 (Psychological Autopsy).

b) No later than ninety (90) days after the approval of this Settlement Agreement, IDOC shall fully comply with Administrative Directive 04.03.100, § II(E)(7), which requires an offender's medical record, including any needed medication, to be transferred to any facility to which the offender is being transferred at the time of transfer.

## XIX. CONFIDENTIALITY

a) No later than six (6) months after the approval of this Settlement Agreement, the IDOC shall comply with the requirements of Administrative Directive 04.03.100, § II(E)(10) as to the confidentiality of mental health records. Additionally, IDOC shall take the following steps to promote the confidential exchange of mental health information between offenders and persons providing mental health services.

b) Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

c) Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)). In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

d) In addition to enforcing the consent requirements set forth in "Medical/Legal Issues: 2. Informed Consent" in the IDOC Mental Health Protocol Manual, incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), within sixty (60) days after the approval of this Settlement Agreement, IDOC shall ensure that Mental Health Professionals who have a treatment/counseling relationship with the offender shall disclose the following to that offender before proceeding: the professional's position and agency; the purpose of the meeting or interaction; and the uses to which information must or may be put. The MHP shall indicate a willingness to explain the potential risks associated with the offender's disclosures.

## XX. CHANGE OF SMI DESIGNATION

The determination that an offender, who once met the criteria of seriously mentally ill, no longer meets such criteria must be made by the offender's mental health treatment

team and documented in the offender's mental health records. Until mental health treatment teams are established, this function shall be performed by a treating MHP.

## XXI.   STAFF TRAINING

a)    Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan and program for staff training as provided in subsection (b), *below.*

b)    Within two (2) years following the approval of this Settlement Agreement, all IDOC and vendor staff who interact with offenders shall receive training and continuing education regarding the recognition of mental and emotional disorders. As directed in the section titled "Training" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), this training shall include material designed to inform the participants about the frequency and seriousness of mental illness, and how to treat persons who have mental illness or persons manifesting symptoms of mental illness. In addition to training on confidentiality as provided in Section XXII(a), *above,* this training shall incorporate, but need not be limited to, the following areas:

i)    The recognition of signs and symptoms of mental and emotional disorders most frequently found in the offender population;

ii)    The recognition of signs of chemical dependency and the symptoms of narcotic and alcohol withdrawal;

iii)    The recognition of adverse reactions to psychotropic medication;

iv)    The recognition of signs of developmental disability, particularly intellectual disability;

v)    Types of potential mental health emergencies, and how to approach offenders to intervene in these crises;

vi)    Suicide prevention;

vii)    The obligation to refer offenders with mental health problems or needing mental health care; and

viii)    The appropriate channels for the immediate referral of an offender to mental health services for further evaluation, and the procedures governing such referrals.

c)    Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this   Settlement

Agreement, IDOC shall develop a written plan for the orientation, continuing education, and training of all mental health services staff.

## XXII.   PARTICIPATION IN PRISON PROGRAMS

a)    Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

## XXIII.   TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY-TO-FACILITY

a)    To ensure continuity of treatment, unless a SMI offender is being transferred to another facility for clinical reasons, IDOC shall make best efforts to ensure that the offender's treating MHP is consulted prior to transfer. If such a consultation is not possible prior to transfer, the MHP shall be consulted no more than seventy-two (72) hours after effectuation of transfer. If a transfer is being made for security reasons only, the reasons for the transfer and the consultation with the offender's treating Mental Health Professional shall be documented and placed in the offender's mental health file.

b)    When a SMI offender is to be transferred from one prison to another, the sending institution, using the most expeditious means available, shall notify the receiving institution of such pending transfer, including any mental health treatment needs.

c)    The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

## XXIV.   USE OF FORCE AND VERBAL ABUSE

IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108 (B), and 20 Ill. Admin. Code 501.30.

