IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | No. 1:07-CV-1298-MMM-JEH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants | ) | |

**FIRST ANNUAL REPORT OF MONITOR PABLO STEWART, MD**

# TABLE OF CONTENTS

BACKGROUND ………………………………………………………………………… 4

METHODOLOGY/MONITORING ACTIVITIES ……………………………………… 7

EXECUTIVE SUMMARY ……………………………………………………………… 9

DETAILED FINDINGS ………………………………………………………………… 16

  IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING ……………… 17

  V: MENTAL HEALTH EVALUATION AND REFERRALS ……………………………. 22

  VI: MENTAL HEALTH SERVICES ORIENTATION …………………………………… 26

  VII: TREATMENT PLAN AND CONTINUING REVIEW ……………………………… 27

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS 33

  IX: ADDITIONAL MENTAL HEALTH STAFF……………………………………………35

  X: BED/TREATMENT SPACE ……………………………………………………………37

  XI: ADMINISTRATIVE STAFFING ……………………………………………………44

  XII: MEDICATION ……………………………………………………………………….. 46

  XIII: OFFENDER FORCED MEDICATION ……………………………………………49

  XIV: HOUSING ASSIGNMENTS ………………………………………………………53

  XV: SEGREGATION ……………………………………………………………………55

  XVI: SUICIDE PREVENTION …………………………………………………………70

  XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES ………………79

  XVIII: MEDICAL RECORDS ………………………………………………………...83

  XIX: CONFIDENTIALITY …………………………………………………………...85

  XX: CHANGE OF SMI DESIGNATION ……………………………………………89

  XXI: STAFF TRAINING ……………………………………………………………..89

XXII: PARTICIPATION IN PRISON PROGRAMS ……………………………………… 91

XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS
      FROM FACILITY TO FACILITY …………………………………………………… 92

XXIV: USE OF FORCE AND VERBAL ABUSE …………………………………………… 93

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS ………………… 102

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ……………………… 109

XXVII: MONITORING …………………………………………………………………… 110

XXVIII: REPORTING AND RECORDKEEPING ………………………………………111


CONCLUSION ……………………………………………………………………………… 113

## BACKGROUND

**IDOC:** IDOC consists of 25 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and two women's facilities. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Two of the facilities have Residential Treatment Units. All facilities have crisis care beds as well as having some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement ("Settlement") was approved May 23, 2016. It covers a range of issues affecting inmates with mental illness or serious mental illness:

- Policies and procedures
- Intake screening
- Medication continuity on arrival
- Referrals
- Mental health evaluations
- Crisis Intervention Team
- Licensure
- Inmate orientation
- Treatment plans and updates
- Psychiatric evaluations
- Follow-up after discharge from specialized treatment settings
- Staffing plans and hiring
- Bed, programming, and office space for residential treatment units, inpatient facilities, and crisis beds
- Administrative staffing
- Medication administration, documentation, evaluations, lab work, side effects monitoring, informed consent, noncompliance follow-up
- Forced medication
- Housing assignment notice and recommendations
- Treatment, housing conditions, and out-of-cell time in segregation and investigative status
- Review of segregation terms length
- Suicide prevention
- Restraints for mental health purposes
- Mental health care records and forms
- Confidentiality
- Change of Seriously Mentally Ill designation
- Staff training
- Nondiscrimination in program participation
- Records and medication continuity on inter-facility transfers
- Use of force and verbal abuse
- Mental health input into discipline

- Continuous quality improvement
- Terms of monitoring this Settlement
- IDOC reporting

**Deadlines:** Deadlines in the Settlement range from immediate to the year 2020, and a number of deadlines on critical issues are contingent upon the approval of a state budget. The team reviewed each provision of the Settlement per the specific deadlines identified in the Settlement. Of note, there are many provisions for which the deadline is "as agreed upon" between the parties but for which the monitoring team did not receive a schedule of specific agreed-upon dates. For these particular issues, the assigned compliance ratings reflect the current status of the issues.

The following table lists the requirements in order of their deadlines to be accomplished. Of the 25 items with deadlines in or before May 2017, 16 have reached Substantial Compliance. Ratings are also indicated for those items to be accomplished "in a reasonable time," in the event that it is determined that a reasonable time is now at hand. A more detailed summary of the compliance status of all Settlement Agreement provisions can be found in the Executive Summary.

| Amended Settlement Agreement provision | Timeline[1] | Substantial Compliance? |
|---|---|---|
|  |  |  |
| Crisis Beds are to be outside Control Units (except Pontiac) | May 2016 | Y |
| Regional Director hires | June 2016 | Y |
| State employee at each facility to supervise State clinical staff, monitor and approve vendor staff | June 2016 | N |
| Architectural plans to Monitor | July 2016 | Y |
| 12 Mental Health Forms in use | July 2016 | Y |
| Treating mental health professionals[2] disclose information to patient | July 2016 | N |
| Medical Records and medication transferred with patient | August 2016 | N |
| Intergovernmental Agreement with Department of Health Services | August 2016 | Y |
| Medication delivery, recording, side effects monitoring, lab work, patient informed, noncompliance follow-up | August 2016 | N |
| Propose any amendment to Staffing Plan | August 2016 | Y |
| Any objections to proposed amended Staffing Plan | October 2016 | Y |
| All policies/procedures/ADs specified in Settlement Agreement – drafts to Plaintiffs and Monitor | November 2016 (unless otherwise |  |

---

[1] Dates are calculated from the approval date of the *Amended* Settlement Agreement, May 23, 2016. If the parties intended for dates to be calculated from the approval of the original Settlement Agreement, January 21, 2016, these will be adjusted.

[2] Referred to throughout the Settlement Agreement and this report as MHP

| | specified) | |
|---|---|---|
| Confidentiality: records, mental health information, policies and training | November 2016 | N |
| Behavior Treatment Program pilot | November 2016 | N |
| Quality Improvement Manager hire | February 2017 | Y |
| Review Committees for SMI Disciplinary Segregation terms | February 2017 | Y |
| Mentally ill Control Unit residents >60 days receive 8 hours out of cell time weekly | May 2016-May 2017 | Y |
| Inmate Orientation policy and procedure | May 2017 | Y |
| Crisis beds at Pontiac moved to protective custody | May 2017 | Y |
| Suicide Prevention measures | May 2017 | N |
| Physical Restraints measures | May 2017 | Y |
| Staff Training plan and program developed | May 2017 | Y |
| Discipline: policies related to self-injury | May 2017 | N |
| Mental health staff Training plan and program developed | May 2017 | Y |
| Transfers: consults and notification | May 2017 | Y |
| | | |
| Mentally ill Control Unit residents >60 days receive 12 hours out of cell time weekly | June 2017-May 2018 | |
| Mental health referrals and evaluations | November 2017 | |
| Staffing to run RTU at Joliet | November 2017 | |
| Central office staff hires for policies and recordkeeping | November 2017 | |
| Screening conducted with sound privacy | May 2018 | |
| Training for all State and vendor staff with inmate contact | May 2018 | |
| Mentally ill Control Unit residents >60 days receive 16 hours out of cell time weekly | June 2018-May 2019 | |
| Inpatient Facility – transfer ownership and expand, policies | November 2018 | |
| Mentally ill Control Unit residents >60 days receive 20 hours out of cell time weekly | June 2019-May 2020 | |
| Segregation and Temporary Confinement for mentally ill: housing decisions, MHP review, treatment and out-of-cell requirements | May 2020 | |
| Develop plans for inpatient care that can be implemented after necessary appropriations | After IGA is signed | |
| Screening on arrival at reception | Reasonable time | Y |
| Psychotropic medications continued on arrival, reviewed, and related documentation | Reasonable time | N |
| Inmate Orientation | Reasonable time | Y |
| Treatment Plans | Reasonable time | N |
| Psychiatry Review frequency | Reasonable time | N |
| Follow-up after Specialized Treatment Settings | Reasonable time | N |
| Forced Medication | Reasonable time | no rating |
| SMI Housing Assignment information and consultation | Reasonable time | N |

| | | |
|---|---|---|
| Change of SMI designation only by treatment team (or treating MHP before teams are operating) | Reasonable time | Y |
| Mental illness does not prevent access to prison programs | Reasonable time | Y |
| Use of Force and Verbal Abuse | Reasonable time | N |
| Discipline system conforms to AD 05.12.103 | Reasonable time | N |
| Discipline in RTU or inpatient is carried out in a mental health treatment context | Reasonable time | no rating |
| Quality Improvement Program implemented | Reasonable time | N |
| Staffing hires – Dixon, Pontiac, Logan | 6-12 months after budget contingent approval date | |
| Staffing: quarterly hiring reports, meeting targets | Quarterly thereafter | |
| RTU Bed Space | 6-15 months after budget contingent approval date | |
| RTU Programming and Office Space | 6 months thereafter | |
| Inpatient Bed Space construction | 9 -16 months after budget contingent approval date | |
| MHP review within 48 hours after Investigative Status/Temporary Confinement placement | 12 months after budget contingent approval date | |

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Reena Kapoor, MD, and Virginia Morrison, JD, with additional data-gathering and analysis having been provided by Aaron Zisser, JD.

To accomplish the monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 19 site visits to a variety of IDOC facilities, where interviews of administrators, staff, and offenders were conducted. While on site, the monitoring team would meet with the administrative and clinical leadership of the facility and then tour the facility. The tour would include observing general population units, segregated housing units, crisis care units, infirmary areas including medical records and restraint rooms, working spaces for the clinical staff, group therapy areas (if present), as well as any other area associated with the provision of mental health services. The monitoring team also extensively toured the Residential Treatment Units at Logan and Dixon. The monitoring team also inspected the Mental Health Unit at Pontiac on three separate occasions.

During the monitoring period, the Monitor personally met with the Director and Assistant Director, as well as the Chiefs of programming, operations, mental health, psychiatry and legal on several occasions. The Monitor also met with counsel for the plaintiffs on several occasions. The Monitor received and considered reports prepared by counsel for the plaintiffs regarding IDOC's response to the Settlement Agreement, as well as receiving and considering reports prepared by counsel for the defendants. Of note, over the course of the monitoring period, various members of the monitoring team interviewed and reviewed the medical records of several hundred offenders. This number of offenders evaluated represents a sufficiently robust sample of the mental health population of the IDOC. Therefore, the opinions presented in this monitoring report are based on a substantial-sized clinical sample of offenders.

In advance of the site visits, a variety of materials were requested. These materials included policies, procedures, training materials, a variety of clinical data, internal audits and reports, inmate grievances, incident reports, Internal Affairs investigations, and other materials.

Monitoring began immediately following the approval of the Amended Settlement Agreement. However, pursuant to Section XXVII(c) of the Settlement, the Monitor requested additional staff for the monitoring team. One individual was not accepted by IDOC; Aaron Zisser, JD was accepted and began work July 1, 2016. Reena Kapoor, MD was also accepted and began work September 20, 2016. When Mr. Zisser left the team in January 2017, the monitor proposed Mr. Thomas Nolan, a psychologist/attorney with extensive experience monitoring prison conditions. IDOC rejected this proposed staffing, and eventually approved Virginia Morrison, JD as an assistant monitor. She began work on May 1, 2017. The monitoring team was purposefully kept small in consideration of the budgetary issues facing Illinois in general and IDOC in particular. Due to the delays in IDOC's approving additional members of the monitoring team, an already lean team was therefore short-staffed for more than three months, significantly hampering the monitoring process.

As a monitoring team, we made multiple visits to every maximum security facility and visited every Reception and Classification ("R&C") unit and the two Residential Treatment Units ("RTUs") in operation during the monitoring period. Additionally, visits were made to selected medium security facilities based on mental health performance data provided by the defendants.

The monitoring team made the following site visits:

| Dixon | Logan | Pontiac |
|---|---|---|
| 6/13/16  Dr. Stewart<br>9/26/16  RTU<br>Dr. Stewart, Dr. Kapoor<br>11/14/16-11/15/16  RTU<br>Dr. Kapoor<br>1/12/16-1/13/16  RTU<br>Dr. Kapoor and Mr. Zisser | 9/8/16  R&C  Dr. Stewart, Mr. Zisser<br>12/12/16-12/13/16<br>Dr. Stewart, Dr. Kapoor, Mr. Zisser<br>4/4/17  Dr. Stewart | 8/26/16  Dr. Stewart<br>11/21/16-11/22/16<br>Dr. Stewart, Mr. Zisser<br>3/3/17  Dr. Stewart |
| **Graham** | **Menard** | **Stateville** |
| Including the R&C<br>1/10/17  Dr. Stewart | Including the R&C<br>10/7/16  Dr. Stewart<br>11/2/16-11/3/16  Mr. Zisser<br>2/16/17-2/17/17  Dr. Kapoor | 6/14/16  Dr. Stewart<br>9/7/16  R&C<br>Dr. Stewart, Mr. Zisser<br>10/19/16-10/20/16  Mr. Zisser<br>1/31/17  Dr. Stewart |
|  | **Pinckneyville**<br>2/7/17  Dr. Stewart |  |

## EXECUTIVE SUMMARY

Throughout the first year of implementing the Settlement, IDOC leadership has been generally cooperative and helpful with the work of the monitoring team. The Director and Assistant Director, as well as the Chiefs of Programming, Operations, Legal, Mental Health and Psychiatry have made themselves available to the Monitor regarding the implementation of the various requirements of the Settlement. In addition to this cooperation and availability, numerous IDOC staff members encountered during the monitoring efforts have demonstrated a willingness for implementing the requirements of the Settlement.

Many significant improvements to the mental health care delivery system in IDOC have occurred during this first year of the Settlement. At all four of the R&Cs, mental health and suicide screenings occur in a timely manner in confidential settings. Mental health referrals and assessments are being accomplished within the required 14-day timeframe for offenders housed in the R&Cs. Mental health services orientation is occurring at all IDOC facilities. Segregation Review Committees were formed and significantly reduced the segregation terms of SMI offenders with more than 60 days left on their segregation terms. Structured out-of-cell activities have begun to occur in the RTUs and the Mental Health Unit at Pontiac. Staff have also begun to offer similar activities to offenders on the mental health caseload living in segregated housing units for greater than 60 days, and in some select facilities, to those in the unit for less than 60 days. Unstructured out-of-cell activities are also being offered and currently meet or exceed the requirements of the Settlement.

IDOC has been extremely hampered in its efforts to implement the requirements of the Settlement by the absence of a budget from the state. This has prevented IDOC from initiating or completing numerous capital projects and hiring the additional staff as directed by the Settlement, and these in turn have limited IDOC's ability to meet clinical requirements of the Settlement. IDOC has been able to partially meet several of the budget-contingent items of the Settlement, however, in the absence of formal budget approval. These include hiring an additional regional psych administrator, construction projects on the four RTUs[3] as well as the new inpatient unit, moving the bulk of crisis beds out of the North House at Pontiac, and the provision of enhanced mental health treatment services to offenders designated to receive inpatient level of care.

Despite the substantial improvements to the mental health care delivery system, IDOC continues to have challenges in meeting the first-year requirements of the Settlement Agreement. Among IDOC's challenges is the grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the first-year requirements of the Settlement. These psychiatric services deficiencies include but are not limited to problems with the proper continuation of medications for offenders entering IDOC, lack of timely follow-up for offenders prescribed psychotropic medication, dangerous practices related to the use of psychotropic medications including those offenders on forced medication, lack of following standard protocols for ascertaining side effects, extreme delays in obtaining psychiatric evaluations, non-participation of psychiatrists in the treatment planning process, lack of timely psychiatric follow up for offenders assigned to crisis beds, and problems related to those offenders designated as requiring inpatient level of psychiatric services. Of note, the overall quality of the psychiatric services provided to the mentally ill offenders of IDOC is exceedingly poor and often times dangerous. IDOC leadership is well aware of the problems related to the insufficient amount of psychiatric services and has taken decisive action to address this issue, but this has not yet been effective. At the time of the submission of this report, however, the lack and quality of psychiatric services negatively impacts all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement.

Custody staff was noted to be acting as "gate keepers" when a mentally ill offender requested to be seen by the Crisis Intervention Team. Although this issue significantly improved over this monitoring period, it remains a concern, particularly as there were reports that the teams themselves had begun not to respond to urgent complaints that did not involve suicidality. The current system of treatment planning is not working and needs to be completely rethought. IDOC has not been able to perform its required treatment plan reviews and updates for mentally ill offenders assigned to RTU, segregation or crisis housing.[4] IDOC is also not meeting the requirements of the Settlement Agreement regarding the transition of offenders from specialized treatment settings.

There remains an absence of "aggressive treatment" for mentally ill offenders assigned to a crisis level of care as the bulk of the treatment activities are limited to daily cell side visits by an MHP. In the facilities monitored, the procedures for forced medications were being followed.

---

[3] To date, IDOC is operating 625 RTU beds at Dixon and 80 RTU beds at Logan.
[4] This is not a budget contingent item.

Significant problems were noted in prescribing psychotropic medications for these offenders, however. Questions also exist regarding the system-wide application of these procedures.

The conditions of segregation for mentally ill offenders remained problematic throughout the monitoring period. Challenges were observed in ensuring that these offenders continued to receive the treatment outlined in their Individual Treatment Plans. Also, there was no formal mechanism for identifying those mentally ill offenders who were decompensating while on segregation status. The only established mechanisms are the weekly segregation rounds, which are conducted at the cell front, and the Crisis Intervention Team. Given the problems with the Crisis Intervention Team, the main recourse available for mentally ill offenders who are decompensating while in segregation is to behaviorally act out, which can result in greater segregation time.

Overall, IDOC is following its own procedures regarding suicide prevention. As previously noted, however, significant problems persist with the Crisis Intervention Team and the treatment afforded suicidal offenders on crisis watch. The current format for reviewing suicides should be redone to emphasize corrective action. Also, IDOC is generally following its own procedures regarding the use of restraints.

IDOC has successfully implemented the use of standardized forms for a variety of clinical tasks such as progress notes, treatment plans and suicide evaluations. Notwithstanding the use of these forms, the medical records, except for the electronic medical records found at Logan, are poorly organized. This disorganization makes it very difficult to adequately follow the clinical care of a mentally ill offender.

Confidentiality is an evolving concept for IDOC. At the beginning of the monitoring period, it was almost nonexistent but has steadily improved. Significant challenges remain, however. The Monitor only recently approved the policy and procedure regarding confidentiality, well past the deadline of November 23, 2016. Although the policy was only recently approved, staff has been trained regarding the requirements of confidentiality. On the other hand, the physical plants are not conducive to providing sound confidentiality, and custody staff continues to be reluctant to move mentally ill offenders to confidential settings and insists that the doors to the treatment rooms remain open while staff stands within hearing distance. Problems with the provision of informed consent are also widespread in the department. Of note, IDOC has reportedly trained 13,000 employees about mental illness.

Although, for the most part, IDOC is following its own procedures about use of force, the number of offender complaints raises serious questions about the application of use of force. Also, the monitoring team observed several incidents of verbal abuse. Both of these issues will be closely monitored going forward.

Disciplinary procedures with mentally ill offenders need refinement as IDOC enters the second year of monitoring. The major concern is that MHPs are not sufficiently advocating for the mentally ill offenders in the disciplinary process. Problems also exist on the custody side of this process. The Chiefs of Mental Health and Operations are well aware of these problems and have assured the monitoring team that this will be addressed going forward.

Continuous Quality Improvement (CQI) is a key element in an adequately functioning correctional mental health system. Although data has been collected this first year of the Settlement, there is a lack of robust corrective action based on the data. The CQI manager was hired on February 16, 2017.

A significant administrative problem has plagued the monitoring team throughout the first year of the Settlement. Unacceptable delays in reimbursement for travel have forced the monitoring team to carry these legitimate charges on their personal credit cards. The current backlog for travel reimbursement is more than eight months with IDOC being unable to state when payment will be received.

A summary of compliance findings is as follows:

| Requirement | Compliance Status |
|---|---|
| | |
| **IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (IV)(a), (b)<br>(IV)(c)<br>(IV)(d), (e)<br>(IV)(f), (g) | Substantial Compliance<br>Noncompliance<br>Substantial Compliance<br>Noncompliance |
| **V: MENTAL HEALTH EVALUATION AND REFERRALS** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (V)(a)<br>(V)(b), (c), (d), (e), (f)<br>(V)(g)<br>(V)(h), (i)<br>(V)(j) | Noncompliance<br>Substantial Compliance<br>Noncompliance<br>Substantial Compliance<br>Deadline November 23, 2017 |
| **VI: MENTAL HEALTH SERVICES ORIENTATION** | Overall: Substantial Compliance<br>Subfindings supporting overall finding: |
| (VI)(a), (b) | Substantial Compliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (VII)(a), (b), (c), (d), (e) | Noncompliance |

| Requirement | Compliance Status |
|---|---|
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS**<br><br>(VIII)(a)<br>(VIII)(b)(i)<br>(VIII)(b)(ii) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Noncompliance<br>No rating at this time |
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>(IX)(a)<br>(IX)(b)<br>(IX)(c)<br>(IX)(d)<br>(IX)(e)<br>(IX)(f) | Overall: Budget contingent<br>Subfindings supporting overall finding:<br>Budget contingent<br>November 23, 2017 deadline<br>Substantial Compliance<br>No rating at this time<br>Substantial Compliance<br>Target date not arrived |
| **X: BED/TREATMENT SPACE**<br><br>(X)(a)<br>(X)(b)(i)<br>(X)(b)(ii)<br>(X)(c)(i)<br>(X)(c)(ii)<br>(X)(d)<br>(X)(e)<br>(X)(f)<br>(X)(g)<br>(X)(h)<br>(X)(i) | Overall: Budget contingent<br>Subfindings supporting overall finding:<br>Budget contingent<br>Substantial Compliance<br>Budget contingent<br>Substantial Compliance<br>Budget contingent<br>Budget contingent<br>Budget contingent<br>Noncompliance<br>Budget contingent<br>Budget contingent<br>Substantial Compliance |
| **XI: ADMINISTRATIVE STAFFING**<br><br><br>(XI)(a), (b)<br>(XI)(c)<br>(XI)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Substantial Compliance<br>Noncompliance<br>November 23, 2017 deadline |
| **XII: MEDICATION** | Overall: Noncompliance |

| Requirement | Compliance Status |
|---|---|
| | Subfindings supporting overall finding: |
| (XII)(a) | No rating at this time |
| (XII)(b) | Noncompliance |
| (XII)(c)(i), (ii), (iii), (iv), (v), (vi) | Noncompliance |
| **XIII: OFFENDER FORCED MEDICATION** | Finding: No rating at this time |
| **XIV: HOUSING ASSIGNMENTS** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (XIV)(a) | Noncompliance |
| (XIV)(b) | Noncompliance |
| (XIV)(c) | Noncompliance |
| **XV: SEGREGATION** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (XV)(a)(i), (ii), (iii), (iv), (v), (vi), (vi), (vii) | Noncompliance |
| (XV)(b)(i) | Substantial compliance |
| (XV)(b)(ii) | No rating at this time |
| (XV)(b)(iii) | Noncompliance |
| (XV)(b)(iv), (v), (vi) | Substantial Compliance |
| (XV)(c)(i) | Noncompliance |
| (XV)(c)(ii) | Budget contingent |
| (XV)(c)(iii) | Noncompliance |
| (XV)(c)(iv) | Noncompliance |
| (XV)(c)(v) | Noncompliance |
| (XV)(c)   (sic) | Noncompliance |
| (XV)(d) | First year requirements not met; overall deadline is May 23, 2020 |
| **XVI: SUICIDE PREVENTION** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (XVI)(a), (b) | Noncompliance |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES** | Overall: Substantial compliance<br>Subfindings supporting overall finding: |
| (XVII)(a), (b), (c) | Substantial compliance |

| Requirement | Compliance Status |
|---|---|
| (XVII)(d) | Noncompliance |
| **XVIII: MEDICAL RECORDS**<br><br>(XVIII)(a)<br>(XVIII)(b) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance<br>No rating at this time |
| **XIX: CONFIDENTIALITY**<br><br>(XIX)(a)<br>(XIX)(b)<br>(XIX)(c)<br>(XIX)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| **XX: CHANGE OF SMI DESIGNATION** | Finding: No rating at this time |
| **XXI: STAFF TRAINING**<br><br>(XXI)(a)<br>(XXI)(b)<br>(XXI)(c) | Overall: Substantial Compliance<br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Deadline May 23, 2018<br>Substantial Compliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Finding: Substantial Compliance |
| **XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY**<br>(XXIII)(a)<br>(XXIII)(b)<br>(XXIII)(c) | Overall: Substantial Compliance<br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Substantial Compliance<br>Substantial Compliance |
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Finding: Noncompliance |

| Requirement | Compliance Status |
|---|---|
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS**<br><br>(XXV)(a)<br>(XXV)(b)<br>(XXV)(c)<br>(XXV)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Noncompliance<br>Noncompliance<br>No rating at this time<br>Noncompliance |
| **XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM**<br><br>(XXVI)(a), (b) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance |
| **XXVII: MONITORING** | Finding:  No rating at this time |
| **XXVIII: REPORTING AND RECORDKEEPING** | Finding: Noncompliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement.

