IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants | ) | |

**MIDYEAR REPORT OF MONITOR PABLO STEWART, MD**

TABLE OF CONTENTS

BACKGROUND ………………………………………………………………4

METHODOLOGY/MONITORING ACTIVITIES ………………………………………7

EXECUTIVE SUMMARY ……………………………………………………… 8

DETAILED FINDINGS ………………………………………………………… 16

   IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING ……………… 17

   V: MENTAL HEALTH EVALUATION AND REFERRALS ……………………………. 22

   VI: MENTAL HEALTH SERVICES ORIENTATION ……………………………………. 28

   VII: TREATMENT PLAN AND CONTINUING REVIEW ……………………………… 29

   VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS..34

   IX: ADDITIONAL MENTAL HEALTH STAFF ………………………………………36

   X: BED/TREATMENT SPACE ……………………………………………………………38

   XI: ADMINISTRATIVE STAFFING ……………………………………………………44

   XII: MEDICATION…………………………………………………………………… 46

   XIII: OFFENDER ENFORCED MEDICATION ……………………………………………52

   XIV: HOUSING ASSIGNMENTS ………………………………………………………57

   XV: SEGREGATION ……………………………………………………………………59

   XVI: SUICIDE PREVENTION ……………………………………………………………72

   XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES ………………80

   XVIII: MEDICAL RECORDS ……………………………………………………………...85

   XIX: CONFIDENTIALITY ……………………………………………………………87

   XX: CHANGE OF SMI DESIGNATION ……………………………………………91

   XXI: STAFF TRAINING ……………………………………………………………...92

XXII: PARTICIPATION IN PRISON PROGRAMS …………………………………93

XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS
        FROM FACILITY TO FACILITY …………………………………………………93

XXIV: USE OF FORCE AND VERBAL ABUSE ……………………………………94

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS …………………103

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ………………………111

XXVII: MONITORING ……………………………………………………………112

XXVIII: REPORTING AND RECORDKEEPING ……………………………………113


CONCLUSION …………………………………………………………………………114

## BACKGROUND

**IDOC:** IDOC consists of 25 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and two women's facilities. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Three of the facilities have Residential Treatment Units. All facilities have crisis care beds as well as having some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement ("Settlement") was approved May 23, 2016. It covers a range of issues affecting inmates with mental illness or serious mental illness:

- Policies and procedures
- Intake screening
- Medication continuity on arrival
- Referrals
- Mental health evaluations
- Crisis Intervention Team
- Licensure
- Inmate orientation
- Treatment plans and updates
- Psychiatric evaluations
- Follow-up after discharge from specialized treatment settings
- Staffing plans and hiring
- Bed, programming, and office space for residential treatment units, inpatient facilities, and crisis beds
- Administrative staffing
- Medication administration, documentation, evaluations, lab work, side effects monitoring, informed consent, non-compliance follow-up
- Enforced medication
- Housing assignment notice and recommendations
- Treatment, housing conditions, and out-of-cell time in segregation and investigative status
- Review of segregation terms length
- Suicide prevention
- Restraints for mental health purposes
- Mental health care records and forms
- Confidentiality
- Change of Seriously Mentally Ill designation
- Staff training
- Nondiscrimination in program participation
- Records and medication continuity on inter-facility transfers
- Use of force and verbal abuse
- Mental health input into discipline

- Continuous quality improvement
- Terms of monitoring this Settlement
- IDOC reporting

**Deadlines:** Deadlines in the Settlement range from immediate to the year 2020; this report calculates many deadlines from the Amended Settlement Agreement approval date of May 23, 2016. A number of deadlines on critical issues were contingent upon, and calculated from, the state budget approval date of July 6, 2017. The team reviewed each provision of the Settlement per the specific deadlines identified in the Settlement. Of note, there are many provisions for which the deadline is "as agreed upon" between the parties but for which the monitoring team did not receive a schedule of specific agreed-upon dates. For these particular issues, the assigned compliance ratings reflect the current status of the issues.

The following table lists the requirements in order of their deadlines to be accomplished. Of the 27 items with deadlines in or before November 2017, 16 have reached Substantial Compliance. Ratings are also indicated for those items to be accomplished "in a reasonable time," in the event that it is determined that a reasonable time is now at hand. A more detailed summary of the compliance status of all Settlement Agreement provisions can be found in the Executive Summary.

| Amended Settlement Agreement provision | Timeline | Substantial Compliance? |
|---|---|---|
|  |  |  |
| Crisis Beds are to be outside Control Units (except Pontiac) | May 2016 | N |
| Regional Director hires | June 2016 | Y |
| State employee at each facility to supervise State clinical staff, monitor and approve vendor staff | June 2016 | N |
| Architectural plans to Monitor | July 2016 | Y |
| 12 Mental Health Forms in use | July 2016 | Y |
| Treating mental health professionals[1] disclose information to patient | July 2016 | N |
| Medical Records and medication transferred with patient | August 2016 | No rating |
| Intergovernmental Agreement with Department of Health Services | August 2016 | Y |
| Medication delivery, recording, side effects monitoring, lab work, patient informed, non-compliance follow-up | August 2016 | N |
| Propose any amendment to Staffing Plan | August 2016 | Y |
| Any objections to proposed amended Staffing Plan | October 2016 | Y |
| All policies/procedures/ADs specified in Settlement Agreement – drafts to Plaintiffs and Monitor | November 2016 (unless otherwise specified) | N |

---

[1] Referred to throughout the Settlement Agreement and this report as MHP

| | | |
|---|---|---|
| Confidentiality: records, mental health information, policies and training | November 2016 | N |
| Behavior Treatment Program pilot | November 2016 | N |
| Quality Improvement Manager hire | February 2017 | Y |
| Review Committees for SMI Disciplinary Segregation terms | February 2017 | Y |
| Mentally ill Control Unit residents >60 days receive 8 hours out of cell time weekly | May 2016-May 2017 | Y |
| Inmate Orientation policy and procedure | May 2017 | Y |
| Crisis beds at Pontiac moved to protective custody | May 2017 | N |
| Suicide Prevention measures | May 2017 | N |
| Physical Restraints measures | May 2017 | N |
| Staff Training plan and program developed | May 2017 | Y |
| Discipline: policies related to self-injury | May 2017 | N |
| Mental health staff Training plan and program developed | May 2017 | Y |
| Transfers: consults and notification | May 2017 | N |
| Mentally ill Control Unit residents >60 days receive 12 hours out of cell time weekly | June 2017-May 2018 | N |
| Staffing: quarterly hiring reports, meeting targets | Quarterly from October 2017 on | N |
| | | |
| Mental health referrals and evaluations | November 2017 | N |
| Staffing to run RTU at Joliet | November 2017 | Y |
| Central office staff hires for policies and recordkeeping | November 2017 | N |
| RTU Programming and Office Space | January 2018 | No rating |
| Staffing hires – Dixon, Pontiac, Logan | January-July 2018 | N |
| RTU Bed Space | January-October 2018 | No rating |
| Inpatient Bed Space construction | January-November 2018 | No rating |
| Screening conducted with sound privacy | May 2018 | Y |
| Training for all State and vendor staff with inmate contact | May 2018 | No rating |
| Mentally ill Control Unit residents >60 days receive 16 hours out of cell time weekly | June 2018-May 2019 | N |
| MHP review within 48 hours after Investigative Status/Temporary Confinement placement | July 2018 | N |
| Inpatient Facility – transfer ownership and expand, policies | November 2018 | No rating |
| Mentally ill Control Unit residents >60 days receive 20 hours out of cell time weekly | June 2019-May 2020 | No rating |
| Segregation and Temporary Confinement for mentally ill: housing decisions, MHP review, treatment and out-of-cell requirements | May 2020 | N |

- 6 -

| | | |
|---|---|---|
| Develop plans for inpatient care that can be implemented after necessary appropriations | After IGA is signed | N |
| Screening on arrival at reception | Reasonable time | Y |
| Psychotropic medications continued on arrival, reviewed, and related documentation | Reasonable time | N |
| Inmate Orientation | Reasonable time | Y |
| Treatment Plans | Reasonable time | N |
| Psychiatry Review frequency | Reasonable time | N |
| Follow-up after Specialized Treatment Settings | Reasonable time | N |
| Enforced Medication | Reasonable time | N |
| SMI Housing Assignment information and consultation | Reasonable time | N |
| Change of SMI designation only by treatment team (or treating MHP before teams are operating) | Reasonable time | N |
| Mental illness does not prevent access to prison programs | Reasonable time | No rating |
| Use of Force and Verbal Abuse | Reasonable time | N |
| Discipline system conforms to AD 05.12.103 | Reasonable time | N |
| Discipline in RTU or inpatient is carried out in a mental health treatment context | Reasonable time | No rating |
| Quality Improvement Program implemented | Reasonable time | N |

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, and Reena Kapoor, MD.

To accomplish the monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 15 site visits to a variety of IDOC facilities, where interviews of administrators, staff, and offenders were conducted. While on site, the monitoring team would meet with the administrative and clinical leadership of the facility and then tour the facility. The tour would include observing general population units, segregated housing units, crisis care units, infirmary areas including medical records and restraint rooms, working spaces for the clinical staff, group therapy areas (if present), as well as any other area associated with the provision of mental health services. The monitoring team also toured the Residential Treatment Units at Dixon and Joliet. The Monitor personally inspected the Mental Health Unit at Pontiac on two separate occasions.

During the monitoring period, the Monitor met with the Director and Assistant Director, as well as the Chiefs of operations, mental health, quality assurance and legal. The Monitor also met with counsel for the plaintiffs on several occasions. The Monitor received and considered reports prepared by counsel for the plaintiffs regarding IDOC's response to the Settlement Agreement, as well as receiving and considering reports prepared by counsel for the defendants. Of note, over the course of the monitoring period, the various members of the monitoring team interviewed and reviewed the medical records of several hundred offenders. This number of offenders evaluated represents a sufficiently robust sample of the mental health population of the

IDOC. Therefore, the opinions presented in this monitoring report are based on a substantial-sized clinical sample of offenders.

In advance of the site visits, a variety of materials were requested. These materials included policies, procedures, training materials, a variety of clinical data, internal audits and reports, inmate grievances, incident reports, various logs, and other materials. The responsiveness to the monitoring team's request for data began to slow down during the course of this monitoring period. That is, some data was not received in a timely manner. In addition, the data when received was often disorganized and difficult to interpret. It is unclear why this occurred. The monitoring team has made every effort to include the most up to date data in this report.

Monitoring began immediately following the submission of the First Annual Report on May 22, 2017. The monitoring team, once again, was purposefully kept small in consideration of the budgetary issues facing Illinois in general and IDOC in particular. The rates of compensation were also purposely kept in the low range.

The monitoring team made the following site visits during the current monitoring period:

| **Pinckneyville**<br>8/21-8/24 Ms. Morrison<br>10/16 Dr. Stewart | **Pontiac**<br>6/19 Dr. Stewart, Ms. Morrison<br>9/11 Ms. Morrison<br>9/19 Dr. Stewart | **Stateville and**<br>**Northern Reception Center**<br>6/20 Dr. Stewart, Ms. Morrison<br>11/7 Dr. Stewart |
|---|---|---|
| **Dixon**<br>8/31-9/1 Dr. Kapoor | **Joliet**<br>6/20 Dr. Stewart | **Menard**<br>11/8-11/9 Dr. Kapoor |
| **Hill**<br>9/7-9/8 Ms. Morrison | **Sheridan**<br>9/7-9/8 Dr. Stewart | **Big Muddy River**<br>8/24-8/25 Ms. Morrison |
| **Lawrence**<br>10/18-10/23 Ms. Morrison | **Robinson**<br>10/23-10/24 Ms. Morrison | |

## EXECUTIVE SUMMARY

During this current monitoring period, May 23-November 22, 2017, IDOC leadership has been generally cooperative and helpful with the work of the monitoring team. The Director and Assistant Director, as well as the Chiefs of Operations, Legal, and Mental Health have made themselves available to the Monitor regarding the implementation of the various requirements of the Settlement. In addition to this cooperation and availability, numerous IDOC staff members encountered during the various site visits have demonstrated a willingness for implementing the requirements of the Settlement. This was especially true of the staff at Pinckneyville and Sheridan.

Improvements to the mental health care delivery system in IDOC have occurred during this first six months of the second year of the Settlement. A greater number of structured out-of-cell

activities are being offered to those mentally ill offenders assigned to segregation, and there was improved content in group therapy in some locations. The RTU at Joliet began accepting mentally ill offenders on 11/6/17. Dixon has made significant progress and is close to being substantially compliant with constructing sufficient bed and treatment space for 625 RTU offenders. More institutions moved from cell side to private contacts for crisis care. Dixon has improved the overall confidentiality of its psychiatric contacts. It is a major improvement that treatment plans in Dixon's STC are now completed during monthly review meetings by members of every discipline treating the patients. The mental status examinations of the mental health evaluations were somewhat more comprehensive.

Despite the improvements to the mental health care delivery system, IDOC continues to not be able to meet the majority of the requirements of the Settlement Agreement. Among IDOC's biggest challenges is the lack of psychiatric services which meet a constitutional minimum level of care. That is, there continues to be a grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the requirements of the Settlement. These psychiatric services deficiencies include but are not limited to problems with the proper continuation of medications for offenders entering IDOC, lack of timely follow-up for offenders prescribed psychotropic medication, dangerous practices related to the use of psychotropic medications, lack of following standard protocols for ascertaining side effects, extreme delays in obtaining psychiatric evaluations, non-participation of psychiatrists in the mental health treatment team treatment planning process[2], and lack of timely psychiatric intervention for offenders assigned to crisis beds. Of note, the overall quality of the psychiatric services provided to the mentally ill offenders of IDOC is exceedingly poor and often times dangerous. The Monitor has alerted IDOC of these deficiencies throughout the life of the Settlement. IDOC leadership has been well aware of the problems related to the insufficient amount of psychiatric services and yet has been unable to adequately solve this issue. At the time of the submission of this midyear report, however, the lack and quality of psychiatric services continues to negatively impact all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement. Of note, these deficiencies regarding psychiatric services were reported in the First Annual Report. The Monitor personally met with Director Baldwin on 6/26/17 to discuss this problem. To date, IDOC is yet to effectively address this emergency.

The monitoring team continued to hear multiple credible complaints from mentally ill offenders at key facilities monitored that Custody staff was acting as "gate keepers" when a mentally ill offender requested to be seen by the Crisis Intervention Team. A data driven analysis of this concern conducted by Assistant Monitor Ginny Morrison did not support this claim by the offenders. It appears that this issue has continued to improve over this monitoring period. The degree of credible complaints regarding "gatekeeping" remains a concern, however.

The current system of treatment planning still is not working and needs to be completely rethought. IDOC is not able to perform its required treatment plan reviews and updates for mentally ill offenders assigned to RTU, segregation or crisis housing. IDOC is also not meeting the

---

[2] The current practice in IDOC is for the MHP to complete a treatment plan. The psychiatrist involved in the case, at times, also completes a treatment plan. These treatment plans are usually independent of one another and regularly contain dissimilar diagnoses.

requirements of the Settlement Agreement regarding the transition of offenders from specialized treatment settings. Of note, all of these issues are not new to this monitoring period. They were all reported on in the Monitor's First Annual Report. IDOC has done little to adequately address these very serious issues.

There continues to be an absence of "aggressive treatment" for mentally ill offenders assigned to a crisis level of care. The bulk of the treatment activities, and in most cases the only treatment, is limited to daily visits by an MHP. In at least two of the facilities monitored, Pontiac and Pinckneyville, these daily visits are mainly conducted in confidential settings, the remainder occur cell side. This includes the crisis cells located in the North House of Pontiac. In the facilities monitored, the procedures for enforced medications were being followed. Significant problems were noted in prescribing psychotropic medications for these offenders, however. Questions also exist regarding the system-wide application of these procedures.

Some institutions run multidisciplinary workgroups that meet routinely to discuss offenders assigned to segregation or others with behavior management issues. The workgroup spots issues and designs incentives and plans for those individuals that ultimately reduce acting out, shorten or prevent segregation terms, reduce disciplinary actions, improve safety, and support many of the treatment goals of this Settlement. This is an effective mechanism for moving toward compliance on a number of this Settlement's requirements.

The observed conditions of segregation for mentally ill offenders remained problematic throughout the monitoring period. Challenges were observed in ensuring that these offenders continued to receive the treatment outlined in their Individual Treatment Plans. Also, there was no formal mechanism for identifying those mentally ill offenders who were decompensating while on segregation status. The only established mechanisms are the weekly segregation rounds, which are conducted at the cell front, and the Crisis Intervention Team. Given the problems with the Crisis Intervention Team, the main recourse available for mentally ill offenders who are decompensating while in segregation is to behaviorally act out, which often results in greater segregation time.

Two suicides occurred in IDOC during the current monitoring period. At the time of this report, the required administrative reviews have only been completed in one of the cases. More about suicide will be discussed in the body of this report. As previously reported, however, significant problems persist with the Crisis Intervention Team, the treatment afforded suicidal offenders on crisis watch and the treatment afforded suicidal offenders in segregation. Also, the current format for reviewing suicides should be rethought to emphasize corrective action. Again, this was previously reported but nothing has occurred to address these deficiencies.

IDOC is generally following its own procedures regarding the use of restraints, although the monitoring team has received credible reports of mentally ill offenders being restrained with their arms above their heads. This issue will be closely followed going forward. Also, a review of the IDOC data on the use of restraints revealed that restraints are utilized at a high rate by the staffs at Pontiac Logan and Dixon. This over reliance on the use of restraints most likely reflects the severity of the mental illness suffered by those mentally ill offenders assigned to these facilities as well as the lack of adequate psychiatric services to address their needs.

The medical records continue to be poorly organized. Delays of 24 hours or more were

noted between the time a mentally ill offender was seen and the time the progress note associated with that visit appeared in the medical record. This was especially a problem with those mentally ill offenders receiving Telepsychiatric services although it was observed throughout all the facilities monitored. This delay and disorganization make it very difficult, and at times impossible, to adequately follow the clinical care of a mentally ill offender.

Confidentiality continues to evolve in IDOC. At the beginning of the implementation of the Settlement Agreement, it was almost nonexistent but steadily improved over the course of the first year of the monitoring. This improvement continued during the current monitoring period, although a considerable number of the crisis contacts still occur at the cell front. Significant challenges remain, however. The physical plants are not designed to provide sound confidentiality. Custody staff continues to be reluctant to move mentally ill offenders to confidential settings and insists that the doors to the treatment rooms remain open while staff stands within hearing distance.

Problems with the provision of informed consent continue to be widespread in the department. The Monitor approved a new form, "Confidentiality Disclosure and Consent for Mental Health Treatment," during a meeting with Chief Hinton on 11/7/17. When implemented, this form should help address some of the problems associated with informed consent.

Documented force is rare or nonexistent in most of IDOC; it is concentrated at three institutions. For the most part, IDOC is following its own procedures about use of force, with most of the reported and videotaped force being professionally handled. Some institutions focus on preventing and deescalating force, which is an excellent route to substantial compliance with this requirement. However, the number of offender complaints, and a small number of documented incidents that appear unnecessary or excessive, raise serious questions about the application of use of force.

Disciplinary procedures with mentally ill offenders continue to need refinement. The major concern is that MHPs are not appropriately advocating for the mentally ill offenders in the disciplinary process. This is occurring because the MHPs are not conducting face-to-face evaluations of the offenders in question.   Problems also exist on the custody side of this process.

Continuous Quality Improvement (CQI) is a key element in an adequately functioning correctional mental health system. To date, IDOC does not have a department-wide CQI system. Data continues to be collected at the facility level based on AD 04.03.125. Although a CQI manager was hired on February 16, 2017, the department-wide CQI system as described in AD 04.04.104 has not been implemented. This is due to six facilities not having an assigned mental health supervisor.[3]

A summary of compliance findings is as follows:

| Requirement | Compliance Status |
|---|---|
| | |
| **IV: INITIAL (INTAKE) MENTAL HEALTH** | Overall: Noncompliance |

---

[3] These facilities are: Danville, Western, Graham, Vandalia, Robinson and Illinois River.

| Requirement | Compliance Status |
|---|---|
| **SERVICES: SCREENING**<br><br><br>(IV)(a), (b)<br>(IV)(c)<br>(IV)(d), (e)<br>(IV)(f), (g) | Subfindings supporting overall finding:<br><br>Substantial compliance<br>Noncompliance<br>Substantial compliance<br>Noncompliance |
| **V: MENTAL HEALTH EVALUATION AND REFERRALS**<br>(V)(a)<br>(V)(b), (c)<br>(V)(d)<br>(V)(e)<br>(V)(f), (g)<br>(V)(h), (i)<br>(V)(j) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance<br>Substantial compliance<br>Noncompliance<br>Substantial compliance<br>Noncompliance<br>Substantial compliance<br>Noncompliance |
| **VI: MENTAL HEALTH SERVICES ORIENTATION**<br><br>(VI)(a), (b) | Overall: Substantial Compliance<br>Subfindings supporting overall finding:<br>Substantial Compliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW**<br><br>(VII)(a), (b), (c), (d), (e) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS**<br><br>(VIII)(a)<br>(VIII)(b)(i)<br>(VIII)(b)(ii) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Noncompliance<br>Noncompliance |

| Requirement | Compliance Status |
|---|---|
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>    (IX)(a)<br>    (IX)(b)<br>    (IX)(c)<br>    (IX)(d)<br>    (IX)(e)<br>    (IX)(f) | Overall: Target date has not arrived<br>Subfindings supporting overall finding:<br>Target date has not arrived<br>Noncompliance<br>Substantial compliance<br>Substantial compliance<br>Substantial compliance<br>Target date has not arrived |
| **X: BED/TREATMENT SPACE**<br><br>    (X)(a)<br>    (X)(b)(i)<br>    (X)(b)(ii)<br>    (X)(c)(i)<br>    (X)(c)(ii)<br>    (X)(d)<br>    (X)(e)<br>    (X)(f)<br>    (X)(g)<br>    (X)(h)<br>    (X)(i) | Overall: Target date has not arrived<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Substantial compliance<br>Target date has not arrived<br>Substantial compliance<br>Substantial compliance<br>Target date has not arrived<br>Target date has not arrived<br>Noncompliance<br>Noncompliance<br>Target date has not arrived<br>Substantial compliance |
| **XI: ADMINISTRATIVE STAFFING**<br><br><br>    (XI)(a)<br>    (XI)(b)<br>    (XI)(c)<br>    (XI)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Substantial compliance<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| **XII: MEDICATION**<br><br>    (XII)(a)<br>    (XII)(b)<br>    (XII)(c)(i), (ii), (iii), (iv), (v), (vi) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| **XIII: OFFENDER ENFORCED MEDICATION** | Finding:  Noncompliance |

| Requirement | Compliance Status |
|---|---|
| | |
| **XIV: HOUSING ASSIGNMENTS**<br><br>(XIV)(a)<br>(XIV)(b)<br>(XIV)(c) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Substantial compliance<br>Substantial compliance |
| **XV: SEGREGATION**<br><br>(XV)(a)(i)<br>(XV)(a)(ii), (iii), (iv), (v), (vi), (vi)(sic), (vii)<br>(XV)(b)(i)<br>(XV)(b)(ii), (iii), (iv)<br>(XV)(b)(v), (vi)<br><br>(XV)(c)(i)<br>(XV)(c)(ii)<br>(XV)(c)(iii), (iv), (c)(sic)<br><br>(XV)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Noncompliance<br>Substantial compliance<br>No rating<br>Substantial compliance<br><br>Noncompliance<br>Target date has not arrived<br>Noncompliance<br><br>Target date has not arrived |
| **XVI: SUICIDE PREVENTION**<br><br>(XVI)(a), (b) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES**<br><br>(XVII)(a), (b)<br>(XVII)(c)<br>(XVII)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Substantial compliance<br>Noncompliance<br>Noncompliance |
| **XVIII: MEDICAL RECORDS** | Overall: Noncompliance |

| Requirement | Compliance Status |
|---|---|
| (XVIII)(a)<br>(XVIII)(b) | Subfindings supporting overall finding:<br>Noncompliance<br>No rating |
| **XIX: CONFIDENTIALITY**<br><br>(XIX)(a)<br>(XIX)(b)<br>(XIX)(c)<br>(XIX)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>No rating<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| **XX: CHANGE OF SMI DESIGNATION** | Finding: Noncompliance |
| **XXI: STAFF TRAINING**<br><br>(XXI)(a)<br>(XXI)(b)<br>(XXI)(c) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>No rating<br>Substantial compliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Finding: No rating |
| **XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY**<br>(XXIII)(a)<br>(XXIII)(b)<br>(XXIII)(c) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Noncompliance<br>Noncompliance |
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Finding: Noncompliance |
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS** | Overall: Noncompliance<br>Subfindings supporting overall finding: |

| Requirement | Compliance Status |
|---|---|
| (XXV)(a)<br>(XXV)(b)<br>(XXV)(c)<br>(XXV)(d) | Noncompliance<br>Noncompliance<br>No rating<br>Noncompliance |
| **XXVI: CONTINUOUS QUALITY INParallel IMPROVEMENT PROGRAM**<br><br>    (XXVI)(a), (b) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance |
| **XXVII: MONITORING** | Finding: Noncompliance |
| **XXVIII: REPORTING AND RECORDKEEPING** | Finding: Noncompliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement.

