E-FILED
Friday, 06 April, 2018  06:18:16 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| ASHOOR RASHO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:07-CV-1298-MMM-JEH |
| | ) | |
| v. | ) | Judge Michael M. Mihm |
| | ) | |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' SUPPLEMENTAL AND AMENDED
PROPOSED FINDINGS OF FACT**

The following Proposed Findings of Fact are submitted by Plaintiffs following the hearing on Plaintiffs' Motion to Enforce the Settlement Agreement (Doc. 1559) held on December 18 – 19, 2017 and February 27 – March 2, 2018.

**PROPOSED FINDINGS OF FACT**

1.      IDOC has failed to fulfill the commitments made in the Settlement Agreement. (Dr. Hinton's testimony, Tr. 378:19-22, 1423:22 – 1424:5.)

2.      Remarkably, as set forth in detail below, the Court-appointed Monitor, the prior monitor, the first IDOC Chief of Psychiatry, and the Chief of Mental Health all agree that the Department is not providing adequate care. (*See* ¶¶ 14-15 (Dr. Patterson); ¶¶ 28-29, 401 (Dr. Dempsey), and ¶¶ 6, 8-9, 18, 23-25, 45, 60, 75, 101-102, 118, 121 (Dr. Hinton).) Defendants have offered no evidence that they are providing adequate care.

3.      More than 12,000 prisoners are in need of mental health treatment in the Illinois Department of Corrections, 4843 of whom are considered by the Department to be "seriously mentally ill" (referred to as SMI.) (Pl. Ex. 22, Summary Chart.)[1]

4.      The Monitor, Dr. Pablo Stewart, found extensive violations of the Settlement Agreement, including the provisions for the five targeted areas at issue here: (1) medication management; (2) mental health treatment in segregation; (3) mental health treatment in crisis; (4) mental health evaluations; and (5) treatment planning. (Pl. Ex. 10, Monitor's First Annual Report, and Ex. 21, Monitor's Midyear Report.)[2]

5.      Separately, and in combination, the deficiencies in these five areas result in serious harm to Class Members, including suffering from untreated or inadequately treated mental illness—such as depression, hearing voices, paranoia and hopelessness –as well as side-effects from mismanaged psychotropic medications; they have resulted in numerous acts of self-harm or harm to others, as well as behavioral problems, which in turn result in isolation and use of restraints. (Dr. Stewart's testimony, Tr. 97, 101, 109-10, 115-16, 128-29, 208-209, 226-28, 258-64.)

6.      Each of these violations means thousands of people are not receiving the mental health care that they require, and are suffering as a result. (Dr. Hinton's testimony, Tr. 1458:17-1459:3 (agreeing that the denial of these services would be painful for those in need of the services).

---

[1] The Plaintiff Class is defined in Section II(l) of the Settlement Agreement as "persons now or in the future in the custody of IDOC who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment . . . ." (Pl. Ex. 1, Settlement Agreement pp. 1, 4.)

[2] Citations for the Monitor's findings of violations are set forth in more detail in each of the subsections below.

7.      On October 1, 2017, Dr. Stewart sent a letter to IDOC stating that "IDOC is in a state of emergency regarding its provision of psychiatric care." The "exceedingly poor and often times dangerous" psychiatric services described in the First Annual Report had continued unabated into the second year of the settlement and Dr. Stewart asked the Department to take immediate action. (Pl. Ex. 18, letter; Pl. Ex. 15, First Annual Report, p. 10.)

8.      Dr. Melvin Hinton, IDOC's Chief of the Office of Mental Health Management and Addiction Recovery Service for the Department, admits that the Department is not and cannot deliver the psychiatric care that the mentally ill prisoners in its custody require. (Dr. Hinton's testimony, Tr. 317, 319-320.)

9.      Mentally ill prisoners in segregation are "across the board" getting worse without the treatment and out-of-cell time that was promised.  (Dr. Hinton's testimony, Tr. 349, 351.)

10.      The Monitor, Dr. Stewart, and IDOC's Chief of Mental Health, Dr. Hinton, agree that violations are caused in large part by the lack of necessary staff. (Dr. Stewart's testimony, Tr. 210:6-9; Dr. Hinton's testimony, Tr. 358:12-14, 358:23-359:12, 361:17-362:6.) At trial, Dr. Hinton was asked how it was that he could hope to solve the problems that he knows exist in the system when they don't have enough staff to do it; Dr. Hinton answered, "that would be difficult." (Dr. Hinton's testimony, Tr. 1377:9-12.)

11.      The problems addressed in this proceeding are not new. (Pl. Exs. 8-13.) Dr. Patterson reported in 2014 that inadequate treatment for those in crisis was attributable to lack of staffing and programs, including access to inpatient beds, residential treatment programs, outpatient treatment programs, short term crisis beds, and management cells for triage and evaluation of inmates who may be in acute crisis and may be in need of hospital beds. (Patterson

Annual Report; Pl. Ex. 10, p. 7.) All of these deficiencies reported by Dr. Patterson in 2014 still

exist today. (Dr. Hinton's testimony; Tr. 356:7-22.)

      12.     In April 17, 2014, IDOC submitted a proposed remedial plan that stated: "All

parties recognize the immensity of the challenges facing the IDOC in providing constitutionally

adequate mental health care." (Pl. Ex. 9, IDOC Proposed Remedial Plan p. 1.)

      13.     Dr. Patterson had found that the system lacked the necessary staffing to provide

adequate care.  (Pl. Ex. 10, Patterson Report p. 8, 17.) The Department agreed, committing to fill

the shortages by October 2015. (Pl. Ex. 9, IDOC Proposed Remedial Plan, p. 17 ("this proposal

identifies the clinical, security and administrative staff necessary to not only provide

constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the

creation of adequate levels of care").) To date, IDOC has still not filled the quotas set in the 2014

proposed plan. (Dr. Hinton's testimony, Tr. 316, 368-70; Pl. Ex. 9, IDOC Proposed Remedial

Plan p. 2.)

      14.     In 2014, Dr. Patterson, citing back to the 2012 Cohen report, described the

absence of a comprehensive mental health services delivery system, the historical lack of

adequate staffing for a system of this size, and needed improvements in segregation and inpatient

care. (Pl. Ex. 10, Patterson Report p. 8, 15.)  Dr. Patterson had identified several of these areas as

emergencies. (Pl. Ex. 10, p. 9.) However, "[d]espite it being over two years since distribution of

the Cohen Report, more than sixteen months since the May 8, 2013 Agreed Order, and the onsite

and telephonic review and consultations of the monitor, the IDOC mental health services have

not moved forward as anticipated or as agreed by the priorities and ordered by the court." (Pl. Ex.

10, p. 18.)

15.     Dr. Hinton is aware of Dr. Patterson's recommendation to revitalize and expand leadership and to develop a reporting and management structure. (Dr. Hinton's testimony, Tr. 351:23-352:1, 352:21-24; Pl. Ex. 10, Patterson Annual Report, p. 4.) More than three and a half years after Dr. Patterson's recommendation, IDOC still does not have the technology or staffing to know what mental health services are actually being delivered to mentally ill prisoners. (Dr. Hinton's testimony, Tr. 352:25-353:23.)

16.     The IDOC's internal reports demonstrate its awareness of systemic and ongoing failures in the provision of mental health treatment. In either August or September of 2017, Health Care Administrators from 24 IDOC facilities completed a form entitled, "Healthcare Contract Monthly Performance Monitoring Report," which assessed Wexford's contract compliance. Nearly every facility reported that Wexford was not complying with the IDOC's administrative directives and that there were vacant psychiatry positions, with attendant hour shortages and appointment backlogs. Facilities also documented deficiencies on issues ranging from AIM screens to treatment planning. The reports indicate that the IDOC has been notifying Wexford of its contractual failures. Such notifications dated as far back as 2011. (Pl. Ex. 17, IDOC Healthcare Contract Monthly Performance Monitoring Reports; summarized in Plaintiffs' Reply Brief in Support of the Motion to Enforce (Doc. 1610), p. 6-9.)

I.      **MEDICATION MANAGEMENT**

    A.      **Defendants' Failure to Provide Minimally Adequate Medication Management**

17.     IDOC has less that 60% of the psychiatrists needed to provide appropriate care to IDOC prisoners. (Dr. Hinton's testimony, Tr. 314-316; Pl. Ex. 23, Summary of WHS Staffing Reports (showing 28.8 of the 65.75 budgeted psychiatry positions were filled in November 2017);

Pl. Ex. 37, Summary of DX 5 (showing 38.63 budgeted psychiatry positions were filled in February 2018).)

18.      IDOC, through its vendor Wexford, has never had more than 65% of the psychiatrists required. (Ms. Gedman's testimony, Tr. 505:12-15, 513: 25-514:4.) Wexford cannot, therefore, deliver the hours required to provide the needed psychiatric care. (*Id.* at 505:16-506:3, 511: 5-7, 517: 22-24.)

19.      As a result, the psychiatric backlog has remained consistently, and unconscionably, high. (Pl. Ex 38 (Summary of Defendants Ex. 1 and weekly backlog reports from May 2016 through February 2018).)



Pl. Ex. 38.

20.      IDOC presented a trend chart of its weekly psychiatric backlog data, showing a reduction from September 2017 to February 2018. (DX 35.) Plaintiffs have submitted similar trend charts utilizing Defendants' weekly psychiatric backlog data going back to April 2014 (when Defendants' submitted the remedial staffing plan) to date. This longer view of the data shows that the psychiatric backlog sharply increased following the May 2016 settlement agreement and has merely returned to levels that were unacceptable in 2014.



Pl. Ex. 40

21.     The current backlog remains higher than it was in 2014, when IDOC admitted that it had to fill psychiatric vacancies and retain that staff in order to provide the necessary mental health treatment. (Pl. Ex. 39 and Ex. 40; Ex. 9, IDOC Remedial Plan, p. 17 ("this proposal identifies the clinical, security and administrative staff necessary to not only provide constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the creation of adequate levels of care").)

22.     IDOC has known for years that it does not have enough psychiatrists to provide sufficient psychiatric care. (Dr. Hinton's testimony, Tr. 317:12-15, Tr. 349:13-16.) Around the time of the Settlement Agreement, Wexford warned IDOC that there was going to be a challenge to fill all of the required psychiatrist positions. (Ms. Gedman's testimony, Tr. 531: 2-7; Dr. Hinton's testimony, Tr. 1406:17-22.)

23.     As of the most recent data, IDOC has filled 38.63 out of 65.75 budgeted psychiatric positions. (DX 5; Pl. Ex. 39, summary of DX5). This leaves staff psychiatrists with unreasonably high caseloads. (DX5, DX1A, and Dr. Hinton's testimony, Tr. 1385-1388 (showing Dixon's psychiatric caseload to be 241 patients per psychiatrist; Menard: 572 patients per psychiatrist, Pontiac: 231 patients per psychiatrist.)

24.     IDOC cannot deliver the psychiatric care that is needed and consequently prisoners with mental illness are being harmed by the lack of medication management. (Dr. Hinton's testimony, Tr. 317:7-11, 319:18-22, 320:8-13, 1450:3-8.) Dr. Hinton admits that this is dangerous. (*Id.* at 319:23-320:3.)

25.     Dr. Stewart concluded that the lack of sufficient and quality psychiatric care in the IDOC is placing Class Members in danger.  (Pl. Ex. 18, Oct. 1, 2017 letter; Dr. Stewart's testimony, Tr. 235-37; Pl. Ex. 21, Midyear Report p. 9, 115; Dr. Hinton's testimony, Tr. 343:2-7.) That opinion continues to date. (Dr. Stewart's testimony, Tr. 1177:12 – 1179:7.)

26.     As of March 2, 2018, Dr. Hinton testified that IDOC still didn't have the psychiatrists needed and that he did not know when they would. (Dr. Hinton's testimony, Tr. 1362:19 – 1363:8.)

27.     IDOC's former Chief of Psychiatry, Dr. Michael Dempsey, agreed that IDOC's psychiatric services were in a state of emergency, as to both the quantity and the quality, during his tenure from November 2015 to May 2017. (Dr. Dempsey testimony, Tr. 197-201.)

