E-FILED
Friday, 06 April, 2018 06:18:17 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| ASHOOR RASHO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:07-CV-1298-MMM-JEH |
| | ) | |
| v. | ) | Judge Michael M. Mihm |
| | ) | |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PROPOSED CONCLUSIONS OF LAW**

## I.  THE VIOLATIONS

### A.    Defendants Are In Violation of The Settlement Agreement.

1.    The evidence at the hearing held on December 18-19, 2017, and February 28-March 2, 2018, demonstrates that Defendants have substantially violated material terms of the Settlement Agreement, causing severe and ongoing harm to Class Members. Defendants have admitted -- or not presented evidence disputing -- many, if not all, of those violations.

2.    With regard to the provision of medication management, the Court finds that Defendants have violated each of the following sections of the Settlement Agreement: sections VII(d) and  XII(b) requiring timely evaluation and follow-up (Proposed Findings of Facts ("PFOF") ¶¶ 17-20, 29-30); section XII(c)(i) requiring procedures for medication administration (PFOF ¶ 47-48); section XII(c)(ii) requiring charting of medication efficacy and side-effects (PFOF ¶¶ 37-38); section XII(c)(iii) requiring implementation of protocols to ascertain side-effects of psychotropic medications (PFOF ¶¶ 39-40, 42, 44-45); sections XII(c)(v) and XIX(d) requiring informed consent (PFOF ¶ 49); and section XII(c)(vi) requiring follow-up to medication non-compliance (PFOF ¶¶ 34-35).

1

3.      With regard to the provision of mental health treatment for Class Members in crisis, the Court finds that Defendants have violated the following sections of the Settlement Agreement: section II(e) requiring the provision of short-term, aggressive mental health intervention designed to stabilize and reduce the acute presenting symptoms (PFOF ¶¶ 66-75, 80-85) and section VIII(b)(i) requiring follow-up assessments and evaluations after discharge from crisis watches (PFOF ¶¶ 97-99).

4.      With regard to the treatment of Class Members in segregation, the Court finds that Defendants are in violation of the following sections of the Settlement Agreement: section XV(a)(iii) requiring continuation, at a minimum, of the treatment required in their Treatment Plan (PFOF ¶¶ 118-121); section XV(a)(vi)(c)(iii) requiring enhanced treatment if necessary to prevent decompensation, supportive counseling by MHP as indicated in the Treatment Plan, participation in multidisciplinary team meetings, and weekly unstructured out of cell time (PFOF ¶¶ 117, 121-125, 128); section XV(c) requiring six (6) hours of structured out of cell time per week  (in additon to the required unstructured out of cell time) for mentally ill individuals in segregation for longer than sixty (60) days (PFOF ¶¶ 117, 132, 137-138); section  XV(a)(iv) requiring an MHP review within forty-eight (48) days of placement in segregation (PFOF ¶¶ 143, 145); and  section XV(a)(vii)/(c)(v) requiring that if any time an MHP determines that a mentally ill individual in segregation is decompensating due to the conditions of segregation, that individual shall be recommended to be moved out of segregation and to a higher level of care (PFOF ¶¶118, 146-147).

5.      With regard to the provision of mental health treatment planning for Class Members in segregation, crisis, and/or residential treatment unit level of care, the Court finds that Defendants are in violation of the following sections of the Settlement Agreement: section

VII(a) requiring that any individual on the mental health case load have a collectively prepared mental health treatment plan (PFOF ¶¶ 157, 161, 163-164); section VII(b) requiring the provision of individual treatment plans (PFOF ¶¶ 157-158); and section VII(c) requiring regular updates to individual Treatment Plans for Class Members on crisis watches, in segregation or at the RTU level of care (PFOF ¶¶ 93-96, 167-171, 173).

6.      With regard to the provision of timely mental health evaluations for Class Members, the Court finds that Defendants are in violation of section V(f) requiring that evaluations resulting from a referral for routine mental health services be completed within fourteen (14) days from the date of the referral. (PFOF ¶186).

### B.      Defendants Ongoing Failures to Provide Adequate Mental Health Treatment Violate the 8th Amendment

7.      To establish a violation of the Eighth Amendment, Plaintiffs must prove that Defendants have been deliberately indifferent to their serious mental health needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted). To evaluate whether a claim of deliberate indifference to serious medical needs rises to the level of an Eighth Amendment violation, courts use a two-part test, looking both to an objective component, which is the seriousness of the need, and a subjective component, which is the conduct of the officials in response to that need. *Greeno v. Daley,* 414 F. 3d 645, 653 (7th Cir. 2005).

### (1)      The Objective Component – Seriousness of Condition and Resulting Harm

8.      "A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir.

