## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-1298 |
| | ) | |
| ROGER E. WALKER, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the Court on Plaintiffs' Motion for Enforcement of the Settlement Agreement (ECF No. 1559) and Motion to Amend Request for Relief and Memorandum on the Enforcement Process (ECF No. 1681). The Motions are GRANTED to the extent provided herein.

## IDENTIFICATION OF PARTIES AND OVERVIEW OF ACTION

This case is a class action brought under 42 U.S.C § 1983 alleging violations of the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794. (ECF No. 711-1 at 1). Plaintiffs challenge the adequacy of the delivery of mental health services to mentally ill prisoners in the physical custody and control of the Illinois Department of Corrections ("IDOC" or "Department"). *Id*.

On August 14, 2015, this Court certified a class in this case for purposes of litigation, and pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, as follows:

> Persons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") [who] are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism or drug addition,

developmental disorder, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purpose of this class definition.

(ECF No. 252 at 7). Often referenced by both Parties, this case involves inmates who are "seriously mentally ill." (*See e.g.* ECF Nos. 1965 and 1966-1). There are approximately 44,000 inmates in the custody of the IDOC, of whom more than 12,000 are believed to be mentally ill. (ECF No. 1758 at 50, testimony of Defendant Dr. Melvin Hinton ("Dr. Hinton")). Approximately 4,800 of these inmates are considered "seriously mentally ill." (ECF No. 1758 at 51, testimony of Dr. Hinton; *see also* ECF No. 1966-1 at 2, Plaintiffs place the number at 4,843). Ashoor Rasho, Patrice Daniels, Gerrodo Forrest, Keith Walker, Otis Arrington, Donald Collins, Joseph Herman, Henry Hersman, Rasheed McGee, Fredricka Lyles, Clara Plair, Desiree Hollis, and Crystal Stoneburner serve as the class representatives.

The Defendants are John Baldwin, the Acting Director of the IDOC and Dr. Hinton, the Department's Chief of Mental Health Services and Addiction Recovery Services.

The Parties entered into a comprehensive settlement agreement resolving the action set forth in the Plaintiffs' Third Amended Complaint, the operative complaint in this matter. (ECF No. 260). A fairness hearing was held on May 13, 2016. (Minute Entry dated 5/13/2016). During the hearing, the Court found the agreement to be fair and reasonable, over the voluminous objections that were filed by various inmates[1]. *Id.* The executed Settlement Agreement can be found in this docket, and is referred to herein as the "Settlement Agreement." (ECF No. 711-1). The instant Motions are brought alleging violations of the Settlement Agreement and the Constitution.

---

[1] All objections have been filed in this docket.

<u>**PROCEDURAL HISTORY**</u>

On November 8, 2007, Plaintiff Ashoor Rasho filed a *pro se* Complaint alleging, among other things, that the Defendants had violated his Eighth Amendment rights by providing him insufficient medical treatment for his mental illness. (*See* ECF No. 1). Plaintiff's lawsuit was filed against various IDOC employees, including the then-Director of the IDOC, Roger E. Walker, Jr. *Id.*

On December 21, 2007, Judge Harold A. Baker entered his Merit Review and Order on Pending Motions finding that the Plaintiff had stated claims for violations of the Eighth Amendment right to be free from: (1) indifference to a serious medical need; and (2) cruel and unusual punishment. (*See* ECF No. 9).

On November 5, 2008, Marc R. Kadish entered his appearance on behalf of the Plaintiff (ECF No. 47), and thereafter during the December 1, 2008, scheduling conference requested leave to file an amended complaint. (*See* Minute Entry dated December 1, 2008).

On May 4, 2009, an Amended Class Action Complaint was filed by Plaintiff Ashoor Rasho, Patrice Daniels, Gerrodo Forrest, Lynda Smith, Laterial Stinson, and Keith Walker, on their own behalf and on behalf of all mentally ill inmates who were or will be incarcerated in an IDOC adult correctional center. (ECF No. 54). The lawsuit again named several administrators within the IDOC. *Id.* The Plaintiffs and class members sought declaratory and injunctive relief requiring the Defendants to take prompt action to remedy the alleged violations of the Plaintiffs' and class members' constitutional rights regarding the mental health care they received. (*See* ECF No. 54; *see also* ECF No. 84).

On October 25, 2010, this case was transferred to this Court pursuant to instructions from the then-Chief U.S. District Court Judge Michael P. McCuskey. (TEXT ORDER dated

10/25/2010). During the status conference held on October 29, 2010, Plaintiffs indicated that they were working toward class settlement and selection of outside experts to make recommendations to the Parties as to certain issues that had been identified. (Minute Entry dated 10/29/2010). Shortly thereafter, Plaintiffs sought to amend their operative Complaint for purposes of adding additional named plaintiffs, clarifying which counts were against which defendants, and eliminating damages claims on behalf of any named plaintiffs except Ashoor Rasho. (ECF No. 85). The Plaintiffs also filed a memorandum in support of its Motion to Certify Class noting that the requested class certification was for settlement purposes. (ECF No. 83-84). Defendants Dr. Sylvia Mahone, Dr. Michael F. Massa, and Wexford Health Sources, Inc. filed an objection to the Motion for Class Certification. The claims against these Defendants were ultimately severed from the rest of the case, and refiled in a separately docketed case. *Rasho v. Walker, et al.*, ILCD Case No. 11-cv-1308; (*see also*, ECF No. 98, Case Management Order, fn. 1). The claims in the severed case were ultimately resolved by way of settlement. *Rasho v. Walker, et al.*, ILCD Case No. 11-cv-1308, (ECF No. 111).

On May 6, 2011, this Court entered an Order on the Stipulated Motion for Class Certification for Settlement Purposes (ECF No. 83) preliminarily certifying the class as:

> All persons who are now or will be incarcerated in adult correctional facilities operated by the Illinois Department of Corrections ("IDOC") and who, while incarcerated have a serious mental illness, defined as an Axis I disorder in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (hereafter "DSM-IV"), except that a diagnosis of alcoholism or drug addiction or any form of sexual disorder shall not by itself constitute a serious mental illness for purposes of this class definition.

(ECF No. 97 at 1-2). In addition, the Court issued an Order on May 6, 2011, staying the formal discovery efforts while the Parties pursued an expert report and while the Parties negotiated a possible settlement. (ECF No. 98 at 2). On May 7, 2012, the Parties submitted a Status Report

at the direction of the Court detailing the efforts that had occurred in furtherance of the potential settlement and possible consent decree. (ECF No. 117). A status conference was held the next day wherein the Parties indicated the continued desire to work toward settlement. (Minute Entry dated 5/8/2012). At that time, the Court set the matter for another status conference on August 16, 2012. *Id.* That status conference was held and the Parties indicated during that hearing that a "great deal" of progress had been made toward settlement. (Minute Entry dated 8/16/2012). The matter was again set over for a status conference for September 13, 2012. On September 12, 2012, the Plaintiffs submitted a Status Report detailing the efforts of the possible consent decree and indicated the areas to which there were disputes. (ECF No. 120). At the Status Conference the next day, the Parties indicated that it was possible to complete the proposed consent decree by November 1, 2012. (Minute Entry dated 9/13/2012). The matter was then continued until November 8, 2012. *Id.*

In the Status Report dated November 7, 2012, the Plaintiffs again indicated that the Parties were working through a draft of the proposed consent decree. (ECF No. 121). During the Status Conference the next day, the Court continued the matter over until January 9, 2013, and directed the interim mental health director, IDOC director, and any other person necessary to the settlement process to attend the hearing in person. (Minute Entry dated 11/8/2012).

