**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| ASHOOR RASHO, et al., | |
| Plaintiffs, | No. 1:07-CV-1298-MMM-JEH |
| v. | |
| DIRECTOR JOHN R. BALDWIN, et al., | Hon. Michael M. Mihm |
| Defendants. | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

Defendants respectfully submit the following proposed findings of fact and conclusions of law on plaintiffs' motion for a permanent injunction (Dkt. 2112), based on the entire record before the court, including the evidence submitted at the preliminary injunction hearing conducted on December 18 and 19, 2017, and February 27, 28 and March 1 and 2, 2018, and during the permanent injunction hearing conducted on August 27 through 31 and September 5 through 7, 2018.

**I.      Introduction and Summary of Findings of Fact and Conclusions of Law**

1.      This case was brought as a class action under 42 U.S.C § 1983 alleging violations of the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794, based on alleged failures to deliver adequate mental health services to mentally ill prisoners in the physical custody and control of the Illinois Department of Corrections ("IDOC" or "Department"). (Dkt. 711-1 and PX-1, Amended Settlement Agreement, §§I (a) and (b); Dkt. 260, Third Amended Complaint.)[1]

---

[1] Plaintiffs' Third Amended Complaint also contained a substantive due process claim under the Fourteenth Amendment (Dkt. 260, Count III), but the Settlement Agreement makes no mention of that claim, and in in any event, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the

2.      On May 23, 2016, the Court approved an Amended Settlement Agreement. (Dkt. 709 and 711-1.)

3.      On October 10, 2017, plaintiffs, through class counsel, filed a Motion to Enforce the Settlement Agreement (Dkt. 1559), which they later requested to convert into a motion for preliminary injunction. (Dkt. 1675.) Plaintiffs claimed that the Department was not in substantial compliance with five particular parts of the Settlement Agreement, and asserted that those violations rose to the level of "deliberate indifference" to plaintiffs' mental health needs in violation of the Eighth Amendment, and also violated the Americans with Disabilities Act by discriminating against mentally ill prisoners in segregation because of their mental illness disability. (Dkt. 1559 at 32 and 39 ¶ 3; Dkt. 1857 at 42 ¶ k.)

4.      After the Court conducted an evidentiary hearing on plaintiffs' request for a preliminary injunction, the Court entered an order on May 25, 2018 granting plaintiffs' motion for a preliminary injunction. (Dkt. 2070.) The Court's May 25, 2018 order did not address plaintiffs' ADA/Rehabilitation Act claim.

5.      Plaintiffs' thereafter moved to convert the preliminary injunction into a permanent injunction. (Dkt. 2112.) Accordingly, the Court conducted an evidentiary hearing on plaintiffs' motion for a permanent injunction over the course of eight days from August 27–31 and September 5–7, 2018. The purpose of the permanent injunction hearing was to determine if plaintiffs could prove by a preponderance of the evidence that they are entitled to a permanent injunction to correct a current and ongoing systemic violation of the Eighth Amendment or the ADA as a result of deliberate indifferent to the mental health needs of the plaintiff class

---

standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

throughout the IDOC system. The hearing constituted a trial on the merits on plaintiffs' Eighth Amendment and ADA/Rehabilitation Act claims.

6.      Based on the entire record, discussed below, the Court concludes that plaintiffs have not met their burden of proof. In short, plaintiffs have not demonstrated, in the words of the Seventh Circuit, that "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate [mental health] care." *Phillips v. Sheriff of Cook Cnty*., 828 F.3d 541, 554 (7th Cir. 2016) (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)). Although plaintiffs pursued a case alleging systemic failures to deliver adequate mental health throughout the IDOC system, their evidence was focused almost exclusively on particular conditions affecting prisoners in segregation and crisis at Pontiac and Dixon. Although plaintiffs raised concerns about certain aspects of care provided at those facilities, the record does not support a conclusion that "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" are causing the entire mentally ill "inmate population" within the IDOC system to be effectively denied access to adequate mental health care that meets constitutional standards. Although the Department is not yet in full compliance with all requirements of the Settlement Agreement, the Court is satisfied that the Department now has the leadership, staffing, facilities, and procedures and policies in place to ensure that mentally ill prisoners are reasonably protected against significant harm of decompensation, and are receiving the "minimal civilized measure of life's necessities" that are required to meet "contemporary standards of decency" required to provide constitutionally adequate care.

7.      Plaintiffs also have not established that the defendants are being "deliberately indifferent" to the need to provide adequate mental health care to mentally ill prisoners housed in the Illinois Department of Corrections. Although at times the Department's pace at effecting

change has been slower than some desired, and the levels of staffing have been lower than desired, the defendants have not exhibited a "wanton" or "subjectively reckless" disregard for the challenges they face in providing a mental health system that meets constitutional standards. Far from being "deliberately indifferent," over the years since the initiation of the *Rasho* litigation, and particularly since the execution of the Settlement Agreement, the Department of Corrections has continued to build and enhance an entirely new mental health care system.

## II.     Procedural History

### A.  Plaintiffs' Motion to Enforce the Settlement Agreement and Motion for Preliminary Injunction

8.      In Dr. Stewart's First Annual Report dated May 22, 2017, Dr. Stewart reported that even though the Department had made "significant" and "substantial" improvements to its mental health care delivery system, it continued to "have challenges in meeting the first-year requirements of the Settlement Agreement." (PX-15 at 9–10.) Dr. Stewart reiterated these points in a letter to the Department dated October 1, 2017. (PX-18.)

9.       Plaintiffs followed Dr. Stewart's October 1, 2017 letter with a Motion to Enforce the Settlement Agreement, filed October 10, 2017. (Dkt. 1559.) Plaintiffs contended that the Department was not in substantial compliance with five parts of the Settlement Agreement, and further contended that those violations constituted "deliberate indifference" in violation of the Eighth Amendment and amounted to intentional discrimination in violation of the Americans with Disabilities Act. (Dkt. 1559.) Plaintiffs contended that the alleged failures in the five areas were "systemic" throughout the IDOC system. (Dkt. 1559 at 27.)

10.     The five areas of the Settlement Agreement addressed in plaintiffs' motion related to *Evaluations* of mentally ill prisoners within 14 days of their referral for mental health services under §V(f); *Treatment Planning* under §VII(a), (b), (c), and (d); *Medication Management* under

§XII(b), §XII (c)(ii), (iii), (v), and (vi), and §XIX(d); treatment for prisoners in *Segregation* under §XV(a)(iii) and (vi), §XV(c)(iii), and §XV(c) on p. 20[2]; and treatment for prisoners on *Crisis* watches under §II(e) and §VIII(b)(i). And although plaintiffs' Motion to Enforce the Settlement Agreement did not allege a violation of §IX of the Settlement Agreement, which specifically applies to hiring additional mental health staff, they also sought relief as to mental health staffing. (Dkt. 1559 at 40 ¶ 7 and ¶ 8(d); Dkt. 1900 ¶ 3.)

11.     On December 5, 2017, plaintiffs requested to convert their motion to enforce the Settlement Agreement into a motion for preliminary injunction (Dkt. 1675). The Court thereafter conducted an evidentiary hearing on plaintiffs' motion for a preliminary injunction over the course of six days on December 18 and 19, 2017, and February 27, 28 and March 1 and 2, 2018. After the preliminary injunction hearing, the parties submitted proposed findings of fact and conclusions of law. (Dkt. 1965 and 1966.)

12.     On April 25, 2018, the Court announced its intention to issue a preliminary injunction and scheduled a hearing on May 22, 2018 to address the nature of relief the Court could enter consistent with the Settlement Agreement and the Prison Litigation Reform Act. During the May 22, 2018 hearing, with input from the parties (but over defendants' objection), the Court determined the relief that would be contained in the preliminary injunction order.

13.     On May 25, 2018, the Court entered an order granting plaintiffs' motion for a preliminary injunction. (Dkt. 2070.) The Court's order discussed the background of the case and the proceedings related to the preliminary injunction motion. The order also explained the basis for the Court's conclusion that plaintiffs' had satisfied the elements for a preliminary injunction with respect to the five specific areas of the Settlement Agreement related to (a) initial mental

---

[2] §XV has two provisions labeled §XV(c) (pp. 19, 20).

health evaluations, (b) treatment planning, (c) medication management, (d) mental health care for prisoners on crisis watches, and (e) mental health care for prisoners in controlled housing (referred to as segregation). (*Id*.) The order also imposed the relief discussed with the parties at the May 22, 2018 hearing. (*Id*. at 39–42.)

14.     Under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2), the Court's preliminary injunction automatically expired after 90 days (on August 23, 2018). The Court did not extend its preliminary injunction order, and neither party requested an extension. Instead, on June 6, 2018, plaintiffs moved for a permanent injunction. (Dkt. 2112). The Court accordingly conducted a trial on the merits over the course of eight days from August 27–31 and September 5–7, 2018.

**B.  The Permanent Injunction Hearing**

15.     For purposes of the permanent injunction hearing, the parties agreed that the Court could consider the evidence presented during the preliminary injunction hearing. (Dkt. 2286, Proposed Pretrial Order; Fed. R. Civ. P. 65(a)(2).) During the permanent injunction hearing, plaintiffs introduced additional exhibits and testimony from four witnesses: the settlement monitor, Dr. Pablo Stewart; prisoners Joe Champs and Ralph Kings, who are housed at the Pontiac Correctional Center; and former prisoner Anthony Gay, who had been recently released from the Dixon Correctional Center. Plaintiffs did not present testimony from, or evidence about, any designated class representatives in either hearing.

16.     In addition to the evidence presented at the preliminary injunction hearing, at the permanent injunction hearing defendants introduced new exhibits and testimony from the Department's Acting Director, John Baldwin; Dr. Melvin Hinton, the Department's Chief of Mental Health and Addition Recovery Services (Baldwin and Hinton are the two current defendants named in their official capacities); Dr. William Puga, the Department's Chief of

Psychiatry; three of the Department's "psychologist administrators," Dr. Inna Mirsky (Stateville), Dr. Melissa Stromberger (Hill), and Dr. Kelly Renzi (Pontiac); Dr. Jeff Sim, the Department's Statewide Manager of Quality Assurance and Quality Improvement;  Executive Vice President and Chief Administrative Officer of Wexford Mental Health Sources, Inc., Elaine Gedman; Wexford's Mental Health Quality Assurance Coordinator, Amy Mercer (formerly Amy Cantorna); Wexford's Regional Mental Health Director for Illinois, Dr. Bill Elliott; Wexford's Vice President of Special Projects, Cheri Laurent; and two Wexford psychiatrists: telepsychiatrist (at Vienna and Vandalia), Dr. Jack Yen, and face-to-face psychiatrist at Dixon, Dr. Al Doyle, and a retained expert, Holly Andrilla.

17.     The purpose of the hearing was to determine if plaintiffs could prove by a preponderance of the evidence that they are entitled to a permanent injunction to correct a current and ongoing systemic violation of the Eighth Amendment and the ADA as a result of deliberate indifference to the mental health needs of the plaintiff class throughout the IDOC system. The hearing was a trial on the merits of all issues that were or could have been litigated during the trial on plaintiffs' Eighth Amendment and ADA/Rehabilitation Act claims.

### C.  The Monitor's Role and Conclusions

18.     Pursuant to §XXVII of the Settlement Agreement, the parties agreed to the appointment of Dr. Pablo Stewart as a monitor to review and assess the Department's compliance with the Settlement Agreement and to assist in resolving disputes "in the most expeditious and non-adversarial fashion possible." (§XXVII(f)(iii).) As part of his duties as the monitor, Dr. Stewart submits to the parties and the Court an annual report as well as midyear status updates. (§XXVII(m) and (n).) Dr. Stewart's reports are based on periodic visits to various IDOC facilities by members of the monitoring team. (PX-10 at 9; PX-21 at 8; PX-52 at 8–9.) Dr. Stewart admits that the focus of his reviews has been on the "big five" facilities: Dixon, Logan,

Stateville, Menard, and Pontiac. (PI 1059:15–20; Tr. 1166:8–20.)[3] Dr. Stewart acknowledged that some of the prisons do not have serious issues (Tr. 1165:25–1166:7), that Logan has made "tremendous progress" (Tr. 1166:11), and that the most serious problems are limited to a few institutions like Pontiac and Dixon (Tr. 1166:8–20). Dr. Stewart also acknowledged that he would need to look at the specific facilities to see what is happening at that facility in regards to mental health treatment (Tr. 1162:17–20), which he did not do. In 2018, Dr. Stewart and his team have not visited Big Muddy, Danville, Decatur, Hill, Jacksonville, Kewanee, Lincoln, Murphysboro, Robinson, Sheridan, Southwestern, Taylorville, or Vandalia. (PX-52 at 2, 8–9.)

19.    Dr. Stewart's reports include his findings and conclusions about the Department's "substantial compliance" and "non-compliance" with various aspects of the Settlement Agreement. (PX-21 at 5–7, 17.) In making those determinations, Dr. Stewart acknowledged that "[i]n practice, IDOC *has made significant progress on a number of requirements*. These would be more accurately described as 'partially compliant,' but by the terms of the Settlement, those provisions must be found in Non-compliance." (PX-21 at 17, emphasis added; PI Tr. 1061:19–1062:9.) The Court thus recognizes that Dr. Stewart's findings of "non-compliance" at particular facilities may involve areas where the Department is partially compliant. (*Id*.) It falls to the Court to determine whether the record supports a finding that the Department is not in "substantial compliance" as that term is defined in §II(t) of the Settlement Agreement, and whether any areas of non-compliance rise to a violation of federal law.

20.    Dr. Stewart acknowledged the Department's leadership has been "extremely cooperative" with his monitoring efforts. (PI Tr. 543:7–544:5, 545:23–546:6, 639:2–10; PX-15 at 9; PX-21 at 8.) Dr. Melvin Hinton, the Department's Chief of Mental Health, testified that

---

[3] Transcripts from the preliminary injunction hearing are cited as PI Tr. [page:line]. Trancripts from the preliminary injunction trial are cited as Tr. [page:line].

whenever Dr. Stewart has raised specific issues for the Department to address, the Department has done everything it can to address the requests. (PI Tr. 1362:1–4; Tr. 508:17–509:3.)

21.　　On May 27, 2018, after the preliminary injunction hearing, Dr. Stewart provided a Second Annual Report. (PX-52.) That report was based on visits to selected prison in 2017 and early 2018, with the last visit being at Pontiac on April 27, 2018. (*Id*. at 8–9.) In addition, after the Court issued its May 25, 2018 preliminary injunction order, Dr. Stewart undertook an effort to assess the Department's compliance with that order. (Tr. 960:8–961:9; PX-53.) The Department in turn submitted its own quarterly report, dated July 23, 2018, concerning the status of its compliance with the various provisions of the Settlement Agreement, as well as its compliance with the Court's May 25 order. (DX-55.) The Department's report also responded to and disputed Dr. Stewart's findings of non-compliance. (*Id*.)

22.　　During the permanent injunction hearing, Dr. Stewart described the methodology he used to assess the Department's compliance with the Court's preliminary injunction order. That methodology entailed having members of the monitoring team review mental health charts at 11 of the 28 IDOC prisons, and assign a "1, 2, 3" rating to various activities reviewed (such as treatment plans and aspects of crisis care), with a rating of 1 indicating the monitoring team's finding of non-compliance, a 2 indicating partial compliance, and a 3 indicating compliance. (PX-53; 8/30/2018 Tr. 992:23–993:7.) The monitoring team then averaged the scores and arbitrarily determined that to achieve a rating of "compliance" in any area required an average score of at least 2.31. (8/30/2018 Tr. 992:23–993:7; PX-53 at 2.) Dr. Stewart acknowledged that his findings were not based on the care actually being currently provided, but were instead based only on what he found documented in the charts his team reviewed. (Tr. 1118:25–1119:3.)

23.　　Dr. Stewart acknowledged several errors in the methodology and review conducted by the monitoring team. These errors included, among others: (1) not giving the

Department a rating of compliance where the Department was providing daily individual contact by a mental health professional, consultation with or referral to the psychiatrist, immediate scheduling with the psychiatric provider for anyone who is currently on psychotropic medications or in need of a psychiatric evaluation, scheduled psychiatric follow up interval, collaborative treatment planning both during and prior to discharge from crisis watch, and ensuring therapeutic contacts are done in a confidential setting, but was not also providing additional individual or group therapy sessions that Dr. Stewart wanted (Tr. 1101:20–1102:19); (2) use of a different methodology by at least one of the assistant monitors, who assigned one grade for an entire institution rather than rating individual files (Tr. 1105:11–1106:15); (3) stating that 20 charts (out of 92) did not include psychiatric notes, but later changing that sentence to state that only 20 charts *had* psychiatric notes, and ultimately stating that the entire sentence was wrong (Tr. 1106:19–1108:4); (4) failing to rate files according to his own stated criteria (e.g., giving a "2" rating based on his note that it was not clear if the psychiatrist participated in the crisis watch treatment plan, even though the treatment plan clearly indicated the psychiatrist was involved (Tr. 1114:7–1116:11), and giving a "1" rating for not having a treatment plan prior to discharge from crisis watch even though there was a treatment plan and the psychiatrist was involved which should have warranted a rating of "3" (Tr. 1121:5–1124:4 and 1124:17–1126:20); giving a "1" rating for psychiatric appointments that were less than a week late even though he stated that appointments late by a week or two would warrant a rating of "2" (Tr. 1141:6–1142:21)); (5) including numerous offenders in his assessment of control unit housing who had been placed in segregation months and years before the preliminary injunction order was entered, even though he claimed he focused only on those offenders placed in segregation after May 25, 2018 (Tr. 1130:13–1131:22); (6) including offenders who spent less than 16 days in segregation in his assessment of control unit housing subsections which only

10

applied to those in segregation more than 16 days (Tr. 1133:20–1135:9, 1161:4–8); (7) rating

care as inadequate even when staff considered whether the offender should be moved to a higher

level of care and exercised their judgment not to make the referral (Tr. 1140:19–1141:5); (8)

finding inadequate care not based on his assessment of the standard of care, but instead based

solely on what is dictated in the settlement agreement (Tr. 1143:3–1144:10); (9) changing

several ratings because he did not understand that all lab results have the medical director's name

listed rather than the doctor who ordered the labs (Tr. 1149:2–7); (10) failing to provide written

instructions to his assistant monitors regarding how to rate charts (Tr. 1151:7–10); (11)

incorrectly calculating the average score for section 9, which resulted in a finding of non-

compliance rather than partial compliance (Tr. 1156:7–20); and (12) presuming that staffing

levels were inadequate based on backlog reports, even though the majority of prisons have no or

minimal backlogs (Tr. 1156:25–1157:13, 1160:2–25, 1161:18–21).

24.     On questioning by the Court during the permanent injunction hearing, Dr. Stewart

admitted to problems with his rating methodology and stated that he would not use it again. (Tr.

1168:6–25.) The Court also asked Dr. Stewart to comment on whether mentally ill prisoners

were continuing to suffer injuries despite the progress that had been reported by the defendants.

(8/30/18 Tr. at 1164:7–1165:11.) Dr. Stewart expressed his general conclusion that the care

being provided is "still resulting in unnecessary harm to the class members" (Tr. at 1165:21–24),

and stated that based on the care provided at various institutions, "objectively it looks like it's

doing really well—and maybe it is objectively—[but] subjectively it's not." (Tr. at 1167:15–16.)

