E-FILED
Wednesday, 26 September, 2018  05:10:56 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| ASHOOR RASHO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:07-CV-1298-MMM-JEH |
| | ) | |
| v. | ) | Judge Michael M. Mihm |
| | ) | |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

The following Proposed Findings of Fact are submitted by Plaintiffs following the

evidentiary hearing on Plaintiffs' Motion for a Permanent Injunction (Doc. 1221) held on August

27-31 and September 5-7, 2018, as well as the hearing on Plaintiffs' Motion to Enforce the

Settlement Agreement (Doc. 1559) held on December 18 – 19, 2017 and February 28 – March 2,

2018.

## PROPOSED FINDINGS OF FACT

1.      More than 12,000 prisoners are in need of mental health treatment in the Illinois

Department of Corrections, 4843 of whom are considered by the Department to be "seriously

mentally ill" (referred to as SMI). (Pl. Ex. 22, Summary Chart.)[1]

2.      At issue here are deficiencies in five substantive areas—medication management,

mental health treatment in segregation, mental health treatment on crisis watches, mental health

---

[1] The Plaintiff Class is defined in Section II(l) of the Settlement Agreement as "persons now or in the future in the custody of IDOC who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment . . . ." (Pl. Ex. 1, Settlement Agreement pp. 1, 4.)

evaluations, and treatment planning. Insufficient staffing is a problem common to all five substantive areas.

3.     Separately, and in combination, the deficiencies in the five areas at issue here result in serious harm to Class Members, including suffering from untreated or inadequately treated mental illness—such as depression, hearing voices, paranoia and hopelessness—as well as side-effects from mismanaged psychotropic medications; they have resulted in numerous acts of self-harm or harm to others, as well as behavioral problems, which in turn result in seclusion and enforced medications, and increased disciplinary actions. (Dr. Stewart's 12/18/17 Testimony, Tr. 97, 101, 109-10, 115-16, 128-29, 208-209, 226-28, 258-64; Dr. Stewart's 8/30/18 testimony, Tr. 1172-73.)

4.     Witnesses on both sides have agreed that isolation—the defining element of both segregation and crisis—is detrimental to mental illness and that, without adequate care, Class Members are being harmed. (Dr. Stewart's 12/18/17 Testimony, Tr. 121:15-20 and 8/30/2018 testimony, Tr. 1023; Dr. Hinton's testimony, Tr. 349:20-24; Dr. Renzi's 9/5/2018 Testimony, Tr. 1660, 1688.) Mentally ill prisoners in segregation "across the board" get worse without the treatment and out-of-cell time that is needed.  (Dr. Hinton's 12/19/17 testimony, Tr. 349, 351.) They are suffering untreated mental illness, including increased depression, anxiety, and hallucinations, among other things. They are having behavioral difficulties, including self-injury. They are ending up further isolated in crisis cells and are subject to increased use of enforced medications, restraints and use of force. (Dr. Stewart's 12/18/17 testimony, Tr. 208:23-209:15 and 8/30/2018 testimony, Tr. 1023, 1171-72; Pl. Ex. 43 and 56 (rates of segregation and crisis); DX 12C at p.2 (describing increasing use of enforced medications in response to new restrictions on four-point restraints).)

5.      Dr. Stewart described that Class Members in Illinois's segregation units as among "some of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely" and the level of urgency is "as serious as I've seen." (Dr. Stewart's 12/18/17 testimony, Tr. at 1147:15 – 1148:4.)

6.      Through two years of monitoring, the appointed Monitor, Dr. Pablo Stewart, has found extensive violations of the Settlement Agreement on all five targeted issue here: (1) medication management; (2) mental health treatment in segregation; (3) mental health treatment in crisis; (4) mental health evaluations; and (5) treatment planning. (Pl. Ex. 10, Monitor's First Annual Report; Pl. Ex. 21, Monitor's Midyear Report; Pl. Ex. 52, Second Annual Report.) On October 1, 2017, Dr. Stewart sent a letter to IDOC stating that "IDOC is in a state of emergency regarding its provision of psychiatric care." The "exceedingly poor and often times dangerous" psychiatric services described in the First Annual Report had continued unabated into the second year of the settlement, and Dr. Stewart asked the Department to take immediate action. (Pl. Ex. 18, letter; Pl. Ex. 15, First Annual Report, p. 10.) The Monitor's findings in the Second Annual Report, issued in May 2018, were generally consistent with the First Annual Report. The Monitor attributed the IDOC's failures to insufficient staff, in quantity and quality. (Dr. Stewart's 8/30/18 Testimony, Tr. 958.) Dr. Stewart found IDOC out of compliance with 18 of 25 sections of the settlement agreement; only finding compliance in the areas of origination, housing and training. (Id.)

7.      Even after the Court's issuance of the preliminary injunction on May 25th, 2018, the Monitor during the summer found that the IDOC was not providing adequate mental health treatment to Class Members in the areas covered by the Order. (Dr. Stewart's 8/30/2018 testimony, Tr. 1094.) Although the Department has created new forms and announced new

procedures, "when the rubber hits the road, when care needs to be given, it's still not adequate … it's still resulting in unnecessary harm to class members." (*Id*. at 1165:17-24.)

8.      Today, the inadequacies in all five areas of mental health treatment before the Court remain unacceptable in terms of providing minimally adequate care to people. (Dr. Stewart's 8/30/2018 testimony, Tr. 1167:23 – 1168:5.) The Monitor has found that throughout IDOC's system, not just at Pontiac and Menard but especially at those facilities, Class Members are suffering. "They have untreated mental illness, incompletely treated mental illness; they're held in segregation for exceedingly long times that have resulted in their worse symptoms. And that continues. And so they get worse … And this is the suffering that's going on right now." (*Id.* at 1172-73; *see also* Dr. Hinton's 3/2/18 testimony, Tr. 1458:17-1459:3 (agreeing that the denial of these services would be painful for those in need of the services).

9.      Acting Director Baldwin has known since shortly after his appointment in 2015 that there was a serious problem with the way IDOC delivered mental health care. (Baldwin's 8/27/18 testimony, Tr. 61.) IDOC "knows [it] need[s] to do better." (Baldwin's 8/27/18 testimony, Tr. 82:21-22.) Acting Director Baldwin is a driving force behind many of the changes underway in the Department's provision of mental health treatment, but there is no guarantee that he will remain in the position in the years to come. (*Id.* at Tr. 61.)

10.     At the August trial, Acting Director John Baldwin could not unequivocally say that adequate care was being provided. "We need to keep pressure on our system to make sure we continue to move forward." (Dir. Baldwin's 8/27/2018 testimony, Tr. 124:8-10.) When asked whether IDOC could provide adequate psychiatric care without all contracted-for staff, Director Baldwin explained, "I believe it was adequate based on where we were. We have made, I think, major strides where we're going. We're going to do better. So, in that sense, yes. And a year from

now, I think we have demonstrated that we will do better." (Dir. Baldwin's 8/27/2018 testimony, Tr. 91:16-24.)

11.    At the December 2017 and February-March 2018 evidentiary hearings, the current Monitor, the prior monitor, the first IDOC Chief of Psychiatry, and the Chief of Mental Health all agreed that the Department was not providing adequate care. (*See* ¶¶ 27, 28, 30 (Dr. Patterson); ¶¶ 60, 61, 84, 85 (Dr. Dempsey), and ¶¶ 154, 194 (Dr. Hinton).)

12.    At the August trial, IDOC's Chief of Mental Health, Dr. Hinton, testified to a change of opinion about the overall adequacy of care for mentally ill prisoners. However, Dr. Hinton's change of view is based upon having "proper procedures in place to provide adequate treatment" and the "adjustments and updates to procedures" in an effort to comply with the May 25th Order, and not based on actual care being provided to actual people in the Department's custody. (Dr. Hinton deposition testimony, 8/31/2018 Tr. 1185-6). At trial, Dr. Hinton suggested that the Department's audit results demonstrate that the new policies are being implemented to provide adequate care; but the audits do not support Dr. Hinton's testimony. Instead, these audits show resounding failures throughout the entire system. (Dr. Hinton's 8/28/2018 testimony, Tr. 452:18-24; Pl. Ex.58.) If this case has demonstrated anything over the last four years, it is that policies, procedures and forms do not provide care.

13.    Moreover, Dr. Hinton testified that he did not have the day-to-day knowledge to certify whether the individual facilities were complying with the Court's May 25th Order. (Dr. Hinton's 8/28/2018 testimony, Tr. 439:19-25.) For at least the last year, however, Dr. Hinton has received two sets of regular reports regarding the day-to-day activity in the mental health programs at individual facilities: the Monthly Facility Performance Reports and Dr. Sim's quality control audit reports, both of which demonstrate a failing system.  The IDOC's

internal reports demonstrate its awareness of systemic and ongoing failures in the provision of mental health treatment.

14.     In monthly facility performance reports (Pl. Ex. 17 and 51), IDOC health care administrators assess Wexford's contract compliance. In August/September 2017 and June 2018 reports, nearly every facility reported that Wexford was not complying with the IDOC's administrative directives and that there were vacant psychiatry positions, with attendant hour shortages and appointment backlogs. The June 2018 reports show that Wexford failed to supply more than 10,000 hours of required clinical staff (psychiatric providers, QMHPs, and BHTs) time in that one month alone. (Pl. Ex. 51; Dr. Mirsky's 8/27/18 testimony, Tr. 80; Dr. Renzi's 9/5/18 testimony, Tr. 1651-55.) The reports indicate that the IDOC has been notifying Wexford of its contractual failures. Such notifications dated as far back as 2011. (Pl. Ex. 17, IDOC Healthcare Contract Monthly Performance Monitoring Reports; summarized in Plaintiffs' Reply Brief in Support of the Motion to Enforce (Doc. 1610), p. 6-9.)

15.     The second kind of regular centralized reports is the result of a new audit tool to assess the delivery of mental health services. (Dr. Sim's 2/28/18 testimony, Tr. 848; 8/31/2018 Tr. 1353:22-25.) The first reports, in January 2018, showed "serious deficiencies in the actual delivery of services" with scores well below the 85% threshold the IDOC set for acceptable performance. (Pl. Ex. 35A-C; Dr. Sim's 2/28/18 testimony, Tr. 887-91, 901:1-7; Dr. Hinton's 8/31/18 testimony, Tr. 1375:20-25.) In July 2018, another round of internal audits were completed on the issues of crisis care, psychiatric services, mental health care for segregation prisoners, and mental health evaluations. (Dr. Sim's 8/31/18 testimony, Tr. 1312.) Again, prisons throughout the system—in all three regions—had scores well below IDOC's 85% threshold:

    a.   The Northern Region resulted in an average of 63.8%.
    b.   The Central Region resulted in an average of 56%.

      c.   The Southern Region resulted in an average of 53.51%.

(Dr. Sim's 8/31/18 testimony, Tr. 1339 – 1340; Pl. Ex. 58.) Dr. Sim testified that facilities across

the board received lower compliance scores than in past audits, with the difference being the

inclusion of more robust quality assessments consistent with assessing compliance with the

Court's May Order. (Dr. Sim's 8/31/18 testimony, Tr. 1360-1361.)

      16.    Defendants have not produced any reports that would support Dr. Hinton's newly

minted opinion of adequacy. Defense Exhibits 3B and 3C are simply different presentations of

the same data resulting from Dr. Sim's audit, detailed above, showing system-wide failure to

provide the quality of services required by IDOC's policies and procedures. Evidence has

demonstrated that Defendants' very recent crisis audits and the three "certifications" of

compliance in the record (DX 3 and DX 67) have no validity whatsoever, but were created to

cloak IDOC's failure to make any real, significant progress following the preliminary injunction.

(¶ 318.)

*The Cause of the Problem:*
*Defendants' Obdurate Failure to Adequately Staff*

      17.    As set forth in detail below, Defendants continue to violate the requirements of

the Settlement Agreement, the Court's preliminary injunction order, and the federally protected

rights of the Plaintiff Class with regard to all five areas addressed in this litigation. Before

addressing those five areas—medication management, crisis watches, segregation, treatment

planning, and mental health evaluations, it is necessary to address a glaring failure common to

each: lack of necessary staff. The Department's longstanding failure to provide sufficient staff is

well known to all involved in this litigation.  (Dr. Stewart's 12/18/17 testimony, Tr. 210:6-9;

Dr. Hinton's 12/19/18 testimony, Tr. 358:12-14, 358:23-359:12, 361:17-362:6.) At the March

trial, Dr. Hinton was asked how it was that he could hope to solve the problems that he knows

exist in the system when they don't have enough staff to do it; Dr. Hinton answered, "that would be difficult." (Dr. Hinton's 3/2/18 testimony, Tr. 1377:9-12.)

18.     Acting Director Baldwin recognized that insufficient staff puts prisoners in danger. (Dr. Baldwin's 8/27/18 testimony, Tr. 95: 16-19.)

19.     On May 25, 2018, after years of Defendants' inadequate staffing—failing to live up to its own staffing plan in 2014 and commitment to meet that staffing in 2016—the Court ordered Defendants to provide "sufficient staff to address constitutional violations in the five areas identified in this order" by August 25, 2018.

20.     Defendants have failed to comply with the Court Order. (Pl. Ex. 48A; Ms. Gedman's 8/29/19 testimony, Tr. 802.) Comparisons of the actual filled staff positions to staffing plan submitted in July 2018, as well as the prior staffing plans, show that Defendants persist in understaffing this system.

Summary of WHS Staffing Reports - Current Staffing Levels
Compared to Staffing Plans by FTE

|  | Site MH Service Director | MH Unit Director | Staff Psychologist | QMHP | BHT | RN-MH | Staff Assistant | Psychiatrist | DON Psych Nurse | Recreational Therapist |
|---|---|---|---|---|---|---|---|---|---|---|
| 2014 Staffing Plan | 6 | 9 | 13 | 111 | 86 | 35.5 | 16 | 75.75 | 3 | 4 |
| May 16 Amended Staffing Plan | 6 | 11 | 24 | 130 | 60 | 40 | 34.5 | 65.75 | 3 | 5 |
| July 18 Amended Staffing Plan | 6 | 11 | 25 | 163 | 85 | 71.4 | 38.5 | 65.75 | 3 | 5 |
| Filled FTEs August 2018 | 7 | 4 | 13.03 | 115 | 64 | 20 | 53 | 49.86 | 2 | 5 |

Pl. Ex. 48A (comparing filled staff positions to the 2014, 2016 and the July 2018 staffing plans).

21.     Defendants' July 2018 plan, DX 55B, shows that IDOC believes they need 163 QMHPs to provide constitutionally adequate care in all five areas covered by the preliminary injunction. Not only has IDOC failed to staff the 163 QMHPs that they need to provide

constitutionally adequate care, but they continue to not fully staff QMHPs to even the levels required by the May 2016 staffing plan. (Pl. Ex. 48A). The Defendants currently have 115 or 116 out of 130 budgeted QMHP positions filled, nearly the same number that they had in January 2018. (*See* Pl. Ex. 48A, summarizing DX5B (showing 115 QMHPs on August 7, 2018) and Pl. Ex. 37, summarizing DX 5 (showing 115 QMHPs on February 22, 2018).) QMHPs are essential to the functioning of this system; they perform the vast majority of the non-medication functions at issue here, as well as other duties required by the Settlement and run the mental health program.

22.     Defendants have not provided any evidence or explanation as to either why they have not staffed QMHPs to the level required by the May 2016 staffing plan, let alone the higher numbers required by the July 2018 staffing plan crafted in response to this Court's May 25th Order or when such staffing will be achieved.

23.     Similarly, has failed to staff psychiatric providers, and is still missing 15.9 (24%) psychiatric providers required by the May 2016 staffing plan and by the Wexford contract. This is 25.9 (34%) fewer psychiatric providers than Defendants committed to providing in 2014 to provide constitutionally adequate care to a *smaller* number of seriously mentally ill prisoners and, again, in 2016 with the Settlement Agreement. (Pl. Ex. 48A). The Department is not delivering and cannot deliver the psychiatric care that the mentally ill prisoners in its custody require without the adequate psychiatric providers. (Dr. Hinton's 12/19/17 testimony, Tr. 317, 319-320.) There is insufficient evidence for the Court to determine whether WHS's profit motive inhibited Wexford's hiring of sufficient psychiatric and other clinical staff. Staffing makes up about 65% of Wexford's costs, and Wexford's goal is to deliver care in the most cost effective manner. (Ms. Gedman's 8/29/18 testimony, Tr. 743, 815.) IDOC pays Wexford the equivalent of

$192 per hour per psychiatrist, but Wexford is paying anywhere from $180 per hour to $400 per hour for in-person psychiatrists. (Ms. Gedman's 8/29/18 Testimony, Tr. 740, 807-8.) Ms. Gedman testified that face-to-face psychiatrists are paid far more than telepsychiatrists; as an example, she stated that the lowest-paid in-person psychiatrist makes $180 per hour (a number fairly close to the $192/hour reimbursement rate), while the lowest-paid telepsychiatrst makes only $155 per hour. (*Id.* at 820.).) (Ms. Gedman's 8/29/18 testimony, Tr. 743, 815.)

24.     The numbers of psychiatric providers under the May 2016 and July 2018 staffing plans fall significantly below the 75.75 psychiatric providers that Defendants agreed to provide with both the Settlement Agreement, which promises the staffing levels set forth in IDOC's April 2014 Plan.  (Pl. Ex. 1, Settlement Agreement,  §§ II(c), IX, Additional Mental Health Staff, p. 3, 11-2.). Defendants unilaterally altered the staffing plan without following the process set forth in the Settlement Agreement. (Ms. Gedman's 8/29/18 testimony, Tr. 782; *see also* Ms. Laurent's 9/6/18 testimony, Tr. 1814.)

25.     The evidence raises serious questions about how the IDOC could require *fewer* psychiatric providers in 2018 than it stated it needed in 2014 to provide constitutionally adequate care.  The number of mentally ill prisoners has increased sharply since 2014, and Director Baldwin believes that this trend is accelerating with more people with severe mental illness being incarcerated in the future. (Df. Ex. 63, showing population trend (2014-2018); Dir. Baldwin's 8/27/2018 testimony, Tr. 53:21-25.)

26.     The only explanations offered by Defendants were vague references to increased efficiencies in providing care. (*See, e.g.* Dr. Hinton's 8/28/2018 testimony, Tr. 353, 375, 428: 20-25; 464-65, 522:13-17.) But the "efficiencies" cited to fill the void of 15-26 missing psychiatric providers were of short-term, non-sustainable measures, several which actually appeared to

-10-

reduce the treatment time provided to Class Members. (Dir. Baldwin's 8/27/18 testimony, Tr. 129 (gap in staff has been filled with overtime, which is not a long-term solution); Dr. Hinton's 3/2/18 testimony, Tr. 1369:18-21; 8/28/28 Testimony, Tr. 433-35,457 (unlimited overtime); Ms. Gedman's 2/27/18 testimony, Tr. 501:11-15 (attributing reduction in backlog to overtime); 8/29/18 testimony, Tr. 808 (explaining additional compensation for overtime); Dr. Renzi's 9/5/2018 Testimony, Tr. 1675-76 1721(using overtime to reduce backlogs and provide care, as Pontiac had done in June and July 2018, would be "very difficult to sustain" long term); Dr. Stromberger's 9/5/2018 Testimony, Tr. 1433 (describing staff "burnout" resulting in turnover) and  1449 (only can meet needs of caseload through overtime, which is not a sustainable solution); Dr. Sim's 8/31/18 testimony, Tr. 1341-1342, 1344-1347 (acknowledging that using overtime and borrowed staff form other facilities were not permanent solutions).)

27.    The problems addressed in this litigation are not new. (Pl. Exs. 8-13.) Dr. Patterson reported in 2014 that inadequate treatment for those in crisis was attributable to lack of staffing and programs, including access to inpatient beds, residential treatment programs, outpatient treatment programs, short term crisis beds, and management cells for triage and evaluation of inmates who may be in acute crisis and may be in need of hospital beds. (Pl. Ex. 10, Patterson Annual Report, p. 7.) All of these deficiencies reported by Dr. Patterson in 2014 still exist. (Dr. Hinton's 12/19/17 testimony; Tr. 356:7-22.)

28.    Dr. Patterson had found that the system lacked the necessary staffing to provide adequate care.  (Pl. Ex. 10, Patterson Annual Report, p. 8, 17.) The Department agreed, committing to fill the shortages by October 2015. (Pl. Ex. 9, IDOC Proposed Remedial Plan, p. 17 ("this proposal identifies the clinical, security and administrative staff necessary to not only

provide constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the creation of adequate levels of care").)

29.     In April 17, 2014, IDOC submitted the proposed remedial plan that stated: "All parties recognize the immensity of the challenges facing the IDOC in providing constitutionally adequate mental health care." (Pl. Ex. 9, IDOC Proposed Remedial Plan p. 1.) To date, IDOC has still not filled the quotas set in the 2014 proposed plan. (Dr. Hinton's testimony, Tr. 316, 368-70; Pl. Ex. 9, IDOC Proposed Remedial Plan p. 2; *see also* Laurent's 9/6/18 testimony, Tr. 1883-84, 1956 (Wexford has never provided enough full-time equivalent mental health or psychiatric providers required under IDOC's contract).)

30.     In 2014, Dr. Patterson, citing back to the 2012 Cohen report, described the absence of a comprehensive mental health services delivery system, the historical lack of adequate staffing for a system of this size, and needed improvements in segregation and inpatient care. (Pl. Ex. 10, Patterson Report p. 8, 15.)  Dr. Patterson had identified several of these areas as emergencies. (Pl. Ex. 10, p. 9.) However, "[d]espite it being over two years since distribution of the Cohen Report, more than sixteen months since the May 8, 2013 Agreed Order, and the onsite and telephonic review and consultations of the monitor, the IDOC mental health services have not moved forward as anticipated or as agreed by the priorities and ordered by the court." (Pl. Ex. 10, p. 18.)

31.     This submission will now discuss, in turn, each of the five areas of substantive violations at issue – (1) medication management, (2) mental health care on crisis watches, (3) treatment in segregation, (4) quality and timely treatment planning, and (5) mental health evaluations – followed by discussion of Defendants' inadequate effort to comply with the Court Order generally and specifically with regard to the staffing requirements.

