IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| ASHOOR RASHO, et al., ) | |
| ) | |
| Plaintiffs, ) | No. 1:07-CV-1298-MMM-JEH |
| ) | |
| v. ) | Judge Michael M. Mihm |
| ) | |
| DIRECTOR JOHN R. BALDWIN, et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
PROPOSED INJUNCTION ORDER**

Defendants' years-long failure to meet their own promises or to comply with the multiple court orders to provide constitutional care and treatment to prisoners with mental illness necessitates that the injunction include appropriate requirements, standards, and safeguards. Defendants' proposed order sets out extremely broad and vague requirements, giving unfettered discretion to the IDOC. The proposed order has no deadlines or even requirements for timeliness, and fails to respond with urgency to the harms established at the hearings. Defendants' proposed order would allow IDOC to continue existing practices that have failed to achieve constitutional care and are contrary to the most basics professional standards of care. Defendants asked the Court for time to create a plan and instead they have offered empty words.

**I.    The Relief Ordered Must Include the Detail Necessary To Correct the Violations of Federal Rights in Light of the History of Those Violations**

While the Court's Order for relief must be deliberately narrow to minimize intrusion into correctional operations, the relief ordered also must be sufficient to fulfill its function of remedying the violations at hand. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2018 WL 985759, at *3 (M.D. Ala. Feb. 20, 2018) ("courts retain a responsibility to remedy constitutional

violations"); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *24 (N.D. Cal. Oct. 3, 2005) ("In fashioning an appropriate remedy, the Court must exercise restraint, using the least possible power adequate to the remediation of constitutional violations … However, the Court is not required to restrict its powers to those means that have proven inadequate, or that show no promise of being fruitful.") (internal citation omitted).

In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court explained that more expansive relief may be appropriate–even under the PLRA analysis–where supported by particular findings that relief is necessary in order to cure the violations. "While the order does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion … The order's limited scope is necessary to remedy a constitutional violation." *Id.* at 533 The mandate of "[n]arrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends … The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Id.* at 531.

Where the extent of the violations, and the prior efforts to address them, are complex, so too must be the resulting relief. *Indiana Protection and Advocacy Services Com'n v. Commissioner, Indiana Dept. of Correction*, 2012 WL 6738517, *24 (S.D. Ind., Dec. 31, 2012) ("[t]he remedy may be as complex as the evidence of the violation"). In order to craft effective relief to cure the constitutional violations, therefore, courts must take into account any relevant history of non-compliance. *Benjamin v. Schriro*, 370 Fed.Appx. 168, 171 (2d Cir. 2010) (unpublished) ("The needs-narrowness-intrusiveness requirement of the PLRA notwithstanding, we find that nearly a half-decade of untruthfulness, non-compliance and inaction constitutes

sufficient justification for the intrusiveness of a subsequent order to compel compliance with an original order entered pursuant to the PLRA that has been ignored.").

Defendants have had many opportunities over many years to develop a functional mental health treatment system but time and again have failed to do so. None of the issues raised in these proceedings are new. They are the same core systemic problems that this case—through litigation, three independent experts, agreed orders, the Settlement Agreement, and a preliminary injunction—has sought to address for the last decade. That history cannot be ignored when determining the scope of relief needed to correct the violations.

This case is now well past the point of the generalities contained in Defendants' proposal. *Westefer v. Neal,* 682 F.3d 679 (7th Cir. 2012), on which their memorandum relies, once again provides no authority to limit the scope of this Court's injunction to the vagueness proposed by Defendants here. In any event, this Court has done exactly what the Seventh Circuit in *Westefer* said should be done: give Defendants an opportunity to develop a plan to remedy the constitutional violations detailed in this Court's Order. Defendants have completely failed to fulfill this responsibility. Defendants have submitted only broad goals, with no deadlines, and no hint of how they intend to achieve these goals. Defendants' proposed injunction would be completely unenforceable, as it contains no objective standards at all.

## II.    Proposed Language for the Injunction to Address the Constitutional Violations

Plaintiffs request that the Court order include firm requirements for constitutional care in each of the areas at issue. Plaintiffs set forth proposed requirements for the injunction order in each of the areas of deficiencies. Plaintiffs then provide for other related requirements, including for Defendants' implementation plan, and for ongoing reporting and monitoring.

