E-FILED
Monday, 03 December, 2018  02:50:50 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR JOHN R. BALDWIN, et al., | ) | |
| | ) | |
| Defendants | ) | |

**MIDYEAR REPORT OF MONITOR PABLO STEWART, MD**

TABLE OF CONTENTS

BACKGROUND ………………………………………………………………………  4

METHODOLOGY/MONITORING ACTIVITIES ………………………………………  7

EXECUTIVE SUMMARY …………………………………………………………  9

DETAILED FINDINGS …………………………………………………………...  15

IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING ………………16

V: MENTAL HEALTH EVALUATION AND REFERRALS ……………………………20

VI: MENTAL HEALTH SERVICES ORIENTATION …………………………………… 24

VII: TREATMENT PLAN AND CONTINUING REVIEW ……………………………... 25

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS. 31

IX: ADDITIONAL MENTAL HEALTH STAFF…………………………………………33

X: BED/TREATMENT SPACE ………………………………………………………… 35

XI: ADMINISTRATIVE STAFFING …………………………………………………... 44

XII: MEDICATION…………………………………………………………………… 46

XIII: OFFENDER ENFORCED MEDICATION ………………………………………… 50

XIV: HOUSING ASSIGNMENTS ……………………………………………………… 54

XV: SEGREGATION …………………………………………………………………… 55

XVI: SUICIDE PREVENTION …………………………………………………………... 67

XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES ……………....75

XVIII: MEDICAL RECORDS ……………………………………………………………79

XIX: CONFIDENTIALITY ……………………………………………………………… 81

XX: CHANGE OF SMI DESIGNATION ………………………………………………84

XXI: STAFF TRAINING ………………………………………………………………85

XXII: PARTICIPATION IN PRISON PROGRAMS …………………………………….. 84

XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS
             FROM FACILITY TO FACILITY …………………………………………… 86

XXIV: USE OF FORCE AND VERBAL ABUSE ……………………………………. 87

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS ……………...95

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ……………………. 103

XXVII: MONITORING …………………………………………………………... 104

XXVIII: REPORTING AND RECORDKEEPING ………………………………… 104


CONCLUSION ……………………………………………………………………105

## BACKGROUND

**IDOC:** IDOC consists of 29 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and two additional facilities for women. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Three of the facilities, Logan, Joliet and Dixon, have Residential Treatment Units. The Joliet Treatment Center began receiving offenders on October 4, 2017 and as of November 24, 2018 has a census of 106. The Amended Settlement Agreement states that the Joliet Treatment Center's census should be "at least 360"[1] as of October 6, 2018.  The RTU at Pontiac is not operating as of the submission of this report. The Amended Settlement Agreement states that the RTU at Pontiac is to open no later than July 6, 2018 with a census of 169[2].  All facilities have crisis care beds as well as having some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement ("Settlement") was approved May 23, 2016. It covers a range of practices affecting inmates with mental illness or serious mental illness:

- Policies and procedures
- Intake screening
- Medication continuity on arrival
- Referrals
- Mental health evaluations
- Crisis Intervention Team
- Licensure
- Inmate orientation
- Treatment plans and updates
- Psychiatric evaluations
- Follow-up after discharge from specialized treatment settings
- Staffing plans and hiring
- Bed, programming, and office space for residential treatment units, inpatient facilities, and crisis beds
- Administrative staffing
- Medication administration, documentation, evaluations, lab work, side effects monitoring, informed consent, non-compliance follow-up
- Enforced medication
- Housing assignment notice and recommendations
- Treatment, housing conditions, and out-of-cell time in segregation and investigative status
- Review of segregation terms length
- Suicide prevention
- Restraints for mental health purposes
- Mental health care records and forms

---

[1] Amended Settlement Agreement, page 12, section X(b)ii(C).

[2] Id page 12, section X(b)ii(B)

- Confidentiality
- Change of Seriously Mentally Ill designation
- Staff training
- Nondiscrimination in program participation
- Records and medication continuity on inter-facility transfers
- Use of force and verbal abuse
- Mental health input into discipline
- Continuous quality improvement
- Terms of monitoring this Settlement
- IDOC reporting

**Deadlines:** Deadlines in the Settlement range from immediate to the year 2020; this report calculates many deadlines from the Amended Settlement Agreement approval date of May 23, 2016. A number of deadlines on critical issues were contingent upon, and calculated from, the state budget approval date of July 6, 2017. The team reviewed each provision of the Settlement per the specific deadlines identified in the Settlement. Of note, there are many provisions for which the deadline is "as agreed upon" between the parties but for which the monitoring team did not receive a schedule of specific agreed-upon dates. For these particular issues, the assigned compliance ratings reflect the current status of the issues.

The following table lists the requirements in order of their deadlines to be accomplished. Of the 38 items with deadlines on or before November 22, 2018, 22 have reached Substantial Compliance. Ratings are also indicated for those items to be accomplished "in a reasonable time," in the event that it is determined that a reasonable time is now at hand. A more detailed summary of the compliance status of all Settlement Agreement provisions can be found in the body of the report.

| Amended Settlement Agreement provision | Timeline | Substantial Compliance? |
|---|---|---|
| | | |
| Crisis Beds are to be outside Control Units (except Pontiac) | May 2016 | No |
| Regional Director hires | June 2016 | Yes |
| State employee at each facility to supervise State clinical staff, monitor and approve vendor staff | June 2016 | No |
| Architectural plans to Monitor | July 2016 | Yes |
| 12 Mental Health Forms in use | July 2016 | Yes |
| Treating mental health professionals[3] disclose information to patient | July 2016 | Yes |
| Medical Records and medication transferred with patient | August 2016 | No |
| Intergovernmental Agreement with Department of Health Services | August 2016 | Yes |

---

[3] Referred to throughout the Settlement Agreement and this report as MHP

| | | |
|---|---|---|
| Medication delivery, recording, side effects monitoring, lab work, patient informed, non-compliance follow-up | August 2016 | Not consistently |
| Propose any amendment to Staffing Plan | August 2016 | No finding |
| Any objections to proposed amended Staffing Plan | October 2016 | No finding |
| All policies/procedures/ADs specified in Settlement Agreement – drafts to Plaintiffs and Monitor | November 2016 (unless otherwise specified) | No |
| Confidentiality: records, mental health information, policies and training | November 2016 | No |
| Behavior Treatment Program pilot | November 2016 | No |
| Quality Improvement Manager hire | February 2017 | Yes |
| Review Committees for SMI Disciplinary Segregation terms | February 2017 | Yes |
| Mentally ill Control Unit residents >60 days receive 8 hours out of cell time weekly | May 2016-May 2017 | No |
| Inmate Orientation policy and procedure | May 2017 | Yes |
| Crisis beds at Pontiac moved to protective custody | May 2017 | No |
| Suicide Prevention measures | May 2017 | No |
| Physical Restraints measures | May 2017 | Yes |
| Staff Training plan and program developed | May 2017 | Yes |
| Discipline: policies related to self-injury | May 2017 | No |
| Mental health staff Training plan and program developed | May 2017 | Yes |
| Transfers: consults and notification | May 2017 | No |
| Mentally ill Control Unit residents >60 days receive 12 hours out of cell time weekly | May 2017-May 2018 | Not consistently |
| Staffing: quarterly hiring reports, meeting targets | Quarterly from October 2017 on | No |
| Mental health referrals and evaluations | November 2017 | No |
| Staffing to run RTU at Joliet | November 2017 | No |
| Central office staff hires for policies and recordkeeping | November 2017 | No |
| RTU Programming and Office Space | January 2018 | No |
| Staffing hires – Dixon, Pontiac, Logan | January-July 2018 | No |
| RTU Bed Space | January-October 2018 | No |
| Inpatient Bed Space construction | January-November 2018 | Yes |
| Screening conducted with sound privacy | May 2018 | Yes |
| Training for all State and vendor staff with inmate contact | May 2018 | Yes |
| Mentally ill Control Unit residents >60 days receive 16 hours out of cell time weekly | June 2018-May 2019 | No |
| MHP review within 48 hours after Investigative Status/Temporary Confinement placement | July 2018 | No |
| Inpatient Facility – transfer ownership and expand, policies | November 2018 | No |

| | | |
|---|---|---|
| Mentally ill Control Unit residents >60 days receive 20 hours out of cell time weekly | June 2019-May 2020 | Target date has not arrived |
| Segregation and Temporary Confinement for mentally ill: housing decisions, MHP review, treatment and out-of-cell requirements | May 2020 | Target date has not arrived |
| Develop plans for inpatient care that can be implemented after necessary appropriations | After IGA is signed | Yes |
| Screening on arrival at reception | Reasonable time | Yes |
| Psychotropic medications continued on arrival, reviewed, and related documentation | Reasonable time | Not consistently |
| Inmate Orientation | Reasonable time | Yes |
| Treatment Plans | Reasonable time | No |
| Psychiatry Review frequency | Reasonable time | No |
| Follow-up after Specialized Treatment Settings | Reasonable time | No |
| Enforced Medication | Reasonable time | Yes |
| SMI Housing Assignment information and consultation | Reasonable time | Yes |
| Change of SMI designation only by treatment team (or treating MHP before teams are operating) | Reasonable time | Yes |
| Mental illness does not prevent access to prison programs | Reasonable time | No finding |
| Use of Force and Verbal Abuse | Reasonable time | Some institutions |
| Discipline system conforms to AD 05.12.103 | Reasonable time | No |
| Discipline in RTU or inpatient is carried out in a mental health treatment context | Reasonable time | Yes |
| Quality Improvement Program implemented | Reasonable time | Yes |

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish the monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 18 site visits of 14 different IDOC facilities, where interviews of administrators, staff, and offenders were conducted. While on site, the monitoring team would meet with the administrative and clinical leadership of the facility and then tour the facility. The tour would include observing general population units, segregated housing units, crisis care units, infirmary areas including medical records and restraint rooms, working spaces for the clinical staff, group therapy areas (if present), as well as any other area associated with the provision of mental health services. The monitoring team also toured the Residential Treatment Units at Logan and Joliet. The Monitor personally inspected the Mental Health Unit at Pontiac on four separate occasions.

During the monitoring period, the Monitor was called as a witness by counsel for the plaintiffs during an Evidentiary Hearing before Judge Mihm and testified on August 30, 2018. The Court had issued a Temporary Injunction on May 25, 2018 regarding the provision of mental health care in the following five areas: Mental Health Crisis Watch, Control Unit Housing, Psychotropic Medication, Psychiatric Services and Treatment Plans. The Monitoring Team made a concerted effort to focus on these issues prior to the Evidentiary Hearing and to prepare a separate report detailing its findings. In fact, the Monitoring Team made 11 facility visits consisting of a total of 15 days between June 12 and August 8, 2018. On October 30, 2018, the Court issued a Permanent Injunction regarding the following areas: Medication Management, Mental Health Treatment in Segregation, Mental Health Treatment on Crisis Watch, Mental Health Evaluations and Mental Health Treatment Plans. The Department was further ordered to submit to the Court an action proposal to address these deficiencies.

During the course of the most recent Evidentiary Hearing, the Monitor observed the testimony of the Director, the Chiefs of Mental Health & Psychiatry, Amy Mercer-Elaine Gedman-William Elliot from Wexford Health, Stateville Mental Health Authority Dr. Mirsky and Jack Yen, M.D., Telepsychiatrist. Various aspects of their testimonies will be referenced in this midyear report. The Monitor also met with counsel for the plaintiffs on several occasions. The Monitor received and considered reports prepared by counsel for the plaintiffs regarding IDOC's response to the Settlement Agreement, as well as receiving and considering reports prepared by counsel for the defendants. The Monitor personally reviewed numerous court filings by various class members as well as attempting to interview these individuals. Of note, over the course of the monitoring period, the various members of the monitoring team interviewed and reviewed the medical records of several hundred offenders. This number of offenders evaluated represents a sufficiently robust sample of the mental health population of the IDOC. Therefore, the opinions presented in this monitoring report are based on a substantial-sized clinical sample of offenders.

In advance of the site visits, a variety of materials were requested. These materials included policies, procedures, training materials, a variety of clinical data, internal audits and reports, inmate grievances, incident reports, various logs, and other materials. IDOC was responsive to the requests of the Monitoring Team. The Monitoring Team has made every effort to include the most up to date data in this report.

Monitoring began immediately following the submission of the Second Annual Report on May 27, 2018. The monitoring team, once again, was purposefully kept small in consideration of the budgetary issues facing Illinois in general and IDOC in particular. The rates of compensation were also purposely kept in the lower range.

The monitoring team made the following site visits during the current reporting period:

| Centralia | Graham | Illinois River | Joliet |
|---|---|---|---|
| 7/20 Dr. Stewart and Ms. Gibson | 7/16-7/17 Ms. Morrison | 7/23  Dr. Kapoor | 10/22  Dr. Kapoor |
| Lawrence | Logan | Menard | Pinckneyville |

| 7/19  Dr. Stewart and Ms. Gibson | 6/27  Dr. Stewart and Ms. Gibson | 6/25 and 10/17 Dr. Stewart and Ms. Gibson | 10/16  Dr. Stewart and Ms. Gibson |
|---|---|---|---|
| Shawnee<br><br>7/23  Ms. Gibson | Stateville<br><br>6/25-6/26  (proper) Dr. Kapoor<br><br>10/11-10/12  (NRC) Ms. Morrison | Vienna<br><br>8/6-8/8 Ms. Morrison | Western<br><br>7/18-7/20 Ms. Morrison |
| Pontiac<br>6/26 and 10/18  Dr. Stewart     6/12, 9/11, 9/12  Dr. Stewart and Ms. Gibson |||| 

## EXECUTIVE SUMMARY

As noted above, there has been a tremendous amount of litigation during this reporting period. The Monitoring Team found that IDOC was not meeting the requirements of the Court's Preliminary Injunction of May 25, 2018. The findings of the Monitoring Team regarding these areas will be provided in the appropriate subsections of this report. The findings of the Monitoring Team regarding other areas of the Amended Settlement Agreement will also be detailed below. I refer the reader to the various subsections of this report for a comprehensive description of IDOC progress, or lack thereof, towards achieving compliance with the requirements of the Amended Settlement Agreement.

The Department is critically understaffed. This includes both clinical an custody staff. This lack of staff is the main contributing factor to the poor quality of the mental health care[4] provided to the mentally ill offenders within IDOC. There are isolated areas of the mental health care system that are better than others, such as the Joliet Treatment Center (JTC), the STC at Dixon and the trauma-informed/gender specific treatment programs at Logan. Although the quality of the care provided at JTC generally meets the requirements of the Amended Settlement Agreement, the census of this unit is well under a third of what is currently required. That is, the census as of November 24th is 106 and not the 360 that is required. In discussions with IDOC leadership why the census at the JTC is so low, the response is that the staff of JTC needs "protection" (from having to take on a larger census) or words to that effect. I suspect the actual reason is a lack of staff. This unacceptably low census at the JTC coupled with a male census of only 10 at Elgin and the absence of a functional RTU at Pontiac result in the various facilities including, but not limited to, Menard, Pontiac, Pinckneyville, and Stateville Proper having to house and attempt to treat exceedingly mentally ill offenders at their facilities. The treatment needs of this particular group of mentally ill offenders surpass what can be safely provided at these facilities. This is an exceptionally dangerous situation which puts staff and offenders at life-threatening risk. The Monitor shared this same concern with the Director on June 26, 2017. The fact that the census at the JTC is only 106, almost 18 months after my discussion with the Director, is emblematic of the

---

[4] I use this term to encompass the entirety of services provided to the mentally ill offenders currently housed in IDOC.

difficulties that IDOC has had in meeting its responsibilities under the Amended Settlement Agreement.

The fact that IDOC is currently capable of only providing a small cohort of seriously mentally ill offenders with the care they require has a ripple effect throughout the Department. That is, it contributes to self-injurious behaviors, staff assaults, use of force incidents, administration of involuntary medication, restraint use and excessively long stays in Crisis where mentally ill offenders do not receive adequate emergency care. Also, the Monitoring Team has found that these seriously mentally ill offenders are often just left unattended in segregated housing units, where they are allowed to "refuse" to participate in out-of-cell activities.[5] The net result of all of this is that the Department, by not providing an appropriate level of care to a large number of seriously mentally ill offenders, is creating a large cohort of offenders with worsening mental health symptoms and acting out behaviors. That is, the Department is creating its own problems which it is currently incapable of addressing. This downward spiral can only be addressed by a large infusion of clinical and custody staff, the opening of the RTU at Pontiac and bringing JTC and Elgin up to full capacity.

Finally, as noted above, the Department demonstrates an inability to provide the majority of seriously mentally ill offenders an appropriate level of mental health care. That is, seriously mentally ill offenders are routinely held at facilities that lack the ability to adequately care for them. The Monitor has regularly observed that this situation contributes to an "us versus them" mentality. The "us" being custody staff, and at times the mental health staff, and the "them" being the seriously mentally ill offenders. This phenomenon is most readily observable at Pontiac. Throughout the first 2 ½ years of the Amended Settlement Agreement, Pontiac has consistently led the Department in use of force incidents, restraint use, crisis stays and court filings documenting the regular physical abuse of mentally ill offenders. The Monitor has personally observed this throughout his tenure.

As Monitor, I have gained a much deeper appreciation for some of the underlying reasons for the culture of abuse and retaliation that exists at Pontiac. This appreciation includes the fact that the custody staff at Pontiac work in a very stressful environment. This constant stress leads to custody staff suffering from vicarious and secondary trauma.[6] These medically recognized conditions result in acting out behavior on the part of the custody officer toward the offenders as well as contributing to health, marital and substance-related problems. This appreciation, however, does not excuse the culture of abuse and retaliation that exists at Pontiac. During the reporting period, I have had several communications with Chief Lindsay regarding this issue. She has repeatedly stated that "the Department takes allegations of abuse seriously." I sincerely believe that her statement accurately reflects her earnest viewpoint. I firmly believe, however, that Chief Lindsay and other high ranking Departmental Officials[7] do not possess an accurate grasp of the depth of the culture of abuse and retaliation that currently exists at Pontiac. The current leadership

---

[5] An Administrative Review was completed by Jamie Chess, Psy.D. on 9/20/18 of a suicide that occurred at Dixon during the reporting period. Dr. Chess noted "While the offender routinely refused programming, he may have decided to participate if more diverse programming was offered."

[6] It remains my recommendation that the staff at Pontiac receive treatment directed at their trauma-related disorders.

[7] Director Baldwin testified at the most recent Evidentiary Hearing "I disagree without reservation of his (Dr. Stewart's) opinion of Pontiac. I thought that was inappropriate." Transcript of the testimony of John Baldwin, August 27, 2018, page 112, lines 12 &13.

at Pontiac, including the Deputy Director of the Central District, have not been able to correct this situation. This situation cannot be solved until such time as Department Leadership admits that there is a problem. This starts with Director Baldwin. I am available at any time to meet with the Director to discuss this issue. I also respectfully invite Director Baldwin to tour Pontiac with me so he can observe this situation from my perspective.

Unless this situation is addressed in an expeditious manner, there will continue to exist a considerable risk of serious injury and death to both mentally ill offenders and staff at Pontiac and other facilities. This includes all facilities that are forced to maintain mentally ill offenders whose treatment needs exceed that which can be safely provided.

