**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| **ASHOOR RASHO, et al.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )        **No. 07-1298** |
| | ) |
| **ROGER E. WALKER,** *et al*., | ) |
| | ) |
| **Defendants.** | ) |

## PERMANENT INJUNCTION ORDER

This Permanent Injunction Order is intended to memorialize this Court's Orders dated October 30, 2018, December 20, 2018, and February 26, 2019, into a single document stating the reasons for the injunction, the terms of the injunction, and the acts the Defendants must perform as required under Rule 65 of the Federal Rules of Civil Procedure.

## OVERVIEW OF THE ACTION

This case is a class action brought under 42 U.S.C § 1983 alleging violations of the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794. (ECF No. 711-1 at 1).  Plaintiffs challenge the adequacy of the delivery of mental health services to mentally ill prisoners in the physical custody and control of the Illinois Department of Corrections ("IDOC" or "Department"). *Id*.

On August 14, 2015, this Court certified a class in this case for purposes of litigation, and pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, as follows:

> Persons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") [who] are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the

1

34    American Psychiatric Association.  A diagnosis of alcoholism or drug addiction,
35    developmental disorder, or any form of sexual disorder shall not, by itself, render
36    an individual mentally ill for the purpose of this class definition.
37

38  (ECF No. 252 at 7).  As of June 21, 2018, there were approximately 40,237 inmates in the custody

39  of the IDOC, of whom more than 12,228 are believed to be mentally ill.  (ECF No. 2286 at 2; *see*

40  *also* ECF No. 1758 at 50, testimony of Defendant Dr. Melvin Hinton ("Dr. Hinton")).

41  Approximately 5,112 of these inmates are considered "seriously mentally ill ("SMI")."  (*Id*.; ECF

42  No. 1758 at 51, testimony of Dr. Hinton; *see also* ECF No. 1966-1 at 2, Plaintiffs place the number

43  at 4,843).  As of June 30, 2018, 9,576 of the inmates were on the IDOC psychiatric caseload.  (ECF

44  No. 2286 at 2).  As of July 2018, 913 inmates on the IDOC mental health caseload were housed in

45  segregation.  *Id*.  Ashoor Rasho, Patrice Daniels, Gerrodo Forrest, Keith Walker, Otis Arrington,

46  Donald Collins, Joseph Herman, Henry Hersman, Rasheed McGee, Fredricka Lyles, Clara Plair,

47  Desiree Hollis, and Crystal Stoneburner serve as the class representatives.

48        The Defendants are John Baldwin, the Acting Director of the IDOC, and Dr. Hinton, the

49  Department's Chief of Mental Health Services and Addiction Recovery Services.

50        On December 17, 2015, the Parties announced they had entered into a comprehensive

51  settlement agreement resolving the action set forth in the Plaintiffs' Third Amended Complaint,

52  the operative complaint in this matter.  (*See* Minute Entry dated 12/17/2015; ECF No. 711-1; and

53  ECF No. 260).   Notice of the Settlement was given to the class members and a fairness hearing

54  was held on May 13, 2016.  (ECF No. 289; Minute Entry dated 5/13/2016).  During the hearing,

55  the Court found the agreement to be fair and reasonable, over the voluminous objections that were

56  filed by various inmates[1].  *Id*.  The executed Settlement Agreement can be found in this docket,

57  and is referred to herein as the "Settlement Agreement."  (ECF No. 711-1).  The instant Motion is

---

[1] All objections have been filed in this docket.

58    brought alleging violations of the Settlement Agreement and the Constitution.  The procedural

59    history is sufficiently captured in this Court's Order dated May 25, 2018, and will not be recited,

60    provided however, the Court will detail the additional history occurring after the entry of its

61    Preliminary Injunction Order.  (ECF No. 2070 at 2-11).

62          On June 6, 2018, Plaintiffs filed their Motion for Permanent Injunction requesting that the

63    Court hold a hearing on the merits of Plaintiffs' claims, and upon making the necessary merits

64    determination, enter an order converting the Court's Preliminary Injunction Order to a permanent

65    injunction.  (ECF No. 2112).

66          On June 8, 2018, Dr. Pablo Stewart's Second Annual Report was docketed.  (ECF No.

67    2122).  In his Report, Dr. Stewart provides that "the Department is noncompliant with 18 of 25

68    [Settlement Agreement terms] and substantially compliant in only 3 [terms] (orientations, housing

69    assignments and training) [and] [a]s is explained more fully in the body of the report, these

70    noncompliance ratings are primarily due to inadequate staffing."  (ECF No. 2122 at 9).  It should

71    also be noted that Dr. Stewart presented the Court with a Monitor Chart Review Report during the

72    permanent injunction hearing.  (Pl. Ex. 53).  In the report, Dr. Stewart provided his assessment of

73    the IDOC's compliance with the Court's Preliminary Injunction Order.  His assessment included

74    a review of mental health charts at several institutions.  The general methodology used was to

75    assign a rating of "1, 2, or 3," with 1 being non-compliance, 2 being partial compliance, and 3

76    indicating compliance.   During his testimony, however, certain information regarding the

77    methodology was revealed that gave this Court pause in considering the data.    Most notably, it

78    was revealed that one of the assistant monitors collecting the data used a different methodology in

79    her rating.  Given that, the Court cannot give significant weight to the Monitor's findings in that

80    regard.

3

81    On July 20, 2018, Plaintiffs filed their Motion for Order requesting that the Court enter an
82    order enforcing their right to the fees previously awarded, but deferred, pursuant to the Settlement
83    Agreement.  (ECF No. 2233).  On August 3, 2018, Defendants filed their Opposition to the Motion
84    for Order.  (ECF No. 2276).  The Defendants argued, among other things, the Court had not made,
85    by entry of the Preliminary Injunction Order, a finding of an actual violation of the Plaintiffs'
86    federal rights.  (ECF No. 2276 at 2).

87    Between August 27, 2018, and September 7, 2018, testimony and evidence were taken and
88    arguments were made in support of the Parties' respective positions on the Motion for Permanent
89    Injunction.  The Parties were given the opportunity to submit post-hearing briefs in support of their
90    positions.  (ECF Nos. 2405, 2406, and 2407).

91    On October 30, 2018, this Court entered its first Order addressing the Plaintiffs' request
92    for permanent injunction.  (ECF No. 2460).  In the Order, the Court granted the Plaintiffs' Motion
93    finding that permanent injunctive relief was necessary to address the constitutional deficiencies in
94    the Defendants' care and treatment of mentally ill inmates.  (ECF No. 2460 at 1).  The Court
95    provide the Parties with an opportunity to brief the proposed remedy.

96    On December 20, 2018, after presented with briefs and argument, the Court entered an
97    Order providing for specific injunctive relief that was narrowly drawn, extends no further than
98    necessary to correct the violation of the Federal right, and is the least intrusive means necessary to
99    correct the violation of the Federal right.  (ECF No. 2516).

100   On February 26, 2019, the Court, among other things, modified its Order dated December
101   20, 2018, after considering the Defendants' Motion for Reconsideration or Modification of
102   Injunction Orders.  (ECF No. 2579).  The Defendants appealed the Court's Orders.  (ECF No.
103   2583).

4

104       On March 7, 2019, Plaintiffs filed a Motion for Relief from Court Orders to Conform

105  Injunctive Relief Order to Rule 65. (ECF No. 2592).  In their Motion, Plaintiffs informed the Court

106  that it made two inadvertent omissions or mistakes in its injunctive relief Orders.  The Plaintiffs

107  specifically noted that the Court failed to revise the permanent injunction Order to incorporate the

108  modifications it made to the Order during the February 19, 2019, hearing and memorialized in the

109  Order dated February 26, 2019. (ECF No. 2579; see also Minute Entry dated 2/19/2019). The

110  Plaintiffs also state that the Court's Order should have included the specific staffing requirements

111  of the Defendants' 2014 Remedial Staffing Plan instead of referencing the document in its Order.

112  This Court agreed and entered an indicative ruling requesting that the Seventh Circuit Court of

113  Appeals remand the case for purposes of modifying the preliminary injunction Order(s) to conform

114  to the requirements of Rule 65 of the Federal Rules of Civil Procedure.

115       On April 15, 2019, the United States Court of Appeals for the Seventh Circuit remanded

116  the matter back to this Court for the limited purpose of permitting the district court to modify the

117  preliminary injunction Order to conform to the requirements of Rule 65 of the Federal Rule of

118  Civil Procedure.  (ECF No. 2628).

119       This Order follows.

120                    **SUMMARY OF DECISION**

121       Under the Eighth Amendment, inmates suffering from serious mental illnesses are entitled

122  to adequate medical care. To establish a constitutional violation, Plaintiffs must prove that

123  Defendants have been deliberately indifferent to their serious medical needs, specifically in this

124  case their mental health needs. "[D]eliberate indifference to serious medical needs of prisoners

125  constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."

126  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted).  Having fully considered the

127    evidence and testimony presented during the preliminary and permanent injunction hearings, the

128    Court finds that Defendants have been deliberately indifferent to Plaintiff's medical needs in

129    medication management, mental health treatment in segregation, mental health treatment on crisis

130    watch, mental health evaluations, and mental health treatment plans within the meaning of the

131    Eighth Amendment.  In this case, the overwhelming evidence establishes that at the time of the

132    preliminary injunction hearing, the Defendants were deliberately indifferent to the Plaintiffs'

133    medical needs.  Most notably, the evidence showed that there were systemic and gross deficiencies

134    in staffing that effectively denied the Plaintiffs access to adequate medical care.

135    At the permanent injunction hearing, Defendants' evidence emphasized the changes to the

136    delivery of mental health services that had been implemented by the IDOC after this Court's Order

137    dated May 25, 2018.  The Defendants have implemented policies and procedures that have created

138    improvements in the overall delivery of mental health services.  However, the record still shows

139    there are systemic and gross deficiencies in the staffing of mental health providers that have a

140    serious detrimental effect on the overall delivery of medical services to the Plaintiffs.  Moreover,

141    while there has been a decrease in the overall backlog of mental health contacts, the Defendants

142    have relied heavily on the use of overtime to achieve these results.  The testimony of the

143    Defendants' own witnesses reveals this practice is unsustainable and there is no Plan B.

144    This litigation has unfolded for over a decade.  In that time, some changes have been made

145    to increase the quality of care for mentally ill inmates, but it is not enough.  Despite the recent

146    serious efforts by the Defendants, the Court finds that a permanent injunction is necessary to force

147    the Defendants to adequately staff their institutions with the necessary mental health providers and

148    other personnel to provide the constitutionally required care.

149    **SETTLEMENT AGREEMENT**

150          On May 23, 2016, the last signature was acquired on the Settlement Agreement purportedly

151    resolving the decade long dispute between the Parties.  (ECF No. 711-1 at 33).  The Settlement

152    Agreement is a comprehensive document with the purpose of reaching an agreement that settled

153    the litigation in a manner that is "fair, reasonable, and adequate to protect the interests of all

154    parties."  (ECF No. 711-1 at 2).

155          The Settlement Agreement allows for the Plaintiffs to seek relief from this Court if there is

156    a dispute as to whether or not the Defendants are in substantial compliance with the terms

157    contained therein.  (ECF No. 711-1 at 29).  The Settlement Agreement specifically provides:

158          f)  If the Court finds that Defendants are not in substantial compliance with a
159          provision or provisions of this Settlement Agreement, it may enter an order
160          consistent with equitable and legal principles, but not an order of contempt, that is
161          designed to achieve compliance.
162
163          g) to permit enforcement of the terms of this Settlement Agreement in federal court,
164          the parties agree that, should it become necessary to seek the Court's assistance as
165          to violations of this agreement, any order granting such relief must include a finding
166          that the relief sought is narrowly drawn, extends no further than is necessary to
167          correct the violation of the federal right, and is the least intrusive means for doing
168          so.
169
170    (ECF No. 711-1 at 30) (emphasis added).

171          The Court has previously found that a preliminary injunctive hearing was an appropriate

172    mechanism under the terms of the Parties' Settlement Agreement and the Prison Litigation Reform

173    Act, 18 U.S.C. § 3626 ("PLRA").  Defendants objected to that procedure arguing Plaintiffs would

174    never have the obligation of actually proving there had been a violation of federal law.  (ECF No.

175    1709 at 2).  The Court disagreed and noted that the Plaintiffs would ultimately need to seek

176    permanent relief at some point.  That, of course, is what the Plaintiffs have done with the filing of

177    their Motion for Permanent Injunction.

7

178    Moreover, the Plaintiffs specifically note they have not moved for enforcement of the

179    Preliminary Injunction Order under Section XXIX(i) of the Settlement Agreement.  (ECF No.

180    2424 at 2).  Plaintiffs instead argue they are seeking relief under Section XXIX(d), (f), and (g).

181    The Parties appear to generally agree an action under Section XXIX(d), (f), and (g) would not

182    abrogate the Settlement Agreement.  As for an action pursuant to Section XXIX(i), the answer

183    appears more questionable.  Section XXIX(i) provides:

184    If Plaintiffs contend that Defendants have not complied with an order entered under
185    the preceding paragraphs, they may, after reasonable notice and meeting with
186    Defendants, move for further relief from the Court to obtain compliance with the
187    Court's prior order.  The Court may apply equitable principles and may use any
188    appropriate equitable or remedial power available to it.  This may include returning
189    the case to the active docket and setting a trial date. The information gathered by
190    the Monitor during the life of this Settlement Agreement, the Monitor's reports,
191    including all reports and material supplied by Defendants, may be used in Plaintiffs'
192    case at such a trial, along with the testimony of the Monitor, which may address
193    ultimate issues in this case.
194
195    (ECF No. 711-1 at 30).  Plaintiffs' current position is inconsistent with their previous position

196    wherein they specifically relied on Section XXIX(i) to support their position that the Monitor's

197    Second Annual Report was admissible.  (ECF No. 2264 at 2, "Section XXIX(i) of the Settlement

198    Agreement explicitly provides for the consideration of the Monitor's report and testimony as

199    evidence during a trial in which Plaintiffs contend that Defendants have not complied with a court

200    order enforcing the Settlement Agreement.") (Emphasis added).   Moreover, Plaintiffs have

201    asserted the position in their post-hearing brief that Defendants failed to adhere to the terms of this

202    Court's May 25, 2018, Order, arguably invoking Section XXIX(i).  (*See e.g.* ECF No. 2406 at 24).

203    Defendants, for their part, argue that "[o]nce the final judgment order is entered, that order

204    will supersede the Settlement Agreement and will provide [P]laintiffs the relief necessary to

205    protect their rights under federal law."  (ECF No. 2427 at 7).  Defendants argue Plaintiffs have

206 chosen to "reactivate" this case.  Of course, the reality is, this case was limited to examining a

207 limited area of the Settlement Agreement.

