IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants | ) | |

**FOURTH ANNUAL REPORT OF MONITOR PABLO STEWART, MD**

TABLE OF CONTENTS

BACKGROUND ……………………………………………………….…..4

METHODOLOGY/MONITORING ACTIVITIES …………………………………7

EXECUTIVE SUMMARY …………………………………………………….8

DETAILED FINDINGS ……………………………………………………13

IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING …………….14

V: MENTAL HEALTH EVALUATION AND REFERRALS ………………………….16

VI: MENTAL HEALTH SERVICES ORIENTATION …………………………….21

VII: TREATMENT PLAN AND CONTINUING REVIEW …………………………22

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT
   SETTINGS………………………………………………………………29

IX: ADDITIONAL MENTAL HEALTH STAFF………………………………..31

X: BED/TREATMENT SPACE …………………………………………….35

XI: ADMINISTRATIVE STAFFING …………………………………………...43

XII: MEDICATION………………………………………………………...44

XIII: OFFENDER ENFORCED MEDICATION ………………………………..49

XIV: HOUSING ASSIGNMENTS …………………………………………54

XV: SEGREGATION …………………………………………………….55

XVI: SUICIDE PREVENTION …………………………………………….68

XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES …………….74

XVIII: MEDICAL RECORDS ……………………………………………...79

XIX: CONFIDENTIALITY ………………………………………………...80

XX: CHANGE OF SMI DESIGNATION …………………………………….83

XXI: STAFF TRAINING ……………………………………………………83

XXII: PARTICIPATION IN PRISON PROGRAMS ……………………………84

XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS
       FROM FACILITY TO FACILITY ……………………………………85

XXIV: USE OF FORCE AND VERBAL ABUSE …………………………………85

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS ………………92

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ……………………100

XXVII: MONITORING …………………………………………………………101

XXVIII: REPORTING AND RECORDKEEPING …………………………………101

CONCLUSION ………………………………………………………………102

## BACKGROUND

**IDOC:** IDOC consists of 29 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and two additional facilities for women. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Four of the facilities--Logan, Joliet, Pontiac and Dixon--have Residential Treatment Units. The Joliet Treatment Center began receiving offenders on October 4, 2017 and as of May 15, 2020, the census was 168 out of 300 beds. The RTU at Pontiac officially opened on January 6, 2020, and as of May 15, 2020 the census was 75 out of 165 beds. The RTU at Dixon has been operating throughout the life of the Amended Settlement Agreement. As of May 15, 2020, its census was 518 out of 676 beds. Logan's RTU has been operating throughout the life of the Amended Settlement Agreement. As of May 15, 2020, its census was 86 out of 146 beds. I particularly point out the Department's RTUs as they play an extremely integral function within the IDOC and they have been chronically underutilized throughout my tenure as Monitor. All facilities have crisis care beds as well as some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement ("Settlement") was approved May 23, 2016. It covers a range of practices affecting inmates with mental illness or serious mental illness:

- Policies and procedures
- Intake screening
- Medication continuity on arrival

- Referrals
- Mental health evaluations
- Crisis Intervention Team
- Licensure
- Inmate orientation
- Treatment plans and updates
- Psychiatric evaluations
- Follow-up after discharge from specialized treatment settings
- Staffing plans and hiring
- Bed, programming, and office space for residential treatment units, inpatient facilities, and crisis beds
- Administrative staffing
- Medication administration, documentation, evaluations, lab work, side effects monitoring, informed consent, non-compliance follow-up
- Enforced medication
- Housing assignment notice and recommendations
- Treatment, housing conditions, and out-of-cell time in segregation and investigative status
- Review of segregation terms length
- Suicide prevention
- Restraints for mental health purposes
- Mental health care records and forms
- Confidentiality
- Change of Seriously Mentally Ill designation
- Staff training
- Nondiscrimination in program participation
- Records and medication continuity on inter-facility transfers
- Use of force and verbal abuse
- Mental health input into discipline
- Continuous quality improvement
- Terms of monitoring this Settlement
- IDOC reporting

**Deadlines:** Deadlines in the Settlement ranged from 2016 through 2020; this report calculates many deadlines from the Amended Settlement Agreement approval date of May 23, 2016. A number of deadlines on critical issues were contingent upon, and calculated from, the state budget approval date of July 6, 2017. The team reviewed each provision of the Settlement per the specific deadlines identified in the Settlement. Of note, there are many provisions for which the deadline is "as agreed upon" between the parties but for which the monitoring team did not receive a schedule of specific agreed-upon dates. For these particular issues, the assigned compliance ratings reflect the current status of the issues without reference to timeliness.

The following table lists the requirements in order of their deadlines to be accomplished. All items have now reached their specified deadlines or are required to be accomplished "in a reasonable time." Among these requirements, 29 have reached Substantial Compliance, a decline

4

from the ratings as of the previous report. A more detailed summary of the compliance status of all Settlement provisions can be found in the body of the report.

| Amended Settlement Agreement provision | Timeline | Substantial Compliance? |
|---|---|---|
| | | |
| Crisis Beds are to be outside Control Units (except Pontiac) | May 2016 | Some institutions |
| Regional Director hires | June 2016 | Yes |
| State employee at each facility to supervise State clinical staff, monitor and approve vendor staff | June 2016 | No |
| Architectural plans to Monitor | July 2016 | Yes |
| 12 Mental Health Forms in use | July 2016 | Yes |
| Treating mental health professionals[1] disclose information to patient | July 2016 | Yes |
| Medical Records and medication transferred with patient | August 2016 | Yes |
| Intergovernmental Agreement with Department of Health Services | August 2016 | Yes |
| Medication delivery, recording, side effects monitoring, lab work, patient informed, non-compliance follow-up | August 2016 | Some issues |
| Propose any amendment to Staffing Plan | August 2016 | Original requirement-n/a |
| Any objections to proposed amended Staffing Plan | October 2016 | Original requirement-n/a |
| All policies/procedures/ADs specified in Settlement Agreement – drafts to Plaintiffs and Monitor | November 2016 | Yes |
| Confidentiality: records, mental health information, policies and training | November 2016 | No |
| Behavior Treatment Program pilot | November 2016 | Yes |
| Quality Improvement Manager hire | February 2017 | Yes |
| Review Committees for SMI Disciplinary Segregation terms | February 2017 | Yes |
| Mentally ill Control Unit residents >60 days receive 8 hours out of cell time weekly | May 2016-May 2017 | No |
| Inmate Orientation policy and procedure | May 2017 | Yes |
| Crisis beds at Pontiac moved to protective custody | May 2017 | No |
| Suicide Prevention measures | May 2017 | Some issues |
| Physical Restraints measures | May 2017 | Some institutions |
| Staff Training plan and program developed | May 2017 | Yes |
| Discipline: policies related to self-injury | May 2017 | Yes |
| Mental health staff training plan and program developed | May 2017 | Yes |
| Transfers: consults and notification | May 2017 | Yes |

---

[1] Referred to throughout the Settlement and this report as MHP

| | | |
|---|---|---|
| Mentally ill Control Unit residents >60 days receive 12 hours out of cell time weekly | May 2017-May 2018 | No |
| Staffing: quarterly hiring reports, meeting targets | Quarterly from October 2017 on | No |
| Mental health referrals and evaluations | November 2017 | No |
| Staffing to run RTU at Joliet | November 2017 | No |
| Central office staff hires for policies and recordkeeping | November 2017 | Yes |
| RTU Programming and Office Space | January 2018 | No |
| Staffing hires – Dixon, Pontiac, Logan | January-July 2018 | No |
| RTU Bed Space | January-October 2018 | No |
| Inpatient Bed Space construction | January-November 2018 | Some issues |
| Screening conducted with sound privacy | May 2018 | Yes |
| Training for all State and vendor staff with inmate contact | May 2018 | Yes |
| Mentally ill Control Unit residents >60 days receive 16 hours out of cell time weekly | June 2018-May 2019 | No |
| MHP review within 48 hours after Investigative Status/Temporary Confinement placement | July 2018 | Some institutions |
| Inpatient Facility – transfer ownership and expand, policies | November 2018 | No |
| Mentally ill Control Unit residents >60 days receive 20 hours out of cell time weekly | June 2019-May 2020 | No |
| Segregation and Temporary Confinement for mentally ill: housing decisions, MHP review, treatment and out-of-cell requirements | May 2020 | No |
| Develop plans for inpatient care that can be implemented after necessary appropriations | After IGA is signed | Yes |
| Screening on arrival at reception | Reasonable time | Yes |
| Psychotropic medications continued on arrival, reviewed, and related documentation | Reasonable time | Yes |
| Inmate Orientation | Reasonable time | Yes |
| Treatment Plans | Reasonable time | No |
| Psychiatry Review frequency | Reasonable time | No |
| Follow-up after Specialized Treatment Settings | Reasonable time | Some issues |
| Enforced Medication | Reasonable time | Some institutions |
| SMI Housing Assignment information and consultation | Reasonable time | Yes |
| Change of SMI designation only by treatment team (or treating MHP before teams are operating) | Reasonable time | Yes |
| Mental illness does not prevent access to prison programs | Reasonable time | Yes |
| Use of Force and Verbal Abuse | Reasonable time | Some institutions |
| Discipline system conforms to AD 05.12.103 | Reasonable time | Yes |

| Discipline in RTU or inpatient is carried out in a mental health treatment context | Reasonable time | Yes |
|---|---|---|
| Quality Improvement Program implemented | Reasonable time | Yes |

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish the monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 23 site visits of 15 different IDOC facilities, where interviews of administrators, staff, and offenders were conducted. While on site, the monitoring team would meet with the administrative and clinical leadership of the facility and then tour the facility. The tour would include observing general population units, segregated housing units, crisis care units, infirmary areas including medical records and restraint rooms, working spaces for the clinical staff, group therapy areas (if present), as well as any other area associated with the provision of mental health services. The monitoring team also toured all Residential Treatment Units. The monitoring team inspected the Mental Health Unit at Pontiac on three separate occasions. The team also requested and analyzed systemwide data, and a sampling of health care or master file records, as to some requirements.

1.  6/25/19          Pontiac          Gibson
2.  7/10-7/11/19     Menard           Stewart & Gibson
3.  7/23/19          Pinckneyville    Gibson
4.  8/8-8/9/19       Joliet           Kapoor
5.  8/23/19          Western          Gibson
6.  8/27/19          Shawnee          Gibson
7.  9/9-9/10/19      Logan            Kapoor
8.  9/20/19          Illinois River   Stewart & Gibson
9.  9/24/19          Lincoln          Gibson
10. 10/18/19         Lawrence         Gibson
11. 10/28/19         Centralia        Gibson
12. 11/6/19          Logan            Stewart
13. 11/8/19          Pontiac          Stewart
14. 12/23/19         Pinckneyville    Gibson
15. 12/30/19         Menard           Gibson
16. 1/17/20          Graham           Gibson
17. 1/29/20          Dixon            Stewart
18. 1/30/20          Dixon            Stewart & Gibson
19. 1/31/20          Stateville       Stewart
20. 2/1/20           NRC              Stewart
21. 2/11/20          Big Muddy        Gibson
22. 2/20/20          Pontiac          Stewart & Gibson
23. 3/10/20          Joliet           Stewart

## EXECUTIVE SUMMARY

My concluding remarks of the Midyear Report of November 30, 2019 began with "There continues to be a staffing emergency within IDOC."[2]  Unfortunately, that remains the theme for the entire 4th year of the Amended Settlement Agreement. It has never been my style to nag. I would be shirking my duties as Monitor, however, if I didn't keep the staffing issue in everyone's consciousness. Staffing shortfalls, in my opinion, are preventing IDOC from meeting the requirements of the Amended Settlement Agreement. The Monitoring Team was able to conduct 10 on-site reviews before the Covid-19 crisis shut down travel. So, the opinions expressed in the Report and based on data analysis and on-site inspections.

IDOC is Noncompliant in several areas that are integral in providing constitutional level mental health and psychiatric care. They include deficiencies in mental health evaluations, treatment planning, frequencies of psychiatric visits, medication distribution, OOC time for mentally ill offenders in segregated housing, treatment for mentally ill offenders in segregated housing, gate keeping of the Crisis Intervention Team, physical restraints for mental health purposes, confidentiality, use of force and discipline of SMI offenders. All of these deficiencies are due to not having a sufficient number of mental health and psychiatric staff.

What has been different these past several months is that I am now able to have reasonable conversations with defendants' counsel. I find this extremely helpful in moving this process along. I sincerely hope this continues moving forward.

Of note, this report covers the period from June 1, 2019 through March 10, 2020. This is due to the Covid-19 emergency and that Force Majeure was triggered by the Governor's Emergency Declaration of March 9, 2020.

A summary of compliance findings follows:

| Requirement | Compliance Status |
|---|---|
|  |  |
| **IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING** | Overall: Previously found to be in Substantial Compliance. |
| (IV)(a), (b), (c), (d), (e), (f), (g) | Previously found to be in Substantial Compliance |
| **V: MENTAL HEALTH EVALUATION AND REFERRALS** | Overall: Noncompliance<br>Subfindings supporting overall finding: |
| (V)(a) | Noncompliance |
| (V)(b), (c) | Substantial Compliance |
| (V)(d) | Noncompliance |

---

[2] Midyear Report, November 30, 2019, page 98.

| Requirement | Compliance Status |
|---|---|
| (V)(e) | Substantial Compliance |
| (V)(f), (g) | Noncompliance |
| (V)(h), (i) | Substantial Compliance. |
| (V)(j) | Noncompliance |
| **VI: MENTAL HEALTH SERVICES ORIENTATION** | Overall: Previously found to be in Substantial Compliance. |
| (VI)(a), (b) | |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW** | Overall: Noncompliance |
| | Subfindings supporting overall finding: |
| (VII)(a), (b), (c), (d) | Noncompliance |
| (VII)(e) | Substantial Compliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS** | Overall: Noncompliance |
| | Subfindings supporting overall finding: |
| (VIII)(a) | Substantial Compliance |
| (VIII)(b)(i) | Noncompliance overall (11 institutions in substantial compliance) |
| (VIII) (b)(ii) | Substantial Compliance |
| **IX: ADDITIONAL MENTAL HEALTH STAFF** | Overall: Noncompliance |
| | Subfindings supporting overall finding: |
| (IX)(a), (b) | Noncompliance |
| (IX)(c), (d), (e) | Substantial Compliance |
| (IX)(f) | No rating due to ongoing litigation/negotiations between the parties on this issue |
| **X: BED/TREATMENT SPACE** | Overall: Noncompliance |
| | Subfindings supporting overall finding: |
| (X)(a), (b)(i) | Substantial Compliance |
| (X) (b)(ii) | Noncompliance |
| (X)(c)(i), (ii) | Substantial Compliance |
| (X)(d), (e), (f), (g), (h) | Noncompliance |
| (X)(i) | Substantial Compliance |

| | |
|---|---|
| **XI: ADMINISTRATIVE STAFFING**<br><br><br>(XI)(a), (b)<br>(XI)(c),<br>(XI)(d) | Overall: Substantial Compliance<br><br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Noncompliance<br>Substantial Compliance |
| **XII: MEDICATION**<br><br><br>(XII)(a)<br>(XII)(b)<br>(XII)(c)(i)<br>(XII)(c)(ii), (iii), (iv), (v)<br>(XII)(c)(vi) | Overall: Noncompliant<br><br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Noncompliance<br>Noncompliance<br>Substantial Compliance<br>Noncompliance |
| **XIII: OFFENDER ENFORCED MEDICATION** | Finding: Noncompliance overall<br>(15 institutions in substantial compliance) |
| **XIV: HOUSING ASSIGNMENTS**<br>  (XIV)(a), (b), (c) | Overall: Previously found to be in Substantial Compliance |
| **XV: SEGREGATION**<br><br><br>(XV)(a)(i)<br>(XV)(a)(ii), (iii)<br>(XV)(a)(iv)<br><br><br>(XV)(a)(v), (vi)<br>(XV)(a)(vi)  (sic)<br>(XV)(a)(vii)<br>(XV)(b)(i), (ii), (iii), (iv) (v), (vi)<br>(XV)(c)(i), (ii), (iii), (iv)<br>(XV)(c)(v)<br>(XV)(c) (sic)<br>(XV)(d) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Substantial Compliance<br>Noncompliance<br>Noncompliance<br>(19 institutions in substantial compliance)<br>Noncompliance<br>Noncompliance<br>Substantial Compliance<br>Substantial Compliance<br>Noncompliance<br>Substantial Compliance<br>Noncompliance<br>Noncompliance |

| | |
|---|---|
| **XVI: SUICIDE PREVENTION** | Overall: Noncompliance |
| (XVI)(a) | Subfindings supporting overall finding: Substantial Compliance except the timely notification of CIT. |
| (XVI)(b) | Noncompliance due to the issues regarding the timely notification of CIT |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES** | Overall: Noncompliance |
| (XVII)(a) | Subfindings supporting overall finding: Noncompliance overall (20 institutions in Substantial Compliance) |
| (XVII)(b), (c) (XVII)(d) | Substantial Compliance Noncompliance |
| **XVIII: MEDICAL RECORDS** (XVIII)(a), (b) | Overall: Substantial Compliance Subfindings supporting overall finding: Substantial Compliance |
| **XIX: CONFIDENTIALITY** | Overall: Noncompliance |
| (XIX)(a),(b) (XIX)(c) (XIX)(d) | Subfindings supporting overall finding: Substantial Compliance Noncompliance Substantial Compliance |
| **XX: CHANGE OF SMI DESIGNATION** | Finding: Substantial Compliance |
| **XXI: STAFF TRAINING** (XXI)(a), (b), (c) | Overall: Previously found to be in Substantial Compliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Finding: Previously found to be in Substantial compliance |
| **XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY** (XXIII)(a), (b), (c) | Overall: Previously found to be in Substantial Compliance |

| | |
|---|---|
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Finding: Noncompliance (19 institutions in substantial compliance) |
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS**<br><br>(XXV)(a)<br>(XXV)(b),(c)<br>(XXV)(d) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br>Noncompliance<br>Substantial Compliance<br>No rating |
| **XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM**<br>(XXVI)(a), (b) | Overall: Substantial Compliance<br><br>Substantial Compliance |
| **XXVII: MONITORING** | Finding: Substantial Compliance |
| **XXVIII: REPORTING AND RECORDKEEPING** | Finding: Substantial Compliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement.

**Overall structure:** This Section is organized along the same structure as the Settlement; each major section below corresponds with a substantive section of the Settlement. That said, the Settlement includes provisions that appear multiple times across different sections. The Monitor attempts in this report to address each substantive requirement in that section of the Settlement where it appears.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that non-compliance is, nonetheless may be in substantial compliance with the provision of the Settlement.

**Compliance ratings:** In previous reports, the team applied the "Substantial Compliance" and "Noncompliance" ratings for each provision, as specified in the Settlement. In actual fact, these may mask IDOC's true performance in meeting the requirements of the Settlement. IDOC has made substantial progress on a number of requirements, which possibly could be more accurately described as "partially compliant." The terms of the Settlement, however, only allow for the use of "Substantial Compliance" and "Noncompliance."

Section II (t) of the Amended Settlement Agreement defines "Substantial Compliance" as follows: The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious.

Substantial Compliance can be found for obligations imposed under this Settlement either IDOC-wide or at specific facilities. For the purposes of this report, most compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the monitor of this seismic shift for IDOC, I continue to feel that it is more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. Most Settlement provisions are complex with many factors to fulfill, so the Substantial Compliance findings are growing. It is important to note that during the first three years of monitoring the Settlement, IDOC has improved the overall quality of psychiatric and mental health services offered to the offender population. IDOC still has a long way to go to fully meet the requirements of the Settlement, especially in terms of staffing.

