IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants | ) | |

**REPORT OF MONITOR CONCERNING COMPLIANCE WITH**

**INJUNCTION ORDERS**

# TABLE OF CONTENTS

BACKGROUND……………………………………………………3

METHODOLOGY/MONITORING ACTIVITIES…………………...3

COMPLIANCE RATINGS……………………………………...4

EXECUTIVE SUMMARY…………………………………….... 5

DETAILED FINDINGS…………………………………………… 6

STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT
OF CORRECTIONS………………………………………….... 7

CLASS MEMBERS WHO ARE PLACED ON A MENTAL………... 9
HEALTH CRISIS WATCH

CLASS MEMBERS WHO ARE PLACED IN SEGREGATION……. 15

CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC
MEDICATION………………………………………………… 21

TREATMENT PLANS………………………………………... 26

COMPLIANCE REQUIREMENTS………………………………... 31

CONCLUSIONS…………………………………………………. 32

## BACKGROUND

The Court has entered several orders regarding the *Rasho* matter. On October 30, 2018, the Court granted Plaintiffs' Motion for Permanent injunction and entered an Order finding that Defendants have been deliberately indifferent to the mental health needs of mentally ill inmates in custody of the Illinois Department of Corrections in violation of the Eighth Amendment to the United States Constitution. The Court deferred entering specific injunctive relief, instead allowing Defendants an opportunity to submit a proposal to address their constitutional deficiencies. On November 13, 2018, Defendants submitted their proposed remedy order. On November 20, 2018, Plaintiffs submitted their memorandum in support of their proposed remedy order. On December 4, 2018, Defendants submitted their reply. On December 13, 2018, the above motions and proposed orders came before the Court for oral argument. The Court entered an order on December 20, 2018 specifying five areas of constitutional violation:

- Staffing requirements at the Illinois Department of Corrections
- Class members who are placed on mental health crisis watch
- Class members who are placed in segregation
- Class members who are prescribed psychotropic medication
- Treatment plans

The Court also ordered "The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and functions." This report is submitted to comply with this portion of the Court's Order.

The Court has subsequently entered several Orders regarding this matter: February 26, 2019; March 19, 2019; and March 28, 2019. The Seventh Circuit issued an order on April 15, 2019. Finally, the Court issued an Order on April 23, 2019 "to memorialize the Court's Orders dated October 30, 2018, December 20, 2018 and February 26, 2019." This report follows the requirements listed in the April 23, 2019 Order.

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish these monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 12 virtual site visits of 12 different IDOC facilities, where interviews of administrators and staff were conducted. During these virtual site visits, the monitoring team would obtain information about staffing, the mental health and psychiatric case load, Covid-related issues, out-of-cell time, and the operations of crisis beds and segregated housing. These virtual site visits would be followed up by chart reviews of mentally ill offenders assigned to crisis beds and segregated housing.

Virtual Site visits:

1.  Dixon               July 8th
2.  Logan               August 3rd
3.  Lawrence            August 10th
4.  Pinckneyville       September 16th
5.  Menard              September 24th
6.  Pontiac             September 30th
7.  Graham              October 15th
8.  Western             October 22nd
9.  Stateville          October 29th
10. Stateville-NRC      November 5th
11. Illinois River      December 16th
12. Hill                December 17th

The Monitor interviewed 23 class members from four different facilities: Dixon, Pontiac, Menard and Joliet. The Monitor also reviewed 115 treatment plans and 50 psychiatric progress notes from throughout the Department. The systemwide backlog reports, which, are provided weekly were reviewed. Drawing upon tracking provided by each institution, the Monitoring Team analyzed the timeliness of evaluations and psychiatric contacts; the length of stay in crisis watch; the locations where patients in crisis watch were housed; crisis watch follow-up appointments; and referrals to RTU, BMU and inpatient care.

The Monitor had a call with members of the Department leadership team[1] on August 31, 2020 to discuss the need for maintaining out-of-cell time for class members to minimize staff assaults, self-injurious behaviors and crisis care placements. Finally, the Monitor and Assistant Monitor, Ms. Morrison met several times with Drs. Hinton and Puga to discuss the underutilization of the inpatient facility at Elgin.


## COMPLIANCE RATINGS

The following compliance ratings will be applied in this report:

- Substantial Compliance: The Defendants will be in Substantial Compliance with the terms of the Court Orders if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Court Orders. Substantial Compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious. Substantial Compliance will be found only for the Department as a whole and not for individual facilities.

---

[1] Marcus Hardy, Amanda Smith, Doug Simmons, Alyssa Williams, John Eilers and Robert Fanning.

- Noncompliance: This rating will be applied if the Defendants do not satisfy the definition of Substantial Compliance.

## EXECUTIVE SUMMARY

This report covers the period from July 1, 2020 through December 31, 2020. The results of the monitoring finds that the Department is Noncompliant in the following areas:

- Staffing requirements at the Illinois Department of Corrections
- Class members who are placed on a mental health crisis watch
- Class members who are placed in segregation
- Class members who are prescribed psychotropic medication
- Treatment plans and mental health evaluations

As I initially stated in the Court Report of January 15, 2020 and restated in the Court Report of July 28, 2020 "the major contributing factor to these noncompliance ratings is the lack of an adequate number of staff." Unfortunately, this situation hasn't changed throughout 2020. It remains my opinion that the Department will continue to struggle with compliance to the Court's Order until such time that they are adequately staffed. The following are summaries of the findings for staffing, crisis watch, segregation, medications and treatment plans:

- **Staffing**: Significant staffing shortages exist despite the Department's claims to the contrary. These shortages are the biggest impediment to the Department's achieving substantial compliance with the Court's order.

- **Crisis Watch:** Class members assigned to a crisis watch receive inadequate treatment given the emergency nature of their placement. The treatment interventions that are offered often occur at cell front and not in confidential settings. Referrals to higher levels of care are not occurring in a timely manner with the exception of Logan.

- **Segregation:** Class members are being assessed promptly upon admission to segregation. Their treatment plans are only being reviewed and updated 56% of the time. Class members are receiving very little treatment while housed in segregation, including out-of-cell time.

- **Psychotropic Medication**: Problems exist in performing timely psychiatric follow ups. Class members prescribed psychotropic medications area being assessed for side effects, laboratory monitoring, informed consent and medication adherence. Early medication distribution times require modification to help with improved medication adherence.

- **Treatment plans and mental health evaluations:** Treatment planning backlogs continue. Outpatient and segregation treatment plans tend to be very generic and not individualized to the patients' unique treatment needs. They also are not the products of a multidisciplinary effort. RTU and inpatient treatment plans are better in these regards. Mental health evaluations are also backlogged. NRC is still not able to meet its mental health evaluation burden.

The compliance findings are as follows:

| Requirement | Compliance Status |
|---|---|
| | |
| **1: STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT OF CORRECTIONS** | Overall: Noncompliance<br><br>Subfindings supporting overall findings: |
| 1(a)<br>1(b)<br>1(c)<br>1(d) | Noncompliance<br>Substantial compliance<br>Substantial compliance<br>No rating |
| **2: CLASS MEMBERS WHO ARE PLACED ON A MENTAL HEALTH CRISIS WATCH**<br><br>2(a), (b), (c), (d), (e), (f), (g) | Overall: Noncompliance<br><br>Subfindings supporting overall findings:<br><br>Noncompliance |
| **3: CLASS MEMBERS WHO ARE PLACED IN SEGREGATION**<br><br>3(a)<br><br><br>3(b), (c), (d)(i), (d)(ii), (d)(iii), (d)(iv)<br><br>3(d)(v)<br>3(d)(vi)<br>3(e)<br>3(f)<br>3(g) | Overall: Noncompliance<br>Subfindings supporting overall findings:<br><br>Noncompliance for IDOC<br>(19 institutions in Substantial compliance)<br><br>Noncompliance<br><br>Substantial compliance<br>Noncompliance<br>Noncompliance<br>No rating<br>Noncompliance |
| **4: CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC MEDICATION**<br><br>4(a)<br>4(b)(i)<br>4(b)(ii), (iii)<br>4(b)(iv)<br>4(b) (v)<br>4(b)(vi) | Overall: Noncompliance<br><br>Subfindings supporting overall findings:<br><br>Noncompliance<br>Noncompliance<br>Substantial compliance<br>Noncompliance<br>Substantial compliance<br>No rating |
| | |

| 5: TREATMENT PLANS | Overall: Noncompliance<br>Subfindings supporting overall findings: |
|---|---|
| 5(a)<br>5(b)<br><br>5(c) | Noncompliance<br>Noncompliance for IDOC<br>(5 institutions in Substantial compliance)<br>Noncompliance |
| **6: COMPLIANCE REQUIREMENTS**<br>6(a)<br>6(b)<br>6(c) and 6(d) | Overall: Substantial compliance<br>Subfindings supporting overall findings:<br>Substantial compliance<br>Substantial compliance<br>Not subject to compliance ratings |