## XXV.   DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

a)    IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code § 504.50(d)(3). Those policies and procedures are contained in Administrative Directive 05.12.103.

b)    No later than one (1) year after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor, shall develop and implement policies and

procedures to provide that, for mentally ill offenders, (i) punishment for self-injurious behavior (*e.g.*, suicide attempts or self-mutilation) is prohibited; (ii) punishment for reporting to IDOC staff or vendor staff feelings or intentions of self-injury or suicide is prohibited; and (iii) punishment for behavior directly related to self-injurious behavior, such as destruction of state property, is prohibited unless it results in the creation of a weapon or possession of contraband.

    c)     For any offender who is in RTU or inpatient treatment for serious mental illness, the disciplinary process will be carried out within a mental health treatment context and in accordance with this Section. Discipline may include loss of privileges or confinement to cell on the treatment unit for a specified period, but may not entail ejecting an offender from the treatment program.

    d)     No later than six (6) months after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor and the IDOC's designated expert, shall develop and implement a pilot Behavior Treatment Program ("BTP") at Pontiac CC for SMI offenders currently subject to sanction for a serious disciplinary infraction. IDOC will review this pilot and consider implementation at other facilities.

## XXVI.     CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

    a)     IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101 (Eff. 8/1/2014), § II(E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility and throughout IDOC.

    b)     The statewide QI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above*, are taken.

## XXVII.     MONITORING

    a)     The parties have agreed to hire Doctor Pablo Stewart as the monitor.

    b)     The Monitor may retain such appropriate staff with the approval of IDOC including clinical and administrative experts as are necessary to conduct the requisite monitoring. IDOC agrees to pay for all agreed upon costs associated with said monitoring pursuant to a reasonable budget to be agreed upon by and between the IDOC and the Monitor.

c)    The Monitor shall submit to counsel for the parties the *curriculum vitae* of any proposed clinical and administrative experts and shall seek the advice and consent of counsel prior to retaining experts.

d)    Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

e)    The Monitor and any experts or other staff retained hereunder in connection with the monitoring function shall contract for their services directly with IDOC and shall be governed by existing IDOC rules and regulations regarding their employment, especially relating to compensation and expenses.

f)    The general principles for monitoring shall include:

i)    The reporting and on-site aspects of the monitoring shall be more intensive at the outset and likely decrease as compliance is achieved;

ii)    Monitoring may consist of specifying what empirical data IDOC should collect, including written reports from IDOC and its vendors; on-site inspections; oral and written reports from the Monitor; and appropriate consultation in aid of compliance;

iii)    The Monitor's role shall include: gathering of appropriate data and statistics; conducting on-site inspections; assessing whether required policies and procedures are adequate; assessing and reporting to the parties on whether the objectives of the  Settlement Agreement are being met;  and, where disputes between the parties occur or where there appears to be non-compliance, assisting to resolve such matters in the most expeditious and non-adversarial fashion possible;

iv)    The Monitor may make recommendations for modifications or improvements to IDOC operations, policies, and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data.  IDOC shall accept such recommendations, propose an alternative, or reject the recommendation;

v)    The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this  Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel. The Monitor and his staff will be limited to five (5) days of onsite inspection time up to four (4) times per year during the life of the Settlement Agreement per staff member unless they obtain approval from IDOC for additional onsite inspection time, which IDOC will not unreasonably withhold.

The Monitor shall provide IDOC's legal office with at least forty-eight (48) hours' notice prior to any visit to any IDOC facility.

g)    Statements in any section of this Settlement Agreement that require the Monitor to take action are not to be construed as a limitation upon the Monitor's ability to review and report upon all matters contained within this Agreement.

h)    Reports, documents, data, and other information provided by IDOC to the Monitor will also be available to Plaintiffs' counsel on a confidential basis and for use in this matter only.

i)    A review of records by the Monitor or his staff shall not constitute a waiver of IDOC's quality assurance privilege. Moreover, any such disclosures shall not constitute a waiver or serve as precedent in other legal proceedings with respect to the aforementioned quality assurance privilege. In addition, Plaintiffs and the Monitor and his staff agree to keep said documentation confidential, if the documentation is confidential, and not to disclose, publish or use for public consumption any of the records reviewed by Plaintiffs, the Monitor or his staff.

j)    In addition to the quality assurance privileges described above, other records or information the disclosure of which is objected to by either party based upon a claim of privilege, confidentiality, or relevance to the implementation of the Settlement Agreement shall not be disclosed by the Monitor to the other party or to the public. Such material shall be made available for inspection by the Court, along with a precise statement of the objection or objections to disclosure prepared by the objecting party, and the Court shall render a decision on the disclosure.