**Overall structure:** This Section is organized along the same structure as the Settlement; each major section below corresponds with a substantive section of the Settlement. That said, the Settlement includes provisions that appear multiple times across different sections. The Monitor attempts in this report to address each substantive requirement in that section of the Settlement where it appears.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement. This significantly lengthens the report, but it is critical that the team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and

suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that non-compliance is, nonetheless may be in substantial compliance with the provision of the Settlement.

**Compliance ratings:** As discussed above, the team institutes the "Substantial Compliance" and "Noncompliance" ratings for each provision, as specified in the Settlement. In actual fact, these may mask true performance. In practice, IDOC has made significant progress on a number of requirements. These would be more accurately described as "partially compliant," but by the terms of the Settlement, those provisions must be found in Noncompliance.

Section II (t) of the Amended Settlement Agreement defines "Substantial Compliance" as follows: The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious. Substantial compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this first report, compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the monitor of this seismic shift for IDOC, the Monitor felt it more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. As IDOC makes progress with these changes, the Monitor anticipates that subsequent reports may include compliance ratings for specific facilities.

## IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING

**Summary**: At all four R&Cs, screenings were conducted on a timely basis by appropriate staff in confidential settings, though there were problems with thoroughness. Medication bridge orders were sometimes not written or filled, or orders were discontinued without the required explanation. A number of orders that *were* written reflected questionable psychiatric practice. Fairly often, prior mental health records were not available. Suicide screening forms were generally completed except for prisoners transferred to Stateville on a writ.

**(IV)(a): Specific requirement:** All persons sentenced to the custody of IDOC shall receive mental health screening upon admission to the prison system. Absent an emergency which requires acting sooner, this screening will ordinarily take place within twenty-four (24) hours of reception (*see* "Components of Mental Health Services" at pg. 5 in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101(II)(E)(2)), but in any event no later than forty-eight (48) hours after reception, as

required by IDOC Administrative Directive 04.04.100 (II)(G)(2)(b) (*see also* IDOC Administrative Directive 05.07.101).

**Findings:** In all cases reviewed at the four R&C centers, mental health screenings occurred on the day of the inmate's arrival to the facility. The Monitor personally visited IDOC's four Reception and Classification units to assess compliance with the requirements of this section of the Agreement. The Monitor found that screenings are conducted on a timely basis by appropriate staff in confidential settings. The Monitor noted, however, significant difficulties with medication bridge orders, thoroughness of the screenings, and consideration of prior mental health records.

**(IV)(b): Specific requirement:** The mental health screening conducted upon admission to IDOC shall be conducted by a Mental Health Professional [MHP][5] and shall use IDOC Form 0372 (Mental Health Screening). In those instances where a mental health screening is performed by an unlicensed mental health employee, said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement.

**Findings:** This requirement was satisfactorily met at all of the R&C facilities.

**(IV)(c): Specific requirement:** Offenders transferred from a receiving and classification facility who have been screened and referred for further mental health services shall be administered the Evaluation of Suicide Potential, IDOC Form 0379, but need not be administered the mental health screening form again.

**Findings:**

- At Stateville, no suicide screenings were conducted for those inmates at the R&C on writ from another IDOC facility.
- At Dixon and Menard, the charts the monitoring team reviewed did contain suicide assessments completed upon transfer to Dixon from Reception & Classification or from another IDOC facility.
- At all other facilities inspected, offenders transferred from a R&C facility that have been screened and referred for further mental health services were administered the Evaluation of Suicide Potential using IDOC Form 0379.

**(IV)(d): Specific requirements:** In order to encourage full and frank disclosure from offenders being screened, mental health screening shall take place in the most private space available at the receiving and classification facilities. Within two (2) years of the approval of this Settlement Agreement, IDOC will ensure that mental health screening at all receiving and classification facilities takes place only in spaces that ensure sound confidentiality.

**Findings:** At each facility, intake screenings occurred in a confidential setting that

---

[5] The Settlement uses MHP to indicate Mental Health Professional. This report adopts that convention as well.

provided sound confidentiality.

**(IV)(e): Specific requirement:** IDOC shall develop policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

**Findings:** AD 04.04.101, effective date of 5/1/2016, provides the Mental Health SOP Manual with the authority to fulfill this requirement. The Mental Health SOP Manual clearly states on page 78 "for those offenders who arrive at an IDOC facility on verifiable, prescribed psychotropic medication, the psychotropic medication shall be continued (bridged) for up to 30 days or until such time as a psychiatric provider can evaluate the inmate for ongoing psychotropic medication. This evaluation may be no more than 30 days from arrival into an IDOC facility."

**(IV)(f): Specific requirement:** Following transfer to IDOC custody, an offender's prescription for psychotropic medication shall be reviewed by a licensed physician or psychiatrist, and modified only if deemed clinically appropriate. Any change in psychotropic medication, along with the reason for the change, shall be documented in the offender's medical record. The psychiatrist or other physician, or nurse practitioner acting within the scope of their license, must also document on the offender's chart the date and time at which they discussed with the offender the reason for the change, what the new medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the new medication, and answered any questions the offender had before starting the medication.

**Findings:** Numerous concerns regarding the procedures for addressing the continuation of medication were identified.

At Menard, in one of two cases involving medications, proper procedure was followed. The inmate had three different psychotropics in jail prior to arriving to Menard; upon arrival, there was no break in medication, as the inmate was seen by a nurse practitioner on the day he arrived. A bridge order had been completed upon arrival, and he was waiting to see the psychiatrist. In the other case at Menard, however, the medication was discontinued without documentation explaining the discontinuation. The intake screening did not pick up the fact that the inmate was previously treated with two different psychotropic medications and that he had a history of mental health treatment in IDOC (Centralia 2010). The Monitor noted him to be very anxious and unable to sit calmly during the Monitor's interview. He had a referral for a mental health evaluation, but no urgency level was noted. Although not strictly a psychotropic medication issue, in the same case, the inmate had been prescribed a variety of medications for serious medical issues. But he went four days without his medication for diabetes and hypertension, as well as a blood thinner. This inmate should have had those medications continued without interruption. The lack of such medications for four days could have resulted in serious medical complications.

Medication bridge orders at Stateville and Logan R&Cs did not provide adequate explanations of discontinuation. At Logan, bridge orders often entailed hurried "rubber-stamping" of multiple, powerful psychiatric medications by a physician assistant who did not indicate whether he had actually visited with the inmate. To the extent a note existed, it was not

easy to find in the mental health record. Also, the bridge order itself did not indicate if the physician assistant actually saw the patient.

At Logan, there were a number of examples of inadequate bridge orders:

- An offender experienced a nine-day break in her medications as there was no bridge order written. A medication order was subsequently issued but only after the offender made a request to have her medications restarted.

- An offender had her Xanax discontinued without a clinical explanation being documented in the medical record. Also, no alternative medication was provided.

- An offender had a bridge order for a tremendously large dose of psychotropic medication. Medical staff should have questioned the clinical appropriateness of this excessive dosage and called for an immediate psychiatric evaluation.

- Another offender was receiving a very high dosage of a medication, which should have prompted a review by a psychiatrist. Of note, the dosage did not appear to be justified by the inmate's clinical presentation or mental health records.

At Stateville, because of inadequate access to prior mental health records (discussed below), inmates may receive different medicines than they received before arriving. In many cases, bridge orders were done appropriately. The following several cases, however, are illustrative of improper procedures being followed:

- There is no explanation as to why a different medication is prescribed.

- There were no notes indicating staff considered a different medication or treatment for a detainee who was noted to have hoarded his medications.

- A progress note documented that staff intended to order medication on August 12, but the actual medication order was not written until August 18.

- No explanation was provided as to why Prozac and Trazodone were not continued.

During the November 2016 visit to Pontiac, the Monitor evaluated an inmate who reported that upon entry into the facility he was being treated with antipsychotics, antidepressants, and an antihypertensive, but medication orders could not be located in the medical record.

At Graham's R&C, bridge orders were generally completed. However, in one case during the Monitor's January 10, 2017 visit, the Monitor noted that an inmate arrived to the facility on November 30, 2016. The screening listed medications, but a bridge order was not written until a week afterwards. The medication orders were eventually written but only after an inmate initiated request for the medications.

**(IV)(g): Specific requirement:** Screening will include identifying neurodevelopmental disabilities, suicidal ideation or intent, current or past self-injurious behavior, the presence or

history of symptoms of mental illness, current or past use of psychotropic medications, or the presence of conditions that require immediate intervention, in addition to the information required to be documented on IDOC Form 0372 (Mental Health Screening).

**Findings:** The screenings lasted approximately 10 to 15 minutes according to both offenders and screening staff. Although the screenings generally addressed the topic areas outlined in this section, there were consistent deficiencies noted with the thoroughness in what was recorded of the screenings, especially as relates to the mental status examinations (MSE).

- o At Menard, MSEs usually entailed just a single word or brief phrase, such as "I'm good," "I'm cool," "I'm all right," "OK," "Tired," "Alright, content," and "OK, but a little nervous."
- o At Stateville, MSEs read "Stressing," "Moody," and "Despondent and hungry."
- o At Logan, where the screenings often lasted only five or seven minutes per the offenders, the MSEs included ones that read "Depression and anxiety are bad" and "Not happy, sad."
- o At Graham mental status examinations were similarly limited in scope.

The apparent brevity of the screenings at the R&C facilities can lead to missing mental health issues including suicidality, past treatments including medications and other vital psychosocial information.

**Specific requirement:** The screening process shall also include review of the records, which accompany the offender.

**Findings:** At Menard, a serious problem regarding the availability of prior mental health records was noted. Medical records were not available to R&C staff for detainees coming from county jails. Records from prior IDOC placements were also not available to the staff conducting the screenings.

At Stateville, intake staff does not have access to mental health records on those inmates sent to Stateville on writs as well as records on newly admitted offenders from counties other than Cook County. Cook County will forward mental health records for those offenders receiving mental health services. Cook County will also alert IDOC staff to the presence of any challenging mental health cases prior to their arrival at Stateville. There was a problem with the organization of the medical records for the offenders assigned to the R&C unit. The files consisted of loose and disorganized sheets of paper, which made it very difficult to follow the assessment process.

At Graham and Logan, mental health screeners were equally hampered by not having access to the mental health records on detainees arriving from county jail. Also, screening staff did not have access to the medical records of those offenders who have previously been housed in IDOC.

The R&C facilities are *de facto* control (or segregation) units as defined in Section II (g). Although not specifically required in the Settlement Agreement, it is the Monitor's strong recommendation that offenders on the mental health caseload housed at the various R&C facilities be afforded the same level of structured and unstructured out of cell time as those who

are housed in a segregation unit. It is the Monitor's further recommendation that both structured and unstructured out of cell time begin as soon as offenders are placed on the mental health caseload and not after they have been on the unit for greater than 60 days.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary**: Policy is in place and referral procedures generally are being followed. The required forms are in use and offenders were aware of self-referral procedures. Evaluations were completed by MHPs, but sources conflicted as to whether the 14-day requirement was met. All responses to referrals were timely in the charts reviewed, but inmates indicated extended response times to their self-referrals and IDOC data showed a backlog for evaluations at some facilities.

Custody and mental health staff sometimes failed to appreciate the growing severity of a situation and intervene before it becomes an actual emergency. Staff does, however, routinely respond to emergencies, but it appeared that some custody staff inappropriately acts as a barrier to requests to call the Crisis Intervention Team, though improvement was evident during the first year. IDOC reports having mechanisms to field external requests for referral; IDOC has been actively working on capturing that in policy, which is currently in draft form.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** The monitoring team found that IDOC is fulfilling the requirements of this subsection of the Settlement Agreement for mentally ill offenders in the R&C units. This same attention to providing timely mental health evaluations does not equally exist in the general population and control units. Also, the Monitor found that both custody and mental health staff are slow to provide "an alternative response in case of emergency." That is, staff routinely responds to "emergencies" but fail to appreciate the growing severity of a situation and intervene before it becomes an actual emergency. This lack of timely "pre-emergency" intervention by staff is most likely due to being overcommitted because of insufficient staffing levels.

**(V)(b): Specific requirement:** Referral may be made by staff and documented on IDOC Forms 0387 and 0434 or by self-referral by the offender.

**Findings:** This requirement has been inconsistently met during this monitoring period. When referrals are made, they are documented on IDOC forms 0387 and 0434. Offenders report that although referrals are made, it remains difficult to actually be seen by an MHP. The monitoring team through its chart reviews and offender interviews has confirmed this complaint. Dr. Kapoor, however, found inmates at Dixon were aware that they could access mental health

services by submitting a written request or by asking an officer to call a mental health professional on their behalf. This probably reflects the fact that Dixon has a longer history of dealing with mentally ill offenders than the remainder of the system. Also, the Warden at Dixon has impressed the Monitor by his enthusiasm and leadership in the area of providing quality mental health services to mentally ill offenders.

**(V)(c): Specific requirement:** IDOC shall ensure that the referral procedures contained in IDOC AD 04.04.100, section II (G)(4)(a) and (b) for offender self-referral are created and implemented in a timely fashion in each facility.

Section II (G)(4)(a) and (b) provide:

(a) The Chief Administrative Officer of each facility shall ensure a procedure for referring offenders for mental health services is established.
    (1) Referrals from staff shall:
        (a) Be initiated on the Mental Health Services Referral, DOC 0387;
        (b) Be submitted to the facility's Office of Mental Health Management through the chain of command; and
        (c) Include a copy of the Incident Report, DOC 0434, if applicable.

    (2) The facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in the offender's behavior or behavior that may endanger themselves or others, if not treated immediately.

(b) Procedures for self-referrals by offenders for mental health services shall be provided in the offender handbook. The offender will be encouraged to submit their requests on the Offender Request, DOC 0286.

**Findings:** IDOC reports that AD 04.04.101, effective date 5/1/2016, provides the Mental Health SOP Manual with the authority to fulfill the procedural aspects of this requirement. The Mental Health SOP Manual clearly states on page 23: "Offenders may be referred for mental health services by staff, or may submit a request. Requests to see the Psychiatric Provider are routed through the MHP. Staff should use the Mental Health Services Referral Form (DOC 0387)." The monitoring team found that the procedure for referrals was generally being followed. As noted in other parts of this report, problems have existed during the first year of the Settlement Agreement with the Crisis Intervention Team.

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** The monitoring team found that all offenders transferred into the custody of IDOC received a screening as described in Section IV, *above.*

**(V)(e): Specific requirement:** IDOC shall develop a policy and procedure by which other sources with credible information (including other offenders or family members) may refer an offender for a mental health evaluation. The policy and procedure shall include a record-keeping mechanism for requests, which shall record who made the request and the result of the referral.

**Findings:** IDOC reports that family members may make referrals via the website and by calling the facility.  These referrals are then submitted to mental health staff. The department has developed an AD and provided it to the Monitor for approval. The department has submitted additional changes based on the Monitor's feedback.   The Monitor has approved the department's changes to the AD. At the time of the submission of this report, the AD remains in draft form.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** In all cases reviewed, the mental health evaluations were generally completed within this 14-day timeframe. In the 30 charts Dr. Kapoor reviewed at Dixon, for example, all contained complete Mental Health Assessments that were completed by an MHP within 14 days of arrival at Dixon, and in many cases within 48 hours.  The evaluation forms included relevant clinical information such as past psychiatric history, suicide assessments, medications, and diagnoses.  Offenders reported that they were able to see an MHP for routine concerns within a reasonable time frame, typically about a week, when they were referred by staff or upon their own request. At Menard, in general, the 12 reviewed charts contained complete Mental Health Assessments within 14 days of arrival at the facility. Also, at the four R&C units, all mental health evaluations occurred within 14-day timeframe.

Then again, the latest IDOC quarterly report indicates that there is a backlog of mental health evaluations at certain facilities.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** There have been significant problems with IDOC's ability to fulfill this requirement during the first year of the Settlement. The Monitor first noted serious problems with this issue during an August 26, 2016 tour of Pontiac. Every one of the offenders the Monitor interviewed that day said that custody staff routinely ignored their requests to be seen by the facility Crisis Intervention Team. Of note, a mentally ill offender had committed suicide the evening prior to the tour, which may account for some of the intensity of reactions from the offenders. However, after a more thorough review of this particular issue, it was the Monitor's firm opinion that custody staff was inappropriately acting as "gate keepers" to the facility's Crisis Intervention Team. The Monitor formally reported these concerns to Chief Hinton in an email dated September 1, 2016.

Over the next several months, the monitoring team continued to hear similar complaints about custody staff acting as gatekeepers for the Crisis Intervention Team at a variety of facilities

toured. Among eight inmates interviewed in Menard segregation, they reported that they could not see an MHP for crisis services unless they were actively trying to injure themselves. In another example, Dixon inmates and staff both reported that they could access a mental health professional during crises such as suicidal thoughts or actions, usually within minutes. However, many inmates reported that officers, and later Crisis Intervention Teams themselves, interpreted "crisis" narrowly, saying that a mental health professional could only be called if an inmate said specifically that he wanted to hurt himself. Requests such as "I'm not okay; I need to talk to someone before I do something stupid…" would not result in a call to the Crisis Intervention Team. This practice appeared to be a result of understaffing and a lack of clarity among officers (some of whom work with mentally ill offenders only occasionally) about the crisis intervention policy. The Settlement Agreement is very clear regarding this issue. It requires that the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems and not be limited to suicidal thoughts or actions. In order to fulfill the spirit of provision (g), "crisis" should be interpreted in a manner that allows mental health intervention before an inmate gets to the point of self-harm.

The Monitor personally met with Director Baldwin on November 10, 2016 to share his concern about this very serious issue. The Director gave his assurances that he would take care of this problem. Of note, the Monitor received almost no complaints about this issue over the course of the Monitor's next several tours. The Monitor appreciates Director Baldwin's straightforward handling of this issue. In such an important matter, which really reflects a cultural shift for IDOC, however, ongoing supervision and training of custody staff is imperative.

During the Monitor's tour of Stateville proper on January 31, 2017, the Monitor encountered a slightly different problem with the facility's Crisis Intervention Team. The Monitor received several credible complaints from offenders housed in the segregation unit about a particular staff member. This staff member would threaten the offenders with being written up if he called for the facility Crisis Intervention Team and the offenders were not placed on a suicide watch. Another serious example that this requirement was not being met at Stateville proper involved an offender with multiple serious medical problems including diabetes and heart disease resulting in his being confined to a wheel chair. This offender experienced a variety of significant psychosocial stressors including the death of his mother. His request to speak with the Crisis Intervention Team was denied due to his not being frankly suicidal. This offender petitioned the Court on this matter, which directed plaintiffs' counsel to investigate his claims. The net result was the offender's being placed on a crisis watch by the time of the Monitor's visit to Stateville on January 31, 2017.

All the needless suffering experienced by this offender could have been avoided if staff had properly carried out the requirements of this subsection of the Settlement Agreement. Again, the requirement for this subsection clearly states, "the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems" and not just for suicidal offenders. In later site visits, it was troubling to hear that some Crisis Intervention Teams had begun to adopt the narrower view and were not responding to calls about urgent complaints that did not concern suicidality.

Overall, the Department is making progress in its ability to fulfill the requirements of this subsection of the Settlement Agreement. At the time of the submission of this report, however,

the Department still has a way to go in meeting this requirement. The Monitor is aware that the Settlement Agreement sets a November 23, 2017 deadline for the department to fulfill its obligation regarding this requirement. This extremely important issue will be a continuing focus of future monitoring efforts.

**(V)(h): Specific requirement:** The results of a mental health evaluation shall be recorded on IDOC Form 0374 (Mental Health Evaluation). These documents shall be included as part of the offender's mental health record as required by IDOC AD 04.04.100, section II (G)(3).

**Findings:** Form 0374 is routinely used by mental health staff to record the results of a mental health evaluation throughout all the facilities monitored.

**(V)(i): Specific requirement:** Mental health evaluations shall be performed only by mental health professionals. In those instances where an evaluation is performed by an unlicensed mental health employee, said mental health employee will have obtained at least a Master's degree in Psychology, Counseling, Social Work or similar degree program or have a Ph.D./Psy.D. and said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement. Further, a licensed MHP will review, and if the evaluation is satisfactory, sign off on any evaluation performed by an unlicensed mental health employee within seven (7) days after the evaluation has been completed. If the evaluation is not satisfactory, it shall be redone by a licensed MHP.

**Findings:** This requirement is being met throughout the facilities monitored.

**(V)(j): Specific requirements:** The provisions of this Section shall be fully implemented no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** As previously noted, the department is making progress towards fulfilling the requirements of this Section but is not yet in substantial compliance.

## VI: MENTAL HEALTH SERVICES ORIENTATION

**Summary**: The required policy has been in place since at least 2013. Each facility produces its own orientation manual, but all reviewed manuals satisfy this requirement. A comprehensive orientation program was present at each facility monitored.

**(VI)(a): Specific requirement:** In addition to information regarding self-referrals to be included in the offender handbook as required by IDOC AD 04.04.100, § II (G)(4)(b), information regarding access to mental health care shall be incorporated as part of every offender's initial reception and orientation to IDOC facilities. The basic objective of such orientation is to describe the available mental health services and how an offender may obtain access to such services.

**Findings:** IDOC does not utilize a department-wide orientation manual. Each facility produces its own orientation manual. The Monitor reviewed the orientation manuals from each IDOC facility and found them all to fulfill the requirements of this section.

**(VI)(b): Specific requirement:** IDOC shall develop and implement a written policy and procedure concerning such orientation no later than one (1) year after approval of this Settlement Agreement.

**Findings:** IDOC has AD 04.01.105, effective date 7/1/2013, which governs facility orientation. This AD states "The Department shall establish a comprehensive orientation program for incoming offenders at all correctional facilities that shall include the distribution of an orientation manual prepared in a format consistent throughout the Department." A comprehensive orientation program was present at each facility monitored.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**: Reviewed medical records contained treatment plan forms with the required fields. However, it was common for the content not to be individualized and to omit key information such as recommendations about the frequency of clinical contacts or goals. It was apparent that the form was often completed without benefit of team input. The Logan RTU implemented a system to remedy this; the Monitor looks forward to that bearing fruit.

As to plan timeliness, there were instances of backlog and erratic timing of completion. In all crisis bed records reviewed, the offender's treatment plan was not reviewed and updated upon entrance nor updated weekly or upon discharge. The Dixon STC (RTU level) exceeded timeliness standards; the Logan RTU was beginning to comply but was not yet successful. Segregation requirements were not being accomplished in any IDOC facility monitored. Annual outpatient plans were generally timely.

IDOC has not met its requirement to conduct timely psychiatric evaluations of mentally ill inmates who are prescribed psychotropic medications; only Dixon STC (RTU) was successful. There were thousands of psychiatric evaluations and follow-up appointments delayed or not completed, with staff reports of six-month waits at some locations. IDOC reports indicated noncompliance at 22 facilities. Psychiatric care heavily relies on tele-psychiatry, even for initial evaluations, crisis care and RTU evaluations. As of the most recent data, there were 3,658 backlogged psychiatry appointments.

The Monitor noted progress notes in the charts of SMI offenders but was unable to determine if these progress notes reflected the actual number of clinical contacts. There was significant variability in the frequency of recorded contacts.

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** During visits to Dixon, the team reviewed the medical records of more than 30 SMI inmates; all contained a treatment plan, however, several contained plans that were mostly left blank or were not signed by critical members of the treatment team, such as the psychiatrist. They did not routinely contain specific recommendations about the frequency of clinical contacts or goals other than medication compliance and symptom reduction. Overall, it appeared that the plans were being completed by a mental health professional in a rote, "cut and paste" manner, without multidisciplinary input from members of the team.

Similarly, the 12 reviewed records at Menard contained a treatment plan, and the most recent revision of the form contains the elements required by the Settlement Agreement (e.g., goals, interventions, frequency, responsible staff). However, treatment plans appeared to be completed essentially at random intervals. The mental health staff said that they completed treatment plans "when they could," and the charts contained plans as infrequently as once per year. Menard did not appear to have an organized system for the completion of treatment plans, nor were the plans individualized to the needs of the particular inmate. In the case of a Pontiac inmate housed in the RTU, the inmate was being treated with three different psychotropic medications, none of which were reflected in the treatment plan at the time of the Monitor's visit in November 21, 2016.