**Overall structure:** This Section is organized along the same structure as the Settlement; each major section below corresponds with a substantive section of the Settlement. That said, the Settlement includes provisions that appear multiple times across different sections. The Monitor attempts in this report to address each substantive requirement in that section of the Settlement where it appears.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that non-compliance is, nonetheless may be in substantial compliance with the provision of the Settlement.

**Compliance ratings:** As discussed above, the team institutes the "Substantial Compliance" and "Non-compliance" ratings for each provision, as specified in the Settlement. In actual fact, these may mask true performance. In practice, IDOC has made significant progress on a number of requirements. These would be more accurately described as "partially compliant," but by the terms of the Settlement, those provisions must be found in Non-compliance. The monitoring team encourages the Court and the parties to consider allowing a modification of the ratings to permit a finding of Partial Compliance.

Section II (t) of the Amended Settlement Agreement defines "Substantial Compliance" as follows: The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious. Substantial compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this report, compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the monitor of this seismic shift for IDOC, I felt it more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. As IDOC makes progress with these changes, the Monitor will consider that subsequent reports may include compliance ratings for specific facilities.

## IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING

> **Summary**: At the R&Cs evaluated, screenings were conducted in a timely manner by appropriate staff in confidential settings. Screening MHPs review the available records, though records do not always arrive from other corrections settings and MHPs do not have access to inmates' previous IDOC health care records.
>
> "Evaluation of Suicide Potential" was being administered to offenders transferred from an R&C facility, this includes those offenders transferred back to NRC on writs.
>
> Policies and Procedures have been developed to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption. Psychiatric contact, however, was sometimes very delayed. Problems were also noted in that the medications were often changed without providing documentation in the medical record for the change. The offenders were not always informed about the changes.

**(IV)(a): Specific requirement:** All persons sentenced to the custody of IDOC shall receive mental

health screening upon admission to the prison system. Absent an emergency which requires acting sooner, this screening will ordinarily take place within twenty-four (24) hours of reception (*see* "Components of Mental Health Services" at pg. 5 in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101(II)(E)(2)), but in any event no later than forty-eight (48) hours after reception, as required by IDOC Administrative Directive 04.04.100 (II)(G)(2)(b) (*see also* IDOC Administrative Directive 05.07.101).

**Findings:** During the first year of the Settlement Agreement, the monitoring team reviewed all IDOC reception centers. The Monitor personally inspected the Northern Reception Center (NRC) for the purposes of this report. 16 of 17 screenings reviewed demonstrated that they occurred within the 24-48 hours requirement. The one exception was a case of an offender arriving at the facility on a Friday evening and not being screened until the following Monday morning. Warden Pfister was made aware of this situation and assured me that this would not occur in the future.

Assistant Monitor, Reena Kapoor, M.D., inspected the R&C unit at Menard and found that it was meeting this requirement.

**(IV)(b): Specific requirement:** The mental health screening conducted upon admission to IDOC shall be conducted by a Mental Health Professional [MHP][4] and shall use IDOC Form 0372 (Mental Health Screening). In those instances where a mental health screening is performed by an unlicensed mental health employee, said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement.

**Findings:** The NRC as well as the R&C unit at Menard are fulfilling this requirement. At the NRC, for example, 17 of 17 screenings reviewed confirmed that IDOC Form 0372 is used and that the screenings are conducted by MHPs or unlicensed staff that are supervised by licensed MHPs.

**(IV)(c): Specific requirement:** Offenders transferred from a receiving and classification facility who have been screened and referred for further mental health services shall be administered the Evaluation of Suicide Potential, IDOC Form 0379, but need not be administered the mental health screening form again.

**Findings:** The monitoring team reviewed this requirement at the facilities monitored during this reporting period. There was strong practice, among a subset of the facilities,[5] with 90% of 48 relevant charts reflecting a timely suicide screening on transfer to the facilities.[6] Completed suicide assessments were administered to those offenders transferred to Dixon from Reception & Classification or from another IDOC facility. At Robinson, the screenings were conducted by

---

[4]   The Settlement uses MHP to indicate Mental Health Professional. This report adopts that convention as well.

[5]   Throughout this report, analysis referring to "five institutions" reflects a review of practices at Big Muddy River, Hill, Lawrence, Pinckneyville, and Robinson.

[6]   The relevant charts were patients who arrived at the institutions between November 2016 and the date of review. There were no screening forms in 10% of these charts; it is unknown whether this reflected missed screenings or filing issues.

nurses, as vacancies and extended medical leave have left the facility with only one MHP through much of 2017. While screening by nurses cannot be considered fully in compliance with the Agreement, it is a reasonable short-term solution under the circumstances.

There were notable exceptions to the practice of timely suicide assessments on arrival, however. A mentally ill offender from Menard was received at Pontiac at 3am, the morning of the 6/17/17. He was not administered the Evaluation of Suicide Potential, IDOC form 0379. He went on to attempt to hang himself, was pepper sprayed, and eventually was housed in crisis. There was another example at Pontiac where a mentally ill offender was not administered the Evaluation of Suicide Potential. Additionally, a mentally ill offender was transferred from NRC to Sheridan off a 15-minute watch in a crisis cell for attempting to hang himself. At Sheridan, the screening indicated "no further action required" with a nursing note stating "psych (-)." Approximately two weeks later this offender attempted suicide and was placed in a crisis cell.

During the first year of the Agreement, the monitoring team did find compliance among the facilities reviewed. Of note, the NRC is now conducting suicide screenings for offenders temporarily housed there on writs.

**(IV)(d): Specific requirements:** In order to encourage full and frank disclosure from offenders being screened, mental health screening shall take place in the most private space available at the receiving and classification facilities. Within two (2) years of the approval of this Settlement Agreement, IDOC will ensure that mental health screening at all receiving and classification facilities takes place only in spaces that ensure sound confidentiality.

**Findings:** During the first year of the Settlement Agreement, the monitoring team found substantial compliance with this requirement at all of the reception centers. The most current review of the NRC revealed 16 of the 17 screenings reviewed took place in a confidential setting. In the remaining case, the offender stated that a custody officer was standing in the doorway of the screening room. The offender explicitly stated that the presence of the custody officer prevented him from being 100% open with the screener. Again, Warden Pfister was made aware of this situation and assured me that this practice would cease. Dr. Kapoor found that the R&C unit at Menard was meeting this requirement.

**(IV)(e): Specific requirement:** IDOC shall develop policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

**Findings:** AD 04.04.101, effective date of 5/1/2016, provides the Mental Health SOP Manual with the authority to fulfill this requirement. The Mental Health SOP Manual clearly states on page 78 "for those offenders who arrive at an IDOC facility on verifiable, prescribed psychotropic medication, the psychotropic medication shall be continued (bridged) for up to 30 days or until such time as a psychiatric provider can evaluate the inmate for ongoing psychotropic medication. This evaluation may be no more than 30 days from arrival into an IDOC facility."

**(IV)(f): Specific requirement:** Following transfer to IDOC custody, an offender's prescription for psychotropic medication shall be reviewed by a licensed physician or psychiatrist, and modified only if deemed clinically appropriate. Any change in psychotropic medication, along

with the reason for the change, shall be documented in the offender's medical record. The psychiatrist or other physician, or nurse practitioner acting within the scope of their license, must also document on the offender's chart the date and time at which they discussed with the offender the reason for the change, what the new medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the new medication, and answered any questions the offender had before starting the medication.

**Findings:** Several of the cases reviewed at the NRC included transfer of offenders previously prescribed psychotropic medications. All of these cases were reviewed by a licensed physician or psychiatrist. Among these cases, however, were numerous examples where the offenders' medications had been changed by the prescribers. In none of these cases were the reason(s) for the changes documented in the medical record.  There was also no documentation that the prescribers discussed with the offenders the reason for these changes, what the new medication was expected to do, what alternative treatments were available and what, in general, are the side effects of the new medication.

The R&C unit at Menard is not meeting the requirements of this subsection of the Settlement Agreement. Although prescriptions are consistently ordered for offenders who enter the facility on psychotropic medication, the offenders are not typically seen by a psychiatrist to review the appropriateness of the regimen for several weeks or even months. When the offenders are eventually seen by a psychiatrist, the documentation is exceptionally poor, with no clinical rationale for the psychiatrist's treatment decisions documented.

**(IV)(g): Specific requirement:** Screening will include identifying neurodevelopmental disabilities, suicidal ideation or intent, current or past self-injurious behavior, the presence or history of symptoms of mental illness, current or past use of psychotropic medications, or the presence of conditions that require immediate intervention, in addition to the information required to be documented on IDOC Form 0372 (Mental Health Screening).

**Findings:** The screenings generally addressed the topic areas outlined in this section. As described in the first annual report, there were consistent deficiencies noted with the thoroughness in what was recorded during the screenings. This was especially problematic with the mental status examinations (MSE). There was progress noted during the current review in that the mental status examinations were more comprehensive, although there is still room for improvement.

**Specific requirement:** The screening process shall also include review of the records, which accompany the offender.

**Findings:** Not all offenders arriving at the NRC are accompanied by their mental health records. In those cases, in which offenders were accompanied by their mental health records, staff reviewed them. A significant problem with records, however, does exist. Several of the offenders interviewed at the NRC were returnees to IDOC who had received mental health care during their previous incarcerations. Screening staff do not have a mechanism to retrieve these previous mental health records.

As previously reported, the R&C units are *de facto* control (or segregation) units as defined in Section II (g). During a recent tour of the NRC, the Monitor was glad to hear that SMI offenders

with greater than 60 days in segregation are offered two groups per week in addition to their yard time. The majority of mentally ill offenders at NRC, however, are not offered groups even though they routinely stay there for greater than 60 days. Although not specifically required in the Settlement Agreement, it is the Monitor's strong recommendation that offenders on the mental health caseload housed at the various R&C units be afforded the same level of structured and unstructured out of cell time as those who are housed in a segregation unit. It is the Monitor's further recommendation that both structured and unstructured out of cell time begin as soon as offenders are placed on the mental health caseload and not after they have been on the unit for greater than 60 days.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary:** Authorized **s**taff continue to provide timely evaluations, on the required forms, for mentally ill offenders at the Menard R&C and the NRC. Mentally ill offenders with a psychiatric history are not automatically referred for a mental health assessment, however. Once offenders transfer to other facilities, evaluations are less timely there, and backlogs are reported in at least 15 institutions.

Appropriate referral policies are in place at the facilities monitored. Offenders are familiar with self-referral procedures and mental health staff routinely respond to referrals from them, their families, and custody and other corrections staff. A high percentage of MHP responses are timely.

Crisis Intervention Teams have been trained and are in place at all institutions. Logs show them fielding large numbers of crisis calls. Although staff endorse an inclusive approach to taking crisis calls and admitting inmates to crisis care, it is troubling that inmates continue to voice concerns that their requests are ignored.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** No real improvement has occurred in this section since the first annual report. At that time, the monitoring team found that IDOC is fulfilling the requirements of this subsection of the Settlement Agreement for mentally ill offenders in the R&C units. This same attention to providing timely mental health evaluations does not equally exist in the general population and control units. Also, the Monitor found that both custody and mental health staff are slow to provide "an alternative response in case of emergency." That is, staff routinely responds to "emergencies" but fail to appreciate the growing severity of a situation and intervene before it becomes an actual emergency. This lack of timely "pre-emergency" intervention by staff is most likely due to being overcommitted because of insufficient staffing levels.

The NRC and the R&C unit at Menard were monitored for this midyear report. Currently, mental health referrals are occurring at the NRC but not all offenders who are prescribed medications receive a referral for a mental health assessment. This means that some mentally ill offenders who are being prescribed psychotropic medications remain there for upwards of 90 days without the benefit of a mental health evaluation. At Menard, the mental health assessments are routinely being completed within the 14-day requirement.

In the Quarterly Reports of 6/30/17 and 10/23/17, IDOC describes that there are backlogs in providing mental health evaluations "at fifteen facilities." As of 11/10/17, there was a backlog of 438 mental health evaluations Department-wide. The quarterly reports of 10/23/17 then goes on to erroneously state that "Wexford has increased the number of Telepsychiatry hours to address

this backlog." Of note, the increased number of Telepsychiatry hours is meant to reduce the backlog of psychiatric evaluations and has nothing to do with the requirements of this section "Mental Health Evaluations and Referrals." An error of this degree calls into question the reliability of these quarterly reports.

**(V)(b): Specific requirement:** Referral may be made by staff and documented on IDOC Forms 0387 and 0434 or by self-referral by the offender.

**Findings:** It was clear from mental health and custody staff interviews, and from logs and medical records, that referrals routinely take place. Mental health leadership at Hill, Lawrence, and Pinckneyville emphasized how frequently they receive referrals from custody staff, and that a number of them were good partners in observing and sharing key behavioral information. In total, at least 510 referrals were evident in records the monitoring team reviewed, *in addition* to those specifically made to the Crisis Intervention Teams. In records, there were referrals from officers, clinical services, inmate job supervisors, teachers, health care staff, inmates on behalf of other inmates, self-referrals, intra-mental health department, and family.

**(V)(c): Specific requirement:** IDOC shall ensure that the referral procedures contained in IDOC AD 04.04.100, section II (G)(4)(a) and (b) for offender self-referral are created and implemented in a timely fashion in each facility.

Section II (G)(4)(a) and (b) provide:

Referrals for mental health services may be initiated through staff, credible outside sources such as family members, other offenders or self-reporting.

(a) To ensure proper handling of requests from credible outside sources, the Department shall ensure mail room staff and facility operators, gatehouse staff and other staff who may come in contact with family members, visitors or other interested persons are aware of procedures for receiving and addressing inquiries regarding referrals for mental health services. Additionally, the contact information and procedures by which outside sources may refer offenders for mental health services shall be provided on the Department's website.

(b) The Chief Administrative Officer of each facility shall ensure a procedure for referring offenders for mental health services is established.

(1) Referrals from staff shall:
(a) Be initiated on the Mental Health Services Referral, DOC 0387;
(b) Be submitted to the facility's Office of Mental Health Management through the chain of command; and
(c) Include a copy of the Incident Report, DOC 0434, if applicable.

(2) The facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in the offender's behavior or behavior that may endanger themselves or others, if not treated immediately.

- 23 -

(c) Procedures for self-referrals by offenders for mental health services shall be provided in the offender handbook. The offender will be encouraged to submit their requests on the Offender Request, DOC 0286.

**Findings**: IDOC has an Administrative Directive in place concerning these requirements. It also requires each institution to create an Institutional Directive. The monitoring team reviewed these policies at numerous facilities, and will continue to do so throughout the monitoring process. Each of the facilities reviewed provided a copy of the Institutional Directive with language largely corresponding, or consistent with, the Administrative Directive.

During the monitoring period, IDOC administration distributed a memo to all facilities reinforcing these requirements. The Chief of Operations emphasized the terms of the Administrative Directive; the expected documentation method; and the expectation that all Lieutenants be trained members of the Crisis Intervention Team, that staff explain to inmates about the Crisis Intervention Team, and that there be an investigation of any allegation that referrals or Crisis Intervention Team calls are not being made. The memo was accompanied by substantial dissemination instructions.

In terms of implementation, it was clear from mental health and custody staff interviews, and from logs and medical records, that referrals routinely take place. For more detail, please see V(b), above. All institutions have provided documentation showing that staff have been trained and can serve on Crisis Intervention Teams; the total pools per facility range from 25 to 84 staff. Some facilities described the team members, showing a range of professional disciplines. Crisis Intervention Teams were operational during the first year of monitoring and, drawing on incident logs, incident reports, and charts, it was evident that Crisis Intervention Team members have been called on at least 565 occasions in a recent, approximately three-month period.[7] For more discussion, please see Section V(g), below. In the First Annual Report, the Monitor found that self-referral procedures were detailed in inmate orientation handbooks. As a spot check, inmates interviewed at Dixon were aware that they could access mental health services by submitting a written request, asking an officer to call an MHP on their behalf, or speaking with an MHP during weekly segregation rounds.

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** Due to the large volume of mentally ill offenders that come through the Northern Reception Center coupled with the limited number of staff, this is not occurring. Only those mentally ill offenders that are designated as SMI receive a mental health referral and evaluation.

---

[7] For the most part, IDOC institutions provided incident logs for July through September, 2017. There was some variability in the time periods covered by the logs, and some question of whether only SMI or all on the mental health caseload are included in some logs. The monitoring team supplemented this with Crisis Intervention calls evident in chart reviews at five institutions, which were not always captured on the logs. It appears that some institutions routinely include these events on logs while others do not; it therefore seems likely that this total underrepresents the total number of crisis calls made.

**(V)(e): Specific requirement:** IDOC shall develop a policy and procedure by which other sources with credible information (including other offenders or family members) may refer an offender for a mental health evaluation. The policy and procedure shall include a record-keeping mechanism for requests, which shall record who made the request and the result of the referral.

**Findings:** IDOC reports that family members may make referrals via the website and by calling the facility; the monitors verified that the website offers this information.  These referrals are then submitted to mental health staff. The department has developed an Administrative Directive and provided it to the Monitor for approval. The department has submitted additional changes based on the Monitor's feedback.   The Monitor has approved the department's changes to the Administrative Directive. The Administrative Directive became effective system wide on 6/1/17.

In the meantime, a few sources suggest that the Mental Health Department is receiving such referrals. In logs and medical records, the monitoring team encountered a small number of mentions of referrals from other inmates and family. The monitoring team conducted limited staff interviews, concentrating on visiting and mailroom staff, which yielded uneven results; some were unaware of the expectations, while others gave a number of examples of the types of issues families raise and the appropriate actions the staff had taken in response, sometimes well beyond the basic requirements.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** As noted in V(d), the staff at the Northern Reception Center only refers mentally ill offenders designated as SMI for mental health evaluations. When these referrals occur, they are completed within the 14-day timeframe. In one example of a mainline institution, however, Mental Health Assessments were completed by a QMHP within 14 days of arrival at Dixon, and in most cases, much sooner. Timeliness was uneven at some other institutions, with about 60% clearly completed in this timeframe.[8]

Mentally ill offenders at Dixon report being able to see a QMHP for routine concerns within a few days.  This is consistent with a monitoring team assessment of the timeliness of responses to 196 referrals evident in chart reviews at five institutions.[9]

Response times appeared consistent between self-referrals and staff or family referrals. The patterns were:

- ▪ MHP responses on the same or next day        33%
  (whether crisis referral or not)

---

[8]   In the following analysis, the monitoring team did not establish whether the inmates arrived with R&C evaluations; in that event, these percentages would improve. With the 31 new arrivals in the chart samples at Big Muddy River, Hill, Lawrence, Pinckneyville, and Robinson. 60% of the evaluations were clearly completed within 14 days; most of the others were completed later, although a few charts were missing evaluations altogether.
[9]   Big Muddy River, Hill, Lawrence, Pinckneyville, Robinson

- ▪ MHP responses timely                    90%[10]
  (includes above responses)

- ▪ 10% of MHP responses appeared to take from 3 weeks to 2 months or may have been missed. These tended to be concentrated at Pinckneyville.

The timeliness of psychiatry responses to referrals was much worse. For an analysis, please see section VII.

There were only two instances documented where inmates complained of unanswered self-referrals during site reviews, although a more systematic review would be necessary to determine whether this is a problem.

As of 11/10/17, however, there was a backlog of 438 mental health assessments within the Department. The majority of this backlog was located in two facilities, Graham (129) and Western (146), although Big Muddy, Hill, Menard, Pinckneyville, Pontiac and Vandalia all reported significant backlogs.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** Based on a review of system-wide incident logs, and incident reports and health care records from some facilities, it was evident that Crisis Intervention Team members have been called on at least 565 occasions in a recent, approximately three-month period. There were examples of the team being called out for a range of urgent matters – either that the inmates voiced or staff observed – such as odd behavior, anxiety, and an impulse to hurt others, so logged calls appropriately were *not* confined to claims of suicidality. There were also a number of examples where there *were* claims of suicidality and, although the recorded facts suggested the claims might not be genuine,[11] staff took a conservative approach and admitted to crisis watch. It was rare, in the cases reviewed, for a team member to return an inmate to his or her cell without crisis watch, and in those cases, documents showed the inmate withdrawing his request and/or his concern being addressed by a different mechanism. MHPs and Psych Administrators at Pinckneyville, Lawrence, and Hill said the deliberate culture change they had cultivated over time was taking full effect, noting how frequently custody staff now call them for crisis screenings—during working hours and overnight—and naming Segregation Lieutenants and others as knowledgeable champions. All of the foregoing are *indications* that IDOC staff are using a broad interpretation of the need for crisis admissions and are not preventing admissions.

Previously, information had come to the monitoring team that some staff may be unreceptive to crisis intervention requests and either inappropriately served as gatekeepers, or the teams themselves may not be responding. Opinions ran the gamut among the segregation offenders interviewed. Within the same institution, opinions ranged from full custody cooperation when the

---

[10]  Where there were multiple referrals from the same source close in time, these were only counted as 1 referral if they appeared routine.

[11]  Here, the monitoring team is referring only to those cases in which an MHP recorded the inmate's own words that his request was for another purpose, such as wanting a cell change.

interviewee makes crisis requests, to objections to gatekeeping when the interviewee's described concern was not urgent, to an observation that genuine crisis requests trigger a chorus of "copycat" requests in the housing unit, to feeling legitimate requests are disregarded and mocked. Officers in Dixon's X House stated strongly that they call Mental Health immediately upon an offender's request. However, a number of offenders at Dixon, and at Pontiac, stated that they must make threats of self-harm in order to see a mental health professional urgently.

The monitoring team conducted a limited data driven investigation of gatekeeping or lack of response; the information summarized above does not support such a concern, although at key facilities monitored, mentally ill offenders voiced credible concerns about "gatekeeping." More data will be needed to confirm or rule out this concern.

**(V)(h): Specific requirement:** The results of a mental health evaluation shall be recorded on IDOC Form 0374 (Mental Health Evaluation). These documents shall be included as part of the offender's mental health record as required by IDOC AD 04.04.100, section II (G)(3).

**Findings:** Form 0374 is routinely used by mental health staff to record the results of a mental health evaluation throughout all the facilities monitored.