28.     Dr. Dempsey testified extensively about irregularities and inadequacies in the psychiatric care. Dr. Dempsey described that IDOC has no consistent standards or procedures for psychiatric care and no oversight or clinical review. (Dr. Dempsey's testimony, Tr. 165:6-15, 201.) Although he developed a new evaluation form in an effort to achieve some standard

-8-

practices, many psychiatrists did not complete the evaluation form, including, for example, not even filling in critical information such as the psychiatrist's impression of the patient or the patient's history of suicidality (*Id.* at 165, 168-171.) He also described incidents of psychiatrists purposefully using sub-therapeutic doses of medications for enforced medications. (*Id.* at 193-97.)

### *(1) Timely Evaluation and Follow-Up*

29.     The Settlement Agreement requires that Class Members who are prescribed new psychotropic medication be evaluated by a psychiatrist at least twice in the first 60 days. (Pl. Ex. 1 p. 15 (Section XII(b).) Thereafter, psychiatric follow-up must occur at a minimum of every 30 days with extensions up to 60 or 90 days when stability is reached and documented. (Pl. Ex. 1 p. 10 (Sect. VII).)

30.     IDOC is in violation of the Settlement's requirements for timely psychiatric evaluation and follow-up. (Dr. Stewart's testimony, Tr. 243:2-3; 237:8-12, 249:12-17; Pl. Ex. 21, Midyear Report p. 32-33, 48-50.) Significant backlogs of psychiatric appointments have existed since before the Settlement Agreement was entered. (Pl. Exs. 38-40, Summaries of Weekly Backlog Data.) In 2014, IDOC committed to filling the vacant budgeted psychiatric positions (Ex. 9, IDOC Remedial Plan), but failed to do so (Pl. Ex. 23, Summary of Staffing Reports) and a result the backlog increased substantially (reaching a high of almost 4000 in December 2016). With efforts to increase psychiatric hours through overtime and increased use of telepsychiatry, was reduced from over 3000 in October 2017 to 1380 in February 2018. (Pl. Ex. 38-40; DX 1.)

31.     These settlement timelines for psychiatric evaluation and follow-up are "minimal" relative to accepted standards of practice in psychiatry. (Dr. Stewart's testimony, Tr.  237:8-12, 240:18-241:5, 249-250.) Psychotropic medications are not benign and most be closely monitored. (*Id.* at 241.)

32.     IDOC's psychiatric backlog is unacceptable. (Dr. Stewart's testimony, Tr. 260:5-6.) Timely follow-up is essential to proper diagnosis and effective treatment. (*Id.* at 249-50.) The failure to do so results in the in exacerbation of mental illness and decompensation; it leads to increases in the use of crisis cells, restraints, use of force, and suffering. (*Id.* at 260.)

### (2) Psychiatric Response to Medication Non-Compliance

33.     Psychotropic medications can have harsh side effect profiles that require constant monitoring. (Dr. Stewart's testimony, Tr. 241-43, 293-94.) The failure to do so leads to poor medication compliance: those experiencing side effects will stop taking their medications and their illnesses will go untreated. (*Id.* at 307.)

34.     The Settlement Agreement requires MHPs to follow-up with prisoners who are medication non-compliant, and to refer the patient to a psychiatrist if they cannot resolve the non-compliance. (Pl. Ex. 1, p. 16 (Sect. XII(vi).) IDOC is in violation of this requirement. (Dr. Stewart's testimony, Tr. 256-257; 290-291; Pl. Ex. 21, Midyear Report p. 52-53.)

35.     In the overwhelming number of cases, Dr. Stewart found that there was no follow-up response to medication non-compliance. In all of his monitoring, he saw only one or two instances of a psychiatrist following up on non-compliance. (Dr. Stewart's testimony, Tr. 290:20-291:17.) In fact, Dr. Stewart observed cases where, instead of addressing the non-compliance with the patient, the psychiatrist discontinued the patients' medications with no follow-up. (*Id.* at 291-93.)

36.     Dr. Stewart's review of prisoners who stopped taking their medication found that the primary reason for cessation was unaddressed side effects. (Dr. Stewart's testimony, Tr. 293:5-15.)

### *(3) Charting Medication Efficacy and Side-Effects*

37.     IDOC is also failing to chart medication efficacy and side effects, which is required by both standard psychiatric practice and the Settlement Agreement (Section XII(c)(ii)). (Ex. 1, p. 15; Dr. Stewart's testimony, Tr. 257-59; Pl. Ex. 21, Midyear Report p. 51.)

38.     Through both chart reviews and Class Member interviews, Dr. Stewart found that charting of medication efficacy and side-effects is not being done. He has observed Class Members exhibiting severe side-effects that were not charted in their records, such as involuntary movements, akathisia (a subjective sense of needing to be in motion) and pseudo-Parkinson side effects such as stiffness and drooling. (Dr. Stewart's testimony, Tr. 251-52, 258-259).)

### *(4) Ascertaining Side Effects of Psychotropic Medication*

39.     IDOC is also violating standard protocols for ascertaining side effects of psychotropic medication, which are required by Section XII(c)(iii) of the Settlement Agreement (Pl. Ex. 1, p. 15; Pl. Ex. 21, Midyear Report p. 51-52.) The result is that Class Members are suffering unnecessarily from medication side-effects, including those resulting with physical injury. (Dr. Stewart's testimony, Tr. 263:22-264:6, 298-99. *See also* Dr. Dempsey's testimony, Tr. 172-73, 176 (describing limited ability to assess a patient's physical appearance and related side-effects with IDOC's telepsychiatry practice).)

40.     Dr. Stewart has found that the lack of proper laboratory and neurological follow-ups is subjecting Class Members to very dangerous side-effects. (Dr. Stewart's testimony, Tr. 307.) The risk of failing to properly monitor for side effects from psychotropic medications include the onset of "long-standing, long-term, intractable side effects." (Dr. Dempsey's testimony, Tr. 177: 14-25.)

41.     Protocols for ascertaining side effects, such as bloodwork, vary depending on the medication. For example, atypical antipsychotics alter blood sugar and blood lipids. This can result in weight gain and Type 2 diabetes, so these metabolic parameters need to be frequently monitored. (Dr. Stewart's testimony, Tr. 261:5-262:1.) Some medications are also known to have a significant impact on blood pressure. (*Id.* at 262: 18-24.) For other medications, lithium for example, blood work is required to insure that the medication is at therapeutic blood levels. (*Id.* at 262:2-17.)

42.     IDOC's use of standard protocols for monitoring psychotropic medications is done in a haphazard manner, if done at all. (Dr. Stewart's testimony, Tr. 237:13-19, 263: 5-21.) For example, Dr. Stewart described irregular and inconsistent labs to monitor lithium efficacy. (*Id.* at 263: 5-21.) He observed almost no blood pressure monitoring and inconsistent neurological evaluations. (*Id.* at 237:13-19.) When Dr. Stewart did observe labs, he did not see how the results were linked to the patient's care. (*Id.* at 237:13-19, 263: 5-21.)

43.     Another example of a dangerous side-effect is tardive dyskinesia, which involves abnormal, involuntary movement of the tongue, mouth and extremities. If not caught early, tardive dyskinesia can cause severe and permanent problems with movement and expression. (Dr. Dempsey's testimony, Tr. 177:14-178:9, 179:5-7, 180:10-21, 183:1-4.) Antipsychotic medications present a risk for tardive dyskinesia. The incidence of tardive dyskinesia associated with first generation antipsychotic medications (such as Haldol and Prolixin) is 5 percent. The incidence associated with second generation antipsychotics is 1 percent. (*Id.* at 181:12-19.)

44.     Dr. Dempsey's review of AIMs screens conducted by psychiatrists in IDOC showed that either the AIMs screens are not actually being done, or that they are being done incorrectly. (Dr. Dempsey's testimony, Tr. 181:25-182:18.) "[F]or the overwhelming majority of

-12-

the patients, no matter how long they've been exposed to antipsychotic medications, the results are always zero which is impossible as far as I'm concerned for the number of patient years of exposure within the Department of Corrections." (*Id.* at 181: 1-10. *See also* Dr. Hinton's testimony, Tr. 375:25-23 (admitting that there is no process in place to ensure that AIMs screens are being performed or accurately reported); Pl. Ex. 2, WHS Contract, Sect. 2.2410, p. 13 ("vendor psychiatrists shall screen offenders who are on antipsychotic medication for tardive dyskinesia once every six months.").)

45.     Remarkably, the new Chief of Psychiatry, Dr. Puga, admitted that he did not conduct AIMS screens as a staff psychiatrist at Pontiac, even for patients for whom he prescribed Haldol and of one who had previously received an AIMS score of "moderate." (Dr. Puga's testimony 1254-57; DX 25, Singleton psychiatric records (under seal); DX 28, Span psychiatric records (under seal) at pg. 54 of 71 (showing an AIMS score of 3 (moderate) in March 2017 and pgs. 1-35, Dr. Puga's psychiatric reports for July 2017 – February 2018.)

46.     IDOC policy requires regular AIMs testing every six months, and every three months if tardive dyskinesia is diagnosed or suspected. (DX. 49, IDOC Mental Health SOP, p. 91-92; Dr. Puga's testimony 1256:15-18.)

### (5)     *Medication Administration*

47.     IDOC is failing to use procedures that could ensure the "taking of medication by the offenders so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered and taken by the offenders as prescribed," as required by Section XII(c)(1). (Pl. Ex. 1, p. 15; Pl. Ex. 21, Midyear Report, p. 50-51; Dr. Stewart's testimony, Tr. 255:18-256:22.) In some instances, in segregation units, the staff place the medication packet in the chuckhole and walk away, without any assurance that the medication is taken. In other

instances, prisoners may place the medication in their mouth, but spit out later (a practice known as "cheeking." (Dr. Stewart's testimony, Tr. 122:25-123:4; 254:1-17.)

48.     Dr. Stewart described, as an example, a prisoner at Pontiac in September, who brought to their visit a significant number of pills in his pant leg, stating that it was easy not to take medicine in segregation because no one spends time ensuring that they actually take it.  (Dr. Stewart's testimony, Tr. 255:1-17.)

### (6) Informed Consent

49.     IDOC is also violating standard psychiatric practice of informed consent, which is required by Sections XII (c)(v) and XIX(d) of the Settlement Agreement. (Pl. Ex. 1, Settlement Agreement pp. 15-16, 22; Dr. Stewart's testimony, Tr. 265, 294-95; P. Ex. 21, Midyear Report p. 52, 91.) All patients, including prisoners, have the right to informed consent, except those on enforced medications. (Dr. Stewart's testimony, Tr. 264: 10-265:3.)

### B.     Defendants' Response to the Psychiatric Emergency in IDOC

50.     IDOC's plan to address the psychiatric backlog was to increase telepsychiatry hours for those at outpatient level of care over the course of October through December 2017. (Pl. Ex. 19, IDOC's Plan to Reduce the Psychiatric Backlog; Dr. Stewart's testimony, Tr. 303.) Even if the Defendants were able to achieve the goal of their October 2017 plan to reduce the psychiatric backlog to 1,525, the backlog would remain unacceptably high. (Dr. Stewart's testimony, Tr. 303:2-6.)

51.     In fact, the current backlog – which has benefited from a recent major effort by IDOC to increase psychiatric hours – is roughly the same as it was when Dr. Patterson issued his report about inadequate staffing in April 2014 and when the IDOC admitted they needed to increase hiring in order to provide constitutional care. (Pl. Ex. 9, IDOC Remedial Plan; Pl. Ex. 10, Aug. 21, 2014, Patterson Report p. 8, 17; Pl. Ex. 38.)