2011)(quoting *Greeno*, 414 F.3d at 653). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

9.      Class Members have objectively serious psychiatric conditions for which they have been diagnosed as requiring treatment. The failure to provide that treatment can cause further injury and severe, unnecessary pain and suffering. For prisoners who require mental health treatment, the failures of treatment in the five targeted areas—segregation, crisis, medication management, treatment planning, and timely mental health evaluations—cause inevitable suffering and create an unacceptable risk of further injury. (PFOF ¶¶ 24-25, 32, 43-44, 68, 75, 80-87, 99, 113-117, 119-120, 123, 158, 164, 191). Overwhelming evidence of Class Members being injured and suffering unnecessarily from untreated or poorly treated mental illness has been presented at trial, including evidence of mental decompensation, paranoia, anguish, anxiety, depression, hallucinations, medication side-effects, and self-harm. (PFOF ¶¶ 6, 24-25, 32, 38-40, 68, 113-114, 120, 123, 164).

10.      The five areas of violations frequently overlap in their consequence to Class Members. (PFOF ¶¶ 5-6). The failure to do proper treatment planning can lead to problems in medication management. (PFOF ¶¶ 24, 163-165) or problems in the provision of appropriate care (PFOF ¶¶ 72, 96, 141, 147, 153-54, 156, 158). The failure to provide appropriate medication management or other needed treatment, then leads to decompensation. (PFOF ¶¶ 32, 119, 123-124, 156, 158). Because behavioral issues and self-harm frequently arise from mental health decompensation in prison, these Class Members may go to disciplinary segregation or may be placed on crisis watches. (PFOF ¶¶ 108-115, 139). The isolation of segregation and crisis

4

watches can further exacerbate the mental illness, leading to further physical and mental health harm. (PFOF ¶¶ 108-111). The lack of adequate therapeutic treatment in both crisis and segregation has profound impact prisoners in those restrictive environments with mental illness. (PFOF ¶¶ 108-114, 123, 127). Those on crisis watches may be kept physically safe, but their psychiatric condition is worsened by failure to treat their acute deterioration. (PFOF ¶¶ 66-68). In segregation, the Monitor has found Illinois's mentally ill prisoners to be the most psychiatrically worse-off that he has seen in his career, they are "suffering immensely" and the level of urgency is severe. (PFOF ¶ 123).

11.     Defendants admit that Class Members are suffering and in pain because they are not receiving the psychiatric care that they require. (PFOF ¶¶ 2, 8).

12.     The Court finds that Defendants' failure to provide adequate medication management for Class Members creates actual harm, a substantial risk of future serious harm, and unnecessary suffering in the form of untreated mental illness, harmful side effects, increased incidence of restraints, use of force, self-harm, crisis, and segregation

13.     The Court finds that Defendants' failure to provide mental health treatment for Class Members in crisis creates actual harm, a substantial risk of future serious harm, and unnecessary suffering in the form of untreated mental illness, decompensation, increased incidence of self-harm, restraints, use of force, and more time in crisis.

14.     The Court finds that Defendants' failure to provide adequate mental health treatment for Class Members in segregation creates actual harm, a substantial risk of future serious harm, and unnecessary suffering in the form of untreated mental illness, decompensation, mental and physical pain, and increased incidence of self-harm, restraints, crisis, and more segregation.

15.     The Court finds that Defendants' failure to conduct proper treatment planning for Class Members creates actual harm, a substantial risk of future serious harm, and unnecessary suffering in the form of untreated mental illness, self-harm, use of force, crisis, and segregation.

16.     The Court finds that the combined failures in these five areas (medication management, treatment planning, mental health evaluation, and treatment to those in crisis and segregation) creates actual harm and places Class Members at substantial risk of future serious harm, and unnecessary suffering in the form of untreated mental illness, decompensation, medication side effects, and increased incidence of self-harm, restraints, use of force, crisis, and segregation.

### (2)     Subjective Component – Deliberate Indifference

17.     The subjective component requires a plaintiff to "provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016), *cert.den.*, 137 S. Ct. 1578 (2017). In *Petties,* the Court explained that the subjective requirement of deliberate indifference does not require proof of actual intent to harm. *Id.* at 728 ("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!' Most cases turn on circumstantial evidence …"). The Court then discussed the many ways that deliberate indifference can be established in individual cases, many of which also apply here, including continuing in a harmful course of conduct; treatment decisions that constitute a "substantial departure from accepted professional judgment, practice, or standards"; failing to follow an existing protocol; persisting in a course of treatment known to be ineffective; and inexplicable delay in treatment which serves no penological interest. *Id.* 729-30.

18.     In systemic cases, the subjective component of deliberate indifference "can be demonstrated by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983); *see also Phillips v. Sheriff v. Cook County*, 828 F.3d 541, 554 (7th Cir. 2016) (quoting and relying on *Wellman*). In *Coleman v. Wilson*, 912 F. Supp. 1282, 1304 (E.D. Cal. 1995)*,* the court found that this standard was met where, like here, "defendants have known for years of the gross deficiencies in the provision of mental health care to inmates incarcerated in the CDC, and that they have failed to take reasonable steps to avert the obvious risk of harm to mentally ill inmates that flows from the failure to remedy those deficiencies."