In the Status Report dated January 4, 2013, the Parties explained that the Defendants had engaged in a financial analysis of the proposed settlement, but outside of that action, there had been little change from what was reported to the Court on November 7, 2014. (ECF No. 122). During the January 9, 2013, Status Conference, the Court established additional deadlines for Defendants with respect to responding to the Plaintiffs' settlement proposal. (*See* TEXT ONLY ORDER dated 1/9/2013, "Discussion held and the Court sets deadlines for parties to address

pending issues. A deadline of 1/23/2013 is set for the defense to submit definition [e.g. 'serious mental illness'] to Plaintiffs' counsel (Other Deadline). Also set for defense counsel is the "Staffing and Building Proposal" deadline (Secondary Other Deadline) set for 2/8/2013."). The Court set the matter over until March 19, 2013, and again required the Parties to provide a Status Report in advance of the status conference.

The Status Report dated March 15, 2013, contained significant discussions on the status of the negotiations. (ECF No. 128). At that time, however, Plaintiffs specifically noted that, while the Defendants felt continued negotiations could bear fruit, Plaintiffs were not optimistic about the prospects of a settlement. (ECF No. 128 at 4). Plaintiffs also noted that they felt Defendants' most recent proposal was a step backwards in the negotiation process. *Id*. During the following Status Conference, Plaintiffs' counsel requested that the Court intervene and assist with the negotiations. (Minute Entry dated 3/19/2013). The Court agreed to do so, and set a settlement conference for April 16-18, 2013, and directed the parties to file brief with their positions (under seal) in advance of the settlement conference. *Id*. The settlement conference was held and, at least in this Court's view, yielded some positive results. In fact, shortly thereafter the Court entered an Agreed Order dated May 8, 2013, in order to "facilitate a consent decree in this matter." (ECF No. 132; *see also* Minute Entry dated 5/8/2013). The May 8, 2013, Agreed Order specifically provided, among other things, that the Court would "appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of correctional programs and the delivery of mental healthcare." (ECF No. 132 at 6). Dr. Raymond F. Patterson was ultimately appointed as the Monitor. (*See* ECF No. 138, Motion for Order and TEXT ORDER dated 8/13/2013 and 8/21/2013). In a Status Report dated September 24, 2013, the Defendants outlined the activities

they had taken in compliance with the May 8, 2013, Agreed Order to initiate efforts to improve the delivery of mental health services to seriously mentally ill offenders.  (ECF No. 153).

On July 23, 2014, the Court entered a TEXT ORDER setting this case for a Status Conference on August 15, 2014, subsequently reset for September 4, 2014.  (TEXT ORDER dated 7/23/2014 and TEXT ORDER dated 8/15/2014).  The Court noted that several class members, *pro se*, had moved the Court to compel the IDOC to comply with the May 8, 2013, Agreed Order.  Additionally, on August 6, 2014, Plaintiffs, via their attorneys, filed a Motion to Enforce the Court's Order dated May 9, 2014.  (ECF No. 182).  In their Motion, it was noted that "[c]lass counsel's patience having been exhausted, and with no end in sight, the class seeks an order from this Court enforcing the completion of defendants' obligations under the May 8, 2013 Order, together with attorneys' fees and costs of having to continuously pursue these issues and bring this motion, and any other such relief or sanction as the Court may deem appropriate."  (ECF No. 182 at 8).

A Status Conference was held on September 4, 2014, and a written Order was entered on September 5, 2014, outlining this Court's ruling during the Conference.  (*See* Minute Entry dated 9/4/2014 and ECF No. 192).    In the Order, the Court directed Defendants to take certain actions to inform Plaintiffs of its efforts to adhere to terms of the May 8, 2013, Agreed Order.  (ECF No. 192).  The Court reserved ruling on the Plaintiffs' Motion to Enforce and set the matter for a two day hearing on the proposed consent decree for November 20-21, 2014.  (ECF No. 192).  However, after the November 20-21, 2014, hearing, the Court found that no further action would be taken on the Motion.  (*See* TEXT ORDER dated December 9, 2014, explain "Plaintiffs' Motion to Enforce May 8, 2013 Agreed Order [182] is GRANTED to the extent that the Court subsequently scheduled 9/4/2014 and 11/23/2014 status conferences and personally participated in settlement

negotiations on 11/23/2014 and 11/24/2014."). The Court also noted that "after two days of negotiations, the parties had made substantial progress toward the wording for a final Consent Decree." (TEXT ORDER dated 11/24/2014). It was also noted that "the identification of points of controversy [that] cannot be resolved without IDOC, State Government and State Agency input." *Id*. The Court, therefore, scheduled a supplemental settlement conference on Friday, March 20, 2015. *Id*. Prior to the hearing, the Court noted "little progress seems to have occurred since the November, 2014 settlement hearings." (Minute Entry dated 3/19/2015). The March 20, 2015, hearing did not result in a settlement agreement and it started to become clear that prospects for a settlement were diminishing. (*See* TEXT ORDER dated 3/23/2011). During the hearing, Plaintiffs renewed their previously filed Motion to Enforce. (TEXT ORDER dated 3/23/2015). The matter was scheduled for hearing on July 20-21, 2015. *Id*. For their part, the Defendants sought an order from the Court that "[w]hen the motion to enforce has been resolved, the defendants [only then would be required to] participat[e] in the open exchange of information and regular telephone conferences with the Monitor and opposing counsel." (ECF No. 218 at 4). The Court ultimately denied that request. (Minute Entry dated 5/1/2015). Additionally, other motions were filed that resulted in the matter being scheduled for a hearing on July 7, 2015. During that hearing it became clear that settlement negotiations had broken down and the case was scheduled for trial. (Minute Entry dated 7/7/2015).

On August 14, 2015, this Court certified a class in this case for purposes of litigation, and pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the class was defined as follows:

> Persons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") [who] are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism or drug addition,

developmental disorder, or any form of sexual disorder shall not, by itself, render
an individual mentally ill for the purpose of this class definition.

(ECF No. 252 at 7).

On December 17, 2015, the Parties informed the Court of a proposed resolution of this

matter and provided a draft of that agreement. (Minute Entry dated 12/17/2015). On December

22, 2015, the Court received a final copy of that agreement, as well as a proposed notice to the

class. (ECF No. 289). The Court reviewed the agreement and made a preliminary determination

that was a fair, adequate, and reasonable resolution of this action. (ECF No. 290). A fairness

hearing was ultimately set for May 13, 2016. (Minute Entry dated 12/22/2015). During the

hearing, the Court found the agreement to be fair and reasonable, over the voluminous objections

that were filed by various inmates[2]. *Id*. The executed agreement can be found in this docket.

(ECF No. 711-1).

As part of the Settlement Agreement, the Parties agreed to the appointment of a monitor.

(ECF No. 711-1 at 25). Ultimately, Dr. Pablo Stewart was selected as the Court appointed monitor.

*Id.*

On June 15, 2017, Dr. Stewart submitted his First Annual Report. (ECF No. 1373). In his

report, Dr. Stewart explained "[m]any significant improvements to the mental health care delivery

system in IDOC have occurred during this first year of the Settlement." (ECF No. 1373 at 9). Dr.

Stewart explained:

At all four of the R&Cs, mental health and suicide screenings occur in a timely
manner in confidential settings. Mental health referrals and assessments are being
accomplished within the required 14-day timeframe for offenders housed in the
R&Cs. Mental health services orientation is occurring at all IDOC facilities.
Segregation Review Committees were formed and significantly reduced the
segregation terms of SMI offenders with more than 60 days left on their segregation
terms. Structured out-of-cell activities have begun to occur in the RTUs and the
Mental Health Unit at Pontiac. Staff have also begun to offer similar activities to

---

[2] All objections have been filed in this docket.

9

offenders on the mental health caseload living in segregated housing units for greater than 60 days, and in some select facilities, to those in the unit for less than 60 days. Unstructured out-of-cell activities are also being offered and currently meet or exceed the requirements of the Settlement.

(ECF No. 1373 at 9). However, Dr. Stewart further explained:

Despite the substantial improvements to the mental health care delivery system, IDOC continues to have challenges in meeting the first-year requirements of the Settlement Agreement. Among IDOC's challenges is the grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the first-year requirements of the Settlement.