In any event, Dr. Stewart admitted that the harm he identified is no longer systemic, and that in

his view, "the most serious problems are limited to a few of the institutions the Court just

mentioned [Dixon and Pontiac]." (Tr. at 1166:8–20.)

25.     Although the Court's preliminary injunction order largely credited Dr. Stewart's testimony and conclusions presented during the preliminary injunction hearing (Dkt. 2070 at 19, 35), Dr. Stewart's general conclusions presented at the permanent injunction trial do not support the same level of deference.

26.     Based on the entire record developed during the preliminary injunction hearing and the permanent injunction hearing, the Court makes the following findings of fact and conclusions of law:

## III.  Findings of Fact

### A.  Overview of the Department's Mental Healthcare System

27.     As of July 25, 2018, IDOC housed over 40,000 prisoners in a variety of minimum-, medium-, and maximum-security facilities located throughout the State of Illinois. (DX-63; https://www.bjs.gov/ content/pub/pdf/p16.pdf.) Although the overall prison population has decreased by over 8,000 since 2015, the number of prisoners designated as mentally ill has increased. (PI Tr. 671:16–21.) As of July 25, 2018, the Department housed 12,166 prisoners who were designated as mentally ill, of whom 5,061 were designated seriously mentally ill. (DX-63.)

28.     In conjunction with the settlement of the *Rasho* case, the State embarked on a commitment to build a new mental health system for mentally ill prisoners in Illinois. The Department's Chief of Mental Health Services, Dr. Melvin Hinton, testified that "every aspect of mental health service delivery is either being implemented, retooled, thought of in a . . . new way, or created. It is literally a new system that we are attempting to build to make sure that we appropriately address the needs of the population we serve." (PI Tr. 1287:17–25.) Dr. Hinton testified at the trial that the Department is now meeting the standards developed by the National Commission of Correctional Health Care (NCCHC) (DX-70), the American Corrections

12

Academy, and National Institutions of Corrections, and is providing care that is comparable to the Federal Bureau of Prisons. (Tr. 332:2–19; 382:22–388:4; 420:17–421:1.)

29.     The Department's Assistant Director Gladyse Taylor testified that "daily it is a top priority for the agency to be focused on improving the delivery of mental health services to our population." (PI Tr. 691:23–692:1, 718:20–23.) Ms. Taylor also testified that the Department is pursuing three key objectives in developing a new mental health system. (*Id*. 672:23–673:11.) The first objective involves assessing each patient's mental health needs. (*Id*. 673:1–2.) To meet this objective, the Department has invested $75 million in a new intake data system to help assess mentally ill patients during their intake into the prison system. (*Id*. 673:18–675:18.) The Department has also committed to provide mental health services based on each patient's level of care. (*Id*. 675:19–676; DX-46, Administrative Directive 04.04.100.)

30.     The Department's second objective involves aligning resources to obtain necessary funds for projects that include building new facilities, remodeling existing facilities, hiring mental health staff, purchasing a new electronic health record system, and purchasing new equipment. (PI Tr. 678:8–24, 681:19–683:14, 1290:14–1298:7.) To meet this objective, the Department has already invested more than $45 million to build new facilities and rehabilitate existing facilities to provide mental health services to prisoners. (*Id*. 679:4–24.) This includes the construction of new Residential Treatment Units (RTUs) at Joliet ($17 million), Logan ($15.9 million), Elgin ($6.4 million), and Dixon and Pontiac ($6.4 million). (*Id*. 679:4–24, 733:24–744:19; DX-6, DX-6A, DX-6C, DX-6D, DX-6F, DX-6G.) In addition, the Department has constructed space at existing facilities to move crisis cells outside of segregated housing. (*Id*. 740:6–8, 744:25–745:23, 1348:5–1349:15.) The Department has also obtained funding to build a new $150 million inpatient facility at Joliet that is underway. (*Id*. 679:19–24.) Director Baldwin also testified that the Department has requested proposals to build a 200-bed hospital adjacent to

13

Joliet Treatment Center, which could be completed as soon as summer of 2021. (Tr. 32:21–35:3.) This hospital will hold approximately 150 mentally ill patients, 25 general medicine beds, and 20 beds that are a combination of both mentally ill and general medicine. (Tr. 34:18–21.) This facility will replace the two wings at Elgin and will be the top of the pyramid in regards to mental health care. (Tr. 32:21–35:1.) The Department has also initiated a project to close Pontiac's north cellhouse to refurbish that area and create more treatment space. (Tr. 47:8–49:2.) Dr. Stewart acknowledged the Department's commitment to building and remodeling facilities to provide better care to mentally ill prisoners. (PI Tr. 549:10–555:5.)

31.     The Department's third objective involves changing IDOC's culture and operations to accommodate the needs of mentally ill prisoners. (Tr. 45:2–17; Tr. 536:6–14; PI Tr. 684:24– 685:17, 1311:9–1312:1.) To meet this objective, the Department has provided training delivered by the National Alliance of Mental Illness (NAMI) to the entire IDOC entire staff of over 12,000 employees (PI Tr. 680:12–15; 1294:10–20), implemented "verbal judo" training for "de-escalation" teams at each facility (*id*. 1358:17–1359:17, 1462:25–1426:19), installed a new director of training to conduct ongoing training (*id*. 1293:19–1294:20), hired a full-time quality assurance manager responsible for assessing and reporting about quality issues system-wide (*id*. 722:16–24, 850:20–852:16), has developed a new patient satisfaction survey (*id*. 871:11–20), created a new Standard Operating Procedure Manual for Mental Health (*id*. 1318:11–14 and DX-49), revised and issued new Administrative Directives related directly to mental health (*e.g*., DX-44, DX-45, and DX-46; Tr. 1317:6–1318:10), developed a new on-the-job orientation guide for Mental Health Professionals, activity therapists, and behavioral health technicians (Tr. 1318:18–22), developed a presentation to familiarize security staff on key points related to the *Rasho* settlement (*id*. 750:8–16), developed new forms for treatment planning and tracking patient evaluations (*id*. 677:24–678:7, 1319:16–1324:12), provided training on the use of the new forms

14

(Tr. 680:8–24; 1335:13–1336:16 and DX-12), developed a process for mental health professionals to provide input before seriously mentally ill prisoners are moved to different housing, including to and from segregation (*id*. 753:13–755:10 and DX-33 and DX-45), developed new programs for structured out-of-cell time and developed a new form to keep track of out-of-cell time (*id*. 690:16–25, 769:17–771:4 and DX-8B), created new wellness programs for IDOC prisoners and staff (Tr. 691:12–19, 722:12–19, 1311:17–1312:10, 1453:12–19), trained its staff on the proper use of physical restraints (*id*. 773:15–776:5, 687:14–688:6, and DX-44), purchased new tear-resistant mattresses for prisoners on crisis watch (Tr. 776:6–777:4), changed its procedures to reduce the number of prisoners in segregation and reduce the segregation time for prisoners in segregation (*id*. 689:22–690:7, 751:17–753:5, 1160:23–1161:4, 1312:11–1315:433); created a new class of officers, called correctional treatment officers, who must have bachelors of arts degrees to serve at Joliet Treatment Center and Elgin (Tr. 39:4–7); developed a new medication formulary (Tr. 558:22–25; 559:10–16,), eliminated various medications that are likely to be abused (Tr. 559:20–560:6), created a new newsletter to keep psychiatric providers informed of particular issues related to the Rasho case specifically and care overall (DX-60; Tr. 573:13–575:22), and has developed a host of forms to keep track of the Department's compliance with all aspects of patient care (DX-59). As discussed below, the Department's ongoing efforts to build and enhance its mental health delivery system, which started long before plaintiffs' motion to enforce the Settlement Agreement, undermine the contention that the Department is being deliberately indifferent to prisoners' mental health needs.

32.     In the preliminary injunction order, the Court credited the Department for its efforts to address the issues related to providing mental health treatment, including its construction of new facilities to provide care to prisoners who are most in need. (Dkt. 2070 at 36–37.) Nevertheless, the Court concluded that the Department had not made sufficient progress

with regard to mental health staffing to provide a constitutionally required level of care throughout the IDOC system. (*Id*. at 36.) The Court based its conclusion primarily on testimony from Dr. Stewart, the Department's former Chief of Psychiatry, and the Department's Chief of Mental Health, who acknowledged the challenges presented by the levels of staffing that existed at that time. (*Id*. at 15–20.) Dr. Hinton's testimony at the preliminary injunction hearing related to the staffing that existed in 2017, several months before the Court issued its preliminary injunction order, and more than eight months before the permanent injunction hearing.

33.     The Court's preliminary injunction order required the Department to evaluate whether its staffing plan is consistent with constitutional requirements, and to provide sufficient staff to provide a constitutional level of care in the particular areas addressed in the Court's preliminary injunction order. (Dkt. 2070 at 40–41, ¶¶ 3–5.) The Department implemented a number of changes to comply with the Court's May 25, 2018 order. (*See*, *e.g*., DX-57.) The Department also worked with Wexford to identify additional staff needed not just to comply with minimal constitutional requirements, but also to fully meet all of the requirements imposed by the Settlement Agreement (PX-1), the Department's Standard Operating Procedures (DX-49), and the Department's various administrative directives (e.g., DX-42, DX-44, DX-45, DX-46), and to provide better delivery of mental health services. (Tr. 867:24–869:6; 8/2/18 Tr. 427:19–428:10; 430:25–431:8; Tr. 1841:2–1842:5; see also DX-55, Attachment B.)

34.     The Department's and Wexford's additional efforts with respect to hiring mental health staff since the preliminary injunction hearing are addressed below.

### B.  Mental Health Staffing.

35.     Multiple witnesses testified at the permanent injunction hearing that the Department now has the leadership, staffing, and procedures in place to provide care that meets constitutional requirements by being adequate to prevent significant injury and decompensation.

16

36.      The Department's Acting Director, John Baldwin, testified about the
Department's overall and ongoing commitment to delivering quality mental health care,
including its efforts to address staffing issues in regard to mental health care, recruiting for
nurses (who are DOC employees), and putting out for bid a 200-bed inpatient/general medicine
facility that will be built adjacent to the Joliet Treatment Center. (Tr. 23:22–24:8; 26:11–27:6.)
He also testified about the Department's initiative to enter into an agreement with the University
of Illinois-Chicago to provide mental health and social work services. (Tr. 30:11–31:11.)

37.      The Department's Chief of Mental Health, Dr. Melvin Hinton, testified that the
Department has implemented procedures to address staffing shortages, including authorizing
unlimited overtime (Tr. 458:6–9), partnering with Southern Illinois University to provide
additional psychiatric services at Pontiac and Logan to reduce the psychiatry backlog (Tr.
456:23–457:9; 516:9), and bringing psychologists in on weekends and second shifts at Dixon to
provide additional coverage (Tr. 463:25–465:1). Dr. Hinton's conclusion that the Department is
now delivering necessary and appropriate care is based on the Department's recent audit results,
the number of staff who have been added, the policies and procedures that the Department has in
place, and the overall change in the Department's culture to support mental health care. (Tr.
498:2–11, 432:17–19, 523:22–25; 531:25–532:6; 535:2–536:5.) Dr. Hinton also confirmed that
the Department prioritizes its existing psychiatric services to ensure that those needing the most
acute care get it, so as to prevent an emergency situation or decompensation. (*Id*. 542:9–543:8.)

38.      The Department's Chief of Psychiatry, Dr. William Puga, testified that access to
care has improved in various ways, including by simplifying procedures, like the procedure for
renewing medications, so that less time is being spent on paperwork and more time could be
spent on direct patient care. (DX-47A, Tr. 561:8–563:15.) Dr. Puga testified that with the over 50

17

FTE psychiatric providers now in place, the Department has sufficient psychiatric providers to protect patients against decompensation. (Tr. 584:15–23.)

39.     Wexford's Regional Mental Health Director for Illinois, Dr. Bill Elliott, testified that he was responsible for developing recommendations for staffing of non-psychiatric positions other than mental health nurses in response to the Court's May 25, 2018 order. (Tr. 866:2–17.) In making his staffing recommendations, Dr. Elliott, who has a Doctor of Philosophy and Counseling Psychology and is a licensed clinical psychologist in both Indiana and Illinois (Tr. 823:4–8), determined what staff was necessary to fully execute all of the requirements in the Department's administrative directives, the Department's Standard Operating Procedure Manual, the May 2016 Settlement Agreement, and the Court's May 25, 2018 order. (Tr. 867:24–869:6.)

40.     The Department also presented testimony from "psychologist administrators" at three facilities (Stateville, Hill, and Pontiac) who testified about the care provided at each facility with the mental health staffing that each facility currently has in place. Dr. Mirsky, the psychologist administrator for Stateville, testified that the following mental health care is being provided with the staff in place at Stateville: mental health staff see any prisoners who transfer in and conduct a mental health screening (Tr. 214:4–15); if the prisoner is then placed on the mental health caseload they are scheduled with an MHP within two weeks to complete a mental health evaluation which is a more thorough assessment of the inmate's mental health history (Tr. 215:9–19); at the next appointment the treatment plan is completed and the inmate is scheduled for appointments, typically on a monthly basis if they are assigned outpatient level of care (Tr. 220:3–221:3); prisoners in general population are also provided group therapies, like anxiety, symptom management, anger management, cognitive behavioral therapy (Tr. 222:2–17); prisoners in segregation are offered psychoeducational-based groups (Tr. 222:25–223:12); multidisciplinary team meetings (consisting of mental health department staff, MHPs, BHTs, and

psychiatrists) occur every morning (Tr. 223:22–224:9); prisoners placed in segregation are screened within 48 hours (Tr. 229:20–230:3); rounds are conducted in segregation every Tuesday by the BHTs (Tr. 230:17–231:3); on Fridays the MHP and psychiatrist meet with segregation prisoners to update their treatment plans (Tr. 232:23–233:14); crisis team members respond to assess prisoners in crisis (Tr. 234:14–235:1); confidential visits of prisoners in crisis are performed by MHPs (Tr. 238:24–239:10); prisoners on crisis are seen by psychiatrists even if not on medications (Tr. 239:11–18). Dr. Mirsky testified that, based on her experience and what she has personally observed at Stateville, the quality of mental health care being delivered to prisoners is good. (Tr. 273:3–8.)

41.    Dr. Stromberger, the psychologist administrator at Hill Correctional Center, provided the following testimony about how mental health care is provided with the staff in place at Hill: Hill is a medium security facility with a mental health caseload of around 470 to 480 (Tr. 1375:19–1376:5); Hill provides outpatient care exclusively, which includes therapy and a lot of group programming (Tr. 1376:13–17); when staff at Hill observes that a patient has needs that cannot be addressed at Hill, staff discusses that patient's case at the weekly meeting including with the psychiatrist and an RTU referral is completed (Tr. 1376:20–1377:15); when prisoners first transfer to Hill, the mental health professionals do a file review, assign the patient to a caseload, and refer the patient to the psychiatrist (Tr. 1378:6–18); after that, a mental health evaluation is completed in collaboration with the offender and it is determined whether group programming is appropriate and the frequency of therapy sessions (Tr. 1378:19–1379:5); Hill mainly offers process groups on topics including co-occurring disorders, trauma, depression, anxiety, managing adjustment, and managing sleep (Tr. 1380:22–1381:5); Hill also provides educational groups like how to develop coping skills (Tr. 1381:5–7); for the current four prisoners who have been in segregation for more than 60 days at Hill, educational groups are

provided on anger and sleep hygiene (Tr. 1392:12-22); prisoners are screened within 48 hours of being placed in segregation to get a baseline of their mental health status (Tr. 1386:6–12); Dr. Stromberger personally makes recommendations regarding whether discipline is appropriate for mentally ill offenders, after consulting with the adjustment committee and the offender's primary therapist (Tr. 1386:13–1387:12); prisoners in segregation receive a cell-front check-in every seven days with a mental health professional regarding their mental status, any decompensation, and whether they need a referral to their primary therapist or the psychiatrist (Tr. 1388:19–1389:1); if the mental health professional conducting segregation rounds determines that the offender would benefit from an out-of-cell confidential session, they will pull the individual out of the cell right then (Tr. 1389:2–7); Hill has multidisciplinary team meetings to discuss patients and policies on Thursdays which include the full-time MHPs and the two staff assistants who manage scheduling (Tr. 1390:15–1391:20); prisoners on crisis watch see an MHP daily for approximately 30 minutes in a confidential therapy room to assess their risk and emotional stability, and  to provide programming regarding the reasons they went on watch, how to get off watch, and how to solve problems without going on crisis watch (Tr. 1395:6–21); and a multidisciplinary discussion, including the patient, occurs before a patient is discharged from crisis watch (Tr. 1403:1–12). Dr. Stromberger confirmed that while additional staff would help Hill improve its delivery of mental health care, Hill currently has the staff in place to do weekly rounds for segregation, daily crisis assessments, and protect patients from decompensation. (Tr. 1446:14–1447:7; 1449:12–22.)

42.     Dr. Renzi, the psychologist administrator at Pontiac Correctional Center, provided the following testimony regarding how Pontiac is providing mental health care with the staff in place at Pontiac: offenders receive individual therapy on a case-by-case basis (Tr. 1604:16–22); outpatient offenders receive at least one or two mental health groups a week and RTU level

offenders receive four groups a week (Tr. 1604:23–1605:7); groups for outpatients include psychoeducational skills-building based on a dialectical behavioral therapy model and socialization groups based around movies (Tr. 1605:11–20); on a daily basis the mental health department reviews each offender who is on crisis watch to discuss his current presentation and make recommendations based on that (Tr. 1610:24–1611:13); QMHPs conduct confidential (when possible) daily assessments of prisoners on crisis watch to gauge the prisoners' mood, behavior, and risk of engaging in self-harm and harm to others. (Tr. 1612:9–1613:19); prisoners are referred to higher levels of care on a case-by-case basis, which is discussed at the daily crisis watch discussions (Tr. 1615:16–1617:2); weekly clinical supervision and staffing meetings are held to discuss offenders where there have been treatment obstacles (Tr. 1617:9–24); weekly multidisciplinary meetings are held, including nursing staff, security staff, the assistant warden of programs, and regional psychologist supervisors, to discuss offenders in each segregation cellhouse and issues that need to be addressed (Tr. 1617:25–1618:17); Pontiac conducts monthly teleconferences with all DOC facilities to present difficult treatment cases and obtain recommendations (Tr. 1630:3–10); and Pontiac has been successfully using medication to eliminate the need to use four-point restraints (Tr. 1635:16–1636:23).

43.  Dr. Yen testified that he starts his days at Vienna in multidisciplinary meetings. (Tr. 143:20–21). During those meetings they discuss the most seriously ill prisoners including those on crisis and those in segregation. (Tr. 144: 8–13). Similar meetings occur at Vandalia. (Tr. 144: 14–16).