-12-

I.      MEDICATION MANAGEMENT

    A.      **Defendants' Psychiatric System is Unable to Provide Proper
       Medication Management**

32.     The IDOC remains unable to provide adequate medication management to Class

Members, as demonstrated by its continually insufficient staff, internal audit reports, psychiatric

backlog, and testimony of witnesses.

*1.  Insufficient Staff to Provide Medication Management*

33.     In 2014, IDOC committed to staffing 76.75 budgeted psychiatric positions (Ex. 9,

IDOC Remedial Plan), as part of the staffing necessary to provide constitutionally adequate

mental health treatment.

34.     Despite increases in its SMI population, IDOC amended its staffing plan in 2016,

reducing the number of psychiatric providers from 76.75 to 67.75. (Pl. Ex. 48A (comparing

2014, 2016, and 2018 staffing plans).)

35.     Even with that reduction, IDOC has never employed the number of psychiatric

providers required. To date, IDOC remains 20 psychiatric providers short of meeting the reduced

number of psychiatric providers required by the May 2016 Staffing Plan (which is 9 fewer than

required by the 2014 Staffing Plan). (Ms. Gedman's 8/29/18 testimony, Tr. 812-13.)

36.     In an email dated January 24, 2018, the Deputy Governor and Chief Operating

Officer of the State of Illinois wrote to Wexford Health Sources, Inc. about the "persisting

challenge" of the lack of needed psychiatrists. (Pl. Ex. 59; Dir. Baldwin's 8/27/2018 testimony,

Tr. 89-90.) The email states that the IDOC "cannot be put in a position that limits our ability to

adequately provide the level of care our population so desperately needs and deserves." (Pl. Ex.

59 at p.3.) On February 7th, Deputy Governor Childress wrote again to Wexford that, "we need

every effort be made to bring the IDOC into consent decree compliance and for Wexford to be in contract compliance in the [next] few months." (Pl. Ex. 59 at p.1-2.)

37.     In August 2018, Director Baldwin admitted that IDOC was still short psychiatrists and Wexford had failed to get IDOC into compliance with its psychiatric staffing. (Dir. Baldwin's 8/27/2018 testimony, Tr. 92:22 – 93:7; 94.)

38.     IDOC contracted for the number of psychiatrists that it needed to provide the psychiatric care to the people in its custody who need that care. (Dr. Hinton's 12/19/18 testimony, Tr. 316; Baldwin's 8/27/18 testimony, Tr. 80.) Without the psychiatric providers that it has contracted for, IDOC cannot deliver the psychiatric care that is required for its patients. (*Id.* Tr. 317:7-11.)[2].

39.     IDOC, through its vendor Wexford, has never met the requirements for psychiatrist providers. (Ms. Gedman's 2/27/18 testimony, Tr. 505:12-15, 513: 25-514:4 and 8/29/19 testimony, Tr. 770, 812-13.) Wexford cannot, therefore, deliver the hours required to provide the needed psychiatric care. (*Id.* at 505:16-506:3, 511: 5-7, 517: 22-24; *see also* Pl. Ex. 51; Dr. Mirsky's 8/27/18 testimony, Tr. 80; Dr. Renzi's 9/5/18 testimony, Tr. 1651-5.)

40.     The lack of adequate psychiatric providers leaves staff psychiatrists with unreasonably high caseloads. (Dr. Hinton's 3/2/18 testimony, Tr. 1385-1388 (showing Dixon's psychiatric caseload to be 241 patients per psychiatrist; Menard: 572 patients per psychiatrist, Pontiac: 231 patients per psychiatrist).) Dr. Doyle testified that, at Dixon, he has a caseload of 170 prisoners. (Dr. Doyle's 9/6/18 testimony, Tr. 1800-1.) A comparison of DX 5B to the present psychiatric caseloads yields a ratio of 266.6 prisoners per psychiatrist at Menard, and 253.9 prisoners per psychiatrist at Pontiac.

---

[2] The testimony refers to the number of psychiatrists called for under the current staffing plan and contracted for with Wexford as 69, but it is actually 67.75. (PX48A, DX5b.)

41.     By comparison, published staffing ratios in correctional mental health literature recommend that one psychiatrist is required for every 150 on psychotropic medications (at the outpatient level of care). (Dr. Elliott's 8/30/2018 Testimony, Tr. 924-26, discussing Dr. Metzner's article in the *Oxford Textbook of Correctional Mental Health*.)

42.     Dixon, a key facility for providing a higher level of mental health care for male prisoners, has an acute shortage of psychiatrists. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1775.) Dixon currently has 4.05 psychiatrists (*id*.) compared with the 13 FTE psychiatrists budgeted in the Departments' 2014 Proposed Remedial Plan. (DX 5A p. 10; PX 9, p.19-20.) Dr. Doyle testified that he personally has a caseload of 170. (*Id*. at 1800-01.) This lack of staff makes it very difficult to provide proper quality of care. (*Id.* at 1801.)

43.     Dr. Yen described that he provides telepsychiatry at both Vienna and Vandalia. At both facilities he is the only psychiatrist; he works .5 FTE hours at Vienna and .38 FTE hours at Vandalia. (DX 5B, p. 38-39). Because he works part-time, if a patient goes on crisis watches on a Friday, for example, he will not be able to see a psychiatrist (Dr. Yen)—or have medications adjusted—until the following Wednesday. (Dr. Yen's 8/27/2018 Testimony, Tr. 170-72.) Vandalia has had a psychiatric backlog of about 50 for the last several months. (Dr. Yen's 8/27/2018 Testimony, Tr. 182.) This backlog is attributable to the shortage of psychiatric staff. (Dr. Yen's 8/27/2018 Testimony, Tr. 187-88.) Dr. Yen does initial diagnostic evaluations via tele-psychiatry, but he does not receive the full medical records of the patients he is evaluating. (PX 18; Dr. Yen's 8/27/2018 Testimony, Tr. 172-73.) Dr. Yen had no knowledge of whether the rooms where his patient see him on the video are sound confidential. (Dr. Yen's 8/27/2018 Testimony, Tr. 174.)

44.     The problem is not one of hiring alone, but of retention. Dr. Renzi testified about ongoing and significant turnover of psychiatrists at Pontiac. (Dr. Renzi's 9/5/18 testimony, Tr. 1659.) She testified that one of the psychiatrists hired within the last six months already had left after two months, and that another psychiatrist had transferred to a different facility in the last few months. (*Id*. 1657-58.) The majority of psychiatrists currently working at Pontiac have been hired within the last six months. (*Id*.) This turnover is significant because it detrimentally affects the Department's ability to provide continuity of care to prisoners, many of whom have significant trauma histories. (*Id*. at 1659.)

45.     With adequate staffing levels, psychiatric staff—and other clinical staff—would have time to provide quality care. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1807 (admitting that prisoners with mental illness "may not be progressing as well as they could if we had more.") Dr. Doyle described an approach to psychiatry that involved physical or biological, emotional, social, and spiritual components (Dr. Doyle's 9/6/2018 Testimony, Tr. 1736:6-12, 1752-53); however, psychiatrists who have extremely high caseloads or who, like Dr. Yen, provide tele-psychiatry in 2-10 minutes sessions, focus on medication management and not in-depth and comprehensive care.  If IDOC had more staff, they would be able to provide more structured out-of-cell time that could protect more people against decompensation. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1793-94; Dr. Yen's 8/27/2018 Testimony, Tr. 187; 197-98.)

### 3. *Internal Audit Reports Demonstrate Systemic Failures in Psychiatry*

46.     Internal auditing developed by Dr. Sim is meant to assess whether the providers are meeting the requirements of IDOC's policies and procedures in their provision of care to Class Members. (Hinton; Dr. Sim's 8/31/18 testimony, Tr. 1353.) The newest audit tool is more

robust than the January 2017 tool, incorporating assessments of quality and compliance with the Court's May 25th Order. (Dr. Sim's 8/31/18 testimony, Tr. 1305, 1308.)

47. The results show the system is failing to provide adequate psychiatric care. The internal audit of care provided in May-June 2018 shows regional scores for the entire system below IDOC's own 85% threshold: 70.4% (Northern), 55.3% (Central), and 75.2% (Southern). (Pl. Ex. 58.)

48. Many facilities had no or low psychiatric backlogs, as of August 17, 2018, still failed to meet the 85% threshold in the audit of psychiatric services:

    a. Taylorville had no backlog, but scored only 10%.

    b. Western, had no backlog, but scored 74%.

    c. Hill, with a psychiatric backlog of 9, scored 27%.

    d. Illinois River, with a psychiatric backlog of just 1, scored 42%.

    e. Logan, with a psychiatric backlog of just 6, scored 65%.

    f. Sheridan, with a psychiatric backlog of just 1, scored 61%.

    g. Stateville, with a psychiatric backlog of 8, scored 73%.

    h. Stateveille NRC, with a psychiatric backlog of 44, scored 15%.

    i. Vandalia, with a psychiatric backlog of 47, scored 28%.

    j. Decatur, with a psychiatric backlog of 44, scored 38%.

    k. Southwestern with a psychiatric backlog of 5, scored 67%.

(DX 1D; PX 58, Statewide – MHA and Regional Audit Results.)

49. Facilities that have both a backlog and poor CQI results for psychiatric care include Pontiac (with a backlog of 94 and CQI score of 55%) and Menard (with a backlog of 118 and CQI score of 72%).

-17-

### 3.  The Psychiatric Backlog Demonstrates a Failing Psychiatric System

50.      The psychiatric backlog measures the timeliness of scheduled psychiatric appointments; it does not measure quality of care. (Elliott's 8/29/2018 Testimony, Tr. 857.) But the backlog data is important because it reflects the longstanding failure to appropriately staff psychiatric providers to provided needed care.

51.      There has *never* been a time when there was no psychiatric backlog across the system. (Dr. Elliott's 8/30/2018 Testimony, Tr. 937.) That backlog increased substantially over time, reaching a high of almost 4000 in December 2016.

52.      Since these enforcement proceedings began,[3] IDOC and its vendor have pushed to reduce the backlog by increasing tele-psychiatry and overtime from existing providers. (Ms. Laurent's 9/6/18 testimony, Tr. 1819, 1827 1869-70, 1885-86.)  Those efforts have achieved reductions in the backlog of schedule psychiatric appointments from over 3000 in October 2017 to 908 in August 2018. (Pl. Ex. 38-40; DX 1, 1C and 1D.)

53.      To date, without stable staffing, the backlogs continue fluctuate up and down. (Laurent's 9/6/18 testimony, Tr.  1822.). For example, Pontiac had a psychiatric backlog of 285 in September 2017, but it got the all the way down to 16 in April 2018, and then rose again to get to 228 in July 2018. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1666-68; DX-1D.)

54.      The backlog remains unacceptably high and the Department is still missing 25% of the psychiatric providers contracted for to provide appropriate care to IDOC prisoners. (Pl. Exs. 38 and 48A.). *See Brown v. Plata*, 563 U.S. 493, 528, 131 S. Ct. 1910, 1938 (2011)("although the State points to limited gains in staffing between 2007 and 2008, the record shows that the prison system remained chronically understaffed through trial in 2008.").

---

[3] The dispute resolution process required by the Settlement Agreement was initiated in July 2018 and the motion seeking court enforcement was filed in October 2018.

55.     "The conditions for which the people are backlogged … are not benign conditions. They're of the most serious type of mental illness." (Dr. Stewart's 8/30/18 testimony, Tr. 1176:11-15.) We're talking about real serious psychotic disorders, serious mood disorders, anxiety disorders, cognitive disorders. All of these … are real heavy hitters. So backlogs there make a difference [more] than just talking about, you know, hangnails." (Id. 1176:19-25.)



Pl. Ex. 38.

56.     At both trials, IDOC presented trend charts of its weekly psychiatric backlog data, showing a reduction in the backlog. The downward slope of Defendants' trend, however, only exists by using a September 2017 start date (two months after the dispute resolution process was initiated) and ignoring the variations, with ups and downs over the last year. (DX 35.)

57.     Looking at Defendants' weekly psychiatric backlog data going back to April 2014 (when Defendants' submitted the remedial staffing plan) provides a more realistic picture. This longer view of the data shows that the psychiatric backlog sharply increased following the May 2016 settlement agreement and has merely returned to levels that were unacceptable in 2014. (Pl. Ex. 50B, Ex. 9, IDOC Remedial Plan, p. 17 ("this proposal identifies the clinical, security and

administrative staff necessary to not only provide constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the creation of adequate levels of care").)

Summary of DX-1C, Historical Psychiatric Backlog from May 6, 2016 to August 3, 2018



Source: DX-1C, sheet "Historical Psych BL", data column "Weekly Backlog Totals"          **PLAINTIFF'S EXHIBIT 50B**

### 4. The Testimony at the Hearing Demonstrated Significant Failures in the Psychiatric System

58.     IDOC cannot deliver the psychiatric care that is needed and consequently prisoners with mental illness are being harmed by the lack of medication management. (Dr. Hinton's testimony, Tr. 317:7-11, 319:18-22, 320:8-13, 1450:3-8.) Dr. Hinton admits that this is dangerous. (*Id.* at 319:23-320:3.)

59.     Dr. Stewart concluded that the lack of sufficient and quality psychiatric care in the IDOC is placing Class Members in danger.  (Pl. Ex. 18, Oct. 1, 2017 letter; Dr. Stewart's testimony, Tr. 235-37; Pl. Ex. 21, Midyear Report p. 9, 115; Dr. Hinton's testimony, Tr. 343:2-

7.)  That opinion continues to date. (Dr. Stewart's 8/30 testimony, Tr. 1095:3-7.); Dr. Stewart's

3/1/18 testimony, Tr. 1177:12 – 1179:7.)

60.     IDOC's former Chief of Psychiatry, Dr. Michael Dempsey, agreed that IDOC's

psychiatric services were in a state of emergency, as to both the quantity and the quality, during

his tenure from November 2015 to May 2017. (Dr. Dempsey's 12/18/17 testimony, Tr. 197-201.)

61.     Dr. Dempsey testified extensively about irregularities and inadequacies in the

psychiatric care. Dr. Dempsey described that IDOC has no consistent standards or procedures for

psychiatric care and no oversight or clinical review. (Dr. Dempsey's 12/18/17 testimony,

Tr. 165:6-15, 201.) Although he developed a new evaluation form in an effort to achieve some

standard practices, many psychiatrists did not complete the evaluation form, including, for

example, not even filling in critical information such as the psychiatrist's impression of the

patient or the patient's history of suicidality (*Id.* at 165, 168-171.) He also described incidents of

psychiatrists purposefully using sub-therapeutic doses of medications for enforced medications.

(*Id.* at 193-97.)

62.     Dr. Doyle testified by the psychiatric practice at Dixon's X-House (sometimes

referred to as the Disciplinary Psychiatric Unit, or DPU), which houses some of the system's

most seriously mentally ill prisoners, psychiatrist tend to meet with their patients at their cell

front instead of in a confidential setting, despite that confidentiality is extremely important to

allowing patients to be honest about their symptoms and experiences and trust their provider will

not share such information with other prisoners or guards. (Dr. Doyle's 9/6/2018 Testimony, Tr.

1734-35, 1799-1800.) These sessions tend to be shorter than confidential psychiatric visits. (*Id.*

at 1737.)  These settings are not conducive to proper assessing a patient or providing therapeutic

intervention due to the extreme noise level. (*Id.* at 1800.)

63.     Similarly, the mental health care overall is much more limited at Dixon's X-House, despite that its residents are "are just, by definition, sicker, more seriously mentally ill." (Dr. Doyle's 9/6/2018 Testimony, Tr. 1734.)  Although X-House is considered at Residential Treatment Unit by IDOC, and it houses RTU level of care prisoners, Dr. Doyle acknowledged that the X-House does not provide a residential level of care, let alone an inpatient level of care. (*Id.* at 1763.) Class Members at X-House receive far fewer mental health groups than prisoners in the Dixon's other RTU, the Special Treatment Center (STC) and they do not participate in multidisciplinary team meetings related to their care. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1743-44, 1791, 1793.)

    **B.     As A Result Of Failing Psychiatric System, Defendants Continue To Violate The Requirements of the Settlement Agreement, May 25 Order, and The Constitution in the Following Areas**

            *(1) Timely Evaluation and Follow-Up*

64.     Timely evaluation and follow-up is essential to proper diagnosis and effective treatment. (Dr. Stewart's testimony, Tr. 249-50.) The failure to do so results in unnecessary suffering from mental illness, exacerbation of the symptoms of mental illness, and can lead to decompensation, which in the prison setting resulting in further injuries through isolation, disciplinary incidents, use of force incidents, and suffering. (*Id.* at 260.)

65.     The Court's May 25th Order required that "Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards." (Doc. 2070, May 25, 2018 Order, Paragraph 6.)

66.     In the IDOC system, timeliness of psychiatric care must be measured by: (1) the time the referral to the timing of the care provided, (2) whether scheduled appointments occur on time; and (3) whether the scheduling of psychiatric appointments is appropriate. Only the

second—timeliness of scheduled appointments is measured by Defendants' backlog, and that shows itself to remain dangerously high. (Dr. Stewart's 12/18/17 testimony, Tr. 260:5-6.)

67.     The Monitor found that IDOC's is not adequately providing timely psychiatric care. (Dr. Stewart's 8/30/18 testimony, Tr. 1064:9-13.) Of the 142 files reviewed by the Monitor this summer, only 45% provided timely follow-ups by psychiatric providers. (*Id.* at 1063-64.). The Monitor's analysis, importantly, considers a factor that the backlog does not: whether or not the psychiatric provider is setting the follow-up schedule appropriate based on a finding of stability (for a longer period between appointments) or no finding of stability (requiring a shorter time period between appointments). (*Id.* at 1064:10-21.)

68.     In the Second Annual Report, issued on June 8, 2018, the Monitor looked  more closely at timely response to psychiatric referrals, which also is not covered by the psychiatric backlog. (Ms. Mercer's 8/29/19 testimony, Tr. 683.) Of referrals (which are frequently from QMHPs) only 47% were seen by the psychiatrist within two weeks of the referral and the late responses were three to two months, and some were not responded to at all. (Dr. Stewart's 8/30/18 testimony, Tr. 1066-67.) This is not adequate psychiatric care. (*Id.* 1067:15-17.)

69.     The specific timelines for psychiatric follow-up required by the Settlement (requiring follow-up from 30-90 days depending on the level of care and whether stability has been reached) are "minimal" relative to accepted standards of practice in psychiatry in light of the need to closely monitor these types of medications. (Dr. Stewart's testimony, Tr.  237:8-12, 240-41, 249-250; Pl. Ex. 1 p. 15 (Section XII(b).)

70.     Defendants have continuously failed to meet those agreed up requirements. (Dr. Stewart's 12/18/17 testimony, Tr. 243:2-3; 237:8-12, 249:12-17; Pl. Ex. 21, Midyear Report p. 32-33, 48-50; Pl. Ex. 52, Second Annual Report p. 26.) In his Second Annual Report,

Dr. Stewart found that, due to chronic understaffing of psychiatric providers, IDOC was not able to keep up with psychiatric follow-up (Pl. Ex. 52, p. 30.) Dr. Stewart found that a majority of late psychiatric responses were 3-8 weeks, 9 out of the 99 had no psychiatric follow up at all, which resulted in a discontinuation of medication (Pl. Ex. 52, pg. 31.)

### (2) Psychiatric Response to Medication Non-Compliance

71.     Psychotropic medications can have harsh side effect profiles that require constant monitoring. (Dr. Stewart's 12/18/17 testimony, Tr. 241-43, 293-94.) The failure to do so leads to poor medication compliance: those experiencing side effects will stop taking their medications and their illnesses will go untreated. (*Id.* at 307.)

72.     Both the Court's May 25th Order, Sect. 7(f) and the Settlement Agreement require MHPs to follow-up with prisoners who are medication non-compliant and to refer the patient to a psychiatrist if they cannot resolve the non-compliance. (Pl. Ex. 1, p. 16 (Sect. XII(vi).)

73.     IDOC has failed to adequately respond to medication non-compliance. (Dr. Stewart's testimony, Tr. 256-257; 290-291; Pl. Ex. 21, Midyear Report p. 52-53; Pl. Ex. 52, Second Annual Report, p.50; Pl. Ex. 53, Monitor's August 2018 Report, p. 13-14.)

74.     In the most recent monitoring, over the summer, the Monitor reviewed 42 files that documented medication non-compliance. QMHPs did not consistently timely follow-up on the non-compliance; at times, QMHPs were not even notified of the non-compliance for several weeks. (Pl. Ex. 53, Monitor's August 2018 Report, p. 13-14.)

75.     Mental health staff at the facilities have likewise reported ongoing problems with follow-up because the nursing staff who administer the medications do not notify them of the non-compliance. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1642-44 (discussing DX 67, Pontiac compliance certification); Dr. Stromberger's 9/5/2018 Testimony, Tr. 1413 (discussing DX 67,

-24-

Hill compliance certification.) Dr. Mirsky, the psychiatry administrator at Stateville, testified that she was not aware of any other procedure used at Stateville to check for medication compliance other than weekly segregation rounds. (Dr. Mirsky's 8/27/2018 Testimony, Tr. at 133.)

76.    Dr. Stewart's review of prisoners who stopped taking their medication found that the primary reason for cessation was unaddressed side effects. (Dr. Stewart's 12/18/17 testimony, Tr. 293:5-15.)

77.    This is not a new issue. Throughout two years of monitoring, Dr. Stewart has found irregularities on psychiatric follow-up to medication non-compliance.  (Dr. Stewart's 12/18/17 testimony, Tr. 290:20-291:17.) In fact, Dr. Stewart observed cases where, instead of addressing the non-compliance with the patient, the psychiatrist discontinued the patients' medications with no follow-up. (*Id.* at 291-93.)

78.    Dr. Puga testified that he is currently working on some formulary changes, to include different types of medications such as ones that need to be taken less frequently or that dissolve more quickly. (Dr. Puga's 8/28/18 testimony, Tr. 558-60). However, some of his proposals have not been approved and others just started being implemented this summer. (*Id.*) Evidence was not submitted regarding how many of the more than 9000 Class Members on the psychiatric caseload will be impacted by these changes and insufficient time has passed to determine their impact on the long standing problems with medication administration and compliance.