### A. Staffing

The Court's decision found that inadequate staffing is the root cause of the violations at issue and has been a persistent problem for many years. Defendants' proposal utterly fails to address this root problem. Instead, it commits Defendants only to adopt "a staffing plan" to provide the care which – in the Department's own professional judgment – is necessary.

We have been here twice before. Defendants provided a staffing plan in 2014 and a supplemental plan in July 2018, which, taken together, were to provide sufficient staffing to provide a constitutional level of care. These plans have never been implemented. According to IDOC's October 2018 report, it still has not achieved the required staffing levels and, in fact, has lost clinical staff since the August trial.

The injunction should include the following requirements:

1) Within six months of this Order, Defendants shall have hired additional staff sufficient to meet the staffing requirements of Defendants' 2014 Remedial Staffing Plan.

2) Within nine months of this Order, Defendants shall hire and maintain additional staff sufficient to meet the staffing requirements of Defendants' July 2018 staffing plan.

3) Within 12 months of this Order, Defendants shall hire and maintain sufficient staff to address constitutional violations identified in this Order.

### B. Treatment of Class Members in Crisis

Instead of a system to provide for the acute care needs of those whose mental health has decompensated, Defendants' proposal would continue IDOC's reliance on "crisis watches" that operate contrary to correctional and community mental health standards of care. Defendants' proposed order entirely fails to address the constitutional violations found by the Court: the failure to provide acute mental health treatment to those in crisis Instead, it calls for the

continued the seclusion for days, weeks or even months of those in acute crisis or distress from decompensation of their mental health. This brutal and merciless practice must stop.

Dr. Stewart and Dr. Renzi testified that the isolation inherent in "crisis watches" is dangerous to mental illness. Standard mental health practices for treatment of people in acute distress strictly limit the use of crisis watches and other forms of seclusion to short and discrete periods of intervention. That evidence was uncontradicted. Consistent with those well accepted standards of care, the injunction should include requirements to achieve three goals with regard to those in crisis: (1) provide acute mental health treatment; (2) limit the use of isolation that is central to the current "crisis watch" practice; and (3) require that, where used, crisis watches be conducted in a manner consistent with correctional and community mental health standards for the use of seclusion.

1) IDOC shall provide acute mental health treatment to those who are psychotic, clinically unstable (including acutely suicidal or at imminent risk of self-harm), or waiting for placement into a higher level of care treatment facility/unit.

    a) Goals of the acute treatment program must include controlling psychotic symptoms, stabilizing the patient, keeping the patient safe, and improving activities of daily living.[1]

    b) Mental health staff should conduct daily assessments of each patient and order the needed therapeutic interventions, coordinate patient care, and recommend changes to the level of care and/or placement.

    c) Patients should have increased monitoring and attention, individual and group therapies, and psychosocial activities.

    d) Psychotropic medications should be evaluated, made available, and managed as clinically indicated.

    e) Housing should be in a safe and therapeutic environment conducive to symptom stabilization and maintenance of good personal hygiene.[2]

---

[1] Activities of daily living generally refer to ambulation, bathing, dressing, feeding and toileting, as well as decision-making and social interaction. Ex. A, MH-G-02 (Definitions)

2) IDOC shall discontinue the current the isolation of persons in need of acute mental health treatment including through the current practice of placing people on "crisis watch" (e.g., strip cells).[3]

3) Crisis watches should only be used for patients exhibiting behavior dangerous to self or others as a result of mental illness and may only be ordered upon a finding by an appropriately trained and licensed mental health professional that no other less restrictive treatment is appropriate. When used, crisis watches are to be employed for the shortest duration possible.[4]

4) No Class Member shall be held on a crisis watch for more than 48 hours unless they receive care that includes at a minimum:

   a) Certification in writing of the need for the placement, consistent with the above requirements, by appropriately trained and licensed supervisory staff as designated by the IDOC, including a determination as to whether any other mental health treatment unit placement is appropriate.

   b) Assessment upon admission, by the multidisciplinary treatment team, to initiate aggressive mental health treatment designed to stabilize the patient.

   c) Intensive mental health interventions as clinically appropriate, including counseling, group treatment, and psychotropic medication.

   d) Daily assessment of patient progress and reevaluation of treatment interventions.