A summary of compliance findings follows:

| Requirement | Compliance Status |
|---|---|
| | |
| **IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING** | Overall: Substantial compliance<br>Subfindings supporting overall finding: |
| (IV)(a), (b),<br>(c),<br>(d), (e)<br>(IV)(f)<br>(IV)(g) | Substantial compliance<br>No rating<br>Substantial compliance<br>Non-compliant<br>Non-compliant |
| **V: MENTAL HEALTH EVALUATION AND REFERRALS**<br>  (V)(a)<br>(V)(b), (c)<br>(V)(d)<br>(V)(e)<br>(V)(f), (g)<br>(V)(h), (i)<br>(V)(j) | Overall: Non-compliant<br>Subfindings supporting overall finding:<br>Non-compliant<br>Substantial compliance<br>No rating<br>Substantial compliance<br>Non-compliant<br>Substantial compliance<br>Non-compliant |
| **VI: MENTAL HEALTH SERVICES ORIENTATION**<br><br>  (VI)(a), (b) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW** | Overall: Non-compliance<br>Subfindings supporting overall finding: |

| Requirement | Compliance Status |
|---|---|
| (VII)(a), (b), (c), (d)<br>(e) | Non-compliance<br>Substantial compliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS**<br><br>(VIII)(a), (b)(i), (b)(ii) | Overall: No rating<br>Subfindings supporting overall finding:<br>No rating |
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>(IX)(a), (b)<br>(IX)(c)<br>(IX)(d), (e)<br>(IX)(f) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Non-compliance<br>No rating<br>Substantial compliance<br>No rating |
| **X: BED/TREATMENT SPACE**<br><br>(X)(a)<br>(X)(b)(i), (ii)<br>(X)(c)(i), (ii)<br>(X)(d), (e), (f), (g)<br>(X)(h)<br>(X)(i) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Non-compliance<br>Non-compliance<br>Non-compliance<br>Target date not arrived<br>Substantial compliance |
| **XI: ADMINISTRATIVE STAFFING**<br><br>(XI)(a), (b)<br>(XI)(c),<br>(XI)(d) | Overall: Non compliance<br>Subfindings supporting overall finding:<br><br>Substantial compliance<br>Non compliance<br>Substantial compliance |
| **XII: MEDICATION**<br><br>(XII)(a)<br>(XII)(b) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Non-compliance |

| Requirement | Compliance Status |
|---|---|
|   (XII)(c)(i), (ii), (iii), (iv) (v), (vi) | Non-compliance<br>Substantial compliance |
| **XIII: OFFENDER ENFORCED MEDICATION** | Finding: Previous findings of substantial compliance remain for 15 institutions<br>No finding for 14 institutions |
| **XIV: HOUSING ASSIGNMENTS**<br><br><br>  (XIV)(a), (b), (c) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance |
| **XV: SEGREGATION**<br><br><br>  (XV)(a)(i)<br>  (XV)(a)(ii),(iii),(iv),(v),(vi), (vi)(sic)<br>  (XV)(a)(vii)<br>  (XV)(b)(i),(ii), (iii), (iv) (v), (vi)<br>  (XV)(c)(i), (ii), (iii), (iv)<br>  (XV)(c)(v)<br>  (XV)(c)(sic)<br>  (XV)(d) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Substantial compliance<br>Non-compliance<br>Substantial compliance<br>Substantial compliance<br>Non-compliance<br>Substantial compliance<br>Noncompliance<br>Target date not arrived |
| **XVI: SUICIDE PREVENTION**<br><br><br>  (XVI)(a), (b) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Non-compliance |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES**<br><br><br>  (XVII)(a)<br>  (XVII)(b),(c)<br>  (XVII)(d) | Overall: No rating<br>Subfindings supporting overall finding:<br><br>Insufficient data to arrive at a rating<br>Substantial compliance<br>No rating |
| **XVIII: MEDICAL RECORDS**<br><br><br>  (XVIII)(a) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>Non-compliance |

| Requirement | Compliance Status |
|---|---|
| (XVIII)(b) | No rating |
| **XIX: CONFIDENTIALITY**<br><br><br>(XIX)(a)<br>(XIX)(b)<br>(XIX)(c),(d) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br>No rating<br>Non-compliance<br>Non-compliance |
| **XX: CHANGE OF SMI DESIGNATION** | Finding: Substantial compliance |
| **XXI: STAFF TRAINING**<br><br>(XXI)(a), (b), (c) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Finding: Substantial compliance |
| **XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY**<br>(XXIII)(a), (b), (c) | Overall: No rating<br>Subfindings supporting overall finding:<br>No rating |
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Finding: Non-compliance |
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS**<br><br><br>(XXV)(a),(b)<br>(XXV)(c)<br>(XXV)(d) | Overall: Non-compliance<br>Subfindings supporting overall finding:<br><br>Non-compliance<br>Substantial compliance<br>Non-compliance |
| **XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM**<br><br>(XXVI)(a), (b) | Overall: Substantial compliance<br>Subfindings supporting overall finding:<br>Substantial compliance |

| Requirement | Compliance Status |
|---|---|
| | |
| **XXVII: MONITORING** | Finding: Non-compliance |
| **XXVIII: REPORTING AND RECORDKEEPING** | Finding: Substantial compliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement.

**Overall structure:** This Section is organized along the same structure as the Settlement; each major section below corresponds with a substantive section of the Settlement. That said, the Settlement includes provisions that appear multiple times across different sections. The Monitor attempts in this report to address each substantive requirement in that section of the Settlement where it appears.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that non-compliance is, nonetheless may be in substantial compliance with the provision of the Settlement.

**Compliance ratings:** As discussed above, the team institutes the "Substantial Compliance" and "Non-compliance" ratings for each provision, as specified in the Settlement. In actual fact, these may mask true performance. In practice, IDOC has made limited progress on a number of requirements. These possibly could be more accurately described as "partially compliant," but by the terms of the Settlement, those provisions must be found in Non-compliance.

Section II (t) of the Amended Settlement Agreement defines "Substantial Compliance" as follows: The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances

in which any violations are minor or occasional and are neither systemic nor serious. Substantial compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this report, most compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the monitor of this seismic shift for IDOC, to date, I felt it more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. Two years of reviews have yielded enough data to assess certain practices, and specific facilities have begun to reach substantial compliance for some requirements. Most Settlement Agreement provisions are complex with many factors to fulfill, so the substantial compliance findings are few, but this is an important step forward.

## IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING

> Based on previous reviews of all reception centers, and a recent review of the site that handles the great majority of intakes, IDOC is in substantial compliance with most components of the Screening requirements. There is a good infrastructure in place to screen offenders on the date of arrival. Screenings take place in private offices, employ the required form covering the required topics, and include records review when available. All screeners reportedly have clinical licenses or are supervised by the regional administrator.
>
> NRC psychiatrists tend to go beyond the requirements and conduct a full evaluation on the day of arrival for patients with documented psychotropic medication orders. For those patients, orders to continue medication are written timely and all observed modifications were clinically appropriate with clinical notes about discussing with patients the necessary facts. Some orders were filled timely, while a few patients experienced a three-day delay in receiving their medication.
>
> These medication practices have been uneven in the reception centers in the recent past, so more of a track record is needed to establish substantial compliance with this subsection.
>
> Other areas of concern are some screeners appearing to omit some screening questions, the absence of many records from jails or previous IDOC incarcerations, and the time to psychiatry review where patients report a recent history of medication but do not have documentation. While some of these go beyond the letter of the Settlement, the monitoring team encourages improved practice as a matter of patient safety and good clinical care.

(IV)(a): Specific requirement: All persons sentenced to the custody of IDOC shall receive mental health screening upon admission to the prison system. Absent an emergency which requires acting sooner, this screening will ordinarily take place within twenty-four (24) hours of reception (*see* "Components of Mental Health Services" at pg. 5 in the IDOC Mental Health Protocol Manual

(incorporated by reference into IDOC Administrative Directive 04.04.101(II)(E)(2)), but in any event no later than forty-eight (48) hours after reception, as required by IDOC Administrative Directive 04.04.100 (II)(G)(2)(b) (*see also* IDOC Administrative Directive 05.07.101).

**Findings:** While IDOC operates four reception centers, fully 74% of the intakes take place at Stateville Northern Reception Center ("NRC").[8] The monitoring team has reviewed all reception centers in past reporting periods; during this term, the team concentrated on NRC. NRC staff described the systems to ensure that screenings take place on the date of arrival; have designed an extensive, efficient physical plant layout to facilitate that; and dedicate the vast majority of their MHP resources to this responsibility. The monitoring team observed three different MHPs conducting screenings concurrently and they followed the system, although it was of concern that two screeners omitted some of the questions. In the monitoring team's chart reviews, each file contained the standard screening and it appeared that they were all timely. The amount of recorded detail varied significantly, but was adequate or better in most cases.

**(IV)(b): Specific requirement:** The mental health screening conducted upon admission to IDOC shall be conducted by a Mental Health Professional [MHP][9] and shall use IDOC Form 0372 (Mental Health Screening). In those instances where a mental health screening is performed by an unlicensed mental health employee, said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement.

**Findings:** The monitoring team has observed at all reception centers that the individuals conducting screening are MHPs and they consistently use the required form. During the current monitoring period, two of the five MHPs at NRC reportedly do not have clinical licenses and had been working prior to this Settlement Agreement. The regional administrator, a psychologist, indicated that he supervises them weekly.

**(IV)(c): Specific requirement:** Offenders transferred from a receiving and classification facility who have been screened and referred for further mental health services shall be administered the Evaluation of Suicide Potential, IDOC Form 0379, but need not be administered the mental health screening form again.

**Findings:** The monitoring team did not review this requirement during the monitoring period. In previous periods, the team has observed good practice at a number of IDOC facilities.

**(IV)(d): Specific requirements:** In order to encourage full and frank disclosure from offenders being screened, mental health screening shall take place in the most private space available at the receiving and classification facilities. Within two (2) years of the approval of this Settlement Agreement, IDOC will ensure that mental health screening at all receiving and classification facilities takes place only in spaces that ensure sound confidentiality.

**Findings:** The monitoring team previously determined that all reception centers conduct

---

[8] Data provided by IDOC legal counsel indicate there were 8,987 intakes to IDOC from June through October 2018 and that 6,636 of those were processed at NRC.

[9] The Settlement uses MHP to indicate Mental Health Professional. This report adopts that convention as well.

screenings with sound confidentiality. By observation of three mental health staff conducting screenings in offices with the doors closed and no other persons present in the rooms, the team reconfirmed that this practice continues at NRC.

**(IV)(e): Specific requirement:** IDOC shall develop policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

**Findings:** In the October 2018 Quarterly Report the Department correctly states that they are in compliance with this requirement due to their having policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

**(IV)(f): Specific requirement:** Following transfer to IDOC custody, an offender's prescription for psychotropic medication shall be reviewed by a licensed physician or psychiatrist and modified only if deemed clinically appropriate. Any change in psychotropic medication, along with the reason for the change, shall be documented in the offender's medical record. The psychiatrist or other physician, or nurse practitioner acting within the scope of their license, must also document on the offender's chart the date and time at which they discussed with the offender the reason for the change, what the new medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the new medication, and answered any questions the offender had before starting the medication.

**Findings:** As noted, IDOC does have this policy in place. NRC psychiatrists have an office in the same area where other screening functions take place, and psychiatrists review many offenders on the day of arrival. Reportedly, it is common for psychiatrists to conduct their full evaluation then, and the monitoring team's chart review results were consistent with this.

Among the charts reviewed, about one-third of the caseload patients arrived with a current psychotropic prescription. Orders to continue medication were issued timely. About half of the medication orders remained the same. The other half were modified in a clinically appropriate way, in the view of the Monitor, and the psychiatrists documented the rationale and having discussed with the patient the items described in this requirement. For some patients, the medications were also delivered timely, while a few patients experienced a three-day delay before receiving the medication.

This is a strong showing by NRC. Since the monitoring team has observed noncompliance at NRC and other reception centers up through the Second Annual Report, this report will note NRC's progress but this does not yet reach the level of a substantial compliance finding. This is an area where "partially compliant," would be the most accurate description, but given the findings options in the Settlement Agreement, the monitoring team must find performance on this requirement noncompliant.

While this requirement is limited to patients arriving with a current prescription, it is also common that patients self-report a recent history of psychotropic medication but do not have documentation. In this situation, some patients at NRC see psychiatrists quickly and have their medications restarted, while others in the team's chart reviews were not seen for four to six weeks.

The monitoring team encourages IDOC to consider means to shorten this time to psychiatric review.

> **(IV)(g): Specific requirement:** Screening will include identifying neurodevelopmental disabilities, suicidal ideation or intent, current or past self-injurious behavior, the presence or history of symptoms of mental illness, current or past use of psychotropic medications, or the presence of conditions that require immediate intervention, in addition to the information required to be documented on IDOC Form 0372 (Mental Health Screening). The screening process shall also include review of the records which accompany the offender.

> **Findings:** The monitoring team has previously verified these components of the screening. Observed practice at NRC was consistent with past findings.

By observation during this and previous monitoring periods, mental health staff do review, as part of the screening, the records that accompany the offenders. Significant problems, however, continue to negatively affect the Department's ability to fully comply with this requirement. As described in previous Monitors' reports, it is problematic that a substantial number of offenders arrive without records. For example, in the Assistant Monitor's chart sample in October, 65% did *not* include previous records. NRC and regional staff report significant improvement in the frequency with which Cook County—one of the largest sources of intakes—now provides health records. A number of other counties are less successful. When offenders return on a parole violation, their IDOC records remain at the last facility at which they were housed. While there is no current practice to seek or transfer those records for reception center staff's use, IDOC staff began problem-solving conversations with the monitoring team on point, and IDOC's quarterly reports notes internal discussion of options as well.

The absence of records is problematic not only for screening but because a large proportion of the mental health caseload remains onsite long enough to need treatment. During the week of the monitoring visit, for example, 40% of the patients had been on the caseload longer than 30 days,[10] the minimum point for psychiatric follow-up

## V: MENTAL HEALTH EVALUATION AND REFERRALS

> **Summary:** The Department has reduced its backlog of mental health evaluations to 231 from over 500 at the time of the 2nd Annual Report. This current number remains unacceptably elevated. Self-referrals as well as referrals from staff and "credible outside sources" are occurring although the required record keeping is not being consistently accomplished. Mental health evaluations are generally not being performed at NRC, most likely due to staffing problems. There is very credible evidence that custody staff continue to insert themselves between the mentally ill offenders and the Crisis Intervention Team.

---

[10]   These patients, of course, had been *onsite* longer than that.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** In the October 2018 Quarterly Report the Department correctly states that the existence of a backlog of mental health evaluations is better reported in subsection V(f). Due to the tremendous backlog noted at the time of the 2nd Annual Report, however, it was also reported in this subsection. The backlog at the time of the 2nd Annual Report was over 500 cases. In the opinion of the Monitor, this number was indicative of inadequate "mental health evaluation or response in case of an emergency shall be **timely** provided.(emphasis added)" The Department has made great strides in reducing the backlog to 231 as of November 16, 2018. Although 231 is unacceptable, this smaller backlog suggests that the Department's timeliness has improved but not enough to warrant a rating of substantial compliance. This backlog, along with a number of others, was reduced through use of overtime. This is a commendable short-term effort that puts tasks on a better footing; it is not indicative, however, that conditions have significantly changed and would support timely practice in the future.

**(V)(b): Specific requirement:** Referral may be made by staff and documented on IDOC Forms 0387 and 0434 or by self-referral by the offender.

**Findings:** The monitoring team did not perform an analysis of self- and staff referrals during this reporting period, apart from staff referrals generated by reception center screening. In previous monitoring, the team has found that patients and staff are making referrals and employ these forms. A rating of substantial compliance will be assigned based on this past performance coupled with the reception center data.

**(V)(c): Specific requirement:** IDOC shall ensure that the referral procedures contained in IDOC AD 04.04.100, section II (G)(4)(a) and (b) for offender self-referral are created and implemented in a timely fashion in each facility.

Section II (G)(4)(a) and (b) provide:

Referrals for mental health services may be initiated through staff, credible outside sources such as family members, other offenders or self-reporting.

(a) To ensure proper handling of requests from credible outside sources, the Department shall ensure mail room staff and facility operators, gatehouse staff and other staff who may come in contact with family members, visitors or other interested persons are aware of procedures for receiving and addressing inquiries regarding referrals for mental health services. Additionally, the contact information and procedures by which outside sources may refer offenders for mental health services shall be provided on the Department's website.

(b)The Chief Administrative Officer of each facility shall ensure a procedure for referring offenders for mental health services is established.

(1) Referrals from staff shall:

(a) Be initiated on the Mental Health Services Referral, DOC 0387;
(b) Be submitted to the facility's Office of Mental Health Management through the chain of command; and
(c) Include a copy of the Incident Report, DOC 0434, if applicable.

(2) The facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in the offender's behavior or behavior that may endanger themselves or others, if not treated immediately.

(c) Procedures for self-referrals by offenders for mental health services shall be provided in the offender handbook. The offender will be encouraged to submit their requests on the Offender Request, DOC 0286.

**Findings**: The Department has the required referrals procedures. As reported in the 2nd Annual Report, as well as prior reports, the aspects that have been monitored are being properly implemented.

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** The charts reviewed at NRC this monitoring period contained examples of people with a record of mental health treatment as well as those who self-reported a history but it was not  documented. A referral was issued for each man; the monitoring team did not encounter examples where referrals were not made.[11] The services provided did *not* include the Mental Health Evaluation conducted by an MHP. All men *were* seen by a psychiatrist, who completed either a full psychiatric evaluation or a detailed progress note. There were, however, timeliness issues that will be discussed in subsection (f), below.

Additionally, the Monitoring Team exclusively reviews the records of offenders on the mental health case load. Due to this fact, the Monitoring Team is unable to accurately report on this subsection. This would require a comprehensive review of offenders not on the mental health case load to determine if individuals with a "known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation or referral." Given the records that the Monitoring Team has reviewed, this requirement is generally being met. However, the data obtained from a review of only those offenders on the mental health case load is inadequate to correctly answer the question posed by this subsection. The Department will not receive a rating for this subsection at this time.

**(V)(e): Specific requirement:** IDOC shall develop a policy and procedure by which other sources with credible information (including other offenders or family members) may refer an

---

[11]   As described below, however, this is the nature of the charts reviewed; the sampling did not intentionally select charts to determine whether any referrals were overlooked.

offender for a mental health evaluation. The policy and procedure shall include a record-keeping mechanism for requests, which shall record who made the request and the result of the referral.

**Findings:** As reported in the 2nd Annual Report, the Department has developed this policy and procedure and the monitoring team has observed it being implemented to some extent. A number of IDOC facilities apparently do not have, or consistently use, a record-keeping mechanism.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** Referrals for evaluation can be created at any institution. A substantial portion of those, of course, occur at reception centers, so the monitoring team concentrated this period's review at NRC. The psychiatric caseload database maintained by staff showed that, at best, on the date of review, only 12% of patients due for a Mental Health Evaluation had received one.[12] This was consistent with the team's chart review; the team pulled only charts of men onsite one month or longer, and *none* contained this type of evaluation. Staff did prioritize more acute cases, and showed a much higher compliance rate with patients they found to need RTU level of care or to qualify as SMI. These results are not surprising given the staffing levels at this institution. With *almost half* of the MHP positions vacant, staff is taking sensible measures to prioritize, but this is a clear illustration that it is impossible to meet the mandates with the amount of staffing available.

All men in the chart sample *were* seen by a psychiatrist, who completed either a full psychiatric evaluation or a detailed progress note. A significant number were seen quickly, but 60% of the sampled patients were not seen until four to seven weeks after the referral.

The Wexford-produced backlog data for the full IDOC system, reporting later, in the week of November 16, 2018, is 231 for Mental Health Evaluations. Although the majority of the backlog, 136, is in the 1-14 day category, this remains a serious deficiency.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:**

"IDOC 04.04.100 has been updated, with the approval of the Monitor since the original Settlement Agreement was filed with the Court on January 21, 2016. The pertinent section of AD 04.04.100 which applies to this requirement is II (G)(4)(b)(3). It states "The facility Crisis Intervention Team **shall** (emphasis added) be contacted immediately for offenders with serious or

---

[12] This is a *very* conservative reading of the data. The date of referral is not captured in the database, so this is measured not from the date of referral, but from the date the patient was put *on the caseload* (which could be the date of referral or a point substantially later than the referral). On the first date of the monitoring visit, 264 patients had been on the caseload for more than 14 days and only 31 are shown as having evaluations. The monitoring team spoke with several staff about the possibility of paper trail or data entry delays, but staff most knowledgeable about those aspects thought the database was an accurate reflection of practice.

urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior that may endanger themselves, if not treated immediately."[13]

During the current monitoring period, the monitoring team has continued to receive complaints from plaintiffs' counsel and from numerous offenders at a variety of facilities that custody staff act as gatekeepers for the Crisis Intervention Team. A particular egregious example occurred at Pontiac on September 12, 2018, when a mentally ill offender asked to speak with a member of the crisis intervention team who was evaluating someone on the same tier. The crisis intervention team member ignored the offender's request and walked away. The offender then asked custody staff to have this person return because the offender wanted to hurt himself. The custody staff refused and the offender then cut his left arm and began banging his head which resulted in a serious laceration above his left eye. A Lieutenant and Major were eventually called and the offender was evaluated and placed on a crisis watch.

These complaints have been present throughout the duration of the Settlement Agreement. As Monitor, my opinion is that these complaints of gatekeeping by the custody staff are compelling. I once again request that Departmental Leadership address this very serious issue.

**(V)(h): Specific requirement:** The results of a mental health evaluation shall be recorded on IDOC Form 0374 (Mental Health Evaluation). These documents shall be included as part of the offender's mental health record as required by IDOC AD 04.04.100, section II (G)(3).

**Findings:** This requirement is being met at all of the facilities monitored.

**(V)(i): Specific requirement:** Mental health evaluations shall be performed only by mental health professionals. In those instances where an evaluation is performed by an unlicensed mental health employee, said mental health employee will have obtained at least a Master's degree in Psychology, Counseling, Social Work or similar degree program or have a Ph.D./Psy.D. and said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement. Further, a licensed MHP will review, and if the evaluation is satisfactory, sign off on any evaluation performed by an unlicensed mental health employee within seven (7) days after the evaluation has been completed. If the evaluation is not satisfactory, it shall be redone by a licensed MHP.

**Findings:** The Monitor Team has found that this requirement is being met at all of the facilities monitored.

**(V)(j): Specific requirements:** The provisions of this Section shall be fully implemented no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** The deadline for fully implementing the requirements of this section of the Amended Settlement Agreement was November 22, 2017. The Department has made progress in meeting these requirements but remains short of this goal due in large part to the backlog of mental health evaluations present at the time of this report.

---

[13] 2nd Annual Report, pages 23 & 24.

## VI: MENTAL HEALTH SERVICES ORIENTATION

**Summary**: As previously reported, IDOC continues to fulfill the requirements of this section of the Settlement. The required policy has been in place since at least 2013. Each facility has produced its own orientation manual which satisfy this requirement. A comprehensive orientation program was present at each facility monitored.

**(VI)(a): Specific requirement:** In addition to information regarding self-referrals to be included in the offender handbook as required by IDOC AD 04.04.100, § II (G)(4)(b), information regarding access to mental health care shall be incorporated as part of every offender's initial reception and orientation to IDOC facilities. The basic objective of such orientation is to describe the available mental health services and how an offender may obtain access to such services.

**Findings:** IDOC does not utilize a department-wide orientation manual. Each facility has produced its own orientation manual. The Monitor has previously reviewed the orientation manual from each facility and found them to fulfill the requirements of this section.