208       First and foremost, the Court finds that this Order is entered pursuant to Section XXIX(g)

209 of the Parties' Settlement Agreement.  This is the Order contemplated by the Parties under that

210 provision.  Nonetheless, whether the Plaintiffs' permanent injunction request is brought under

211 XXIX(g) or XXIX(i), the Court finds the Settlement Agreement remains intact.  The language of

212 the Settlement Agreement does not address the status after either such hearing.  Moreover, it has

213 been clear to both Parties that this hearing was limited to addressing five areas.  This was not a

214 "full" trial on the merits on all of the claims; nor was it a situation where the Parties tore up the

215 Settlement Agreement to have this Court decide the outcome on all matters.

216       Additionally, to be clear, this Court has jurisdiction over Plaintiffs' federal claims pursuant

217 to 28 U.S.C. § 1331.  There is no dispute as to the Court's jurisdiction.  Furthermore, the Parties

218 have specifically provided for a dispute resolution process under the terms of the Settlement

219 Agreement.  In order to find liability, the Court must find both a violation of the terms of the

220 Settlement Agreement AND a violation of federal law.  (ECF No. 711-1 at 29-30).

221       In that regard, as part of their preliminary injunction request, the Plaintiffs identified five

222 areas where they challenged the adequacy of the mental health treatment and conditions for

223 prisoners required under the terms of the Settlement Agreement and the U.S. Constitution.  The

224 five areas included:  Mental Health Evaluations (ECF No. 711-1 at 8-9, Section V), Treatment

225 Planning (ECF No. 711-1 at 9-10, Section VII), Medication Management (ECF No. 711-1 at 15-

226 16, Section XII), Mental Health Treatment in Restricted Housing/Segregation (ECF No. 711-1 at

227 16-21, XV), and Mental Health Treatment on Crisis Watch (see e.g. ECF No. 711-1 at 3).  Plaintiffs

228 seek their permanent injunction based on violations of these same areas.  (ECF No. 2286 at 2).

229        In this Court's previous Order, it found that the Plaintiffs had established all of the

230    necessary requirements for a preliminary injunction to be issued.  (ECF No. 2070).  The record at

231    that time contained ample evidence to meet the preliminary injunction standard that inmates with

232    mental illness were receiving constitutionally inadequate treatment in the areas of Mental Health

233    Evaluations, Treatment Planning, Medication Management, Mental Health Treatment in

234    Restricted Housing/Segregation, and Mental Health Treatment on Crisis Watch.  The Court

235    specifically concluded that the testimony of almost all of the medical doctors at the preliminary

236    injunction hearing established that, in one form or another, the system in place to treat mentally ill

237    inmates at the IDOC was in a state of emergency.  (ECF No. 2070 at 6).  The Parties have agreed

238    that all of the evidence presented in the preliminary injunction hearing is incorporated into the trial

239    record for determination in this matter.  (ECF No. 2286 at 2); *see also* Fed. R. Civ. P. 65(a)(2).

240        Now Plaintiffs move the Court to enter an order converting the Court's Preliminary

241    Injunction Order to a permanent injunction.  (ECF No. 2112).  In determining whether a permanent

242    injunction should issue, the analysis generally requires a court to consider: (1) whether the plaintiff

243    has suffered or will suffer irreparable injury, (2) whether there are inadequate remedies available

244    at law to compensate for the injury, (3) the balance of hardships, and (4) the public interest.  *Sierra*

245    *Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008) *citing eBay Inc. v.*

246    *MercExchange, L.L.C.,* 547 U.S. 388 (2006); *e360 Insight v. The Spamhaus Project,* 500 F.3d 594,

247    604 (7th Cir. 2007).  This Court must also consider the parameters of the Parties' Settlement

248    Agreement as noted above.  In sum, in order for the Plaintiffs to establish that they suffered (or

249    will suffer) irreparable injury, the Court finds that it must determine whether, by a preponderance

250    of the evidence, the Plaintiffs have proven that the violations of the Settlement Agreement have

251   occurred, and that these violations of the Settlement Agreement establish a constitutional (or other

252   federal right) violation.

253         On October 30, 2018, this Court granted Plaintiffs'[2] Motion for Permanent injunction and

254   entered an Order finding Defendants John Baldwin, Acting Director of the Illinois Department of

255   Corrections ("IDOC"), and Dr. Melvin Hinton, Chief of Mental Health Services and Addiction

256   Recovery Services of the Illinois Department of Corrections (Baldwin and Dr. Hinton are referred

257   to herein as "Defendants"), have been deliberately indifferent to the mental health needs of

258   mentally ill inmates in the custody of the Illinois Department of Corrections in violation of the

259   Eighth Amendment to the United States Constitution.   (ECF No. 2460).   The Court deferred

260   entering specific injunctive relief, instead allowing Defendants an opportunity to submit a proposal

261   to address their constitutional deficiencies.   *Id*.   On November 13, 2018, Defendants submitted

262   their proposed remedy order.   (ECF No. 2473).   On November 20, 2018, Plaintiffs submitted their

263   memorandum in support of their proposed remedy order.   (ECF No. 2481).   On December 4, 2018,

264   Defendants submitted their Reply.   (ECF No. 2496, Defendants' Opposition to Plaintiffs' Proposed

265   Injunctive Relief).

266                                        **<u>DISCUSSION</u>**

267         All parties and the Monitor recognize the immensity of the challenges facing the
268         IDOC in providing constitutionally adequate mental health care.

269
270   (Pl. Ex. 9, IDOC's Proposed Remedial Plan dated April 17, 2014).

271
272   **<u>Reasons for the Injunction</u>**

273

---

[2]   Plaintiffs have been defined as "[p]ersons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") [who] are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.   A diagnosis of alcoholism or drug addiction, developmental disorder, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purpose of this class definition."   (ECF No. 252 at 7).

274        As noted above, the Plaintiffs argue the Defendants are not in compliance with the

275   Settlement Agreement in the areas of Mental Health Evaluations, Treatment Planning, Medication

276   Management, Mental Health Treatment in Restricted Housing/Segregation, and Mental Health

277   Treatment on Crisis Watch.  After the preliminary injunction hearing, the Defendants generally

278   acknowledged they had not fully complied with the terms of the Settlement Agreement.  (ECF No.

279   1965 at 5).  At that point, the Defendants instead argued the evidence at the hearing was insufficient

280   for this Court to make a finding that there has been a systemic lack of substantial compliance.

281   (ECF No. 1965 at 5, Defendants argued "although the Court finds the Department has not fully

282   complied with all aspects of the Settlement Agreement, a finding of a systemic lack of substantial

283   compliance is not supported by the record.").

284        During the permanent injunction hearing, the Defendants primarily focused on what had

285   changed between the preliminary injunction hearing and the permanent injunction hearing.  It

286   should be noted that after the permanent injunction hearing, Defendants again acknowledge they

287   are not in full compliance with all of the terms of the Settlement Agreement.  However, they argued

288   that "the IDOC now has the leadership, staffing, facilities, and procedures and policies in place to

289   ensure that mentally ill prisoners are reasonably protected against significant harm of

290   decompensation, and are receiving the 'minimal civilized measures of life's necessities' that are

291   required to meet 'contemporary standards of decency' required to provide constitutionally

292   adequate care.  (ECF No. 2405 at 3).

293        In support of their case, Defendants offered the testimony of: (1) Baldwin (ECF No. 2370);

294   (2) Jack Yen, M.D., Wexford Health Sources (ECF No. 2370); (3) Inna Mirsky, Ph.D. (ECF No.

295   2370); (4) Dr. Hinton (ECF Nos. 2371 and 2372); (5) William Puga, M.D. IDOC Chief of

296   Psychiatry (ECF No. 2372); (6) Amy Mercer, Illinois Regional Mental Health Quality Assurance

Coordinator for Wexford Health Sources (ECF No. 2373); (7) Elaine Gedman; Executive Vice President and Chief Administrative Officer at Wexford Health Sources (ECF No. 2373); (8) William Elliott, Ph.D., Regional Mental Health Director for Illinois at Wexford Health Sources (ECF Nos. 2373 and 2374); (9) Holly Andrilla, Defendants' Expert Witness (ECF No. 2375; *see also* Df. Ex. 62, CV of Andrilla); (10) Jeffrey Sim, Statewide Mental Health Quality Improvement Manager, IDOC (ECF No. 2375); (11) Melissa Stromberger, Ph.D., Psychologist Administrator for Hill Correctional Center (ECF No. 2376); (12) Kelly Ann Renzi, Ph.D., Psychologist Administrator at Pontiac Correctional Center (ECF No. 2376); (13) Al Doyle, M.D., Staff Psychiatrist at Dixon Correctional Center (ECF No. 2377); and (14) Cheri Laurent, Vice President of Special Projects for Wexford Health Sources (ECF No. 2377).

In support of their position, Plaintiffs called: (1) Pablo Stewart, M.D., Court Monitor (ECF No. 2374); (2) Joe Champ, inmate at Pontiac Correctional Center (ECF No. 2376); (3) Ralph Kings, inmate at Pontiac Correctional Center (ECF No. 236); and (4) Anthony Gay, former inmate within the IDOC (ECF No. 2376). In addition to the testimony taken during the permanent injunction hearing, the Court has also considered the testimony taking during the preliminary injunction hearing, including the testimony of: (1) Dr. Stewart (ECF Nos. 1757, 1758, 1903 and 1905); (2) Michael Dempsey, M.D., former staff psychiatrist for Wexford Health Sources from January of 2013 until September 2015, located at Pontiac Correctional Center, former Acting Chief of Health Services, Illinois Department of Corrections, and former Chief of Psychiatry, Illinois Department of Corrections (ECF No. 1757; *see also* Pl. Ex. 28, CV of Dr. Dempsey); (3) Samuel Span, inmate at Pontiac Correctional Center (ECF No. 1758); Dr. Hinton (ECF Nos. 1758 and 1906); Corrie Singleton, inmate at Pontiac Correctional Center (ECF No. 1758); Gedman (ECF No. 1903); Gladyse Taylor, Assistant Director, IDOC (ECF No. 1904), Marcus Hardy, Executive

13

320   Assistant to the Director of the IDOC (ECF No. 1904); Sandra Funk, Chief of Operations, IDOC

321   (ECF No. 1904), Sim (ECF No. 1904), Mercer (*nee* Cantorna) (ECF No. 1904); and Dr. Puga (ECF

322   No. 1905).

323   ***Inadequate Staffing***

324          The Court will address the areas of Mental Health Evaluations, Treatment Planning,

325   Medication Management, Mental Health Treatment in Restricted Housing/Segregation, and

326   Mental Health Treatment on Crisis Watch in turn. However, the Court initially notes that, having

327   fully considered all of the testimony and evidence, it still concludes that the IDOC has failed to

328   maintain adequate staffing levels to provide adequate mental health treatment in compliance with

329   the Constitution. The Court further finds that the deficiencies in several of the areas identified

330   have greatly improved in certain locations within the IDOC. Indeed, Defendants also provide that,

331   particularly since the execution of the Settlement Agreement, the IDOC has continued to build and

332   enhance an entirely new mental health care system. (ECF No. 2405 at 4). In that regard, the

333   Defendants noted, and the Court acknowledges, the IDOC has invested more than $45 million to

334   build new facilities and rehabilitate existing facilities to provide mental health services to the

335   inmates. (ECF No. 1904 at 16). In addition, the IDOC notes that it has obtained funds to build a

336   new $150 million inpatient facility at Joliet. (ECF No. 2405 at 13; ECF No. 1904 at 16, 77). These

337   facilities will ultimately improve the care of mentally ill inmates, but, in and of itself, are

338   insufficient to address the deficiencies in mental health care.

339          The IDOC's inability to properly staff the institutions with psychiatrists has been a

340   persistent problem. (ECF No. 1716, Pl. Ex. 23, providing summary staffing levels for Nov. 2015,

341   Sept. 2016, and June 2017). At the preliminary injunction hearing, Dr. Hinton acknowledged that

342   the IDOC had only 29 psychiatrists available, with a system-wide need of 65 psychiatrists. (ECF

14

343   No. 1758 at 48).  That number has increased, and Dr. Hinton testified that Wexford is now

344   delivering between 50 to 55 psychiatrists for their use in the correctional centers.  (ECF No. 2372

345   at 10).  Dr. Hinton maintained that Wexford has made substantial improvements in the delivery of

346   full-time equivalents since the preliminary injunction hearing.  (ECF No. 2372 at 10).  Dr. Hinton

347   also noted that the IDOC has authorized the use of unlimited overtime, use of psychologists on

348   weekends, second shifts, telepsychiatry services at Dixon Correctional Center, and partnering with

349   Southern Illinois University to provide additional psychiatric services at Pontiac Correctional

350   Center and Logan Correctional Center.  (ECF No. 2372 at 11, 35, 36, and 42-48).  This Court

351   agrees some improvements have been made.  Nonetheless, there is still a serious deficiency in the

352   delivery of mental health treatment, and the improvements are driven by an unsustainable use of

353   overtime.  Again, the delivery of mental health services will be discussed in the five areas below.

354        To be clear, the Court finds that the record presented establishes by a preponderance of the

355   evidence, there was insufficient staffing at the IDOC at the time of the preliminary injunction.  The

356   Defendants have not generally disputed the Court's findings on this issue.  The evidence was

357   detailed in this Court's Preliminary Injunction Order but reiterated here for the sake of

358   completeness.

359        First, when asked directly about the ability to provide psychiatric care with such a

360   deficiency in staffing, Dr. Hinton's testimony at the preliminary injunction hearing was clear – the

361   IDOC cannot deliver the required level of care.  Dr. Hinton testified as follows:

362        Q.  You know today you can't deliver the care—the psychiatric care that is required
363        for the 12,000 patients because you don't have enough psychiatrists?
364
365        A.  Correct.
366
367   (ECF No. 1758 at 50).