## IV: INITIAL (INTAKE) MENTAL HEALTH SERVICES: SCREENING

> The Monitoring Team did not conduct an official review of IDOC's compliance for this requirement during the current monitoring period. This was due to the fact that IDOC has been found in Substantial Compliance with this requirement since the Midyear Report of 11/30/18. The finding of Substantial Compliance was reconfirmed in the Third Annual Report of 5/14/19. As stated in the Midyear Report of 11/30/19, the Monitoring Team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties.

**(IV)(a): Specific requirement:** All persons sentenced to the custody of IDOC shall receive mental health screening upon admission to the prison system. Absent an emergency which requires acting sooner, this screening will ordinarily take place within twenty-four (24) hours of reception (*see* "Components of Mental Health Services" at pg. 5 in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101(II)(E)(2)), but in any event no later than forty-eight (48) hours after reception, as required by IDOC Administrative Directive 04.04.100 (II)(G)(2)(b) (*see also* IDOC Administrative Directive 05.07.101).

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(b): Specific requirement:** The mental health screening conducted upon admission to IDOC shall be conducted by a Mental Health Professional [MHP][3] and shall use IDOC Form 0372 (Mental Health Screening). In those instances where a mental health screening is performed by an unlicensed mental health employee, said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement.

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(c): Specific requirement:** Offenders transferred from a receiving and classification facility who have been screened and referred for further mental health services shall be administered the Evaluation of Suicide Potential, IDOC Form 0379, but need not be administered the mental health screening form again.

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(d): Specific requirements:** In order to encourage full and frank disclosure from offenders being screened, mental health screening shall take place in the most private space available at the receiving and classification facilities. Within two (2) years of the approval of this Settlement Agreement, IDOC will ensure that mental health screening at all receiving and classification facilities takes place only in spaces that ensure sound confidentiality.

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(e): Specific requirement:** IDOC shall develop policies and procedures to ensure that an offender who has a current prescription for psychotropic medication is able to continue receiving medication without interruption upon transfer to IDOC custody.

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(f): Specific requirement:** Following transfer to IDOC custody, an offender's prescription for psychotropic medication shall be reviewed by a licensed physician or psychiatrist and modified only if deemed clinically appropriate. Any change in psychotropic medication, along with the reason for the change, shall be documented in the offender's medical record. The psychiatrist or other physician, or nurse practitioner acting within the scope of their license, must also document on the offender's chart the date and time at which they discussed with the offender the reason for the change, what the new medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the new medication, and answered any questions the offender had before starting the medication.

**Findings:** Previously found to be in Substantial Compliance.

**(IV)(g): Specific requirement:** Screening will include identifying neurodevelopmental disabilities, suicidal ideation or intent, current or past self-injurious behavior, the presence or history of symptoms of mental illness, current or past use of psychotropic medications, or the

---

[3] The Settlement uses MHP to indicate Mental Health Professional. This report adopts that convention as well.

presence of conditions that require immediate intervention, in addition to the information required to be documented on IDOC Form 0372 (Mental Health Screening). The screening process shall also include review of the records which accompany the offender.

**Findings:** Previously found to be in Substantial Compliance.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary:** IDOC continues to have a backlog of mental health evaluations, approximately half of which are more than 14 days late. IDOC is still not reporting the number of backlogged mental health evaluation from the largest Reception Center, Stateville NRC. IDOC has established the required referral procedures for staff and others to request that a mental health evaluation is completed. Among the subset of cases that are tracked, when a mental health evaluation is completed, only 43% of them are done within the 14-day requirement. The Monitoring Team continues to encounter complaints that custody staff are acting as gatekeepers to the Crisis Intervention Team.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** IDOC persists in its efforts to change the overall intent of this requirement. The latest attempt to change the meaning of this requirement occurred in the Department's Quarterly Report of April 23, 2020. The specific language of this requirement states "Mental Health evaluation, or an appropriate alternative response in the case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101." The Quarterly Report goes on to state how IDOC is meeting the emergency component of this requirement. It goes on to state that requirement V(f) is more appropriate for listing the Department's backlog of mental health evaluations. I agree that the backlog should be reported in V(f), however, the backlog is also appropriately reported in V(a), because of the wording "Mental Health evaluation…shall be timely provided." As such, the backlog data will be reported in V(a) & V(f).

The following is the mental health evaluation backlog data for the months of December 2019 and January and February 2020:

| | | |
|---|---|---|
| 12/13/19 | 371 mental health evaluations backlogged | 163 (43.9%) greater than 14 days late |
| 1/17/20 | 391 mental health evaluations backlogged | 223 (57%) greater than 14 days late |
| 2/14/20 | 269 mental health evaluations backlogged | 115 (42.7%) greater than 14 days late |
| Overall | 1,031 mental health evaluations backlogged | 501 (49%) greater than 14 days late |

In this particular sample, 501 (49%) of the backlogged mental health evaluations are greater than 14 days late. This means that in this particular sample, 49% of the offenders have waited at least 28 days to receive a mental health evaluation. Also, the backlog numbers IDOC reports on page 4 of the Quarterly Report of April 23, 2020 are significantly different from the backlog numbers I receive weekly from Wexford. Finally, IDOC continues to use incorrect numbers to compute its percentages not backlogged and cases not backlogged more than 14 days.

The above data doesn't include the backlogged mental health evaluations at Stateville NRC, the largest Reception Center which has, by far, the greatest obligation for evaluations. I personally visited NRC on February 1, 2020. At the time of my visit, NRC was backlogged 285 mental health evaluations.[4] Note that **this would double the February backlog** number cited above.[5] It remains unexplained why these numbers from NRC are not reported on the weekly backlog data that the Monitoring Team receives.

So, assuming that IDOC is meeting the emergency component of this requirement, it still falls short in meeting the timeliness component of this requirement. A rating of Noncompliance will be assigned.

For comparison purposes only and not used to arrive at a rating for this requirement, the following is the data for March, April and May:

| | | |
|---|---|---|
| 3/13/20 | 207 mental health evaluations backlogged | 92 (44.4%) greater than 14 days late |
| 4/17/20 | 256 mental health evaluations backlogged | 161 (62.8%) greater than 14 days late |
| 5/15/20 | 186 mental health evaluations backlogged | 148 (79%) greater than 14 days late |
| Overall | 649 mental health evaluations backlogged | 401(62%) greater than 14 days late |

As with the December through February data, the March through May data does not include the backlogged mental health evaluations from NRC.

**(V)(b): Specific requirement:** Referral may be made by staff and documented on IDOC Forms 0387 and 0434 or by self-referral by the offender.

**Findings:** The Department is in Substantial Compliance for V(b).

**(V)(c): Specific requirement:** IDOC shall ensure that the referral procedures contained in IDOC AD 04.04.100, section II (G)(4)(a) and (b) for offender self-referral are created and implemented in a timely fashion in each facility.

Section II (G)(4)(a) and (b) provide:

---

[4] This information was shared with the Defendants' counsel on 3/10/20.

[5] While there is not an exact correlation because these two figures were gathered two weeks apart, the Monitor has no reason to believe that the backlog in IDOC's tracking was substantially different on February 1 than on February 14.

Referrals for mental health services may be initiated through staff, credible outside sources such as family members, other offenders or self-reporting.

(a) To ensure proper handling of requests from credible outside sources, the Department shall ensure mail room staff and facility operators, gatehouse staff and other staff who may come in contact with family members, visitors or other interested persons are aware of procedures for receiving and addressing inquiries regarding referrals for mental health services. Additionally, the contact information and procedures by which outside sources may refer offenders for mental health services shall be provided on the Department's website.

(b) The Chief Administrative Officer of each facility shall ensure a procedure for referring offenders for mental health services is established.

(1) Referrals from staff shall:
(a) Be initiated on the Mental Health Services Referral, DOC 0387;
(b) Be submitted to the facility's Office of Mental Health Management through the chain of command; and
(c) Include a copy of the Incident Report, DOC 0434, if applicable.

(2) The facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in the offender's behavior or behavior that may endanger themselves or others, if not treated immediately.

(c) Procedures for self-referrals by offenders for mental health services shall be provided in the offender handbook. The offender will be encouraged to submit their requests on the Offender Request, DOC 0286.

**Findings**: As reported in the Third Annual Report and the Midyear Report of November 30, 2019, IDOC has established the required referral procedures. The Department is in Substantial Compliance with V(c).

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** I personally visited NRC on February 1, 2020. During this visit, I determined, with the assistance of NRC's Mental Health leadership, that the facility was backlogged 285 mental health evaluations. This backlog is due to NRC's tremendous workload and being severely understaffed for Qualified Mental Health Professionals. NRC processed 2,336 new intakes during

the months of December 2019 and January 2020.[6] Given the importance of NRC within the IDOC, the Department will continue to receive a rating of Noncompliance until it properly staffs NRC and the Mental Health Evaluations are conducted per ADs 04.04.100 and 04.04.101.

Again, all of this information was shared with counsel for the Defendants on March 10, 2020. During that call, I provided a number of suggestions to counsel how the Department might deal with the backlog of mental health evaluations at NRC. So, I am taken back by IDOC's response to this issue as stated in the Quarterly Report of April 23, 2020. The solution is very straightforward. That is, provide NRC with an adequate number of QMHPs.

**(V)(e): Specific requirement:** IDOC shall develop a policy and procedure by which other sources with credible information (including other offenders or family members) may refer an offender for a mental health evaluation. The policy and procedure shall include a record-keeping mechanism for requests, which shall record who made the request and the result of the referral.

**Findings:** IDOC has developed the required policy and procedure, AD 04.04.100. As such, the Department will be found in Substantial Compliance with V(e). My criticism remains that the Department lacks a mechanism to monitor the implementation of AD 04.04.100.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** The Monitoring Team reviewed data for the population requiring evaluations, a more appropriate measure than analyses that compare to the total mental health caseload.[7] The team reviewed, for a two-month period, all available cases where an evaluation was due,[8] a total of 1,544 patients. In that group, only 43% of the evaluations were completed in a timely manner. Another 17% of evaluations in this analysis were completed within a week after the deadline, a limited but meaningful delay when the required timeframe is short. Worse, fully 40% of evaluations completed later—up to two months later—or missed altogether.[9]

---

[6] The Monitor refers to these as the months immediately preceding the backlog number cited. This means that 12% of NRC's required evaluations from that period *remained* backlogged as of February 1. It does not capture whether the completed evaluations were conducted timely or late.

   This rate of intakes is common for NRC. According to figures provided by IDOC counsel, NRC intake was 1,018 in February, 852 in March (after COVID-19 began to have effects), and 903 in April.

[7] Only a minority of the mental health caseload requires an evaluation in any given month. By way of illustration, let us say, hypothetically, that 800 patients need evaluations in a certain month. If 260 cases are late for an evaluation, the compliance rate is very different if described as percent of evaluations required (68%) or percent of the entire caseload (98%).

[8] The analysis is based on IDOC's "mental health database" for all IDOC institutions; this database tracks deadlines and completion dates for a number of mental health requirements, including evaluations. Notably, two institutions with substantial relevant populations could not be included in this analysis. Logan had more than 200 evaluations due in the period reviewed, but it did not provide completion dates, and as mentioned, Stateville NRC evaluations are omitted from this database. This analysis therefore takes into account all evaluations due in a two-month period, June and July 2019, for 27 facilities. The database showed a total of 1,654 evaluations due, but 110 of those are exempted by policy because an evaluation had been completed in the preceding 60 days (the Mental Health Standard Operating Procedure Manual, page 15). Therefore, this analysis draws on 1,544 cases.

[9] The analysis counted an evaluation as missed if more than two months had passed since its due date, or if the

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** The issue of timely response by the Crisis Intervention Team is IDOC's "Achilles' Heel." That is, no matter the amount of attention paid to this critical issue by departmental leadership, it remains a weakness and vulnerability. As I stated in the Midyear Report of November 30, 2019,

> "it has never been the intention of the Monitoring Team to have the Department conduct investigations into alleged gate keeping incidents. Rather, I want the department to consider that the chronic, department-wide complaints from Rasho class member about gate keeping is an indication of the overall lack of timely psychiatric and mental health care throughout the Department. That is, the only way that a significant number of class members can access mental health staff is through the crisis intervention process. This fact quickly overwhelms custody and clinical staff. So, it remains my opinion, based on tours conducted by the Monitoring Team as a whole, that gate keeping remains a somewhat intractable problem. This problem requires an increase of staff, both custody and clinical, to properly address the sizeable mental health needs of Rasho Class members."

The situation has not improved during the current reporting period. As such, the Department will continue to receive the rating of Noncompliance for (V)(g).

**(V)(h): Specific requirement:** The results of a mental health evaluation shall be recorded on IDOC Form 0374 (Mental Health Evaluation). These documents shall be included as part of the offender's mental health record as required by IDOC AD 04.04.100, section II (G)(3).

**Findings:** IDOC is in Substantial Compliance with this requirement.

**(V)(i): Specific requirement:** Mental health evaluations shall be performed only by mental health professionals. In those instances where an evaluation is performed by an unlicensed mental health employee, said mental health employee will have obtained at least a Master's degree in Psychology, Counseling, Social Work or similar degree program or have a Ph.D./Psy.D. and said mental health employee will be supervised by a licensed MHP no fewer than four hours per month. This exception for unlicensed mental health employees applies only to those mental health employees currently working in IDOC and grandfathered in prior to this Settlement. Further, a licensed MHP will review, and if the evaluation is satisfactory, sign off on any evaluation performed by an unlicensed mental health employee within seven (7) days after the evaluation has been completed. If the evaluation is not satisfactory, it shall be redone by a licensed MHP.

---

evaluation was already overdue and not completed as of the time the patient transferred to another institution. There were 243 such cases in the 1,544 examined, or 16%. In a small subset of these, it appeared an attempt had been made but the patient refused. This provides a good reason for delay, but the monitoring team expects a reasonable effort at a second attempt, and none was evident in these cases.

**Findings:** IDOC is in Substantial Compliance with this requirement.

**(V)(j): Specific requirements:** The provisions of this Section shall be fully implemented no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** This particular deadline has passed and, as discussed above, several provisions remain outstanding. Therefore, (V)(j) is found not in compliance.

## VI: MENTAL HEALTH SERVICES ORIENTATION

> **Summary**: IDOC has been found to be in Substantial Compliance with this requirement since the First Annual Report of May 22, 2017. The monitoring team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties.

**(VI)(a): Specific requirement:** In addition to information regarding self-referrals to be included in the offender handbook as required by IDOC AD 04.04.100, § II (G)(4)(b), information regarding access to mental health care shall be incorporated as part of every offender's initial reception and orientation to IDOC facilities. The basic objective of such orientation is to describe the available mental health services and how an offender may obtain access to such services.

**Findings:** Previously found to be in Substantial Compliance.

**(VI)(b): Specific requirement:** IDOC shall develop and implement a written policy and procedure concerning such orientation no later than one (1) year after approval of this Settlement Agreement.

**Findings:** Previously found to be in Substantial Compliance.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**:  Most mentally ill offenders have some sort of treatment plan. They are often not current or created in a multidisciplinary fashion. These plans often contain all of the necessary elements but lack specificity and individualization.

As to timeliness, a backlog of treatment plans persists but crisis care plans are routinely accomplished during a crisis stay and are generally timely after admission and before discharge. This cannot be said about the treatment plans for mentally ill offenders assigned to segregated housing; only 50% of reviewed charts demonstrated that a treatment plan was prepared within the 7-day requirement. Staff from Pontiac, Menard and Western Illinois stated that they do not have enough staff to complete treatment planning for mentally ill offenders assigned to segregated housing. RTUs are meeting their treatment planning requirements.

Finally, a data driven analysis demonstrated that mentally ill offenders who are prescribed psychotropic medication often are not seen as often as called for in the Settlement.

**(VII)(a):  Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** In the monitoring team's experience, most or all patients do have some sort of treatment plan. Quality, process, and timeliness are separate issues discussed under other subsections, below. During this monitoring period, the team conducted an analysis on crisis watch treatment plans, studying them in a systemwide sample totaling 399 documents offered as treatment plans.[10] In all cases in that study, the patient had a documented treatment plan at some point during the watch (though not necessarily at each required point in the watch), at all institutions except one. As of the Monitor's Midyear Report, there was a notable exception at Joliet; the absence of plans at that time was not repeated in the February sample, so the monitoring team is hopeful that the issue has been remedied. Systemwide, February logs indicated that plans were completed in 94% of admissions and discharges.[11]

---

[10]  The sample was drawn from all institutions that had crisis watches in September 2019 or February 2020. Facilities were asked to provide all crisis watches, or a sample chosen by random selection method (every 4th or every 10th case), depending on the number of watches at an institution.

[11]  This is based on the crisis watch logs for February 2020 provided by 22 institutions. Those without crisis watches, and those for whom the data was not discernible, were exempted. In reviewing the chart sample, the rate of missed plans appeared somewhat higher, but it is unknown whether this is accurate or a product of mistakes in transmitting the documents.

In terms of crisis watch plans being prepared collectively by the treating mental health team, the sample showed:

|  | Real-time MDTT[12] | Sequential review likely | No indication of multidisciplinary input |
| --- | --- | --- | --- |
| On admission | 21% | 24% | 55% |
| On discharge | 48% | 29% | 24% |

The second figure—labeled "Sequential review likely" in the table—refers to plans that appear to have been prepared by one discipline and reviewed by another, who could give input. This is contrary to the Monitor's views on appropriate treatment planning, but does reflect IDOC's efforts to involve multiple disciplines in treatment planning while facing staffing shortages. These data demonstrate substantial improvement in multidisciplinary input into *admission* plans; the rate has more than quadrupled the rate found one year ago.  Multidisciplinary input into *discharge* treatment plans dipped in the early part of the monitoring period but has returned to the same level as found in the Monitor's Third Annual Report.

In addition to reviewing crisis watch treatment plans, the Monitoring Team conducted a department-wide review of treatment planning and found that most mentally ill offenders assigned to outpatient, RTU or inpatient levels of care have a treatment plan. The treatment plans prepared in the RTUs and the inpatient unit were generally prepared in a multidisciplinary manner. This was especially true for the inpatient unit. The outpatient treatment plans were often prepared by an MHP and signed off by a psychiatric practitioner some time later.

The biggest problem noted with treatment planning is the persistent backlog. The Defendants, in their most recent Quarterly Report, describe "Percentage of Caseload Not Backlogged." Based on their calculations, this number consistently exceeds 94%. This is the same arithmetic error that was employed regarding the percentage of mental health evaluations not backlogged in Section V. The percentages reported by the Defendants are erroneous in that not everyone in the caseload requires at treatment plan to be completed at the time of the reported backlog. The Defendants don't report how many class members of the entire mental health caseload require a new or updated treatment plan. So, their percentages reported on page six of the most recent Quarterly Report are incorrect and, as such, cannot be used as a basis for formulating an opinion regarding the actual extent of the treatment plan backlog.

The following is a sample of the actual numbers of treatment plans that have been backlogged from December 2019 through February 2020:

| | | |
| --- | --- | --- |
| 12/13/19 | 579 backlogged | 360 backlogged greater than 14 days (62%) |
| 1/17/20 | 697 backlogged | 502 backlogged greater than 14 days (72%) |
| 2/14/20 | 624 backlogged | 433 backlogged greater than 14 days (69%) |

---

[12]  The monitoring team included cases where progress notes or a plan mentioned psychiatry and MHP participation, whether or not those persons signed the document, as well as cases signed the same or following day, as it could be common for a clinician to participate by phone but not receive paperwork for signature until the next day.

Of note, the above numbers are provided to the Monitoring Team on a weekly basis. Also, notable, the percentages reported are the percentage of treatment plans that are greater than 14 days late out of the weekly total of backlogged treatment plans, not out of the entire mental health caseload.