## 1: STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT OF CORRECTIONS

> **Summary: Staffing shortages exist at various facilities even though the Department claims to be meeting and exceeding the Court's staffing requirements. The Monitoring Team discovered those facilities who report being "fully staffed" have difficulties meeting the requirements of Court's order.**
>
> **Defendants did conduct the required staffing evaluation and created an amended staffing plan. The Monitor has repeatedly stated that the staffing evaluation and the amended staffing plan are inadequate to address the treatment needs of the Department.**

**1(a): Specific requirement**: Within 90 days of this order, Defendants must employ additional staff necessary to have the following system-wide levels in the following positions: 7 Site Mental Health Service Directors; 12 Mental Health Unit Directors; 16 Staff Psychologists; 142.5 Qualified Mental Health Professionals; 102 Behavioral Health Technicians; 54.5 Registered Nurses – Mental Health; 24 Staff Assistants; 85.5 Psychiatric Providers; 1 Director of Nursing – Psychiatric; 5 Recreational Therapists.

**Finding:** The following statement appears on pages 2 of the Defendant's quarterly report of January 25, 2021 regarding their compliance with the Court Order:

"IDOC believes it is in substantial compliance with this part of the Court's Order. The Order requires the Defendants to employ specific staff (a total of 449.50 FTEs) within 90 days of the Order. The Department works with its vendor, Wexford, to assign the appropriate number of mental health staff to its facilities. As detailed in Attachments 1, 5 and as shown on the following chart, as of the end of 2020, IDOC and Wexford have *exceeded* their obligations under the Order

to hire Psychologists, Qualified Mental Health Professionals, Mental Health Staff Assistants (more than double), Director of Nursing-Psychiatric, and Recreational Therapists. With the inclusion of the 31.0 Mental Health RNs transferred from Wexford to IDOC employ (80.0 FTE RNs being employed at those sites), IDOC and Wexford also exceeded their obligations for Mental Health RNs. Overall, the total FTEs of 527.713 equate to over 78 FTEs more than the 449.5 ordered by the Court."

As I have reported in previous reports, the staffing numbers put forward by IDOC are inconsistent with what the monitoring team found during its virtual site tours. Furthermore, the staffing numbers reported by IDOC are not even consistent with their own data. Page three of IDOC's most recent quarterly report states, among other things, that the Department has an excess of 34.5 QMHPs. Then, in attachment 1 to this report, IDOC lists the following vacancies for QMHPs;

- Danville          2 QMHP vacancies
- Hill              2 QMHP vacancies
- Illinois River    1 QMHP vacancy
- Logan             9 QMHP vacancies
- Dixon             6 QMHP vacancies
- Menard            3 QMHP vacancies
- Pontiac           6 QMHP vacancies
- Western           2 QMHP vacancies

IDOC's stated vacancies of QMHP's is inconsistent with their claim that the Department has an excess of 34.5 QMHP's. Until such time as the staffing numbers reported to the Monitoring Team by the facilities and the numbers reported in the Department's quarterly reports are internally consistent, a rating of Noncompliance will be assigned.

**1(b): Specific requirement:** Within 120 days of this order, Defendants shall evaluate whether their staffing plan is sufficient to provide mental health treatment consistent with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation, and mental health evaluations.

**Finding:** The Department, in fact, conducted this evaluation. In that regard they are in substantial compliance with this requirement. The Monitor has consistently reported that their staffing plan is grossly inadequate. Moreover, this staffing plan is not sufficient to provide mental health treatment consistent with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation and mental health evaluations.

**1(c): Specific requirement:** Within 180 days of this order, Defendants shall report their findings and submit a proposed amended staffing plan to the Court, the Monitor and Plaintiffs' counsel.

**Finding:** The Department fulfilled this requirement. Their plan, however, is grossly unsatisfactory in meeting the actual mental health needs of the Rasho Class members.

8

**1(d):  Specific requirement:** After the report, the Court will consider if any modifications to the Defendants' staffing is necessary.

**Finding:**  No rating assigned.


## 2:  CLASS MEMBERS WHO ARE PLACED ON A MENTAL HEALTH CRISIS WATCH

> **Summary: Crisis watches are consistently used for patients exhibiting dangerousness to themselves or others, or are gravely disabled. An admission is always ordered by an MHP; no cases were encountered of crisis watch being used when less restrictive treatment would have been preferable. In a considerable number of cases the duration of the crisis watch was not the shortest duration possible. The components of treatment offered to crisis watch patients are MHP and psychiatry contacts and treatment planning. These three activities are insufficient to deal with the complexities of the patients on a crisis watch. The majority of the monitored facilities do not offer additional forms of treatment. Treatment plans are generally being reevaluated and updated. Daily MHP checks are occurring but not always in confidential settings. Referrals to a higher level of care were not occurring in a timely manner.**

**2(a):  Specific requirement:**  Crisis watches should only be used for patients exhibiting behavior dangerous to self or others as a result of mental illness and may only be ordered upon a finding by an appropriately trained and licensed mental health professional that no other less restrictive treatment is appropriate. When used, crisis watches are to be employed for the shortest duration possible.

**Finding:** It is the monitoring team's experience that crisis watches are consistently used for patients exhibiting dangerousness to themselves or others, or who are gravely disabled. An admission is always ordered by an MHP; the monitoring team has not encountered examples of crisis watch being used when less restrictive treatment would have been preferable.

For a substantial number of admissions, however, it does not appear that the duration was the shortest possible. To define this term, the monitoring team first looks to the Settlement Agreement, which employs a threshold commonly used by prison systems for this type of treatment setting. It specifies that crisis beds are designed for short-term stays, which it defines as "generally no longer than ten (10) days." While this is not a firm deadline, the Settlement Agreement definition expects patients needing more care to be transferred to a "more…intensive care setting"; the definition indicates that patients who do not need a more intensive care setting are to be discharged. Thus, if Defendants have determined a patient does not need a higher level of care but the patient is also not discharged, then presumptively the additional time in crisis watch is excessive and not the shortest duration possible.

Crisis watch logs indicate that 20% of crisis watches exceeded that threshold,[2] a practice that is not "minor or occasional." This rate that has not improved throughout 2020. Most disturbing were the 71 stays lasting one month or more[3]--***three times*** the length presumed by the Settlement Agreement to be appropriate—with a few exceeding *nine months*. These presumptively fail to meet the standard set in 2(a) and are an inappropriate use of this treatment setting. Rather, these patients require a higher level of care. This practice was widespread, occurring at 19 institutions, though it was by far the most prevalent at Dixon, Pontiac, and Joliet.

A few—12 of the 220 patients with stays longer than ten days--were explained by waiting for a higher level of care after staff made a timely referral.[4] With other patients, however, staff did not initiate referrals until the patient had spent weeks or months in a crisis cell, and most were not referred at all. If staff were considering transfers and finding them unnecessary, this was not apparent in the documents the monitoring team reviewed. The Monitor finds that many of these stays were not the shortest duration possible. See section 2(f) below for more discussion of referrals.

However, in Defendants' October 2020 and January 2021 quarterly reports, they describe several measures underway to improve crisis care. Staff now track the frequency of admissions, and staff are to re-examine, and consider adjustments, to the treatment plans of patients with four or more crisis watches in a quarter. Additionally, IDOC has been offering weekly case consultations involving psychiatry, psychology, and mental health staff of all institutions with patient(s) who have been on crisis watch for a week or more at the time of the consultation. Defendants also report they have held a series of meetings, both internally and as a working group with Plaintiffs' counsel, to brainstorm improvements to crisis care. These kinds of supports are most welcome and are likely to enhance patient care; the monitoring team looks forward to the results.

A rating of Noncompliance will be assigned based on not meeting the "shortest duration possible" aspect of this requirement.