k)    Within three (3) months of the adoption of the policies and procedures referenced throughout this Settlement Agreement, the Monitor may prepare report forms for use by the institutions and central office, which shall be submitted to counsel for the Plaintiffs and the Defendants for prior approval before being put into use. Such report forms will require the submission of specified data relevant to the Settlement Agreement for evaluation by the Monitor. IDOC shall prepare the reports quarterly during the first two years of this Settlement Agreement, and twice per year thereafter, unless the Monitor determines that the interim goals have not been met or the Monitor determines that less frequent reports are sufficient. The Monitor will specify the dates for all such submissions upon the approval of the forms described in this specific paragraph.

l)    The Monitor shall prepare and submit an annual report to be submitted to the parties and the Court every twelve (12) months as to IDOC's substantial compliance with the provisions of the Settlement Agreement. The first report shall be issued one year after Court approval of the settlement. Subsequent reports shall be issued annually after that date.

m)    In his annual report, the Monitor shall evaluate the status of IDOC compliance with the relevant provisions of the Settlement Agreement using the following standards: Substantial Compliance and Non-Compliance. In order to assess compliance,

the Monitor shall review a sufficient number of pertinent documents, interview necessary staff, and interview a sufficient number of offenders to accurately gauge current conditions.

n)    The Monitor shall also prepare and submit to the parties a status update six (6) months after the filing of each annual report on IDOC progress as to this Settlement Agreement.

o)    If, during a period of Substantial Compliance, the Monitor identifies a material violation of the Settlement Agreement, IDOC shall still be considered to be in Substantial Compliance throughout the pertinent period if it promptly develops and implements a timely and appropriate remedy that, in the Monitor's view, results in compliance within a reasonable period of time.

p)    In the event that the designated monitor is no longer able or willing to serve as the Monitor, the parties shall select another Monitor using the same method as the initial selection.

q)    The Monitor shall not be subject to dismissal except upon good cause and the agreement of both parties, subject to Court approval, or by the Court upon motion of one of the parties and a showing of good cause, as determined after a hearing before the Court. The moving party must establish good cause by clear and convincing evidence.

r)    Plaintiffs' counsel shall be entitled to tour those portions of each facility where mentally ill prisoners are housed and treated, and to talk to class members at their cells, after providing a minimum of forty-eight (48) hours notice to IDOC. Counsel shall also be permitted to have confidential legal visits with members of the plaintiff class identified during such cell front visits. All such visits will be subject to reasonable security measures and the subject facility's legal visit scheduling process so that they will not interfere with either the confidentiality of such visits or the operations of the IDOC facility in which the offender is housed. Nothing in this subsection shall be construed to limit any right of access Plaintiffs' counsel may otherwise have pursuant to statute or otherwise.

## XXVIII.    REPORTING AND RECORDKEEPING

Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

## XXIX.    DISPUTE RESOLUTION

a)    If Plaintiffs believe that the Defendants are not in substantial compliance with any provision of this Settlement Agreement, Plaintiffs shall provide the Defendants, in writing, specific reasons why they believe that the Defendants are not in substantial compliance with such provision or provisions, referencing the specific provision or provisions. Plaintiffs may not allege that the Defendants are not in Substantial Compliance based on minor or isolated delays in compliance.    To the extent Plaintiffs rely on observations or opinions of the Monitor to support an allegation that the Defendants are not in substantial compliance, Plaintiffs shall make a reference to the written reports of the Monitor and to portions thereof which support Plaintiff's belief. To the extent Plaintiffs rely upon documents provided by Defendants to support an allegation that Defendants are not in substantial compliance, Plaintiffs shall make reference to the specific performance measures which support Plaintiffs' belief.

b)    Defendants shall have the opportunity to consult their designated expert with respect to Plaintiff's allegations that the Defendants are not in substantial compliance with such provision or provisions. The Defendants shall provide Plaintiffs with a written response to the notification within thirty (30) days of its receipt. The Defendants' response shall contain a description of the steps they took to investigate the issues addressed in the Plaintiffs' notice, the results of the investigation, and, where the Defendants propose corrective action, a specific plan for addressing the described issues. If no corrective action is proposed by reason of legal considerations or for other reasons, the Defendants' response shall specifically state those reasons and any statutes, regulations, expert opinion, or technical bases upon which they are relying in reaching such conclusion.