Overall at the facilities monitored, the treatment plans, when completed, were "boiler plate" in nature. That is, almost all the treatment plans reviewed contained the same generic language regardless of the psychiatric condition of the offender. The treatment plans were not routinely prepared collectively by the offender's treating mental health team. Rather, an individual staff person completed them without apparent input from other members of the treatment team. That is, at times an MHP completed the treatment plan without input from other staff. At other times, the psychiatrist would complete only the psychiatric portions of the treatment plan again without input from other staff. It became clear during the review of several hundred-treatment plans that these documents did not facilitate the delivery of mental health services. Rather, their appearance suggested they were viewed as yet another requirement imposed upon the mental health and psychiatric staff that needed to be "checked off."

At the beginning of the monitoring period, there was a backlog noted in completing the treatment plans. The Monitor encountered cases in which there was no treatment plan in the inmate's chart and other examples of treatment plans being completed well after the inmate arrived at the facility. As noted above, the treatment plans were not comprehensive in nature and usually did not integrate the psychiatric treatment of the mentally ill offender. The treatment plan often omitted mention of medication interventions that were supposedly occurring. The Monitor also encountered several cases of gross misdiagnosis. Several cases were encountered where an offender was overtly psychotic but was instead diagnosed as suffering from non-psychotic conditions.

Over the course of the first year of the Settlement Agreement, IDOC has made attempts to have the treatment plans prepared collectively by the offender's treating mental health team. For example, Logan implemented a system of multi-disciplinary treatment plan meetings with RTU offenders in December 2016. These efforts were significantly hampered by the absence of a sufficient number of competent psychiatrists. At the end of this monitoring period, the treatment plans still did not reflect a team approach to care and the plans remained nonspecific documents that did not contribute to the mental health care of offenders.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** IDOC Form 0284 is consistently being used for treatment planning and reviews throughout the facilities monitored. The form does contain the required items. Records at Dixon, Menard, Pontiac and Logan support this. As noted above, however, the treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities are being completed in a generic manner that does not facilitate the provision of mental health services.

**(VII)(c): Specific requirement:** Treatment plans shall be reviewed and updated for offenders designated as receiving outpatient level of care services annually, or sooner when clinically indicated (e.g., when level of care changes).

**Findings:** The monitoring team found that this requirement was generally being accomplished.

**Specific requirement:** Where the IDOC provides crisis or inpatient care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** IDOC does not currently provide any formal inpatient care. There is a cohort of severely mentally ill offenders that has been designated as requiring inpatient level of services. Although not specifically required by the Settlement, IDOC is providing enhanced services to these offenders. These services include: weekly visits by a psychiatrist; individual sessions with an MHP as tolerated; "enhanced" out of cell activities; and weekly visits by an MHP.

A review of the designated inpatient offenders at Pontiac and Logan revealed that these offenders are extremely ill and require immediate placement in a psychiatric hospital. This review also demonstrated that IDOC is inconsistently providing the enriched services noted above. A significant problem noted with this cohort of offenders is that the majority of them present with multiple acute psychiatric symptoms. The presence of these symptoms is a direct reflection of the poor psychiatric care they are receiving. So, it is in the context of this poor psychiatric care that IDOC is attempting to provide additional services to their designated inpatient offenders. The Monitor is well aware that these services are not a requirement of the

Settlement Agreement. The variable quality of the services provided, however, are demonstrative of the current deficiencies in the mental health treatment system within IDOC and the need for an inpatient treatment facility.

This crisis care requirement is not being accomplished in any IDOC facility. When an offender is placed into crisis care, a "Crisis Care Plan" is completed. This crisis care plan governs the particular care that an offender receives while receiving crisis level care. This crisis care plan is not the treatment plan. Throughout IDOC the offender's treatment plan is not reviewed and updated upon entrance into crisis level of care nor was it updated weekly or upon discharge in all cases reviewed.

For example, at Pontiac in November 2016, the Monitor encountered inmates in crisis for prolonged periods that had no treatment plans. The Monitor also encountered an inmate who had been on crisis for ten days with an outdated treatment plan. Also, another inmate in crisis for a lengthy period had no treatment plan. These types of problems (i.e., prolonged crisis placement without updated treatment planning) were noted at all the facilities monitored.

Also, during a monitoring visit to Logan on December 12, 2016, a psychotic mentally ill offender was placed in crisis care due to being suicidal. Her previous treatment plan was scanned into the record without any changes to address her worsening psychosis or her suicidality.

**Specific requirement:** For those offenders receiving RTU care, treatment plans shall be reviewed and updated upon entrance and thereafter no less than every two (2) months, or more frequently if clinically indicated, and upon discharge.

**Findings:** This is starting to occur at the RTUs at Dixon and Logan.

At Dixon, inmates in STC did generally have plans updated monthly – more frequently than mandated -- but plans for inmates in X House did not meet the timeliness requirement. Plans also were not reviewed upon RTU discharge. The IDOC leadership has stated that Dixon is working to meet or exceed the treatment plan requirements outlined in the Settlement Agreement within the next year. The goal is for all patients in an RTU setting (both STC and X House) to have monthly treatment plan reviews. However, Dixon currently does not have adequate mental health staff (MHPs and behavioral health technicians) to complete treatment plans on the required schedule.

The monitoring team noted during a December 2016 tour that Logan had not yet implemented policies to comply with the provisions of this subsection of the Settlement Agreement. Logan began to comply with this requirement later in the monitoring period.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** This requirement is not being accomplished in any monitored IDOC facility.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the

following:

(i)      For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)     For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)    Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** IDOC has not met its requirement to conduct timely psychiatric evaluations of its mentally ill offenders who are prescribed psychotropic medications. Throughout this first year of the Settlement Agreement, there have been thousands of psychiatric evaluations and follow-up appointments that have been delayed or just not completed. This places the mentally ill offenders in the IDOC at great risk of harm. This fact first came to the Monitor's attention during a monitoring visit to Logan in December 2016. At that time 82 psychiatric evaluations and approximately 600 psychiatric follow-up appointments were backlogged at this facility alone. As IDOC relies upon a vendor, Wexford Health, to provide psychiatric evaluations, the Monitor requested that Wexford come up with a plan to reduce this backlog at Logan. The plan provided was exceedingly insufficient to deal with this backlog. As of January 27, 2017, there remained approximately 3,000 psychiatric evaluations and follow-up appointments backlogged in IDOC.

The plan provided by Wexford to address this backlog relied heavily on the use of tele-psychiatry. Tele-psychiatry is a modality that has been shown to be effective in providing psychiatric care in correctional settings but with certain limitations. Tele-psychiatry is not authorized, as a matter of best practice, for initial psychiatric evaluations, for use in emergency psychiatric situations, and is never to be used in residential or inpatient settings. It is only authorized for "routine follow-ups." In the IDOC system of care, this translates to mentally ill inmates who are assigned to the outpatient level of care. During the monitoring period, tele-psychiatry has been used for initial evaluations as well as crisis care and RTU evaluations. At many IDOC facilities, including Graham, for example, <u>all</u> the psychiatric visits are done via tele-psychiatry. This does not meet best practice standards and should stop immediately as it places the mentally ill offenders at great risk for harm.

Another important aspect of the proper use of tele-psychiatry is that the tele-psychiatrist must have the patient's complete medical and mental health record in front of him/her during the course of the psychiatric visit. Logan is the only IDOC facility using an electronic medical record. Tele-psychiatry is an unauthorized modality within IDOC with the exception of Logan. This assumes that the tele-psychiatrist has complete remote access to Logan's mentally ill offenders' medical and mental health records.

At Pontiac, the Monitor found that, in some cases, offenders were not even seen every 60 to 90 days. Staff was writing prescriptions for six months, apparently in the belief that more frequent follow-up is not required. In other settings, psychiatric visits routinely exceeded the 30-day limit. The most significant finding at Logan during the December 12, 2016 visit was the tremendous backlog in psychiatric care, including both psychiatric follow-up visits and new intake evaluations. Staff reported that there was a six-month wait for a routine psychiatric follow-up visit. As of that visit, 594 follow-up visits and 82 new intake evaluations were pending. The Monitor did see a few examples of inmates in the Pontiac RTU receiving psychiatric evaluations at the required intervals.

As discussed elsewhere in this report, during the Monitor's November 21, 2016 visit to Pontiac, he reviewed the case of an inmate who had been on crisis since August 29, 2016. A psychiatrist had not seen him while he was in crisis care. A psychiatrist saw him August 14, and the inmate received a diagnosis of unspecified depressive disorder, for which he was being treated with an anti-depressant. The note stated the inmate would be followed up with by psychiatry in three months, though this had not occurred by the time of monitoring visit. Of note, the inmate's medication order had expired on November 14, but he continued to receive the anti-depressant medication.

As of January 3, 2017, Graham was behind on 56 psychiatric follow-ups. At Menard, inmates who were prescribed psychotropic medications did not see a psychiatrist every 30 days. In most of the charts reviewed, the psychiatrists' notes stated that follow-up in 30 days was indicated, but then two to three months elapsed before the next appointment without documentation of a clinical reason for the delay. When asked during the site visit, the psychiatrist stated that lapses between psychiatric appointments were typically a result of understaffing. The facility leadership reported that they had a backlog of 105 psychiatric appointments as of February 16, 2017 and were operating with roughly 3.5 of the 6 FTE psychiatrists allotted to the facility.

In the Dixon RTUs, psychiatric evaluations were reliably completed according to policy (every 30 days) in the STC, but not in the X House. Of note, the Settlement Agreement allows for the frequency of psychiatric assessments to decrease from every 30 days to every 60 or 90 days once clinical stability has been documented in the medical record. None of the charts the monitoring team reviewed contained such a notation, suggesting either that the psychiatrists were unaware of the policy or that no patients were stable enough to reduce the frequency of contact.

In a supplement to the quarterly report of March 23, 2017, IDOC reported that "Psychiatrists are typically evaluating offenders who are prescribed psychotropic medications at appropriate intervals in the following facilities: IL-River, Stateville, Vienna. Those facilities with a backlog are being triaged. Typically, the backlog is attributed to staffing challenges." This translates to 22 IDOC facilities not meeting the requirements of this subsection of the Settlement Agreement. This is consistent with the findings of the monitoring team. Of note, as of March 31, 2017, there was a backlog of 3,658 new and follow-up psychiatric visits. The Monitor notes that this requirement is not budget contingent.

**(VII)(e): Specific requirement:** Upon each clinical contact with an SMI offender, the MHP shall record a progress note in that offender's mental health records reflecting future steps

to be taken as to that offender based on the MHP's observations and clinical judgment during the clinical contact.

**Findings:** This is generally occurring throughout IDOC. In the Dixon RTUs, all the charts reviewed contained documentation of clinical contacts by mental health professionals. The charts of patients in the STC contained notes at least on a weekly basis, and usually much more often (e.g., daily group therapy notes). In the X House, charts were noticeably less complete. Notes of clinical contacts were sporadic, and the charts contained no group notes at all. When completed, the notes did contain clinically relevant information and plans for follow up.

The Monitor observed progress notes in the charts of SMI offenders but was unable to determine if these progress notes reflected the actual number of clinical contacts. As described throughout this report, the medical records are extremely poorly organized often with loose documents and pages filed out of order. It was very difficult to follow the clinical care of a particular SMI offender and find necessary clinical information due to the disorganized condition of the medical records. Finally, the progress notes themselves were generally of poor quality.

## VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

> **Summary**: MHPs were involved in the decision to return crisis bed patients to general population; it was a treatment team decision only at Dixon. Five-day follow-up occurred at Stateville but not at the other locations monitored. Follow-up suicide risk evaluation was variable but generally noncompliant. The Monitor conducted a limited review of 30-day follow-up for general population prisoners and those cases were compliant.

**(VIII)(a): Specific requirement:** SMI offenders shall only be returned to general population from a specialized treatment setting with the approval of either the treating MHP or, once established, with the approval of the multidisciplinary treatment team. The Settlement provides a definition of "Specialized Treatment Setting": Housing in a crisis bed, residential treatment unit, or inpatient mental health setting.

**Findings:** This requirement is being met at all the facilities monitored. Dixon was the only facility where the decision to move an offender from RTU or crisis care was the product of a multidisciplinary treatment team.

**(VIII)(b)(i): Specific requirement:** For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form, which will be specifically designed for this purpose by IDOC and approved by the Monitor.

**Findings:** During the Monitor's January 31, 2017 tour of Stateville, he found that these 5-day, daily follow-ups were occurring. However, at Pontiac, Dixon, Menard, Logan, Graham and Pinckneyville the monitoring team found that five days of daily follow-ups were not occurring. IDOC reported in its first three quarterly reports: "The requirements of subsection (b)(i) are currently being done in some cases and will be done on a widespread basis once staffing increases. IDOC is actively working on recruitment and hiring efforts in order to fully meet the requirements." IDOC goes on to state in a supplement to the quarterly report of March 23, 2017: "The criteria in this section requires a substantial increase in mental health staffing, which remains a challenging obstacle." The monitoring team notes, however, that these requirements are not budget-contingent. Finally, the monitor has not approved the required form used in these follow-ups.

**Specific requirement:** This five-day assessment process will be in addition to IDOC's current procedure for crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from crisis watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

**Findings:** At Pontiac, the monitoring team found that, while the suicide risk evaluation was being conducted within seven days of discharge from crisis care, the monthly evaluations were not occurring. At Logan, the seven-day follow evaluations were not being conducted, and while monthly evaluations were conducted for some period of time, they were not conducted each month for a full six months. Neither Dixon nor Menard had implemented policies required by provision (b)(i) of this section; suicide evaluations are not completed within seven days or monthly for six months.

**(VIII)(b)(ii): Specific requirement:** Offenders returned to general population or to an outpatient level of care setting from a specialized/residential treatment facility shall be reviewed by an MHP within 30 days to assess the progress of the treatment goals. The IDOC Form 0284 shall be reviewed annually thereafter, unless otherwise clinically indicated (e.g., change in level of care) as required by IDOC AD 04.04.101, section (F)(2)(c)(4)(c).

**Findings:** As an initial matter, the term "specialized/residential treatment facility" is not defined in the Settlement, and the monitoring team interprets this term to be synonymous with "specialized treatment setting," the definition of which is discussed above.

IDOC, in a supplement to the quarterly report of March 23, 2017, states: "The transition of offenders from an RTU setting to an outpatient setting is being followed in accordance with stated directives." The monitoring team did not specifically review this particular cohort for the purposes of this report.

The monitoring team found that offenders in general population at Menard and Logan did receive follow-up care from an MHP within 30 days of release from crisis watch or the infirmary. This has not been the general practice in IDOC during the monitoring period, however.

This requirement will be closely evaluated during the next monitoring period.

## IX: ADDITIONAL MENTAL HEALTH STAFF

**Summary**: Understaffing is very evident at all but one IDOC facility monitored and this was identified as a key reason a number of other Settlement provisions have not been met. Turnover is reported as high. Without a state budget, the requirement is held in abeyance as the budget contingent approval date has not occurred.

Four key positions have been hired to support the opening of an RTU at Joliet. IDOC did not take advantage of its option to submit a proposed staffing plan amendment; the window for submitting that proposal is closed. IDOC has been providing quarterly hiring reports.

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** IDOC's quarterly reports indicate that the targets in the Remedial Plan have not been met. Because the state budget has not been passed, the budget-contingent approval date has not yet occurred, so the Settlement does not yet require IDOC to meet Remedial Plan standards.

At the time of this report, Dixon was understaffed 1.65 psychologists, 17 mental health professionals, 14 behavioral health technicians, and 8.75 psychiatrists. This understaffing of mental health professionals was a major concern during the monitoring team's Dixon visits. The RTUs in the STC, which are arguably the best-staffed areas of the facility, were functioning with 40% fewer mental health staff than IDOC's staffing plan requires. Each RTU in the STC is slated to have 2 mental health professionals and 3 behavioral health technicians (to care for approximately 80 SMI inmates), but as of November 2016, only 1 mental health professional and 2 behavioral health technicians staffed 4 of the 5 units. Because of the understaffing, groups were frequently cancelled if the group leader was called to manage a crisis, since no other staff member was available to cover.

Inadequate staffing levels are the main reason that some policies required by the Settlement Agreement have not yet been implemented at Dixon. In addition, the Monitor's interviews with staff revealed that understaffing is a major cause of burnout in clinicians, ultimately causing high levels of turnover in the mental health staff. The MHPs indicated that their pay and benefits are comparable to non-DOC positions (if not higher), and most clinicians enjoy working with the inmate population. However, mental health professionals frequently

leave their DOC positions because they cannot keep up with the workload, which they say has steadily grown in the past few years.

Pontiac and Logan were similarly understaffed. At the time of this report, Pontiac was understaffed 1.15 psychologist, 2.5 behavioral health technicians, 1.5 registered nurses, and 2.9 psychiatrists. Logan was understaffed 3.21 psychiatrists. Logan was unique in that its staffing exceeded the requirements specified in the Remedial Plan by 1 psychologist, 6.5 MHPs, 5 behavioral health technicians, 1 registered nurse and 1 recreational therapist.

As with other IDOC facilities, understaffing of mental health professionals was a major concern during the monitoring visits to Menard. The staffing plan calls for 6 full-time psychiatrists, but only 3.5 were in place. Staffing of behavioral health technicians and MHPs was somewhat better: 2 of 15 MHP positions were unfilled, and 1 of 9 behavioral health technician positions was unfilled. Inadequate staffing levels have led to a backlog of psychiatric appointments and sporadic completion of treatment plans. In addition, some practices required by the Settlement, such as follow-up after crisis placement, simply cannot be implemented with current staffing levels.

The Monitor is acutely aware that in the absence of a budget, IDOC is not required to meet the requirements of this section. IDOC has exceeded the requirements of the Settlement Agreement in those cases where hiring has occurred.

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:** As noted above, IDOC has until November 23, 2017 to fulfill the requirements of this subsection of the Settlement. To date the following positions for the Joliet Treatment Center have been filled: warden, assistant warden for programs, a social worker, and psych administrator.

**(IX)(c): Specific requirement:** Defendants will have three (3) months from the approval of the Settlement Agreement to propose an amendment to the staffing plan. The Monitor and Plaintiffs shall have forty-five (45) days following the submission of the revised staffing plan to state whether they have an objection to the proposed revisions and provide data to support the objections. Following receipt of any objection and supporting data, the parties will either accept the Monitor's and/or Plaintiffs' suggestions or the issue will be resolved through the dispute resolution process.

**Findings:** IDOC did not provide any proposed amendment to the staffing plan, nor has IDOC indicated it intends to do so.

**(IX)(d): Specific requirement:** To the extent the positions listed on Exhibits A and B of the Approved Remedial Plan are to be filled by Mental Health Professionals, these positions shall be allocated solely to the provision of the mental health services mandated by this Settlement Agreement.

**Findings:** The monitoring team did not evaluate this particular requirement.

**(IX)(e): Specific requirement:** In accordance with its obligations in Section XXVIII, *infra*, IDOC will include quarterly hiring progress reports related to the additional mental health staff identified in the Approved Remedial Plan. Where a target may not have been met, the Monitor will review the reasons for failure to meet the target and, if necessary, propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized.

**Findings:** IDOC includes quarterly hiring reports in its quarterly reports.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** The target dates as specified in the Settlement have not yet arrived.

## X: BED/TREATMENT SPACE

**Summary**: This requirement is held in abeyance as there is no budget contingent approval date. Nevertheless, the facilities have been identified and various construction projects have occurred at each facility despite no appropriations having been made. Architectural plans were submitted and are consistent with the requirements of the Remedial Plan.

Dixon has the full complement of RTU beds and the most recent data indicates 470 beds were filled. It has adequate space to conduct group therapy and private clinical meetings, but site visits revealed that some of the clinical space is not being used, compromising confidentiality. Contracts for construction of additional treatment and staff space is out to bid as of this writing. As expected, RTUs are not yet operating at Pontiac or Joliet. A contract for the major renovations at Pontiac is being put out to bid.

Construction of the first 80 RTU beds and adequate space for programming and confidentiality at Logan was completed in October 2016 and the unit is fully occupied. The second phase of construction is projected to be complete in September 2017 and will create 10 more beds than required.

Though not complete, there are good steps toward providing RTU-level care and out of cell time at these facilities. Still, the absence of an adequate number of RTU beds in the system is causing very lengthy stays in crisis beds, an inappropriate setting for such patients.

Crisis cells were not located in control units, except at Logan, where the prisoners remain in their "SMI Segregation" housing unit for crisis watch. The Pontiac crisis cells were moved out of its control unit by the deadline, but conditions in the interim were highly anti-therapeutic. The care provided in crisis beds falls far short of the expected "aggressive intervention," and stays are commonly much longer, than Settlement requirements. An IGA is signed for access to inpatient beds at DHS; related construction has not begun.

**(X)(a): Specific requirement:** The Approved Remedial Plan identified four facilities at which IDOC would perform renovations, upgrades, and retrofits to create bed/treatment space for SMI offenders requiring residential levels of care: (i) Dixon Correctional Center (male offenders only); (ii) Pontiac Correctional Center (male offenders only); (iii) Logan Correctional Center (female offenders only); and (iv) the former IYC Joliet facility (male offenders only). The necessary funding to complete this construction is dependent upon additional appropriations.

**Findings:** Additional appropriations have not been made for these renovations, upgrades and retrofits. These four facilities have in fact been identified and various construction projects have occurred at each facility. The monitoring team notes that the construction projects that have been accomplished to date exceed the requirements of the Settlement.

**(X)(b): RTU beds for male offenders**

**(i): Specific requirement:** Approximately 1,150 units of RTU bed space for male offenders have been identified.

**Findings:** IDOC has identified these units of RTU bed space for male offenders.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

> **(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;
>
> **(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and
>
> **(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings:** As to (A), IDOC in a supplement to its quarterly report of March 23, 2017, reported that Dixon currently operates an RTU program with 470 participating offenders. Dr. Kapoor on her monitoring visit to Dixon in January 2017 noted that Dixon had 625 RTU beds. Each of Dixon's RTUs has adequate space to conduct group therapy and private clinical meetings between mental health staff and offenders. However, not all assessments of inmates were conducted in a confidential setting. In Dixon's RTU called X House, several inmates noted that the psychiatrist sees them cell-side or at a table in the middle of the day room, and they worried about disclosing sensitive information within earshot of other inmates. A room for confidential group therapy exists in the X House, but none of the inmates interviewed had ever been inside. Group sessions are generally conducted in the day room. In contrast, inmates and staff in the other RTU, called STC, reported that their individual clinical meetings occur in a confidential setting. Community meetings are conducted in the day room of the housing unit, but group therapy sessions occur in a confidential setting in Building 65. The facility leadership indicated that they are running out of space in Building 65 as the group program expands, and a

second location for groups (the former dietary center) will be created after budget approval. Construction for additional treatment and staff space went out to bid on April 13, 2017. The Department only received one bid and because it was so high, the contract will be put back out for bidding.

As to (B), currently, Pontiac is not operating an RTU. There is a Mental Health Unit at Pontiac, which operates similar to an RTU but IDOC has made it very clear to the Monitor that this unit is not an RTU. IDOC has completed some work at providing improved treatment spaces in the vicinity of the Mental Health Unit but the contract for the major renovations will be put back out to bid.

The relatively large number of seriously mentally ill offenders at Menard who require RTU placement underline the urgency of bringing RTU beds online. These Menard offenders experience long delays in transfers. During the site visit, the mental health staff noted that transfers of SMI prisoners to an RTU bed (usually at Dixon) routinely take one to two months. In the interim, the inmate is usually held in a crisis cell. In one particularly difficult case, an inmate had been refused by Dixon for more than six months and was held in the infirmary during that time under conditions that were essentially 23-hour lockdown. While in the infirmary, the inmate had a brief evaluation by an MHP daily, but otherwise he had no access to groups or any other treatment that might help break his cycle of self-injury. During the exit interview, the monitoring team briefly discussed this case with Chief Hinton and the other IDOC and Wexford leadership. Although the team acknowledges the complexity of managing an individual with chronic self-injury and a personality disorder diagnosis, the discussion did not clarify why the inmate would not be eligible for transfer to an RTU.

**(X)(c): RTU beds for female offenders**

**(i): Specific requirement:** IDOC has identified RTU bed and programming space for 108 female offenders at Logan CC.

**Findings:** IDOC has identified 108 RTU beds for female offenders at Logan Correctional Center.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make these 108 RTU beds available on the following schedule:

> **(A)** RTU beds and programming space for 80 female offenders no later than six (6) months after the budget contingent approval date; and
> **(B)** RTU beds and programming space for an additional 28 female offenders no later than twelve (12) months after the budget contingent approval date.