**(V)(i): Specific requirement:** Mental health evaluations shall be performed only by mental health professionals. In those instances where an evaluation is performed by an unlicensed mental health employee, said mental health employee will have obtained at least a Master's degree in Psychology, Counseling, Social Work or similar degree program or have a Ph.D./Psy.D. and said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement. Further, a licensed MHP will review, and if the evaluation is satisfactory, sign off on any evaluation performed by an unlicensed mental health employee within seven (7) days after the evaluation has been completed. If the evaluation is not satisfactory, it shall be redone by a licensed MHP.

**Findings:** This requirement is being met throughout the facilities monitored.

**(V)(j): Specific requirements:** The provisions of this Section shall be fully implemented no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** The submission of this report corresponds with the 18-month time requirement specified in the Settlement Agreement. As noted above, difficulties in fully implementing the requirements of this section persist.

## VI: MENTAL HEALTH SERVICES ORIENTATION

**Summary**: The Department continues to fulfill the requirements of this section of the Settlement. The required policy has been in place since at least 2013. Each facility produces its own orientation manual, but all reviewed manuals satisfy this requirement. A comprehensive orientation program was present at each facility monitored.

**(VI)(a): Specific requirement:** In addition to information regarding self-referrals to be included in the offender handbook as required by IDOC AD 04.04.100, § II (G)(4)(b), information regarding access to mental health care shall be incorporated as part of every offender's initial reception and orientation to IDOC facilities. The basic objective of such orientation is to describe the available mental health services and how an offender may obtain access to such services.

**Findings:** IDOC does not utilize a department-wide orientation manual. Each facility produces its own orientation manual. The Monitor reviewed the orientation manuals from each IDOC facility and found them all to fulfill the requirements of this section.

**(VI)(b): Specific requirement:** IDOC shall develop and implement a written policy and procedure concerning such orientation no later than one (1) year after approval of this Settlement Agreement.

**Findings:** IDOC has AD 04.01.105, effective date 7/1/2013, which governs facility orientation. This AD states "The Department shall establish a comprehensive orientation program for incoming offenders at all correctional facilities that shall include the distribution of an orientation manual prepared in a format consistent throughout the Department." A comprehensive orientation program was present at each facility monitored.

## VII: TREATMENT PLAN AND CONTINUING REVIEW[12]

**Summary:** Treatment plans are being prepared for mentally ill offenders with a few exceptions noted. They are not, however, being prepared "collectively" as required by the Settlement Agreement. The only exception to this is at the Dixon STC, where multidisciplinary teams routinely meet to prepare treatment plans for their assigned offenders.

A continuing problem is that the treatment plans are non-specific, often using the same language to address different problems for different offenders. It is common to find two separate and very different treatment plans prepared for the same offender. One plan is prepared by the MHP and the other plan by the prescribing psychiatrist. They are often at odds with one another, even listing differing diagnoses for the same offender. Overall, the treatment planning process currently in place in IDOC does not facilitate the treatment of mentally ill offenders and should be completely rethought. Also, the requirement for reviewing and updating treatment plans for mentally ill offenders assigned to Crisis or Segregation is not being met anywhere in the Department.

Equally important to the problems note with treatment planning, IDOC is not meeting its requirement to conduct timely psychiatric evaluations and follow-up appointments for those mentally ill offenders who are prescribed psychotropic medications. During the week of 11/10/17, there was a backlog of 2132 psychiatric evaluations and follow-up visits in the Department. The only facility that was meeting this requirement was the STC at Dixon.

The monitoring team noted numerous progress notes in the medical records of SMI offenders but was unable to determine if these progress notes reflected the actual number of clinical contacts. Of note, however, was the variability in the frequency and quality of the recorded clinical contacts.

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** The Department is not meeting this requirement. That is, the monitoring team noted that for those offenders requiring on-going outpatient, inpatient or residential mental health services, a treatment plan was usually prepared. At Menard, the treatment plans were completed at seemingly random intervals. Dr. Kapoor also noted that there did not appear to be an organized system for the completion of treatment plans.

These treatment plans, however, were not "prepared collectively by the offender's treating mental health team." Rather, MHPs prepare one plan and a psychiatrist often completes a

---

[12] A few word processing "gremlins" were encountered when writing this section. It is possible that the reader might find two different summaries when printing the document. The actual summary is four paragraphs with a slight white line running between paragraphs 2 & 3. I apologize for any confusion that this may cause the reader.

competing plan. These plans often have inconsistent diagnoses. These plans are not "prepared collectively by the offender's treating mental health team."

Single clinicians complete the treatment planning form—indeed one member of the monitoring team only encountered *one* jointly prepared plan out of 229 plans reviewed—and the vast majority use boilerplate language with little or no reference to the inmate's particular needs or treatment. In four of the institutions subject to systematic analysis, only 14% of the plans reviewed could be said to be tailored to the patient. The positive exception was Robinson; while staff struggled with missed or late treatment plans, nearly every general population patient in a random sample had a tailored treatment plan (albeit created by the MHP alone). Effectively, then, compliance for the system is -0-, at least based on the 11 institutions where health care records were reviewed.

Timeliness compliance was also low in several treatment settings. There were not clear patterns of practice across institutions. In some, the plans were present but the issue was lateness. Some completed initial plans but not updates, or vice versa. Some were successful in one treatment setting but not another.

Although not captured in written treatment plans, staff at some locations do routinely consult across disciplines in a daily meeting about crisis cases and others cases calling for special staffing. The monitoring team observed this meeting at Lawrenceville; reportedly, a psychiatric PA and a psychiatrist participate in those meetings at Lawrence and Stateville, respectively. Reviewed charts had a handful of notes indicating an MHP and a psychiatric PA or psychiatrist had conferred about the patient. Reportedly, Lawrence's Telepsychiatrist and the MHPs have begun meeting on about five treatment plans per week since the summer.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** IDOC Form 0284 is consistently being used for treatment planning and reviews throughout the facilities monitored. The form does contain the required items. However, the treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities are being completed in a generic manner that does not facilitate the provision of mental health services. The Monitor has informed the Department throughout the life of the Settlement Agreement that IDOC Form 0284 needs to be significantly modified in order to facilitate the treatment of mentally ill offenders. Chief Hinton has recently created a new treatment planning form, which the Monitor has approved and will be implemented in the near future. The hope is that this new treatment planning form will facilitate the tailoring of the plans to the specific needs of the mentally ill offenders and allow for modifications as the treatment progresses. This newly approved treatment planning form, however, does not relieve the Department of the requirements of this section of the Settlement Agreement. In particular, the requirement that "such plans will be prepared collectively by the offender's treating mental health team" remains in effect. The Monitor will continue to interpret this requirement to mean that the Department is responsible

for conducting treatment planning meetings in which all staff involved in a particular offender's care are present and contribute to the creation of a comprehensive treatment plan. This same procedure applies to those mentally ill offenders in Crisis and/or Segregation who require treatment plan updates and reviews.

**(VII)(c): Specific requirement:** Treatment plans shall be reviewed and updated for offenders designated as receiving outpatient level of care services annually, or sooner when clinically indicated (e.g., when level of care changes).

**Findings:** The monitoring team reviewed hundreds of medical records of mentally ill offenders at the outpatient level of care. Although treatment plans were present in the overwhelming majority of the records reviewed, significant problems were noted. As reported in VII(a), the treatment plans were not prepared collectively by the offenders' treating mental health team. The treatment plans were very generic in nature. That is, many of the plans contained similar treatment interventions often using the same language. They did not appear to have been created to address the unique needs of the mentally ill offenders. Additionally, the monitoring team noted there were often delays in completing the treatment plan after a mental health evaluation had been finalized.

In a sample of 67 charts of inmates on the general population caseload, 94% had treatment plans generated within the year preceding the site visit. The majority were updated *more often* than the annual requirement. Some were updated in response to changes in the inmate's condition, though some were glaringly missed in this regard. In the subset where an annual update due date was discernible, 54% were completed timely.[13]

**Specific requirement:** Where the IDOC provides crisis or inpatient care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** This requirement is not being accomplished in any of the monitored IDOC facilities. In an analysis of 90 Crisis Watch admissions in 2017, four of five of the institutions *did not complete treatment plans in that setting*. Lawrence completed initial treatment plans on 95% of its crisis watch admissions. No institutions completed treatment plans weekly thereafter, nor on discharge.

**Specific requirement:** For those offenders receiving RTU care, treatment plans shall be reviewed and updated upon entrance and thereafter no less than every two (2) months, or more frequently if clinically indicated, and upon discharge.

**Findings:** It is a major improvement that treatment plans in Dixon's STC are now completed during monthly review meetings that include the psychiatrist, QMHP, BHT, nurse, and officer assigned to the inmate's RTU. The monitoring team witnessed several of these treatment planning meetings for inmates in Building 38, and it was clear that the treatment team and inmate found them meaningful and beneficial. However, no such process has been implemented for SMI

---

[13]   The relevant population was a total of 24 cases. This paragraph's analyses incorporate chart reviews from five institutions.

offenders in the X House, where treatment plans were still completed sporadically and without the input of a multidisciplinary team.

The timeliness and frequency requirements are not being met in X House. STC, offenders did generally have plans updated monthly.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** This requirement is not being accomplished in any monitored IDOC facilities including but not limited to Dixon, Menard, Pontiac, Pinckneyville or Stateville Proper. Compliance was also poor in the five institutions[14] where a data-driven analysis was performed. For initial plans within one week of placement, only 22% met the requirement.[15] In the majority, no plan was present. Where there was a plan, numbers were about equally divided between timely and late cases.

In terms of monthly updates thereafter, relevant records showed only 31% compliance:[16] Among noncompliant cases, some had one or two updates, but not all that would have been required. The majority had no updates at all. This requirement also was not being met in the segregation units at Dixon.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)     For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)    For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)   Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** The requirement that offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days is not being accomplished in any of the monitored IDOC facilities. There continues to be a tremendous backlog

---

[14] Big Muddy River, Hill, Lawrence, Pinckneyville, Robinson.

[15] This analysis is based on 81 Segregation placements in 2017 across the same five institutions.

[16] This analysis draws on 45 Segregation placements in 2017 at those same institutions where the terms were longer than 5 weeks.

of psychiatric follow up visits throughout the Department. As of 11/10/17, there was a backlog of 1868 follow up visits. As such, mentally ill offenders often go for months without seeing a psychiatrist. The monitoring team observed prescriptions for psychotropic medications being written for anywhere from two to six months to cover the extended periods between psychiatrist visits. At Menard, mentally ill offenders reported seeing a psychiatrist 2-3 times within the past year despite reporting medication problems. This included mentally ill offenders on enforced medications.

Regarding the subsections (i)-(iii):

(i): For mentally ill offenders at the outpatient level of care, psychiatric visits routinely occurred on a 90-day schedule, although a sizeable number of visits occur at even greater intervals. Of note, this was usually done without any documentation that "stability had been observed and documented in the offender's medical record by the attending psychiatrist." For further analysis, please see XII(b) below.

In addition to routine monitoring, response to referrals was poor—whether the referrals were from staff or patients, urgent, routine, or reporting medical issues such as side effects and noncompliance.

- In the monitoring team's analysis, only 38% of psychiatry responses met the standard. Timely responses were especially found at Lawrence, where the onsite, full-time Psychiatric Physician's Assistant had much more timely contacts of all types.

- Thus, 62% were not seen for 3 to 10 weeks. This was the case even if there were multiple referrals, multiple sources, and/or staff requests for "first available" appointment or observations of side effects or noncompliance. Occasionally, inmates went into crisis watch or discontinued taking their medications after a prolonged period without response.

(ii): The monitoring team did not evaluate this RTU requirement for the midyear update. In general, this requirement was not being met in any of the non-RTU units monitored.

(iii): The monitoring team did not evaluate those mentally ill offenders on the "inpatient list" for the midyear report.

Both sub-requirements (ii) and (iii) will be monitored and reported in the 2nd annual report.

**(VII)(e): Specific requirement:** Upon each clinical contact with an SMI offender, the MHP shall record a progress note in that offender's mental health records reflecting future steps to be taken as to that offender based on the MHP's observations and clinical judgment during the clinical contact.

**Findings:** During this reporting period, the monitoring team reviewed several hundred medical records of offenders on the mental health case load. Mental health progress notes were present in all of the medical records reviewed. The monitoring team was unable to determine with any degree of accuracy if the progress notes observed in the medical records were a reflection of "each clinical contact with an SMI offender" being recorded in the medical record. The exception to this is the large number of medication changes that occurred without a corresponding progress

note in the medical records. The monitoring team also observed that there was a wide range in the quality of the progress notes reviewed.

## VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

**Summary**: MHPs approve the return of SMI offenders to general population from a specialized treatment setting; this decision is not yet made by a multidisciplinary treatment team.

The monitoring team is aware of two institutions that have begun five days of follow-up after crisis watch discharge. Most facilities conducted a suicide screening within one week, but did not repeat it monthly for six months.

MHPs did generally review inmates' care within 30 days after transitioning from RTU to outpatient treatment.

**(VIII)(a): Specific requirement:** SMI offenders shall only be returned to general population from a specialized treatment setting with the approval of either the treating MHP or, once established, with the approval of the multidisciplinary treatment team. The Settlement provides a definition of "Specialized Treatment Setting": Housing in a crisis bed, residential treatment unit, or inpatient mental health setting.

**Findings:** The monitoring team confirmed that the treating MHPs approve the return of SMI offenders to general population from a specialized treatment setting. In no cases was this approval the product of a multidisciplinary treatment team.

**(VIII)(b)(i): Specific requirement:** For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form, which will be specifically designed for this purpose by IDOC and approved by the Monitor.

**Findings:** IDOC has not fully implemented this requirement. At the time of this report, it is occurring at Stateville proper and Menard; it was not occurring as of site visits at Dixon, Big Muddy River, Hill, Lawrence, Pinckneyville, and Robinson. The Quarterly Report of 10/23/17 states "the requirements of subsection (b)(i) are currently being done in many cases and will be done on a widespread basis once staffing increases. IDOC is actively working on recruitment and hiring efforts in order to fulfill the requirement." Of note, this is almost the exact quote from the quarterly reports of 9/29/16, 12/23/16 and 6/30/17. First of all, these five-day follow ups are not "currently being done in many cases." Throughout the first 18 months of the Settlement Agreement, the monitoring team has not found any facility to have been meeting this requirement with the exception of Stateville proper. Menard only began accomplishing this in September 2017. The staff at Stateville, however, reported that they only began performing these follow up visits in January 2017. This is yet another example of the misleading data presented as fact in the Quarterly Reports. The Monitor has approved the use of BHTs to perform these duties but that has not occurred to date.

**Specific requirement:** This five-day assessment process will be in addition to IDOC's current procedure for crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from crisis watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

**Findings:** This full requirement is not generally being met. All members of the monitoring team observed that most of the facilities monitored conducted an evaluation of suicide potential within seven calendar days after discharge from crisis but not necessarily monthly for at least six months. For example, in a sample of 2017 crisis watches at five institutions, 88% were seen within one week after discharge from crisis care,[17] and the Evaluation of Suicide Potential was regularly used. In some instances, staff saw the inmates two to three times during that first week. To a lesser extent, staff also followed up with these inmates monthly, at a rate of 68% compliance in relevant cases.[18] Lawrence and Hill had strong performance in this area.

The staff at Menard were compliant with both aspects of (VIII)(b)(i)—they began conducting the evaluation of suicide potential on mentally ill offenders within seven (7) calendar days of discontinuation from crisis watch and thereafter on a monthly basis for at least six (6) months in September 2017; staff at Dixon did not comply with either provision.

**(VIII)(b)(ii): Specific requirement:** Offenders returned to general population or to an outpatient level of care setting from a specialized/residential treatment facility shall be reviewed by an MHP within 30 days to assess the progress of the treatment goals. The IDOC Form 0284 shall be reviewed annually thereafter, unless otherwise clinically indicated (e.g., change in level of care) as required by IDOC AD 04.04.101, section (F)(2)(c)(4)(c).

**Findings:** As an initial matter, the term "specialized/residential treatment facility" is not defined in the Settlement, and the monitoring team interprets this term to be synonymous with "specialized treatment setting," the definition of which is discussed above. The monitoring team did note that this was occurring in some of the facilities monitored including Menard, Pontiac and Pinckneyville.

---

[17] This analysis draws on 61 crisis watches in 2017 at Big Muddy River, Hill, Lawrence, and Robinson. Cases where the inmate was readmitted to crisis care within that week, or had not been out of crisis care for more than one week, were excluded. This was supplemented by a log provided by Sheridan showing its initial follow-ups.

[18] There were 34 admissions where the inmate was out of crisis care long enough for at least one monthly visit. Cases where the inmate was readmitted to crisis care within the first month were excluded. Cases were considered compliant if there were contacts at monthly intervals for as long as the inmate had been out of crisis care, even if the six-month mark has not been reached.

## IX: ADDITIONAL MENTAL HEALTH STAFF

**Summary**: Six months have not passed since the budget contingent approval date of July 6, 2017. Lack of staffing, however, continues to be the primary impediment contributing to IDOC's being out of compliance in the majority of the sections of the Settlement. Dixon, for example, routinely operates with 40-50% less mental health staff than is called for in its staffing plan, and IDOC reports a similar level of staffing for the newly opened facility at Joliet as well as for Logan and Pontiac.

MHPs do appear to be solely dedicated to providing mental health services under this Settlement.

IDOC provides quarterly hiring reports and has not proposed any staffing plan amendment. The dates for meeting targets have not yet passed, so any

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** Six months have not passed since the budget contingent approval date of July 6, 2017. Lack of staffing, however, continues to be the primary impediment contributing to IDOC's being out of compliance in the majority of the sections of the Settlement. In the Quarterly Report of 10/23/17, the Department describes its efforts at addressing this serious staff shortage.

Staffing was not improved at Dixon as of the monitoring team's visit. Dixon routinely operates with 40-50% less mental health staff than is called for in its staffing plan. At that time of the monitoring visit, there were just 4.9 FTE of the 10 FTE psychiatry positions filled. Similarly, each RTU in the STC is slated to have 2 QMHPs and 3 BHTs to care for approximately 80 SMI inmates, but the units continue to be staffed by only 1 QMHP and 2 BHTs. Understaffing continues to be the root cause of several problems affecting the provision of mental health care, including staff burnout and turnover.

Similar staffing shortages were also noted for Logan and Pontiac. No rating will be given for this requirement as the deadline has not arrived.

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:** The deadline for this requirement has arrived. The Quarterly Report of 10/23/17 states "Approximately half of the positions approved for the JTC have been filled."

**(IX)(c): Specific requirement:** Defendants will have three (3) months from the approval of the Settlement Agreement to propose an amendment to the staffing plan. The Monitor and Plaintiffs shall have forty-five (45) days following the submission of the revised staffing plan to state whether they have an objection to the proposed revisions and provide data to support the objections. Following receipt of any objection and supporting data, the parties will either accept the Monitor's and/or Plaintiffs' suggestions or the issue will be resolved through the dispute resolution process.

**Findings:** IDOC did not provide any proposed amendment to the staffing plan, nor has IDOC indicated it intends to do so.

**(IX)(d): Specific requirement:** To the extent the positions listed on Exhibits A and B of the Approved Remedial Plan are to be filled by Mental Health Professionals, these positions shall be allocated solely to the provision of the mental health services mandated by this Settlement Agreement.

**Findings:** The Quarterly Report of 10/23/17 states "the mental health staff who have been hired are allocated solely to the provision of mental health as required by the Agreement." The monitoring team has no reason to challenge the veracity of this statement.

**(IX)(e): Specific requirement:** In accordance with its obligations in Section XXVIII, *infra*, IDOC will include quarterly hiring progress reports related to the additional mental health staff identified in the Approved Remedial Plan. Where a target may not have been met, the Monitor will review the reasons for failure to meet the target and, if necessary, propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized.

**Findings:** IDOC includes quarterly hiring reports in its quarterly reports.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** All of the target dates as specified in the Settlement have not yet arrived. It appears to the Monitor that staffing targets will very likely not be reached by the target dates. The Monitor will notify parties when specific staffing levels are not met by the target dates.

## X: BED/TREATMENT SPACE

**Summary**: The four required RTU facilities have been identified. The RTU at Logan has opened ahead of the target date. The Joliet RTU began receiving mentally ill offenders on 11/6/17. The Monitor is not optimistic about the Pontiac RTU opening on time. Crisis beds continue to be located in control units notwithstanding reports to the contrary by IDOC. IDOC should move quickly on fully opening the RTUs at Pontiac and Joliet. Mentally ill offenders will continue to suffer needlessly until this occurs.

**(X)(a): Specific requirement:** The Approved Remedial Plan identified four facilities at which IDOC would perform renovations, upgrades, and retrofits to create bed/treatment space for SMI offenders requiring residential levels of care: (i) Dixon Correctional Center (male offenders only); (ii) Pontiac Correctional Center (male offenders only); (iii) Logan Correctional Center (female offenders only); and (iv) the former IYC Joliet facility (male offenders only). The necessary funding to complete this construction is dependent upon additional appropriations.

**Findings:** These four facilities have been identified and various construction projects have occurred at each facility.

### (X)(b): RTU beds for male offenders

**(i): Specific requirement:** Approximately 1,150 units of RTU bed space for male offenders have been identified.

**Findings:** IDOC has identified these units of RTU bed space for male offenders.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

   **(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;

   **(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and

   **(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings**:

(A) Dixon has made significant progress and is close to being substantially compliant with the provisions in this section. Dixon has the required 626 RTU beds, and each RTU unit has adequate space to conduct group therapy and private clinical meetings between mental health staff and offenders. In the X House, construction has been completed on group therapy rooms in each of the 4 wings, with a total of 5 group rooms. In addition, construction is in progress to create private mental health offices on each X House

wing for individual assessments.  Considerable thought has gone into this process, particularly because many staff members have extremely difficult memories of a hostage incident that occurred with a QMHP a few years ago.  At the time of the monitoring visit, both security and mental health staff felt comfortable with the plan to create plexiglass windows in the doors of the treatment rooms.  This construction may well be sufficient for Dixon to be in substantial compliance with this section.

(B) Pontiac has plans for a RTU of at least 169 beds. Construction has not begun on this project. The deadline for completion is 7/6/18.

(C) IYC-Joliet began receiving mentally ill offenders on 11/6/17. The Monitor has been informed that approximately 20 mentally ill offenders will be housed at this facility by the end of 2017. The deadline for having a capacity of 360 is 10/6/18.

The Monitor is well aware that the deadline for the opening of these units has not been reached. As such, the department will receive a "target date has not arrived" rating for this provision of the Settlement Agreement. The overwhelming need for these higher acuity beds, however, is constantly being demonstrated by the long waits for RTU admission, extremely high rates of self-injurious behavior, lengthy stays in Crisis and the frequent reliance on the use of restraints. The lack of these higher acuity beds for the mentally ill offender population of IDOC, results in their needlessly suffering. The Monitor personally shared these concerns with the Director on 6/26/17, strongly encouraging him to accelerate the opening of the RTUs at Joliet and Pontiac.  His response was less than reassuring. He stated "we're moving fast for Illinois."

**(X)(c): RTU beds for female offenders**

**(i): Specific requirement:** IDOC has identified RTU bed and programming space for 108 female offenders at Logan CC.

**Findings:** IDOC has identified 118 RTU beds for female offenders at Logan Correctional Center.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make these 108 RTU beds available on the following schedule:

> **(A)** RTU beds and programming space for 80 female offenders no later than six (6) months after the budget contingent approval date; and
>
> **(B)** RTU beds and programming space for an additional 28 female offenders no later than twelve (12) months after the budget contingent approval date.

**Findings:** Logan RTU Phase I was completed in October 2016. It is currently fully occupied. Phase II has also been completed. Logan will have created 118 RTU beds, 10 more than the 108 required by the Settlement Agreement. The beds are divided among five housing units. Staff and offenders alike stated that the housing units provide adequate programming space and confidentiality of sound and sight.