52.     Defendants' submitted plan stated a goal of reducing the outpatient psychiatric backlog (then at 3,552) by 2,027 by December 15, 2017. (Pl. Ex. 19, IDOC's Plan to Reduce the Psychiatric Backlog, p. 1; Dr. Hinton's testimony, Tr. 1422:9-24.) The backlog did reduce in October and November 2017, but then increased in December and January, reaching 2370 on January 26, 2018. (Dr. Hinton's testimony, Tr. 1423:3-9.) Dr. Hinton could not give an explanation for backlog's increase in January 2018. (*Id.* at 1423:17-21.)

53.     IDOC's recent effort to address the deficiency in psychiatric providers relies on temporary measures, such as incentivizing overtime hours. (Dr. Hinton's testimony, Tr. 1369:18-21; Ms. Gedman's testimony, Tr. 501: 11-15.)

54.     IDOC has not presented any plan to address the current backlog at higher levels of care or at facilities not included in the plan, such as Pontiac and Logan which have significant backlogs. (Dr. Stewart's testimony, Tr. 302-305; Pl. Ex, 19, IDOC's Plan to Reduce the Psychiatric Backlog.)

55.     IDOC's plan to increase telepsychiatry hours in order to reduce the outpatient psychiatric backlog does not address the qualitative concerns about the use of telepsychiatry. (Dr. Stewart's testimony, Tr. 301:4-25; Pl. Ex. 19, IDOC's Plan to Reduce the Psychiatric Backlog.)

56.     IDOC has not submitted any plan to permanently fill vacant psychiatric positions and to provide psychiatric care of sufficient quality and quantity for the long-term, including so that the backlog does not increase again. (Dr. Stewart's testimony, Tr. 307:7-22, 1086:21-1087:15,174:21 -1176:10.)

57.     IDOC has not advanced any substantive effort to use mid-level practitioners to overcome the years-long difficulty of hiring psychiatrists. Dr. Hinton testified that they have only started "to look at mid-level providers," but he could not say how many nurse practitioners

are in the system. (Dr. Hinton's testimony, Tr. 1305:11-24,1306:11-19, 1367-68.) There is no schedule for Wexford to hire new nurse practitioners. (*Id.* at 1368:11-14.) Similarly, IDOC is "developing a pilot program" to explore using primary care physicians for outpatient medication management; but no such program actually begun. (*Id.* at 1307:21-23, 1363:19-22.) Dr. Hinton did not have a specific timetable for this pilot program. (*Id.* at 1364-65.)

58.     Between May and December 2017, Dr. Hinton participated in at least two meetings with the IDOC's Medical Director and Wexford's Head of Psychiatry to discuss the quality of psychiatric care in the IDOC. (Dr. Hinton's testimony, Tr. 314:6-20.)

59.     There are approximately 2000 hours of psychiatry needed that are unfilled (based on FTE positions allocated in the staffing plan). (Dr. Hinton's testimony, Tr. 1366-67.) Dr. Hinton could not state when he believed those hours would be filled. (*Id.* at 1368:20-23.) To date, IDOC cannot provide the psychiatric care required by Class Members because they do not have enough psychiatric providers. (*Id.* at 1369:1-12.) Dr. Hinton could not even estimate when IDOC would be able to provide this care. (*Id.* at 1369:13-17.)

II.     **MENTAL HEALTH TREATMENT ON CRISIS WATCHES**

A.     **Evidence Establishing Grossly Inadequate Care and Treatment For Those In Crisis**

60.     The crisis level of care typically refers to an acute exacerbation of mental illness, such as worsening psychosis or mania, or acting out behaviorally, or when someone is acutely suicidal or potentially violent. (Dr. Stewart's testimony, Tr. 38:17-21, 51:18-21.)[3] In IDOC,

---

[3] In IDOC, there are different level-of-care designations that refer to the severity of an individual's mental health condition and treatment needs. (Dr. Stewart's testimony, Tr. 38:8-10.)  Other levels of care include "outpatient," which is the lowest level of care, "residential," and "inpatient." Individuals with a residential designation may or may not reside in a "residential treatment unit" or RTU. There are not currently any operating inpatient facilities in IDOC. (*Id.* at 38:8-16, 39:4-23).

those in crisis are placed in crisis cells, which are isolation cells. (*Id.* at 51:21-22, 52:3-6, 98:1-5.) Crisis cells are not therapeutic environments. (*Id.* at 75:10-12, 97:23-24.)

61.     Crisis cell placements, or "watches," need to be short, generally 3-5 days, because the isolation will cause decompensation of the individuals who are already in acute distress.  (Dr. Stewart's testimony, Tr. 219-222.) While keeping them on crisis watch can prevent suicide or acts of self-harm, without the necessary treatment, their psychiatric condition gets worse. (*Id.* at 1098:18 – 1099:8.)

62.     Crisis cells are those that "hopefully have been suicide-proofed." For example, possible ligature points are covered. The person may have a "suicide smock" made of rip-proof material. On constant or 10 minute watches, they would not have any clothing, bedding, or other personal property or hygiene items such as toothpaste or deodorant. (Dr. Stewart's testimony, Tr. 74:7-15, 75:12-13; Dr. Dempsey's testimony, Tr. 183:22-184:2; Mr. Span's testimony, Tr. 281, 282:1-4; Mr. Singleton's testimony, Tr. 398:6-14.)

63.     As the person in crisis begins to stabilize, the privileges within a crisis cell increase. For example, once he or she reaches a 15 minute watch, a mattress is added to the cell. At a 30 minute watch, hygiene items and clothing are returned. (Dr. Stewart's testimony, Tr. 74:16-75:9; Mr. Span's testimony, Tr. 282:9-13; *see also* Pl. Ex. 5, Administrative Directive 04-04-102, Sect. II.E Crisis Treatment Supervision Levels, p. 4.)

64.     The purpose of crisis cells or watches in correctional mental health systems is to, first, protect the individual from self-harm or harming others and, second, to provide appropriate mental health assessment and intervention, such as re-evaluating medication, re-evaluating the psychosocial treatments, and addressing whatever issues precipitated the crisis. (Dr. Stewart's testimony, Tr. 219:5-17, 220:19-23.)

-17-

*Treatment for Stabilization of Class Members in Crisis*

65.    Section II(e) of the Settlement Agreement states that crisis beds are "beds that are available within the prison for short-term, aggressive mental health intervention designed to reduce the acute presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting." (Pl. Ex. 1, p. 3.)

66.    IDOC is not providing aggressive mental health intervention designed to reduce acute presenting symptoms and stabilize people in crisis. (Dr. Stewart's testimony, Tr. 221:18-22. 1094:17 – 1997:3; Pl. Ex. 21, Midyear Report p. 43-44.) Dr. Stewart testified that he has reviewed hundreds of crisis placements and that, while they are serving the self-harm prevention purpose, he has not observed any cases of aggressive mental health interventions being provided in crisis watches. (Dr. Stewart's testimony, 221:18-22; 221-224, 1095-96.)

67.    The only treatment that regularly occurs on crisis watches is the daily contact by the Qualified Mental Health Professional (referred to as "QMHP" or "MHP"), which are confidential sessions at some facilities but happen cell front at others. (Dr. Stewart's testimony, Tr. 1094:8-16.)

68.    Those on crisis watches are the most acute patients in the system; the failure to adequately treat them has a severe negative impact on their mental health and risks danger to others and grave disability, as well as suicide. (Dr. Stewart's testimony, Tr. 1097:6-13, 1135:8-12.) Class Members are being harmed and injured by the lack of aggressive mental health treatment on crisis watches, including that they are suffering from untreated mental illness, self-harm, and other acting-out behaviors such as smearing themselves with bodily fluids and feces, and risk being placed in restraints. (Dr. Stewart's testimony, Tr. 226:23-227:9.)

69.     The Settlement Agreement incorporates the Department's policies on crisis care. (Pl. Ex. 1, Sect. F, p.13.) IDOC's Mental Health Protocols Manual and Administrative Directive 04.04.100 both state that crisis placements should usually be ten days or less and "require diagnostic assessment and temporary clinical intervention for stabilization or diagnostic purposes." (DX 46, Administrative Directive 04.04.100, Sect. II(E); DX 49, SOP Manual, p. 31.) Clinical intervention for stabilization or diagnostic purposes is also not being done on crisis watches. (Dr. Stewart's testimony, Tr. 609-610.)

70.     IDOC is not complying with Administrative Directive 04.04.102 (Pl. Ex. 5, p. 8.) which requires that the daily evaluations assess the offenders' response to treatment efforts on crisis watches. (Dr. Stewart's testimony, Tr. 611:7-22.) Very little, if any, treatment occurs on crisis watches other than placement in the watch cell itself. (*Id.* at 611-12.)

71.     Dr. Stewart's opinion is that the Settlement Agreement's standards for crisis care are very minimal relative to standard mental health practices, but even those are not being implemented. (Dr. Stewart's testimony, Tr. 228:16-20.) He found that IDOC's practices with regard to crisis watches are not consistent with professional and accepted standards for mental health treatment. (*Id.* at 227:10-15, 611-12, 1095-96.)

72.     Frequently, there is no psychiatric evaluation of those on crisis watches or their medications. For example, in a review of 80 crisis watches, Dr. Stewart only found that 19 involved any sort of psychiatric contact. (Dr. Stewart's testimony, Tr. 223:20-224:14, 237:20-24, 641; Pl. Ex. 21, Midyear Report p. 44.) In the few cases where psychiatric contacts that did occur during crisis, Dr. Stewart's review found that psychiatry did not respond to indicia of greater need, such as multiple crisis admissions in a short period of time, or lengthy admissions, or

pending transfer to a residential treatment unit (RTU.) (Dr. Stewart's testimony, Tr. 224:23-225:1.)

73.     In the IDOC system, people in crisis receive a daily contact with a mental health professional (MHP.) These visits often occur at cell-front, which requires speaking through a solid door, often within earshot of other prisoners or staff. (Dr. Stewart's testimony, Tr. 75:14-18.) These cell-front checks are not mental health treatment or counseling sessions. (*Id.* at 225-26.)

74.     Dr. Hinton admits that cell-front discussions do not afford privacy or confidentiality, and that prisoners do not want others to overhear their mental health information. (Dr. Hinton's testimony, Tr. 379-380.)

75.     In the final quarter of 2017, a total of 232 Class Members spent more than ten days on watches: 132 mentally ill prisoners had at least one ten-day stay in crisis and another 100 spent ten days or more, cumulative, on watches in that period. (Dr. Stewart's testimony, Tr. 225:2-5; Pl. Ex. 22, Summary Chart.) Dr. Stewart's opinion is that the number of mentally ill prisoners in the IDOC having crisis stays greater than ten days is evidence of an inadequate mental health system. (Dr. Stewart's testimony, Tr. 228:11-19.)

76.     IDOC's Mental Health Procedures Manual states that "patients who remain on crisis treatment level of care after ten consecutive days will be considered for a higher level of care." (DX 49, p.31; Dr. Stewart's testimony, Tr. 602.) Depending on the individual, this could be to a residential treatment unit or to inpatient level of care. (Dr. Stewart's testimony, Tr. 603:15-22.)  The Manual states that the inpatient level of care "exceeds the level of care that the Department is able to provide at the outpatient or special RTU levels of care and results in

commitment to outside facilities for a duration considered clinically necessary by the patient's treatment team." (DX 49, p.31; Dr. Stewart's testimony, Tr. 604-605.)

77.     The Manual goes on to give a protocol for "enhanced treatment" to those who require an inpatient level of care. (Def's Ex. 49 at p.31-32.) Dr. Stewart was not aware of that "enhanced treatment" being provided to anyone in crisis, including the "significant number" of class members that he has reviewed who were on crisis watches for more than ten days. (Dr. Stewart's testimony, Tr. 607-608.) Dr. Stewart testified about ways of providing aggressive mental health treatment to those on crisis watches, including psychiatric care, counseling, out of cell time, and group therapy. (*Id.* at 1097-98.)

78.     Dr. Stewart testified that part of the reason why crisis stays last so long is that the IDOC is unable to transfer these individuals to the next higher level of care. For example, there is a backlog preventing transfers to RTUs and there is currently not an operational hospital. (Dr. Stewart's testimony, Tr. 228:19-229:17; Dr. Hinton's testimony, Tr. 344:16-23.)