19.     In *Indiana Protection and Advocacy Services Commission v. Commissioner, Indiana Department of Corrections*, 2012 WL 6738517, at *23 (S.D. Ind. 2012), the court found defendants were deliberately indifferent where they failed to provide "minimally adequate mental health care in terms of scope, intensity, and duration" to mentally ill prisoners in segregation. *See also Balla v. Idaho State Bd. of Corrections*, 595 F. Supp.1558, 1577 (D. Idaho 1984) (where psychiatric care consists almost solely of "[w]holesale prescription of psychiatric drugs," "[i]t represents a deliberate indifference to the serious medical needs of the inmates."); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1251-52 (M.D. Ala. 2017)  (In "challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference" and "repeated examples of negligent conduct support an inference of systemic disregard for the risk of harm facing mentally ill prisoners.").

20.     Evidence demonstrating repeated notice to Defendants of systemic failures in the mental health treatment in the five targeted issues began with the Cohen Report in 2012. (PFOF ¶ 14). It continued with Dr. Patterson's reports in 2013-2015, warning of substantial harm to Class Members. (PFOF ¶ 11-15). In 2016-2017, Dr. Dempsey, during his tenure as Chief of Psychiatry, notified IDOC of the systemic mismanagement of psychiatric medications. (PFOF ¶¶ 27-28). Dr. Stewart's reports, beginning in May 2017 and continuing with his October 1, 2017, emergency letter, warned again that Class Members were suffering and being harmed. (Pl. Exs. 15, 18, and 21; PFOF ¶ 7).

21.     Dr. Hinton, who has been the Chief of Mental Health throughout the tenure of this case, admits that IDOC knows of the ongoing harms to Class Members today and going back to 2013. (PFOF ¶¶ 6, 15-16, 22).

22.     Defendants' own 2014 Remedial Plan acknowledged that IDOC had to increase staffing levels throughout its system (to fill and retain budgeted but vacant clinical staff positions) in order to meet the minimum standards of care required by the Settlement Agreement and to provide "constitutionally adequate care." (PFOF ¶¶ 12-15, 21, 201(a)).  The 2014 Plan represented the number of positions that IDOC believed necessary in order to meet the requirements of the Settlement Agreement and to provide the needed care to Class Members. (PFOF ¶¶ 21, 204).  IDOC's staffing, however, continues to fall short (PFOF ¶¶ 16, 18, 190, 201).

23.     As a result, IDOC has had significant backlogs in psychiatric and mental health services for years. (PFOF ¶¶ 19, 187-188, 195, 201). The Monitor, Defendants' Chief of Mental Health, and Defendants' mental health services provider (Wexford) all testified that IDOC has not provided the psychiatric care required by the Settlement Agreement due to inadequate

staffing levels; without the staff they simply cannot supply the hours required to provide the care needed. (PFOF ¶¶ 18, 21, 189, 201(a)). Today, the psychiatric backlog – which increased significantly after the Settlement Agreement and then decreased after the initiation of these proceedings – is at the same level as it was in 2014 when IDOC and Dr. Patterson both reported that adequate and necessary mental health care was not being provided. (PFOF ¶¶ 19-21, 51).

24.     Defendants have had many opportunities throughout this long litigation, and more recently following the Settlement Agreement, to take action to protect Class Members from immense suffering, actual harm, and risks of future harm. At each turn, however, they have failed to do so. As of this date, although Defendants contend that they are trying to hire and retain more mental health staff, they have not proposed a credible plan that will enable them to meet even the 2014 staffing levels, or otherwise provide adequate care. (PFOF ¶¶ 54, 56, 196, 205). *See Brown v. Plata*, 563 U.S. 493, 528, 131 S. Ct. 1910, 1938 (2011)("although the State points to limited gains in staffing between 2007 and 2008, the record shows that the prison system remained chronically understaffed through trial in 2008.").

25.     The district court in *Braggs* explained, "prison officials' efforts to correct systemic deficiencies that simply do not go far enough when weighed against the risk of harm also support a finding of deliberate indifference." 2017 WL 2773833 at *56. "On a global level, the state of the mental-health care system is itself evidence of ADOC's disregard of harm and risk of harm: in spite of countless reports, emails, and internal documents putting ADOC on notice of the actual harm and substantial risks of serious harm posed by the identified inadequacies in mental-health care, those inadequacies have persisted for years and years." *Id.* at *59.

26.     The Third Circuit, in *Wharton v. Donberg*, 854 F.3d 234 (3rd Cir. 2017), likewise made clear that deliberate indifference includes officials taking "ineffectual action" relative to the "task at hand." *Id.* at 244. The Court explained:

> We look to see whether the gap between the officials' actions or inaction and the problem they were trying to solve was so large that those actions display deliberate indifference. Imagine an inmate who came to the prison infirmary with a cut and with kidney failure and was given only a bandage. We would have no trouble concluding that this could constitute deliberate indifference.

*Id.* citing *Rouse v. Plantier*, 182 F.3d 192, 194-95, 198-99 (3d Cir. 1999) (suggesting that providing diabetic inmates with only one insulin injection per day and less-than-daily blood sugar monitoring, when they needed more, can constitute deliberate indifference).