(ECF No. 1373 at 10). These deficiencies were again emphasized in Dr. Stewart's Midyear Report of the Monitor dated November 22, 2017. (ECF No. 1646).

On October 10, 2017, Plaintiffs filed their Motion for Enforcement of the Settlement Agreement. (ECF No. 1559). In their Motion, Plaintiffs argue the Defendants are not in compliance with the Settlement Agreement in any of the following areas: (1) Treatment Plans; (2) Evaluations; (3) Medications; (4) Segregation; and (5) Crisis Treatment and Transitions. (ECF No. 1559). The Plaintiffs subsequently filed their Motion to Amend Request for Relief and Memorandum on the Enforcement Process further supporting their position. (ECF No. 1681).

An evidentiary hearing on the Motions was held on December 18 and 19, 2017, and February 27-March 2, 2018. (Minute Entries dated 12/18/2017, 12/19/2017, 2/27/2018, 2/28/2018, 3/1/2018, and 3/2/2018). The Court conducted the evidentiary hearing in two phases. In phase one, Plaintiffs presented their evidence on December 18 and 19, 2017. Plaintiffs introduced exhibits and called as witnesses Dr. Pablo Stewart, the Court Monitor under the Settlement Agreement; Dr. Michael Dempsey, the Department's former Chief of Psychiatry; Dr. Melvin Hinton, the Department's Chief of Mental Health; and Corrie Singleton and Sam Span,

two mentally ill prisoners housed at Pontiac Correctional Facility. (ECF No. 1652, 1751, and 1758).

On February 27 and 28 and March 1 and 2, 2018, Defendants introduced exhibits, cross examined Dr. Stewart, and presented testimony from Dr. William Puga, the Department's new Chief of Psychiatry; Dr. Hinton; Gladyse Taylor, the Department's Assistant Director; Sandra Funk, the Department's Chief of Operations; Marcus Hardy, the Department's Executive Assistant to the Director; Dr. Jeff Sim, the Department's Statewide Mental Health Quality Improvement Manager; Elaine Gedman, Executive Vice President and Chief Administrative Officer of Wexford Mental Health Sources, Inc.; and Amy Cantorna, Wexford's Mental Health Quality Assurance Coordinator. (ECF No. 1866, and 1903-06). Dr. Stewart was recalled for additional questioning on particular topics at the request of the Court. (ECF No. 1905).

After the close of evidence on March 2, 2017, the Court heard arguments from counsel. The Parties have submitted proposed findings of fact and conclusions of law. (ECF Nos. 1857, 1965, and 1966). On April 25, 2018, this Court orally announced its ruling on the Plaintiffs' Motion and Amended Motion to Enforce Settlement Agreement, and sets the matter for hearing on possible equitable relief. Both Parties submitted briefs in advance of the hearing. (ECF Nos. 2049 and 2057). On May 22, 2018, a hearing was held to discuss the possible forms of preliminary relief. (Minute Entry dated 5/22/2018). This Order follows.

## DISCUSSION

The Court begins with a discussion on its authority to render this decision. Section XXIX of the Settlement Agreement sets forth provisions for dispute resolution. There has been no dispute that the Parties have engaged in the necessary procedure to bring this matter to this Court. (*See* ECF No. 711-1 at 29, Settlement Agreement provides for an informal dispute resolution amongst

the Parties.). The Settlement Agreement allows for the Plaintiffs to seek relief from this Court if

there is a dispute as to whether or not the Defendants are in substantial compliance. (ECF No.

711-1 at 29). The Settlement Agreement specifically provides:

> f) If the Court finds that Defendants are not in substantial compliance with a provision or provisions of this Settlement Agreement, it may enter an order consistent with equitable and legal principles, but not an order of contempt, that is designed to achieve compliance.

> g) to permit enforcement of the terms of this Settlement Agreement in federal court, the parties agree that, should it become necessary to seek the Court's assistance as to violations of this agreement, <u>any order granting such relief must include a finding that the relief sought is narrowly drawn, extends no further than is necessary to correct the violation of the federal right, and is the least intrusive means for doing so.</u>

(ECF No. 711-1 at 30) (Emphasis added). The underlined language tracks the language contained

in the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"). While the Settlement Agreement

does not specifically provide for a preliminary injunction hearing, the PLRA provides for

preliminary injunctive relief to remedy violations. The PLRA provides:

> (2)Preliminary injunctive relief.—

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. <u>Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.</u> The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C. § 3626(a)(2) (Emphasis added). Given the above, the Court finds that a preliminary

injunctive hearing is the appropriate mechanism. Defendants have objected to this mechanism

arguing Plaintiffs will never have the obligation of actually proving there is a violation of federal law. (ECF No. 1709 at 2). The Court disagrees as the Plaintiffs will have to seek permanent relief at some point in this proceeding. The Court finds the procedure utilized is consistent with the terms of the Settlement Agreement and the PLRA.

### *Preliminary Injunction Standard and Summary of Decision*

In order to satisfy the requirements for a preliminary injunction, at the onset, Plaintiffs must show: (1) without a preliminary injunction, they will suffer irreparable harm before the final resolution of his claims; (2) 'traditional legal remedies would be inadequate'; and (3) that they have 'some likelihood of succeeding on the merits of his claim.'" *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1004 (C.D. Ill. 2009). If the Plaintiffs establish the required showing, the Court then must balance the potential harms to the parties and, if appropriate, the public interest. *Id.*

The Court finds that the Plaintiffs have established all of the necessary requirements for a preliminary injunction to be issued. As more fully explained below, the Court finds that the Plaintiffs will suffer irreparable harm before the final resolution of the claims. The record contains ample evidence that they are receiving inadequate mental health treatment in the areas of treatment plans, evaluations, medications, segregation, and crisis treatment and transitions. The testimony of almost all of the medical doctors at the hearing clearly stated, in one form or another, the system in place to treat mentally ill inmates at the IDOC is in a state of emergency.

Testimony was also offered demonstrating the irreparable harm being done to the inmates. Not only did the Plaintiffs offer the testimony of mentally ill inmates (ECF No. 1758 at 4, *et seq.* and 127, *et seq.*), Dr. Hinton testified, among other admissions, that there are a significant number

of mentally ill inmates who are in dangerous situations because there is inadequate staffing at the IDOC (ECF No. 1758 at 53).

The Court also finds that the traditional legal remedies are inadequate. The Court finds an injunction must be issued in order to prevent the continuing harm the inmates face from the IDOC's inability to maintain adequate staffing. Finally, the Court finds the Plaintiffs have established a likelihood of succeeding on the merits of their claim. As noted above, the testimony at the hearing adequately showed the current "emergency" state of the IDOC's ability to treat mentally ill inmates.

The Court has considered the balance of the potential harms to the Parties and the public interest. The Court recognizes there are budgetary and some non-economic hurdles (e.g. recruitment) in properly staffing the institutions with adequate mental health professionals. Nonetheless, the Court finds any such constraints are dwarfed by the immense harm to the inmates. The failure to properly treat these inmates – particularly those in segregation - is making them worse "across the board" according to Dr. Hinton. (ECF No. 1758 at 82). These are mentally ill individuals, who themselves are left, in a very real way, at the mercy of the IDOC to provide them with the constitutionally minimal level of health care. And this is simply not being done, and based on the record presented, will not be done unless there is a preliminary injunction issued by this Court.

Finally, the Court has considered the public interest in issuing this preliminary injunction. The Defendants did not raise any issue as to public safety or the ability to operate the prisons if there was adequate staffing. In fact, the record indicates quite, to the contrary, that adequate staffing may actually decrease certain prison problems. (*See* ECF No. 1757 at 260, testimony of Dr. Stewart explained that there is an increase in the use of crisis cells, use of restraints, use of

force, all as a result of patients not being seen frequently enough). The Court recognizes there is a financial component to adequately staffing the institutions. However, the evidence presented during the hearing was that adequate staffing has been budgeted, the positions are just not being filled.