44.  Dr. Doyle testified that at Dixon, everyone on the team collaborates to provide care to mentally ill prisoners. (Tr. 1740:22–1741:21.) Dr. Doyle explained how the backlog numbers are a cipher because in the Department's system, if a patient is being seen weekly is seen one week on a Tuesday and the following week on a Thursday, that would be considered a

backlog, whereas in a typical psychiatric practice that is not considered a backlog. (Tr. 1776:7–15.) Although Dixon was able to nearly eliminate the backlog for psychiatric visits after its hiring of a certified nurse practitioner (Jennifer Hoffman) as an additional psychiatric provider, the backlog in follow-up appointments has since increased somewhat because that psychiatric provider was reassigned to provide psychiatric care exclusively to patients on crisis watches. (Tr. 1776:16–19.) Dr. Doyle acknowledged that having more psychiatric providers would enable them to spend more time with patients, but stated that quality care is currently being provided. (Tr. 1802:1–1803:12.) Dr. Doyle also testified that with the current number of psychiatric providers at Dixon, mentally ill prisoners at Dixon are not being harmed because of insufficient staff to address their needs. (Tr. 1806:24–1807:6.)

45.     Amy Mercer also testified about her observation of care being provided at Dixon. She testified about her participation at a recent multidisciplinary meeting at Dixon where mental health professionals, behavioral health technicians, staff assistants, and psychiatrists discussed their mental health caseload. (Tr. 655:20–656:5.) She described how the mental health staff "discussed every individual who was on crisis, who saw them that day, what their interaction was like, whether that person was responsive or not, willing to talk, how they came across, what their demeanor was, how they presented, what they said. The group then discussed what was the appropriate next step to take . . . whether to keep them at the same level [of care], change their level and what to do next." (Tr. 656:8–657:11.) The group also "discussed every disciplinary ticket that had been issued in the last 24 hours to anyone who was designated as seriously mentally ill. They went over the details of every one of the tickets and discussed as a group what action should be taken or not taken in regard to those tickets. It was an opportunity—every MHP was then given an opportunity to let the group know if there were any issues going on with anyone on the caseload  that they wanted other people to be aware of, that that they wanted the

22

psychiatrist to be aware of. And the BHTs who see everyone in the morning community meeting and in the afternoon community meeting then had an opportunity to let everyone know if there was anything they observed during those meetings that they wanted the MHP to know or the psychiatrist to know." (Tr. at 657:12–658:4.) Ms. Mercer also described how as a result of these meetings, patients could have their psychiatry appointment moved ahead of the scheduled due date. (Tr. 658:5–14.)

46.     The testimony from these witnesses is unrefuted, and corroborated by the numbers discussed below.

47.     In January 2018, at the time of the preliminary injunction hearing, the Department had in place 33.53 full-time equivalent psychiatric providers. (DX-9.) In the seven-month period from January 2018 through July 2018, the Department's staffing vendor, Wexford, added an additional 17 full-time equivalent psychiatric providers, bringing the total to 50.55 as of August 27, 2018. (Tr. 1846:25–1847:1; DX-80.) To provide the 50.55 FTEs, Wexford now has in place 105 individual psychiatric providers, including 14 certified nurse psychiatric practitioners and 91 psychiatrists. (DX-80.) Thirty-four psychiatrists provide psychiatric services "face-to-face" at various prisons—including Pontiac, Dixon, Logan, Stateville, and Menard—while an additional 57 psychiatrists provide telepsychiatry, primarily at prisons where the mentally ill population is at the outpatient level of care. (DX-80.) Because most psychiatric providers work part-time, Wexford is able to, and does, call on them and offer financial incentives for them to provide additional hours on an as-needed basis.

48.     Wexford and the Department have worked, as suggested by Dr. Stewart, to hire certified nurse practitioners—licensed professionals who are authorized to prescribe medicine—to provide psychiatric services along with psychiatrists. (PI Tr. 446:20–447:25; 448:1–23; 504:17–22; 1302:11–1306:6, 1434:4–7, 1448:19–1449:4.) Dr. Hinton explained that Illinois

recently passed a law to grant prescriptive authority to clinical psychologists, and that the Department developed systems to make sure "mid-level" psychiatric providers are properly trained with proper access to psychiatrists for appropriate clinical supervision. (*Id*. 1305:25–1306:19.) The Department also worked with the State to streamline the process for candidates to become licensed in Illinois. (*Id*. 1309:18–1310:7, 1452:11–18.) The Department also contacted the University of Illinois about providing nurse practitioners. (*Id*. 341:10–13.) As a result of these efforts, the Department now has 14 certified nurse practitioners to provide care to class members as psychiatric providers. (DX-80.)

49.     In addition to the new psychiatric providers hired by Wexford, the Department has separately entered into an Intergovernmental Agreement with Southern Illinois University to develop a relationship with medical residents in SIU's psychiatry program to provide psychiatric services to the Department. (DX-68; Tr. 26:11–27:6.) SIU is currently providing 8 hours of weekly psychiatric care at Pontiac and Logan in addition to the services provided by the Wexford psychiatric providers. (Tr. 26:11–27:6; 550:3–7.)

50.     The hiring of additional psychiatric providers has resulted in a substantial decrease in the backlog of psychiatric appointments. On September 29, 2017, the day before Dr. Stewart sent his October 1, 2017 letter, the psychiatric backlog was 3,385. (DX-35B.) By January 5, 2018, the psychiatric backlog had been reduced to 2,223. (*Id*.) By August 17, 2018, the psychiatric backlog had been reduced to 908. (DX-1D; DX-35B.) But even more compelling than the overall reduction in the total psychiatric backlog number *is that the backlog has been reduced to nearly zero for new psychiatric appointments*. (DX-1F.) For example, as of August 17, 2018, the facilities with RTU-levels of care (Joliet, Logan, Pontiac, and Dixon) had *no backlogs* in new face-to-face psychiatric appointments. (*Id*.) Joliet, Logan, and Pontiac also had *no backlogs* in new appointments done by telepsychiatry, and Dixon had a backlog of just two

24

new telepsychiatry appointments, with those two being late by just 1 to 14 days. (*Id*.) This shows that those needing new appointments with psychiatric providers are getting them.

51.     The psychiatric backlog report also shows that the backlog is limited to follow-up appointments at certain facilities. Nine facilities (Danville, East Moline, Jacksonville, Joliet Treatment Center, Lincoln, Murphysboro, Taylorville, Vienna, and Western) *reported no backlogs in psychiatric appointments at all*. (DX-1F.) Another ten facilities had fewer than ten backlogged psychiatric appointments in total. (*Id*.) The remaining ten facilities reported backlogs in follow-up appointments, but the vast majority of those were late by only 1 to 14 days. (*Id*.) This record does not show "gross deficiencies" in psychiatric appointments system-wide.

52.     Wexford has also continued to hire qualified mental health professionals. For 2018, the budgeted total number for qualified mental health professionals system-wide was initially 131 full-time equivalents (DX-9), which was then increased to 139 by July 31, 2018 (DX-9B). As of January 23, 2018, Wexford had 111 FTE QMHPs in place, plus 12 more who had been hired but not yet started, leaving 8 QMHP positions to fill system-wide. (*Id*.) As of July 31, 2018, Wexford reported having 117 full-time equivalent QMHPs, with another 17.95 FTEs who had been hired but not yet started, plus another 6.34 FTEs identified in the hiring pipeline. (Tr. 770:24–772:5; 773:3–15; DX-9B.) For the 17.95 FTEs representing candidates who were hired but not yet started, it is predicted based on past performance that 95% of those candidates will ultimately begin work. (Tr. 770:24–772:5; 773:3–15.) As of August 7, 2018, 14 prisons had in place their full budgeted allotment of QMHPs and one facility (Jacksonville) had double its full budgeted allotment of QMHPs. (DX-5B.)

53.     Wexford also has continued to hire behavioral health technicians (BHTs). Dr. Stewart has approved allowing the Department and Wexford to use BHTs to perform certain tasks normally assigned to MHPs (such as daily segregation rounds) to help give the MHPs

additional time to complete other tasks, such as the initial evaluations (as well as treatment

planning, other follow-up visits, and leading structured out-of-cell activities, all discussed

below). (PX-21 at 4.) As of January 2018, the Department budgeted 60 full time equivalent

positions for behavioral health technicians throughout the system. (DX-9.) As of January 28,

2018, Wexford had 58 BHTs in place, plus two others hired but not yet started, leaving no BHT

positions to be filled. (*Id.*) (Tr. 450:9–22.) As of July 31, 2018, Wexford had 63 BHT's in place,

with an additional 5 candidates hired but not started and 13 candidates in the pipeline. (DX-9B.)

54.     In addition to the mental health staff who are hired and assigned to particular

facilities, Wexford also hires "PRN" (*pro re nata*) staff to be available to provide coverage at

each facility when requested by the facility on an as-needed basis.  (DX-22; DX-5; PI Tr.

443:22–444:3; 454:14–20; Tr. 482:12–22; Tr. 1837:8–14.) For example, Dr. Stromberger

testified about how she uses a PRN mental health professional to conduct the weekly segregation

rounds at Hill Correctional Center. (Tr. 1389:12–1390:13.) Cheri Laurent testified that Wexford

has PRN (or as needed) mental health staff in each position classification that can provide

services at specific facilities. (DX-22A; Tr. 1833:1–16.) Wexford has also hired telepsychiatrists

and "traveling psychiatrists" who are not yet assigned to particular facilities. (PI Tr. 441:5–7.)

55.     If PRN staff are not available, then Wexford can request current staff to provide

overtime because those individuals have already received security clearances to work at

correctional facilities. (Tr. 1875:4–16.)

56.     The Department's Chief of Mental Health Services, Dr. Melvin Hinton, testified

that in addition to Wexford's hiring of mental health staff (PI Tr. 1289:18–22; 1299:18–

1302:10), the Department has also hired substantial administrative staff statewide to address the

needs of the *Rasho* case (*id*. 1288:6; 1302:15–24). When Dr. Hinton started in 2012, the

Department had only two central office staff dedicated to mental health care. (*Id*. 1302:21–23.)

Since then, besides adding Dr. Hinton as the Chief of Mental Health Services and adding a Director of Psychiatry (now filled by Dr. Puga) (*id*. 1290:14–20), the Department has added three regional psychologist administrators to provide oversight to the prison facilities in those regions (*id*. 1292:13–22), a mental health training coordinator (Tim Lawrence) who is charged with developing and implementing mental health training to mental health professionals and other prison staff (*id*. 1293:19–1294:20),  a full-time quality improvement manager (Dr. Jeff Sim) charged with developing and implementing a mental health quality assurance process with audit tools and steps for corrective actions (*id*. 864:10–16, 1294:22–1295:23), facility "psychologist authorities" who are designated to see that the Department's policies and procedures are followed (*id*.1297:18–1298:2; Tr. 213:16–214:3), plus additional support staff to assist with quality assurance and training and other functions (PI Tr. 1295:25–1296:21). The Department has also hired a new class of "correctional treatment officers" to work at the residential treatment units, like the Joliet Treatment Center, and who are required to have a Bachelor of Arts degree. (PI Tr. 1310:12–24; Tr.39:4–13.) The Department is in compliance with §XI(d) of the Settlement Agreement, which requires the Department to hire ten central office staff. (DX-55 at 15.)

57.    Wexford's Elaine Gedman and Cheri Laurent testified about Wexford's efforts to recruit, hire, and retain the full range of mental health workers, including psychiatric providers. Since 2013, Wexford has hired 598 mental health staff, has lost 337 staff for various reasons, and reports a net increase in headcount of 410 as of July 31, 2018, representing an increase of 290%. (DX-37A; Tr. 754:12–24; 763:11–20; 765:6–19.) Cheri Laurent explained that premium pay has been offered to psychiatrists to get them to work more hours above and beyond their normal hours, and confirmed that psychiatrists are more willing to provide telepsychiatry rather than face-to-face psychiatry. (Tr. 1830:12–1832:11.)

58.     Wexford's Elaine Gedman testified to the many approaches employed to recruit mental health staff including, for example,  (1) attending conferences, (2) hosting dinners, lunches and other events, (3) developing and maintaining relationships with colleges and universities that educate and train mental health professionals, and (4) conducting extensive advertising in many different forms, such as voice mail blasts, cold calling, direct mailers, referral follow-ups and other outreach efforts on the internet. (Tr. 725:7–21, 729:15–730:10, 732:15–734:23; DX-18A (recruitment efforts); DX-43 (schools they reach out to).)

59.     Since 2014, Wexford has spent over $3.6 million focused on a wide range of recruiting activities in an effort to hire mental health staff to provide services to Illinois prisoners. (DX-11; DX-39; DX-20; PI Tr. 439:11–16.) Wexford regularly confers with the Department about its recruiting and hiring efforts, including during regular weekly, monthly, and quarterly meetings. (PI Tr. 434:11–19, 483:20–484:6.) Gedman testified that Wexford's recruiting mantra is "What else can we do?" recognizing that there is "no magic bullet," and also recognizing the need to try different approaches to see what works best. (PI Tr. 484:11–23; Tr. 725:2–16.) Ms. Gedman also testified that when she discussed Wexford's staffing approach with Dr. Stewart, he did not make any criticisms or suggest any changes. (Tr. 725:22–726:19).

60.     Both Ms. Gedman and the defendants' workforce staffing expert, Holly Andrilla, testified about the nationwide and Illinois shortage in psychiatric providers. (Tr. 738:10–14; Tr. 1208:2–4; DX-62 at 1; DX-11A.) Ms. Andrilla testified about the shortage in psychiatric providers throughout the country and in Illinois, where 57% of counties have no listed psychiatric providers. (DX-62 at 5; Tr. 1208:4.) Gedman testified that the location of the prison facility is "probably the number one reason" making hiring difficult, with any facility that is not near Chicago being more challenging to staff. (PI Tr. 445:17–21.) Highly educated professionals, such as psychiatric providers, prefer to be near larger cities given the compensation they receive.

(Tr. 746:22–747:23.) Hiring for correctional settings presents additional challenges, including the need for staff to be screened for qualifications, cleared by passing a background check and drug test, and trained. (PI Tr. 456:20–458:16.) Higher-level professionals also do not want the restrictions presented by working in a correctional setting, such as not being able to bring certain items into facilities, such as cell phones, magazines, and check books, and having to "punch a clock" to report work hours to the Department. (Tr. 747:2–14.) Additionally, with the expansion of telepsychiatry, psychiatrists have many more opportunities that they can pursue out of their home offices, which makes providers even less willing to undertake long commutes to correctional facilities throughout Illinois. (Tr. 747:15–748:6.) Dr. Stewart acknowledged that difficulties in hiring psychiatric providers is "the new normal." (PI Tr. 1081:3–12.)

61.    Recognizing this reality, Ms. Gedman testified that Wexford has pursued a multi-faceted approach to increase staffing, including by asking existing psychiatric staff to take on additional hours at their current hourly rates (PI Tr.455:3–7), paying bonuses to psychiatric providers for working additional hours in a quarter (PI Tr.455:8–18), paying stipends to convince psychiatric providers to travel to distant facilities (PI Tr.460:8–16), offering rates as high as $300 an hour for telepsychiatry hours and $400 per hour for psychiatrists to travel to facilities for face-to-face visits (PI Tr. 455:8–456:21; Tr. 740:17–22), and paying bonuses up to $10,000 to attract new psychiatrists (PI Tr.487:12–15; DX-39). Between October 1, 2017 and July 31, 2018, Wexford had paid $400,000 in bonuses to psychiatrists above their normal hourly rates (DX-11A), and its top-earning psychiatrist in 2017 grossed $677,811 (PI Tr.; Tr. 491:22–492:6; DX-11A). These efforts have resulted not only in hiring and retaining more psychiatric providers, but also in substantially reducing the backlog for psychiatric visits. (PI Tr. 1434:11–17; DX-1D.)

62.    Although Wexford is able to offer incentive and premium pay to psychiatrists, Wexford cannot provide these same incentives or pay increases to other psychiatric providers,

such as mental health nurse practitioners and mental health physician's assistants, because those salaries are governed by a collective bargaining agreement. (Tr. 1840:5–13.)

63.     Wexford's annualized pay for psychiatric providers and psychologists is well above the 90th percentile of rates paid nationally and in Illinois, with the lowest-paid Wexford psychiatrists and psychologists making more than their highest-paid cohorts (on average) in Illinois and nationwide. (PI Tr. 475:21–24; Tr. 743:3–745:11; DX-36; DX-36C; DX-36D.) As of August 2018, Wexford's annualized pay to its psychiatrists to provide services to Illinois prisoners ranged from $312,000 to $572,000, compared to a national average range of $201,573 to $218,941, and an Illinois average range of $184,392 to $211,245. (DX-36C; DX-11A.)

64.     In addition to recruitment efforts, Wexford's Cheri Laurent explained other efforts to provide staff to facilities. For example, Wexford addressed access to telepsychiatry at Menard and was able to increase the telepsychiatry units from three to six, which meant patients could be seen in their housing unit, which was easy for security staff to accommodate. (Tr. 1828:13–1829:11.) Additionally, Wexford has reallocated psychiatrists from one facility (East Moline) to another (Sheridan) when it was clear from the backlog report that there were more hours of care available than was needed by East Moline. (Tr. 1829:12–1830:11). After this reallocation, the psychiatric backlog at Sheridan was effectively eliminated. (*Id.*; DX-1D.)

65.     Section IX(e) of the Settlement Agreement requires the Department to provide quarterly progress reports on its hiring of mental health staff, and requires Dr. Stewart to review any failure to meet hiring targets and, if necessary, "propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized." Although Dr. Stewart's October 1, 2017 letter noted the need for the Department to hire more psychiatrists (PX-18), Dr. Stewart never proposed any specific "techniques by which to achieve the [Department's] hiring goals." Dr. Hinton testified that Dr. Stewart has never

notified the Department that any specific staffing levels required under the Settlement Agreement had not been met. (PI Tr. 1433:11–18.) Dr. Stewart also has never suggested that the Department use a vendor other than Wexford to hire mental health staff. (*Id*. 1429–1430:1.)

66.     Plaintiffs did not offer any concrete evidence to refute the Department's testimony that it now has the staffing in place to provide sufficient care to protect mentally ill prisoners from significant injury from decompensation. (E.g., Tr. 143: 20–21; 144: 14–16 ; Tr. 569:5–17; Tr. 223:23-224–9; Tr. 420:17–421:1.)  Dr. Stewart offered his conclusory opinion that the level of staffing remains insufficient (PX-53 at 15), but he did not explain why or how. Plaintiffs also presented testimony from two current prisoners at Pontiac (Mr. Champs and Mr. King) and one former prisoner at Pontiac and Dixon (Mr. Gay) who testified about the care they received. Their testimony showed that each of them received extensive individualized care based on their particular needs. Anthony Gay received care above and beyond that which is required. While at Pontiac he was scheduled to see Dr. Renzi twice a week. (Tr. 1538:23–24.) When he transferred to Dixon he began seeing Dr. Doyle on a weekly basis in spite of Dr. Doyle's large caseload. (Tr. 1538: 3–9.) Mr. Gay testified that he received great care from Dr. Doyle. (Tr. 1536: 8–16.) Additionally, he received groups 3 to 4 times per week while at Dixon, plus individual therapy sessions with QMHPs, such as Dr. Stone. (Tr. 1547: 13-15; 1548: 16–18.)

67.     Plaintiffs have not demonstrated that prisoners class-wide are suffering injury or decompensation as a result of any particular staffing issues. Even if psychiatric appointments are late by some number of days at certain facilities, prisoners continue to be seen separately by their primary therapist (a mental health professional), by other therapists, and also by behavioral health technicians who run groups and conduct other visits.