### (3) *Charting Medication Efficacy and Side-Effects*

79.    IDOC is failing to chart medication efficacy and side effects, which is required by standard psychiatric practice, the May 25th Order (Sect. 7(b)), and the Settlement Agreement (Section XII(c)(ii)).  (Ex. 1, p. 15; Dr. Stewart's testimony, Tr. 257-59; Pl. Ex. 21, Midyear

Report p. 51; 1073-74; Pl. Ex. 52, Second Annual Report p.50; Dr. Stewart's 8/30/18 testimony, Tr. 1074.)

80.     Monitoring since the Court's May Order found that more than half of the psychiatric progress notes reviewed were blank as to whether medication efficacy and side-effects were discussed. (Dr. Stewart's 8/30/18 testimony, Tr. 10741074:11-16.)

81.     The Monitor has observed Class Members exhibiting severe side-effects that were not charted in their records, such as involuntary movements, akathisia (a subjective sense of needing to be in motion) and pseudo-Parkinson side effects such as stiffness and drooling. (Dr. Stewart's 12/18/17 testimony, Tr. 251-52, 258-259).)

82.     Unaddressed side effects are also a primary reason why prisoners stop taking their medications. (Dr. Stewart's 12/18/17 testimony, Tr. 293:5-15; Pl. Ex. 52, Second Annual Report, p. 48 (describing multiple reports of women at Logan discontinuing their medications when unable to speak directly with psychiatrist about problems with medications or discuss alternatives).)

### *(4) Ascertaining Side Effects of Psychotropic Medication*

83.     IDOC is also violating standard protocols for ascertaining side effects of psychotropic medication, which are required by both the Court's Order, Sect. 7(c) and (d) and Section XII(c)(iii) of the Settlement Agreement (Pl. Ex. 1, p. 15; Pl. Ex. 21, Midyear Report p. 51-52; Pl. Ex. 52, Second Annual Report, p. 49-50; Dr. Stewart's 8/30/18 testimony, Tr. 1074, 1077-78.)

84.     The consequence of this failure is that Class Members are suffering unnecessarily from medication side-effects, including those resulting with physical injury. (Dr. Stewart's 12/18/17 testimony, Tr. 263:22-264:6; 12/19/17 testimony, Tr. 298-99. *See also* Dr. Dempsey's

testimony, Tr. 172-73, 176 (describing limited ability to assess a patient's physical appearance
and related side-effects with IDOC's telepsychiatry practice).)

85.    Dr. Stewart has found that the lack of proper laboratory and neurological follow-
ups is subjecting Class Members to very dangerous side-effects. (Dr. Stewart's 12/19/17
testimony, Tr. 307.) The risk of failing to properly monitor for side effects from psychotropic
medications include the onset of "long-standing, long-term, intractable side effects."
(Dr. Dempsey's testimony, Tr. 177: 14-25.)

86.    Protocols for ascertaining side effects, such as bloodwork, vary depending on the
medication. For example, atypical antipsychotics alter blood sugar and blood lipids. This can
result in weight gain and Type 2 diabetes, so these metabolic parameters need to be frequently
monitored. (Dr. Stewart's 12/18/17 testimony, Tr. 261:5-262:1.) Some medications are also
known to have a significant impact on blood pressure. (*Id.* at 262: 18-24.) For other medications,
lithium for example, blood work is required to insure that the medication is at therapeutic blood
levels. (*Id.* at 262:2-17.)

87.    IDOC has had standard protocols for monitoring psychotropic medications
throughout these proceeding; the problem is that they are done in a haphazard manner, if done at
all. (Dr. Stewart's 12/18/17 testimony, Tr. 237:13-19, 263: 5-21.) For example, Dr. Stewart
described irregular and inconsistent labs to monitor lithium efficacy.  (*Id.* at 263: 5-21.) He
observed almost no blood pressure monitoring and inconsistent neurological evaluations. (*Id.*
at 237:13-19.) When Dr. Stewart did observe labs, he did not see how the results were linked to
the patient's care. (*Id.* at 237:13-19, 263: 5-21.)

88.    Another example of a dangerous side-effect is tardive dyskinesia, which involves
abnormal, involuntary movement of the tongue, mouth and extremities. If not caught early,

tardive dyskinesia can cause severe and permanent problems with movement and expression. (Dr. Dempsey's testimony, Tr. 177:14-178:9, 179:5-7, 180:10-21, 183:1-4.) Antipsychotic medications present a risk for tardive dyskinesia. The incidence of tardive dyskinesia associated with first generation antipsychotic medications (such as Haldol and Prolixin) is 5%. The incidence associated with second generation antipsychotics is 1 percent. (*Id.* at 181:12-19.)

89.     Dr. Dempsey's review of AIMs screens conducted by psychiatrists in IDOC showed that either the AIMs screens are not actually being done, or that they are being done incorrectly. (Dr. Dempsey's testimony, Tr. 181:25-182:18.) "[F]or the overwhelming majority of the patients, no matter how long they've been exposed to antipsychotic medications, the results are always zero which is impossible as far as I'm concerned for the number of patient years of exposure within the Department of Corrections." (*Id.* at 181: 1-10. *See also* Dr. Hinton's 12/19/17 testimony, Tr. 375:25-23 (admitting that there is no process in place to ensure that AIMs screens are being performed or accurately reported); Pl. Ex. 2, WHS Contract, Sect. 2.2410, p. 13 ("vendor psychiatrists shall screen offenders who are on antipsychotic medication for tardive dyskinesia once every six months.").)

90.     Remarkably, the new Chief of Psychiatry, Dr. Puga, admitted that he did not conduct AIMS screens as a staff psychiatrist at Pontiac, in violation of IDOC's policy. (Dr. Puga's 3/1/18 testimony, Tr. 1256:15-18; DX. 49, IDOC Mental Health SOP, p. 91-92 (requiring regular AIMs testing every six months, and every three months if tardive dyskinesia is diagnosed or suspected).) Dr. Puga failed to conduct this standard and important assessment even on patients for whom he prescribed Haldol and of one who had previously received an AIMS score of "moderate." (Dr. Puga's 3/1/18 testimony 1254-57; DX 25, Singleton psychiatric records ; DX 28, Span psychiatric records,  p. 54 of 71 (showing an AIMS score of 3 (moderate)

in March 2017) and p. 1-35, Dr. Puga's psychiatric reports for July 2017 – February 2018 (showing no AIMS).)

### (5)   *Medication Administration*

91.     The Court's May 25th Order required that the IDOC "Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed."

92.     The Monitor personally witnessed nursing staff at Pontiac Correctional Facility failing to comply with this order. (Dr. Stewart's 8/30/2018 testimony, Tr. 1070-72.) Dr. Renzi admitted that Pontiac is continues to have difficulty in assuring that offenders are actually taking their medication. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1642-44; DX 67.)

93.     There is a significant population on the IDOC caseload that requires "mouth checks" to ensure that the medication has been taken. (*Id.* at 1073.)  However, the monitoring over the summer was limited to chart reviews. Therefore, the analysis of medication administration was limited to assessing the documentation in the Medication Administration Record, which would not include any information regarding the *manner* of administration. (*Id.* at 1069-70.)

94.     The Monitor's Annual Reports have consistently found that IDOC fails to use procedures that could ensure the "taking of medication by the offenders so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered and taken by the offenders as prescribed," as required by Section XII(c)(1). (Pl. Ex. 1, p. 15; Pl. Ex. 21, Midyear Report, p. 50-51; Dr. Stewart's testimony, Tr. 255:18-256:22; Pl. Ex. 52, Second Annual Report, p. 49-50.) In some instances, in segregation units, the staff place the medication packet in the chuckhole and walk away, without any assurance that the medication is taken. In

other instances, prisoners may place the medication in their mouth, but spit out later (a practice known as "cheeking." (Dr. Stewart's 12/18/17 testimony, Tr. 122:25-123:4; 254:1-17.)

95.     Dr. Stewart described, as an example, a prisoner at Pontiac in September, who brought to their visit a significant number of pills in his pant leg, stating that it was easy not to take medicine in segregation because no one spends time ensuring that they actually take it. (Dr. Stewart's 12/18/17 testimony, Tr. 255:1-17.)

### B.     Defendants' Response to the Psychiatric Emergency in IDOC

96.     The only formal plans submitted by IDOC address problems in the psychiatric care was the Nov. 1, 2018 plan to increasing tele-psychiatry, which targeted the outpatient level of care over the course of October through December 2017. (Pl. Ex. 19, IDOC's Plan to Reduce the Psychiatric Backlog; Dr. Stewart's 12/19/17 testimony, Tr. 303.)  The testimony of IDOC and IDOC witnesses has established that other efforts include (1) ongoing recruitment of psychiatric providers and (2) temporary measure such as overtime incentives and re-allocating existing staff.  (Dir. Baldwin's 8/27/18 testimony, Tr. 129 (staffing deficiencies have been addressed by using overtime, which is not a long-term, permanent solution).)

97.     IDOC's plan to increase telepsychiatry hours in order to reduce the outpatient psychiatric backlog does not address the qualitative concerns about the use of telepsychiatry. (Dr. Stewart's 12/19/17 testimony, Tr. 301:4-25; Pl. Ex. 19, IDOC's Plan to Reduce the Psychiatric Backlog.)

98.     IDOC's recent effort to address the deficiency in psychiatric providers relies on temporary measures, such as incentivizing overtime hours. (Dir. Baldwin's 8/27/18 testimony Tr. 129; Ms. Laurent's 9/6/18 testimony, Tr. 1827; Dr. Hinton's 3/2/18 testimony, Tr. 1369:18-21; Ms. Gedman's testimony, Tr. 501: 11-15.) Dr. Doyle, for example, worked several days at Hill and Stateville NRC to help reduce their backlogs, in addition to his full-time schedule at Dixon.

(Dr. Doyle's 9/6/2018 Testimony, Tr. 1762; *see also* Dr. Renzi's 9/5/2018 Testimony, Tr. 1640-41; 1655; 1721 (acknowledging that Pontiac's use of overtime psychiatry hours is not a long-term solution.)

99.     IDOC has substantially increased its use of telepsychiatry in recent months. The Monitor has continually raised a number of concerns, including that telepsychiatry is not evidenced based in a correctional practice and recommending that it not be used for initial evaluations or for complex situations such as involving people in crisis, people with cognitive disabilities or with language access issues. (Pl. Ex. 52, Second Annual Report p.31; Pl. Ex. 18; Dr. Stewart's 8/30/2018 testimony, Tr. 1095-96.) Dr. Hinton testified that he discussed Dr. Stewart's concerns with him and provided him the SOP Manual. (Dr. Hinton's 8/28/2018 testimony, Tr. 530:1-14.) The Standard Operating Procedures Manual provides the protocols for the use of telepsychiatry in the IDOC, but does not address Dr. Stewart's particular concerns. (DX 49, p.87-90.) In fact, the SOP Manual specifically allows for the use of telepsychiatry for those in crisis, referring to it as a "complex" follow-up that would include a 25-minute session with the patient. (*Id.* at p.89, sect. 6(l).) On this record, Dr. Stewart's questions remain unanswered. It is troubling that this massive experiment with telepsychiatry has not been thoroughly vetted with the Monitor.

100.     IDOC has not submitted any plan to address turnover to permanently staff psychiatric positions and to provide psychiatric care of sufficient quality and quantity for the long-term, including so that the backlog does not increase again. (Dr. Stewart's 12/19/17 testimony, Tr. 307:7-22; 3/1/18 testimony, Tr. 1086:21-1087:15, 1174:21 -1176:10; Dr. Elliott's 8/30/2018 Testimony, Tr. 940 (turnover is "always a problem").) In fact, the only plans they have described are the continued recruitment efforts, which have been unsuccessful to date.

101.    IDOC has not advanced any substantive effort to use mid-level practitioners to overcome the years-long difficulty of hiring psychiatrists. Dr. Hinton testified that they have only started "to look at mid-level providers," but in March he could not say how many nurse practitioners are in the system. (Dr. Hinton's 3/2/18 testimony, Tr. 1305:11-24,1306:11-19, 1367-68.) IDOC did not implement any schedule for Wexford to hire new nurse practitioners. (*Id.* at 1368:11-14.)

102.    As of August, Defendants showed that their staffing consisted of: 57 tele-psychiatrists who provide 23.4 FTEs; 34 in-person psychiatrists who provide 14 FTEs; and 14 Mental Health Nurse Practitioners or Physician's Assistances who provide 12.8 FTEs. (DX 80.)

103.    According to Dr. Doyle, Nurse Hoffman, a nurse practitioner at Dixon, was one of those new recent new hires. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1784-85.) She was able to assist in lowering Dixon's psychiatric backlog. (*Id.* at 1776.) Nurse Hoffman's role soon changed, however, when she was assigned to provide necessary care to those on crisis watches, in response to the May 25 Court Order, including providing psychiatric care to those in crisis and multidisciplinary treatment plans upon discharge from crisis. (*Id.* at 1767, 1784-85.) However, staffed with only 4.95 out of 10 psychiatric providers positions staffed (DX 5B, p.11), Nurse Hoffman's focus on patients in crisis meant fewer psychiatric hours for other care. (*Id.* at 1776:15-19.)  In yet another illustration of the Hobson's Choice facing IDOC mental health providers: Dixon's psychiatric backlog dropped down to only 14, as of May 4, 2018, but then increased to 229 by August 17, 2018.

104.    Similarly, IDOC touted "developing a pilot program" to explore using primary care physicians for outpatient medication management; but no such program actually begun. (Dr. Hinton's 3/2/18 testimony, Tr. 1307:21-23, 1363:19-22.) Dr. Hinton did not have a specific

timetable for this pilot program. (*Id.* at 1364-65.) No further evidence or testimony about this program was submitted at the August-September hearing.

105.    IDOC did enter into a contact with Southern Illinois University to provide seven hours of telepsych care a week – three and half hours at Logan and three and half hours at Pontiac. (Dir. Baldwin's 8/27/18 testimony, Tr. 27-29; DX 68.)[4] However, given thousands of hours that IDOC is short psychiatric care (see Pl. Ex. 51), this is only a drop in the bucket. IDOC does not have a concrete plan to expand this program (Dir. Baldwin's 8/27/18 testimony, Tr. 29.)

106.    Between May and December 2017, Dr. Hinton participated in at least two meetings with the IDOC's Medical Director and Wexford's Head of Psychiatry to discuss the quality of psychiatric care in the IDOC. (Dr. Hinton's 12/19/17 testimony, Tr. 314:6-20.)

107.    In the month of June 2018, the Department failed to provide 4,801.33 hours of psychiatric care due to unfilled vacancies. (Pl. Ex. 51.) As of the August-September hearing, there were still approximately 20 unfilled psychiatric provider positions, translating to 41,600 hours of psychiatry not being provided by the Department annually. (Ms. Gedman's 8/29/18 testimony, Tr. 746, 812-13.) To date, IDOC still cannot provide the psychiatric care required by Class Members because they do not have enough psychiatric providers.

## II.    MENTAL HEALTH TREATMENT ON CRISIS WATCHES

### A.    Evidence Establishing Grossly Inadequate Care and Treatment For Those In Crisis

108.    Crisis refers to an acute exacerbation of mental illness, such as worsening psychosis or mania, or acting out behaviorally, or when someone is acutely suicidal or potentially violent. (Dr. Stewart's 12/18/17 testimony, Tr. 38:17-21, 51:18-21.)

---

[4] The testimony refers to eight hours, however, the contract itself specifies three and half hours per week at each facility for total of seven hours. (DX 68.)

109.    The purpose of crisis cells or watches in correctional mental health systems is to, first, protect the individual from self-harm or harming others and, second, to provide appropriate mental health assessment and intervention, such as re-evaluating medication, re-evaluating the psychosocial treatments, and addressing whatever issues precipitated the crisis. (Dr. Stewart's testimony, Tr. 219:5-17, 220:19-23.) The crisis cells, as they exist and are used in the IDOC, are inappropriate for mental health intervention.

110.    In any system – correctional or community mental health – crisis watches, or seclusion, is an intervention to be used "only for patients exhibiting behavior dangerous to self or others as a result of mental illness." (DX 70, National Commission on Correctional Health Care Standards (NCCHC), MH-1-01, p.109.) Under the NCCHC Standards, seclusion should only be used upon a clinical finding that "no other less restrictive treatment is appropriate" and "treatment plan provide for removing patients from …seclusion as soon as possible." (*Id.* at 109.)

111.    The isolation cells designed to keep the individual safe and to allow for close observation. (Dr. Stewart's 8/30/18 testimony, Tr. 977-78, 983, 985:16-19.) They are devoid of furniture and fixtures with possible ligature points covered. (Dr. Stewart's 8/30/18 testimony, Tr. 977-78, 985 and 12/18 testimony, Tr. 74.) Crisis cells are completely bare. (DX 6F, photo of Elgin crisis cell). The only property allowed in the cell are a suicide-proof smock, blanket and/or mattress. (Dr. Stewart's 12/18/2017 testimony, Tr. 74-75; Dr. Dempsey's 12/18/17 testimony, Tr. 183:22-184:2; Mr. Span's 12/19/2017 testimony, Tr. 281, 282:1-4; Mr. Singleton's 12/19/2017  testimony, Tr. 398:6-14.) When mattresses are provided, they are soiled from previous inmates and too dirty to use. (Mr. King's 9/5/2018 testimony, Tr. 1489.) At the 30-minute watch level, staff might allow the person to have hygiene items and a jumpsuit.

(Dr. Stewart's 12/18/2017 testimony, Tr. 74:16-75:9; Mr. Span's 12/19/2017 testimony, Tr. 282:9-13; *see also* Pl. Ex. 5, Administrative Directive 04-04-102, Sect. II.E Crisis Treatment Supervision Levels, p. 4.)

### *IDOC's Prolonged Crisis Placements Violate Standards of Care and Are Indicative of a Broken Mental Health Treatment System*

112.    The amount of time that any person spends in crisis should be strictly limited because the conditions themselves will cause a person's mental health to deteriorate. (Dr. Stewart's 12/18/2017 testimony, Tr. 219-222; 8/30 Tr. 979: 7-17; Dr. Renzi's 9/5/2018 Testimony, Tr. 1660 (isolation is contraindicated for most mental illnesses)

113.    IDOC places hundreds of Class Members on crisis watches every month. In June 2018, there were a total of 620 crisis watch placements and in July there were 486. (Pl Ex. 53, Attach. 4; Pl. Ex. 43.)

114.    Many of those watch placements are for extraordinarily long amounts of time given the circumstances and nature of seclusion. Dr. Stewart's most recent evaluation of IDOC's use of crisis watches found that people are being kept on crisis watch for three to seven days, with some having multiple placements or being kept longer than 10 days. (Dr. Stewart's 8/30/2018 testimony, Tr. 988:10-16.) As a matter of course, prisoners in IDOC placed on crisis watch stay there in 24-hour cycles "in these very, very challenging conditions." (*Id.* at 989:2-9)

115.    The number of mentally ill prisoners in the IDOC having crisis stays greater than ten days is evidence of an inadequate mental health system. (Dr. Stewart's testimony, Tr. 228:11-19.) The system wide data in IDOC, shows that those numbers getting worse instead of better, with more lengthy watch placement in 2018 than in 2017:

      a.    In the final quarter of 2017, a total of 232 Class Members spent more than ten days on watches: 132 mentally ill prisoners had at least one ten-day stay in crisis

and another 100 spent ten days or more, cumulative, on watches in that period.

(Dr. Stewart's testimony, Tr. 225:2-5; Pl. Ex. 22, Summary Chart.)

b. In 2018, the numbers were far higher, with 121 crisis watches for more than ten

days in the month of July alone and 85 crisis watches in the month of June.

(Dr. Stewart's 8/30/2018 testimony, Tr. 1014; PX43; Dr. Renzi's 9/5/2018

Testimony, Tr. 1678-80.)

116.    These lengthy placements in crisis– without the provision of acute levels of care –

violate standard of care in both the community and correctional practices to limit seclusion to the

shortest amount of time possible. (Dr. Stewart's 8/30/2018 testimony, Tr. at 981:18- 982; DX 70,

NCCHC Standards, at p.110; Dr. Renzi's 9/5/2018 Testimony, Tr. 1681-82.)

117.    Once a Class Member is placed in crisis in the Illinois system, however, his or her

placement is only reviewed once every 24 hours. Dr. Renzi – who runs the mental health

treatment services at Pontiac – is not aware of any other system outside of IDOC that allows for

seclusion for 24 hours at a time. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1682-83.)

118.    The NCCHC Standards provide orders for seclusion should generally be limited

to 12 hours. (Dx 70 at p.110.) Dr. Stewart and Dr. Renzi both testified that other systems limit

seclusion to hours per day. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1682-83; Dr. Stewart's

8/30/2018 testimony, Tr. 978:16-21(California rules limits seclusion orders to 4 hour).)

119.    Within Illinois state mental health centers, seclusion is strictly limited by the

Illinois Mental Health Codes, which prohibits seclusion for more than two hours unless a

physician or registered nurse with supervisory responsibilities personally examines the patient

within that 2-hour window and confirms, in writing, that seclusion does not pose an undue risk to

the patient's health. *See* 405 ILCS 5/2-109(a)*.* In no event are seclusion orders valid for more

than 16 hours. *Id.* Once a seclusion order has been issued, seclusion may be used for all or part of

that 16-hour period, but once the 16-hour period expires, the patient cannot be put in seclusion

again during the next 48 hours without written authorization from the facility director. 405 ILCS

5/2-109(d).

### IDOC Fails to Provide Adequate Treatment for Those in Mental Health Crisis

120.     A crisis watch placement is not the equivalent of acute hospitalization; it is

seclusion. (Dr. Stewart's 8/30/18 testimony, Tr. 986:5-13; *see also* DX 70 (NCCHC Standards,

MH-G-02, p. 85-86 (providing for acute care units separate from seclusion). The mental health

treatment provided on crisis watches, even for lengthy watch placements, does not comport with

mental health standards for acute hospitalization. (Dr. Stewart's testimony, Tr. 1017: 15-18.)

Contrary to professional standards, crisis cells in IDOC are not therapeutic environments. (*Id.*

at 75:10-12, 97:23-24; Dr. Doyle's 9/6/2018 Testimony, Tr. 1769.)[5]

121.     It is "absolutely not" acceptable to keep people in seclusion for weeks to a month

at a time." (Dr. Stewart's 8/30/18 testimony, Tr. 979: 1-5.) While keeping them on crisis watch

can prevent suicide or acts of self-harm, without the necessary treatment, their psychiatric

condition gets worse. (*Id.* at 1098:18 – 1099:8.)