---

[2] The requirements set forth in Paragraph 1 entirely from the National Commission on Correctional Health Care (NCCHC) Standards on mental health programs for acute treatment. Ex. A, MH-G-02, Mental Health Programs and Residential Units, p. 85-86 (requiring the provision of acute care separate from the use of seclusion and/or inpatient psychiatric hospitalization). These requirements are classified as "essential" in NCCHC's accreditation program. Acute treatment other than of the use of seclusion (crisis watches) for those whose mental illness has decompensated is well established in correctional mental health practices.

[3] *See, e.g.* Ex. B, Oxford Textbook of Correctional Psychiatry, Chapter 22, Levels of Care, Jeffrey L. Metzner and Kenneth L. Appelbaum (setting out standards for crisis treatment functions in a "safe and therapeutic environment as characterized by supportive clinical interventions and a nonpunitive approach … **routine use of strip cell status** (e.g., no personal property, use of suicide smock, no out-of-cell time) **are examples of nontherapeutic mileus**.").

[4] Ex. A, NCCHC Standards, Restraint and Seclusion, MH-1-01, p.109 (an "essential" component to a treatment system under the NCCHC standards).

  e) Out-of-cell time for confidential counseling and groups, psychiatric care, therapeutic activities, and recreational or leisure activities.

  f) For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care and assess whether transfer to a higher level of care facility. If the team finds a higher level of care facility is not required, it must explain in writing why it is not appropriate and how the team will provide the care needed at the existing facility. Prisoners who have multiple crisis watch placements within a six-month period should be considered for psychiatric hospitalization.

5) Until the IDOC has demonstrated compliance with the treatment requirements set forth above, no Class Member shall be held on crisis watch for more than 48 hours.

**C.** **Treatment of Class Members in Control Units**

Defendants' proposal ignores the demonstrated harms being done to Class Members in segregation by the multiple failures to provide adequate care. Defendants' proposal draws on the language of the preliminary injunction, but it removes entirely the requirement that mental health staff determine whether Class Members in segregation have decompensated and require removal from the unit; minimum requirements for the continuation of treatment in segregation; the requirement that treatment plans protect against decompensation; minimum timelines for rounds or other assessments; and pharmacological care.

To address the deficiencies in Defendants' Proposed Order, Plaintiffs propose the following:

1) Mental Health Professionals shall assess any class member promptly upon initial placement in administrative detention, disciplinary segregation, or other similar restrictive status (collectively referred to as Control Unit). The purposes of the assessment shall include: (a) to determine whether the patient has decompensated and should be removed from the Control Unit; and (b) to provide a baseline against which any future decompensation or deterioration of the patient's mental status can be measured. Such review shall be documented in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff.

2) No Class Member shall be held in a Control Unit for more than sixteen days unless they receive care that includes at a minimum:

  a) Timely review and updates of their mental health treatment plan to reflect their change of placement and address the impact of that setting on their mental health

      condition in an effort to protect them from decompensation. At a minimum, the treatment specified in the individual's prior treatment plan must continue; no person in segregation should receive less than the treatment they received prior to segregation. Treating MHPs and the Warden shall coordinate to ensure that mentally ill prisoners receive the services required by their treatment plan.
  b) Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff.
  c) Pharmacological treatment (if applicable).
  d) Participation in multidisciplinary team meetings to the extent clinically appropriate.
  e) MHP or mental health treatment team recommendations to post-segregation housing.
  f) Structured and unstructured out of cell time sufficient to protect against decompensation. Structured out of cell time includes therapeutic, educational and recreational activities that involve active engagement by their participants for the duration of the activity.

3) Until the IDOC has demonstrated compliance with the treatment requirements set forth above, no Class Member shall be held in any Control Unit for longer than 60 days.