**(VI)(b): Specific requirement:** IDOC shall develop and implement a written policy and procedure concerning such orientation no later than one (1) year after approval of this Settlement Agreement.

**Findings:** AD 04.01.105, Facility Orientation, effective 7/1/13, governs facility orientation. This AD states "The Department shall establish a comprehensive orientation program for incoming offenders at all correctional facilities that shall include the distribution of an orientation manual prepared in a format consistent throughout the Department." A comprehensive orientation was present at each facility monitored.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**: The Department is not meeting its requirements regarding treatment planning for outpatient, crisis watch or segregation status offenders. Even at the JTC, the practice is for the psychiatrist to complete the initial treatment plan with the monthly updates completed by the multidisciplinary treatment team. Treatment planning forms are not being completely filled out.

The Department is also not meeting its requirements regarding the timely follow up of mentally ill offenders who are prescribed psychotropic medications except at the JTC. Telepsychiatry is not being utilized in an evidence-based manner. Additionally, Telepsychiatric providers are not operating under a protocol or an Administrative Directive.

After 30 months of the Amended Settlement Agreement, the Department still clings to an erroneous notion regarding the meaning of the word "collectively."

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section

(II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** The monitoring team, in preparation of the August 2018 Evidentiary Hearing, reviewed over 100 treatment plans of class members and found that these plans were often completed by a MHP or a psychiatric provider. The plans prepared by psychiatric providers typically only addressed medication. Similarly, those plans prepared by the MHP did not incorporate the offenders' psychotropic medication needs.

Subsequent to the Evidentiary Hearing, the Monitoring team conducted numerous site visits and found:

- Pontiac: Little to no evidence of treatment plans being prepared "collectively by the offender's treating mental health team." For example, plans were prepared by a MHP with the psychiatric provider signing off on these plans days to over a month later.
- Menard: None of the treatment plans reviewed showed evidence of multidisciplinary collaboration. Either the MHP or psychiatric provider completed the plan. In those cases where the psychiatric provider did sign off on the plans created by a MHP, it was accomplished several days after initial completion.
- Pinckneyville: Similar to Menard, treatment plans did not demonstrate evidence of multidisciplinary collaboration. Again, they were completed by either a MHP or a psychiatric provider.
- Stateville-NRC: initial crisis watch plans were created solely by MHPs, while general population plans were created solely by psychiatry; the disciplines did not sign off on each other's plans. On the other hand, a slight majority of plans were reasonably well-tailored to the individual, an improvement over the trend of generic plans seen in the system.

The Wexford-produced data from the week of November 16, 2018 found that there was a backlog of 390 treatment plans throughout the Department. Almost half of the total backlogged treatment plans is at Pontiac with 188.

A large part of the discussion regarding this subsection found in the October 2018 Quarterly Report revolves around the meaning of the word "collectively." Throughout my tenure as Monitor, I have made it exceedingly clear that "collectively" means that all of the staff involved with the mental health care of a given offender meet together to discuss the treatment needs of the offender in question. As I reported in the 2nd Annual Report, my opinion regarding why the Department continues to fight this universally accepted meaning of the word "collectively" as it applies to treatment planning is due to the high volume of mentally ill offenders and severely inadequate numbers of staff to treat them. The Court in its Permanent Injunction Order of October 30, 2018 stated in part: "The evidence at the preliminary injunction hearing makes it clear that the lack of adequate staffing significantly impacts treatment planning."[14]

---

[14] Permanent Injunction Order, October 30, 2018, page 38.

There is no shortcut to mental health treatment planning. I have tried to work constructively with the Department on this issue by going on the record to say that the psychiatric provider may be present at these meetings via telepsychiatry. Based on the totality of the data presented above, the Department is not in compliance with this subsection.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** Page 27 of the 2nd Annual Report states "it is also too early to determine if this new form[15] will satisfy the requirements of this subsection of the Settlement Agreement." This was due to the fact that the Monitoring Team only had approximately four months to evaluate the implementation of this new form by the time of the submission of the 2nd Annual Report.

By late July, the Monitoring Team had reviewed over 100 treatment plans and found that nearly half were incomplete, not individualized, contained generic boiler plate language and were of overall poor quality. From August through October, treatment plans reviewed during site visits began to show improvement. While IDOC has further to go to satisfy this requirement, the observed progress is welcome.

The Quarterly Report of October 2018 states on page seven "There is no question Form 0284 requires entry of each of the areas in this subsection[16] and IDOC is, therefore, in compliance with this subsection." The Monitoring Team's review found that this form is not always fully completed, or contains information of little value to that patient, so the mere presence of the various requirements of this subsection on a form does not equate with compliance if those fields are not populated with meaningful information.

**(VII)(c): Specific requirement:** Treatment plans shall be reviewed and updated for offenders designated as receiving outpatient level of care services annually, or sooner when clinically indicated (e.g., when level of care changes).

**Findings:** The Department was found to be noncompliant with this subsection on the 2nd Annual Report. During site visit reviews in this reporting period, 72% of charts met this requirement. In a number of cases, plans were updated multiple times during a year; Western Illinois was particularly strong in this regard.

**Specific requirement:** Where the IDOC provides crisis or inpatient care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** The Monitoring Team did not review any treatment plans for offenders at the inpatient level of care for this report.

---

[15] Modification to Form 0284 as approved by the Monitor and effective February 1, 2018.
[16] Subsection VII(b).

The Department began creating treatment plans for offenders in Crisis status in February 2018 by utilizing a new form[17] that had been approved by the Monitor. The 2nd annual report noted that it was too early to determine if, by using this new form, the Department was in compliance with the requirements of this subsection. Prior to the Evidentiary Hearing in August 2018, the Monitoring Team reviewed 89 medical records of offenders who had recently been placed on Crisis status to determine if treatment plans were reviewed and updated upon entrance to Crisis. Treatment plans were only found in 32 of the medical records reviewed. Of those that were completed, the majority were only completed by a MHP. Psychiatry was only involved in 13 of the Crisis watch treatment plans.

Again, prior to the August 2018 Evidentiary Hearing, the Monitoring Team conducted a slightly different chart review to determine if treatment plans were being updated at the recommended intervals. This review of 124 medical records found, among other things, that treatment plans were not generally being updated upon discharge from crisis watch.

This chart reviewed didn't exclusively look at offenders on crisis watch status, so the Monitoring Team conducted several site visits subsequent to the August 2018 Evidentiary Hearing to look more specifically at this issue:

- Pinckneyville: Initial crisis watch treatment plans were created by MHPs with the psychiatrist not involved in this planning process. In one case of an offender being on crisis watch for more than a week, his treatment plan was not updated.
- Menard: Initial crisis watch treatment plans were created but without evidence of multidisciplinary involvement. Only one offender had been on crisis for more than a week and his treatment plan had not been updated.
- Pontiac: Initial crisis watch treatment plans were created but without any psychiatric involvement. These plans were not being updated on a weekly basis.
- Stateville-NRC: In the Stateville-NRC sample, initial plans were still completed by either an MHP or a psychiatrist but there was no indication of collaboration. The content was of reasonable quality. It appeared there was one exception where no initial plan was generated. Discharge plans were much improved from the system norm; about half were generated in a multidisciplinary team meeting, while the other half seemed to reflect serial review of the plan. The content in almost half of the reviewed discharge plans was tailored to addressing root causes that could lead to readmission, and it appeared the plan was discussed with the patient in every case.

The monitoring team also conducted a systemwide study of crisis watch discharge treatment plans. This study compared practice at two points in time: the first month of the monitoring round and the most recent month for which data was available.[18] While practice appeared poor in June, by September there were definite signs of improvement.

---

[17] DOC0377

[18] The team asked IDOC to provide a sample of discharge treatment plans, with the selection method specified, or all discharge treatment plans in institutions where the crisis watch census is typically low. It is not entirely clear that the selection method was followed, but IDOC did provide a substantial number of records. This analysis reviews the materials provided for June and September admissions.

Key aspects of good clinical practice are captured in the court's injunctions and were used to assess these treatment plans: (a) presence of a treatment plan at or near discharge, which is updated to address the causes of admission for that patient and to prevent recurrence, (b) the plan is created by a multidisciplinary team, and (c) the plan is discussed with the patient.

In both months studied, there were records available from 24 IDOC institutions; the small number of remaining facilities indicated they did not have crisis watches during the month. In June, only a minority of records included a discharge-related plan; only 36% of the provided cases included such a plan, so a much smaller data set was analyzed. This issue occurred much less frequently in the September data, and was concentrated at three institutions. This suggests that discharge plans are being created more often, though the degree of improvement is unclear.[19]

Whether treatment plans contain meaningful treatment information has been a source of concern throughout the monitoring. While such plans are still in the minority on crisis watch discharge, incremental improvement is evident.

|  | June | September[20] |
|---|---|---|
| Plans tailored to the patient's reasons for crisis watch and preventing recurrence | 28% | 31% |
| Plans partially reflecting the above; largely these are boilerplate but with some bearing on this patient | 28% | 32% |
| Inadequate plan | 44% | 27% |

The best practice in creating well-done discharge treatment plans occurred at Hill, Illinois River, Jacksonville, Logan, Vienna and Western Illinois.

The largest improvement occurred with staff undertaking to create a plan in multidisciplinary teams. Where, in June, this clearly occurred as a joint enterprise in only 14% of the records, this practice was demonstrated in 47% of the records provided in September. This, of course, is still a minority and further improvement is needed, but this significant progress is commendable. The best practices in joint treatment planning were evident at Dixon, East Moline, Illinois River, Logan, Stateville and Stateville NRC, Vandalia, and Western Illinois.

---

[19]  In June, IDOC provided records responsive to this request for 118 crisis watches, but only 43 of them contained discharge treatment plans. It is unclear how much this reflects a failure to create plans and how much is explained by misunderstanding the data request, patient records being unavailable, crisis watch being current as of the data request and therefore it is premature for discharge plans, etc.

In September, IDOC provided records related to 143 crisis watches, 125 of which included discharge treatment planning in the expected form or in detailed progress notes. Again, it is unclear which of the foregoing reasons may explain the missing plans. Only Graham had a consistent pattern of demonstrating that both disciplines were involved in the discharge *decision* but no demonstration of any revised treatment plan. Joliet and Pontiac also showed a significant number of plans and a significant number of apparently missing plans. For these and other reasons, the monitoring team acknowledges that a substantial number of discharge plans are being created—more than the team has observed in previous monitoring periods—but the team did not analyze whether plans are being created for all crisis watch discharges.

[20]  Analysis omits records where a plan was missing, so does not total 100%

Additionally, IDOC encourages a practice whereby either an MHP or psychiatry provider produces the plan and the other reviews it and provides input later. The largest percentage of records in this study were handled this way in June; the practice continued in September but was greatly reduced in favor of direct team meetings in person or by phone or video conference.[21] The Monitor strongly believes serial reviews are not good clinical practice and do not satisfy the requirement, but this practice does reflect a step in the direction of multidisciplinary treatment planning.

Finally, it does appear to be the norm for clinicians to discuss these treatment plans with the patients. Based on the patient's signature on the plan, and/or a progress note describing the content of the patient-provider conversation, it appears patients were informed in at least 81% of the June records and 68% of the September records.[22]

Among those that were noncompliant, a few updated plans were untimely, though by a short period. In other cases, the patient had a number of crisis watches or other clinical changes that should have led to a treatment plan update but did not. This sample was limited, however, so it is unclear the extent to which it may be generalizable.[23]

**Specific requirement:** For those offenders receiving RTU care, treatment plans shall be reviewed and updated upon entrance and thereafter no less than every two (2) months, or more frequently if clinically indicated, and upon discharge.

**Findings:** Dr. Kapoor's tour of the JTC revealed that monthly treatment plans were being completed. The treatment planning for the RTUs at Logan and Dixon were not reviewed during the current reporting period.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** As noted above, the Monitoring Team reviewed 124 medical records to determine if treatment plans were being updated at the recommended intervals. Very few of these records demonstrated that treatment plans were "being reviewed and updated within seven (7) days of placement on segregation status." This review was not specifically directed at the treatment

---

[21] In June, this appeared to be the practice in 60% of the treatment plans. In September, it appeared serial reviews occurred in 19%. The percentage of plans created solely by one discipline stayed steady. Therefore, the reduction in serial reviews shifted to an increase in multidisciplinary, real-time reviews.

[22] In the remaining cases, there is no related documentation. It is unclear whether, and in what proportions, this reflects a practice issue or a documentation issue. Also, these signatures or progress notes are a good proxy for determining whether patients are informed but are not definitive; it is, of course, possible, that signatures are obtained without much discussion. It is unclear whether the lower percentage of documentation in September represents fewer compliant discussions or is explained by other reasons.

[23] Among 75 charts reviewed at Graham, Stateville-NRC, Vienna, and Western Illinois, many belonged to patients who had been on the caseload less than one year since the last treatment plan. Thus, this analysis draws on 25 relevant charts.

planning in segregated housing units so the Monitoring Team looked explicitly at this issue during a number of site visits. The results obtained from the various site visits confirmed this overall finding:

- Pontiac: Treatment plans were not being completed within one week of placement on segregation status nor are they being reviewed and updated monthly.
- Pinckneyville: There was some evidence of treatment plans being reviewed and updated upon segregation placement but only by the MHP. These plans were not being reviewed and updated monthly.
- Menard: Treatment plans were not being reviewed and updated upon segregation placement or monthly thereafter.
- Stateville-NRC: Among the charts reviewed, only one contained a treatment plan within a week after placement, and that plan was fully generic without reference to the particular patient's needs or the restrictive housing setting. A small minority of the reviewed patients had been in segregation more than five weeks, and they did not have updated plans.
- Also, a treatment planning backlog of 390 with 188 of them found at Pontiac, one of the Department's primary segregation facilities, was reported on November 16, 2018.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)   For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)   For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)   Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** The Department has had chronic difficulties satisfying the requirements of this subsection. This was largely reflected in the tremendous backlog of psychiatric appointments, both initial evaluations and follow ups. At the time of the submission of the 2nd Annual Report, there was a backlog of 3397 psychiatric appointments. I am pleased to report that this backlog has been reduced to 734 as of November 16, 2018, although this represents an increase of 265 since October 26, 2018. This reduction has been accomplished by an increased use of psychiatric providers, including telepsych. The October 2018 Quarterly Report accurately describes that I have encouraged Wexford to increase the number of Telepsychiatric providers. What the Quarterly Report omits, however, is that I am consistently on the record stating that telepsychiatry should be limited to the stable outpatient population. The Department is currently utilizing telepsych to

address all levels of care including crisis. I have never authorized this use of telepsychiatry. The Department also does not have an evidence-based protocol or an Administrative Directive for the proper use of telepsych. Although I am sincerely pleased with the reduction of the backlog for psychiatric appointments, the Department will continue to receive a rating of noncompliance for this subsection until such time that an approved evidence-based protocol and Administrative Directive for telepsych are created and implemented.

Prior to the most recent Evidentiary Hearing, the Monitoring Team reviewed 142 medical records of offenders who were being prescribed psychotropic medication. Only 64 of the medical records reviewed had evidence of psychiatric evaluations being completed per the requirements of this subsection.

Subsequent to the Evidentiary Hearing, the Monitoring team conducted numerous site visits and found:

- Pontiac: Numerous instances of new medications being prescribed for 3 months and routine medication orders written for six months.
- Menard: Numerous instances of new medications being prescribed for 3 months and follow ups not occurring in a timely manner.
- Pinckneyville: Numerous instances of new medications being prescribed for 3 months without timely follow up.
- Stateville-NRC: In a small set of general population patients onsite longer than 30 days, 70% were seen by psychiatry at 30-day intervals or more often.
- Dr. Kapoor toured the JTC and found that offenders were typically being seen every 2-4 weeks by a psychiatrist or nurse practitioner  depending on clinical need.

**(VII)(e): Specific requirement:** Upon each clinical contact with an SMI offender, the MHP shall record a progress note in that offender's mental health records reflecting future steps to be taken as to that offender based on the MHP's observations and clinical judgment during the clinical contact.

**Findings:** The Monitoring team has literally reviewed thousands of progress notes written by MHPs following a clinical contact with SMI offenders. As stated in previous reports, there is no way to determine if progress notes are in fact written after each clinical contact. Due to the large number of progress notes found in the medical records of SMI offenders, it appears that the Department is satisfying the requirements of this subsection.

## VIII:   TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

**Summary**: The Monitoring Team did not conduct an analysis of the data regarding this requirement. The Department will not receive a formal rating. A formal rating will be assigned in the 3rd Annual Report.

**(VIII)(a): Specific requirement:** SMI offenders shall only be returned to general population

from a specialized treatment setting with the approval of either the treating MHP or, once established, with the approval of the multidisciplinary treatment team. The Settlement provides a definition of "Specialized Treatment Setting": Housing in a crisis bed, residential treatment unit, or inpatient mental health setting.

**Findings:** The Department continues to meet the requirements of this subsection. Although the Department is in substantial compliance with this requirement, it remains unclear to what extent multidisciplinary treatment teams are involved in this process.

**(VIII)(b)(i): Specific requirement:** For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form, which will be specifically designed for this purpose by IDOC and approved by the Monitor.

**Findings:** At the time of the 2nd Annual Report, the followings facilities were in compliance with this requirement: Logan, East Moline, Pinckneyville, Illinois River, Stateville Proper and Menard. Given the attention devoted by the Monitoring Team to the obligations of the preliminary injunction, this requirement was only partially reviewed. Dr. Kapoor reported that the JTC was fully meeting this requirement. The staff at Menard, Pinckneyville and Pontiac reported that they are meeting this requirement.

**Specific requirement:** This five-day assessment process will be in addition to IDOC's current procedure for crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from crisis watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

**Findings:** Again, given the attention devoted by the Monitoring Team to the obligations of the preliminary injunction, the monitoring team did not review this requirement during this monitoring period. Staff at Menard and Pontiac reported that this is occurring.

**(VIII)(b)(ii): Specific requirement:** Offenders returned to general population or to an outpatient level of care setting from a specialized/residential treatment facility shall be reviewed by an MHP within 30 days to assess the progress of the treatment goals. The IDOC Form 0284 shall be reviewed annually thereafter, unless otherwise clinically indicated (e.g., change in level of care) as required by IDOC AD 04.04.101, section (F)(2)(c)(4)(c).

**Findings:** This requirement was not reviewed for this report

## IX: ADDITIONAL MENTAL HEALTH STAFF

**Summary:** The Department is not meeting its staffing requirements for the RTUs at Dixon, Logan and Joliet. Of note, the deadline for the opening of the putative RTU at Pontiac was 7/6/18. This deadline has not been met. The current staffing at Pontiac is significantly below the requirements called for in the Amended Staffing Plan of May 2016.

The Department is submitting quarterly hiring reports to the Monitor.

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** All staffing levels are current as of 11/23/2018:

- Dixon:                                                    Vacancies as of 4/20/18

  - Mental Health Training Director-    1.00 FTE vacant        0.00
  - Mental Health Unit Director-        3.00 FTEs vacant       3.00
  - Post-Doc psychologist-             1.00 FTE vacant        0.00
  - Pre-Doc psychologist-              2.00 FTEs vacant       2.00
  - Staff psychologist-                1.975 FTEs vacant      2.97
  - QMHP-                              0.00 FTE vacant        4.00
  - Recreation therapist-             2.00 FTE vacant        0.00
  - BHT-                               3.00 FTE vacant        1.00
  - Psychiatrist-                      5.250 FTEs vacant      5.20
- Logan:
  - Mental Health Unit Director-        3.00 FTEs vacant       3.00
  - Post-Doc psychologist-             2.00 FTEs vacant       2.00
  - Staff psychologist-                2.00 FTEs vacant       1.00
  - QMHP-                              7.00 FTEs vacant       2.00
  - Recreation Therapist-             1.00 FTE vacant        1.00
  - BHT-                               2.00 FTEs vacant       2.00
  - RN-Mental Health-                  2.00 FTEs vacant       1.00
  - Psychiatrist-                      3.137 FTEs vacant      4.41
- Pontiac:
  - Mental Health Unit Director-        3.00 FTEs vacant       2.00
  - Post-Doc psychologist-             2.00 FTEs vacant       2.00
  - Staff psychologist-                1.0 FTE vacant         0.00
  - QMHP-                              4.00 FTEs vacant       2.00

| | | | |
|---|---|---|---|
| o | BHTs- | 2.00 FTEs vacant | 0.00 |
| o | Psychiatrist- | 3.725 FTEs vacant | 4.15 |

Dixon and Logan had deadlines for meeting their staffing requirements on February 6, 2018. Pontiac's deadline was July 6, 2018. The Department is clearly not meeting its staffing responsibilities for these three facilities. A review of this six-month data demonstrates that overall, little actual progress has been made.

 **(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:** All staffing levels are current as of 11/23/18:

|  |  | Vacancies as of 4/20/18 |
|---|---|---|
| o Mental Health Unit Director- | 1.00 FTE vacant | 0.00 |
| o Post-Doc psychologist- | 1.00 FTE vacant | 1.00 |
| o BHT- | 1.00 FTEs vacant | 1.00 |
| o RN-Mental Health- | 2.00 FTEs vacant | 11.0 |
| o Staff assistant- | 1.00 FTEs vacant | 0.00 |
| o Psychiatrist- | 1.50 FTEs vacant | 4.50 |

The Joliet Treatment Center remains non-compliant regarding its staffing responsibilities, although they have made good progress in hiring mental health nurses.