15

368          Dr. Hinton was also asked about the dangers the lack of appropriate staffing can have on

369   an individual who is taking psychotropic medicine.  His testimony went as follows:

370          Q. And you've heard all the ills that can come if somebody is on psychotropic
371          medicine and it's not being monitored, right?
372
373          A. Correct.
374
375          Q. And you know that's dangerous, don't you?
376
377          A. Correct.
378
379          Q.  And you know that the 6,000 people are being endangered every day they're
380          not seen correctly; isn't that right?
381
382          A. Certainly is a concern, yes.
383
384          Q.  It's more than a concern.  It's your responsibility that they get that care; isn't
385          that right?
386
387          A. Correct.
388
389          Q. And you know they're not getting it?
390
391          A. Correct.
392
393   (ECF No. 1758 at 52-53).
394
395          Dr. Hinton's testimony at the preliminary injunction hearing regarding inmates who are in

396   segregation was extremely troublesome.  Dr. Hinton explained:

397          Q. [ ].  Why do you have so many mentally ill people in segregation and so few
398          regular population people in segregation?
399
400          A. I think, in general, the percentage of folks who are mentally ill tend to have more
401          behavioral issues, in part because of their mental illness.
402
403          Q. So, you've got so many of them in segregation because they do -- they don't
404          follow the rules well, right?
405
406          A. In part.
407
408          Q. And has anyone, to your knowledge, wondered whether or not putting mentally
409          ill people in segregation is good for them?

410
411          A. Yes.
412
413          Q. Who's done that?
414
415          A. I have.
416
417          Q. And what's your view?
418
419          A. My view is there's nothing -- there's nothing that is a good thing about being in
420          segregation. We need to make sure that they have proper access to treatment.
421
422          Q. Now, I believe your testimony the last time I took it on that subject was it won't
423          hurt them if we treat them with the treatment they need, right?
424
425          A. Access to treatment, correct.
426
427          Q. But how do you know they're getting the treatment they need if they're in
428          segregation?
429
430          A. That's why we have to make sure that there are no barriers to the access to
431          treatment.
432
433          Q. But you don't have enough people?
434
435          A. Correct.
436
437          Q. So, you know they're not getting the right treatment?
438
439          A. We know that there's significant staffing shortages.
440
441          Q. They're not getting the right kind of psychiatric care, right?
442
443          A. We don't have -- correct, we don't have the right staffing requirements.
444
445          Q. They're not getting enough groups because you don't have enough people to run
446          the groups?
447
448          A. Correct.
449
450          Q. And you know from your own personal judgment that if you're not doing that
451          for people in segregation, they're going to get worse; isn't that right?
452
453          A. Across the board.
454
455    (ECF No. 1758 at 81-82) (emphasis added).

456        Second, Dr. Michael Dempsey, M.D., staff psychiatrist for Wexford Health Sources from

457   January 2013, until September 2015, who was physically located at Pontiac Correctional Center,

458   also testified about the lack of psychiatric staffing at the IDOC in the following manner:

459        Yeah, we don't have enough psychiatrists to treat the patients. We just don't. If I
460        remember correctly, IDOC had projected that they needed 66-1/2 full-time-
461        equivalent psychiatrists to provide care for the population within the IDOC. I'm
462        not sure if we've reached 25 full-time-equivalents at this point since I haven't been
463        working there for the last six months. I know it's not 66.
464
465   (ECF No. 1757 at 197). Dr. Dempsey further explained the problems associated with the lack of

466   staffing are as follows:

467        I believe that we didn't have enough psychiatrists with the kind of expertise that is
468        necessary to understand the correctional system.
469
470        Corrections is a unique environment. It takes into account the fact that a person
471        with a serious mental illness who is not in a natural environment is somehow
472        expected, without the kind of supports they need, to function adequately, to
473        understand the rules, the regulations.
474
475        And when you have patients who are seriously mentally ill, who may be psychotic,
476        who have impaired reality testing, and you put them in an environment where
477        they're segregated, where they're not treated to any appropriate degree or
478        subtherapeutically, and their options are limited, and they have to make important
479        decisions, I find it becomes an emergent situation.
480
481   (ECF No. 1757 at 199).
482
483        Finally, when discussing the psychiatric and mental health backlog (more fully discussed

484   below), Dr. Stewart explained during the preliminary injunction hearing:

485        Well, you know -- again, that backlog can't be taken in isolation. You gotta look at
486        the overall system. So, here we're talking about, you know, increased use of crisis
487        cells, increased use of restraints, increased use of force, people suffering because
488        of untreated mental illness. All of that has to -- is linked in some way with the fact
489        that patients aren't being seen frequently enough or seen at all.
490
491   (ECF No. 1757 at 260)(Emphasis added). In his Mid-Year Report, Dr. Stewart further explained:

492        IDOC leadership has been well aware of the problems related to the insufficient
493        amount of psychiatric services and yet has been unable to adequately solve this

18

issue.  At the time of the submission of this midyear report, however, the lack and quality of psychiatric services continues to negatively impact all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement. Of note, these deficiencies regarding psychiatric services were reported in the First Annual Report. The Monitor personally met with Director Baldwin on 6/26/17 to discuss this problem. To date, IDOC is yet to effectively address this emergency.

(ECF No. 1646 at 9).

The record leaves no question there was constitutionally deficient care being provided by the Defendants at the time of the preliminary injunction hearing.  The Court also finds for reasons stated herein, that despite the good efforts of the Defendants, constitutionally deficient care is still being provided.  The Court's finding is based generally on the fact that there is insufficient mental health staffing at the IDOC.  Moreover, to the extent there have been improvements in the delivery of mental health services, the record is clear those measures are unsustainable.

As noted above, Dr. Hinton testified at the preliminary injunction hearing as follows:

Q.  You know today you can't deliver the care—the psychiatric care that is required for the 12,000 patients because you don't have enough psychiatrists?

A.  Correct.

(ECF No. 1758 at 50).  Dr. Hinton testified at the permanent injunction hearing that the IDOC is now providing adequate care to mentally ill inmates.  (ECF No. 2372 at 31).  The Court does not doubt the sincerity of Dr. Hinton's current assessment.  However, his current position is in stark contrast with the evidence presented at the preliminary injunction hearing only three months earlier, and therefore is viewed with considerable caution.  (*See* ECF No. 2070, *ad passim*; *see also* ECF No. 2070 at 16-18, Order capturing portions of Dr. Hinton's testimony; *supra*, p. 13-17).  Importantly, it appears Dr. Hinton's assessment is based largely on the fact that the IDOC has the "proper procedures in place to provide adequate treatment," and not based on the actual care being given to inmates.  (ECF No. 2375 at 5, Dr. Hinton, testifying in a deposition dated August 17,

19

525    2018, avoided addressing whether inmates were being given adequate care, instead testifying "[i]t

526    is my testimony that we have the proper <u>procedures</u> in place to provide adequate treatment to all

527    of our population.")(Emphasis added).  Additionally, it should be noted that Defendants maintain

528    they now have the leadership, staffing, and procedures in place to provide the necessary

529    constitutional care. (ECF No. 2405 at 16).  Dr. Hinton also explained that he did not have anything

530    to do with the certification from the IDOC that they were in compliance with the Court's May 25,

531    2018, Order.  (ECF No. 2372 at 18).  Dr. Hinton specifically explained he was not at every prison

532    for the "day-to-day activit[ies]."  *Id*.   It is clear the IDOC is concerned with the staffing levels of

533    mental health providers.  Baldwin testified that the IDOC continues to ask Wexford for additional

534    mental health staff.  (*See also* ECF No. 2370 at 95, Baldwin acknowledges that he understood that

535    the staff Wexford is supposed to provide is the amount necessary to provide the required service).

536    Both Baldwin and Dr. Hinton testified about expanding the relationship with Southern Illinois

537    University and the University of Illinois to provide additional mentally health hours but at present

538    this is *de minimis*.  Baldwin testified about the IDOC continuing to engage in recruitment fairs.

539        Like Dr. Hinton, Baldwin also maintains the opinion that the IDOC has enough staff on

540    board to provide adequate medical treatment to the mental ill inmates.  (ECF NO. 2453 at 70).

541    However, Baldwin also lacks an adequate basis for his position as it is based on the fact that the

542    IDOC has made progress in its hiring, yet he acknowledges that he does not know to what level

543    the hiring has been made.  *Id*.  Additionally, Baldwin testified that he "believe[s] [ ] right now [the

544    IDOC] ha[s] an adequate number of psychiatrist[s], and as we get our whole structure in place,

545    [they will] need to increase staff [ ]."  *Id*.  The fact that the IDOC does not have all the necessary

546    structures in place further demonstrates the problems with the current care for mentally ill inmates.

547    Moreover, the current status of the structures suggests more staff is necessary to compensate for

548   the current deficiencies.  (*See also* ECF No. 2354 at 50, Baldwin acknowledging that buildings by

549   themselves do not treat the inmates).

550         Moreover, it is generally undisputed that adequate staffing is necessary to deliver adequate

551   care.  In his Second Annual Report of Monitor, Dr. Stewart made it clear that non-compliance with

552   the Settlement Agreement is a direct result of inadequate staffing.  (ECF No. 2122 at 9).  Even

553   given his change in position, Dr. Hinton acknowledged that it takes the right number of people to

554   provide the required care.  (EFC No. 2372 at 31).  When pressed regarding the situation at Dixon,

555   Dr. Hinton's position was most telling:

556         Q. So, psychiatrists, 1255, psychologist, 692, QMHPs, 1272, BHTs, 607.  That
557         comes to roughly 3700 [hours].
558
559         You got more people vacant – oh, no.  You managed to cut the vacancies from 3700
560         to 3000 hours.  Is that adequate?
561
562         A. It's an improvement.
563
564         Q. Is it adequate?
565
566         A. Well, I think – I can't answer that yes or no, so –
567
568   (ECF No. 2372 at 49).

569         In July 2018, Defendants submitted their staffing plan.  (Pl. Ex. 48A; Df. Ex. 55B).

570   Notably, Defendants' staffing plan provides for the equivalent of 65.75 psychiatrists.  (Pl. Ex. 48A;

571   Df. Ex. 55B).  The actual number of on-staff psychiatrists sits somewhere between 50-55.  *See*

572   *supra*, p. 13.  It should also be noted that the staffing shortage is not limited to psychiatrists.

573   Defendants' staffing of Mental Health Directors, Psychologists, Behavioral Health Technicians,

574   and other Mental Health Employees is also deficient.  (Pl. Ex. 48A; *see also* Df. Ex. 6 and Df. Ex.

575   38; after the Settlement Agreement was signed in May 2016, the IDOC increased its mental health

576   staffing from 80 FTEs to 453.6 FTEs.  In January 2018, the overall headcount was 364.).

21

577        Again, the testimony at the preliminary injunction hearing clearly established that the

578   mentally ill inmates were receiving inadequate care.  As noted above, Dr. Hinton, Dr. Dempsey,

579   and Dr. Stewart each testified about the deficiencies in mental health staff and the impact on the

580   inmates.    Dr. Hinton  acknowledged  at  the  preliminary  injunction  hearing  that  given  the

581   deficiencies in staffing, inmates in segregation were getting worse "across the board."  Dr. Stewart

582   called the situation an "emergency."  Even with the additional mental health staff hired after the

583   preliminary injunction hearing, the numbers associated with mental health providers are deficient

584   to provide the constitutionally required care.  In fact, the June 2018 monthly facility performance

585   report showed Wexford had failed to supply more than 10,000 hours of required clinical staff for

586   that month.  (Pl. Ex. 51; ECF No. 2376 at 290, Renzi's testimony).

587        The Court has given little weight to the testimony of Holly Andrilla, Defendants' expert,

588   who  opined  that,  statistically,  given  the  public  in  general,  the  IDOC  has  more  than  enough

589   psychiatrists to treat its mentally ill population.  (ECF No. 2375 at 59, Andrilla concluded, among

590   other things, "[e]very facility except Vienna, the ratio of psychiatrists per seriously mentally ill

591   people exceeds the ratio of the general population [ ].").  Andrilla is a research scientist with the

592   WWAMI  Rural  Health  Research  Center  and  the  Center  for  Health  Workforce  Studies  in  the

593   Department of Family Medicine at the University of Washington School of Medicine.  (Df. Ex.

594   62). The Court takes no issue with the expert's credentials or even her general methodology.

595   However, the Court finds the expert's analysis is inapplicable because her analysis compares the

596   non-prison population with the prison population.  (*See* ECF No. 2375 at 82-83, Andrilla explained

597   the  source  of  her  data).   The  doctors  and  medical  providers  in  this  case,  on  both  sides,  have

598   meticulously detailed the difficulties in treating the prison population with the current staff.  The

599   use of overtime is pervasive, and to put it in terms of the witnesses, "unsustainable."  (*See infra*,

600  pp. 23-24).  It is impossible to believe there is adequate staff, even with overtime and other efforts,

601  given the significant number of inmates who are not being timely treated based on the Defendants'

602  own backlog assessment.  Andrilla's assessment is simply contrary to the testimony and

603  established facts in this case.

604  To fully appreciate the impact of the staffing deficiencies, one need not look much further

605  than the IDOC's backlog.  The term "backlog report" was used throughout the preliminary and

606  permanent injunction hearings.  The backlog report contains data supplied by the correctional

607  center.  Mercer, Illinois Regional Mental Health Quality Assurance Coordinator for Wexford

608  Health Sources, explained her role as quality assurance coordinator is to monitor, report, and

609  translate data related to the IDOC's compliance with the Settlement Agreement.  (ECF No. 2373

610  at 6).  Mercer noted that, in the past, each facility would use a different mechanism to capture the

611  mental health treatment data.  (ECF No. 2373 at 14).  Mercer implemented the use of a database

612  template at every facility so that each facility's database would look the same and the facilities

613  would collect the same data.  (ECF No. 2373 at 15).  Additionally, she focused on getting the

614  facilities to collect and record the appropriate data in the database.  (ECF No. 2372 at 6).  Mercer

615  explained that some of the data is automatically updated based on data that is manually inputted.

616  (ECF No. 2373 at 10, "[W]hen certain information is entered into the database, for example, the

617  date that an individual is identified as needing mental health services, the date that a person was

618  last seen, what - -the number of days that the provider has indicated that they want to see that

619  person again, the database automatically generates due dates and follow-ups due dates and, *et*

620  *cetera*.").  Mercer noted, however, that the failure to manually input certain information can cause

621  inflated numbers in the database.  (ECF No. 2373 at 8).  Ultimately, the backlog report (psychiatry)

622  represents the backlog in "New/Face to Face," "Follow Up/Face to Face," "New Telepsych," and

623    "Follow up/Telepsych."  (*See* Df. Ex. 1F).  The backlog is measured in increments of "1-14 day

624    backlogged," 15-30 day backlogged," "31-45 day backlogged," "46-60 day backlogged," and

625    "Greater than 60 day backlogged."  *Id*.