As previously reported, a backlogged treatment plan equates to a mentally ill offender not having an up-to-date document directing his/her psychiatric and mental health care. Due to the dynamic nature of psychiatric disorders, an outdated treatment plan could result in a mentally ill offender either being subjected to ineffective treatments that are no longer needed or not having his/her serious mental illness effectively addressed. Conversely, a mentally ill offender could also be receiving treatment that could harm his/her serious mental illness.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** Clinicians do, for the most part, use a form formatted to call for goals, frequency and duration of treatment activities, and the staff responsible. The content in those fields, however, is not always genuinely a goal or a treatment activity that would advance that goal.

Highlighting crisis watch plans, staff do continue to improve in recording patients' **problems and goals**: in the systemwide study referenced above, 52% of the plans captured these well.[13] Another 19% were adequate but had minimal content and minimal tailoring to the patient. Fully 29% were insufficient. These reflected issues such as missing a key problem of the patient's, lack of discernible problems or goals, content that appeared unrelated to the patient, and completely empty templates.

The **interventions** were not as well developed, but are also improving. Here, 31% in the study were written well, and another 14% were adequate. While the majority were insufficient, the rate of sufficient plans has doubled since one year ago. Insufficient plans principally took the form of naming the *Rasho*-required contacts but not discussing what treatment would take place during them. Some referenced the type and frequency of contacts from another level of care. Some were inapplicable to that patient. Some omitted one or more of the problems that led to the crisis watch.[14]

Outpatient treatment plans utilized the correct forms. The forms contain all of the required elements of this subsection but they tended to be very generic and not especially individualized. There was a paucity of actual treatment provided. For outpatient mentally ill

---

[13] This includes clearly tailored problems and goals, and instances where the language is standardized but fits the patient's situation and would be helpful in reducing his or her acute symptoms sufficient to discharge to less intensive care.

[14] Where the monitoring team found the essential goals or interventions, and there was additional boilerplate that appeared inapplicable, those plans were counted as *sufficient*.

offenders, the plans typically are for the patient to receive one 15- to 30-minute individual meeting with an MHP every 30, 60 or 90 days.

The treatment plans were of better quality at the RTUs of Logan, Dixon and Joliet. As the Pontiac RTU opened on January 6, 2020 and covid-19 restrictions were put in place at the beginning of March, the Monitoring Team hasn't reviewed the treatment planning of the RTU.

Treatment planning for those mentally ill offenders assigned to segregated housing will be discussed below.

**(VII)(c): Specific requirement:** Treatment plans shall be reviewed and updated for offenders designated as receiving outpatient level of care services annually, or sooner when clinically indicated (e.g., when level of care changes).

**Findings:** The Defendants, in their most recent Quarterly Report, describe "Percentage of Caseload Not Backlogged." Based on their calculations, this number consistently exceeds 94%. This is the same arithmetic error that was employed regarding the percentage of mental health evaluations not backlogged in Section V. The percentages reported by the Defendants are erroneous in that not everyone in the caseload requires at treatment plan to be completed at the time of the reported backlog. The Defendants don't report how many class members of the entire mental health caseload require a new or updated treatment plan. So, their percentages reported on page six of the most recent Quarterly Report are incorrect and, as such, cannot be used as a basis for formulating an opinion regarding the actual extent of the treatment plan backlog.

The following is a sample of the actual numbers of treatment plans that have been backlogged from December 2019 through February 2020:

| | | |
|---|---|---|
| 12/13/19 | 579 backlogged | 360 backlogged greater than 14 days (62%) |
| 1/17/20 | 697 backlogged | 502 backlogged greater than 14 days (72%) |
| 2/14/20 | 624 backlogged | 433 backlogged greater than 14 days (69%) |

Of note, the above numbers are provided to the Monitoring Team on a weekly basis. Also, notable, the percentages reported are the percentage of treatment plans that are greater than 14 days late out of the weekly total of backlogged treatment plans, not out of the entire mental health caseload.

As previously reported, a backlogged treatment plan equates to a mentally ill offender not having an up to date document directing his/her psychiatric and mental health care. Due to the dynamic nature of psychiatric disorders, an outdated treatment plan could result in a mentally ill offender being subjected to psychotropic medication that is no longer needed or is not effectively addressing his/her serious mental illness.

**Specific requirement:** Where the IDOC provides crisis or inpatient care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** It is routine for staff to update a patient's Master Treatment Plan soon after crisis watch admission and again on discharge. Institutions maintain crisis watch logs and provide them

monthly; in the most recent data provided to the monitoring team, logs showed plans completed for 94% of admissions and the same percentage for discharges.[15] The team did not examine weekly updates during this monitoring period.

**Specific requirement:** For those offenders receiving RTU care, treatment plans shall be reviewed and updated upon entrance and thereafter no less than every two (2) months, or more frequently if clinically indicated, and upon discharge.

**Findings:** The Monitoring Team conducted a comprehensive review of treatment plans for the January 15, 2020 Court Order Report. That review found the RTUs at Dixon, Logan and Joliet were meeting this requirement. The RTU at Pontiac opened on January 6, 2020, so, not enough time has passed before the covid-19 restrictions kicked in to adequately review that facility.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** As reported in the January 15, 2020 Court Order Report, only 50% of segregation admissions for mentally ill offenders demonstrated that a treatment plan was prepared within seven days after admission. This finding was based on a nine-facility[16] review conducted by the Monitoring Team. Three of these nine facilities--Pontiac, Menard and Western Illinois--did not complete any treatment planning for mentally ill offenders assigned to segregation. At Pontiac, mental health leadership reported that they are aware of this requirement but are often not able to accomplish this due to not having enough staff. Similar issues were present at Menard and Western Illinois. Mental health leadership at Western Illinois stated they are unable to do segregation treatment plans at all.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)     For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)    For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

---

[15] This is based on the crisis watch logs for February 2020 provided by 22 institutions. Those without crisis watches, and those for whom the data was not discernible, were exempted. In reviewing the chart sample, the rate of missed plans appeared somewhat higher, but it is unknown whether this is accurate or a product of mistakes in transmitting the documents.

[16] Pontiac, Menard, Pinckneyville, Western, Shawnee, Illinois River, Lawrence, Lincoln and Centralia.

(iii)    Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** To review this provision for outpatients, the monitoring team analyzed contacts for 231 psychiatric patients, drawn from across IDOC, for whom at least three appointments could be discerned in recent months.[17]

Among these cases:

- **only 23% met the Settlement requirement** of psychiatry seeing the patient every 30 days, or within a longer interval the provider designates if the patient is more stable

- on the other extreme, a somewhat larger proportion, 29%, were unreasonably delayed, with multiple late contacts, at least one of which exceeded one week. Most commonly, these took place up to three weeks late, but a small number exceeded that

The remaining cases—almost half—fell between these poles and showed a range of smaller deficiencies. In some, staff began to establish a pattern of these patients being seen timely but had one exception; in others, there were a few late contacts of short duration.

As for **RTUs,** Dixon, Logan and Joliet were evaluated using the same study method described above.[18] In this sample, the providers' plan was almost always to follow the patients at the expected 30-day intervals; the professionals considered very few of these patients stable enough to see them less often, and it was common to return to 30-day appointments after trying a longer interval. These practices are to their credit.

---

[17] The IDOC Psych Database is structured to show the most recent psychiatric appointment completed, but not a series of previous appointments from which one could determine whether the required intervals are being maintained. Therefore, the following structure was used for this study.

The monitoring team reviewed a Psych Database from each relevant institution for each month from August 2019 through February 2020, although a few institutions provided data for some months but not all. A sample of 523 patients was chosen by random selection method of every 20 patients. They were chosen from all institutions except Murphysboro, which reported it had no patients on the psychiatric caseload during the period studied, and Elgin, which was analyzed separately. Because Stateville-NRC tends to have a much shorter-term population, cases were instead chosen as an accidental sample of patients with at least two contacts, distributed across all psychiatrists. As will be described below, many records were removed during the analysis and substitutes chosen; ultimately, the monitoring team reviewed entries for 581 patients.

Among the sample of 581, only 231 were able to yield at least 3 contacts from which timeliness could be determined with confidence (or 2 contacts at Stateville-NRC). The most common obstacle to this was in instances where at least one contact greatly exceeded the expected interval but since the most recent contact displaces those that came before it, one cannot be certain that there weren't other, timely contacts during that interval, and there were no other indicia to guide that determination. Most such cases were eliminated from this analysis. Those cases were only retained if there were three *other* contacts on which to make a judgment, in which case, the case was retained but only the *contact* involving uncertainty was removed.

[18] For this treatment setting, an accidental sample of 41 patients was chosen.

On the other hand, **only 12% of the sample showed a *pattern* of the appointments occurring every 30 days** (or another interval that had been ordered), as required.

- Almost half of the patients had some appointments that were late a limited amount, up to one week
- A nearly equal number had one or more appointments that were later than that, typically up to two weeks late

As for inpatients, all patients in the Psychiatric Database for Elgin are listed to see psychiatrists weekly, and site visits and chart reviews during previous monitoring years demonstrated that these inpatients were, in fact, seen at least weekly by their psychiatric providers. The monitoring team analyzed a 24% sample of all Elgin patients during the monitoring period and the patterns of contact strongly suggest a routine that ensures patients are seen within the Settlement timeframes and very likely on a weekly basis.[19]

**(VII)(e): Specific requirement:** Upon each clinical contact with an SMI offender, the MHP shall record a progress note in that offender's mental health records reflecting future steps to be taken as to that offender based on the MHP's observations and clinical judgment during the clinical contact.

**Findings:** The monitoring team regularly observes progress notes, consistent with this requirement, in all charts reviewed. No information has come to the team's attention to suggest that any clinical contacts are not being captured in progress notes. As mentioned in prior Monitor's reports, the team is unaware of any method that could systematically search for clinical contacts that went undocumented.

---

[19] The team reviewed each Psychiatric Database issued monthly by Elgin from August 2019 through February 2020. In comparing the patient names across this time span, and correlating them with Elgin's Mental Health Databases issued in those same months, the monitoring team determined that Elgin treated 59 patients during that period. The team selected every 5th patient and retained those cases where at least 3 contacts could be discerned. Where 3 or more contacts could not be discerned, those cases were removed from the sample and substitute cases chosen, also by every 5th case when possible. Ultimately, analysis was conducted with a set of 14 patients who showed a pattern of contact, which constitutes 24% of the 59-patient population in the time period reviewed.

Each database captures the most recent contact, which displaces all previous contacts in that data field. Thus, a database issued monthly cannot show weekly contacts occurring between reports. However, Elgin's databases show that (a) each patient has a weekly follow-up plan, (b) all patient contacts in the provided databases occur on the same days (for example, in August, all patients were seen on either August 6 or 8), and (c) the contact dates across the months follow a consistent, 4-week pattern (for example, patients have documented contacts on September 11, October 9, November 7, and so on). While this does not definitively show that each contact occurred timely, it does demonstrate a routine that supports a high likelihood that the providers' plans will be met and that contacts occur well within the 30-day requirement of the Settlement.

## VIII:   TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

**Summary**: Although follow-up after crisis care is a commonly known responsibility, records reviews showed a surprisingly low compliance rate of 60% for five-day follow-ups and 69% for suicide evaluations. Issues included late, interrupted, or incomplete follow-up contacts, or instances where no follow-up was evident. A majority of institutions showed difficulties, but 11 are found in substantial compliance.

Based on a very large sample, follow-up of patients discharged from inpatient care or an RTU occurs consistently and IDOC is in substantial compliance with that requirement.

**(VIII)(a): Specific requirement:** SMI offenders shall only be returned to general population from a specialized treatment setting with the approval of either the treating MHP or, once established, with the approval of the multidisciplinary treatment team. The Settlement provides a definition of "Specialized Treatment Setting": Housing in a crisis bed, residential treatment unit, or inpatient mental health setting.

**Findings:** As noted in earlier reports, IDOC is meeting the requirements of VIII(a). It is not clear, however, the extent to which multidisciplinary treatment teams are involved in this process with the exception of the RTUs at Joliet and Logan and the STC at Dixon.

**(VIII)(b)(i): Specific requirement:** For offenders transitioning from Crisis placement, there will be a five (5) working day follow-up period during which the treating MHP will assess the offender's stability on a daily basis since coming off Crisis Watch. This assessment may be performed at cell front, using a form, which will be specifically designed for this purpose by IDOC and approved by the Monitor.

**Findings:** The monitoring team reviewed the records of 211 patients with crisis watches for documentation of this follow-up and found that only 60% were in compliance. Others were initiated late, had interruptions unexplained by weekends, or completed fewer than five contacts. In 15%, there was no indication of follow-ups at all.[20]

The deficiencies were distributed among many of the institutions, but 11 managed this requirement consistently throughout the year and are found in Substantial Compliance.[21]

---

[20] The cases were chosen by accidental sampling of 26 institutions' crisis watch logs for August, November, and January. The monitoring team counted any individual or group contact as satisfying this requirement.

[21]  Big Muddy River, Centralia, Danville, Jacksonville, Lincoln, Pinckneyville, Robinson, Shawnee, Sheridan, Taylorville, Vandalia

**Specific requirement:** This five-day assessment process will be in addition to IDOC's current procedure for crisis transition, which IDOC will continue to follow. This procedure requires an MHP to conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender within seven (7) calendar days of discontinuation from crisis watch, and thereafter on a monthly basis for at least six (6) months. Findings shall be documented in the offender's medical record.

**Findings:** In the study described above, the monitoring team also reviewed the seven-day suicide evaluation requirement. Only 69% of reviewed records were in compliance. Noncompliant cases were evenly divided between evaluations conducted late[22] and those for whom there was no indication that any evaluation had been completed. The team did not examine during the monitoring period the monthly follow-up requirement.

**(VIII)(b)(ii): Specific requirement:** Offenders returned to general population or to an outpatient level of care setting from a specialized/residential treatment facility shall be reviewed by an MHP within 30 days to assess the progress of the treatment goals. The IDOC Form 0284 shall be reviewed annually thereafter, unless otherwise clinically indicated (e.g., change in level of care) as required by IDOC AD 04.04.101, section (F)(2)(c)(4)(c).

**Findings:** Elgin Treatment Center provided a list of all patients it returned to a lower level of care; the monitoring team reviewed records from two, three-month periods,[23] selecting an 86% sample. In nearly every case, an MHP at the receiving institution documented substantive contact with the patient within the required timeframe. There were only two exceptions, each of which took place one week later than required.

Each of the four institutions tasked with operating an RTU also provided monthly lists of discharges from those programs. The monitoring team requested records for all discharges made known to the team from November through January. In each case, an MHP in the receiving program documented a substantive contact with the patient within the first 30 days. Anecdotally, it has also been the monitoring team's impression from staff interviews that these patient meetings occur routinely.

IDOC is found to be in Substantial Compliance on section VIII(b)(ii).

---

[22] In cases reviewed as of the Midyear Report, some missed the deadline by a short time. In records from more recent months, however, this was no longer the case.

[23] Discharges that took place from late May through late August 2019, and from November 2019 through January 2020

## IX: ADDITIONAL MENTAL HEALTH STAFF

**Summary:** My opinion remains that IDOC is significantly understaffed. This can be seen through a variety of metrics: backlogs in mental health evaluation and treatment planning, extended stays on crisis watch, the paucity of treatment that is actually provided to the outpatient population of mentally ill offenders, and not meeting agreed upon out-of-cell time for mentally ill offenders housed in segregation units. This is by no means a comprehensive list of failings on the part of IDOC. In all fairness to the Defendants, I can't imagine their ever meeting all of the requirements of the Settlement with their current level of staffing.

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** At this 4th year juncture of the Settlement, IDOC continues to find itself with an inadequate number of psychiatric, mental health and support staff to care for all of the mentally ill inmates housed throughout the Department. The monitoring team has been talking about the "staff emergency" that exists in the Department all through the life of the Settlement. I'm not sure what else I can say at this point. In my opinion, IDOC will likely never meet the requirements of the Settlement in the absence of sufficient staff. Of note, meeting the staffing requirements of the Approved Remedial Plan will not provide sufficient staff to meet the requirements of the Settlement.

To further explain how the Approved Remedial Plan does not meet the current staffing needs of the Department, I completed a review of IDOC's overall population levels and mental health case load over a six-year period. The mental health caseload on May 1, 2014 was 10,692. The overall inmate population of IDOC at that time was 48,719. This means that the mental health caseload made up 21.9% of the overall inmate population. As of April 23, 2020, the mental health caseload was 12,438. The overall inmate population was 35,149. This means that the mental health caseload made up 35% of the overall inmate population. Regardless of the percentage, the mental health caseload has increased by almost 2,000 people over this six-year period and will continue to climb moving forward. To the best of my knowledge, the mental health and psychiatric staffing planners have not taken this increase into account.

Section IX(a) uses the staffing levels from the "Restructured Mental Health Plan"[24] for the operation of IDOC's outpatient and RTU settings. All staffing levels are current as of March 20, 2020.

- Dixon:                                              Vacant FTEs
  - Mental Health Training Director          1.0
  - Mental Health Unit Director               2.0
  - Post-Doc Psychologist                      1.0
  - Pre-Doc Psychologist                        1.0
  - QMHPs                                            9.0
  - BHTs                                              3.0
  - Psychiatrists                                    3.35
- Logan:
  - Mental Health Unit Director               1.0
  - Post-Doc Psychologist                      1.0
  - QMHPs                                            15.0
  - RNs-MH                                          4.0
  - Psychiatrists                                    2.4
- Pontiac:
  - Staff Psychologist                            1.3
  - QMHPs                                            7.0
  - Rec Therapist                                  1.0
  - BHTs                                              3.0
  - Psychiatrists                                    2.4

The deadline for Dixon and Logan meeting their staffing requirements was February 6, 2018. Pontiac's deadline was July 6, 2018. In these three facilities alone, there are vacancies for **31 QMHPs and 9.062 Psychiatrists.** IDOC continues to be Noncompliant with IX(a).

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:** All staffing vacancies are current as of March 20, 2020:

Joliet:                                                Vacant FTEs

- Site Mental Health Director                 1.0
- QMHP                                               1.0
- BHT                                                 2.0
- RNs-MH                                            6.0

---

[24] As Monitor, I have not been informed how the staffing numbers in this plan were determined. I can only report the vacancies noted in the March 20, 2020 Wexford staffing report. A review of the current backlogs for essential mental health services within the Department, however, demonstrates that no matter what staffing plan is used, it falls very short of meeting the mental health needs of the mentally ill offenders throughout the Department.

The deadline for Joliet to meet its staffing requirements was November 22, 2017. Joliet's staffing vacancies have improved over the reporting period. If the proposed staffing numbers are adequate, however, it is unclear why Joliet's census is only 168 out of a reported 300 bed capacity as of May 15, 2020. The Department will continue to receive a rating of Noncompliance for IX(b).

**(IX)(c): Specific provision:** Defendants will have three (3) months from the approval of the Settlement Agreement to propose an amendment to the staffing plan. The Monitor and Plaintiffs shall have forty-five (45) days following the submission of the revised staffing plan to state whether they have an objection to the proposed revisions and provide data to support the objections. Following receipt of any objection and supporting data, the parties will either accept the Monitor's and/or Plaintiffs' suggestions or the issue will be resolved through the dispute resolution process.

**Findings:** As previously reported, the Defendants did not propose an amendment to the staffing plan within the three-month deadline. I've always assigned a "no rating" for IX(c). Perhaps the rating of Substantial Compliance is more appropriately applied.

**(IX)(d): Specific requirement:** To the extent the positions listed on Exhibits A and B of the Approved Remedial Plan are to be filled by Mental Health Professionals, these positions shall be allocated solely to the provision of the mental health services mandated by this Settlement Agreement.

**Findings:** As previously reported, IDOC is in Substantial Compliance with this requirement.

**(IX)(e): Specific requirement:** In accordance with its obligations in Section XXVIII, *infra*, IDOC will include quarterly hiring progress reports related to the additional mental health staff identified in the Approved Remedial Plan. Where a target may not have been met, the Monitor will review the reasons for failure to meet the target and, if necessary, propose reasonable techniques by which to achieve the hiring goals as well as supporting data to justify why these techniques should be utilized.