**2(b): Specific requirement:** IDOC shall provide appropriate mental health treatment to stabilize the symptoms and protect against decompensation.

**Finding:** The key components of treatment that IDOC offers in crisis watch are MHP contacts, psychiatry contacts and treatment planning. Some facilities offer additional treatments. These facilities and the additional treatments they offer will be noted below.

---

[2] This analysis is based on all crisis watches on IDOC logs for June and September 2020 from all institutions at which a crisis watch occurred, at total of 1,101 admissions. Murphysboro reportedly had no crisis watches and Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after 10 days is not an option. It is not feasible to assess, at any scale, whether stays less than 10 days are the shortest possible for those individuals.

[3] Again, these were identified from only two months of logs. The number of stays of this length, per year, would be much higher.

[4] Already pending before that crisis watch, or initiated within the 10 days or a few days afterward

The following data was obtained from a 12-facility[5] review of 89 crisis placements:

- Daily checks with a QMHP: 81 of 89 crisis watches – 91%. This review found that only 51% of these daily contacts occurred in a confidential setting.

- Presence of treatment plans:
    - Upon admission: 72 of 89 – 80%
    - Upon discharge: 72 of 89 – 80%
    - Of note, the cohorts of the 72 class members were not identical.

- Additional treatments:
    - Pontiac – in-cell workbooks
    - Graham – additional cell front contacts by BHTs
    - Pinckneyville – one additional meeting with a QMHP per week
    - Logan – psychoeducational meetings with BHTs
    - NRC – Offers the "ALIVE" curriculum once a week

- Seen by a psychiatric practitioner during their crisis watch period: 58 of 89 – 65%

Additionally, the monitoring team reviewed initial psychiatry contacts as one indicator of appropriate mental health treatment in this setting. The team analyzed logs showing 1,082 crisis watches, the total of two months of crisis watches at all relevant institutions.[6] In that sample, logs showed that 64% of patients saw a psychiatric provider by the second day after admission.

It appeared that just over 20% of patients waited longer to be seen—most saw a provider within one week but some initial contacts took over two weeks. The logs did not demonstrate any psychiatric contact for 15% of patients.[7] This analysis method is not able to discern whether psychiatric providers saw these patients *as often* as would be appropriate for treatment sufficient to stabilize symptoms and protect against decompensation, but date of first contact is one significant point in such an analysis.

Treatment planning provided limited support for stabilizing symptoms and protecting against decompensation, but shows some improvement. The monitoring team conducted a 154-treatment plan study and found that the identification of goals had improved to 83%, but the interventions to address those problems were effectively recorded in only 48% and multidisciplinary input seemed to decline.[8] These components are essential to stabilizing symptoms and protecting against decompensation.

As these findings illustrate, IDOC offers some clinical support for crisis watch patients,

---

[5] Dixon, Logan, Lawrence, Pinckneyville, Menard, Pontiac, Graham, Western, Stateville, NRC, Illinois River and Hill.

[6] The monitoring team analyzed all crisis stays contained on logs provided by all IDOC institutions for July and September 2020. Kewanee and Murphysboro reported no crisis watches during those months.

[7] A relatively small subset of this group was in a crisis watch a short time – one to two days. These were 3% of the total crisis watches.

[8] For detail on the study method and findings, please see Treatment Plans, section 5 below

but is not yet providing appropriate mental health treatment to stabilize the symptoms and protect against decompensation.

**2(c): Specific requirement:** Reevaluations of treatment and medication will occur as needed and mental health treatment shall be determined and any necessary interventions to stabilize individuals shall occur.

**Finding:** As noted above in 2(b), in a 12-facility sample, 80% of class members assigned to crisis care received a reevaluation of their treatment plans within the first week of crisis placement. In the same sample, 65% of class members were seen by a psychiatrist who could reevaluate their medication during their crisis watch period. These low percentages are inconsistent with a rating of substantial compliance.

**2(d): Specific requirement:** Daily assessment in a confidential setting of the patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required.

**Finding:** Again, as noted in 2(b) above, daily assessments were occurring at a rate of 91%. Out of this cohort, however, only 51% of these contacts were confidential in nature and this appears to be part of a wider decline in practice. The monitoring team noted increased mention of nonconfidential contacts in other crisis watch documentation, and Defendants report cell side crisis watch contacts at Dixon and Menard, and a rate of more than 50% at Pontiac, driven by quarantined cell blocks and other COVID-related limitations.[9]

Also, only five of the 12 facilities reviewed offered any sort of additional treatments. Finally, this 12-facility review showed that only 31% of the charts reviewed had any documentation regarding the appropriateness of the class members' level of care and/or referral to a higher level of care.

**2(e): Specific requirement:** Prior to discharge from crisis watch, a multidisciplinary team (with the patient) shall review and update the treatment plan.

**Finding:** Requirement removed in the February 2019 Order.

**2(e): Specific requirement:** *No later than at the time of discharge from crisis watch*, an appropriate mental health professional (with the patient) shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan will address causes which led to the deterioration and the plan for risk management to prevent relapse.

**Finding:** To assess this requirement, the monitoring team reviewed 81 crisis watch patients drawn from all institutions that had crisis watches in Fall 2020.[10] In nearly every case – 98% -- staff generated a treatment planning document, an important step. However, only 47% of them addressed the causes of the crisis watch and planned for relapse prevention. A higher percentage identified appropriate goals, but the majority of treatment plans did not include interventions that

---

[9] Defendants' Quarterly Report (Order), January 25, 2021

[10] For detail on the study method and findings, please see Treatment Plans, section 5 below

would advance the goals. Most typically, the problematic plans restated the standard frequency of contacts without discussing what treatment would occur during them, while others relied on boilerplate language whose relevance to the goals was unclear, or omitted some of the presenting problems altogether.

On the other hand, the practice of involving and informing patients seems well-established. In every reviewed crisis watch discharge plan, it appeared the patient was involved based on his or her signature, quotes from the patient, and/or a clinician's description within the plan or progress note, so this aspect appears to be implemented very well.

**2(f):  Specific requirement:**  For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility, or explain in writing why establishing such a plan is not appropriate.

**Finding:** Crisis watch logs indicate that 20% of the sampled stays[11] exceeded 10 days. As discussed above, 10 days is an approximate measure established in the Settlement Agreement to signal the timing for stability or a higher level of care decision. Very few such patients were referred and it was rare to see documented decisions that such a transfer was unnecessary. These concerns were observed at a similar rate throughout 2020.

Referrals might appropriately be made either to inpatient care, RTU, or BMU, depending on the individual patient's needs. But among the patients with the most extended stays (those lasting ***one month to more than nine months***), only 23 were referred to any of these levels of care. Quite a number of other patients whose stays exceeded 10 days should also have been referred, but in cases of one month or more there is no doubt.

The referrals completed can be summarized as:

| Length of stay | Number of people | Referred to RTU/BMU | Referred to inpatient |
|---|---|---|---|
| 11-29 days | 149 | 10 | 2 |
| 1 – 3 months | 60 | 8 | 1 |
| 3 months - >1 year | 11 | 0 | 2 |

As to the requirement to explain in writing if a higher level of care transfer is not appropriate for patients with extended stays, this has not been apparent in the documents reviewed by the monitoring team, though Defendants assert, in their quarterly reports, that it is routine practice. As one example, among the crisis watch treatment plans that the monitoring team studied for the various Monitor's reports in 2020 and the instant report, 53 stays exceeded ten days. Of those, only 17% indicated that a higher level of care referral was made or was considered and

---

[11]  As above, this is based on a review of lengths of stay for all patients in crisis watch at all institutions in the months of June and September 2020, according to IDOC logs.

found not appropriate.[12] This rate is similar to that found in a similarly structured study for the Monitor's Third Annual Report, which was issued approximately one month after this Court's Injunctive Orders.