c)    Plaintiffs agree to advise Defendants of their acceptance or rejection of Defendants' response within seven (7) business days of its receipt. The parties shall meet to discuss and attempt to resolve any disputes addressed in the written submissions. The Defendants and Plaintiffs shall meet within fourteen (14) business days of Plaintiffs' rejection of Defendants' response, unless a later meeting is agreed by both sides. The Monitor will participate in these meetings to offer evaluations of the disputed conditions and recommendations for resolution.

d)    If Defendants and Plaintiffs are not successful in their efforts to resolve their dispute, they may jointly or individually seek relief from the Court to effect substantial compliance with the Settlement Agreement, but not through a petition for contempt. For all obligations within this Settlement Agreement that are "budget contingent," after engaging in the dispute resolution outlined in (a)-(c), Plaintiffs may request that the Court return this case to the active docket if a necessary appropriation is not made within fifteen (15) months of the start of the Fiscal Year for 2016 and within six (6) months of the start of the Fiscal Year for all subsequent fiscal years.

e)    The Court's jurisdiction shall terminate three (3) years after the Approval Date or the Budget Contingent Approval Date, whichever is later, with respect to any provisions of this Settlement Agreement for which there is no outstanding determination that Defendants are not in substantial compliance. If the Court determines that Defendants

are not in substantial compliance, with any provisions of this Settlement Agreement at any time during the three (3) year period of the Settlement Agreement, the Court's jurisdiction with respect to such provisions shall continue for the remainder of the three (3) year period or for a period to be ordered by the Court of not more than two (2) years from the date of the Court's finding that Defendants are not in substantial compliance.

f) If the Court finds that Defendants are not in substantial compliance with a provision or provisions of this Settlement Agreement, it may enter an order consistent with equitable and legal principles, but not an order of contempt, that is designed to achieve compliance.

g) To permit enforcement of the terms of this Settlement Agreement in federal court, the parties agree that, should it become necessary to seek the Court's assistance as to violations of this agreement, any order granting such relief must include a finding that the relief sought is narrowly drawn, extends no further than is necessary to correct the violation of the federal right, and is the least intrusive means for doing so.

h) The parties acknowledge that no provision of this Settlement Agreement has an adverse impact on public safety or the operation of the criminal justice system.

i) If Plaintiffs contend that Defendants have not complied with an order entered under the preceding paragraphs, they may, after reasonable notice and a meeting with Defendants, move for further relief from the Court to obtain compliance with the Court's prior order. The Court may apply equitable principles and may use any appropriate equitable or remedial power available to it. This may include returning the case to the active docket and setting a trial date. The information gathered by the Monitor during the life of this Settlement Agreement, the Monitor's reports, including all reports and materials supplied by Defendants, may be used in Plaintiffs' case at such a trial, along with the testimony of the Monitor, which testimony may address ultimate issues in this case.

j) Three years after the approval date of this Settlement Agreement or the budget contingent approval date, whichever is later, Plaintiffs may move to abrogate this agreement except XXIX(g)-(i) and XXXIII will continue in effect.

## XXX. FORCE MAJEURE

a) *Force majeure* events are earthquakes, floods, fire, plague, Acts of God (as defined in applicable law), and other natural disasters; terrorism, riots or civil disturbances; war, whether declared or not; strikes; nuclear or chemical contamination; and failure of public infrastructure.

b) If any *force majeure* event occurs which causes or may cause a delay in or impediment to performance in complying with any provision of the Settlement Agreement, IDOC shall notify Plaintiffs' counsel and the Monitor in writing within fifteen (15) business days of when IDOC first knew that the event might cause a delay. This notice shall specifically reference this Section XXX of the Settlement Agreement. Within seven (7) days thereafter, IDOC shall provide Plaintiffs' counsel and the Monitor with a written

description of the anticipated length of time the delay may persist, the cause or causes of the delay, and the measures taken or to be taken to prevent or minimize the delay, and the schedule on which those measures shall be implemented.