**Findings:** Logan RTU Phase I was complete in October 2016. It is currently fully occupied. Phase II is set for substantial completion on September 21, 2017. Logan will have created 118 RTU beds, 10 more than the 108 required by the Settlement Agreement. The beds are divided among five housing units. Staff and offenders alike stated that the housing units provide adequate programming space and confidentiality of sound and sight.

**(X)(d): Specific requirements:** The facilities and services available in association with

the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:**

**Dixon RTU:** During monitoring team visits to Dixon, it became clear that IDOC began modifying its practices to comply with the Settlement in stages. At Dixon, there are two RTUs: STC, which houses approximately 350 inmates with mental illness and provides a residential ("group home") level of care; and Dixon Psychiatric Unit (DPU, also known as the X House), which houses approximately 110 inmates with mental illness and provides a residential level of care for higher-security inmates than those housed in STC. The STC underwent changes first, beginning its RTU program in March of 2015. Overall, the STC's compliance with the Agreement is significantly better than the X House, which began implementing RTU programming only in November 2016.

As to Dixon's RTU programming in segregation, the facility began providing structured programming in September 2016, with the full RTU program implemented in November 2016. Based on a review of daily group schedules and examples of out-of-cell tracking for offenders, and interviews of offenders and clinical staff, the team determined that at the time of the November site visit, the RTUs in STC had already implemented 15 hours per week of structured programming, while the X House had implemented 5 hours per week. However, by the January 2017 site visit, the X House offered approximately 5 hours of structured activity and 10 hours of unstructured activity per week. The structured programs included Community Meeting, Bipolar Group, Anxiety Group, Relationships and Problem Solving Group, and work assignments. Inmates reported that the programs are run by caring clinicians and are relevant to the offenders' needs, though they did not occur in a confidential setting. Some offenders reported that they were also receiving individual therapy with an MHP. The inmates generally regarded the increased programming and emphasis on mental health treatment as a positive development, though many of the changes were too new to assess fully. At the time of the November site visit, all groups were offered to all offenders in segregation, regardless of how long they had been in segregation. The facility had just begun tracking the number of hours per week that each offender spent out of cell. Anecdotally, the MHPs who work in the X House reported that six to eight offenders at a time attended their groups, and about 50% of the offenders in segregation never attended groups even though they were offered.

**Pontiac Mental Health Unit:** The Mental Health Unit at Pontiac, as described above, is not currently functioning as an RTU unit. As such, it is not as well developed as the RTU at Dixon. This is due in large part to the fact that the Pontiac Mental Health Unit has just begun operating in earnest during the monitoring period. This program has had to develop its own treatment spaces and is heavily dependent upon the willingness of security staff to move the

offenders for group and individual meetings. The Monitor personally observed custody staff's reluctance about moving mentally ill offenders from the Mental Health Unit to locations where confidential interviews could take place. There are newly remodeled confidential group and individual therapy rooms. There was no evidence of functioning mental health treatment teams as the facility is exceedingly short of psychiatric services. Of note, data provided by the facility demonstrated that 31 of 36 offenders in the Mental Health Unit received one to nine hours of structured out-of-cell time a week.

**Logan RTU:** At the time of the December site visit, Logan Correctional Center had implemented an RTU program that was clearly beginning to improve the mental health of mentally ill offenders. Offenders housed in the RTU were being offered 12 hours per week of structured programming. Inmates and staff reported that, although the changes were fairly new, they had already noticed several benefits: less frequent crises, more positive contact between staff and offenders, and greater offender investment in treatment. However, the reforms are still a work in progress, and many provisions required by the Settlement have not yet been implemented.

### (X)(e): Inpatient beds

**Specific requirement:** Within three (3) months of the approval date of this Settlement Agreement, IDOC shall enter into an intergovernmental agreement ('IGA') with the Illinois Department of Human Services ('DHS') to secure at least 22 beds for female offenders and at least 22 beds for male offenders in an existing DHS-owned mental health facility. The necessary funding to complete this construction is dependent upon additional appropriations. Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date. Within thirty (30) months of the approval of this Settlement Agreement, IDOC will transition to assuming control or ownership of said facility and provide approximately sixty (60) additional beds and programming space for separate housing of male and female offenders in need of an inpatient level of care. During that transition period, IDOC shall consult closely with the Monitor and IDOC's own retained mental health expert to develop any additional policies and procedures and design programming and treatment space that is appropriate for a forensic hospital. After the IGA is signed, IDOC will continue to develop plans for inpatient care that can be implemented after necessary appropriations.

**Findings:** IDOC has entered into this IGA with the Illinois Department of Human Services. The remainder of the requirements of this subsection of the Settlement are budget contingent.

### (X)(f): Crisis beds

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of

the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

**Findings:** As noted above, the Settlement permits crisis cells at Pontiac to be located in a Control Unit for the first year after approval. During the Monitor's initial visit to Pontiac on August 26, 2016, the Monitor inspected the crisis cells located in the North House. The Monitor found this unit to be the most chaotic and anti-therapeutic prison unit the Monitor has ever toured in 30 years of working in correctional psychiatry. The Monitor immediately shared these serious concerns about housing mentally ill offenders requiring a crisis level of care on the North House to the Chiefs of Mental Health and Legal, both verbally and in writing. To the Monitor's dismay, this situation was unchanged on the Monitor's follow up visit of November 21, 2016. The Monitor personally interviewed several of the mentally ill offenders housed at that time in crisis cells on the North House. Their collective responses confirmed the Monitor's clinical hunch that due to the extremely chaotic nature of the North House, potentially suicidal offenders would feign being non-suicidal just to get off the North House. Finally, on a March 3, 2017 visit, the Monitor was informed that a new crisis area had recently opened and North House was only being used as an overflow site for offenders requiring crisis care. Of note, it took six months to complete this move.

In the remainder of the facilities monitored, the crisis cells were not located in control units. The one exception was noted during a site visit to Logan in December 2016. Logan has a designated "SMI Segregation" housing unit. When these offenders are placed on a crisis watch, they do not physically move to another location; their status is simply changed on a white board, and they receive a suicide smock instead of regular clothing.

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: Crisis beds are an integral part of a well-functioning correctional mental health treatment system. As stated in the Settlement, they are meant to provide an acute and aggressive level of care designed to rapidly stabilize mentally decompensated offenders. If, due to the severity of their mental illness, the offenders are not able to stabilize in a relatively short period of time, which is defined as "generally no longer than 10 days," then they need to be transferred to a higher level of care. In all fairness to IDOC, it currently does not have a well-functioning correctional mental health treatment system. The number of mentally ill offenders continues to overwhelm the resources available in the current mental health treatment system. Of note, there are no inpatient services available. This results in extremely ill offenders being housed in the RTUs, Control Units, General Population Units, and R&C Units. There are not sufficient services available to adequately address the needs of this extremely ill population. All of this results in seriously mentally ill offenders being placed in crisis beds, which represent the highest

level of psychiatric care currently available to mentally ill offenders in the IDOC. The crisis beds have become *de facto* inpatient care.

The level of services provided to offenders in crisis care is woefully inadequate to meet their treatment needs. Basically, offenders in crisis care only receive a non-confidential visit with an MHP on a daily basis. The only exception to this non-confidential MHP visit is at Pontiac, which began confidential visits in March 2017. A psychiatrist does not evaluate the offenders to determine if their medications should be adjusted or changed. These mentally ill offenders do not receive any "aggressive mental health" interventions. During a November 2016 Pontiac visit, the Monitor reviewed the case of an inmate who was in crisis care since August 29, 2016. A psychiatrist had not seen him while he was in crisis care. A psychiatrist saw him August 14, 2016 and the inmate received a diagnosis of unspecified depressive disorder, for which he was being treated with an antidepressant. The note stated the inmate would be followed up by psychiatry in three months, though this had not occurred by the time of monitoring visit. Of note, the inmate's medication order had expired a week before the visit, but he continued to receive the anti-depressant medication. During the same visit, the Monitor also encountered an inmate in crisis care who was overwhelmingly psychotic, *i.e.,* responding to internal stimuli and being internally preoccupied. Six days prior to placement on crisis, a psychiatrist diagnosed the inmate with adjustment disorder with depressed mood, and the inmate was being treated with an antidepressant. The Monitor found no evidence in the inmate's chart that the psychiatrist was aware of the patient's psychotic symptoms.

Another egregious example of the inadequate care that mentally ill offenders receive while in crisis care occurred in Stateville proper. During the Monitor's January 31, 2017 tour of the crisis cells, the Monitor noted an offender covered in feces that was being "hosed off" by the custody staff. When the Monitor interviewed this offender, he said he had been covered in feces for over a week. He went on to state that the only reason staff cleaned him up was because "they heard you was coming." Also, all the mentally ill offenders in crisis cells that the Monitor interviewed stated the MHPs always just asked the same four questions on their daily cell front visits: are you suicidal, are you homicidal, do you have something in your cell to harm yourself, and are you taking your medication. These four questions were the extent of the visit.

"Aggressive" intervention, required by the Settlement, cannot be provided simply by virtue of placement into a crisis cell and cell-side monitoring. This will not accomplish the aim of "reducing the acute, presenting symptoms and stabilizing the offender." Inmates in crisis watch need actual treatment, such as one-to-one and group therapies as well as an aggressive reevaluation of the patients' prescribed psychotropic medication. It seems offenders may receive more treatment in segregation than in crisis care, though additional out-of-cell time is provided for those in crisis for prolonged periods.

**(X)(g): Specific requirement:** IDOC shall also ensure that each RTU facility has adequate space for group therapy sessions; private clinical meetings between offenders and Mental Health Professionals; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures. IDOC shall also ensure that each RTU facility has adequate office space for the administrative and mental health staff required by this Settlement Agreement.

**Findings:** This requirement is budget contingent.

**(X)(h): Specific requirement:** The treatment and other space required by subsections (d)-(g), *above,* shall be completely available no later than six (6) months after the work completion dates identified in subsection (a), *above*, for the four facilities identified there, and for any other residential treatment or outpatient facilities at which it is determined that modifications are needed no later than December 2017**.**

**Findings:** Although this subsection references both the budget contingency requirement of (X)(a) and a specific date deadline, for purposes of this report, the Monitor will interpret this requirement as being budget contingent.

**(X)(i): Specific requirement:** Within forty-five (45) days of the selection of the Monitor, IDOC will submit to the Monitor descriptions and architectural plans, if being used, in sufficient detail to enable the Monitor to determine whether construction undertaken pursuant to this section complies with the previously approved Remedial Plan. If, having reviewed these descriptions and plans, the Monitor concludes that the space allocations in any or all facilities under this Settlement Agreement are not consistent with the Remedial Plan, the Monitor shall so inform IDOC and Plaintiffs' counsel, and IDOC shall have thirty (30) days to propose additional measures that address the Monitor's concerns.

**Findings:** Chief Lindsay sent the required floor plans to the Monitor within the time frame specified in the Settlement. These floor plans are consistent with the requirements of the Remedial Plan.

## XI: ADMINISTRATIVE STAFFING

**Summary**: IDOC hired three regional directors, who are licensed psychologists, and they were in place prior to the filing of the Settlement. A Statewide Quality Improvement Manager was hired timely in February 2017; however, at the time of the submission of this report, he also remains in the position of central regional director. At the facilities toured, there were MHPs serving in the role of Clinical Supervisor and hiring was reportedly ongoing in other locations. Although the deadline for hiring central office staff has not passed, only 3 of 10 contemplated positions have been hired.

### (XI)(a): Regional Directors

**Specific requirement:** Within thirty (30) days after the approval of this Settlement Agreement, to the extent it has not already done so, IDOC will hire two regional directors who are licensed psychologists or psychiatrists to assist the IDOC Chief of Mental Health Services.

**Findings:** IDOC actually hired three regional directors who are licensed psychologists and they were in place prior to the filing of the Settlement. They were:

- Dr. Horn, northern regional director, who was hired March 2014
- Dr. Sim, central regional director, who was hired January 2015

- Dr. Reister, southern regional director, who was hired December 2014

### (XI)(b): Statewide Quality Improvement Manager

**Specific requirement:** IDOC will also create a position for a statewide Quality Improvement Manager (the QI Manager). In addition to the other responsibilities assigned to the QI Manager in this Settlement Agreement, the QI Manager or one or more qualified designees shall have the responsibility for monitoring the provision of mental health services performed within IDOC by state or vendor employees and the performance of any vendor(s) under the vendor contract(s). This position shall be filled only by a State, not vendor, employee, and shall be filled no later than nine (9) months after the approval of the Settlement Agreement.

**Findings:** This position was initially posted during July 2016. The first candidates were interviewed during September 2016. The position had to be reposted because the first candidates turned down the position. Subsequent interviews were conducted during January 2017. Dr. Jeff Sim, who assumed the duties of statewide Quality Improvement Manager on February 16, 2017, filled the position. It is unclear, however, how much time Dr. Sim is actually dedicating to this position as, at the time of the submission of this report, he remains the central regional director.

### (X)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings:** At the facilities toured, there were MHPs serving in the role of Clinical Supervisor. At the time of this report, Clinical Supervisor vacancies were present throughout IDOC. IDOC reports, however, that it is making progress on this requirement as hiring is ongoing.

### (X)(d): Central office staff

**Specific requirement:** IDOC shall hire ten (10) central office staff (*i.e.*, non-facility-specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. These positions will be filled no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** IDOC reports that it has hired a Mental Health Training Coordinator, Chief of Psychiatry and CQI Manager. The Monitor is well aware that the deadline for this requirement is not until November 23, 2017. It is reasonable to expect, however, that some additional hiring of central office staff dedicated to "implement the policies and record-keeping requirements of this Settlement Agreement" would have been accomplished by one year into the monitoring process.

## XII: MEDICATION

**Summary**: The contemporaneous recording of medication administration has increasingly been met during the monitoring period. The frequency of psychiatric follow-up was variable but generally poor, including in situations calling for increased contact. Medication orders sometimes expired for weeks. The timing of medication passes is a major deterrent to medication compliance. Medication efficacy and side effects information often was not recorded, even where side effects were evident in prisoners the Monitor interviewed. Blood tests and neurological tests were sometimes conducted but do not appear to be routine practice. Informed consent reportedly is not practiced. Records do not seem to reflect a system for following up medication noncompliance.

For many of these practices, performance was much better at Dixon.

**(XII)(a): Specific requirement:** In accordance with the provisions of IDOC AD 04.03.100, section II (E)(4)(d)(1), no later than ninety (90) days after the approval of this Settlement Agreement, medical staff shall record contemporaneously on offender medical records all medications administered and all offender contacts with medical staff as to medications. With respect to offenders taking psychotropic medications, "contemporaneously" means that the medication, the amount of the medication, and whether the offender took it or refused it will be recorded at the time the medication is delivered, either on a temporary record from which information is subsequently transferred to a permanent record located elsewhere, or in the permanent record at the time of delivery.

**Findings:** This requirement has increasingly been met during the monitoring period. The monitoring team will pay special attention to this important requirement during the next monitoring period.

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending

psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** The monitoring team did not systematically assess whether inmates starting new medications had two psychiatric visits within 60 days as this data was not available. The charts reviewed at Dixon by Dr. Kapoor contained psychiatric notes at least every 30 days indicating a renewal of medications. Among the cohort of offenders reviewed by Dr. Kapoor were numerous cases where there was a new prescription for psychotropic medication.

Dr. Kapoor's observations at Dixon are in stark contrast to the rest of IDOC. At Logan, offenders were not being seen as required. Due to this lack of appropriate follow-up, a significant number of offenders just stopped taking their medications. Even when nurses noted significant medication noncompliance, a psychiatrist still did not see the offender as required by Section XII (c)(vi) of the Settlement. At Pontiac on March 2, 2017, there was a backlog of approximately 250 psychiatric follow-up appointments. This means that this cohort of mentally ill offenders who had been prescribed psychotropic medications was not being seen in a timely manner. Again, among this cohort of offenders were numerous cases where there had been a new prescription for psychotropic medication. Due to the extreme lack of competent psychiatrists at all facilities monitored, offenders who are prescribed psychotropic medications are not being seen every 30 days, or documented as stable and being seen every 60 to 90 days, as is required by AD 04.04.101, section II (F)(5).

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

**Findings:** There are two aspects of this requirement that the monitoring team encountered. The first was the often chaotic and unpredictable nature of the psychiatric care throughout IDOC. Medication orders often expired and the offender may or may not continue receiving his or her medication. This problem was noted at all the facilities monitored, with the exception of Dixon, but was especially prevalent at Pontiac and Menard. At Menard, psychotropic medication orders were allowed to expire, and often staff did not correct the problem until an inmate had already missed a week or two of medication. This can result in these offenders suffering needlessly from withdrawal symptoms as well as a worsening of psychiatric symptoms.

The second aspect is that medications are passed at times that may be convenient for the staff but certainly not for the offender. For example, the morning medication pass at Graham was 2:00 am. This extremely inappropriate time to pass medications results in significant numbers of offenders refusing their "morning" dose of medication. This is not just a problem at Graham. The monitoring team noted inappropriate medication pass times throughout IDOC. This is a problem that requires immediate attention.

Overall, when a given offender had a valid prescription, there was reasonable assurance that he or she would at least be offered the proper medication, albeit on an inappropriate schedule. The monitoring team did find some positive examples, however. At Menard, all 8 segregated inmates interviewed reported that a nurse administered their medications in a timely manner.

**(ii): Specific requirement:** The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskenesia [sic], high blood pressure, and liver function decline;

**Findings:** This requirement was not consistently being met throughout IDOC. The one exception was at Dixon. The psychiatric notes at Dixon contained clinically relevant information about medication compliance, response, and side effects. In the remainder of the facilities monitored, there were few examples of proper charting regarding medication efficacy and side effects. In the overwhelming majority of the cases reviewed, there was little to no attention paid to either the efficacy or the side effects of the prescribed medications. In a significant number of cases, the Monitor noted the offender to be displaying overt signs of medication side effects with no mention of this found in the medical record.

**(iii): Specific requirement:** Adherence to standard protocols for ascertaining side effects including client interviews, blood tests, blood pressure monitoring, and neurological evaluation;

**Findings:** The monitoring team found no evidence that adherence to standard protocols for ascertaining side effects was occurring on a regular basis. There was some evidence of an occasional blood test being obtained. These blood tests were not obtained routinely or certainly not on the entire cohort of offenders who require these blood tests as part of their treatment with psychotropic medications. There was evidence that certain neurological evaluations were being done but again not routinely or on all the offenders who required them as part of treatment.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results;

**Findings:** As noted above, this lab work was not routinely obtained or reported. For example, at Menard, the 12 medical charts reviewed indicated that lab tests, AIMS exams, and metabolic monitoring were completed sporadically.

**(v): Specific requirement:** That offenders for whom psychotropic drugs are prescribed receive timely explanation from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** This requirement is not being met in IDOC with the exception of Dixon. At Dixon, offenders in the STC reported that they were given an opportunity to discuss medication options with the psychiatrist in a confidential setting, but patients in the X House noted that they were seen cell-side and often felt uncomfortable discussing medication issues in that setting. For the remainder of IDOC, visits with a psychiatrist, when they occur, reportedly are rushed and

very superficial. The monitoring team interviewed hundreds of offenders as well as reviewing their medical records to ascertain if this requirement was being met. The overwhelming majority of the offenders reported that their visits with the psychiatrist only last a few minutes and that they are often not allowed to ask questions. This was consistent with the medical records where little to no documentation was present to satisfy this requirement. It is also important to note that during the monitoring period, there was a backlog of over 3,000 psychiatric follow-up visits. This means that the offenders prescribed psychotropic medication were never afforded the opportunity to discuss medication issues with their prescribing psychiatrist.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** There was no evidence that this was occurring in IDOC. The monitoring team found numerous examples of medication noncompliance with offenders housed in control units for which nothing was done. That is, there was no documentation in the offenders' medical records that the MHP was aware of these noncompliance issues or that the offender was referred to a psychiatrist. In fact, there were examples of the psychiatrist discontinuing the offenders' medications without a visit if noncompliance was reported.

## XIII: OFFENDER FORCED MEDICATION

**Summary**: In all cases reviewed, the treating psychiatrist initiated the involuntary medication request for an appropriate clinical reason, and IDOC's policies and procedures were subsequently followed. However, there are allegations to the contrary that bear examination. It may be unusual that enforced medication orders may remain in place indefinitely.

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:
a) Administration of Psychotropic Medication
    1) Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and
    B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the

medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

2) Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2) The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical

Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with

20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** The monitoring team reviewed 6 cases at Dixon in which offenders were receiving enforced medications. In each of these cases, the treating psychiatrist initiated the involuntary medication request for an appropriate clinical reason, and IDOC's policies and procedures were subsequently followed. One aspect of IDOC's practices around enforced medication seemed unusual. IDOC allows an enforced medication order to remain in place indefinitely, whereas in other states (such as Connecticut and California), the order is time-limited (*e.g.*, 6 or 12 months) and can only be renewed after another hearing.

At Menard, Dr. Kapoor reviewed the chart of an offender at the facility receiving forced medication. In that case, the inmate had been in the infirmary essentially continuously for about 6 months because of self-injury. Despite a forced medication order, medication changes were not actively being made, nor was a psychiatrist seeing the inmate every 30 days to assess the efficacy of the treatment plan.

At Pontiac, as well as other facilities monitored, the overall procedures for the administration of forced medication were being followed. Significant problems existed in the actual prescription and follow up for psychotropic medications, however. Medically unauthorized and inappropriate uses of psychotropic medication were noted in the overwhelming majority of the cases reviewed. In addition to this substandard usage of psychotropic medications, psychiatrists were not seeing the offenders every 30 days as is required by the Settlement.

Finally, the Monitor received from plaintiffs' counsel several allegations that the procedures for offender forced medications were not properly followed. The Monitor takes these allegations very seriously. This issue will continue to be closely monitored during the next monitoring periods.

## XIV: HOUSING ASSIGNMENTS

**Summary**: IDOC's reports suggest that notice to clinicians is not occurring, and no system for this appeared to be in place in the facilities monitored. The team learned of security-clinician collaboration, but it was individual-driven. Neither were there procedures for consulting on post-segregation housing, except where Pontiac was transferring prisoners to other facilities. The team did not encounter any instances of recorded reasons for rejecting an MHP's housing recommendation.

**(XIV)(a): Specific requirements:** Cell assignments for SMI offenders shall be based on the recommendations of the appropriate security staff. However, notice shall be made to members of the SMI offender's mental health treatment team within twenty-four (24) hours of a new or changed cell assignment. It is expected that MHPs will monitor the location of each SMI offender on their caseload. IDOC will require MHPs to alert security staff of their concerns

regarding SMI offender housing assignments and related contraindications. In all instances, an SMI offender's housing assignment shall serve both the security needs of the respective facility and the treatment needs of the offender.

**Findings:** IDOC reported in its quarterly report: "While recruitment initiatives are proceeding, additional staff will be needed in order to meet the 24-hour requirement." The monitoring team notes that, in the Settlement, the deadline for compliance with this requirement is not tied to staffing levels.

During monitoring visits, the monitoring team found that no procedure for this requirement was in place at Stateville, Menard, Logan, or Pontiac. At Logan, staff reported that there is consultation if an inmate is coming to or leaving the RTU. The team found that mental health staff do, in some instances, work collaboratively with security staff to address housing concerns. However, without a formal procedure in place, implementation is scattered and dependent on the personal proclivities of individual staff members.

**(XIV)(b): Specific requirement:** For those offenders who have served fifteen (15) days or longer in Administrative Detention or Disciplinary Segregation, an MHP who is a member of the SMI offender's mental health treatment team shall be consulted regarding post-segregation housing recommendations pursuant to Section XVIII (a)(v)(F), *below*.

**Findings:** During our monitoring visits, staff reported that there is no procedure in place at Stateville, Logan, or Menard. At Pontiac, staff reported that this type of consultation does happen because, unlike in other facilities, every transfer out of segregation entails being transferred to another facility. Therefore, staff feels obligated to provide information to the receiving facility. At Dixon, when inmates are released from segregation, the facility follows the general policy that SMI inmates return to the RTU unit from which they came. If no bed is available in that RTU, the MHP finds a bed in another RTU unit that is staffed by the same psychiatrist in order to maintain continuity of care to the extent possible.

**(XIV)(c): Specific requirement:** If security staff rejects a housing recommendation made by an MHP as to an SMI offender, the security staff representative shall state in writing the recommendation made by the MHP and the factual basis for rejection of the MHP recommendation.

**Findings:** Because no procedure is in place to ensure consultation with MHPs regarding their recommendations for post-segregation housing, facilities also do not routinely record justifications for any disagreements with MHPs' recommendations.