**(X)(d): Specific requirements:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101,

section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:** The target date has not arrived for this requirement. The following is the current status of these units:

**Dixon RTU:** Inmates are now offered approximately 6 hours per week of structured time and 12 hours of unstructured time out of cell. Additionally, two of the three RTU units in the X House have implemented communal meals for lunch and dinner, adding a pro-social component to the treatment milieu and an additional 45 minutes per day of out-of-cell time.

**Pontiac Mental Health Unit:** This unit houses some of the most seriously mentally ill offenders in the Department. Many of them are too impaired to take advantage of the limited treatment opportunities offered on this unit. Department resources need to be reallocated to address the treatment needs of this population. Also, the construction of ample treatment spaces should be greatly accelerated. Given the current rate of progress, the Monitor is not optimistic that this RTU will be completed by the target date of 7/6/18.

**Logan RTU:** Please see X(c)(ii), above.

**Joliet RTU:** The Monitor inspected this facility on 6/20/17. This was obviously prior to their accepting mentally ill offenders. The progress of this unit will be closely followed moving forward.

**(X)(e): Inpatient beds**

**Specific requirement:** Within three (3) months of the approval date of this Settlement Agreement, IDOC shall enter into an intergovernmental agreement ('IGA') with the Illinois Department of Human Services ('DHS') to secure at least 22 beds for female offenders and at least 22 beds for male offenders in an existing DHS-owned mental health facility. The necessary funding to complete this construction is dependent upon additional appropriations. Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date. Within thirty (30) months of the approval of this Settlement Agreement, IDOC will transition to assuming control or ownership of said facility and provide approximately sixty (60) additional beds and programming space for separate housing of male and female offenders in need of an inpatient level of care. During that transition period, IDOC shall consult closely with the Monitor and IDOC's own retained mental health expert to develop any additional policies and procedures and design programming and treatment space that is appropriate for a forensic hospital. After the IGA is signed, IDOC will continue to develop plans for inpatient care that can be implemented after necessary appropriations.

**Findings:** IDOC has entered into this IGA with the Illinois Department of Human Services. The target dates for the remainder of the requirements of this subsection of the Settlement Agreement have not arrived.

**(X)(f): Crisis beds**

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

**Findings:** One set of crisis cells is still located in the North House of Pontiac. These cells are referred to as "overflow." On 9/19/17 there were two mentally ill offenders in crisis cells in North House. The Monitor spoke with a custody sergeant who stated "there are always one or two overflows in crisis in North House."  The Settlement Agreement clearly states "such cells will be relocated to a protective Custody Unit no later than twelve (12) months after approval of the Settlement Agreement." This apparently is not happening. The Quarterly Reports of 6/30/17 & 10/23/17 incorrectly state "Although it took some time, Pontiac's crisis cells were moved prior to the May 2017 due date." This is another example of erroneous information being presented as fact in the quarterly reports.

The Quarterly Reports of 6/30/17 & 10/23/17 go on to state "each facility in question has crisis beds outside of the main control units." Plaintiffs' counsel determined that the primary crisis cells at Lawrence Correctional Center were located in a control unit, and this was confirmed by Assistant Monitor Ginny Morrison during her tour from 10/18-10/20. The monitoring team observed that Lawrence is in the process of retrofitting cells in a different building to replace those in the control unit. The first set of replacement cells was anticipated to open in November 2017. The quarterly reports create a misleading impression that the placement of crisis care beds is resolved, when in fact, a significant number of patients are still placed in control units in a few locations.

Several institutions use control units as overflow for crisis care; some logs show this was used this rarely,[19] but Pontiac appears to have used a control unit for at least 13% of its crisis cases in recent months.[20] At Menard, mentally ill offenders who are housed in segregation who need a crisis bed are moved to a crisis cell located in a general population wing of the same building. The crisis cells at Logan were not monitored during this reporting period. Of note is that, although

---

[19]  For example, from July through September, Stateville shows 9 such cases, Big Muddy River shows 2, and Robinson and Western Illinois each show 1.
[20]  Aggregating July and September yields a total of 13%. August shows a much higher number, but legal counsel has explained that staff made a consistent labeling error. It was not possible, at the time of this writing, for the monitoring team to determine a correct rate for August.

Stateville and Northern Reception Center have made appropriate efforts to retrofit cells outside of control units, the monitoring team observed cells in the NRC infirmary and in Unit A that have points that self-harming patients could potentially use to tie materials to attempt hanging. The team encourages Stateville to review those units for possible safety improvements.

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: As was reported in the first annual report, "crisis beds are an integral part of a well-functioning correctional mental health treatment system. As stated in the Settlement, they are meant to provide an acute and aggressive level of care designed to rapidly stabilize mentally decompensated offenders. If, due to the severity of their mental illness, the offenders are not able to stabilize in a relatively short period of time, which is defined as "generally no longer than 10 days," then they need to be transferred to a higher level of care. In all fairness to IDOC, it currently does not have a well-functioning correctional mental health treatment system. The number of mentally ill offenders continues to overwhelm the resources available in the current mental health treatment system. Of note, there are no inpatient services available. This results in extremely ill offenders being housed in the RTUs, Control Units, General Population Units, and R&C Units. There are not sufficient services available to adequately address the needs of this extremely ill population. All of this results in seriously mentally ill offenders being placed in crisis beds, which represent the highest level of psychiatric care currently available to mentally ill offenders in the IDOC. The crisis beds have become de facto inpatient care."

The level of services provided to offenders in crisis care has remained woefully inadequate to meet their treatment needs during the current monitoring period. Mentally ill offenders in crisis care only receive an evaluation for suicide potential on admission, and sometimes on discharge,[21] and an MHP contact on a daily basis. Among the institutions monitored, mentally ill offenders in crisis have the option of being seen in a confidential setting at Menard, Pinckneyville, Lawrence, Hill, Big Muddy River, and a portion of the crisis beds at Pontiac.[22] Big Muddy River was able to accomplish this change during the monitoring period, a significant improvement. Elsewhere, the visits are not confidential. The monitoring team observed clinical contacts at some locations, reviewed chart notes, and discussed cases with staff. MHPs were routinely very knowledgeable about the offenders, and often conducted goal-directed contacts to address the stressors and mental health issues contributing to the admissions. At Pinckneyville, Big Muddy River, and Lawrence, crisis cases were discussed by all MHPs at daily staff meetings. Pinckneyville also provides nursing checks twice daily.

The department is also not meeting the requirements of section VII (c) of the Settlement

---

[21] This is based on a review of 80 crisis admissions from Big Muddy River, Hill, Lawrence, and Robinson; the analysis is heavily weighted toward practice at Lawrence as many more cases were reviewed there. Suicide screenings were evident at admissions for 91% of the cases, while 69% showed screenings on discharge.
[22] The mentally ill offenders housed in crisis cells in the North House receive their daily evaluations cell side.

Agreement regarding SMI offenders who are placed in crisis beds. That is, the Department is not reviewing and updating the treatment plan upon entrance to crisis and thereafter once weekly, or more frequently if clinically indicated. Please see VII(c) above for an analysis.

A psychiatrist does not routinely evaluate the offenders to determine if their medications should be adjusted or changed. These mentally ill offenders do not receive any "aggressive mental health" interventions. In an analysis of 80 of the crisis watches the monitoring team reviewed, only 19 had any psychiatry contact. While a handful of these admissions were brief and/or involved inmates who said they were not genuinely in crisis, in most cases, psychiatric evaluation would be expected. Psychiatry did not respond to indicia of greater need, such as many admissions in a short time, very lengthy admissions, and pending RTU referrals. For example, with three men--living in crisis watch for 1 month to 2.5 months--each was seen only once or twice in that length of time.

Examples of the poor care while on crisis include:

- A mentally ill offender who stated "cutting is my coping skill." He had been on crisis several times during the preceding few months and did not have a treatment plan in his medical record. The Monitor evaluated him on 6/19/17 and found him to be extremely psychotic. Of note, his most current visit with a psychiatrist was four months earlier, 2/18/17, when he was prescribed two different antidepressants.
- A mentally ill offender placed on crisis for attempting to hang himself. He did not have a mental health assessment or a treatment plan in his medical record. He had not been seen by a psychiatrist and had gone at least five days without receiving his prescribed medications.
- A mentally ill offender placed on crisis for attempting to hang himself. There was no mental health assessment or treatment plan in his medical record. There was also no crisis plan even though he had been on crisis for over two days. He had not taken any of his medications for at least three days. His medications included two psychotropics and one cardiac medication.
- A mentally ill offender in crisis at the North House in Pontiac receives his daily contacts with a MHP at cell side, although not all of these visits have been documented in the medical record. His most current treatment plan was over five months old and he had not seen a psychiatrist for two months. Of note, his medications had been prescribed for three months although there was no documentation of stability.

Not much has changed in the care of mentally ill offenders placed on crisis during this reporting period. As was reported in the first annual report "'Aggressive' intervention, required by the Settlement, cannot be provided simply by virtue of placement into a crisis cell and daily monitoring by a MHP. This will not accomplish the aim of "reducing the acute, presenting symptoms and stabilizing the offender." Inmates in crisis need actual treatment, such as one-to-one and group therapies as well as an aggressive reevaluation of the patients' prescribed psychotropic medication. It seems offenders may receive more treatment in segregation than in crisis care, though additional out-of-cell time is provided for those in crisis for prolonged periods."

**(X)(g): Specific requirement:** IDOC shall also ensure that each RTU facility has adequate space for group therapy sessions; private clinical meetings between offenders and Mental Health Professionals; private initial mental health screenings; and such other therapeutic or evaluative

mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures. IDOC shall also ensure that each RTU facility has adequate office space for the administrative and mental health staff required by this Settlement Agreement.

**Findings:** The Department is meeting this requirement at Logan and Joliet and should meet this requirement at Dixon upon completion of the current construction projects.

**(X)(h): Specific requirement:** The treatment and other space required by subsections (d)-(g), *above,* shall be completely available no later than six (6) months after the work completion dates identified in subsection (a), *above,* for the four facilities identified there, and for any other residential treatment or outpatient facilities at which it is determined that modifications are needed no later than December 2017**.**

**Findings:** The target dates for this requirement have not arrived.

**(X)(i): Specific requirement:** Within forty-five (45) days of the selection of the Monitor, IDOC will submit to the Monitor descriptions and architectural plans, if being used, in sufficient detail to enable the Monitor to determine whether construction undertaken pursuant to this section complies with the previously approved Remedial Plan. If, having reviewed these descriptions and plans, the Monitor concludes that the space allocations in any or all facilities under this Settlement Agreement are not consistent with the Remedial Plan, the Monitor shall so inform IDOC and Plaintiffs' counsel, and IDOC shall have thirty (30) days to propose additional measures that address the Monitor's concerns.

**Findings:** As reported in the first annual report, Chief Lindsay sent the required floor plans to the Monitor within the time frame specified in the Settlement. These floor plans are consistent with the requirements of the Remedial Plan.

## XI: ADMINISTRATIVE STAFFING

**Summary**: Regional directors and a statewide quality improvement manager have been hired, although not all positions are being worked full-time.

Each institution has designated a Psych Administrator position, though about 20% are vacant.

Hiring of the required Central Office staff is very limited.

### (XI)(a): Regional Directors

**Specific requirement:** Within thirty (30) days after the approval of this Settlement Agreement, to the extent it has not already done so, IDOC will hire two regional directors who are licensed psychologists or psychiatrists to assist the IDOC Chief of Mental Health Services.

**Findings:** As reported in the first annual report, IDOC actually hired three regional directors who are licensed psychologists and they were in place prior to the filing of the Settlement. They were:

- Dr. Horn, northern regional director, who was hired March 2014
- Dr. Sim, central regional director, who was hired January 2015. As reported in the Quarterly Report dated 10/223/17, Dr. Sim is only devoting 75% of his time to this position as he is also the Continuous Quality Improvement Manager.
- Dr. Reister, southern regional director, who was hired December 2014

### (XI)(b): Statewide Quality Improvement Manager

**Specific requirement:** IDOC will also create a position for a statewide Quality Improvement Manager (the QI Manager). In addition to the other responsibilities assigned to the QI Manager in this Settlement Agreement, the QI Manager or one or more qualified designees shall have the responsibility for monitoring the provision of mental health services performed within IDOC by state or vendor employees and the performance of any vendor(s) under the vendor contract(s). This position shall be filled only by a State, not vendor, employee, and shall be filled no later than nine (9) months after the approval of the Settlement Agreement.

**Findings:** This position was filled on 2/16/17, eight days before the deadline, by Dr. Jeff Sim. Curiously, Dr. Sim was also serving at the Central Regional Director at the time of his appointment to Statewide Quality Improvement Manager. The Quarterly Report of 10/23/17 states that Dr. Sim is only devoting 25% of his time to this role. This is consistent with the fact that IDOC is not operating a statewide continuous quality improvement program.

### (XI)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings:** There continues to be vacancies in these positions throughout the Department. These include positons at Danville, Graham, Vandalia, Robinson, and Illinois River. Chief Hinton reported to the Monitor on 11/7/17 that Western also had a vacancy. The Quarterly Report of 10/23/17, however, lists the position at Western as having been filled. Regardless, multiple vacancies exist 17 months after the deadline. In addition to negatively affecting the quality of mental health services at these five or six facilities, the Department is unable to implement its Statewide Quality Improvement system until all positions are filled.

**(XI)(d): Central office staff**

**Specific requirement:** IDOC shall hire ten (10) central office staff (*i.e.*, non-facility-specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. These positions will be filled no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** The deadline has arrived for filling these positions. To date, IDOC has not reported the hiring of "ten (10) central office staff (i.e. non-facility specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. Regarding this specific requirement, the Quarterly Report of 10/23/17 states "With regard to subsection (d), the Department is not required to fill these positions until 18 months after the Agreement. However, the Department hired a Mental Health Training Coordinator, Tim Lawrence, and a chief of psychiatry, Dr. Michael Dempsey. Dr. Dempsey recently resigned and the Department plans to hire a new chief of psychiatry. The Department made an offer to a candidate last week and is in salary negotiations with that candidate." It is important to note that Dr. Dempsey quit his position over six months ago, so he has not "recently resigned." The Department's response to this very important issue is to provide misleading information in an apparent attempt to obfuscate the issue. The monitoring team needs to know:

- When will Dr. Sim fully assume the position of Statewide Quality Improvement Manager?
- When will all IDOC facilities have an assigned mental health supervisor?
- When will IDOC hire ten (10) dedicated central office staff to manage the Settlement Agreement, including a Chief of Psychiatry?

## XII: MEDICATION

**Summary**: Staff makes every effort to "contemporaneously record the administration of psychotropic medication. SMI offenders with a new prescription are not being seen at least twice within 60 days after starting a new medication. Offenders are not being evaluated every 30 days by a psychiatrist. There was a backlog of over 1800 psychiatric follow-up visits in early November. Mentally ill offenders are routinely followed every 90-180 days even though "stability" has not been documented. Serious problems exist with the medication distribution system. Poor compliance with medications is rarely referred to the psychiatrist. Offenders can go for weeks or months before anything is done about poor compliance with their medications. The efficacy or side effects of prescribed medications are not routinely documented in the offenders' medical records. Protocols for laboratory and neurological evaluations are not generally followed. Laboratory work is sometimes obtained but in a haphazard fashion that doesn't support the care of the mentally ill offender.

**(XII)(a): Specific requirement:** In accordance with the provisions of IDOC AD 04.03.100, section II (E)(4)(d)(1), no later than ninety (90) days after the approval of this Settlement

Agreement, medical staff shall record contemporaneously on offender medical records all medications administered and all offender contacts with medical staff as to medications. With respect to offenders taking psychotropic medications, "contemporaneously" means that the medication, the amount of the medication, and whether the offender took it or refused it will be recorded at the time the medication is delivered, either on a temporary record from which information is subsequently transferred to a permanent record located elsewhere, or in the permanent record at the time of delivery.

**Findings:** As reported in the first annual report, "this requirement has increasingly been met during the monitoring period." The monitoring team observed the medication administration process and noted that staff makes every effort to contemporaneously record if an offender to or refused his/her medication.

At Hill and Lawrence, while medication administration records were in use, nearly half of the relevant charts showed unexplained gaps in recording for one to two days per month. At this time, it is unclear what this may reflect.[23]

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** In *none* of the facilities monitored were:

- SMI offenders who have new prescriptions being evaluated two times within the first 60 days of treatment: Among 12 patients newly on medication in 2017 at Hill, Lawrence, Pinckneyville, and Robinson, follow-up was compliant in only 2 of the cases. More commonly, these patients were seen after 90 days, and some were not seen for 120 days.

---

[23]  The monitoring team reviewed medical administration records at these facilities for 42 inmates who were prescribed psychotropic medication. Of those, 20 patients' records had these gaps, usually in multiple months of 2017, but not every month.

- Offenders who are prescribed psychotropic medications being evaluated by a psychiatrist at least every 30 days: Only at Dixon were *some* patients seen every 30 days, but the quality of the notes—which omitted such critical information as diagnosis and medication effects--was so poor as to render them useless

In fact, in a sample of 113 patients at five other institutions across general population and segregation, only *one* could be said to have follow-up occur at 30-day intervals during 2017. Indeed, follow-up did not adhere to any regular schedule for any of these patients; the intervals appeared haphazard and rarely seemed to adjust to indications of acuity.

The time between appointments was almost evenly divided between:

- Appointments 4 to 8 months after the previous contact
- Appointments 90 days after the previous contact
- Appointments 60 days after the previous contact
- Appointments within 30 days after the previous contact

Notably, that means that 25% of the appointments in this sample exceeded even the maximum permitted by the Agreement for outpatient contacts (90 days).

Concurrently, psychiatrists too often issue medication orders without seeing the inmates. Among this sample of 113 patients, there were 27 verbal orders, in 2017, to continue medication. This excludes bridge orders that extend medication a brief time; this conclusion refers only to those verbal orders where an appointment did not follow for at least another month. In a handful of cases, the verbal orders extended the medication for 90 days, serially, and the patients were not seen for 8 months. This sample also contained five orders to discontinue medication, rather than seeing the patient to assess whether a medication adjustment would address reported side effects or reasons underlying noncompliance.[24] IDOC leaders report that they have recently conducted trainings to curb the practice of orders issued without seeing the patients; this is a welcome step.

In some instances, the psychiatrist or psychiatric physician's assistant wrote a plan to follow up more quickly, but subsequent appointments almost never occurred according to that plan. In some locations, particularly Lawrence, custody practices—lockdowns, physical plant issues, staffing shortages—played a role. Most commonly, an explanation was not evident for these lengths of time between psychiatry contacts.

- In none of the medical records reviewed was "stability" documented and the extension of follow-up appointments properly considered.

Indeed, among the sampled records that did not have 30-day contacts were:

- New arrivals to the institution, with whom the psychiatrists would have insufficient history to determine stability

---

[24] These also were *not* cases where the psychiatrist and staff had previously made multiple attempts to address the noncompliance.

- Offenders newly on medication
- Offenders reporting side effects to nurses, MHPs, and in self-referrals
- Offenders newly going off all medication
- Offenders referred by nurses and MHPs for noncompliance follow-up

It appeared these offenders generally were not prioritized for psychiatry follow-up and were just as likely to wait 2 to 6 months for a contact.[25] In some cases, these offenders were not seen until they went on crisis watch.

As of 11/10/17, there was backlog of 264 new psychiatric evaluations and 1868 follow up appointments.

The Department has suggested that an expansion of Telepsychiatry will address these problems. The Monitor sent a letter to Dr. Hinton on 10/1/17 listing a variety of concerns about the wholesale use of Telepsychiatry to solve this state of "psychiatric emergency" that currently exists in IDOC. To date, these concerns have not been addressed by Dr. Hinton or any member of the IDOC leadership. Also, these psychiatric issues are necessarily the purview of the Chief Psychiatrist, whose position has been vacant for over six months.

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

**Findings:** On the whole, the Department is not meeting this requirement at any of the facilities monitored during this reporting period. On the positive side, there was medication continuity for inmates arriving from other IDOC facilities with current psychotropics medication orders. All medications were delivered from the day of arrival in the 31 relevant charts in one analysis.

However, the monitoring team reviewed a significant number of medical records that documented very poor medication compliance that was not being reported to the prescriber, or those reports were not conveyed until the problem had existed for a week, and up to several weeks. So as far as the prescriber knew, the mentally ill offender had been taking their medication when in fact they had not.

Another serious problem exists regarding whether "there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed." The Monitor observed that this particular requirement is not being met. This widespread problem is referred to as "cheeking." This occurs when an offender appears to have taken their medication but they actually don't swallow it and spit it out for use at a later time. This is especially a problem in the control units where the medication is passed out at cell front. While

---

[25] It took more than one month to be seen for those patients in this sample: 45% of the 31 new arrivals; 83% of the 12 patients newly on medication; 83% of 6 patients reporting side effects; 67% of the 3 patients newly going off all medication; 67% of the 6 patients referred for noncompliance.

conducting interviews at Pontiac, the Monitor was handed a small package by a mentally ill offender, which contained 13 Prozac capsules and seven unknown white pills. The Monitor immediately turned this package over to Major Blackard. In further questioning the mentally ill offender involved, he stated that it was easy to cheek medications because the staff pass the offender their pills and quickly walk away. In yet another case at Pontiac, the monitored interviewed a mentally ill offender who was in the infirmary due to an intentional drug overdose. This offender stated that he had saved "50 Benadryl's, 40 lithium's and 'a shitload of other pills.'" Whether he actually took all of the medications that he claimed to have taken is not the point. The medical records confirmed that in fact he had taken an overdose of prescription medications. This is an extremely serious problem that requires immediate attention.

   **(ii): Specific requirement:** The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskinesia [sic], high blood pressure, and liver function decline;

   **Findings:** Meeting this continues to be a problem for the Department. In the overwhelming majority of the medical records reviewed during this reporting period, little to no attention was paid to either the efficacy or the side effects of the prescribed medications. As was reported in the first annual report, the monitoring team encountered numerous mentally ill offenders who were displaying medication-induced side effects. In all of these cases, there was no mention of these side effects in the offenders' medical records.

   Of note, the Department's response to this requirement, as noted in the Quarterly Report dated 10/23/17, is "the Department has devised a brochure that provides a list of the side effects associated with medications. This brochure is part of the mental health manual and is available to all offenders." This brochure will do little to address this requirement until such time as there are an adequate number of competent psychiatrists who are given the time and resources to provide a constitutionally mandated level of care to the mentally ill offenders housed in the IDOC.

   **(iii): Specific requirement:** Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood pressure monitoring, and neurological evaluation;

   **Findings:** There has been no change in the Department's response to this requirement since the submission of the first annual report. That is, the monitoring team found no evidence that adherence to standard protocols for ascertaining side effects was occurring on a regular basis. There was some evidence of an occasional blood test being obtained. These blood tests were not obtained routinely and certainly not on the entire cohort of offenders who require these blood tests as part of their treatment with psychotropic medications. There was evidence that certain neurological evaluations were being done but again not routinely or on all the offenders who required them as part of treatment.