79.     Two Class Members testified about their experiences on crisis watches. Both testified to the lack of needed mental health treatment and that their mental health deteriorated on crisis watch.

80.     Class Member Samuel Span testified that in October of 2017, he spent 28 consecutive days on crisis. (Mr. Span's testimony, Tr. 280:5-9.) Mr. Span testified that during that 28-day crisis stay, he shut down emotionally and socially and was no longer able to comprehend what was going on around him. He felt depressed most of the time, detached from reality, and started to hallucinate. Overall, he felt that his symptoms were aggravated to the point where they were almost unbearable (*Id.* at 283:7-14, 284:5-11, 285:22-286:4.) Mr. Span testified

that during that 28-day crisis stay, he had only two MHP visits in a confidential setting. (*Id.* at 282:18-21, 284:20-24.)

81.     Mr. Span did not see the psychiatrist while he was on crisis watches. (DX 28, Dr. Puga's reports of psychiatric visits with Mr. Span (under seal) on June 16, July 11, August 15, and November 28, 2017.)

82.     On December 18, 2017, Class Member Corrie Singleton testified that, with the exception of one day (November 27th), he had been on crisis watches since October 8, 2017. (Mr. Singleton's testimony, Tr. 400:1-21.) At the time of his testimony, Mr. Singleton was on "continuous watches" because he swallowed several batteries in a recent effort to kill himself. (*Id.* at 396-97, 406-07.) Mr.  Singleton testified that being in crisis cells for a long time "messes with him psychologically;" it takes a toll on his mind and makes him feel like he is about to die. (*Id.* at 405:3-10.)

83.     Mr. Singleton testified that the only property he had in his cell was a suicide blanket and a suicide smock; he did not have a mattress. (Mr. Singleton's testimony, Tr. 398:2-14.) In the week leading to his testimony, Mr. Singleton had only been able to wash and brush his teeth once. (*Id.* at 398:15-21.)

84.     Mr. Singleton testified that while he has been on crisis watches, he was taken out of his cell to meet with his psychiatrist, but has not had any confidential visits with an MHP or attended any treatment groups. (Mr. Singleton's testimony, Tr. 403:18-404:12.) Mr.  Singleton described his daily MHP visit as follows: the MHP asks how he is doing and whether he is suicidal or homicidal. Then they tell him whether his watch status will change (for example, if he will stay at continuous watch or go to 10 minute watch.) (*Id.* at 404:13-405:2.)

85.     That Mr. Singleton did not stabilize on crisis watches – and continued to self-harm and attempt suicide—even with weekly sessions with Dr. Puga, demonstrates that he needed a higher level of care. (Dr. Stewart's testimony, Tr. 1164:13-21.)

86.     Mr. Singleton testified that in the two months leading to his testimony, he had placed in four-point restraints seven or eight times, for time periods ranging from 4 hours to 72 hours. (Mr. Singleton's testimony, Tr. 401:5-16.) This means that he was tied to a bed by his arms and legs. (*Id.* at 401:19-25; Dr. Stewart's testimony, Tr. 98-99.)

87.     Mr. Singleton described that being in restraints is physically painful, with lower back and arm pain, cramps and charley horses. Emotionally, he testified that being in restraints feels like torture. He feels that he is being stripped of his life and dignity. He feels depressed; he hears voices; it is a nightmare that is never-ending. He further testified that being in restraints makes him distrustful of those who allow him to remain in this painful state for prolonged periods. (Mr. Singleton's testimony, Tr. 402:1-8, 405:3-406:8.)

88.     Mr. Singleton testified that when he is placed in restraints, his left arm is restrained above his head (his right arm is placed at his side because it is dislocated.) (Mr. Singleton's testimony, Tr. 401:17-25; 402:21-403:7.) Dr. Stewart personally observed that people are restrained with their arms above their heads at Pontiac Correctional Center, positioning which is unnecessary and particularly painful. (Dr. Stewart's testimony, Tr. 99.)[4]

89.     In the days and weeks following being in four-point restraints, Mr. Singleton did not received any increase in mental health treatment. (Mr. Singleton's testimony, Tr. 403:8-12.)

---

[4] It was only after this hearing, in approximately February 2018, that Pontiac stopped positioning restraints with arms above the head. IDOC states that they have issued a directive to all facilities that positioning restraints with arms above the head is now forbidden. (Dr. Hinton's testimony, Tr. 1361:4-5.)

90.     Dr. Stewart testified that restraints are being overused on those on crisis watches, especially at Pontiac, Logan and Dixon, because of the lack of adequate mental health treatment. (Dr. Stewart's testimony, Tr. 98:13-17; 100-101.)

*Required Treatment Planning of Class Members in Crisis*

91.     Section VII(c) of the Settlement Agreement provides that treatment plans for those in crisis will be reviewed and updated upon entrance and thereafter weekly or more frequently as clinically indicated and upon discharge. (Pl. Ex. 1, p. 9.)

92.     Given the acute presentation of mental illness of those in crisis, it is imperative that their treatment plans to be reviewed. (Dr. Stewart's testimony, Tr. 52:7-12.)

93.     Defendants are not in compliance with Section VII(c) of the Settlement Agreement. Defendants are not reviewing treatment plans when a prisoner is placed in crisis or during crisis, and they are not reviewing them upon discharge. (Dr. Stewart's testimony, Tr. 50:5-19, 51:12-16, 52:13-20, 54:1-11, 65:18-19; Pl. Ex. 21, Midyear Report p. 31.)

94.     Dr. Stewart has never seen a treatment plan updated during a crisis watch placement. (Dr. Stewart's testimony, Tr. 223:17-19.)

95.     For example, although Corrie Singleton was one of the few who had individualized treatment planning by his MHP (although not multidisciplinary) in 2017, but that ended when he went on crisis watches in October. (DX 54, Singleton 2017 Treatment Plans dated: March 6, 2017, July 7, September 18 and December 29, 2017). During the two months on crisis watches, when he was in acute need of aggressive treatment, he did not have any treatment plan and decompensated further, which resulted in more disciplinary tickets and frequent placements in four-point restraints. (Mr. Singleton's testimony, Tr. 396-404.)

96.     Defendants fail to update treatment plans after a person is discharged from crisis, instead they are returned to their prior treatment plan with no update to take into account the deterioration that led to the crisis, no assessment of why the crisis occurred or how future crises might be avoided. (Dr. Stewart's testimony, Tr. 52:21-54:11; 1099:13-25.) Defendants' new crisis treatment plan form does not fix this problem. (*Id.* at 93:24-94:15, 101:20-102:21: 612-14; DX 14, Revised Crisis Care Treatment Form 0377.)

*Transitions From Crisis*

97.     Section VIII(b)(1) of the Settlement Agreement requires that for five days following a crisis watch placement, MHPs assess stability on a daily basis. (Pl. Ex. 1, p. 10.) This provision recognizes that there is an adjustment period to coming off crisis during which the person is vulnerable. (Dr. Stewart's testimony, Tr. 230:18-31:4.) IDOC is only complying with this requirement of VIII(b)(1) in Stateville proper[5] and Menard. (Dr. Stewart's testimony, Tr. 231:5-9; Pl. Ex. 21, Midyear Report p. 35.)

98.     Section VIII(b)(1) also requires a follow-up suicide evaluation within seven days of discharge from crisis and then monthly thereafter for six months. (Pl. Ex. 1, p. 10.) Defendants are only conducting the first suicide evaluation, but are not continuing to assess monthly for six months. (Dr. Stewart's testimony, Tr. 232:23-233:8.)

99.     Defendants' failure to conduct necessary evaluations and assessments of those who are discharged from crisis watches results in unnecessary harm and suffering, especially as those failures combine with inadequate treatment planning and psychopharmacology. (Dr. Stewart's testimony, Tr. 231:10-23, 234:2-7.)

        **B.     Defendants' Response to the Lack of Mental Health Treatment for Those in Crisis**

---

[5] As opposed to Stateville Northern Reception Center (NRC), a receiving unit.

100.     In 2014, Dr. Patterson reported that inadequate treatment in crisis is attributable to lack of staffing and programs, including access to inpatient beds, residential treatment programs, outpatient treatment programs, short term crisis beds, and management cells for triage and evaluation of inmates who may be in acute crisis and may be in need of hospital beds. (Pl. Ex. 10, Patterson Annual Report, p. 7.) All of the deficiencies indicated by Dr. Patterson's report still exist today. (Dr. Hinton's testimony, Tr. 356:7-22.)

101.     Dr. Hinton admitted that he has no way of knowing whether his directives for appropriate crisis care treatment are being carried out by each facility. (Dr. Hinton's testimony, Tr. 327:1-329:1.) For example, an internal compliance reports revealed that at Robinson Correctional Center, staff was not notifying mental health staff of crisis issues, and that there was improper follow up (failure to complete form 377) and post-crisis review (failure to complete form 379.) (Dr. Hinton's testimony, Tr. 335:9-22, 336:3-20; Pl. Ex. 17, IDOC Healthcare Contract Monthly Performance Monitoring, p. 82.) Dr. Hinton admitted that although these services are critical to the delivery of mental health care to people in crisis, he did not initiate a corrective action plan after receiving the above report about Robinson Correctional Center, he has not seen a plan created by the facility itself, and he does not know if one exists. (Dr. Hinton's testimony, Tr. 336:15-25, 337:1-22.) It would have been the responsibility of Robinson's administrators—the same staff who failed in the first instance— to ensure that a corrective action plan was implemented. (*Id.* at 338:12-23.)

102.     Reports regarding failures to deliver necessary mental health services are maintained at the facilities only; IDOC does not collect data about its failure to provide mental health care in a central location. (Dr. Hinton's testimony, Tr. 338:4-7.)

103.     Nearly two years after Defendants were required to start treatment planning for those on crisis watches, in February 2018, Defendants revised Form 377 to add a section for a "crisis care treatment plan, which essentially copies the treatment plan boxes from Form 294 into the crisis record. (DX 14; Dr. Stewart's testimony, Tr. 95-96; Dr. Hinton's testimony, Tr. 1352-53.) The revised form does not address any issue about the quality of treatment planning for those on crisis. (Dr. Stewart's Testimony, Tr. 93:24-96:13, 631:10-14, 1100-1101, 1112-1113:10.) Dr. Stewart testified that the new form "still falls way short" of the meeting the requirements for treatment planning and care for those on crisis watches. (*Id.* at 568: 4-8, 570:2-18.)

104.     The revised Form 377 does not address the failure to conduct treatment planning upon discharge from crisis**.** Instead, it calls for reverting back to the same inadequate, pre-crisis treatment plan that allowed the prisoner to deteriorate in the first place. (Dr. Stewart's testimony, Tr. 102:7-21, 1101:17-25.) The revised Form 377 states "once crisis level of care is discontinued, this crisis treatment plan shall be considered complete, and the treatment plan previously listed in the medical chart shall resume . . . ." (Def. Ex. 14.)

## III.     SEGREGATION

### A.     Defendants' Failure to Provide Minimally Adequate Treatment Necessary to Withstand the Impact of Segregation

105.     Segregation refers to prisoner confinement in his or her cell for 22 or more hours a day. (Dr. Stewart's testimony, Tr. 103:9-104:5.) In the mental health profession, segregation is defined by the hours in cell, regardless of whether the housing unit is disciplinary segregation or other confinement. (*Id.* at 103-04.)

106.     For example, Class Member Samuel Span testified that most days he spends 24 hours a day in his segregation cell. (Mr. Span's testimony, Tr. 273:8-11.) He described that the

-27-

cell is "six by five" and allows him four paces from front to back. The width is shorter than his arm span. At 6'2'', he is able to touch the ceiling while standing. (*Id.* at 273:16-274:2.) The cell contains a bed, steel toilet, and steel sink, with no separation between the bed, toilet, and sink. (*Id.* at 274:3-8.)