27.     Here, in each of the five areas, the gap between Defendants' action and the problem at hand is significant.

a.     In crisis care, Class Members who are acutely deteriorated require both safe housing to protect against self-harm and mental health treatment to address their acute mental health needs. IDOC, however, is only providing the latter – a crisis cell placement without the mental health treatment intervention. (PFOF ¶¶ 66-68).

b.     Likewise, as to treatment planning, Defendants presented evidence that they have a form which has been recently revised. (PFOF ¶¶ 177). Forms, however, cannot provide quality care and this form does not address most of the qualitative issues raised, or the staffing barriers to utilizing the form. (PFOF ¶¶ 179-83, 190-193). The three sets of treatment plans submitted into evidence in this case each demonstrate ways in which Defendants' focus on the form over actual treatment planning fails Class Members who are desperately in need of real care. (PFOF ¶¶ 141, 158-59, 171).

c.      As to medications, Defendants focus on the recent reduced numbers of backlogged psychiatric appointments but did not submit any evidence regarding the significant qualitative problems about medication management that Dr. Stewart and Dr. Dempsey described. (PFOF ¶ 55-57).

d.      As to segregation – where the Monitor testified that Illinois has the worst psychiatric suffering that he has seen in his career – the only action described by Defendants is the development of new spreadsheet to track out of cell time. (PFOF ¶¶ 123, 148-149-152).

e.      As to the backlog of mental health evaluations,  - the numbers have remained at near the same levels since 2014 - without increased staffing there is no way to reduce the backlog without taking away from other areas of care. (PFOF ¶¶ 52, 190-195).

28.      Defendants' action to address the staffing deficiencies that underlie the violations in each of these five areas consistent has been to continue the same staffing recruitment activities that have been failing the Department for the last four years. (PFOF ¶ 201).

29.      At hearing, Defendants' witnesses consistently testified that they were aware of the challenges" and that they were trying, or hoping, to address them. (*See e.g.* PFOF ¶ 10). But, the specific actions that they described were in large part very recent steps – many occurring during the pendency of these proceedings – that were insufficient to address the scope of the problems, in either quantity or quality. (PFOF ¶¶ 196-205). *See Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal. 1995) (the prison system's "responses have frequently occurred only under the pressure of this and other litigation. Given that history, the court not only has no confidence that defendants will continue to adequately monitor inmates on psychotropic

11

medication for risks from heat exposure, it regretfully concludes that without an order defendants are likely not to do so.").

30.      The Court finds that the gap between Defendants' actions and the urgent, but longstanding, mental health needs of Class Members is substantial. *See Indiana Protection and Advocacy Services Commission v. Commissioner, Indiana Department of Corrections*, 2012 WL 6738517 (S.D. Ind. 2012)( "deliberate indifference to a serious medical need may be manifested by 'woefully inadequate action' as well as no action at all"); *Coleman v. Wilson*, 912 F.Supp. 1282, 1319 (E.D. Cal. 1995) ("patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it").

31.      The Court finds that Defendants are deliberately indifferent to serious risk of harm – and actual harms, including suffering – caused to Class Members by the failure to provide adequate medication management.

32.      The Court finds that Defendants are deliberately indifferent to serious risk of harm – and actual harms, including suffering – caused to Class Members who are placed on crisis watches by the failure to provide necessary mental health treatment.

33.      The Court finds that Defendants are deliberately indifferent to serious risk of harm – and actual harms, including suffering – caused to Class Members in segregation without necessary mental health treatment and out-of-cell time.

34.      The Court finds that Defendants deliberately indifferent to serious risk of harm – and actual harms, including suffering – caused to Class Members by the failure to provide timely mental health evaluations.

35.     The Court finds that Defendants are deliberately indifferent to serious risk of harm – and actual harms, including suffering – caused to Class Members by the combined failures in these five areas (medication management, treatment planning, mental health evaluation, and treatment to those in crisis and segregation).

C.     **Defendants Have Discriminated Against Class Members in Segregation in Violation of the Americans with Disabilities Act.**

36.     Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.10 To state an ADA or Rehabilitation Act claim, a plaintiff must allege "that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

37.     The Court finds that that Class Members are qualified individuals with disabilities. See 29 CFR 1630.2(g)(1)(i), 1630.2(h)(2).

38.     Plaintiffs bring two theories of discrimination against Class Members in segregation in violation of the ADA, denial of reasonable accommodations and disparate impact.

39.     The Department of Corrections is a public entity required to make reasonable accommodations in order to avoid discrimination on the basis of disability. *See, e.g., Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998). The regulations implementing Title II of the ADA require that a public entity:

> make reasonable modifications in policies, practices, or procedures when the
> modifications are necessary to avoid discrimination on the basis of disability,

13

unless the public entity can demonstrate that making the modifications would
fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

40.     The Seventh Circuit has held that public entities have an independent duty to take
"prophylactic" steps to accommodate individuals with disabilities when necessary to avoid
discrimination. *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).
In other words, a plaintiff can "demonstrate discrimination on the basis of disability by [the
City's] refusal to make a reasonable accommodation." *Washington v. Ind. High Sch. Athletic
Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999). *See also McCoy v. Tex. Dep't Crim. Justice*, 2006
WL 2331055, at *7 and n. 6 (S.D. Tex. Aug. 9, 2006) ("failure to make reasonable
accommodations to the needs of a disabled prisoner may have the effect of discriminating against
that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer
more pain and punishment than non-disabled prisoners.").