In the end, the Court finds there is little harm in requiring the Defendants to do what they agreed to do, budgeted to do, and, based on this record, are constitutionally required to do.

### *Inadequate Staffing*

As noted above, the Plaintiffs argue the Defendants are not in compliance with the Settlement Agreement in the areas of treatment plans, evaluations, medications, segregation, and crisis treatment and transitions. The Defendants acknowledge they have not fully complied with the terms of the Settlement Agreement. (ECF No. 1965 at 5). The Defendants instead argue the evidence at the hearing was insufficient for this Court to make a finding that there has been a systemic lack of substantial compliance.

The most fundamental issue effecting each of these areas is the IDOC's deficiency in psychiatric and other mental health staffing. This is generally undisputed. The IDOC houses approximately 12,000 inmates who suffer from mental illness, with over 4,800 who are considered seriously mentally ill. (ECF No. 1716, Pl. Ex. 22; *see also* ECF No. 1758 at 50, testimony of Dr. Hinton). These inmates need a certain level of on-going care. During the hearing, several of the witnesses testified about the system-wide staffing problems and the IDOC's inability to meet the required standard of care under the Constitution.

The IDOC's inability to properly staff the institutions with psychiatrists has been a persistent problem. (ECF No. 1716, Plt. Ex. 23, providing summary staffing levels for Nov. 2015, Sept. 2016, and June 2017). Dr. Hinton acknowledged that the IDOC had only 29 psychiatrists

available, with a system-wide need of 65 psychiatrists.  (ECF No. 1758 at 48).  The Defendants explain, however, efforts have been made to increase the staffing levels, or otherwise meet the inmates' mental health needs by utilizing alternatives.  For example, the IDOC has considered a program to utilize primary care physicians to provide mental health services, as well as considering the use of certified nurse practitioners.  (ECF No. 1758 at 74).  At least as to this point, these efforts have not materialized into any significant improvements in the inmates' mental health treatment.

When asked directly about the ability to provide psychiatric care with such a deficiency in staffing, Dr. Hinton's testimony was clear – the IDOC cannot deliver the required level of care. In the simplest form, Dr. Hinton testified as follows:

> Q.  You know today you can't deliver the care—the psychiatric care that is required for the 12,000 patients because you don't have enough psychiatrists?
>
> A.  Correct.

(ECF No. 1758 at 50).

Dr. Hinton was asked about the dangers the lack of appropriate staffing can have on an individual who is taking psychotropic medicine.  The harm was demonstrated in the following exchange:

> Q.  And you've heard all the ills that can come if somebody is on psychotropic medicine and it's not being monitored, right?
>
> A. Correct.
>
> Q. And you know that's dangerous, don't you?
>
> A. Correct.
>
> Q.  And you know that the 6,000 people are being endangered every day they're not seen correctly; isn't that right?
>
> A. Certainly is a concern, yes.

Q. It's more than a concern. It's your responsibility that they get that care; isn't that right?

A. Correct.

Q. And you know they're not getting it?

A. Correct.

(ECF No. 1758 at 52-53).

Dr. Hinton's testimony regarding inmates who are in segregation was also alarming. Dr. Hinton explained the problem related to this issue in the following questions and answers:

Q. [ ]. Why do you have so many mentally ill people in segregation and so few regular population people in segregation?

A. I think, in general, the percentage of folks who are mentally ill tend to have more behavioral issues, in part because of their mental illness.

Q. So, you've got so many of them in segregation because they do -- they don't follow the rules well, right?

A. In part.

Q. And has anyone, to your knowledge, wondered whether or not putting mentally ill people in segregation is good for them?

A. Yes.

Q. Who's done that?

A. I have.

Q. And what's your view?

A. My view is there's nothing -- there's nothing that is a good thing about being in segregation. We need to make sure that they have proper access to treatment.

Q. Now, I believe your testimony the last time I took it on that subject was it won't hurt them if we treat them with the treatment they need, right?

A. Access to treatment, correct.

Q. But how do you know they're getting the treatment they need if they're in segregation?

A. That's why we have to make sure that there are no barriers to the access to treatment.

Q. But you don't have enough people?

A. Correct.

Q. So, you know they're not getting the right treatment?

A. We know that there's significant staffing shortages.

Q. They're not getting the right kind of psychiatric care, right?

A. We don't have -- correct, we don't have the right staffing requirements.

Q. They're not getting enough groups because you don't have enough people to run the groups?

A. Correct.

Q. And you know from your own personal judgment that if you're not doing that for people in segregation, they're going to get worse; isn't that right?

A. Across the board.

(ECF No. 1758 at 81-82)(Emphasis added).

Dr. Michael Dempsey, M.D., staff psychiatrist for Wexford Health Sources from January 2013, until September 2015, who was physically located at Pontiac Correctional Center, also testified about the lack of psychiatric staffing at the IDOC. Dr. Dempsey explained:

Yeah, we don't have enough psychiatrists to treat the patients. We just don't. If I remember correctly, IDOC had projected that they needed 66-1/2 full-time-equivalent psychiatrists to provide care for the population within the IDOC. I'm not sure if we've reached 25 full-time-equivalents at this point since I haven't been working there for the last six months. I know it's not 66.

(ECF No. 1757 at 197). Dr. Dempsey further explained the problems associated with the lack of staffing are as follows:

I believe that we didn't have enough psychiatrists with the kind of expertise that is necessary to understand the correctional system.

Corrections is a unique environment. It takes into account the fact that a person with a serious mental illness who is not in a natural environment is somehow expected, without the kind of supports they need, to function adequately, to understand the rules, the regulations.

And when you have patients who are seriously mentally ill, who may be psychotic, who have impaired reality testing, and you put them in an environment where they're segregated, where they're not treated to any appropriate degree or subtherapeutically, and their options are limited, and they have to make important decisions, I find it becomes an emergent situation.

(ECF No. 1757 at 199).

Finally, when discussing the psychiatric and mental health backlog (more fully discussed below), Dr. Stewart explained:

Well, you know -- again, that backlog can't be taken in isolation. You gotta look at the overall system. So, here we're talking about, you know, increased use of crisis cells, increased use of restraints, increased use of force, people suffering because of untreated mental illness. All of that has to -- is linked in some way with the fact that patients aren't being seen frequently enough or seen at all.

(ECF No. 1757 at 260)(Emphasis added). In his Mid-Year Report, Dr. Stewart further explained:

IDOC leadership has been well aware of the problems related to the insufficient amount of psychiatric services and yet has been unable to adequately solve this issue. At the time of the submission of this midyear report, however, the lack and quality of psychiatric services continues to negatively impact all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement. Of note, these deficiencies regarding psychiatric services were reported in the First Annual Report. The Monitor personally met with Director Baldwin on 6/26/17 to discuss this problem. To date, IDOC is yet to effectively address this emergency.

(ECF No. 1646 at 9).

The Defendants imply the Plaintiffs are unable to show that prisoners suffered harm from the delay in conducting initial evaluations. (ECF No. 1965 at 15). Contrary to that position, each of the above-referenced doctors who testified during the hearing unequivocally stated the inmates'

conditions were getting worse as a result of this staffing problem.  Parenthetically, the Court very much appreciates the candor of Dr. Hinton.  The Court finds his testimony in regard to the IDOC's staffing extremely credible.   Dr. Hinton admitted virtually everything that the Plaintiffs were alleging in terms of the scope of the problem, the reason why the problem has not been adequately addressed, and his testimony was collaborated with the others doctors testifying.    All of them made it clear this is an emergency situation.