68.     Although obtaining and retaining qualified and trained mental health staff to work in the correctional setting remains a continuing challenge for the Department, the record shows

that the Department and Wexford now have the personnel needed to provide adequate mental health care to Illinois prisoners and to protect mentally ill prisoners from significant harm and the risk of serious decompensation. Although some prisons face more staffing challenges than others, the record does not support a finding that the staffing currently in place is "grossly deficient" or results in a systemic risk of harm to mentally ill prisoners throughout the IDOC system. The record also does not support a finding that the Department has been deliberately indifferent to the need to recruit and hire the clinical and administrative staff needed to provide constitutionally adequate care.

### C. Medication Management under §VII(d); §XII(b), §XII(c)(i), (ii), (iii), (v), and (vi); and §XIX(d)

69.　Section VII(d) of the Settlement Agreement provides that offenders who have been prescribed psychotropic medications "shall be evaluated by a psychiatrist at least every thirty (30) days," although longer periods between appointments are allowed for patients who have stabilized. Section XII(b) of the Settlement Agreement similarly requires patients receiving new psychotropic medications to be evaluated at least twice within the first 60 days of receiving the medication. Section XII(c)(i) requires reasonable assurance that prescribed psychotropic medications are timely delivered and taken. Sections XII(c)(ii), (iii), (v), and (vi) of the Settlement Agreement refer to the Department's obligation to chart and explain medication side effects and efficacy, and to refer patients to a psychiatrist if they refuse to take their required medicine. Section XIX(d) addresses the Department's need to obtain patient informed consent.

70.　Plaintiffs' motion to enforce the Settlement Agreement asserted a violation of §VII(d) and §XII(b) based on the backlog in psychiatric appointments that stood at 3,270 in May 2017, and 3,552 in October, 2017. (Dkt. 1559 at 12, 17.)

71.     Based on the record presented at the preliminary injunction hearing, the Court found that the defendants' failure to comply with the settlement requirements for medication management created a dangerous situation and constituted deliberate indifference. (Dkt. 2070 at 23–2.)

72.     As discussed above, the level of psychiatric staffing has improved substantially since the time of the preliminary injunction hearing, with the Department having substantially reduced the backlog in scheduled psychiatric visits, with many prisons reporting no backlogs at all.

73.     To address medication issues, the psychiatric providers complete detailed "Psychiatric Progress Note[s]" each time they meet with patients for their psychiatric evaluations. (*See, e.g.*, DX-25, DX-28, DX-54; Tr. 1236:2–1243:24.) The Progress Notes list any current psychotropic medications and note their level of effectiveness, the patient's level of compliance in taking the medicine, and any side effects. (*Id.*; *see, e.g.*, pages 1 and 3 of the Progress Notes in DX-25.) The Progress Notes also prompt the psychiatric provider to ensure the patient has a copy of the Psychotropic Medication Information brochure (DX-47) and to verbally review with the patient "any medication changes, side-effects, risks and benefits of treatment or refusing treatment with the offender." (*Id.* at 5.) The Progress Notes also indicate if the psychiatric provider recommends to continue, discontinue, or start any medications. (*Id.* at 5–6.)

74.     The record also shows that the Department addresses the use and delivery of psychotropic and other medications in a number of ways.  All mentally ill prisoners receive a "Psychiatric Diagnostic Evaluation." (See, e.g., DX-28, showing Span's diagnostic evaluations dated 3/13/17 and 7/11/17.) The Diagnostic Evaluation lists any prescribed psychotropic medications and notes their effectiveness, the level of the patient's compliance, and any side effects. (*Id.* and Tr. 1245:12–1246:8.) It also identifies past medications and notes the patient's

condition, level of compliance, effectiveness, and side effects. (*Id.*) The Diagnostic Evaluation also provides for instructions to discontinue medications or start new medications, and also provides for the patient to give or refuse his or her informed consent. (*Id.*)

75.     The Department's form for treatment plans (Form 0284) also addresses patient medications, possible side effects and alternatives, and provides for the patient to give or refuse his or her informed consent. (DX-13; Tr. 563:8–564:7.) The treatment plan provides for the patient to confirm that he or she has "received a copy of the psychotropic medication information brochure from my psychiatric provider that indicates what medication(s) are being prescribed for me. He/She has explained why I am prescribed these medications, the possible side effects, and alternative treatments." (See, e.g., DX-13 and the last page of each treatment plan prepared for "Tyler," Span, and Singleton at PX-25, PX-32, and DX-54.) The informational brochure referenced in the treatment plans is DX-47. This brochure addresses directions provided to the patient by the psychiatric provider, how the medication is to be administered, the patient's right to refuse the medication, the type and class of medication prescribed, possible side effects, and available alternative treatments. (*Id.*; Tr. 1333:22–1334:5.)

76.     The Department has also developed a new form titled "Confidentiality Disclosure and Consent to Treatment" (DX-15). The Department uses this form to document its instructions to prisoners about the confidentiality of their mental health treatment, and also to confirm the patient's consent to the treatment, including administration of any medications. (*Id.*; Tr. 1356:17–1358:3; see also DX-59 (form 0537) and Tr. 418:17–419:2 (Hinton testimony re that form).)

77.     Dr. Doyle testified how psychiatrists at Dixon Correctional Center manage medications for prisoners. The psychiatrist determines the symptoms the patient is experiencing, prescribes an appropriate medication, provides an information sheet to the patient so he can

understand the possible side effects, and has a discussion with the patient regarding which of the side effects are more likely. (Tr. 1748:14–1752:9; DX-47.) At Dixon, the psychiatrists see everyone on the mental health caseload, even if the patient is not prescribed psychotropic medication. (Tr. 1753:9–21.) When prisoners who were taking psychotropic medications at another correctional facility are transferred to Dixon, their medications are continued even if they have not yet been seen by a psychiatrist, which happens within 30 days of the transfer. (Tr. 1753:22–1754:10.) Dr. Doyle explained that individual sessions can range from 15–20 minutes and can be even longer if the person is insightful. (Tr. 1737:3–1738:1.) Dr. Doyle has had psychiatric sessions that have even lasted 90 minutes and only ended at the patient's request. (Tr. 1738:23–1739:4.)

78.     Dr. Yen, who treats patients at Vienna and Vandalia, testified that patients who are being started on medications or have had recent medication changes are seen within a month, but patients who have been stable on their medications for three or four months are seen every 60 days, which can then be lengthened to every 90 days if they remain stable. (Tr. 152:9–153:5.) Like Dr. Doyle, Dr. Yen addresses side effects with his patients by discussing the common and more serious side effects, possible medication alternatives, and whether lab work will be necessary to monitor the medication. (Tr. 153:6–154:19.) Dr. Yen measures the efficacy of the medication by asking the patient for feedback regarding their symptoms, discussing the patient with the MHP and nurses to see what they have observed, and by observing the patient as needed. (Tr. 154:20–155:17.)

79.     The Department's procedures require staff to notify a mental health professional if a patient refuses to take any prescribed psychotropic medication for three consecutive days. (PX-49 at 41.) Dr. Hinton testified that the Department has instructed nursing staff about the importance of delivering medications properly, including doing mouth checks to make sure the

prisoner takes the medication. (Tr. 1333:18–1334:9.) The administration of medications is tracked using a "Medication Administration Record" (MAR) that nurses use to note when medications are delivered. (Tr. 1334:22–1335:12.) Dr. Yen testified that prisoners who refuse to take their medication are referred to him as the psychiatrist, which allows him to discuss the situation with the patient and recommend alternatives, including discontinuation of the medication. (Tr. 156:25–157:9.) Dr. Puga also testified about changes to the formulary, which include using dissolvable medications so that staff can be sure prisoners are taking the medications. (Tr. 558:22–25; 559:10–16.) He also has eliminated some medications that are likely to be abused. (Tr. 559:20–560:6.) Although Dr. Stewart testified about one instance where he saw a prisoner "cheeking" his medication, Dr. Stewart did not report the incident to any one at the Department. (Tr. 1072:1–11.)

80.     The Department has implemented an Electronic Health Record system at Logan and Decatur, and has committed to install a new Electronic Health Record system that will provide real-time documentation of medication administration in a format that is compatible with the system used in Cook County, the county that commits the largest number of prisoners to the state prison system. (PI Tr. 681:19–683:14, 1334:10–15; 1426:21–25; 1427:1–18; Tr. 852:4–11.)

81.     Based on the entire record, the evidence does not support a finding of gross or systemic deficiencies related to the administration and management of medications for prisoners on psychotropic medications. Plaintiffs also have not provided any evidence that prisoners class-wide are suffering or facing substantial harm as the result of any delays in scheduling their psychiatric evaluations on the schedule required under the Settlement Agreement. The record also does not support a finding that the defendants are being deliberately indifferent to the need to hire and train sufficient staff needed to administer medication in a manner that meets constitutional standards and prevents significant harm.

### D.  Initial Evaluations by Mental Health Professionals under §V(f)

82.    Section V(f) of the Settlement Agreement provides that "Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral."

83.    Plaintiffs acknowledged in their motion to enforce the Settlement Agreement that "the Monitor did not make a finding of non-compliance" with respect to the evaluations required under §V(f). (Dkt. 1559 at 18.) And although the Court's preliminary injunction order noted the existence of a backlog with respect to initial evaluations, the order did not contain any specific relief as to initial evaluations except as to the need to provide sufficient staffing to provide a constitutional level of care in each of the five areas addressed in the Court's order. (Dkt. 2070 at 39–42.)

84.    During the permanent injunction hearing, the defendants presented the backlog report as of August 17, 2018 (DX-1D), as well as a summary of the portion of the report pertaining to initial evaluations (DX-1G). Those exhibits show that as of August 17, 2018, 15 prisons reported *no backlog in initial evaluations*. (DX-1D and DX-1G.) Thirteen prisons reported a total of just 1 to 16 backlogged initial evaluations, representing a small fraction of the total mental health caseload at each prison. (*Id*.) Only one prison, Western, reported a significant backlog in initial evaluations:  109, representing 24.3% of its mental health caseload. (*Id*.) Amy Mercer testified about her recent work with Western to reduce its MHP backlogs. (Tr. 708:11–12.)

85.    Plaintiffs did not present any evidence as to initial evaluations, and Dr. Stewart likewise did not point out any particular issues with initial evaluations. He also did not review them as part of his compliance review.

86.     This record does not support a finding that there are systemic and gross deficiencies in providing initial evaluations that are resulting in the inmate population being effectively denied access to adequate mental health care. To the contrary, the record shows that with the exception of Western (where Amy Mercer is helping to address its backlog), prisoners at all other IDOC facilities are receiving timely initial evaluations.

**E.  Treatment Plans under §VII(a), (b), and (c)**

87.     Section VII(a) of the Settlement Agreement provides that "any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans shall be prepared collectively by the offender's treating mental health team." Section VII(b) of the Settlement Agreement requires the treatment plans to be recorded on the Department's Form 0284 or its equivalent, and must specify things such as treatment goals, the frequency and duration of intervention/treatment activities, and staff responsible for those activities. Section VII(c) of the Settlement Agreement requires the treatment plans to be reviewed and updated on various schedules based on the patient's level of care.

88.     Dr. Stewart acknowledged in his 2017 Midyear Report that "[t]reatment plans are prepared for mentally ill offenders with few exceptions" using the Department's Form 0284. (PX-21, Midyear Report at 29.) The primary criticism raised by plaintiffs and Dr. Stewart was that the treatment plans were often prepared in a "boilerplate" manner without all of the fields completed, were not sufficiently individualized based on collective input from the mental health team," and were often delayed past the schedule required under the Settlement Agreement. (Dkt. 1559 at 8–9; Tr. 1044:2–20.) Although the Court credited Dr. Stewart's testimony that staffing deficiencies were resulting in treatment plans not being updated with sufficient frequency (Dkt. 2070 at 26–28), the full record shows that the Department has made substantial improvements with respect to treatment planning.

38

89.     In early 2018, the Department revised its Form 0284 treatment plan document (DX-13) to respond to issues Dr. Stewart raised with respect to treatment planning. (Tr. 561:10–562:25, 1077:9–12.) Dr. Stewart approved the Department's revision to its treatment plan form, recognizing that it is an improvement over the prior form. (Tr. 1042:1–25.) The revised treatment plan form provides for the mental health professional to make notes about changes to the treatment plan, and also provides for the psychiatric provider to review and sign-off on those changes. (DX-13; Tr. 562:10–25, 1076:24–1077:9.) Dr. Stewart also acknowledged that after he raised concerns about treatment planning, the Department instituted a training program with respect to treatment planning. (Tr. 1088:19–24.) Dr. Hinton testified that the Department revised its treatment plan form (DX-13) to prompt input on the treatment plan from the multidisciplinary team (Tr. 1332:17–1333:17) and provided training to its staff about how to complete the form (1335:13–1336:16). Dr. Puga testified that he has again revised the treatment plan form in an effort to make treatment planning more useful and individualized. (Tr. 565:7–566:25, DX-13A, DX-13B.)

90.     Dr. Hinton also testified about the Department's development of a new Form 0377 to create a specialized treatment plan for patients in a crisis setting. (Tr. 411:10–412:6.) During the preliminary injunction hearing, Dr. Stewart acknowledged that to respond to issues he raised with respect to the need to improve treatment planning for those on crisis, the Department has adopted the revised Form 0377 to improve treatment planning for patients on crisis watch. (DX-14, Tr. 568:15–24, 1100:3–13, 1109:19–110:19.) The revised Form 0377 requires an updated treatment plan upon the initiation of a crisis watch, and also provides for a separate treatment plan to be prepared during the crisis watch. (*Id*.) It also provides that "the treating mental health professional or psychiatric provider (if applicable) shall schedule a follow-up upon entrance and during stay in crisis," and prompts the mental health professional to make a referral

to psychiatric provide during the patient's stay in crisis if necessary. (DX-14 at 2; Tr. 1111:4–7.)
The MHP also is directed to review and update the treatment plan upon discharge from crisis.
(DX-14 at 2.) Dr. Stewart admitted this is a positive step. (Tr. 568:15–24, 1100:3–13, 1109:19–
110:19.)

91.    In addition to the formal 0284 and 0377 treatment plan forms, Dr. Stewart has
acknowledged that the psychiatrists' Progress Notes, though not a formal treatment plan on Form
0284, "would cover the psychiatrist's view of the treatment plan." (Tr. 1067:12–19, 1133:14–
23.)

92.    Dr. Stewart also acknowledged in his Second Annual Report that 92% of
outpatient prisoners had treatment plans completed within the year preceding the review. (PX-52
p. 26.) Although Dr. Stewart concluded generally that treatment plans for prisoners in
segregation were not being updated in accordance with the timelines established by the
Settlement Agreement (PX-52 p. 26), Dr. Stewart reported in his 2017 Midyear Report that the
required treatment planning for prisoners in segregation *generally was being done as required* at
the Department's medium security facilities, but not in the required timeframe at five facilities he
monitored for his Midyear Report: Dixon, Menard, Pontiac, Pinckneyville, and Stateville. (PX-
21 at 32.)

93.    Dr. Stewart also testified during the permanent injunction hearing about his
review of treatment plans at various facilities, and offered his general view that treatment plans
were not being prepared and updated as required. (Tr. 1005:22–1006:20.) But during cross
examination, Dr. Stewart admitted that several treatment plans that he believed were missing
were in fact in the file, and that he should have given the Department credit for full compliance
with respect to those treatment plans. (Tr. 1121:5–1124:4; DX-69.) For example, Dr. Stewart
claimed that treatment plans were not being completed prior to discharge from crisis watch for

certain individuals, but then admitted that the files did in fact show that treatment plans were being done. (Tr. 1124:17–1126:22.) Dr. Stewart has admitted that his findings about deficient treatment plans are largely "anecdotal," and that he had not notified the Department about any specific treatment plans that were deficient. (Tr. 1063:16–25.) Dr. Elliott testified that although it may be desirable to update a treatment plan prior to discharge from crisis watch, it is not important to do so within the whole context of getting someone on and off of crisis watch. (Tr. 881:4–11.)

94.     Dr. Stewart acknowledged in his 2017 Midyear Report that "[i]t is a major improvement that treatment plans in Dixon's STC [specialized treatment center, or RTU] are now being completed during monthly review meetings that include the psychiatrist, QMHP, BHT, nurse, and officer assigned to the inmate's RTU." (PX-21 at 31.) Dr. Stewart also confirmed that the Dixon RTU is "consistently meeting the 60-day requirement for treatment planning. (PI Tr. 1055:15–19.)

95.     At the preliminary injunction hearing, Dr. Stewart expressed his view that members of the multidisciplinary team should meet simultaneously to discuss the treatment plan. (Tr. 1048:17–25, 1052:17–25, 1070:15–20.) After that hearing, Dr. Stewart concluded in his Second Annual Report that that various prisons are in fact completing treatment plans in a multidisciplinary setting, including Dixon, Joliet, Logan, Illinois River, and Elgin. (PX-52 at 25.)

96.     Leaving aside for a moment whether in-person multidisciplinary treatment team meetings are required to meet a constitutional level of care, Dr. Stewart acknowledged that such meetings were occurring at the Joliet and Dixon special treatment units (RTUs). (Tr. 1049:5–12.) Dr. Stewart also acknowledged that psychiatrists and mental health professionals regularly meet at Pontiac to collaborate about patient treatment and that such collaboration would meet

41

the collaboration requirement. (Tr. 1072:13–23, 1075:5–12.) Dr. Puga testified about his regular consultations with MHPs and other team members when he visited Pontiac for psychiatric clinics. (Tr. 1217:9–19, 1218:2–1219:3, 1222:18–1224:9.) He also testified that the multidisciplinary team meet as a group at 8 a.m. and 3 p.m. to discuss the treatment of the patients on crisis watch. (*Id.*) Dr. Puga also testified that he would review patients' treatment plans at the end of his day of conducting clinics. (Tr. 1219:15–20.) Wexford's offer letter to psychiatrists also informs psychiatrists that they "will also be required to participate in weekly multidisciplinary treatment team meetings that will be conducted between the hours of 8 a.m. and 8 p.m. CT, Monday–Friday." (DX-34; Tr. 494:12–22.)

97.     Dr. Yen likewise testified at the permanent injunction hearing that he participates in multidisciplinary team meetings that are regularly held at Vienna and Vandalia (where he conducts clinics by telepsychiatry) to discuss patients, including their diagnoses and updates to their treatment plans. (Tr. 143:20–145:25.) Dr. Yen also confirmed that he is notified when his patients are placed on crisis watch and then sees those patients on his next scheduled clinic or sooner if it is an emergency. (Tr. 162:9–23.) Dr. Yen also confirmed that he and the treatment team review the treatment plans for patients who are on crisis and participates in modifications to those plans with the goal to address the reasons the patient is in a crisis setting. (Tr. 164:1–13.) Dr. Yen also confirmed that he is notified when his patients are placed into segregation and that if particular concerns are raised concerning those patients he sees them during his next scheduled clinic and discusses with them how to get them out of segregation and back into the general population. (Tr. 160:2–22.)

98.     Similarly, Dr. Doyle testified about his participation in multidisciplinary team meetings held regularly at Dixon where the treatment team, including the psychiatrist and QMHPs, discussed their patients and updates to their treatment plans. (Tr. 1740:10–1741:19.)