122.     "That's what happens in crisis. You just psychologically drop." Anthony Gay

described being on crisis watches as being "a brick in the river." (Mr. Gay's testimony, Tr.

1549:19-25.) Mr. Gay spent decades in isolation, rotating between segregation and on crisis

watches, during which he repeatedly deteriorated to the point of significant physical and

---

[5] In his Second Annual Report, Dr. Stewart found that 19% of totals crisis placements at Pontiac
are in segregation units and 25% of crisis placements at Stateville and Lincoln are in segregation
units, with half of those being longer than 72 hours (Pl. Ex. 52, p. 42.)

emotional injury. To the question of what would have made the crisis watches placements better, Mr. Gay answered: music to listen to; groups to engage and interact with others; and confidential psychotherapy. (*Id.* at 1550.) The lack of these most basic elements of care, and simple humanity, demonstrate the cruelty of prolonged seclusion in IDOC's system for mentally ill prisoners who are acutely in need.

123.    On May 25, 2018, the Court ordered IDOC to provide "appropriate mental health treatment to stabilize the symptoms and protect against decomposition" to those in crisis, as ordered. (Doc. 2070, May 25, 2018 Order, Sect. 1(a).)

124.    Dr. Stewart concluded that IDOC is failing meet the requirements of the preliminary injunction to provide "appropriate mental health treatment to stabilize the symptoms and protect against decomposition" to those in crisis, as was Ordered by the Court on May 25th. (Dr. Stewart's 8/30/18 testimony, Tr. 990-92.)  In a review of 92 crisis treatment files this summer, the Monitor found that the overwhelming majority of people in crisis watches are only getting one 15-20 minute daily session with a QMHP. (Dr. Stewart's 8/30/18 testimony, Tr. 990: 6-19; Pl. Ex. 53, p. 1.)

125.    Care "appropriate" to stabilize symptoms and protect against decomposition in the context of crisis watches, however, requires more than a single daily session. It would be mean providing an immediate psychiatric assessment relating to the use of short-term medications to stabilize them acutely, as well as other treatment modalities like therapy to help stabilize them or move them to a less or higher level of care.  (Dr. Stewart's 8/30/18 testimony, Tr. 987-88.) Therefore, to measure compliance with the Court's Order, Sect. 1(a), the Monitor reviewed each file for whether the person in crisis received each of: daily checks by an MHP in a confidential setting; other mental health treatment in addition to the daily checks; and a psychiatric evaluation

or intervention. (Dr. Stewart's 8/30/18 testimony, Tr. 993:24 – 994:13). Each of these treatment modalities are necessary to provide adequate care during crisis watches, as well as to achieve compliance with the language of the Court Order requiring appropriate treatment on crisis watches. (*Id.* at 994:21 – 995:9.)

126.    Dr. Mirsky confirmed Dr. Stewart's finding: while on crisis watches, prisoners at Stateville will have one daily session with a QMHP. (Dr. Mirsky's 8/27/2018 Testimony, Tr. 239.) The time varies, but QMHPs try to see them for 15 or 20 minutes. (*Id.*) Other than those 15-20 minutes, unless they are given reading materials, those prisoners have nothing else to do the remaining 23 and a half hours a day. (*Id.* at 295.)

127.    In fact, this is not an issue in dispute. Defendants admit that this is all the care that they are providing to those on crisis watches regardless of the individual's level of need. The procedures set forth in the June 11th Bulletin equate to one daily out of cell session and, potentially, a psychiatric visit. (DX 57; (Dr. Hinton's 8/28/18 testimony, Tr. 327-328, 334, 341.) Dr. Elliot admitted that IDOC has combined the daily assessment (required by the Order, P1(C) and the therapeutic interventions (required by the Order, P1(a) into a single daily QMHP session. (Dr. Elliott's 8/29/2018 Testimony, Tr. 894.)

128.    This is grossly insufficient treatment relative to the needs of those in crisis and the conditions of seclusion. While daily sessions are an improvement over the five minute cell front-visits, the one daily session "really isn't different. It's still a very brief check-in." (Dr. Stewart's 8/30/18 testimony, Tr. 990: 20-24.) The once daily 15-30 minute session must be considered in the other 23 and a half hours a day that people who already in crisis are in these stark, non-therapeutic conditions. (*Id.* at 991.)  Ralph Kings, a prisoner who was on crisis watches twice between May and August, testified that the daily assessments had not changed significantly when

compared to his past stints on watches, and that he was not offered treatment opportunities while on watch other than the single daily session. (Mr. Kings' 9/5/18 testimony, Tr. 1493.)

129.    Group therapy is not provided to prisoners on crisis watches (Dr. Renzi's 9/5/2018 Testimony, Tr. 1632-33), despite the fact that isolation is contraindicated for most mental illnesses (*Id.* at 1660) and can cause further decompensation (*Id.* at 1688.) This practice is contrary to an acute inpatient treatment program where patients are permitted to attend groups and are able to come and go from their rooms. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1686-87.) People on crisis watches are not given the opportunity to leave their cell for yard until they have been on watches for at least 10 days. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1688.) The *only* out-of-cell time they receive is for daily assessments (15-45 minutes per day), psychiatric appointments once every 14 days, and showers. (*Id*. at 1688-89.)

130.    Notably, according to Wexford, there are actually groups designed for people in crisis, although no evidence of groups occurring in IDOC's system was presented. (Dr. Elliott's 8/29/2018 Testimony, Tr. 843.)

131.    Although IDOC witnesses were repeatedly questioned by defense counsel about people going on crisis watches for reasons other than acute symptoms of mental illness, Dr. Elliot admitted that the decision to place someone on crisis watch is a professional judgment to be made by the clinician, after completing a suicide risk assessment. (Dr. Elliott's 8/29/2018 Testimony, Tr. 881-82; *see also* Dr. Mirsky's 8/27/2018 Testimony, Tr. 234-35 (describing process of assessing suicidal risk in response to a crisis call).) If there is no mental disorder operating or suicidal ideation, "then there is, by definition, no reason to go on crisis watch." (Dr. Elliott's 8/29/2018 Testimony, Tr. at 882.)

132.     The Court Ordered, Sect. 1(b) requires "Reevaluations of treatment and medication will occur as needed and mental health treatment shall be determined and any necessary interventions to stabilize individuals shall occur." Although IDOC is now conducting confidential daily assessments, any reevaluations and assessment of intervention need is illusory. Everyone on crisis watches gets the same treatment – daily assessments and psychiatric referral—regardless of individualized needs. Everyone in crisis gets the same treatment – one daily session and possibly a psychiatric visit—regardless of the severity of the individual's need for treatment; their ability to participate in treatment; or the duration of the watch.

133.     The Monitor found IDOC's provision of care required by the Order, Sect. 1(b) to be inadequate. (Dr. Stewart's 8/30/18 testimony, Tr. 998:10-15.) In reaching that conclusion, the Monitor reviewed 89 crisis watch treatment plans assessing whether there had been a multidisciplinary crisis watch treatment plan when the person went into crisis; whether there was a psychiatric involvement when the person went into crisis; and if different treatment options were assessed and explored. (Dr. Stewart's 8/30/18 testimony, Tr. 997: 6-19.) The Monitor found that only 31 of the 98 files had a treatment plan and most were not completed by a multidisciplinary team and only 13 of the cases had a psychiatrist involved in the treatment. (*Id.* at 998: 2-9.)

134.     Dr. Renzi, Pontiac's psychologist administrator, testified that Pontiac only began the practice of requiring a psychiatrist to meet with a prisoner within a couple of days of going on crisis watch in response to the Court's May 25th Order. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1699.) However, Pontiac does not actually have sufficient psychiatric staff to ensure that a psychiatrist visits a prisoner within the first three days of being on crisis watches. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1640; DX 67, Pontiac.) Pontiac attempts to fill the gap by borrowing

psychiatrists from other facilities to work overtime on the weekends, but Dr. Renzi admitted that this is not a long-term solution. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1640-41; 1655; 1721.)

135.    IDOC's new procedures, by their stated terms requiring confidential daily assessment, seem to properly facilitate the requirements of Sect. 1(c) of the Court's May 25th Order, requiring: "Daily assessment in a confidential setting of patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required."

136.    The Monitor's review of 92 crisis treatment files found that although some were providing the confidential assessments, overall they were inadequate. (Dr. Stewart's 8/30/18 testimony, Tr. 998:16-999, 1003:23 – 1004:16.) Dr. Stewart's experience from two years of monitoring is that much of the time when confidential treatment is denied it is due to security restrictions, security officers now allowing the person to come out of the crisis cell—at times due to insufficient staffing to facilitate the movement –and is more rarely but sometimes due to prisoner refusals. (*Id.* at 1001-1002.) In either instance, it would be appropriate for the mental health provider to try again later, especially where—as in crisis—these sessions are the only non-custodial contact the person in crisis will receive. (*Id.* at 1003.)

137.    Dr. Stewart has found that the mental health condition of prisoners in crisis gets worse during their crisis placements. (Dr. Stewart's 8/30/18 testimony, Tr. 989:10-21.) Those on crisis watches are the most acute patients in the system; the failure to adequately treat them has a severe negative impact on their mental health and risks danger to others and grave disability, as well as suicide. (Dr. Stewart's testimony, Tr. 1097:6-13, 1135:8-12.) Class Members are being harmed and injured by the lack of aggressive mental health treatment on crisis watches, including that they are suffering from untreated mental illness, self-harm, and other acting-out

behaviors such as smearing themselves with bodily fluids and feces, and risk being placed in restraints.[6] (Dr. Stewart's testimony, Tr. 226:23-227:9.)

### Internal Audit Reports Support Dr. Stewart's Conclusions That the System Fails to Provide Adequate Crisis Care

138.    Internal auditing developed by Dr. Sim is meant to assess whether the providers are meeting the requirements of IDOC's policies and procedures in their provision of care to Class Members. (Hinton; Dr. Sim's 8/31/18 testimony, Tr. 1353.) The newest audit tool, is more robust, incorporating assessments of quality and compliance with the Court's May 25th Order. (Dr. Sim's 8/31/18 testimony, Tr. 1305, 1308.)

139.    The results show the system is failing to provide adequate care to those in crisis. The internal audit of care provided in May-June 2018 shows regional scores for the entire system below IDOC's own 85% threshold: 48.7% (Northern), 66.7% (Central), and 45% (Southern). (Pl. Ex. 58.)

140.    Only 4 of the eighteen facilities audited met IDOC's own 85% threshold requirement, demonstrating a system that is failing to provide adequate care to those in crisis:

      a.  Danville: N/A[7]
      b.  Dixon: 52%
      c.  Joliet TC: 63%
      d.  Lincoln: N/A
      e.  Pontiac: 68%
      f.  Sheridan: 83%
      g.  Stateville: 3%
      h.  Stateville NRC: 23%

---

[6] To the extent that Defendants cite to the decline in use of restraints of evidence of their own "progress," it should be noted that they only did so in response to these Court proceedings. Up until the time of the preliminary injunction trial, Pontiac was still routinely using four-point restraints, sometimes for days at a time. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1684-85.) Moreover, the rise of the two other most restrictive interventions – seclusion and enforced medications –  have risen in this same period. Thus, the decline in restraints, unfortunately, is *not* an indicator of a better functioning treatment system, but one where, at least, blatant torture has been eliminated.

[7] Facilities that do not have psychologist administrator on staff were not audited.

    i.   Decatur: 92%
    j.   East Moline: 97%
    k.   Graham: N/A
    l.   Hill: 39%
    m.  Illinois River: 69%
    n.  Jacksonville: N/A
    o.  Kewanee: N/A
    p.  Logan: 41%
    q.  Taylorville: 100%
    r.  Western: 29%
    s.  Big Muddy: 58%
    t.  Centralia: N/A
    u.  Lawrence: N/A
    v.  Menard: 55%
    w.  Pinckneyville: 85%
    x.  Robinson: N/A
    y.  Shawnee: 0%
    z.  Southwestern: 0%
    aa. Vandalia: 72%
    bb. Vienna: N/A

(PX 58, Statewide – MHA and Regional Audit Results; *See also* Dr. Sim's 8/31/18 testimony, Tr. 1341-1342, 1349, 1353, 1360-1361.)

### *Care for Those Who Do Not Promptly Stabilize on Crisis Watches*

141.    The Court's May 25th Order required that, "For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility, or explain in writing why establishing such a plan is not appropriate."

142.    The Monitor assessed compliance with this requirement in two ways. Because the Order did not specify a time frame, the Monitor used ten days – which he viewed as exceeding long—because that is the requirement of the settlement agreement. In the file review (consisting of 33 mental health files), the Monitor found that there was documentation of at least discussions of referring patients to a higher level of care. (Dr. Stewart's 8/30/2018 testimony, Tr. 1010:1-6.)

The second review was a data driven analysis of all crisis watches in the month of June, throughout the Department. (*Id.* at 1011: 16-24; PX53, Attach. 3 and 4).

143.    The Monitor's data-driven analysis showed 620 crisis watches in June 2018. (Dr. Stewart's 8/30/2018 testimony, Tr. 1014; PX53, Attach. 4.) Of those, 85 prisoners remained on crisis watches for more than ten days, but only 13 of them were referred to a higher level of care. (*Id.*) Of the 13 prisoners who were referred to a higher level of care, most of the referrals came well after ten days on watch, with some on watches for months. (*Id.* at 1015-16.)

144.    Dr. Stewart explained that once individuals in crisis are fully assessed, and if they are not at a great risk of self-harm or harming others they should be taken out of the seclusion. (Dr. Stewart's 8/30/18 testimony, Tr. 989:1-9.) Like a hospital emergency room, the patient should either be stabilized to return to their outpatient or residential home or be provided with a higher level of care. (*Id.* at 979:7-17; 987-988).

145.    Dr. Doyle also agreed that, out in the world, a person in acute crisis would not stay in an emergency room for four months—rather, that person would be transferred to a higher or lower level of care. (Dr. Doyle's 9/6/2018 testimony, Tr.1786.) In the IDOC, however, prisoners can spend days, weeks, and months on crisis without being provided a higher level of care. (*Id*. 1786, 1795-96.) After ten days on crisis watches, however, "it is absolutely imperative to take a look at what other options may be indicated or warranted," including a higher level of care. (Dr. Elliott's 8/29/2018 Testimony, Tr. 883.)

146.    For example, Anthony Gay—who was one of the few IDOC prisoners formally designated as "inpatient level of care"—spent four months on crisis watches at Dixon, engaging in serious acts of self-harm, but was never transferred to a higher level of care  because the appropriate placement did not (and still does not) exist within the IDOC. (Dr. Doyle's 9/6/2018

testimony, Tr.at 1786-87.) Dr. Doyle explained that he was able to spend extra time with Anthony Gay, including some visits that went as long as 90 minutes. (*Id*. at 1779.) Through this intensive care, Anthony Gay was able to be stabilized and released from crisis after four months of continued self-harm. (*Id*. at 1787-88.) But, Dr. Doyle also conceded that he could not afford to spend that much time with many of his patients. (*Id.* at 1779-80.)

147.     Anthony Gay also testified that he was able to progress with the more intensive treatment he received at Dixon in the months prior to his discharge; however, he was the *only* one his unit to provided individual counseling. (Mr. Gay's 9/5/18 testimony, Tr. 1548-49). If Dixon had more psychiatric staff, Dr. Doyle could provide longer and more intensive care with more patients. (Dr. Doyle's 9/6/2018 testimony, Tr. at 1780, 1802-3, 1806.)

148.     Dr. Doyle testified that he is "hoping" that they're "not doing any damage," but "couldn't say for sure if there isn't some." (Dr. Doyle's 9/6/2018 Testimony, Tr. 1806.) Mr. Gay was certainly damaged by his years in isolation with the needed care, as have other Class Members who have testified, Mr. Singleton (¶¶ 160-163), Mr. Span(¶¶ 188, 192, 219, 223, 255-57),  Mr. Kings (¶¶ 128, 190, 192, 220, 254, 280), and Mr. Champs (¶¶ 191), as well as those who have not, Tyler (¶¶ 271-71.)

149.     Dr. Doyle acknowledged that, if the Department had a fully functioning hospital, he would expect prisoners to go in and out of the hospital on an acute basis, with the exception of a few individuals who would need long-term hospitalization. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1764-65.)

150.     According to Acting Director Baldwin, however, plans for a fully functioning hospital are only in the initial stages, with appropriations not to be decided until 2021. (Dr. Baldwin's 8/27/18 testimony, Tr. 83.)

151.    IDOC's Mental Health Procedures Manual states that "patients who remain on crisis treatment level of care after ten consecutive days will be considered for a higher level of care." (DX 49, p.31; Dr. Stewart's testimony, Tr. 602.) Depending on the individual, this could be to a residential treatment unit or to inpatient level of care. (Dr. Stewart's testimony, Tr. 603: 15-22.)  The Manual states that the inpatient level of care "exceeds the level of care that the Department is able to provide at the outpatient or special RTU levels of care and results in commitment to outside facilities for a duration considered clinically necessary by the patient's treatment team." (DX 49, p.31; Dr. Stewart's testimony, Tr. 604-605.)

152.    The Manual goes on to give a protocol for "enhanced treatment" to those who require an inpatient level of care. (Def's Ex. 49 at p.31-32.) However, IDOC's new procedures in response to the Court's May 25th Order do *not* require enhanced treatment for those who on crisis watches. Dr. Stewart testified about ways of providing aggressive mental health treatment to those on crisis watches, including psychiatric care, counseling, out of cell time, and group therapy, which would be similar to the enhanced care model used by IDOC for those few —like Mr. Gay—who are designated as "inpatient level of care." (*Id.* at 1097-98.)

153.    Similarly, the new inpatient treatment program implemented this year, "Pre-Inpatient Admission Program" or "PAP" to provide enhanced level of care for prisoners designated as inpatient but not physically at Elgin Treatment Center, is not provided to those on crisis watches. (Dr. Elliott's 8/29/2018 Testimony, Tr. 850, 891.) That program only includes the 31 prisoners who have been designated as inpatient for "quite some time." (*Id.* at 891; *see also* Dr. Doyle's 9/6/2018 testimony, Tr. 1760-61, 1805-6, regarding the inpatient list that has been static for years.)

### *The Requirements of the Court Order for Crisis Care Are Not News to the IDOC*

154.     In 2014, two years prior to the settlement, Dr. Patterson reported that inadequate treatment in crisis is attributable to lack of staffing and programs, including access to inpatient beds, residential treatment programs, outpatient treatment programs, short term crisis beds, and management cells for triage and evaluation of inmates who may be in acute crisis and may be in need of hospital beds. (Pl. Ex. 10, Patterson Annual Report, p. 7.) All of the deficiencies indicated by Dr. Patterson's report have continued. (Dr. Hinton's testimony, Tr. 356:7-22.)

155.     IDOC's failure to provide this level of care is a continuation of its failure to meet the obligations of the settlement agreement to provide aggressive mental health intervention designed to reduce acute presenting symptoms and stabilize people in crisis. (Dr. Stewart's 8/30/18 testimony, Tr. 986:14-24; (Pl. Ex. 52, Second Annual Report, p 43, 70; Dr. Stewart's testimony, Tr. 221:18-22. 1094:17 – 1997:3.) In his Second Annual Report, Dr. Stewart observed that IDOC "has a long way to go to meet the crisis requirements" in the Settlement Agreement (Pl. Ex. 52, p 43.)

156.     Dr. Stewart testified that he has reviewed hundreds of crisis placements and that, while they are serving the self- harm prevention purpose, he has not observed *any* cases of aggressive mental health interventions being provided in crisis watches. (Dr. Stewart's testimony, 221:18-22; 221-224, 1095-96.)

157.     These failures to provide needed care to those in acute crisis also violate IDOC's own policies. (Dr. Stewart's testimony, Tr. 227:10-15, 611-12, 1095-96.). The Mental Health Protocols Manual and Administrative Directive 04.04.100 both state that crisis placements should usually be ten days or less and "require diagnostic assessment and temporary clinical intervention for stabilization or diagnostic purposes." (DX 46, Administrative Directive

-48-

04.04.100, Sect. II(E); DX 49, SOP Manual, p. 31.) Administrative Directive 04.04.102 requires that the daily evaluations assess the offenders' response to treatment efforts on crisis watches. (Pl. Ex. 5, p. 8; Dr. Stewart's testimony, Tr. 611:7-22.) By requiring assessment of treatment efforts, the AD requires both the daily evaluations and treatment efforts. But, by its own directive, very little, if any, treatment occurs on crisis watches other than placement in the watch cell itself. (*Id.* at 611-12.)

### *Class Member Testimony Regarding the Impact of Crisis Watches*

158.    Four Class Members testified about their experiences on crisis watches. They each described the lack of needed mental health treatment and that their mental health deteriorated on crisis watch.

159.    Class Member Samuel Span testified that in October of 2017, he spent 28 consecutive days on crisis. (Mr. Span's testimony, Tr. 280:5-9.) Mr. Span testified that during that 28-day crisis stay, he shut down emotionally and socially and was no longer able to comprehend what was going on around him. He felt depressed most of the time, detached from reality, and started to hallucinate. Overall, he felt that his symptoms were aggravated to the point where they were almost unbearable (*Id.* at 283:7-14, 284:5-11, 285:22-286:4.) Mr. Span testified that during that 28-day crisis stay, he had only two MHP visits in a confidential setting and he did not see a psychiatrist. (*Id.* at 282:18-21, 284:20-24; DX 28, Dr. Puga's reports of psychiatric visits with Mr. Span (under seal) on June 16, July 11, August 15, and November 28, 2017.)

160.    On December 18, 2017, Class Member Corrie Singleton testified that, with the exception of one day (November 27th), he had been on crisis watches since October 8, 2017. (Mr. Singleton's testimony, Tr. 400:1-21.) At the time of his testimony, Mr. Singleton was on "continuous watches" because he swallowed several batteries in a recent effort to kill himself.

(*Id.* at 396-97, 406-07.) Mr. Singleton testified that being in crisis cells for a long time "messes with him psychologically;" it takes a toll on his mind and makes him feel like he is about to die. (*Id.* at 405:3-10.)