4) Mental health staff shall assess class members in Control Units to determine if changes are required to their level of care, placement, or privilege restrictions to protect them against decompensation. The psychologist administrator at each facility, or their equivalent, will have the authority to remove a person from segregation based on clinical of decompensation.

### D. Medication Management

Similarly, Defendants' proposed order for medication management fails to address central violation in this area – the failure of psychiatric staff to properly and timely evaluate and follow-up on patients taking psychiatric medications. Instead Defendants seek to limit psychiatric care, by prohibiting psychiatric providers from seeing their patients at intervals "not to exceed established policy." (Def. Paragraph 5(c).) The proposal does not address the many problems identified in these proceedings as causing serious harms to Class Members. The injunction should include:

1) Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards.

2) IDOC shall accomplish the following in psychiatric services:

    a) Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed.

    b) Regularly chart medication efficacy and side effects, including both subjective side effects reported by the patient.

    c) Take clinically appropriate steps to ascertain and test for potential side effects from medications and consult with the patient concerning potential medication side effects and alternatives.

    d) Timely perform lab work for these side effects and timely reporting on results.

    e) Provide class members for whom psychotropic drugs are prescribed with timely explanations from appropriate medical staff about what the medication is expected to do, what alternative treatments are available, and what in general are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

    f) Clinical follow-up with class members who experience medication noncompliance as necessary to resolve the non-compliance including by the psychiatric provided as clinically appropriate.

### E. Timely Evaluations and Treatment Planning

Defendants' proposals on evaluations and treatment planning fail to address the violations found by the Court. For example, Defendants do not include any timeline for initial evaluations, without which necessary treatment cannot begin. The Defendants' proposals on treatment planning explicitly undermine the Settlement's requirements for collective treatment planning. Given the testimony on the enormously beneficial and important function of collective treatment planning, it should be expressly included in this Order. However, if the Court determines otherwise, at a minimum, the Order should remain silent on who prepares the treatment plans and instead address the substantive requirements for individualized treatment and timely reviews. The Order should require the following:

    1) Mental health evaluations shall be conducted in a timely manner to ensure that individuals in need of treatment, or re-evaluation of existing treatment, are evaluated

without undue delay. Evaluations shall occur no less than 14 days from the time when the need for the evaluation is known by staff, and sooner if clinically indicated.

2) All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs and updated regularly as clinically appropriate.

   a) The treatment plans will include long and short term objectives for the individual, with a schedule of treatment interventions to be utilized to achieve those goals.

   b) Treatment plans shall be reviewed and updated at regular intervals as clinically necessary.

   c) Treatment plan updates will include updating goals as appropriate; assessing the individual's response to treatment and progress on the treatment goals, with the treatment interventions taken; and updating the specific interventions to be taken or continued accordingly.

   d) Treatment plan will be collectively updated and reviewed by the treatment team with the collaboration of the patient to the fullest extent possible.

F. **DEFENDANTS SHOULD BE REQUIRED TO SUBMIT A DETAILED IMPLEMENTATION PLAN TO ACHIEVE THE REQUIREMENTS OF THIS ORDER**

Defendants should be required to submit an implementation plan within forty-five days of this Order that sets forth in detail how it plans to achieve the results required above. For each of the requirements of this Order, Defendants' plan should provide: (1) the process and procedures that will be utilized to achieve compliance; (2) timelines for interim steps and the completion of each requirement; (3) qualitative and quantitative measureable outcomes for the achievement of each requirement.

As to the staffing requirements, which Defendants have failed to achieve for at least the last four years, Defendants' plan shall include the following:

1) A comprehensive assessment of its staffing needs to implement the requirements of this Order in light of its other staffing obligations and hiring requirements. The needs assessment should be conducted in consultation with the Monitor.

2) The assessment shall include:
   a) The necessary ratios of clinical staff for the relevant populations within the

        mental health caseload.
- b) The necessary number of mental health staff by facility population and timelines for such hiring.
- c) The number of security or correctional staff, including the ratio of officers to patients needed to provide the services required in treatment units.
- d) The timelines for hiring, including specific interim staffing levels from now to the staffing deadlines.
- e) How facilities will operate their mental health services in the interim with insufficient staffing levels.
- f) How these staffing requirements impact or relate to staffing of Defendants' other duties in the provision of mental health care that do not fall within the scope of this Order.