 **(IX)(c): Specific provision:** Defendants will have three (3) months from the approval of the Settlement Agreement to propose an amendment to the staffing plan. The Monitor and Plaintiffs shall have forty-five (45) days following the submission of the revised staffing plan to state whether they have an objection to the proposed revisions and provide data to support the objections. Following receipt of any objection and supporting data, the parties will either accept the Monitor's and/or Plaintiffs' suggestions or the issue will be resolved through the dispute resolution process.

**Findings:** As noted in previous reports, the Defendants did not opt to proposed a staffing plan amendment in the early months of Settlement Agreement implementation.

 **(IX)(d): Specific requirement:** To the extent the positions listed on Exhibits A and B of the Approved Remedial Plan are to be filled by Mental Health Professionals, these positions shall be allocated solely to the provision of the mental health services mandated by this Settlement Agreement.

**Findings:** To date, the monitoring team has not encountered any examples of MHPs being required to deliver work other than provision of mental health services.

 **(IX)(e): Specific requirement:** In accordance with its obligations in Section XXVIII,

*infra*, IDOC will include quarterly hiring progress reports related to the additional mental health staff identified in the Approved Remedial Plan. Where a target may not have been met, the Monitor will review the reasons for failure to meet the target and, if necessary, propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized.

**Findings:** The Quarterly Reports prepared by the Department contain hiring progress reports.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** As of the staffing report of 11/23/18 prepared by Wexford, only Centralia, Illinois River, Sheridan, Taylorville and Vienna are fully staffed. Of note, the Monitoring Team continues to opine that given the various backlogs, overall non-compliance with the Settlement Agreement and staff stresses observed during the site visits, even a "fully staffed" facility is "understaffed." Also, the Monitoring Team is not aware of any extensions of the various staffing deadlines agreed to by plaintiffs' counsel.

## X: BED/TREATMENT SPACE

**Summary**: The required number of RTU beds for male offenders have been identified. The reported RTU bed count is 1070, although this counts 422 beds at Joliet where the census is only 107. So, the actual bed count is 755. The RTU at Pontiac is not functioning at the time of this report. There is only 80 RTU beds for females out of the required 108. There are 15 "pre-inpatient admission program" beds at Logan. The Monitoring team is not clear what these beds are and if they should be counted against the 108 bed, RTU total. An analysis of the crisis watch data clearly demonstrated that there is an inadequate number of crisis beds within the Department.

The Department is not meeting its requirement for providing at least 20 inpatient beds for both male and female offenders. The census for these units as of 11/1/18 was 12 female and 10 males.

12%, or 349 out of a total of 1237, crisis admissions during the months of May through September 2018 exceeded the 10-day maximum length of stay criteria.

**(X)(a): Specific requirement:** The Approved Remedial Plan identified four facilities at which IDOC would perform renovations, upgrades, and retrofits to create bed/treatment space for SMI offenders requiring residential levels of care: (i) Dixon Correctional Center (male offenders only); (ii) Pontiac Correctional Center (male offenders only); (iii) Logan Correctional Center (female offenders only); and (iv) the former IYC Joliet facility (male offenders only). The necessary funding to complete this construction is dependent upon additional appropriations.

**Findings:** The Department is in compliance with this requirement.

**(X)(b): RTU beds for male offenders**

**(i): Specific requirement:** Approximately 1,150 units of RTU bed space for male offenders have been identified.

**Findings:** Approximately 1,150 units of RTU bed space for male offenders have been identified.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

> **(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;
> **(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and
> **(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings**: Melissa Jennings provided the Monitor with the following numbers on November 26, 2018:

- Dixon-RTU bed count of 648 due to 28 of its 676 beds being designate as inoperable. The deadline for additional construction to increase treatment and administrative office space is July 6, 2018.
- Pontiac-No number was provided for RTU beds at Pontiac. The deadline for this requirement was July 6, 2018. Based on the monitoring team's visits to Pontiac, this unit won't likely be functional until 2019.
- IYC-Joliet-The deadline for the 360 RTU beds and programing space is October 6, 2018. The RTU bed count is reported to be 422. The census on November 26, 2018 was 107.

**(X)(c): RTU beds for female offenders**

**(i): Specific requirement:** IDOC has identified RTU bed and programming space for 108 female offenders at Logan CC.

**Findings:** RTU bed count is reported to be 80. There are an additional 15 beds designated as PIAP, "pre-inpatient admission program." This PIAP is reported to be a higher level of care than an RTU.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make these 108 RTU beds available on the following schedule:

    **(A)** RTU beds and programming space for 80 female offenders no later than six (6) months after the budget contingent approval date; and

    **(B)** RTU beds and programming space for an additional 28 female offenders no later than twelve (12) months after the budget contingent approval date.

**Findings:**

    **(A)** The deadline for creating RTU beds and programming space for 80 female offenders was February 6, 2018. The requirement has been met.

    **(B)** The deadline for creating RTU beds and programming space for an additional 28 female offenders is July 6, 2018. This requirement has not been met. The Monitoring Team will need to receive very specific details on what this PIAP is and does it count against RTU beds or inpatient beds.

**(X)(d): Specific requirements:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:** The Monitoring Team inspected the RTU at the JTC during this reporting period. This RTU is meeting these requirements. The RTUs at Dixon and Logan will be inspected for the 3rd annual report. Hopefully, the RTU at Pontiac will be operating soon during the next monitoring period. Until that occurs, the Department will receive a rating of non-compliance for this requirement.

A review of the following data demonstrated that there continues to be substantial need for beds at higher levels of care. Indications include:

- At least 12% of the crisis watches systemwide exceeded 10 days. That is, 350 admissions exceeded the point at which policies expect a patient usually to need more than the short-term crisis stabilization and therefore to need a higher level of care.[24] The need may be for inpatient care or for RTU, depending on the nature of the patients' illnesses.

---

[24]  Data was compiled from crisis watch logs provided by IDOC for every institution from May through September. It was not feasible for IDOC to provide October data in time for inclusion in this analysis.

    Those logs show 2,937 crisis watches. The length of crisis watches spanning two months (that is, beginning in one month and ending in another) are not always recorded; the monitoring team matched such stays where it could be reasonably inferred, but lengths of stay could not be determined for 6% of admissions; the analysis treated those as being within expected timeframes. Thus, all numbers in this analysis are very likely conservative.

    The 12% that exceeded 10 days breaks out as follows: 3% stayed only 1 to 2 days longer, while 9% stayed substantially longer. The longest stays were evident across half of IDOC's facilities; they were most concerning at Dixon, Lawrence, Stateville and NRC, Pontiac, and Graham. There were no apparent patterns across time.

Particularly egregious among those admissions were the two men who had been in crisis watch for 9 months and more than 1 year, and the 11 patients who had each been in crisis watch for 2 to 3 months.

- There were also 147 patients in this period who had problematic, multiple admissions to crisis watch suggestive of a need for higher levels of care. In these cases, patients stayed in crisis watch up to 11 times in a few months, their stays were independently lengthy and/or added up to large portions of that span of time, and/or a pattern of worsening was evident (admissions coming closer together and/or lengthening over time).[25]

Although these cases were evident at more than half of IDOC's facilities, they occurred with highest frequency at Dixon, Pontiac, Logan, Lawrence, Stateville/Stateville-NRC, Pinckneyville, and Illinois River. Some of these institutions are tasked with providing mental health services to the most severely impaired offenders in the Department. Several of these institutions house higher custody level inmates. These facts provide objective evidence regarding the lack of a sufficient number of higher level treatment beds.

IDOC Mental Health staff increased their referrals to higher levels of care during this monitoring period. This is likely a positive development stemming from a greater appreciation of the expectation to refer, as well as staff being encouraged by the greater number of beds that have come online. Staff recorded referring 216 patients[26] during the five months reviewed.[27] Most institutions had patients needing higher level of care during that period; only seven did not show the need and/or did not make referrals.[28]

By almost a 2:1 margin, staff make more referrals for patients who have *not* shown extensive crisis than for those who have. Referrals are not yet used as often as one might expect for patients with prolonged or repeated crisis watch stays. While there were 311 patients for whom crisis watch exceeded ten days[29] or where multiple admissions were a concern, only 79 of those patients were referred to a higher level of care.

| Institution | Patients with extended or multiple[30] admissions | Of those, how many referred | | Other referrals | Total higher level of care referrals[31] |
|---|---|---|---|---|---|
| Big Muddy River | 4 | 0 | | 0 | 0 |

---

[25] This included most patients with three stays or more but excluded some where stays were short and spaced out over time.

[26] This number may be lower than actual referrals as Dixon does not report any RTU placements it may make from its own population.

[27] Each IDOC institution provided monthly logs of referrals, or reported that no referrals were made, for the period spanning May through September.

[28] The facilities that did not refer patients to higher level of care during this monitoring period were: Big Muddy River, Decatur, Kewanee, Lincoln, Murphysboro, Southwestern, and Taylorville. Elgin is not included in this analysis as it is the highest level of care.

[29] Some of these patients experienced more than one admission longer than 10 days

[30] Includes only those patients fitting the criteria described above

[31] This includes patients who had extended or multiple crisis watches *and* those who did not but were referred for other reasons

| | | | | | |
|---|---|---|---|---|---|
| Centralia | 3 | 0 | | 3 | 3 |
| Danville | 7 | 7 | | 0 | 7 |
| Dixon | 57 | 1 | | 1 | 2 |
| East Moline | 2 | 1 | | 1 | 2 |
| Graham | 7 | 6 | | 1 | 7 |
| Hill | 4 | 1 | | 4 | 5 |
| Illinois River | 13 | 7 | | 11 | 18 |
| Jacksonville | 1 | 1 | | 2 | 3 |
| Joliet | 5 | 0 | | 0 | 0 |
| Lawrence | 27 | 7 | | 3 | 10 |
| Logan | 20 | 5 | | 30 | 35 |
| Menard | 10 | 0 | | 10 | 10 |
| Pinckneyville | 24 | 7 | | 2 | 9 |
| Pontiac | 60 | 8 | | 16 | 24 |
| Robinson | 3 | 0 | | 2 | 2 |
| Shawnee | 6 | 2 | | 3 | 5 |
| Sheridan | 4 | 2 | | 0 | 2 |
| Stateville and Stateville-NRC | 37 | 9 | | 39 | 48 |
| Vandalia | 2 | 1 | | 0 | 1 |
| Vienna | 1 | 0 | | 1 | 1 |
| Western | 17 | 16 | | 6 | 22 |
| Decatur, Kewanee, Lincoln, Southwestern, Taylorville | 0 | 0 | | 0 | 0 |

As the numbers of referrals increase, so do the lengths of time to transfer and rejections. Where rejections previously appeared rare, there were 30 during this monitoring period. Only a

subset of entries recorded time to transfer (or rejection);[32] in that group, 44% waited between one month and six months.

Lengths of time to decision and to transfer certainly suggest the need for more beds at these levels of care. In other corrections systems, an increase in rejections typically reflects either (1) that staff need a period to become accustomed to judging which referrals are appropriate, or (2) that the increased referrals surface previously unidentified need, and decisionmakers become more selective as they manage the need exceeding the available beds. The monitoring team encourages IDOC administration to monitor referral decision practices for which of these reasons, or other reasons, may be driving extended decision timelines and higher rate of rejections. Reviewing these practices early can help the administration choose the right interventions to prevent this from escalating and becoming an entrenched problem. The availability of, and access to, RTU and inpatient beds is one of the linchpins for whether the rest of the mental health system can come into compliance with its obligations.

**Dixon RTU:** As reported in the 2nd Annual Report: **"**At the time of the midyear report, mentally ill offenders were being offered approximately 6 hours per week of structured time and 12 hours per week of unstructured time. IDOC began reporting structured and unstructured out-of-cell time for mentally ill offenders in segregation in January 2018. They are not currently reporting these hours for mentally ill offenders assigned to an RTU. The Quarterly Report of April 25, 2018 is silent regarding the number of out-of-cell hours offered and/or completed for mentally ill offenders assigned to an RTU. Similar to the reporting requirements for mentally ill offenders assigned to segregation, the Monitor will request that IDOC maintain this data for mentally ill offenders assigned to an RTU."[33] The Monitoring Team did not inspect the Dixon RTU during the current reporting period. Also, the Quarterly Report of October 2018 is silent regarding the number of structured and unstructured out-of-cell hours the offenders housed in the Dixon RTU receive.

**Pontiac Mental Health Unit:** The Monitor has received a variety of completion dates for the construction of the RTU at Pontiac. The Quarterly Report of October 2018 states "The construction at Pontiac and Dixon is nearly complete as of October 5, 2018. Substantial completion is expected by the end of November for both sites." As stated above, the Monitoring Team did not inspect the Dixon RTU during the current reporting period. I personally visited Pontiac on 10/18/18. I observed the state of the construction of the RTU. The RTU still has a long way to go until completion. Regardless of when it is finally completed, there is currently no operating RTU at Pontiac.

**Logan RTU:** As reported in the 2nd Annual Report: "Documenting the out-of-cell time for the mentally ill offenders assigned to RTU level of care is similar to Dixon. That is, the out-of-cell time is reported as "offered" and not the actual number of hours of participation. The number of hours offered, however, does exceed the requirements of this subsection of the Settlement

---

[32] Analysis was conducted on 104 referrals, as the majority of referrals did not contain all relevant dates.

[33] 2nd Annual Report, page 40.

Agreement."[34] The Monitoring Team inspected Logan on 6/27/18 but did not monitor this particular metric.

**Joliet RTU:** The offenders housed on the Joliet Treatment Center are receiving the prescribed amount of structured and unstructured out-of-cell time.

### (X)(e): Inpatient beds

**Specific requirement:** Within three (3) months of the approval date of this Settlement Agreement, IDOC shall enter into an intergovernmental agreement ('IGA') with the Illinois Department of Human Services ('DHS') to secure at least 22 beds for female offenders and at least 22 beds for male offenders in an existing DHS-owned mental health facility. The necessary funding to complete this construction is dependent upon additional appropriations. Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date. Within thirty (30) months of the approval of this Settlement Agreement, IDOC will transition to assuming control or ownership of said facility and provide approximately sixty (60) additional beds and programming space for separate housing of male and female offenders in need of an inpatient level of care. During that transition period, IDOC shall consult closely with the Monitor and IDOC's own retained mental health expert to develop any additional policies and procedures and design programming and treatment space that is appropriate for a forensic hospital. After the IGA is signed, IDOC will continue to develop plans for inpatient care that can be implemented after necessary appropriations.

**Findings:**

- The deadline to make **at least** (emphasis added) 22 beds available for female offenders was 4/6/18. As of 11/1/18, there is a census of 14 females offenders in these beds.
- The deadline to make **at least** (emphasis added) 22 beds available for male offenders was 11/6/18. As of 11/1/18, there is a census of 10 male offenders in these beds.

The Quarterly Report of October 2018 states "Elgin is  gradually increasing it population as appropriate and as allowed in the Agreement." There is nothing in the Amended Settlement Agreement that allows the Department to drag its feet in meeting these 22 bed minimum requirements.

### (X)(f): Crisis beds

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement,

---

[34] Ibid

offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

**Findings:** Certainly, IDOC facilities have established crisis beds. While the monitoring team previously has found good practice, with the exception of Pontiac, on the requirement to house crisis patients outside control units, there was a surprising uptick in the use of segregation cells for these patients. The logs of six institutions[35] showed this practice, where previously the team has seen it at only two or three locations. Some of those facilities had only one to four such admissions—minimal in relation to their total admissions. Few recorded whether the patients were moved out of such cells within 72 hours. Absent that information, the team cannot definitively determine that those institutions remain in substantial compliance despite this minimal use of control unit cells, but it appears unlikely.

Others, however, were more concerning:

- Pontiac had 62% of its crisis watches in North House, the segregation unit, and the monthly number increased over time. This affected 262 admissions.
- Stateville proper housed 35% of its crisis watches in control units, affecting 27 admissions.
- Robinson, similarly, housed 33% of its crisis watches in control units, albeit based on a smaller crisis watch population.
- Lincoln continued to find medical patient competition for the cells also needed for crisis watch, so that 75% of its crisis watches were initiated in control units. These men were moved within the 72-hour window.
- There is credible evidence that offenders on crisis watch were being housed in the segregation unit and moved to a non-segregation unit the day prior to Dr. Kapoor's visit to the JTC. The Monitor has also received credible information that offenders on a crisis watch in North House at Pontiac, a segregation unit, would be moved to the infirmary on the day prior to monitoring visits.

When the need for overflow cells happens this frequently—and, in the case of Pontiac, Stateville, and Lincoln, for more than one year—this cannot be said to be exigent circumstances. This is especially true of the tricks the staff at the JTC tried to pull on Dr. Kapoor.

This illustrates many endemic challenges that the Department faces (including but not limited to): 1) there is an increase in the number of mentally ill offenders who require such services; 2) the current system of care is unable to properly identify and intervene with those mentally ill offenders prior to their requiring placement on crisis watch; 3) mentally ill offenders on a crisis watch receive insufficient and inadequate mental health care; 4) mentally ill offenders on a crisis watch are not able to be transferred to a higher level of care in timely manner; and, 5)

---

[35]  Big Muddy River, Illinois River, Lincoln, Pontiac, Robinson, Stateville-NRC / Stateville proper. Another 13 institutions did not record cell location data in a way that it could be analyzed; for a few of those, crisis watch placement is extremely rare—likelihood of control unit use is even lower—but that is not the case for all 13 institutions. The monitoring team has observed good practice at some of those institutions, and the team has not visited others. The Monitor is not making a finding as to those facilities, but given what appears to be backsliding on this requirement elsewhere, it is more difficult to be confident in facility practice without data.

there is an inadequate number of crisis cells within the Department.

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: As noted in subsection X(D), during the months of May through September 2018, there were 1237 crisis watch admissions. 12% or 349 admissions exceeded 10 days. The Monitoring Team documented that:

- There is an absence of "aggressive mental health interventions."
- An inability to transfer mentally ill offenders to higher levels of care on a timely basis.

**(X)(g): Specific requirement:** IDOC shall also ensure that each RTU facility has adequate space for group therapy sessions; private clinical meetings between offenders and Mental Health Professionals; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures. IDOC shall also ensure that each RTU facility has adequate office space for the administrative and mental health staff required by this Settlement Agreement.

**Findings:** The Department is meeting this requirement at Joliet and Logan. The Department will continue to receive a non-compliance rating for this requirement until such time as all of the construction at Dixon and Pontiac is completed.

**(X)(h): Specific requirement:** The treatment and other space required by subsections (d)-(g), *above,* shall be completely available no later than six (6) months after the work completion dates identified in subsection (a), *above,* for the four facilities identified there, and for any other residential treatment or outpatient facilities at which it is determined that modifications are needed no later than December 2017**.**

**Findings:** The deadlines for this requirement have not arrived.

**(X)(i): Specific requirement:** Within forty-five (45) days of the selection of the Monitor, IDOC will submit to the Monitor descriptions and architectural plans, if being used, in sufficient detail to enable the Monitor to determine whether construction undertaken pursuant to this section complies with the previously approved Remedial Plan. If, having reviewed these descriptions and plans, the Monitor concludes that the space allocations in any or all facilities under this Settlement Agreement are not consistent with the Remedial Plan, the Monitor shall so inform IDOC and Plaintiffs' counsel, and IDOC shall have thirty (30) days to propose additional measures that address the Monitor's concerns.

**Findings:** As previously reported, the Monitor received the required floor plans within the time frame specified in the Settlement. These floor plans are consistent with the requirements of the Remedial Plan.

## XI: ADMINISTRATIVE STAFFING

**Summary**: The Department currently has three regional directors, a statewide quality improvement manager, a chief of psychiatry, three training staff and three office support staff.

There are currently three facilities without mental health authorities: Danville, Jacksonville and Shawnee.

### (XI)(a): Regional Directors

**Specific requirement:** Within thirty (30) days after the approval of this Settlement Agreement, to the extent it has not already done so, IDOC will hire two regional directors who are licensed psychologists or psychiatrists to assist the IDOC Chief of Mental Health Services.

**Findings:** As reported previously, IDOC filled these positions within the required time frame. They are all licensed psychologists:

- Dr. Patrick Horn, northern regional director, hired March 2014;
- Dr. Luke Fairless, who replaced Dr. Sim, became the full-time central regional director in January 2018;
- Dr. Shane Reister, southern regional director, hired December 2014.

### (XI)(b): Statewide Quality Improvement Manager

**Specific requirement:** IDOC will also create a position for a statewide Quality Improvement Manager (the QI Manager). In addition to the other responsibilities assigned to the QI Manager in this Settlement Agreement, the QI Manager or one or more qualified designees shall have the responsibility for monitoring the provision of mental health services performed within IDOC by state or vendor employees and the performance of any vendor(s) under the vendor contract(s).  This position shall be filled only by a State, not vendor, employee, and shall be filled no later than nine (9) months after the approval of the Settlement Agreement.

**Findings:** This position was filled on 2/16/17, eight days before the deadline, by Dr. Sim. For the first 11 months he held this position, Dr. Sim was only devoting 0.25 FTE to the duties of Statewide Quality Improvement Manager. He began working full-time in this position on 1/16/18.

### (XI)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility

and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings:** The October 2018 Quarterly Report states that Dixon, Hill, Joliet, Logan, Menard, Pinckneyville, Pontiac, Stateville and Western are filled by PSA-8Ks; Big Muddy, Centralia, Decatur, Elgin[36], Graham, Illinois River, Lawrence, Lincoln, Murphysboro, Robinson, Sheridan, Southwestern, Taylorville, Vandalia and Vienna are filled by Social Worker IVs; East Moline, Elgin[37], Kewanee and Stateville-NRC are also in compliance with appropriately licensed mental health professionals or psychologists in place.