626          The numbers on the August 17, 2018, backlog report show an improvement from the

627    numbers presented during the preliminary injunction hearing.  (Df. Ex. 1F).  Defendants provide

628    that the psychiatric backlog has been reduced to a total of 908.  (Df. Ex. 1D and 35B).  Defendants

629    further provide that the backlog for new psychiatric appointments has been reduced to nearly zero.

630    (Df. Ex. 1F).  Nonetheless, while the backlog number may have been reduced, it is still significant

631    in terms of the timing of the reductions, the current level of backlog, quality, and the methods

632    undertaken to reduce the backlog.  The evidence presented at the preliminary injunction hearing

633    showed, as of October 2017, there were a total of 4,010 backlogged contacts.  (ECF No. 1757 at

634    213).  And as the Court noted in its previous Order, a significant reduction in the backlog only

635    came about at the same time or after the filing of the Plaintiffs' initial Motion.  (*See id*., *see also*

636    ECF No. 1559, filed on 10/10/2017).  Additionally, Baldwin acknowledged that the backlog had

637    been reduced, at least in part, by overtime, a method he and others acknowledge is not a long-term

638    solution.  (ECF No. 2370 at 129, "Not a log-term permanent [solution].  I see it as a short-term

639    [solution].").

640          Confirming the inability to continue the current efforts and the inadequacies of staffing,

641    Renzi, Psychologist Administrator at Pontiac Correctional Center, testified as follows:

642          Q.  I notice in the charts and in your testimony that in terms of trying to deal with
643          the backlogs and provide adequate care, you're trying to have people come from
644          other institutions and work there and also offer additional overtime, correct?
645
646          A.  Yes.
647
648          Q.  That doesn't sound like a very good plan.  I mean, is that sustainable in the
649          long term?

650
651          A.  In the long term, it would be difficult to sustain that.
652
653          Q.  Yes.
654
655          A.  However, the mentality – the idea that providing them some service is better
656          than providing them no service.
657
658          Q.  Yes.  So – but would it be fair to say that you acknowledge that you do need
659          more staff at Pontiac.
660
661          A.  I would acknowledge that, yes.
662
663   (ECF No. 2376 at 356).  Stromberger, Psychologist Administrator at Hill Correctional Center, also

664   affirmed this with her testimony as follows:

665          Q.  Well, how does it all get done if you only have half the staff you're supposed
666          to have?
667
668          A.  We work very hard.
669
670          Q.  You work overtime, right?
671
672          A.  At times.
673
674          Q.  And is there burnout because of the excess amount of work?
675
676          A.  Yeah.
677
678          Q.  And do you lose good people because they're working too hard?
679
680          A.  Yeah.
681
682          Q.  And isn't that a problem?
683
684          A.  I would say.
685
686          --
687
688          Q.   Well, do you have an understanding of whether there were deficiencies –
689          continued deficiencies in staffing of mental health people?
690
691          A.  Continued deficiencies in terms of staffing.  Yes, there's been deficiencies for
692          quite some time for staffing.
693

694     (ECF No. 2376 at 1433-34).  In the Court's view there is presently no "Plan B."
695

696     At Dixon Correctional center, part of the plan to reduce the backlog was to have

697     psychologists work on the weekends, non-traditional hours, and second shift.  (ECF No. 2372 at

698     43).  The Court agrees with Baldwin that the use of overtime is not sustainable.  As Dr. Stewart

699     testified, the overtime was putting a strain on employees.  (ECF No. 2374 at 264, "Centralia has a

700     minimal backlog, but the staff out there is at wit's end.  They don't have enough people.").  Dr.

701     Stromberger testified that working excessive overtime causes problems with retention because of

702     burnout.  (ECF No. 2376 at 68).  The Court has also considered the fact that in many cases the task

703     associated with the backlog had been outstanding in the "1-14 day backlogged" benchmark.  (Df.

704     Ex. 1F).  Nonetheless, even with the overtime, the backlog is still significant in certain facilities,

705     including Pontiac, Dixon, and Menard.  (Df. Ex. 1F).  It should be noted that the deficiencies in

706     staffing are not only related to psychiatrists.  The deficiencies lie in all areas of mental health staff.

707     (Pl. Ex. 48A; Df. Ex. 55B).  This is a real problem, and one that must be addressed now.

708     Both Parties utilize the processes implemented by Dr. Sim in support of their positions.

709     Defendants note that his work has resulted in a useful tool to allow the Defendants to focus on

710     problem areas.  Plaintiffs assert the reports show serious deficiencies in the actual delivery of

711     services – and further demonstrate the difficulty with staffing.  This Court finds both are correct.

712     Dr. Sim has been tasked with developing and implementing a mental health quality

713     assurance process.  Dr. Sim's process includes an audit tool and a mechanism to allow the

714     correctional centers to make corrective action.  Dr. Sim described two different audit processes:

715     (1) internal audits, conducted by the psychologist administrator or a social worker at the facility;

716     and (2) external audits, conducted quarterly by regional administrators.  Dr. Sim explained that his

717     audit identifies 315 "problem statements."  Problem statements are "verbiage" that came from the

718  settlement agreement, standard operating procedures, or the administrative directives.  (ECF No.

719  2375 at 125).  These problem statements are then placed into four broad categories.  (ECF No.

720  2375 at 126-128).  The review uses these statements when conducting their audit as follows:

721      [ ] when the mental health authorities, the psych administrator or social worker for
722      when they conduct their audit, when they open up the documentation, the medical
723      charts, if they see that certain things are not being [done] – that is on this list, that
724      means it's considered non-compliant.
725
726  (ECF No. 2375 at 126).

727      The internal audit in turn uses these compliance categories and the problem statements to

728  assess the Department's compliance in the following ten areas: (1) Intake; (2) Crisis Writ and

729  Transfer; (3) Mental Health Follow-Up; (4) Mental Health Treatment Plan; (5) Crisis

730  Management, Intervention and Documentation; (6) Psychiatric Services; (7) Mental Health

731  Disciplinary Review/Restricted Housing; (8) Use of Restraints; (9) Mental Health Evaluations;

732  and (10) Supervision for Non-Clinical Licensed Mental Health Staff. (ECF No. 2375 at 130; Df.

733  Ex. 3D).  The audits used to be conducted every month.  (ECF No. 2375 at 132).  Starting in July

734  2018, the audits were conducted every other month.  *Id*.  Dr. Sim explained this change was to

735  allow mental health staff more time to provide services to inmates.  In addition, Sim explained this

736  would allow the auditors the ability to review the data and develop effective corrective action

737  plans.  (ECF No. 2375 at 133).   The correctional centers can use the results as a tool to take

738  corrective action.  Undoubtedly, this is a good thing.

739      However, in July 2018, several of the institutions were performing below the 85%

740  threshold set by the IDOC.  (ECF No. 2375 at 180).  In some cases, significantly lower.  That, in

741  and of itself, does not raise undue concern.  But, an examination of the results further reveals the

742  difficulty the IDOC is having with staffing.  The following discussion highlights this Court's

743  concerns:

27

744    Q. For the corrective action plans for Pontiac marked July 18th, these would be the
745    corrective action plans to follow the audit that we just looked at, correct?
746
747    A. Yes.
748
749    Q. Okay. And we see the 20 -- for the first sheet is about mental health treatment
750    plans, and it has that compliance score of 20 percent at the top, correct?
751
752    A. Yes.
753
754    Q. Okay. And the first deficiency is, Mental health treatment plan was not filed in
755    the medical record, correct?
756
757    A. Correct.
758
759    Q. And that's a clerical? It's listed as a clerical error on Missing Information?
760
761    A. Yes.
762
763    Q. That's the category?
764
765    A. Yes.
766
767    Q. But we don't know from this whether the treatment plan just wasn't done or it
768    wasn't filed?
769
770    A. I don't know.
771
772    Q. Okay. But regardless, the action plan is for staff to use overtime to do treatment
773    plans, right?
774
775    A. Yes.
776
777    Q. Okay. And the deficiency number two also relating to treatment plans is that
778    there wasn't -- there was no monthly treatment plan updated for mental health
779    patient in restrictive housing for more than one month. Do you see that?
780
781    A. Deficiency number two.
782
783    Q. Deficiency number two, correct?
784
785    A. Yes.
786
787    Q. So, that would have been one of the top three most common deficiencies for
788    Pontiac in this audit?
789

790       A. Yes.

791

792       Q. And the corrective action plan here is for MHPs to use monthly one-to-one
793       sessions for treatment planning for seg offenders. Do you see that?

794

795       A. Yes.

796

797       Q. So, that means that they're going to take time from the prisoner's individual
798       counseling session to meet the treatment planning requirement, correct?

799

800       A. That's what it shows.

801

802 (ECF No. 2375 at 162-64). This colloquy between Plaintiffs' counsel and Dr. Sim demonstrates

803 the ongoing shift by the Defendants of their limited staff resources from one area of concern to

804 another and the need to cover essential items by use of overtime. This is simply unsustainable.

805      The Court further finds the Defendants have been aware of these deficiencies for an

806 unreasonable period of time, and their failure to address these deficiencies amounts to deliberate

807 indifference. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (*citing Todaro v. Ward*, 565

808 F.2d 48, 52 (2d Cir. 1977)) ("When systematic deficiencies in staffing, facilities or procedures

809 make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers.").

810 There have undoubtedly been efforts on the part of the Defendants to address the staffing needs

811 regarding mental health; however, these efforts have been generally ineffective – and have gone

812 on far too long without any significant attempt to adapt or modify based on the knowledge gained

813 from their recruitment efforts. While some efforts have been successful, including the recent

814 expansion of the use of tele-psychiatry, the Defendants have failed to achieve a minimum level of

815 medical service to avoid the label of cruel and unusual punishment. *Id.*

816 ***Medication Management***

817      Dr. Stewart explained that psychiatric conditions are brain illnesses. (ECF No. 1757 at

818 241). Dr. Stewart testified that psychotropic medications can have harsh side effects and require

819 constant monitoring. (ECF No. 1757 at 242, Dr. Stewart specifically explained "[s]ome of [the

820    medication] have some pretty harsh side effect profiles that require constant monitoring [and some

821    that] you need to follow-up with laboratory work; you need to follow-up with [ ]blood pressure

822    monitoring in certain cases [and] follow-up on the abnormal involuntary movement scale.”).

823    Additionally, the failure to properly monitor an inmate's medication may result in poor medication

824    compliance, including the possibility that the inmate will cease taking medication.  (ECF No. 1758

825    at 40, Dr. Stewart testified “where you have poor medication compliance because people are

826    experiencing side effects, and they don't get those addressed, so the medications are just stopped.”).

827    Dr. Stewart ultimately concluded at the preliminary injunction hearing that “[i]t's rare when

828    someone is being seen every 30 days [and he has] [f]ound examples of people being seen -- of

829    medications being routinely written for anywhere from two to six months.”  (ECF No. 1757 at

830    243).  The reason Dr. Stewart was given by prescribers, the nursing staff, and the clinical

831    administrators for medication being prescribed for longer periods of time was because “[the IDOC

832    doesn't] have enough people to see people every 30 days so [they] write the meds longer so the

833    meds won't expire, and hopefully [they'll] see them within a couple months or three months.”

834    (ECF No. 1757 at 243-44).  Dr. Stewart also testified that class members were exhibiting severe

835    side-effects that were not charted in their records.  (ECF No. 1757 at 251).

836        These conclusions went generally uncontested at the preliminary and permanent injunction

837    hearings.    In fact, Dr. Hinton acknowledged at the preliminary injunction hearing that

838    understaffing is a significant problem regarding medication management, noting that thousands of

839    inmates who receive medication in the general population are placed in a dangerous situation by

840    not being seen by psychiatrists.  (ECF No. at 319-20).

841        The danger was recognized by the Parties and several provisions were inserted into the

842    Settlement Agreement to insure proper medication management.

843    Sections XII(b) of the Settlement Agreement provides:
844
845    Within ninety (90) days after the approval of this Settlement Agreement, IDOC
846    shall also comply with the provisions of IDOC Administrative Directive 04.04.101,
847    § II(F)(5), except that under no circumstances shall a SMI offender who has a new
848    prescription for psychotropic medication be evaluated as provided therein fewer
849    than two (2) times within the first sixty (60) days after the offender has started on
850    the new medication(s).
851
852  (ECF No. 711-1 at 15).  The referenced Administrative Directive provides:
853
854    Offenders who are prescribed psychotropic medication shall be evaluated by a
855    psychiatrist at least every 30 days, with extensions on follow-up care for those who
856    psychiatrist have found and documented that the offender has reached stability
857    (outpatient level of care:  Not to exceed 90 days; RTU level of care:  not to exceed
858    60 days).
859
860  Additionally, the Settlement Agreement requires:
861
862    The regular charting of medication efficacy and side effects, including both
863    subjective side effects reported by the patient, such as agitation, sleeplessness, and
864    suicidal ideation, and objective side effects, such as tardive, dyskinesia, high blood
865    pressure, and liver function decline [and]
866
867    Adherence to standard protocols for ascertaining side effects including client
868    interviews, blood tests, blood pressure monitoring, and neurological evaluations [
869    ].
870
871    (ECF No. 711-1 at 15).

872    In addition to the staffing issues discussed above, the evidence at the permanent injunction

873  hearing revealed the continuation of significant issues with the IDOC's medication management.

874  First, the mental health staff at the correctional centers recognize there is an issue with follow-up

875  because the nursing staff who administer the medications do not notify them when inmates are

876  non-compliant.  Dr. Renzi testified that a lot of the inmates will accept the medication from the

877  nurse, and then put the medication in their mouth as to appear as though they are taking it.  (ECF

878  No. 2376 at 278).  However, the inmates may "cheek" the medication or swallow it, and later

879  regurgitate it.  *Id*.  Dr. Renzi acknowledged that Pontiac continues to have difficulty in assuring

880  that offenders are actually taking their medication, but there have been educational efforts to train

881  staff.  (ECF No. 2376 at 277-79).  Dr.  Stromberger testified that nursing staff are not fully aware

882  of referral protocol when class members refuse medications.  (ECF No. 2376 at 48).  Dr.