**Findings:** The following is an excerpt from the Midyear Report of November 30, 2019, pages 32-33: **"**As stated in the Monitor's Third Annual Report, IDOC provides quarterly hiring progress reports related to the additional mental health staff identified in the approved Remedial Plan." This practice continues to this date.

 "As Monitor, I have regularly met with IDOC staff to discuss their chronic staffing shortfalls. The first formal meeting to discuss staffing took place at IDOC headquarters on June 26, 2017. The Director and Chiefs Lindsay and Hinton participated in this meeting as well as representatives from Wexford. At this meeting, I made several concrete recommendations on how to increase staffing. These recommendations included utilizing primary care physicians and advanced practice nurses to provide psychiatric care. At this meeting I also authorized the increased use of telepsychiatry.

The Monitoring Team provided IDOC with its own staffing analysis and plan on May 27,

2018. This staffing plan contained many concrete steps that IDOC should take to address their staffing issues. Of note, the Monitoring Team has yet to receive any response from IDOC regarding this staffing analysis and plan. More recently, I met with the executive staff of IDOC on January 30, 2019. Staffing was one of the primary topics of this meeting. At that meeting I have proposed holding a "staffing summit" where several days can be dedicated to addressing the serious staffing problems facing IDOC. IDOC once again did not get back to me regarding the feasibility of holding the "staffing summit." I then requested the addition of a staffing expert to the Monitoring team. This request was also not acted on by the Department. Eventually, the Department engaged VitalCore Health Strategies, which conducted a comprehensive staffing analysis. As Monitor, I consulted with VitalCore as their staff were conducting this analysis and fully agreed with their recommendations. IDOC has yet to fully implement the recommendations contained in the VitalCore report of August 8, 2019. I also proposed that IDOC contract with VitalCore to assist in addressing the critical staffing problems facing IDOC. IDOC has not acted on this proposal. Finally, I met with IDOC's executive staff on November 8, 2019. At this meeting, staffing was discussed, as well as the Department's response to the VitalCore report. Again, in my role as Monitor, I provided the executive staff with concrete suggestions about how to address the Department's staffing emergency."

I continue to make myself available to consult with IDOC leadership about staffing. Also, I am still waiting to hear from the Department about the Monitoring Team's staffing plan, the feasibility of holding a "staffing summit," and my ability to add a staffing consultant to the Monitoring Team. Finally, I am yet to receive a response from IDOC about my recommendation to hire VitalCore to assist in the current staffing emergency facing the Department. In spite of all of the above-listed problems, IDOC is meeting the letter of this requirement but certainly not the spirit. I am forced, however, to assign a rating of Substantial Compliance for IX(e).

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** To the best of my knowledge, the parties are still negotiating and possibly litigating this issue. The Monitoring Team has been kept in the dark about this issue. I am formally requesting that the Monitoring Team be fully informed about the progress regarding (IX)(f). No rating will be assigned.

## X: BED/TREATMENT SPACE

**Summary**: During the current monitoring period, IDOC has lowered the stated bed capacity at JTC from 360 to 300 beds. This 300 number is below the required number of beds stated in the Amended Settlement Agreement. This number of stated bed capacity is almost academic as the census of JTC has been hovering around 167 the entire 4th year of monitoring. Crisis cells are being extensively used without making timely referrals to higher levels of care. This fact cases undue harm to those mentally ill offenders held in crisis beds for longer than 10-days. 10-days is an eternity to held in a crisis cell. This is especially problematic given that all of the male RTUs are being underutilized.

**(X)(a): Specific requirement:** The Approved Remedial Plan identified four facilities at which IDOC would perform renovations, upgrades, and retrofits to create bed/treatment space for SMI offenders requiring residential levels of care: (i) Dixon Correctional Center (male offenders only); (ii) Pontiac Correctional Center (male offenders only); (iii) Logan Correctional Center (female offenders only); and (iv) the former IYC Joliet facility (male offenders only). The necessary funding to complete this construction is dependent upon additional appropriations.

**Findings:** IDOC is in Substantial Compliance with this requirement.

**(X)(b): RTU beds for male offenders**

**(i): Specific requirement:** Approximately 1,150 units of RTU bed space for male offenders have been identified.

**Findings:** IDOC has identified 1,287 units of RTU bed space for male offenders. IDOC is in Substantial Compliance.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

**(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;

**(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and

**(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings**: The necessary construction was completed, but the chronic, substantial underutilization of the beds, in the face of documented, unmet need, demonstrates that IDOC is not making RTU beds available to the extent required by the Settlement.

- Dixon-RTU bed count of 676. Census as of May 15th was 518. This compares with the average census reported in the Midyear Report of 610.
- Pontiac-RTU bed count of 165. Census as of May 15th was 75. This compares with the average census reported in the Midyear Report of 48.
- Joliet-RTU bed count of 300. Census as of May 15th was 168. This compares with the average census reported in the Midyear Report of 167.

The data presented above was received from Ms. Jennings, IDOC legal counsel, on May 21, 2020. IDOC is clearly Noncompliant with this requirement.

**(X)(c): RTU beds for female offenders**

**(i): Specific requirement:** IDOC has identified RTU bed and programming space for 108 female offenders at Logan CC.

**Findings:** IDOC has identified RTU bed and programming space for 146 female offenders at Logan CC. IDOC is in Substantial Compliance with this requirement.

**(ii): Specific requirement:** IDOC will perform the necessary construction to make these 108 RTU beds available on the following schedule:

**(A)** RTU beds and programming space for 80 female offenders no later than six (6) months after the budget contingent approval date; and

**(B)** RTU beds and programming space for an additional 28 female offenders no later than twelve (12) months after the budget contingent approval date.

**Findings:** Greater than the required number of beds (146) has been constructed at Logan and space is sufficient for programming. The census as of May 15, 2020 was 86. Referral logs indicate that admissions to RTU happen quickly and the Monitoring Team is not aware of any waiting list. The team has observed this consistently over time and does not see indications of unmet need. IDOC is in Substantial Compliance with this requirement.

**(X)(d): Specific requirements:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:**

- **Dixon RTU:** I made a 1 ½ days visit to Dixon on January 29 and 30, 2020. I was accompanied by Assistant Monitor Miranda Gibson on January 30. What we found was consistent with what was reported in IDOC's Quarterly Report on April 23, 2020. That is, the STC at Dixon provides 48.5 hours of unstructured time and 12 to 13 hours of structured time to the mentally ill offenders housed there. The DXP only provides 5 hours of structured time to the mentally ill offenders housed there. DXP has insufficient space and staff to provide the required number of structured hours. Also, medication pass in the DXP often interferes with the start of the morning group due to the fact that no inmate movement

36

is allowed during medication pass. I discussed this issue and possible solutions with the Warden during my site visit.

- **Pontiac RTU:** This RTU is divided into a Behavior Modification Unit ("BMU") and a Modified Therapeutic Community. IDOC's most recent Quarterly Report states that all mentally ill inmates assigned to this RTU are offered 12 hours of unstructured time and 10 to 12 hours of structured time weekly. I made a visit to the Pontiac RTU on February 20, 2020. I determined by speaking with both IDOC staff as well as mentally ill offenders that members of the Modified Therapeutic Community actually receive 2, 1.5-hour groups per week, and 9 hours of yard per week. Both staff and offenders mentioned attending "movie groups." The offenders made it clear that they enjoyed the movies but that there was not a discussion following the movie viewing. In all fairness to everyone, movie groups should be counted as unstructured out-of-cell time, not structured.

- **Logan and Joliet RTUs:** These facilities are meeting the requirements of this subsection.

### (X)(e): Inpatient beds

**Specific requirement:** Within three (3) months of the approval date of this Settlement Agreement, IDOC shall enter into an intergovernmental agreement ('IGA') with the Illinois Department of Human Services ('DHS') to secure at least 22 beds for female offenders and at least 22 beds for male offenders in an existing DHS-owned mental health facility. The necessary funding to complete this construction is dependent upon additional appropriations.

**Findings**: The relevant parties signed an intergovernmental agreement and this requirement is in Substantial Compliance.

**Specific requirement:** Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date.

**Findings**: To the Monitor's knowledge, the necessary construction and improvements were made. The facility has been in use since April 2018 and the census climbed to about 68% occupancy and was maintained there for at least six months. As documented in previous monitoring team analyses, this is far less than the need for inpatient beds, but was a significant help. However, since October, the census has declined each month. Throughout the most recent quarter for which the Monitor has data, the **census was _less than half_ of capacity**.[25] Under these conditions, IDOC cannot be said to be making available the required 44 beds.

---

[25] The numbers reached this level in either December or January, depending on the source material, and remained there through April. This analysis draws on the MHP Database and Psych Database provided monthly for December through February from Elgin, and the average censuses provided in the documents titled MH Data and Projection by Facility, for 2019 and 2020. This trend _preceded_ public knowledge of the need to enact pandemic-related restrictions, so that cannot be the primary explanation.

At the same time, there was substantial unmet need.

- At least 28 referrals during this monitoring year waited 2 months or more, and some transferred, were withdrawn, or remain waiting up to 11 months.[26]
- Another 128 patients were housed in crisis watch—a placement meant to last approximately 10 days before need for more care is apparent-- *for 3 months to more than 1 year* and were never referred.

By several other measures, there is a much higher number of patients needing inpatient care, but the need in the patients above is beyond dispute. Failing to mitigate this unmet need by letting more than half of existing inpatient beds stand empty is a serious issue of noncompliance with clear harm.

**Specific requirement:** Within thirty (30) months of the approval of this Settlement Agreement, IDOC will transition to assuming control or ownership of said facility and provide approximately sixty (60) additional beds and programming space for separate housing of male and female offenders in need of an inpatient level of care.

**Findings**: Although IDOC was very late to get started on this very important project, they are making steady progress to meeting this goal. Since the 30 months have passed, however, IDOC is Noncompliant with this requirement.

**Specific requirement:** During that transition period, IDOC shall consult closely with the Monitor and IDOC's own retained mental health expert to develop any additional policies and procedures and design programming and treatment space that is appropriate for a forensic hospital. After the IGA is signed, IDOC will continue to develop plans for inpatient care that can be implemented after necessary appropriations.

**Findings:** Dr. Puga and I have been meeting to discuss policies and procedures for a forensic hospital. This collaboration needs to greatly increase moving forward.

**(X)(f): Crisis beds**

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

---

[26] This is based on Elgin referral log data as of April 10, the most recent data in the monitoring team's possession.

**Findings:** IDOC facilities have established crisis beds as required. In the past, the effort to keep crisis cells out of control units made great progress, but there has been substantial decline in 2019-2020. In logs from recent months, 14 institutions employed segregation cells for crisis watch.[27] That number increased in each monitoring report for the last two years. Such placements are permitted in exigent circumstances for three days or less, but 58% of the segregation placements lasted longer than allowed. Aside from Pontiac, the total of impermissibly lengthy segregation placements constituted 3% of *all* crisis watches reviewed.[28]

A new larger use of control units was established, or came to the Monitor's attention, in 2019. Both Joliet and Pontiac have established specialized housing units—Behavior Management, and an RTU, respectively—and both populations include significant numbers of segregation-status patients. These institutions house crisis watch patients from these populations on their regular housing unit in cells with suicide-safety construction but in the same noisy, nontherapeutic environment. Pontiac does have a wall to create some separation for segregation offenders, but crisis watch patients remain on the same tier as the segregation prisoners and are surrounded by other RTU status prisoners who are not in crisis. When monitoring team members accompanied MHPs for cell-side crisis watch contacts, the contacts were conducted no differently from outpatient contacts. When considering Pontiac placements in addition to those described above, the total of crisis watches in a control unit was 17% of all crisis watches in the period reviewed, and 78% of them exceeded the three days permitted in exigent circumstances.

Stateville and Lincoln previously had relatively high rates of usage, and both improved in recent months. Taylorville used segregation cells for 60% of its crisis watches throughout the monitoring period.[29] Taylorville will come off the substantial compliance list and IDOC should support staff in strategizing safe housing for the crisis watch patients who consistently exceed the crisis beds available. Dixon and Murphysboro will join the list of institutions in substantial compliance, bringing the total to 23;[30] others on the list will maintain their status, because their usage remains infrequent, but IDOC is cautioned to observe and respond to the consistent slide on this requirement, and to particularly address the much higher levels of use at Pontiac and Joliet.

Additionally, instances are surfacing of housing patients in general population while in crisis watch. This is contrary to the requirement to house such patients in "a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such

---

[27] The monitoring team analyzed all crisis stays contained on logs provided by all IDOC institutions, except Kewanee and Murphysboro, which reportedly had no watches, for June, September, and February. There were crisis watches in control units at Big Muddy River, Centralia, Jacksonville, Joliet, Lincoln, Logan, Menard, Pinckneyville, Pontiac, Robinson, Stateville, Taylorville, Vienna, and Western Illinois.

[28] This analysis refers to all relevant institutions *except* Pontiac, which will be discussed below.

[29] For Taylorville, the monitoring team reviewed and compiled crisis watch figures for every watch from June 2019 through February 2020.

[30] Institutions in substantial compliance are Big Muddy River, Centralia, Danville, Decatur, Dixon, East Moline, Graham, Hill, Illinois River, Jacksonville, Kewanee, Lawrence, Logan, Menard, Murphysboro, Pinckneyville, Robinson, Shawnee, Sheridan, Southwestern Illinois, Vandalia, Vienna, and Western Illinois.

placement is available, transferred to another facility which has an appropriate crisis bed available."

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: Logs show that all institutions except two had crisis watches during the monitoring round. In terms of aggressive mental health treatment to reduce acute symptoms and stabilize the patient, IDOC continues the practice of daily MHP meetings with the patient; the monitoring team has observed that some contacts provide therapeutic guidance, but many are an assessment alone. For psychiatry contacts, the monitoring team reviewed a sample of 1,723 crisis watches;[31] in it, 36% of patients saw a psychiatric provider by the day after admission, the standard the Monitor would expect for a crisis setting. While this is a low rate, it did show improvement in more recent months. The largest group of patients was seen later. Fully 15% appeared to have no psychiatric contact, particularly at Lawrence, Illinois River, Graham, Hill, Menard, Pontiac, and Lincoln. Frequently, this was *not* explained by a very short crisis stay.

These "treatment" activities do not meet the standard of "aggressive mental health treatment." The community standard calls for an immediate evaluation by a mental health professional and psychiatrist. Then the patient would receive a combination of medication and psychotherapeutic support to address the particular crisis. Crisis patients in the community are either quickly stabilized and released or transferred to a higher level of care. In all fairness, this system of crisis care is not occurring within IDOC.

Additionally, logs suggest that, for a substantial number of patients, the care is not serving to stabilize them within ten days or effecting a transfer to a more intensive care setting. Crisis watch logs show 22% of crisis watches exceeding the expected ten days.[32] This rate is significantly worse than the rate found as of the Third Annual Report. IDOC asserts in the April 23, 2020 Quarterly Report that all patients are assessed daily for the need for higher level of care and also by the tenth day of their watch. This has not been substantiated in the treatment plans provided monthly nor the Monitoring Team's chart reviews conducted onsite, and has not been observable in the multidisciplinary team meetings and crisis care staffing meetings that the Monitoring Team has witnessed.

---

[31] This consists of all crisis watches on IDOC logs for June, September, and February from all institutions at which a crisis watch occurred. It omits 186 cases in which the information about psychiatry contact was not recorded or was unclear.

[32] This analysis is based on the above-referenced review taking into account all 1,909 crisis watches. Kewanee and Murphysboro reportedly had no crisis watches and Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after 10 days is not feasible.

Most disturbing was the widespread practice of crisis watches lasting 30 days or more, which occurs more than 2.5 times as often as it did one year ago. Shockingly, a few patients were in crisis watch for more than 1 year. The crisis care system was never designed to be a defacto inpatient psychiatric service.

| Length of stay | Number of people (in only 3 months of crisis watches) |
|---|---|
| 11-29 days | 278 |
| 1 – 3 months | 129 |
| 3 months - >1 year | 22 |

Excessive lengths of stay occurred at 23 institutions, though it was most prevalent at Dixon, Joliet, and Pontiac. While it is understood that these institutions treat higher acuity patients, that cannot be the end of the analysis. Crisis beds are designed for short-term stabilization. There should be a culture of routinely referring these patients to facilities better equipped to provide more intensive care, and there is not. Only 6% of these cases were recognized as needing a higher level of care and referred by the 10-day point. This needs to change.

**(X)(g): Specific requirement:** IDOC shall also ensure that each RTU facility has adequate space for group therapy sessions; private clinical meetings between offenders and Mental Health Professionals; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures. IDOC shall also ensure that each RTU facility has adequate office space for the administrative and mental health staff required by this Settlement Agreement. .

**Findings:** During the current reporting period, I was able to personally visit the RTUs at Logan, Pontiac, Joliet ("JTC") and Dixon. Based on my site visits, the RTUs at Logan, Pontiac, JTC and the STC at Dixon are in Substantial Compliance with this requirement. The X-house at Dixon only has one small and cramped room in which to conduct structured out-of-cell group activities. The Department will receive a rating of Substantial Compliance when the issue at Dixon's X-house is addressed.

**(X)(h): Specific requirement:** The treatment and other space required by subsections (d)-(g), *above,* shall be completely available no later than six (6) months after the work completion dates identified in subsection (a), *above,* for the four facilities identified there, and for any other residential treatment or outpatient facilities at which it is determined that modifications are needed no later than December 2017**.**

**Findings:** Please see the findings of (X)(g) above.

**(X)(i): Specific requirement:** Within forty-five (45) days of the selection of the Monitor, IDOC will submit to the Monitor descriptions and architectural plans, if being used, in sufficient detail to enable the Monitor to determine whether construction undertaken pursuant to this section complies with the previously approved Remedial Plan. If, having reviewed these descriptions and

plans, the Monitor concludes that the space allocations in any or all facilities under this Settlement Agreement are not consistent with the Remedial Plan, the Monitor shall so inform IDOC and Plaintiffs' counsel, and IDOC shall have thirty (30) days to propose additional measures that address the Monitor's concerns.

**Findings:** The Department has been in Substantial Compliance with this requirement for the life of the Settlement Agreement.


## XI: ADMINISTRATIVE STAFFING

> **Summary**: IDOC is meeting the requirements for Regional Directors, Quality Improvement Manager and Central Office Staff. At the time of this report there are two vacancies for Clinical Supervisors.

### (XI)(a): Regional Directors

**Specific requirement:** Within thirty (30) days after the approval of this Settlement Agreement, to the extent it has not already done so, IDOC will hire two regional directors who are licensed psychologists or psychiatrists to assist the IDOC Chief of Mental Health Services.

**Findings:** The Department has exceeded the requirements of XI(a) throughout the life of the Settlement. There are currently three Regional Directors: Dr. Horn (North), Dr. Fairless (Central) and Dr. Reister (South). IDOC obviously remains in Substantial Compliance.

### (XI)(b): Statewide Quality Improvement Manager

**Specific requirement:** IDOC will also create a position for a statewide Quality Improvement Manager (the QI Manager). In addition to the other responsibilities assigned to the QI Manager in this Settlement Agreement, the QI Manager or one or more qualified designees shall have the responsibility for monitoring the provision of mental health services performed within IDOC by state or vendor employees and the performance of any vendor(s) under the vendor contract(s). This position shall be filled only by a State, not vendor, employee, and shall be filled no later than nine (9) months after the approval of the Settlement Agreement.

**Findings:** The Department is in Substantial Compliance with this requirement.

### (XI)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility

and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings:** At the time of this report, Danville and Elgin had vacancies for this supervisory position. At Elgin, however, Ms. Jennings, IDOC legal counsel, reported that the clinical supervision is accomplished in a multidisciplinary manner by three State Social Worker IVs with a Psychiatrist conducting clinical supervision. Although this is a creative solution for this vacancy, the clinical supervisor is a full-time position. Also, given the current underutilization of Elgin beds, the time and energies of these four staff are better applied to clinical care and increasing the census.