It appears that this is principally an issue of not initiating appropriate referrals, as there are many empty beds to which patients could transfer. A large percentage of Elgin's beds have been unfilled since its opening, and ***only one-third of its beds were filled*** throughout this monitoring period; 475 beds stood empty in the men's RTUs as of November 24, 2020. With hundreds of patients sitting for extended periods in crisis watch,[13] which is not equipped for anything but very short-term stabilization, it simply cannot be said that there is no need for those empty beds.[14]

Among those who *were* referred, it is encouraging that there has been a substantial increase in overall completed RTU and BMU transfers (from an average of almost 8 per month earlier in the monitoring period, to an average of almost 26 per month from August through November) and overall completed Elgin transfers (from an average of 2 per month earlier in the monitoring period, to an average of 6 per month from September through November).[15] This likely results from improvements IDOC has undertaken, including streamlining referral paperwork, setting decision deadlines, tasking regional supervisors with weekly monitoring of pending referrals, and centrally authorizing movement to Elgin, as well as some easing of COVID-related movement restrictions accompanying an influx of prisoners from jails. Nevertheless, the December censuses for men's RTUs and for Elgin remain *below* those early in the monitoring period, when underutilization was already apparent.[16]

IDOC is Noncompliant with the requirement to establish a plan to provide a higher level of care, or explain in writing why establishing such a plan is not appropriate, for patients who do not stabilize sufficiently to be discharged from crisis watch.

---

[12]   This determination is made based on referral logs from Elgin and each institution throughout the monitoring period, and the treatment plans provided for a crisis watch treatment plan study, during this monitoring period and for the Monitor's report on injunctive orders submitted in July 2020. While a decision for, or against, a higher level of care would typically be part of a treatment plan, it is possible that it could be recorded in other parts of the crisis care records, and the monitoring team did not review the entire crisis stay records.

[13] The reader is cautioned to remember that the patients discussed herein are identified from only two months of crisis watches. An annualized figure would be much greater.

[14] The women's RTU does not experience these difficulties. Lengthy crisis watches are rare at the women's facilities. Nearly all RTU transfers were accomplished in less than one month during this monitoring period, a pattern that has been sustained over time. Only 4 placements were delayed but completed in less than two months, a new development because of COVID quarantining. The patients were *not* confined in crisis watch during their waits. Meanwhile, RTU censuses ranged from 86 to 112, with a bed capacity of 146, but there was no indication of unmet need for those beds.

[15] These are *not* confined to patients with lengthy crisis care stays. This refers to all patients referred and transferred to these levels of care, and includes women as well as men.

   This includes accommodating new referrals to Elgin and almost entirely clearing out a backlog of patients awaiting Elgin, 7 of whom had been waiting 5 to 15 months. Another three patients remain on the log after 5 to 11 months; two of them are marked as improved and may no longer require placement, but are being monitored for possible transfer. Unfortunately, another 4 patients left prison after waiting for Elgin 6 to 10 months without ever being placed.

[16] According to information provided monthly by each relevant facility, and/or IDOC legal counsel, average censuses for RTUs totaled 928 in June. In December, they totaled 918. Elgin censuses have been 15 to 17 since at least June 2020. Presumably, this is because patients were discharged in addition to the new intakes.

**2(g): Specific requirement:** Out of cell time for confidential counseling and groups, psychiatric care, therapeutic activities, and recreational or leisure activities, *unless contraindicated.*

**Finding:** During the reporting period, the Monitoring Team discovered that although 91% of class members received daily counseling checks, only 51% of them occurred in an out-of-cell, confidential setting. Also, among the reviewed facilities, only two, Pinckneyville and Logan, offered additional out-of-cell therapeutic activities.

Based on the data reviewed by the monitoring team, little to no out-of-cell time is being provided to those class members assigned to a crisis level of care.

## 3: CLASS MEMBERS WHO ARE PLACED IN SEGREGATION

> **Summary: Prompt assessments after placement into segregation are only occurring at a rate of 84-89%. Treatment plan reviews and updates were only occurring at a rate of 56%. Segregation rounds were noted to occur at a rate of 61%. Continuation of a mentally ill offender's treatment plan is not a metric examined by IDOC. Using a variety of matrices, my opinion as Monitor is that this is generally not occurring. Class members in segregation receive medications but timely psychiatric follow ups remain a challenge. MHP's properly recommend post-segregation placement. Finally, given all of the problems noted above, my opinion as Monitor is that class members in segregation do not receive adequate treatment by MHP's. Psychiatrists are involved to a lesser degree due to the problems with timely follow ups.**

**3(a): Specific requirement:** Promptly after placement into segregation, a mental health professional shall assess the class member to establish a baseline against which any future decompensation can be measured. Such review shall be documented in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff.

**Findings:** The monitoring team analyzed 283 placements in restrictive housing for the presence of a mental health professional's assessment.[17]

In determining whether the required contact is prompt, the monitoring team considered the Settlement Agreement and the purpose of this type of assessment. The Settlement Agreement sets an expectation that the assessment be completed within two days. Indeed, corrections systems and scholars often recognize the first 24 hours in segregation as one of the highest risk factors for

---

[17]   For this analysis, IDOC provides records of mental health caseload patients placed in control units. Where an institution has few placements, IDOC provides all cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. During this monitoring period, the team reviewed the documents provided for July, August, and November 2020 for those institutions not previously found in substantial compliance. The reviewer examined a total of 283 placements drawn from 11 institutions.

suicide, and they require a screening within *one* day, not two. With an issue of this sensitivity and risk, there is little room to safely expand a timeframe requirement. In this analysis, the monitoring team relaxed the standard to four days—twice the time provided in the Settlement Agreement—as the maximum time that could be considered prompt.[18] A time as long as a week, for example, is certainly not prompt under these circumstances.

The monitoring team's review yielded these results:

- 80% of provided records clearly demonstrated a contact within two days[19]
- 4% were completed in a short time thereafter, which could reasonably be considered prompt

The remaining placements were completed unreasonably late--up to 10 days after placement--or the provided documents did not demonstrate that a review was completed.

In a separate nine-facility[20] review by the Monitor, 50 of 56 (89%) charts documented that class members in segregated housing had evidence of an MHP review within two days.

It is of note that a significant subset of both of these datasets[21] were assessments completed by Behavioral Health Technicians, nurses, and custody members of Crisis Intervention Teams, none of whom are mental health professionals as defined in the Corrected Second Amended Settlement Agreement. An MHP did later review and sign off on these assessment forms, though there is no indication that the MHPs interacted with the patients.

By reviewing these documents remotely, the monitoring team did not have the opportunity to review whether the documentation is placed in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff. However, the monitoring team has always observed these documents in the charts during previous onsite visits, has not noted absences, and no information to the contrary has come to the team's attention. Therefore, the monitoring team believes that this element is being met.

Previously, 19 institutions have been found in Substantial Compliance with the parallel

---

[18] Defendants have also argued that the screening requirement can be met in crisis watch if the patient transfers there soon after his or her change to segregation status. This would, however, defeat the purpose of the screening—to gauge the patient's adjustment to the isolation and stressful conditions of a segregation unit. The Monitor declines to adopt Defendants' interpretation, but does consider a screening to be effective and timely if performed within the same timeframe beginning at the patient's return from crisis watch.

[19] Defendants' January 25, 2021 Quarterly Report indicates that Defendants also reviewed records that overlap with this sample, examining essentially the same records for November 2020 (there was one institution's data potentially available to Defendants that was not available at the time of the monitoring team analysis). Defendants found 92% of these records to have been completed within 2 days, in contrast to the monitoring team's findings of 80%. It appears this is a difference of interpretation on a few of the documents provided.

[20] Stateville, Western, Graham, Pinckneyville, Menard, Logan, Lawrence, Pontiac and Joliet

[21] In the larger dataset, this constituted 13% of the assessments, all of which were treated as timely in this results summary. The practice appeared at four institutions: Hill (one time only), Illinois River, Menard, and Pinckneyville.

requirement in the Settlement Agreement.[22] The monitoring team believes that they are in Substantial Compliance with the Injunctive Orders on this responsibility as well. As to the institutions' practice analyzed above, the findings do *not* support a Substantial Compliance finding.[23] Compliance thresholds should align with the sensitivity and risk of each requirement. Routine practices may well be satisfied with a sustained compliance rate of at least 85%. Where the risk is higher if the requirement is missed—in this case, the possibility of failing to identify and address suicidality—compliance thresholds should be established at a higher level. For this reason, as well as the open question of non-mental health professionals conducting this assessment, the Monitor finds the overall IDOC compliance insufficient, though substantially improved. The rating remains Noncompliance.

**3(b): Specific requirement:** A mental health professional shall review and recommend any clinically necessary modifications to the prisoner's individual treatment plan.