c)     Plaintiffs' counsel and the Monitor shall respond, in writing, to IDOC's claim of a delay or impediment to performance within thirty (30) days of receipt of the *force majeure* notice provided under this Section XXX. If the Monitor agrees that the delay has been or will be caused by a *force majeure* event, and Plaintiffs' counsel accepts the Monitor's position, the parties shall stipulate to an extension of the deadline(s) for all requirement(s) affected by the delay for a period equivalent to the delay actually caused by such circumstances. The stipulation shall be filed as a modification to the Settlement Agreement pursuant to Section XXXI (Modification), *below*, and shall be subject to approval by the Court as therein provided.

d)     If IDOC's claim of *force majeure* delay is not resolved pursuant to subsection (c), either Plaintiffs or Defendants may submit this matter to the Court for resolution. If the Court determines that the delay or impediment to performance has been or will be caused by a *force majeure* event, IDOC shall be excused as to that event(s) and delay, for a period of time equivalent to the delay caused by such circumstances.

e)     When IDOC asserts a claim of *force majeure*, IDOC shall bear the burden of proving that any delay of any requirement(s) of this Settlement Agreement was caused by or will be caused by a *force majeure* event. IDOC shall also bear the burden of proving the duration and extent of any delay(s) attributable to such circumstances.

f)     Absent compliance with the provisions of subsections (a) - (e), *above*, no claim of *force majeure* or emergency may be made to excuse performance under any provision of this Settlement Agreement after the fact.

## XXXI.     MODIFICATION

a)     The parties recognize that the change of some conditions or practices may reduce the necessity of change to other conditions or practices. Therefore, the parties agree that it may be appropriate that the Settlement Agreement be modified from time to time. After six (6) months of operation under the Settlement Agreement, Defendants may ask Plaintiffs' counsel to review a proposed modification to any portion of the Settlement Agreement.

b)     If Plaintiffs' counsel agree with the proposed modification, the parties will seek Court approval of the modification.

c)     If Plaintiffs' counsel disagree with the proposed modification, the parties will meet and confer as to whether they can reach agreement. If the parties cannot agree, within thirty (30) days, the parties will seek the assistance of the magistrate judge assigned to this case to mediate the dispute.

d) If mediation is not successful, then appropriate relief may be sought from the Court in the form of a motion for modification.

## XXXII.    SCOPE; COURT APPROVAL; FUNDING

a) Scope -

The parties hereby memorialize the terms of their agreement in this Settlement Agreement.

This Settlement Agreement constitutes the entire agreement of the parties and except for any Protective Order entered by the Court, supersedes all prior agreements, representations, negotiations and undertakings in this litigation not set forth or incorporated herein.

b) Court Approval

i) The Settlement Agreement is not effective absent approval by the Court. All Parties and their counsel will use their best efforts to obtain Court approval of this Agreement.

ii) Unless otherwise indicated, the term of this Settlement Agreement shall commence upon the date of approval by the Court.

c) Funding

i) The IDOC agrees to make all possible good faith efforts to seek all necessary funding to implement fully the terms of this Settlement Agreement.

ii) In the event that the parties are unable to agree as to whether there is sufficient funding to implement fully this Settlement Agreement, the parties shall meet and confer. In the event that the parties continue to be unable to agree, the parties may invoke the dispute resolution procedures of this Settlement Agreement, pursuant to Section XXIX.

## XXXIII.    ATTORNEY FEES

The parties agree that an award of fees is appropriate in this matter. The Court shall determine the amount of fees and costs due to Plaintiffs' counsel. Fees are to be determined as if the Plaintiffs are the prevailing party. One half of this sum shall be payable one hundred twenty (120) days after the Court determines that amount. The remaining half of the fees will become immediately due if the Court enters an order pursuant to Section XXIX(g). In no event will the award be more than six million dollars.

Signed and approved Amended Settlement Agreement consisting of thirty-two (32) pages for Plaintiff's Class.

Dated: _5/20/16_         _____
                                     HAROLD C. HIRSHMAN


Signed and approved Amended Settlement Agreement consisting of thirty-two (32) pages for Defendants.

Dated: _23 MAY 16_        _____
                                     JOHN BALDWIN