**XV: SEGREGATION**

**Summary**: The Monitor received one facility policy governing segregation and protective custody placement and it appeared compliant. Staff at three facilities reported a common practice of consulting MHPs about double-celling. All of the segregation units inspected met the minimum requirements for living conditions and privileges. The noisy and chaotic environments, though, are inappropriate for housing the seriously mentally ill. Some SMI inmates were living in Menard's Enhanced Security Status.

Mentally ill offenders in segregation did not consistently continue to receive the treatment specified in their treatment plans and Pontiac reportedly denies access to group therapy as a disciplinary measure. IDOC reports that MHPs are not reviewing prisoners within 48 hours of placement nor updating treatment plans on schedule. Treatment plans were continued, but the team encountered no evidence of enhanced therapy. Weekly rounds occurred except for certain units at Pontiac. In most facilities, records reflected either monthly supportive counseling or none. Treatment teams have not been established.

After a steady increase during the monitoring period, facilities now offer 10 hours of unstructured out-of-cell time; most facilities house few, if any, inmates more than 60 days in segregation. Refusals, which can be a significant indication of mental deterioration, are not followed up.

MHPs did appear to have discretion to place segregated inmates in crisis cells, though the revolving door between those settings, with lengthy crisis stays, was of concern.

Review Committees were constituted and reportedly completed their work, and substantial amounts of segregation time were cut. It appears that 300 and 400 level tickets were eliminated from SMI inmates' records; with other tickets, it was unclear how fully mental health input was taken into account.

Compliance with requirements for Investigatory Status/Temporary Confinement are largely consistent with segregation compliance statuses. By the end of the monitoring period, structured out-of-cell time exceeded requirements at Logan and Dixon, but fell far short at Pontiac.

**XV(a)(i): Specific requirement:** Prior to housing two offenders in a cell, the respective Lieutenant or above shall comply with Administrative Directive 05.03.107 which requires an offender review that shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues; and significant negative life changes, such as additional time to serve, loss of spouse or children, etc. The respective security staff shall consult with the mentally

ill offender's treatment team regarding the appropriateness of such placement in accordance with Section XVII of this Settlement Agreement.

Of note, AD 05.03.107 provides: The Chief Administrative Officer of each facility with segregation and protective custody units designed to double cell offenders shall develop a written policy that includes, but is not limited to, the following for routine segregation and protective custody placement:

- Segregation placement
- PC placement
- Documentation
- Review of documentation and final determination
- Compatibility contraindications
- Review with other inmates
- Upon determination to double-cell:
  - Documentation
  - Suitability review following placement
  - Documentation upon release
- Documentation and Reassessment for disciplinary report

**Findings:** The Monitor requested a copy of the written policy from each facility with segregation and protective custody units designed to double cell offenders, but received only the policy from Pinckneyville. This particular policy did fulfill the requirements of this section of the Settlement, but for Pinckneyville alone.

At Dixon, according to security and clinical staff, security staff consults with mental health staff regarding housing decisions, such as whether an individual needs a single cell or can be safely housed in a double cell. Two of the RTU units (approximately 100 beds) contain single cells exclusively, and MHPs have input into decisions about who is housed there.

Although none of the mental health and psychiatric staff at Menard knew of a formal policy that dictates the practice, they said security staff routinely consults with mental health staff regarding housing decisions, such as whether an SMI individual needs a single cell or can be safely housed in a double cell.

At Stateville proper, custody staff in the segregation unit was familiar with a requirement of having to consult with mental health staff prior to double celling offenders.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services

in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** In general, all the segregation units inspected met the minimum requirements of this section of the Settlement. That being said, all of the segregation units were filthy, noisy and inappropriate for housing the seriously mentally ill. At Pontiac, segregation was especially chaotic and noisy, making it impossible for staff to provide valid and reliable mental health or psychiatric assessments and treatment.

Also of note, Menard seems to be unusual, and perhaps unique, among IDOC facilities in its use of "enhanced security status," which appeared to be a level of restriction even beyond segregation. The warden stated that this status is used to manage inmates who have repeated behavioral problems while in segregation. It involves 2:1 staffing and the use of leg restraints when an inmate leaves his cell. A committee reviews this status every 90 days. At the time of the site visit, five inmates were on that status, two of whom were designated SMI.

In the quarterly report dated March 23, 2017 in the section dealing with segregation, IDOC stated "Additionally, IDOC has proposed changes to Departmental Rule 504." In the supplement to this quarterly report dated April 28, 2017, IDOC stated "Additionally, IDOC made changes to Departmental Rule 504." Since the Settlement expressly relies on the terms of Departmental Rule 504 as it was written at the time the Settlement was signed, changes to the Rule can potentially undermine what the Settlement was designed to accomplish. It is concerning that IDOC changed the Rule without discussion with the Monitor or plaintiffs' counsel as to the potential impacts on this Settlement's terms. The Monitor strongly advises IDOC to notify the Monitor and plaintiffs' counsel, in more detail, in advance of relevant rule or policy changes, so that potential Settlement impacts can be identified and avoided. As to this particular rule change, the Monitor requests that IDOC explain which provisions were changed and the purpose of those changes.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings:** The mentally ill offenders in segregation did not consistently continue to receive, at a minimum, the treatment specified in their treatment plans. At Pontiac, numerous mentally ill offenders complained of not being allowed to attend groups if they received any disciplinary tickets. If this alleged action is accurate, it runs counter to good mental health treatment. That is, if an offender is acting out to such an extent that he is written up, then it is a strong indication that he requires more and not less treatment.

The individual treatment plans, however, of all the offenders in segregation were found to be inadequate. As noted in Section VII, above, the treatment plans were very non-specific, often using the identical treatment approaches regardless of the offenders' diagnoses. In the majority of the segregation units inspected, there was less than adequate space for confidential treatment

to occur and there were significant problems noted with medications. The problems with medications are explained in detail in section XII of this report.

At Menard, the monitoring team observed group therapy and spoke with inmates and staff about it. An adequate group therapy space for segregated prisoners has been used since approximately November 2016, when Menard began providing structured programming. At the time of the February site visit, the facility offered six hours per week of structured programming, comprised of four 90-minute groups per week. Among the eight inmates interviewed, they reported that the therapy groups are well organized and helpful. This supports any treatment plan that contains a recommendation for group therapy. One small issue arose during the site visit regarding eligibility for group therapy in segregation. The group leaders interpreted the Settlement to mean that SMI inmates became ineligible when they only had 60 days of segregation time remaining. This seemed a curious interpretation of the Agreement and inconsistent with practices at other IDOC facilities. The monitoring team raised the issue during the exit interview, and the facility leadership agreed that inmates become eligible for groups after 60 days of segregation placement, and they remain eligible for the duration of their segregation time.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** This procedure is not, as a general matter, being implemented in the IDOC. IDOC reported in its quarterly report of March 23, 2017 that the requirements regarding MHP reviews within 48 hours will be implemented once staffing is increased. The monitoring team notes, however, that this requirement is not budget-contingent under the Settlement.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** These procedures are not being implemented in the IDOC. IDOC reported in its quarterly report that the requirements regarding updates to treatment plans within seven days and monthly will be implemented once staffing is increased. The team notes, however, that these requirements are not budget-contingent under the Settlement.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Supportive counseling by an MHP as indicated in the ITP

E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

*Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* The treatment plans were continued, if they previously had been prepared for the offenders. There were many cases reviewed where an offender in segregation did not have a treatment plan or it was extremely outdated. In one case of an offender who arrived at Pontiac on October 25, 2016, the Monitor found no evidence of a treatment plan. Upon interviewing this offender, the Monitor noted that he was suffering from significant psychotic symptoms. There was no documentation in his medical record regarding his psychosis. Also, the monitoring team found no evidence at any of the facilities monitored of mentally ill offenders receiving "enhanced therapy as necessary to protect from decompensation that may be associated with segregation."

*Rounds*: Weekly rounds of mentally ill offenders in segregation were initiated during this first monitoring year. This requirement was inconsistently accomplished at first but by the end of this monitoring period, weekly rounds were occurring on a regular basis at all the facilities monitored. At Stateville, rounds were occurring, though the records were disorganized. Eleven charts reviewed at Menard indicated that mental health rounds are completed by an MHP every seven days. At Pontiac during the November 2016 visit, the Monitor reviewed North House and the South House mental health unit; rounds were occurring in those areas. Rounds were also occurring in the segregation unit at Logan.

Dixon inmates reported that rounds do occur on a routine basis, but this was not consistently documented in the medical charts the monitoring team reviewed. IDOC's quarterly report indicated that this provision was not implemented at Pontiac and the team confirmed during the site visit that rounds were not being conducted in all portions of the facility. Rounds were occurring in the North and South Houses but not in East and West Houses.

*Pharmacological treatment*: As with other populations, poor handling of pharmacological treatment was evident in segregation cases reviewed. Offenders were not seen every 30 days as required by the Settlement. Medications were allowed to expire with the offenders going weeks at a time without their medications. Protocols regarding laboratory and side effect monitoring were not being followed.

*Supportive counseling by an MHP as indicated in the ITP*: Offenders universally complained about the lack of counseling while being in segregation. This was confirmed by the monitoring team's review of medical records of offenders housed in segregation. The usual

frequency of counseling visits by an MHP was monthly if at all. This issue was especially problematic at Pontiac. This lack of supportive counseling is one of the reasons there is such a demand placed on the Crisis Intervention Team. The offenders report that the only way to speak with any mental health staff is by asking to see the Crisis Intervention Team.

Several SMI inmates at Menard, however, reported that they were receiving individual therapy with an MHP on a weekly or semi-weekly basis.

*Participation in multidisciplinary team meetings once teams have been established:* Over the course of the monitoring period, the monitoring team did not encounter a functioning multidisciplinary team in any of the segregation units visited.

*MHP or mental health treatment team recommendation for post-segregation housing:* Please see (XIV)(b), above.

*Documentation of clinical contacts in the medical record:* Please see (VII)(e), above.

*Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* The Monitor is aware that the majority of IDOC facilities do not house offenders in segregation for longer than 60 days. In those facilities that do, the amount of out-of-cell time offered to these offenders has steadily increased over the monitoring period. At the time of the submission of this report, mentally ill offenders in segregation are routinely offered 10 hours of unstructured out-of-cell time per week. Offender refusals, however, continue to present difficulties. Simply documenting that the inmate refused and not doing anything about it is inadequate. Refusals can be a significant indication of mental deterioration and should be considered a serious psychiatric symptom.

The actual schedule of unstructured out-of-cell time is also problematic. Stateville has been providing 10 hours of yard time per week, but this was broken down into five hours on Saturday and five hours on Sunday, with no yard time during the week. In large part, as a result of this heavy concentration of recreation time, Stateville was seeing a significant amount of refusals. The yard was a very limited area, with limited activities, and no toileting facilities. Once an inmate was out for yard, he was required to remain outside for the full five hours.

At Menard, inmates received 7 to 7.5 hours of yard per week; in the team's early site visits, this was distributed across three days a week, but as of the February site visit, this was consolidated to a five-hour block and a two-hour block. The facility was employing individual runs to further facilitate yard time. However, Menard's documentation made it very hard to track serial refusers, which can be common when yard time is offered in one lengthy block of time.

The Monitor's concern about refusers is that repeated refusals may indicate improperly treated mental illness. An inmate may be psychotic and not want to go out because of unwarranted fears that other inmates may hurt him during yard time, or he may be depressed and require clinical interventions.

**XV(a)(vi):[6] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c) *below.[7]*

**Findings:** In all segregation facilities monitored, mentally ill offenders who had been in administrative or disciplinary segregation for periods longer than sixty (60) days do not receive out-of-cell time in accordance with subsection (c), *below.* Requirements regarding unstructured out-of-cell time were being met at the end of the monitoring period. Structured out-of-cell time was being offered but did not meet the requirements of subsection (c), *below.*

**XV(a)(vii): Specific requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Administrative Detention or Disciplinary Segregation requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the mentally ill offender shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed or elevated level of care) as recommended by the MHP[8] unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** For the most part, there is no formal procedure for mental health staff to identify inmates for removal from segregation, other than through weekly segregation rounds and/or calls for a Crisis Intervention Team. This is particularly a problem in combination with no 48-hour, seven-day, or monthly reviews or treatment plan updates for new segregation placements. There is a heavy reliance on segregation rounds, which are extremely cursory and conducted at the cell front, and crisis placements.

There are numerous instances of mentally ill offenders being removed from segregation into crisis watch for prolonged periods, only to be returned directly from crisis watch back into segregation. The vast majority of placements into crisis watch for ten or more days (ten out of 14 at Stateville and 19 out of 23 at Menard) were from segregation.

- Stateville: Of the ten offenders coming out of crisis watch in July through September 2016 after ten or more consecutive days in crisis watch, and who had been in segregation when put into crisis watch, all but one were placed directly back into segregation from crisis watch. The only one not placed back into segregation had been on crisis watch for five months. In two other cases, the offenders were placed into segregation directly from long periods in crisis watch, including one period that was 1.5 months.

- Menard: For offenders for whom information is available, all but one of the inmates placed from segregation into crisis watch for a period of ten or more days were then

---

[6] This numbering from the Settlement Agreement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement Agreement.
[7] Note: this refers to the second occurrence of a subsection (c), on page 20 of the Settlement Agreement
[8] IDOC's compliance with the portion of this provision regarding MHP recommendations for placement into crisis care is discussed elsewhere this report.

returned to segregation. This is particularly problematic where staff has not provided input regarding current mental health status as part of the Segregation Review Committee process (see discussion below, XV(b)(iii)).

- Pontiac: While crisis watch seems like a frequent recourse, it is positive that there appears to be an increasing use of RTUs following lengthy stays in crisis watch. There also were many instances in which a mentally ill offender was quickly transferred from crisis to the RTU. But it appears that, like the other facilities, staff identify an offender as requiring removal from segregation only after an actual crisis.

**XV(b)** As to SMI offenders in Disciplinary Segregation:

**XV(b)(i):Specific requirements:** IDOC will organize Review Committees ('Committees') to review the segregation terms of all SMI offenders in segregation with at least 60 days of remaining segregation time as of the approval date of this Settlement Agreement. These Committees will be comprised of attorneys, security professionals, and MHPs.

**Findings:** In the quarterly report of March 23, 2017, IDOC indicated "those reviews have occurred for SMI offenders and are complete at all facilities." Consistent with this, Dixon, Logan and Menard security staff informed the team that each of their facilities had created a SMI Review Committee, which reviews all cases of segregated SMI prisoners. The quarterly report and information provided ahead of and during the monitoring team's site visits indicated that substantial amounts of time were cut.

**XV(b)(ii): Specific requirements:** The Committees shall eliminate any and all 300 and 400 level tickets and the accompanying segregation time from each SMI offender's disciplinary record.

**Findings:** IDOC purports to have met this requirement. The monitoring team will evaluate this issue going forward.

**XV(b)(iii): Specific requirements:** With regard to all remaining tickets, the Committees shall examine: (1) the seriousness of the offenses; (2) the safety and security of the facility or any person (including the offender at issue); (3) the offender's behavioral, medical, mental health and disciplinary history; (4) reports and recommendations concerning the offender; (5) the offender's current mental health; and (6) other legitimate penological interests.

**Findings:** The monitoring team reviewed this requirement at Logan, Menard, and Pontiac. Here, the segregation review process was flawed by not fully considering current mental health, weighing current symptoms in favor of segregation retention, and documentation suggested reviews were cursory or may not have taken MHP input into account.

At Menard, while MHP input was accepted, the facility failed to consider factor (5), the offender's current mental health status, that is, the potential impact of segregation on the offender's mental health. The focus – in terms of the way that an offender's mental health factored into the committee's decision – was instead entirely on the role of the offender's mental health in the infractions themselves. Key members of the review committee reported this to the monitoring team.

At Logan, the review process considered risk of self-harm to be a factor weighing *against* earlier release from segregation, the concern being that inmates would have greater access to property they could use to inflict self-harm and would have of less staff supervision. This is an enormously flawed approach, as the risk of self-harm should be a factor in favor of release from segregation. This is particularly concerning given that the review process was directed specifically at inmates identified as SMI. A significant majority of inmate suicides occur in segregation, as segregation itself imposes psychic stress, which can exacerbate depression and other potentially lethal psychiatric symptoms as well as creating psychiatric disorders *de novo* in offenders without pre-existing mental illness.

At Pontiac, staff reported that they worked backwards from the date they wanted the person to be released and then reduced the time accordingly. This presumably accounted for current mental health status, but the staff was unable to clearly articulate why this was the case.

The team also notes that a number of SMI offenders went through the review process but nonetheless have lengthy periods in segregation remaining. Documentation regarding mental health staff's input into this process is limited, as the decisions were usually the result of discussion among the committee members. In the case of Stateville, where there is more documentation, the recorded reasoning was generic (even copied and pasted in some cases), and explanations regarding remaining segregation time in a couple of cases indicate a need for earlier release than what was decided. Indeed, the staff indicated that the mental health staff's recommendations considered the need for at least some discipline where the offender incurred numerous infractions. In one case, mental health staff recommended an additional 43 months' reduction "based on continuing mental health and behavioral symptoms" and the new segregation release date is January 23, 2020. In another case, on the same basis, documents state that mental health staff recommended an additional 150-month [sic] reduction with a segregation release date of February 4, 2028.[9] Offenders told the monitoring team that they did not even realize they had time cut from their segregation terms.

Logan operates a unique program that is essentially an ongoing version of the SMI Segregation Review Committee. Through this program, staff revisits each long-term segregation offender's status and provides opportunities for further cuts to segregation time. While this program is generally a good idea, the monitoring team learned that, when, in the course of reviewing an inmate's case, staff identifies that an offender is at greater risk of self-harm if released from segregation, such risk is a factor that weighs *against* releasing the offender from segregation. Multiple members of the committee, including the director of mental health services and an attorney, confirmed this practice. Staff reported that segregation provides more security and supervision so that the offender cannot as easily get items to cause harm to themselves. Staff also indicated that release to general population can be overwhelming to the offender and cause her to become self-injurious. Of course, this approach does not seem to account for the possibility of putting into place various supports and interventions that would mitigate this risk, as well as the national statistical reality that the majority of  prisoner suicides occur in segregation.

---

[9]  Both of these terms are labeled as reductions, but it appears extensions were intended and they were mislabeled.

Offenders brought before the review committee had – and took – the opportunity to describe the impact of remaining in segregation for a prolonged period of time. One offender reported that offenders in long-term segregation think about suicide, lack support or meaningful contact, and are affected by other offenders' screaming and engaging in other disturbing behaviors. She said that officers do not seem to care about the offenders' well being and will even say as much, sometimes even telling an offender to harm herself. While these claims were not substantiated, it was evident that the offender experienced real anguish as a result of the ongoing placement.

Another offender brought before the review committee reported that her day consists of waiting on her trays, waiting on the nurses, and going to sleep. She reported that "because I have nothing to do," she would often start thinking "crazy thoughts." She said, "I feel like I'm caged in." She said that she does not deserve "to be punished so heinously." She reported that her last phone call was eight months earlier and that she received no visits.

The monitoring team plans continued and extensive evaluation of this requirement during the upcoming monitoring period.

**XV(b)(iv): Specific requirements:** The committees shall have the authority to recommend to the Chief Administrative Officer that an SMI offender's remaining segregation time be reduced or eliminated altogether based on the factors outlined in XV(b)(iii).

**Findings:** The monitoring team found that these committees have the authority specified in this subsection of the Settlement. Throughout the monitoring period, the monitoring team encountered numerous examples of SMI offenders' remaining segregation time being reduced or eliminated altogether based on the factors outlined in XV(b)(iii). At Dixon, the main Disciplinary Officer reported that, after the committee completed its initial review, the population of segregated SMI prisoners was reduced by approximately one-half. At the time of the November site visit, there were just nine inmates in the facility with more than 60 days to serve in segregation. Of note, three of these inmates have very lengthy segregation sentences (2.5 years, 4 years, and 12 years). Several inmates at Menard have very lengthy segregation sentences even after review by the committee. At Menard, there was one inmate whose segregation sentence was cut down to 24 years (ending in 2041) from 51 years (ending in 2068). Of note, as a facility, Logan was especially proactive in meeting this requirement.

**XV(b)(v): Specific requirements:** The decision for reduction or elimination of an SMI offender's segregation term (excluding the elimination and reductions relative to 300 and 400 level tickets) ultimately rests with the CAO who, absent overriding concerns documented in writing, shall adopt the Committees' recommendations to reduce or eliminate an SMI offender's segregation term.

**Findings:** This requirement was being met at all the facilities monitored.

**XV(b)(vi): Specific requirements:** These reviews shall be completed within nine (9) months after approval of the Settlement Agreement.

**Findings:** This requirement was met at all the facilities monitored. In addition, IDOC reports that this requirement was accomplished timely throughout the system

**XV(c)** Mentally ill offenders in Investigative Status/Temporary Confinement:

**XV(c)(i): Specific requirements:** With regard to offenders in Investigatory Status/ Temporary Confinement, IDOC shall comply with the procedures outlined in 20 Ill. Admin. Code § 504 and Administrative Directive 05.12.103.

20 Illinois Administrative Code Section 504 Subpart D: Segregation, Investigative Confinement and Administrative Detention—Adult provides:

Applicability, definitions, and responsibilities for IDOC staff regarding placement of offenders in segregation status; segregation standards for offenders placed into segregation, investigative confinement, administrative detention; and standards for recreation for offenders in segregation status.

AD 05.12.103 provides:

II (G): Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

II (H): Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any

reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

(1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317

for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** The details of the disciplinary process for SMI offenders are discussed in Section XXV, *below.*

II (I): Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** There is currently not a reliable system to identify mentally ill offenders who are deteriorating due to continued placement in segregation.

**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** These reviews are not yet occurring anywhere in IDOC; the budget contingent approval date has not yet occurred.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
**8)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** Please refer to the findings under section XV(a)(vi), *above.*

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below.*[10]

**Findings:** In all segregation facilities monitored, mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days do not receive out-of-cell time in accordance with subsection (c), *below.* Unstructured out-of-cell time, in accordance with subsection (c), *below,* was being offered at the end of the monitoring period. Problems persisted in meeting the requirements for structured out-of-cell time.

**XV(c)(v): Specific Requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Investigatory Status/Temporary Confinement requires relocation to either a crisis cell or higher level of care, the MHP's recommendation shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the SMI offender shall be placed in an appropriate mental health setting (*i.e.,* Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** Please refer to the findings under section XV (a)(vii), *above.*

---

[10] Note: this refers to the second occurrence of a subsection (c), on pages 19 and 20 of the Settlement.

**XV(c)[11]: Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i. For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii. For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii. For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv. For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:**

**Structured out-of-cell time:** Structured time, as with all therapeutic activities, needs to be documented in the inmate's medical record. In addition, IDOC sorely needs to develop and implement an electronic method for tracking structured time. As not all structured activities are documented in an offender's medical record, IDOC relies upon rosters or logbooks to monitor structured time. A system to track "refusals" currently does not exist.

Overall, the amount of structured out-of-cell time has improved over this first year of the Settlement. More groups and other therapeutic activities are being offered with more offenders participating. Logan began providing structured programming for mentally ill offenders in November 2016. At the time of the February 2017 site visit, the facility was offering five hours per week of structured programming. Dixon began providing structured programming for mentally ill offenders in segregation in September 2016. At the time of the January 2017 visit, X House offered approximately five hours of structured activities per week. The offenders from the X House reported that the activities were run by caring clinicians and were relevant to the offenders' needs. The structured activities, however, were not being carried out in a confidential setting.

Problems still exist in meeting the four-hour per week threshold, however. At Pontiac, the largest segregation facility in IDOC, the team found that mentally ill offenders are not receiving the required four hours of structured out-of-cell time. Data collected as recently as March 2017 show that of the offenders in North House, 74 of 168 only receive 1 to 1.5 hours per week, and of the offenders in West House, 60 of 120 receive 1 to 4 hours per week.

---

[11] As above, this appears mislabeled in the Settlement but is carried forward here.

**Unstructured out-of-cell time:** Please refer to the findings under section XV(a)(vi)(H), *above.*

**The 60-day requirement:** By way of technical assistance, it is of serious concern that this particular requirement of the Settlement only calls for increased out-of-cell time for offenders in segregation for more than 60 days. Any amount of segregation causes its own unique set of mental health issues. It can exacerbate preexisting mental health issues as well as causing new mental illness to occur. Also, there are potentially contradictory requirements with Section XV (a)(vi)(H), which calls for "weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at a relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP." The Monitor requests that the monitoring team receive clarification on this issue from the parties as soon as practicable.