   Similar to the Department's response to XII(c)(ii), the Quarterly Report dated 10/23/17 states "The lab work requirement is also included in the mental health manual." The Monitor would like to point out that the lab work requirement has been present in the mental health manual for the duration of the Settlement Agreement. Its mere presence has done little to ensure "Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood

pressure monitoring, and neurological evaluation." As with the requirements of section XII(c)(ii), the requirements of this subsection will not be able to be met until such time as there are an adequate number of competent psychiatrists who are given the time and resources to provide a constitutionally mandated level of care to the mentally ill offenders housed in the IDOC.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results;

**Findings:** As noted above, this lab work has not been obtained or reported in a timely manner.

**(v): Specific requirement:** That offenders for whom psychotropic drugs are prescribed receive timely explanation from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** As with most of the requirements of this section, no real change has occurred with this requirement during this monitoring period. As was reported in the first annual report, this requirement is not being met in IDOC with the exception of Dixon. At Dixon, offenders in the STC reported that they were given an opportunity to discuss medication options with the psychiatrist in a confidential setting, but patients in the X House noted that they were seen cell-side and often felt uncomfortable discussing medication issues in that setting. For the remainder of IDOC, visits with a psychiatrist, when they occur, reportedly are rushed and very superficial. The monitoring team interviewed hundreds of offenders as well as reviewing their medical records to ascertain if this requirement was being met. The overwhelming majority of the offenders reported that their visits with the psychiatrist only last a few minutes and that they are often not allowed to ask questions. This was consistent with the medical records where little to no documentation was present to satisfy this requirement. It is also important to note that during the current monitoring period, there was a backlog of over 1800 psychiatric follow-up visits. This means that these offenders prescribed psychotropic medication were never afforded the opportunity to discuss medication issues with their prescribing psychiatrist.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** The Department has not made any progress in addressing this requirement during the current monitoring period. As was reported in the first annual report, there was little evidence that this was occurring in IDOC. The monitoring team found numerous examples of medication non-compliance with offenders housed in control units for which nothing was done. That is, there was no documentation in the offenders' medical records that the MHP was aware of these non-compliance issues or that the offender was referred to a psychiatrist. In fact, there were examples of the psychiatrist discontinuing the offenders' medications without a visit if non-compliance was reported.

In general population facilities, however, some examples of noncompliance referrals were evident. The monitoring team did not conduct a systematic review, but encountered 11 examples of nursing staff notifying MHPs of a patient's noncompliance. While these referrals were sometimes made much later than is good practice, especially at Robinson, in each instance the MHP met with the inmate in a reasonable time and completed a referral to a psychiatrist. Dixon, Graham, Robinson, and Shawnee incident logs reflect 29 referrals to the mental health department for medication refusals in recent months, as well.[26]

## XIII: OFFENDER ENFORCED MEDICATION

**Summary**: Offenders subject to enforced medication are found in only nine institutions. All facilities have trained staff able to serve on a Treatment Review Committee; some appear to substitute other physicians for the required psychiatrist on the committee, but this seems a reasonable adaptation.

Psychiatrists documented the clinical reasons for the request and it appeared these were included in notices to the inmates. Staff Assistants were regularly appointed and hearings were held, appropriately staffed, and documented. Inmates reportedly were informed of at least some rights of appeal and some availed themselves of it.

Some medication orders contained unsupportable pharmacological practices and psychiatrists did not follow up with these patients as often as the Administrative Code and the Settlement Agreement require.

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

a) Administration of Psychotropic Medication

1) Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a

---

[26] The monitoring team has not examined the response to those referrals.

physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

2) Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2)The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of

individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by

the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** Institutions reported to the Monitor 182 inmates during the monitoring period for whom enforced medication can be ordered. These were nearly all concentrated at Dixon, Pontiac, and Logan. The distribution was:

- Dixon (120), Pontiac (28), Logan (14)

- Big Muddy River, Illinois River, Menard, Pinckneyville, Stateville, Western Illinois: 1 to 5 each
- 17 institutions had no inmates subject to enforced medication

The monitoring team reviewed a 9% sample of these medical records drawn from five of the institutions.

In four instances, medication was given as an emergency before the hearing. Documentation raised some concerns, but there was insufficient information to reach conclusions.[27]

Each institution provided a list of staff who have been trained and serve as Treatment Review Committee members. In some instances, the pool of members includes mental health professionals and psychiatrists; in other instances, that is less clear. IDOC has indicated that, where hearings are rare and there is not a standing committee, regional administrators ensure that committees are correctly composed at the time of hearing.  In the monitoring team's chart sample, a Treatment Review Committee did hold a hearing in each case; the committees were composed of MHPs and either a psychiatrist or the medical director. While this does not meet the letter of the Administrative Code, it is a reasonable adaptation in the face of psychiatry shortages, in the opinion of the monitoring team.

In all cases reviewed, a psychiatrist documented facts on which he or she determined that: i) the offender suffers from a mental illness or mental disorder; and ii) the medication is in the medical interest of the offender; and iii) the offender is either gravely disabled or poses a likelihood of serious harm to self or others. Generally, those facts were also captured in a notice to the inmate.

Staff assistants were appointed in all reviewed cases. Inmates were almost always present[28] and there was no indication any had been excluded. There was no mention of the inmates offering witnesses or documents, nor of the committee declining either of these options. A written summary of the hearing and the committee's reasons for approving medication administration did appear in each reviewed health care record.

The Administrative Code requires that these inmates be evaluated by a psychiatrist at least every 30 days while these decisions are in place; this did *not* occur. Interviewed mental health staff indicated that inmates are informed that they have a right to appeal every six months. Examples of inmates taking advantage of this opportunity were apparent in the Stateville charts.

---

[27] In one case, it was not fully clear whether emergency medications were given. In another, the administration was in an earlier medical chart volume that the monitor did not review. In a third, justification procedures were followed but the administration seemed to occur for five days, beyond the permitted time. In the fourth case, justification was presented but it was questionable whether the inmate's condition was acute. One instance of anything, of course, does not constitute a pattern, so there is insufficient information to determine whether these rise to the level of ongoing concern.

[28] A notice was evident in half of the cases. Inmates were clearly present in ¾ of the cases. The presence of notices and inmates was inconclusive in the other cases and the monitoring team was unable to seek alternative information sources.

The monitoring team determined that Dixon continues to manage enforced medications reasonably well. Upon reviewing the medical charts, the clinical rationale for enforced medication was consistently documented in the psychiatrists' notes and medication orders. Staff maintains a centralized list and all offenders subject to enforced medications are housed in an RTU setting so that they can be monitored closely; there were 110 such inmates during the monitoring visit.

As these analyses indicate, the monitoring team observed many good practices in the enforced medication cases reviewed. The most glaring exception was the lack of psychiatric follow-up for this vulnerable population. Also, the pharmacological practices in these "offender forced medications" were abysmal. There were no documented reasons for the choice of a particular medication. This was especially problematic when reviewing the choice of medications used for the "IM backup." These "IM backups" are orders for injectable medications used if an offender refuses to take the prescribed oral medication. The standard of practice is to use an equivalent dose of an equivalent medications. That is, one would substitute an injectable antipsychotic medication for the refusal of an antipsychotic medication. This has not generally been the practice. Several other aspects of the Administrative Code requirements were not reviewed during this monitoring period.

## XIV: HOUSING ASSIGNMENTS

**Summary**: The appropriate policies are in place. MHPs do routinely learn quickly about cell assignments and feel their input into housing decisions, including post-segregation placement, is sought and respected. MHPs could not recall instances of custody staff overriding MHPs' housing recommendations for patients.

**(XIV)(a): Specific requirements:** Cell assignments for SMI offenders shall be based on the recommendations of the appropriate security staff. However, notice shall be made to members of the SMI offender's mental health treatment team within twenty-four (24) hours of a new or changed cell assignment. It is expected that MHPs will monitor the location of each SMI offender on their caseload. IDOC will require MHPs to alert security staff of their concerns regarding SMI offender housing assignments and related contraindications. In all instances, an SMI offender's housing assignment shall serve both the security needs of the respective facility and the treatment needs of the offender.

**Findings:** During the monitoring period, IDOC administration distributed a memo to all facilities reinforcing this requirement and those that follow in (b) and (c). To date, five institutions visited have provided local policies containing this language, or substantially similar language.

At several institutions visited, the administration sends a daily email about cell moves of mentally ill inmates; some concern all moves, and some concentrate on moves in and out of segregation. There is also a procedure, apparently in system-wide use, in which mental health, medical, investigations, and other departments are emailed about segregation placements and asked to note concerns or sign-off on double-celling eligibility.

Lawrence MHPs are also able to check the relevant database themselves. In some institutions, moves have limited effect on access to patients in that contacts take place in the mental health offices. Several MHPs at each institution visited confirmed that they learn quickly about moves from custody and from each other, and they have not had difficulty in this regard.

**(XIV)(b): Specific requirement:** For those offenders who have served fifteen (15) days or longer in Administrative Detention or Disciplinary Segregation, an MHP who is a member of the SMI offender's mental health treatment team shall be consulted regarding post-segregation housing recommendations pursuant to Section XVIII (a)(v)(F), *below*.

**Findings:** The monitoring team notes that MHPs are being consulted regarding post-segregation housing. Also, during the monitoring period, IDOC administration distributed a memo to all facilities reinforcing this requirement. To date, five institutions visited have provided local policies containing this language, or substantially similar language.

Dixon security staff consults with mental health staff regarding housing decisions, such as single-cell status and RTU placement after segregation. Both Hill and Lawrence clinical leaders emphasized that custody staff is receptive to their advice about housing. Big Muddy River staff has not been consulting with MHPs on post-segregation placements, but the administration committed to doing so.

**(XIV)(c): Specific requirement:** If security staff rejects a housing recommendation made by an MHP as to an SMI offender, the security staff representative shall state in writing the recommendation made by the MHP and the factual basis for rejection of the MHP recommendation.

**Findings:** During the monitoring period, IDOC administration distributed a memo to all facilities reinforcing this requirement. To date, five institutions visited have provided local policies containing this language, or substantially similar language. None of the Psych Administrators or MHPs interviewed could identify any instances when security staff overrode their opinions about housing placements for mentally ill inmates.

## XV: SEGREGATION

**Summary**: Some institutions run multidisciplinary workgroups that meet routinely to discuss segregation offenders individually, spotting behavioral issues and designing incentives and other solutions to prevent and solve those behavioral management problems. These are effective means to shorten segregation terms, reduce tickets, and support all of the treatment goals that are the subject of this section's requirements.

Segregation units generally met the conditions of the Administrative Directives cited herein, but the noise and chaos were anti-therapeutic for mentally ill offenders.

Mental Health rounds did take place consistently. These treatment requirements were met at very low levels: MHP contact within 48 hours, continuing prior treatment plans, counseling if included in the treatment plan, generating new treatment plans and updating them monthly, providing enhanced therapy if needed. Pharmacological treatment is poor, consistent with this treatment for other populations. These deficiencies may be contributing to overuse of calls for Crisis Intervention Teams.

The monitored institutions reportedly offered 6 to 15 hours per week of unstructured out of cell time, but there are concerns about the accuracy of this information. The conditions of unstructured out of cell time at some locations also were a disincentive to its use.

Similar concerns existed about the accuracy of reported structured out of cell time, and the difference between hours scheduled and hours received, which could be reduced by refusals, cancellations, and other causes. With current reporting capabilities, it is difficult to discern the amount of treatment received. IDOC improved the content of some therapy groups offered, and trained BHTs to conduct Rounds in order to make MHPs more available for counseling and group therapy.

MHPs are able to arrange for offenders to be placed in crisis care or other higher levels of care with collaboration from custody staff and administration. There is not a reliable system for identifying mentally ill offenders who are deteriorating due to continued placement in a control unit.

As of the first annual report, IDOC appeared to have met the requirements related to review of segregation terms and tickets.

As to all of the above requirements, the analysis applies equally to offenders in Investigatory Status/Temporary Confinement.

**XV(a)(i): Specific requirement:** Prior to housing two offenders in a cell, the respective Lieutenant or above shall comply with Administrative Directive 05.03.107 which requires an offender review that shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or

mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues; and significant negative life changes, such as additional time to serve, loss of spouse or children, etc. The respective security staff shall consult with the mentally ill offender's treatment team regarding the appropriateness of such placement in accordance with Section XVII of this Settlement Agreement.

Of note, AD 05.03.107 provides: The Chief Administrative Officer of each facility with segregation and protective custody units designed to double cell offenders shall develop a written policy that includes, but is not limited to, the following for routine segregation and protective custody placement:

- Segregation placement
- PC placement
- Documentation
- Review of documentation and final determination
- Compatibility contraindications
- Review with other inmates
- Upon determination to double-cell:
    - Documentation
    - Suitability review following placement
    - Documentation upon release
- Documentation and Reassessment for disciplinary report

**Findings:** The Quarterly Report of 10/23/17 states "Double-cell reviews are in place, and all facilities are in the process of implementing the requirements of this Section. On June 23rd, a memo was sent to all wardens reminding them of the requirements outlined in this section. Additionally, wardens were instructed to draft institutional directives reiterating the requirements in this section. The Monitor had requested a list of facilities that have complied with this requirement. On November 20, 2017, the Monitor received confirmation from Chief Funk "that all facilities have an institutional directive relative to the double celling of special populations." Additionally, Psych Administrators at several institutions convincingly described to the monitoring team the particulars of this process and its routine nature. Please see section XIV, above.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** The segregation units inspected generally met the criteria outlined in this subsection. There were numerous complaints from offenders about the lack of cleaning supplies and hygienic items. These segregation units were uniformly unfit for housing mentally ill offenders. The units themselves were oppressively loud and chaotic. They do not contribute to providing quality mental health care. The North House at Pontiac was especially anti-therapeutic and remains one of the worst correctional units the Monitor has toured in over 30 years of working within the correctional psychiatric field.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings:** Prior to addressing the specifics of this subsection, it is important to restate that the treatment planning in the Department as a whole is exceedingly poor. The plans are not the product of a multidisciplinary team, very non-specific, usually utilizing the same generic treatment approaches regardless of the offenders' diagnoses. It is not uncommon to find two treatment plans in a given medical record, one created by the MHP and another created by the prescriber. These plans often contain incongruous diagnoses, which further deteriorate the quality of care provided.

This is the status of the treatment plans prior to a mentally ill offender being placed in segregation. The monitoring team found that even these plans are not continued in segregation. The one exception was at Menard where mentally ill offenders in segregation reported receiving weekly or semi-weekly counseling visits by the MHPs. Usually, the only treatment that is consistently continued in segregation is medications. Please see section XII above which describes the problems with medications in general and in segregated housing units in particular.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** This procedure is not, as a general matter, being implemented in the IDOC. The Quarterly Report of 10/23/17 is silent about IDOC's meeting this requirement. In an analysis of 76 Segregation placements in 2017, the monitoring team determined that only 36% satisfied this requirement.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** This requirement is not being accomplished in the majority of the monitored IDOC facilities. Compliance was poor in the five institutions where, Assistant Monitor Ginny Morrison completed a detailed analysis. She found for initial plans within one week of placement, only 22% met the requirement.[29] In the majority, no plan was present. Where there was a plan, numbers were about equally divided between timely and late cases. In terms of monthly updates

---

[29] This analysis is based on 81 Segregation placements in 2017 across five institutions.

thereafter, relevant records showed only 31% compliance:[30]  Among noncompliant cases, some had one or two updates, but not all that would have been required, but the majority had no updates at all.

The Quarterly report of 10/23/17 stated "The Department is working with haste to implement these provisions as its staffing increases." Please note that this is not a budget contingent item.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Supportive counseling by an MHP as indicated in the ITP
E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

*Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* Please see subsection XV(a)(iii) for specifics regarding this requirement. Menard was the only facility that consistently continued the ITPs for those mentally ill offenders placed in segregation.  Otherwise, the only treatment that is continued is medication. Also, the monitoring team did not find any evidence of the offenders being provided "with enhanced therapy as necessary to protect from decompensation that may be associated with segregation."

*Rounds*: Staff has adopted rounds as a routine practice. For the most part, they were successful, with 81% of relevant charts showing documentation of weekly rounds for caseload patients. Staff consistently reports that they provide rounds for every Segregation resident; the monitoring team did not undertake a review of this point. Where practice was noncompliant, nearly

---

[30]  This analysis draws on 45 Segregation placements in 2017 at those same institutions where the terms were longer than 5 weeks.

universally there was rounds documentation but it contained occasional gaps.[31]However, in the prison where this mainly occurred, Segregation prisoners reported that rounds take place consistently, which suggests the gaps may have been a problem of charting and/or filing rather than practice. There is a problematic practice in place at Big Muddy River; the MHPs are accompanied throughout by a custody officer, and must speak to the inmates through the chuckholes.

At Dixon, BHTs have been trained to do segregation rounds in order to free up MHPs to do more individual and group therapy. Segregation rounds do occur weekly and are consistently documented in the medical charts. At Pontiac, the Monitor observed that weekly rounds were occurring on a regular basis.

*Pharmacological treatment*: All the problems noted with medications are present for those mentally ill offenders in segregated housing. These include but are not limited to lack of timely follow-up, poor medication compliance, mismanagement of medication-induced side effects, lack of timely laboratory/medical/neurological evaluations and improper supervision of medication distribution that allows for "cheeking."

*Supportive counseling by an MHP as indicated in the ITP*: As noted in several previous sections of this report, the ITP was not consistently implemented for those mentally ill offenders in segregation with the exception being Menard. The lack of counselling by MHPs was frequently voiced by mentally ill offenders in segregation. This lack of counselling has contributed to the overuse and potential burnout of the Crisis Intervention Teams. Ultimately, this lack of counselling leads to mentally ill offenders acting out and being placed in Crisis.

*Participation in multidisciplinary team meetings once teams have been established:* The monitoring team is not aware of any institution operating a multidisciplinary team in the treatment of mentally ill offenders in segregation.

*MHP or mental health treatment team recommendation for post-segregation housing:* Please see (XIV)(b), above.

*Documentation of clinical contacts in the medical record:* Please see (VII)(e), above.

*Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* All of the monitored facilities offered unstructured out-of-cell time for mentally ill offenders in segregation, for example:

- Dixon-12 hours per week
- Menard-7 hours per week (5-hour and 2-hour sessions)
- North House, Pontiac-2 hours/day X 3 days/week
- Pinckneyville-10 hours/week
- Stateville Proper-5 hours/day X 3 days/week

---

[31]  This analysis is based on a review of 68 Segregation placements of mentally ill inmates at five institutions. It took into account interruptions such as crisis watch admissions and offsite transfers. Segregation placements of less than one month, or where the length of placement could not be determined with confidence, were excluded.

- NRC-4 hours weekly (this information is included although NRC is not officially a segregation unit. In the opinion of the Monitor it is a de facto segregation unit.)

Significant problems with the yard schedule were noted at Stateville Proper and NRC. Offenders complained that once they went to yard, they were required to remain out for the entire 4 or 5 hours. This was especially problematic in that there are no toileting facilities on the yard. They also said that they would not be allowed back inside even if it began to rain. Additionally, there was no documentation regarding mentally ill offenders in segregation who refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**XV(a)(vi):[32] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c) *below.[33]*

**Findings:** Significant discrepancies exist between what the Department is claiming to provide and what the monitoring team observed. In the Quarterly Report of 10/23/17 the Department is representing that all facilities are meeting the 2nd year requirement for structured out-of-cell time. It is the opinion of the Monitor that all of the facilities in the Department are not meeting the requirements of this subsection of the Settlement Agreement.

Using Pontiac as an example, during a visit on 6/19/17, the staff informed the Monitor that they were only able to offer one or two hours of group per week per mentally ill offender. This was confirmed by multiple mentally ill offenders who consistently reported that they only attended two groups per week at most with some weeks only attending one group. It was due to this lack of groups that the Monitor first raised the issue of allowing BHTs to conduct weekly segregation rounds to free up MHPs to provide more groups. Dr. Hinton informed the Monitor that due to having to train and supervise the BHTs in their new duties, the increase in groups would not occur until mid-October. On a follow-up visit to Pontiac on 9/19/17, the Monitor was informed that since mid-August staff began offering weekly movie groups. So, for the majority of the current monitoring period, mentally ill offenders would only be able to attend at most four hours of structured out-of-cell time.

At Dixon, on the other hand, it was the monitoring team's impression that out-of-cell time improved during the reporting period, with offenders being offered approximately 6 hours per week of structured time and 12 hours of unstructured time. It is noteworthy that staff has begun a Dialectical Behavioral Therapy group for offenders in the X House, which offenders reported to be helpful because it specifically addresses self-injury.

However, widespread treatment refusal continues to be a problem in the X House, including in segregation. Although groups and unstructured activities are offered to all SMI

---

[32] This numbering from the Settlement Agreement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement Agreement.
[33] Note: this refers to the second occurrence of a subsection (c), on page 20 of the Settlement Agreement

offenders, only about 50% of eligible inmates take advantage of the opportunities. The team did not undertake a comparison between hours offered and received. IDOC leaders said that they hope the opening of the Joliet Treatment Center will allow transfer of some of these inmates to a more therapeutic setting for assessment and treatment.

Stateville leadership stated that all caseload offenders are offered group five days per week in segregation; the monitoring team did not seek to verify this. Groups reportedly are tailored to the inmate population and, as of the summer monitoring visit, staff were developing a group to prepare offenders to reenter general population after a segregation term.

It is noteworthy that leaders and MHPs at Stateville and Lawrence said they seek to include inmates in groups without waiting for the 60-day point, and some examples were evident in chart reviews. Big Muddy River, Robinson, and Hill are among those institutions where nearly all segregation terms are 30 days or less, so the Agreement's out-of-cell time requirements very rarely apply at these sites. This was borne out in caseload lists provided before and during the visits, and in chart reviews.

This specific requirement states that mentally ill offenders "will receive" out-of-cell time in accordance with subsection (c) below. The hours of structured out-of-cell time provided in the Quarterly Report are listed as "offered" and not actually received. As of this report, the Department does not have a comprehensive reporting system of how many hours of structured out-of-cell time each mentally ill offenders are actually receiving. The exception to this was noted at Pinckneyville. The staff provided the Monitor a hand-made spread sheet listing the groups attended by each offender who had spent greater than 55 days in segregation. Until the Department can document the actual amount of structured out-of-cell time that each mentally ill offender is receiving, it will remain the opinion of the Monitor that _some_ mentally ill offenders in segregation are receiving _some_ amount of structured out-of-cell time.

**XV(a)(vii): Specific requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Administrative Detention or Disciplinary Segregation requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the mentally ill offender shall be placed in an appropriate mental health setting (_i.e._, Crisis Bed or elevated level of care) as recommended by the MHP[34] unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** In the facilities monitored, MHPs have the authority to move a mentally ill offender to crisis. They also have the authority to refer a mentally ill offender to an RTU but this seldom happens given the lack of adequate number of RTU beds. The problem is that there is no formal procedure for mental health staff to identify offenders for removal from segregation other than weekly segregation rounds and/or contact with the Crisis Intervention Team. This is especially problematic given the difficulty noted in continuing the ITP when an offender goes to

---

[34] IDOC's compliance with the portion of this provision regarding MHP recommendations for placement into crisis care is discussed elsewhere this report.

segregation. Unfortunately, a very common method for mentally ill offenders to be moved to crisis is by acting out, usually by performing some self-injurious act.

**XV(b)** As to SMI offenders in Disciplinary Segregation:

**XV(b)(i): Specific requirements:** IDOC will organize Review Committees ('Committees') to review the segregation terms of all SMI offenders in segregation with at least 60 days of remaining segregation time as of the approval date of this Settlement Agreement. These Committees will be comprised of attorneys, security professionals, and MHPs.

**Findings:** The Quarterly report of 10/23/17 states "Notably, those reviews have occurred for SMI offenders and are complete at all facilities." The monitoring team will closely follow this issue moving forward.

An important, complementary structure exists at four of the institutions monitored, and its activities support reducing segregation terms and tickets, and increasing safety while enhancing the mental health services provided. As such, it supports compliance with XV(b)(i) and many of the requirements that follow in this section. That structure is a custody-mental health interdisciplinary workgroup that takes different forms at different institutions.