107.    The literature demonstrates that in general, mentally ill prisoners are overrepresented in the segregation population in a prison. This is true in Illinois, where more than 80% of the prisoners in segregation are Rasho Class Members (897 out of 1105). (Pl. Ex. 22, Summary Chart.) In contrast, the approximately 200 non-mentally ill prisoners in segregation come out of a group of approximately 30,000. (Pl. Ex. 22, Summary Chart; Dr. Stewart's testimony, Tr. 104:14-19, 106:20-107:3; Dr. Hinton's testimony, Tr. 347:18-348:1.)

108.    The reason for the overrepresentation of mentally ill prisoners in segregation is that behavioral issues and disciplinary tickets tend to result from deteriorated mental health. Mental illness is exacerbated by isolation (segregation), which leads to more behavioral issues and disciplinary tickets. For those in segregation, in other words, their mental illness leads to behaviors that result in tickets which cause more segregation, and the cycle continues ad nauseam. (Dr. Stewart's testimony, Tr. 107: 4-21; Dr. Hinton's testimony, Tr. 348:2-8.)

109.    A person with a pre-existing mental illness placed in segregation for any amount of time will have an exacerbation of their pre-existing mental illness. For example, if someone has schizophrenia, their schizophrenia will become worse just by being in segregation. (Dr. Stewart's testimony, Tr. 109:14-20, 110:3-9.)

110.    Being in segregation also has cognitive impact, such as a degradation of coping mechanisms. Examples of behaviors that occur when coping mechanisms are degraded include

cutting, smearing feces, and throwing bodily fluids. (Dr. Stewart's testimony, Tr. 110:3-9, 110:24-112:5.)

111.    Being in segregation also leads to increases in self-harm and other acting-out behaviors. (Dr. Stewart's testimony, Tr. 109:21-110:9.) Self-harm, such as cutting, is a significant problem for mentally ill prisoners in segregation in Illinois. (*Id.* at 110:14-22.)

112.    Because of the detrimental impact of segregation, the National Commission on Correctional Health Care (NCCHC) considers 15 days to be long-term segregation.[6] (Dr. Stewart's testimony, Tr. 126:6-19.)

113.    Samuel Span testified that his mental health has worsened during the years that he has spent in segregation. He has started to have flashbacks of traumatic events in his life when he was screaming, crying, and begging. He visually experiences these flashbacks and hears them within his mind, and the flashbacks repeat over and over again. Mr. Span testified that he also experiences depression in his cell, he feels alone, like there is no one to help or understand him, and he is unable to focus on getting better. (Mr. Span's testimony, Tr. 277-278, 286 -287.)

114.    Corrie Singleton testified that he made multiple suicide attempts in the last several months because of the stress of returning to segregation. Mr. Singleton previously spent years in segregation, and described it as an ongoing nightmare. Segregation makes him feel like he is becoming a different person; it causes him to hallucinate, hear voices, and to want to kill himself and other people. The fact that Mr. Singleton's release date is coming up does not help him cope with segregation, and in fact, it worries him given his current condition. (Mr. Singleton's testimony, Tr. 396:11-17, 406-408.)

---

[6] https://www.ncchc.org/solitary-confinement

115.     Behavior that results in mentally ill prisoners being placed in segregation also often results in the loss of other privileges, such as yard time, groups, or TVs. These losses further contribute to a person's worsening mental illness. (Dr. Stewart's testimony, Tr. 117:17-118:20.) Mr. Span, for example, testified that he was under restrictions excluding him from yard, commissary, TV, and visitation. He stated that these restrictions have taken a "great mental toll" and that "Most days it makes me feel hopeless." (Mr. Span's testimony, Tr. 275:13-276:16.)

116.     Dr. Stewart testified that he has found exacerbation of mental illness in every Class Member in segregation that he has reviewed. (Dr. Stewart's testimony, Tr. 115:3-9.) As an example of the exacerbation of pre-existing mental illness, Dr. Stewart discussed a man at Pontiac who he had interviewed recently, in December 2017, and early, in June 2017, and had spent the intervening time in segregation. In the more recent interview, the prisoner described a "black spot" on the wall of his cell that was asking him for blood. The man had not presented with such a severe degree of psychosis in the previous interview. (*Id.* at 112:17-115:2.)

117.     Dr. Hinton agrees that IDOC is not providing the mandated treatment and out-of-cell time and, that without that treatment and out-of-cell time, those in segregation will "across the board" get worse. (Dr. Hinton's testimony, Tr. 349, 351)

118.     IDOC's treatment of mentally ill prisoners in segregation does not meet minimum professional standards and is failing to protect mentally ill prisoners who are decompensating in segregation. (Dr. Stewart's testimony, Tr. 208.)

119.     The lack of adequate mental health treatment in Illinois's segregation units has resulted in the overprescription of the crisis intervention team, overuse of crisis placement, frequent use of restraints, and frequent use of force. (Dr. Stewart's testimony, Tr. 128:21-129:3.) The facilities that use restraints the most are Pontiac, Logan, and Dixon. This corresponds to the

-30-

facilities that have segregation housing and also those places that have the most severely mentally ill prisoners. (*Id.* at 99:23-100:7, 116:19-117:9.)

120.    As a result of Defendants' violations of the Settlement Agreement's segregation provision and the inadequate mental health treatment system, Class Members are being harmed. (Dr. Stewart's testimony, Tr. 121:15-20; Dr. Hinton's testimony, Tr. 349:20-24.) They are suffering untreated mental illness, including increased depression, anxiety, and hallucinations, among other things. They are having behavioral difficulties, including self-injury. They are ending up further isolated in crisis cells. And they are subject to an increased use of restraints and use of force. (Dr. Stewart's testimony, Tr. 208:23-209:15.)

### The Settlement's Specific Treatment Requirements
### for Class Members in Segregation

121.    Defendants are not in compliance with the Settlement Agreement's requirement that mentally ill prisoners in segregation shall continue to receive, at a minimum, the treatment specified in their individual treatment plan with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. (Pl. Ex. 1, p. 17, 19 (Sections XV(a)(iii.), XV(a)(vi)(A) and XV(c)(iii)(A)); Dr. Stewart's testimony, Tr. 119-121, 1141-42; Pl. Ex. 21, Midyear Report p. 62-63.)

122.    These requirements are consistent with professional standards that those with mental illness will require more mental health treatment in segregation than they do outside of segregation. (Dr. Stewart's testimony, Tr. 121:5-11.) Dr. Stewart has seen no evidence of this standard being met in Illinois. (*Id.* at 120:2-15.)

123.    Without the required mental health treatment, Class Members in segregation are getting worse. They are decompensating, going into crisis, acting out and getting more

segregation time. (Dr. Stewart's testimony, Tr. 1139:15-25.) Dr. Stewart described that Class

Members in Illinois's segregation units are "some of the sickest individuals psychiatrically

that I've seen in my career, and I've only worked with seriously mentally ill. And these people

are just suffering immensely" and the level of urgency is "as serious as I've seen." (*Id.* at

1147:15 – 1148:4.)

124.    Defendants are not in compliance with the minimum requirements for

pharmacological treatment under Section XV(a)(vi)(C) and XV(c)(iii)(C). (Pl. Ex. 1, p. 17, 19;

Dr. Stewart's testimony, Tr. 122-23.) Dr. Stewart testified that the IDOC's medication

management for those in segregation is worse than for Class Members elsewhere in the system.

In particular, Dr. Stewart noted a significant problem in the failures to ensure that those in

segregation who are prescribed psychotropic medication actually take the medication. (Dr.

Stewart's testimony, Tr. 122:14-123:4; Pl. Ex. 21, Midyear Report, p. 64.)

125.    Defendants are not providing the necessary supportive counseling to Class

Members in segregation as required by the Sections XV(a)(vi)(D) and XV(c)(iii)(D). (Pl. Ex. 1,

Settlement Agreement pp. 17, 19; Dr. Stewart's testimony, Tr. 125:15-20, 126:20-127:2.) In his

midyear report, Dr. Stewart wrote that "the lack of counseling has contributed to the overuse and

potential burnout of the crisis intervention teams." (Pl. Ex. 21, Midyear Report, p. 64; Dr.

Stewart's testimony, Tr. 123:20-124:13.)

126.    Samuel Span, who had been in segregation for three years and two months,

testified that he had not been out of his cell for a counseling session in over a month. He was also

not seen in October because his therapist did not have time. (Mr. Span's testimony, Tr. 272:10-

11, 274:25-275:4, 278:18-279:10.) Corrie Singleton testified that he has not been out of his cell

for a counseling session since September 2017. (Mr. Singleton's testimony, Tr. 409:18-21.)

127.    Providing supportive counseling with a particular therapist is important in order to minimize the decompensation that occurs in segregation. (Dr. Stewart's testimony, Tr. 123:7-15.) It can also help to decrease acting-out behavior that leads to crisis placements. (Pl. Ex. 21, Midyear Report p. 64; Dr. Stewart's testimony, Tr. 124:21-125:11.) In California, for example, mentally ill prisoners in segregation receive daily rounds and a weekly confidential counseling session, as well as monthly visits from a psychiatrist. (Dr. Stewart's testimony, Tr. 127:3-16.)

128.    Defendants are not complying with Settlement requirements for participation in multidisciplinary team meetings once teams have been established. (Pl. Ex. 1, p. 17, 19 (Sections XV(a)(vi)(E) and XV(c)(iii)(E); Dr. Stewart's testimony, Tr. 129:8-12; Pl. Ex. 21, Midyear Report p. 64.) A multidisciplinary treatment team meeting would include all people involved in the patient's care, including the psychiatrist, psychologist, social worker, and behavioral health technicians. The team would discuss the case, conduct a group interview with the patient, and then formulate and implement a treatment plan. (Dr. Stewart's testimony, Tr. 129:13-130:1.)

*The Settlement's Out-of-Cell Time Requirements*

129.    Section XV(c) of the Settlement requires "mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time." The requirement for year two of the Settlement is six hours of structured and six hours of unstructured out of cell time per week. (Pl. Ex. 1, p. 20.)

130.    The Settlement Agreement's out of cell provisions do not begin until the prisoner has been in segregation for 60 days, but the American Psychiatric Association's position is that segregation terms for mentally ill prisoners should be as brief as possible and out of cell time should be provided during this time. (Dr. Stewart's testimony, Tr. 143:14-144:9.)

131.    In IDOC, structured out of cell time is generally provided via group therapy. (Dr. Stewart's testimony, Tr. 127:23-24.) Unstructured out of cell time is generally provided with yard or other recreation time, such as dayroom. (*Id.* at 127:24-128:1, 145:23-146:2.)

132.    Defendants are in violation of the structured out of cell time requirements. (Pl. Ex. 21, Midyear Report p. 65; Dr. Stewart's testimony, Tr. Tr. 136-142.)

133.    Out of cell time for mentally ill prisoners in segregation is necessary because interacting with other individuals and with professional staff helps prevent a more rapid decline in mental health status. (Dr. Stewart's testimony, Tr. 142:13-22.) Dr. Stewart recounted how multiple prisoners have informed him during interviews how they "hang on" from one group to the next. (*Id.* at 142:23-143:13.)

134.    As an example of Defendants' failure to comply with the structured out of cell time requirements, Dr. Stewart specifically noted that Pontiac was not running as many hours of group as are needed to ensure that all mentally ill prisoners in segregation receive six hours per week. In fact, the mental health supervisor at Pontiac informed Dr. Stewart in June of 2017 that due to inadequate staffing, they were only providing 1-2 hours per week. (Dr. Stewart's testimony, Tr. 136:14-139:17.) November 2017 staffing reports showed that since then (June), Pontiac's staffing for mental health professionals (MHPs; the staff members that run groups) decreased. (Dr. Stewart's testimony, Tr. 139:18-24; Pl. Ex. 23a, WHS Amended Restructure Plan Staffing Update, Nov 27, 2017; Pl. Ex. 23(b), WHS Amended Restructure Plan Staffing Update, June 23, 2017.)

135.    Dr. Stewart's monitoring team has found just one facility—Pinckneyville—with documented evidence that mentally ill prisoners are actually receiving and attending the required number of structured out of cell time hours. (Dr. Stewart's testimony, Tr. 131:18-24.)