41.     The accommodations that Class Members in segregation have requested are the
out-of-cell time and the minimal standards of treatment set forth in the Settlement Agreement,
both intended to ameliorate the severe impact of isolation on mental illness. (PFOF ¶¶ 118, 121-
122, 127, 129).

42.     Without the needed accommodations, Class Members with mental illness in
segregation have suffered, including decompensation of their mental illness, in ways that prevent
them from either (1) participating in the few activities available in segregation, such as yard and
showers, or other privileges, and (2) being released from segregation and back into General
Population where they can participate in the Department's programs and activities, such as
school and visits with their loved ones. (PFOF ¶¶ 107-108, 115-117, 120, 133, 137-141, 147).

Thus, by denying Class Members in segregation these reasonable accommodations, Defendants deny them access to prison programs, activities, and services.

43.     The Court finds that the evidence at trial demonstrated that, without the reasonable accommodations intended to ameliorate the deleterious impact of segregation, Class Members have suffered decompensation which in turn results in denials of access to programs, activities and services.

44.     The Court finds that Defendants have discriminated against Class Members in segregation by refusing to provide reasonable accommodations—out-of-cell time and the minimum requirements for mental health treatment to prevent deterioration of their mental illness —which prevents Class Members from exiting segregation and results in the denial of access to IDOC's programs and services that are available either in segregation or upon release from segregation to prisoners in general population.

45.     To demonstrate a disparate impact claim, a plaintiff must show that the defendant "adopt[ed] a policy or practice that is 'facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity.'" *Swan v. Bd. of Educ.*, No. 13 C 3623, 2013 WL 3872799, at *5 (N.D. Ill. July 25, 2013) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)).

46.     The Title II regulations explicitly address disparate impact discrimination, stating that a "public entity may not … utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [and/or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. §§ 35.130(b)(3)(i)-(ii).

47.     Evidence presented at trial demonstrates the facially neutral treatment of prisoners in segregation actually causes greater harm to people with mental illness. (PFOF ¶ 108-114.)

48.     Testimony at trial demonstrated that segregation has a negative impact on mental health (PFOF ¶ 108-112). *See also* Ex. A, Monitor's First Annual Report at 63 ("segregation itself imposes psychic stress, which can exacerbate depression and other potentially lethal psychiatric symptoms as well as creating psychiatric disorders de novo in offenders without pre-existing mental illness."). Based on similar evidence, the district court in Alabama, in *Braggs,* held that "[g]iven the consensus on the substantial risk of harm of decompensation for these most severely mentally ill prisoners, the court concludes that it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances." 2017 WL 2773833, at *52 (M.D. Ala. June 27, 2017).

49.      Other mental health prisoner class actions have resulted in findings by courts consistent with this evidence. In *Madrid v. Gomez*, 889 F. Supp.1146 (N.D. Cal. 1995), the court found that, while segregation in and of itself does not constitute cruel and unusual punishment, segregation for prisoners "at particularly high risk for suffering very severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness" is indeed cruel and unusual punishment and akin to "putting an asthmatic in a place with little air to breathe." *Id.* at 1265-66. *See also Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999).[1]

50.     Dr. Stewart testified that he has found exacerbation of mental illness in every Class Member in segregation who he has reviewed. (PFOF ¶ 118). Defendants' Chief of Mental

---

[1] *See also* National Commission on Correctional Health Care, Position Statement on Solitary Confinement, April 10, 2016. The American Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness, December 2012.[1]

Health, Dr. Hinton, agreed that IDOC is not providing the mandated treatment and out-of-cell time for those in segregation and, that without it, those in segregation will "across the board" get worse. (PFOF ¶ 119).

51.     As a result, Class Members in segregation often accrue more disciplinary tickets and accumulate additional segregation time. (PFOF ¶¶ 108, 115, 117, 139-40). Approximately 81% of IDOC's segregation population has mental illness (PFOF ¶ 107). Evidence of the restrictive impact caused to Class Members in segregation includes increased placements on crisis watches, more segregation time, and privilege restrictions such as the loss of yard time, commissary, or television. (PFOF ¶¶ 110, 115-17, 119-20, 139-40).

52.     The Court finds that Class Members with mental illness are disparately impacted by segregation in the harm caused by segregation to their mental health, their functioning, and their ability to participate in prison programs, activities and services.

## II.     Preliminary Injunctive Relief is Warranted by the Evidence and the Law

53.     The above findings demonstrate that Plaintiffs have shown a likelihood of success on the merits; Plaintiffs have no adequate remedy at law; Plaintiffs will suffer irreparable injury absent preliminary injunctive relief; the balance of equities tips in Plaintiffs' favor; and that the preliminary injunction is in the public interest. *In re Jimmy John's Overtime Litigation*, 877 F.3d 756, 769 (7th Cir. 2017).