Based on the record presented (and under the applicable standard of review), the Court finds the Defendants are not complying with the terms of the Settlement Agreement in the five areas identified herein because, among other things, they have maintained insufficient staffing levels to address the mental health needs of the inmates.  The Court finds that the deficient staffing levels has created an emergency situation, and a situation where the Defendants are unable to provide the constitutionally required care.  The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.  *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)(*citing Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977))("When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers.").  There have undoubtedly been efforts on the part of the Defendants to address the staffing needs with regard to mental health, however, these efforts have been wholly ineffective – and have gone on far too long without any real attempt to adapt or modify based on the knowledge gained from their recruitment efforts.  Bottom line is, these Defendants are required to maintain a minimum level of medical service to avoid the imposition of cruel and unusual punishment.  *Id*.  They have not done so.

Given this background, the Court will now address each of the specific areas.

**Medications**

Dr. Stewart explained that psychiatric conditions are brain illnesses. (ECF No. 1757 at 241). Some of the medication used to treat psychiatric conditions have harsh side effects. *Id*. Because of these side effects, monitoring is required. *Id*. The Settlement Agreement addresses some of the required monitoring for inmates who are taking psychotropic medication.

Sections XII(b) of the Settlement Agreement provides:

Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC Administrative Directive 04.04.101, § II(F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

(ECF No. 711-1 at 15). The referenced Administrative Directive provides:

Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, with extensions on follow-up care for those who psychiatrist have found and documented that the offender has reached stability (outpatient level of care: Not to exceed 90 days; RTU level of care: not to exceed 60 days).

Additionally, the Settlement Agreement requires:

The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive, dyskinesia, high blood pressure, and liver function decline [and]

Adherence to standard protocols for ascertaining side effects including client interviews, blood tests, blood pressure monitoring, and neurological evaluations [ ].

(ECF No. 711-1 at 15).

Dr. Stewart's conclusion related to these requirements was that "[i]t's rare when someone is being seen every 30 days [and he has] [f]ound examples of people being seen -- of medications being routinely written for anywhere from two to six months." (ECF No. 1757 at 243). The reason Dr. Stewart was given by prescribers, the nursing staff, and the clinical administrators for

21

medication being prescribed for longer periods of time was because "[the IDOC doesn't] have enough people to see people every 30 days so [they] write the meds longer so the meds won't expire, and hopefully [they'll] see them within a couple months or three months." (ECF No. 1757 at 243-44). Dr. Hinton and Dr. Dempsey both discussed the ramifications associated with the failure to monitor individuals on psychotropic medication. (ECF No. 1758 at 108-110, Dr. Hinton discussed AIMS score, a process in which psychiatrist or psychiatric provider checks a patient for involuntary movements resulted from medication; *see also* ECF No. 1757 at 179-183, testimony of Dr. Dempsey). And, as explained above, all of these doctors recognized there is a serious staffing issue resulting in the inability to provide adequate care.

Section XII(c)(vi) of the Settlement Agreement provides:

> The offender, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by a MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

(ECF No. 711-1 at XX).

Dr. Stewart reviewed the Defendants' compliance with this provision, and testified:

> [I]in a significant number of charts, I noted that there were periods of time where a person -- it was documented they did not take their medication.

> So, then I would look back in the medical record for -- during that time frame to see if there was a progress note from a mental health professional that indicated that they visited the offender and reviewed the medication non-compliance. And in the overwhelming majority of the cases, there was -- I did not find evidence of that.

> And then I would continue to look in those cases where I did find that the MHP had visited the offender and discussed compliance.

> If there were continued non-compliance of the medication, in those cases I would check the chart again to see if there was a referral to a psychiatrist and if the psychiatrist had met with the offender. And I believe that, in my review, I only found one or two examples of -- where the psychiatrist had actually spoken to the person regarding non-compliance.

(ECF No. 1758 at 23-24). Mental health professionals ("MHP") include:

[A] physician who is licensed to practice medicine and is board-certified in psychiatry by the American Board of Psychiatry and Neurology ("ABPN") or the American Osteopathic Board of Psychiatry and Neurology ("AOBPN"), or has completed four (4) years of an accredited post-graduate training program in psychiatry; a psychologist with a Ph.D/Psy.D and licensed as a clinical psychologist; a licensed psychiatric nurse (i.e., a nurse licensed as an R.N. and certified in psychiatric-mental health); a licensed clinical social worker; or an individual licensed to provide mental health services with a Ph.D/Psy.D or Master's degree in Psychology, Counseling, Social Work or similar degree program. "Licensed" means currently licensed by the State of Illinois.

(ECF No. 711-1 at 4).

Finally, the Plaintiffs also presented evidence that there are problems associated with the timely administration or taking of medication by the offenders. One major problem is that inmates are given their medications but not monitored closely to ensure they have ingested the pills, especially in segregation. *Infra* pg. 29. For example, Dr. Stewart testified one of the inmates he visited had numerous pills on his person that he had not taken. (ECF No. 1757 at 254). In addition, staff members are not making sure inmates are adequately informed about what medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication. These are serious concerns, and the Court doubts any of the medical witnesses would disagree that these issues are avoidable with the proper medication management provided in the Settlement Agreement.

Based on the record presented, the Court finds the Defendants have failed to comply with the terms of the Settlement Agreement with regard to medication management. The Court finds the Defendants have prescribed (or allowed to be prescribed) psychotropic medication in a manner that has created a seriously dangerous situation. Specifically, the Court finds that psychotropic medication has been prescribed with inadequate monitoring, including the supervision to ensure inmates are taking the medication and monitoring of the effects of the same. The Court further

finds the failure to properly dispense the medication has created an emergency situation, and a situation where the Defendants are not providing the constitutionally required care. The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

**<u>Evaluations</u>**

As previously noted, there is no dispute the Defendants have failed to comply with Section V(f) of the Settlement Agreement. Section V(f) provides:

> Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (*see* IDOC Administrative Directives 04.04.100 § II(G)(2)(b) and 04.04.101 §II(F)(2)(c)).

(ECF No. 711-1 at 8).

There was much evidence regarding the significant backlog in psychiatric contacts with inmates. Contacts are activities that psychiatrists and mental health professionals are supposed to accomplish, including evaluations, treatment plans, and follow-up. (ECF No. 1757 at 212-13).

The Defendants argue that the backlog has substantially declined, noting that there is now a backlog of 313 initial evaluations. (ECF No. 1894, Df. Ex. 1a; *but see also* ECF No. 1757 at 213, where it was noted there was a backlog of 445 evaluations, 780 treatment planning contacts, and 2785 follow-up visits). The Defendants further note that a significant amount of these are only delayed 1-14 days. Finally, the Defendants suggest that the record does not identify the number of mentally ill prisoners at the various facilities, and thus, the Court is unable determine how the number of late evaluations at those four facilities compares to the number of mentally ill prisoners at those facilities. (ECF No. 1965 at 14). The Defendants argument that the Court is unable to determine the extent of the problem based solely on the size of the backlog without additional information regarding the population is unpersuasive. Dr. Hinton testified as to the unacceptable nature of the backlog. (ECF No. 1758 at 52, *et seq.*).

Overall, the Court finds this backlog further demonstrates the harm of the on-going emergency staffing problem in the system. Evidence presented at the hearing showed, as of October 2017, there were a total of 4,010 backlogged contacts. (ECF No. 1757 at 213). The Defendants argue they have taken steps to reduce backlogs in psychiatric evaluations. And, the record does reflect that there have been times, including most recently, that there has been reductions in the backlog with respect to certain activities. (ECF No. 1894, Df. Ex. 35; ECF No. 1964-4 at 1). However, the overall backlog remains significant. *Id.* Additionally, the Court would note that the most significant reduction only came around, or after, the filing of the Plaintiffs' initial Motion. (*See id.*, *see also* ECF No. 1559, filed on 10/10/2017). And sometimes at the detriment of providing other services.