Although there are no formal multidisciplinary meetings regarding prisoners in segregation, there is constant consultation among the mental health staff regarding segregation prisoners. (Tr. 1796:14–1798:6.) Additionally, Dixon assigns one psychiatric provider to crisis watch, who then consults with the other psychiatric providers when a patient is placed on crisis. (Tr. 1739:5–1740:6.)

99.     As detailed above, the psychologist administrators from Stateville, Hill, and Pontiac also each testified about how the treatment teams at those facilities conduct regular multidisciplinary team meetings to discuss the status of their patients, including their diagnoses, symptoms, participation in groups, and their treatment plans. Dr. Stromberger, from Hill, testified about the distinction between treatment plans used during crisis (the Form 0377), which emphasizes the "here and now" in an effort to stabilize the patient who is on crisis, compared to the regular Form 0284 treatment plan that is used to lay out the who, what, and how of the projected plan for the patient's mental health care. (Tr. 1384:12–1385:22.) Dr. Mirsky, from Stateville, similarly testified about how Stateville uses the Form 0377 to create a treatment plan for patients on crisis watch, followed by an update to the regular treatment plan after the patient is discharged from crisis. (Tr. 241:6–22.) Dr. Mirsky also testified that Stateville uses its Friday multidisciplinary team meetings to discuss treatment plans for prisoners who are on segregation status. (Tr. 232:23–233:14.)

100.     During the permanent injunction hearing, plaintiffs submitted selected treatment plans for four prisoners at Pontiac, showing that a single QMHP at Pontiac had proposed the same treatment recommendations for those four prisoners. (PX-55c, g, i, and m.) Although Dr. Stewart concluded that these treatment plans were "worthless" because of their similarities (Tr. 1090:15–1091:5), he did not provide support for that conclusion. The treatment plans did not include the patients' identity, Dr. Stewart did not testify that he had any familiarity with these

individuals, and he testified that it would be difficult to determine whether a treatment plan was sufficiently individualized without knowing the patient. (Tr. 1084:10–12.) Defendants presented samples of treatment plans from Lawrence, Centralia, and Logan that each varied greatly from the four treatment plans presented by plaintiffs and from each other. (Tr. 1115:22–1116:25; Tr. 1121:5–1122:8 ; Tr. 1125:2–1126:4; Tr. 1152:22–1153:25; Tr. 1154:23–1155:4.)

101.    Plaintiffs presented testimony from prisoners Champs and Kings, and former prisoner Anthony Gay, but plaintiffs did not present any evidence regarding these prisoners' treatment plans, much less evidence indicating that their treatment plans were boilerplate rather than individualized for them. To the contrary, the evidence showed that Mr. Gay's treatment plans were updated at Pontiac on February 1, 2018, and then at Dixon on April 28, 2018, and June 22, 2018, and that his plans were highly individualized. (DX-85 pp. 5358; Tr. 1558:19–1559:12; DX-88 at 318319; DX-85 at 465–468; Tr. 1563:4–1564:6.) Mr. Gay also received an individualized treatment plan while on crisis watch on April 15, 2018. (DX-85 at 277-280; Tr. 1561:18–1562:14.)

102.    Similarly, the mental health records for prisoners "Tyler," Span, and Singleton, introduced during the preliminary injunction hearing, show that each had his treatment plan updated multiple times. Tyler's treatment plans (at Dixon) were updated on January 10, February 9, March 9, April 20, June 9, June 22, and September 7, 2017. (PX-25.) Span's treatment plans (at Stateville, Dixon, and Pontiac) were updated on January 15, January 24, March 23, June 23, August 11, November 9, 2017, and January 4, 2018. (PX-32.) Singleton's treatment plans (at Pontiac) were updated on March 6, July 7, September 18, and December 29, 2017. (DX-54.)

103.    The evidence pertaining to each prisoner who testified shows that each of them received individualized treatment plans that were regularly updated and changed. There is no

evidence that any of them suffered any injury attributed to any deficiencies related to their treatment plans.

104.     The entire record now before the Court does not support a finding of systemic failures to provide adequate treatment plans throughout the IDOC system. The weekly backlog report shows that as of August 17, 2018, twelve facilities *had no backlogs with respect to treatment plans*. (DX-1D and DX-1I.) Six facilities had only *ten or fewer* total backlogs in treatment plans, while another seven facilities had fewer than 40 backlogged treatment plans, representing 2.4% to 8.2% of their total mental health caseloads. (*Id*.)

105.     Apart from the numbers, the record shows that the mental health treatment teams are conducting regular multidisciplinary team meetings where the treatment team discusses patients and their treatment plans. The record also shows that the Department has adopted particular procedures to review and update treatment plans for patients who are in crisis. The Department also has modified the treatment plan form to make it more useful, and regularly audits treatment plans to ensure they are being completed in a timely and individualized manner. (Tr. 1311:4–1312:3; DX-3D.) The record does not support a finding that the defendants are being deliberately indifferent to the need to create and update individualized treatment plans.

### F.  Segregation Care under §XV(a)(iii) and (vi), §XV(c)(iii), and §XV(c)

106.     Section XV of the Settlement Agreement contemplates that certain mentally ill prisoners will face administrative detention or other controlled settings, referred to as "segregation," and requires the Department to take various steps to mitigate the risks to mentally ill prisoners who are in segregation.

107.     Although plaintiffs, through Dr. Stewart, have made general assertions about the risks posed by placing mentally ill prisoners in segregation (e.g., Tr. 1019:10–23), the record shows the Department now provides a number of services to mitigate that risk to seriously

mentally ill prisoners who are in segregation, including (a) reducing the offenses that qualify for segregation, (b) having a mental health professional review recommended discipline for mentally ill prisoners to determine if the prisoner should not go to segregation or have his or her segregation time reduced because of the mental illness; (c) providing ongoing psychiatric and therapist visits to ensure that segregated prisoners are receiving proper medication and appropriate treatment plans; (d) providing structured and unstructured out-of-cell time, and (e) evaluating segregated mentally ill prisoners to ensure they are receiving the appropriate level of care.

*Steps to Reduce Segregation*

108.    The Department has taken various steps, not challenged or disputed by the plaintiffs, to reduce segregation time for mentally ill prisoners. For example, in April 2017, long before the preliminary injunction hearing, the Department embarked on a major undertaking to review all segregation sentences, remove a variety of offenses that previously would have triggered segregation time, and reduced segregation sentences for prisoners in segregation. (See Departmental Rule 504, 20 Ill. Admin Code §504; see also PI Tr. 1313:20–1314:12; 1340:17– 1342:4.) Plaintiffs' witness Joe Champs admitted that his time in segregation was reduced by the Department as a result of this process. (Tr. 1470:6–18.)

109.    The Department also adopted a policy and practice for a mental health professional to review the discipline recommendation whenever seriously mentally ill prisoners receive a disciplinary ticket that could include segregation. A mental health professional reviews the infraction to determine if the mental illness is a mitigating factor that justifies either no time or reduced time in segregation. (DX-45; Tr. 1212:18–1313:16; 1342:5–11.) Dr. Stromberger from Hill testified about how she personally reviews cases where seriously mentally ill patients are referred for segregation, and personally determines if the mental illness presents a mitigating

46

factor to justify reducing the recommended segregation time, or eliminating it altogether. (Tr. 1386:13–1387:12.) Dr. Stromberger testified that her recommendations are routinely followed by security staff, and identified just one time when security staff overruled her recommendation. (Tr. 1387:13–1388:1.)

110.    Dr. Renzi similarly testified that seriously mentally ill prisoners at Pontiac receive a recommendation from mental health, before discipline is finalized, regarding whether the mental illness contributed to the offense. (Tr. 1623:25–1624:9.) Dr. Renzi testified that if the person's mental illness did not contribute to the offense, mental health staff recommends segregation time be, at most, 50% of the possible maximum amount of time, but if the mental illness did contribute, mental health staff recommends that there not be any segregation, restriction of privileges, or anything else so that staff can address the behavior in treatment instead of through the disciplinary process. (Tr. 1624:4–1625:17.)

111.    Dr. Mirsky testified regarding the same process at Stateville, stating that when mental health staff is notified that a seriously mentally ill offender was written a ticket that could potentially lead to segregation, a non-treating MHP is assigned to review the ticket, meet face-to-face with the inmate, and determine if there were mitigating factors that contributed to the inmate receiving the ticket. (Tr. 226:17–228:3.) Amy Mercer testified about her participation in this same process at Dixon. Every ticket is discussed as a group with the psychiatrist, MHPs, and BHTs, and the group determines what action should be taken in regards to the ticket. (Tr. 657:12–658:4.)

*MHP Evaluations of Offenders Placed Into Segregation, Updated Treatment Plans, and Recommendations for a Higher Level of Care*

112.    In addition to the mental health professional's review of segregation sentences for seriously mentally ill prisoners discussed above, §XV(a)(iv) of the Settlement Agreement

47

requires a mental health professional to evaluate any mentally ill offender no later than 48 hours after placement in segregation. Sections XV(a)(vi)(D) and XV(c)(iii)(D) require "[s]upportive counseling as indicated in the ITP [individual treatment plan]," while §§XV(a)(iii), XV(a)(vi)(A), and XV(c)(iii)(A) (p. 19) similarly require offenders in segregation to continue to receive the treatment outlined in their treatment plans with enhanced therapy as needed to prevent decompensation.

113.    The Department's most recent quarterly report discusses the Department's efforts to ensure coverage to comply with the 48-hour requirement for assessments of mentally ill prisoners placed into segregation. (DX-52 at 20.) That report notes that the Department's internal auditing process found only four instances where the offender was not seen by an MHP within 48 hours of placement into segregation. (*Id.*)

114.    With respect to prisoners in segregation receiving "enhanced therapy as necessary to protect from decompensation that may be associated with segregation" (§XV(a)(vi)(A)), Dr. Stewart has acknowledged the Department's commitment to achieve this through more psychiatric hours, including by telepsychiatry or by adding additional "mid-level psychiatric providers." (PI Tr. 1143:7–11, 1144:19–24.) As discussed above, the Department has supplemented its psychiatric staff with such "mid-level psychiatric providers," and has substantially reduced the backlog in psychiatric visits.

115.    In addition, each of the psychologist administrators testified regarding the specific group programming offered to segregation prisoners at their facilities. (See ¶¶42-43, 45, above.) For example, Dr. Renzi from Pontiac explained that while treatment planning provides a formal way to review treatment goals and to review progress, these important goals are still being met at Pontiac by having almost daily contact between the offender and mental health staff, nursing staff, and security. (Tr. 1626:10–18.) Dr. Doyle testified regarding the group programming

available at Dixon for segregation prisoners, including "everything" from lifestyle change to criminal thinking, and movies. (Tr. 1743:11–17.) Movie groups are not just to get prisoners out of their cells, but to allow prisoners to work on socialization and interpersonal skills that they will need once they leave segregation. (Tr. 1607:11–1608:10.) Dr. Stewart testified that movie groups would "certainly" contribute to lessening prisoners' decompensation. (Tr. 1029:6–17.) Dr. Elliott described in detail the groups which Wexford offers to prisoners, including traditional group therapy, which includes therapy and process groups, and psychoeducational groups, which are highly structured classroom instruction. (Tr. 842:7–25.) Dr. Elliott could not provide an exact number of how many groups were currently being run, but stated that it was in the hundreds statewide. (Tr. 843:1–3.) Specifically, Wexford has 21 separate sets of curricula for psychoeducational groups that are typical for correctional patients, including, for example, bipolar disorder, post-traumatic stress disorder, and anxiety disorder. (Tr. 843:8–17.) Wexford also has groups that are specifically designed for prisoners in segregation, like the GATE intervention (Grounding, Assessment, Treatment, and Exit Strategy), and for prisoners on crisis watch, like ALIVE, which is intended to engage the offender in reasons for living and developing coping strategies. (Tr. 843:20–845:2.)

116.   Dr. Hinton testified about the Department's commitment to providing services to prisoners in segregation, including group therapy sessions, and the ability to interact more meaningfully with MHPs and BHTs through rounds conducted in confidential settings, and construction of new space at Pontiac, Dixon and other facilities to support these services. (Tr. 1342:20–1346:25.) Dr. Stewart has agreed to the Department's use of behavioral health technicians to conduct rounds in segregation to free up mental health professionals to spend more time on treatment planning and running structured group sessions. (PX-21 at 4; Tr. 1342:20–1343:2.) Dr. Stewart acknowledged that using BHT's to conduct rounds for prisoners in

segregation has helped reduce the backlogs for evaluations by psychiatrists and MHPs. (Tr. 581:8–12.)

117.    Section XV(a)(vii) of the Settlement Agreement provides that if an MHP determines that a prisoner in segregation requires relocation to a crisis cell or a higher level of care, the MHP must make the recommendation to the CAO (chief administrative officer, or warden), who must follow the recommendation or provide written reasons why security concerns should overrule the MHP's professional judgment. Plaintiffs have not identified any instance where an MHP failed to exercise professional judgment as required in §XV(a)(vii) with respect to recommendation for a higher level of care, or any instance where prison officials overruled that professional judgment.

118.    Although Dr. Stewart provided information regarding referrals to higher levels of care for crisis watches that lasted more than 10 days in June 2018 (PX-53, Attachment 4), this analysis provided little insight into the process of recommending a higher level of care. Dr. Stewart's analysis focused on all crisis watches that extended more than 10 days, but Dr. Stewart did not present evidence showing that every crisis watch extending more than 10 days requires a higher level of care. Dr. Stewart did not examine progress notes, which would have shown whether a higher level of care had been considered but rejected. (Tr. 1139:17–1140:6.) The Settlement Agreement notably does not require that a crisis watch end after a certain number of days. (Tr. 1108:16–19.) Testimony from the inmate witnesses, such as Ralph Kings and Anthony Gay, demonstrated that crisis watches may last longer at the request of the inmate, even when mental health staff believes the crisis has passed. (E.g., Tr. 1499:7–1500:8.)

*Out-of-Cell Time*

119.    Section XV(c)(ii) [p. 20] of the Settlement Agreement requires that mentally ill offenders who are in segregation more than 60 days are to receive a specified number of hours of

50

structured and unstructured out-of-cell time. This number was six hours at the time of the preliminary injunction hearing, and had increased to eight hours by the time of the permanent injunction hearing.

120. Plaintiffs initially cited page 65 of Dr. Stewart's 2017 Midyear Report as evidence that the Department is in violation of the six-hour structured out-of-cell requirement. (Dkt. 1857 ¶ 118.) Dr. Stewart's comments were based on his observations at one facility, Pontiac, on one day, September 19, 2017, where unidentified offenders purportedly told Dr. Stewart that they only attended two groups per week, with some attending only one group per week. (*Id.*) The prisoners' comments about what groups they attended are hearsay and do not address what structured time they were offered.

121. Apart from his particular criticism about Pontiac, Dr. Stewart extolled the Department's treatment provided to patients at the Joliet Treatment Center, including its provision of structured and unstructured time. (PI Tr. 559:8–600:8.) Dr. Stewart also praised Logan Correctional Center, which has over 51% of its total population designated seriously mentally ill (see DX-62 at 14, Fig. 6), stating that its progress has been "tremendous." (Tr. 1166:11.)

122. When Dr. Stewart analyzed the Department's efforts to provide out-of-cell time, he concluded that the efforts were inadequate because the Settlement Agreement requires a certain number of hours to be "received," not just "offered," and inmate refusals resulted in the Department not meeting the terms of the Settlement Agreement. (Tr. 1053:18–1054:10.) But even Dr. Stewart acknowledged that force should not be used to require prisoners to participate in out-of-cell time when they exercise their right to refuse to attend. (Tr. 1136:13–1137:15.) Prisoners are being offered significant structured out-of-cell time for groups, movies, and individual therapy when warranted. As reported in the Department's July 2018 Quarterly Report,

if an offender refuses structured out-of-cell time, mental health staff speak personally with the offender to determine the reason for the refusal. (DX-55.) This information is recorded on a form and placed into the offender's file. (*Id.*) Repeated refusals are discussed weekly at multidisciplinary meetings and decompensation forms are submitted when applicable. (*Id.*) When common reasons for refusals are identified, they are addressed to the extent possible. (*Id.*)

123.    The Department's quarterly report shows the out-of-cell time being offered by each facility. (DX-55 at 26–27.) The Department uses a standardized spreadsheet (DX-8B) to track the Department's overall compliance with the structured and unstructured out-of-cell requirements. This form was initially developed at Pinkneyville, and then was rolled out system-wide based on Dr. Stewart's approval of that form. (PI Tr. 1164:22–1165:11.) Dr. Stewart acknowledged that the Department's adoption of the new form to keep track of out-of-cell time is "a good thing." (PI Tr. 1148:5–21.)

124.    As of July 23, 2018, all facilities except Pontiac offered at least the out-of-cell time required by the Settlement Agreement (8 hours of both structured and unstructured), and many facilities exceeded the requirements. (DX-55 at 26.) On a facility-wide basis, Pontiac regularly offers seven or more hours of structured out-of-cell time to most mentally ill offenders (but offers 10 hours to mentally ill offenders in the South Mental Health unit), and 13.5 hours of unstructured out of cell time. *Id.* The Department also is in the process of completing new treatment space at Pontiac and Dixon that will allow more room for structured group and confidential individual meetings, as well as new RTU and crisis space. (DX-6B; Tr. 550:7–555:5, 638:19–629:5, 736:2–739:1, 745:18–23, 818:15–18, 1124:25–1125:6, 1342:20–1343:2, 1345:10–1346:25, 1350:2–10.)

125.    The inmate witnesses each testified about the time they have spent out of their cells. Joe Champs testified that he leaves his cell for groups once a week and for movies twice a

week. (Tr. 1465:22–25.) Ralph Kings testified that when in segregation, he leaves his cell for medical passes, one-on-one mental health sessions, group therapy, recreation, yard, and visits. (Tr. 1480:14–19.) Mr. Kings stated that although he was offered group three times a week, he would only go once a week. (Tr. 1495:10–15.) Mr. Kings' one-on-one therapy sessions occurred every two weeks and lasted between 45 and 75 minutes. (Tr. 1500:9–10.) After Mr. Kings was moved to a male therapist's caseload based on inappropriate activity he was engaging in, Mr. Kings began refusing his one-on-one sessions. (Tr. 1501:21–1502:15.) Anthony Gay testified that while at Dixon from June through August 2018, he attended three to four groups a week. (Tr. 1547:2–18.) Although he went to most groups offered at Dixon, he would refuse to attend if the group was being offered by a mental health staff member he did not like. (Tr. 1584:18–1585:1.) Mr. Gay did not attend all of the groups offered to him at Pontiac. (Tr. 1585:15–19.)

126.    The record does not support a finding that Pontiac's being short one hour of structured out-of-cell time each week, on average, has resulted in a substantial risk of serious harm to prisoners at Pontiac, let alone elsewhere. To the contrary, Dr. Doyle testified that seriously mentally ill people may always be in the process of decompensating as a result of their mental illness, but not as a result of the amount of out-of-cell time. (Tr. 1794:19–2.)