161.     Mr. Singleton testified that the only property he had in his cell was a suicide blanket and a suicide smock; he did not have a mattress. (Mr. Singleton's testimony, Tr. 398:2-14.) In the week leading to his testimony, Mr. Singleton had only been able to wash and brush his teeth once. (*Id.* at 398:15-21.)

162.     Mr. Singleton testified that while he has been on crisis watches, he was taken out of his cell to meet with his psychiatrist, but has not had any confidential visits with an MHP or attended any treatment groups. (Mr. Singleton's testimony, Tr. 403:18-404:12.) Mr.  Singleton described his daily MHP visit as follows: the MHP asks how he is doing and whether he is suicidal or homicidal. Then they tell him whether his watch status will change (for example, if he will stay at continuous watch or go to 10 minute watch.) (*Id.* at 404:13-405:2.)

163.     That Mr. Singleton did not stabilize on crisis watches – and continued to self-harm and attempt suicide—even with weekly sessions with Dr. Puga, demonstrates that he needed a higher level of care. (Dr. Stewart's testimony, Tr. 1164:13-21.)

### *IDOC's Failure to Plan for Care Upon Discharge From Crisis Watches*

164.     The Monitor has consistently found that Defendants fail to update treatment plans when a person is discharged from crisis, instead they are returned to their prior treatment plan with no update to take into account the deterioration that led to the crisis, no assessment of why the crisis occurred or how future crises might be avoided. (Dr. Stewart's testimony, Tr. 52:21-54:11; 1099:13-25.)

165.    At the March hearing, Defendants announced a new crisis treatment plan form, but it failed to cure this problem, as it too returned the patient to his or her prior treatment plan (*Id.* at 93:24-94:15, 101:20-102:21: 612-14; DX 14, Revised Crisis Care Treatment Form 0377.) The revised Form 377 states "once crisis level of care is discontinued, this crisis treatment plan shall be considered complete, and the treatment plan previously listed in the medical chart shall resume . . . ." (Def. Ex. 14.)

166.    The Court's May 25th Order, Sect. 1(d) required the Defendants to start doing the obvious – assess and update a patient's treatment needs to take into consideration the crisis placement:

> Prior to discharge from crisis watch an appropriate mental health professional with the patient shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan will address causes which led to the deterioration and the plan for risk management to prevent relapse.

167.    The Monitor found the Department was also not compliant with the Court Order requiring a multidisciplinary team treatment plan upon discharge from crisis watches (Dr. Stewart's 8/30/18 testimony, Tr.1005-6). Of the 90 files reviewed, 59 had no multidisciplinary treatment plan upon discharge from crisis watch. (*Id*.).

168.    Four Pontiac crisis treatment files from July 2018 were submitted into evidence. Each contained a treatment plan at the time of discharge from crisis that were word for words identical. (PX55C, bates no. 22-25 (July 12, 2018); PX55G, bates nos. 76-80 (July 23, 2018); PX55I, bates nos. 28-31 (July 30, 2018), PX55M, bates 12-15 (July 9, 2018) and bates 55-59 (July 30, 2018); Dr. Stewart's 8/30/2018 testimony, Tr. 1083 -1091.) Those files also show treatment records documenting no mental health treatment beyond the daily assessments. (Pl. Exs. 55C, 55G, 55I, 55M.)

**B.      Defendants' Inadequate Response to the Court Order and Lack of Mental Health Treatment for Those in Crisis**

169.      After multiple meetings of top decision makers, Defendants' June 11th Bulletin announced its procedures in response to the Court's May 25th Order. As established above, the treatment changes provided by this Bulletin are, by their own terms, inadequate to required care on crisis watches. Further, evidence establishes that even those minimal changes have not been implemented.[8]

170.      At most, the Department has made improvements in conducting daily confidential assessments of those on crisis watches; and it has promulgated yet another protocol for treatment planning and psychiatric involvement.

171.      Whether those protocols are each being implemented is not proven. In December, Dr. Hinton admitted that he has no way of knowing whether his directives for appropriate crisis care treatment are being carried out by each facility. (Dr. Hinton's testimony, Tr. 327:1-329:1.) Similarly, in August, he testified that he does not have that knowledge. (Dr. Hinton's 8/28/18 Testimony, Tr. 439.)

172.      Ms. Mercer (then-Cantorna) testified at the first hearing about a new system she had developed around end of summer 2017 to track follow-up after discharge from crisis watch. (*Id.* at 1000:21-1001:18, 1029:2-14.) In August, however, she testified that the mental health staff at the facilities were not using the database to document follow-up appointments.

---

[8]The June 11th Bulletin states that the daily sessions will be at least 15-20 minutes and take place out of cell. (DX 57, Memo.) Other than providing the language of the Court Order, specific changes to mental health care procedures for those on crisis watches announced in the Bulletin are: any prisoner on psychotropic medications is to be immediately scheduled to see a psychiatric provider at the next available clinic and then 14 days thereafter; a crisis care treatment plan is to be filed in the medical chart; at discharge from crisis, the multidisciplinary team should update the individual's treatment plan; and for those who are not discharged from crisis watches within 10 days, a higher level of care should be considered and documented. (DX 57; Dr. Hinton's 8/28/18 testimony, Tr. 327-28, 334-36, 338, 343.)

173.     The only central reporting process submitted at trial was Dr. Sim's CQI audit reports. The purpose of the audit is to ensure that the policies and procedures are being followed. (Dr. Hinton's 8/28/18 testimony, Tr. 363.) Those audit reports show that the system is failing; not only at the "tough" facilities, but throughout the system.

174.     Other than CQI results, any other reports about failures to deliver necessary mental health services are maintained only at the facilities; IDOC does not collect data about its failure to provide mental health care in a central location. (Dr. Hinton's 12/19/17 testimony, Tr. 338:4-7.)

175.     For example, internal compliance reports revealed that at Robinson Correctional Center, staff was not notifying mental health staff of crisis issues, and that there was improper follow up (failure to complete form 377) and post-crisis review (failure to complete form 379.) (Dr. Hinton's testimony, Tr. 335:9-22, 336:3-20; Pl. Ex. 17, IDOC Healthcare Contract Monthly Performance Monitoring, p. 82.) Dr. Hinton admitted that although these services are critical to the delivery of mental health care to people in crisis, he did not initiate a corrective action plan after receiving the report about Robinson Correctional Center, he has not seen a plan created by the facility itself, and he does not know if one exists. (Dr. Hinton's testimony, Tr. 336:15-25, 337:1-22.) It would have been the responsibility of Robinson's administrators—the same staff who failed in the first instance— to ensure that a corrective action plan was created and implemented. (*Id.* at 338:12-23.)

176.     One month prior to the August 27 trial, IDOC initiated a process to "audit" implementation of its memorandum (DX 57, 57B) relating to crisis care. (Dr. Hinton's 8/28/18 testimony, Tr. 336; (Dr. Mirsky's 8/27/2018 Testimony, Tr. 243-44; DX 3G.) Based on the

evidence provided, those submissions are not a true audit of the mental health services provided for one week of crisis watch placement, as they appear to suggest.

177.    The audit reports are completed by the administrators of mental health services at the facilities (in other words, a self-audit.). Dr. Renzi from Pontiac, was the only witness who testified about the actual audit process. She described that she selects the files she will review and she reviews *only* one mental health progress note and/or the mental health treatment plan (form 377). (Dr. Renzi's 9/5/2018 Testimony, Tr. 1707-9; 1724.) This limited sample distorts the reality where, for example, the patients' progress notes indicate that he was only seen cell-front for 5-10 minutes a day most days in a week, yet is credited as having received "increased daily contact length" in the audit based on the single day when he received a 20-minute out-of-cell visit. (Pl. Ex. 55o; Dr. Renzi's 9/5/2018 Testimony, Tr. 1701-1707.) The same prisoner was also marked as receiving "additional treatment opportunities" based on information written in his treatment plan, but his mental health records for the relevant time period contained no indication of additional treatment actually being provided. (Pl. Ex. 55o; Dr. Renzi's 9/5/2018 Testimony, Tr. 1709-12.)

178.    Dr. Hinton's opinion on the adequacy of the mental health treatment to stabilize symptoms and protect against decompensation is based solely on the weekly self-audits. (Dr. Hinton's 8/28/18 testimony, Tr. 451-452.) Based on Dr. Renzi's testimony—which is the only evidence regarding how these audits were conducted at the facilities—the audits cannot be considered as credible evidence. (*See ¶* 318, Dr. Renzi's 9/5/2018 testimony, Tr. 1639, 1686-87.)

## III.    SEGREGATION

### A.    Defendants' Failure to Provide Minimally Adequate Treatment Necessary to Withstand the Impact of Segregation

#### 1. *The Impact of Segregation on Class Members*

179.     Class Member Samuel Span testified that most days he spends 24 hours a day in his segregation cell. (Mr. Span's testimony, Tr. 273:8-11.) The cell is "six by five" and allows him four paces from front to back. The width is shorter than his arm span. At 6'2'', Mr. Span is able to touch the ceiling while standing. (*Id.* at 273:16-274:2.) The cell contains a bed, steel toilet, and steel sink, with no separation between the bed, toilet, and sink. (*Id.* at 274:3-8. *See also* Mr. Kings' testimony, Tr. 1480; Mr. Champs' testimony, Tr. 1458-59.)

180.     Segregation refers to prisoner confinement in his or her cell for 22 or more hours a day. (Dr. Stewart's testimony, Tr. 103:9-104:5.) In the mental health profession, segregation is defined by the hours in cell, regardless of whether the housing unit is disciplinary segregation or other confinement. (*Id.* at 103-04.)

181.     The literature demonstrates that, in general, mentally ill prisoners are overrepresented in the segregation population in a prison. This is true in Illinois, where more than 80% of the prisoners in segregation are Rasho Class Members (897 out of 1105). (Pl. Ex. 22, Summary Chart.) In contrast, the approximately 200 non-mentally ill prisoners in segregation come out of a group of approximately 30,000. (Pl. Ex. 22, Summary Chart; Dr. Stewart's 12/18/17 testimony, Tr. 104:14-19, 106:20-107:3; Dr. Hinton's 12/19/17 testimony, Tr. 347:18-348:1.)

182.     Mentally ill prisoners are overrepresented in segregation because their behavioral issues and disciplinary tickets tend to result from deteriorated mental health. Mental illness is exacerbated by isolation (segregation), which leads to additional behavioral issues and more disciplinary tickets. For those in segregation, their mental illness leads to behavior that results in more tickets, which leads to more segregation time; the cycle continues ad nauseam. (Dr. Stewart's 12/18/17 testimony, Tr. 107: 4-21; Dr. Hinton's 12/19/17 testimony, Tr. 348:2-8.)

183.     A person with a pre-existing mental illness placed in segregation for any amount of time will have an exacerbation of their pre-existing mental illness. For example, if someone has schizophrenia, their schizophrenia will become worse just by being in segregation. (Dr. Stewart's 12/18/17 testimony, Tr. 109:14-20, 110:3-9.)

184.     Being in segregation also has cognitive impact, such as a degradation of coping mechanisms. Examples of behaviors that occur when coping mechanisms are degraded include cutting, smearing feces, and throwing bodily fluids. (Dr. Stewart's 12/18/17 testimony, Tr. 110:3-9, 110:24-112:5.)

185.     Being in segregation also leads to increases in self-harm and other acting-out behaviors. (Dr. Stewart's 12/18/17 testimony, Tr. 109:21-110:9.) Self-harm, such as cutting, is a significant problem for mentally ill prisoners in segregation in Illinois. (*Id.* at 110:14-22.)

186.     Dr. Renzi, Pontiac's Psychologist Administrator, agrees that isolation is contraindicated for most mental illnesses, and that segregation can be a stressful environment in terms of its impact on mental illness. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1660.)

187.     Because of the detrimental impact of segregation, the National Commission on Correctional Health Care (NCCHC) considers 15 days to be long-term segregation.[9] (Dr. Stewart's 12/18/17 testimony, Tr. 126:6-19.)

188.     Samuel Span testified that his mental health has worsened during the years that he has spent in segregation. He has started to have flashbacks of traumatic events in his life when he was screaming, crying, and begging. He visually experiences these flashbacks and hears them within his mind, and the flashbacks repeat over and over again. Mr. Span testified that he also

---

[9] https://www.ncchc.org/solitary-confinement

experiences depression in his cell, he feels alone, like there is no one to help or understand him, and he is unable to focus on getting better. (Mr. Span's testimony, Tr. 277-278, 286 -287.)

189.    Corrie Singleton testified that he made multiple suicide attempts in the months prior to his testimony because of the stress of returning to segregation. Mr. Singleton previously spent years in segregation, and described it as an ongoing nightmare. Segregation makes him feel like he is becoming a different person; it causes him to hallucinate, hear voices, and to want to kill himself and other people. The fact that Mr. Singleton's release date was approaching did not help him cope with segregation; it worried him even more because of his current condition. (Mr. Singleton's testimony, Tr. 396:11-17, 406-408.)

190.    Ralph Kings testified that he had been in segregation for nine years, and still had another 12 years left on his segregation sentence. (Mr. King's testimony, Tr. 1479-80.) He testified that long-term segregation has aggravated his depression, and caused him to require a higher level of care. (*Id*. at 1481.) He testified that looking ahead to many more years in segregation leaves him feeling hopeless and depressed. (*Id*. at 1481-82.)

191.    Joe Champs testified that spending most of his days in his cell had caused his mental health to "slip" because he has nobody to talk to. (Mr. Champs' Testimony, Tr. 1462.) Segregation "leaves him too much time in his own head." (*Id*. 1460.) After six months in segregation, Mr. Champs found himself doing things he would not normally do, such as plucking all the hair from his mustache. (*Id*. 1462-3.)

192.    Behavior that results in mentally ill prisoners being placed in segregation also often results in the loss of other privileges, such as yard time, groups, or TVs. These losses further contribute to a person's worsening mental illness. (Dr. Stewart's 12/18/17 testimony, Tr. 117:17-118:20.) For Mr. Kings, restrictions on his phone privileges and visits have left him

disconnected from his family. (Mr. King's testimony, Tr. at 1481.) Mr. Span testified that he was under restrictions excluding him from yard, commissary, TV, and visitation. These restrictions have taken a "great mental toll" and he is left hopeless. (Mr. Span's testimony, Tr. 275:13-276:16.)

193.    Dr. Stewart testified that the mental illness of every Class Member in segregation who he has reviewed was exacerbated. (Dr. Stewart's 12/18/17 testimony, Tr. 115:3-9.) For example, Dr. Stewart discussed a man at Pontiac who he interviewed in December 2017, and again in June 2018, who had spent the intervening time in segregation. In the June 2018 interview, the prisoner described a "black spot" on the wall of his cell that was asking him for blood. The man had not presented with such a severe degree of psychosis in the December 2017 interview. (*Id.* at 112:17-115:2.)

194.    In December 2017, Dr. Hinton agreed that IDOC was not providing the mandated treatment and out-of-cell time and, that without that treatment and out-of-cell time, those in segregation will "across the board" get worse. (Dr. Hinton's 12/19/17 testimony, Tr. 349, 351)

195.    IDOC's treatment of mentally ill prisoners in segregation fails to meet minimum professional standards and fails to protect mentally ill prisoners from decompensation. (Dr. Stewart's 12/18/17 testimony, Tr. 208.)

196.    As a result of Defendants' inadequate mental health treatment system for segregation, Class Members are being harmed. (Dr. Stewart's 12/18/17 testimony, Tr. 121:15-20; Dr. Hinton's 12/19/17 testimony, Tr. 349:20-24.) They are suffering from untreated mental illness, including increased depression, anxiety, and hallucinations. They are having behavioral difficulties including self-injury. They are subject to increased use of enforced medications,

restraints and force. (Dr. Stewart's 12/18/17 testimony, Tr. 208:23-209:15; DX 12C at p.2 (describing increasing use of enforced medications).)

197.    The lack of adequate mental health treatment in Illinois's segregation units results in the overuse of crisis intervention teams, overuse of crisis placement, frequent use of force, enforced medications, and, historically, the use of restraints. (Dr. Stewart's 12/18/17 testimony, Tr. 128:21-129:3; 208:23-209:15; DX 12C at p.2 (describing increasing use of enforced medications.) The facilities that had historically used restraints most often are Pontiac, Logan, and Dixon—the facilities with the most segregation housing and the most severely mentally ill prisoners. (*Id.* at 99:23-100:7, 116:19-117:9. Pl. Ex. 56.) Moreover, Dr. Renzi testified that Pontiac stopped using restraints only recently. (Dr. Renzi's 9/5/18 testimony, Tr. 1635.)

198.    The majority of IDOC's SMI prisoners in segregation are at Pontiac, Menard, Dixon and Pinckneyville, each of these facilities also have high rates of people on crisis watch (Def. Ex. 1F; Pl. Ex. 56.)

199.    Dr. Stewart described Class Members in Illinois's segregation units are "some of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely" and the level of urgency is "as serious as I've seen." (Dr. Stewart's 8/30/18 testimony, Tr. at 1147:15 – 1148:4.)

200.    Without the required mental health treatment, Class Members in segregation are getting worse. They are decompensating, going into crisis, acting out and getting more segregation time. (Dr. Stewart's 3/1/18 testimony, Tr. 1139:15-25; see also 8/30/18 testimony at 1023 (minimum standards for care are important because it is well-documented that mental illness gets worse in control settings).)

-59-

### 2. *Failure to Continue Treatment Plans and Enhance Mental Health Treatment in Segregation*

201.    Defendants are failing to provide mentally ill prisoners in segregation with, at a minimum, the treatment specified in their individual treatment plan, and with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. (Pl. Ex. 1, p. 17, 19 (Sections XV(a)(iii.), XV(a)(vi)(A) and XV(c)(iii)(A)); Dr. Stewart's testimony, Tr. 119-121, 1141-42; Pl. Ex. 21, Midyear Report p. 62-63; Pl. Ex. 52, Second Annual Report p. 61-62; Dr. Stewart's 8/30/18 testimony, Tr. 1023-24.)

202.    These requirements are consistent with professional standards that those with mental illness will require more mental health treatment in segregation than they do outside segregation. (Dr. Stewart's 12/18/17 testimony, Tr. 121:5-11.) Dr. Stewart has seen no evidence of this standard being met in Illinois. *(Id.* at 120:2-15.)

203.    The mental health treatment provided to Class Members in segregation has not improved since the May 25, 2018 Order. In his August 2018 report, after review of 80 treatment files from 11 facilities, Dr. Stewart found that IDOC was not providing additional treatment to those in segregation or identifying those in segregation who are decompensating (Pl. Ex. 53; Dr. Stewart's 8/30/18 testimony, Tr. 1025:1-14.)

204.    Dr. Doyle testified that, at Dixon, there are fewer groups offered in the disciplinary psychiatric unit (X-House) then in the Special Treatment Unit, despite both units being Residential Treatment Units. Dr. Doyle further testified that X-House houses prisoners "are, just by definition, sicker, more seriously mentally ill." (Dr. Doyle's 9/6/2018 Testimony, Tr. 1734.) As a result, many RTU level-of-care prisoners in segregation at Dixon are not

receiving the heightened care they need or the treatment required by their treatment plan. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1743-44, 1763, 1790-91.)

205.     For example, Joe Champs was receiving *more* mental health treatment before he was placed in segregation. Prior to his transfer to Pontiac in April 2018, Mr. Champs last treatment plan (at Stateville) provided him with weekly one-on-one therapy; at Pontiac he receives *no* individual therapy and only one weekly group. (Mr. Champs' 9/5/18 testimony, Tr. 1464-6.)

### 3. Insufficient Structured Out-of-Cell Time to Protect Against Decompensation

206.     The IDOC has consistently failed to provide the structured out-of-cell time necessary to protect mentally ill prisoners from decompensation in segregation. (Pl. Ex. 21, Midyear Report p. 65; Dr. Stewart's testimony, Tr. 136-142; Pl. Ex. 52, Second Annual Report.)

207.     Through both file review and a Department-wide data analysis, the Monitor found that IDOC is not in compliance with this Court's May 25th Order, Sect. 2(c) (requiring Class Members in any Control Unit for periods longer than 60 days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation. (Dr. Stewart's 8/30/2018 testimony, Tr. 1053.)

208.     To assess compliance with the Court's order to provide sufficient out-of-cell time to protect against decompensation, the Monitor conducted both a file review and a data driven analysis. From the review of 46 files, the Monitor found that IDOC had not complied with this provision (*Id.* at 1053:13-17.) The Department-wide data analysis found that 31% of Class Members were not even offered the required hours, with the biggest shortfall in the number of structured out-of-cell hours. (Pl. Ex. 53, Monitor's Report on May 23 Order, Attach. 2.) While prisoners in segregation for more than 60 days were *offered* an average of 6.7 hours per week,

Class Members, only actually received an average of 3.4 hours per week (if actual attendance at treatment activity is counted). Only five Class Members actually attended the required amount of total out of cell time (16 hours, including structured and unstructured). (Pl. Ex. 53, Attach. 2 at p.2.)

209.    The lack of adequate structured out-of-cell time is a continuation of the Department's failure to meet its commitment under Section XV(c) of the Settlement, which requires "mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time." The current requirement of the Settlement is eight hours of structured and eight hours of unstructured out of cell time per week. (Pl. Ex. 1, p. 20; Dr. Stewart's 8/30/2018 testimony, Tr. 1057-58.)[10]

210.    Out-of-cell time for mentally ill prisoners in segregation is necessary because interacting with other individuals and with professional staff helps prevent a more rapid decline in mental health status. (Dr. Stewart's 12/18/17 testimony, Tr. 142:13-22.) Dr. Stewart recounted how multiple prisoners have informed him during interviews how they "hang on" from one group to the next. (*Id.* at 142:23-143:13.)

211.    Dr. Stewart explained that the difference between offering out of cell time and prisoners receiving out of cell time is significant. An inmate's refusal to participate in a structured or unstructured activity can be a reflection of worsening mental illness. (Dr. Stewart's 12/18/17 testimony, Tr. 131:25-132:9.) Dr. Doyle agreed that a prisoner with mental illness refusing to come out of his or her cell is a problem that requires a mental health response, such as

_____

[10] Neither the Court Order nor the Settlement Agreement gave specific requirements for the provision of out of cell provisions during their first two months in segregation, but the American Psychiatric Association's position is that segregation terms for mentally ill prisoners should be as brief as possible and out of cell time should be provided during this time. (Dr. Stewart's 12/18/17 testimony, Tr. 143:14-144:9.)

a change in medications or other mental health intervention. (Dr. Doyle's 9/6/2018 Testimony,

Tr. 1773. *See also,* Dr. Mirsky's 8/27/2018 Testimony, Tr. 275-76 (refusing groups or other

mental health services can be a potential indicator of decompensation).)