3) A plan to improve retention of current mental health staff, including an IDOC conducted assessment of WHS and IDOC mental health staff turnover.

As to the treatment of Class Members who are in acute mental health crisis, Defendants' plan shall also include the following.

4) Details of how IDOC will provide acute mental health care, including:

- a) Defined goals with final and interim timelines for achieving those goals, and qualitative and quantitative measures for meeting the timelines set forth.
- b) The location at which care will be provided, for both housing and out-of-cell activities.
- c) Staffing ratio calculations by clinical staff and population for the treatment program.
- d) The provision of ongoing staffing needs assessments or planning to address the number of patients, the severity of their illness, and the number of mental health staff to manage the level of care for each.

5) A detailed plan as to how IDOC will limit the use of isolation and seclusion in the current crisis watch practices. The plan must include:

- a) How IDOC will insure that crisis watches are only used for patients exhibiting behavior dangerous to self or others as a result of mental illness, including timelines and staffing requirements for initial assessments of those in crisis and ongoing assessments of those placed on crisis watches. [5]

---

[5] Correctional and community mental health standards provide for face-to-face assessment by qualified clinical staff before an order allowing the use of seclusion and before any renewals of that order. For example, the Illinois Mental Health Code prohibits seclusion for more than two hours unless a physician or registered nurse with supervisory responsibilities personally examines the patient within that 2-hour window and confirms, in writing, that seclusion does not pose an undue risk to the patient's health. *See* 405 ILCS 5/2-109(a). *See also,* Ex. A, NCCHC Standards, MH-1-01, p.110 Compliance Indicator 1(b) ("in each case, use is authorized by a

11

    b)     How IDOC will insure that crisis watches are not used unless no other less restrictive treatment is appropriate, including a description of what less restrictive treatment options may be considered and utilized in crisis intervention.

    c)     How IDOC will insure that crisis watches are limited to the shortest duration possible.[6]

    d)     How the location of crisis watch cells will provide a supportive and therapeutic environment with clinical staff coverage to facilitate the goal of stabilizing and treating the individual to facilitate discharge out of crisis watch.[7]

    e)     Re-assessment of IDOC's policies relating to hygiene and property allowances for those on crisis watches or otherwise with acute mental health needs to insure that they comply with modern standards of correctional mental health care.

---

physician or other qualified mental health professional where permitted by law, after reaching the conclusion that no other less restrictive treatment is appropriate"); Ex. C, Jeffrey L. Metzner, MD, et al., Resource Document on the Use of Restraint and Seclusion in Correctional Mental Health Care, 35 J. Am. Acad. Psychiatry Law 4, 417, at 420, 2007 (initial face-to-face assessment by a licensed professional, appropriately trained in the use of seclusion, within four hours of the actual seclusion.).

[6] *See e.g.,* Ex. A, NCCHC Standards, MH-1-01, p.111 ("when seclusion is used, "it is employed for the shortest time possible in keeping with current community practice."); 405 ILCS 5/2-109(d) ( allowing a seclusion order up to sixteen hours, if certain requirements are met, but after the 16 hours expires the patient cannot be put in seclusion again during the next 48 hours without written authorization from the facility director).

[7] Best practices in correctional mental health recommend that seclusion occur in the health care unit whenever possible. However, wherever the physical placement of a crisis watch, the placement should be characterized as a supportive and therapeutic environment. Ex. A, NCCHC Standard, MH-1-101, p. 110-11; Ex. B, Chapter 22, Levels of Care (crisis watch units must "provide for observation (e.g., suicide watch), diagnosis, and treatment functions in a safe and therapeutic environment as characterized by supportive clinical interventions and a nonpunitive approach."); Ex. C, Jeffrey L. Metzner, MD, et al., Resource Document on the Use of Restraint and Seclusion in Correctional Mental Health Care, 35 J. Am. Acad. Psychiatry Law 4, 417, 2007.