The PSA-8K position at Danville remains vacant despite considerable efforts to hire; the Social Worker IV position at Jacksonville is also vacant despite efforts to hire; and, the Social Worker IV position at Shawnee is also vacant due to a recent departure. While the Stateville-NRC position is filled, the employee has given notice of retirement expected to take effect this month.

The seriousness of the lack of these mental health leaders in these three and potentially four facilities is more than enough for the Department to be found in non-compliance with section XI.

### (XI)(d): Central office staff

**Specific requirement:** IDOC shall hire ten (10) central office staff (*i.e.*, non-facility-specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. These positions will be filled no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** The October 2018 Quarterly Report describes the central office staff complement as the above-described regional directors and quality improvement manager, a chief of psychiatry, three training staff, and three office support staff, for a total of 11 people. It appears the Department is in substantial compliance with this requirement.

---

[36] Elgin is reported twice; it appears there may be two types of state employees filling supervisory positions.

[37]

- 45 -

## XII: MEDICATION

**Summary**: Medication administration is documented contemporaneously in the offenders' medical records. The Department has a psychiatric backlog of 721 as of 11/16/18. Telepsychiatry is being used in a non-evidenced manner throughout the Department. This is a very serious situation that could lead to very critical problems for the mentally ill offenders.

Another serious issue is the manner in which some mentally ill offenders in segregation are being administered their medications. They are being brought out of their cells in cuffs and given their medications in front of their cells. Some offenders are even forced to kneel down during this maneuver. The Monitoring Team is available to work with the staff to develop a more humane and effective method of medication distribution.

**(XII)(a): Specific requirement:** In accordance with the provisions of IDOC AD 04.03.100, section II (E)(4)(d)(1), no later than ninety (90) days after the approval of this Settlement Agreement, medical staff shall record contemporaneously on offender medical records all medications administered and all offender contacts with medical staff as to medications. With respect to offenders taking psychotropic medications, "contemporaneously" means that the medication, the amount of the medication, and whether the offender took it or refused it will be recorded at the time the medication is delivered, either on a temporary record from which information is subsequently transferred to a permanent record located elsewhere, or in the permanent record at the time of delivery.

**Findings:** This requirement is currently being met by the Department.

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** The most salient fact regarding this requirement is as of 11/16/18, there were 721 psychiatric follow-up appointments backlogged throughout the Department. This included a backlog of 114 for offenders placed in a RTU. 19 out of the 29 facilities in the Department reported a backlog. The largest backlogs were found at the following facilities:

- Pinckneyville        176
- Shawnee              115
- Big Muddy            70
- Pontiac              66
- East Moline          55
- Dixon                49
- Illinois River       45
- Hill                 44
- Robinson             35

Although the backlog of 721 is a reduction from the backlog of 1182 reported on 5/18/18, it is still unacceptably elevated. The Quarterly report of October 2018 states "with regard to (b), the continued expansion of telepsychiatry will help with the medication review backlog." I refer the reader to section VII(d), page 28, for a discussion about the lack of evidence-based use of Telepsychiatry within the Department.

In preparation for the Evidentiary Hearing in August 2018, the Monitoring Team reviewed 142 medical records of offenders who were prescribed psychotropic medication. This particular review evaluated if offenders prescribed psychotropic medication were being seen by a psychiatric provider at regular intervals consistent with constitutional standards. The particular standards used in this review were those specified in the Amended Settlement Agreement. Timely follow ups occurred in only 64 of the medical records reviewed, 45%. Other medical records in this review indicated extensive time between psychiatric visits and the medication orders without evidence of stability documented.

In a four-institution study of general population and restrictive housing patients, psychiatry follow-up was consistent with these standards in 59% of the cases, an unreasonably low compliance rate.[38] In those compliant cases, psychiatry generally saw the patients every 30 days-- or more often after a crisis watch or medication adjustment—or at longer intervals, up to 90 days, with reasonable assessments that those patients were stable.

The most common pattern in the noncompliant cases was a patient being judged to need 30-day follow-up but it not taking place for 45 to 60 days. In a few cases, there was not follow up after a new medication or indicia of instability, such as a crisis watch, or extended times of 3 to 4 months to appointment when a shorter interval was determined necessary.

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

---

[38] For this analysis, the monitoring team reviewed charts at Graham, Stateville-NRC, Vienna, and Western Illinois. The sample included only patients on psychotropic medication, as per the requirement's definition, and excluded any patients not onsite or on the caseload long enough for at least one 30-day follow-up.

**(i): Specific requirement:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

**Findings:** As Monitor, I have been very critical of the manner in which medication has been distributed in segregated housing units. That is, through the food slots, which allowed for cheeking and hoarding of medications. During the current reporting period, however, the Department has instituted an draconian policy for the distribution of medications in segregated housing units. That is, offenders are cuffed up and brought out of their cells to take their mediations. If an offender has a cellmate, then the cellmate is also cuffed up while this is going on. I have had reports from mental health staff at Pontiac that the offenders are even forced to kneel when they are administered their medications. The Quarterly report of October 2018 really tries to soft pedal this maneuver by stating "At Pontiac, for example, the Warden directed healthcare staff to remove any offender from his cell to observe medication delivery if mouth checks were not possible cell front." I am also aware that this procedure is being utilized at Menard. I am unclear if this is occurring throughout the Department. It was brought to my attention by a mental health staff member at Pontiac who was appalled by this whole procedure.

There is no doubt that this procedure will decrease cheeking and hoarding of medications. This is also a very dangerous maneuver in that it will likely result in even poorer medication compliance, further worsening of offenders' psychiatric disorders, greater acting out behavior such as staff assaults and self-injurious behaviors. So, by addressing the issue of cheeking and hoarding of medication in this manner, the Department is potentially creating more problems for itself. I am available to work closely with the Department to help develop a more humane and effective manner of distributing psychotropic medications.

**(ii): Specific requirement:** The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskinesia [sic], high blood pressure, and liver function decline;

**Findings:** A chart review conducted prior to the Evidentiary Hearing in August 2018 demonstrated that the Department is showing improvement in this aspect of care. For this review, 69 charts were reviewed with 38, 55%, were properly addressing this requirement. Although this 58% completion rate is very low and does not warrant a compliance rating, it is a major improvement over previous reviews.

**(iii): Specific requirement:** Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood pressure monitoring, and neurological evaluation;

**Findings:** As with (ii) above, the Department is showing improvement in this very important aspect of care. A review of 72 charts confirmed that 38 charts, 53%, were properly addressing this requirement. Again, 53% is a rather low completion rate and does not warrant a compliance rating, but it does demonstrate significant improvement over previous reviews.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results;

**Findings:** The Department is also showing improvement in this clinical area. A chart review verified that 49% of the cases were fulfilling this requirement. Again, this 49% completion rate does not warrant a compliance rating but it absolutely shows improvement over previous reviews.

**(v): Specific requirement:** That offenders for whom psychotropic drugs are prescribed receive timely explanation from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** The Monitoring Team found the Department in compliance with this requirement. It is important to note, however, that this compliance was based on a box being checked on the psychiatric progress note. Only a small number of the charts reviewed specifically noted that these topics were discussed and that mentally ill offenders were given written information pertaining to their prescriptions.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** A review of 42 charts[39] revealed that most cases of noncompliance were relayed to an MHP. An MHP would then visit the offender to discuss the reasons for the noncompliance. The timeliness of these visits, however, was inconsistent. In some cases, the MHP was not notified until several weeks after the missed dose. If noncompliance remained an issue, the MHP would refer the patient to a psychiatrist.

---

[39] It was very difficult to find a sufficient number of charts to properly evaluate this issue of noncompliance. This was due to the fact that in most charts reviewed, compliance or noncompliance with medications was not documented.

## XIII: OFFENDER ENFORCED MEDICATION

**Summary**: The number of patients subject to enforced medication remains consistent with previous reporting in 2018, with 49 patients newly coming under these decisions during the monitoring period.

Previous reviews have noted an emerging pattern of following the required processes, though more demonstration is needed for about half of the IDOC facilities; 15 facilities were previously found in substantial compliance and maintain that status to date.

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

a) Administration of Psychotropic Medication

1) Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

2) Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health

professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2)The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** At 187, the number of patients subject to enforced medication decisions is consistent with that found at the time of the Monitor's Second Annual Report. Logs indicate that 49 of those decisions were issued by Treatment Review Committees during this monitoring period. Fewer than half of IDOC institutions house such patients and, since more beds are opening at Joliet and Elgin, a significant number of these patients have shifted there, not surprisingly.

In previous monitoring, patterns of good practice were beginning to emerge for various process elements required to fairly and reasonably reach an enforced medication decision. There were enough exceptions that further monitoring is needed for 13 facilities, but IDOC is on a good path with this Settlement Agreement requirement. Fifteen institutions have previously been found in substantial compliance, and they remain in that status.

## XIV: HOUSING ASSIGNMENTS

**Summary**: The finding for this requirement is unchanged from the 2nd Annual Report. The Department remains in substantial compliance. That is, MHPs are informed of housing changes by security staff. MHPs are also consulted about post-segregation housing recommendations. MHPs do not report that their housing recommendations are overridden by security staff.

**(XIV)(a): Specific requirements:** Cell assignments for SMI offenders shall be based on the recommendations of the appropriate security staff. However, notice shall be made to members of the SMI offender's mental health treatment team within twenty-four (24) hours of a new or changed cell assignment. It is expected that MHPs will monitor the location of each SMI offender on their caseload. IDOC will require MHPs to alert security staff of their concerns regarding SMI offender housing assignments and related contraindications. In all instances, an SMI offender's housing assignment shall serve both the security needs of the respective facility and the treatment needs of the offender.

**Findings:** This requirement is being met.

**(XIV)(b): Specific requirement:** For those offenders who have served fifteen (15) days or longer in Administrative Detention or Disciplinary Segregation, an MHP who is a member of the SMI offender's mental health treatment team shall be consulted regarding post-segregation housing recommendations pursuant to Section XVIII (a)(v)(F), *below*.

**Findings:** This requirement is being met.

**(XIV)(c): Specific requirement:** If security staff rejects a housing recommendation made by an MHP as to an SMI offender, the security staff representative shall state in writing the recommendation made by the MHP and the factual basis for rejection of the MHP recommendation.

**Findings:** This requirement is being met.

## XV: SEGREGATION

**Summary**: After 30 months of attempting to the implement the requirements of the Amended Settlement Agreement, the Department remains very far from meeting its responsibilities regarding providing mental health care to the offenders in segregation. Critical aspects such as mentally ill offenders being evaluated within 48 hours of placement in segregation, update and review of treatment planning, and the provision of the required minimum number of hours of structured and unstructured out-of-cell time are not being met. There are many reasons for the Department's failure with this section of the Amended Settlement Agreement. In the opinion of the Monitor, the two most striking reasons are the tremendous shortage of mental health and custody staff as well as the Department's clinging to outdated custody notions regarding mentally ill offenders and segregation. If a mentally ill offender, due to their mental illness, has a behavioral problem that results in a disciplinary infraction, this offender should receive a greater amount of mental health care and not placed into segregation. Placement in segregation will result in a worsening of their underlying mental illness and a creation of new psychiatric pathology. It is the opinion of the Monitor that until the Department rethinks its use of segregation in general and with mentally ill offenders in particular, the requirements of this section will never be able to be fully achieved.

**XV(a)(i): Specific requirement:** Prior to housing two offenders in a cell, the respective Lieutenant or above shall comply with Administrative Directive 05.03.107 which requires an offender review that shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues; and significant negative life changes, such as additional time to serve, loss of spouse or children, etc. The respective security staff shall consult with the mentally ill offender's treatment team regarding the appropriateness of such placement in accordance with Section XVII of this Settlement Agreement.

Of note, AD 05.03.107 provides: The Chief Administrative Officer of each facility with segregation and protective custody units designed to double cell offenders shall develop a written policy that includes, but is not limited to, the following for routine segregation and protective custody placement:

- Segregation placement
- PC placement
- Documentation
- Review of documentation and final determination
- Compatibility contraindications
- Review with other inmates
- Upon determination to double-cell:

- o Documentation
- o Suitability review following placement
- o Documentation upon release
- Documentation and Reassessment for disciplinary report

**Findings:** The Department continues to meet the requirements of this subsection.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** No real progress in regard to this requirement over the course of the Amended Settlement Agreement. That is, the Department continues to insist upon placing severely mentally ill offenders in these filthy, loud and completely countertherapeutic segregation units. The requirements of this subsection are not being met throughout the Department. The one exception is Logan, where their trauma-informed, gender specific approach to treatment results in their segregation units generally meeting these requirements.

It remains my firm recommendation that the Department rethink its use of segregated housing units in regard to mentally ill offenders. This is yet another area where the Department is contributing to its own problems. The placement of seriously mentally ill offenders in segregation exacerbates their pre-existing mental illness as well as causing the development of new forms of psychiatric pathology. It is imperative that the Department fully embraces the reality that it is the largest provider of mental health care in the state of Illinois. As such, outdated correctional notions about the use of segregation need to be completely rethought. I firmly believe that the Department will not be able to fully comply with the Amended Settlement Agreement or any future orders from the Court until it fully accepts its 21st century role of providing mental health treatment in a correctional environment.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings**: It is important to begin the discussion regarding this requirement reminding the reader that very little treatment is provided to mentally ill offenders within the Department. The

most that non-segregation offenders receive is one, 15-30 minute individual session per month[40] and timely medication follow up if they are lucky. There are an extremely limited number of groups available to non-segregation offenders. So, a chart review of mentally ill offenders in segregation revealed that there was some evidence that pre-segregation treatment plans were continued while in segregation. The Department is making some effort to comply with this requirement but not enough to earn a compliance rating. Also, due to severe staffing shortages, the mentally ill offenders in segregation at Pontiac do not even have the option of receiving and individual session.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** During previous monitoring rounds, chart reviews have shown a low percentage of compliance on this important risk prevention measure. A review, conducted in June and July 2018, of 92 charts demonstrated a compliance rate of 27% regarding this requirement.

The Department's most recent Quarterly Report describes a number of measures taken to facilitate this responsibility being accomplished—reconfiguring staff schedules; considering alternative staffing for the task; and incorporating this requirement in a major policy document, Departmental Rule 504, to reinforce its importance. The Department encourages the use of the Mental Health Evaluation form for this contact, which is a good approach, albeit almost two years late.[41] The Department has also proposed a new form for this purpose, which is pending approval. Approval of any form to be used for this review is postponed until receipt of the exact wording from the Court on this issue.

Additional site visits demonstrated compliance percentages beginning to increase.[42] By September, IDOC provided 115 screenings, drawn from 21 institutions, for SMI patients newly placed in restrictive housing that month as a sample demonstrating this practice. Where timeliness could be discerned, it was excellent.[43] These are signs of progress, but not enough to warrant a rating of compliance.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** The Quarterly Report of October 2018 states "review and update treatment plans of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated. These provisions have been

---

[40] MHPs at Pontiac confirm that no individual sessions occur due inadequate numbers of staff.

[41] This "48-hour" requirement has been in effect since May 2016 but only began receiving attention from the Department after the issuance of the Preliminary Injunction on May 25, 2018.

[42] This requirement was assessed at Graham, Vienna, Western Illinois, and Stateville-NRC. Practice was especially good at Vienna.

[43] Because of differences in recording methods, timeliness could be calculated for just over half of the cases, but in that subset, 95% met the deadline.

implemented although, due to staffing issues, are not occurring at all required times." This description is consistent with the findings of the Monitoring Team.

A four-institution study[44] demonstrated what the monitoring team has consistently observed: institutions are not fulfilling this requirement. Vienna was the exception; impressively, staff created segregation-specific plans at the one-week point, tailored to the patient and often signed by psychiatry and MHPs (only one plan was missed). There were no one-week plans at any of the other institutions in this study. A smaller set of patients remains in segregation long enough to require treatment plan updates monthly thereafter, but nevertheless, the reviewer found only three updates total across all four institutions.

Additional site visits revealed that treatment plans are not being updated or reviewed within one week of placement on segregation status and thereafter monthly or more frequently if clinically indicated. The facilities in question were Pontiac and Menard. The reasons given for not fulfilling this requirement is that there is too much work and not enough staff. The Monitor is in full agreement with this statement.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Supportive counseling by an MHP as indicated in the ITP
E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

*Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* The Quarterly Report of October 2018 states "It is without dispute that treatment plans are continued if they previously had been prepared for offenders." The Monitoring Team does not hold this same optimistic view of the Department's response to this requirement, [Please see XV(a)(iii) above for details.] The Quarterly Report, however, is silent about the issue of "enhanced therapy as necessary to protect from

---

[44] Patients with segregation placements at Graham, Stateville-NRC, Vienna, Western Illinois

decompensation." As has been previously reported, the Monitoring Team has not encountered any evidence of enhanced therapy being provided to mentally ill offenders to protect from decompensation that may be associated with segregation.

*Rounds*: Rounds are well-established; during the monitoring team visits, all institutions have demonstrated that they have systems in place and designated staff to accomplish this. Nevertheless, interruptions to the system are not uncommon. In the four-institution review referenced previously, only 65% of segregation cases had rounds documented for the full length of the patient's placement. The monitoring team does not encounter individual patients being missed entirely; rather, there are gaps in the rounds performance—either all patients missed for a week, or sporadic misses for individual patients. Additionally, an 87 count chart review prior to the August Evidentiary Hearing looking into this issue revealed rounds are completed and recorded inconsistently. For example, the Quarterly Report of October 2018 reports that rounds are only conducted every other week at the West House of Pontiac.

*Pharmacological treatment*: As of 11/16/18, the Department had a total backlog of psychiatric follow up visits of 721, 66 of which were at Pontiac. The Monitoring Team is well aware that pharmacological treatment does occur in these setting. Please refer to section XII(c)(i) for a discussion regarding the manner of medication distribution in segregated housing units.

*Supportive counseling by an MHP as indicated in the ITP*: In the monitoring team's experience, counseling is rare in segregation. Most typically, MHP contacts occur in response to patient self-referrals or group therapy. The Department's most recent quarterly report notes that efforts at improvement have been particularly concentrated at Pinckneyville, Menard, Logan, and Lawrence. Unfortunately, the large population of mentally ill in segregated housing at Pontiac do not receive any supportive counseling on an individual basis due to staffing problems.

*Participation in multidisciplinary team meetings once teams have been established:* The Quarterly Report of October 2018 very disingenuously addressed this requirement. The Department persists with its frankly incorrect interpretation of the word collectively. This means "as a group or as a whole", not an Ad Seriatim definition of "one after another." Ironically, the Department does employ multidisciplinary teams at Dixon's STC and at the JTC. It would be to the Department's advantage to state that they are unable to have multidisciplinary team meetings due to staffing issues. That way a plan could be developed to address this problem.

*MHP or mental health treatment team recommendation for post-segregation housing:* MHP recommendation for post-segregation housing is occurring throughout the Department.

*Documentation of clinical contacts in the medical record:* Clinical contacts were routinely documented in all records reviewed by the monitoring team.

*Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* Mentally ill offenders who are in Administrative Detention or disciplinary segregation are offered weekly unstructured out-of-cell time. The Monitoring Team has found that the Department is inconsistently achieving the out-of-cell time goals established in the Amended Settlement Agreement. This is due to a variety of reasons including, but not limited to, out-of-cell time scheduled for the convenience of the staff and not the offenders, limited

toileting facilities, fear of assault, and inclement weather. To the Department's credit, efforts have been made to ensure that the mentally ill offenders receive the appropriate amount of out-of-cell time. A serious problem exists at Pontiac, however, where some mentally ill offenders are withheld their allotted out-of-cell time. The occurs as an act of retaliation on the part of the custody staff because of acting out behavior by the mentally ill offender.

**XV(a)(vi):[45] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c) *below.[46]*

**Findings:** As of June 2018, mentally ill offenders housed in a control unit for longer than 60 days are required to receive at least 8 hours of structured and 8 hours of unstructured activities per week.

In preparation for the August 2018 Evidentiary Hearing, Assistant Monitor, Ms. Morrison, conducted an analysis of out-of-cell time in control units in the Department. This analysis consisted of looking at all of the Department's facilities and all of the mentally ill offenders who were housed in a control unit for the month of June 2018. She eliminated from her analysis those mentally ill offenders who were housed in a control unit for less than 60 days. The following is a summary of her findings:

- Only about a third of all facilities had stays 60 days or more.
- On average, mentally ill offenders are being offered 15.3 hours per week.
- 31% of this population were not being offered the required hours.
- On average, 6.7 hours of structured activities was being offered.
- Some facilities used large blocks of yard time, up to six hours per day, to satisfy their unstructured hours component.
- Due to the extremely high rate of refusals, the actual number of hours received was, on average:
  - Total out-of-cell hours was 7.5 with the requirement being 16.
  - Total  structured out-of-cell hours was 3.4 with the requirement being 8.

The issue of refusals has been a constant theme throughout the life of the Settlement Agreement. The Department has taken a rather concrete view of the refusal issue. The Quarterly Report of October 2018 states in part on page 21 "IDOC cannot force offenders to participate in out-of-cell time…IDOC offers the required out-of-cell time at every facility…" As Monitor, I have never suggested that the Department force offenders to participate in out-of-cell activities. What I have said repeatedly is that refusal rates are linked to the psychiatric condition of the patient and the quality and accessibility of the out-of-cell activity. In any clinical setting, a certain treatment refusal rate is expected. When refusal rates as seen in the Department exist, it must be addressed as a clinical failure. As an initial matter, such high refusal rates are strong evidence that the mentally ill population is undertreated and subjected to inadequate mental health care as a whole. The medical literature uses the term 'adherence to treatment" which suggests that the sicker

---

[45] This numbering from the Settlement Agreement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement Agreement.