883  Stromberger, however, did note that there had been some educational follow-up on that issue.

884       This testimony is consistent with Dr. Stewart's testimony during the preliminary injunction

885  hearing.  Dr. Stewart testified that one major problem is that inmates are given their medications

886  but not monitored closely to ensure they have ingested the pills, especially in segregation.  (ECF

887  No. 1757 at 123).  Dr. Stewart testified one of the inmates he visited had numerous pills on his

888  person that he had not taken.  (ECF No. 1757 at 254).  It should be noted that Dr. Puga is certainly

889  aware of these issues and has been working on measures to assist in medication compliance.  (ECF

890  No. 2372 at 136-37).  Nonetheless, these issues again highlight the general staffing issues and the

891  need for additional measures to be considered.

892  ***Mental Health Treatment in Segregation***

893       Segregation refers to an inmate's confinement in his or her cell for a period of 22 to 23

894  hours a day.  (ECF No.  1757 at 103).  In the IDOC, over 80% of the inmates in the IDOC who are

895  in segregation are mentally ill.  (Pl. Ex. 22, 897 out of 1105 inmates in segregation are mentally

896  ill).  Dr. Hinton opined that the "percentage of [inmates] who are mentally ill tend to have more

897  behavioral issues, in part because of their mental illness."  (ECF No. 1758 at 81).  Dr. Hinton

898  further opined that "there's nothing that is a good thing about being in segregation."  *Id.*

899  Supporting such an opinion, Dr. Stewart testified "[a] person with a pre-existing mental illness

900  placed in segregation will have an exacerbation of their pre-existing mental illness."  (ECF No.

901  1757 at 109).  Segregation can also cause a degradation of coping mechanisms and lead to

902  increases in self-harm and other acting-out behaviors.  (ECF No. 1757 at 109-111).  Dr. Renzi also

903  agreed that segregation can have a negative effect on mental illness.  (ECF No. at 2376 at 295).

904    Inmates Champs, King, Span, and Singleton all testified about their negative experience in

905    segregation. (ECF No. 2376 at 91-112, 113-148; ECF No. 1758 at 271-287, 394-412). Given this,

906    it is clear mental health issues must be addressed for mentally ill inmates in segregation.

907            Under Sections XV(a)(iii), the Parties agreed that:
908

909            Mentally ill offenders in segregation shall continue to receive, at a minimum, the
910            treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and
911            the Warden shall coordinate to ensure that mentally ill offenders receive the
912            services required by their ITP.
913

914    (ECF No. 711-1 at 17). The Settlement Agreement places certain timeframes on MHP's review

915    of, and updates to, the treatment plans for mentally ill offenders placed in segregation. *Id*. Dr.

916    Stewart explained the purpose of this requirement is simple – when you place an inmate "into a

917    segregation system, you need to review and update the treatment plan given the vastly different

918    environment the person is in." [3] (ECF No. 1905 at 82).

919            During the preliminary injunction hearing, Dr. Stewart testified that the IDOC's medication

920    management for those in segregation is worse than for Class Members elsewhere in the system.

921    (ECF No. 1757 at 123). Dr. Stewart specifically noted that there is a significant problem in the

922    failure to ensure that those in segregation who are prescribed psychotropic medication actually

923    take the medication. (ECF No. 1757 at 123). Additionally, there was testimony and evidence

924    during the preliminary injunction hearing regarding Defendants' non-compliance with the out-of-

---

[3] It should be noted that Dr. Stewart also explained that inmates in segregation are:

    [ ] some of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely.

    And so -- you know, and they get nothing. Couple little things thrown at them. But they really don't get any sort of regular treatment.

    And so this is a real serious issue, you know. I don't want to put a number on it. It's, it's -- it's as serious as I've seen.

(ECF No. 1905 at 182-83).

925  cell time required for mentally ill inmates placed in segregation.  (ECF No. 1757 at 136; s*ee also*

926  ECF No. 711-1 at 20, Section XV(c) of the Settlement requires "mentally ill offenders in a Control

927  Unit setting for longer than sixty (60) days shall be afforded out-of-cell time.")

928        Dr. Stewart explained at the preliminary injunction hearing that the consequences of this

929  failure are:

930        [ ] psychiatric decompensation. And then we run into that whole line, you know,
931        acting out, writing up, more segregation time and/or going to crisis, coming out. It's
932        -- the fact that (vi)(A), which is continuation of the initial treatment plan with
933        enhanced therapy, if necessary, to protect from decompensation that may be
934        associated with segregation, that's not being done. People are getting worse in
935        segregation.
936
937  (ECF No. 1905 at 174).

938        In addition to the above, during the permanent injunction hearing, there was additional

939  evidence presented regarding inmates' out-of-cell time.  In the record it is generally accepted that

940  out-of-cell time for mentally ill inmates in segregation is necessary to avoid a rapid decline in

941  mental health.  Plaintiffs argue that the lack of adequate structured out-of-cell time is a continuation

942  of the Defendants' failure to meet their obligation under Section XV(c) of the Settlement

943  Agreement.  Plaintiffs also argue that Defendants are not adequately addressing an inmate's refusal

944  to participate in out-of-cell time.

945        As it relates to Menard, Pontiac, and Dixon, the "received" and "received minus refusal"

946  structured out-of-cell time by inmates during June 24, 2018, through June 30, 2018, was

947  summarized in Plaintiffs' Exhibits 45B, 45C, and 45D.  Plaintiffs presented information regarding

948  these institutions because they have large segregation populations.  (*See* ECF No. 2374 at 124, Dr.

949  Stewart testified that "I know Pontiac has a very large segregation population, but Menard also has

950  a large segregation population.").  The evidence showed inmates were receiving an average of 6.05

951  hours at Menard, 6.97 hours at Pontiac, and 9.3 hours at Dixon.  (Pl. Ex. 45B, 45C, and 45D).

34

952    However, it was noted that "received" hours included those that were taken and offered but

953    refused.  *Id.*  The actual average out-of-cell time was 4.24 hours at Menard, 2.996 hours at Pontiac,

954    and 3.13 hours at Dixon.  *Id.*   Parenthetically, it should be noted that the majority of structured

955    out-of-cell time was by way of movies.  (Pl. Ex. 45A; *see also* ECF No. 2374 at 126[4]).

956          The most significant issue raised by these numbers is the importance of staffing.  Dr. Doyle

957    and Dr. Mirsky both testified that refusing group or other mental health services can be a potential

958    indicator of decompensation. (ECF No. 2377 at 48; ECF No. 2370 at 276).  Nonetheless, the record

959    indicates a lack of concern or follow-up for those individuals refusing to participate in these

960    activities.

961    ***Mental Health Treatment on Crisis Watch***

962          Like segregation, inmates who are on crisis watch are in isolation and additional care is

963    necessary to avoid exacerbating their mental health issues.  Crisis refers to an acute exacerbation

964    of mental illness, such as worsening psychosis or mania, or acting out behaviorally, or when

965    someone is acutely suicidal or potentially violent.  (ECF No. 1757 at 51-53).  The purpose of crisis

966    cells or watches in correctional mental health systems is to, first, protect the individual from self-

967    harm or harming others, and second, to provide appropriate mental health assessment and

968    intervention, such as re-evaluating medication, re-evaluating the psychosocial treatment, and

969    addressing whatever issues precipitated the crisis (ECF No. 1757 at 219; *see also* at 38, Dr. Stewart

---

[4] Dr. Stewart testified about the use of movies as a structured treatment activity:

> It certainly would -- it could contribute to lessening the decompensation, but I don't -- it's not a -- necessarily a therapeutic activity, so I would question its validity for that purpose.

> I think it's a good thing to get people out of their cells and doing anything. I want to be real clear about that.

(ECF No. 2374 at 126).

explained that the crisis level of care is needed to assist "people that are presenting with acute problems that need aggressive intervention to deal with a particular acute issue.")  During the preliminary injunction hearing, Dr. Stewart testified that it is "imperative that their treatment is reviewed, not just by one individual but for the entire treatment team that's involved with the case [ ] [a]nd that's not happening."  (ECF No. 1757 at 52).

The Settlement Agreement provides certain requirements as it relates to crisis treatment.

First, the Settlement Agreement provides:

> Beds that are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilized the offender prior to transfer to a more or less intensive care setting, as required by IDOC Administrative Directive 04.04.102, § II(F)(2).

(ECF No. 711-1 at 3).

Dr. Stewart testified at the preliminary injunction hearing that, based on his review, the only treatment that regularly occurs on crisis watches is the daily contact by the MHP, which are confidential sessions at some facilities but take place most often at the cell front.  (ECF No. 1905 at 131).  Dr. Stewart explained that:

> But again, as I said, the only thing that occurs is being placed in the cell, having certain property removed, and then getting these daily visits. <u>And so there's no specialized treatment that occurs for people in crisis</u>.

(ECF No. 1903 at 198-99) (emphasis added).

The Settlement Agreement also provides:

> For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis watch. This assessment may be performed at cell front, using a form which will be specifically designed for this purpose by IDOC and approved by the Monitor. This five-day assessment process will be in addition to IDOC's current procedure for Crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation

1005   of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar
1006   days of discontinuation from Crisis Watch, and thereafter on a monthly basis for at
1007   least six (6) months. Findings shall be documented in the offender's medical record.
1008
1009   (ECF No. 711-1 at 10).
1010
1011   Dr. Stewart concluded that, at the time of the preliminary injunction hearing, Defendants

1012   are only conducting the first suicide evaluation, but are not continuing to assess monthly for six

1013   months. (ECF No. 1757 at 232).  Dr. Stewart also opined that the Defendants' failure to conduct

1014   necessary evaluations and assessments of those who are discharged from crisis watches results in

1015   unnecessary harm and suffering, especially as those failures combine with inadequate treatment

1016   planning and psychopharmacology.  (ECF No. 1757 at 231).  There was no evidence to the contrary

1017   presented by the Defendants about the conditions at the time of the preliminary injunction hearing.

1018   Additionally, evidence regarding crisis watch was presented during the permanent injunction

1019   hearing.  Most notably, Plaintiffs presented evidence of inmates who were kept on crisis watch

1020   longer than 10 days.  In June 2018, there were 620 inmates placed on crisis watch, in July 2018,

1021   there were 486.  (Pl. Ex. 53; Pl. Ex. 43).  Of those inmates, 85 were kept on crisis watch longer

1022   than 10 days in June, and 121 inmates met that criteria in July.  (ECF No. 2374 at 111-12; Pl. Ex.

1023   43; ECF No. 2376 at 314, Dr. Renzi's Testimony).  The IDOC's Mental Health Procedures Manual

1024   provides that "patients who remain on crisis treatment level of care after ten consecutive days will

1025   be considered for a higher level of care."  (Df. Ex. 49, p. 31).  The record reveals little compliance

1026   with this requirement.

1027   Moreover, Dr. Mirsky confirmed Dr. Stewart's finding that inmates on crisis watch are

1028   getting between 15-20 minutes of time with qualified mental health profesionals and little other

1029   time.  Notably, Dr. Doyle explained:

1030   "[If the IDOC had additional staff] it would mean that we could spend more time.
1031   Some people, it takes them a few minutes just to get comfortable sitting with you
1032   as a psychiatrist.  So we could establish better rapport.
1033
1034   Looking at the reverse as to what the damage is, I'm hoping that we're not doing
1035   any damage, but I couldn't say for sure if there isn't some."
1036
1037   (ECF No. 2377 at 81).

### Mental Health Evaluations

1039   As previously noted, there is no dispute the Defendants have failed to comply with Section

1040   V(f) of the Settlement Agreement.  Section V(f) provides:

1041   Evaluations resulting from a referral for routine mental health services shall be
1042   completed within fourteen (14) days from the date of the referral (*see* IDOC
1043   Administrative Directives 04.04.100 § II(G)(2)(b) and 04.04.101 §II(F)(2)(c)).
1044
1045   (ECF No. 711-1 at 8).
1046

1047   There was much evidence regarding the significant backlog in psychiatric contacts with

1048   inmates.  Contacts are activities that psychiatrists and mental health professionals are supposed to

1049   accomplish, including evaluations, treatment plans, and follow-up.  (ECF No. 1757 at 212-13).

1050   The Defendants argue that the backlog has substantially declined, noting that there is now

1051   a backlog of 313 initial evaluations.  (ECF No. 1894, Df. Ex. 1a; *but see also* ECF No. 1757 at

1052   213, where it was noted there was a backlog of 445 evaluations, 780 treatment planning contacts,

1053   and 2,785 follow-up visits; *compare with* Df. Ex. 1).  The Defendants further note that a significant

1054   amount of these are only delayed 1-14 days.  Finally, the Defendants suggest that the record does

1055   not identify the number of mentally ill prisoners at the various facilities, and thus, the Court is

1056   unable determine how the number of late evaluations at those four facilities compares to the

1057   number of mentally ill prisoners at those facilities.   (ECF No. 1965 at 14).  The Defendants'

1058   argument that the Court is unable to determine the extent of the problem based solely on the size

1059   of the backlog without additional information regarding the population is unpersuasive.  Dr. Hinton

1060   testified as to the unacceptable nature of the backlog existing at the time of the preliminary

1061   injunction hearing.  (ECF No. 1758 at 52, *et seq.*).

1062        As discussed before, while the backlog number may have been reduced, it is still significant

1063   in terms of timing of the reductions, the current level of backlog, quality, and the methods

1064   undertaken to reduce the backlog.  *Supra*, p. 22-24.  The current system's reliance on overtime is

1065   not viable.  *Id*.

1066   ***Mental Health Treatment Plans***

1067        The treatment plan document plays a very important role in the delivery of mental health

1068   care – it guides the treatment of an inmate.  (ECF No. 1906 at 106, 113, Dr. Hinton's Testimony;

1069   *see also* 280, Dr. Mirsky acknowledging treatment plans are the most fundamental document in

1070   the whole mental health system).  The plan is created for each inmate who is diagnosed with a

1071   mental illness or receiving mental health care services.  (ECF No. 1906 at 112).  The treatment

1072   plan should capture how treatment is ultimately delivered and the goals of treatment.  (ECF No.

1073   1906 at 38).  The IDOC utilizes the treatment plan to make sure that the inmate consents to the

1074   treatment.  *Id*.

1075        The Settlement Agreement provides:

1076   As required by IDOC Administrative Directive 04.04.101, § II(F)(2)(c)(4), any
1077   offender requiring on-going outpatient, inpatient or residential mental health
1078   services shall have a mental health treatment plan. Such plans will be prepared
1079   collectively by the offender's treating mental health team.
1080
1081   (ECF No. 711-1 at 9).