### (XI)(d): Central office staff

**Specific requirement:** IDOC shall hire ten (10) central office staff (*i.e.*, non-facility-specific staff including the positions mentioned in (a)-(d), above) to implement the policies and record-keeping requirements of this Settlement Agreement. These positions will be filled no later than eighteen (18) months after the approval of this Settlement Agreement.

**Findings:** The Department is in Substantial Compliance with this requirement.

## XII: MEDICATION

> **Summary**: A data-driven analysis of the frequency of medication follow-ups revealed that IDOC is not routinely meeting the requirements of this Section for any level of care except inpatient. The actual quality of the individual psychiatric visits has greatly improved over time. That is, there is much better documentation of medication side effects, using standard protocols to evaluate medication side effects, informed consent and medication compliance. The backlog of psychiatric visits remained a problem throughout the monitoring period.
>
> The Department has improved in its medication distribution times but there are several facilities who still attempt to administer medications at 4am and 5am. It is incumbent on the Department to demonstrate that other typical barriers are not hindering medication distribution in its facilities.

**(XII)(a): Specific requirement:** In accordance with the provisions of IDOC AD 04.03.100, section II (E)(4)(d)(1), no later than ninety (90) days after the approval of this Settlement Agreement, medical staff shall record contemporaneously on offender medical records all medications administered and all offender contacts with medical staff as to medications. With respect to offenders taking psychotropic medications, "contemporaneously" means that the medication, the amount of the medication, and whether the offender took it or refused it will be recorded at the time the medication is delivered, either on a temporary record from which information is subsequently transferred to a permanent record located elsewhere, or in the permanent record at the time of delivery.

**Findings:** The Department has been consistently meeting this requirement since the Midyear Report of November 22, 2017.

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** To review this provision for outpatients, the monitoring team analyzed contacts for 231 psychiatric patients, drawn from across IDOC, for whom at least three appointments could be discerned in recent months.[33] Among these cases:

- **only 23% met the Settlement Agreement requirement** of psychiatry seeing the patient every 30 days, or within a longer interval the provider designates if the patient is more stable

- on the other extreme, a somewhat larger proportion, 29%, were unreasonably delayed, with multiple late contacts, at least one of which exceeded one week. Most commonly, these took place up to three weeks late, but a small number exceeded that

The remaining cases—almost half—fell between these poles and showed a range of smaller deficiencies. In some, staff began to establish a pattern of these patients being seen timely but had one exception; in others, there were a few late contacts of short duration.

As for specialized treatment settings, the **RTUs** at Dixon, Logan and Joliet were evaluated using the same study method described above.[34] In this sample, the providers' plan was almost always to follow the patients at the expected 30-day intervals; the professionals considered very few of these patients stable enough to see them less often, and it was common to return to 30-day appointments after trying a longer interval. These practices are to their credit. On the other hand, **only 12% of the sample showed a *pattern* of the appointments occurring every 30 days** (or whatever interval had been ordered), as required.

- Almost half of the patients had some appointments that were late a limited amount, up to one week

- A nearly equal number had one or more appointments that were later than that, typically up to two weeks late

---

[33] For more detail on the method, please see section (VII)(d) above.

[34] For this treatment setting, an accidental sample of 41 patients was chosen.

In crisis watch, the monitoring team reviewed a sample of 1,723 crisis watches and found that 36% of patients saw a psychiatric provider by the day after admission, the standard the Monitor would expect. While this is a low rate, it did show improvement in more recent months. The largest group of patients was seen later. Fully 15% appeared to have no psychiatric contact during crisis watch. For more detail, please see section 2(b), above.

As for inpatients, all patients in the Psychiatric Database for Elgin are listed to see psychiatrists weekly, and site visits and chart reviews during previous monitoring years demonstrated that these inpatients were, in fact, seen at least weekly by their psychiatric providers. The monitoring team analyzed a 24% sample of all Elgin patients during the monitoring period and the patterns of contact strongly suggest a routine that ensures patients are seen within the Settlement timeframes and very likely on a weekly basis.[35]

The numbers in the above studies differ from the backlog numbers because they are measuring different things. The studies above capture how timely or untimely the contacts were when they took place. The backlog reports capture a snapshot of how many expected appointments have been completed and how many are overdue when the report is generated. Because these snapshots are provided often, they also give a picture. But the reports are not designed to show whether the already completed contacts were timely or untimely at the time they were conducted.

Nevertheless, as previously reported, the psychiatric backlog must be taken into consideration when evaluating IDOC's performance regarding this requirement. This is due to the fact that a backlogged psychiatric visit equates to a mentally ill offender not being seen per the requirements of this section. The figures below aggregate all levels of care.

1. One year ago, the backlog report of 5/31/19 noted a backlog rate of 8.5%. The following facilities reporting a much higher backlog rate than 8.5%:
     a. Robinson      backlog rate of 26.2%
     b. Shawnee       backlog rate of 24%
     c. Dixon         backlog rate of 22.6%
     d. Western       backlog rate of 18.8%
     e. Pontiac       backlog rate of 17.4%
     f. Logan         backlog rate of 12.2%

2. The backlog report of 11/22/19 showed significant improvement. The overall backlog rate was 2.8%. Fewer facilities exceeded this backlog rate:
     a. Western       backlog rate of 17%
     b. Sheridan      backlog rate of 14%
     c. Hill          backlog rate of 10.2%
     d. Logan         backlog rate of 5.6%

---

[35] For more description of the method and analysis, please see section (VII)(d) above.
.

1:07-cv-01298-JEH-RLH    # 3038    Filed: 06/01/20    Page 46 of 101

3. Finally, the backlog report of 3/6/20 shows an overall backlog rate of 4.65%. Several facilities exceed this rate:
   a. Dixon          backlog rate of 17%
   b. Jacksonville   backlog rate of 14.1%
   c. Robinson       backlog rate of 9.1%
   d. Hill           backlog rate of 8.3%
   e. Pinckneyville  backlog rate of 8.2%

Although the most recent figures are higher than at midyear, both reports capture a significantly lower rate than one year ago. This backlog data strongly suggests that IDOC is continuing to make progress in meeting the requirements of (XII)(b). Although the Department still falls short of a Substantial Compliance rating, their efforts are noted and greatly appreciated.

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to and taken by the offenders as prescribed;

**Findings:** It is common for prisons to experience obstacles to patients receiving medication. These can include practices such as medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; security staff preventing nursing staff from accessing housing units, or patients from attending the medication line; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and hoarding or selling medication; and medication errors. These are all potential impediments that IDOC must protect against and staff must make a showing that these common obstacles are not affecting its medication delivery.

To amplify one of these points, as previously reported, medication distribution times play a significant role in mentally ill offenders refusing their medications. The Midyear Report of November 30, 2019 reported that nine facilities were distributing medications at 4am and that an additional eight facilities were distributing medications at 5am. A recent review of medication distribution times reveals that for 4am, the number of facilities has dropped to five. For 5am, the number of facilities has dropped to four. This is very good improvement but the Department still has a long way to go. As I have discussed with the Chief of Psychiatry, almost all psychiatric medications can be administered once a day, preferably at bedtime. Also, the use of long-acting injectable medications would certainly free up staff time as these medications can be safely administered every two to four weeks. The Department has made good progress in addressing this critical issue, but not enough to warrant a rating of Substantial Compliance.

**(ii): Specific requirement:** The regular charting of medication efficacy and side effects, including both subjective side effects reported by the patient, such as agitation, sleeplessness, and suicidal ideation, and objective side effects, such as tardive dyskinesia [sic], high blood pressure, and liver function decline;

**Findings:** The monitoring team conducted a five-facility[36] tour which included reviewing the charts of 52 mentally ill offenders currently being prescribed psychotropic medications. Further reviews were cut short because of Covid-19 travel restrictions. The monitoring team found that 51 of 52 charts reviewed complied with this requirement.

**(iii): Specific requirement:** Adherence to standard protocols for ascertaining side effects, including client interviews, blood tests, blood pressure monitoring, and neurological evaluation.

**Findings:** The same chart review found 51 of 52 charts reviewed complied with this requirement.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results.

**Findings:** The same chart review found 47 of 51 charts reviewed complied with this requirement.

**(v): Specific requirement:** That offenders for whom psychotropic drugs are prescribed receive timely explanation from the prescribing psychiatrist about what the medication is expected to do, what alternative treatments are available, and what, in general, are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** The same chart review found 51 of 52 charts reviewed complied with this requirement.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** Finally, the same chart review found 51 of 52 charts contained evidence that the psychiatric practitioner reviewed the MAR and noted if the patient was compliant with his/her psychotropic medications. In this particular cohort, there were no cases of an MHP needing to get involved with medication noncompliance, so no information was available on which to assess key portions of this requirement.

---

[36] Pontiac, Stateville, NRC, Joliet and Dixon.

## XIII: OFFENDER ENFORCED MEDICATION

**Summary**: Staff continued to follow routine procedures but patterns of problems have begun to surface. Notices were occasionally incomplete or possibly not delivered. It was not clear how effectively staff assistants could help a patient represent his or her interests when different people served notice and appeared in the hearing. There was a growing number of witness requests, and records were not always clear about whether witness information was included and whether the basis for exclusion was appropriate.

IDOC does convene hearings with the required personnel who appear to routinely engage the patient, and the patient may speak on his or her own behalf. Staff creates a hearing record, though in almost half of cases, there are substantial questions about whether standards are met for emergency administration, decisions for enforced medication status, and denial of appeals during six-month reviews.

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

   a)  Administration of Psychotropic Medication

   1)  Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

   B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

   2)  Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was

administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2) The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating

to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the

written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** IDOC provided documentation showing 134 patients who newly became subject to enforced medication. The monitoring team reviewed a 32% accidental sample of those cases, drawn from 12 institutions.[37]

In nearly all cases, the facilities issued a written notice to the patient. There were a small number, however, where the institution did not substantiate that, and in three cases, the notice contained no rationale, so did not fulfill one of the essential purposes of notice.

---

[37] Logs were requested for all institutions with relevant patients from June 2019 through February 2020. Reviewed cases were drawn from Dixon, Elgin, Graham, Illinois River, Joliet, Lawrence, Logan, Pinckneyville, Pontiac, Stateville, Vienna, and Western Illinois.

Similarly, a staff assistant was always assigned, but in at least one-third of the cases, the person who served the notice was not the staff assistant in the hearing. This substantially limits the patient's ability to contest the enforcement, as several said they wished to do, as there was no indication that any staff member knew the patient's positions ahead, so as to be able to communicate them, nor helped the patient prepare. In one case, a staff assistant gave his or her own testimony about the patient's condition, which is inappropriate.

Because the monitoring team selected records from logs, it is a given that all of these proposed orders were given a hearing. It was not feasible to systematically determine whether any enforced medication took place absent a hearing, but the uniformity of records, language, and procedures would suggest that hearings are routine and exceptions would be unlikely.

The required mental health disciplines participated in each hearing and maintained a written hearing record. The patients almost always appeared and the exchanges captured in the hearing record indicate that patients have the opportunity to speak on their own behalf; in a few cases, the hearing record noted the patient refused the option to participate.

Witnesses were requested in about 16% of reviewed cases, and it was not clear that they were always handled appropriately. Stateville's records indicated nothing about whether the witnesses were interviewed and their evidence considered, or whether there was a decision to exclude them and on what basis; a Joliet record was also unclear about this, though staff confirmed to IDOC Legal Counsel that interviews were conducted and the content presented. Pontiac denied witnesses in two cases for irrelevance; the staff assistant reportedly interviewed both proposed witnesses and the content of the proffered testimony was described in only one of those cases, so the reason for the other irrelevance determination is unclear.

There continued to be problems with decisions reached to enforce medications when the facts stated in the record did not demonstrate that the standard – that the patient is gravely disabled or at substantial risk of inflicting serious harm to him- or herself or others – had been met. Only 54% clearly met the standard, based on the materials provided. This remained a significant concern. There were also a small number of appeals in the sample; the patients' requests to discontinue the status were denied. Given that a number of people remain in the status for years, and bases for denial were unclear in this current review, it was unclear on what basis any appeal might be successful, and therefore whether the right is genuinely upheld.

About 16% of the selected records involved emergency enforced medication instead of, or in addition to, longer-term decisions. They, too, raised questions about whether a risk of imminent serious harm existed in about half of the cases. For one patient, it appeared that an order for emergency administration was put in place for three consecutive periods of 72 hours. It is difficult to picture a genuine emergency existing for nine days.

The monitoring team has previously found 15 institutions to be in Substantial Compliance and the finding remains in place.

## XIV: HOUSING ASSIGNMENTS

> **Summary**: IDOC has been in Substantial Compliance with this requirement since the Midyear Report of November 22, 2017. The monitoring team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties.

**(XIV)(a): Specific requirements:** Cell assignments for SMI offenders shall be based on the recommendations of the appropriate security staff. However, notice shall be made to members of the SMI offender's mental health treatment team within twenty-four (24) hours of a new or changed cell assignment. It is expected that MHPs will monitor the location of each SMI offender on their caseload. IDOC will require MHPs to alert security staff of their concerns regarding SMI offender housing assignments and related contraindications. In all instances, an SMI offender's housing assignment shall serve both the security needs of the respective facility and the treatment needs of the offender.

**Findings:** Previously found to be in Substantial Compliance.

**(XIV)(b): Specific requirement:** For those offenders who have served fifteen (15) days or longer in Administrative Detention or Disciplinary Segregation, an MHP who is a member of the SMI offender's mental health treatment team shall be consulted regarding post-segregation housing recommendations pursuant to Section XVIII (a)(v)(F), *below*.

**Findings:** Previously found to be in Substantial Compliance.

**(XIV)(c): Specific requirement:** If security staff rejects a housing recommendation made by an MHP as to an SMI offender, the security staff representative shall state in writing the recommendation made by the MHP and the factual basis for rejection of the MHP recommendation.

**Findings:** Previously found to be in Substantial Compliance.

## XV: SEGREGATION

**Summary**: IDOC appropriately considers classification concerns and confers with mental health staff before double-celling mentally ill offenders. The ITPs that are continued provide little if any substantive treatment other than medications. The overall conditions of the segregated housing units are not meeting the standards called for in the Settlement. 48-hour reviews were only being completed at a rate of 76%. Treatment plans were only completed within the seven-day window at a rate of 62%. Rounds were only occurring at a rate of 76%. Out-of-cell time for mentally ill offenders in segregation for 16 days or more but less than 60 days was 5.31 hours of structured time received and 6.79 hours of unstructured time received per week. Out-of-cell time for mentally ill offenders in segregation for 60 days or more was 5.48 hours of structured time received and 4.04 hour of unstructured time received per week.

As reported in the most recent quarterly report, IDOC has made great progress in reducing the amount of segregation time for SMI offenders. I am also aware that IDOC has a pilot program involving keeping mentally ill offenders in segregation for no more than 29 days. As Monitor, I have not been kept up to date about this program. Based on my 34 years of experience and training as a correctional psychiatrist and the current psychiatric literature, it is my informed opinion that any amount of time spent in segregation by mentally ill offenders is detrimental to their mental health. If IDOC desires to place mentally ill offenders in segregated housing, then they must fulfill all of the requirements of the Settlement to minimize the unnecessary harm inflicted upon this cohort.

**XV(a)(i): Specific requirement:** Prior to housing two offenders in a cell, the respective Lieutenant or above shall comply with Administrative Directive 05.03.107 which requires an offender review that shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues; and significant negative life changes, such as additional time to serve, loss of spouse or children, etc. The respective security staff shall consult with the mentally ill offender's treatment team regarding the appropriateness of such placement in accordance with Section XVII of this Settlement Agreement.

Of note, AD 05.03.107 provides: The Chief Administrative Officer of each facility with segregation and protective custody units designed to double cell offenders shall develop a written policy that includes, but is not limited to, the following for routine segregation and protective custody placement:

- Segregation placement
- PC placement
- Documentation
- Review of documentation and final determination
- Compatibility contraindications

- Review with other inmates
- Upon determination to double-cell:
  - Documentation
  - Suitability review following placement
  - Documentation upon release
- Documentation and Reassessment for disciplinary report

**Findings:** IDOC continues to meet the requirements of this subsection. A rating of Substantial Compliance will be assigned.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** As reported on page 50 of the Midyear Report[38] of November 30, 2019, "The segregated housing units do not consistently meet this requirement. This is especially true of the segregated housing units at Pontiac, Menard and the X-House at Dixon. A consistent theme from the mentally ill offenders with whom I have spoken over the life of the Settlement Agreement, includes but is not limited to, is that the cells in the segregated housing units are filthy, often soiled by blood and feces. Cleaning supplies are in short supply as are hygiene items such as soap. In addition, it has been brought to my attention that clean bedding, lighting, adequate heating and ventilation as well as property, commissary, food, exercise and mail are problems for mentally ill offenders assigned to segregated housing. It remains the opinion of the Monitor that if the Department chooses to house mentally ill offenders in segregated housing units, then it must fully live up to these requirements."

Since November 30, 2019, the Monitor has been able to conduct site visits of Dixon, Stateville, NRC, Pontiac and Joliet, including the segregated housing units. Nothing from these more recent visits changes my opinion expressed in the Midyear Report. IDOC is Noncompliant with XV(a)(ii).

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services

---

[38] This report covered the period of June 1- November 30, 2019.

required by their ITP.

**Findings**: The first question in evaluating IDOC's response to this particular requirement is "do all the mentally ill offenders assigned to segregated housing have a current and/or updated treatment plan?" The treatment plan backlog is able to partially answer this question. The following are treatment plan backlogs from May 31, 2019 through March 13, 2020:

- 5/31/19    470 Department wide    Pontiac-87    Pinckneyville-51    Illinois River-122
- 6/28/19    463 Department wide    Pontiac-67    Pinckneyville -50    Illinois River -88
- 7/26/19    483 Department wide    Pontiac-78    Pinckneyville -23    Illinois River -94
- 8/30/19    528 Department wide    Pontiac-79    Pinckneyville -35    Illinois River -73
- 9/27/19    500 Department wide    Pontiac-56    Pinckneyville -62    Illinois River -47
- 10/25/19    525 Department wide    Pontiac-46    Pinckneyville -78    Illinois River -43
- 11/22/19    523 Department wide    Pontiac-8    Pinckneyville -82    Illinois River -57
- 12/20/19    609 Department wide    Pontiac-5    Pinckneyville -79    Illinois River -59
- 1/24/20    679 Department wide    Pontiac-8    Pinckneyville -75    Illinois River -53
- 2/28/20    648 Department wide    Pontiac-20    Pinckneyville -55    Illinois River -18
- 3/13/20    649 Department wide    Pontiac-7    Pinckneyville -71    Illinois River -26

Again, as previously reported on page 51 of the Midyear Report of November 30, 2019 "The Department does not report which of these backlogged treatment plans are for those mentally ill offenders assigned to segregated housing. So, it is impossible to accurately state how much of this backlog refers to segregated housing. As Monitor, it is my opinion that at least a portion of this backlog does involve mentally ill offenders assigned to segregated housing. This is especially true at Pontiac. Dr. Renzi informed the Monitoring Team that due to staffing shortages, she is not able to review or update the treatment plans for mentally ill offenders assigned to segregation. In addition, all mentally ill offenders assigned to outpatient segregation have the same treatment plan. That is, they all receive, per week: two movie groups, one weekly clinical group, an individual session every 30-60 days and medications as indicated.

The Monitor is of the opinion that some treatment occurs for those mentally ill offenders assigned to segregated housing for those that have a treatment plan. This treatment is very non-specific, generic and inadequate to address the serious mental health needs of this patient cohort." Overall, the generally inadequate treatment plans may be continued while a mentally ill offender is assigned to segregated housing.