**Finding:** The monitoring team reported in the Midyear Report of November 30, 2020 that the results of a nine-facility review found that only 50% of the 56 segregation charts reviewed had evidence of treatment plan reviewed by a mental health professional.[24] In a separate 11-facility review[25], the Monitor found that only 43 of the 77, 56%, segregation charts reviewed had evidence of a treatment plan reviewed within the first seven days of placement, a reasonable measure of timeliness set out in the Settlement Agreement.

**3(c): Specific requirement:** Rounds shall be conducted by appropriate mental health staff, which may include behavioral health technicians.

**Finding:** The monitoring team conducted an 11-facility[26] review to assess the Department's compliance with this requirement. This review examined the segregation placements of 83 class members. The results were that only 67 of the 83 (61%) class members in segregation had weekly rounds consistently documented in their medical records. Of the 11 facilities reviewed, Hill, Illinois River, Stateville, Pinckneyville and Logan properly documented weekly segregation rounds. The following facilities failed to conduct/document weekly segregation rounds:

- Western - Weekly rounds were consistently documented for seven of the eight class members. No rounds documented for one of the class members.
- Graham – Weekly rounds were consistently documented for seven of the nine class members. No rounds documented for two of the class members.
- Pontiac – Weekly rounds were consistent for six of the seven class members. No rounds were documented for one of the class members.

---

[22] Big Muddy River, Danville, Decatur, East Moline, Elgin, Kewanee, Jacksonville, Lincoln, Logan, Murphysboro, Robinson, Shawnee, Sheridan, Southwestern, Stateville proper and NRC, Taylorville, Vandalia, Vienna, and Western Illinois.

[23] This applies to Centralia, Dixon, Graham, Hill, Illinois River, Joliet, Lawrence, Menard, Pinckneyville, Pontiac, and Western Illinois.

[24] Midyear Report of November 30, 2020, page 54.

[25] Dixon, Logan, Lawrence, Pinckneyville, Menard, Pontiac, Graham, Western, Stateville, Illinois River and Hill.

[26] Dixon, Logan, Lawrence, Pinckneyville, Menard, Pontiac, Graham, Western, Stateville, Illinois River and Hill.

- Menard – Weekly rounds were consistently documented for the months of June and July for seven class members. August rounds were only documented for one of the six applicable class members.
- Lawrence – Only two of six class members received weekly rounds during their time in segregation.
- Dixon – Weekly rounds were consistently documented for six of the reviewed class members. One class member had rounds documented for one month of his placement, but not the full duration. Two class members did not have rounds documented in their charts.

**3(d): Specific requirement:** Class members who are in a Control Unit for periods of sixteen days or more shall receive care that includes, at a minimum:

(i): Continuation of their mental health treatment plan with such treatment as necessary to protect from any decompensation.

**Findings:** As reported in the Court Order Report of July 28, 2020, this particular requirement has been difficult to properly monitor. In previous reports, the Monitor has referred to three indices as indirect evidence of the Department's not meeting the requirements of this subsection:

1. Overall departmental treatment plan backlog data.
2. Low percentage of class members assigned to segregation who have their treatment plans reviewed/updated within the first week of segregation placement.
3. Low rates of treatment plan updates for those class members housed in segregation for greater than 30 days.

Items 1 & 2 have remained problematic during the current reporting period. In the Corrected Amended Settlement Agreement item 3 was changed to updating the treatment plan every 90 days. Item 3 is no longer applicable to this requirement. The following data apply to items 1 & 2:

1. The following is the treatment plan backlog data for July through December 2020:

| | total plans backlogged | plans backlogged greater than 14 days |
|---|---|---|
| 7/17 | 70 | 17 |
| 8/14 | 92 | 31 |
| 9/18 | 185 | 90 |
| 10/16 | 159 | 77 |
| 11/13 | 210 | 133 |
| 12/11 | 207 | 131 |

Of note, the treatment plan backlog data for the month of January averages 260.

2. As reported in 3(b), above, in a separate 11-facility review[27], the Monitor found that only 43 of the 77, 56%, segregation charts reviewed had evidence of a treatment plan reviewed within the first seven days of placement, a reasonable measure of timeliness set out in the Settlement Agreement. This indicates that almost half of the class members assigned to segregation do not have an updated treatment plan.

The facts of the treatment planning backlog and the low percentage of treatment plan reviews/updates within the first week of segregation placement are, in the opinion of the Monitor, indirect evidence that the Department is not meeting the requirements of this subsection.

Finally, the actual treatment plans for class members in segregation are very inadequate. They are not uniformly multidisciplinary in nature and the treatment interventions are not individualized to the particular class member.

(ii): Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff.

**Findings:** Please refer to the findings of 3(c), above.

(iii): Pharmacological treatment (if applicable).

**Findings:** Pharmacological treatment does occur in segregation. The same problematic medication issues that affect the Department exist with class members in segregation. These problematic issues will be discussed in Section Four, below. In general, they are inconsistent psychiatric follow-ups and extremely early medication distribution times, which contributes to poor medication adherence. Limited demonstration has been provided concerning other obstacles to medication provision, which are detailed in section 4(b) below, and in other reports of the Monitor, and are common in prison system health care delivery.

(iv): Meeting with MHP or multidisciplinary team meetings to the extent necessary.

**Findings:** Based on a review of the treatment plans for class members assigned to segregation, meetings with an MHP occur infrequently. That is, per the treatment plan, meetings with an MHP are scheduled monthly for 15-30 minutes. The monitoring team did not find any evidence that class members assigned to segregation met with a multidisciplinary team except episodically for treatment plan updates.

(v): MHP or mental health treatment team recommendations to post-segregation housing.

**Findings:** The Department is meeting this requirement.

(vi): Structured and unstructured out of cell time sufficient to protect against decompensation. Structured out of cell time includes therapeutic, educational and recreational activities that involve active engagement by their participants for the duration of the activity.

---

[27] Dixon, Logan, Lawrence, Pinckneyville, Menard, Pontiac, Graham, Western, Stateville, Illinois River and Hill

**Findings:** A data driven analysis was conducted for out-of-cell time, both structured and unstructured, for the months of July and August 2020. The data is reported in "hours per week." The following is the data for class members in segregation who have been there greater than 16 days but less than 60 days:

|         | Unstructured      | Structured       |
|---------|-------------------|------------------|
| July    | offered – 6.11    | offered – 1.77   |
|         | received – 3.94   | received – 0.83  |
| August  | offered – 3.91    | offered – 1.63   |
|         | received – 2.43   | received – 0.67  |

The data confirms that class members assigned to segregation did not receive structured and unstructured out of cell time sufficient to protect against decompensation.

**3(e): Specific requirement:** Class members in any Control Unit for periods longer than sixty days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation unless clinically contraindicated. If an inmate refuses out of cell time, an MHP shall follow-up with the inmate to determine whether or not there is a risk of further decompensation.

**Finding:** A data driven analysis was conducted for out-of-cell time, both structured and unstructured, for the months of July and August 2020. The data is reported in "hours per week." The following is the data for class members in segregation who have been there greater than 60 days:

|         | Unstructured      | Structured       |
|---------|-------------------|------------------|
| July    | offered – 5.01    | offered – 3.14   |
|         | received – 3.13   | received – 1.95  |
| August  | offered – 3.48    | offered – 2.51   |
|         | received – 2.36   | received – 1.89  |

The data confirms that class members assigned to segregation for periods longer than 60 days did not receive structured and unstructured out of cell time sufficient to protect against decompensation.

**3(f): Specific requirement:** Mental health staff shall assess class members in Control Units to determine if a higher level of care is necessary and if so, to make proper recommendations to facility authority.

**Finding:** As previously reported, referrals to a higher level of care for class members in Control Units is not a metric followed by IDOC. Due to the Covid pandemic and its associated travel restrictions, the monitoring team has not been able to perform any on-site visits of any of the IDOC facilities since March 2020. This means that as Monitor, I don't have enough objective data to assign a rating to this requirement. In the past, however, the Monitor has observed that

when a class member decompensates while in segregation, he/she may be transferred to a crisis bed. There were significant examples, however, when severely ill class members, who required referrals to a higher level of care, were allowed to languish in their segregation cells. For the current reporting period, IDOC will receive a "no rating" for this requirement.

**3(g): Specific requirement:** Continued treatment by mental health professional and/or psychiatric provider to the extent clinically indicated.