**Segregation-like settings:** The team has a similar concern regarding out-of-cell time for those inmates who, while not in formal segregation, are in segregation-like confinement for a prolonged period of time. Mentally ill offenders often stay in R&C units for longer than 60 days. This is a particular problem at the Stateville and Menard R&Cs. Efforts should be made to provide mentally ill offenders in R&C units the same amount of structured and unstructured out-of-cell time that is provided to offenders housed in control units.

**XV(d): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: The first year provisions of this Section have not been met. The overall deadline for nearly all provisions is several years hence. The monitoring team will continue to closely follow this issues during the next monitoring period.

## XVI: SUICIDE PREVENTION

**Summary**: The training requirements have been met. Crisis Intervention Teams are constituted and operating according to the provisions of this subsection, but some custody staff reportedly make judgments that the severity of the situation does not warrant calling the team. The teams sometimes do not respond to mentally ill offenders presenting with serious issues other than suicide, and those offenders have not routinely been placed on a crisis watch. Within crisis watch, staff are observing the requirements.

Administrative Review teams do review suicides and make recommendations, but there is little attention to the quality of medical or mental health care and some relevant health care records. The lack of a corrective action plan with assigned responsibilities and timeframes significantly limits this mechanism's effectiveness.

**(XVI)(a): Specific requirements:** IDOC shall comply with its policies and procedures for identifying and responding to suicidal offenders as set out in Administrative Directive 04.04.102 and the section titled "Identification, Treatment, and Supervision of Suicidal Offenders" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). IDOC shall also ensure that Forms 0379 ("Evaluation of Suicide Potential"); 0377 ("Crisis Watch Record"); and 0378 ("Crisis Watch Observation Log") are used in conjunction with these policies and procedures.

The section titled "Identification, Treatment and Supervision of Suicidal Offenders" from the IDOC Mental Health SOP Manual[12] provides general guidelines for the handling of suicidal offenders. AD 04.04.102, however, provides a number of specific requirements:

II (F) Requirements**:** The Chief Administrative Officer of each facility shall:
 1)Establish a Crisis Intervention Team.
 a. The Crisis Intervention Team shall consist of: (1) A Crisis Intervention Team Leader who shall be an MHP; (2) All facility MHPs and nursing staff; and (3) At least one member of the facility's security staff of the rank of Lieutenant or above. **NOTE:** Other Crisis Intervention Team members may be chosen from facility staff upon the recommendation of the Team Leader to ensure at least one member is on site at all times.
 b. Prior to serving, all members of the Crisis Intervention Team shall receive training in accordance with Paragraph II.g.1. Crisis Intervention Team Members on leave of absence shall be required to make up missed training upon return and prior to resuming service on the Crisis Intervention Team.
 c. All Crisis Intervention Team Members shall participate in quality assurance meetings no less than once per quarter.
   (1)     Meetings shall be held to: (a) Review all events involving offender suicide during the previous quarter; (b) Review the Facility's Prevention and Intervention Plan in accordance with Paragraph II.G; and (c) Assess the adequacy of the facility's training program in relation to the facility's needs
   (2)     Meetings shall be documented in writing and shall: (a) Include the date and minutes of the meeting, a list of all persons in attendance and any recommendations or issues noted; (b) Be submitted to the Chief Administrative Officer, the respective Regional Psychological Administrator and the Chief of Mental Health

**Findings:** At all facilities monitored, Crisis Intervention Teams have been formed and trained. Due to the nascent stage of the CQI program, it is unclear if "all crisis team members [shall] participate in quality assurance meetings no less than once per quarter."

 2)  Designate a Crisis Care Area.

---

[12] The Settlement references "Mental Health Protocol Manual." IDOC has changed the name of this manual to "Mental Health SOP Manual."

a. Crisis care areas shall be used to house offenders determined by an MHP to require removal from his or her current housing assignment for the purpose of mental health treatment or observation.

b. Excluding exigent circumstances as determined by the Director or a Deputy director, segregation units shall only be utilized for crisis care areas if no other crisis care areas are available, and only until alternative crisis care areas are available.

c. Cells designated as crisis care areas shall: Allow for visual and auditory observation of the entire cell; Allow for prompt staff access; Control outside stimuli; Contain beds that are suicide resistant and constructed of a metal base, cinder block, concrete slab or herculite material; Contain a pass through or chuck holes that open out of the cell; Contain mesh coverings over all vents; Contain laminated glass over all windows or be safely and security glazed windows; and Be made appropriately suicide resistant and provide adequate lighting and temperature.

**Findings:** As reported in Section X(f) *above,* crisis cells are still located in segregated housing units at Logan, and as overflow at Pontiac, but not in other facilities monitored.

II (G): Prevention and Intervention Plan

The Chief Administrative Officer, in consultation with the facility's mental health authority, shall establish a written procedure for responding to, and providing emergency mental health services, including prevention and intervention of emergency mental health situations. The procedure shall be reviewed annually and shall be approved by the Chief of Mental Health and shall include, at a minimum, provisions for the following: training, referrals for emergency mental health situations, crisis intervention team response, crisis watch, response to self-inflicted injuries and suicide, and quality improvement reviews.

**Findings:** IDOC is meeting this requirement at the majority of its facilities. The Monitor has received the Institutional Directive called for in this subsection of the Settlement from 22 of the IDOC facilities. IDOC had one year from the approval of the Settlement to address the requirements of this very important requirement. The Monitor is concerned, however, in reviewing the individual Institutional Directives on this subject, that some of them only became effective in the month prior to the submission of this report.

1) Training
The Chief of Mental Health, in consultation with the Office of Staff Development and Training shall establish standardized training programs that provide information on emergency mental health services. All training shall be provided by an MHP, or in the absence of the MHP, a current crisis team member and, where appropriate, shall include enhanced content specific to the facility.

a. Level I Training shall be required as part of annual cycle training for all staff that have regular interaction with offenders, and shall include a minimum of one hour of the following: (1) Elements of the facility's Prevention and Intervention Plan; (2) Demographic and cultural parameters of suicidal behavior in a correctional setting, including incidence and variations in precipitating factors; (3) Risk factors and behavioral indicators of suicidal behavior; (4)

Understanding, identifying, managing and referring suicidal offenders, including the importance of communication between staff; (5) Procedural response and follow-up procedures including crisis treatment supervision levels and housing observation; and (6) Documentation requirements.

b. Level II Training shall be required as part of annual cycle training for all personnel identified in the facility's Prevention and Intervention Plan as having the authority to initiate a crisis watch. Level II training shall consist of a minimum of four hours of in-depth didactic and experiential training in assessing suicide risk and procedures for initiating a crisis watch.

c. Level III Training shall be required for all Crisis Intervention Team members, excluding MHPs, and shall consist of 24 hours of advanced training in the philosophy of suicide prevention and continuous quality improvement of the facility's Prevention and Intervention Plan.

(1) Crisis Intervention Team members shall also be trained by an MHP, designated by the Chief of Mental Health, in consultation with the Office of Staff Development and Training. This training will give the Crisis Intervention Team member the ability to instruct on the standardized training curriculum that provides information on emergency mental health services during cycle training, in the absence of the MHP. (2) Training shall be completed prior to active service with the Crisis Intervention Team.

d. Clinical Continuing Education shall be required for all Crisis Intervention Team members and shall consist of a minimum of one hour per quarter of training to assist Crisis Intervention Team members in monitoring facility policy and procedure and in reviewing suicide attempts or completions. Clinical Continuing Education Training may be obtained through participation in the quarterly Crisis Intervention Team quality assurance meeting.

**Findings:** The training requirements specified in this subsection of the Settlement Agreement have been met.

2) Referrals for Emergency Mental Health Situations
Staff shall immediately notify the Crisis Intervention Team, through his or her chain of command, of any situation whereby an offender exhibits behavior indicative of mental or emotional distress, imminent risk for harm to self or an attempted suicide.

**Findings:** Please refer to the findings under Section V(g), *above.*

3) Crisis Intervention Team Response
a. At least one Crisis Team member shall be on site at all times. The designated Crisis Intervention Team Leader shall be available by phone when not on site.
b. The Chief of Mental Health and the respective Regional Psychological Administrator shall be notified within 24 hours of the suicide of an offender, and within 72 hours of any attempted suicide.

c. Upon notice of a potential crisis situation, a Crisis Intervention Team member shall: (1) Implement necessary means to prevent escalation and to stabilize the situation. (2) Ensure that the offender is properly monitored for safety. (3) Review the situation with the Crisis Team Leader or and MHP to determine what services or referrals shall be provided. If the Crisis Intervention Team Leader is not on grounds and cannot be reached by telephone, and there are no MHPs on grounds, the Crisis Team member shall contact an alternative MHP and the review may be completed via telephone. (4) Initiate a crisis care treatment plan to monitor and facilitate the delivery of services, including referrals for mental or medical examination, and any additional recommendations of the MHP. The crisis care treatment plan shall be documented on the Crisis Watch Log, DOC 0377. Referrals for additional examination or services following the offender's release from a crisis care treatment level of care shall be documented on a DOC 0377. (5) If determined that the offender does not need to be placed in the crisis care area, notify the Shift Commander of any additional care requirements for security staff.

**Findings:** IDOC is meeting the requirements of this section of the Settlement.

4) Crisis Watch
a. A crisis watch shall be initiated when: (1) An offender exhibits behavior that is likely to cause harm to him or herself. (2) Mental health issues render an offender unable to care for him or herself. (3) Gestures, threats or attempts of suicide are made. (4) The Evaluation for Suicide Potential, DOC 0379, if administered, indicates need. (5) Less restrictive measures have failed or are determined to be clinically ineffective.

**Findings:** As noted in Section V(g) *above,* during the monitoring period, crisis watch has almost exclusively been used to house suicidal offenders and reportedly some Crisis Intervention Teams will not respond if the complaint falls under one of the other criteria. Mentally ill offenders presenting with serious issues other than suicide have not routinely been placed on a crisis watch. This particular issue will be closely monitored during the next monitoring period.

b. Determination to initiate a crisis watch shall be made by an MHP. If an MHP is not available, the following individuals, in order of priority, may initiate a crisis watch: (1) Respective Regional Psychologist Administrator, (2) Any Regional Psychologist Administrator, (3) Chief of Psychiatry, (4) Chief of Mental Health Services, (5) Chief Administrative Officer in consultation with a Crisis Intervention Team Leader, (6) Back-up Duty Administrative Officer in consultation with a Crisis Intervention Team Member
c. Offenders in crisis watch shall not be transferred to another facility unless clinically indicated and approved by the Chief of Mental Health or in the absence of the Chief of Mental Health, the Chief of Psychiatry.
d. Upon initiation of a crisis watch, an MHP shall determine: (1) The appropriate level of supervision necessary in accordance with Paragraph II.E.; and (2) Allowable property, including the type and amount of clothing.

e. Unless medically contraindicated: (1) Water shall be available in the cell or offered at regular intervals. When water is not available in the cell, the offers shall be documented on the DOC 0377. (2) Meals not requiring utensils shall be provided in the cell or crisis care area. If contraindicated, alternative nutrition sources shall be provided.

f. The offender's vital signs shall be taken by health care staff within 24 hours of placement on crisis watch, or sooner if the offender has been placed in restraints for mental health purposes.

g. Prior to placement in a designated crisis care area, the offender shall be strip-searched and the cell inspected for safety.

h. Offenders shall be monitored at appropriate intervals, dependent upon level of supervision. All observations shall be documented within the appropriate staggered intervals, on the Crisis Watch Observation Log, DOC 0378, and shall include staff's observation of the offender's behavior and speech, as appropriate.

i. The offender shall be evaluated by an MHP, or in his or her absence, a Crisis Intervention Team member, in consultation with the Crisis Team Leader, at least once every 24 hours. The evaluation shall assess the offender's current mental health status and response to treatment efforts. The evaluation shall be documented on the DOC 0377.

j. An offender's crisis watch shall only be terminated by an MHP following the completion of an evaluation assessing the offender's current mental health status and the offender's response to treatment efforts. The evaluation shall be documented in the offender's medical record and the termination of the crisis watch shall be documented on the DOC 0377.

**Findings:** IDOC is not meeting the requirements of this section of the Settlement. Crisis watch was used almost exclusively for suicidal offenders to the neglect of those offenders whose "mental health issues render an offender unable to care for him or herself."

5) Response to Self-Inflicted Injury and Suicides

a. Responses to medical emergencies shall be in accordance with AD 04.03.108, and shall include immediate notification of an MHP.

b. In the event of attempted suicide, the preservation of the offender's life shall take precedence over preservation of the crime scene; however, any delay in response due to security factors shall be noted in the Incident Report, DOC 0434.

**Findings:** On March 3, 2017, the Monitor was present on the Pontiac Mental Health Unit when a SMI offender attempted suicide while on a ten-minute watch status. I was able to observe the response of the custody staff and the medical staff to this emergency. The combined response of the custody and medical staff that I observed was done professionally and expeditiously. The quick action of the staff resulted in saving the offender's life.

My concern about this case, however, involves the precarious nature of this offender's health prior to and after he attempted suicide. A MHP progress note on the

morning prior to the offender's suicide attempt stated "hemoglobin level must be at least a 10 before he will be considered to be taken off watch." Hemoglobin level is a reflection of the oxygen carrying capacity of the blood. Normal hemoglobin level for an otherwise healthy male is 13.5-17.0. A hemoglobin level of less than 13.5 requires a medical workup to determine its cause. In this case the primary cause of the offender's extremely low hemoglobin level was the fact that he suffers blood loss by repeatedly cutting himself. This behavior is most likely due to the severity of his mental illness and prolonged housing in segregation. All of this means that the offender was in a precarious state of health prior to losing more blood during his suicide attempt.[13] Chief Hinton informed me that the offender was taken to a local hospital for medical stabilization where he received one unit of blood and his hemoglobin level was noted to be 7.5. Staff reportedly consulted with the facility medical director. Upon return to Pontiac the offender was placed in four-point restraints to prevent any further self-injurious behavior and was housed in the infirmary. He was subsequently placed on a continuous watch.

There are many serious problems noted with this case. This offender, with a history of repeated self-injurious behaviors, had a hemoglobin level of less than ten while he was on suicide watch. At this point he was at risk of dying from a relatively trivial loss of blood. He required aggressive medical stabilization for this "less than ten" hemoglobin level. He subsequently lost more blood and received only minimal medical stabilization and was quickly returned to Pontiac where he remained at significant risk of death. This offender should have been kept at the local hospital until he truly was hemodynamically stable. If that were not possible, he should have been moved to a prison hospital where he could receive additional needed medical care.

The concern is that the monitor learned about this case by pure coincidence. There may be other mentally ill offenders in similarly precarious medical conditions that are at risk of death from trivial self-injurious behaviors. The monitoring team will be closely reviewing this issue moving forward.

6) Quality Improvement Reviews
a. Mortality Review: In the event of an offender's suicide, the Chief of Mental Health shall designate an MHP to complete a psychological autopsy. The psychological autopsy shall be documented on the Psychological Autopsy, DOC 0375, and shall be submitted to the Chief of mental Health within seven working days of assignment.
b. Administrative Review
    (1) In the event of an offender's suicide, the Chief Administrative Officer shall:
    (a) Establish a clinical review team who shall systemically analyze the event. The Review Team shall consist of: i. Mental health and medical staff, including an MHP, a psychiatrist and a registered or licensed

---

[13] I use the term "suicide attempt" due to the lethal nature of his actions. It is possible that the offender did not intend to end his life. Regardless, he could have easily died were it not for the quick action of the staff.

practical nurse. Medical staff chosen for the clinical review team shall have no direct involvement in the treatment of the offender for a minimum of 12 months prior to the event. ii. A security staff supervisor. **NOTE:** Facility administrators or staff, whose performance or responsibilities maybe directly involved in the circumstances of the suicide, shall not be chosen for the review team.

(b) Designate a clinical review team Chairman who shall ensure all relevant documentation pertaining to the offender and his or her treatment including, but not limited to, the master file, medical record, Medical Director's death summary and the DOC 0375, if applicable, is available to the clinical review team.

(2) Within ten working days following the suicide, the clinical review team shall complete a review to:

(a) Ensure appropriate precautions were implemented and Department and local procedures were followed; and

(b) Determine if there were any personal, social or medical circumstances that may have contributed to the event, or if there were unrealized patterns of behavior or systems that may have indicated earlier risk.

(3) Upon completion of the review, the Chairperson shall submit a written report to the Chief Administrative Officer, the facility's Training Coordinator, the Chief of Mental Health and the respective Deputy Director summarizing the review team's findings and providing any recommended changes or improvements.

**Findings:** The Administrative Reviews make recommendations, but they contain no clear corrective action plan that delineates who is responsible for following up on each recommendation, the time frame in which changes should be made, or the plan to reassess problem areas. IDOC Administrative Directive 04.04.102 *(Suicide Prevention and Intervention and Emergency Services)* is also vague in this area, specifying no action beyond simply reporting the Administrative Review team's findings to the Chief Administrative Officer, Training Coordinator, and Chief of Mental Health. This is a critical flaw in IDOC's suicide prevention strategy, rendering the mortality reviews essentially meaningless for affecting systemic change.

In addition, the Administrative Reviews address mainly whether security protocols were followed, without much attention paid to the quality of medical or mental health care. Although the Psychological Autopsy (DOC 0375) contains a more thorough and detailed assessment of the mental health factors contributing to the inmate's death, its findings and recommendations are not routinely incorporated into the Administrative Review. This lack of attention paid to the Psychological Autopsy seems inconsistent with the protocol outlined in Administrative Directive 04.04.102, which states that the 0375 report should be reviewed by the Administrative Review team.

Of note, the Administrative Review team did not routinely look at the following sources of information in suicide cases:

a. Medication Administration Records around the time of death

b. Medical charts from previous IDOC admissions
c. Outside medical and mental health records, such as county jail or parole records, particularly when the inmate's suicide occurred a short time after arrival at the IDOC facility
d. Pre-sentencing investigation reports and other court-related mental health evaluations, such as fitness to stand trial
e. Video footage of the relevant areas of the facility, both before and after discovery of the suicide

In some cases, these records were reviewed during the Psychological Autopsy, but in other cases they seem to have been missed altogether. In particular, it seemed odd that the Administrative Review team did not comment on whether video footage matched the written incident reports submitted by staff members about the suicide discovery and response. This review would be essential in one of the suicides, where inmates raised concerns about officers doing "fake rounds" and the log book documentation appeared to be altered.

All the suicides occurred in known high-risk circumstances in corrections: in single cells, by hanging, shortly after arrival in IDOC or after a housing change, in inmates with mental health and substance abuse problems. Nothing about the immediate circumstances of the deaths struck the Monitor as unusual. However, the Administrative Reviews identified many of the same systemic problems with mental health care that the *Rasho* monitoring team has noticed during facility tours and records reviews:

a. Severe understaffing of psychiatrists and MHPs
b. Inconsistent follow-up with psychiatrists and MHPs
c. Poor recognition and follow-up of serious psychiatric symptoms
d. Inadequate gathering of outside records to aid with diagnosis and treatment planning
e. Lack of meaningful treatment plans

This is obviously concerning, since it suggests that systemic deficiencies are contributing to offenders' deaths. Of note, the above-listed recommendations were first discussed with the Chiefs of Mental Health, Psychiatry and Legal during the Monitor's first visit to Pontiac on August 26, 2016.

Two of the six suicides occurred at Graham Correctional Center. Although the numbers are too small to draw inferences about the quality of mental health care at Graham, the monitoring team will closely monitor this facility during the next monitoring period.

**(XVI)(b): Specific requirements:** IDOC shall ensure that the policies, procedures, and record-keeping requirements identified in (a), *above*, are implemented and followed in each adult correctional facility no later than one (1) year after the approval of this Settlement Agreement.

**Findings**: Although IDOC is meeting some of the requirements of this section of the Settlement, overall IDOC falls short of being in substantial compliance. All the items in this section are of critical importance. Ongoing problems with the responsiveness of the Crisis

Intervention Teams requires constant supervision and training of all staff involved. The poor quality of psychiatric services leaves mentally ill offenders at increased risk for suicide and contributes to their spending excessive periods of time in crisis. The administrative review process of offender suicides needs to rethought. The current process does not allow for corrective action to be implemented throughout IDOC to prevent future suicides.

The monitoring team is available to work closely with IDOC leadership to assist in addressing the deficiencies noted in this section of the Settlement.

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary**: Each reviewed chart contained proper documentation of the clinical reasons for the restraint. Dixon does not keep track of the total time in restraints, and there is indication of at least some very lengthy restraint cases.

The Monitor received the Institutional Directive concerning security restraints from 21 of the 25 IDOC facilities. The team encountered no indication of such restraints being used for punishment.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G): Requirements

1. Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

   a. Under no circumstances shall restraints be used as a disciplinary measure.

   b. Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately make contact with the psychiatrist within one hour of the offender being placed into restraints, and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall make contact with the physician or the licensed clinical psychologist.

2. Crisis treatment shall be initiated in accordance with AD 04.04.102.

a. The initial order for the use of restraints shall not exceed four hours.

b. Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

c. If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1. Only a psychiatrist who has conducted a face to face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face to face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2. If a psychiatrist, physician or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3. The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face to face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4. Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b. The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g. the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1. Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not

applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2. Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3. Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4. Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychiatrist.

5. The amount of restraint used shall be reduced as soon as possible to the level of lest restriction necessary to ensure the safety and security of the offender and staff.

6. Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7. Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8. Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status b utilized, justification of the care shall be documented in the offender's medical chart.

9. Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10. All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings:** The overall requirements of this section of the Settlement Agreement were being met throughout the monitored facilities. IDOC's records indicate that Dixon had 13 restraints from September through December of 2016. During the site visits, the monitoring team reviewed charts of four restrained patients and observed a restraint in the infirmary on November 15, 2016. Each of the charts contained proper documentation of the clinical reasons for the restraint. IDOC's practice appears to allow a psychologist--usually the lead MHP--or

psychiatrist to order the restraint, which initially lasts up to four hours and then can be renewed for 16 hours. The Monitor would note that the facility does not keep track of the total time in restraints for each patient, and this information is crucial to understanding whether the policy is functioning appropriately. For example, although only 13 restraints occurred in the four-month period of September through December 2016, one inmate had been in restraints continuously from October 12, 2016 until the day of the site visit on January 12, 2017 (92 days or 2,208 hours). Tracking this incident as one restraint simply does not capture the totality of the circumstances. Moving forward, all IDOC facilities should document not only the number of restraints initiated, but also their duration.

The case described above is an example that restraints are being used with seriously mentally ill offenders whose treatment needs exceed what is currently available in IDOC. The lack of a mental health treatment system that can adequately address the needs of these seriously mentally ill offenders results in needless suffering for these individuals. Due to a combination of exceedingly poor psychiatric care, insufficient numbers of MHPs, lack of RTU beds,  and insufficient number of custody staff to ensure that offenders receive appropriate amounts of out-of-cell time, these seriously mentally ill offenders end up being kept in restraints. The monitoring team plans to follow the cases of mentally ill offenders who required placement in restraints closely moving forward.

**(XVII)(b): Specific requirement:** IDOC will continue to comply with 20 Ill. Admin. Code §§ 501.30, 501.40 and 501.60, and Administrative Directive 05.01.126. The Administrative Code sections are titled Section 501.30: Resort to Force; Section 501.40: Justifiable Use of Force; and Section 501.60: General Use of Chemical Agents.

IDOC AD 05.01.126 provides for:

II (F): The Chief Administrative Officer shall ensure a written procedure for the use and control of security restraints is established. The written procedure shall provide for the following:

Use of Security Restraints

(1)     Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints shall be used: (a) To prevent an offender from escaping. (b) To retake an offender who has escaped. (c) To prevent or suppress violence by an offender against another person or property. (d) When transporting an offender outside the facility for the purposes of transfers, writs, etc., except when transporting offenders to assigned work details outside the facility, pregnant offenders for the purposes of delivery, or offenders assigned to the Moms and Babies Program on approved day release while transporting a minor child. (e) When transporting a transitional security offender for other than job related or programmatic activities directly related to successful completion of the transition center program.

(2)     Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints may be used: (a) When moving an

offender who is in disciplinary segregation or who is in segregation pending investigation within the facility; or (b) Whenever the Chief Administrative Officer deems it is necessary in order to ensure security within the facility or within the community.

(3)     Offenders on funeral or critical illness furlough shall be restrained in accordance with AD 05.03.127.

Inventory and Control

(a) A written master inventory of all security restraints, dated and signed by the Chief Administrative Officer, shall be maintained.

(b) All security restraints that have not been issued to staff shall be stored and maintained in a secure area or areas that are not accessible to offenders.

(c) A log documenting issuance and return of security restraints shall be maintained in a secure area or areas. The log shall include: (1)     Date and time issued;          (2) Receiving employees name; (3)   Issuing employees name; (4)          Date and time returned; and (5) Name of employee receiving the returned restraints.