At Hill, the Wardens must approve the proposed segregation placement of any mentally ill offender. A workgroup drawn from the administration, mental health, and many other departments meets routinely to discuss each of these offenders individually, spotting behavioral issues and designing incentives, tailored groups, and other mechanisms to prevent and solve those behavioral management problems. Similarly, at Lawrence, the Segregation Lieutenant and Counselor, MHPs, an Assistant Warden, and a member of the Adjustment Committee meet to monitor, share information, and address issues concerning every mentally ill offender in segregation. Stateville has a similar workgroup that meets monthly to address problem cases. Pontiac meets biweekly for general population offenders on the caseload, and in the PMH unit, they attempt to involve the offenders. These systems are very beneficial for day to day management of the population and can be very effective in moving IDOC toward substantial compliance with this Settlement.

**XV(b)(ii): Specific requirements:** The Committees shall eliminate any and all 300 and 400 level tickets and the accompanying segregation time from each SMI offender's disciplinary record.

**Findings:** IDOC purports to have met this requirement. The monitoring team will evaluate this issue going forward.

**XV(b)(iii): Specific requirements:** With regard to all remaining tickets, the Committees shall examine: (1) the seriousness of the offenses; (2) the safety and security of the facility or any person (including the offender at issue); (3) the offender's behavioral, medical, mental health and disciplinary history; (4) reports and recommendations concerning the offender; (5) the offender's current mental health; and (6) other legitimate penological interests.

**Findings:** IDOC purports to have met this requirement. The monitoring team will evaluate this issue going forward.

**XV(b)(iv): Specific requirements:** The committees shall have the authority to recommend to the Chief Administrative Officer that an SMI offender's remaining segregation time be reduced or eliminated altogether based on the factors outlined in XV(b)(iii).

**Findings:** Similar to the other subsections regarding the reduction/elimination of segregation time, the monitoring team will evaluate this issue going forward.

**XV(b)(v): Specific requirements:** The decision for reduction or elimination of an SMI offender's segregation term (excluding the elimination and reductions relative to 300 and 400 level tickets) ultimately rests with the CAO who, absent overriding concerns documented in writing, shall adopt the Committees' recommendations to reduce or eliminate an SMI offender's segregation term.

**Findings:** This requirement was being met at all the facilities monitored.

**XV(b)(vi): Specific requirements:** These reviews shall be completed within nine (9) months after approval of the Settlement Agreement.

**Findings:** This requirement was met at all the facilities monitored. In addition, IDOC reports that this requirement was accomplished in a timely manner throughout the system

**XV(c)** Mentally ill offenders in Investigative Status/Temporary Confinement:

**XV(c)(i): Specific requirements:** With regard to offenders in Investigatory Status/ Temporary Confinement, IDOC shall comply with the procedures outlined in 20 Ill. Admin. Code § 504 and Administrative Directive 05.12.103.

20 Illinois Administrative Code Section 504 Subpart D: Segregation, Investigative Confinement and Administrative Detention—Adult provides:

Applicability, definitions, and responsibilities for IDOC staff regarding placement of offenders in segregation status; segregation standards for offenders placed into segregation, investigative confinement, administrative detention; and standards for recreation for offenders in segregation status.

AD 05.12.103 provides:

II (G): Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

II (H): Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

    a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

    b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

        (1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

        (2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

        (3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

    a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

    b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

    c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

        (1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** The details of the disciplinary process for SMI offenders are discussed in Section XXV, *below.*

II (I): Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** As reported in subsection XV(a)(vii), above, there is currently not a reliable system to identify mentally ill offenders who are deteriorating due to continued placement in segregation.

**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** These reviews are not occurring anywhere in IDOC. The Budget Contingent Approval date has not yet occurred.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
**8)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** Please refer to the findings under section XV(a)(vi), above.

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary

Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below.*[35]

**Findings:** Please refer to section XV(a)(vi), above.

**XV(c)(v): Specific Requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Investigatory Status/Temporary Confinement requires relocation to either a crisis cell or higher level of care, the MHP's recommendation shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the SMI offender shall be placed in an appropriate mental health setting (*i.e.,* Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** Please refer to the findings under section XV (a)(vii), above.

**XV(c)[36]: Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i. For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii. For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii. For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv. For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:**

**Structured out-of-cell time:** Please refer to section XV(a)(vi), above.

**Unstructured out-of-cell time:** Please refer to the findings under section XV(a)(vi)(H), above.

**The 60-day requirement:** As was reported in the first annual report, it remains a serious concern that this particular requirement of the Settlement only calls for increased out-of-cell time

---

[35] Note: this refers to the second occurrence of a subsection (c), on pages 19 and 20 of the Settlement.

[36] As above, this appears mislabeled in the Settlement but is carried forward here.

for offenders in segregation for more than 60 days. Any amount of segregation causes its own unique set of mental health issues. It can exacerbate preexisting mental health issues as well as causing new mental illness to occur.

During the current reporting period, the monitoring team noted that Stateville Proper is offering all mentally ill offenders in segregation structured out-of-cell time. Pinckneyville is offering structured out-of-cell time to mentally ill offenders in segregation after 55 days. The staff told me that they will attempt to offer structured out-of-cell time after 45 days in the future.

**Segregation-like settings:** The team has a similar concern regarding out-of-cell time for those inmates who, while not in formal segregation, are in segregation-like confinement for a prolonged period of time. Mentally ill offenders often stay in R&C units for longer than 60 days. This is a particular problem at the Stateville and Menard R&Cs. Efforts should be made to provide mentally ill offenders in R&C units the same amount of structured and unstructured out-of-cell time that is provided to offenders housed in control units.

**XV(d): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: The Department is struggling to meet the overall requirements of this section of the Settlement. The deadline for most of these provisions is 2.5 years in the future. The monitoring team will continue to closely review these issues moving forward.

## XVI: SUICIDE PREVENTION

**Summary:** Crisis Intervention Teams had been established and trained at all facilities. There was no evidence that all crisis intervention team members participate in quarterly quality assurance meetings.

The expected policies have been demonstrated in nearly every facility and training requirements have been met.

Significant improvement was observed in the functioning of Crisis Intervention Teams and admission to crisis watch. Gatekeeping remains a concern. Psychiatric treatment is rare on crisis watch, and some crisis cells are still located in segregated housing units.

There were two completed suicides during the monitoring period. Although both will be the subject of psychological autopsies, there is no indication that the findings of the first one were disseminated throughout the system and used to inform practice changes, a critical function of such a review process.

**(XVI)(a): Specific requirements:** IDOC shall comply with its policies and procedures for identifying and responding to suicidal offenders as set out in Administrative Directive 04.04.102

  
and the section titled "Identification, Treatment, and Supervision of Suicidal Offenders" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). IDOC shall also ensure that Forms 0379 ("Evaluation of Suicide Potential"); 0377 ("Crisis Watch Record"); and 0378 ("Crisis Watch Observation Log") are used in conjunction with these policies and procedures.

The section titled "Identification, Treatment and Supervision of Suicidal Offenders" from the IDOC Mental Health SOP Manual[37] provides general guidelines for the handling of suicidal offenders. AD 04.04.102, however, provides a number of specific requirements:

II (F) Requirements**:** The Chief Administrative Officer of each facility shall:
 1) Establish a Crisis Intervention Team.
 a. The Crisis Intervention Team shall consist of: (1) A Crisis Intervention Team Leader who shall be an MHP; (2) All facility MHPs and nursing staff; and (3) At least one member of the facility's security staff of the rank of Lieutenant or above. **NOTE:** Other Crisis Intervention Team members may be chosen from facility staff upon the recommendation of the Team Leader to ensure at least one member is on site at all times.
 b. Prior to serving, all members of the Crisis Intervention Team shall receive training in accordance with Paragraph II.g.1. Crisis Intervention Team Members on leave of absence shall be required to make up missed training upon return and prior to resuming service on the Crisis Intervention Team.
 c. All Crisis Intervention Team Members shall participate in quality assurance meetings no less than once per quarter.

> (1) Meetings shall be held to: (a) Review all events involving offender suicide during the previous quarter; (b) Review the Facility's Prevention and Intervention Plan in accordance with Paragraph II.G; and (c) Assess the adequacy of the facility's training program in relation to the facility's needs
>
> (2) Meetings shall be documented in writing and shall: (a) Include the date and minutes of the meeting, a list of all persons in attendance and any recommendations or issues noted; (b) Be submitted to the Chief Administrative Officer, the respective Regional Psychological Administrator and the Chief of Mental Health

**Findings:** Crisis Intervention Teams had been established and trained at all facilities. There was no evidence, however, that "all crisis intervention team members shall participate in quality assurance meetings no less than once per quarter."

 2) Designate a Crisis Care Area.
 a. Crisis care areas shall be used to house offenders determined by an MHP to require removal from his or her current housing assignment for the purpose of mental health

---

[37] The Settlement references "Mental Health Protocol Manual." IDOC has changed the name of this manual to "Mental Health SOP Manual."

treatment or observation.

b.  Excluding exigent circumstances as determined by the Director or a Deputy director, segregation units shall only be utilized for crisis care areas if no other crisis care areas are available, and only until alternative crisis care areas are available.

c. Cells designated as crisis care areas shall:  Allow for visual and auditory observation of the entire cell;  Allow for prompt staff access;  Control outside stimuli;  Contain beds that are suicide resistant and constructed of a metal base, cinder block, concrete slab or herculite material;  Contain a pass through or chuck holes that open out of the cell; Contain mesh coverings over all vents;  Contain laminated glass over all windows or be safely and security glazed windows; and   Be made appropriately suicide resistant and provide adequate lighting and temperature.

**Findings:** As reported in Section X(f) above, some crisis cells are still located in segregated housing units. These include North House at Pontiac, and Lawrence. There appears to be significant use of these units as overflow at Pontiac, and to a smaller extent at Stateville, Big Muddy River, Robinson, and Western Illinois.

II (G): Prevention and Intervention Plan

The Chief Administrative Officer, in consultation with the facility's mental health authority, shall establish a written procedure for responding to, and providing emergency mental health services, including prevention and intervention of emergency mental health situations. The procedure shall be reviewed annually and shall be approved by the Chief of Mental Health and shall include, at a minimum, provisions for the following: training, referrals for emergency mental health situations, crisis intervention team response, crisis watch, response to self-inflicted injuries and suicide, and quality improvement reviews.

**Findings:** IDOC continues to meet this requirement at the majority of its facilities. The Monitor had previously received the Institutional Directive called for in this subsection of the Settlement from 22 of the IDOC facilities. IDOC had one year from the approval of the Settlement to address the requirements of this very important requirement.

1)  Training
The Chief of Mental Health, in consultation with the Office of Staff Development and Training shall establish standardized training programs that provide information on emergency mental health services. All training shall be provided by an MHP, or in the absence of the MHP, a current crisis team member and, where appropriate, shall include enhanced content specific to the facility.

a.      Level I Training shall be required as part of annual cycle training for all staff that have regular interaction with offenders, and shall include a minimum of one hour of the following:   (1) Elements of the facility's Prevention and Intervention Plan; (2) Demographic and cultural parameters of suicidal behavior in a correctional setting, including incidence and variations in precipitating factors; (3) Risk factors and behavioral indicators of suicidal behavior; (4) Understanding, identifying, managing and referring suicidal offenders, including the importance of communication between staff; (5) Procedural response and follow-up procedures

including crisis treatment supervision levels and housing observation; and (6) Documentation requirements.

b. Level II Training shall be required as part of annual cycle training for all personnel identified in the facility's Prevention and Intervention Plan as having the authority to initiate a crisis watch. Level II training shall consist of a minimum of four hours of in-depth didactic and experiential training in assessing suicide risk and procedures for initiating a crisis watch.

c. Level III Training shall be required for all Crisis Intervention Team members, excluding MHPs, and shall consist of 24 hours of advanced training in the philosophy of suicide prevention and continuous quality improvement of the facility's Prevention and Intervention Plan.

> (1) Crisis Intervention Team members shall also be trained by an MHP, designated by the Chief of Mental Health, in consultation with the Office of Staff Development and Training. This training will give the Crisis Intervention Team member the ability to instruct on the standardized training curriculum that provides information on emergency mental health services during cycle training, in the absence of the MHP. (2) Training shall be completed prior to active service with the Crisis Intervention Team.

d. Clinical Continuing Education shall be required for all Crisis Intervention Team members and shall consist of a minimum of one hour per quarter of training to assist Crisis Intervention Team members in monitoring facility policy and procedure and in reviewing suicide attempts or completions. Clinical Continuing Education Training may be obtained through participation in the quarterly Crisis Intervention Team quality assurance meeting.

**Findings:** The training requirements specified in this subsection of the Settlement Agreement continue to be met.

2) Referrals for Emergency Mental Health Situations

Staff shall immediately notify the Crisis Intervention Team, through his or her chain of command, of any situation whereby an offender exhibits behavior indicative of mental or emotional distress, imminent risk for harm to self or an attempted suicide.

**Findings:** Please refer to the findings under Section V(g), above.

3) Crisis Intervention Team Response

a. At least one Crisis Team member shall be on site at all times. The designated Crisis Intervention Team Leader shall be available by phone when not on site.

b. The Chief of Mental Health and the respective Regional Psychological Administrator shall be notified within 24 hours of the suicide of an offender, and within 72 hours of any attempted suicide.

c. Upon notice of a potential crisis situation, a Crisis Intervention Team member shall: (1) Implement necessary means to prevent escalation and to stabilize the situation. (2) Ensure that the offender is properly monitored for safety. (3) Review the situation with the Crisis Team Leader or and MHP to determine what services

or referrals shall be provided. If the Crisis Intervention Team Leader is not on grounds and cannot be reached by telephone, and there are no MHPs on grounds, the Crisis Team member shall contact an alternative MHP and the review may be completed via telephone. (4) Initiate a crisis care treatment plan to monitor and facilitate the delivery of services, including referrals for mental or medical examination, and any additional recommendations of the MHP. The crisis care treatment plan shall be documented on the Crisis Watch Log, DOC 0377. Referrals for additional examination or services following the offender's release from a crisis care treatment level of care shall be documented on a DOC 0377. (5) If determined that the offender does not need to be placed in the crisis care area, notify the Shift Commander of any additional care requirements for security staff.

**Findings:** IDOC is generally meeting the requirements of this section of the Settlement. In the overwhelming number of crisis cases reviewed, psychiatrists were not called in to evaluate the mentally ill offenders' need for a medication adjustment. The only exception to this was at Sheridan where Dr. Yuan, the facility's psychiatrist, sees everyone in crisis on Thursdays. If the offenders in crisis are discharged prior to his Thursday rounds, then Dr. Yuan attempts to see them at his next possible visit.

4) Crisis Watch
a. A crisis watch shall be initiated when: (1) An offender exhibits behavior that is likely to cause harm to him or herself. (2) Mental health issues render an offender unable to care for him or herself. (3) Gestures, threats or attempts of suicide are made. (4) The Evaluation for Suicide Potential, DOC 0379, if administered, indicates need. (5) Less restrictive measures have failed or are determined to be clinically ineffective.

**Findings:** The department has significantly improved in meeting this requirement during the monitoring period. Please see Section V(g), above, for details. The monitoring team will continue to closely monitor this requirement as we keep on receiving multiple credible complaints of "gatekeeping" on the part of staff.

b. Determination to initiate a crisis watch shall be made by an MHP. If an MHP is not available, the following individuals, in order of priority, may initiate a crisis watch: (1) Respective Regional Psychologist Administrator, (2) Any Regional Psychologist Administrator, (3) Chief of Psychiatry, (4) Chief of Mental Health Services, (5) Chief Administrative Officer in consultation with a Crisis Intervention Team Leader, (6) Back-up Duty Administrative Officer in consultation with a Crisis Intervention Team Member
c. Offenders in crisis watch shall not be transferred to another facility unless clinically indicated and approved by the Chief of Mental Health or in the absence of the Chief of Mental Health, the Chief of Psychiatry.
d. Upon initiation of a crisis watch, an MHP shall determine: (1) The appropriate level of supervision necessary in accordance with Paragraph II.E.; and (2) Allowable property, including the type and amount of clothing.

e. Unless medically contraindicated: (1) Water shall be available in the cell or offered at regular intervals. When water is not available in the cell, the offers shall be documented on the DOC 0377. (2) Meals not requiring utensils shall be provided in the cell or crisis care area. If contraindicated, alternative nutrition sources shall be provided.

f. The offender's vital signs shall be taken by health care staff within 24 hours of placement on crisis watch, or sooner if the offender has been placed in restraints for mental health purposes.

g. Prior to placement in a designated crisis care area, the offender shall be strip-searched and the cell inspected for safety.

h. Offenders shall be monitored at appropriate intervals, dependent upon level of supervision. All observations shall be documented within the appropriate staggered intervals, on the Crisis Watch Observation Log, DOC 0378, and shall include staff's observation of the offender's behavior and speech, as appropriate.

i. The offender shall be evaluated by an MHP, or in his or her absence, a Crisis Intervention Team member, in consultation with the Crisis Team Leader, at least once every 24 hours. The evaluation shall assess the offender's current mental health status and response to treatment efforts. The evaluation shall be documented on the DOC 0377.

j. An offender's crisis watch shall only be terminated by an MHP following the completion of an evaluation assessing the offender's current mental health status and the offender's response to treatment efforts. The evaluation shall be documented in the offender's medical record and the termination of the crisis watch shall be documented on the DOC 0377.

**Findings:** The Department has improved in its response to this requirement during the monitoring period.

5) Response to Self-Inflicted Injury and Suicides

a. Responses to medical emergencies shall be in accordance with AD 04.03.108, and shall include immediate notification of an MHP.

b. In the event of attempted suicide, the preservation of the offender's life shall take precedence over preservation of the crime scene; however, any delay in response due to security factors shall be noted in the Incident Report, DOC 0434.

**Findings:** The Monitor's concerns, as reported in this subsection of the first annual report, persist during this monitoring period. That is, the Department continues to operate under this unofficial[38] "10.0 hemoglobin rule." This means that before an offender can be taken off crisis watch their hemoglobin level must at least be 10. This is dangerous medical practice that places mentally ill offenders with a history of self-injurious behavior at risk of death. Of note, the Department has yet to address these concerns.

6) Quality Improvement Reviews

---

[38] The monitor was unable to locate any departmental policies regarding this issue.

a. Mortality Review: In the event of an offender's suicide, the Chief of Mental Health shall designate an MHP to complete a psychological autopsy. The psychological autopsy shall be documented on the Psychological Autopsy, DOC 0375, and shall be submitted to the Chief of mental Health within seven working days of assignment.

b. Administrative Review

(1) In the event of an offender's suicide, the Chief Administrative Officer shall:

(a) Establish a clinical review team who shall systemically analyze the event. The Review Team shall consist of: i. Mental health and medical staff, including an MHP, a psychiatrist and a registered or licensed practical nurse. Medical staff chosen for the clinical review team shall have no direct involvement in the treatment of the offender for a minimum of 12 months prior to the event.   ii. A security staff supervisor. **NOTE:** Facility administrators or staff, whose performance or responsibilities maybe directly involved in the circumstances of the suicide, shall not be chosen for the review team.

(b) Designate a clinical review team Chairman who shall ensure all relevant documentation pertaining to the offender and his or her treatment including, but not limited to, the master file, medical record, Medical Director's death summary and the DOC 0375, if applicable, is available to the clinical review team.

(2) Within ten working days following the suicide, the clinical review team shall complete a review to:

(a) Ensure appropriate precautions were implemented and Department and local procedures were followed; and

(b) Determine if there were any personal, social or medical circumstances that may have contributed to the event, or if there were unrealized patterns of behavior or systems that may have indicated earlier risk.

(3) Upon completion of the review, the Chairperson shall submit a written report to the Chief Administrative Officer, the facility's Training Coordinator, the Chief of Mental Health and the respective Deputy Director summarizing the review team's findings and providing any recommended changes or improvements.

**Findings:** Sadly, two mentally ill offenders committed suicide during the monitoring period. The Administrative Review and Psychological Autopsy were only completed on one of the suicides prior to the submission of this midyear report. Therefore, this review is limited to one suicide.

As reported in the first annual report, the Administrative Review in this case makes recommendations, but they contain no clear corrective action plan that delineates who is responsible for following up on each recommendation, the time frame in which changes should be made, or the plan to reassess problem areas.  IDOC Administrative Directive 04.04.102 (Suicide Prevention and Intervention and Emergency Services) is also vague in this area, specifying no action beyond simply reporting the Administrative Review team's findings to the Chief

Administrative Officer, Training Coordinator, and Chief of Mental Health.  This is a critical flaw in IDOC's suicide prevention strategy, rendering the mortality reviews essentially meaningless for affecting systemic change. Also, the psychological autopsy refers to the corrective actions in the administrative review. The net result is the lack of a systematic, departmental corrective action plan. This means that the lessons learned from this suicide remain at the particular institution.

These concerns were clearly stated in the first annual report with no real improvement noted during the monitoring period. This lack of improvement belies a serious problem within the Department. There appears to be a misunderstanding of what "corrective action" means. The issues gleaned from this tragedy should have been disseminated system wide, incorporated into the training curriculum, measured for effectiveness and then fed back to all of the facilities in the Department and then measured again for effectiveness. The results of this process could then result in modifications of existing Administrative Directives and SOPs. None of this occurred. Of note, these issues were presented to the Chiefs of Mental Health and Legal on August, 26, 2016. At that time, the Monitor directed IDOC leadership to reevaluate their suicide review process. Also, the absence of a functioning system-wide quality improvement program is partly responsible for these problems.

The problems with the suicide review process have been well known to the defendants since at least August 26, 2016. That being said, the real tragedy of this suicide is that it was a result of inadequate psychiatric care and medication management. The mentally ill offender in this case, although he was being prescribed medication, was not seen by a psychiatrist from 11/7/16 through 5/7/17. During this six-month period, he displayed poor medication compliance that was not reported to the prescribing physician. He was then seen on 5/7/17 by a psychiatrist. "The psychiatrist requested a one month follow-up appointment. This one month follow-up appointment should have been on 6/7/17, **but was not scheduled on that date due to a significant backlog of psychiatric patients.**"[39](emphasis added.) The mentally ill offender, who was designated SMI, was scheduled on the 7/15/17 psychiatric clinic. He committed suicide on 6/14/17. Although I am unable to state to a reasonable degree of medical certainty that this lack of timely follow up was the cause of his committing suicide, I absolutely can state that it was a significant contributing factor.

**(XVI)(b): Specific requirements:** IDOC shall ensure that the policies, procedures, and record-keeping requirements identified in (a), *above*, are implemented and followed in each adult correctional facility no later than one (1) year after the approval of this Settlement Agreement.

**Findings**: IDOC has shown improvement in its ability to meet the requirements of this section of the Settlement during the monitoring period. Overall, however, IDOC falls short of being in substantial compliance. All the items in this section are of critical importance. Ongoing concerns about the responsiveness of the Crisis Intervention Teams requires constant supervision and training of all staff involved. The poor quality of psychiatric and medical services leaves mentally ill offenders at increased risk for suicide and contributes to their spending excessive periods of time in crisis. The administrative review process of offender suicides needs to be rethought. The current process does not allow for corrective action to be implemented throughout IDOC to prevent future suicides.

---

[39] Administrative Review of offender suicide, June 21, 2017, page 4.

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary:** IDOC is generally meeting this requirement. Appropriate policies have been demonstrated at most facilities. Fewer than half of the institutions employed restraints, and the use was concentrated in three institutions.

All of the charts reviewed by the psychiatric members of the monitoring team indicated that the restraints were used in accordance with IDOC's policies and for clinically appropriate reasons. The monitoring team did not find any evidence that physical restraints are being used to punish offenders.

Many of the lengths of orders were for short periods. Troublingly, two institutions applied restraints to some patients for lengthy periods and/or a great number of times. These suggest the need for a higher level of care than is being provided in those institutions.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1.    Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

    a.    Under no circumstances shall restraints be used as a disciplinary measure.

    b.    Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately make contact with the psychiatrist within one hour of the offender being placed into restraints, and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall make contact with the physician or the licensed clinical psychologist.