136.     Dr. Stewart explained that the difference between offering out of cell time and prisoners receiving out of cell time is significant. An inmate's refusal to participate in a structured or unstructured activity can be a reflection of worsening mental illness. (Dr. Stewart's testimony, Tr. 131:25-132:9.)

137.     Dr. Stewart's midyear report states that for prisoners at Dixon X house, only about 50% of eligible prisoners took advantage of offered out of cell time. (Pl. Ex. 21, Midyear Report p. 65-66.) Dr. Stewart's interpretation of the above refusal rate is that these prisoners are too mentally ill to take advantage of the opportunities, which can be a manifestation of learned helplessness (where the person cannot even fathom a way to get better), which is one of the cognitive distortions that results from segregation. (Dr. Stewart's testimony, Tr. 132:16-133:16, 133:25-135:1.)

138.     Samuel Span testified that on any given day, he spends "basically 24 hours" in his cell and that he not had any groups within the last month. Even when he was getting groups, it was not six hours per week. (Mr. Span's testimony, Tr. 273:8-11, 275:5-6, 279:11-23.) Mr. Span has been placed on "yard restriction" which violates the Settlement Agreement's requirement that all Class Members receive the requisite structured and unstructured out-of-cell time. (Pl. Ex. 36; Mr. Span's testimony, Tr. 1151:13 – 1152:2.)

139.     While in segregation, Mr. Span received many tickets for inappropriate non-violent conduct, which resulted in additional segregation time and privilege restrictions. (Dr. Puga's testimony, Tr. 1268:17-24; Pl. Ex. 36, Span disciplinary record, August-October 2017.) From July to October 2017, Mr. Span received seven tickets (for non-violent conduct), for which he received another 14 months of segregation, 19 months of "audio visual restriction", 5 months of yard restrictions and other privilege restrictions. (Pl. Ex. 36.)

140.     Dr. Puga testified that Mr. Span's behavioral issues in segregation have been discussed at the mental health treatment team meetings, but that he does not have time to work with his patient on coping with segregation. (Dr. Puga's testimony, Tr. 1268:17-24; 1269:3-14, 1274- 1275.) Similarly, making sure that Mr. Span received the out-of-cell time that he is entitled to under the Settlement Agreement was "not my responsibility" despite Dr. Puga's acknowledgment of the importance of that time to mental health in segregation. (*Id.* at 1262-63) Dr. Puga agrees that unstructured out of cell time, such as yard, absolutely has therapeutic benefit. (*Id.* at 1275:8-21.) Regarding whether he would want to know if his patients were routinely restricted from yard by security staff, Dr. Puga answered that he has not addressed that issue that because "the psychiatric need has been so great that I want to address the psychiatric need." (*Id.* at 1275:22 – 1276:9.)

141.     Dr. Puga was, however, a member Mr. Span's treatment team. (Dr. Puga's testimony, Tr. 1258:20-25.) Mr. Span's August 11, 2017 treatment plan provided that he would see the psychiatrist once a month for 15-30 minutes; see a MHP monthly for 30 minutes for counseling; and have audiovisual privileges as a "distracting coping skill to maintain stability." (Pl. Ex. 32 at bates no. Span MHTP000024-25; Dr. Puga's testimony, Tr. 1265-1266.) Because security staff placed him on AV restriction, Mr. Span does not have a television in his cell – where he spends all day most days—despite that provision for one in his mental health treatment plan. (Dr. Puga's testimony, Tr. 1268:14-16; Mr. Span's testimony, Tr. 276.)

*The Settlements Requirements for Review & Evaluation of Those in Segregation*

142.     The Settlement Agreement contains several terms that require mental health staff to regularly review, monitor and evaluate Class Members in segregation. Section XV(a)(iv) requires review mentally ill prisoners within 48 hours after initial placement in segregation and

-36-

Section VII(c) requires that treatment plans are reviewed and updated within seven days of placement and then monthly thereafter. (Pl. Ex. 1, p. 9, 17.)

143.    Defendants are not complying with those provisions. As to the 48 hour evaluation (Sect. XV(a)(iv)), Dr. Stewart's found that only 36% of Class Members were evaluated as required. (Dr. Stewart's testimony, Tr. 148:1-22; Pl. Ex. 21, Midyear Report p. 62.) As to the Treatment Plan reviews (Section VII(c)) Dr. Stewart found that Dixon, Menard, Pontiac, Pinckneyville, and Stateville proper were not complying with this provision at all and other medium security facilities including Big Muddy, Hill, Lawrence, and Robinson had only 22% compliance. (Dr. Stewart's testimony, Tr. 150:21-151:23; Pl. Ex. 21, Midyear Report p. 32.)

144.    These provisions are intended to provide evaluations necessary to monitor and respond to deterioration in mental illness. (Dr. Stewart's testimony, Tr. 147.) The failure to do so has profound and dangerous effects  – the loss of the opportunity to intervene before harmful effects of segregation start to occur, such as behavioral acting out, cutting, engaging in untoward behavior that can result in more segregation time, or needing a crisis unit. (*Id.* at 148:25-149:11; Tr. 152:13-23, 1140:7-20.)

145.    IDOC's failure to comply with both XV(a)(iv) and VII(c) evidences that Class Members in the IDOC are not being routinely evaluated for the harmful effects of segregation. (Dr. Stewart's testimony, Tr. 151:24-152:12.) Outside of these two intended mechanisms within the Settlement Agreement, Dr. Stewart has not seen any other regular formal procedure to achieve routine monitoring. (*Id.* at 205-207, 121-122.)

146.    In a functioning system, if the regular assessments and reviews revealed that a prisoner with mental illness was deteriorating in segregation, Section XV(a)(vii) of the Settlement Agreement allows for MHPs to facilitate the relocation of that prisoner out of

segregation to a crisis or higher level of care. (Pl. Ex. 1, p. 18; Dr. Stewart's testimony, Tr. 205:3-10.) However, in IDOC, due to the above-described violations, there is no mechanism to identify those who should be removed from segregation due to the above described inadequacies until or unless they self-report as being in crisis.  (Pl. Ex. 21, Midyear Report p. 66; Dr. Stewart's testimony, Tr. 207-208.)

147.    Dr. Stewart has found that a significant number of mentally ill prisoners in the IDOC cycle from segregation to crisis watches and back into segregation. (Dr. Stewart's testimony, Tr. 234:8-12; Pl. Ex. 21, Midyear Report p. 66-67.) For example, Corrie Singleton is currently in segregation for disciplinary tickets that he received while on crisis watch. (Mr. Singleton's testimony, Tr. 399:22-25.) Similarly, a young man who committed suicide on October 27, 2017, had cycled between crisis and segregation in the months leading to his death. (Dr. Stewart's testimony, Tr. 73:24-74:2, 75:19-23).[7]

## B.  Defendants' Response to the Segregation Failures

148.    Defendants have not submitted any plan to address the inadequacies in the mental health treatment system for segregation. (Dr. Stewart's testimony, Tr. 209:16-20.) Defendants have not proposed any plan to comply with the settlement's requirement to provide enhanced treatment in segregation to protect against decompensation. (*Id.* at 1143:3-15.)

149.    Defendants' only action—other than Wexford's continuing recruitment efforts— have been inadequate. They have switched to using BHT to perform segregation rounds in order to free up some time for MHPs to perform other work. However, that change alone—absent an

---

[7] Following the December 18-19 hearing, Plaintiffs' counsel received reports from Class Members about another suicide. Defendants have confirmed that a Class Member at Lawrence Correctional Center committed suicide on December 1, 2017. Records show that this twenty-one year-old man had also cycled between segregation and crisis in the months leading to his death.

increase in staffing—only allows for a few additional groups and is not sufficient to achieve compliance with scope of violations at issue. (Dr. Stewart's testimony, Tr. 141:25-142:6.)

150.    Dr. Hinton knows that mentally ill prisoners in segregation – "across the board" – will decompensate without access to mental health treatment (including psychiatric care and groups), but IDOC does not collect data in a centralized way to know which mentally ill prisoners in segregation are getting the mental health treatment that they need. (Dr. Hinton's testimony, Tr. 349, 351.)

151.    IDOC did introduce testimony at trial of a new spreadsheet to track individual out-of-cell time in segregation, which was implemented in January 2018 with the first data set to be produced to the Monitor in April. (Dr. Stewart's testimony, Tr. 1148:10-18.) This is something that the Monitor has been asking for since August 2016. (*Id.* at 1148:21 – 1149:9.) The out-of-cell time at issue has been required by the settlement since May 2016. (*Id.* at 1149:10-17.)

152.    The new spreadsheet tracks whether individuals in segregation are receiving out-of-cell time. It does not address, and Defendants have not submitted, what will be done with that information or how failures will be addressed. (Dr. Stewart's testimony, Tr. 1150: 19-20.)

IV.    **TREATMENT PLANNING**

153.    A treatment plan is a document that guides the provision of care for an individual patient. (Dr. Stewart's testimony, Tr. 40:5-9; Dr. Hinton's testimony, Tr. 1395:14.) According to the NCCHC standards, the treatment plan specifies a patient's particular course of therapy and the role of their treatment team members in carrying it out; it must be individualized and should include the treatment goals and activities. (Dr. Stewart's testimony, Tr. 43, 64:7-12, 66-67; Pl. Ex. 14, NCCHC Mental Health Standards, p. 107.)

154.    A treatment plan is a dynamic document; to guide the treatment it needs to be constantly modified based upon a patient's response to treatment and symptom presentation. (Dr. Stewart's testimony, Tr. 42: 14-43:13, 1047:16-25; *see also* Pl. Ex. 1, Settlement Agreement, p. 9-10 (requiring that treatment plan reviews "shall assess the progress of documented treatment goals.").)

155.    Given the complex nature of psychiatric treatment, which includes medical, psychosocial, and/or behavioral interventions, treatment plans need to include input from a multidisciplinary team of mental health professionals, as well as the cooperation of the patient, where possible, to ensure a comprehensive plan. (Dr. Stewart's testimony, Tr. 40-41, 44:1-10, 62:7-12.)

156.    Treatment planning is a necessary component of a mental health treatment system. (Dr. Stewart's testimony, Tr. 576:10-16 (although treatment planning takes staff time away from providing care to patients, "it's done because of the acknowledgement of how important it is and how basic it is to quality of care."), 1070:17-22 ("It's not taking time out of the schedule because that's part of their duties.").) Dr. Hinton agrees that the treatment planning is "very important function to mental health service delivery" and is a "must" under the Mental Health Protocols. (Dr. Hinton's testimony, Tr. 1320:18-21, 1388:18-23, 1394.)

A.      **IDOC's Treatment Plans Fail In Quality and Do Not Meet Minimum Standards of Care**

157.    IDOC's treatment planning fails to meet the most basic, minimal standard of care. (Dr. Stewart's testimony, Tr. 1053-54.) The treatment plans in IDOC are not helpful and do not facilitate the provision of mental health care; the forms are completed more as an administrative requirement and not true treatment planning. (*Id.* at 53:9-10, 23-25, 54:23-55:13, 56:14-16; 561:14-16.)  The treatment plans in IDOC are boilerplate, frequently giving identical boilerplate

treatment intervention for prisoners with vastly different treatment needs, and without

responding to changes in their stability or conditions. (*Id.* at 1044-47.)

158.    The treatment plans of "Tyler," a class member who committed suicide in

October 2017, were not individualized and did not facilitate the care that IDOC knew he needed.

Tyler had two serious suicide attempts (prior to his suicide) following which IDOC conducted

"psychological autopsies" to analyze what happened. The conclusion from both was that Tyler

had a need for individual therapy. Tyler's psychiatrist had also noted that Tyler needed

individual therapy. Yet even after these three explicit recommendations for a patient who was

actively suicidal, Tyler's updated treatment plans never provided for individual counseling.

Instead, his treatment plans contained the same boilerplate language as Dr. Stewart has seen in

many others. (Dr. Stewart's testimony, Tr. 68:19-71:25, 75:25-90:23; Pl. Ex. 25, Tyler's 2017

treatment plans.)