54.     "Every order granting an injunction ... must ... state the reasons why it issued." Fed. R. Civ. P. 65(d). Just as "the court must find the facts specially and state its conclusions of law separately" when it presides over a bench trial, "the court must similarly state the findings and conclusions that support its action" when it "grant[s] or refus[es] an interlocutory injunction." Fed. R. Civ. P. 52(a). Similarly, the Prisoner Litigation Reform Act, 18 USC §

3626(2) requires that the court not only make findings of the violations and harms, and that the

relief ordered is narrowly tailored to provide the remedy. For preliminary relief under the PLRA,

the relief must be narrowly tailored to correct the harm demonstrated; for an order of prospective

relief, it must "extend no further than necessary to correct the violation of the Federal right of a

particular plaintiff or plaintiffs."

55.     The prospective relief ordered by the Court must meet the requirements of the

Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA):

> Prospective relief in any civil action with respect to prison conditions shall extend no
> further than necessary to correct the violation of the Federal right of a particular plaintiff
> or plaintiffs. The court shall not grant or approve any prospective relief unless the court
> finds that such relief is narrowly drawn, extends no further than necessary to correct the
> violation of the Federal right, and is the least intrusive means necessary to correct the
> violation of the Federal right. The court shall give substantial weight to any adverse
> impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C.A. § 3626(1)(A). *See also Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011), *cert.*

*den.*, 556 U.S. 904 (2012).

56.     This court has "evaluated the record as a whole and identified evidence that fully

supports the scope of the injunctive relief granted." *Id.* at 558 *citing Armstrong v.*

*Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010) ("[T]he language of the PLRA does not

suggest that Congress intended a provision-by-provision explanation of a district court's

findings.... the statutory language [means] that the courts must do what they have always done

when determining the appropriateness of the relief ordered: consider the order as a whole."). In

*Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court explained that more expansive relief

may be appropriate –even under the PLRA analysis –where supported by particular findings that

relief is necessary in order to cure the violations. "While the order does in some respects shape or

control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion … The order's limited scope is necessary to remedy a constitutional violation." *Id.* at 533  The mandate of "[n]arrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends … The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Id.* at 531.

57.     The Courts' findings demonstrate that the relief is both proportional to the violations and necessary in order to correct those violations. Each element of the relief order is supported by the findings of fact as well as the history of Defendant inability or unwillingness to cure the violations. *See Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004), *cert. denied*, 543 U.S. 1054 (2005) ("The application of those criteria is case-specific and must be undertaken in light of both the magnitude of existing constitutional violations and the available alternative remedies.").

58.     The Court rejects Defendants' argument that *Westefer v. Neal,* 682 F.3d 679 (7th Cir. 2012) is controlling in this case. There, following an appeal and prior to a trial on remand, the State presented a detailed plan with specifications for procedures to protect the due process rights of prisoners being transferred to the supermax facility. 682 F.3d 679, 681-83 (7th Cir. 2012). Instead of finding the case to be moot, as the State had intended, the district court entered the ten-point plan as its injunctive relief order. *Id.* at 682. The Seventh Circuit overturned, explaining that "[i]n crafting the injunction in this case, however, the district court mistakenly conflated what is constitutionally adequate to satisfy due process with what is constitutionally required." *Id.* at 684. Under Supreme Court precedent, all that was constitutionally required to meet due process requirements prior to a supermax transfer was informal, nonadversarial due

process. *Id.* The district court order went "well beyond this, locking in highly specific formal requirements controlling the timing and content of the notice and hearing that each transferred inmate must receive, and even going so far as to impose a right to appeal." *Id.* There was no basis for the Court to require the more extensive due process procedures that went above and beyond legal requirements in order to cure the federal violation. *Id.*

59.     This case presents very different issues then *Westefer*, both in terms of the breadth of the violations at hand and the history of Defendants' failure to cure those violations. The appropriate relief must take into consideration the long history of Defendants failing to correct the very problems at issue here, beginning with the independent expert process in 2011-2012, and continuing through Defendants violations of the agreed orders for interim relief in 2013, Defendants' violations of their own 2014 Remedial Plan; violations of the Settlement Agreement, and continuing, most recently, with the failure to develop the comprehensive plan required by the Agreement's Dispute Resolution process. *See Benjamin v. Schriro*, 370 Fed.Appx. 168, 171 (2d Cir. 2010) (unpublished) ("The needs-narrowness-intrusiveness requirement of the PLRA notwithstanding, we find that nearly a half-decade of untruthfulness, non-compliance and inaction constitutes sufficient justification for the intrusiveness of a subsequent order to compel compliance with an original order entered pursuant to the PLRA that has been ignored." ). *See also Armstrong v. Brown*, 768 F.3d 975, 985-86 (9th Cir. 2014) ("Relief that might have raised concerns about breadth and intrusiveness in the first instance is acceptable in this context, because the district court 'has attempted narrower, less intrusive alternatives—and those alternatives have failed. . . .'").