The testimony of Dr. Stewart explained that the requirements in the Settlement Agreement for the psychiatric evaluation and follow-up are "minimal" in the context of medical care. (ECF No. 1758 at 39). The failure to properly evaluate a mentally ill individual will result in the exacerbation of the mental illness. (ECF No. 1757 at 260; *see also* ECF No. 1758 at 53, wherein Dr. Hinton explained the dangerous nature of this inaction).

Based on the record presented, the Court finds the Defendants have violated the Settlement Agreement with regard to the requirement of evaluations. The Defendants have failed to maintain adequate the mental health staff so that there are timely inmate evaluations, treatment planning contacts, and follow-ups. This failure has created an emergency situation, and a situation where the Defendants are not providing the constitutionally required care. The testifying medical doctors all made it clear that the evaluations (and other contacts) are necessary to guide the care needed. Without properly engaging in these activities, simply put, there is a significant risk that the care will be ineffective. The Court further finds the Defendants have been aware of these deficiencies

for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

**<u>Treatment Plans</u>**

Plaintiffs contend the Defendants have failed to adhere to the Settlement Agreement's requirements related to treatment planning. In sum, the Settlement Agreement provides:

> As required by IDOC Administrative Directive 04.04.101, § II(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

(ECF No. 711-1 at 9).

Plaintiffs specifically argue the treatment plans are being done in a perfunctory manner that do not facilitate the delivery of mental health services. (ECF No. 1559 at 14). The Plaintiffs also argue that the IDOC has failed to perform the required treatment plan reviews and updates for mentally ill offenders assigned to residential treatment units, segregation, and crisis housing. (ECF No. 1559 at 15). Defendants, however, argue that the reviewed treatment plan form was adopted as a result of issues raised by the Monitor, and the evidence introduced at trial demonstrates the Defendants are in substantial compliance with the requirements of the Settlement Agreement. (ECF No. 1965 at 17-23).

Specifically, Defendants explain Dr. Stewart acknowledged that treatment plans are being prepared for mentally ill offenders with few exceptions. However, he did state that there was a backlog in treatment plans. (ECF 1905 at 79). Dr. Stewart found the bigger issue to be, in a majority of medical files he reviewed, was that the treatment plan used boilerplate language and did "not address the treatment needs of a particular mentally ill offender." (ECF No. 1905 at 80).

The Court notes there was limited information on specific treatment plans that were deficient. Dr. Stewart did review the treatment plan of "Tyler," a SMI inmate who committed

suicide on October 27, 2017, and went as far as saying that the plan had "significant deficiencies that, in [his] opinion, led to the suicide." (ECF No. 1716, Pl. Ex. 25; ECF No. 1757 at 72-91; ECF No. 109 at 1064). In reviewing his treatment plan pages, he identified numerous pages that were left blank. (ECF No. 1757 at 83, 84, 87). Specifically, portions that Dr. Stewart said were "key elements of a person's mental status" as well as the assessment function test that should have listed his history of self-harm. (ECF No. 1757 at 78). Dr. Stewart's testimony highlighted his general observations regarding the preparation of the treatment plans.

> Q. In this period of time, from your annual report in May 2017 to your midyear report, did you find any substantive improvement overall in the quality of treatment planning?
>
> A. In the quality of the treatment planning, no.
>
> Q. And certainly did we see any improvement in the quality of Tyler's treatment planning?
>
> A. No, at all. In reviewing these, this is what I referred to earlier, that they go through this and leave pages blank. I mean, they have the form set up there. All you gotta do is check a couple boxes, and they didn't bother to do that, which is very common for -- with treatment planning that I've reviewed this last 18 months.

(ECF No. 1757 at 91).

Dr. Stewart testified there is a "huge urgency" in the area of treatment planning and believes that staff needs to make treatment planning a priority. ECF 1905 at 1057-1058. When pressed on the question of priorities overall Dr. Stewart said, "I agree that priorities need to be made, but the priority that hasn't been made is to go out and get sufficient staff so you don't have to make these very dangerous choices of doing follow-up visits versus treatment plans." (ECF No. 1905 at 95). The common theme noted throughout this Order is that the staff deficiencies constrain the delivery of mental health services. In this regard, Dr. Stewart testified:

> I think we saw from the testimony in the last couple of days about the backlogs. And although the bulk of the backlogs belong to follow-up appointments, there

were a significant number, in my opinion, of backlogs for psychiatric evaluations and treatment planning.

So, if the treatment plan is designed to provide the framework from which the care is provided, and if it's late, then the care is delayed. That's about all I can say about timeliness.

(ECF No. 1905 at 79). In the end, the evidence presented at the hearing related to treatment plans clearly showed that IDOC's failure to properly staff the institutions effects their ability to timely and effectively complete, review, and monitor the treatment plans.

Based on the record presented, the Court finds the Defendants have failed to comply with the terms of the Settlement Agreement with regard to treatment plans. The Court finds the Defendants have failed, in a systemic way, to properly create, update, and monitor the treatment plans. This problem has been caused, in a large part, by the Defendants' failure in addressing the staffing needs. The Court finds, and the record shows, the staffing deficiency has caused the Defendants to have to make the "very dangerous choice" of choosing what service to provide at the exclusion of others. *See supra* pg. 27. The Court further finds the failure to properly address the treatment plans has created an emergency situation, and a situation where the Defendants are not providing the constitutionally required care. The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

**Segregation**

Under Sections XV(a)(iii):

Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

(ECF No. 711-1 at 17). The Settlement Agreement also places certain timeframes on MHP's review of, and updates to, the treatment plans for mentally ill offenders placed in segregation.

The purpose of this requirement is simple – when you place an inmate[3] "into a segregation system, you need to review and update the treatment plan given the vastly different environment the person is in." (ECF No. 1905 at 82). Dr. Hinton's testimony detailed above makes it clear that the requirements related to inmates who are in segregation are simply not being met. *Supra*, pg. 16. In fact, Dr. Hinton testified that, in his view, "there's nothing that is a good thing about being in segregation." (ECF No. 1758 at 82). The record, at least as it relates to mentally ill inmates, supports this conclusion.

Dr. Stewart testified that the IDOC's medication management for those in segregation is worse than for Class Members elsewhere in the system. Dr. Stewart specifically noted that there is a significant problem in the failure to ensure that those in segregation who are prescribed psychotropic medication actually take the medication. (ECF No. 1757 at 123).

Additionally, there was testimony and evidence during the evidentiary hearing regarding Defendants' non-compliance with the out-of-cell time required for mentally ill inmates placed in segregation. (ECF No. 1757 at 136; s*ee also* ECF No. 711-1 at 20, Section XV(c) of the Settlement

---

[3] It should be noted that Dr. Stewart also explained that inmates in segregation are:

> [ ] some of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely.
>
> And so -- you know, and they get nothing. Couple little things thrown at them. But they really don't get any sort of regular treatment.
>
> And so this is a real serious issue, you know. I don't want to put a number on it. It's, it's -- it's as serious as I've seen.

(ECF No. 1905 at 182-83).

requires "mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time.")

Dr. Stewart explains the consequences of this failure are:

[ ] psychiatric decompensation. And then we run into that whole line, you know, acting out, writing up, more segregation time and/or going to crisis, coming out. It's -- the fact that (vi)(A), which is continuation of the initial treatment plan with enhanced therapy, if necessary, to protect from decompensation that may be associated with segregation, that's not being done. People are getting worse in segregation.

(ECF No. 1905 at 174).

Based on the record presented, the Court finds the Defendants have failed to comply with the terms of the Settlement Agreement with regard to segregation. The testimony during the hearing shows deficiencies in medical treatment in segregation have created an extremely dangerous situation. The length of time, sometimes staggering, that inmates are put in segregation, without properly addressing their mental health medical needs, furthers the mental decomposition of the inmate. Moreover, the failure to address the inmates' mental health needs after being released exacerbates the inmates' mental health problems. The Court further finds that the failure to properly address the mental health needs of inmates in segregation has created an emergency situation, and a situation where the Defendants are not providing the constitutionally required care. The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to adequately address these deficiencies amounts to deliberate indifference.