*MHP Recommendations Concerning Post-Segregation Housing*

127.    When seriously mentally ill prisoners leave segregation, §XV(c)(iii)(F) of the Settlement Agreement requires a mental health professional to become involved to make a recommendation on appropriate post-segregation housing. (Tr. 750:17–21, 753:13–755:12, 1315:2–4.) This is captured on a post-segregation housing form (DX-33). Plaintiffs presented no evidence to show a lack of substantial compliance with this requirement. Additionally, Dr. Stewart found in his Second Annual Report that the Department is complying with this section of the Settlement Agreement, noting that MHPs are consulted regarding post-segregation housing

53

recommendations and the recommendations are not overridden by security staff. (PX-52 at 56–57.)

*Medications for Offenders in Segregation*

128.    Sections XV(a)(vi)(C) and XV(c)(iii)(C) of the Settlement Agreement require offenders in segregation to receive any applicable "[p]harmacological treatment." The Court's findings with respect to pharmacological treatment are addressed above in its discussion of medication management.

129.    The inmate witnesses testified regarding pharmacological treatment they received while in segregation. Joe Champs testified that he spoke to psychiatric providers several times in the last few months and that his medications were adjusted during those visits. (Tr. 1463:9–1464:8.) Ralph Kings testified regarding his regular, face-to-face visits with the psychiatrist and the changes that were made to his medications as a result of those visits. (Tr. 1503:2–1505:10.) Anthony Gay testified that there was an order directing staff to provide him enforced medication if he did not willingly take his medication, but enforced medications were never administered because he took his medication. (Tr. 1557:20–1558:5.) There is no evidence indicating that pharmacological treatment of segregation prisoners differs at all from the treatment of mentally ill prisoners who are not in segregation.

130.    Although each facility discussed a slightly different method by which they implemented the Department's policy in regards to discipline for mentally ill offenders, the record does not support a conclusion that there are gross and systemic deficiencies in the procedures being followed or that the Department is being deliberately indifferent to the particular needs of mentally ill prisoners in segregation.

### G. Crisis watches under §II(e) and §VIII(b)(i)

131.    Crisis watch is most often (though not exclusively) used to monitor prisoners to prevent self-harm including suicide. (PI Tr. 572:16–22.) Section II(e) of the Settlement Agreement defines "Crisis Beds" as beds to be available for short-term (generally no longer than 10 days) for "aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting." Section II(e) also requires the crisis beds are to be located apart from a segregation setting absent exigent circumstances. *Id.* Section VIII(b)(i) of the Settlement applies to prisoners transitioning out of a crisis placement, and requires an MHP to assess the prisoner for five consecutive days after leaving crisis, and also to conduct an Evaluation of Suicide Potential (Form 0379) within seven days and then monthly for at least six months.

132.    The Court's preliminary injunction order expressed concern that the Department was not providing adequate contacts to prisoners who are in a crisis setting, and required the Department to enhance those contacts. (Dkt. 2070 at 31–32, 39–40.) During both hearings, the Department presented substantial evidence concerning the care it provides for mentally ill prisoners who are in a crisis setting.

*Care During Crisis*

133.    To provide crisis beds that meet the definition in §II(e) of the Settlement Agreement, the Department has required crisis beds to be out of segregation settings except in exigent circumstances. (DX-55 at 14; PI Tr. 745:6–17, 1348:20–1349:7.) Dr. Hinton testified at the preliminary injunction hearing that this had already occurred "at the overwhelming number of facilities," and he could think of just one facility—Pontiac—where crisis beds remained in segregation because of ongoing construction to provide new space for mental health treatment. (PI Tr. 1349:7–1350:1.) He testified that the crisis cells at Pontiac will be relocated when that

55

construction is completed. (*Id*. 1350:3–10.) As of at least July 2018, all facilities, including Pontiac, have crisis cells outside of segregation and are in compliance with the Department's policies and the Settlement Agreement. (DX-55 at 14.) Dr. Stewart acknowledged at the preliminary injunction hearing that the Department had already taken steps to provide for confidential mental health consultations for patients on crisis watch, including by constructing new pods at Pontiac and constructing new mental health treatment space. (PI Tr.  1123:18–1124:7.)

134.    Plaintiffs' based their alleged lack of compliance with §II(e) on Dr. Stewart's opinion that the Department was not providing sufficiently "aggressive" mental health interventions to reduce the "acute presenting symptoms" and stabilize people in crisis. (Dkt. 1857 ¶ 56.) The Settlement Agreement does not address any particular "aggressive" care for prisoners in crisis beyond what is already included in specific provisions of the Settlement Agreement. Even before the preliminary injunction hearing, prisoners on crisis watch were receiving daily visits from an MHP who completes the Form 0377 Crisis Watch Record (DX-14), as well as an Evaluation of Suicide Potential (Form 0378), as required under §XVI of the Settlement Agreement. Plaintiffs' motion did not allege any violation of §XVI, and Dr. Stewart previously found the Department to be generally in compliance with that section. (PX-21 at 73–80.) Dr. Stewart also acknowledged that the Department's revised Crisis Care Record (Form 0377) (DX-14) prompts the mental health professional to make any necessary referrals to the patient's psychiatric provider (PI Tr. 1111:20–1112:1.) In his Second Annual Report, Dr. Stewart also noted that "progress notes reflected meaningful therapeutic contacts and, where the monitoring team was able to observe these contacts, they were tailored, goal-directed, genuine treatment." (PX-52 at 75.) Dr. Stewart also acknowledged that patients on crisis watch were

receiving daily visits from mental health providers to assess their risk of self-harm, but in his view, such visits did not constitute sufficiently "aggressive" treatment. (PI Tr. 1094:8–1097:3.)

135.    In response to the Court's preliminary injunction order, the Department directed mental health staff to increase the length of the daily crisis assessment visits to at least 15 to 20 minutes, and to continue to conduct them in a confidential setting whenever possible. (DX-57; Tr. 327:11–328:17.) The Department also reiterated and expanded its prior direction that when mentally ill prisoners are moved to crisis, they are to be automatically scheduled on the psychiatric caseload. (DX-57; PI Tr. 1347:22–1348:4; Tr. 333:16–334:21.) These visits ensure that crisis watch prisoners who are on psychotropic medications receive psychiatric evaluations and explanations of their medications. (*Id*.) Dr. Stewart acknowledged the Department had previously committed to do this, though he complained that the meeting would not occur until the next scheduled appointment. (PI Tr. at 1117:19–1120:25.) The Department responded to this by requiring the patient to be scheduled for a psychiatric assessment with the next available psychiatrist without delay. (DX-57.) Psychiatric providers are also on call to receive calls at any hour to address emergency situations. (Tr. 334:24-335:8; 543:1–9.)

136.    Dr. Puga testified that arrangements can be made for patients to be seen by a psychiatrist within three hours if there is a need for a quick intervention. (Tr. 584:15–585:13.) Dr. Yen described times he might be called for an emergency, like when an inmate is hurting himself even after property has been taken away and might be in need of enforced medication. (Tr. 162:9–23.) Dr. Doyle testified that he has also been called when patients are having a crisis and nursing staff is not sure what to do. (Tr. 1745:4–13.)

137.    Dr. Elliot testified that offenders on crisis are receiving treatment in the form of programs like ALIVE, a psychoeducational module that provides prisoners with coping skills and discusses reasons for living. (Tr. 844:16–845:2.) Dr. Doyle testified, however, that

individuals in crisis who are suicidal or homicidal are usually actively psychotic and not suitable to be in group therapy. (Tr. 1759:2–11.)

138.    Prisoners on crisis watches also receive updated treatment plans that are specific to the particular issues pertaining to the crisis using the Department's revised Form 0377, discussed above with regard to treatment plans. (DX-57; DX-14; PI Tr. 1347:12–21; 1352:21–1353:22; Tr. 1384:12–1285:22; 241:6–22; 232:23–233:14.) At Dixon, a certified psychiatric nurse (a psychiatric provider) creates treatment plans specifically for prisoners on crisis watch. (Tr. 1756:8–15.) Dr. Yen testified that when his patients are on crisis watch, he, along with the MHP and the patient, reviews the previous treatment plans and tries to modify the plan to try to get the patient off of crisis and to prevent future crisis watches. (Tr. 164:1–13.) Dr. Hinton and Dr. Puga testified that Pontiac conducts multidisciplinary meetings twice a day for patients in crisis. (PI Tr. at 1217:9–19, 1218:9–1219:3.) Dr. Stewart acknowledged that if those meetings are occurring, "that would meet the requirement." (*Id*. 1116:1–1117:15, 1223:3–25.)

139.    The Department has directed that crisis watch treatment plans are to be completed collaboratively between the MHP, psychiatrist, and the patient. (DX-57.) The Department presented unrefuted testimony from several witnesses showing the Department's use of multidisciplinary meetings to address patient needs, including when they are on crisis watch. (Tr. 223:22–224:9; 1390:15–1391:20; 1403:1–12; 1617:9–24.)

*Post-Crisis Follow-up*

140.    To address the post-crisis follow-up required by §VIII(b)(i) of the Settlement Agreement, on November 1, 2017, the Department issued Procedural Bulletin No. 12-004 to address the required procedure for discontinuation of crisis watches and the required follow-up. (DX-2; Tr. 1350:20–1351:19.) The bulletin reiterated the requirement that a crisis watch can only be terminated by an MHP after an evaluation assessing the patient's current medical status

and response to treatment efforts, and requires the evaluation to be documented on the Department's Crisis Watch Form 0377 (DX-14). (*Id.*) The bulletin directed MHPs to conduct the required screening for suicide potential within seven days after the discontinuation of the crisis watch and then monthly for the next six months. (*Id.*) The bulletin also reiterated the requirement for the five days of follow-up visits after the patient leaves crisis, to be documented on the Department's Crisis Watch Discharge Assessment Form 0528 (DX-17). (*Id.*) An MHP uses the Crisis Watch Discharge Assessment Form (DX-17) to track the required visits for five days after a patient comes off crisis watch, as well as the follow-up suicide evaluations. (PI Tr. 1350:21– 25; 1351:1–6, 1355:4–23.) Dr. Stewart acknowledged that this form addresses the need for post-crisis follow-up visits. (*Id.* 1136:18–1137:15.)

141.    In addition to the steps outlined above, when a prisoner's crisis watch is discontinued, the Department's revised Form 0377 (DX-14) also prompts the mental health professional to update the prisoner's treatment plan. (PI Tr. 1353:23–1354:24.) The Department has updated its internal audit process to ensure this is being done at each institution. (*Id.* 842:16– 855:8, 1354:19–24; )

142.    In June 2018, the Department reiterated these requirements, and also clarified that patients who are on a crisis watch for 10 days must be evaluated to determine whether they should be placed on a higher level of care. (DX-57; Tr. 338:24–339:17; see also DX-2.)  The Department also convenes a crisis watch multidisciplinary team to convene to address the patient's care and treatment plan before the patient is removed from crisis. (*Id.*; Tr. 1403:1–12.)

143.    The Department also now has in place a special crisis watch audit process. (DX-3F, 3G, and 3H.) These audits are in addition to the Department's regular internal and external audit process, described below. (Tr. 336:7–17; DX-3F; DX-3G, DX-3H.) The crisis watch audits have been conducted at individual prisons weekly since July 2018. To conduct the weekly crisis

watch audit, the psychologist administrator for the prison reviews the files of prisoners on crisis and evaluates compliance with the following seven aspects of crisis care: (1) increased daily contact length with patient (at least 15 minutes); (2) psychiatric referral made or procedural protocol initiated; (3) participation of the psychiatric provider during the crisis watch discharge process; (4) adding additional treatment opportunities (i.e., groups when appropriate or additional one-on-one sessions or activities); (5) ensuring that proper evaluation of the patient's level of care is completed and documented; (6) elevating the patient's level of care, if recommended; and (7) ensuring that assessments are done in a confidential setting. (DX-3F, 3G, and 3H.)

144.    The record shows that the Department has prioritized care for patients in crisis and has implemented policies and procedures to make reasonable efforts to protect crisis patients from harming or decompensation. The record also does not support a finding that the Department's care for patients in crisis is grossly deficient system-wide, or departs substantially or radically from any accepted standard of care. The record also does not support a finding that the Department is being deliberately indifferent to the need to provide appropriate crisis care.

**H.  The Department's Quality Assurance Process**

145.    The defendants presented testimony from two quality assurance officials: Amy Mercer and Dr. Jeff Sim, who testified about what Wexford and the Department do to track and ensure compliance with the Settlement Agreement.

146.    Ms. Mercer is the Illinois Regional Mental Health Quality Assurance Coordinator for Wexford. (Tr. 605:24–606:1.) Her role is to monitor the work performed by mental health staff at all of the Department's facilities to track compliance with the *Rasho* Settlement Agreement, translate the *Rasho* requirements to ensure they are understood by the mental health

staff, and gather and report data concerning the facilities' level of compliance with certain requirements. (Tr. 606:2–617:21.)

147.    Shortly after Ms. Mercer joined Wexford in January 2017, she embarked on a project to update and standardize the databases at each prison to allow them to consistently keep track of certain deadlines required under the Settlement Agreement. (Tr. 716:3–717:8.) Ms. Mercer uses the data from each facility database to generate a weekly report that shows any backlog in psychiatric visits or selected MHP duties related to initial evaluations, follow-up visits, and treatment planning. (DX-1D; Tr. 629:12–644:11.) Ms. Mercer described how she contacts "almost every facility on an almost weekly basis to discuss their numbers with them, to figure out if their numbers have changed, how the change occurred, what the reason is of the backlog and to make sure they're not making any errors in how they're reporting their numbers." (Tr. 719:5–12.) The weekly backlog report lists the facilities alphabetically. (DX-1D.) To more clearly show which prisons have backlogs, Ms. Mercer sorted the August 17, 2018 backlog report in ascending order, showing the prisons with zero backlogs first, followed by the prisons with higher backlogs. (DX-1F, DX-1G, DX-1H, DX-1I.) These reports also list the total psychiatric and mental health caseload for each prison, along with a percentage of the backlog compared to the total caseload. (*Id.*) Ms. Mercer also compared the psychiatry backlog report from January 5, 2018 to August 17, 2018, to show (by total numbers and percentages) how many appointments were backlogged on each date by either 1–14 days, 15–30 days, 31–45 days, or longer. (DX-1E.) This comparison shows that by August 17, 2018, the greatest percentage of that backlog (71.4%) represented appointments that were just 1 to 14 days late. (*Id.*) Less than 10% of the backlog was late by more than 30 days. (*Id.*)

148.    Ms. Mercer also described that as part of her quality assurance monitoring effort she attends multidisciplinary meetings where mental health professionals, behavioral health

technicians, staff assistants, and psychiatrists discuss their mental health caseload. (Tr. 655:20–656:5.) Ms. Mercer's description of a recent team meeting at Dixon, where approximately 20 people participated and "discussed every individual who was on crisis, who saw them that day, what their interaction was like, whether that persons was responsive or not, willing to talk, how they came across, what their demeanor was, how they presented, what they said" (Tr. 656:8–657:11) is discussed above.

149.    Dr. Sim is the Department's Statewide Mental Health Quality Improvement Manager. (Tr. 1304:4–6.) He described that his primary responsibility as the Department's Statewide Mental Health Quality Improvement Manager is to audit the prison facilities statewide and develop protocols and procedures for auditing. (Tr. 1304:7–11.) He described two different audit processes: internal audits, conducted by the psychologist administrator or a social worker at the facility; and external audits, conducted quarterly by regional administrators. (Tr. 1304:4–25; 1317:1–5.)

150.    Under Dr. Sim's direction, the Department has been conducting its internal audits since September 2017. (Tr. 1305:7–12.) The audit has grown from initially auditing 174 "problem statements" to now auditing 315 problem statements. (Tr. 1305:22–23; DX-3D.) The problem statements are designed to track the Department's compliance with the *Rasho* Settlement Agreement, as well as with the Department's Standard Operating Procedure Manual and its various Administrative Directives. (Tr. at 1306:11–15.) The problem statements are divided into four broad categories: (a) Missing Information or Clerical Errors; (b) Office of Mental Health Services Policy and Procedure Deviation; (c) Clinical Judgment/Assessment/ Skills Deficit; and (d) Writing Skills. (Tr. 1307:17–1309:18.) The internal audit in turn uses these compliance categories and the problem statements to assess the Department's compliance in the following ten areas: Intake; Crisis Writ and Transfer; Mental Health Follow-Up; Mental

Health Treatment Plan; Crisis Management, Intervention and Documentation; Psychiatric

Services; Mental Health Disciplinary Review/Restricted Housing; Use of Restraints; Mental

Health Evaluations; and Supervision for Non-Clinical Licensed Mental Health Staff. (Tr.

1311:12–1312:3; DX-3D.) In January through May 2018, the Department audited these ten areas

monthly. The Department then moved to conducting the audit every other month so as to

maintain quality audits, implement corrective action plans, and achieve a better balance between

using staff for auditing versus providing clinical services. (Tr. 1312:6–7; 1313:17–1314:12.)

151.     Dr. Sim collects the internal audit data in an "audit dashboard," which is also

available for use by each facility. (DX-3C; Tr. 1322:25–1323:1.) The "audit dashboard" allows

the results to be filtered in multiple ways. For example, although the audit results include the

responses to all 315 "problem statements," the results can be filtered to look at the results for just

one problem statement, like "treatment plan does not have at least one modality in treatment."

(Tr. 1320:18–1321:10.) Additionally, results can be filtered to only look at specific facilities. (Tr.

1321:17–24.) Although the Department currently gives all audit findings the same weight (for

example, a box not being checked has the same weight as an error involving lack of clinical

judgment) (Tr. 1360:2–17), by being able to filter the audit results, the Department can focus on

the most important "problem statements." The Department uses the audit results to develop

corrective action plans, which are discussed with the applicable security officers and mental

health staff to ensure that corrective actions are taken. (Tr. 1326:15–1330:11.)

***

152.     The entire record now before the Court shows that the Department has made a

substantial and concerted effort to deliver quality mental health care throughout the

Department's system. Although the Department continues to face challenges in hiring and

retaining the numbers of qualified mental health staff needed to comply with every aspect of the

63

Settlement Agreement, the Court is satisfied that the Department now has the leadership, staffing, and policies and procedures in place to deliver a constitutional level of care to mentally ill prisoners. The record does not support a finding that the care currently delivered throughout the system is grossly deficient or radically or substantially below any accepted standard of care. The record also does not support a finding that Department officials are being deliberately indifferent to the recognized need to deliver a constitutional level of care to Illinois prisoners.

## IV. Conclusions of Law

### A. Federal Jurisdiction

153. Federal jurisdiction in this case arises under 18 U.S.C. § 1331.

154. Federal courts can expressly agree to retain jurisdiction to enforce a settlement when justified by federal interests. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1188 and n.7 (7th Cir. 1985). When the parties settled this matter, the Court entered an order retaining jurisdiction "to provide a forum to address issues of compliance and performance of the terms of the Settlement." (Dkt. 709.)

155. Even though the Court has jurisdiction to consider plaintiffs' Motion to Enforce the Settlement Agreement, the question is more complicated with respect to what relief the Court can enter. For the reasons discussed below, the Court concludes that while the Court has jurisdiction to consider plaintiffs' motion and decide whether plaintiffs have identified a violation of federal law, the Court is not authorized under the Settlement Agreement and under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a), to issue plaintiffs' requested relief unless the Court finds both (a) that the defendants are not in substantial compliance with the Settlement Agreement, *and* (b) that the lack of substantial compliance would violate the Constitution or federal law.