212.    In June 2018, the out-of-cell tracking systems used by IDOC showed a high rate

of refusals at Menard, Pontiac and Dixon, which are the facilities that house the overwhelming

majority of SMI prisoners in segregation for sixty days or more. (Pl. Ex. 45B, 45C, 45D;

Dr. Stewart's 8/30/18 testimony, Tr. 1036-38; Pl. Ex. 57; see also Pl. Ex. 21, Midyear Report p.

65-66 (finding that class members in Dixon X House, only about 50% of eligible prisoners took

advantage of offered out of cell time).)

a.    On average, Pontiac offered just under 7 hours per week of structured out-of cell-

time (treatment activities and movie groups) to prisoners in long-term segregation. The IDOC

counts a refusal as time out of cell.  But if "refused" time is subtracted from the structured out of

cell time that is offered, that averages goes down to just under 3 hours per week of time actually

spent in treatment activities. (Pl. Ex. 45(b).)

b.    On average, Menard offered 6.05 hours per week of structured out-of cell-time to

prisoners in long-term segregation; however, if "refused" time is subtracted that averages goes

down to 4.24 hours per week spent in treatment activities. (Pl. Ex.45(c).)

c.    On average, Dixon offered 9.3 hours per week of structured out-of cell-time to

prisoners in long-term segregation; if "refused" time is subtracted that averages goes down to

3.13 hours per week spent in treatment activities. (Pl. Ex.45(d).)

213.    This amount of therapeutic out-of-cell time is inadequate to protect prisoners in

long-term segregation from decompensation. (Dr. Stewart's 8/30/2018 testimony, Tr. 1037:5-9,

1038:16-25.)

214.    Dr. Stewart's professional opinion is that these prisoners are too mentally ill to take advantage of the opportunities offered, which can be a manifestation of learned helplessness (where the person cannot even fathom a way to get better), a common cognitive distortion resulting from segregation. (Dr. Stewart's 12/18/17 testimony, Tr. 132:16-133:16, 133:25-135:1.)

215.    The overwhelming number of refusals, for both structured and unstructured out of cell time, shown on Defendants' out-of-cell trackers (DX 8B) is a significant red flag that Defendants are not providing the mental health treatment necessary to protect against decompensation. (Dr. Stewart's 12/18/17 testimony, Tr. 132:16-133:16, 133:25-135:1; 8/30/2018 testimony at 1034-38.)

216.    The Department, however, does not acknowledge that refusals are a possible indicator of mental decompensation. (Dr. Stewart's 8/30/2018 testimony, Tr. 1034; (Dr. Mirsky's 8/27/2018 Testimony, Tr. 275-78, 302-303 (describing the lack of any process to follow-up on refusals despite acknowledging that those refusals could potentially mean that the person is decompensating).) When a prisoner is refusing treatment and out-of-cell time, the mental health provider must consider whether or not refusals indicate decompensation. (Dr. Stewart's 8/30/2018 testimony, Tr. 1034:3-22.)

217.    At Pontiac, 70% of the "structured" out-of-cell time is provided through movies. (Pl. Ex. 45A (summary of DX 8B).) Dr. Elliot testified that movies should be classified as unstructured out-of-cell time. (Dr. Elliott's 8/30/2018 testimony, Tr. 941.) In order to attend a movie group, prisoners are shackled and some are strip-searched, depending on their housing unit. (Dr. Renzi's 9/5/2018 testimony, Tr. 1719-20.) Most prisoners do not actually attend the

movies, and Pontiac "offers" the movie groups to many more prisoners than the space actually could accommodate. (Dr. Renzi's 9/5/2018 testimony, Tr. 1692-97.)

218.     Structured out of cell time provided at Pontiac, to Class Members in segregation for more than 60 days, consists of 70% movies, 27% groups, 2% individual sessions, and 1% psychiatry. That fails to provide an adequate level of therapeutic activities needed to protect prisoners with mental illness from decompensation in long-term segregation. (Dr. Stewart's 8/30/18 testimony, Tr. 1029:18-25.) It is inadequate care. (*Id.* at 1029:25.) Dr. Renzi admitted that Class Members in segregation at Pontiac do not receive at least eight hours of structured out-of-cell time due to limited staff, lockdowns, and lack of space. (Dr. Renzi's 9/5/2018 testimony, Tr. 1641-42.)

219.     At the December hearing, Samuel Span testified that on any given day, he spends "basically 24 hours" in his cell and that he had not had any groups within the last month. Even when he was getting groups, it was not six hours per week. (Mr. Span's testimony, Tr. 273:8-11, 275:5-6, 279:11-23.) Mr. Span has been placed on "yard restriction" which violates the Settlement Agreement's requirement that all Class Members receive the requisite structured and unstructured out-of-cell time. (Pl. Ex. 36; Mr. Span's testimony, Tr. 1151:13 – 1152:2.)

220.     Ralph Kings, who also is in long-term segregation at Pontiac, testified that, because of back pain, he usually cannot attend the twice-weekly movie groups that require "sit[ing] on a steel stool, with no back support, with our hands cuffed behind our back for three hours straight." (Mr. Kings' testimony, Tr. 1495-6.) Mr. Kings testified that he had been requesting mental health groups—covering topics like anger management, coping skills, dealing with depression—as an alternative to the movie groups, but these had been denied. (Id. at 1495-97.)

### *(4)  Insufficient Individual One-on-One Counseling In Segregation*

221.    The individual counseling, provided once every 30-60 days, is insufficient to the mentally ill prisoner from the decompensation associated with segregation. (Dr. Stewart's 8/30/18 testimony, Tr. 1026:17-20.)

222.    Defendants have long failed to provide the necessary supportive counseling to Class Members in segregation as required by the Sections XV(a)(vi)(D) and XV(c)(iii)(D). (Pl. Ex. 1, Settlement Agreement pp. 17, 19; Dr. Stewart's 12/18/17 testimony, Tr. 125:15-20, 126:20-127:2.) In his midyear report, Dr. Stewart wrote that "the lack of counseling has contributed to the overuse and potential burnout of the crisis intervention teams." (Pl. Ex. 21, Midyear Report, p. 64; Dr. Stewart's 12/18/17 testimony, Tr. 123:20-124:13.)

223.    Samuel Span, who had been in segregation for three years and two months, testified that he had not been out of his cell for a counseling session in over a month. He was also not seen in October because his therapist did not have time. (Mr. Span's testimony, Tr. 272:10-11, 274:25-275:4, 278:18-279:10.) Corrie Singleton testified that he has not been out of his cell for a counseling session since September 2017. (Mr. Singleton's testimony, Tr. 409:18-21.)

224.    Providing supportive counseling with a therapist who has established a therapeutic relationship is important in order to minimize the decompensation that occurs in segregation. (Dr. Stewart's 12/18/17 testimony, Tr. 123:7-15.) It can also help to decrease acting-out behavior that leads to crisis placements. (Pl. Ex. 21, Midyear Report p. 64; Dr. Stewart's testimony, Tr. 124:21-125:11.) In California, for example, mentally ill prisoners in segregation receive daily rounds and a weekly confidential counseling session, as well as monthly visits from a psychiatrist. (Dr. Stewart's testimony, Tr. 127:3-16.)

### (5)  No Meaningful Multidisciplinary Treatment Planning for Prisoners in Segregation

225.     Multidisciplinary team meetings are "invaluable" because they give psychiatric staff an opportunity to consult with other staff who have had more regular, face-to-face contact with the patients. (Dr. Doyle's 9/6/2018 Testimony, Tr. 1777.)

226.     Defendants are not providing Class Members in segregation an opportunity to participate in multidisciplinary team meetings. (Dr. Stewart's 8/30/2018 testimony, Tr. 1047.) While the Monitor found—and Defendants' witnesses testified to – informal or "scattered examples" of treatment staff discussing cases amongst themselves, the Department did not comply with the May 25th Order to provide for "participation in multidisciplinary team meetings to the extent clinically appropriate." (Dr. Stewart's 8/30/2018 testimony, Tr. 1047.)

227.     Dr. Doyle described mental health staff having informal discussions about patients while waiting in the X House "bubble" for security staff to escort them around the cellhouse. (*Id.* at 1797.) But those conversations are necessarily limited, because of the lack of confidentiality with security staff is present. (*Id.* at 1798-1800.)

228.     Dr. Stromberger testified that Hill is unable to comply with the multidisciplinary meeting requirement for segregation prisoners due to "significant shortage of mental health staff with no on-site psychiatry." (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1409-1411; DX 67.)

229.     Dr. Mirsky also testified that, until recently Stateville also did not comply with the Order to provide multidisciplinary meetings for Class Members in segregation due to a lack of psychiatric providers. (Dr. Mirsky's 8/27/2018 Testimony, Tr. 165-65; DX 67.)

230.     The failure to provide multidisciplinary treatment team meeting for Class Members in segregation is a continuation of years long failure of the Department to comply with its promises under the Settlement Agreement.  (Pl. Ex. 1, p. 17, 19 (Sections XV(a)(vi)(E) and

XV(c)(iii)(E); Dr. Stewart's testimony, Tr. 129:8-12; Pl. Ex. 21, Midyear Report p. 64; Pl. Ex. 52, Second Annual Report, p. 61.) A multidisciplinary treatment team meeting would include all people involved in the patient's care, including the psychiatrist, psychologist, social worker, and behavioral health technicians. The team would discuss the case, conduct a group interview with the patient, and then formulate and implement a treatment plan. (Dr. Stewart's testimony, Tr. 129:13-130:1.)

231.    Of course, it is nearly impossible for the part-time telepsychiatrists to participate in ad hoc treatment team meetings. (Dr. Stromberger's 9/5/28 testimony, Tr. 1391-91.)

*(6)  Poor Pharmacological Treatment for Prisoners in Segregation*

232.    Defendants are not providing adequate pharmacological treatment to prisoners in segregation. The Monitor's August report found that prisoners in segregation are not receiving timely follow-up, which resulted in a finding that the Department had not complied with the Court's May 25th Order, Sect. 2(b)(iii). (Dr. Stewart's 8/30/2018 testimony, Tr. 1045.)

233.    This finding is consistent with the Monitor's prior findings regarding the requirements of the Settlement Agreement's Sections XV(a)(vi)(C) and XV(c)(iii)(C). (Pl. Ex. 1, p. 17, 19; Dr. Stewart's testimony, Tr. 122-23.) Dr. Stewart testified that the IDOC's medication management for those in segregation is worse than for Class Members elsewhere in the system because of problems assuring that the prisoners are actually receiving and taking the prescribed medications. (Dr. Stewart's testimony, Tr. 122:14-123:4; Pl. Ex. 21, Midyear Report, p. 64.)

234.    Further, the Monitor's file review found that medication prescriptions were often being written for long periods of time without any indication that stability had been reached. (Dr. Stewart's 8/30/2018 testimony, Tr. 1046.) However, prescriptions should only be written for long periods – 60 to 90 days – if the psychiatric provider has assessed that there are no issues

with side effects and there has been a continually positive treatment response to the medication. (Dr. Stewart's 8/30/2018 testimony, Tr. 1047.) That is not the case in IDOC. (Dr. Stewart's 8/30/2018 testimony, Tr. 1045-46; *see also* Pl. Ex. 52, Second Annual Report, p. 47, 49.)

235.     Consistent with Dr. Stewart's finding, there continues to be a significant backlog of more than 900 scheduled psychiatric follow-up appointments.

236.     Facilities with high segregation populations also have significant vacancies and turnover in psychiatric providers. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1656-58, 1677.) At Pontiac, for example, about half of the current psychiatric providers are new within the last six months, and one psychiatrist who started within the last six month already has resigned. (*Id.* at 1657-58.) This turnover is disruptive to patients' continuity of care. (*Id.* at 1659.)

### *(7)  Inadequate Review & Evaluation of Prisoners in Segregation*

237.     The May 25th Court Order also required an initial assessment:

Mental Health Professionals shall assess any class member promptly after initial placement in administrative detention, disciplinary segregation, or other similar restrictive status (collectively referred to as Control Unit). Such review shall be documented in the patient's progress notes. The purpose of the assessment shall be at a minimum to determine whether the patient has decompensated and should be removed from the Control Unit and to provide a baseline against which any future decompensation or deterioration of the patient's mental status can be measured.

Order, Sect. 2(a).

238.     To meet this requirement, IDOC defined "promptly" as within 48 hours of placement in segregation (which is consistent with the settlement agreement).  (Dr. Hinton's 8/28/18 testimony, Tr. 345.) IDOC used its Mental Health Screening Form to perform this task, and has been working on developing a new form. (*Id.*)

239.     Of the 92 segregation mental health files that the Monitor reviewed, only 25 contained a mental health screening promptly after placement in the control unit and even those

failed to assess the patient's suitability for segregated housing. (Dr. Stewart's 8/30/2018 testimony, Tr. 1021; PX 53 at p.6.) None of the 25 files (that contained a screening) included an assessment of whether the patient had decompensated and should be removed from the control unit. (Dr. Stewart's 8/30/2018 testimony, Tr. 1021.)

240.   Similarly, the Logan Correctional Center's corrective action plans and CQI audit results show non-compliance in the area of a mental health professionals not completing a mental health screening within 48 of placement in restrictive housing. (Dr. Sim's 8/31/18 testimony, Tr. 1326.)

241.   Because of the known impact of segregation on mental health, it is extremely important for clinical staff to monitor and respond to deterioration in mental illness. (Dr. Stewart's 12/18/17 testimony, Tr. 147. *See also* Dr. Mirsky's 8/27/2018 Testimony, Tr. 275-76 (agreeing that one of the problems of segregation is decompensation).) Yet, Defendants have consistently failed to adequately review, monitor and evaluate Class Members in segregation. (Pl. Ex. 15, p. 58; Pl. Ex. 52, p. 57, 59-60.)

242.   It is well-established in psychiatric literature that segregation "absolutely worsens a person's pre-existing mental illness. So if you're schizophrenic before you go in, your schizophrenia will get worse." It is also documented to cause new symptoms of mental illness. (Dr. Stewart's 8/30/2018 testimony, Tr. 1019-20.)

243.   The failure to do so has profound and dangerous effects  – the loss of the opportunity to intervene before harmful effects of segregation start to occur, such as behavioral acting out, cutting, engaging in untoward behavior that can result in more segregation time, or needing a crisis unit. (Dr. Stewart's testimony, Tr. 148:25-149:11; Tr. 152:13-23, 1140:7-20.)

244.    IDOC's failure to conduct an initial assessment upon placement into segregation is consistent with their two-year long failure to comply with the Settlement's requirement of an assessment within 48 hours placement in segregation. (Pl. Ex. 1, Settlement Agreement, Section XV(a)(iv); Dr. Stewart's testimony, Tr. 148:1-22; Pl. Ex. 21, Midyear Report p. 62 (finding that only 36% of Class Members were evaluated as required); Pl. Ex. 52, Second Annual Report p. 59-60 (finding that only 31% of Class Members were evaluated as required).)

245.    The Monitor also found that the IDOC had failed to fully comply with the Court's May 25th Order, Sect. 2(d) requiring that: "Mental health staff shall assess class members in Control Units to determine if a higher level of care is necessary and if so, to make proper recommendations to facility authority." (Pl. Ex. 53; 1060-61.)

246.    The most routine form of monitoring the stability of mentally ill prisoners in segregation is the weekly rounds. Segregation rounds are essentially a cell-front check-in. (Dr. Stewart's 12/18/17 testimony, Tr. 122.) According to Dr. Mirsky—who runs the mental health treatment program at Stateville—the purpose of the rounds is to ask if the prisoner has any issues, is taking their medication, or wants to talk with his primary MHP or psychiatrist. (Dr. Mirsky's 8/27/2018 Testimony, Tr. 231.)

247.    Because Hill Correctional Center is chronically understaffed, Dr. Stromberger, the Psychologist Administrator, testified that they have to use an on-call (PRN status) mental health professional to conduct the weekly rounds. (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1389-1390.) However, since the on-call MHP only works one day a week, she does not attend the multi-disciplinary meetings where the staff discuss any particular patient concerns. (*Id.* at 1390.)

248.    Dr. Stewart explained that given the limited clinical contacts – with the high rate of refusals and infrequent treatment planning – the rounds are the only formal mechanism for

regularly tracking and identifying individuals who may be decompensating. (Dr. Stewart's 8/30/2018 testimony, Tr. 1041.) However, Dr. Mirsky testified that the round is typically conducted by BHTs who have no clinical mental health training, and it is unclear whether the BHTs assigned to segregation rounds even are aware of which prisoners have repeatedly refused groups. (Dr. Mirsky's 8/27/2018 Testimony, Tr. 275-78.)

249.    The minimum standards of care required by the Court's Order for all Class Members in segregation included weekly rounds by mental health staff. (Sect. 2(b)(ii).) In August, the Monitor again found that the IDOC was generally not conducting these weekly rounds and had failed to comply with the Court's May Order. (Dr. Stewart's 8/30/18 testimony, Tr. 1042, 1044). This finding is consistent with the Monitor's Second Annual Report in May 2018, and the prior reports.

250.    The Court's May 25th Order does not specify the timing of treatment plan updates and reviews, but does require (1) multidisciplinary meetings generally, and (2) that all class members have a treatment plan that is individualized and particularized based on the patient's specific needs . . ." (Order, Sect. 8.) The Monitor found that IDOC failed to comply with both requirements.

251.    Dr. Stromberger admitted that Hill Correctional Center is unable to meet this requirement due to staffing shortages.

252.    Dr. Renzi admitted that segregation prisoners at Pontiac also are not receiving monthly treatment plans reviews. Dr. Renzi's 9/5/2018 Testimony, Tr. 1645.) Pontiac's reported mental health backlog was 326 as of August 17, 2018, but backlog was actually at least 100 visits higher due to a mistake in calculating the mental health backlogs. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1668; Mercer's 8/29/18 Testimony, Tr. 684-88 (describing DX 78).)

253.    Class Members are not being regularly evaluated for the harmful effects of segregation. (Dr. Stewart's testimony, Tr. 151:24-152:12, 205-207, 121-122.) In a functioning system, if the regular assessments and reviews revealed that a prisoner with mental illness was deteriorating in segregation, QMHPs would be able to facilitate the relocation of that prisoner out of segregation to a crisis or higher level of care. (Pl. Ex. 1, p. 18; Dr. Stewart's testimony, Tr. 205:3-10.) The Settlement, Sect. XV(a)(vii), provides for such a system, however, in IDOC, without functioning mechanisms to identify those who are deteriorating such a process means very little. There has to be formal mechanisms by which Class Members are specifically monitored to identify those who should be removed from segregation.  (Pl. Ex. 21, Midyear Report p. 66; Dr. Stewart's testimony, Tr. 207-208.)

254.    Dr. Stewart has found that a significant number of mentally ill prisoners in the IDOC cycle from segregation to crisis watches and back into segregation. (Dr. Stewart's testimony, Tr. 234:8-12; Pl. Ex. 21, Midyear Report p. 66-67.) For example, at the time of his testimony Corrie Singleton was in segregation for disciplinary tickets that he received while on crisis watch. (Mr. Singleton's testimony, Tr. 399:22-25.) Ralph Kings, who has been in segregation for nine years, described being on crisis watches many times, including for a period of eight months in 2017. (Mr. Kings' testimony, Tr. 1487, 1499.) Most recently, Mr. Kings had been placed on crisis watches after the facility ran out of his medications for several weeks, leading him to suffer from untreated depression and ultimately resulting in a suicide attempt. Similarly, a young man who committed suicide on October 27, 2017, had cycled between crisis

and segregation in the months leading to his death. (Dr. Stewart's testimony, Tr. 73:24-74:2, 75:19-23).[11]

255.    Just as prisoners with mental illness cycle between segregation and crisis watches, others who have trouble coping with segregations' effects end up receiving additional disciplinary tickets that result in further restrictions and further isolation. For example, while in segregation, Mr. Span received many tickets for inappropriate non-violent conduct, which resulted in additional segregation time and privilege restrictions. (Dr. Puga's testimony, Tr. 1268:17-24; Pl. Ex. 36, Span disciplinary record, August-October 2017.) From July to October 2017, Mr. Span received seven tickets (for non-violent conduct), for which he received another 14 months of segregation, 19 months of "audio visual restriction", 5 months of yard restrictions and other privilege restrictions. (Pl. Ex. 36.)

256.    Dr. Puga testified that Mr. Span's behavioral issues in segregation was discussed at the mental health treatment team meetings, but that Dr. Puga did not have time to work with Mr. Span on coping with segregation. (Dr. Puga's testimony, Tr. 1268:17-24; 1269:3-14, 1274-1275.) Similarly, making sure that Mr. Span received the out-of-cell time was "not my responsibility" despite Dr. Puga's acknowledgment of the importance of that time to mental health in segregation. (*Id.* at 1262-63) Dr. Puga agrees that unstructured out of cell time, such as yard, absolutely has therapeutic benefit. (*Id.* at 1275:8-21.) Regarding whether he would want to know if his patients were routinely restricted from yard by security staff, Dr. Puga answered that

---

[11] Following the December 18-19 hearing, Plaintiffs' counsel received reports from Class Members about another suicide. Defendants have confirmed that a Class Member at Lawrence Correctional Center committed suicide on December 1, 2017. Records show that this twenty-one year-old man had also cycled between segregation and crisis in the months leading to his death.

he has not addressed that issue that because "the psychiatric need has been so great that I want to address the psychiatric need." (*Id.* at 1275:22 – 1276:9.)

257.    Dr. Puga was, however, a member Mr. Span's treatment team. (Dr. Puga's testimony, Tr. 1258:20-25.) Mr. Span's August 11, 2017 treatment plan provided that he would see the psychiatrist once a month for 15-30 minutes; see a MHP monthly for 30 minutes for counseling; and have audiovisual privileges as a "distracting coping skill to maintain stability." (Pl. Ex. 32 at bates no. Span MHTP000024-25; Dr. Puga's testimony, Tr. 1265-1266.) Because security staff placed him on AV restriction, Mr. Span does not have a television in his cell – where he spends all day most days—despite that provision in his mental health treatment plan requiring a TV. (Dr. Puga's testimony, Tr. 1268:14-16; Mr. Span's testimony, Tr. 276.)