6) A detailed plan as to how IDOC will provide the care and treatment to those who are placed on crisis watches, including:

   a) Defined goals with final and interim timelines for achieving those goals, and qualitative and quantitative measures for meeting the timelines set forth.
   b) The location that care will be provided, for both housing and out-of-cell activities.
   c) Staffing ratio calculations by clinical staff and population for the treatment program.
   d) IDOC will conduct regular reviews of patterns of crisis watch placements for the purpose of assessing trends, programs and procedures to find ways to reduce reliance on the crisis intervention system.

**G. Other Requirements relating to the PLRA findings and Ongoing reporting and monitoring of compliance.**

In addition to the substantive terms, the injunction should make the appropriate findings consistent with the Prison Litigation Reform Act (PLRA) and include requirements for regular reporting by Defendants, ongoing monitoring, and access by Plaintiffs' counsel.

1) The relief ordered herein addresses the findings of this Court as to the scope and nature of the constitutional violations and is supported by the evidence presented at the various hearings. The relief extends no further than is necessary to correct the violations of federal rights found by the Court, and is narrowly drawn and least intrusive means to correct those violations. (18 U.S.C.A. § 3626(1)(A).)

2) Beginning 30 days from this Order, Defendants shall provide monthly reports of its actions to comply with each section of this Order to the Court, the Monitor, and Plaintiffs. The report shall describe Defendants' progress with compliance on each of the terms and the measureable outcomes identified by Defendants' plan on each such term; identify any challenges or barriers to achieving compliance in the timeframe given; and provide the summary data related to each category of violations addressed by this Order. As to hiring, the monthly reports must include total staffing levels (by facility and clinical position) and numbers of new hires, new FTE staff (hired and started); and turnover (by facility and clinical position). For any facility that remains understaffed for more than 30 days, the Report should include a description of specific interim measures and long term plan for that facility's mental health staffing.

3) On a regular basis (no less than every 60 days), Defendants shall provide within its monthly report the results of its own quality assurance audit corresponding to the provisions of this Order. These results shall include an accompanying certification of Defendants' CQI Manager of whether compliance has been reached with Defendants' quality assurance audit requirements.

13

4) The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and function.

5) Plaintiffs' counsel shall continue to be entitled to access information relating to the provision of mental health treatment and conditions for Class Members, to tour those portions of each facility where mentally ill prisoners are housed and treated, and to talk to class members at their cells, after providing a minimum of forty-eight (48) hours notice to IDOC. Counsel shall also be permitted to have confidential legal visits with members of the plaintiff class identified during such cell front visits. All such visits will be subject to reasonable security measures and the subject facility's legal visit scheduling process so that they will not interfere with either the confidentiality of such visits or the operations of the IDOC facility in which the offender is housed. Nothing in this subsection shall be construed to limit any right of access Plaintiffs' counsel may otherwise have pursuant to statute or otherwise.

RESPECTFULLY SUBMITTED,

By:     /s/ Amanda Antholt
One of the attorneys for Plaintiffs

| | |
|---|---|
| Harold C. Hirshman<br>DENTONS US LLP<br>233 S. Wacker Drive, Suite 7800<br>Chicago, IL  60606<br>Telephone: (312) 876-8000<br>Facsimile:  (312) 876-7934<br>harold.hirshman@dentons.com | Laura J. Miller<br>Amanda Antholt<br>Samantha Reed<br>Equip for Equality<br>20 N. Michigan Ave., Suite 300<br>Chicago, IL 60602<br>(312) 341-0022 (phone)<br>laura@equipforequality.org<br>amanda@equipforequality.org<br>Samantha@equipforequality.org |
| Marc R. Kadish<br>Mayer Brown LLP<br>71 S. Wacker Dr.<br>Chicago, IL  60606<br>(312) 701-8747 (phone)<br>(312) 706-8774 (fax)<br>mkadish@mayerbrown.com | Alan Mills<br>Nicole Schultz<br>Uptown People's Law Center<br>4413 N Sheridan<br>Chicago, IL  60640<br>(773) 769-1410 (phone)<br>alan@uplcchicago.org<br>nicole@uplcchicago.org |