[46] Note: this refers to the second occurrence of a subsection (c), on page 20 of the Settlement Agreement

patients tend to have the most difficulty with treatment regimens. This means that for psychiatric patients, treatment refusals are correlated to higher levels of acuity. Given my intimate knowledge of the mental health treatment available to mentally ill offenders housed in the control units of the Department, I am certain that the high refusal rate for out-of-cell activities is due to a combination of the acuity of the offenders' mental illness and lack of adequate mental health treatment.

**XV(a)(vii): Specific requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Administrative Detention or Disciplinary Segregation requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the mentally ill offender shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed or elevated level of care) as recommended by the MHP[47] unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** The Department is meeting the requirements of this subsection of the Settlement Agreement.

**XV(b)** As to SMI offenders in Disciplinary Segregation:

**XV(b)(i): Specific requirements:** IDOC will organize Review Committees ('Committees') to review the segregation terms of all SMI offenders in segregation with at least 60 days of remaining segregation time as of the approval date of this Settlement Agreement. These Committees will be comprised of attorneys, security professionals, and MHPs.

**Findings:** This requirement was not monitored during the current reporting period. The Quarterly Report of October 2018 states that this reviews have occurred for SMI offenders and are complete at all facilities. The Department has been found in compliance on this requirement in the past. They will receive a rating of compliance for this reporting period. This requirement will be more closely monitored moving forward.

**XV(b)(ii): Specific requirements:** The Committees shall eliminate any and all 300 and 400 level tickets and the accompanying segregation time from each SMI offender's disciplinary record.

**Findings:** The Department is in compliance with this requirement.

**XV(b)(iii): Specific requirements:** With regard to all remaining tickets, the Committees shall examine: (1) the seriousness of the offenses; (2) the safety and security of the facility or any person (including the offender at issue); (3) the offender's behavioral, medical, mental health and disciplinary history; (4) reports and recommendations concerning the offender; (5) the offender's current mental health; and (6) other legitimate penological interests.

---

[47] IDOC's compliance with the portion of this provision regarding MHP recommendations for placement into crisis care is discussed elsewhere this report.

**Findings:** This requirement was not monitored during the current reporting period. The Quarterly Report of October 2018 states that this review was conducted within the allowable timeframes. The Department has been found in compliance on this requirement in the past. They will receive a rating of compliance for this reporting period. This requirement will be more closely monitored moving forward.

**XV(b)(iv): Specific requirements:** The committees shall have the authority to recommend to the Chief Administrative Officer that an SMI offender's remaining segregation time be reduced or eliminated altogether based on the factors outlined in XV(b)(iii).

**Findings:** The Department is in compliance with this requirement.

**XV(b)(v): Specific requirements:** The decision for reduction or elimination of an SMI offender's segregation term (excluding the elimination and reductions relative to 300 and 400 level tickets) ultimately rests with the CAO who, absent overriding concerns documented in writing, shall adopt the Committees' recommendations to reduce or eliminate an SMI offender's segregation term.

**Findings:** The Department is in compliance with this requirement.

**XV(b)(vi): Specific requirements:** These reviews shall be completed within nine (9) months after approval of the Settlement Agreement.

**Findings:** The Department is in compliance with this requirement.

**XV(c)** Mentally ill offenders in Investigative Status/Temporary Confinement:

**XV(c)(i): Specific requirements:** With regard to offenders in Investigatory Status/ Temporary Confinement, IDOC shall comply with the procedures outlined in 20 Ill. Admin. Code § 504 and Administrative Directive 05.12.103.

20 Illinois Administrative Code Section 504 Subpart D: Segregation, Investigative Confinement and Administrative Detention—Adult provides:

Applicability, definitions, and responsibilities for IDOC staff regarding placement of offenders in segregation status; segregation standards for offenders placed into segregation, investigative confinement, administrative detention; and standards for recreation for offenders in segregation status.

AD 05.12.103 provides:

II (G): Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

II (H): Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP

and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

> (1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

> (2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

> (3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** Please see section XXV, page 95, Discipline of Seriously Mentally Ill Offenders, for a discussion about the disciplinary process.

II (I): Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or

behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** Please see section XXV, page 95**,** for a discussion about "Observation and Follow-Up

**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** This is not occurring on a consistent basis within the Department. Please see section XV(a)(iv), above, for a further discussion on this requirement.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
**8)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** Please see section XV(a)(vi) above for a discussion about this requirement.

- 65 -

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below.*[48]

**Findings:** Please see section XV(a)(vi) above for a discussion about this requirement.

**XV(c)(v): Specific Requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Investigatory Status/Temporary Confinement requires relocation to either a crisis cell or higher level of care, the MHP's recommendation shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the SMI offender shall be placed in an appropriate mental health setting (*i.e.,* Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** The Department is meeting the requirements of this subsection of the Settlement Agreement.

**XV(c)[49]: Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i. For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii. For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii. For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv. For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:** Please see XV(a)(vi) above, for a discussion of this requirement.

**Structured out-of-cell time & unstructured out-of-cell time:** Again, please see XV(a)(vi) above, for a discussion regarding this requirement.

---

[48] Note: this refers to the second occurrence of a subsection (c), on pages 19 and 20 of the Settlement.

[49] As above, this appears mislabeled in the Settlement but is carried forward here.

**The 60-day requirement:** Based on the data presented in XV(a)(vi), the Department is not meeting the 8 hours of structured out-of-cell time. It is only offering 6.7 hours and offenders are only receiving 3.4 hours weekly. The offered hours for unstructured out-of-cell time exceeds the minimum requirement of 8 hours but only 4.1 hours are actually received. It remains my ardent recommendation that the Department provide these out-of-cell hours to any mentally ill offender in segregation, regardless of how many days they are in segregation..

**Segregation-like settings:** I have expressed similar concerns for mentally ill offenders who are held in segregation-like settings such as R&C units. These offenders should receive similar out-of-cell opportunities as those in segregated housing.

**XV(d): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: I am very pessimistic about the Department's chances of fulfilling this requirement within the 4 year requirement. At this point the major impediment to achieving this goal is an overwhelming lack of clinical and custody staff.

## XVI: SUICIDE PREVENTION

> **Summary:** Crisis Intervention Teams have been formed and trained at each departmental facility. Potentially deadly interference with the operation of the Crisis Intervention Teams by custody staff continues to plague the Department. Mentally ill offenders placed on crisis watch status do not receive adequate mental health care. Crisis cells are still located in control-unit housing. Finally, the administrative reviews and psychological autopsies conducted after a suicide are stuck in a blind-loop system. That is, the often critical information contained in these documents is not part of a corrective action plan or some sort of feedback loop to help prevent future suicides. Therefore, the Department will not receive a rating of substantial compliance until such time as it can demonstrate that custody staff do not interfere with the operation of the Crisis Intervention Team **and** AD 04.04.102 is rewritten to include a corrective action plan based on the findings of the post suicide Administrative Review and Psychological Autopsy.

**(XVI)(a): Specific requirements:** IDOC shall comply with its policies and procedures for identifying and responding to suicidal offenders as set out in Administrative Directive 04.04.102 and the section titled "Identification, Treatment, and Supervision of Suicidal Offenders" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). IDOC shall also ensure that Forms 0379 ("Evaluation of Suicide Potential"); 0377 ("Crisis Watch Record"); and 0378 ("Crisis Watch Observation Log") are used in conjunction with these policies and procedures.

The section titled "Identification, Treatment and Supervision of Suicidal Offenders" from

the IDOC Mental Health SOP Manual[50] provides general guidelines for the handling of suicidal offenders. AD 04.04.102, however, provides a number of specific requirements:

II (F) Requirements: The Chief Administrative Officer of each facility shall:
 1)Establish a Crisis Intervention Team.
 a. The Crisis Intervention Team shall consist of: (1) A Crisis Intervention Team Leader who shall be an MHP; (2) All facility MHPs and nursing staff; and (3) At least one member of the facility's security staff of the rank of Lieutenant or above. **NOTE:** Other Crisis Intervention Team members may be chosen from facility staff upon the recommendation of the Team Leader to ensure at least one member is on site at all times.
b. Prior to serving, all members of the Crisis Intervention Team shall receive training in accordance with Paragraph II.g.1. Crisis Intervention Team Members on leave of absence shall be required to make up missed training upon return and prior to resuming service on the Crisis Intervention Team.
c. All Crisis Intervention Team Members shall participate in quality assurance meetings no less than once per quarter.

> (1)    Meetings shall be held to: (a) Review all events involving offender suicide during the previous quarter; (b) Review the Facility's Prevention and Intervention Plan in accordance with Paragraph II.G; and (c) Assess the adequacy of the facility's training program in relation to the facility's needs
>
> (2)    Meetings shall be documented in writing and shall: (a) Include the date and minutes of the meeting, a list of all persons in attendance and any recommendations or issues noted; (b) Be submitted to the Chief Administrative Officer, the respective Regional Psychological Administrator and the Chief of Mental Health

**Findings:** As previously reported, all facilities have formed Crisis Intervention Teams and all of the Teams have received the required training. This information was confirmed during the 18 site visits that were conducted during the reporting period. The Monitoring Team, however, did not review each facility's quality assurance records to determine if the members of the Crisis Intervention Teams are fulfilling their QA requirements.

2) Designate a Crisis Care Area.
    a. Crisis care areas shall be used to house offenders determined by an MHP to require removal from his or her current housing assignment for the purpose of mental health treatment or observation.
    b. Excluding exigent circumstances as determined by the Director or a Deputy director, segregation units shall only be utilized for crisis care areas if no other crisis care areas are available, and only until alternative crisis care areas are available.
    c. Cells designated as crisis care areas shall: Allow for visual and auditory observation of

---

[50] The Settlement references "Mental Health Protocol Manual." IDOC has changed the name of this manual to "Mental Health SOP Manual."

the entire cell;  Allow for prompt staff access;  Control outside stimuli;  Contain beds that are suicide resistant and constructed of a metal base, cinder block, concrete slab or herculite material;  Contain a pass through or chuck holes that open out of the cell; Contain mesh coverings over all vents;  Contain laminated glass over all windows or be safely and security glazed windows; and   Be made appropriately suicide resistant and provide adequate lighting and temperature.

**Findings:** Each Facility has provided the locations of their designated crisis care areas. The monitoring team has viewed the crisis care areas in each facility toured and has found them to have the required features. For the most part, crisis care is not in segregation, but there are notable exceptions. For a full discussion, please see X(f), above.

II (G): Prevention and Intervention Plan

The Chief Administrative Officer, in consultation with the facility's mental health authority, shall establish a written procedure for responding to, and providing emergency mental health services, including prevention and intervention of emergency mental health situations. The procedure shall be reviewed annually and shall be approved by the Chief of Mental Health and shall include, at a minimum, provisions for the following: training, referrals for emergency mental health situations, crisis intervention team response, crisis watch, response to self-inflicted injuries and suicide, and quality improvement reviews.

**Findings:** The Quarterly report of October 2018 states on page 24 "There is no dispute that the Department has fulfilled this requirement." The fact of the matter is that during the first 30 months of monitoring the Settlement Agreement, the Monitoring Team has only received 22 of the required Institutional Directives required by AD 04.04.102. I am fully aware that Crisis Intervention Teams have been established at each facility so the Department will receive a provisional compliance rating for II (G) pending receipt of all 29 Institutional Directives.

1) Training
The Chief of Mental Health, in consultation with the Office of Staff Development and Training shall establish standardized training programs that provide information on emergency mental health services. All training shall be provided by an MHP, or in the absence of the MHP, a current crisis team member and, where appropriate, shall include enhanced content specific to the facility.
a.      Level I Training shall be required as part of annual cycle training for all staff that have regular interaction with offenders, and shall include a minimum of one hour of the following:   (1) Elements of the facility's Prevention and Intervention Plan; (2) Demographic and cultural parameters of suicidal behavior in a correctional setting, including incidence and variations in precipitating factors; (3) Risk factors and behavioral indicators of suicidal behavior; (4) Understanding, identifying, managing and referring suicidal offenders, including the importance of communication between staff; (5) Procedural response and follow-up procedures including crisis treatment supervision levels and housing observation; and (6) Documentation requirements.

b. Level II Training shall be required as part of annual cycle training for all personnel identified in the facility's Prevention and Intervention Plan as having the authority to initiate a crisis watch. Level II training shall consist of a minimum of four hours of in-depth didactic and experiential training in assessing suicide risk and procedures for initiating a crisis watch.

c. Level III Training shall be required for all Crisis Intervention Team members, excluding MHPs, and shall consist of 24 hours of advanced training in the philosophy of suicide prevention and continuous quality improvement of the facility's Prevention and Intervention Plan.

> (1) Crisis Intervention Team members shall also be trained by an MHP, designated by the Chief of Mental Health, in consultation with the Office of Staff Development and Training. This training will give the Crisis Intervention Team member the ability to instruct on the standardized training curriculum that provides information on emergency mental health services during cycle training, in the absence of the MHP. (2) Training shall be completed prior to active service with the Crisis Intervention Team.

d. Clinical Continuing Education shall be required for all Crisis Intervention Team members and shall consist of a minimum of one hour per quarter of training to assist Crisis Intervention Team members in monitoring facility policy and procedure and in reviewing suicide attempts or completions. Clinical Continuing Education Training may be obtained through participation in the quarterly Crisis Intervention Team quality assurance meeting.

**Findings:** This training requirement has been met.

2) Referrals for Emergency Mental Health Situations: Staff shall immediately notify the Crisis Intervention Team, through his or her chain of command, of any situation whereby an offender exhibits behavior indicative of mental or emotional distress, imminent risk for harm to self or an attempted suicide.

**Findings:** There remains a serious problem with custody staff acting as gate keepers to the Crisis Intervention Team. Please see section V(g)**,** page 22 for details.

3) Crisis Intervention Team Response

a. At least one Crisis Team member shall be on site at all times. The designated Crisis Intervention Team Leader shall be available by phone when not on site.

b. The Chief of Mental Health and the respective Regional Psychological Administrator shall be notified within 24 hours of the suicide of an offender, and within 72 hours of any attempted suicide.

c. Upon notice of a potential crisis situation, a Crisis Intervention Team member shall: (1) Implement necessary means to prevent escalation and to stabilize the situation. (2) Ensure that the offender is properly monitored for safety. (3) Review the situation with the Crisis Team Leader or and MHP to determine what services or referrals shall be provided. If the Crisis Intervention Team Leader is not on grounds and cannot be reached by telephone, and there are no MHPs on grounds,

the Crisis Team member shall contact an alternative MHP and the review may be completed via telephone. (4) Initiate a crisis care treatment plan to monitor and facilitate the delivery of services, including referrals for mental or medical examination, and any additional recommendations of the MHP. The crisis care treatment plan shall be documented on the Crisis Watch Log, DOC 0377. Referrals for additional examination or services following the offender's release from a crisis care treatment level of care shall be documented on a DOC 0377. (5) If determined that the offender does not need to be placed in the crisis care area, notify the Shift Commander of any additional care requirements for security staff.

**Findings:** When called, the response of the Crisis Intervention Team is generally timely. As noted in section V(g), problems continue to exist with access to the Crisis Intervention Team.

4) Crisis Watch
a. A crisis watch shall be initiated when: (1) An offender exhibits behavior that is likely to cause harm to him or herself. (2) Mental health issues render an offender unable to care for him or herself. (3) Gestures, threats or attempts of suicide are made. (4) The Evaluation for Suicide Potential, DOC 0379, if administered, indicates need. (5) Less restrictive measures have failed or are determined to be clinically ineffective.

**Findings:** This requirement has been met throughout the life of the Settlement Agreement. Problems have arisen, however, with mentally ill offenders withholding their genuine degree of suicidality out of fear of being placed on a crisis watch with its overwhelmingly austere conditions, prolonged lengths of stay and lack of any meaningful psychiatric care..

b. Determination to initiate a crisis watch shall be made by an MHP. If an MHP is not available, the following individuals, in order of priority, may initiate a crisis watch: (1) Respective Regional Psychologist Administrator, (2) Any Regional Psychologist Administrator, (3) Chief of Psychiatry, (4) Chief of Mental Health Services, (5) Chief Administrative Officer in consultation with a Crisis Intervention Team Leader, (6) Back-up Duty Administrative Officer in consultation with a Crisis Intervention Team Member
c. Offenders in crisis watch shall not be transferred to another facility unless clinically indicated and approved by the Chief of Mental Health or in the absence of the Chief of Mental Health, the Chief of Psychiatry.
d. Upon initiation of a crisis watch, an MHP shall determine: (1) The appropriate level of supervision necessary in accordance with Paragraph II.E.; and (2) Allowable property, including the type and amount of clothing.
e. Unless medically contraindicated: (1) Water shall be available in the cell or offered at regular intervals. When water is not available in the cell, the offers shall be documented on the DOC 0377. (2) Meals not requiring utensils shall be provided in the cell or crisis care area. If contraindicated, alternative nutrition sources shall be provided.

f. The offender's vital signs shall be taken by health care staff within 24 hours of placement on crisis watch, or sooner if the offender has been placed in restraints for mental health purposes.

g. Prior to placement in a designated crisis care area, the offender shall be strip-searched and the cell inspected for safety.

h. Offenders shall be monitored at appropriate intervals, dependent upon level of supervision. All observations shall be documented within the appropriate staggered intervals, on the Crisis Watch Observation Log, DOC 0378, and shall include staff's observation of the offender's behavior and speech, as appropriate.

i. The offender shall be evaluated by an MHP, or in his or her absence, a Crisis Intervention Team member, in consultation with the Crisis Team Leader, at least once every 24 hours. The evaluation shall assess the offender's current mental health status and response to treatment efforts. The evaluation shall be documented on the DOC 0377.

j. An offender's crisis watch shall only be terminated by an MHP following the completion of an evaluation assessing the offender's current mental health status and the offender's response to treatment efforts. The evaluation shall be documented in the offender's medical record and the termination of the crisis watch shall be documented on the DOC 0377.

**Findings:** The Department is meeting the requirements of this subsection.

5) Response to Self-Inflicted Injury and Suicides

a. Responses to medical emergencies shall be in accordance with AD 04.03.108 and shall include immediate notification of an MHP.

b. In the event of attempted suicide, the preservation of the offender's life shall take precedence over preservation of the crime scene; however, any delay in response due to security factors shall be noted in the Incident Report, DOC 0434.

**Findings:** The Department is meeting this requirement.

6) Quality Improvement Reviews

a. Mortality Review: In the event of an offender's suicide, the Chief of Mental Health shall designate an MHP to complete a psychological autopsy. The psychological autopsy shall be documented on the Psychological Autopsy, DOC 0375, and shall be submitted to the Chief of mental Health within seven working days of assignment.

b. Administrative Review

(1) In the event of an offender's suicide, the Chief Administrative Officer shall:

(a) Establish a clinical review team who shall systemically analyze the event. The Review Team shall consist of: i. Mental health and medical staff, including an MHP, a psychiatrist and a registered or licensed practical nurse. Medical staff chosen for the clinical review team shall have no direct involvement in the treatment of the offender for a minimum of 12 months prior to the event.   ii. A security staff supervisor. **NOTE:** Facility

- 72 -

administrators or staff, whose performance or responsibilities maybe directly involved in the circumstances of the suicide, shall not be chosen for the review team.

(b) Designate a clinical review team Chairman who shall ensure all relevant documentation pertaining to the offender and his or her treatment including, but not limited to, the master file, medical record, Medical Director's death summary and the DOC 0375, if applicable, is available to the clinical review team.

(2) Within ten working days following the suicide, the clinical review team shall complete a review to:

(a) Ensure appropriate precautions were implemented and Department and local procedures were followed; and

(b) Determine if there were any personal, social or medical circumstances that may have contributed to the event, or if there were unrealized patterns of behavior or systems that may have indicated earlier risk.

(3) Upon completion of the review, the Chairperson shall submit a written report to the Chief Administrative Officer, the facility's Training Coordinator, the Chief of Mental Health and the respective Deputy Director summarizing the review team's findings and providing any recommended changes or improvements.

**Findings:** Three mentally ill offenders committed suicide during the monitoring period. The Administrative Reviews and Psychological Autopsies were completed on all of them in time to be included in this report.

As Monitor, I have noted in each of the previous reports that the Administrative Reviews and Psychological Autopsies serve no practical purpose for the Department. That is, these documents are often thoughtfully prepared but their recommendations have never been incorporated in any sort of feedback loop/corrective action plan that I am aware of. I first pointed this out to Dr. Hinton and Chief Lindsay on my first visit to Pontiac on August 26, 2016. Tragically, I am not aware of any substantive changes being made to the suicide review process during this last 27 months.

Two of the three suicides in the reporting period occurred at Dixon. Jamie Chess, Psy.D., Psychologist Administrator wrote two very thoughtfully prepared Administrative Reviews. Dr. Chess also included some very important recommendations to help prevent future suicides. Administrative Directive 04.04.102, effective date 11/1/2017 is titled "Suicide Prevention and Intervention and Emergency Services," section G(6)(b)(3) states "upon completion of the review, the Chairperson shall submit a written report to the Chief Administrative Officer, the facility's Training Coordinator, the Chief of Mental Health and the respective Deputy Director summarizing the review team's findings and providing any recommended changes or improvements." This is a blind loop. Per the Administrative Directive, nobody has the responsibility of doing anything with the findings and the recommendations from this Administrative Review. The same is true of the psychological autopsy except that the findings and recommendations only go to the chief of Mental Health.