1082        Plaintiffs have generally argued that the treatment plans are being done in a perfunctory

1083   manner that do not facilitate the delivery of mental health services.  (ECF No. 1559 at 14; *see also*

1084   ECF No. 2406 at 78, "The treatment plans in IDOC are not helpful and do not facilitate the

1085   provision of mental health care; the forms are completed more as an administrative requirement

1086   and not true treatment planning.").

1087          This Court's May 25, 2018, Order required that "[a]ll class members shall have a treatment

1088   plan that is individualized and particularized based on the patient's specific need, including long

1089   and short term objectives, updated and reviewed with the collaboration of the patient to the fullest

1090   extent possible." (ECF No. 2070 at 41).

1091          The evidence at the preliminary injunction hearing makes it clear that the lack of adequate

1092   staffing significantly impacts treatment planning.  Defendants argue the full record shows the

1093   IDOC has made substantial improvements with respect to treatment planning.  This includes the

1094   use of a revised treatment plan document reviewed and approved by Dr. Stewart.  (Df. Ex. 13).

1095   The problem arises, however, in the actual completion of the treatment plans.   The mental health

1096   providers are so overworked that the treatment plans often become perfunctory.

1097          Plaintiffs presented the Court with treatment plans from inmates at Pontiac Correctional

1098   Center.  (ECF No. 2374 at 180).  These treatment plans contained identical, or nearly identical,

1099   language describing the therapeutic focus, problems, and activity.  (*See* Pl. Ex. 55C, 55G, 55I, and

1100   55M).  Dr. Stewart opined:

1101          What I – what I glean from this, in all seriousness, is this is a reflection of how
1102          overworked the mental health professionals are, where they are basically cutting
1103          and pasting these things because it's just one more requirement they have because
1104          they're stretched way too thin.  That's how I read this.
1105
1106          These treatment plans are identical.  They're basically all worthless.  They may
1107          apply to one of these people, and there may be some overlap, but come on, the same
1108          wording on four different patients?
1109
1110          So, that's why I see this as the mental health professionals – and this confirms, you
1111          know, my walking around Pontiac.  These people are just really – they're hurting
1112          out there, the mental health professionals, because they have so much work, and
1113          there's not enough.
1114

1115   (2374 at 188).

1116   ***Deliberate Indifference***

1117   The above demonstrates the Defendants have breached the Settlement Agreement in the

1118   five areas advanced by the Plaintiffs.  In order to warrant action by this Court, the Court must also

1119   find there is a violation of federal law.

1120   To establish an Eighth Amendment violation, Plaintiffs must prove that Defendants have

1121   been deliberately indifferent to their serious medical needs, and in this case, their mental health

1122   needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary

1123   and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104

1124   (citations omitted).

1125   An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the

1126   plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and

1127   (2) "the defendants were deliberately indifferent to that risk."  *Minix v. Canarecci*, 597 F.3d 824,

1128   831 (7th Cir. 2010). The objective element requires that the plaintiff's medical need to be

1129   "sufficiently serious."  *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).  The subjective

1130   element requires that the "official must both be aware of facts from which the inference could be

1131   drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*

1132   *v. Brennan,* 511 U.S. 825, 837 (1994).

1133   To meet the objective prong, the medical need must be one that has been diagnosed by a

1134   physician as mandating treatment or one that is so obvious that even a lay person would easily

1135   recognize the necessity for a doctor's attention.  *Gutierrez*, 111 F.3d at 1373.  A medical condition

1136   "need not be life-threatening to be serious; rather, it could be a condition that would result in

1137   further significant injury or unnecessary and wanton infliction of pain if not treated."  *Gayton v.*

41

1138    *McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  The Seventh Circuit has agreed with other courts in

1139    concluding that the "[t]reatment of the mental disorders of mentally disturbed inmates is a "serious

1140    medical need."  *Wellman*, 715 F.2d at 272 (citing *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.

1141    1980)); *Inmates v. Pierce,* 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin,* 551 F.2d 44, 47

1142    (4th Cir. 1977).

1143        The subjective component requires a plaintiff to "provide evidence that an official actually

1144    knew of and disregarded a substantial risk of harm."  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir.

1145    2016); *Farmer*, 511 U.S. at 837.  In order to establish deliberate indifference, "a plaintiff does not

1146    need to show that the official intended harm or believed that harm would occur."  *Id.,* (*citing*

1147    *Farmer*, 511 U.S. at 842).  However, medical malpractice, negligence, or even gross negligence

1148    do not equate to deliberate indifference.  *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

1149    *See also Estelle*, 429 U.S. at 106; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

1150        The Seventh Circuit has recognized claims of systemic deficiencies in a prison's health

1151    care facility as a second category of deliberate indifference claims.  *Cleveland-Perdue v. Brutsche,*

1152    881 F.2d 427, 430–31 (7th Cir. 1989).  In case of alleged systemic deficiencies, deliberate

1153    indifference can be demonstrated by "proving there are such systemic and gross deficiencies in

1154    staffing, facilities, equipment, or procedures that the inmate population is effectively denied access

1155    to adequate medical care."  *Wellman*, 715 F.2d. at 272 (citing *Ramos*, 639 F.2d at 575); *Phillips v.*

1156    *Sheriff of Cook Cty.*, 828 F.3d 541, 554 (7th Cir. 2016), *reh'g and suggestion for reh'g en banc*

1157    *denied* (Aug. 3, 2016) (Claims of "systemic deficiencies at the prison's health care facility rendered

1158    the medical treatment constitutionally inadequate for all inmates, [ ]" plaintiffs must demonstrate

1159    that "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures

1160    that the inmate population is effectively denied access to adequate medical care.")).  The Seventh

1161    Circuit has concluded "that a clear consensus had been reached indicating that a prison official's

1162    failure to remedy systemic deficiencies in medical services akin to those alleged in the present case

1163    constituted deliberate indifference to an inmate's medical needs." *Cleveland-Perdue*, 881 F.2d at

1164    431. *See Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), (affirming a district court decision

1165    finding that systemic deficiencies in the Alabama prisons including inadequate staffing, treatment

1166    by unqualified personnel, incomplete medical records, and lack of written procedures establishing

1167    the duties and responsibilities of the medical personnel.).

1168        There is no dispute that the Plaintiffs suffer from serious medical conditions. (*See supra*,

1169    p. 2, definition of class). The Court has also found above that the Defendants have failed to provide

1170    medical treatment as required by the Settlement Agreement in the five areas advanced by the

1171    Plaintiffs. The Court also finds that the failure to provide treatment in the above areas puts the

1172    Plaintiffs at a significant risk for further injury and severe unnecessary pain and suffering. At the

1173    time of the preliminary injunction hearing, this fact was firmly established. Dr. Hinton, Dr.

1174    Dempsey, and Dr. Stewart all testified that the conditions in the IDOC, particularly the deficiencies

1175    in staffing, created a substantial risk of harm for mentally ill inmates. *Supra,* p. 13-17. These

1176    doctors used terms such as "dangerous," "emergent," and "emergency," to describe the situation.

1177    Given this evidence, and considering the standard outlined in *Wellman*, this Court finds the

1178    Defendants' inadequate staffing levels creates a systemic problem that has effectively denied the

1179    mentally ill inmates access to adequate and constitutionally required care.

1180        It should be noted that Defendants maintain the position that the law requires this Court to

1181    limit its decision to the care currently being provided by the Defendants. (ECF No. 2368 at 1).

1182    The Defendants further maintain any issues concerning the care the IDOC provided in the past are

1183    moot and irrelevant to a claim seeking forward-looking injunctive relief. *Id*. In support of their

1184    positions, Defendants note that the Supreme Court has explained that "deliberate indifference,

1185    should be determined in light of the prison authorities' current attitudes and conduct [ ]."  (ECF

1186    No. 2368 at 3); *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  Defendants further note that a

1187    plaintiff pursuing a permanent injunction must demonstrate a continuing need for the injunction

1188    "during the remainder of the litigation and into the future," and even if prison officials "had a

1189    subjectively culpable state of mind when the lawsuit was filed," they "could prevent issuance of

1190    an injunction by proving, during the litigation, that they were no longer unreasonably disregarding

1191    an objectively intolerable risk of harm and that they would not revert to their obduracy upon

1192    cessation of the litigation."  *Id*.; *Farmer*, 511 U.S. 825, 846 and n. 9 (1970).

1193         In *Helling*, the Plaintiff complained that he was exposed to unreasonably high levels of

1194    environmental tobacco smoke due to his cellmate's smoking habits.  *Id.*  The Supreme Court found

1195    Plaintiff stated a claim, but cautioned that he may have difficulty in proving the objective and

1196    subjective factors of a deliberate indifference claim because he had since been moved to a new

1197    prison, no longer had a cellmate who smoked, and the state had enacted new policies in effect

1198    regarding smoking.  *Id.*  Here, much of this case surrounds the Defendants' most recent actions –

1199    or actions since the preliminary injunction was issued – to correct significant deficiencies in the

1200    delivery of mental health treatment.  The Supreme Court and Seventh Circuit precedent require

1201    this Court to consider the totality of the circumstances, including the condition as described at the

1202    preliminary injunction hearing, the chances of these conditions reoccurring, as well as the current

1203    attitude of the Defendants, in considering whether or not a permanent injunction should issue.

1204    Additionally, the Court has relied on the fact that the Defendants' actions frequently occur in

1205    response to the Court's intervention.  *See Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal.

1206    1995) (The Court in granting a permanent injunction cited the defendants' history of refusing "to

1207     address the serious issues underlying the preliminary injunction until forced to do so under

1208     pressure of this litigation.").

1209           Defendants also argue that the problem is no longer systemic but only one that affects a

1210     few of the institutions.  The Defendants specifically note the weekly backlog report shows that as

1211     of August 17, 2018, twelve facilities had no backlog with respect to treatment plans, six facilities

1212     had only ten or fewer total backlogs in treatment plans, while another seven institutions had fewer

1213     than 40 backlogged treatment plans.  (Df. Ex. 1D and DX 1I).  There is no doubt the Defendants

1214     have been able to reduce the backlogs generally and even substantially at certain institutions.

1215     However, the backlog remains a real issue within the IDOC given the significant problems with

1216     documentation as well as the widespread use of overtime to handle most of the staffing needs to

1217     address the backlog.  Moreover, the ability to minimize the backlog at certain locations comes at

1218     the cost of providing care in other areas.  The Defendants have failed to put forth any long-term

1219     sustainable solution to address their staffing needs.

1220           The record also establishes the Defendants knew of, and disregarded, a substantial risk of

1221     harm to the Plaintiffs.  While the record shows the Defendants have made efforts to address many

1222     of the problems associated with the delivery of adequate mental health care, particularly recently,

1223     the Court remains concerned with the overall lack of a sense of urgency.  As previously noted in

1224     this Court's Preliminary Injunction Order, the issues associated with the staffing deficiencies

1225     began as far back as 2014 when the Defendants created their own 2014 remedial plan, and at this

1226     time, the Defendants have yet to fulfill any of their own staffing requirements.  A significant

1227     problem with the Defendants' approach is the reliance on Wexford to provide the necessary

1228     staffing to fulfill their constitutional obligation.  This record demonstrates Wexford has been

1229     unable to handle this job, a job the Defendants are unable to delegate to evade their constitutional

1230   duties.  (*See* Pl. Ex. 7, p. 2, Wexford long recognized the need to amplify its recruitment efforts).

1231   High level officials in the Governor's office have written Wexford "encouraging" them to fill the

1232   required positions, yet the staff necessary to provide constitutional care has yet to be hired; nor

1233   have the Defendants generally sought to take a different approach.  (ECF No. 2354 at 72; Pl. Ex.

1234   59, p. 3; *see also* ECF No. 2354 at 76, Baldwin testified that they depend on their partners for

1235   filling the vacancies.).  The Court recognizes that the changes needed in the IDOC have been

1236   monumental.  The Parties also recognized this and entered into a comprehensive Settlement

1237   Agreement providing deadlines and budget contingencies.  However, the Defendants have failed

1238   to meet many of the terms.  It is clear mentally ill inmates continue to suffer as they wait for the

1239   IDOC to do what it said it was going to do.  (*See supra*, fn. 2).  The Court cannot allow this to

1240   continue.  The Court further finds that there is no adequate remedy at law.  The Defendants must

1241   provide adequate and constitutionally required care for mentally ill inmates.

1242         Defendants argue the balancing of harms weighs in their favor as Plaintiffs have not met

1243   their burden of proof to show the class members are currently facing a sufficiently identified harm

1244   in the absence of granting additional prospective relief.  The Court disagrees with Defendants'

1245   assessment for the reasons stated herein.  The Defendants also argue that compliance with a Court

1246   imposed order taxes an already over-worked mental health staff.  This argument further

1247   demonstrates the need for additional staff.

1248         Given all of this, the Court finds that a permanent injunction must issue in order to ensure

1249   the constitutionally required care will be given to the mentally ill inmates in the custody of the

1250   Defendants.

1251         In sum, the Court finds that Defendants have been deliberately indifferent to the medical

1252   needs of the Plaintiffs in medication management, mental health treatment in segregation, mental

1253    health treatment on crisis watch, mental health evaluations, and mental health treatment plans

1254    within the meaning of the Eighth Amendment.

1255            The Court further finds the Plaintiffs have established by a preponderance of the evidence

1256    that a permanent injunction is appropriate and necessary.  The Court specifically finds that the

1257    Plaintiffs have suffered or will suffer irreparable injury if a permanent injunction is not issued.

1258    There are significant deficiencies in the delivery of mental health services within the IDOC.  The

1259    evidence establishes that there are systemic and gross deficiencies in staffing that effectively

1260    denied the Plaintiffs access to adequate medical care.  The Plaintiffs are at a significant risk of

1261    harm.  The Court further finds that there are no adequate remedies available at law to compensate

1262    for these injuries.  Plaintiffs are mentally ill inmates incarcerated within the IDOC, and Defendants

1263    are required to provide adequate care.  The balance of hardships weighs heavily in favor of the

1264    Plaintiffs.  While appropriately staffing the IDOC with mental health providers is a significant

1265    task, it is one that can, and must, be done.  The public interest also weighs heavily in favor of the

1266    Plaintiffs.

1267            In considering the appropriate remedy, Defendants correctly provide that the Court issued

1268    its Order as contemplated under §XXIX(g) of the Parties' Settlement Agreement.  (*See* ECF No.