As reported above in XV(a)(ii), the Monitor has conducted five site visits since November 30, 2019. Nothing from these more recent visits changes the opinions expressed in the Midyear Report. IDOC is Noncompliant with the provisions of XV(a)(iii).

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** The monitoring team analyzed 632 placements in restrictive housing for the presence of an MHP review; 72% of provided records clearly demonstrated a timely contact and 2% were completed in a reasonable time thereafter.[39] Another 9% were completed unreasonably late, up to 2 weeks after placement, and for 16%, provided documents did not demonstrate that a review was completed.

After the Midyear Report, Defendants undertook an analysis of the monitoring team's data reported therein and took issue on several bases. The monitoring team's analysis, above, is adjusted for cases that Defendants correctly identified should not be included, were duplicates, or had a calculation error.

Defendants also argue that, where patients are placed in segregation status but moved to crisis watch within 48 hours, the Monitor should consider the requirement satisfied by the crisis watch contacts that take place. The Monitor declines to adopt this interpretation, which is contrary to the central purpose of the requirement. National data has long shown that one of the most vulnerable times for prisoner suicide is in the first days of segregation placement; the purpose of the requirement is to address that risk and to gauge how the patients are adjusting to *segregation conditions*. In the scenario the Defendants cite, then, the monitoring team considers the requirement to be triggered only upon the prisoner's crisis watch discharge and return to restrictive housing, and the team counts as timely all cases in which there is a documented review within two days thereafter.

Even with the adjustments the team did adopt, the provided documents showed markedly lower performance in June than in the subsequent months analyzed; October and January performance was more consistent with that seen at the end of Year 3, suggesting that the June information may have been an anomaly.

Shawnee and Stateville now join the institutions found in Substantial Compliance, bringing the total to 19.[40] Earlier in this monitoring year, it appeared that Joliet had reached that level, but its performance has not been sustained, so it will be considered among the noncompliant institutions. While not yet reaching substantial compliance, Western Illinois greatly improved since the Midyear Report.

---

[39]  For this analysis, IDOC provides records of mental health caseload patients placed in control units. Where an institution has few placements, IDOC provides all cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. During this monitoring period, the team reviewed all documents provided for June, October, and January, a total of 632 placements drawn from all 26 institutions that placed mentally ill patients in control units in those months.

[40]  Institutions substantially compliant for this requirement are Big Muddy River, Centralia, Danville, Decatur, East Moline, Elgin, Kewanee, Jacksonville, Lincoln, Logan, Murphysboro, Robinson, Shawnee, Sheridan, Southwestern, Stateville proper and NRC, Taylorville, Vandalia, and Vienna.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter monthly or more frequently if clinically indicated.

**Findings:** Page 19 of IDOC's Quarterly Report of April 23, 2020 states "These provisions have been implemented although, due to staffing issues, are not occurring at all required times." I strongly concur with this statement. A review of 74 charts of mentally ill offenders assigned to segregated housing conducted for the Midyear Report of November 30, 2019 found that only 62% had treatment plans reviewed and updated within of seven (7) days of being assigned to segregated housing.

The Monitoring Team is extremely pleased that parties agreed on changing the 30-day treatment plan update requirement to a 90-day schedule.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Supportive counseling by an MHP as indicated in the ITP
E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

A) *Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* Please refer to XV(a)(iii), above, for a discussion of the problems associated with the continuation of the ITP in Segregation. Also, the Monitoring Team completed site visits for six facilities[41] between December 23, 2019 and February 20, 2020. Problems in meeting this requirement were noted in four of the six facilities, with Big Muddy River and Pontiac performing the best out of this cohort.

---

[41] Pinckneyville, Menard, Graham, Dixon, Big Muddy River, Pontiac

B) *Rounds*: The following is an excerpt from the Midyear Report of November 30, 2019, "The Quarterly Report of October 23, 2019 states 'Each facility is fully compliant with this requirement.' The data obtained from a seven-facility[42] chart review refutes this claim. Only 45 of 64 (70%) charts reviewed demonstrated compliance with this requirement. The Monitoring Team's data to support this finding is as follows:

- Menard: 3 of 3 charts reviewed demonstrated that rounds were inconsistently documented. That is, at least one month missing for each of the reviewed offenders.
- Lincoln: One month of rounds was missing in the charts of two offenders.
- Lawrence: Rounds were the main area of inconsistent findings for this segregation sample.
- Shawnee: Rounds were missing from 2 of the charts reviewed."

Data from the six-facility site visit referenced in *(A)*, above, confirms the findings from the Midyear Report. Of the 46 charts reviewed, only 35 documented weekly rounds for all weeks of the offenders' period in segregation. This equates to a 76% completion rate. This represents a slight improvement during the reporting period but the Department still has a long way to go to achieve Substantial Compliance.

C) *Pharmacological treatment*: Pharmacologic treatment does occur when mentally ill offenders are placed into segregation.

D) *Supportive counseling by an MHP as indicated in the ITP*: Not much has changed with this requirement since the Midyear Report of November 30, 2019. That is, the Monitoring Team found evidence that some supportive counseling was occurring. When it does occur, the sessions last between 15 and 30 minutes at a frequency of every 30 to 60 days.

E) *Participation in multidisciplinary team meetings once teams have been established:* The Department continues to improve in this regard as the Monitoring Team encounters more examples of this occurring.

F) *MHP or mental health treatment team recommendation for post-segregation housing:* This is occurring throughout the Department.

G) *Documentation of clinical contacts in the medical record:* There is no absolute way for the Monitoring Team to measure whether this is occurring for all contacts. After reviewing hundreds of medical records over the course of the Settlement and finding many documented contacts in segregation, I feel that this requirement is being met.

---

[42] Menard, Centralia, Illinois River, Lincoln, Lawrence, Shawnee and Western.

H) *Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* A comprehensive analysis of out-of-cell time offered to this particular cohort of mentally ill offenders was conducted for the months of October 2019 and January 2020. The data was analyzed for mentally ill offenders in segregated housing for <60 days. The results follow:

October 2019 unstructured out-of-cell time:  offered    10.55 hours per week
                                              received   6.79 hours per week

January 2020 unstructured out-of-cell time:   offered    8.94 hours per week
                                              received   5.31 hours per week

The hours received fail to meet the 10 hours per week out-of-cell minimum which is the usual standard applied to cohorts like this.

**XV(a)(vi):[43] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c) *below.[44]*

**Findings:** The Settlement requires that mentally ill offenders assigned to segregated housing shall receive 10 hours each of structured and unstructured out-of-cell time per week. The Monitoring Team conducted a comprehensive analysis of out-of-cell time for this cohort for the months of October 2019 and January 2020. The results follow:

- October 2019:                                offered        received
  - Structured out-of-cell time                8.45           2.79
  - Unstructured out-of-cell time              10.03          6.21

- January 2020:
  - Structured out-of-cell time                8.87           5.48
  - Unstructured out-of-cell time              10.93          4.04

These numbers fall short of meeting the requirements of this subsection.

**XV(a)(vii): Specific requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Administrative Detention or Disciplinary Segregation requires relocation to either a crisis cell or higher level of care, the MHP's recommendations shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the mentally ill offender shall be placed in an appropriate mental health setting (*i.e.*, Crisis Bed or elevated level

---

[43] This numbering from the Settlement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement.
[44] Note: this refers to the second occurrence of a subsection (c), on page 20 of the Settlement

of care) as recommended by the MHP[45] unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** The Department is meeting this requirement.

**XV(b)** As to SMI offenders in Disciplinary Segregation:

**XV(b)(i): Specific requirements:** IDOC will organize Review Committees ('Committees') to review the segregation terms of all SMI offenders in segregation with at least 60 days of remaining segregation time as of the approval date of this Settlement Agreement. These Committees will be comprised of attorneys, security professionals, and MHPs.

**Findings:** The Department is in Substantial Compliance with this requirement.

**XV(b)(ii): Specific requirements:** The Committees shall eliminate any and all 300 and 400 level tickets and the accompanying segregation time from each SMI offender's disciplinary record.

**Findings:** The Department is in Substantial Compliance with this requirement.

**XV(b)(iii): Specific requirements:** With regard to all remaining tickets, the Committees shall examine: (1) the seriousness of the offenses; (2) the safety and security of the facility or any person (including the offender at issue); (3) the offender's behavioral, medical, mental health and disciplinary history; (4) reports and recommendations concerning the offender; (5) the offender's current mental health; and (6) other legitimate penological interests.

**Findings:** The Department is in Substantial Compliance with this requirement.

**XV(b)(iv): Specific requirements:** The committees shall have the authority to recommend to the Chief Administrative Officer that an SMI offender's remaining segregation time be reduced or eliminated altogether based on the factors outlined in XV(b)(iii).

**Findings:** The Department is in Substantial Compliance with this requirement.

**XV(b)(v): Specific requirements:** The decision for reduction or elimination of an SMI offender's segregation term (excluding the elimination and reductions relative to 300 and 400 level tickets) ultimately rests with the CAO who, absent overriding concerns documented in writing, shall adopt the Committees' recommendations to reduce or eliminate an SMI offender's segregation term.

**Findings:** The Department is in Substantial Compliance with this requirement.

---

[45] IDOC's compliance with the portion of this provision regarding MHP recommendations for placement into crisis care is discussed elsewhere this report.

**XV(b)(vi): Specific requirements:** These reviews shall be completed within nine (9) months after approval of the Settlement Agreement.

**Findings:** The Department is in Substantial Compliance with this requirement.

**XV(c)** Mentally ill offenders in Investigative Status/Temporary Confinement:

**XV(c)(i): Specific requirements:** With regard to offenders in Investigatory Status/ Temporary Confinement, IDOC shall comply with the procedures outlined in 20 Ill. Admin. Code § 504 and Administrative Directive 05.12.103.

20 Illinois Administrative Code Section 504 Subpart D: Segregation, Investigative Confinement and Administrative Detention—Adult provides:

Applicability, definitions, and responsibilities for IDOC staff regarding placement of offenders in segregation status; segregation standards for offenders placed into segregation, investigative confinement, administrative detention; and standards for recreation for offenders in segregation status.

AD 05.12.103 provides:

II (G): Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

II (H): Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was

issued.

(2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

(1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary

action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** Please refer to section XXV(a) for a discussion of this requirement.

II (I): Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** Please refer to section XXV(a) for a discussion on this requirement.

**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** Please see section XV(a)(iv), above, for a discussion on this requirement.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
**8)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** Please see the first XV(a)(vi) listed, above, for a discussion about this requirement.

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (c), *below.*[46]

**Findings:** Please see the second XV(a)(vi) listed, above, for a discussion about this requirement.

**XV(c)(v): Specific Requirement:** If, at any time, it is determined by an MHP that a mentally ill offender in Investigatory Status/Temporary Confinement requires relocation to either a crisis cell or higher level of care, the MHP's recommendation shall be immediately transmitted to the CAO or, in his or her absence, a facility Assistant CAO, and the SMI offender shall be placed in an appropriate mental health setting (*i.e.,* Crisis Bed or elevated level of care) as recommended by the MHP unless the CAO or Assistant CAO specifies in writing why security concerns are of sufficient magnitude to overrule the MHP's professional judgment. In such cases, the offender will remain in segregation status regardless of his or her physical location.

**Findings:** The Department is in Substantial Compliance with this requirement.

---

[46] Note: this refers to the second occurrence of a subsection (c), on pages 19 and 20 of the Settlement.

**XV(c)[47]: Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

    i.    For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

    ii.    For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

    iii.    For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

    iv.    For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:** Please see the second XV(a)(vi) above, for a discussion of this requirement.

**Structured out-of-cell time & unstructured out-of-cell time:** Please see the second XV(a)(vi), above, for a discussion of this requirement.

**The 60-day requirement:** The Department is not meeting this "60-day" requirement.

**Segregation-like settings:** As I have previously reported, all offenders housed in reception centers, especially those who are mentally ill, need much more out-of-cell time than they are currently receiving.

**XV(d): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: This date, May 22, 2020, has passed, so the Department is in Noncompliance with XV(d).

---

[47]  As above, this appears mislabeled in the Settlement but is carried forward here.

## XVI: SUICIDE PREVENTION

**Summary:** As reported previously, crisis teams have been formed and trained and crisis intervention data is being tracked in the CQI system. Each facility has a designated crisis area. Due to the great demand for crisis care beds, patients are sometimes found outside of these designated areas. Each facility has an Institutional Directive regarding crisis care. Of note, there continues to be an issue of custody staff acting as gatekeepers to the Crisis Intervention Team.

Four completed suicides occurred during the monitoring period. Administrative Reviews and Psychological Autopsies were completed in a timely manner. There was also evidence that the lessons learned from these tragedies were being disseminated throughout the Department.

**(XVI)(a): Specific requirements:** IDOC shall comply with its policies and procedures for identifying and responding to suicidal offenders as set out in Administrative Directive 04.04.102 and the section titled "Identification, Treatment, and Supervision of Suicidal Offenders" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). IDOC shall also ensure that Forms 0379 ("Evaluation of Suicide Potential"); 0377 ("Crisis Watch Record"); and 0378 ("Crisis Watch Observation Log") are used in conjunction with these policies and procedures.

The section titled "Identification, Treatment and Supervision of Suicidal Offenders" from the IDOC Mental Health SOP Manual[48] provides general guidelines for the handling of suicidal offenders. AD 04.04.102, however, provides a number of specific requirements:

II (F) Requirements: The Chief Administrative Officer of each facility shall:
 1) Establish a Crisis Intervention Team.
 a. The Crisis Intervention Team shall consist of: (1) A Crisis Intervention Team Leader who shall be an MHP; (2) All facility MHPs and nursing staff; and (3) At least one member of the facility's security staff of the rank of Lieutenant or above. **NOTE:** Other Crisis Intervention Team members may be chosen from facility staff upon the recommendation of the Team Leader to ensure at least one member is on site at all times.
 b. Prior to serving, all members of the Crisis Intervention Team shall receive training in accordance with Paragraph II.g.1. Crisis Intervention Team Members on leave of absence shall be required to make up missed training upon return and prior to resuming service on the Crisis Intervention Team.
 c. All Crisis Intervention Team Members shall participate in quality assurance meetings no less than once per quarter.
         (1)     Meetings shall be held to: (a) Review all events involving offender suicide during the previous quarter; (b) Review the Facility's Prevention and Intervention Plan in accordance with Paragraph II.G;

---

[48] The Settlement references "Mental Health Protocol Manual." IDOC has changed the name of this manual to "Mental Health SOP Manual."

and (c) Assess the adequacy of the facility's training program in relation to the facility's needs

(2)     Meetings shall be documented in writing and shall: (a) Include the date and minutes of the meeting, a list of all persons in attendance and any recommendations or issues noted; (b) Be submitted to the Chief Administrative Officer, the respective Regional Psychological Administrator and the Chief of Mental Health

**Findings:** As had been previously reported, the requirements of Administrative Directive 04.04.102, effective 11/1/17, are being met. That is, Crisis Teams have been formed and trained. Crisis Intervention data is tracked in the CQI system.

2) Designate a Crisis Care Area.
   a. Crisis care areas shall be used to house offenders determined by an MHP to require removal from his or her current housing assignment for the purpose of mental health treatment or observation.
   b. Excluding exigent circumstances as determined by the Director or a Deputy director, segregation units shall only be utilized for crisis care areas if no other crisis care areas are available, and only until alternative crisis care areas are available.
   c. Cells designated as crisis care areas shall:  Allow for visual and auditory observation of the entire cell;  Allow for prompt staff access;  Control outside stimuli;  Contain beds that are suicide resistant and constructed of a metal base, cinder block, concrete slab or herculite material;  Contain a pass through or chuck holes that open out of the cell; Contain mesh coverings over all vents;  Contain laminated glass over all windows or be safely and security glazed windows;  and   Be made appropriately suicide resistant and provide adequate lighting and temperature.

**Findings:** Each facility has a designated crisis area. As previously reported, over the course of the Settlement implementation, the Monitoring Team has inspected the crisis cells throughout all of the Department's facilities and found them to have all the required features. For a discussion of crisis beds in control units, please see Section X(f), above.

II (G): Prevention and Intervention Plan

The Chief Administrative Officer, in consultation with the facility's mental health authority, shall establish a written procedure for responding to, and providing emergency mental health services, including prevention and intervention of emergency mental health situations. The procedure shall be reviewed annually and shall be approved by the Chief of Mental Health and shall include, at a minimum, provisions for the following: training, referrals for emergency mental health situations, crisis intervention team response, crisis watch, response to self-inflicted injuries and suicide, and quality improvement reviews.

**Findings:** As previously reported, IDOC has provided Institutional Directives for all institutions capturing the key provisions of the crisis intervention policy. The Monitoring Team has reviewed each Institutional Directive and found they are consistent with the Department's

Administrative Directives 04.04100, 04.04101 & 04.04102. The Monitoring Team will not be reviewing this requirement in future reports unless requested by the Court and/or the parties.

1) Training

The Chief of Mental Health, in consultation with the Office of Staff Development and Training shall establish standardized training programs that provide information on emergency mental health services. All training shall be provided by an MHP, or in the absence of the MHP, a current crisis team member and, where appropriate, shall include enhanced content specific to the facility.

a.      Level I Training shall be required as part of annual cycle training for all staff that have regular interaction with offenders, and shall include a minimum of one hour of the following:  (1) Elements of the facility's Prevention and Intervention Plan; (2) Demographic and cultural parameters of suicidal behavior in a correctional setting, including incidence and variations in precipitating factors; (3) Risk factors and behavioral indicators of suicidal behavior; (4) Understanding, identifying, managing and referring suicidal offenders, including the importance of communication between staff; (5) Procedural response and follow-up procedures including crisis treatment supervision levels and housing observation; and (6) Documentation requirements.

b. Level II Training shall be required as part of annual cycle training for all personnel identified in the facility's Prevention and Intervention Plan as having the authority to initiate a crisis watch. Level II training shall consist of a minimum of four hours of in-depth didactic and experiential training in assessing suicide risk and procedures for initiating a crisis watch.

c. Level III Training shall be required for all Crisis Intervention Team members, excluding MHPs, and shall consist of 24 hours of advanced training in the philosophy of suicide prevention and continuous quality improvement of the facility's Prevention and Intervention Plan.

> (1) Crisis Intervention Team members shall also be trained by an MHP, designated by the Chief of Mental Health, in consultation with the Office of Staff Development and Training. This training will give the Crisis Intervention Team member the ability to instruct on the standardized training curriculum that provides information on emergency mental health services during cycle training, in the absence of the MHP.  (2) Training shall be completed prior to active service with the Crisis Intervention Team.

d. Clinical Continuing Education shall be required for all Crisis Intervention Team members and shall consist of a minimum of one hour per quarter of training to assist Crisis Intervention Team members in monitoring facility policy and procedure and in reviewing suicide attempts or completions.  Clinical Continuing Education Training may be obtained through participation in the quarterly Crisis Intervention Team quality assurance meeting.

**Findings:** IDOC is in Substantial Compliance with this requirement.

2) Referrals for Emergency Mental Health Situations: Staff shall immediately notify the Crisis Intervention Team, through his or her chain of command, of any situation whereby an offender exhibits behavior indicative of mental or emotional distress, imminent risk for harm to self or an attempted suicide.

**Findings:** As previously reported, this remains a troublesome issue for the Department that requires a multifaceted approach to solve. Please see V(g) for more details on this issue.