**Finding:** IDOC is currently unable to provide continued treatment by mental health professional and/or psychiatric provider to the extent clinically indicated. Their deficiencies are noted in sections 3(a), 3(b), 3(c), 3(d)(i), 3(d)(ii), 3(d)(iii), 3(d)(iv), 3(d)(vi) and 3(e).

## 4: CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC MEDICATION

> **Summary: There remains a problem with timely psychiatric follow ups. The Department is doing very well with the monitoring of medication-related side effects, laboratory monitoring of medications, informed consent and medication adherence. The Department continues to pay attention to ensuring that class members actually receive their prescribed medications although problems still exist with early medication distribution times.**

**4(a): Specific requirement:** Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards.

**Finding:** To review this provision for **outpatients**, the monitoring team analyzed contacts for 535 psychiatric patients, drawn from across IDOC, for whom at least three appointments could be discerned in recent months.[28]

---

[28] The IDOC Psych Database is structured to show the most recent psychiatric appointment completed, but not a series of previous appointments from which one could determine the intervals at which patients are being seen. Therefore, the following structure was used for this study.

The monitoring team reviewed a Psych Database from each relevant institution for each month from June through November 2020. A sample was chosen generally by random selection method of every 10 patients, though there were exceptions if the caseload was small or for a few other reasons. Cases were chosen from all institutions except Murphysboro, which reported it had no patients on the psychiatric caseload during the period studied, and Elgin, which was analyzed separately. Because Stateville-NRC tends to have a much shorter-term population, cases were instead chosen by going systematically through every case in the June database, comparing them to later databases to identify cases that had 3 contacts, and retaining all such cases.

A contact was counted as timely if it occurred within 30 days, even if the provider had ordered a return to clinic in a shorter period, because the Settlement Agreement only requires patients to be seen within 30 days (that is the reviewer assessed whether the contact met the Settlement Agreement requirement, *not* whether the patient was seen within the time the psychiatric provider specified). If a provider ordered an appointment *more* than 30 days hence, the contact was counted as timely if completed within that time, and none could exceed 90 days, as per Settlement Agreement terms. In all cases, if a contact was attempted timely but not completed because of COVID quarantine, the contact was counted as timely if it was rescheduled within 2 weeks, the normal length of a quarantine; the reviewer

As "regular intervals consistent with constitutional standards" has not been defined, the reviewer began with the Settlement Agreement intervals as one means of measurement. **Only 23% met the Settlement Agreement requirement** of psychiatry seeing the patient every 30 days, or within a longer interval the provider designates if the patient is more stable. This is identical to the monitoring team's previous analysis, in its report submitted in July 2020,[29] and employs a much larger sample. It may be noteworthy that at four institutions--including Dixon, which houses one of the largest patient populations—*not a single patient in the sample met this standard.*

Often, contacts were delayed one week or less, once or multiple times. Should the Court wish to consider whether this is consistent with constitutional standards, the rate of patients whose pattern of contacts meets this standard, inclusive of the group above, rises to 64%.

The information above describes performance for IDOC overall, while performance is variable among institutions. Some trends to consider:

- Only one institution, with a very small relevant population, fully met the Settlement Agreement requirement.

- If the standard is expanded to allow an additional week, this was more commonly the norm at institutions.
  - At 15 institutions, this standard was met in the majority of sampled cases (though "majority" ranged from 58% to 93%).
  - However, only 7 institutions were found to meet this standard in 85% or more of their cases[30]

- Other institutions had a mix of cases across the timeliness spectrum. Additionally, there were four institutions—again including Dixon's large population—where the dominant trend was *un*timely cases. In those four institutions, the *majority* of sampled patients had waits extended two weeks to two months beyond what was ordered, and/or delays occurred for multiple appointments.

This analysis contributes in significant part to the compliance picture, and it is necessarily incomplete. There were contacts eliminated from this analysis because the timing could not clearly be discerned from the databases; if investigated, those contacts have the potential to lower

---

encountered very few cases where the records indicated this type of delay. Where it was difficult to confidently discern the interval between two contacts, the contact in question was eliminated from this analysis and the cases were only retained if there were three *other* contacts on which to make a judgment.

[29] This is the most appropriate comparison because the July 2020 analysis examined a pattern of 3 or more contacts over a 7-month period, and the instant analysis did so over a 6-month period.

It differs from the results in the Monitor's most recently submitted Midyear Report because there was only enough data in the monitoring period, at that point, to examine **2** contacts, not 3. That analysis gave an early look at the trends, but 3 contacts is the *minimum* to establish a pattern, and a caution to this effect was given in that report.

[30] No threshold has been set for Substantial Compliance for the frequency of psychiatric contacts, but 85% is often discussed in corrections system lawsuits as a threshold for some requirements, and that may be appropriate in this instance.

performance percentages.[31]    Additionally, a complementary analysis would be necessary to determine whether the conduct of these psychiatric evaluations met at least the minimum expectations for professional skill and judgment, and whether the patients seen at longer intervals were sufficiently stable for such a regimen.

As for specialized treatment settings, the **RTUs** were evaluated using the same study method described above, reviewing a total of 57 cases. Performance was fairly consistent across institutions.

- **Only 33% of the sample showed a *pattern* of the appointments occurring every 30 days** or a longer interval if the patient was thought to be stable. This is a low level of performance, but is substantially improved from that captured in the Monitor's July 2020 report.[32]

- If the standard is expanded to allow an additional week, as above, that standard is met in 82% of reviewed cases.

- The remaining 18% of sampled patients had waits extended an additional ½ to four weeks beyond what was ordered, and/or delays occurred for multiple appointments.

In this sample, as in the study undertaken for the Monitor's last report on this Court's injunctive orders, providers almost universally ordered contact at 30-day intervals or less; extending to longer intervals remained extremely rare—in this study, it occurred only twice.

In **crisis watch**, the team analyzed logs showing 1,082 crisis watches, the total of two months of crisis watches at all relevant institutions.[33]  In that sample, logs showed that 64% of patients saw a psychiatric provider by the second day after admission. It appeared that just over 20% of patients waited longer to be seen—most saw a provider within one week but some initial contacts took over two weeks. The logs did not demonstrate any psychiatric contact for 15% of patients.[34]  This analysis method is not able to discern whether psychiatric providers saw these patients with a frequency that could be found to be consistent with constitutional standards, but date of first contact is one significant point in such an analysis.

---

[31]  Most commonly, those contacts exceeded the expected interval by 2 to 4 weeks. Since the most recent contact displaces those that came before it in the databases, one cannot be certain that there weren't other, timely contacts during that interval.

   If those proved to be timely, that would not change the pattern of timeliness for a given patient (the measurement is the presence or absence of late contact(s), not proportion). However, if these contacts proved to be as late as they appear, that could convert as many as 152 patients into the category of having lengthy delays, increasing that least-compliant category by as much as 28% of the total population.

[32]  As with the outpatient study described above, the results differ from those in the Monitor's most recently submitted Midyear Report because there was only enough data in the monitoring period, at that point, to examine **2** contacts, and the instant analysis captures a pattern of 3 or more contacts.

[33]  The monitoring team analyzed all crisis stays contained on logs provided by all IDOC institutions for July and September 2020. Kewanee and Murphysboro reported no crisis watches during those months.

[34]  A relatively small subset of this group was in a crisis watch a short time – one to two days. These were 3% of the total crisis watches.

As for **inpatients**, IDOC reports that all Elgin patients see a psychiatric provider at least three times per week. The monitoring team did not review this practice, apart from noting the three-day follow-up plans indicated throughout Elgin's Psych Database.

Whatever standards are ultimately determined, it is the Monitor's opinion that this performance is not yet consistent with meeting this Court's order.

**4(b): Specific requirement:** IDOC shall accomplish the following in psychiatric services:

(i): Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to, and taken by, the offenders as prescribed.

**Findings:** "As previously reported, it is common for prisons to experience obstacles to patients receiving medication. These can include practices such as medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; security staff preventing nursing staff from accessing housing units, or patients from attending the medication line; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and hoarding or selling medication; and medication errors. These are all potential impediments that IDOC must protect against and staff must make a showing that these common obstacles are not affecting its medication delivery.

Throughout my tenure as Monitor the Department has made progress in reducing these barriers to medication distribution. For example, Defendants note having undertaken process studies, through the Continuous Quality Improvement program, examining the length of time from a nurse receiving a medication order to the time the medication is dispensed. More demonstrations such as this would be most welcome.