(d) A written report shall be filed on lost, broken, or malfunctioning security restraints. The report shall be reviewed by the Chief of Security and maintained on file with the security restraints inventory records for no less than one year.

**Findings:** IDOC is meeting this requirement at the majority of its facilities. The Monitor, however, has only received the Institutional Directive called for in this subsection of the Settlement from 21 of the 25 IDOC facilities.

**(XVII)(c): Specific requirement:** Physical restraints shall never be used to punish offenders on the mental health caseload.

**Findings:** The monitoring team found no evidence that physical restraints are being used to punish offenders on the mental health caseload.

**(XVII)(d): Specific requirement:** The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** With the exception of not producing all the policies regarding the use of restraints, IDOC is meeting the requirements of this subsection of the Settlement Agreement.

## XVIII: MEDICAL RECORDS

**Summary**: The required forms are in general use throughout IDOC. When an offender is transferred from one facility to another, his entire medical record accompanies him. The overall quality of the medical records is poor.

**(XVIII)(a): Specific requirement:** In recognition of the importance of adequate records to treatment and continuity of care, no later than sixty (60) days after the approval of this Settlement Agreement, IDOC shall fully implement the use of the standardized forms it has developed to record offender mental health information and to constitute an offender's mental health file, including IDOC Forms 0372  (Mental Health Screening); 0374 (Mental Health Evaluation); 0284 (Mental Health Treatment Plan); 0282 (Mental Health Progress Note); 0387 (Mental Health Services Referral); 0380  (Mental Health Segregation Rounds); 0376 (Order for Use of Therapeutic Restraints for Mental Health Purposes); 0379 (Evaluation of Suicide Potential); 0378 (Crisis Watch Observation Log); 0377 (Crisis Watch Record); 0371 (Refusal of Mental Health Services); and 0375 (Psychological Autopsy).

**Findings:** Over the first year of implementing the Settlement Agreement, use of the above-listed standardized forms has become increasingly common. Currently, these forms are in general use throughout IDOC. For example, at Dixon and Menard, the monitoring team reviewed examples of each of the forms delineated in the Settlement in inmates' medical charts, with the exception of 0375 (Psychological Autopsy). IDOC leadership indicated that the 0375 form is used only when a death occurs for psychiatric reasons (*e.g.,* suicide), which has not occurred at Dixon in approximately two years.

The use of these standardized forms has contributed to making the medical records more usable. As reported in other sections of this report, however, the medical records remain very disorganized. This disorganization makes it very difficult to adequately follow the clinical care of a mentally ill offender.

**(XVIII)(b): Specific requirement:** No later than ninety (90) days after the approval of this Settlement Agreement, IDOC shall fully comply with Administrative Directive 04.03.100, § II(E)(7), which requires an offender's medical record, including any needed medication, to be transferred to any facility to which the offender is being transferred at the time of transfer.

AD 04.03.100, section II (E)(7):  The medical record shall be transferred to the receiving facility at the time of offender movement.

(7)(a): In the event that an offender is transferred from the Illinois Department of Juvenile Justice to an IDOC facility, the entire original medical record shall be transferred with the offender. The transferring youth center may keep a copy of the medical record. Such movement shall be treated as a departmental transfer with regard to documentation.

 (7)(b): The medical record and, if applicable, medication shall be sealed in a clear plastic envelope through which the offender's name and ID number can be easily identified.

 (1) If the information on the DOC 0090 is not urgent in nature, the DOC 0090 shall be placed inside the front cover of the medical record.

 (2) If the DOC 0090 contains urgently needed medical or medication disbursement information, the following steps shall be taken: (a) The DOC 0090 shall be folded in half to promote confidentiality and a notation of "URGENT MEDICAL INFORMATION" shall be

made in bold print on the exposed (blank) side of the DOC 0090. (b) The folded DOC 0090 with the notation side up shall be enclosed on top of the medical record inside the clear plastic so that these individuals can be immediately identified and evaluated upon arrival at a new institution. (c) Prior to transferring an offender who has significant medical problems as determined by the transferring facility Medical Director, the transferring Health Care Unit Administrator or Director of Nursing shall telephone the receiving Health Care Unit Administrator or Director of Nursing to advise of the transfer.

(7)(c): A member of the receiving health care staff shall complete the Reception Screening section of the DOC 0090. The DOC 0090 shall be placed chronologically in the progress notes section of the medical record; no progress note shall be required.

**Findings:** When an offender is transferred from one facility to another, his entire medical record accompanies him. The monitoring team has not yet had the opportunity to examine the packaging and labeling requirements described above, nor to determine whether the medications were accompanying the offender.

During a monitoring team visit to the Stateville R&C unit on September 7, 2016 the monitoring team discovered that when offenders were returned to the R&C unit on a writ, their medical records did not accompany them. Rather, a copy of the "Offender Health Status Transfer Summary" accompanied the offender. This procedure is based on AD 05.03.120, which doesn't formally consider an offender's being returned to a facility on a writ as a transfer. This is a potentially dangerous procedure even though it doesn't violate the requirements of this subsection of the Settlement. The Monitor's strong recommendation is to forward with the offender his most current volume of his medical record to the receiving facility. This change would not cause an undue burden for either the sending or the receiving facility and could prevent a potential medical or psychiatric disaster.

## XIX: CONFIDENTIALITY

**Summary**: Medical Information Confidentiality Statements were routinely in use at the facilities monitored. An Administrative Directive has been modified to comply with the requirement to have a policy, and training on that policy has been occurring. IDOC made progress in moving away from cell side visits as the norm and made more staff offices available. However, those offices are underused as some custody staff remain reluctant to escort prisoners, and when prisoners are brought to the offices, it is common practice for officers to remain within hearing distance. A better balance between confidentiality and security concerns is needed. Records suggest that disclosure and informed consent practices are absent in some cases and minimally performed in others, particularly in psychiatry contacts.

**XIX(a): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, the IDOC shall comply with the requirements of Administrative Directive 04.03.100, § II(E)(10) as to the confidentiality of mental health records.

AD 04.03.100, section II (E) (10) provides: Offender medical and mental health records are confidential. Access to medical and mental health records shall be limited to health care staff, other Department personnel and outside State and federal agencies on a need-to-know basis as determined appropriate by the Facility Privacy Officer or the Health Care Unit Administrator. All staff having access to medical records or medical information shall be required to sign a Medical Information Confidentiality Statement, DOC 0269, and a new DOC 0269 shall be signed during cycle training annually thereafter. The most recent DOC 0269 shall be retained in the staff member's training file.

**Findings:** The monitoring team was provided the Medical Information Confidentiality Statements, DOC 0269, from Pontiac, Stateville, Menard, Logan and Dixon. Based on a review of these DOC 0269s, it appears that IDOC is meeting the requirements of this subsection of the Settlement. The monitoring team will review these signed confidentiality statements from the remainder of the IDOC facilities during the next monitoring cycle.

**Specific requirement:** Additionally, IDOC shall take the following steps to promote the confidential exchange of mental health information between offenders and persons providing mental health services:

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** IDOC has modified AD 04.04.100 to address the requirement of this item. The modification involves subsection II (F)(2)(b) which states, "All mental health services shall be conducted in a manner which ensures confidentiality and sensitivity to the offender regardless of status or housing assignment." The Monitor wanted clarification on the phrasing "shall be conducted in a manner which ensures" as the Settlement uses the term "requiring" when it comes to confidentiality. Chief Lindsay stated, "The paragraph begins with 'shall,' which means it is required." Based on her assurances, the Monitor approved this modification to AD 04.04.100 on May 4, 2017. Moving forward, the monitoring team will evaluate all mental health contacts within IDOC as requiring confidentiality.

Training regarding staff's responsibility to ensure confidentiality has been occurring in IDOC.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible. 36

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** Confidentiality is an evolving concept for the IDOC. At the beginning of the monitoring period, little to no confidentiality was occurring in the delivery of mental health services. Cell-front visits were the norm as there was an almost complete lack of staff offices which provided sound confidentiality. As staff offices slowly became available, the monitoring team observed resistance on the part of custody staff to escort mentally ill offenders to confidential settings. Custody staff would routinely cite "security issues" as the basis for their not wanting to move mentally ill offenders. Confidentiality and security are both integral parts of a well-functioning correctional mental health system, which must learn to coexist if the department is to meet the requirements of the Settlement. After the Monitor's meeting with the Director on November 10, 2016, the monitoring team noted slow but steady improvement in the area of confidentiality. This noted improvement in the area of confidentiality is contrasted with several significant impediments to meeting the requirements of this section of the Settlement. The physical plants of all the facilities monitored are not conducive to providing sound confidentiality. Also, custody staff continues to interfere with the mental health staff's ability to conduct confidential meetings with the mentally ill offenders. In addition to custody staff's ongoing reluctance to move mentally ill offenders to confidential settings, they now insist that

the doors to the treatment rooms remain open with their standing within hearing distance of the treatment encounter. All of these issues will be closely monitored going forward.

**(XIX)(d): Specific requirement:** In addition to enforcing the consent requirements set forth in "Medical/Legal Issues: 2. Informed Consent" in the IDOC Mental Health Protocol Manual, incorporated by reference into the IDOC AD 04.04.101 section II (E)(2) within sixty (60) days after the approval of this Settlement Agreement, IDOC shall ensure that Mental Health Professionals who have a treatment/counseling relationship with the offender shall disclose the following to that offender before proceeding: the professional's position and agency; the purpose of the meeting or interaction; and the uses to which information must or may be put. The MHP shall indicate a willingness to explain the potential risks associated with the offender's disclosures.

Medical/Legal Issues: 2. Informed Consent in the IDOC Mental Health Protocol Manual provides:

Before initiating psychotropic medication, the psychiatric provider must complete at least a brief history and Mental Status Examination to determine that the offender (a) has a basic understanding that he or she has a Mental Health Problem, (b) understands that medication is being offered to produce relief from that problem, and (c) is able to give consent to treatment. The clinician must also inform the offender about alternative treatments, the appropriate length of care, and the fact that he or she may withdraw consent at any time without compromising access to other Health Care. With the exception of Mental Health emergencies, informed consent must be obtained from the offender each time the Psychiatric Provider prescribes a new class of Psychotropic Medication.[14]

**Findings:** Throughout the monitoring period, this issue appears not to have received a lot of attention from the mental health and psychiatric staff. The lack of sufficient numbers of both mental health and psychiatric staff also contributes to the fact that the requirements of this subsection of the Settlement are not being met. The monitoring team has certainly reviewed medical records in which QMPs have documented their efforts at informed consent. Even when present, the documentation of these attempts at providing informed consent tend to be superficial. The problems are even worse for the psychiatrists. Due to the tremendous backlog of psychiatric visits, mentally ill offenders report they are not even given the opportunity to provide informed consent. In the cases where a psychiatrist sees mentally ill offenders, there is rarely documented evidence that informed consent was obtained in the manner specified in this subsection of the Settlement.

---

[14] The Manual defines "Informed Consent": "Informed Consent is defined as consent voluntarily given by an offender, in writing, after he or she has been provided with a conscientious and sufficient explanation of the nature, consequences, risks, and alternatives of the proposed treatment." This section of the Manual also provides: "Offenders should be advised of the Limits of Confidentiality prior to their receiving any Mental Health Services." This requirement is nearly identical to the requirement discussed above regarding confidentiality, so the team does not address it again here under Informed Consent.

## XX: CHANGE OF SMI DESIGNATION

**Summary**: Treatment teams make this decision in the Dixon RTUs; MHPs reportedly make this decision at Menard. The monitoring team did not encounter any cases in violation of this requirement, though the Monitor has received several credible complaints to this effect, so the issue bears examination.

**Specific requirement:** The determination that an offender, who once met the criteria of seriously mentally ill, no longer meets such criteria must be made by the offender's mental health treatment team and documented in the offender's mental health records. Until mental health treatment teams are established, this function shall be performed by a treating MHP.

**Findings:** Mental health treatment teams in Dixon's RTUs review each inmate's diagnosis and SMI designation during the monthly treatment plan meeting. Only the treatment team can change an SMI designation. During the site visits, the monitoring team met with several offenders with limited insight into their mental illness that had requested removal of their SMI designation. After reviewing the cases with the treating MHPs, it appeared that the treatment teams were making clinically appropriate decisions about SMI designation and the necessary level of care for the inmates.

At Menard, all the staff and inmates the team interviewed reported that only mental health professionals can change an SMI designation. Menard does not yet have multidisciplinary teams in place, so the inmate's treating MHP makes this decision.

The monitoring team has received a number of credible complaints about this procedure from plaintiffs' counsel. Although unsubstantiated at this time, the monitor received a complaint that a SMI offender had his SMI status changed prior to a disciplinary hearing. Every mentally ill offender that the Monitor has spoken with over the first year of the Settlement implementation met the criteria for SMI. Only a small fraction of these offenders was officially designated SMI. So instead of the emphasis of taking away a SMI designation, IDOC should put its effort into properly designating mentally ill offenders as SMI. This is a critical issue as SMI status significantly impacts the disciplinary process. The Monitor is aware, however, that with proper treatment, an SMI offender could theoretically not meet the criteria for SMI. In that case, a change in designation is appropriate.

## XXI: STAFF TRAINING

**Summary**: IDOC produced the two required training plans in the final days before submission of this report; thus, it has met the timeliness requirement. More than 13,000 staff reportedly have had NAMI training, which may cover some or all of the topics required by this section. An examination of the adequacy of the plans and curriculum will take place in Year 2. Understandably at this stage of a culture change, there are signs that not all staff appreciate the principles that this training is meant to instill, and leadership reinforcement is needed.

**XXI(a): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan and program for staff training as provided in subsection (b), *below*.

**Findings:** IDOC has produced a "plan and program for staff training as provided in subsection (b), *below,*" which is required by this subsection of the Settlement.

**XXI(b): Specific requirement:** Within two (2) years following the approval of this Settlement Agreement, all IDOC and vendor staff who interact with offenders shall receive training and continuing education regarding the recognition of mental and emotional disorders. As directed in the section titled "Training" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), this training shall include material designed to inform the participants about the frequency and seriousness of mental illness, and how to treat persons who have mental illness or persons manifesting symptoms of mental illness. In addition to training on confidentiality as provided in Section XXII (a), *above*, this training shall incorporate, but need not be limited to, the following areas: i) The recognition of signs and symptoms of mental and emotional disorders most frequently found in the offender population; ii) The recognition of signs of chemical dependency and the symptoms of narcotic and alcohol withdrawal; iii) The recognition of adverse reactions to psychotropic medication; iv) The recognition of signs of developmental disability, particularly intellectual disability; v) Types of potential mental health emergencies, and how to approach offenders to intervene in these crises; vi) Suicide prevention; vii) The obligation to refer offenders with mental health problems or needing mental health care; and viii) The appropriate channels for the immediate referral of an offender to mental health services for further evaluation, and the procedures governing such referrals.

**Findings:** The monitoring team noted mixed results regarding IDOC's response to these training requirements. The monitor is well aware that the requirements of subsection (b) have a deadline of May 23, 2018. IDOC reports that over 13,000 employees have received the National Alliance on Mental Illness ("NAMI") training. Chief Lindsay has represented that the NAMI training materials include the areas designated in subsection (b). The monitoring team has not been provided with these materials so the monitoring team is unable to render an opinion regarding their adequacy. Other problems are noted, however. During a monitoring visit at Dixon, IDOC leadership indicated that they have undertaken some staff training, but not to the extent required by the Settlement. Chief Lindsay reported that all Dixon staff members also underwent NAMI training in late 2015 or early 2016 in response to the *Rasho* litigation.

At Menard, mental health staff and inmates consistently raised concerns about corrections officers' understanding of mental illness and commitment to the *Rasho* reforms. The staff noted that officers "blame mental health" for having to do more work and generally consider the reform effort "stupid." The facility leadership acknowledged that more work needs to be done with line staff in order for the reforms to be successful.

As the deadline for meeting the requirements of subsection (b) is May 23, 2018, IDOC is not out of compliance with this subsection. The monitoring team plans on working very closely with IDOC staff to ensure that these critical trainings are accomplished. Of note, objectively

measuring the effects of these trainings on staffs' attitudes and behavior would make an excellent CQI project.

**XXI(c): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan for the orientation, continuing education, and training of all mental health services staff.

**Findings:** IDOC has produced a "plan for the orientation, continuing education, and training of all mental health services staff," which is required by this subsection of the Settlement.

## XXII: PARTICIPATION IN PRISON PROGRAMS

**Summary**: During both Dixon and Menard site visits, the monitoring team did not encounter any offenders who were denied access to programs within the prisons. To the extent early release programs are included in this requirement, some problematic practices were observed

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** IDOC appears to be meeting the requirements of this section of the Settlement at all of the monitored facilities. For example, during both Dixon and Menard site visits, the monitoring team did not encounter any offenders who were denied access to educational, religious, work, or substance abuse programs because of a mental health diagnosis or prescription of psychotropic medication. However, the team would note one very serious concern that was raised about SMI offenders' ability to participate in parole or other early release programs. Offenders and MHPs described a system in which SMI inmates could be approved for parole and given a release date, but they did not actually leave the facility on that date in most cases. Offenders packed their belongings, walked to the front door of the facility, and then returned to their housing units after learning that no beds were available at one of the few community facilities that accepts SMI offenders. Understandably, this system caused significant distress in the offenders, many of whom have low frustration tolerance, high anxiety, and limited coping skills. In the monitor's opinion, "Participation in Prison Programs" should also include equal access to early release programs. At the very least, facilities should stop the practice of

informing offenders at the last minute about whether they will be paroled on a given day. The current system causes unnecessary distress in offenders who are already quite fragile.

## XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY

**Summary**: According to mental health and custody staff at the facilities monitored, all provisions of this subsection have been satisfied.

**XXIII(a): Specific requirement:** To ensure continuity of treatment, unless a SMI offender is being transferred to another facility for clinical reasons, IDOC shall make best efforts to ensure that the offender's treating MHP is consulted prior to transfer. If such a consultation is not possible prior to transfer, the MHP shall be consulted no more than seventy-two (72) hours after effectuation of transfer. If a transfer is being made for security reasons only, the reasons for the transfer and the consultation with the offender's treating Mental Health Professional shall be documented and placed in the offender's mental health file.

**Findings:** IDOC is generally meeting the requirements of this subsection of the Settlement, according to mental health and custody staff interviewed. The monitoring team will continue to closely monitor this in the future.

**XXIII(b): Specific requirement:** When a SMI offender is to be transferred from one prison to another, the sending institution, using the most expeditious means available, shall notify the receiving institution of such pending transfer, including any mental health treatment needs.

**Findings:** IDOC is generally meeting the requirements of this subsection of the Settlement, according to mental health and custody staff interviewed. The monitoring team will continue to closely monitor this in the future.

**XXIII(c): Specific requirement:** The provisions of this section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** The reported compliance occurred within this required timeframe.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**:  There were consistent, specific accounts of a location in segregation at Menard in which corporal punishment was allegedly meted out.  In the limited number of cell extraction materials reviewed, questions were raised about whether staff used available and adequate means to prevent the cell extraction, particularly at Pontiac. However, once an extraction was underway, required procedures were closely followed and professionally conducted. There also appeared to be significantly higher rates of unplanned uses of force at Pontiac; the reasons have not been examined to date. The number and uniformity of credible allegations, filed with the Court and provided by plaintiffs' counsel since then, of excessive force and inappropriate uses of chemical spray in IDOC raise serious questions.

At multiple institutions, the monitoring team directly observed, or noted in reviews of documents, instances of substantially unprofessional conduct in the form of racial slurs, provoking inmates, use of demeaning profanity, and posted signs seeming to endorse stereotypes and violence. It is unclear whether there have been institutional responses.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[15] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:
a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted purpose.
b) Use of force shall be terminated as soon as force is no longer necessary.
c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.
d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or

---

[15] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believe the Settlement contemplated AD 03.02.108(I)(B).

05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.    Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed

whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

      1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

      2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

      3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

      4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.      Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall

designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.     Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings:** During the team's Menard site visit, offenders in segregation consistently reported concerns about physical abuse at the hands of corrections officers. In particular, they noted that the area just outside the mental health offices does not have security cameras, and officers sometimes took inmates there "to rough them up." Only one of the offenders reported that he had personally suffered physical abuse; the others noted a belief that this was happening to other inmates. These reports by offenders are consistent with reports received from plaintiff counsel about unprovoked assaults by custody staff occurring at Menard. The team reported this concern to the facility leadership during the exit interview and recommended that cameras be added in the area around the mental health offices. Warden Lashbrook said that she would look into the allegations. Chief Hinton seemed to imply that changes to security practices were outside the scope of the Settlement; this is incorrect. Section XXIV of the Settlement clearly authorizes the monitoring team to investigate and offer recommendations about any violation regarding use of force and verbal abuse.

Regarding cell extractions, in the materials the team reviewed, procedures are generally followed. Video is taken and preserved, and this video reveals assiduous attention to the detailed procedure laid out in the AD. Incident reports are submitted. The *Rasho* monitoring team had limited ability to review these practices, however, so has insufficient information on which to make a substantial compliance finding.

Cell extraction teams are generally not apprised of whether the inmate is on the mental health caseload, is SMI, is medication noncompliant, or the like. While the AD does not specifically require that the team be provided with such information or otherwise involve the

mental health staff in order to provide advice or attempt directly to de-escalate, the monitoring team encourages IDOC to consider using these practices, which are common in corrections and would greatly support the AD's expectations to gain voluntary compliance (see, e.g., AD 05.01.173(II)(I)(9)).

The AD Policy Statement states: "In accordance with Department Rule 501, the Department authorizes the use of force to extract an offender from a cell only as a last resort or when other means are unavailable or inadequate and only to the degree reasonably necessary to control the situation." While the reviewed cell extractions were conducted professionally and according to procedure, the potential involvement of MHPs presents "available and adequate means" to prevent a cell extraction. Their involvement prior to these cell extractions could possibly avoid the necessity to conduct a cell extraction. The net result would be that cell extractions would truly be the "last resort" as envisioned by Rule 501. To the extent staff did make efforts to obtain MHP input, such efforts were not memorialized in documentation provided to the monitoring team. Documents on cell extractions do not provide sufficient information regarding justification, other steps taken, or MHP involvement. Given the substantial amount of force used during cell extractions and negative outcomes that offenders may experience, all reasonable efforts should be made to avoid using the procedure and to instead gain voluntary compliance.

At Pontiac, the monitoring team had concerns regarding decisions to activate the tactical team for a cell extraction and regarding unplanned uses of OC spray. Specifically, the documentation creates substantial ambiguity as to whether a particular use of force was justified. Incidents at Pontiac suggest a potential pattern of premature use of the cell extraction team and/or OC spray, and, at a minimum, do not entail adequate documentation of the rationale for such force being used. The uses of force seem more a reaction to noncompliance rather than to concerns about safety and security. Therefore, it appears that other steps could reasonably have been taken before resorting to the use of force or that the lack of other recourse should have been clearly documented. Unlike at the other facilities, many of the calculated uses of force at Pontiac were directed at something other than routine movement for cell change or shakedowns. Indeed, the monitoring team observed many more unplanned uses of force at Pontiac.

- On November 9, 2016, an inmate was observed with a jumpsuit over his head and refused to remove it. A tactical team was activated, and OC spray ultimately was used. The document does not provide an explanation as to the need for the inmate to remove the jumpsuit or whether it was so urgent that a tactical team be deployed without first seeking assistance from mental health staff.

- On October 30, 2016, an inmate was observed with a safety blanket draped over his head. A tactical team was activated, and OC spray ultimately was used. The document does not provide an explanation as to the need for the inmate to remove the safety blanket from his head or whether it was so urgent that a tactical team be deployed without first seeking assistance from mental health staff.

- On October 31, 2016, an inmate on the mental health unit threw a food tray after becoming upset that his cell had been shaken down. A tactical team was activated, and OC spray ultimately was used. The document does not provide an explanation as to the

need to remove the inmate or whether it was so urgent that a tactical team be deployed without first seeking assistance from mental health staff.

The monitoring team also reviewed multiple, credible reports of excessive use of force and inappropriate uses of chemical spray occurring throughout IDOC that were filed with the Court. The monitoring team did not investigate each one of these reports. Their sheer number and the uniformity of complaints, however, raise serious questions about the overall use of force within IDOC.

At Logan, the monitoring team encountered similar examples in which mental health staff was not involved before the tactical team completed its uses of force. The monitor personally reviewed the cell extraction video of a mentally ill offender who was cutting herself in her cell and refused to move to a crisis cell. As with the reviewed cases at Pontiac, the Tactical Team meticulously followed proper procedures and successfully moved the offender to a crisis cell. At no time, however, did mental health staff get involved. The Monitor fully appreciates that mental health staff should not interfere with the tactical team once it has been activated. As described in detail above, the Monitor feels it is incumbent on the mental health staff to be actively involved with the mentally ill offenders to attempt to gain their cooperation to avoid having to call for a tactical team.