2.    Crisis treatment shall be initiated in accordance with AD 04.04.102.

    a.    The initial order for the use of restraints shall not exceed four hours.

b.  Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

c.  If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1.  Only a psychiatrist who has conducted a face to face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face to face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2.  If a psychiatrist, physician or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3.  The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face to face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4.  Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b.     The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g. the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1.  Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the

offender in restraints.

2.  Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3.  Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4.  Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychiatrist.

5.  The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6.  Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7.  Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8.  Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be utilized, justification of the care shall be documented in the offender's medical chart.

9.  Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10. All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings:** IDOC is generally meeting this requirement. All of the charts reviewed by the psychiatric members of the monitoring team indicated that the restraints were used in accordance with IDOC's policies and for clinically appropriate reasons.

A detailed review demonstrated that institutions reported 236 applications of restraints for mental health purposes to date in 2017. More than half of the institutions did not make use of this method. Use was by far the heaviest at Pontiac, Logan, and Dixon. The distribution was:

- 83 -

- Pontiac (108), Logan (58), Dixon (45)
- Danville, Graham, Hill, Illinois River, Lawrence, Menard, Pinckneyville, Stateville, Western: 1 to 6 each
- 14 institutions did not use restraints

At Pontiac and Logan, many of the restraints uses were concentrated in a small number of inmates—some were subject to restraints 9, 11, or 19 times.

It was not possible to determine with precision the length of restraint application for all cases.[40] Logs for the first half of the year showed more than 1/3 were limited to four hours, and the vast majority lasted 24 hours or less. The exception was Pontiac, which had a disturbingly high rate of lengthy restraints use--14 lasted two to four days; Dixon also had one man in restraints for a full week during this period; another man was in restraints in excess of 2,000 continuous hours in 2016.

The frequent and lengthy use of restraints at Pontiac, Logan and Dixon is a reflection of the severity of the mental illness suffered by these offenders as well as the insufficient nature of the mental health care delivery system to adequately address their needs. This problem has many causes. Although the Department represents that it is meeting the requirement for out-of-cell time, "offered" out-of-cell time does not equate to mentally ill offenders actually participating in these activities. The monitoring team observed that the most severely impaired individuals are often unable to participate in these activities due to the severity of their mental illness. This lack of participation then contributes to their further decompensation and acting out, often in a self-injurious manner. This coupled with the lack of "aggressive mental health intervention" received by mentally ill offenders in crisis then results in their being placed in restraints. The absence of a RTU at Pontiac, the unhurried opening of the Joliet RTU, and the current lack of an inpatient facility all contribute to mentally ill offenders needlessly suffering due to being kept in restraints. These problems are only exacerbated by the inadequate number of staff, both clinical and custody.

**(XVII)(b): Specific requirement:** IDOC will continue to comply with 20 Ill. Admin. Code §§ 501.30, 501.40 and 501.60, and Administrative Directive 05.01.126. The Administrative Code sections are titled Section 501.30: Resort to Force; Section 501.40: Justifiable Use of Force; and Section 501.60: General Use of Chemical Agents.

IDOC AD 05.01.126 provides for:

II (F): The Chief Administrative Officer shall ensure a written procedure for the use and control of security restraints is established. The written procedure shall provide for the following:

Use of Security Restraints

(1)     Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints shall be used: (a) To prevent an offender from escaping. (b) To retake an offender who has escaped. (c) To prevent or suppress violence by an offender against another

---

[40] Some institutions recorded the times while others only recorded dates.

person or property. (d) When transporting an offender outside the facility for the purposes of transfers, writs, etc., except when transporting offenders to assigned work details outside the facility, pregnant offenders for the purposes of delivery, or offenders assigned to the Moms and Babies Program on approved day release while transporting a minor child. (e) When transporting a transitional security offender for other than job related or programmatic activities directly related to successful completion of the transition center program.

    (2)    Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints may be used: (a) When moving an offender who is in disciplinary segregation or who is in segregation pending investigation within the facility; or (b) Whenever the Chief Administrative Officer deems it is necessary in order to ensure security within the facility or within the community.

    (3)    Offenders on funeral or critical illness furlough shall be restrained in accordance with AD 05.03.127.

Inventory and Control

(a) A written master inventory of all security restraints, dated and signed by the Chief Administrative Officer, shall be maintained.

(b) All security restraints that have not been issued to staff shall be stored and maintained in a secure area or areas that are not accessible to offenders.

(c) A log documenting issuance and return of security restraints shall be maintained in a secure area or areas. The log shall include: (1)   Date and time issued; (2) Receiving employees name; (3)       Issuing employees name; (4) Date and time returned; and (5) Name of employee receiving the returned restraints.

(d) A written report shall be filed on lost, broken, or malfunctioning security restraints. The report shall be reviewed by the Chief of Security and maintained on file with the security restraints inventory records for no less than one year.

**Findings:** IDOC is meeting this requirement at the majority of its facilities. The Monitor had previously reviewed the Institutional Directives called for in this subsection of the Settlement Agreement for 21 facilities.

**(XVII)(c): Specific requirement:** Physical restraints shall never be used to punish offenders on the mental health caseload.

**Findings:** The monitoring team did not find any evidence that physical restraints are being used to punish offenders on the mental health caseload. The monitoring team did receive several credible complaints about mentally ill offenders being restrained with the arms above their head. This will be closely monitored by the monitoring team going forward.

**(XVII)(d): Specific requirement:** The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** Due to the concerns listed above, the provisions of the section are not being fully implemented at this time.

## XVIII: MEDICAL RECORDS

**Summary**: The required forms are in wide use in IDOC, although often there are blank pages containing no meaningful clinical information. It may be time to revisit these forms to determine if they can be modified to improve clinical care, as has begun with the treatment planning form.

The disorganized and incomplete condition of the medical records is often an impediment to treatment and continuity of care.

**(XVIII)(a): Specific requirement:** In recognition of the importance of adequate records to treatment and continuity of care, no later than sixty (60) days after the approval of this Settlement Agreement, IDOC shall fully implement the use of the standardized forms it has developed to record offender mental health information and to constitute an offender's mental health file, including IDOC Forms 0372  (Mental Health Screening); 0374 (Mental Health Evaluation); 0284 (Mental Health Treatment Plan); 0282 (Mental Health Progress Note); 0387 (Mental Health Services Referral); 0380  (Mental Health Segregation Rounds); 0376 (Order for Use of Therapeutic Restraints for Mental Health Purposes); 0379 (Evaluation of Suicide Potential); 0378 (Crisis Watch Observation Log); 0377 (Crisis Watch Record); 0371 (Refusal of Mental Health Services); and 0375 (Psychological Autopsy).

**Findings:** The monitoring team continues to find evidence that the above-listed forms are in wide use within the Department. As previously reported, the use of these standardized forms has contributed to "adequate records to treatment and continuity of care." Although these forms are being utilized, a closer review reveals that they are often incompletely filled out, with many blank pages containing no meaningful clinical information. As the Mental Health Treatment Plan, form 0284, is currently under revision, it may be time to revisit these forms to determine if they can be modified to improve clinical care.

The condition of the medical records is often an impediment "to treatment and continuity of care." That is, they are disorganized with items missing or misplaced which make it very difficult to adequately follow the course of a given offender's treatment. There has been no improvement in the quality of the medical records since the submission of the first annual report.

**(XVIII)(b): Specific requirement:** No later than ninety (90) days after the approval of this Settlement Agreement, IDOC shall fully comply with Administrative Directive 04.03.100, § II(E)(7), which requires an offender's medical record, including any needed medication, to be transferred to any facility to which the offender is being transferred at the time of transfer.

AD 04.03.100, section II (E)(7):  The medical record shall be transferred to the receiving facility at the time of offender movement.

(7)(a):  In the event that an offender is transferred from the Illinois Department of Juvenile Justice to an IDOC facility, the entire original medical record shall be transferred with the offender. The transferring youth center may keep a copy of the medical record. Such movement shall be treated as a departmental transfer with regard to documentation.

(7)(b): The medical record and, if applicable, medication shall be sealed in a clear plastic envelope through which the offender's name and ID number can be easily identified.

(1) If the information on the DOC 0090 is not urgent in nature, the DOC 0090 shall be placed inside the front cover of the medical record.

(2) If the DOC 0090 contains urgently needed medical or medication disbursement information, the following steps shall be taken: (a) The DOC 0090 shall be folded in half to promote confidentiality and a notation of "URGENT MEDICAL INFORMATION" shall be made in bold print on the exposed (blank) side of the DOC 0090. (b) The folded DOC 0090 with the notation side up shall be enclosed on top of the medical record inside the clear plastic so that these individuals can be immediately identified and evaluated upon arrival at a new institution. (c) Prior to transferring an offender who has significant medical problems as determined by the transferring facility Medical Director, the transferring Health Care Unit Administrator or Director of Nursing shall telephone the receiving Health Care Unit Administrator or Director of Nursing to advise of the transfer.

(7)(c): A member of the receiving health care staff shall complete the Reception Screening section of the DOC 0090. The DOC 0090 shall be placed chronologically in the progress notes section of the medical record; no progress note shall be required.

**Findings:** The monitoring team did not evaluate this requirement during the current monitoring period.

## XIX: CONFIDENTIALITY

**Summary**: The information the Monitor has gathered to date about the Medical Information Confidentiality Statement and about training both appear promising.

Confidential mental health contacts continue to improve. A number of institutions have now demonstrated that they permit contacts in spaces with sound privacy in crisis care, on housing units, and in mental health offices. Some operate with the door ajar and activity nearby, but no officer posted. The exceptions were troubling, and included persistent examples of cell side crisis evaluations, custody staff standing within hearing distance, and groups held in open areas where custody staff routinely pass through.

The Monitor approved a new confidentiality form; otherwise, there was no evident progress on informed consent.

**XIX(a): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, the IDOC shall comply with the requirements of Administrative Directive 04.03.100, § II(E)(10) as to the confidentiality of mental health records.

AD 04.03.100, section II (E) (10) provides: Offender medical and mental health records are confidential. Access to medical and mental health records shall be limited to health care staff, other Department personnel and outside State and federal agencies on a need-to-know basis as determined appropriate by the Facility Privacy Officer or the Health Care Unit Administrator. All staff having access to medical records or medical information shall be required to sign a Medical Information Confidentiality Statement, DOC 0269, and a new DOC 0269 shall be signed during cycle training annually thereafter. The most recent DOC 0269 shall be retained in the staff member's training file.

**Findings:** The monitoring team had previously reviewed DOC 0269 from a subset of facilities. These forms from the remaining facilities were not reviewed for this midyear report. This will be accomplished for the second annual report.

**Specific requirement:** Additionally, IDOC shall take the following steps to promote the confidential exchange of mental health information between offenders and persons providing mental health services:

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** IDOC modified AD 04.04.100 on May 4, 2017 to satisfy this requirement, although it wasn't accomplished within the required timeframe.

The Monitor was assured that training regarding staff's responsibility to ensure confidentiality has been occurring in IDOC.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

> Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible.
> 36

> Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

> Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

> In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** Subsection II(F)(2)(b) of AD 04.04.100, as modified on May 4, 2017, states "All mental health services shall be conducted in a manner which ensures confidentiality and sensitivity to the offender regardless of status or housing assignment." Throughout the course of this

monitoring period, the monitoring team found persistent examples of this requirement not being met. These include but are not limited to daily crisis evaluations being conducted cell side, custody staff standing within hearing distance of clinical encounters, and groups being held in open areas where custody staff routinely pass through.

Conducting cell side crisis contacts is especially problematic; this occurs at Dixon and the North House of Pontiac. At Robinson, the MHP conducts the encounter in the patient's infirmary room, but an officer is posted in the room. To Pinckneyville's and Big Muddy River's credit, staff solved this problem during the round, and all crisis contacts now occur in a private setting unless the patient refuses. While inmates' conditions in segregation are not as acute as on crisis watch, it is similarly problematic that Big Muddy River's segregation rounds are conducted through the chuckholes with an officer immediately adjacent.

Confidentiality practices have improved at Dixon. In Dixon's segregation units, construction has been completed on one confidential therapy/assessment room per wing, and an additional room is anticipated. The monitoring team was concerned in prior rounds about confidentiality of psychiatric assessments in the X House. It is a significant improvement that inmates and staff now report that these visits occur in a private office unless the inmate refuses to come out of his cell, which the staff estimated occurs about 1/3 of the time. In those cases, the psychiatrist sees the inmate cell-side to perform a mental status exam.

For general population contacts, the institutions monitored generally bring patients to the mental health offices, or an office is made available on each housing unit. Stateville staff says they keep the door slightly ajar, while all other institutions' staff say they routinely meet with closed doors.[41] The monitoring team observed that some of these offices are in very quiet, private areas. For others, there was enough unit activity nearby that people outside were unlikely to be able to discern clinical conversations, even if the door was ajar, and the sound was low enough to not impede the contact, though mentally ill offenders might be uncomfortable with how easily they can be viewed by other offenders and staff.

For segregation units, there was a range of spaces being employed. NRC uses a classroom; Stateville proper and Robinson bring patients to the main mental health offices. Hill, Pinckneyville, and Big Muddy River use on-unit offices under conditions similar to those described above. At Pontiac, staff and patients sit in large holding cages, or in an office, both out of view of unit activity. None required an officer in the room; some kept their doors slightly ajar.

Groups were held in classrooms or on-unit staging rooms;[42] Stateville was especially creative in converting rooms into a welcoming environment with murals. Each of these particular locations was separate from traffic. Pinckneyville allows a closed door for groups with an officer posted outside; Stateville requires an officer in the room or nearby.

---

[41]  Staff were interviewed on this point at Big Muddy River, Hill, Lawrence, Pinckneyville, Robinson, and Stateville.

[42]  Big Muddy River, Lawrence, Pinckneyville, Stateville

(XIX)(d): Specific requirement: In addition to enforcing the consent requirements set forth in "Medical/Legal Issues: 2. Informed Consent" in the IDOC Mental Health Protocol Manual, incorporated by reference into the IDOC AD 04.04.101 section II (E)(2) within sixty (60) days after the approval of this Settlement Agreement, IDOC shall ensure that Mental Health Professionals who have a treatment/counseling relationship with the offender shall disclose the following to that offender before proceeding: the professional's position and agency; the purpose of the meeting or interaction; and the uses to which information must or may be put. The MHP shall indicate a willingness to explain the potential risks associated with the offender's disclosures.

Medical/Legal Issues: 2. Informed Consent in the IDOC Mental Health Protocol Manual provides:

> Before initiating psychotropic medication, the psychiatric provider must complete at least a brief history and Mental Status Examination to determine that the offender (a) has a basic understanding that he or she has a Mental Health Problem, (b) understands that medication is being offered to produce relief from that problem, and (c) is able to give consent to treatment. The clinician must also inform the offender about alternative treatments, the appropriate length of care, and the fact that he or she may withdraw consent at any time without compromising access to other Health Care. With the exception of Mental Health emergencies, informed consent must be obtained from the offender each time the Psychiatric Provider prescribes a new class of Psychotropic Medication.[43]

Findings: No real progress has been made in this area during the current monitoring period. The findings from the first annual report remain valid. That is, "throughout the monitoring period, this issue appears not to have received a lot of attention from the mental health and psychiatric staff.  The lack of sufficient numbers of both mental health and psychiatric staff also contributes to the fact that the requirements of this subsection of the Settlement are not being met. The monitoring team has certainly reviewed medical records in which QMPs have documented their efforts at informed consent. Even when present, the documentation of these attempts at providing informed consent tend to be superficial. The problems are even worse for the psychiatrists. Due to the tremendous backlog of psychiatric visits, mentally ill offenders report they are not even given the opportunity to provide informed consent. In the cases where a psychiatrist sees mentally ill offenders, there is rarely documented evidence that informed consent was obtained in the manner specified in this subsection of the Settlement."[44]

The Monitor approved a new confidentiality and consent form on 11/7/17. This form, "Confidentiality Disclosure and Consent for Mental Health Treatment," describes the limits of confidentiality and is an omnibus consent form that will hopefully address this deficiency.

---

[43] The Manual defines "Informed Consent": "Informed Consent is defined as consent voluntarily given by an offender, in writing, after he or she has been provided with a conscientious and sufficient explanation of the nature, consequences, risks, and alternatives of the proposed treatment." This section of the Manual also provides: "Offenders should be advised of the Limits of Confidentiality prior to their receiving any Mental Health Services." This requirement is nearly identical to the requirement discussed above regarding confidentiality, so the team does not address it again here under Informed Consent.

[44] First annual report, page 88.

## XX: CHANGE OF SMI DESIGNATION

**Summary**: The monitoring team continues to receive reports that mentally ill offenders are losing their SMI status prior to disciplinary proceedings. These reports are unsubstantiated at this time. Staff interviews described some practices that would serve as a check on such a practice. The monitoring team will attempt to conduct a systematic review on this issue in the future.

**Specific requirement:** The determination that an offender, who once met the criteria of seriously mentally ill, no longer meets such criteria must be made by the offender's mental health treatment team and documented in the offender's mental health records. Until mental health treatment teams are established, this function shall be performed by a treating MHP.

**Findings:** The monitoring team found good practice on this requirement at Dixon; team members also spoke with the Psych Administrators at three institutions to learn their local practices. At Stateville, change in diagnosis or SMI status are both data points that are logged after every psychiatry appointment; in such cases, the full mental health team reportedly would meet to discuss whether they concur. Hill staff report they would consult the IDOC and Wexford regional administrators, and would follow the patients for three to six months after any such change in designation, particularly if the inmate was being considered for removal from the caseload.

The Pinckneyville Psych Administrator anticipates such changes would be rare, since they have not occurred during her tenure and she finds little disagreement among the department's disciplines. She asserts that, should such a case occur, she would convene a case conference and would only approve the change if the entire treatment team agreed. When an offender requests to be seen only as needed or to come off the caseload, there are forms for department or Wexford approval and, like Hill, the staff would maintain the SMI designation while monitoring the inmate for a number of months.

This information serves as part of the picture concerning changes in SMI designation; the monitoring team has not undertaken a systematic investigation of this issue. The monitoring team continues to receive reports that mentally ill offenders are losing their SMI status prior to disciplinary proceedings. These reports are unsubstantiated at this time. The monitoring team will attempt to conduct a systematic review on this issue for the 2nd annual report.

## XXI: STAFF TRAINING

**Summary**: IDOC timely submitted a staff training plan. The deadline for implementing that plan is in mid-2018.

**XXI(a): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan and program for staff training as provided in subsection (b), *below*.

**Findings:** IDOC has met this requirement by submission of this plan and program for staff training to the monitoring within one (1) year following the approval of the Settlement Agreement.

**XXI(b): Specific requirement:** Within two (2) years following the approval of this Settlement Agreement, all IDOC and vendor staff who interact with offenders shall receive training and continuing education regarding the recognition of mental and emotional disorders. As directed in the section titled "Training" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), this training shall include material designed to inform the participants about the frequency and seriousness of mental illness, and how to treat persons who have mental illness or persons manifesting symptoms of mental illness. In addition to training on confidentiality as provided in Section XXII (a), *above*, this training shall incorporate, but need not be limited to, the following areas: i) The recognition of signs and symptoms of mental and emotional disorders most frequently found in the offender population; ii) The recognition of signs of chemical dependency and the symptoms of narcotic and alcohol withdrawal; iii) The recognition of adverse reactions to psychotropic medication; iv) The recognition of signs of developmental disability, particularly intellectual disability; v) Types of potential mental health emergencies, and how to approach offenders to intervene in these crises; vi) Suicide prevention; vii) The obligation to refer offenders with mental health problems or needing mental health care; and viii) The appropriate channels for the immediate referral of an offender to mental health services for further evaluation, and the procedures governing such referrals.

**Findings:** The deadline for this requirement is May 23, 2018.

**XXI(c): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan for the orientation, continuing education, and training of all mental health services staff.

**Findings:** IDOC has developed this written plan for the orientation, continuing education, and training of all mental health services staff within one (1) year of the approval of the Settlement Agreement.

## XXII: PARTICIPATION IN PRISON PROGRAMS

**Summary**: During both Dixon and Menard site visits, the monitoring team did not encounter any offenders who were denied access to programs within the prisons. To the extent early release programs are included in this requirement, some problematic practices were observed

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** This requirement was not evaluated by the monitoring team for the midyear report.

## XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY

**Summary**: MHPs are notified ahead of facility transfer, but do not always notify the receiving institution of the offenders' mental health needs.

**XXIII(a): Specific requirement:** To ensure continuity of treatment, unless a SMI offender is being transferred to another facility for clinical reasons, IDOC shall make best efforts to ensure that the offender's treating MHP is consulted prior to transfer. If such a consultation is not possible prior to transfer, the MHP shall be consulted no more than seventy-two (72) hours after effectuation of transfer. If a transfer is being made for security reasons only, the reasons for the transfer and the consultation with the offender's treating Mental Health Professional shall be documented and placed in the offender's mental health file.

**Findings:** IDOC is meeting the requirements of this subsection of the Settlement Agreement.

**XXIII(b): Specific requirement:** When a SMI offender is to be transferred from one prison to another, the sending institution, using the most expeditious means available, shall notify the receiving institution of such pending transfer, including any mental health treatment needs.

**Findings:** The monitoring team encountered several examples of this not occurring. These include a mentally ill offender being transferred from a 15-minute suicide watch and the receiving

facility not being informed, a mentally ill offender being transferred from crisis for cutting and the receiving facility not informed, and a mentally ill offender being transferred for fighting with staff and being suicidal without the receiving facility informed.

It is also noteworthy that there are significant communication breakdowns affecting continuity of care *within* an institution—Dixon—where general population, STC, and DPU operate almost autonomously. For example, if an offender in STC is moved to segregation, the QMHP in STC often does not know of the transfer and therefore does not provide any clinical information to the receiving QMHP.  In fact, the staff reported that the offender's treatment plans continue to be completed by the STC staff for the first 30 days of segregation placement, even though the STC staff has not seen or assessed the inmate during that time.  Overall, the coordination of care between Dixon's three settings is very poor.

**XXIII(c): Specific requirement:** The provisions of this section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** The Department is not currently meeting this requirement.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**:  Use of force was concentrated in three institutions, was rare in many others, and reportedly did not occur at all in almost half of the facilities. Some institutions employed a practice of preventing and deescalating incidents, including involving MHPs in that process, and the results were an impressively low use of force rate. It would serve IDOC well to replicate this approach in the system.

Tactical teams operated professionally and according to policy, and more than one-third of their activations ended without using force. There were a small number of incidents in which the OC use or physical force appeared excessive or unnecessary; in one instance, mental health treatment and safety concerns would have been better served by deferring an action involving a psychotic inmate.

Single institutions yielded particular concerns. The consistency and frequency of offender complaints of physical abuse at one—the type of actions unlikely to be documented—were disturbing and merit further examination. Likewise, there were repeated complaints of verbal abuse at another institution, potentially affecting a large mental health caseload.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[45] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:

a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted

---

[45] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believe the Settlement contemplated AD 03.02.108(I)(B).

purpose.

b) Use of force shall be terminated as soon as force is no longer necessary.

c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.

d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or 05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G. Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

> 1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

> 2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

> 3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

> 4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.      Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A

member (also known as Number 4 person) shall provide immediate back-up to the team members with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.       Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings:** Assistant Monitor Ginny Morrison conducted a data-driven review of use of force incidents[46] based on the following materials:

- Logs of incidents produced by IDOC; these were represented as capturing all incidents involving inmates on the mental health caseload. Logs were generally

---

[46]  This report will use the term "use of force" to include takedowns, physical restraint beyond ordinary handcuffing and not for mental health purposes, use of oleoresin capsicum (OC) spray, and activations of the Tactical team, even if physical force was not used in any of these events.

produced for incidents in July, August, and September 2017.[47] A few institutions provided logs for all of 2017.