159.    Tyler's treatment plans did not satisfy any psychiatric standard of care, especially

because they showed no changes or interventions in response to his ongoing suicidal ideation and

actions. (Dr. Stewart's testimony, Tr. 89:21-90:8.)

160.    Under NCCHC standards, treatment plans should include relapse prevention and

risk management strategies. (Dr. Stewart's testimony, Tr. 64:17-65:4; Pl. Ex. 14, NCCHC

Mental Health Standards, p. 108.) Treatment plans in the IDOC do not address relapse

prevention. (Dr. Stewart's testimony, Tr. 65:5-8.)

161.    IDOC uses Form 284 for its treatment plans. (Dr. Stewart's testimony, Tr. 55:14-

16.) Dr. Stewart often sees multiple sections of Form 284 left blank for no reason. (Dr. Stewart's

testimony, Tr. 55-56.)  Defendants' own recent quality review process found significant

deficiencies in the treatment plans, with a compliance rate of 35% across the system. (Pl. Ex. 35b; Dr. Hinton's testimony, Tr. 1396:2-10.)

162.     Sections VII (a) & (b) of the Settlement Agreement require that the mental health treatment team collectively create a treatment plan for any prisoner requiring on-going outpatient, inpatient, or residential mental health services. (Pl. Ex. 1, p. 9-10.)

163.     IDOC is only "collectively" preparing treatment plans at the Dixon Special Treatment Center ("STC"). Collective treatment planning means that every member of the multidisciplinary team meets together with their patient to create the plan. Separate submissions of treatment plan forms by different professionals or professionals signing the treatment plan at different times, without collaborations, is not considered collective preparation. (Dr. Stewart's testimony, Tr. 56:17-58:10, 1048-49, 1052-53.) The separate submissions of treatment plans by different members of the treatment team often result in plans with competing and incongruous diagnoses. (*Id.* at 55:21-25, 56:4-13.)

164.     IDOC's failure to do collective treatment planning is harming class members. For example, indices of decompensation, such as restraints and use force, occur more frequently in facilities like Pontiac that do not collectively prepare treatment plans. (Dr. Stewart's testimony, Tr. 59:24-60:13, 1053.) Another consequence is that if MHPs are not aware of psychiatric treatment, then they cannot effectively monitor medication compliance. (*Id.* at 60:14-62:12)

### B.     IDOC Has Violated the Settlement's Requirement to Update Treatment Plans

165.     Section VII (c) of the Settlement Agreement requires that treatment plans be reviewed and updated on a regular basis. The frequency of required updates depends on the level of care, with more frequent reviews required for higher levels of care. For outpatient level of care, treatment plans shall be updated annually, or sooner if clinically updated. For RTU level of care,

treatment plans should be updated upon placement in RTU care and thereafter no less than once every two months, or more frequently if clinically indicated, and upon discharge from RTU level of care. For segregation status, treatment plans shall be reviewed and updated within seven days of placement on segregation and thereafter monthly, or more frequently if clinically indicated, and upon discharge from segregation status. For inpatient or crisis level of care, treatment plans shall be updated upon entrance into that status, weekly thereafter, or more frequently if clinically indicated, and then again upon discharge from that status. (Pl. Ex. 1, p. 9-10.)

166.    The Settlement Agreement's approach to treatment plan updates is consistent with professional mental health standards and practices and reflects that patients with more severe mental illness need more frequent reviews. (Dr. Stewart's testimony, Tr. 45:1-20.)

167.    The IDOC is not in compliance with Section VII(c.) (Pl. Ex. 21, Midyear Report p. 31-32; Dr. Stewart's testimony, Tr. 45-51.)

168.    At to the RTU level of care, IDOC is not updating or reviewing the treatment plans every two months other than at the Logan and Dixon RTU housing units. (Dr. Stewart's testimony, Tr. 46:8-20.)

169.    As to crisis level of care, IDOC admits that it has not done treatment planning for those on crisis watches. (Dr. Stewart's testimony, Tr. 49:18-51:4.) Dr. Stewart has never seen a patient chart that shows with an updated treatment plan during crisis watches. This means that IDOC is not updating treatment plans of those who are suicidal. (*Id.* at 51:6-16, 52:14-17, 65:9-19.)

170.    The IDOC is also not updating treatment plans upon discharge from crisis. (Dr. Stewart's testimony, Tr. 52:18-20, 54:1-11.) As a result, those who have deteriorated to the point

of crisis, simply resume the same treatment that allowed them to previously enter into crisis. (*Id.* at 52:21-53:25.)

171.    Neither Samuel Span (who was on crisis watches for the month of October) nor Corrie Singleton (who was on watches for October – December), had their treatment plans updated while on watches or at the time of their discharge. (Pl. Ex. 32, Span Treatment Plans and DX 54, Singleton Treatment Plans.) When Mr. Singleton received a new treatment plan on December 29, 2017 (after discharge from crisis watches), it was identical to his September treatment plan with the exception of the MHP's name and a hand-written note adding that he would now receive groups four times per week. (DX 54, compare September plan on pages 17-19 to the December plan on pages 24-26 (of the PDF). Similarly, Mr. Span's file shows that his treatment plan was not updated for 9 days following his discharge from crisis watches, and the update does not reflect his recent month long crisis placement. (Pl. Ex. 32.) Other than removing the allowance of his audiovisual privileges from the plan, Mr. Span's November treatment plan is identical to his August treatment plan. (Pl. Ex. 32, compare bates no. Span MHTP000024-25 to Span MHTP000030-31.)

172.    Regarding the requirement for a treatment plan review within seven days of entrance into segregation, the purpose is to evaluate how an individual is doing in a segregation setting and modify the treatment plan accordingly. (Dr. Stewart's testimony, Tr. 150:14-20.)

173.    Dr. Stewart found that in Dixon, Menard, Pontiac, Pickneyville, and Stateville, neither the seven day segregation treatment plan reviews nor monthly follow-up reviews were being conducted. (Dr. Stewart's testimony, Tr. 105:24-151:2; Pl. Ex. 21, Midyear Report p. 32.) At Big Muddy, Hill, Lawrence, and Robinson, the seven day segregation treatment plan reviews

and monthly follow-up reviews were performed in about 22% of the cases. (Dr. Stewart's testimony, Tr. 151: 3-5, Mid-Year Report, p. 32.)

174.    The segregation treatment plan reviews are important because mental illness will get worse in segregation; therefore, it is imperative to try to intervene to stop deterioration, and incidents of self-harm or behaviorally acting out, which will lead to more segregation time or crisis watches. (Dr. Stewart's testimony, Tr. 152: 13-22.) It can also lead to the increased use of restraints, as Mr. Singleton described.  (Dr. Stewart's testimony, Tr. 97:1-98:16, 101:5-16; Mr. Singleton's testimony, Tr. 401-403.)

### A.  Defendants' Response to the Treatment Planning Failures

175.    IDOC's response to the deficiencies in treatment planning does not reflect the urgency of the issue. (Dr. Stewart's testimony, Tr. 1057:15-18)

176.    From the December 2017 hearing to the March 1, 2018 hearing, the Monitor did not find any significant improvements in treatment planning. (Dr. Stewart's testimony, Tr. 1041:8-17.) The quality and timeliness of the treatment planning continued to be deficient. (*Id.*)

177.    IDOC has revised its Form 284 to allow treatment team members to separately review and sign off on a single form. (Dr. Hinton's testimony, Tr. 1333:10-17.) The new form was implemented in February 2018. (DX 13, Revised form 284; Dr. Hinton's testimony, Tr. 1324: 8-12.)

178.    While the new form should resolve the issue of competing forms in a single patient file, Dr. Stewart testified that he has reviewed cases where treatment team members signed off on the same form previously and that it has not resulted in coordinated, well-though-out care. (Dr. Stewart's testimony, Tr. 591-92.)

179.     The new form does not resolve the problems with treatment planning. (Dr. Stewart's testimony, Tr. 1042). Dr. Stewart testified that he approved the form because it was an improvement over the old form, so it was worth trying: "It can't get any worse. At least that's my hope." (*Id.* at 1042:22-25.)

180.     The new form does not include any space for accessing the patient's progress on their treatment. (Dr. Stewart's testimony, Tr. 596:10-14.) The new form does not include any assessment of relapse prevention or risk management for those who have gone into or come out of crisis. (*Id.* at 596:15-597:4.)

181.     The form does not address the lack of individualization of IDOC's treatment planning, which is not something that can be created by a form. (Dr. Stewart's testimony, Tr. 592:24- 593, 635: 13-25.) It is the interactive and dynamic process of treatment planning that provides for quality of care, not the form. (*Id.*)

182.     The IDOC asserts that during the summer of 2017 they provided increased training to improve the quality of treatment planning. (Dr. Stewart's testimony, Tr. 90:24-91:3.).) However, Dr. Stewart found no improvement in the quality of treatment plans following that training. (*Id.* at 91:5-8.)

183.     As of February 22, 2018, Defendants had a backlog of 606 Class Members in need of treatment plans. (DX 1A, Weekly MH Backlog Report.) While that backlog is a slight reduction from the start of these proceedings (from 780 in October 2017), there is no evidence that Defendants' data includes the treatment plan updates for segregation and crisis placements. (Dr. Stewart's testimony, Tr. 1091: 6-15.) Those updates are required by the Settlement but Defendants have violated those provisions entirely. (*Id.* at 51-52, 65, 150.)  Defendants failure to show that these required treatment plans are included in the data, despite that Defendants have

not been doing them, leads to the conclusion that the backlog of treatments is actually significantly higher.

## V.    TIMELY EVALUATIONS

184.    Section V(f) of the Settlement Agreement requires that evaluations resulting from a referral for routine mental health services be completed within fourteen days from the date of the referral. (Pl. Ex. 1, p. 8.)

185.    Fourteen days for a mental health evaluation to take place is a generous standard. (Dr. Stewart's testimony, Tr. 211:16-212:6.)

186.    The IDOC is not in compliance with Section V(f.) (Dr. Stewart's testimony, Tr. 213:10-12; Pl. Ex. 21, Midyear Report p. 25-26.)

187.    As of October 27, 2017, there was backlog of 445 for mental health evaluations. (DX 1, Weekly MH Backlog Report; Dr. Stewart's testimony, Tr. 213.) Between October 6 and 27, the backlog increased in Centralia, Dixon, and Pontiac. (Dr. Stewart's testimony, Tr. 213:7-22.)

188.    A backlog of 313 remains. (DX 1A, Weekly MH Backlog Report; Dr. Hinton's testimony, Tr. 1450:9-12.) Defendants' most current backlog data showed several facilities have mental health evaluations more than 60 days overdue: at Graham, 57 of 81 backlogged mental health evaluations were more than 60 days overdue. (DX 1A; Dr. Stewart's testimony, Tr. 1210:3-15.) At Pinckneyville, 23 of the 39 backlogged mental health evaluations were more than 60 days overdue. (*Id.*) At Western, 100 out of 119 backlogged mental health evaluations were more than 60 days overdue. (DX 1A.)

189.    The Defendants have not submitted any plan to address the backlog of mental health evaluations. (Dr. Stewart's testimony, Tr. 213:23-214:14.) Without increasing staffing

levels, Defendants cannot eliminate the backlog of mental health evaluations. Using BHTs to conduct segregation rounds to free up MHPs is not sufficient. (*Id.* at 217:25-218:20.)

*Hobson's Choice*

190.    Defendants have not submitted any plan to explain how the QMHPs can fulfill any of the important functions that IDOC now requires of them (including the mental health evaluations, treatment planning, counseling, groups, crisis care, and more) without sacrificing other of those functions. (Dr. Stewart's testimony, Tr. 1146, 1182:3 – 1183:20.)

191.    The fact that mental health professions staff have to chose to not perform one essential function in order to fulfill another means that Class Members are not receiving even the minimal care that they require. (Dr. Stewart's testimony, Tr. 1051:19 – 1052:10 ("It's not a choice. You need to do all of this.").)