60.     Courts have found that the preferred method for first orders of relief is to start with allowing the defendant to submit a proposed remedial plan. *Lipscomb v. Pfister*, 2014 WL

287269, *3 (C.D. Ill. Jan. 27, 2014) (ordering the warden to "craft a policy that will address the constitutional violation found by the jury" and submit "a remedial plan to the Court"). Here, however, Defendants have already had the opportunity to develop and implement their own plan to provide adequate mental health treatment. The Court need not repeat those failed efforts in vain. *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *24 (N.D. Cal. Oct. 3, 2005) ("the Court is not required to restrict its powers to those means that have proven inadequate, or that show no promise of being fruitful."). *See also Lacy v. Dart*, No. 14 C 6259, 2015 WL 5921810, *13 (N.D. Ill. Oct. 8, 2015) (noting plaintiffs' proposed changes to Sheriff's proposed order "do not adequately take into account the corrections context," but finding Sheriff's version is "too broad and indefinite to protect plaintiffs' federal rights" and giving defendants an opportunity to submit a revised proposal).

61.     As the First Circuit explained:

> The constitutional violations here are substantial in both scope and degree. They have defied correction for more than two decades. The district court has tried more conventional measures, but found them wanting. It has afforded the Commonwealth ample opportunity to bring preexisting mechanisms up to speed or otherwise to correct the phalanx of problems. It has witnessed the Commonwealth's continued inability to cure the constitutional infirmities plaguing the delivery of health care in the correctional system. This abject failure matters in the narrowness-need-intrusiveness inquiry.

*Morales Feliciano v. Rullan*, 378 F.3d 42, 54-55 (1st Cir. 2004). Similarly, the Ninth Circuit held in *Armstrong v. Brown*, 768 F.3d 975, 985-87 (9th Cir. 2014), that "[t]he State, through its conduct over the past twenty years, has proven that the same vindication of federal rights cannot be achieved with less involvement by the district court. The State has failed to suggest—let alone implement—any viable means to ensure accountability and protect the Plaintiff class that is narrower or less intrusive than the Modified Injunction, despite ample opportunity to do so." *Id.* at 986.

62.  While the court's order for relief must be deliberately narrow to minimize intrusion into correctional operations, the relief ordered also must be sufficient to fulfill its function of remedying the violations at hand. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2018 WL 985759, at *3 (M.D. Ala. Feb. 20, 2018) ("courts retain a responsibility to remedy constitutional violations") c*iting Brown v. Plata*, 563 U.S. 493, 511 (2011) (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)). "System-wide relief is required if the injury is the result of violations of a statute or the constitution that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury." *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005); *see also Skinner v. Uphoff*, 234 F. Supp. 2d 1208, 1218 (D. Wyo. 2002) ("Of course, the remedy ordered by this Court shall extend no further than necessary to correct the violation of the Federal right, but if it is necessary to enact systemic and prophylactic measures in order to correct the violations found to exist in this instance, the Court may do so.").

## **Plaintiffs' Amended Request for Relief**

In order to bring Defendants into compliance with federal law and to prevent further harm to Plaintiffs Class Members, Plaintiffs request that the Court order Defendants to:

1. For any Class Member placed on a mental health crisis watch:

    a.  A psychiatric provider shall meet face-to-face with the patient to assess the need to modify psychotropic medication treatment, as soon as practicable after the patient is placed on crisis watch, but in no event shall this meeting occur later than 24 hours after the patient is placed on crisis watch;

b. The multidisciplinary treatment team shall complete a crisis treatment plan, within 24 hours of placement on crisis watch.

c. The crisis treatment plan shall include, at a minimum, the following:

    i. Daily mental health treatment interventions including psychotherapeutic and supportive counseling, which are advanced, as tolerated, during the crisis placement to achieve stabilization;

    ii. After the first 24 hours, daily out-of-cell time with therapeutic and/or recreational activities for reasonable periods of time based on the treatment team's assessment.

    iii. Daily assessment in a confidential setting of patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required.

d. Prior to discharge from crisis watches, the multidisciplinary team, with the patient, shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan shall include, at a minimum, consider the causes which lead to the patient deteriorating so that crisis placement was required, and a plan for risk management and relapse prevention.

e. For anyone who does not stabilize sufficiently to be discharged from crisis watches within ten days of the placement, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility.