**Crisis Treatment**

Dr. Stewart explained that the crisis level of care is needed to assist "people that are presenting with acute problems that need aggressive intervention to deal with a particular acute issue." (ECF No. 1757 at 38). Dr. Stewart further testified that it is "imperative that their treatment

is reviewed, not just by one individual but for the entire treatment team that's involved with the case [ ] [a]nd that's not happening."  (ECF No. 1757 at 52).  The Settlement Agreement provides certain requirements as it relates to crisis treatment.

First, the Settlement Agreement provides:

> Beds that are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilized the offender prior to transfer to a more or less intensive care setting, as required by IDOC Administrative Directive 04.04.102, § II(F)(2).

(ECF No. 711-1 at 3).

Dr. Stewart testified that, based on his review, the only treatment that regularly occurs on crisis watches is the daily contact by the MHP, which are confidential sessions at some facilities but takes place most often at the cell front.  (ECF No. 1905 at 131).  Dr. Stewart explained that:

> But again, as I said, the only thing that occurs is being placed in the cell, having certain property removed, and then getting these daily visits. And so there's no specialized treatment that occurs for people in crisis.

(ECF No. 1903 at 198-99)(Emphasis added).

The Settlement Agreement also provides:

> For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form which will be specifically designed for this purpose by IDOC and approved by the Monitor. This five-day assessment process will be in addition to IDOC's current procedure for Crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from Crisis Watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

(ECF No. 711-1 at 10).

Dr. Stewart concluded, based on his review, Defendants are only conducting the first suicide evaluation, but are not continuing to assess monthly for six months. (ECF No. 1757 at 232). Dr. Stewart also opined that the Defendants' failure to conduct necessary evaluations and assessments of those who are discharged from crisis watches results in unnecessary harm and suffering, especially as those failures combine with inadequate treatment planning and psychopharmacology. (ECF No. 1757 at 231). Based on the testimony presented at the hearing, the Court finds that there is a serious deficiency in the treatment of inmates who are placed in, and subsequently transitioned from, crisis treatment. It is the opinion of this Court that this deficiency is directly caused by the Defendants' inadequate staffing of mental health professionals.

Based on the record presented, the Court finds the Defendants have failed to comply with the terms of the Settlement Agreement with regard to crisis treatment. The testimony during the hearing shows deficiencies in medical treatment for inmates in crisis have created an extremely dangerous situation. Inmates' needs are not being properly addressed, particularly by the lack, and quality, of contacts with mental health providers. Moreover, the Defendants are not providing adequate contact with the inmates after they have come off of crisis watch. The Court further finds the failure to properly address the mental health needs of inmates in crisis watch has created an emergency situation, and a situation where the Defendants are not providing the constitutionally required care. The Court further finds the Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to adequately address these deficiencies amounts to deliberate indifference.

**Deliberate Indifference**

To establish a constitutional violation, Plaintiffs must prove that Defendants have been deliberately indifferent to their serious medical needs, specifically their mental health needs.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted).

An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and (2) "the defendants were deliberately indifferent to that risk." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). The objective element requires that the plaintiff's medical need to be "sufficiently serious." *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). The subjective element requires that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837(1994)

To meet the objective prong, the medical need must be one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gutierrez*, 111 F.3d at 1373. A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The Seventh Circuit has agreed with other courts in concluding that the "[t]reatment of the mental disorders of mentally disturbed inmates is a "serious medical need." *Wellman*, 715 F.2d at 272 *citing Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980); *Inmates v. Pierce,* 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir. 1977).

The subjective component requires a plaintiff to "provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.

2016), *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur." *Id., citing Farmer*, 511 U.S. at 842. However, medical malpractice, negligence, or even gross negligence do not equate to deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). *See also Estelle*, 429 U.S. at 106; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

The Seventh Circuit has recognized claims of systemic deficiencies in a prison's health care facility as a second category of deliberate indifference claims. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989). In case of alleged systemic deficiencies, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman*, 715 F.2d. at 272 *citing Ramos*, 639 F.2d at 575. The Seventh Circuit has concluded "that a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs." *Cleveland-Perdue*, 881 F.2d at 431. *See Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), (affirming a district court decision finding that systemic deficiencies in the Alabama prisons including inadequate staffing, treatment by unqualified personnel, incomplete medical records and lack of written procedures establishing the duties and responsibilities of the medical personnel.).

The Court has considered each of the above areas of non-compliance, as well as the efforts the Defendants have made to cure the deficiencies. The Court finds that the Defendants have been constitutionally deficient in the delivery of care in each of the areas identified herein. The Court further finds that when taken together, it is abundantly clear the deficiencies create an emergency situation. The Court finds, considering all of the areas of non-compliance in total, and in spite of

the positive changes already made, the Defendants' conduct amounts to deliberate indifference. It is unquestionable that the lack of adequate staffing is placing inmates in significant harm. During the Hearing held on May 22, 2018, Defendants argued that the evidence presented was "thin" with respect to the harm to the inmates. This Court disagrees and anyone reviewing this matter need only look to the testimony of the doctors. Dr. Hinton, Dr. Dempsey, and Dr. Stewart all testified, in some form, that the staffing deficiency has created an emergency situation. To further emphasize this point, the Court would note:

Dr. Hinton testified:

> Q. Do you believe that adequate care is being given to the 11- or 12,000 mentally ill people in the system today?
>
> A. I believe there are shortcomings.
>
> Q. So, you believe that many people are getting inadequate care; isn't that right?
>
> A. I do believe there are shortcomings, yes.
>
> Q. What do you mean, "I believe there are shortcomings"?
>
> A. <u>Again, as we pointed out, there are sufficient-- or significant staffing issues that need to be addressed</u>.
>
> Q. And that means some people are getting inadequate care, right?
>
> A. Certainly would lend to that.

(ECF No. 1758 at 94-95)(Emphasis added).

Dr. Dempsey testified:

> Q. And referring you to page nine, Dr. Stewart explains that the lack and quality of psychiatric services has contributed to an emergency situation. Is that consistent with your view of the state of the system when you left in May of 2017?
>
> A. Yes, it is.
>
> [ ]

A. My answer is yes, I considered it an emergency situation.

(ECF No. 1757 at 198-199).

And Dr. Stewart surmised:

> Despite the improvements to the mental health care delivery system, IDOC continues to not be able to meet the majority of the requirements of the Settlement Agreement. Among IDOC's biggest challenges is the lack of psychiatric services which meet a constitutional minimum level of care. That is, there continues to be a grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the requirements of the Settlement.

(ECF No. 1646 at 9).

In this case, the Court finds there has been a systemic constitutional deficiency in addressing the psychiatric and mental health professional staffing shortage. The Court recognizes the Defendants have made efforts to recruit and attract these professionals. Unfortunately, these efforts have not been sufficiently fruitful. Nonetheless, this is not a problem the Defendants can hide from; nor is it a problem that has only recently surfaced. In fact, the Defendants have been well aware of its staffing problem, and all constitutional deficiencies mentioned above, perhaps even before the filing of this case. If the Defendants are unable to recruit the talent they need, they must come up with alternatives that satisfy their obligation to provide constitutionally required care for mentally ill inmates. The Court would note that the Defendants have suggested the use of tele-psychiatry, primary care physicians, and nurse practitioners. The Court makes no finding as to whether these are viable plans, but the Defendant is certainly encouraged to determine the feasibility of such use.