64

156.    Also, for the Court to have and exercise jurisdiction to enter requested prospective relief, plaintiffs must show that they have "sustained or is immediately in danger of sustaining some direct injury . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-2 (1983). "Past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief .  .  . if unaccompanied by any continuing, present adverse effects." *Id*. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

**B.  Dispute Resolution under the Settlement Agreement**

157.    The Settlement Agreement's Dispute Resolution provision in §XXIX provides for the Court to enter relief if the Court finds the defendants are not in substantial compliance with the Settlement Agreement *and* the lack of compliance violates the federal right at issue. Section XXIX(f) provides that "if the Court finds that Defendants are not in compliance with a provision or provisions of this Settlement Agreement, it may enter an order consistent with equitable and legal principles, but not an order of contempt, that is designed to achieve compliance." Section XXIX(g) in turn reads that "should it become necessary to seek the Court's assistance as to violations of this Settlement Agreement, any order granting such relief must include a finding that the relief sought is narrowly drawn, extends no further than is necessary *to correct the violation of the federal right*, and is the least intrusive means for doing so" (emphasis added).

158.    Consistent with the limitations on relief imposed by the Prison Litigation Reform Act, 18 U.S.C. § 3626(a), the parties have read §XXIX(f) in conjunction with section XXIX(g) to require the Court to engage in a two-step process before it can order relief. *First*, under section XXIX(f), the Court must determine if the defendants "are not in substantial compliance with a provision or provisions of [the] Settlement Agreement." *Second*, under section XXIX(g) the Court must determine if that violation constitutes a "violation of the federal right," which in this

case is either a violation of the Eighth Amendment or the Americans with Disabilities Act. (Dkt. 1559 at 25–32, 36–39; Dkt. 1610 at 21.)

159.    The language in §XXIX(g) of the Settlement Agreement incorporates language from the Prison Litigation Reform Act, 18 U.S.C. § 3626(a), which governs a court's authority to enter an injunction in the corrections context. *Westerfer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, where prison conditions are found to violate federal rights, the court may enter either "[final] prospective relief" or "preliminary injunctive relief," but in either case the court must find that the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A) and (2).

160.    Under the PLRA, preliminary injunctive relief automatically expires 90 days after its entry unless the court makes required findings to convert the order into one for prospective relief. 18 U.S.C. § 3626(a)(2). Prospective relief under the PLRA is terminable by motion after two years, or earlier by agreement of the parties. *Id*. at § 3626(b)(1)(A). A defendant is entitled to immediate termination of any prospective relief that is approved or granted without a finding that the relief meets this "narrowly drawn" requirement. *Id*. at § 3626(b)(2).

161.    The *Westerfer* case is instructive as to the limitations on relief the Court may enter if the Court finds a violation of plaintiffs' asserted federal rights. *Westerfer* arose out of challenges to IDOC's transfers of prisoners to the Tamms "supermax" prison. 682 F.3d at 681. In an effort to remedy the objections, the IDOC developed a voluntary "Ten-Point Plan for Tamms." *Id*. After a bench trial, the district court entered an injunction that incorporated IDOC's Ten-Point Plan. *Id*. IDOC challenged the terms of the injunction on appeal, asserting that the court's order exceeded the limits imposed under the PLRA by exceeding the minimal requirements needed to avoid a constitutional violation. *Id*. The Seventh Circuit agreed and

66

vacated the injunction, holding that the order was not "narrowly drawn," extended further than necessary to remedy the constitutional violation, and was not the "least intrusive means" to correct the violation of the federal right, as required under § 3626(a) of the Prison Litigation Reform Act. *Id*. The court noted that the purpose of the PLRA is to preserve "significant administrative discretion and flexibility for prison officials," and ruled that the district court's order eliminated that "operational discretion and flexibility" afforded to prison administrators. *Id*. at 681–82, 683–84. In reviewing and rejecting the district court's order, the Seventh Circuit held that the requirements the district court incorporated into its order went "well beyond what the Supreme Court has said is constitutionally required." *Id*. at 686. The court instructed that, consistent with the PLRA, *the Department must be allowed to craft a plan that satisfies the minimal constitutional standards*. *Id*. at 683, 686. The district court is then to review the Department's recommended plan to ensure it meets minimal constitutional requirements. *Id*. at 686. This approach reinforces the public interest in allowing prison officials the significant "operational discretion and flexibility" in the operation of state prison. *Id*. at 681–82, 683–84.

162.    Consistent with this law and the Settlement Agreement, if the Court were to find that the Department is in violation of federal law, the proper approach for prospective injunctive relief would be for the Court to follow the process described in *Westerfer* and first specify how current conditions and practices within the Department fall short of constitutional standards, allow the Department to craft a remedial plan, and then verify whether the Department's proposed plan meets minimal constitutional standards. 682 F.3d at 686.

163.    On the other hand, if the Court finds either that the defendants are in substantial compliance with the Settlement Agreement, or that they are not in substantial compliance *but the lack of substantial compliance does not rise to the level of a violation of the Eighth Amendment*

67

*or the Americans with Disabilities Act,* then the Court has no basis to enter an order "to correct a violation of the federal right."

164.    In deciding whether there is an ongoing violation of federal law that justifies prospective injunctive relief, §XXIX(i) of the Settlement Agreement provides that the Court "may use any appropriate equitable or remedial power available to it. This may include returning the case to the active docket and setting a trial date." The Court concludes that the hearing before the Court on plaintiffs' motion for a permanent injunction was a full and fair trial on the ultimate issue in this case, which is whether the Department is violating the Eighth Amendment and the ADA/Rehabilitation Act as a result of "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate [mental health] care." *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016) (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)).

### C.  Standards for a Permanent Injunction

165.    As noted above, under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2), the Court's preliminary injunction automatically expired on August 23, 2018, which was 90 days after entry of the May 25, 2018 order. The Court did not extend its preliminary injunction order, and neither party requested an extension. Instead, on June 6, 2018, plaintiffs moved for a permanent injunction. (Dkt. 2112.)

166.    The Supreme Court has reiterated that under well-established principles of equity, plaintiffs seeking permanent injunctive relief must demonstrate (1) that they have suffered an irreparably injury; (2) that remedies available at law, such as money damages are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiffs and defendants, a remedy in equity is warranted; and (4) that the public interest would be not be

68

disserved by a permanent injunction. *eBay v. MercExchange*, LLC, 547 U.S. 388, 391 (2006) (citing cases).

167.    Plaintiffs' request for permanent prospective injunctive relief gives rise to the question whether the Court's decision should be based on the current state of mental health care delivered by the Department, as opposed to the care the Department provided in the past, including at the time of the preliminary injunction hearing. The Supreme Court has answered this question. To have standing to seek prospective injunctive relief, the plaintiff must show "that he has sustained or is in immediate danger of sustaining some direct injury." *Lyons*, 461 U.S. at 101. "Past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (quoting *O'Shea*, 414 U.S. at 495–96). *Accord Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) (confirming, based on *Lyons*, that "abstract injury is not enough," and "*past exposure to illegal conduct does not itself show a present case or controversy regarding prospective equitable relief*") (emphasis added). "A plaintiff's speculation that he may suffer the same injury at some time in the future is insufficient to establish standing." *Id.*

168.    Under the *Ex parte Young* doctrine, a party may sue "state officials for prospective injunctive relief to enjoin an *ongoing violation* of federal law." *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2002) (emphasis added). Cases that seek injunctive relief based on past violations are not sufficient to justify an injunction absent evidence of an ongoing violation. *See*, *e.g.*, *Sonnleitner v. York*, 304 F.3d 704, 718–19 (7th Cir. 2002) (ruling that the "narrow exception of *Ex Parte Young*" did not apply to plaintiff's claim that his due process rights were violated in the past). The limit on the Court's authority to issue relief to redress a present and ongoing violation of federal law is consistent with the rule under

the PLRA that any relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, [and be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

169.    The Supreme Court has also confirmed in the context of prison litigation that "deliberate indifference should be determined in light of prison authorities' *current attitudes and conduct*, which may have changed considerably since the judgment of the Court of Appeals." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis added). Likewise, the Court in *Farmer v. Brennan* confirmed that in a case seeking an injunction based on alleged deliberate indifference, a plaintiff must demonstrate a continuing need for an injunction "during the remainder of the litigation and into the future," and even if prison officials "had a subjectively culpable state of mind when the lawsuit was filed," they "could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." 511 U.S. 825, 846 and n.9 (1970).

170.    The law cited above confirms that the Court's authority to enter forward-looking injunctive relief is limited to redressing an ongoing violation of federal law. This determination must be based on the care the Department is presently providing to the plaintiff class, not the care that was provided to the class at the time of the preliminary injunction hearing, or at any other time in the past.

171.    With these rules in mind, the Court considers whether plaintiffs have met their burden to prove by a preponderance of evidence that prospective relief is necessary to correct current and ongoing violations of the Eighth Amendment and the ADA.

**D.  Plaintiffs' Eighth Amendment Claim**

172.    Plaintiffs contend that the Department's violations of the Settlement Agreement are causing them to suffer cruel and unusual punishment in violation of the Eighth Amendment. (Dkt. 1559 at 25–29, 39.)

173.    The Supreme Court has confirmed that not every claim by a prisoner that he or she has not received adequate medical treatment constitutes a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer*, 511 U.S. at 832 (internal citations and quotation marks omitted). In cases involving an alleged lack of adequate medical care, the Eight Amendment is implicated if prison officials are deliberately indifferent to a known lack of care that results "in pain and suffering which no one suggests would serve any penological purpose." *Id*. at 103.

174.    For plaintiffs to prove that lack of mental health care violates the Eighth Amendment, they must provide both an objective and a subjective element of the deliberate indifference test:  *first*, that the record *objectively* shows a risk of serious harm to the inmate population; and *second*, that the defendants are subjectively "deliberately indifferent" to that harm. *Farmer*, 511 U.S. at 834, 837 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *Wilson v. Seiter*, 501 U.S. 294, 299 (1981); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*). The objective risk of harm must be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

175.    In cases alleging systemic violations of the Eighth Amendment, the Seventh Circuit has looked first to whether "systemic deficiencies at the prison's health care facility

[have] rendered the medical treatment constitutionally inadequate for all inmates." *Cleveland-Purdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989). In *Cleveland-Purdue*, the court affirmed that Indiana prison officials were not entitled to qualified immunity for alleged systemic deliberate indifference based on evidence that the officials had failed to investigate a death at a prison hospital, and also failed to train staff and implement policies to prevent additional deaths that followed the first one. *Id*. at 429. In *Wellman v. Faulkner*, the court stated the test as whether "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" are so great that "the inmate population is effectively denied access to adequate medical care." 715 F.3d 269, 272 (7th Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). The *Wellman* court affirmed a finding of systemic deliberate indifference based on evidence that the prison officials had failed to address "impenetrable language barriers" that prevented physicians from communicating with their patients, failed to fill the position of staff psychiatrist for two years, failed to remedy repeated instances of mistreatment of medical conditions, failed to address pervasive overcrowding, and failed to stock adequate medical supplies, resulting in the re-use of used medical supplies. 715 F.2d at 272–74.

176.     More recently, the Seventh Circuit affirmed the district court's rejection of a systemic deliberate indifference claim (and decertification of the class) based on alleged systemic failures to provide adequate dental care where the evidence failed to show a consistent pattern of inadequate care or a systemic policy failure that that adversely affected the entire class. *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 557–58 (7th Cir. 2016). The court's rejection of the class claims for injunctive relief did not prevent individual actions for damages, or a damages claim that had been asserted by a more narrowly defined class. *Id*. at 558. In this case, however, there are no individual claims for damages, and there is no narrower certified class seeking damages.

177.    If a plaintiff shows that prison officials are subjectively aware of the risk of an objectively significant harm, then the court must also consider whether the public officials are "deliberately indifferent" to that known risk of harm. *Petties*, 836 F.3d at 728. When this Court granted plaintiffs' motion for a preliminary injunction, the order recognized the need for the plaintiffs to prove that the defendants are subjectively aware of the risk of harm (Dkt. 2050 at 60), but the order did not elaborate on what the plaintiffs need to prove to establish that the defendants have the required culpable mental state to be found deliberately indifferent to the known risk of harm.

178.    The Supreme Court has confirmed that even in cases alleging systemic failures related to conditions of confinement, courts still must examine the prison officials' state of mind to determine whether their response to the presented conditions was sufficiently "wanton" to constitute deliberate indifference. *Wilson*, 501 U.S. at 299–303 (discussing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The Court in *Wilson* confirmed the rule from *Estelle* that deliberate indifference requires more than negligence to establish the "requisite culpable state of mind." *Id*. at 297 (citing *Estelle*, 429 U.S. at 106). Following *Wilson*, the Supreme Court in *Farmer v. Brennan* described the required mental state as "subjective recklessness." 511 U.S. at 839–40. Citing *Farmer*, the Seventh Circuit has confirmed that "[e]ven objective recklessness— failing to act in the face of an unjustifiably high risk that is so obvious that it should be known— is insufficient to make out a claim." *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 836– 38).

179.    Establishing deliberate indifference is relatively straightforward when the evidence shows the public officials are aware of the substantial risk and ignore it. *Farmer*, 511 U.S. at 837; *Petties*, 836 F.3d at 729. On the other hand, courts recognize that deliberate indifference is difficult to establish when officials are aware of the risk and take action to remedy

it. *Whiting*, 839 F.3d at 662; *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017). For example, there is no deliberate indifference where a doctor provides even minimal treatment based on his or her medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982); *Whiting*, 839 F.3d 662; *Petties*, 836 F.3d at 729. As the Seventh Circuit ruled in *Whiting*, unless the evidence shows that the care provided departs so "radically" or "substantially" from accepted professional judgment, practice, or standards, there is no deliberate indifference. 839 F.3d at 663. This is consistent with the Supreme Court's statement in *Farmer* that "*prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted*." 511 U.S. at 844 (emphasis added).

180.     To determine whether prison officials' efforts to address a known risk rise to the level of deliberate indifference, courts look to the nature of the effort made. For example, evidence that prison officials have persisted with a course of treatment that they know is ineffective could raise an issue of fact to allow the question to be presented to a jury. *Petties*, 836 F.3d at 726. Examples include where a prison official knew a prisoner faced a serious risk of appendicitis but merely gave the prisoner aspirin and sent him back to his cell, *Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000), or where a prisoner experiencing persistent severe vomiting continued to receive nothing more than antacids for more than three years, *Greeno v. Daily*, 414 F.3d 645, 655 (7th Cir. 2005), or where prison officials needlessly delayed treatment that could have been easily provided or chose an "easier and less efficacious treatment" that they knew to be ineffective, *Petties*, 836 F.3d at 730 (collecting cases). This analysis requires the court to examine "the totality of an inmate's medical care when considering whether that care evidences indifference to serious medical needs." *Id.* at 728. "[E]vidence that *some* medical professional

74

would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Id*. at 729 (emphasis in original).[4]

181.    The Third Circuit in *Wharton v. Danberg*, 854 F.3d 234, 237–38 (3d Cir. 2017), recently analyzed whether efforts by prison officials, even if not fully successful in correcting the problem, rise to the level of deliberate indifference. *Wharton* involved a long-standing problem of over-detentions, where prisoners were held in prison past their release date. *Id*. at 237. In an effort to remedy that problem, Delaware implemented a new Central Offender Records (COR) system designed to "centralize, standardize, and generally improve the state's processing of inmate releases." *Id*. Despite the implementation of the new COR system, a class of prisoners sued the Delaware prison officials for violating the Eighth Amendment because the COR system had failed to fix the problem and "thousands" of prisoners continued to face over-detentions each year. *Id*. at 238. Despite that continuing problem, the trial court granted the defendants' motion for summary judgment based on prison officials' ongoing effort to remedy the problem. *Id*. at 244–47.

182.    In affirming summary judgment for the defendant prison officials, the Third Circuit recognized that the over-detentions presented a serious risk of harm and the prison officials were aware of the ongoing risk. *Id*. at 243. The court nevertheless affirmed summary judgment for the officials based on the lack of evidence that would allow a reasonable factfinder to conclude that the officials were deliberately indifferent. *Id*. at 244–45. Like the record here, the record in *Wharton* showed "a variety of efforts by [prison officials] to improve COR and address the over-detention problem." *Id*. The efforts included increased staffing levels, efforts to

---

[4] Three dissenting judges in *Petties* noted that where a prisoner receives some care and the dispute is about the quality of that care, there may be a claim for negligence under state law, but not one for constitutional deliberate indifference. 836 F.3d at 735–36.

improve training, upgrades in technology, and the creation of special units to handle certain types of releases." *Id*. The director of the COR division testified that COR leadership was "always looking at ways to be more efficient." *Id*.

183.    The Third Circuit distinguished the Delaware officials' actions in *Wharton* from cases where officials persist in engaging in "ineffectual action" that they know will not work. *Id*. at 244. The court recognized that the job of the federal courts is not to review the "wisdom of prison policy" or to "render a program evaluation," but to evaluate the officials' state of mind to determine if they are being deliberately indifferent." *Id*. Although the Third Circuit noted that over-detentions remained "rampant" and the efforts made by the Delaware officials had yet to succeed in tackling the challenge, the court concluded that the evidence could not establish as a matter of law that the "efforts to improve COR so obviously miss the mark that pursing those efforts manifests deliberate disregard for the real problem and thereby amounts to deliberate indifference." *Id*. The court thus affirmed the district court's grant of summary judgment for the defendants on the Eighth Amendment claim. *Id*. at 244–47.

184.    Based on the entire factual record now before the Court and the applicable law discussed above, the Court concludes that plaintiffs have not met their burden of proving by a preponderance of evidence that the Department (and in particular, the two current official-capacity defendants, the Department's Acting Director John Baldwin, and its Chief of Mental Health Services, Dr. Melvin Hinton) are being deliberately indifferent to plaintiffs' mental health needs throughout the IDOC system. The record does not support a conclusion that there are "gross deficiencies" or systemic failures in delivering adequate mental health care throughout the IDOC system, nor does the record show that mentally ill prisoners are suffering or facing a present risk of significant harm as a result of the alleged areas of systemic non-compliance with the Settlement Agreement. In addition, the record does not support a conclusion that the

defendants are being deliberately indifferent to the risk of harm and the recognized need to provide constitutionally adequate mental health care to prisoners throughout the IDOC system.

### 1.   Lack of Evidence of Systemic Deficiencies and Systemic Ongoing Harm.

185.    As noted above, the objective component for an Eighth Amendment violation does not depend on whether the Department officials have been negligent or whether the Department has failed to comply with all contractual requirements under the Settlement Agreement. Rather, the test under Seventh Circuit law is whether "systemic deficiencies at the prison's health care facility [have] rendered the medical treatment constitutionally inadequate *for all inmates*." *Cleveland-Purdue*, 881 F.2d at 430–31 (emphasis added); *see also Wellman*, 715 F.2d at 272 (looking to whether systemic deficiencies were so great that "*the inmate population* is effectively denied access to adequate medical care") (emphasis added). What is "adequate" is measured against "contemporary standards of decency," *Helling*, 509 at 36, with the constitution protecting against "only those deprivations denying 'the minimal civilized measure of life's necessities.'" *Wilson*, 501 at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

186.    Also, in considering whether a plaintiff faces harm from delayed medical care, the plaintiff must offer "verifying medical evidence" that the delay, rather than the plaintiff's underlying condition, caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714–715 (7th Cir. 2007). Types of evidence that satisfy the verifying medical evidence standard include "expert testimony about the delay's effect" or other medical evidence showing "the plaintiff suffered because of the delay." *Id.* at 715. "[E]vidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id*.