### B.    Defendants' Response to the Segregation Failures

258.    At neither the first evidentiary hearing nor the trial on the merits did Defendants submit any plan to address the inadequacies in the mental health treatment system for segregation or to provide enhanced treatment in segregation to protect against decompensation. (Dr. Stewart's testimony, Tr. 209:16-20, 1143:3-15.)

259.    Unlike the area of crisis watches, where IDOC at least promulgated protocol changes, IDOC's bulletins and memos remained unchanged for the provision of treatment to mentally ill prisoners in segregation.

260.    Dr. Hinton knows that mentally ill prisoners in segregation – "across the board" – will decompensate without access to mental health treatment (including psychiatric care and groups), but IDOC does not collect data in a centralized way to know which mentally ill prisoners in segregation are getting the mental health treatment that they need. (Dr. Hinton's testimony, Tr. 349, 351.)

261.     Defendants have been recalcitrant in their refusal, or inability, to meaningfully implement formal mechanisms to mental health staff to identify, assess and respond to those who are deteriorating in segregation. Instead, they insist that their own informal processes, or clinical judgments of their staff, are sufficient and should be trusted to provide the needed car. Dr. Elliott testified that the primary mental health professional "knows the men and women on his or her caseload and is aware of any kind of evidence of decompensation." (Dr. Elliott's 8/29/2018 Testimony, Tr. 852.)

262.     The high number of crisis watches demonstrates this does not and cannot work. The Court cannot trust that QMHPs – who rotate; who are overwhelmed with their workloads; and who do not even conduct the weekly segregation rounds – will notice that a patient they otherwise see only every 30-60 days individually is deteriorating, much less have time to conduct an evaluation and take the necessary steps to respond to that individual.

## IV.     TREATMENT PLANNING

263.     A treatment plan is a document that guides the provision of care for an individual patient. (Dr. Stewart's testimony, Tr. 40:5-9; Dr. Hinton's testimony, Tr. 1395:14.) According to the NCCHC standards, the treatment plan specifies a patient's particular course of therapy and the role of their treatment team members in carrying it out; it must be individualized and should include the treatment goals and activities. (Dr. Stewart's testimony, Tr. 43, 64:7-12, 66-67; Pl. Ex. 14, NCCHC Mental Health Standards, p. 107.)

264.     A treatment plan is a dynamic document; to guide the treatment it needs to be modified based upon a patient's response to treatment and symptom presentation. (Dr. Stewart's testimony, Tr. 42: 14-43:13, 1047:16-25; *see also* Pl. Ex. 1, Settlement Agreement, p. 9-10 (requiring that treatment plan reviews "shall assess the progress of documented treatment goals.").)

265.    Given the complex nature of psychiatric treatment, which includes medical, psychosocial, and/or behavioral interventions, treatment plans need to include input from a multidisciplinary team of mental health professionals, as well as the cooperation of the patient, where possible, to ensure a comprehensive plan. (Dr. Stewart's testimony, Tr. 40-41, 44:1-10, 62:7-12.) This is particularly important given the complexity of IDOC patients. "[P]atients in a correctional setting tend to be sicker both medical[ly] and psychiatrically" and they have more extensive substance abuse histories, which impact their treatment. (Dr. Stewart's 2/27/18 Testimony, Tr. 560.) Both Dr. Renzi (Pontiac) and Dr. Yen (Vandalia and Vienna) testified their patients were more likely to have significant trauma histories that impact their treatment. (Dr. Yen's 8/27/2018 Testimony, Tr. 179; Dr. Renzi's 9/5/19 Testimony, Tr. 1659.)   Dr. Yen described that his IDOC patients tend to be more complex than his private practice patients, such as patients with dual diagnosis, substance abuse histories and traumatic brain injuries. (Dr. Yen's 8/27/18 Testimony, Tr. 176-78.)

266.    Treatment planning is a necessary component of a mental health treatment system. (Dr. Stewart's testimony, Tr. 576:10-16 (although treatment planning takes staff time away from providing care to patients, "it's done because of the acknowledgement of how important it is and how basic it is to quality of care."), 1070:17-22 ("It's not taking time out of the schedule because that's part of their duties.").) Dr. Hinton agrees that the treatment planning is "very important function to mental health service delivery" and is a "must" under the Mental Health Protocols. (Dr. Hinton's testimony, Tr. 1320:18-21, 1388:18-23, 1394; *see also* Dr. Mirsky's 8/27/2018 Testimony, Tr. 280 (treatment plans are fundamental to the mental health system).)

### A.    IDOC's Treatment Plans Do Not Meet Minimum Standards of Care

267.    IDOC's treatment planning fails to meet the most basic, minimal standard of care. (Dr. Stewart's testimony, Tr. 1041, 1053-54.) The treatment plans in IDOC are not helpful and do not facilitate the provision of mental health care; the forms are completed more as an administrative requirement and not true treatment planning. (*Id.* at 53:9-10, 23-25, 54:23-55:13, 56:14-16; 561:14-16.)  The treatment plans in IDOC are boilerplate, frequently giving identical boilerplate treatment intervention for prisoners with vastly different treatment needs, and without responding to changes in their stability or conditions. (*Id.* at 1044-47.).

268.    The Court's May 25th Order required that: "All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs, including long and short term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible."

269.    Following the Order, however, the IDOC's treatment plans have remained "generic, boilerplate."(Dr. Stewart's 8/30/2018 testimony, Tr. 1080-81.) The Monitor found that the majority of treatment plans reviewed were not individualized or comprehensive and more than half were incomplete. (*Id.*) Based on a review of 100 treatment files across 11 facilities, the Monitor concluded that IDOC is not currently providing adequate treatment planning to facilitate the individualized care of Class Members. (*Id.* at1081:18-22.)

270.    Five recent mental health treatment plans of four different Class Members at Pontiac, who were being discharged from crisis watches, demonstrate the failure to do individualized treatment planning. (Pl. Ex. 55C, bates no. 22-25 (July 12, 2018); Pl. Ex.55G, bates nos. 76-80 (July 23, 2018); Pl. Ex. 55I, bates nos. 28-31 (July 30, 2018), Pl. Ex. 55M, bates 12-15 (July 9, 2018) and bates 55-59 (July 30, 2018).) The plans are lengthy and give the

appearance of individualization, for example, describing that the patient, "[b]ecomes depressed, irritable or anxious for brief periods that result in desperate attempts to avoid abandonment and self-destructive behaviors, racing thoughts and poor concentration." *Id.* However, each of the five treatment plans are identical to one another, making them "worthless." (Dr. Stewart's 8/30/2018 testimony, Tr. 1083 -1091.) The Monitor commented, "this is a reflection of how overworked the mental health professionals are, where they are basically cutting and pasting these things because it's just one more requirement they have because they're stretched way too thin. That's how I read this." (*Id.* 1090:19-25.)

271. The treatment plans of "Tyler," a class member who committed suicide in October 2017, were not individualized and did not facilitate the care that IDOC knew he needed. Tyler had made two prior serious suicide attempts following which IDOC conducted "psychological autopsies" to analyze what happened. The conclusion from both were that Tyler needed individual therapy. Tyler's psychiatrist had also noted in the chart that Tyler needed individual therapy. Yet even after these three explicit recommendations for a patient who was actively suicidal, Tyler's updated treatment plans never provided for individual counseling – and he received the therapy that he needed. Instead, his treatment plans contained the same boilerplate language as Dr. Stewart has seen in many others. (Dr. Stewart's 12/18/17 testimony, Tr. 68:19-71:25, 75:25-90:23; Pl. Ex. 25, Tyler's 2017 treatment plans.)

272. Tyler's treatment plans did not satisfy any psychiatric standard of care, especially because they showed no changes or interventions in response to his ongoing suicidal ideation and actions. (Dr. Stewart's 12/18/17 testimony, Tr. 89:21-90:8.) Under NCCHC standards, treatment plans should include relapse prevention and risk management strategies. (Dr. Stewart's 12/18/17 testimony, Tr. 64:17-65:4; Pl. Ex. 14, NCCHC Mental Health Standards, p. 108.) Treatment

plans in the IDOC do not address relapse prevention. (Dr. Stewart's 12/18/17 testimony, Tr. 65:5-8.)

273.     With the exception of Logan and Dixon's STC, IDOC does not generally use collective treatment planning, which would allow for collaboration among the multidisciplinary team involved with the patient, as well as the patient him or herself. Defendants acknowledged the significance of multidisciplinary team meetings and treatment planning when it entered the Settlement Agreement (Sections VII (a) & (b)) but have consistently failed to meet that promise. (Pl. Ex. 1, p. 9-10; Dr. Stewart's testimony, Tr. 56:17-58:10, 1048-49, 1052-53; Pl. Ex. 52, Second Annual Report, p. 26; Dr. Doyle's 9/6/2018 testimony, Tr. 1754-55, 1777 (admitting that multidisciplinary treatment planning is not done in Dixon's X-House; that it is done in the STC; and is "invaluable" to providing appropriate care).)

274.     IDOC's failure to do collective treatment planning is harming class members. For example, indices of decompensation occur more frequently in facilities like Pontiac that do not collectively prepare treatment plans. (Dr. Stewart's testimony, Tr. 59:24-60:13, 1053.) Another consequence is that if MHPs are not aware of psychiatric treatment, then they cannot effectively monitor medication compliance. (*Id.* at 60:14-62:12)

### B.     IDOC Fails to Timely & Regularly Update Treatment Plans

275.     The purpose of individualized treatment plans cannot be fulfilled unless they are regularly reviewed and modified based upon a patient's response to treatment and symptom presentation. (Dr. Stewart's testimony, Tr. 42: 14-43:13, 1047:16-25.)

276.     The Settlement provided minimum time requirements for reviews and updates of treatment plans based on the level of care, with more frequent reviews for those in conditions of isolation (segregation and crisis) known to adversely impact mental health. (Pl. Ex. 1, p. 9-10

(annual for outpatient level of care; every two months for residential, and monthly for inpatient.) This approach is consistent with professional mental health standards and practices and reflects that patients with more severe mental illness need more frequent reviews. (Dr. Stewart's testimony, Tr. 45:1-20.)

277.    IDOC has not complied with the Settlement's more frequent treatment plan requirements for residential level of care, crisis and segregation. (Pl. Ex. 21, Midyear Report p. 31-32; Dr. Hinton's testimony, Tr. 1449:16-1450:2; Dr. Stewart's testimony, Tr. 46:8-20, 51-52, 65, 150.)

*Segregation*

278.    In his Second Annual Report, while Dr. Stewart found that only 15-30% of the prisoners in segregation had a timely treatment plan update and none of the prisoners in crisis had the treatment plan update required by the Settlement Agreement. (Pl. Ex. 52, p. 26 and 29.) The segregation treatment plan reviews are essential because mental illness will get worse in segregation; therefore, it is imperative to try to intervene to stop deterioration, and incidents of self-harm or behaviorally acting out, which will lead to more segregation time or crisis watches. (Dr. Stewart's 12/18/17 testimony, Tr. 152: 13-22.)

279.    Joe Champs has been in segregation since March 2018, but did not receive a treatment plan until September 1, 2018, just a few days prior to this testimony in this matter. (Mr. Champs' 9/5/18 testimony, Tr. 1464.)

280.    Ralph Kings testified that, before his most recent updated treatment plan in July 2018, he had not received an updated treatment plan since late 2017. (Mr. Kings' 9/5/2018 testimony, Tr. 1493-94.) When Mr. Kings found out that he was entitled to monthly treatment plans in segregation, he asked mental health staff about getting a new treatment plan. (*Id.* at

1494.) Staff responded that he had to wait, either because Pontiac was understaffed or because he was only entitled to a new treatment plan annually. (*Id.* 1494-95; *see also* Ms. Mercer's 8/29/18 testimony, Tr. 687.)

281.    The facilities with the highest segregation populations, including Dixon, Menard, Pontiac, and Pickneyville, are all failing to regularly update treatments plans of Class Members in segregation. (Dr. Stewart's testimony, Tr. 150-452; Pl. Ex. 21, Midyear Report p. 32.) (Dr. Stewart's testimony, Tr. 150:14-20.) Even facilities with smaller segregation populations, have failed to comply, including Stateville, Big Muddy, Hill, Lawrence, and Robinson. (*Id.*)

*Crisis*

282.    IDOC completely disregarded the treatment planning requirements for crisis, both during placements and upon discharge, until the preliminary injunction issued. (Dr. Stewart's 12/18/17 testimony, Tr. 49-52, 54.) Dr. Stewart had never seen a patient chart that shows with an updated treatment plan during crisis watches. (*Id.* at 51:6-16, 52:14-17, 65:9-19.) As a result of IDOC's failure to update treatment plans upon discharge from crisis, those who have deteriorated would simply resume the same treatment that failed to prevent the crisis. (*Id.* at 52:21-53:25.)

283.    Stateville's July 2018 quality audit process showed that the mental health staff were deficient in reviewing and updating treatment plans upon entrance to crisis (Dr. Mirsky's 8/27/2018 Testimony, Tr. 250-51.) And the crisis-watch treatment plans that were written did not address causes which led to deterioration or a plan for risk-management. (*Id.* at 252; DX 3E.)

284.    Neither Samuel Span (who was on crisis watches for the month of October) nor Corrie Singleton (who was on watches for October – December), had their treatment plans updated while on watches or at the time of their discharge. (Pl. Ex. 32, Span Treatment Plans and DX 54, Singleton Treatment Plans.) When Mr. Singleton received a new treatment plan on

December 29, 2017 (after discharge from crisis watches), it was nearly identical to his September treatment plan. (DX 54, compare September plan on pages 17-19 to the December plan on pages 24-26 (of the PDF). Similarly, Mr. Span's file shows that his treatment plan was not updated for 9 days following his discharge from crisis watches, and then did not reflect his recent month long crisis placement. (Pl. Ex. 32.) In fact, it was the same as his prior minimal plan other than that it actually removed the specification that he should have the audiovisual privileges (which security was denying). (Pl. Ex. 32, compare bates no. Span MHTP000024-25 to Span MHTP000030-31.)

*The Treatment Planning Backlog*

285.    IDOC has had a backlog in the hundreds of treatment plans throughout these proceedings, which increased during the pendency of the preliminary injunction. (DX 1D). IDOC's data showed a treatment planning backlog of 780 at the start of these proceedings in October 2017; it went down to 606 in February 2018 and but then has been increasing again to 682 on August 17, 2018. (DX ID.)

286.    The August trial revealed several discrepancies that call into question the reliability of Defendants' mental health backlog data. First, the spreadsheets that the prison mental health administrators use to track treatment plans (and other care) had not been streamlined until just this past August. (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1419-20; Ms. Mercer's 8/29/18 testimony, Tr. 614, 666-68, 712.) Second, the underlying data showed that Pontiac's backlog was significantly miscalculated because all of the segregation status prisoners were scheduled for updates annually instead of monthly. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1668, 1670; Ms. Mercer's 8/29/2018 testimony, Tr. 685-88.) These problems establish the backlog is best understood as a statement of recognized, known delays in scheduled appointments, and not the actual numbers of patients with delays in their mental health treatment.

### *Internal Audit Reports Support Dr. Stewart's Conclusions*
### *That the System Fails to Provide Adequate Treatment Planning*

287.  Defendants' own recent quality review process found significant deficiencies in the treatment plans, with a compliance rate of 35% across the system in January. (Pl. Ex. 35b; Dr. Hinton's testimony, Tr. 1396:2-10.)

288.  The more recent audit, of treatment planning in May and June 2018, show the system is failing to provide adequate treatment planning, with Regional scores at 44% (Northern); 23% (Central), and 27.2% (Southern). (PX 58, Statewide – MHA and Regional Audit Results.)

289.  Most facilities failed to meet IDOC's own 85% threshold:

   a.  Danville: N/A
   b.  Dixon: 88.2%
   c.  Joliet TC: 46%
   d.  Lincoln: 58%
   e.  Pontiac: 20%
   f.  Sheridan: 60%
   g.  Stateville: 41.7%
   h.  Stateville NRC: 0%
   i.  Decatur: 20%
   j.  East Moline: 100%
   k.  Graham: N/A
   l.  Hill: 14.3%
   m.  Illinois River: 30%
   n.  Jacksonville: N/A
   o.  Kewanee: 0%
   p.  Logan: 1.7%
   q.  Taylorville: 20%
   r.  Western: 3.6%
   s.  Big Muddy: 85.7%
   t.  Centralia: N/A
   u.  Lawrence: N/A
   v.  Menard: 21.4%
   w.  Pinckneyville: 23.1%
   x.  Robinson: N/A
   y.  Shawnee: 14.3%
   z.  Southwestern: 8.6%

> aa.  Vandalia: 10.3%
>
> bb.  Vienna: N/A

(PX 58, Statewide – MHA and Regional Audit Results; *See also* Dr. Sim's 8/31/18 testimony, Tr. 1341-1342, 1349, 1353, 1360-1361.)

290.   Even those facilities with low treatment planning backlogs, such as Logan and Menard, do not create quality treatment plans. The IDOC's audit scored Logan with 1.7% compliance in treatment planning and Menard with a CQI score of 21.4% (Def. Ex. 1D; Pl. Ex. 58.)

### C.  Defendants' Inaction, or Ineffective Action, in Response to the Treatment Planning Failures

291.   In February, IDOC implemented a revised Form 284 to allow treatment team members to separately review and sign off on a single form. (Dr. Hinton's testimony, Tr. 1333:10-17; DX 13, Revised form 284; Dr. Hinton's testimony, Tr. 1324: 8-12.)

292.   Dr. Stewart's response to the revisions was that it was an improvement over the old form, so it was worth trying: "It can't get any worse. At least that's my hope." (*Id.* at 1042:22-25.)

293.   A new form is again being drafted but has not been implemented. (Dr. Puga's 8/28/18 testimony, Tr. 565-66.)

294.   Treatment planning responsive to the particular needs of a person with mental illness is not something that can be created by a form. (Dr. Stewart's testimony, Tr. 592:24- 593, 635: 13-25.) The plan is the result of an interactive and dynamic process that provides for quality of care, not the form. (*Id.*)

295.   The IDOC asserted that during the summer of 2017 they provided increased training to improve the quality of treatment planning. (Dr. Stewart's 12/18/17 testimony, Tr. 90:24-91:3.).)  However, Dr. Stewart found no improvement in the quality of treatment plans

following that training. (*Id.* at 91:5-8; 1041.)  The treatment plans remain of poor quality

(Dr. Stewart's 8/30/2018 testimony, Tr. 1080-81, 1090-91; PX 58 (showing failing CQI scores

across the system).

296.    Due to a shortage of MHPs, Pontiac has a backlog of treatment plans for prisoners

both in and out of segregation. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1645.) They have attempted

to address this problem by offering voluntary overtime and rearranging staff assignments, but it

remains unclear whether these efforts will be effective at reducing the backlog. (*Id.* at 1646.) The

facility's corrective actions plans – for audit deficiencies in this area – are to use one-on-one

counseling time to catch up on treatment planning, meaning that prisoners losing their already-

limited psychotherapy in order to do their treatment plan. (Dr. Renzi's 9/5/2018 Testimony, Tr.

1675-76; DX 3E, Pontiac.)

297.    As discussed in more detail below, without significant increases of these

necessary providers, MHPs will not have the time to significantly improve either the quality or

timeliness of treatment planning.

## V.    TIMELY EVALUATIONS

298.    A delay in the mental health evaluation means a delay in getting needed mental

health treatment. (Dr. Stewart's 8/30/2018 testimony, Tr. 1093; Pl. Ex. 52, Second Annual

Report, p. 23 (a backlog one day means that a prisoner has been without any mental health care

for at least 15 days because the IDOC is given 14 days to prepare a treatment plan).) For that

reason, any delay can be "very significant."  (Dr. Stewart's 8/30/2018 testimony, Tr. 1093.)

299.    A backlog of mental health evaluations means that it has been more than 14 days

since the person was identified as being in need of an evaluation of mental health services.

(Dr. Stewart's 8/30/2018 testimony, Tr. 1092:5-14.) In the Monitor's opinion, "the 14-day

leeway to do a mental health evaluation is much too generous. I would cut it in half at least." (*Id.* at 1093:13-18; Dr. Stewart's testimony, Tr. 211:16-212:6.)

300.    For the two years of the settlement, IDOC has not complied with the Settlement Agreement Section V(f) requirement for evaluations within 14 days.  (Dr. Stewart's testimony, Tr. 213:10-12; Pl. Ex. 21, Midyear Report p. 25-26; (Pl. Ex. 52, Second Annual Report p. 20.).) In his Second Annual Report, Dr. Stewart found that the IDOC does not have required policies and procedures detailing how referrals and evaluations should be conducted (Pl. Ex. 52, p. 20.)

301.    Near the start of these proceedings, on October 27, 2017, there was backlog of 445 for mental health evaluations. (DX 1, Weekly MH Backlog Report; Dr. Stewart's testimony, Tr. 213.)  By the February 2018 evidentiary hearing, a backlog of 313 remained. (DX 1A, Weekly MH Backlog Report; Dr. Hinton's testimony, Tr. 1450:9-12.) Despite Ms. Mercer's efforts in the weeks leading to the hearing to work with individual facilities, several still had mental health evaluations more than 60 days overdue: at Graham, 57 of 81 backlogged mental health evaluations were more than 60 days overdue. (Ms. Mercer's 2/-/2018 testimony, Tr. 976-977; DX 1A; Dr. Stewart's testimony, Tr. 1210: 3-15.) At Pinckneyville, 23 of the 39 backlogged mental health evaluations were more than 60 days overdue. (*Id.*) At Western, 100 out of 119 backlogged mental health evaluations were more than 60 days overdue. (DX 1A.)

302.    Following the March hearing, the backlog of delayed mental health evaluations increased to 495 by May 18, 2018. (Pl. Ex. 52, p. 20.) Three months after this Court's May 25th Order, IDOC's mental health evaluation backlog was still 194, with the most significant decline occurring in the three weeks prior to trial. (Def. Ex. 1D.)

303.    The Defendants have not submitted any plan to address the backlog of mental health evaluations. (Dr. Stewart's testimony, Tr. 213:23-214:14.)