This lack of feedback/corrective action is an egregious oversight that the Department has known about for at least 27 months. This issue requires immediate remediation.

**(XVI)(b): Specific requirements:** IDOC shall ensure that the policies, procedures, and record-keeping requirements identified in (a), *above*, are implemented and followed in each adult correctional facility no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** The Department continues to struggle to meet the overall requirements of this subsection of the Settlement Agreement. This subsection calls for the <u>implementation</u> of all of the suicide and crisis-related policies. Significant problems exist in the following areas:

- Custody staff interfering with the work of the Crisis Intervention Team.
- Crisis cells remaining in control units.
- Lack of proper psychiatric care while offenders are on a crisis watch.
- Lack of consistently in performing the 5 day follow ups of offenders who have been discharged from crisis watch status.
- Ongoing problems with the administrative reviews of suicides.

Each of these issues is critically important to the properly operation of a suicide prevention program. The Department will continue to receive a rating of non-compliance until each of these items is addressed.

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary:** The average use of restraints slightly increased in the current reporting period. It was 27/month as compared to 25/month in the previous reporting period. Not all facilities employ physical restraints for mental health purposes. Their use is primarily found in those facilities that treat higher acuity patients (i.e. Dixon, Logan, Joliet and Elgin.) Pontiac was able to reduce its use of restraints by the administration of emergency enforced psychotropic medication prior to an offender requiring restraints. Other facilities with high usage of restraints are encouraged to consider a similar strategy. The Monitoring Team did not conduct a data driven analysis of the use of restraints for this reporting period so no overall rating will be assigned.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1.  Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

    a.  Under no circumstances shall restraints be used as a disciplinary measure.

    b.  Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately make contact with the psychiatrist within one hour of the offender being placed into restraints and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall make contact with the physician or the licensed clinical psychologist.

2.  Crisis treatment shall be initiated in accordance with AD 04.04.102.

    a.  The initial order for the use of restraints shall not exceed four hours.

    b.  Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

    c.   If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1.    Only a psychiatrist who has conducted a face to face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face to face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2.    If a psychiatrist, physician or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3.    The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face to face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4.    Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b.     The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g. the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1.    Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2.    Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3.   Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4.   Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychologist.

5.   The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6.   Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7.   Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8.   Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be utilized, justification of the care shall be documented in the offender's medical chart.

9.   Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10.  All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings:** The rate of restraints use for mental health reasons rose, with 133 total uses in the period reviewed.[51] As in the past, the practice was concentrated where the mission is treating higher acuity patients—Dixon and Logan, and now Joliet and Elgin. Stateville also had a significant amount of use. Another eight institutions also used restraints only once or twice, and more than half of IDOC facilities had no restraints events.

Pontiac has made dramatic improvement. Where previously it had by far the highest amount of use, and some of its practices were problematic, during this round, staff had reduced restraints to *just one event lasting four hours*. This dramatic decrease in the use of restraints is due in large part to the administration of emergency enforced psychotropic medications **prior** to an offender requiring restraints. This is standard emergency psychiatric practice that could be safely

---

[51] This is a higher average over the five months than the previous total of 196 averaged over an eight-month period.

implemented at all facilities, especially those who frequently use restraints for mental health purposes.

Logs indicated that the majority of uses systemwide lasted less than one day, and 95% concluded by the 24-hour point. The longest recorded use was three days though a man, discussed in previous reports, who had been living in restraints for many months was not listed on the logs for unknown reasons. About 20 patients were restrained multiple times, though these were separated in time and almost always a series of short interventions. This does, however, raise the question of whether some of that group is in need of inpatient beds not yet available.

Previously, 14 institutions have been found in substantial compliance on this requirement and they remain in this status.

**(XVII)(b): Specific requirement:** IDOC will continue to comply with 20 Ill. Admin. Code §§ 501.30, 501.40 and 501.60, and Administrative Directive 05.01.126. The Administrative Code sections are titled Section 501.30: Resort to Force; Section 501.40: Justifiable Use of Force; and Section 501.60: General Use of Chemical Agents.

IDOC AD 05.01.126 provides for:

II (F): The Chief Administrative Officer shall ensure a written procedure for the use and control of security restraints is established. The written procedure shall provide for the following:

Use of Security Restraints

> (1)  Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints shall be used: (a) To prevent an offender from escaping. (b) To retake an offender who has escaped. (c) To prevent or suppress violence by an offender against another person or property. (d) When transporting an offender outside the facility for the purposes of transfers, writs, etc., except when transporting offenders to assigned work details outside the facility, pregnant offenders for the purposes of delivery, or offenders assigned to the Moms and Babies Program on approved day release while transporting a minor child. (e) When transporting a transitional security offender for other than job related or programmatic activities directly related to successful completion of the transition center program.
> (2)  Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints may be used: (a) When moving an offender who is in disciplinary segregation or who is in segregation pending investigation within the facility; or (b) Whenever the Chief Administrative Officer deems it is necessary in order to ensure security within the facility or within the community.
> (3)  Offenders on funeral or critical illness furlough shall be restrained in accordance with AD 05.03.127.

Inventory and Control

(a) A written master inventory of all security restraints, dated and signed by the Chief Administrative Officer, shall be maintained.

(b) All security restraints that have not been issued to staff shall be stored and maintained in a secure area or areas that are not accessible to offenders.

(c) A log documenting issuance and return of security restraints shall be maintained in a secure area or areas. The log shall include: (1)   Date and time issued; (2) Receiving employees name; (3)        Issuing employees name; (4) Date  and  time returned; and (5) Name of employee receiving the returned restraints.

(d) A written report shall be filed on lost, broken, or malfunctioning security restraints. The report shall be reviewed by the Chief of Security and maintained on file with the security restraints inventory records for no less than one year.

**Findings:** The Monitor has previously found good practice in 21 Institutional Directives. The team did not review this requirement during the monitoring period.

**(XVII)(c): Specific requirement:** Physical restraints shall never be used to punish offenders on the mental health caseload.

**Findings:** The team did not formally review this requirement during the monitoring period; however, it was the team's impression in previous reviews and current site visits that physical restraints are not being used for punishment.

**(XVII)(d): Specific requirement:** The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** The Monitoring Team will conduct a comprehensive data driven analysis of this section for the 3rd Annual Report. Until that time, no overall rating will be assigned.

## XVIII: MEDICAL RECORDS

**Summary**: The required forms are in wide use within the Department. Many of these forms have undergone extensive revision, with the approval of the monitor, due to emerging clinical necessities.

Overall, the quality of the medical records remains poor. This poor quality of the medical records is an impediment to the provision of acceptable mental health care.

**(XVIII)(a): Specific requirement:** In recognition of the importance of adequate records to treatment and continuity of care, no later than sixty (60) days after the approval of this Settlement Agreement, IDOC shall fully implement the use of the standardized forms it has developed to record offender mental health information and to constitute an offender's mental health file, including IDOC Forms 0372   (Mental Health Screening); 0374 (Mental Health

Evaluation); 0284 (Mental Health Treatment Plan); 0282 (Mental Health Progress Note); 0387 (Mental Health Services Referral); 0380  (Mental Health Segregation Rounds); 0376 (Order for Use of Therapeutic Restraints for Mental Health Purposes); 0379 (Evaluation of Suicide Potential); 0378 (Crisis Watch Observation Log); 0377 (Crisis Watch Record); 0371 (Refusal of Mental Health Services); and 0375 (Psychological Autopsy).

**Findings:** As previously reported, standardized forms are in common use with the Department. Many of these forms have undergone modifications due to emerging clinical needs. The use of these forms has helped improve clinical care. Overall, however, the medical records are of very poor quality, which impedes the provision of adequate mental health care.

**(XVIII)(b): Specific requirement:** No later than ninety (90) days after the approval of this Settlement Agreement, IDOC shall fully comply with Administrative Directive 04.03.100, § II(E)(7), which requires an offender's medical record, including any needed medication, to be transferred to any facility to which the offender is being transferred at the time of transfer.

AD 04.03.100, section II (E)(7):  The medical record shall be transferred to the receiving facility at the time of offender movement.

(7)(a):  In the event that an offender is transferred from the Illinois Department of Juvenile Justice to an IDOC facility, the entire original medical record shall be transferred with the offender. The transferring youth center may keep a copy of the medical record. Such movement shall be treated as a departmental transfer with regard to documentation.

(7)(b): The medical record and, if applicable, medication shall be sealed in a clear plastic envelope through which the offender's name and ID number can be easily identified.

(1) If the information on the DOC 0090 is not urgent in nature, the DOC 0090 shall be placed inside the front cover of the medical record.

(2) If the DOC 0090 contains urgently needed medical or medication disbursement information, the following steps shall be taken: (a) The DOC 0090 shall be folded in half to promote confidentiality and a notation of "URGENT MEDICAL INFORMATION" shall be made in bold print on the exposed (blank) side of the DOC 0090. (b) The folded DOC 0090 with the notation side up shall be enclosed on top of the medical record inside the clear plastic so that these individuals can be immediately identified and evaluated upon arrival at a new institution. (c) Prior to transferring an offender who has significant medical problems as determined by the transferring facility Medical Director, the transferring Health Care Unit Administrator or Director of Nursing shall telephone the receiving Health Care Unit Administrator or Director of Nursing to advise of the transfer.

(7)(c): A member of the receiving health care staff shall complete the Reception Screening section of the DOC 0090. The DOC 0090 shall be placed chronologically in the progress notes section of the medical record; no progress note shall be required.

**Findings:** The monitoring team did not evaluate this requirement during the current monitoring period.

## XIX: CONFIDENTIALITY

**Summary**: Medical records are handled in a confidential manner throughout the Department. Administrative Directive, 04.04.100, was modified to make confidential mental health interactions the standard within the Department. This modification, however, occurred six months past its original deadline. The only locations where confidential mental health interactions occur on a consistent basis are the R&C units. Dr. Kapoor did find that the JTC was also adhering to AD 04.04.100.

An omnibus consent form, which was approved by the Monitor on 11/7/17, wasn't implemented until May 2018. During the interim period, the consent portion of the treatment planning form was used. This often resulted in an offender having two different treatment plans. One of the plans was created by the psychiatrist and the other by a MHP. Hopefully this problem will be finally addressed by the use of this omnibus consent form.

**XIX(a): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, the IDOC shall comply with the requirements of Administrative Directive 04.03.100, § II(E) (10) as to the confidentiality of mental health records.

AD 04.03.100, section II (E) (10) provides: Offender medical and mental health records are confidential. Access to medical and mental health records shall be limited to health care staff, other Department personnel and outside State and federal agencies on a need-to-know basis as determined appropriate by the Facility Privacy Officer or the Health Care Unit Administrator. All staff having access to medical records or medical information shall be required to sign a Medical Information Confidentiality Statement, DOC 0269, and a new DOC 0269 shall be signed during cycle training annually thereafter. The most recent DOC 0269 shall be retained in the staff member's training file.

**Findings:** Based on the 18 site visits conducted by the Monitoring Team during the current reporting period, it is clear that the offender medical records are handled in a confidential manner. The Monitoring Team did not review if all staff having access to medical records have signed DOC 0269. The Quarterly Report of October 2018 is silent on the issue of staff signing DOC 0269.

**Specific requirement:** Additionally, IDOC shall take the following steps to promote the confidential exchange of mental health information between offenders and persons providing mental health services:

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** As previously reported, IDOC modified AD 04.04.100, effective date 6/1/2017, to address the policy and procedure requirement of this subsection of the Settlement Agreement. Training on these policies and procedures is included in correctional staff training. As reported in the 2nd Annual Report and the Quarterly Report of October 2018, the Department received a rating of non-compliance for this requirement because the policy regarding confidentiality was not completed until over six months past the deadline. The Department will continue to receive a non-compliance rating for this requirement due to its not meeting its original deadline.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible. 36

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** AD 04.04.100, was updated with an effective date of 6/1/2017. Subsection

II(F)(2)(b) now establishes the requirement for confidentiality within IDOC. It states "All mental health services **shall**, (emphasis added), be conducted in a manner which ensures confidentiality and sensitivity to the offender regardless of status or housing assignment. The Department continues to struggle to consistently meet this requirement.

As previously reported, the best examples of the Department meeting its confidentiality requirements are the R&C units. As reported in section IV(d), page 17 above, these units are consistently providing confidential mental health services. Of note, during the current reporting period, the Monitoring Team toured all of the R&C units in the Department.

Prior to the August 2018 Evidentiary Hearing, the Monitoring team conducted a chart review of 92 offenders who either were currently on a crisis watch or had recently been on a crisis watch. This review revealed that only 69 offenders were receiving daily contacts and that 40% were not in a confidential setting. Also, MHP progress notes indicated that custody staff was present during these non-confidential contacts. A tour of Pinckneyville and Menard revealed that there is the option to perform the daily crisis contacts in a confidential setting although this doesn't occur if the offender refuses to leave his cell. A tour of Pontiac revealed that daily crisis checks generally occur but not on a consistent basis. When they do occur, they are not consistently done in a confidential manner. A problem in monitoring this issue is the fact that the daily crisis contact progress notes often omit specifying if they are conducted in a confidential manner.

Over the course of the reporting period, the Monitoring Team conducted 18 site visits of 14 different facilities. The overall consensus is that the mental health staff are aware of their responsibilities to provide mental health care in a confidential manner. For example, Dr. Kapoor found that the JTC was substantially compliant with this requirement. She went on to state that the RTU housing units and treatment mall contain adequate space for confidential mental health assessments. Crisis watch assessments are done in a day room of the housing unit, but the area is separate from the hallway containing inmates' cells, and the officer is out of earshot.

The mental health staff throughout the toured facilities also admit that this is not always possible to conduct confidential mental health interactions given their tremendous workload. That is, it is much quicker to conduct a cell front evaluation then waiting for an escort officer. The lack of a sufficient number of escort officers is a tremendous problem throughout the Department. Finally, the MHPs at Pontiac admitted that the custody staff and not the mental health staff have final say over which offender can leave his cell. This fact, negatively impacts the staff's ability to conduct confidential mental health interactions.

The Department will continue to receive a rating of non-compliance until they address these problems related to confidentiality.

**(XIX)(d): Specific requirement:** In addition to enforcing the consent requirements set forth in "Medical/Legal Issues: 2. Informed Consent" in the IDOC Mental Health Protocol Manual, incorporated by reference into the IDOC AD 04.04.101 section II (E)(2) within sixty (60) days after the approval of this Settlement Agreement, IDOC shall ensure that Mental Health Professionals who have a treatment/counseling relationship with the offender shall disclose the following to that offender before proceeding: the professional's position and agency; the purpose of the meeting or interaction; and the uses to which information must or may be put. The MHP

shall indicate a willingness to explain the potential risks associated with the offender's disclosures.

Medical/Legal Issues: 2. Informed Consent in the IDOC Mental Health Protocol Manual provides:

> Before initiating psychotropic medication, the psychiatric provider must complete at least a brief history and Mental Status Examination to determine that the offender (a) has a basic understanding that he or she has a Mental Health Problem, (b) understands that medication is being offered to produce relief from that problem, and (c) is able to give consent to treatment. The clinician must also inform the offender about alternative treatments, the appropriate length of care, and the fact that he or she may withdraw consent at any time without compromising access to other Health Care. With the exception of Mental Health emergencies, informed consent must be obtained from the offender each time the Psychiatric Provider prescribes a new class of Psychotropic Medication.[52]

**Findings:** Throughout the first 30 months of the Settlement Agreement, the Department has struggled with this requirement. As reported in the 2nd Annual Report, "for the first 18 months of the Settlement Agreement, there was little indication that IDOC paid attention to this important requirement."[53] "The Monitored approved an omnibus consent form on 11/7/17 in hope that this new form would help address these deficiencies."[54] The Quarterly Report of October 2018 states that "a standalone confidentiality and consent from was implemented May 2018." The Quarterly Report also states that "the informed consent procedures are addressed in Form 284, the mental health treatment planning form." During the current reporting period the Monitoring team has not encountered this standalone form as the treatment planning form is consistently used to document informed consent. The continued use of the treatment planning form for the purposes of establishing informed consent results in there often being two treatment plans for a given offender. This was the reason why an omnibus form was created in the first place. It is also not lost on the Monitoring Team that this omnibus form was approved by the Monitor in November 2017 and wasn't implemented until May 2018.

## XX: CHANGE OF SMI DESIGNATION

**Specific requirement:** The determination that an offender, who once met the criteria of seriously mentally ill, no longer meets such criteria must be made by the offender's mental health treatment team and documented in the offender's mental health records. Until mental health treatment teams are established, this function shall be performed by a treating MHP.

**Findings:** The Department does not currently track this information on a system-wide basis. The number of SMI-designated offenders has remained basically unchanged over the

---

[52] The Manual defines "Informed Consent": "Informed Consent is defined as consent voluntarily given by an offender, in writing, after he or she has been provided with a conscientious and sufficient explanation of the nature, consequences, risks, and alternatives of the proposed treatment." This section of the Manual also provides: "Offenders should be advised of the Limits of Confidentiality prior to their receiving any Mental Health Services." This requirement is nearly identical to the requirement discussed above regarding confidentiality, so the team does not address it again here under Informed Consent.

[53] 2nd Annual Report page 89.

[54] Ibid.

reporting period.[55] The procedure outlined by this requirement is being followed. This issue encountered by the Monitoring Team is that there is a large group of severely mentally ill offenders who do not carry the SMI designation. As important as this observation is, it is not pertinent to this section of the Settlement Agreement. Finally, the Monitor has not received any reports during the current reporting period that mentally ill offenders are losing their SMI status prior to a disciplinary hearing.

## XXI: STAFF TRAINING

**Summary**: IDOC timely submitted a staff training plan. The implementation of that plan was also accomplished in a timely manner.

**XXI(a): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan and program for staff training as provided in subsection (b), *below*.

**Findings:** As previously reported, IDOC has met this requirement by submission of this plan and program for staff training to the Monitor within one (1) year following the approval of the Settlement Agreement.

**XXI(b): Specific requirement:** Within two (2) years following the approval of this Settlement Agreement, all IDOC and vendor staff who interact with offenders shall receive training and continuing education regarding the recognition of mental and emotional disorders. As directed in the section titled "Training" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), this training shall include material designed to inform the participants about the frequency and seriousness of mental illness, and how to treat persons who have mental illness or persons manifesting symptoms of mental illness. In addition to training on confidentiality as provided in Section XXII (a), *above*, this training shall incorporate, but need not be limited to, the following areas: i) The recognition of signs and symptoms of mental and emotional disorders most frequently found in the offender population; ii) The recognition of signs of chemical dependency and the symptoms of narcotic and alcohol withdrawal; iii) The recognition of adverse reactions to psychotropic medication; iv) The recognition of signs of developmental disability, particularly intellectual disability; v) Types of potential mental health emergencies, and how to approach offenders to intervene in these crises; vi) Suicide prevention; vii) The obligation to refer offenders with mental health problems or needing mental health care; and viii) The appropriate channels for the immediate referral of an offender to mental health services for further evaluation, and the procedures governing such referrals.

**Findings:** As previously reported, Chief Lindsay confirmed that this training requirement was completed within the requisite timeframe.

---

[55] 5112 on 5/9/18 & 5068 on 9/19/18. This is the most current data available.

**XXI(c):  Specific  requirement:** Within  one  (1)  year  following  the  approval  of  the Settlement  Agreement,  Mental  Health  Administrative  Staff  referenced  in  Section  XI(d)  of  this Settlement  Agreement,  IDOC  shall  develop  a  written  plan  for  the  orientation,  continuing education, and training of all mental health services staff.

**Findings:** As  previously  reported,  IDOC  has  developed  a  written  plan  for  the  orientation, continuing education, and training of all mental health services staff within the deadline of May 22, 2017.

## XXII: PARTICIPATION IN PRISON PROGRAMS

> **Summary**: This requirement was reviewed by the Monitoring Team during their site visits. In particular, Dr. Kapoor found that the JTC was in full compliance with this measure.

**(XXII)(a):  Specific  requirement:** Unless  contraindicated  as  determined  by  a  licensed  MHP, IDOC  shall  not  bar  offenders  with  mental  illness  from  participation  in  prison  programs  because of their  illness  or  because  they  are  taking  psychotropic  medications.  Prison  programs  to  which mentally  ill  offenders  may  be  given  access  and  reasonable  accommodations  include,  but  are  not limited  to,  educational  programs,  substance  abuse  programs,  religious  services,  and  work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations  consistent  with  the  Americans  with  Disabilities  Act  and  the  Section  504  of  the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** This  requirement  was  reviewed  by  the  Monitoring  Team  during  their  site visits. Nothing was found to suggest that SMI offenders are barred from participating in the few prison  programs  that  currently  exist.   Dr.  Kapoor  particularly  looked  into  this  issue  during  her tour  of  the  Joliet  Treatment  Center  on  10/22/18.  She  found  the  facility  is  compliant  with  the provisions  in  this  section.   During  her  site  visit,  she  did  not  encounter  any  inmates  who  were denied  access  to  educational,  religious,  work,  or  substance  abuse  programs  because  of  their  SMI designation.   However,  she  noted  her  previous  concern  that  the  Department  does  not  seem  to have a plan for allowing SMI offenders to earn early release credits.  As she understands the situation,  most  SMI  offenders  do  not  have  access  to  the  specific  IDOC  programs  that  offer  early release  credits,  and  they  cannot  substitute  treatment  activities  for  these  programs.   Although  not specifically  addressed  by  the  Settlement  Agreement,  in  her  view,  the  opportunity  to  earn  early release credits should be afforded to SMI offenders.

## XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY

> **Summary**: No rating will be assigned due to the Monitoring Team's not reviewing this section during the current reporting period.

**XXIII(a): Specific requirement:** To ensure continuity of treatment, unless a SMI offender is being transferred to another facility for clinical reasons, IDOC shall make best efforts to ensure that the offender's treating MHP is consulted prior to transfer. If such a consultation is not possible prior to transfer, the MHP shall be consulted no more than seventy-two (72) hours after effectuation of transfer. If a transfer is being made for security reasons only, the reasons for the transfer and the consultation with the offender's treating Mental Health Professional shall be documented and placed in the offender's mental health file.

**Findings:** The Monitoring Team did not review this requirement during the current reporting period.

**XXIII(b): Specific requirement:** When a SMI offender is to be transferred from one prison to another, the sending institution, using the most expeditious means available, shall notify the receiving institution of such pending transfer, including any mental health treatment needs.

**Findings:** The Monitoring Team did not review this requirement during the current reporting period.

**XXIII(c): Specific requirement:** The provisions of this section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** The Department will not receive a rating due to the Monitoring Team not fully reviewing this subsection.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**: When formal use of force incidents are initiated and completed, they generally meet the requirements of this section. However, an informal use of force and retaliation system carried out by the custody staff exists at Pontiac. The details of this system are provided in the body of this section of the report. There is also evidence of intimidation of the mental health staff at Pontiac by the custody staff. Both of these issues have been present at Pontiac throughout the life of the Amended Settlement Agreement.

It is my opinion as Monitor that the Department has not done anything to effectively address this ongoing problem at Pontiac.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[56] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:
a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted

---

[56] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believes the Settlement contemplated AD 03.02.108(I)(B).

purpose.

b) Use of force shall be terminated as soon as force is no longer necessary.

c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.

d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or 05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.    Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

> 1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

> 2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

> 3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

> 4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.     Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A

member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.      Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings:** The monitoring team did not perform a comprehensive, data-driven analysis of this requirement during this monitoring period. Based on numerous site visits and overall familiarity with the use of force policies and procedures, it is my opinion as Monitor that when a formal use of force incident is initiated and completed, the Department is usually meeting the requirements of this subsection.

There exists, however, an informal use of force system at Pontiac. This informal use of force system may exist at other facilities but I have no objective evidence to support that. I am

absolutely convinced of the existence of this informal use of force system at Pontiac. The following are the bases of my opinion:

1. Hundreds of interviews with offenders describing in explicit details how the custody staff physically assault the mentally ill offenders. The details of these assaults are often corroborated by offenders living in proximity to the offender who has been assaulted.
2. The details of some of these assaults have been further corroborated by the mental health staff.
3. The details of some of these assaults have been further corroborated by the offender's medical record.
4. During my site visits, I often encounter mentally ill offenders who present with injuries to their heads and face. I have even encountered mentally ill offenders with newly missing teeth and physical exam evidence of recent trauma to their faces. If I had encountered these types of injuries with my own patients, I would be obligated to report them to the police.
5. Finally, I have reviewed hundreds of filings to the Court regarding these incidents of physical abuse.

I have also encountered the presence of an elaborate system of retaliation perpetrated by the custody staff against the mentally ill offenders at Pontiac. These retaliatory acts include, but are not limited to:

1. Withholding of food/visits/phone calls.
2. Not allowing certain mentally ill offenders to attend required structured or unstructured activities.
3. Setting up certain mentally ill offenders for assault by labeling them "snitches."
4. Providing mentally ill offenders with the means for them to perform self-injurious behaviors (i.e. staples, paperclips, or other sharp objects.)
5. Planting incriminating evidence in the cells of mentally ill offenders, such as weapons or other forms of contraband.

As Monitor, I do not make these allegations frivolously. I have been relaying this information to parties informally and in writing throughout my tenure as Monitor. Nothing has come of my reports. In fact, the staff at Pontiac are more strident in their actions and dealings with me since I have been formally reporting their abuse. Regardless of Chief Lindsay's claims to the contrary, the Department has done nothing to curb these abuses.

During the next reporting period, I will be seeking outside legal consultation, at my own expense, to determine what professional and ethical obligations I have to report this abuse to outside police agencies. I will keep the Department informed of my progress in this regard.


Professional Conduct

AD 03.02.108(I)(B), "Standards of Conduct" provides: The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not

engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

### Findings:

As was reported in the 2nd Annual Report "there have been several critical issues in regards to 'Professional Conduct' during the reporting period. The first is a series of vandalisms that occurred to the cars of mental health staff while they were parked in the staff parking lot at Logan. Several cars were 'keyed' between December 2016 and October 2017. A new Chief Administrative Officer, Warden Austin, came to the facility in August 2017. An investigation began during the summer of 2017. The Monitor has not been informed of the results of this investigation. The working hypothesis has been that the perpetrators of this vandalism are custody staff upset about the ever increasing mental health focus of the facility. I must emphasize that this is just a hypothesis at this time and has not been proven. Regardless, this is a very significant incident which Warden Austin is taking very seriously. I look forward to being informed of the results of the investigation into these incidents."[57] The Monitoring Team has not been informed of the results of this investigation.

There remains the specter of intimidation of the mental health staff by the custody staff at Pontiac. As Monitor, I held a focus group with the QMHPs at Pontiac on 9/11/18. Of note, an attorney from Wexford was present for the entire meeting. I have interviewed thousands of individuals over the course of my psychiatric career and it was blatantly obvious that the QMHPs had been thoroughly coached about what they should say. Even in this very hostile environment, the QMHPs reported that custody staff has the final say about which offenders can come out of their cells. They also reluctantly admitted that they had all been made aware that the custody staff acts as gatekeepers to the Crisis Intervention Team.

Finally, in my role as Monitor, the custody staff at Pontiac has attempted to intimidate me during my interviews with mentally ill offenders. This occurred on 10/18/18 during my interviews with mentally ill offenders who had submitted filings with the Court. Custody staff were standing immediately next to the door to the interview room and could clearly hear my conversations with the offenders. I repeatedly ask the custody officer to back away from the door and I was told he was there "for security." Of note, this has never happened in all of my previous tours of Pontiac. To further highlight this frankly ridiculous claim of "for security", the offender in question was handcuffed behind his back, shackled to a metal stool which was built into the floor, and locked into a cage. This claim of "for security" was reiterated by the custody chain of command including Warden Kennedy and the Deputy Director for the Central District, John Eilers. Thankfully, Chief Lindsay intervened and I was able to proceed with my monitoring duties.

---

[57] 2nd Annual Report, Pages 102 & 103.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary:** Although the Department has made progress in this section, it is still not meeting all of the requirements specified in Administrative Directive 05.12.103.

The current review did not find any evidence of mentally ill offenders being punished for self-injurious behaviors. The Department is yet to consult with the Monitor on this issue, however.

Disciplinary procedures are taking place in a mental health treatment context for offenders assigned to an RTU level of care. Inpatient services were not monitored during the reporting period.

A Behavioral Treatment Program is yet to be initiated within the Department. There is a small Behavioral Management Unit operating at the JTC. The Monitoring team is unclear if this BMU is meant to satisfy the requirements of XXV(d).

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original

notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

(1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** In the Quarterly Report of October 2018, the Department takes the position that "XXV(a) does not impose any obligations on IDOC. Instead, it states that IDOC 'has implemented system-wide policies and procedures governing the disposition of disciplinary proceeds (sic) in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense…' IDOC affirms that these policies and procedures have been and remain implemented." The Monitoring Team agrees with the fact that "system-wide policies and procedures have been implemented." The specifics of this system are found in AD 05.12.103, which explicitly lists the requirements of XXV(a). That is what's being monitored in this subsection.

For the purposes of these requirements, Reena Kapoor, M.D., conducted the following data-driven analysis:

She performed an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in the Illinois Department of Corrections (IDOC). The opinions in this report are based on her review of the following documents:

1. IDOC Administrative Directive 05.12.103, "Administration of Discipline for Offenders Identified as Seriously Mentally Ill."

2. IDOC October 2018 Quarterly Report re: *Rasho* agreement

3. Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), and Offender Disciplinary reports (DOC 0317) for a total of 125 disciplinary infractions adjudicated during September 2018, representing approximately 20% of incidents involving SMI offenders at the following facilities:

1. Big Muddy River – one incident
2. Centralia – four incidents
3. Danville – one incident
4. Decatur – five incidents
5. Dixon – 18 incidents
6. East Moline – one incident
7. Graham—one incident
8. Hill – one incident
9. Illinois River – six incidents
10. Joliet Treatment Center – four incidents
11. Kewanee – one incident
12. Lawrence – 17 incidents
13. Lincoln – two incidents
14. Logan – 12 incidents
15. Menard – seven incidents
16. Pinckneyville – eight incidents
17. Pontiac – 19 incidents
18. Robinson – one incident
19. Shawnee – two incidents
20. Sheridan – four incidents
21. Stateville – eight incidents
22. Vienna – one incident
23. Western Illinois – one incident

**<u>Overall Findings</u>**

I see incremental improvement since my last report in November 2017.  Although some problems persist, I see areas in which IDOC facilities have taken into account the monitoring team's recommendations and completed more meaningful assessments of SMI inmates in the disciplinary process.  First, I will mention the good things, some of which I also noted in previous reports:

1. Segregation is not being used as a punishment (for SMI offenders) for 300- and 400-level infractions at any IDOC facility.

2. The Adjustment Committee consistently receives and reviews input from Mental Health regarding SMI inmates; I found just one possible exception in reviewing 125 disciplinary infractions.

3. I did not see any cases in which inmates received disciplinary infractions for suicide attempts, self-injury, or suicide attempts.

4. Evaluations of offenders by MHPs (as documented in the DOC 0443 forms) appeared more individualized overall and contained less "boiler plate" language. In addition, I did not see any forms that described inmates using pejorative or non-clinical language.

5. In the vast majority of cases, the Adjustment Committee is following IDOC's policy 05.12.133, Section H.2, which states, in relevant part:

> *If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee **shall** adopt those recommendations (emphasis added).*

> *If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

In the 125 records I reviewed, the Adjustment Committee issued a sanction that was equal to or less than the Mental Health recommendation in all but two cases. In these two cases, the Adjustment Committee documented the reason for issuing a higher sanction, though seemingly without submitting an appeal to the Chief Administrative Officer.

Areas for improvement include:

1. The quality of mental health (MH) evaluations documented on the DOC 0443 form is variable. In the vast majority of evaluations that I reviewed, the MHP concluded that mental illness did not contribute to the offense, and he/she did not clearly state a rationale for this conclusion. Although the 0443 reports might be kept brief in order to protect the confidentiality of the inmate's mental health information, the MH clinician's rationale should be documented somewhere (likely a progress note in the medical chart). If IDOC facilities are already doing this, then I would ask that copies of the documentation be provided to the monitoring team. If they are not doing this, I recommend that they begin as soon as possible.

2. MHPs are still not performing face-to-face assessments of SMI offenders after they are charged with disciplinary infractions in most cases; the 0443 forms are completed based on a chart review and/or discussion amongst the mental health staff. I did see some improvement in this area, as MHPs at Pinckneyville, Robinson, and Shawnee appear to be interviewing the inmates about the circumstances of disciplinary infractions. Also, in one of the seven cases I reviewed at Menard, the inmate was interviewed by an MHP after the disciplinary infraction.

3. When making specific recommendations regarding segregation time, MHPs at different facilities appear to be using different standards. For example, at some facilities the segregation recommendation was uniformly one half of the typical sanction for the offense, while at other facilities the recommendation was seemingly chosen at random.

In one case at Dixon, an MHP recommended segregation time of "0 to 9 months," which struck me as a rather wide range.  In another case at Dixon, two inmates were charged with the same offense after being found with contraband pills in their cell, but the MHPs recommended different segregation time (0-3 months for one inmate, 0-6 months for the other) without documenting a rationale for the discrepancy.  As noted in my previous reports, additional training for the mental health staff across IDOC regarding how/why to recommend particular disciplinary sanctions to the Adjustment Committee may be helpful.

4.  Overall, MHPs found mitigating factors related to mental health in more disciplinary cases in September 2018 than during my previous reviews.  Out of the 125 infractions I reviewed from September, mitigating factors were found in 15 cases.  However, I noticed an unusual pattern in which the facilities with the most disciplinary infractions involving SMI offenders—Dixon, Pontiac, Logan, and Lawrence—almost uniformly found that mental illness did not contribute to the offense behavior.  I reviewed 66 infractions at these facilities, and in 65 of these cases the MHP concluded that mental illness was not a factor in the offense.  In the one remaining case (at Dixon), the MHP found that mental illness "minimally" contributed.  I do not know what exactly to make of this pattern, but it raises concerns about the thoroughness of the MHPs' evaluations and/or the culture around inmate discipline at these facilities.

**Additional Requirements:**

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

**Findings:** Weekly cell front rounds are generally being performed in segregation by BHTs.

2.  Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

**Findings:** The Department has not been able to satisfy this requirement at any time during the life of the Amended Settlement Agreement. This is largely due to gross understaffing of MHPs at all of the monitored facilities. This is further evidenced by the significant backlog of Mental Health Evaluations, 231 as of 11/16/18. Mentally ill offenders in segregation must therefore rely on the Crisis Intervention Team. As described in section V(g) of this report, significant problems exist with this process.

3.  If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

**Findings:** This is not occurring. The Department tolerates the existence of serious mental

illness for those offenders on segregation status. This means that this point of "clinical indication" is well past by the time the offender is seen, usually by the Crisis Intervention Team. Given all the problems associated with the Crisis Intervention Team, offenders are allowed to decompensate before they get any help.

4.   Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

**Findings:** The Department is compliant with this requirement.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** The Department is compliant with this requirement.

**(XXV)(b): Specific requirement:** No later than one (1) year after approval of this Settlement Agreement, IDOC, in consultation with the Monitor, shall develop and implement policies and procedures to provide that, for mentally ill offenders, (i) punishment for self-injurious behavior (*e.g.,* suicide attempts or self-mutilation) is prohibited; (ii) punishment for reporting to IDOC staff or vendor staff feelings or intentions of self-injury or suicide is prohibited; and (iii) punishment for behavior directly related to self-injurious behavior, such as destruction of state property, is prohibited unless it results in the creation of a weapon or possession of contraband.

**Findings:** As stated previously, as Monitor, I have never been consulted about this issue. In her review of section XXV for the 2nd Annual Report, Dr. Kapoor stated "In contrast to my November 2017 findings, I did not see any cases in which inmates received Disciplinary Infractions for behaviors that would be better handled  through clinical intervention, such as refusing medication, hiding pills or self-harm."

In her current review, Dr. Kapoor reports "For the most part, inmates did not receive disciplinary infractions for behaviors that would better be handled through clinical intervention (e.g., cheeking or refusing medications).  However, there was one case at Western Illinois in which I question whether a disciplinary infraction should have been issued at all.  In that case, an inmate became angry and threatening during a Crisis Watch evaluation, and the MHP noted that he was also awaiting transfer to an RTU bed at another facility.  He was issued a sanction of 30 days in segregation for this incident.  Given the presumed severity of mental illness and active symptoms in an inmate awaiting an RTU bed, I would strongly urge the facility to consider alternatives to segregation in such cases." The Department will receive a rating of compliance despite this one egregious example.

Finally, the Quarterly Report of October 2018 questions why the Department received a non-compliance rating for this requirement on the 2nd Annual Report. This was due to the fact that the 2nd Annual Report is just that, an annual report. The Department was found non-compliant with this requirement on the midyear report of November 2017. Although improvement was noted in Dr. Kapoor's May 2018 report, the Department was not in compliance for the entire year of May 2017-May 2018.

**(XXV)(c): Specific requirement:** For any offender who is in RTU or inpatient treatment for serious mental illness, the disciplinary process will be carried out within a mental health treatment context and in accordance with this Section. Discipline may include loss of privileges or confinement to cell on the treatment unit for a specified period but may not entail ejecting an offender from the treatment program.

**Findings:** The Quarterly Report of October 2018 correctly questions why the Department received a rating of non-compliance for this requirement on the 2nd Annual Report when the report states "IDOC is currently meeting these requirements." The rating was accurate but the report did not explain the reasons behind this rating. As Monitor, I take full responsibility for this omission. The rating was based on the credible reports I received regarding violations of this requirement at Pontiac.

During the current reporting period the Department is meeting this requirement.

**(XXV)(d): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor and the IDOC's designated expert, shall develop and implement a pilot Behavior Treatment Program ("BTP") at Pontiac CC for SMI offenders currently subject to sanction for a serious disciplinary infraction. IDOC will review this pilot and consider implementation at other facilities.

**Findings:** This mythical Behavior Treatment Program remains a source of intrigue for the Monitoring Team. As noted in the 2nd Annual Report, "Over the duration of the Settlement Agreement, the Monitor has been presented with several plans regarding this Behavioral Treatment Program. To date, this program has not been implemented in any IDOC facility."[58] During her tour of the Joliet Treatment Center on October 22, 2018, Dr. Kapoor reported the existence of a "Behavioral Management Unit" that had been operating for three weeks. There is no mention of this Joliet Behavioral Management Unit in the Quarterly Report of October 2018. As Monitor, I am unaware if this program is meant to fulfill the requirements of this subsection.

The Quarterly Report of October 2018 devotes a large paragraph on page 30 that discusses a "pilot Behavior Treatment Program at Pontiac Correctional Center." The Quarterly Report makes it sound as if this program will be located in the same space as the putative Pontiac RTU. As Monitor, I have personally inspected these spaces numerous times during the reporting period and am able to definitely state that these spaces are nowhere near completion. Regardless of what's really happening with this Behavioral Treatment Unit, it was not operating at Pontiac during the reporting period.

---

[58] 2nd Annual Report, page 113.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

**Summary**: The Department is meeting all of the requirements of this section. The CQI program in its present form still requires improvement. The CQI program requires ongoing maintenance to ensure that it helps to facilitate the Department meetings all of the clinical requirements of the Amended Settlement Agreement.

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** As reported in the Quarterly Report of October 2018, the CQI Manager, Dr. Sim, has been in this position since January 2018. He has developed a audit instrument with a corrective actions component which meets the requirements of this subsection. This coupled with successfully meeting the requirements of section XXVI(b), below, the Department is in compliance with section XXVI.

It is important to note, however, that despite a rating of compliance, the results of a particular CQI audit cannot necessarily be used as evidence of compliance with any of the sections of the Amended Settlement Agreement. That is, as explained in the Quarterly Report of October 2018, the audits are conducted on 20 randomly selected charts at least 15 of which are SMI patients. A particular requirement, such as section XV(a)(iv) "An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such reviews shall be documented" may only be pertinent in a few of the audited charts, if any. For example, if one of the audited charts meets this requirement than it is reported as being in 100% compliance. A more accurate manner to report this finding would be to say that the requirement was met in the one chart where it was an issue.

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** The Department was found to be non-complaint with this requirement on the 2nd Annual Report. This rating was due to Dr. Sim's lack of authority to implement AD 04.04.104 and fill the designated mental health authority positions. The Department will continue to receive a rating of non-compliance for this requirement until such time as AD 04.04.104 is fully implemented.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** The Monitor submitted a request for an increase in the hourly compensation for the members of the monitoring team in June 2017. No formal response has been received by the time of submission of the 2nd annual report. The Monitor once again is requesting that the Department seriously review the pay rates for all of the members of the Monitoring Team.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** The Monitor once again is requesting that the Department develop an evidence-based protocol for the use of Telepsychiatric services.

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** The Department has been meeting this requirement.

## XXVIII: REPORTING AND RECORDKEEPING

**Summary**: The Department has been submitting quarterly reports for the duration of the Settlement Agreement implementation. The quarterly reports of October 2018 is more objective and of overall better quality from the previous reports.

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX

(d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: The Department has been submitting quarterly reports to Plaintiffs' counsel and the Monitor for the duration of the Settlement Agreement. These reports generally contained the information required by this subsection of the Settlement Agreement. Prior to the submission of the quarterly report of October 2018, the reports were not necessarily objective in their descriptions of the progress that IDOC is allegedly making towards implementing the requirements of the Settlement Agreement. I am happy to say that the quality of the October 2018 quarterly report is improved from that of its predecessors. The Monitoring Team looks forward to receiving this type of high quality report moving forward.

## CONCLUSION

The Department continues to struggle to meet the requirements of the Amended Settlement Agreement. The Department has many problems with its provision of mental health care. They include, but are not limited to, clinging to outdated notions about the use of segregated housing with mentally ill offenders, many serious instances of custody staff interfering with the provision of mental health care and the fact that the treatment needs of the mentally ill population exceed that which the Department is safely capable of providing. The data from the first 30 months of monitoring clearly substantiates that the staffing levels of the Approved Remedial Plan of May 2016 are grossly inadequate to meet the requirements of the Settlement Agreement. Until the staffing issue is adequately addressed, the Department will continue to flounder in its efforts to meet the requirements of the Amended Settlement Agreement.


Respectfully submitted,

*Pablo Stewart, M.D.*[59]          Dated: November 30, 2018

Pablo Stewart, MD

---

[59] Indicates electronic signature