1269    2460 at 8; ECF No. 711-1, Settlement Agreement).  Section XXIX(g) of the Settlement Agreement

1270    provides:

1271            If the Court finds that Defendants are not in substantial compliance with a provision
1272            or provisions of this Settlement Agreement, it may enter an order consistent with
1273            equitable and legal principles, but not an order of contempt, that is designed to
1274            achieve compliance.
1275
1276    (ECF No. 711-1 at 30).  This Court also recognizes the restraints for injunctive relief specifically

1277    enumerated in the Prison Litigation Reform Act ("PLRA").  In that regard, the PLRA provides:

47

The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).  This Court is also fully aware that "judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).  Defendants suggest the Seventh Circuit requires the Court "to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards." *See Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012).  In *Westefe*r, the Seventh Circuit reviewed a district court's injunctive order addressing the IDOC's procedures when assigning inmates to the supermax prison.  The district court incorporated the supermax-transfer regime used in Ohio.  In vacating the district court's order, the Seventh Circuit explained:

The district court's injunction goes well beyond this, locking in highly specific formal requirements controlling the timing and content of the notice and hearing that each transferred inmate must receive, and even going so far as to impose a right to appeal. An injunction of this scope and specificity is inconsistent with the "informal, nonadversary" model set forth in *Wilkinson, Hewitt,* and *Greenholtz,* and cannot be reconciled with the PLRA's requirement that injunctions in prison-conditions cases must be narrowly drawn and use the least intrusive means of correcting the violation of the federal right.

*Id*. at 684.  Defendants' reliance on *Westefe*r is misplaced for two reasons.  First, the record here demonstrates a long history of the Defendants' non-compliance with various terms they had agreed upon.  Second, given this history of non-compliance, Defendants' proposal is wholly deficient in addressing their constitutional violations.

The Settlement Agreement was the result of significant negotiations between the Parties over a period of years.  Indeed, in October of 2010, the Parties announced in open court that they

48

1309     were working toward a class settlement.  The Parties worked with a panel of experts to assist in

1310     their settlement efforts.  (ECF No. 117, Joint Status Report dated May 7, 2012).  A comprehensive

1311     settlement conference was held between April 16, 2013, and April 18, 2013.  An Agreed Order

1312     that provided additional working structure resulted from the settlement efforts.  (*See* ECF No. 132).

1313     After additional unsuccessful settlement efforts by the Parties, on March 20, 2015, the matter was

1314     set for trial.  (Minute Entry dated 3/20/2015; *see also* Minute Entry dated 9/17/2015).   On

1315     December 17, 2015, the Parties again announced to the Court that a settlement agreement had been

1316     reached.  (Minute Entry dated 12/17/2015).  On May 23, 2016, the last signature was acquired on

1317     the Settlement Agreement resolving the decade-long dispute between the Parties.  (ECF No. 711-

1318     1 at 33).

1319         Since the agreement was finalized, Defendants have failed to comply with many of its

1320     material terms.  (*See e.g.*  ECF No. 1373, First Annual Report dated May 22, 2017; ECF No. 1646,

1321     Mid-Year Report dated November 22, 2017; ECF No. 2122, Second Annual Report dated June 8,

1322     2018).   While the Monitor has memorialized Defendants' non-compliance, the Defendants

1323     themselves have recognized their deficiencies.  During the preliminary injunction hearing, Dr.

1324     Hinton testified that a significant number of mentally ill inmates were in dangerous situations

1325     because there was inadequate staffing at the IDOC.  (ECF No. 1758 at 53).  The danger associated

1326     with the inadequate staffing applied to every aspect of mental health treatment examined during

1327     the preliminary and permanent injunction hearing.  (*See e.g.* ECF No. 1758 at 319-20, Dr. Hinton

1328     acknowledged that it is dangerous to not monitor an individual on psychotropic medication.).  In

1329     its Orders, this Court specifically found that the Defendants' efforts to comply with the Settlement

1330     Agreement (or its own general directives) only came at the time of, or after, the filing of the

1331  Plaintiffs' initial Motion.  (*See id.*, *see also* ECF No. 1559, filed on 10/10/2017).  Simply put, the

1332  Defendants' actions have been largely reactionary.

1333  Additionally, based on this Court's review, Defendants' proposal falls far short of

1334  addressing their constitutional violations.  The record is clear that the Defendants know what needs

1335  to be done.  When presented with yet another opportunity to establish a reasonable proposal to

1336  address their constitutional deficiencies, they instead provided a document containing simple

1337  generalities.  (*See* ECF No. 2473-1).  The Defendants' most egregious attempt to cure their

1338  constitutional deficiencies is set forth in their proposal regarding mental health staffing.

1339  Defendants propose adopting the vague requirement that they have "a staffing plan and achieve a

1340  level of staffing that provides sufficient number of mental health staff of varying types to provide

1341  class members with adequate and timely evaluations, treatment and follow-up consistent with

1342  contemporary standards of care."  (ECF No. 2473-1 at 4).  Yet, Defendants know they are

1343  understaffed, and they also know the staffing levels which are necessary to provide adequate care.

1344  In fact, Defendants are fully aware of all these deficiencies, as they have both acknowledged the

1345  staffing problems at the IDOC.

1346  Moreover, the record contains ample evidence to demonstrate the IDOC is understaffed.

1347  (ECF No. 2460 at 13-28).  The following exchange at the preliminary injunction hearing puts it

1348  in simplest terms:

1349       Q.  You know today you can't deliver the care—the psychiatric care that is required
1350           for the 12,000 patients because you don't have enough psychiatrists?
1351
1352       A.  [Dr. Hinton] Correct.
1353
1354  (ECF No. 1758 at 50).  For his part, Baldwin testified that the IDOC continues to ask Wexford for

1355  additional staff.  (ECF No. 2354 at 9).  Despite the Defendants' recognition of their staffing

1356  shortage, not enough is being done.  As fully detailed in this Court's Order dated October 30, 2018,

1357 the Defendants' failure to adequately staff their facilities has led to a number of areas where they

1358 have failed to meet the constitutional requirements with respect to the mental health needs of the

1359 inmates.

1360     When there is a "concrete showing of a valid claim and constitutionally mandated

1361 directives for relief," a court should and must act. *Rogers*, 676 F.2d at 1214; s*ee also Hutto v.*

1362 *Finney,* 437 U.S. 678, 687, n. 9 (1978). "A federal court is required to tailor 'the scope of the

1363 remedy' to fit 'the nature and extent of the constitutional violation.'" *Dayton Bd. of Educ. v.*

1364 *Brinkman,* 433 U.S. 406, 420 (1977). Here, it is clear constitutional violations have already

1365 occurred (*see* ECF No. 2460, *ad passim*), and given the general history of Defendants' non-

1366 compliance with the Settlement Agreement, their own directives, and the law, their constitutional

1367 violations will continue unless this Court acts.

## **TERMS OF THE INJUNCTION**

1369     The Court FINDS for the reasons stated herein that the following relief is narrowly drawn,

1370 extends no further than necessary to correct the violation of the Federal right, and is the least

1371 intrusive means necessary to correct the violation of the Federal right.

1372     The Defendants John Baldwin, the Acting Director of the IDOC, and Dr. Hinton, the

1373 Department's Chief of Mental Health Services and Addiction Recovery Services must:

1374 *1.  Staffing requirements at the Illinois Department of Corrections*
1375
1376     a.  Within 90 days of this order, Defendants must employ the additional staff necessary
1377         to have the following system-wide levels in the following positions: 7 Site Mental
1378         Health Service Directors; 12 Mental Health Unit Directors; sixteen Staff
1379         Psychologists; 142.5 Qualified Mental Health Professionals; 102 Behavioral Health
1380         Technicians; 54.5 Registered Nurses – Mental Health; 24 Staff Assistants; 85.5
1381         Psychiatric Providers; 1 Director of Nursing – Psychiatric; 5 Recreational
1382         Therapists.
1383
1384         i.  In order to provide additional clarity on the staffing requirements, the
1385             following describes some of the above positions:

51

1. Site Mental Health Directors will provide guidance, direction, training and clinical supervision to all MHPs, except for psychiatrists within a given facility;

2. Mental Health Unit Directors will function as lead member of a multidisciplinary team, directing and supervising program psychologists and mental health staff, and providing clinical direction, structure and support for the specified unit;

3. Behavioral Health Technicians will assist staff with transporting offenders to group meetings and therapy appointments, oversees some groups, leads community meetings, and participates in activity therapy sessions under the direction of activity therapists. They will also be involved in additional duties as assigned by licensed MHPs. BHTs will be Bachelor level, unlicensed, employees.

4. Mental Health Training Coordinators will be responsible for developing and managing graduate-level students and pre-doctoral and post-doctoral interns.

5. Qualified Mental Health Professional are Licensed Social Workers, Licensed Clinical Social Workers, Licensed Professional Counselors, and Licensed Clinical Professional Counselors; and

6. Psychiatric providers may include the use of mid-level professionals and medical doctors.

b. Within 120 days of this order, Defendants shall evaluate whether their staffing plan is sufficient to provide mental health treatment consistent with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation, and mental health evaluations;

c. Within 180 days of this order, Defendants shall report their findings and submit a proposed amended staffing plan to the Court, the monitor and Plaintiffs' counsel; and

d. After the report, the Court will consider if any modification to the Defendants' staffing is necessary.

The Court specifically notes that the record is clear additional staffing is needed to provide the constitutionally required mental health services at the Illinois Department of Corrections. Almost universally, every witness who appeared during the hearings, at some point during their testimony, stated that there was insufficient staff to provide the needed mental health care for inmates. (*See e.g.* ECF No. 1757 at 139, Dr. Stewart testified about the reason for lack of group activities; ECF No. 1757 at 197, Dr. Michael Dempsey testified that there were not enough

52

1427   psychiatrists to treat patients; ECF No. 1758 at 82, Dr. Hinton explained the IDOC did not have

1428   the right staffing requirements; ECF No. 2354 at 71-76, Baldwin acknowledged that the IDOC

1429   needed to work on staffing; ECF No. 2376 at 356, Kelly Ann Renzi, Ph.D., Psychologist

1430   Administrator at Pontiac Correctional Center; ECF No. Dr. Melissa Stromberger, Psychologist

1431   Administrator at Hill Correctional Center; *but see* ECF No. 2373 at 822, Dr. William Elliott,

1432   Wexford Health Sources' Regional Mental Health Director for Illinois, who testified that Wexford

1433   had the right staffing requirements).

1434          The Court recognizes the amount of staff necessary may not ever be identified with exact

1435   precision.   Nonetheless, the Court finds that immediate action must be taken by the Defendants to

1436   address the dangerous situation that exists in the correctional facilities.   The Court finds the 2014

1437   Remedial Staffing Plan is the valuable piece in analyzing the staffing deficiencies within the

1438   IDOC.   Parenthetically, the Defendants have argued that the 2014 Remedial Staffing Plan is not

1439   contained in the record.   To the contrary, this document is in evidence.   (ECF No. 2362 at 1; ECF

1440   No. 1757 at 19; and ECF No. 1716 at 2, Transcript wherein the document was entered into evidence

1441   without objection).   The IDOC found the staffing contained within the document was sufficient to

1442   satisfy its constitutional violations.   (ECF No. 1716, Exhibit and Witness List, Ex. 9, IDOC

1443   Proposed Remedial Plan dated April 17, 2014, "Pursuant to its September 20, 2013 Facility and

1444   Staffing Plan, the Illinois Department of Corrections ("Department" or "IDOC") is pleased to

1445   present this proposal for staffing levels and bed and treatment space allocations that satisfy its

1446   constitutional duty to provide mental health care to seriously mentally ill ("SMI") offenders.").

1447   Nonetheless, the Plan was provided by the IDOC as part of its self-review to determine what

1448   needed to be done to "satisfy its constitutional duty to provide mental health care to seriously

1449   mentally ill ("SMI") offenders."   (Pl. Ex. 9, p. 1).   Couple with the testimony at the hearings

1450  referenced in this Order, this Court is convinced the staffing requirements contained therein are,

1451  at a minimum, necessary to correct the Constitutional deficiencies currently existing in the IDOC.

1452  The Court also recognizes Defendants have increased staffing efforts since the creation of the

1453  document leaving the most recent shortfall at:   8 Mental Health Unit Directors; 2.97 Staff

1454  Psychologists; 27.5 Qualified Mental Health Professionals; 38 Behavioral Health Technicians;

1455  34.5 Registered Nurses – Mental Health; 35.89 Psychiatric Providers.  (*See* Df. Ex. 5b).  Finally,

1456  the Court has provided the staffing requirements in the aggregate recognizing that the specific

1457  geographical area of need may change, and Defendants must have flexibility to deploy their

1458  staffing resources to the appropriate areas.

1459      The Court recognizes this staffing mandate may not be enough.  (*See* ECF No. 2122 at 10,

1460  Second Annual Report of Monitor, Pablo Stewart, MD, "It has become painfully clear to the

1461  monitoring team over the first two years of the Settlement Agreement that the staffing levels of

1462  the Approved Remedial Plan are totally inadequate to meet the mental health and psychiatric needs

1463  of the mentally ill offender population of the Department."  *See also* ECF No. 1373 at 35, First

1464  Annual Report of the Monitor Pablo Stewart, MD, "Understaffing is very evident at all but one

1465  IDOC facility monitored and this was identified as a key reason a number of other Settlement

1466  provisions have not been met. Turnover is reported as high.").  As such, the Court also directs

1467  Defendants to evaluate whether their current staffing plan meets their constitutional obligation.

1468  This action, in conjunction with the requirement to immediately increase staff, will allow the

1469  Defendants the opportunity to assess their staffing needs while immediately addressing the glaring

1470  staffing deficiencies that currently place the class members in danger.

1471        The Court finds that this directive, based on the evidence, is narrowly drawn, extends no

1472   further than necessary to correct the violation of the Federal right, and is the least intrusive means

1473   necessary to correct the violation of the Federal right.