3) Crisis Intervention Team Response

a. At least one Crisis Team member shall be on site at all times. The designated Crisis Intervention Team Leader shall be available by phone when not on site.

b. The Chief of Mental Health and the respective Regional Psychological Administrator shall be notified within 24 hours of the suicide of an offender, and within 72 hours of any attempted suicide.

c. Upon notice of a potential crisis situation, a Crisis Intervention Team member shall: (1) Implement necessary means to prevent escalation and to stabilize the situation. (2) Ensure that the offender is properly monitored for safety. (3) Review the situation with the Crisis Team Leader or and MHP to determine what services or referrals shall be provided. If the Crisis Intervention Team Leader is not on grounds and cannot be reached by telephone, and there are no MHPs on grounds, the Crisis Team member shall contact an alternative MHP and the review may be completed via telephone. (4) Initiate a crisis care treatment plan to monitor and facilitate the delivery of services, including referrals for mental or medical examination, and any additional recommendations of the MHP. The crisis care treatment plan shall be documented on the Crisis Watch Log, DOC 0377. Referrals for additional examination or services following the offender's release from a crisis care treatment level of care shall be documented on a DOC 0377. (5) If determined that the offender does not need to be placed in the crisis care area, notify the Shift Commander of any additional care requirements for security staff.

**Findings:** As previously reported, when called, the response of the Crisis Intervention Team is generally timely. Please see V(g) for a discussion of problems associated with the timely notification of the Crisis Intervention Team.

4) Crisis Watch

a. A crisis watch shall be initiated when: (1) An offender exhibits behavior that is likely to cause harm to him or herself. (2) Mental health issues render an offender unable to care for him or herself. (3) Gestures, threats or attempts of suicide are made. (4) The Evaluation for Suicide Potential, DOC 0379, if administered, indicates need. (5) Less restrictive measures have failed or are determined to be clinically ineffective.

**Findings:** This requirement has been met throughout the life of the Settlement Agreement.

b. Determination to initiate a crisis watch shall be made by an MHP. If an MHP is not available, the following individuals, in order of priority, may initiate a crisis watch: (1) Respective Regional Psychologist Administrator, (2) Any Regional Psychologist Administrator, (3) Chief of Psychiatry, (4) Chief of Mental Health Services, (5) Chief Administrative Officer in consultation with a Crisis Intervention Team Leader, (6) Back-up Duty Administrative Officer in consultation with a Crisis Intervention Team Member

c. Offenders in crisis watch shall not be transferred to another facility unless clinically indicated and approved by the Chief of Mental Health or in the absence of the Chief of Mental Health, the Chief of Psychiatry.

d. Upon initiation of a crisis watch, an MHP shall determine: (1) The appropriate level of supervision necessary in accordance with Paragraph II.E.; and (2) Allowable property, including the type and amount of clothing.

e. Unless medically contraindicated: (1) Water shall be available in the cell or offered at regular intervals. When water is not available in the cell, the offers shall be documented on the DOC 0377. (2) Meals not requiring utensils shall be provided in the cell or crisis care area. If contraindicated, alternative nutrition sources shall be provided.

f. The offender's vital signs shall be taken by health care staff within 24 hours of placement on crisis watch, or sooner if the offender has been placed in restraints for mental health purposes.

g. Prior to placement in a designated crisis care area, the offender shall be strip-searched and the cell inspected for safety.

h. Offenders shall be monitored at appropriate intervals, dependent upon level of supervision. All observations shall be documented within the appropriate staggered intervals, on the Crisis Watch Observation Log, DOC 0378, and shall include staff's observation of the offender's behavior and speech, as appropriate.

i. The offender shall be evaluated by an MHP, or in his or her absence, a Crisis Intervention Team member, in consultation with the Crisis Team Leader, at least once every 24 hours. The evaluation shall assess the offender's current mental health status and response to treatment efforts. The evaluation shall be documented on the DOC 0377.

j. An offender's crisis watch shall only be terminated by an MHP following the completion of an evaluation assessing the offender's current mental health status and the offender's response to treatment efforts. The evaluation shall be documented in the offender's medical record and the termination of the crisis watch shall be documented on the DOC 0377.

**Findings:** The Department is meeting the requirements of this subsection.

5) Response to Self-Inflicted Injury and Suicides

a. Responses to medical emergencies shall be in accordance with AD 04.03.108 and shall include immediate notification of an MHP.

b. In the event of attempted suicide, the preservation of the offender's life shall take precedence over preservation of the crime scene; however, any delay in response due to security factors shall be noted in the Incident Report, DOC 0434.

**Findings:** The Department is meeting the requirements of this subsection.

6) Quality Improvement Reviews
a. Mortality Review: In the event of an offender's suicide, the Chief of Mental Health shall designate an MHP to complete a psychological autopsy. The psychological autopsy shall be documented on the Psychological Autopsy, DOC 0375, and shall be submitted to the Chief of mental Health within seven working days of assignment.

b. Administrative Review
    (1) In the event of an offender's suicide, the Chief Administrative Officer shall:
    (a) Establish a clinical review team who shall systemically analyze the event. The Review Team shall consist of: i. Mental health and medical staff, including an MHP, a psychiatrist and a registered or licensed practical nurse. Medical staff chosen for the clinical review team shall have no direct involvement in the treatment of the offender for a minimum of 12 months prior to the event.   ii. A security staff supervisor. **NOTE:** Facility administrators or staff, whose performance or responsibilities maybe directly involved in the circumstances of the suicide, shall not be chosen for the review team.
    (b) Designate a clinical review team Chairman who shall ensure all relevant documentation pertaining to the offender and his or her treatment including, but not limited to, the master file, medical record, Medical Director's death summary and the DOC 0375, if applicable, is available to the clinical review team.
    (2) Within ten working days following the suicide, the clinical review team shall complete a review to:
    (a) Ensure appropriate precautions were implemented and Department and local procedures were followed; and
    (b) Determine if there were any personal, social or medical circumstances that may have contributed to the event, or if there were unrealized patterns of behavior or systems that may have indicated earlier risk.
    (3) Upon completion of the review, the Chairperson shall submit a written report to the Chief Administrative Officer, the facility's Training Coordinator, the Chief of Mental Health and the respective Deputy Director summarizing the review team's findings and providing any recommended changes or improvements.

**Findings:** During the current reporting period, four completed suicides occurred within the Department:
- October 18, 2019 at Menard

- November 30, 2019 at Danville
- December 25, 2019 at Hill
- January 26, 2020 at Lawrence

In all of these cases, a psychological autopsy and an administrative review were completed in a timely manner. Also, I was provided the minutes of the Mental Health Quality Oversight Committee meetings of December 10, 2019 and March 10, 2020. These meeting minutes documented that these suicides were discussed per AD 04.04.102. The Department is in Substantial Compliance with this requirement.

**(XVI)(b): Specific requirements:** IDOC shall ensure that the policies, procedures, and record-keeping requirements identified in (a), *above*, are implemented and followed in each adult correctional facility no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** As previously reported and confirmed in this report, the Department continues to fall short of its responsibilities for (XVI)(b).

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary:** A review of the use of restraints indicated that the time a mentally ill offender stays in restraints greatly exceeds community standards. Also, placing a mentally ill offender in restraints should be accompanied by an emergency medication evaluation. The use of emergency psychotropic medications is clinically indicated in all cases where the mental health staff is considering the use of restraints. Often, the judicious use of psychotropic medications can remove the need for a mentally ill offender from having to go into restraints. The Department needs to aggressively address this issue before an overall rating of Substantial Compliance can be applied to this requirement.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1. Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

     a.    Under no circumstances shall restraints be used as a disciplinary measure.

     b.    Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately make contact with the psychiatrist within one hour of the offender being placed into restraints and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall make contact with the physician or the licensed clinical psychologist.

2.    Crisis treatment shall be initiated in accordance with AD 04.04.102.

     a.    The initial order for the use of restraints shall not exceed four hours.

     b.    Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

     c.    If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1.    Only a psychiatrist who has conducted a face to face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face to face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2.    If a psychiatrist, physician or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3.    The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face to face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4.    Orders for restraints shall be documented on the Order for Use of Restraints for

Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b.      The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g. the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1.   Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2.   Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3.   Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4.   Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychologist.

5.   The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6.   Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7.   Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8.   Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be

utilized, justification of the care shall be documented in the offender's medical chart.

9.  Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10.  All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings:** The monitoring team reviewed logs reportedly capturing all uses of restraints for mental health purposes during the monitoring period.[49] The practice is confined to nine institutions, four of which used restraints very minimally. Data was analyzed for 115 patients subject to 372 uses of restraints.[50]

The length of time spent in restraints was of particular concern, The Administrative Directive requires that the first order be limited to four hours for good reason: restraints use is highly intrusive and an emergency medication evaluation and proper medication intervention can often prevent or greatly reduce the amount of time a patient spends in restraints. Yet during the monitoring period, 65% of the uses were extended beyond the initial order. Logan routinely released patients by the four-hour mark, and sometimes in as little as an hour, but the other institutions frequently renewed and greatly extended the orders.

Almost one-quarter of the uses lasted longer than 1 day and as much as 9 days. There is no clinical justification to keep a mentally ill offender in restraints for several days. It was also not uncommon for staff to place the same patient in restraints for long periods close in time in a serial fashion, compounding the unreasonable restraints two to seven times. Thus, at least 94 restraints were facially problematic.

Fortunately, the concerning practices are confined to a minority of institutions. Previously, many institutions were found in Substantial Compliance because of good practices or a sustained record of not employing restraints at all. In this monitoring period, Danville, Graham, Illinois River, Murphysboro, Pinckneyville, and Sheridan will join the list, bringing the total to 20 in Substantial Compliance.[51]

**(XVII)(b): Specific requirement:** IDOC will continue to comply with 20 Ill. Admin. Code §§ 501.30, 501.40 and 501.60, and Administrative Directive 05.01.126. The Administrative Code sections are titled Section 501.30: Resort to Force; Section 501.40: Justifiable Use of Force; and Section 501.60: General Use of Chemical Agents.

IDOC AD 05.01.126 provides for:

II (F): The Chief Administrative Officer shall ensure a written procedure for the use and control of security restraints is established. The written procedure shall provide for the following:

---

[49] Logs were requested for all uses from June 2019 through February 2020.

[50] It appears there were another 11 events but the data provided was incomplete.

[51] Those in Substantial Compliance are: Big Muddy River, Centralia, Danville, Decatur, East Moline, Graham, Hill, Illinois River, Jacksonville, Kewanee, Lincoln, Murphysboro, Pinckneyville, Robinson, Sheridan, Southwestern, Taylorville, Vandalia, Vienna, and Western Illinois.

Use of Security Restraints

(1)     Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints shall be used: (a) To prevent an offender from escaping. (b) To retake an offender who has escaped. (c) To prevent or suppress violence by an offender against another person or property. (d) When transporting an offender outside the facility for the purposes of transfers, writs, etc., except when transporting offenders to assigned work details outside the facility, pregnant offenders for the purposes of delivery, or offenders assigned to the Moms and Babies Program on approved day release while transporting a minor child. (e) When transporting a transitional security offender for other than job related or programmatic activities directly related to successful completion of the transition center program.

(2)     Except as otherwise provided in AD 05.03.130 regarding pregnant offenders, security restraints may be used: (a) When moving an offender who is in disciplinary segregation or who is in segregation pending investigation within the facility; or (b) Whenever the Chief Administrative Officer deems it is necessary in order to ensure security within the facility or within the community.

(3)     Offenders on funeral or critical illness furlough shall be restrained in accordance with AD 05.03.127.

Inventory and Control

(a) A written master inventory of all security restraints, dated and signed by the Chief Administrative Officer, shall be maintained.

(b) All security restraints that have not been issued to staff shall be stored and maintained in a secure area or areas that are not accessible to offenders.

(c) A log documenting issuance and return of security restraints shall be maintained in a secure area or areas. The log shall include: (1)   Date and time issued; (2)   Receiving employees name; (3)        Issuing employees name; (4)  Date and time returned; and (5) Name of employee receiving the returned restraints.

(d) A written report shall be filed on lost, broken, or malfunctioning security restraints. The report shall be reviewed by the Chief of Security and maintained on file with the security restraints inventory records for no less than one year.

**Findings:** IDOC is fulfilling the requirements of this subsection.

**(XVII)(c):  Specific requirement:** Physical restraints shall never be used to punish offenders on the mental health caseload.

**Findings:** The monitoring team has not encountered any indication of restraints being used as punishment.

**(XVII)(d): Specific requirement:** The provisions of this Section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** This deadline has not been met.


## XVIII: MEDICAL RECORDS

**Summary**: IDOC is in Substantial Compliance with the provisions requiring the use of standardized forms and the transfer of records. This Substantial Compliance does not cover the quality of the medical records. Also, during the monitoring period, Dr. Kapoor reported a serious filing backlog at Joliet.

**(XVIII)(a): Specific requirement:** In recognition of the importance of adequate records to treatment and continuity of care, no later than sixty (60) days after the approval of this Settlement Agreement, IDOC shall fully implement the use of the standardized forms it has developed to record offender mental health information and to constitute an offender's mental health file, including IDOC Forms 0372 (Mental Health Screening); 0374 (Mental Health Evaluation); 0284 (Mental Health Treatment Plan); 0282 (Mental Health Progress Note); 0387 (Mental Health Services Referral); 0380 (Mental Health Segregation Rounds); 0376 (Order for Use of Therapeutic Restraints for Mental Health Purposes); 0379 (Evaluation of Suicide Potential); 0378 (Crisis Watch Observation Log); 0377 (Crisis Watch Record); 0371 (Refusal of Mental Health Services); and 0375 (Psychological Autopsy).

**Findings:** IDOC has been in Substantial Compliance with this requirement since the Third Annual Report. Please note, this requirement only speaks to the use of standardized forms and not the overall quality of the medical records.

**(XVIII)(b): Specific requirement:** No later than ninety (90) days after the approval of this Settlement Agreement, IDOC shall fully comply with Administrative Directive 04.03.100, § II(E)(7), which requires an offender's medical record, including any needed medication, to be transferred to any facility to which the offender is being transferred at the time of transfer.

AD 04.03.100, section II (E)(7): The medical record shall be transferred to the receiving facility at the time of offender movement.

(7)(a): In the event that an offender is transferred from the Illinois Department of Juvenile Justice to an IDOC facility, the entire original medical record shall be transferred with the offender. The transferring youth center may keep a copy of the medical record. Such movement shall be treated as a departmental transfer with regard to documentation.

(7)(b): The medical record and, if applicable, medication shall be sealed in a clear plastic envelope through which the offender's name and ID number can be easily identified.

(1) If the information on the DOC 0090 is not urgent in nature, the DOC 0090 shall be placed inside the front cover of the medical record.

(2) If the DOC 0090 contains urgently needed medical or medication disbursement information, the following steps shall be taken: (a) The DOC 0090 shall be folded in half to promote confidentiality and a notation of "URGENT MEDICAL INFORMATION" shall be made in bold print on the exposed (blank) side of the DOC 0090. (b) The folded DOC 0090 with the notation side up shall be enclosed on top of the medical record inside the clear plastic so that these individuals can be immediately identified and evaluated upon arrival at a new institution. (c) Prior to transferring an offender who has significant medical problems as determined by the transferring facility Medical Director, the transferring Health Care Unit Administrator or Director of Nursing shall telephone the receiving Health Care Unit Administrator or Director of Nursing to advise of the transfer.

(7)(c): A member of the receiving health care staff shall complete the Reception Screening section of the DOC 0090. The DOC 0090 shall be placed chronologically in the progress notes section of the medical record; no progress note shall be required.

**Findings:** IDOC is in Substantial Compliance with this requirement.

## XIX: CONFIDENTIALITY

**Summary**: IDOC continues its slow march to being in Substantial Compliance with the Section. Health care records are handled in a confidential manner. Problems persist with the confidentiality of crisis contacts. Informed consent practices have greatly improved. The Department will receive a rating of Substantial Compliance on the Midyear Report of November 2020 if it addresses the issue with the crisis contacts.

**XIX(a): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, the IDOC shall comply with the requirements of Administrative Directive 04.03.100, § II(E) (10) as to the confidentiality of mental health records.

AD 04.03.100, section II (E) (10) provides: Offender medical and mental health records are confidential. Access to medical and mental health records shall be limited to health care staff, other Department personnel and outside State and federal agencies on a need-to-know basis as determined appropriate by the Facility Privacy Officer or the Health Care Unit Administrator. All staff having access to medical records or medical information shall be required to sign a Medical Information Confidentiality Statement, DOC 0269, and a new DOC 0269 shall be signed during cycle training annually thereafter. The most recent DOC 0269 shall be retained in the staff member's training file.

**Findings:** IDOC remains in Substantial Compliance with this requirement.

**Specific requirement:** Additionally, IDOC shall take the following steps to promote the confidential exchange of mental health information between offenders and persons providing mental health services:

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** As previously reported. IDOC modified AD 04.04.100, effective date June 1, 2017. This modification, however, did not occur until six months past the deadline. Apart from this tardiness, IDOC remains in Substantial Compliance with this requirement.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible. 36

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status

unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** The practice of confidential mental health and psychiatric contacts has improved greatly over the four years of Settlement implementation. During the monitoring period, however, an inconsistency of confidentiality was noted with the daily crisis contacts. Also, it was noted that at Dixon's X-house, crisis contacts occur in a private room with the door open with a custody officer standing within earshot. The Department will receive a rating of Substantial Compliance if it addresses these issues before the Midyear Report of November 2020.

**(XIX)(d): Specific requirement:** In addition to enforcing the consent requirements set forth in "Medical/Legal Issues: 2. Informed Consent" in the IDOC Mental Health Protocol Manual, incorporated by reference into the IDOC AD 04.04.101 section II (E)(2) within sixty (60) days after the approval of this Settlement Agreement, IDOC shall ensure that Mental Health Professionals who have a treatment/counseling relationship with the offender shall disclose the following to that offender before proceeding: the professional's position and agency; the purpose of the meeting or interaction; and the uses to which information must or may be put. The MHP shall indicate a willingness to explain the potential risks associated with the offender's disclosures.

Medical/Legal Issues: 2. Informed Consent in the IDOC Mental Health Protocol Manual provides:

Before initiating psychotropic medication, the psychiatric provider must complete at least a brief history and Mental Status Examination to determine that the offender (a) has a basic understanding that he or she has a Mental Health Problem, (b) understands that medication is being offered to produce relief from that problem, and (c) is able to give consent to treatment. The clinician must also inform the offender about alternative treatments, the appropriate length of care, and the fact that he or she may withdraw consent at any time without compromising access to other Health Care. With the exception of Mental Health emergencies, informed consent must be obtained from the offender each time the Psychiatric Provider prescribes a new class of Psychotropic Medication.[52]

**Findings:** IDOC remains in Substantial Compliance with this requirement.

---

[52] The Manual defines "Informed Consent": "Informed Consent is defined as consent voluntarily given by an offender, in writing, after he or she has been provided with a conscientious and sufficient explanation of the nature, consequences, risks, and alternatives of the proposed treatment." This section of the Manual also provides: "Offenders should be advised of the Limits of Confidentiality prior to their receiving any Mental Health Services." This requirement is nearly identical to the requirement discussed above regarding confidentiality, so the team does not address it again here under Informed Consent.

## XX: CHANGE OF SMI DESIGNATION

**Summary**: The Department is in Substantial Compliance with this section. This metric has never been tracked by IDOC. Ongoing review of the overall number of SMI offenders coupled with the lack of complaints regarding the inappropriate removal of SMI designations suggests that no real difficulties exist concerning this requirement. As Monitor, I question whether all of the mentally ill offenders who qualify for SMI designation actually receive this designation. I base this on clinical interviews of mentally ill offenders who clearly met criteria for SMI designation but did not receive this official designation.

**Specific requirement:** The determination that an offender, who once met the criteria of seriously mentally ill, no longer meets such criteria must be made by the offender's mental health treatment team and documented in the offender's mental health records. Until mental health treatment teams are established, this function shall be performed by a treating MHP.

**Findings:** As previously reported, IDOC does not track this particular metric. The monitoring team has not encountered this issue as being problematic during the current reporting period. Again, as previously reported, it is my opinion as Monitor that the Department has under-identified this cohort. That is, I feel that there are many more mentally ill offenders that qualify for this designation but have yet to be identified. As this is not officially a sub-requirement of XX, a rating of Substantial Compliance will be assigned.