As of an April communication, despite the pandemic, IDOC continued to run medication lines on the units with social distancing precautions, and the monitoring team has not been informed of any changes. As previously reported, medication distribution times play a significant role in mentally ill offenders refusing their medications. The Midyear Report of November 30, 2019 reported that nine facilities were distributing medications at 4am and that an additional eight facilities were distributing medications at 5am. The medication distribution times as reported in the Fourth Annual Report revealed that for 4am, the number of facilities has dropped to five. For 5am, the number of facilities has dropped to four. This is very good improvement but the Department still has a long way to go. I have been informed by Ms. Jennings that the medication distribution times as reported in the Fourth Annual Report remain the same for the current reporting period.

As I have discussed with the Chief of Psychiatry, almost all psychiatric medications can be administered once a day, preferably at bedtime. Also, the use of long-acting injectable medications would certainly free up staff time as these medications can be safely administered every two to four weeks. The Department has made good progress in addressing this critical issue, but not enough to warrant a rating of Substantial Compliance."[35]

The above-described situation has not changed since the submission of the Midyear Report. The Department will continue to receive a rating of noncompliance.

(ii):  The regular charting of medication efficacy and side effects.

**Findings:** The monitoring team conducted a 10-facility review[36] of 50 class members currently prescribed psychotropic medications. 49 of the 50 charts reviewed met this requirement.

 (iii):  Take necessary steps to ascertain side effects.

**Findings:** The same chart review found 49 of 50 charts reviewed met this requirement.

(iv):  The timely performance of lab work for these side effects and timely reporting on results.

**Findings:** The same chart review found 41 of 50 charts reviewed met this requirement.

(v):  The class members for whom psychotropic drugs are prescribed receive timely explanations from appropriate medical staff about what the medication is expected to do, what alternative treatments are available, and what in general are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** The same chart review found 47 of 50 charts reviewed met this requirement.

(vi):  That class members, including offenders in a Control Unit who experience medication noncompliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's medication noncompliance said noncompliance remains unresolved, the MHP shall refer the offender to a psychiatric provider.

**Findings:** Finally, the same chart review found 49 of the 50 charts contained evidence that the psychiatric practitioner reviewed the MAR and noted if the patient was compliant with his/her psychotropic medications. In this particular cohort, there were no cases of an MHP needing to get involved with medication noncompliance, so no information was available on which to assess key portions of this requirement.

---

[35] Midyear Report, November 30, 2020, page 46

[36] Pinckneyville, Statesville, Illinois River, Logan, Western, Pontiac, Joliet, Elgin, Lawrence and Menard

**5: TREATMENT PLANS**

**Summary: Overall, the Department has been making slow progress in improving its treatment planning. More progress needs to occur before a rating of Substantial compliance can be assigned. Improvements are needed in the areas of multidisciplinary treatment planning at all levels of care. The RTU's and Elgin are leading the way in this regard. Treatment plans continue to lack individualization as the same treatment intervention is offered for a variety of clinical problems. A treatment planning backlog persists. When plans are created they tend to be timely in nature with the exception of those class members assigned to segregation.**

**Regarding mental health evaluations, the Monitoring Team found that only 47% of the evaluations were completed in two weeks, a reasonable measure of timeliness set out in the Settlement Agreement. An additional 20% of the evaluations were completed within an additional week and slightly more took longer, completed up to two months late. This analysis was based on data received during the reporting period. These numbers, however, do not reflect the almost complete absence of completed mental health evaluations at the NRC.**

**5(a):  Specific requirement:**  All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs, including long and short-term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible.

**Finding:** To adequately discuss the Department's response to this requirement, a review of the treatment planning backlog data for the reporting period is required. The following is a sampling of the actual number of treatment plans that have been backlogged from July through December 2020:

| total plans backlogged | | plans backlogged greater than 14 days |
|---|---|---|
| 7/17 | 70 | 17 |
| 8/14 | 92 | 31 |
| 9/18 | 185 | 90 |
| 10/16 | 159 | 77 |
| 11/13 | 210 | 133 |
| 12/11 | 207 | 131 |

Of note, the treatment plan backlog data for the month of January averages 260.

These backlog numbers document that all class members do not have a treatment plan. This data also suggests that the Department doesn't employ a sufficient number of psychiatric and mental health staff.

To further evaluate the Department's response to this requirement, the Monitor reviewed 115 treatment plans from 27 different facilities. This review included 62 outpatient plans, 24 RTU plans, 25 segregation treatment plans and 4 inpatient plans.

1. Outpatient plans: Of the 62 outpatient treatment plans reviewed, only seven showed evidence of true multidisciplinary planning. These treatment plans were prepared by the QMHP's. Some of these plans omitted involvement by the psychiatrist and many of them were signed by the psychiatrist days, weeks or even months after the date of preparation. The majority of these plans were not individualized to the patients' needs and were generic in nature. These plans did indicate that they were being updated annually, which is the time frame stated in the settlement agreement. This is an acceptable time frame for this level of care.

2. RTU plans: Of the 24 RTU treatment plans reviewed, 17 showed evidence of true multidisciplinary planning. Of note, all of the RTU treatment plans from JTC had multidisciplinary involvement. These RTU plans were better than the outpatient plans in that they were more individualized to the patients' needs. They were prepared in a timely manner per the time frame listed in the settlement agreement. This two-month time frame is acceptable for this level of care.

3. Segregation plans: As reported in 3(b), above, the Monitor conducted an 11-facility review[37] of segregation treatment planning. This review found that only 43 of the 77, 56%, segregation charts reviewed had evidence of a treatment plan reviewed within the first seven days of placement, a reasonable measure of timeliness set out in the Settlement Agreement. In addition, the Monitor reviewed 25 segregation treatment plans. Of these 25 plans, 17 showed evidence of true multidisciplinary treatment planning. The treatment plans, however, were very generic in nature and were not individualized to the needs of the patients. That is, the same treatment intervention was offered regardless of the stated problem. The timeliness of these plans was not assessed because the renewal frequency in the settlement agreement was modified from every month to every three months. Treatment plan renewal every three months is an acceptable standard for this level of care. Not enough time had elapsed for the Monitoring team to accurately assess this particular requirement.

4. Inpatient plans: These plans were prepared in a timely manner and showed true multidisciplinary involvement. They were also individualized to the patients' needs. No problems noted with the inpatient treatment plans.

_____

[37] Dixon, Logan, Lawrence, Pinckneyville, Menard, Pontiac, Graham, Western, Stateville, Illinois River and Hill.

5.  Crisis watch treatment plans: The team analyzed a systemwide sample totaling 154 documents offered as treatment plans.[38] Notably, Elgin does not routinely update treatment plans to focus on the crisis watch care; staff offer the rationale that treatment planning in the program is frequent and therefore crisis watch updates are not always necessary. This is contrary to the Settlement Agreement terms, as well as this requirement.

As discussed in previous Monitor's reports, the treatment plan form calls for problems and long- and short-term objectives, as is appropriate; the actual content, however, has not always recorded that information. Staff still use boilerplate language the vast majority of the time, but much of the boilerplate has become more nuanced and detailed; to the extent it reflects frequent crisis-related situations, that seems a reasonable practice.

In the current study, curiously, staff frequently did not record the problem leading to the crisis watch. One can sometimes discern it from a cover sheet that accompanies crisis admissions or from recorded patient statements. When boilerplate objectives are used, that can also be used to identify the problems implicit therein, especially if it reflects a typical reason for admission such as threatening self-harm in response to distress, in the absence of coping skills. However, there were sometimes indications that the boilerplate was chosen as a habit and may not have been relevant to that patient's admission. Other times, one or more problems were apparent but not addressed in the treatment objectives. In a few plans, objectives were absent altogether. On balance, the **problems and objectives** section was individualized and particularized based on the patient's specific needs—whether completely personalized or employing this more sophisticated boilerplate in a way that appeared appropriate—in 83% of plans reviewed.