Plaintiffs' counsel also provided the monitor with numerous complaints from offenders regarding use of force. Many of these complaints appear to be credible. The monitoring team will closely evaluate these issues during the next monitoring periods.

Professional Conduct

AD 03.02.108(I)(B), "Standards of Conduct" provides: The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

**Findings:** The monitoring team reviewed IDOC's compliance with AD 03.02.108(I)(B), which requires staff to conduct themselves professionally. Unless a facility is substantiating a large number of complaints alleging staff misconduct, it is exceedingly difficult to assess whether there is a general concern regarding professional conduct. The monitoring team cannot spend enough time on-site to assess this question, nor are staff likely to act inappropriately in front of the team. Unlike with use of force, there is very seldom any reporting of unprofessional conduct. The following discussion therefore focuses on the procedures in place to address those instances of unprofessional conduct (including verbal abuse) that may occur.

Examples of unprofessional conduct

Menard: A report forwarded to the monitoring team by plaintiffs' counsel describes how during an especially challenging cell extraction officers were referring to an African-American offender as "nigger, bitch, boy." The monitoring team did not investigate this alleged incident and only report it as potentially a part of a pattern of unprofessional conduct by custody staff towards mentally ill offenders.

Pontiac: While the monitoring team did not witness the offender's conduct that provoked the staff's response, nor does the team have specific information about the offender, an assistant monitor was surprised to witness a member of the security staff at Pontiac call an inmate "dumbass," albeit in the context of telling that inmate to "put your dick away."

Also at Pontiac, signs stenciled on the walls in the housing units seem to promote an us-versus-them mentality, characterizing offenders as evil and promoting an approach that is reactive rather than focused on marshaling available resources, such as mental health staff. These signs held these messages: "Evil is powerless if the good is unafraid"; "In this family no one fights alone"; "Never doubt your instinct." It is strongly recommended that IDOC remove signs of this nature from all facilities.

Logan: At Logan, the monitoring team encountered examples of unprofessional conduct, including an incident on October 29, 2016, in which an officer called an offender a "bitch," which then set off a chain of events that led to significant force being used on the offender to prevent her from retaliating against the officer. The offender suffered injuries to her face and a chipped tooth. Internal Affairs investigated another incident involving the use of racial language and profanity. Internal Affairs reported to the monitoring team that it believed the offender's account, which was corroborated by another offender who witnessed the incident, though Internal Affairs nonetheless did not substantiate the allegation. This illustrates a significant barrier to accurately assessing the frequency of this type of incident. Additionally, the warden reported that during the course of one week shortly before the December 2016 site visit, there were several incidents involving staff using profanity to or about offenders.

Dixon: The interviewed offenders reported that officers frequently use degrading or profane language in their interactions with SMI offenders. For example, one offender in the STC reported that he was usually told to "get the f--- away from the [officers'] bubble" when he approached to ask for help. Similarly, offenders in the X House noted that officers' responses to their requests for help were variable, with some officers calling them "retards" or "crazies."

The Monitor personally observed staff speaking disrespectfully to offenders in several of the facilities toured. The monitor fully appreciates the pressures associated with working with mentally ill offenders. The use of abusive and profane language, however, is never acceptable and is a clear violation of this subsection of the Settlement.

These examples of staff using abusive and profane language in their dealings with offenders are absolutely inappropriate and should cease immediately. The monitor will be working closely with the IDOC leadership to ensure that this behavior comes to an end.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary**: Adjustment Committees have been formed, utilizing the correct personnel, and have been actively functioning. While the system for MHP input is in place, monitoring reviews revealed cases where input was not sought. Staff at monitored facilities reported a system to stay proceedings when inmates are in crisis, but it was not applied in cases the team reviewed at Pontiac and Logan that indicated the inmate was not stable. MHP input tended to be perfunctory, not individualized, and not always informative to custody staff. There were instances where staff identified the contribution of mental illness to the offense but did not recommend mitigation. Some MHPs' term recommendations were consistently higher than the Adjustment Committee's.

Custody staff's adoption of these processes was mixed. Staff did demonstrate episodic willingness to consider the mitigating aspects of mental illness, but this was not a consistent finding. At Pontiac, records indicated that, when the CAO handled Adjustment Committee appeals, the CAO did not consult with the MHP as required. In general, CAOs are not routinely justifying in writing why they overrule the recommendations of mental health staff. The Chief Deputy of Operations was very responsive upon learning of deficiencies.

The overall assessment by the monitoring team is that the staff, both custody and clinical, are slow to respond to the mental deterioration of offenders caused by placement in segregation.

IDOC has distributed some information on the prohibition on discipline for self-injurious behavior or expression, but has not consulted with the Monitor to develop policies and procedures, and the monitoring team learned both of improvements and of offenders disciplined for behaviors related to self-harm.

Concerning discipline of inmates in RTU or inpatient, the available information suggests Dixon's practices are consistent with the requirement. IDOC has not informed the Monitor about any action toward a pilot Behavior Treatment Program, which is now six months overdue.

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

> (1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

> (2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

> (3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term,

that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

(1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** While the system for MHP input is in place, the monitoring team encountered cases where input was not sought as well as cases in which MHPs identified the contribution of mental illness to the offense but did not recommend mitigation. Custody staff's adoption of these processes were mixed. Staff did demonstrate episodic willingness to consider the mitigating aspects of mental illness, but this was not a consistent finding.

Compared with some other IDOC facilities, Menard has relatively few tickets involving SMI offenders. The lead MHP reviews the tickets on a twice-weekly basis and completes the 0443 form to provide input about the offender's mental illness to the disciplinary officer. The MHP estimated that there are about 10 tickets per week that are processed in this manner. As with other IDOC facilities, the 0443 form is completed based on a chart review alone, without actually evaluating the offender and asking him about the circumstances leading to the ticket. In the monitoring team's opinion, a face-to-face assessment is necessary in order to ensure meaningful input into the disciplinary process by the mental health staff. Additionally, staff discovered through the Segregation Review Committee process that some of the infractions were not being subjected to the process for MHP input, but Menard was correcting that failure. It was unclear whether staff was working to identify other potential failures that would not have been discovered as a result of the Segregation Review Committee process.

Staff at each of the facilities reported that, pursuant to an informal understanding, offenders would not have their disciplinary hearings while they were in crisis. However, the 0443 forms provide a checkbox for recommending a stay of the disciplinary proceedings, and this box was never checked on Pontiac and Logan records where MHPs indicated the offender was "not stable" and was in crisis; in fact, segregation was still recommended.

The content of the 0443s tends to be generic and very brief. At Logan, for example, the mental health director noted the generic nature of the 0443 content. The process is not individualized, and it appears to the mental health director that the MHP providing the content is applying too high a standard for recommending consideration of mental health status in determining whether to impose segregation. Each time the form indicated the offender was unstable or in crisis or both, it still did not recommend consideration of the offender's mental health status and recommended, without explanation, a range of up to three or five months in segregation. In fact, among the sample received, not a single one indicated that mental health status should be considered, segregation would pose a risk, or mental health contributed to the behavior. The MHPs' recommendations regarding segregation time generally indicated a range of up to the maximum available for the particular infraction and almost always exceeded the recommendation of the adjustment committee, which was recommending very reasonable periods of segregation time.[16] A Stateville MHP identified "significant" adverse impact of segregation but still recommended up to six or nine months. Menard MHPs found that mental health played a role in the infraction but still recommended segregation time because of the seriousness of the offense or for no stated reason.

Dixon has a procedure in place for MHPs to provide input to the disciplinary officer about SMI offenders who are facing tickets. Every day at noon, the mental health staff meets to review the previous day's tickets, among other things, and decide whether, for each offense, the offender's mental illness contributed to the prohibited conduct. Each ticket is assigned to a particular MHP to review. By design, the MHP who reviews the ticket is not the primary treating MHP for the offender, in order to avoid bias. The monitoring team observed the noon

---

[16] As a result of this practice and others, the warden reported progress in managing groups. She said that when Logan first opened, there were 106 segregation beds and the facility was averaging 120-140 inmates in segregation. In contrast, she reported, as of a site visit, there were 55 inmates in segregation and the facility is using segregation more effectively.

meeting during the November site visit, when the staff reviewed 12 tickets and decided in all cases the offender's illness did not contribute to the offense. The brevity of discussion and cursory nature of the assessments raised concern about whether offenders were receiving adequate mental health evaluations, though the policies and procedures in place are reasonable. In speaking with the mental health staff, it seemed that they simply do not have time to do an in-depth assessment of each ticket, and so they base their assessments on prior knowledge of the offender's clinical status (*e.g.*, medication compliance, "overall presentation," prior ticket history).

A review of disciplinary procedures with SMI offenders that the monitor had with the Chief Deputy of Operations revealed that facility reviews of AD 05.12.103 were occurring and that Adjustment Committees have been formed, utilizing the correct personnel, and have been actively functioning. DOC 0443s were being completed but the recommendations made by mental health staff were often vague and ambiguous. There was also apparent confusion regarding what type of recommendations mental health staff was authorized to make. Finally, a comparison of the 0443s and the monthly summary of the Adjustment Committee actions that is sent to the Deputy Director revealed that Wardens are not routinely justifying in writing why they overrule the recommendations of mental health staff. The Chief Deputy of Operations duly noted these system-wide problems and had a conference call with the wardens immediately after meeting with the Monitor. The Monitor is convinced that the problems noted with the disciplinary procedures with SMI offenders will be significantly reduced if not eliminated on follow-up inspections.

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** As mentioned in section XV(a)(vii) of this report, *above*, problems exist in ensuring that offenders receive timely evaluation when they are at imminent risk of deterioration of their mental health due to their continued placement in segregation. The problems include the

offender's impaired ability to access the Crisis Intervention Team, lack of appropriate follow up and treatment plan reviews by MHPs, and the extremely perfunctory nature of segregation rounds. The overall assessment by the monitoring team is that the staff, both custody and clinical, are slow to respond to the mental deterioration of offenders caused by placement in segregation.

**(XXV)(b): Specific requirement:** No later than one (1) year after approval of this Settlement Agreement, IDOC, in consultation with the Monitor, shall develop and implement policies and procedures to provide that, for mentally ill offenders, (i) punishment for self-injurious behavior (*e.g.,* suicide attempts and self-mutilation) is prohibited; (ii) punishment for reporting to IDOC staff or vendor staff feelings or intentions of self-injury or suicide is prohibited; and (iii) punishment for behavior directly related to self-injurious behavior, such as destruction of state property, is prohibited unless it results in the creation of a weapon or possession of contraband.

**Findings:** At the time of the submission of this report, the Monitor has not been asked to consult with IDOC on the development and implementation of this policy. During site visits of Stateville proper and Menard, written notices about this punishment prohibition were observed but they simply contained the language of section XXV (b). In the supplement to the quarterly report of March 23, 2017, IDOC reported "In accordance with Section XXV(b), IDOC does not punish offenders for reporting indications or feelings of self-harm, for self-harm, or for behavior directly related to self-harm." It goes on to state, "The provisions of subsections (a) through (c) as well as a myriad of other requirements in the Settlement Agreement, are addressed in Departmental Rule 504." As noted below, the monitoring team encountered examples of offenders disciplined for behaviors related to self-harm. Also, Departmental Rule 504 doesn't satisfy the requirements of this subsection of the Settlement, which specifically requires IDOC to consult with the Monitor in the development of a policy regarding self-harm.

During a site visit to Dixon, inmates and staff reported that they no longer issue disciplinary tickets for self-injurious behavior, such as cutting or suicide attempts. However, tickets for destruction of property are issued in cases where, for example, an inmate damages a wall in order to use the cement to cut himself. No tickets are issued for reporting suicidal feelings or intentions. Inmates and staff at Menard reported that that facility does not issue disciplinary tickets for self-injurious behavior, such as cutting or suicide attempts. At Stateville proper, several inmates reported that they were "written up" for requesting a Crisis Intervention Team that did not result in them being placed on a suicide watch. Although staff adamantly denied that this was happening, the Monitor found significant credible evidence that inmates were discouraged from asking for a Crisis Intervention Team unless the request resulted in placement on a suicide watch. At Pinckneyville, a mentally ill offender was written up for "disobeying a direct order" when he was observed by custody staff attempting to overdose on his own medication. He received segregation time for this offense and at the time of the Monitor's evaluation, February 7, 2017, he had spent over 48 hours in segregation without being seen by anyone from mental health.

**(XXV)(c): Specific requirement:** For any offender who is in RTU or inpatient treatment for serious mental illness, the disciplinary process will be carried out within a mental health

treatment context and in accordance with this Section. Discipline may include loss of privileges or confinement to cell on the treatment unit for a specified period, but may not entail ejecting an offender from the treatment program.

**Findings: Room restriction at Dixon**: During the January site visit, the monitoring team reviewed the issue of Room Restriction in detail. The team understands that Room Restriction is used for class 300 and 400 tickets, as a less severe punishment than segregation placement. The mental health staff and officers reported that the most common offenses leading to room restriction are fighting, refusing housing, and insolence. The staff reported that most offenders are placed on room restriction for 10 to 15 days for fighting and refusing housing, and insolence typically leads to a shorter period of restriction, usually 24 to 72 hours. Tickets for these offenses are adjudicated in the same manner as class 100 and 200 tickets, with a hearing before the disciplinary officer and input from the mental health staff.

While on room restriction, inmates are allowed to keep their property in their cell, with the exception of electronics (TVs, radios) and commissary items other than toiletries (*e.g.*, snacks, coffee). If the offender lives in a single cell in the RTU, he stays in the same cell for room restriction. If he is housed in a double cell, then he would be moved to another cell in the STC or perhaps in the X House if there is no room in STC. Dixon has designated 18 cells in the STC for room restriction. The staff reported that these cells are usually full, and overflow in the X House is not uncommon.

Until approximately December 2016, inmates on room restriction were not permitted to participate in structured programming. After that date, offenders were offered the opportunity to participate in community meeting (2 hours per day, or 10 hours per week), though many chose not to attend. The offenders the Monitor interviewed had variable reasons for not attending groups, ranging from "I don't understand what's going on" to "I don't want to get jumped." However, they all stated that room restriction—even without group participation—was preferable to segregation placement, since they were allowed to have more property in their cells.

Of note, Dixon does not seem to track the use of room restriction. For example, there is no easy way to find out how many offenders are placed on that status during a given month, nor is there an easy way to see a particular offender's room restriction history. When the team requested this information for eight offenders during the January site visit, the warden was able to provide it, but only after it was extracted manually from a database. Moving forward, it would be very helpful to develop a tracking system for room restriction to monitor patterns of use and ensure that it has not become "segregation by another name."

There were approximately 10 to 20 inmates in the X House who appeared to be on indefinite room restriction. IDOC's policy states that no inmate is placed on room restriction for more than 60 days. This is true only if interpreted as "60 days <u>at a time</u>." Several inmates fell into a pattern of being placed on room restriction initially for a short time, but then refusing to leave, and therefore being sentenced to an additional 30 days of room restriction. Cumulatively, these inmates had spent one to two years on room restriction status. The offenders and staff reported that this behavior was voluntary; inmates did not want to leave X House because they found the closed setting to be safer than any options available in STC or general population.

Overall, in the team's opinion, Dixon's practice of room restriction does not appear to violate the letter or the spirit of the Settlement. However, the team cannot draw a firm conclusion without evaluating additional data about the frequency of use, duration of confinement, and clinical status of inmates housed in those conditions. IDOC should study the use of room restriction further. At a minimum, IDOC should track monthly statistics for the number of room restriction placements, the duration of confinement, and the reason for confinement. For inmates whose room restriction status is renewed repeatedly, the facility should develop a review process similar to the SMI Segregation Review Committee.

**(XXV)(d): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor and the IDOC's designated expert, shall develop and implement a pilot Behavior Treatment Program ("BTP") at Pontiac CC for SMI offenders currently subject to sanction for a serious disciplinary infraction. IDOC will review this pilot and consider implementation at other facilities.

**Findings:** To date the Monitor has not been consulted regarding such a program. A pilot had not been implemented by the time of the Monitor's March 2017 visit, which was well past the deadline of November 23, 2016.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

> **Summary**: IDOC continues to operate CQI under the Administrative Directive governing health care CQI; facility-based CQI committees are formed and mental health-specific data is being collected. That system is limited in its guidance on using the collected data. A CQI Manager was hired as of February 2017, although he continues to hold another position, and IDOC reports a CQI program is in development.

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** AD 04.03.125 addresses the broad medical CQI program, which includes mental health as a small piece among many other pieces. The cited portion of the SOP Manual relates specifically to a new mental health CQI program. This SOP Manual also cites an AD on a mental health CQI program, but that AD is not yet finalized. For both the broader CQI program and the mental health-specific CQI program, the requirements incorporated by reference in the

Settlement include committee composition and meetings, CQI studies to be conducted, data to be reviewed, and suicide reviews. The Settlement includes additional provisions that emphasize corrective action and create a new statewide CQI Manager position.

As reported in IDOC's quarterly report of March 23, 2017: "The Agreement requires implementation of a quality improvement program. IDOC is developing a CQI program and a CQI manager has been hired." It is not clear what is meant by this comment.

Based upon a year-long review of various aspects of IDOC's CQI system, several points stand out. IDOC has been utilizing AD 04.03.125 as its CQI guide for the ongoing, systematic evaluation of offender care practices, professional or clinical performance, and offender care services in primary care and mental health services. This AD does not represent a robust CQI policy in that it is extremely weak in directing how to utilize the obtained data to actually improve the quality of mental health services at a given facility or throughout IDOC. The overall requirements of AD 04.03.125, however, are generally being accomplished in that facility-based CQI committees are formed and mental health-specific data is being collected. AD 04.03.125 will continue to be used until such time as AD 04.04.104, Mental Health Continuous Quality Improvement Program, is approved and implemented throughout IDOC. The monitoring team looks forward to consulting with IDOC clinical leadership in the development of AD 04.04.104. The goal will be to make it a much more comprehensive CQI policy which utilizes the specific mental health data obtained in a manner to actually improve the quality of the mental health services. This new AD coupled with the new Quality Improvement Manager has the potential of creating a functional and effective CQI program in IDOC.

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** As reported in Section XI(b), IDOC hired Jeff Sim, Psy.D on February 16, 2017. At the time of the submission of this report, however, Dr. Sim remains in his role as Central Regional Psych Administrator. It is unclear if Dr. Sim has actually performed any specific duties related to CQI.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** IDOC has not fulfilled its obligation to inform plaintiffs' counsel when it denied the monitor's request for staff.

**XXVII(f)(iv): Specific requirement:** The monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be

justified with supporting data. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** The Monitor has given very explicit recommendations in a variety of areas including but not limited to proper psychiatric care in general, and the use of psychotropic medication in particular, treatment planning, confidentiality, suicide reviews and the care of offenders assigned to crisis care. In this regard, the Monitor has only received tacit acknowledgement of the Monitor's recommendations from IDOC staff. The Monitor is not suggesting that IDOC is obligated to fully implement the Monitor's recommendations but rather respond to them in an official manner.

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** The monitoring team has enjoyed timely and unlimited access to all relevant files, reports, memoranda and other documents within the control of IDOC or subject to access by IDOC. The monitoring team has also had unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement, as well as having direct access to staff and offenders including partaking in private conversations with the parties and their counsel. Members of the monitoring team have had private conversations with several of the named plaintiffs, plaintiffs' and defendants' counsel, IDOC leadership including the Director, Assistant Director, Chiefs of Programing and Operations, as well as having an ongoing conversation with Dr. Hinton, Chief of Mental Health, and Michael Dempsey, MD, Chief of Psychiatry.

## XXVIII: REPORTING AND RECORDKEEPING

**Summary**: The agency has provided timely quarterly reports. However, the reports sometimes contain declarative statements of compliance without support. Additionally, there are indications that staff is not being forthcoming with relevant information needed for an accurate assessment of system performance.

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the

Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings:** The Monitor received quarterly reports from IDOC dated September 29, 2016, December 23, 2016 and March 23, 2017. The quarterly reports have been submitted on time and include comments on provisions specified in the Settlement. The content of the reports, however, does not adequately describe IDOC's progress toward meeting the requirements of the Settlement. The reports explain when, in the opinion of the author of the reports, certain requirements are being met. The reports, however, omit critical information about problems and lack of progress.

An example of this is taken from the March 23, 2017 quarterly report, Section XIII, Medication. The report states "The Agreement addresses medication issues, including recording information concerning medication, administration, review of medications and effects (including review by an MHP for noncompliance), lab work, and provision of information about certain drugs to the offender." It goes onto state, "IDOC currently implements the requirements of this Section." Since at least December 2016, the Monitor has personally described to the Director; Assistant Director; the Chiefs of Mental Health, Psychiatry and Legal the abysmal state of psychiatric services in general and all deficiencies related to medication in particular. During the quarter that the March 23, 2017 report covers, the Monitor had a call with the Assistant Director explaining that IDOC had a backlog of over 3,000 psychiatric follow-up visits and approximately 500 new psychiatric evaluations. Of note, Chief Lindsay was also on that call, which occurred February 2, 2017. So it is highly inaccurate that "IDOC currently implements the requirements of this Section." Based on the egregious misrepresentation in the Medication section, the Monitor seriously calls into question the reliability and utility of the quarterly reports.

Finally, the requirements of this section of the Settlement also include the responsibility for IDOC to bring additional matters to the attention of the Monitor. Throughout this first year of monitoring the requirements of the Settlement, the Monitor has frequently encountered IDOC trying to keep certain critical information from the Monitor's attention. This may be a by-product of the litigious nature of the *Rasho* matter but these efforts at secrecy do not contribute to the overall goal of meeting the requirements of the Settlement. The overwhelming problems with the psychiatric services are a good example of IDOC's attempts at withholding certain critical information from the Monitor. It took the monitoring team around six months to uncover the problems with psychiatric services. As IDOC was already aware of these problems, the time and efforts of the monitoring team devoted to this issue could have been better dedicated to helping IDOC meet the requirements of the Settlement. It is the Monitor's sincere hope that this will change as this process proceeds with a more candid and reciprocal relationship developing between the monitoring team and IDOC.

## CONCLUSION

IDOC has considerably improved the quality of the mental health services offered to the offender population during the first year of the settlement. Areas of improvement include: providing timely screening and mental health evaluations in the R&C units; transfer of seriously mentally ill offenders from facility to facility; a significant reduction of segregation time for mentally ill offenders; implementation of offender orientation procedures at all IDOC facilities; the proper use of physical restraints for mental health purposes; and structured and unstructured activities being offered at the two operating RTUs and certain segregation units.

The absence of a state budget has hampered IDOC in its efforts to fully meet the requirements of the Settlement. Nevertheless, IDOC has been able to partially meet several budget-contingent requirements of the Settlement. These include: limited hiring of additional mental health staff; construction projects on the four RTUs; partially moving the crisis beds off North House at Pontiac; and the provision of enhanced services for those mentally ill offenders designated and requiring inpatient level of care.

Tremendous problems exist with the quantity and quality of psychiatric services. They include: problems with the continuation of medications upon entry into IDOC; lack of timely medication follow up; dangerous practices related to the use of medication including those offenders receiving forced medications; problems with managing medication side effects; lack of timely psychiatric evaluations; non-participation in multidisciplinary treatment planning; and lack of timely follow up for offenders in crisis beds. These problems pervade almost every aspect of IDOC's mental health delivery system. Furthermore, the problems with the psychiatric services contribute to IDOC being found noncompliant in almost ever aspect of the Settlement.

Although improvement has occurred, IDOC remains noncompliant in many areas of the Settlement. These areas include: treatment planning; transition from specialized treatment settings such as crisis; medication; housing assignments; segregation; suicide prevention; medical records; confidentiality; use of force and verbal abuse; discipline of SMI offenders; continuous quality improvement program; and reporting and record keeping.

I am well aware that such a major shift in addressing the needs of the mentally ill offenders for an institution as large as IDOC can take time. For issues such as suicide prevention, medication management, use of force, confidentiality, discipline and preventing mentally ill offenders from deteriorating while in segregation, however, the time is now. The monitoring team looks forward to a continued collaboration with IDOC on all of the issues detailed in this report. Finally, the monitoring team will be taking a much more active technical assistance role moving forward to help IDOC expeditiously and professionally meet all of the requirements of the Settlement.

Respectfully submitted,

*Pablo Stewart, M.D.*[17]          Dated: May 22, 2017

Pablo Stewart, MD

---

[17] Indicates electronic signature