- Videos of 13 incidents involving the tactical team
- Reports for 26 incidents; these appear to be complete
- One-page summaries, or partial reports, of 33 incidents
- Log entries for an additional 36 incidents, generally detailed
- Interviews of offenders on segregation and/or crisis watch status at Pinckneyville and Pontiac.

Thus, a total of 95 incidents was reviewed, drawing on one or more sources. As with several other key requirements of this Settlement, logs indicate that use of force rarely, if ever, occurs with the mentally ill at most institutions, and is heavily concentrated at Pontiac, Logan, and Dixon. Among reviewed cases, the distribution was:

- Pontiac (67), Logan (51), Dixon (32)
- 12 institutions whose use of force incidents were in the single digits[48]
- 11 institutions with no use of force in the review period[49]

The Monitor received numerous credible reports from mentally ill offenders at Pontiac that custody staff were physically abusing them. The reports were all similar in nature in that these episodes would occur in the evenings or at night when clinical staff was not present. They were occurring primarily in North House and South Mental. The Monitor takes these reports very seriously and will personally spend time at Pontiac during off hours during the next monitoring period.

On the other hand, the monitoring team appreciates those institutions who deescalate incidents, thus avoiding the need for force. Lawrence leadership—both custody and mental health—emphasized their ethic of using force as a last resort, and the low number of incidents would seem to support that. By established practice, a series of staff attempt to deescalate the event, including an MHP and several members of the custody chain of command. This appears to be effective at Lawrence, and the monitoring team has seen it serve well in other correctional systems. Should IDOC choose to implement a similar policy system wide, this strategy would move IDOC toward substantial compliance on this requirement. A Major at Pontiac expressed a similar outlook, noting that he integrates mental health and clinical services staff into a segregation team approach, and that mental health staff are sometimes consulted as incidents begin. It also speaks to the therapeutic milieu at Dixon that, despite housing more than 960 of some of the highest need offenders in the system, there were only 32 force incidents logged.

---

[47] For the most part, IDOC institutions provided incident logs for July through September, 2017. There was some variability in the time periods covered by the logs, and some question of whether only SMI or all on the mental health caseload are included in some logs. The monitoring team reviewed in detail the July and August incidents, portions of June and September incidents, and the first half of 2017 for Pontiac alone.

[48] Stateville, Vandalia, Sheridan, Pinckneyville, Shawnee, Big Muddy River, Danville, Graham, Illinois River, Western Illinois

[49] Centralia, Decatur, East Moline, Jacksonville, Kewanee, Lawrence, Lincoln, Menard, Robinson, Southwest Illinois, Taylorville, Vienna

It is also the case that, even when the Tactical team is activated, a substantial number of these incidents—38% of the Tactical team activations reviewed--ended *without* the team using OC or force. This was noted in logs; the monitoring team viewed videos for a subset of these events, and the videos demonstrated this. This welcome outcome is one factor in favor of finding that unnecessary force is *not* taking place.

Tactical team activations were by far the most frequently logged type of force incident (99). These methods were commonly used to stop self-harming, for enforced medication injections and, of course, for cell extractions.  The teams viewed on video followed required procedures. Not all actions were visible, but the video quality was generally good. Reports indicated that procedures were followed and that the force was necessary. No inmate injuries were recorded in the reports. With a few exceptions that will be noted below, force did *not* appear to be excessive or unnecessary.

There were 60 uses of OC, either as part of the Tactical team intervention or independently. Quantities were not described in the reports, so it was not possible to make a judgment about whether that aspect was excessive. In another 29 events, offenders were taken to the ground, restrained against the wall, or otherwise physically managed so as to require an incident report.

A small number of exceptions to the good practices surfaced. There were one to two examples of each, so they do not constitute patterns. They do illustrate, however, the reasons that use of force requirements are included in mental health lawsuits, and as such, bear watching by IDOC administration.

*Unnecessary*
- An inmate in crisis watch was visibly psychotic, talking in garbled words unrelated to staff's conversation, and unable to follow orders. Staff wanted to move him between crisis watch cells for administrative reasons, but his actions did not cause the need for a move and he was not aggressive, just not complying as he did not understand the orders. The team used OC and extracted him. This event inflicted the pain of OC unnecessarily; there was no reason the cell move could not have been reinitiated when conditions for his compliance might have improved.
- An offender had covered his cell window, but removed the obstruction by the time the Tactical team arrived. In the space of 40 seconds, the team sprayed OC three times and went into the cell to extract the man and there was a struggle (or a fight, it was difficult to see). Some would argue that uncovering the window solved the problem, rendering an extraction unnecessary. At the least, the team did not give the OC an opportunity to work; under ordinary circumstances, that generates compliance and the struggle/fight would have been prevented.
- An offender refused to give his ID and took a fighting stance; the officer used OC in response. Then the offender ran, and the officer used OC again once the offender was captured.
- *Decontamination*: in some cases, the use of OC appeared warranted, but decontamination may not have been offered, or was delayed. In some, the offenders were placed back in the cells from which they were extracted and there is not a mention that the cell was decontaminated. One offender was sprayed in order to get

- 102 -

compliance with his enforced medication; he was not decontaminated until after the injection.

*Excessive*

- In two events at two institutions, an officer responded to an offender's aggression by punching him in the face. In one of them, the report suggests that the lieutenant continued to punch the offender after his initial reaction and while the offender was on the ground (and fighting). This is not a management technique. The offender emerged with multiple puncture wounds in his lip and the lieutenant sought medical treatment for his hand.
- There is a striking number of offenders already in handcuffs, being escorted by multiple officers, who are either taken down or who fall along with the officer(s).

While a large majority of force practices look promising, further review will be necessary to develop more information about patterns, gain information from more diverse sources, and follow up to determine whether the problematic practices above continue.

Professional Conduct

AD 03.02.108(I)(B), "Standards of Conduct" provides: The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

**Findings:** Inmates in Dixon's X House, continued to report verbal abuse by officers, particularly those who work infrequently with SMI offenders. The mental health staff echoed this sentiment, saying that the day shift officers were generally very good at managing SMI offenders and working with mental health, but that weekend and evening staff were variable. Staff abuse and neglect was a complaint raised in a letter to plaintiffs' counsel by a mentally ill offender who committed suicide during the monitoring period. This issue was otherwise not specifically evaluated for this midyear report.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary:** Segregation is not being used as a punishment for SMI offenders for 300- and 400-level infractions at any IDOC facility, and Adjustment Committees consistently receive and review input from Mental Health regarding SMI inmates.

Only two institutions performed face-to-face assessments as part of the MHPs' review; all others relied on chart review and/or discussion amongst the mental health staff. It appeared that the required form was completed in all cases involving SMI offenders, but the quality of the documentation varied greatly between facilities and MHPs. The rationale for MHPs' conclusions and recommendations were sometimes unclear, and recommendations varied widely among facilities and individual MHPs.

At one institution, every single form contained identical language, and every single one determined that the inmate's mental illness did not contribute to the offense behavior; it is extremely unlikely that the purpose of this review is being accomplished at that institution.

Inmates sometimes received harsh sanctions for actions related to their mental health, such as refusing or hiding medication. Mental health staff did not appear to pick up cues for needed follow-up, such as ascertaining the reason for the medication refusals that were the subject of discipline.

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include

segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

> (1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

> (2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

> (3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

> (1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** Assistant Monitor, Reena Kapoor, M.D., conducted a data-driven analysis of 10 facilities for the months of June and July 2017, regarding their adherence to the requirements contained in Administrative Directive 05.12.103. Her results follow:

## Overall Findings

1. Segregation is not being used as a punishment (for SMI offenders) for 300- and 400-level infractions at any IDOC facility.  This is consistent with IDOC's revised policies and the Settlement Agreement.

2. The Adjustment Committee consistently receives and reviews input from Mental Health regarding SMI inmates.  This is also consistent with IDOC policy.

3. Although the DOC 0443 form was completed in all cases involving SMI offenders, the quality of the documentation varied greatly between facilities and MHPs.  In particular, the rationale for MHPs' conclusions and recommendations was not always clear.

4. Only at Jacksonville and Shawnee are MHPs performing face-to-face assessments of SMI offenders after they are charged with disciplinary infractions; at all other facilities, the 0443 form is completed based on a chart review and/or discussion amongst the mental health staff.

5. Additional training for the mental health staff across IDOC regarding how/why to recommend particular disciplinary sanctions to the Adjustment Committee may be helpful, as it appears that recommendations vary widely among facilities and individual MHPs, with no clinical rationale for the differences. The MHPs at Lawrence and Graham appear to be doing a particularly poor job of reviewing disciplinary cases and making appropriate recommendations to the Adjustment Committee (see details below).

6. Inmates appear to be receiving harsh sanctions for refusing or hiding medication (e.g., 1-3 months in segregation for one misappropriated pill). In addition, mental health follow-up to ascertain the reason for the medication refusal is inadequate.

7. At Pontiac, every single Mental Health Review (0443) form contained identical language, and every single one determined that the inmate's mental illness did not contribute to the offense behavior. This raises concerns about the adequacy and individualized nature of the MHPs' 0443 assessments.

**Individual Facility Findings**

*1. Big Muddy River*

There were just two incidents involving SMI offenders in July 2017, both involving verbal threats made by inmates. Both cases appeared to have been reviewed by the MHP, and the Adjustment Committee then followed the MHP's recommendations. In one case, the inmate was given time served and returned to an RTU setting because it was clear that he was psychotic and unstable during the offense, threatening to "blow up Trump Plaza." In the other case, the inmate was given 9 days of segregation, which amounted to time served, and then 45 days of C-grade after making threats to harm another inmate.

*2. Centralia*

12 incidents involving SMI offenders were reported between June 29 and July 25, 2017. In 8 of these cases, Mental Health recommended a lesser sanction than the Adjustment Committee. In 7 of the 8 cases, the Final Disposition was identical to the Adjustment Committee's recommendation, seemingly disregarding the Mental Health input. After reviewing the documents, it was not clear whether IDOC's Administrative Directive (05.12.103, Section H.2) to resolve differences between these two groups was followed. The policy states, in relevant part:

> *If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during*

> segregation is necessary, the committee **shall** adopt those recommendations
> *(emphasis added).*
>
> *If the Adjustment Committee disagrees with the recommendation of the reviewing
> MHP and recommends a more restrictive disciplinary action, the Adjustment
> Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

Complete documentation for only 2 of the 12 disciplinary incidents was provided for
review. The Adjustment Committee's report in both of these cases contains the CAO's
signature, but it does not have any explanation for why the CAO thought it was
appropriate to disregard the MHP's recommendation (or if the CAO even knew that there
was a dispute).

3.  *Graham*

Documentation for one incident was provided for review. On 7/24/17, a mentally ill
offender was caught by the nurse trying to secret away one pill of Buspar 15 mg in his
hand during the med line (rather than swallowing it). The inmate was charged with
Possession of Drugs/Paraphernalia and Disobeying a Direct Order. The 0443-form
indicated that the inmate's mental health status played no role in his behavior, and he
should be sentenced to "no more than 3 months in segregation." He was ultimately
sentenced by the Adjustment Committee to 1 month of segregation and several lesser
sanctions. No documentation was provided to indicate whether anyone from the mental
health staff ever asked the inmate why he refused to take his medication, nor was any
follow-up with the psychiatrist recommended. In my opinion, both of these measures
should clearly be taken when an inmate refuses psychotropic medication or tries to
mislead staff into thinking he has taken it. In addition, 3 months of segregation is a very
harsh punishment for one hidden pill (even if deliberately stolen), so the mental health
staff at Graham may need additional training regarding recommendation of sanctions.

4.  *Jacksonville*

Documentation of one incident was provided for review. An SMI inmate allegedly blew a
kiss at a nurse and called her "Casper" on 7/20/17. He was charged with Sexual
Misconduct, Intimidation or Threats, and Insolence. The 0443-form indicated that mental
health did not play a role in the behavior, and "up to 3 months" of segregation was
recommended. After reviewing video of the incident, the kiss-blowing was
unsubstantiated, and the two most serious charges were dropped. The inmate was
released from segregation after 2 days and given a C-grade sanction for the Insolence
charge.

5.  *Lawrence*

Documentation related to four incidents was provided for review. One of the incidents
involved an inmate in segregation refusing to comply with procedures to remove his
cuffs, pulling an officer's hand though the door trap. Another involved fighting. A third

involved an inmate jumping off the tier in an effort to kill himself.  A fourth involved an inmate refusing to return to GP after crisis watch placement.

Curiously, in all cases, the mental health staff recommended more severe sanctions than the Adjustment Committee ultimately issued. In no case did the MHP interview the inmate or inquire directly into the circumstances of the event, even in the case involving a reported suicide attempt.  In the suicide attempt case, the MHP noted that the inmate had had 3 recent crisis watch placements but concluded that the inmate had "only minimal mental health symptoms" and should sentenced to 6 months in segregation (the Adjustment Committee decided on 21 days). In the incident involving the inmate who refused to return to GP after crisis watch, the mental health review in this case was cursory and did not inquire into the reasons for the inmate's housing referral.  Instead, mental health recommended "up to 3 months of segregation," and the Adjustment Committee sentenced the inmate to 1 month of segregation.  At no point did anyone look into the reasons for the inmate's refusal (e.g. fear of another inmate in GP, gambling debts, inability to follow routine, etc.).

6.  *Menard*

21 incidents involving 14 different SMI offenders were adjudicated in July 2017.  The charges included Sexual Misconduct (handing an officer a letter with sexually inappropriate comments, masturbating in front of a nurse), Contraband Property (two MP3 players), Refusing Direct Orders (to move cells), and Fighting.  In all cases, the Adjustment Committee issued a sanction that was less severe or the same as the recommendation from Mental Health.

Complete documentation for 5 incidents was provided for review.  In all 5 cases, the MHP concluded, based on a chart review, that the inmate's mental health status was unrelated to the offense conduct.  The MHP typically noted that the inmate had been seen for routine appointments and had been compliant with medications, so therefore the inmate's mental health status was stable at the time of the offense.  However, based on my site visits to Menard, inmates' clinical status and medications are not monitored carefully, and the charts are woefully incomplete.  Therefore, drawing conclusions on the 0443-form based on chart review alone is inadequate.

7.  *Pinckneyville*

Documentation related to 5 incidents was reviewed.  In each case, the Adjustment Committee followed the MHP's recommendation regarding segregation placement; in 2 of the 5 cases no segregation was ordered because of the inmate's unstable mental status. After reviewing the details, I am concerned only about one case in which an SMI inmate accepted a single "brown pill" from another inmate and refused to turn it over to the nurse when caught.  This incident resulted in 3 months of segregation, and it does not appear that a psychiatrist ever followed up with the inmate to see why he wanted the other person's medication.  Although it is possible that the inmate simply wanted to "get high," it would be important to rule out another reason before deciding upon sanctions.

8. *Shawnee*

7 incidents involving SMI offenders were reported.  In all cases, the Adjustment Committee followed the recommendations from Mental Health regarding segregation placement, though frequently additional sanctions (e.g. C-grade, GCC, visit restrictions) were added in addition to segregation placement.  Detailed documentation for only 2 of the incidents was provided for review, but in both cases IDOC's policies appeared to be followed appropriately.  In one case, an inmate reported hearing voices that told him to get out of his cell (he was charged with Refusing a Direct Order to return to his cell), but the MHP spoke with him about the incident, documented a normal mental status exam, and concluded that he was not psychotic.  In the other case, the MHP interviewed the inmate, noted active symptoms of psychosis, and recommended against segregation placement.

9. *Vienna*

This facility only provided the 0443 forms for review; there were no Adjustment Committee reports or descriptions of the offense conduct (DOC 0317) for me to review. Therefore, I could not draw any conclusions about the facility's compliance with the SMI Discipline policy.  A review of the 0443 forms indicates that reviewing MHPs base their conclusions upon chart review and consultation with the inmate's treating MHP.  In 1 out of 6 cases, the inmate's illness was found to have contributed to the offense behavior.

10. *Pontiac*

Pontiac had 88 disciplinary incidents in the one-month review period—significantly more than the other 9 facilities combined.   In all cases, the sanction imposed by the Adjustment Committee fell within the range recommended by Mental Health (e.g. 0-30 days).  One of the 88 inmates was given a sentence of 6 months in segregation; all others were sentenced to 3 months or less.

Perhaps because of the large number of disciplinary infractions to process, the 0443 documents from Pontiac are much more formulaic and cursory in their assessments than at other facilities.  In fact, every single 0443 form I reviewed contained the same language:

> *It is the opinion of this MHP that the offender's mental illness did not contribute to the behavior of the offense for which the DOC0317 was issued.  It is this MHP's opinion that consideration for segregation placement of this offender is appropriate based on the offender's mental health symptoms and needs. However, it should be noted that lengthy segregation for the SMI population is not recommended.*

It was not clear to me that the MHP had performed a meaningful review of each individual case and offender.  In addition, no rationale for the MHP's recommendations

for segregation placement (e.g. 1-2 months vs. 15-30 days) was ever documented, making it impossible to determine how these decisions were being made.

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:**  The requirements of this subsection were not being met during the reporting period.

**(XXV)(b): Specific requirement:** No later than one (1) year after approval of this Settlement Agreement, IDOC, in consultation with the Monitor, shall develop and implement policies and procedures to provide that, for mentally ill offenders, (i) punishment for self-injurious behavior (*e.g.,* suicide attempts or self-mutilation) is prohibited; (ii) punishment for reporting to IDOC staff or vendor staff feelings or intentions of self-injury or suicide is prohibited; and (iii) punishment for behavior directly related to self-injurious behavior, such as destruction of state property, is prohibited unless it results in the creation of a weapon or possession of contraband.

**Findings:** To date, the Monitor has not been asked to consult with IDOC staff on this issue. The monitoring team continues to receive reports of mentally ill offenders' being punished for self-injurious behavior. The monitoring team will attempt to perform a data-driven analysis of this issue for the 2nd annual report.

**(XXV)(c): Specific requirement:** For any offender who is in RTU or inpatient treatment for serious mental illness, the disciplinary process will be carried out within a mental health treatment context and in accordance with this Section. Discipline may include loss of privileges or confinement to cell on the treatment unit for a specified period, but may not entail ejecting an offender from the treatment program.

**Findings:**  The monitoring team did not review this requirement for the midyear report.

**(XXV)(d): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor and the IDOC's designated expert, shall develop and implement a pilot Behavior Treatment Program ("BTP") at Pontiac CC for SMI offenders currently subject to sanction for a serious disciplinary infraction. IDOC will review this pilot and consider implementation at other facilities.

**Findings:** To date, the Monitor has not been asked to consult with IDOC on this issue. The Monitor was given, however, a draft outline of the Behavioral Management Unit program for the RTU at Joliet.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

**Summary**: The monitor has approved a draft Administrative Directive governing a mental health CQI program, which incorporates by reference the Settlement requirements. IDOC intends to implement that program once all of its Psych Administrators are hired. In the meantime, IDOC is conducting some CQI activity under a broader, pre-existing CQI policy, but it is not as robust as expected under the Settlement.

No significant changes were observed in the mental health CQI process during this reporting period.

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** As reported in the first annual report, AD 04.03.125 addresses the broad medical CQI program, which includes mental health as a small piece among many other pieces. The cited portion of the SOP Manual relates specifically to a new mental health CQI program. This SOP Manual also cites an AD on a mental health CQI program, 04.04.104. The Monitor has approved that AD but it is yet to be implemented. Chief Hinton explained that he is waiting to implement this department-wide CQI program until all facilities have an assigned mental health authority. At the time of this report, six facilities were without a mental health authority. They included Danville, Western, Graham, Vandalia, Robinson and Illinois River. The monitoring team was not provided with a date when AD 04.04.104 would be implemented.

For both the broader CQI program and the mental health-specific CQI program, the requirements incorporated by reference in the Settlement include committee composition and

meetings, CQI studies to be conducted, data to be reviewed, and suicide reviews. The Settlement includes additional provisions that emphasize corrective action and create a new statewide CQI Manager position.

Nothing has significantly changed in the mental health CQI process during this reporting period. Based upon this current six-month review of various aspects of IDOC's CQI system, several points stand out. IDOC has been utilizing AD 04.03.125 as its CQI guide for the ongoing, systematic evaluation of offender care practices, professional or clinical performance, and offender care services in primary care and mental health services. This AD does not embody the robust CQI policy intended by this section of the Settlement Agreement. The overall requirements of AD 04.03.125, however, are generally being accomplished in that facility-based CQI committees are formed and mental health-specific data is being collected. AD 04.03.125 will continue to be used until such time as AD 04.04.104, Mental Health Continuous Quality Improvement Program, is implemented throughout IDOC. The monitoring team looks forward to consulting with IDOC's clinical leadership in the implementation of AD 04.04.104. The goal will be to develop a much more comprehensive CQI policy which utilizes the specific mental health data obtained in a manner to actually improve the quality of the mental health services.

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** The Department's Quarterly Report of 10/23/17, Section XXVI, "Continuous Quality Improvement Program (CQI)" states "IDOC hired Jeff Sims to be CQI manager. Dr. Sims has started performing duties related to his role as CQI Manager in addition to regional administrator tasks. He estimates that he spends approximately 25% of his time on work related to CQI."  There is no provision in the Settlement for this arrangement.  As such, IDOC is not in compliance with this section of the Settlement.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** The Monitor made requests to IDOC in June 2017 for an increase in his budget. To date there has been no formal response to either the Monitor or plaintiffs' counsel.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** The Monitor has made a variety of specific recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate

mental health care to class members. To date the Monitor has not received any formal response to these recommendations. These recommendations include but are not limited to:

- Modifications to the administrative review process regarding suicides;
- A variety of issues regarding the use of Telepsychiatry;
- Multidisciplinary team involvement in treatment planning
- Psychiatric involvement for mentally ill offenders in crisis
- Implementation of a statewide CQI program

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** The Department has generally been responsive to these issues. Lately, however, some data requests made to Legal have not been timely honored. In particular, this refers to the supporting data regarding structured and unstructured out-of-cell time and data related to the disciplinary process of SMI offenders.

## XXVIII: REPORTING AND RECORDKEEPING

**Summary**: Quarterly reports ae being prepared. The some of the content of these reports is not supported by the available data or the actual practices within IDOC.

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: IDOC does provide a quarterly report. As noted above, some of its content does not appear supportable.

**CONCLUSION**

IDOC continues to slowly improve the quality of the mental health services offered to the offender population. Areas of improvement include: a greater number of structured out-of-cell activities are being offered to those mentally ill offenders assigned to segregation; the RTU at Joliet began accepting mentally ill offenders on 11/6/17; treatment planning at the STC at Dixon is being accomplished by a multidisciplinary staff; and, the RTU at Logan has a capacity for 118 mentally ill women offenders.

Tremendous problems exist with the quantity and quality of psychiatric services. They include: problems with the continuation of medications upon entry into IDOC; lack of timely medication follow-up; dangerous practices related to the use of medication including those offenders receiving enforced medications; problems with managing medication side effects and poor medication compliance; lack of timely psychiatric evaluations; non-participation in multidisciplinary treatment planning; not following protocols for laboratory and medical/neurological evaluations; and, lack of timely follow up for offenders in crisis beds and segregation. These problems pervade almost every aspect of IDOC's mental health delivery system. Furthermore, the problems with the psychiatric services contribute to IDOC being found non-compliant in almost every aspect of the Settlement.

I trust that IDOC will take the experiences of the first 18 months of the Settlement Agreement to heart and move in a much more expeditious manner to address the ongoing suffering of the mentally ill offenders that have been placed in their care.

Respectfully submitted,

_Pablo Stewart, M.D._[50]           Dated: November 22, 2017

Pablo Stewart, MD

---

[50] Indicates electronic signature