192.    Dr. Stewart explained that at Pinckneyville, QMHPs responsible for conducting these evaluations were "overwhelmed by the workload." (Dr. Stewart's testimony, Tr. 1210:21-25.) He explained that each facility has to make decisions about how to devote their MHP time among the various functions. For example, Menard has only 13 backlogged mental health evaluations, but has a backlog of 213 for mental health follow-up appointments. (*Id.* at 1211:8-21.) Similarly, the recent data shows that many facilities have reduced their backlog of mental health evaluations substantially, but have high backlogs for treatment plans and/or evaluations, including Big Muddy, Centralia, Dixon, Graham, Hill, Illinois River, Lawrence, Menard, Pinckneyville, Pontiac, Vandalia and Western.  (Def. Ex. 1A, Feb. 23, 2018, MHP backlog breakdown).

193.    Dr. Sim likewise testified about the effort at Logan to reduce the backlog of mental health evaluations; they were able to do it, but only by prioritizing staff time on the

evaluations over other work, including the mental health treatment plans. (Dr. Sim's testimony 907:18 – 908:11.)

194.    In response to questions about how to deploy limited resources in order to best attack the backlog, Dr. Stewart testified: "We're talking about limited resources. Then in order to address the backlog, we're going to have to be taking from one column, put them in the other column so we're going to be hurting people in other areas." (Dr. Stewart's testimony, Tr. 1192:1-6). He added that Defendants focus on the backlog numbers does not address any concerns about the quality of treatment. (*Id.* at 1192:7-15.)

195.    To assess the totality of the delivery of mental health care by Wexford, one has to look at both the backlogs for the psychiatrists and the backlogs for the mental health professionals. (Ms. Cantorna's testimony, Tr. 981:8-13; Dr. Hinton's testimony, Tr. 1379:5-15.) That total is over 4000. (Pl Ex. 41, Dr. Hinton's testimony, Tr. 1379; DX1A.)

**VI.    Defendants' Response to the Violations Raised In These Proceedings**

196.    The dispute resolution process required by the Settlement Agreement, Sect. XXIX, began in June 2017 and completed in October 2017 when Plaintiffs filed the pending motion to enforce. (Pl. Ex. 16.) Throughout that process, Defendants' did not submit a comprehensive plan as required to address any of the five areas of violations at issue.  (*Id.*) The only IDOC proposals were small steps, insufficient relative to the scope or severity of the issues: (1) use of Behavioral Health Technicians (BHTs) to conduct the weekly segregation rounds, thereby freeing up QMHPs to offer additional mental health groups; (2) to use psychiatric nurse(s) to assist with medication management at Logan Correctional Center; and (3) expand telepsychiatry to decrease the outpatient psychiatric backlog, as set forth in Dr. Hinton's October 2, 2017 letter. (Pl. Exs. 16

and 19.) This minimal response failed to fulfill Defendants' obligation under the Settlement Agreement.

197.    At trial, Defendants described some additional recent efforts, which have been taken in the time since these proceedings began, to improve the tracking of data and compliance:

   a.  Amy Cantorna, a Wexford employee, described improvements that she implemented to tracking the backlog since taking on the role in November 2017. (Ms. Cantorna's testimony, Tr. 928-29975.) Ms. Cantorna also testified that, around end of summer 2017, she developed a new system to track follow-up appointments after crisis watches; although this system was not produced at trial or provided to the monitor. (*Id.* at 1000:21-1001:18, 1029:2-14; Dr. Stewart's testimony, Tr. 1104:10-16.)

   b.  Two weeks prior to the February 28th hearing, Wexford (via Ms. Cantorna) followed up on all facilities that still had backlogs of over 60 days. (*Id.* at 976-977). That same effort could have been made in November. (*Id.* at 1022:2-12.)

   c.  Dr. Sim testified that he started full time as the new statewide mental health quality improvement manager. (Dr. Sim's testimony, Tr. 831, 836-37.)

   d.  Dr. Sim's testified regarding a new audit tool that he has developed. (*Id.* at 848) The first quality control reports from that system were completed in January 2018. (*Id.* at 891:8-19.) Those reports show 64.2 compliance with mental health evaluations across the system. (Pl. Ex. 35C; Dr. Sim's testimony, Tr. 887; Dr. Hinton's testimony, Tr. 1375:20-25). For psychiatric services, the report showed a system-wide compliance rate of less than 50% (Pl. Ex. 35A; Dr. Sim's testimony, Tr. 888:19 – 889:9.) For mental health treatment plans, the report showed a

system-wide compliance rate of 47%. (Pl. Ex. 35B; Dr. Sim's testimony, Tr. 890:6-10.) Dr. Sim agreed that there are "serious deficiencies in the actual delivery of services." (Dr. Sim's testimony, Tr. 901:1-7.)

e.  DX 8A is a new spreadsheet to track individual out-of-cell time in segregation, which was implemented in January with the first data set to be produced to the Monitor in April. (Ms. Cantorn's testimony, Tr. 770; Dr. Stewart's testimony, Tr. 1148:10-18.) This is something that the Monitor has been asking for since August 2016. (Dr. Stewart's testimony, Tr. 1148:21 – 1149:9.) The out-of-cell time at issue has been required by the settlement since May 2016. (1149:10-17.)

198.    Tracking issues is not the same as dealing with the inadequacies. (Dr. Hinton's testimony, Tr. 1450:22 – 1451:6.) IDOC's new quality control program does not actually track the quality of mental health services being provided, it only tracks what treatment providers are reporting has been done and if the forms are being properly completed. (Mr. Sim's testimony, Tr. 898:22-899:9; Tr. 908.)

199.    Relating to the need for cultural changes among security staff, Dr. Hinton described a new training program called "Verbal Judo" but that is not yet in effect. (Dr. Hinton's testimony, Tr. 1458:11-16.)

200.    At trial, Defendants described some additional recent efforts, which have been taken in the time since the motion for injunctive relief was filed, to create or improve their forms related to their obligations under the Settlement Agreement:

a.  DX 2 is a bulletin issued on November 1, 2017, for the mental health professionals statewide describing the requirements for the five-day, seven-day

and monthly follow-ups required upon discharge from crisis watches. (DX2,

bulletin; Dr. Hinton's testimony, Tr. 1350:20 – 1351:19.)

b.   DX 13 is the Revised Treatment Plan (form 284), discussed in Paragraphs 177-82

above.

c.   DX 14 is revised form 377, which adds a section for treatment planning to the

crisis care form. (DX14, bulletin; Dr. Hinton's testimony, Tr.1352-53.) This form

was implemented in February 2018. (*Id.*)

d.   DX 15 is a draft confidentiality disclosure form, not yet implemented. (DX 15; Dr.

Hinton's testimony, Tr. 1357-58.)

e.   DX 17 is a new form, Crisis Watch Discharge Assessments, for MHPs to use

when conducting the five-day assessment following discharge from crisis watches.

(DX17; Dr. Hinton's testimony, Tr. 1355.) This form was issued in November

2017. The five-day assessment has been required by the Settlement Agreement,

Sect. VIII(b)(1) since May 2016. (Pl. Ex. 1, p. 10.)

f.   DX 33 is a form MHPs to make housing recommendations regarding SMI Class

Members. This form was implemented on February 1, 2018. (Dr. Hinton's

testimony, Tr. 1315:25-1316:13.) The Settlement Agreement's requirement

related to housing recommendations is not at issue in the pending motion.

g.   DX 47 is a draft of a brochure about medication side effects. (DX47; Dr. Hinton's

testimony, Tr. 1456:7-10; Dr. Stewart's testimony, Tr. 259.)

201.   Defendants presented evidence regarding its ongoing hiring efforts. Despite those

continued efforts, however, the Department has remained understaffed since 2013. (Ms.

Gedman's testimony, Tr. 505:20-22; Dr. Hinton's testimony, Tr. 1415:13-16.)

a.      IDOC agrees that it requires the entire allotment of staff set forth in its staffing plan to provide the care required. (Dr. Hinton's testimony, Tr. 1372:11-14; Pl. Ex. 9, IDOC's Proposed Remedial Plan, p. 17 ("this proposal identifies the clinical, security and administrative staff necessary to not only provide constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the creation of adequate levels of care").) The staffing plan is contained in Defendants' 2014 Remedial Plan (Pl. Ex. 9) and as set forth the staffing reports (DX 5 and Pl. Exs. 23(a)-23(d)).[8]

b.      Dr. Stewart testified that mental health staffing levels have been well below appropriate levels for the proper provision of care, as well as below the staffing levels previously agreed up by the parties. (Dr. Stewart's testimony, Tr. 544: 16-17, 617:7-21.)

c.      Plaintiffs' demonstrative summaries of the staffing reports show how Defendant have never reached the staffing levels required. (Pl. Exs. 23 and 39.)

d.      The difficulties hiring psychiatrists is not new; there is a longstanding nationwide shortage of psychiatrists. (Dr. Hinton's testimony, Tr. 1448:3-13.) That longstanding shortage of psychiatrists therefore requires a different approach to staffing medication management. (Dr. Stewart's testimony, Tr. 181:10- 1082:5, 1180:9 – 1181:5.) IDOC could hire multiple mid-level professionals for what it pays a single psychiatrist. (*Id.* at 181:19-21, 1144:11-24.)

202.    Finally, Defendants offered testimony regarding the construction at the new or expanded RTU facilities and an inpatient facility. That testimony relates to the provisions of the

---

[8] The Remedial Plan sets forth IDOC's approach to staffing for the entirety of the mental health system, as well as gives increases in staffing to support the RTU explanation. The latter, and the Settlement Agreement's requirements for the staffing increases for the RTU expansions, were not raised in the Motion to Enforce (which does not address the RTU explanation). Those provisions, under Sect. IX (a) have only recently begun to reach the due dates for the new RTUs (Dixon and Logan due in January 2018).

Settlement Agreement that are not raised in this motion, which relates to the provision of care at the existing facilities.

203.    Even with those construction efforts, Dr. Hinton testified that the IDOC system is still without an inpatient hospital. (Dr. Hinton's testimony, Tr. 317:25-318:2.) The Elgin inpatient facility will only, eventually, serve 44 Class Members; it is an interim solution to IDOC's lack of a psychiatric hospital. (Ms. Taylor's testimony, Tr. 719:10-14.)

204.    The IDOC system has too few RTU (residential treatment unit) beds for those in need of a higher level of care. (Dr. Hinton's testimony, Tr. 1396-1397.) Even with the eventual completion and opening of those new RTU facilities, IDOC will still require a system to provide comprehensive mental health care to the thousands of class members who remain in non-RTU facilities, including those in segregation and on crisis watches, and to provide the needed mental and psychiatric care at outpatient facilities throughout the state. (Dr. Stewart's testimony, Tr. 588-89: 14-19.)

205.    Dr. Hinton testified that they are building a mental health treatment system but would not or could not say when that system would be complete. It will be complete when the services are being properly provided. (Dr. Hinton's testimony, Tr. 1409:22-1410:4, 1410:17-22.) In the meantime, more than 12,000 people require care.

RESPECTFULLY SUBMITTED,

By:     /s/ Amanda Antholt
One of the attorneys for Plaintiffs

Harold C. Hirshman (ARDC# 1226290)
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL  60606
Telephone: (312) 876-8000
Facsimile:  (312) 876-7934
harold.hirshman@dentons.com

Alan Mills
Nicole Schult
Uptown People's Law Center
4413 N Sheridan
Chicago, IL  60640
(773) 769-1410 (phone)
alan@uplcchicago.org
Nicole@uplcchicago.org

Marc R. Kadish
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL  60606
(312) 701-8747 (phone)
(312) 706-8774 (fax)
mkadish@mayerbrown.com

Barry C. Taylor
Laura J. Miller
Amanda Antholt
Equip for Equality, Inc.
Suite 300
20 N. Michigan Ave.
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 541-7544 (fax)
barryt@equipforequality.org
laura@equipforequality.org
amanda@equipforequality.org