23

2.  As to Class Members housed in Control Units:

    a.  An MHP shall assess any Class Member no later than forty-eight (48) hours after initial placement in Administrative Detention, Disciplinary Segregation, or other similar restrictive status (collectively referred to as "Control Unit"). Such review shall be documented in the patient's progress notes. The purpose of this assessment shall be (at a minimum) to determine whether the patient has decompensated and should be removed from the Control Unit and to provide a baseline against which any future decompensation or deterioration of the patient's mental health status can be measured.

    b.  Class members who are in a Control Unit for periods of sixteen (16) days or more shall receive care that includes, at a minimum:

        i.  Continuation of their Mental Health Treatment Plan, with enhanced therapy as necessary to protect them from decompensation that may be associated with segregation; with at least one hour or more of individualized mental health treatment intervention, such as psychotherapeutic and supportive counseling, per week;

        ii.  Rounds in every section of each Control Unit, at least once every seven (7) calendar days, which may be conducted by a BHT or QMHP;

        iii.  Pharmacological treatment (if applicable);

        iv.  Participation in multidisciplinary team meetings; and

        v.  MHP or mental health treatment team recommendation for post-segregation housing.

    c.  Class Members in any Control Unit for periods longer than sixty (60) days shall be provided with six (6) hours out-of-cell structured and six (6) hours of-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week; the Department will work to gradually increase the out-of-cell time to not less than a total of twenty (20) hours, with ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week.

        i.  The CAO of each facility where Class Members are housed in Control Units for more than 60 days shall certify on a weekly basis the out-of-cell time provided to each Class Member housed in a Control Unit.

    d.  If, at any time, it is determined by a MHP that a Class Member in a Control Unit requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the Class Member shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed, RTU or other elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

3.  Within 120 days of this Order, Defendants shall hire sufficient staff meet the requirements of Defendants' May 2016 Amended Staffing Plan.

4.  Within 90 days of this Order, Defendants shall evaluate whether their current staffing plan is sufficient to provide mental health treatment consistent with federal law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health

care in segregation, and mental health evaluations. Defendants shall report on their findings and submit a proposed amended staffing plan, if necessary, to the Monitor and Plaintiffs' counsel.

5.  Class Members who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, with extensions on follow-up care for those whose psychiatrists have found and documented that the offender has reached stability (outpatient level of care: not to exceed 90 days; RTU level of care: not to exceed 60 days), except that under no circumstances shall a Class Member who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

6.  IDOC shall accomplish the following in its psychiatric services:

    a.  Administer medications to all Class Members housed in a Control Unit in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

    b.  The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskenesia, high blood pressure, and liver function decline;

    c.  Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood pressure monitoring, AIMs review, and neurological evaluation;

    d.  The timely performance of lab work for these side effects and timely reporting on results;

e.  That Class Members for whom psychotropic drugs are prescribed receive timely explanations from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

f.  That Class Members, including offenders in a Control Unit, who experience Medication Noncompliance, as defined herein, are visited by a MHP.   If, after discussing the reasons for the offender's Medication Noncompliance said Noncompliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

7.  All Class Members shall have a treatment plan that is individualized and particularized based on the patient's specific needs.

a.  The treatment plan must include long and short term goals or objectives, treatment activities, and specify the treatment professionals responsible;

b.  The treatment plan should be developed, updated and reviewed with the collaboration of the patient to the fullest extent possible;

c.  Treatment plans shall be reviewed and updated on regular intervals, as clinically necessary but no less frequently than:

i.  For Class Members at an RTU level of care, upon entrance and thereafter no less than once every two (2) months, or more frequently if clinically indicated, and upon discharge;

27

  ii. For Class Members at a crisis or inpatient care, upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge;

  iii. For Class Members on segregation status, within seven (7) days of placement and thereafter monthly or more frequently if clinically indicated.

 d. Reviews shall assess the progress of the documented treatment goals.

 e. Treatment planning should be multidisciplinary to the fullest extent possible. By no later than one year from this order, treatment plans shall be prepared and reviewed collectively by the multidisciplinary treatment team, with all members of the team present in a face-to-face meeting or (if they are unavailable) with psychiatrists participating by video conference.

8. The Chief of Mental Health and/or Chief of Psychiatry shall certify on a monthly basis each facility's compliance with the above requirements. If any facility that is out of compliance with a requirement, the Chief shall provide a corrective action plan to the Monitor for review and approval within fourteen days.

9. If the Monitor finds non-compliance with the terms of this Order, and a corrective action plan (as set forth above) is not approved and/or fails to achieve compliance, Plaintiffs may move for further relief from the Court to obtain compliance with this order. The Court may apply equitable principles and may use any appropriate equitable or remedial power available to it.

10. Nothing in this Order relieves the Defendants of their obligations under the Settlement Agreement.

RESPECTFULLY SUBMITTED,


By:        /s/ Amanda Antholt        
One of the attorneys for Plaintiffs

Harold C. Hirshman (ARDC# 1226290)
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL  60606
Telephone: (312) 876-8000
Facsimile:  (312) 876-7934
harold.hirshman@dentons.com


Marc R. Kadish
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL  60606
(312) 701-8747 (phone)
(312) 706-8774 (fax)
mkadish@mayerbrown.com

Alan Mills
Nicole Schult
Uptown People's Law Center
4413 N Sheridan
Chicago, IL  60640
(773) 769-1410 (phone)
alan@uplcchicago.org
Nicole@uplcchicago.org

Barry C. Taylor
Laura J. Miller
Amanda Antholt
Equip for Equality, Inc.
Suite 300
20 N. Michigan Ave.
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 541-7544 (fax)
barryt@equipforequality.org
laura@equipforequality.org
amanda@equipforequality.org