Furthermore, this Order is not intended to condemn the Defendants for their efforts addressing the issues related to mental health treatment. The Defendants have made progress in many areas. The Department has obtained funds for construction and remodeling projects. In fact,

the Defendants have already invested $45 million in capital projects.  Additionally, the Monitor noted areas where the Defendants have achieved compliance with the Settlement Agreement, including:

> A greater number of structured out-of-cell activities are being offered to those mentally ill offenders assigned to segregation, and there was improved content in group therapy in some locations. The RTU at Joliet began accepting mentally ill offenders on 11/6/17. Dixon has made significant progress and is close to being substantially compliant with constructing sufficient bed and treatment space for 625 RTU offenders. More institutions moved from cell side to private contacts for crisis care. Dixon has improved the overall confidentiality of its psychiatric contacts. It is a major improvement that treatment plans in Dixon's STC are now completed during monthly review meetings by members of every discipline treating the patients. The mental status examinations of the mental health evaluations were somewhat more comprehensive.

(ECF No. 1646 at 8-9).  But, at the end of the day, the Defendants must address their staffing deficiency.  One of the more problematic issues arising out of the hearing is what appears to be the lack of any sense of urgency on the part of the Defendants to address its staffing issue.  This began as far back as 2014 when the Defendants created their own 2014 remedial plan, and have yet to fulfill the staffing requirements.  The Plaintiffs note that after the Monitor issued his First Annual Report in May 2017, and Plaintiffs initiated the dispute resolution process in June 2017. (ECF No. 2057 at 2-3).  As part of that process, the Defendants were required to investigate the allegations and propose a corrective action plan.  *Id*.  The Plaintiffs allege nothing was done.  *Id*. The Plaintiffs additionally allege no action has been taken by the Defendants to address the alleged deficiencies at any step of the pre-litigation procedure.  *Id*.  The Defendants object to this characterization.  The record certainly supports Plaintiffs' position, but regardless, it appears to this Court the Defendants have been unable to put forth any meaningful plan to address the deficiencies.  The Court further finds his type of relief is consistent with the PLRA, the Settlement Agreement, and the law of this Circuit.  *French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) (District

Court was "within his power in drafting a detailed remedy to curb egregious neglect and mismanagement [ ]" including a comprehensive overhaul of the medical staff.)

Despite this, the Defendants have objected to this Court moving forward with its own plan and not providing them the opportunity to submit its own plan to come into compliance. In support of their position, Defendants provided various district court opinions taking this approach. *See Lipscomb v. Pfister*, No. 12-CV-1041, 2014 WL 287269, at *3 (C.D. Ill. Jan. 27, 2014); *Lacy v. Dart*, No. 14 C 6259, 2015 WL 5921810; and *Skinner v. Uphoff*, 234 F. Supp. 2d 1208, 1217 (D. Wyo. 2002). While this approach may have been prudent in those cases, the Court finds such approach would be ineffective in this case. This case has been pending for over a decade, and the time has certainly come to take action to address the emergency situation described by the doctors who testified at the hearing.

The Court also believes it is necessary to put in place additional measures to ensure inmates are receiving constitutionally required mental health care for a period of time until Defendants have demonstrated its staffing requirements are met. The Court has fully considered the record presented, and finds remedies set forth below satisfy the requirements of the PLRA and the Settlement Agreement. The Court further finds that this is a narrowly tailored injunction that satisfies the Seventh Circuit's requirement, including the requirements contained in *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012). Notably, in *Westerfer*, the Seventh Circuit examined Illinois inmates' challenge to the IDOC's procedures for assigning inmates to the super-max prison. *Id*. The Seventh Circuit reiterated the district court's obligation to consider the operational discretion and flexibility of prisoner administrators in fashioning preliminary injunctive relief. *Id*. at 682. The Seventh Circuit raised concerns over imposing specific timeframes in the context of that case because, among other things, the relief (e.g. additional notice) far exceeded the due

process requirement. *Id*. at 684. In that regard, the Seventh Circuit noted that the district court "ha[d] in effect established the details of that system as constitutional requirements." *Id*. at 686. But here, the Court finds that the timeframes set forth below are necessary, narrowly tailored, and provide the prison mental health staff the flexibility they need in providing the medical care. These timeframes are necessary in order to prevent the unnecessary suffering of inmates and creation of dangerous situations, as described by the medical doctors testifying in this case. Moreover, and contrary to the Defendants' position during the hearing held on May 22, 2018, the Court finds that, to the extent the obligations set forth below are specific in nature, such requirements are necessary to insure inmates receive constitutionally required care given the Defendants' lack of compliance with their own directives and the Settlement Agreement.

THEREFORE, IT IS ORDERED:

In order to bring Defendants into compliance with constitutional law and to prevent further harm to Plaintiffs Class Members, the Court orders as follows:

1. For any class member placed on a mental health crisis watch:

   a. IDOC shall provide appropriate mental health treatment to stabilize the symptoms and protect against decompensation.

   b. Reevaluations of treatment and medication will occur as needed and mental health treatment shall be determined and any necessary interventions to stabilize individuals shall occur.

   c. Daily assessment in a confidential setting of patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required.

   d. Prior to discharge from crisis watch multidisciplinary team with the patient shall review and update the treatment plan.

   e. Prior to discharge from crisis watch an appropriate mental health professional with the patient shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan will address causes which led to the deterioration and the plan for risk management to prevent relapse.

     f.   For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility, or explain in writing why establishing such a plan is not appropriate.

2.   As to class members housed in Control Units:

     a.   Mental Health Professionals shall assess any class member promptly after initial placement in administrative detention, disciplinary segregation, or other similar restrictive status (collectively referred to as Control Unit). Such review shall be documented in the patient's progress notes. The purpose of the assessment shall be at a minimum to determine whether the patient has decompensated and should be removed from the Control Unit and to provide a baseline against which any future decompensation or deterioration of the patient's mental status can be measured

     b.   Class members who are in a Control Unit for periods of sixteen days or more shall receive care that includes at a minimum:

          i.   Continuation of their mental health treatment plan with such treatment as necessary to protect from any decompensation.

         ii.   Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff.

        iii.   Pharmacological treatment (if applicable).

        iv.   Participation in multidisciplinary team meetings to the extent clinically appropriate.

         v.   MHP or mental health treatment team recommendations to post-segregation housing.

     c.   Class members in any Control Unit for periods longer than 60 days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation.

     d.   Mental health staff shall assess class members in Control Units to determine if a higher level of care is necessary and if so, to make proper recommendations to facility authority.

3.   Within 90 days of this order, Defendants shall provide sufficient staff to address constitutional violations in the five areas identified in this order.

4. Within 60 days of this order, Defendants shall evaluate whether their current staffing plan is sufficient to provide mental health treatment consist with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation, and mental health evaluations.

5. Defendant shall report on their findings and submit a proposed amended staffing plan, if necessary, to the monitor and plaintiffs' counsel.

6. Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards.

7. IDOC shall accomplish the following in psychiatric services:

   a. Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed.

   b. The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskenesia, high blood pressure, and liver function decline.

   c. Take necessary steps to ascertain side effects including client interviews, blood tests, blood pressure monitoring, AIMs review, and neurological evaluation.

   d. The timely performance of lab work for these side effects and timely reporting on results.

   e. The class members for whom psychotropic drugs are prescribed receive timely explanations from appropriate medical staff about what the medication is expected to do, what alternative treatments are available, and what in general are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

   f. That class members, including offenders in a Control Unit who experience medication noncompliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's medication noncompliance said noncompliance remains unresolved, the MHP shall refer the offender to a psychiatric provider.

8. All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs, including long and short term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible.

9. Treatment plans shall be reviewed and updated at regular intervals as clinically necessary to assess the progress of the documented treatment goal and update the plan accordingly.

10. A quarterly report created by IDOC shall certify each facility's compliance with the above requirements.

11. Nothing in this order relieves the Defendants of their obligations under the Settlement Agreement.

This preliminary injunction shall expire 90 days after its entry, unless this Court enters a final order for prospective relief before then.  18 U.S.C. § 3626(a)(2).

Entered this 25th day of May 2018.

_____
/s/ Michael M. Mihm
Michael M. Mihm
U.S. District Court Judge