187.    As a threshold matter, neither the plaintiffs nor Dr. Stewart presented evidence of systemic deficiencies that are denying adequate mental health care to all mentally ill prisoners

throughout the IDOC system. Dr. Stewart admits that he focused his review of settlement compliance on prisons like Dixon, Logan, and Pontiac, and that the most serious problems he identified are limited to a few institutions like Pontiac and Dixon. (Tr. 1166:8–20.) Although the monitoring team has visited most (but not all) of the Department's other facilities, Dr. Stewart has not found that the Department is presently violating any provision in the Settlement Agreement system-wide. (See PX-52;Tr. at 1166:1–5; 1166:12–20.) Dr. Stewart acknowledged that Logan, one of the prisons with the highest number and percentage of seriously mentally prisoners (DX-62), has made "tremendous progress." (Tr. 1166:11.) Dr. Stewart's testimony does not show systemic deficiencies throughout the IDOC system.

188.    Plaintiffs likewise focused their evidence almost exclusively on conditions at Pontiac and Dixon. Of the five prisoner witnesses plaintiffs called to testify, four of them were housed at Pontiac, and one of them (Mr. Gay) had been most recently housed at Dixon, but was housed at Pontiac only four months before his testimony. Plaintiffs also did not present testimony from any designated class representative. In any event, the testimony from the plaintiffs' prisoner witnesses shows that their complaints are highly individualized and depend on the context of their particular situations. It was precisely this kind of variation among individuals' complaints and experiences that caused the court to deny class-wide injunctive relief in *Phillips*, where jail detainees were alleging a systemic failure to deliver adequate dental care. 828 F.3d at 555–58.

189.    Although staffing shortages *could* present a risk of systemic harm, the record now before the Court shows that staffing levels vary among each of the Department's prisons, with many prisons being fully or nearly fully staffed (DX-5B), and most prisons reporting either zero or very low backlogs in required psychiatric visits and in required evaluations, follow-up visits, and treatment planning conducted by mental health professionals (DX-1D; DX-1F; DX-1G; DX-

1H; DX-1I). In addition, while defendants' expert, Holly Andrilla, has not previously applied her mental health workforce methodology to prisons, and she did not offer an opinion on the level of staffing that may be *clinically* required in a prison setting, her analysis does show that the Department's staffing for psychiatric providers at each prison meets or substantially exceeds what is available to mentally ill and seriously mentally ill individuals in the general population. (DX-62 at 17–18; Tr. 1241:24–17; 1243:4–6; 1245:5–16.) Given the Supreme Court's directive that constitutionally adequate care is measured against what is tolerated in today's society based on "contemporary standards of decency," *Helling*, 509 at 36, evidence that all except one of the Department's prisons have more than four-times more psychiatric providers per seriously mentally ill person than what is available in Illinois and throughout the United States (DX-62 at 11–12) undermines the contention that the Department's current number of psychiatric providers does not comport with contemporary standards of decency.

190.    The plaintiffs also did not prove that prisoners class-wide are facing a significant injury as a result of (a) any delay in psychiatric visits, (b) any failure to administer their medication or explain side effects, (c) any failure to provide them mental health care or out-of-cell time during stays in segregation, (d) any failure to deliver mental health care when any of them were on a crisis watch, or (e) any delay by mental health professionals in conducting their initial mental health evaluations or follow-up visits. To the contrary, the evidence from the prisoners who testified showed that each of them received regular psychiatric care, had their medications monitored and changed as needed, were presented with opportunities to participate in a range of structured and unstructured out-of-cell activities, received regular care from their psychiatrists and mental health professionals when any of them were in crisis, received regular visits from mental health professionals, and received updates to their treatment plans.

191.    During the permanent injunction hearing, the Court asked Dr. Stewart to comment on whether mentally ill prisoners were continuing to suffer injuries despite the progress that had been reported by the defendants. (Tr. 1164:7–1165:11.) Dr. Stewart stated that "when the rubber hits the road, when the care needs to be given, its's still not adequate . . . [and] it's still resulting in unnecessary harm to the class members." (Tr. 1165:21–24.) On further questioning, Dr. Stewart admitted that the harm he identified is no longer systemic, and that in his view, "the most serious problems are limited to a few of the institutions the Court just mentioned [Dixon and Pontiac]." (Tr. 1166:8–20.) Dr. Stewart further stated that based on the care provided at various institutions, "objectively it looks like it's doing really well—and maybe it is objectively—[but] subjectively it's not." (Tr. 1167:15–16.)

192.    The Court again asked Dr. Stewart for help in trying to assess whether prisoners are facing an injury that is being realized because of the alleged inadequacies under the Settlement Agreement. (Tr. at 1172:6–8.) Dr. Stewart acknowledged that he "didn't adequately express that in [his] reports to the Court and the parties" (Tr. 1172:12–13) and merely repeated his general statement that "[t]here's a lot of suffering going on" (*id*. 1173:3). Dr. Stewart acknowledged that there is no "suffering meter," and he claimed that the evidence of injury is indirect, based on the use of crisis interventions and crisis cells, the number of restraints being used, and the number of enforced medications. (Tr. 1177:15–20.)

193.    The evidence in the record does not show the existence of Dr. Stewart's indirect markers of harm. Dr. Stewart acknowledged that since Dr. Puga has become Director of Psychiatry, the number of restraints has gone down. (Tr. 1177:23–1178:12.) Dr. Renzi from Pontiac likewise testified that Pontiac had not used restraints in several months. (Tr. 1635:16– 1636:23.) And while no witness disputed the need for crisis watches for prisoners who present true risks of self-harm or harm to others, several witnesses testified credibly about the fact that

prisoners often manipulate the crisis process to call for a crisis team when in reality they are seeking some kind of secondary gain. (8/29/18 Tr. 854:9–855:9 (Bill Elliott); 1393:6-1394:5 (Melissa Stromberger); 1635:10–15 (Kelly Renzi); 1745:24–1746:17 (Dr. Doyle).) There is no evidence in the record showing an increase in true crisis incidents, let alone evidence showing an increase in crisis calls that can be attributed to any of the alleged settlement violations. Likewise, the record does not show an increase in enforced medications either overall or attributed to any of the alleged settlement violations. While the Court was willing to accept Dr. Stewart's general descriptions of harm at the preliminary injunction hearing, his generalized statements of harm are not sufficient to establish evidence of actual present or ongoing systemic injuries to justify a prospective injunction.

194.    In contrast to the relatively limited evidence presented by the plaintiffs and Dr. Stewart, the defendants presented a wide range of witnesses and exhibits showing the policies and procedures that the Department has been implemented over the last several years, as well as the nature of care the Department is providing system-wide. This not only includes testimony from administrators, like the Acting Director, Assistant Direct, Director of Mental Health, and Director of Psychiatry, but also from psychiatrists and psychologists who directly provide mental health care at a range of Illinois prisons. The Department also demonstrated that it has in a place a thorough audit process to ensure the Department's compliance with all aspects of the Settlement Agreement.

### 2.  Lack of Deliberate Indifference

195.    Based on the entire record and the applicable law, the Court also cannot conclude that the defendants are exhibiting the requisite mental state to qualify as deliberately indifferent to the mental health needs of prisoners throughout the IDOC system. Although there is no question that prison officials are acutely aware of the challenges they face in meeting all of the

obligations under the Settlement Agreement, the record does not show that prison officials are being deliberately indifferent to those challenges.

196.     The record also shows, and Dr. Stewart agrees, that the Department has made "tremendous progress" and "substantial improvements" in providing mental health care required under the Settlement Agreement. (PX-21 at 17, PX-18; PX-52; Tr. 543:7–547:11; 8/30/18 Tr. at 1166:11.) In each area addressed in plaintiffs' Motion to Enforce the Settlement Agreement, the Department has taken, and is continuing to, take affirmative steps to remedy the problem. Plaintiffs have not demonstrated that the care currently being provided by the Department departs "radically" or "substantially" from accepted standards of care. *Cf. Whiting*, 839 F.3d at 663. Defendants have provided testimony that the care being provided by the Department is equivalent to or greater to what is provided in the community. (Tr. 165: 20–25; 1777:21–1778:19; 1802:1–9.)

### 3.  Available Legal Remedies

197.     As discussed above, the Seventh Circuit recently affirmed the district court's rejection of a systemic deliberate indifference claim (and decertification of the class) based on alleged systemic failures to provide adequate dental care where the evidence failed to show a consistent pattern of inadequate care or a systemic policy failure that that adversely affected the entire class. *Phillips*, 828 F.3d at 557–58. The court noted that its rejection of the class claims for injunctive relief did not prevent individual actions for damages, or a damages claim that had been asserted by a more narrowly defined class. *Id*. at 558. Likewise, the dissenting judges in *Petties* noted that where a prisoner receives some care and the dispute is about the quality of that care, there may be a claim for negligence under state law, but not one for constitutional deliberate indifference. 836 F.3d at 735–36. In this case, no plaintiffs have presented a claim for

82

damages, and the Court does not express a view as to whether any individual plaintiff has a valid claim for damages.

### 4. Balancing of the Harms and the Public Interest

198.    Although there is no question that a lack of mental health care could present the kind of harm to justify injunctive relief, as discussed above, plaintiffs have not met their burden of proof to show that class members are currently facing a sufficiently identified risk of harm in the absence of a new order from this Court granting additional prospective relief.

199.    A balancing of hardships also requires the Court to consider the impact of the requested relief on governmental functions. *See*, *e.g., Winter*, 555 U.S. at 26–27. As the Court stated in *Webster*, 486 U.S. at 613, the public interest "does not stand aside simply because the basis for the relief is a constitutional claim." The PLRA, 18 U.S.C. § 3626(a), reinforces the public interest in allowing prison officials significant "operational discretion and flexibility" in the operation of state prison, and therefore constrains a court's authority to enter an injunction in the corrections context. *Westerfer*, 682 F.3d at 681–84. The Supreme Court has reiterated that the "policy against the imposition of judicial restraints prior to an adjudication of the merits become more significant when there is a reason to believe that the decree will be burdensome." *Winter*, 555 U.S. at 378 (quoting 11A *Wright & Miller* § 2948.2, at 167–68).

200.    The Court recognizes that the documentation needed to show compliance with a court order imposes costs as well as benefits. Dr. Stromberger testified that the amount of documentation that mental health staff are currently required to complete imposes stresses and burdens on already over-worked mental health staff.  (Tr. 1450:22–1451:9.) Although Dr. Stromberger recognized that documentation is important to confirm the care that is being provided, she also noted the need to reduce paperwork that is redundant, as well as requirements

that may undermine the professional judgment of mental health professional and not result in better care. (Tr. 1451:14–1453:24.)

201.    In sum, although the record indicates that the Department continues to face challenges in meeting all of the requirements under the Settlement Agreement within the required timeframes, the entire record does not support a conclusion that the mental health care currently being provided throughout the IDOC system is objectively "inadequate for all inmates" *Cleveland-Purdue*, 881 F.2d at 430–31, or that the relevant "inmate population [is being] effectively denied access to adequate medical care." *Wellman*, 715 F.3d at 272. Accordingly, the Court concludes that plaintiffs have not proved by a preponderance of the evidence that the mental health care the Department is currently providing to the plaintiff class violates the Eighth Amendment, and therefore the Court denies plaintiffs' request for a permanent injunction.

### E.  Plaintiffs' Claim under the Americans with Disabilities Act and Rehabilitation Act

202.    In addition to their Eighth Amendment claim, plaintiffs assert that the defendants are violating the ADA and Rehabilitation Act by discriminating against mentally ill prisoners in segregation by failing to provide them with adequate "out-of-cell time" and adequate treatment to prevent deterioration of their mental illnesses. (Dkt. 1559 at 32 and 39 ¶ 3; Dkt. 1857 at 42 ¶ k; *see also* Dkt. 260 (Third Amended Complaint); Dkt. 2226 (Pretrial Order).)

203.    Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*., prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that individual's disability. *Id*. § 12132. In particular, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." *Id*. Section 203 of the ADA, 42 U.S.C. § 12132, provides that enforcement is to be achieved through the "remedies, procedures, and rights set forth in section 505 of the

Rehabilitation Act." 29 U.S.C. § 794a. Accordingly, the relief under the ADA and the Rehabilitation Act is the same. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667, 671 (7th Cri. 2012).

204.    To prove a prima facie case of discrimination under Title II of the ADA, a plaintiff must show (1) that he is a qualified individual with a disability; (2) that he was denied the benefits of services, programs, or activities of a public entity or otherwise subjected to discrimination by the entity; and (3) that the denial or discrimination was because of his disability. *Lacy v. Cook Cnty.*, 897 F.3d 847, 853 (2018) (quotations omitted). Intentional discrimination under the ADA may be shown by proving deliberate indifference. *Id.* at 863. This also means that where, as here, prisoners allege the same conduct to assert violations of both the Eighth Amendment and the ADA, a failure of the Eighth Amendment claim will also defeat the ADA claim. *See, e.g., Wilke v. Cole,* 630 Fed. Appx. 615, 619 (7th Cir. 2015) (affirming summary judgment against Eighth Amendment and ADA claims where "[t]he same allegations and [insufficient] evidence underlie both" claims). Because plaintiffs' ADA claim overlaps with their Eighth Amendment claim, the Court's findings and conclusions with respect to the Eighth Amendment claim also apply here.

205.    As with a deliberate indifference claim, "negligence alone cannot support a Title II claim." *Morris v. Kingston*, 368 Fed. Appx. 686, 690 (7th Cir. 2010). In *Strominger v. Brock*, the Seventh Circuit affirmed summary judgment against an ADA claim where the record not did show intentional "unlawful animus" against prisoner because of his disability, and reaffirmed the rule that "mere negligence is insufficient" to establish an ADA claim. 592 Fed. Appx. 508, 511–12 (7th Cir. 2014). Thus, even if the Department has not completely fulfilled all of its contractual commitments under the Settlement Agreement with respect to prisoners in segregation at

particular prisons, negligence or breach of contract does not amount to intentional discrimination in violation of the ADA.

206.    Plaintiffs have not demonstrated that any mentally ill prisoners have been excluded from programs or services, including out-of-cell time, because of their status as being designated as mentally ill. To the contrary, the record shows the Department has adopted procedures to accommodate prisoners both before and after spending time in segregation. For example, before a mentally ill prisoner goes to segregation, the Department requires mental health professionals to review the discipline recommendation, determine if the prisoner's mental illness is a mitigating factor, and recommend alternatives, including to avoid segregation or reduce the recommended time for segregation. (DX-45.) In addition, when mentally ill prisoners leave segregation, the Department requires Mental Health Professionals to review the housing recommendation. (DX-33.) The Department also offers segregation prisoners a range of structured and unstructured out-of-cell activities. (DX-8A; Tr.  550:7–555:5, 638:19–629:5, 736:2–739:1, 745:18–23, 818:15–18, 1124:25–1125:6, 1342:20–1343:2, 1345:10–1346:25, 1350:2–10.) The record does not support a conclusion that the Department is discriminating against mentally ill prisoners because of their disability.

207.    In their proposed findings of fact and conclusions of law related to the preliminary injunction motion, plaintiffs suggested for the first time that the Court should conclude that the defendants were violating the ADA based on a "disparate impact" on mentally ill prisoners because they are "overrepresented in segregation." (Dkt. 1857 at 42 ¶ l.) This theory was not timely raised, and in any event, the Supreme Court requires courts to distinguish between "disparate treatment" and "disparate impact" claims. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). In plaintiffs' Motion to Enforce the Settlement Agreement, they complained about IDOC's alleged *disparate treatment* of mentally ill prisoners in segregation, not about an

alleged *disparate impact*. (Dkt. 1559 at 31–32.) Because plaintiffs did not make a disparate

impact claim in their Motion to Enforce the Settlement Agreement (Dkt. 1559) it is too late for

them to raise it in their proposed conclusions of law.

208.     In any event, plaintiffs have not presented evidence that IDOC has adopted

segregation policies that have a disparate impact on mentally ill prisoners. For example,

plaintiffs did not introduce evidence of a "statistically significant disparity" in the out-of-cell

time offered to disabled compared to non-disabled prisoners in segregation. *Cf. Roberts v. City of

Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (affirming dismissal of ADA claim for lack of

factual content showing disparate impact). Although a large portion of prisoners in segregation

are mentally ill, plaintiffs have not shown that IDOC places prisoners in segregation *because*

they are mentally ill. To the contrary, the Department has also taken affirmative steps to reduce

the time that all prisoners, regardless of their mental health status, would spend in segregation,

including by eliminating entire classes of offenses that are eligible for segregation. The

Department has also adopted multiple policies to give accommodations to mentally ill prisoners

to help them avoid segregation, to help them during their time in segregation, and to help them

after they leave segregation.

209.     In short, plaintiffs have not met their burden to prove that the Department is

discriminating against mentally ill prisoners in segregation by failing to give them services that

are available to non-mentally ill prisoners. Accordingly, the Court declines to enter a permanent

injunction with respect to plaintiffs' claims under the ADA and Rehabilitation Act.

## Conclusion

For the reasons provided, plaintiffs' Motion for Permanent Injunction (Dkt. 2112) is

DENIED.

The Court intends this opinion to constitute a final judgment on all issues and claims that were litigated or that could have been litigated related to plaintiffs' claims under the Eighth Amendment and under Title II of the ADA and Section 504 of the Rehabilitation Act.

The Court directs the parties to submit a joint report or separate reports to the Court within 14 days of this opinion addressing what, If any, provisions of the Settlement Agreement remain in place in light of the court's ruling as set forth in this opinion.

September 26, 2018                                 Defendant JOHN R. BALDWIN, et al.

                                                  By: LISA MADIGAN,
                                                    Illinois Attorney General

                                                  /s/ R. Douglas Rees, #6201825
Laura K. Bautista                                 Assistant Chief Deputy Attorney General
Office of the Attorney General                    Office of the Illinois Attorney General
500 South Second Street                           100 West Randolph Street, 12th Floor
Springfield, IL 62701                             Chicago, Illinois 60601
Telephone: (217) 782-5819                         Tel. 312-814-3498
lbautista@atg.state.il.us                         rrees@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 26, 2018, he electronically filed **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification to the following counsel of record:

| | |
|---|---|
| Harold Hirschman | harold.hirschman@dentons.com |
| Alan Mills | alanmills@comcast.net |
| Amanda Antholt | amanda@equipforequality.org |
| Andrew M. Ramage | aramage@bhslaw.com |
| Andy DeVooght | adevooght@loeb.com |

*/s/ R. Douglas Rees*
R. Douglas Rees #6201825
Assistant Chief Deputy Attorney General
100 W. Randolph, 12th Floor
Chicago, IL 60601
312-814-3498
*rrees@atg.state.il.us*