304.     The QMHPs provide the vast majority of individual and group psychotherapy to patients within the Department. (Dr. Elliott's 8/29/2018 Testimony, Tr. 836.) As with treatment planning and other QMHP responsibilities, without increasing staffing levels, Defendants will not be able to eliminate the backlog of mental health evaluations.

### *Overwhelmed*

305.     The lack of staff is a perpetual problem at Hill Correctional Center: even when the Department does hire some good people, the overall lack of personnel leads to overworked staff who leave because of burnout. (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1433).

306.     The Monitor used Centralia, which has a *minimal backlog*, as an example, "[t]he staff there are at wit's end. They don't have enough people." He described a QMHP who broke down crying during his visit because of the workload. (Dr. Stewart's 8/30/18 testimony, Tr. 1167:4-17.)

307.     He described QMHPs at Pinckneyville were "overwhelmed by the workload" (Dr. Stewart's testimony, Tr. 1210:21-2) and commented that QMHPs taking shortcuts copying and pasting treatment plans at Pontiac comes from overwork. (Dr. Stewart's 8/30/2018 testimony, Tr. 1091:6-11.)

### *Can't Do It All - -One or the Other*

308.     Defendants cannot explain how the QMHPs can fulfill all of the important functions that IDOC now requires of them (including the mental health evaluations, treatment planning, counseling, groups, crisis care, and more). (Dr. Stewart's testimony, Tr. 1146, 1182:3-1183:20.)

309.     The fact that mental health professions staff have to chose to not perform one essential function in order to fulfill another means that Class Members are not receiving even the

minimal care that they require. (Dr. Stewart's testimony, Tr. 1051:19 – 1052:10 ("It's not a choice. You need to do all of this.").)

310.    The mental health backlogs reflect this problem. For example, in February, Menard had only 13 backlogged mental health evaluations, but had a backlog of 213 for mental health follow-up appointments. (*Id.* at 1211:8-21.) Similarly, February data shows that many facilities reduced their backlog of mental health evaluations substantially, but have high backlogs for treatment plans and/or evaluations, including Big Muddy, Centralia, Dixon, Graham, Hill, Illinois River, Lawrence, Menard, Pinckneyville, Pontiac, Vandalia and Western.  (Def. Ex. 1A, Feb. 23, 2018, MHP backlog breakdown).

311.    Dr. Sim likewise testified about the effort at Logan to reduce the backlog of mental health evaluations; they were able to do it, but only by prioritizing staff time on the evaluations over other work, including the mental health treatment plans. (Dr. Sim's testimony 907:18 – 908:11.)

312.     In response to questions about how to deploy limited resources to best attack the backlog, Dr. Stewart answered: "[I]n order to address the backlog, we're going to have to be taking from one column, put them in the other column so we're going to be hurting people in other areas." (Dr. Stewart's testimony, Tr. 1192:1-6). He added that Defendants focus on the backlog numbers does not address any concerns about the quality of treatment. (*Id.* at 1192:7-15.)

### *Recent Measure Taken To Reduce the Backlog Are Not Solutions*

313.    To cover staffing deficiencies, mental health staff across the system have been working overtime and on weekends. (Dr. Hinton's 8/28/18 testimony, Tr. 464-465, 468.)

314.     Corrective action plans issued at Pontiac in July call on staff to use overtime or double up on services (by conducting treatment plan meetings at the monthly therapy sessions), none of which are permanent solutions (Dr. Sim's 8/31/18 testimony, Tr. 1341-1342, 1344-1347.)

315.     Hill is currently operating with only half the number of QMHPs it has contracted for, and has been operating with an overall deficiency of mental health staff for quite a while. (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1429-30, 1434.) Mental health staff cannot fulfill all the functions required of them; as a result, Hill has to use PRN staff and overtime, and Dr. Stromberger had to personally cover crisis care in addition to her regular job duties. (Id. 1390, 1431-32, 1449.) The only way that Hill is able to meet the needs of the mental health caseload is through overtime, which Dr. Stromberger testified is not a sustainable solution. (Id. 1449.)

316.     These measures, which are designed to reduce the backogs, "do not address quality of care in any way." (Dr. Elliott's 8/29/2018 Testimony, Tr. 857.) "Ultimately, quality of care involves the interpersonal relationship that exists between the mental health professional and the patient and the integrity of the individual or group treatment that's being provided, some degree of adherence to the individualized treatment plan, and the use of the evidence-based interventions. And none of those are assessed in any way by a backlog." (Dr. Elliott's 8/29/2018 Testimony, Tr. 858.) None of that can be done without staff sufficient in both quantity and quality.

317.     Even if Defendants did hire the 33 new QMHP positions and fill the 15 vacant positions, the Monitor believes that this would still be insufficient to provide adequate mental health treatment within IDOC. (Dr. Stewart's 8/30/18 testimony, Tr. 1094 ("given all the other

duties that they have, not even counting the settlement agreement requirements and all the duties they have to provide good care, these additions of staff are woefully insufficient, in my opinion, to be able to meet the needs of the mental health patients.")

**VI.    Defendants' Response to the Violations Raised In These Proceedings Have been Insufficient to Address the Harms Caused To Plaintiffs**

*(1)    The Certifications and Audits Prepared In Preparation for These Court Proceedings Are Fatally Flawed*

318.    Defendants have submitted three "certifications" from facilities claiming their compliance with the Court's May 25th Order; no objective measures were used to certify and the certifications are worthless.

a.    Dr. Mirsky, the Psychologist Administrator at Stateville Correctional Center, testified that she answered the questions presented based on her belief that the facility had procedures in place to address what was being certified and were not based on actual care provided in Stateville. (Dr. Mirsky's 8/27/2018 Testimony, Tr. 282, 284-85.)

b.    Dr. Stromberger, Psychologist Administrator at Hill Correctional Center Hill, testified that no objective measures were used. She and the warden filled out the certification together in approximately 15 minutes, without looking at any documentation to verify their certification. (Dr. Stromberger's 9/5/2018 Testimony, Tr. 1418.)

c.    Dr. Renzi, Psychologist Administrator at Pontiac Correctional Center Hill, testified that she answered her questions based on her knowledge of operations from completing the other audits. (Dr. Renzi's 9/5/2018 testimony, Tr. 1639.) But these audits, in which Pontiac scored well below threshold, belied the certifications. (Pl. Ex. 58.) Dr. Renzi nonetheless answered "yes" to compliance

of nearly all areas of the Court's Order. In response to whether Pontiac is

providing out of cell time "sufficient to protect against decompensation" for

prisoners in segregation for more than sixty days, Dr. Renzi answered "other"

because they do not always *offer* eight hours due to insufficient staffing. (*Id.*

1686-87; DX 67-Pontiac.) Pontiac actually provides about 3 hours of structured

out of cell time per week (Pl. Ex. 45B), and their extraordinarily high rate of crisis

watches evidences a high rate of decompensation at Pontiac. (*Id.* 1679, 1722.)

No witnesses were proffered for the other 22 prisons, and their certifications were not entered

into evidence. It is deeply troubling that dubious certifications were offered to satisfy a specific

requirement of the May 25 Order. The IDOC's Third Quarter report, Dx 55, is based on these

certifications and, as such, is fundamentally misleading. Defendants' Exhibit 55 is also

contradictory on its face, since it claims essentially complete compliance while acknowledging

in Attachment B the need for more staff hires.

### (2) *Tracking Problems Is Not the Same as Solving Problems*

319.    Tracking issues is not the same as dealing with the inadequacies. (Dr. Hinton's

testimony, Tr. 1450:22 – 1451:6.) Even IDOC's new quality control program does not actually

track the quality of mental health services being provided, it only tracks what treatment providers

are reporting has been done and if the forms are being properly completed. (Mr. Sim's testimony,

Tr. 898:22-899:9; Tr. 908.)

320.    DX 8A is a new spreadsheet to track individual out-of-cell time in segregation,

which was implemented in January with the first data set to be produced to the Monitor in April.

(Ms. Mercer's testimony, Tr. 770; Dr. Stewart's testimony, Tr. 1148:10-18.) This is something

that the Monitor has been asking for since August 2016. (Dr. Stewart's testimony, Tr. 1148:21 –

1149:9.) The out-of-cell time at issue has been required by the settlement since May 2016. (Dr.

Stewart's testimony, Tr. 1149:10-17.)  The data is now tracked, but Defendants have provided no

explanation for what they are going to do with that date to help solve the problems that, now

glaringly, exist.

### (3)    *Last Minute Revisions of Forms and Policies*

321.    Defendants' recently new and revised forms demonstrate a problematic trend:

requirements due long ago under the Settlement Agreement were not be implemented into the

IDOC system until the initiation of these proceedings:

a.  DX 2 is a bulletin issued on November 1, 2017, for the mental health
    professionals statewide describing the requirements for the five-day, seven-day
    and monthly follow-ups required upon discharge from crisis watches. (DX2,
    bulletin; Dr. Hinton's testimony, Tr. 1350:20 – 1351:19.) Each of these follow-
    ups has been required by the settlement since it was approved a year and a half
    earlier, in May 2016.

b.  DX 13 is the Revised Treatment Plan (form 284) implemented in February 2017.
    The new form allows for Defendants' (contested) interpretation of Settlement
    Agreement, Sect. VII, which has been in effect since May 2016. (Discussed
    further in Paragraph 291 above.)

c.  DX 14 is revised form 377, which adds a section for treatment planning to the
    crisis care form. (DX14, bulletin; Dr. Hinton's testimony, Tr.1352-53.) This form
    was implemented in February 2018, but the requirement of treatment plans in
    crisis has been in effect since May 2016. (*Id.;* Pl. Ex. 1, Settlement Agreement,
    Sect. VII(ii); *see also* Paragraph 165 above.)

d.  DX 17 is a new form, Crisis Watch Discharge Assessments, for MHPs to use
    when conducting the five-day assessment following discharge from crisis
    watches. (DX17; Dr. Hinton's testimony, Tr. 1355.) This form was issued in
    November 2017. The five-day assessment has been required by the Settlement
    Agreement, Sect. VIII(b)(1) since May 2016. (Pl. Ex. 1, p. 10.)

e.  DX 15 is a draft confidentiality disclosure form, not yet implemented as of the
    first hearing. (DX 15; Dr. Hinton's testimony, Tr. 1357-58.) Confidentiality is
    also a requirement of the Settlement Agreement. (Pl. Ex. 1, p.22.)

f.  DX 33 is a form for MHPs to make housing recommendations regarding SMI
    Class Members. This form was implemented on February 1, 2018. (Dr. Hinton's

testimony, Tr. 1315:25-1316:13.) The Settlement Agreement's requirement related to housing recommendations is not at issue in the pending motion, but has been required since at least 2016. (PX 1 at § XIV, p.16.)

g.   DX 47 was a draft of a brochure about medication side effects, finalized and implemented in 2017. (DX 47; Dr. Hinton's testimony, Tr. 1456:7-10; Dr. Stewart's testimony, Tr. 259.) Psychiatric disclosure of side-effects has been required by the settlement since May 2016 (Pl. Ex. 1 p.7.)

322.   Late is better than never, but even Defendants admit that forms in and of themselves, do not guarantee adequate care. (Dr. Hinton's 8/28/18 testimony, Tr. 500-501.)

### *(4) Unfinished Construction Projects Cannot be Relied Upon Here*

323.   Defendants offered testimony and photographs regarding the construction at the new or expanded RTU facilities and an inpatient facility. That testimony relates to the provisions of the Settlement Agreement that are not raised in this motion. This matter addresses care existing facilities. Even when the construction projects are completed, persistent staffing shortages will impede use of those critically important treatment spaces. (Dir. Baldwin's 8/27/18 testimony, Tr. 67. 69.)

324.   Even with those construction efforts, Dr. Hinton testified that the IDOC system is still without an inpatient hospital. (Dr. Hinton's testimony, Tr. 317:25-318:2.) The Elgin inpatient facility will only, eventually, serve 44 Class Members; it is an interim solution to IDOC's lack of a psychiatric hospital. (Ms. Taylor's testimony, Tr. 719:10-14.)

325.   Acting Director Baldwin testified that part of Defendants' "improvements" include plans call for a full inpatient hospital, but the Department does not yet even if the funds yet for this project, much less the physical building or the staffing. (Dr. Baldwin's 8/27/18 testimony, Tr. 83.) If the project continues, and if it proceeds on schedule, the appropriations for staffing would come in 2021. (*Id.*)

326.    The IDOC system has too few RTU (residential treatment unit) beds for those in need of a higher level of care. (Dr. Hinton's testimony, Tr. 1396-1397.) The Joliet Treatment Center is currently only housing 72 RTU Class Members. (Dr. Elliott's 8/30/2018 Testimony, Tr. 918-19.) Even with the eventual completion and opening of those new RTU facilities, IDOC will still require a system to provide comprehensive mental health care to the thousands of class members who remain in non-RTU facilities, including those in segregation and on crisis watches, and to provide the needed mental and psychiatric care at outpatient facilities throughout the state. (Dr. Stewart's testimony, Tr. 588-89: 14-19.)

327.    Dr. Hinton testified that they are building a mental health treatment system but would not or could not say when that system would be complete. It will be complete when the services are being properly provided. (Dr. Hinton's testimony, Tr. 1409:22-1410:4, 1410:17-22.) In the meantime, more than 12,000 people require care.

### (5)    *Another Unfulfilled Staffing Plan*

328.    Defendants presented evidence regarding Wexford's ongoing recruitment and continual hiring efforts. (Ms. Gedman's 8/29/18 testimony, Tr. 723-25.) These continued recruitment efforts, however, have left the Department understaffed since 2013. (Ms. Gedman's 2/27/18 testimony, Tr. 505:20-22; Dr. Hinton's testimony, Tr. 1415:13-16; Dr. Stewart's testimony, Tr. 544: 16-17, 617:7-21; Pl. Exs. 23, 39, and 48A.) Wexford has never provided the staffing required by the 2014 staffing plan or even the staffing called for by the Wexford contract.

329.    IDOC agreed that it requires the entire allotment of staff set forth in its staffing plan to provide the care required. (Dr. Hinton's testimony, Tr. 1372:11-14; Pl. Ex. 9, IDOC's Proposed Remedial Plan, p. 17 ("this proposal identifies the clinical, security and administrative

staff necessary to not only provide constitutionally-adequate mental health care to the IDOC SMI population but also facilitate the creation of adequate levels of care").) The staffing plan is contained in Defendants' 2014 Remedial Plan (Pl. Ex. 9) and as set forth the staffing reports (DX 5 and Pl. Exs. 23(a)-23(d)).[12]

330.    IDOC unilaterally changed the staffing plan in May 2016, despite the specific inclusion of the 2014 plan in the Settlement Agreement, to reduce the number of psychiatrists by 9, and increasing other non-psychiatric staff. (Pl. Ex. 48A.) Defendants made this change without following the procedures set forth in the Agreement, which would have required involvement of Plaintiffs and the Monitor in any such changes. (Pl. Ex. 1, Settlement Agreement, §§ II(c), IX(c)-(f), Additional Mental Health Staff, p. 3, 11-12.).

331.    Wexford has recently increased psychiatric providers by 20 FTEs, after years of claiming it was unable to do so, by using tele-psychiatrists who cost less than Wexford is being paid to deliver them. (Gedman's 8/29/18 testimony. Tr. 740, 820. Def. 36C.) However, that increase still does not meet the reduced number of psychiatric providers called for under the May 2016 amended staffing plan and falls well short of the 2014 Remedial Plan.

332.     IDOC remains severely understaffed. The IDOC is short 15.9 (24%) psychiatric providers required by the May 2016 staffing plan and by the Wexford contract. The IDOC is short is 25.9 (34%) psychiatric providers committed to in 2014 to provide constitutionally adequate care to a *smaller* number of seriously mentally ill prisoners; the IDOC reiterated and committed to the 2014 Remedial Plan by incorporating it into the 2016 Settlement Agreement.

---

[12] The Remedial Plan sets forth IDOC's approach to staffing for the entirety of the mental health system, as well as gives increases in staffing to support the RTU explanation. The latter, and the Settlement Agreement's requirements for the staffing increases for the RTU expansions, were not raised in the Motion to Enforce (which does not address the RTU explanation). Some of those provisions, under Sect. IX (a) have recently reached the due dates for the new RTUs (Dixon and Logan due in January 2018).

(*See ¶¶* 21-24, *supra*; Pl. Ex. 48A). The Department is not delivering and cannot deliver the psychiatric care that the mentally ill prisoners in its custody require without adequate psychiatric providers. (Dr. Hinton's 12/19/17 testimony, Tr. 317, 319-320.) It is possible that the continued delay in providing psychiatrists is influenced by Wexford's profit motive. (Ms. Gedman's 8/29/18 testimony, Tr. 743, 815.) IDOC pays Wexford the equivalent of $192 per hour per psychiatrist, but Wexford is paying anywhere from $180 per hour to $400 per hour for in-person psychiatrists. (Ms. Gedman's 8/29/18 Testimony, Tr. 740, 807-8.) Ms. Gedman testified that face-to-face psychiatrists are paid far more than telepsychiatrists; as an example, she stated that the lowest-paid in-person psychiatrist makes $180 per hour (a number fairly close to the $192/hour reimbursement rate), while the lowest-paid telepsychiatrst makes only $155 per hour. (Id. at 820.).) (Ms. Gedman's 8/29/18 testimony, Tr. 743, 815.)

333.    The supposed difficulty in hiring psychiatrists is not new; there is a longstanding nationwide shortage of psychiatrists. (Dr. Hinton's testimony, Tr. 1448:3-13.) That longstanding shortage of psychiatrists therefore required a different approach to staffing medication management. (Dr. Stewart's testimony, Tr. 181:10- 1082:5, 1180:9 – 1181:5.) IDOC could have hired multiple mid-level professionals for what it pays a single psychiatrist. (*Id.* at 181:19-21, 1144:11-24.) Dr. Stewart suggested that Wexford do so at the beginning of his work as the Monitor in this case, two years ago. (Ms. Gedman's 8/29/18 testimony, Tr. 726-7.)

334.    According to Defendants, an additional 84 non-psychiatrist mental health staff are required throughout the entire system in order to provide constitutionally adequate care in each of the five targeted areas. (DX55B, submitted in response to the Court's Order ¶ 4.) The new positions consist of: 33 additional—much needed—QMHPs; 26 BHTs;  31.35 nurses, who are

slated to assist with tele-psychiatry (Laurent's 9/6/18 testimony, Tr. 1842); six staff assistants to provide administrative support; and one additional clinical psychologist. (DX 55B.)

335.    As Defendants' new staffing plan recognizes, increases in staff are sorely needed throughout the system, even at facilities that don not *currently* have backlogs, in order to create an adequate mental health program. However, it is also true that the prisons with the largest SMI populations (Pontiac, Menard, Dixon, Pinckneyville), are the ones that still have significant backlogs and continually have problems with hiring and turnover. (Dr. Stewart's 8/30/18 testimony, Tr. 1063; Dr. Elliott's 8/30/2018 Testimony, Tr. 934-35 (describing difficulties staffing at Dixon and Pontiac, with vacancies at both facilities include mental-health-unit director); Dr. Renzi's 9/5/2018 Testimony, Tr. 1656-57, 1659, 1662-63 (Pontiac has a problem of turnover of QMHPs and psychiatrists, which inhibits the continuity of care and the development of therapeutic relationships).)

336.    Pontiac, for example, has been short four mental health nurses, one mental health director of nursing, two mental health unit directors, and 4.15 psychiatrists since at least 2016. (Dr. Renzi's 9/5/2018 Testimony, Tr. 1652; Pl. Ex. 51, Pontiac.) In the last few months, rather than increase mental health staff, Pontiac lost another MHP and a mental health unit director. (*Id.* at 1652-53.) In June 2018, Pontiac was short 175.66 BHT hours, 653.83 QMHP hours, and 847.25 psychiatry hours. (*Id*. at 1654-55.)

337.    Defendants failed to present any evidence trial on how it will address the ongoing problem of turnover at these and other facilities. (Dr. Elliott's 8/30/2018 Testimony, Tr. 940 (turnover is "always a problem").)

338.    The staffing plan submitted to the Court does not include any new correctional staff, who are necessary to provide escorts and security for mental health programming.

(Dr. Doyle's 9/6/2018 Testimony, Tr. 1757.) Mental health staff waste a significant amount of their already insufficient time waiting, for example, in the X-house "bubble" for security staff to escort them through the cell house. (*Id*. at 1800; *see also* Mr. Gay's 9/5/2018 testimony, Tr. 1532 (describing seeing from his cell his treater in the bubble for an hour and fifteen minutes, waiting for an escort, leaving only 15 minutes for their treatment session.) Dr. Doyle agreed that more security staff could help mental health staff perform their duties. (*Id*. at 1804.)

339.    As discussed in more detail above, the evidence overwhelmingly demonstrates a need to increase the number of QMHPs in order to provide adequate care throughout the system – at facilities both with and without backlogs. (¶¶ 270, 305-312.) And yet, Defendants have provided no explanation whatsoever for why they never fully staffed the QMHPs to levels required by the May 2016 staffing plan and the Wexford contract. Given the failure to fully staff these essential, but long-vacant, budgeted positions, the Court cannot take on faith that Defendants will in fact achieve the increase in staffing, including QMHPs called for by Defendants' July 2018 revised staffing plan.

RESPECTFULLY SUBMITTED,

By:      /s/ Amanda Antholt
        One of the attorneys for Plaintiffs

| | |
|---|---|
| Harold C. Hirshman (ARDC# 1226290) | Alan Mills |
| DENTONS US LLP | Nicole Schult |
| 233 S. Wacker Drive, Suite 5900 | Uptown People's Law Center |
| Chicago, IL  60606 | 4413 N Sheridan |
| Telephone: (312) 876-8000 | Chicago, IL  60640 |
| Facsimile:  (312) 876-7934 | (773) 769-1410 (phone) |
| harold.hirshman@dentons.com | alan@uplcchicago.org |
| | Nicole@uplcchicago.org |
| | |
| Marc R. Kadish | Laura J. Miller |

Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL  60606
(312) 701-8747 (phone)
(312) 706-8774 (fax)
mkadish@mayerbrown.com

Amanda Antholt
Samantha Reed
Equip for Equality, Inc.
Suite 300
20 N. Michigan Ave.
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 541-7544 (fax)
laura@equipforequality.org
amanda@equipforequality.org
samantha@equipforequality.org