1474        2. ***Class members who are placed on mental health crisis watch***:

1475

1476        a.   Crisis watches should only be used for patients exhibiting behavior dangerous to
1477             self or others as a result of mental illness and may only be ordered upon a finding
1478             by an appropriately trained and licensed mental health professional that no other
1479             less restrictive treatment is appropriate. When used, crisis watches are to be
1480             employed for the shortest duration possible;

1481

1482        b.   IDOC shall provide appropriate mental health treatment to stabilize the symptoms
1483             and protect against decompensation;

1484

1485        c.   Reevaluations of treatment and medication will occur as needed and mental health
1486             treatment shall be determined and any necessary interventions to stabilize
1487             individuals shall occur;

1488

1489        d.   Daily assessment in a confidential setting of the patient's progress to determine if
1490             the patient is moving towards stability, whether other or additional treatments are
1491             indicated, or if transfer to a higher level of care is required;

1492

1493        e.   No later than at the time of discharge from crisis watch, an appropriate mental
1494             health professional (with the patient) shall review and update the treatment plan
1495             which will apply after discharge from crisis watch. The updated treatment plan will
1496             address causes which led to the deterioration and the plan for risk management to
1497             prevent relapse;

1498

1499        f.   For anyone who does not stabilize sufficiently to be discharged from crisis watch,
1500             the treatment team must establish a plan to provide a higher level of care, which
1501             may include transfer to a higher level of care facility, or explain in writing why
1502             establishing such a plan is not appropriate; and

1503

1504        g.   Out of cell time for confidential counseling and groups, psychiatric care,
1505             therapeutic activities, and recreational or leisure activities unless clinically contra-
1506             indicted.

1507

1508        In addition to the reasons outlined in this Court's Order dated October 30, 2018, given the

1509   Defendants' general failure to address their deficiencies in the care of mentally ill inmates on crisis

1510   watch, it is necessary to require the above action. The record demonstrates that crisis watch is

1511   often being used in a manner that is detrimental to the inmates.  Inmates are initially screened for

1512   suicidal tendencies but are not always re-accessed thereafter.  (ECF No. 1757 at 232; ECF No.

1513   1903 at 198-99, Dr. Stewart testifying that "there's no specialized treatment that occurs for people

1514   in crisis.").  As such, Dr. Hinton acknowledged that "the primary focus [of crisis watch] is ensuring

1515   [inmates'] safety, ensuring that [inmates] are okay and getting [them] off of a state of crisis [ ]."

1516   (ECF No. 2371 at 34).  Dr. Hinton's own testimony highlights the requirement that crisis watch

1517   should be used for the shortest duration possible.

1518        Dr. Stewart also opined that the Defendants' failure to conduct necessary evaluations and

1519   assessments of inmates who are discharged from crisis watch results in unnecessary harm and

1520   suffering, especially as those failures combine with inadequate treatment planning and

1521   psychopharmacology.  (ECF No. 1757 at 231).  The Court finds that the directives related to

1522   inmates on crisis watch are narrowly drawn, extend no further than necessary to correct the

1523   violation of the Federal right, and are the least intrusive means necessary to correct the violation

1524   of the Federal right.  The Court has fashioned these requirements being mindful to allow as much

1525   operational discretion and flexibility to prison administrators as possible given the record in this

1526   case.

1527        3.   ***Class members who are placed in segregation[5]***

1528

---

[5] Dr. Stewart has explained that inmates in segregation are:

> [S]ome of the sickest individuals psychiatrically that I've seen in my career, and I've only worked with seriously mentally ill. And these people are just suffering immensely.

> And so -- you know, and they get nothing. Couple little things thrown at them.  But they really don't get any sort of regular treatment.

> And so this is a real serious issue, you know. I don't want to put a number on it. It's, it's -- it's as serious as I've seen.

(ECF No. 1905 at 182-83).

a. Promptly after placement into segregation, a mental health professional shall assess the class member to establish a baseline against which any future decompensation can be measured.  Such review shall be documented in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff;

b. A mental health professional shall review and recommend any clinically necessary modifications to the prisoner's individual treatment plan;

c. Rounds shall be conducted by appropriate mental health staff, which may include behavioral health technicians;

d. Class members who are in a Control Unit for periods of sixteen days or more shall receive care that includes, at a minimum:

   i. Continuation of their mental health treatment plan with such treatment as necessary to protect from any decompensation;

   ii. Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff;

   iii. Pharmacological treatment (if applicable);

   iv. Meeting with MHP or multidisciplinary team meetings to the extent necessary;

   v. MHP or mental health treatment team recommendations to post-segregation housing; and

   vi. Structured and unstructured out of cell time sufficient to protect against decompensation.  Structured out of cell time includes therapeutic, educational and recreational activities that involve active engagement by their participants for the duration of the activity.

e. Class members in any Control Unit for periods longer than sixty days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation unless clinically contraindicated.  If an inmate refuses out of cell time, a MHP shall follow-up with the inmate to determine whether or not there is a risk of further decompensation;

f. Mental health staff shall assess class members in Control Units to determine if a higher level of care is necessary and if so, to make proper recommendations to facility authority; and

g. Continued treatment by mental health professional and/or psychiatric provider to the extent clinically indicated.

1575          In addition to the reasons outlined in the Court's Order dated October 30, 2018, Defendants

1576     themselves have recognized that some of the aforementioned directives are necessary.  (*See* ECF

1577     NO. 2473-1 at 3-4).  In addition, three critical points were made during the hearings.  First, Dr.

1578     Hinton testified that the requirements related to inmates who are in segregation are not being met.

1579     Dr. Hinton also testified that, in his view, "there's nothing that is a good thing about being in

1580     segregation."  (ECF No. 1758 at 82).  Second, Dr. Stewart testified that the IDOC's medication

1581     management for those in segregation is worse than for Class Members elsewhere in the system.

1582     Dr. Stewart specifically noted there is a significant problem in ensuring those in segregation who

1583     are prescribed psychotropic medication actually take the medication.  (ECF No. 1757 at 123).  And

1584     third, Dr. Stewart explained the consequences of failing to allow mentally ill inmates out of cell

1585     time as follows:

1586          [ ] psychiatric decompensation. And then we run into that whole line, you know,
1587          acting out, writing up, more segregation time and/or going to crisis, coming out. It's
1588          -- the fact that (vi)(A), which is continuation of the initial treatment plan with
1589          enhanced therapy, if necessary, to protect from decompensation that may be
1590          associated with segregation, that's not being done. People are getting worse in
1591          segregation.
1592
1593     (ECF No. 1905 at 174).  Given the testimony at the hearing, the Court finds that its directives

1594     related to inmates in segregation are narrowly drawn, extend no further than necessary to correct

1595     the violation of the Federal right, and are the least intrusive means necessary to correct the violation

1596     of the Federal right.  The Court has fashioned the requirements being mindful to allow the most

1597     operational discretion and flexibility to prison administrators as possible given the record in this

1598     case.

1599          4.  ***Class members who are prescribed psychotropic medication***
1600
1601               a.  Class members who are prescribed psychotropic medication shall be evaluated by
1602                   a psychiatric provider at regular intervals consistent with constitutional standards;
1603

1604       b.  IDOC shall accomplish the following in psychiatric services:
1605
1606            i.  Administer medications to all class members in a manner that provides
1607                reasonable assurance that prescribed psychotropic medications are actually
1608                being delivered to, and taken by, the offenders as prescribed;
1609
1610            ii.  The regular charting of medication efficacy and side effects;
1611
1612           iii.  Take necessary steps to ascertain side effects;
1613
1614           iv.  The timely performance of lab work for these side effects and timely
1615                reporting on results;
1616
1617            v.  The class members for whom psychotropic drugs are prescribed receive
1618                timely explanations from appropriate medical staff about what the
1619                medication is expected to do, what alternative treatments are available, and
1620                what in general are the side effects of the medication; and have an
1621                opportunity to ask questions about this information before they begin taking
1622                the medication; and
1623
1624           vi.  That class members, including offenders in a Control Unit who experience
1625                medication noncompliance, as defined herein, are visited by an MHP. If,
1626                after discussing the reasons for the offender's medication noncompliance
1627                said noncompliance remains unresolved, the MHP shall refer the offender
1628                to a psychiatric provider.
1629
1630       In addition to the reasons outlined in this Court's Order dated October 30, 2018, the Court

1631   notes that the danger of prescribed psychotropic medications was detailed during the hearings.

1632   Some of the medication used to treat psychiatric conditions have harsh side effects.  (ECF No.

1633   1757 at 241).  Because of these side effects, monitoring is required.  *Id.*   One of the biggest

1634   revelations in the hearings was Dr. Stewart's testimony that "[i]t's rare when someone [on

1635   psychiatric medication] is being seen every 30 days [I've] [f]ound examples of people being seen

1636   -- of medications being routinely written for anywhere from two to six months." (ECF No. 1757

1637   at 243).  This is a significant problem and one that must be addressed immediately.  Given the

1638   testimony at the hearing, the Court finds that the directives related to inmates on psychiatric

1639   medication are narrowly drawn, extend no further than necessary to correct the violation of the

1640 Federal right, and are the least intrusive means necessary to correct the violation of the Federal

1641 right.

1642      5.  ***Treatment plans***

1643

1644           a.  All class members shall have a treatment plan that is individualized and
1645               particularized based on the patient's specific needs, including long and short term
1646               objectives, updated and reviewed with the collaboration of the patient to the fullest
1647               extent possible.

1648

1649           b.  Mental health evaluations shall be conducted in a timely manner to ensure that
1650               individuals in need of treatment, or re-evaluation of existing treatment, are
1651               evaluated without undue delay.

1652

1653           c.  Treatment plans shall be reviewed and updated at regular intervals as clinically
1654               necessary to assess the progress of the documented treatment goal and update the
1655               plan accordingly.

1656

1657      In addition to the reasons outlined in this Court's Order dated October 30, 2018, the Court

1658 emphasizes that it found the Defendants failed, in a systemic way, to properly create, update, and

1659 monitor the treatment plans.  (ECF No. 2460 at 37-38; ECF No. 1905 at 80, Dr. Stewart found that

1660 in a majority of medical files he reviewed, the treatment plan used boilerplate language and did

1661 "not address the treatment needs of a particular mentally ill offender.").  Again, this problem has

1662 been caused, in large part, by the Defendants' failure to address its staffing needs.  The record is

1663 clear that treatment plans and evaluations are critical to the mental health care of inmates.  As such,

1664 the Court finds that the directives related to treatment plans and evaluations are narrowly drawn,

1665 extend no further than necessary to correct the violation of the Federal right, and are the least

1666 intrusive means necessary to correct the violation of the Federal right.

1667      **6.  Compliance Requirements**

1668

1669           a.  A quarterly report created by IDOC shall certify each facility's compliance with the
1670               above requirements.

1671

1672           b.  On a regular basis (no less than every 90 days), Defendants shall provide the results
1673               of their own quality assurance audit.  These results shall include an accompanying

certification of Defendants' CQI Manager of whether compliance has been reached with Defendants' quality assurance audit requirements.

c. The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and functions.

d. Nothing in this Order relieves the Defendants of their obligations under the Settlement Agreement.

## 7. Timing

The terms of this permanent injunction shall remain in place for a period of two years from the date of this Order. *See supra* p. 16; *see also e.g.* 711-1 at 30.

## FINAL COMMENTS ON REMEDY

During the preliminary injunction hearing, Defendants did not generally dispute their deficiencies in mental health care to inmates. (*See* ECF Nos. 2070, Order dated 5/25/2018, *see also* ECF Nos. 1757, 1758, 1903, 1904, 1905, and 1906, transcripts of preliminary injunction hearing). During the permanent injunction proceeding, Defendants' evidence was focused on changes that had occurred between the issuance of this Court's Preliminary Injunction Order and the permanent injunction hearing. (*See* ECF No. 2460, Order dated 10/30/2018; ECF Nos. 2370, 2371, 2372, 2373, 2374, 2375, 2376, 2377, and 2378, transcripts of the permanent injunction hearing). However, Defendants also assert they are doing the best they can considering the market for mental health professionals. These positions are contradictory and problematic. The former highlights the fact that Defendants fail to act urgently without the Court's intervention. As noted in this Court's Order dated October 30, 2018, the Defendants have made some strides since the preliminary injunction hearing. In fact, during the permanent injunction hearing, Baldwin boasted about new avenues for staffing, including working with universities. Yet, exploring these opportunities has only recently occurred. The latter is a problem because the Defendants have far

61

1704    too often relied on their outside vendor for their staffing needs.  Baldwin made this point clear

1705    during the hearing when he testified:

1706        Q. And so in January you knew that you were not providing the level of care
1707        desperately needed and to which these people are entitled?
1708

1709        A. We knew we had a problem, and we were working on a broad front to help
1710        address it. And we still are and will continue.
1711

1712        Q. But you can't tell me how it came to be that you had such a terrible problem in
1713        January of 2018 when you had made promises in May of '16 that, if they had been
1714        kept, wouldn't let you be in that situation, right?
1715

1716        A. Yes. We need to do -- <u>we depended on our partner for filling vacancies</u>.
1717

1718        Q. You depended on your partner -- Wexford -- to deliver care that you had
1719        promised? Is that what you're saying?
1720

1721        A. That's part of it.  We also trained staff.  We also hired our own behavioral
1722        health people in good numbers. And we have made, in my opinion, a reasonable
1723        effort to comply in most areas of the treatment for the mentally ill under our care.
1724

1725    (ECF No. 2354 at 76-77) (emphasis added).

1726        In the end, it was the Defendants' decision to rely on Wexford to solve their problem.  As

1727    this Court noted previously, the Defendants cannot shirk their constitutional obligations by

1728    delegating them to another.  (ECF No. 2460 at 44).  And now the Court must impose the directives

1729    above to avoid the continuance of the constitutional violations.

1730        Parenthetically, several times in their briefs and associated oral arguments, Defendants

1731    have noted that this Court has left the Settlement Agreement in place.  While it is true the Court

1732    has found the Settlement Agreement remains, the reason for such is simple - the Parties agreed to

1733    do so.  (*See e.g.* 711-1 at 30, "If the Court determines that Defendants are not in substantial

1734    compliance, with any provision of this Settlement Agreement at any time during the three (3) year

1735    period of the Settlement Agreement, the Court's jurisdiction with respect to such provision shall

1736    continue for the remainder of the three (3) year period or for a period to be ordered by the Court

1737   of not more than two (2) years from the date of the Court's finding that Defendants are not in

1738   substantial compliance.").   The Parties agreed to litigate certain portions of their dispute if

1739   compliance with the agreement did not occur – and only those portions were litigated.  With respect

1740   to those areas, the Court has found Defendants were not in substantial compliance.   The

1741   requirements imposed herein are those the Court finds are narrowly drawn, extend no further than

1742   necessary to correct the violation of the Federal right, and are the least intrusive means necessary

1743   to correct the violation of the Federal right.

1744

1745         So ordered, this 22nd day of April 2019.

1746

1747                                                s/ Michael M. Mihm
1748                                                Michael M. Mihm
1749                                                U.S. District Court Judge