## XXI: STAFF TRAINING

**Summary**: IDOC has been found to be in Substantial Compliance with this requirement since the Second Annual Report of May 27, 2018. The monitoring team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties.

**XXI(a): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan and program for staff training as provided in subsection (b), *below.*

**Findings:** Previously found to be in Substantial Compliance.

**XXI(b): Specific requirement:** Within two (2) years following the approval of this Settlement Agreement, all IDOC and vendor staff who interact with offenders shall receive training and continuing education regarding the recognition of mental and emotional disorders. As directed in the section titled "Training" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC Administrative Directive 04.04.101, § II(E)(2)), this training shall include material designed to inform the participants about the frequency and seriousness of

mental illness, and how to treat persons who have mental illness or persons manifesting symptoms of mental illness. In addition to training on confidentiality as provided in Section XXII (a), *above*, this training shall incorporate, but need not be limited to, the following areas: i) The recognition of signs and symptoms of mental and emotional disorders most frequently found in the offender population; ii) The recognition of signs of chemical dependency and the symptoms of narcotic and alcohol withdrawal; iii) The recognition of adverse reactions to psychotropic medication; iv) The recognition of signs of developmental disability, particularly intellectual disability; v) Types of potential mental health emergencies, and how to approach offenders to intervene in these crises; vi) Suicide prevention; vii) The obligation to refer offenders with mental health problems or needing mental health care; and viii) The appropriate channels for the immediate referral of an offender to mental health services for further evaluation, and the procedures governing such referrals.

**Findings:** Previously found to be in Substantial Compliance.

**XXI(c): Specific requirement:** Within one (1) year following the approval of the Settlement Agreement, Mental Health Administrative Staff referenced in Section XI(d) of this Settlement Agreement, IDOC shall develop a written plan for the orientation, continuing education, and training of all mental health services staff.

**Findings:** Previously found to be in Substantial Compliance.

## XXII: PARTICIPATION IN PRISON PROGRAMS

> **Summary:** IDOC has be found to be in Substantial Compliance with this requirement since the Midyear Report of November 30, 2018. The monitoring team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties.

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** Previously found to be in Substantial Compliance.

## XXIII: TRANSFER OF SERIOUSLY MENTALLY ILL OFFENDERS FROM FACILITY TO FACILITY

**Summary**: IDOC has been in Substantial Compliance with this requirement since the Third Annual Report of May 24, 2019. The monitoring team will not be reviewing this requirement in future reports unless requested to do so by the Court and/or the parties. Please note that a rating of Substantial Compliance does not connote that IDOC is transferring seriously mentally ill offenders from facility to facility in a timely manner. Long delays remain in the transfer of seriously mentally ill offenders to an RTU facility and/or the inpatient facility at Elgin.

**XXIII(a): Specific requirement:** To ensure continuity of treatment, unless a SMI offender is being transferred to another facility for clinical reasons, IDOC shall make best efforts to ensure that the offender's treating MHP is consulted prior to transfer. If such a consultation is not possible prior to transfer, the MHP shall be consulted no more than seventy-two (72) hours after effectuation of transfer. If a transfer is being made for security reasons only, the reasons for the transfer and the consultation with the offender's treating Mental Health Professional shall be documented and placed in the offender's mental health file.

**Findings:** Previously found to be in Substantial Compliance.

**XXIII(b): Specific requirement:** When a SMI offender is to be transferred from one prison to another, the sending institution, using the most expeditious means available, shall notify the receiving institution of such pending transfer, including any mental health treatment needs.

**Findings:** Previously found to be in Substantial Compliance.

**XXIII(c): Specific requirement:** The provisions of this section shall be fully implemented no later than one (1) year after the approval of this Settlement Agreement.

**Findings:** Previously found to be in Substantial Compliance.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**: During the monitoring year, IDOC initiated a tracking system to facilitate leadership's oversight, and Pontiac implemented several measures to prevent improper force and respond to prisoners who make many such allegations.

Use of force is highly concentrated, with the vast majority occurring at six institutions. The team continued to observe a trend of unnecessary force—that is, force not used as a **last resort** when other means are unavailable or inadequate—and there were indicia of excessive force, but both trends appeared improved in the most recent months. All indications were that force was terminated as soon as it was no longer necessary, and there were no indicia of corporal punishment. A growing number of institutions are found in substantial compliance with these requirements.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[53] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:

a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted purpose.
b) Use of force shall be terminated as soon as force is no longer necessary.
c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.
d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or 05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.    Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee,

---

[53] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believes the Settlement contemplated AD 03.02.108(I)(B).

a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.    Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member

to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.      Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area

that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings:** Notably during the monitoring year, IDOC instituted a tracking system for key data concerning uses of force, which reportedly is subject to leadership's oversight, trend analysis, and response. In response to allegations of excessive and unnecessary force at Pontiac, the facility reportedly has installed additional cameras in three buildings that house mental health patients, required additional use of body cameras, and instituted wellness checks for patients who have made a number of force complaints.

The monitoring team reviewed data for three months[54] during the year as a sample of use of force practice. Logs captured a total of 291 events in that sample. The monitoring team previously identified that many planned uses of force are concluded when the prisoner complies, and before force is actually used. This is one indication of appropriate use of force practice. The team learned that such cases are not captured in IDOC's current tracking method, so the team is no longer able to make observations about that practice, and assessments of current practice and that of previous years will not be comparable.

As in prior rounds, force is highly concentrated. Dixon, Joliet, Lawrence, Pinckneyville, Pontiac, and Stateville have the vast majority of incidents, with another 18 institutions experiencing them rarely, and a few facilities had none. Unsurprisingly, OC was used in the majority of events, and takedowns were employed fairly often, in about one-third of incidents. Completed cell extractions or other planned uses only constituted 13% of incidents in this review. Menard employed warning shots six times; Pontiac and Stateville staff fired them twice and once, respectively.

The monitoring team reviewed 49 reports from 15 institutions.[55] The proportions of the different types of force were similar to the proportions described above. About 30% of the sample took place in a treatment setting (inpatient, RTU, crisis watch, or in the context of enforced medication).

There continued to be a trend in unnecessary uses of force—situations that were not highly dangerous or urgent, where giving a cool-down period, and/or using de-escalation techniques, had a reasonable likelihood of success but there is no indication they were tried. In the language of the relevant Administrative Code, those uses of force above were not employed only as a **last resort** or when other means are unavailable or inadequate. There was a similar number of incidents that raised significant questions of excessive force, particularly when employing OC. Taken together, about 20% of reviewed cases were of concern, an overall rate that reflects improvement in the more recent files reviewed.[48]

The requirements governing tactical teams and cell extractions have appeared well-executed in the monitoring team's prior reviews of videos and reports. In this study and previously, force reports did not raise concerns that force was inappropriate because of the patient's mental state, with one exception discussed in the Midyear Report. All indications were that force was terminated as soon as it was no longer necessary, and there were no indicia of corporal punishment. These facts support the likelihood of compliance with those Administrative Code provisions. Health screening and care were unevenly documented in

---

[54]  June 2019, July 2019, and January 2020

[55]  This is a 28% sample of the logs for June 2019 and January 2020, which represent practice over time

the reports reviewed early in this monitoring period, but staff describe it as routine and it was more consistently shown in more recent reports.

Previously, the monitoring team found institutions in substantial compliance because of good practice and/or the sustained absence of use of force onsite. Big Muddy River, Centralia, Danville, Hill, Lawrence, Murphysboro, Vandalia, and Western will now join them, bringing the total to 19 institutions in substantial compliance.[56]

Professional Conduct

AD 03.02.108(I)(B), "Standards of Conduct" provides: The Department shall require employees to conduct themselves in a professional manner and, whether on duty or off duty, not engage in conduct that is unbecoming of a State employee or that may reflect unfavorably on or impair operations of the Department.

**Findings:** Since the Third Annual Report, the Monitoring Team has not received or observed any incidents of overtly unprofessional conduct.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary:** I tasked Dr. Kapoor to conduct an analysis of the discipline of seriously mentally ill offenders. Her report is included here. As Dr. Kapoor states in her report, "When considering the letter of Section XXV of the Settlement Agreement, IDOC is in substantial compliance." Also, in her report, Dr. Kapoor listed several "concerns" and "recommendations." If the Department can replicate these findings and address, in writing, Dr. Kapoor's concerns and recommendations, then it will receive a rating of Substantial Compliance in the Midyear Report of November 2020 for this particular sub-requirement. Please note, there are a total of six sub-requirements that the Department must fulfill before an overall rating of Substantial Compliance will be assigned to XXV(a).

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

---

[56] Big Muddy River, Centralia, Danville, Decatur, East Moline, Graham, Hill, Jacksonville, Kewanee, Lawrence, Murphysboro, Robinson, Shawnee, Sheridan, Southwestern Illinois, Taylorville, Vandalia, Vienna, and Western Illinois.

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

> (1) The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

> (2) The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

> (3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

> (1) Review the recommendations of the reviewing MHP and the Adjustment Committee;
>
> (2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and
>
> (3) Provide his or her final determination. Any deviation from MHP's recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHP's opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** IDOC's Quarterly Report of April 23, 2020 states that Section XXV(a) "does not impose any obligations on IDOC." As I have previously reported, this is an issue for the parties to work out. As in previous reports, I have asked Assistant Monitor, Reena Kapoor, M.D.,

to conduct an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in IDOC. Her findings from her May 25, 2020 letter to me follow:

"Dear Dr. Stewart:

At your request, I performed an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in the Illinois Department of Corrections (IDOC). The conclusions in this report are based on my review of the following documents:

1.  IDOC Administrative Directive 05.12.103, "Administration of Discipline for Offenders Identified as Seriously Mentally Ill."

2.  IDOC Quarterly Reports dated April 23, 2020 re: original *Rasho* settlement agreement and court order from December 20, 2018

3.  Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), and Offender Disciplinary reports (DOC 0317) for a total of 125 disciplinary infractions adjudicated during April 2020, representing approximately 20% of incidents involving SMI offenders at the following facilities:

    1.  Centralia –  nine incidents
    2.  Danville –  one incident
    3.  Decatur –  four incidents
    4.  Dixon –  18 incidents
    5.  East Moline –  one incident
    6.  Elgin –  one incident
    7.  Graham –  one incident
    8.  Hill – two incidents
    9.  Illinois River –  four incidents
    10. Jacksonville – seven incidents
    11. Joliet Treatment Center – 12 incidents
    12. Lawrence – 8 incidents
    13. Lincoln – two incidents
    14. Logan – six incidents
    15. Menard – five incidents
    16. Pinckneyville – five incidents
    17. Pontiac – 22 incidents
    18. Robinson – one incident
    19. Shawnee – one incident
    20. Sheridan – one incident
    21. Stateville NRC – six incidents
    22. Taylorville – four incidents
    23. Vandalia – one incident
    24. Vienna – one incident
    25. Western Illinois – two incidents

**Findings**

Overall, there have been no substantial changes since my November 2019 report. IDOC has reasonable policies in place regarding discipline of SMI offenders, and my review indicates that the Adjustment Committee at every institution is considering the input of mental health professionals when issuing disciplinary sanctions to SMI offenders. When considering the letter of Section XXV of the Settlement Agreement, IDOC is in substantial compliance. Nonetheless, I note he same concerns about the details of IDOC's discipline process that I noted in May 2019 and November 2019 reports.

IDOC's areas of strength include:

1. IDOC is conducting more meaningful reviews of each disciplinary infraction than during the initial years of the monitoring team's work. During the current review, MHPs found that mental illness was a significant factor in 7 out of 125 cases (5.6%). 142 cases (7.0%). For reference, MHPs found that mental illness was a significant factor in 1 out of 125 disciplinary infractions (0.8%) in November 2018, 18 out of 142 infractions (12.7%) in April 2019, and 10 out of 145 infractions (7.0%) in November 2019.

2. Segregation is not being used as a punishment (for SMI offenders) for 300- and 400-level infractions at any IDOC facility.

3. In contrast to my November 2019 report, I found no cases in which inmates were punished for self-injurious behavior, in violation of section XXV(b) of the Settlement Agreement.

4. The Adjustment Committee consistently receives input from mental health professionals (MHPs) regarding SMI inmates in a timely manner. In reviewing 125 infractions, I found that an MHP completed the DOC 0443 form and submitted it to the Adjustment Committee in all cases.

5. Evaluations of offenders by MHPs (as documented in the DOC 0443 forms) contain fairly standard, non-judgmental language to describe offenders' behavior. Appropriate efforts are made to protect the privacy of offenders' psychiatric diagnosis on the 0443 forms.

6. Across all IDOC facilities, the Adjustment Committee consistently follows IDOC's policy 05.12.133, Section H.2, which states, in relevant part:

   *If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee **shall** adopt those recommendations (emphasis added).*

95

> *If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

In the 125 records I reviewed, the Adjustment Committee issued a sanction that was equal to or less than the mental health recommendation in all cases.

7. Sanctions for similar offenses across different institutions appear much more consistent than during my November 2019 review. For example, all of the sexual misconduct tickets that I reviewed resulted in a sanction of 2-3 months of segregation (sometimes with additional sanctions). This is improved from November 2019, when sanctions for sexual misconduct ranged from 0-6 months for no clear reason.

I continue to have concerns about the same issues I have mentioned in previous reports:

1. There seems to be an inverse relationship between the number of disciplinary infractions at a facility and the likelihood that an MHP will find that mental illness contributed to an inmate's offense. In the current review, Dixon and Pontiac accounted for the greatest proportion of infractions, 40 out of 125 total. Not once did an MHP at either of those facilities find that mental illness contributed to an offender's behavior. The same was true during my November 2019 disciplinary review; no MHP at Pontiac or Dixon found that mental illness contributed to an inmate's offense. This is noteworthy, of course, because those facilities have sizeable populations of mentally ill offenders. Once again, the findings raise the suspicion that mental health staff (1) become numb to inmates' mental illness with greater exposure, (2) do not have time to investigate the disciplinary cases in detail, or (3) use a higher threshold to determine that an inmate's mental illness contributed to a disciplinary offense.

2. The quality of mental health evaluations documented on the DOC 0443 form remains variable. Across the board, MHPs are now checking the box on the second page of the form that says "the offender's mental illness should be considered when imposing discipline (up to and including segregation)," though it is not clear why the MHP thinks that is the case or why IDOC's approach to this form seems to have changed in the past 6 months. Some facilities use "boiler plate" language to complete the 0443 forms, while others attempt to convey something meaningful about the rational for the MHP's recommendation. I would urge all facilities to adopt the latter approach. I would also request (again) that IDOC provide the monitoring team with a copy of the medical chart note that is often completed by the MHP when arriving at a determination for the 0443 form; I understand that this note is likely to contain a more substantive explanation of the MHP's recommendation.

3. MHPs are still not performing face-to-face assessments of SMI offenders after they are charged with disciplinary infractions in most cases; the 0443 forms are completed based on a chart review and/or discussion amongst the mental health staff. I can only assume that IDOC does not consider this a necessary part of the MH/discipline

interface, since they have ignored my recommendation to conduct these face-to-face evaluations for the past few years. Nonetheless, I remain puzzled about how an MHP can arrive at a conclusion about whether mental illness contributed to an offender's behavior without actually asking the offender about the events in question. In my view, simply perusing the chart for evidence of the offender's mental status prior to the infraction is inadequate.

## Recommendations

Based on the information noted above, I recommend that IDOC take the following steps. These recommendations are largely unchanged from my November 2019 report:

1. Adopt a policy of requiring face-to-face assessment of an inmate by an MHP prior to making recommendations on the DOC 0443 form.

2. Provide the Monitoring Team with IDOC's guidelines and/or training scheme for mental health professionals to complete the DOC 0443 form. If no such guidelines and/or training scheme exists, IDOC should develop them.

3. When submitting monthly documentation about discipline, please include any relevant progress notes from the inmate's medical chart that would help the Monitoring Team understand the basis for the MHP's determination regarding the contribution of mental illness to the inmate's offense.


Respectfully submitted,

Reena Kapoor, MD
Associate Professor of Psychiatry
Yale School of Medicine"


**Findings:** As Dr. Kapoor states in her report, "When considering the letter of Section XXV of the Settlement Agreement, IDOC is in substantial compliance." Also, in her report, Dr. Kapoor listed several "concerns" and "recommendations." If the Department can replicate these findings and address in writing Dr. Kapoor's concerns and recommendations, then it will receive a rating of Substantial Compliance in the Midyear Report of November 2020 for this particular sub-requirement. Please note, there are a total of six sub-requirements that the Department must fulfill before an overall rating of Substantial Compliance will be assigned to XXV(a).


**Additional Requirements:**

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

**Findings:** Please refer to XV(a)(iv)(B) for a discussion of this requirement.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

   **Findings:** Two issues prevent IDOC from receiving a rating of Substantial Compliance with this sub-requirement: the persistent backlog of mental health evaluations and the ongoing issue of custody staff acting as gatekeepers to the Crisis Intervention Teams.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

   **Findings:** Based upon my site visits over the course of the 4th year of the Settlement implementation, IDOC continues to house mentally ill offenders in segregation who have already deteriorated and/or are demonstrating signs and symptoms of deterioration.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

   **Findings:** The Department is meeting this requirement.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

   **Findings:** The Department is meeting this requirement.

**(XXV)(b): Specific requirement:** No later than one (1) year after approval of this Settlement Agreement, IDOC, in consultation with the Monitor, shall develop and implement policies and procedures to provide that, for mentally ill offenders, (i) punishment for self-injurious behavior (*e.g.,* suicide attempts or self-mutilation) is prohibited; (ii) punishment for reporting to IDOC staff or vendor staff feelings or intentions of self-injury or suicide is prohibited; and (iii) punishment for behavior directly related to self-injurious behavior, such as destruction of state property, is prohibited unless it results in the creation of a weapon or possession of contraband.

**Findings:** The Department is in Substantial Compliance with this requirement.

**(XXV)(c): Specific requirement:** For any offender who is in RTU or inpatient treatment for serious mental illness, the disciplinary process will be carried out within a mental health treatment context and in accordance with this Section. Discipline may include loss of privileges or confinement to cell on the treatment unit for a specified period but may not entail ejecting an offender from the treatment program.

**Findings:** The Department is in Substantial Compliance with this requirement.

**(XXV)(d): Specific requirement:** No later than six (6) months after the approval of this Settlement Agreement, IDOC, in consultation with the Monitor and the IDOC's designated expert, shall develop and implement a pilot Behavior Treatment Program ("BTP") at Pontiac CC for SMI offenders currently subject to sanction for a serious disciplinary infraction. IDOC will review this pilot and consider implementation at other facilities.

**Findings:** Technically, IDOC is meeting these requirements. I'll be conducting virtual tours of the facilities starting in June 2020 and will be checking on the status of the BTP/BMU at Pontiac. A "no rating" will be assigned for this sub-requirement.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

> **Summary:** IDOC is in Substantial Compliance with this Section.

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** IDOC is in Substantial Compliance with this requirement.

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** IDOC is in Substantial Compliance with this requirement.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** IDOC is yet to respond to my request to review the compensation of the Monitoring Team.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** The Monitoring Team has made many recommendations for the improvement of the mental health and psychiatric care over the life of the Settlement implementation. I have never received any formal communication from the Department about these recommendations

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** The staff have been very cooperative with all of the data requests made by the Monitoring Team.

## XXVIII: REPORTING AND RECORDKEEPING

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: IDOC is in Substantial Compliance with this requirement.

## CONCLUSION

Over the course of this 4th year of the Amended Settlement Agreement, the Monitoring Team has had the opportunity to meet many outstanding correctional professionals. They unanimously want to meet the requirements of the Agreement, but are hampered in their efforts by the lack of staff.

Respectfully submitted,

*/s/ Pablo Stewart, M.D.*                    Dated: May 30, 2020

Pablo Stewart, MD