Crisis watch **interventions** also improved slightly but, as in the past, were not as well developed as the problems and objectives. Here, 48% of the plans were individualized and particularized based on the patient's specific needs, either using appropriate boilerplate or more personal language. Insufficient plans principally took the form of naming the *Rasho*-required contacts but not discussing what treatment would take place during them. Some referenced the type and frequency of contacts from another level of care. Some did not appear applicable to that patient. Some omitted one or more of the problems that led to the crisis watch.[39]

In terms of multidisciplinary input, plans appeared about evenly split between those with psychiatric involvement and those without. About 29% may have been conducted by a multidisciplinary team in real time; this was described directly in a few plans, and suggested by others where multiple disciplines signed the plan on the same date. Another 23% most likely were

---

[38] The monitoring team reviewed an accidental sample of three patients per institution; Kewanee and Murphysboro were exempted as they had no crisis watches during the monitoring period, and Elgin was exempted as it does not tie treatment planning to placement and discharge from crisis watch. Sampled plans were completed in November 2020; if an institution did not provide three plans in that month, additional plans were drawn from October, September, and August until a total of three was reached. The review thus involved 81 patients; because a few plans were missing, the number of admission or discharge plans reviewed was 154.

[39] Where the monitoring team found the essential goals or interventions, and there was additional boilerplate that appeared inapplicable, those plans were counted as *sufficient* unless it obscured the main points so much as to make the plan unworkable.

created by an MHP with a psychiatric provider reviewing it and potentially giving input (based on signatures separated in time). About 46%, however, still appeared created solely by one individual, typically an MHP, or occasionally by a team of MHPs conferring.[40]  Nearly all measures represent a decline from the last monitoring team study.

IDOC clinicians do seem to have a well-established practice of involving and informing patients. In all reviewed crisis watch plans, it appeared the patient was involved based on his or her signature, quotes from the patient, and/or a clinician's description within the plan or progress note.

Overall, the Department has demonstrated some improvement in treatment planning during my tenure as Monitor. Much work remains, however, to bring treatment planning to a level of substantial compliance.

**5(b):  Specific requirement:**  Mental health evaluations shall be conducted in a timely manner to ensure that individuals in need of treatment, or re-evaluation of existing treatment, are evaluated without undue delay.

**Findings:**  The team reviewed, for a two-month period, all available cases where an evaluation was due,[41] a total of 940 patients. In that group, 59% of the evaluations were completed in two weeks, a reasonable measure of timeliness set out in the Settlement Agreement. Another 13% were completed in a reasonably short time thereafter.[42] This compliance rate does not reach substantial compliance, but is much better than observed in the monitoring team's analyses in the reports submitted in summer 2020.

On the other end of the spectrum, the time to evaluate 90 patients was double the requirement, or far more–it appears some were not seen for months—or they were not evaluated at all.[43]  Nearly all of this occurred after there was substantial movement in August to accommodate an influx of prisoners from outside IDOC.

Some institutions consistently managed this requirement well for at least a year. In each of the monitoring teams' analyses, these facilities completed at least 85% of evaluations timely, with few or no outliers with a lengthy time to evaluation. Therefore, the team finds East Moline, Elgin, Kewanee, Shawnee, and Vienna in substantial compliance with this requirement.

Notably, the analysis above omits the institution likely to have the largest population

---

[40]  A subset of this number has psychiatry signatures, but they were well after the patient's discharge from crisis watch. This suggests that the psychiatric review did not take place until it was too late to affect the crisis care.

[41]  The analysis is based on IDOC's "mental health database" for all IDOC institutions; this database tracks deadlines and completion dates for a number of mental health requirements, including evaluations. This analysis considers all evaluations due in a two-month period, June and August 2020, for all facilities except Stateville NRC. The databases showed a total of 1,016 evaluations due, but 76 of those are exempted by policy because an evaluation had been completed in the preceding 60 days. Therefore, this analysis draws on 940 cases.

[42]  Within three additional days, or a little over 20% longer

[43]  In a small subset of these, it appeared an attempt had been made but the patient refused. This provides a good reason for delay, but the monitoring team expects a reasonable effort at a second attempt, and none was evident in these cases.

requiring an evaluation. Stateville NRC processes by far the largest number of intakes to IDOC, a total of 1,093 in the two months that the monitoring team analyzed. Because 40% of the IDOC population is on the mental health caseload, it is predictable that a similar percentage of incoming prisoners would require evaluations and be found to need mental health services; indeed, presumably a higher number should be evaluated, since not all evaluations result in placement on the mental health caseload.

With a population of 1,093 intakes, then, one would expect more than 437 evaluations to be completed in the two months examined.[44] Whether these evaluations were conducted, and their timeliness, would significantly affect the overall compliance rate. It is encouraging that Stateville NRC reportedly has begun to conduct these evaluations, an important improvement over past practice. It is the monitoring team's understanding that this institution's tracking of evaluations due, completed, and overdue has not been systematic, but a system, put in place in January 2021, should remedy this and be able to inform the Fifth Annual Report. These are very welcome developments.

In the meantime, Stateville NRC is reportedly managing a caseload 40% higher than is typical for that institution because transfers to more permanent facilities have been slowed by an increase in COVID-positive patients throughout IDOC, which requires quarantines at those facilities. Although Stateville NRC staff have taken on the responsibility of conducting evaluations, this situation has also resulted in large backlogs on that requirement, ranging from 180 in September to 375 in December. IDOC reports well-thought out actions to remedy this, including using multiple methods to provide access to additional office space, establishing procedures to facilitate faster transfers of mental health patients to permanent facilities where treatment is more available, dedicating MHPs to the evaluation responsibility and security staff to support it, designating space and technology so that external resources can be used for evaluations through telepsychology, and planning for additional administrative support and clinical resources that may be needed in future. Additionally, staff are seeking to provide treatment through three groups reportedly running weekly. While Stateville-NRC is not currently able to meet its evaluation obligations, the monitoring team applauds this strong response to a difficult problem.[45]

**5(c): Specific requirement:** Treatment plans shall be reviewed and updated at regular intervals as clinically necessary to assess the progress of the documented treatment goal and update the plan accordingly.

**Finding:** Again, a discussion about the timeliness of the treatment planning must begin with a review of the treatment plan backlog data. The following is the treatment plan backlog data for July through December 2020:

total plans backlogged                    plans backlogged greater than 14 days

---

[44]  The intake and population numbers in this paragraph were provided by IDOC legal counsel. The total population on November 12, 2020 was reported as 30,364, and the total mental health caseload on that date was reported as 12,139 (40% of 30,364).

[45]  The information in this paragraph is based on Defendants' quarterly report related to the injunctive orders, issued January 25, 2021, and conversations with IDOC legal counsel.

| | | |
|---|---|---|
| 7/17 | 70 | 17 |
| 8/14 | 92 | 31 |
| 9/18 | 185 | 90 |
| 10/16 | 159 | 77 |
| 11/13 | 210 | 133 |
| 12/11 | 207 | 131 |

As noted in 5(a), above, the 125 treatment plans reviewed showed evidence of being reviewed and updated in a timely manner. The glaring exception to this were the treatment plans for those class members assigned to segregation. As stated numerous times in this report, only 56% of the reviewed charts had evidence of a treatment plan being reviewed and updated with the first week of being assigned to segregation.

## 6.    COMPLIANCE REQUIREMENTS

**6(a): Specific requirement:** A quarterly report created by IDOC shall certify each facility's compliance with the above requirements.

**Findings:** IDOC has provided reports on compliance with the above orders on April 23, 2019; July 23, 2019; October 23, 2019; January 23, 2020; April 23, 2020; July 23, 2020; October 23, 2020; and January 25, 2021. Each contains statements certifying whether each facility follows these injunctive orders.

**6(b): Specific requirement:** On a regular basis (no less than every 90 days), Defendants shall provide the results of their own quality assurance audit. These results shall include an accompanying certification of Defendants' CQI Manager of whether compliance has been reached with Defendants' quality assurance audit requirements.

**Findings:** Attachment four of IDOC's Quarterly Reports contain an explanation of the auditing process and includes a memorandum from the CQI Manager, Dr. Sim.

**6(c): Specific Requirement:** The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and functions.

**Findings:** The Monitor's reviews are documented in the reports submitted in July 2019, January 2020, July 2020 and the instant report.

**6(d):** Nothing in this Order relieves the Defendants of their obligations under the Settlement Agreement.

**Findings:** The Monitor and parties acknowledge this and have taken it into account when delivering and monitoring mental health services.

**CONCLUSIONS:** The Department continues to be in noncompliance with all sections of the Court's order. Lack of adequate staffing is the biggest factor contributing to the Department's overall noncompliance with the Court's Order.

Respectfully submitted,

*/s/ Pablo Stewart, M.D.*

Pablo Stewart, M.D.
Rasho Monitor
January 29, 2021