IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

ASHOOR RASHO et al.,                )
                                    )       No. 1:07-CV-1298-MMM-JEH
        Plaintiffs,                 )
                                    )
                                    )       Judge Michael M. Mihm
    vs.                             )
                                    )       Magistrate Judge Jonathan E.
                                    )       Hawley
DIRECTOR ROB JEFFREYS, et al.,      )
                                    )
        Defendants                  )

**FIFTH ANNUAL REPORT OF MONITOR PABLO STEWART, MD**

TABLE OF CONTENTS

BACKGROUND ................................................................................3

METHODOLOGY/MONITORING ACTIVITIES .............................................3

EXECUTIVE SUMMARY ......................................................................5

DETAILED FINDINGS ........................................................................9

V: MENTAL HEALTH EVALUATION AND REFERRALS ...............................10

VII: TREATMENT PLAN AND CONTINUING REVIEW ..................................15

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT
    SETTINGS......................................................................... 21

IX: ADDITIONAL MENTAL HEALTH STAFF..............................................22

X: BED/TREATMENT SPACE ...............................................................23

XI: ADMINISTRATIVE STAFFING .........................................................31

XII: MEDICATION...........................................................................32

XIII: OFFENDER ENFORCED MEDICATION ..............................................35

XV: SEGREGATION .........................................................................40

XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES .................49

XIX: CONFIDENTIALITY ...................................................................53

XXII: PARTICIPATION IN PRISON PROGRAMS .........................................55

XXIV: USE OF FORCE AND VERBAL ABUSE .............................................56

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS ...................63

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM .........................73

XXVII: MONITORING . ...............................................................74

XXVIII: REPORTING AND RECORDKEEPING ...........................................74

CONCLUSION ...........................................................................75

## BACKGROUND

**IDOC:** IDOC consists of 29 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and one additional facility for women. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Four of the facilities--Logan, Joliet, Pontiac and Dixon--have Residential Treatment Units. The RTUs at Dixon and Logan have been operating throughout the life of the Settlement Agreement. The Joliet Treatment Center began receiving offenders on October 4, 2017. The RTU at Pontiac officially opened on January 6, 2020. I particularly point out the Department's RTUs as they play an extremely integral function within the IDOC, and they have been chronically underutilized throughout my tenure as Monitor. All facilities have crisis care beds as well as some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement was approved May 23, 2016. The Corrected Second Amended Settlement Agreement was approved June 9, 2020. In March 2021, the parties reached agreement on removing some items from court oversight and continuing the Court's jurisdiction over 45 provisions for an additional year; the Court so ordered on March 10, 2021.[1] In this report, these documents will be referred to, individually and collectively, as the Settlement Agreement.

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish these monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 15 virtual site visits of 15 different IDOC facilities, where interviews of administrators and staff were conducted. During these virtual site visits, the monitoring team would obtain information about staffing, the mental health and psychiatric caseload, Covid-related issues, out-of-cell time, and the operations of crisis beds and segregated housing. These virtual site visits would be followed up by chart reviews of class members assigned to crisis beds and segregated housing.

Virtual site visits:

---

[1]  The global pandemic caused Defendants to invoke the *force majeure* provision of the Settlement Agreement. While the parties agreed that *force majeure* was appropriate, there were disputes, and court filings, about the effect of that invocation. By the parties' March 2021 agreement, the Court ordered that those disputes are moot.

1. Dixon              July 8
2. Logan              August 3
3. Lawrence           August 10
4. Pinckneyville      September 16
5. Menard             September 24
6. Pontiac            September 30
7. Graham             October 15
8. Western            October 22
9. Stateville         October 29
10. Stateville-NRC    November 5
11. Illinois River    December 16
12. Hill              December 17
13. Danville          January 13
14. Big Muddy         February 18
15. Centralia         March 17

The Monitor also conducted on-site visits to the following facilities:

1. Joliet            March 10
2. Stateville        March 11
3. Stateville-NRC    March 11
4. Pontiac           March 12

During these on-site visits, the Monitor met with the facility's leadership and mental health staff. The Monitor conducted tours of the housing units where class members are assigned, with an emphasis on the segregated housing units and crisis watch cells. The Monitor also conducted interviews of class members who were assigned to segregation and crisis watch as well as interviewing class members who were in restraints.

The Monitor reviewed 165 treatment plans and 103 sets of psychiatric progress notes from throughout the Department, as well as weekly backlog reports for a variety of responsibilities. The team reviewed records of 461 patients upon placement in a control unit, rounds records of 190 class members in restrictive housing, and discipline records and mental health progress notes for 115 disciplinary infractions. The team reviewed databases or logs covering evaluations; psychiatric contacts; therapeutic restraints; enforced medication; crisis care; referrals to higher levels of care; crisis care follow-up, along with progress notes or suicide evaluation forms for 88 such patients; out of cell time for patients in restrictive housing; and use of force from every institution that maintained them.

4

## EXECUTIVE SUMMARY

The lack of an adequate number of clinical and custody staff remains the major impediment preventing IDOC from meeting the requirements of the Corrected Second Amended Settlement Agreement. This is reflected in the ongoing backlog of mental health evaluations that exists throughout the Department with the biggest culprit being NRC. Treatment plans are equally backlogged. Only RTU and Inpatient treatment plans demonstrate true multidisciplinary collaboration. Only half of the class members assigned to segregated housing have their treatment plans reviewed and updated within their first week of placement. The relatively new requirement about the transition of class members from specialized treatment units is only occurring in 74% of the sample reviewed.

The three men's RTUs report having constructed the required number of beds. JTC, however, has a practice of single celling which effectively limits the beds to 190 instead of the required 360. Pontiac's RTU census continues to run at less than 50% of stated capacity. Dixon's RTUs run the closest to full capacity as the combined census of the STC and the DXP was 595 out of a total of 676 beds. Also, the inpatient unit has run at approximately 1/3 of its stated capacity throughout most of the monitoring period.

Medication distribution times at several facilities remain an obstacle to good medication compliance. Overall, psychiatric patients were not seen as frequently as required by the settlement agreement. Performance was much better for class members assigned to the RTU and Inpatient levels of care. Problems persist with the use of enforced medications. While many institutions have made progress, IDOC's restraints' practice has deteriorated ever since 2018. The number of uses has doubled. Restraints are applied for extremely unreasonable lengths. There is a huge surge in patients restrained multiple times. These practices compound each other, up to the point that one patient was restrained for 42 full days. Only 6% of these patients was referred to a higher level of care. Regarding the proper administration of enforced medications, the institutions responsible for nearly all enforced medication continue to struggle meeting the requirements of this section.

The living conditions in segregated housing units at Pontiac fail to meet the standards called for in XV(a)(ii). Class members do continue to receive the treatment outlined in their Individual Treatment Plans. This treatment, however, is not sufficient to address the stresses associated with segregation placement. The Department has a less than 80% completion rate of assessing newly placed class members in segregation within 48 hours. Only 54.1% of class members assigned to segregation had their treatment plans reviewed and updated within 7 days of placement. Medication is provided to class members assigned to segregation. Grossly insufficient out-of-cell time is being offered and received by class members assigned to segregation.

The Covid pandemic has significantly impaired IDOC's ability to provide mental health and psychiatric services in a confidential manner. The Department has created a plan, however, to address these issues moving forward. A serious confidentiality issue exists at Joliet. Custody Treatment Officers are allowed to be present in the room when individual and group treatment activities are occurring. The Department needs to address this issue if they wish to continue receiving a Substantial Compliance rating for this section.

The "Participation in Prison Programs" requirement was previously found to be in substantial compliance. Plaintiffs have raised concerns that RTU patients may not be receiving educational and vocational programming on the same terms as other prisoners and have limited or no access to jobs. The monitoring team has initiated conversation with IDOC to investigate these potential issues.

IDOC has established its Deescalation Response Teams, which appear to have a good success rate. Of the ten institutions the monitoring team is reviewing, two make good use of these teams, but the other institutions do not appear to use them. There were some good examples in incident reports of both the teams, and mental health staff, intervening. More than one-third of reviewed reports, however, raised concerns about unnecessary or excessive force, including large quantities of Oleoresin Capsicum spray deployed, using that spray when a patient is already contained. Please note that the Monitoring Team relied solely upon a review of the "use of force logs" as the foundation of our opinions. Due to Covid-related travel and access issues, the Monitoring Team was not able to interview class members involved in use of force incidents, review their medical records or view footage from fixed cameras as a check upon the accuracy of the "use of force logs." The Monitoring Team reserves the option of modifying its opinions based on any new information obtained during the next monitoring period.

Once again, Assistant Monitor, Reena Kapoor, M.D., conducted an expert analysis of XXV(a). The same concerns as reported in the Midyear Report of November 30, 2020, persist during the current reporting period.

A summary of compliance findings follows:

| Requirement | Compliance Status |
|---|---|
| **V: MENTAL HEALTH EVALUATION AND REFERRALS**<br><br>(V)(a)<br><br>(V)(d), (f), (g) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Noncompliance for 25 institutions<br>Substantial compliance for 5 institutions<br>Noncompliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW**<br><br>(VII)(a)<br>(VII)(b)<br>(VII)(c), (d) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance<br>Substantial compliance<br>Noncompliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS**<br><br>(VIII)(b)(i) | Overall: Noncompliance<br><br><br><br>Noncompliance for 23 institutions |

| Requirement | Compliance Status |
|---|---|
| | Substantial compliance for 7 institutions |
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>   (IX)(a), (b)<br>   (IX)(f) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance<br>No rating |
| **X: BED/TREATMENT SPACE**<br><br>   (X) (b)(ii), (d), (e), (f)<br>   (X)(g) | Overall: Noncompliance<br>Subfindings supporting overall finding:<br><br>Noncompliance<br>No rating |

| XI: ADMINISTRATIVE STAFFING | |
|---|---|
| (XI)(c) | Finding: Noncompliance |
| **XII: MEDICATION** | Overall: Noncompliance |
| (XII)(b), (c)(i)<br>(XII)(c)(iv)<br>(XII)(c)(vi) | Subfindings supporting overall finding:<br>Noncompliance<br>Substantial Compliance<br>No Rating |
| **XIII: ENFORCED MEDICATION** | Finding: Noncompliance<br>Noncompliance for 10 institutions<br>Substantial compliance for 20 institutions |
| **XV: SEGREGATION** | Overall: Noncompliance |
| (XV)(a)(ii)<br>(XV)(a)(iii)<br>(XV)(a)(iv) | Subfindings supporting overall finding:<br>Noncompliance<br>Substantial compliance<br>Noncompliance for 10 institutions<br>Substantial compliance for 20 institutions |
| (XV)(a)(v), (a)(vi) (first and second),<br>(c)(ii), (c)(iii), (c)(iv), (d), (e) | Noncompliance |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES** | Overall: Noncompliance |
| (XVII)(a) | Noncompliance for 7 institutions<br>Substantial Compliance for 23 institutions |
| **XIX: CONFIDENTIALITY** | Finding: Substantial Compliance |
| (XIX)(b), (c) | Substantial compliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Finding: Substantial Compliance |
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Finding: Noncompliance |
| | Noncompliance for 8 institutions<br>Substantial compliance for 22 institutions |

| | |
|---|---|
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS**<br><br>(XXV)(a) | Finding: Noncompliance |
| **XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM**<br>(XXVI)(a), (b) | Overall: Substantial compliance<br><br>Substantial compliance |
| **XXVII: MONITORING** | Finding: Substantial compliance |
| **XXVIII: REPORTING AND RECORDKEEPING** | Finding: Substantial compliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement Agreement.

**Overall structure:** This Section is organized along the same structure as the Settlement Agreement; each major section below corresponds with a substantive section of the Settlement Agreement.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement Agreement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement Agreement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement Agreement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement Agreement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that noncompliance is, nonetheless may be in substantial compliance with the provision of the Settlement Agreement.

**Compliance ratings:** The team applies "Substantial Compliance" and "Noncompliance" ratings for each provision, as specified in the Settlement Agreement. In actual fact, these may mask IDOC's true performance. IDOC has made substantial progress on a number of requirements, which possibly could be more accurately described as "partially compliant." The terms of the Settlement Agreement, however, only allow for the use of "Substantial Compliance" and "Noncompliance."

Section II (u) of the Settlement Agreement defines "Substantial Compliance" as follows: "The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious."

Substantial Compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this report, most compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement Agreement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the Monitor of this seismic shift for IDOC, I continue to feel that it is more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. It is important to note that during the first four years of implementing the Settlement Agreement, IDOC has improved the overall quality of psychiatric and mental health services offered to the offender population. More than 60% of the original provisions were found in Substantial Compliance and were removed from the Settlement Agreement in March 2021 by agreement of the parties and the Monitor. IDOC still has a long way to go to fully meet the requirements of the Settlement Agreement, especially in terms of staffing.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary:** There remains a department-wide backlog of mental health evaluations. Although the absolute number is relatively small given the overall mental health caseload, those affected class members are put at risk of serious harm by not having a timely mental health evaluation. Stateville-NRC has a plan to lower the number of its outstanding mental health evaluations. Staff are beginning to make progress in lowering the backlog at NRC. There is a concern, however, that this is just shifting much of the burden to the receiving facilities. The monitoring team also encountered a problem with the timely completion of mental health evaluations at the Logan, Graham and Menard Reception and Classification units, with Menard having the largest number of untimely mental health evaluations. The monitoring team will closely monitor this moving forward.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** Paragraph V(f) of the Corrected Second Amended Settlement Agreement states "Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (see IDOC Administrative Directives 04.04.100 § II(G)(2)(b) and 04.04.101 § II(F)(2)(c))."

As I reported in the Midyear Report of November 30, 2020, and previously, IDOC has struggled to meet these 14-day requirements. The following is the mental health evaluation backlog data for June 2020 through April 2021:

| | | |
|---|---|---|
| 6/12/20 | 29 mental health evaluations backlogged | 11 (38%) greater than 14 days late |
| 7/10/20 | 13 Mental health evaluations backlogged | 5 (38%) greater than 14 days late |
| 8/14/20 | 38 Mental health evaluations backlogged | 14 (37%) greater than 14 days late |
| 9/11/20 | 83 Mental health evaluations backlogged | 29 (35%) greater than 14 days late |
| 10/9/20 | 102 Mental health evaluations backlogged | 48 (47%) greater than 14 days late |
| 11/6/20 | 126 Mental health evaluations backlogged | 62 (49%) greater than 14 days late |
| 11/20/20 | 123 or 134 (two numbers were reported) | 60 (49% or 45%) greater than 14 days |
| 12/25/20 | 85 Mental Health Evaluations backlogged | 47 (55%) greater than 14 days late |
| 1/22/21 | 68 Mental Health Evaluations backlogged | 49 (72%) greater than 14 days late |
| 2/19/21 | 71 Mental Health Evaluations backlogged | 35 (49%) greater than 14 days late |
| 3/19/21 | 77 Mental Health Evaluations backlogged | 38 (49%) greater than 14 days late |
| 4/23/21 | 75 Mental Health Evaluations backlogged | 43 (57%) greater than 14 days late |
| 4/30/21 | 111 Mental Health Evaluations backlogged | 87 (78%) greater than 14 days late |

IDOC does not track the absolute number of mental health evaluations that are required for a given week. So, there is no way to determine if these backlog numbers represent a large or a small proportion of the total number of mental health evaluations that are required for a given week. Regardless, each backlogged mental health evaluation places that class member at risk of serious harm. The above-listed numbers do not include Stateville-NRC's data.

The monitoring team conducted a study of evaluation timeliness as well, reviewing nearly all evaluations reportedly due at all institutions in a five-month period.[2] For this sample of 2,227 evaluations due, 63% were completed timely.

---

[2] The reviewer drew upon IDOC's MHP Databases, which reflect the date an evaluation is due and the date it is completed. Each institution provides this database monthly to the monitoring team. The reviewer examined all evaluations shown as due in June, August, October, and December 2020 and February 2021. This was supplemented with clarifications from institutions and IDOC legal counsel.

Among the evaluations listed, some were identified as not due because policy does not require a new evaluation when one has been completed in the preceding 60 days, or because the database incorrectly interpreted a change in circumstance as a new patient. An additional set of cases may or may not have been due, missed, or late; those have been removed from the analysis while staff looks into those cases. Stateville-NRC practice was not included, as it was analyzed separately.

Another 26% were completed within an additional 14 days. Unfortunately, those completed later could be *quite* delayed:

- 111 took 1 to 3 months to complete
- 8 evaluations took 3 to 9 months to complete
- A small proportion were missed altogether (2%)

These lengthier cases, of a month or more, are evident at 11 institutions.

These timeliness numbers come with a significant *caveat*, however. If a patient is due for an evaluation at one facility and transfers to another before it is completed, it is not clear that it remains possible to reflect the original due date. If not, some portion of the evaluations that appear timely are, in fact, late. IDOC and the monitoring team are in conversation with the Department to learn more.

In the Monitor's Midyear Report, the team issued findings that five institutions were in substantial compliance. Quite a number of other institutions now appear to have strong performance. Given the uncertainties about the timeliness programming, however, it would be unwise to make any further designations of substantial compliance until the correctness of the system calculations is confirmed.

Another major area of concern regarding mental health evaluations is the large number of backlogged mental health evaluations at Stateville-NRC. In the Midyear Report of November 30, 2020, the following numbers of backlogged mental health evaluations from NRC were reported:

| | |
|---|---|
| June | 160 |
| July | 99 |
| August | 169 |
| September | 180 |

Beginning in February 2021, the backlog numbers from Stateville-NRC were reported on the weekly backlog report:

| | | |
|---|---|---|
| 2/19/21 | 402 backlogged evaluations | 302 (75%) greater than 14 days late |
| 3/19/21 | 384 backlogged evaluations | 268 (70%) greater than 14 days late |
| 4/23/21 | 114 backlogged evaluations | 75 (66%) greater than 14 days late |
| 4/30/21 | 115 backlogged evaluations | 73 (63%) greater than 14 days late |
| 5/21/21 | 86 backlogged evaluations | 43 (50%) greater than 14 days late |

During my site visit to Stateville-NRC on March 11, 2021, the staff informed me of a new program aimed at reducing the number of backlogged mental health evaluations. If an inmate is identified at screening as being a class member, every effort is made to transfer that individual no later than day 10. If the class member is not transferred by day 10, then he is referred to a state social worker for a mental health evaluation.

On the one hand, it is beneficial to move patients quickly to institutions equipped to provide ongoing treatment. There is evidence of this in Stateville-NRC's MHP Databases, which suggest at least 295 patients were transferred during March.[3]

On the other hand, there is little indication that evaluations are being completed timelier. Among a set of 266 patients onsite in February, who required an evaluation, IDOC's tracking shows:[4]
- only 33 clearly have an evaluation completed at Stateville-NRC
- only 5 of those were timely
- another 111 had no evaluation as of the end of March; these were all overdue one to four months

The remaining 122 patients in that sample appeared to have transferred in March and it is unclear whether an evaluation had been completed before transfer. Each of these was overdue by March 1, so any completed evaluations were late, and 77% of this group was a minimum of 14 days late.

NRC staff told the Monitor that the best measure of this program's success is the backlog numbers, and this undoubtedly is a good faith belief. The most recent numbers demonstrate that this new "transfer program" is resulting in a reduced backlog of mental health evaluations *at Stateville-NRC*, but it appears principally to shift the problem of overdue evaluations to the receiving institutions.

Moreover, it is unclear whether the original due date is preserved after a patient transfers. It is very possible that the system resets, since it automatically sets an evaluation deadline based on the date *an institution* adds the patient to its own caseload. If that is occurring, hundreds of cases would be falling off the backlog reports without the evaluations having been completed. The monitoring team and IDOC are looking into this question.

Importantly, IDOC has initiated sensible plans to address the demand for evaluations at Stateville-NRC. As described above, the institution is prioritizing mental health transfers and has written Administrative Directive 05.05.112 to guide that practice. IDOC reports that mental health,

---

[3] This is derived by comparing the names and prison numbers on the MHP Databases provided by Stateville-NRC for February and March.

[4] The monitoring team is informed that, in January 2021, Stateville-NRC began tracking certain MHP responsibilities employing the MHP Database used by the other IDOC institutions. The monitoring team reviewed the February database for all evaluations due in February; for those with no evaluation completed, the reviewer also checked the March database for updates. The monitoring team had similarly been tracking evaluation completion for a set of names previously provided by IDOC as needing an evaluation in December. To the extent members of that cohort remained at Stateville-NRC in February, they were included in this analysis. This sample of 266 people constitutes a 41% sample of the patients that Stateville-NRC has listed as being present during February.

Clinical Services, and Operations staff are coordinating in this endeavor. Expectations have been set for mental health staff to complete evaluations for patients who require them and are onsite more than 10 days. One MHP has been assigned to this task and there are plans to hire a second person for this purpose; an officer is dedicated, during two shifts per day, to facilitate patient escorts to the MHPs, an important element that supports completing this task. IDOC has requested that additional clerical staff be hired, and that an assessment be conducted to determine whether the staffing matches the responsibilities after this plan has been operationalized. It appears that IDOC is also considering utilizing MHPs in other locations, as IDOC reports it is designating rooms and setting up technology for telepsychology. As of the April Quarterly Report, IDOC was also in the process of constructing cellhouse offices, and two offices and group space in Unit I, for this purpose.[5]

The compliance rates currently warrant a Noncompliance rating. However, both the improvements in the backlog reports, and IDOC having brought good analysis and resources to this issue at Stateville-NRC, bode well for the possibility of moving toward substantial compliance.

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** During the monitoring period, the monitoring team has conducted virtual site visits at all four of the department's Reception and Classification ("R&C") units. The Monitor made an in-person site visit to Stateville-NRC on March 11, 2021. The problems associated with the large number of uncompleted mental health evaluations at Stateville-NRC are described in V(a), above. In the monitoring team's study, Logan, Graham and Menard, which have R&C units, had timeliness rates of 78%, 54%, and 41% respectively; their largest number of late evaluations were completed within 14 days, but Menard had a significant number that took longer or appeared to have been missed.[6] As for automatically referring patients with a mental health history, this is captured in policy and it has been generally understood in conversations with staff, but the monitoring team does not have information that would specifically identify these cases and verify that the referral took place as required.

IDOC will receive a rating of substantial compliance when the departmental backlog, including the backlog at Stateville-NRC, begins to approach zero and the timeliness at Menard improves.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

---

[5] The information in this paragraph is drawn from IDOC's Quarterly Report dated April 23, 2021, the Monitor's interviews of staff, and the Administrative Directive provided by IDOC legal counsel.

[6] For a description of the study method, please see section V(a), above

**Findings:** Please see V(a), above, for details of IDOC's problems in meeting this requirement.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** As reported in the Midyear Report of November 30, 2020 "This issue continues to be problematic for the Department. Calls for a crisis intervention team are not always promptly answered. As I have stated in previous reports, this is a chronic problem that has plagued the Department throughout my tenure as Monitor. I continue to make myself available to consult with departmental leadership about how the issue can be resolved." Based upon my interviews with class members during the reporting period, it remains my opinion that this continues to be a serious issue for the Department.

IDOC asserts that at least some of the written patient complaints indicate that there was a staff response, but that the patients did not understand that that was a member of the Crisis Intervention Team. IDOC reports that, since discovering this in February, it has updated orientation handbooks to clarify the types of staff who may respond. IDOC indicates that it regularly reinforces the responsibility to call for a Crisis Intervention Team member, including in a communication in December 2020 and in updated cadet training and updated annual training.[7]

Overall, this requirement remains in Noncompliance.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**: There remains a backlog of uncompleted treatment plans throughout the Department. As with the mental health evaluations, the absolute number is relatively small given the overall mental health caseload. Those affected class members, however, are put at risk of serious harm by not having a timely treatment plan.

The RTU and Inpatient treatment plans are generally prepared in a multidisciplinary manner. Outpatient, Segregation, and Crisis Watch plans are not. Only 54.1% of class members assigned to segregation have their treatment plans reviewed and updated within the first week of placement.

For both outpatient and RTU psychiatric visits, it was very rare for a patient to be seen every 30 days, but common for the appointments to miss the mark by a short time. IDOC reports that the pandemic particularly impacted psychiatric care and that psychiatric practitioners mitigated this by reviewing charts and renewing orders if a contact was to be missed. This practice falls below the standard of care, however. Most plans retain a 30-day regimen and extensions to 60 or 90 days are infrequent. Occasionally, the time to those appointments appears to exceed the maximum 90 days. Inpatient psychiatric care goes well beyond Settlement Agreement requirements.

---

[7] The information in this paragraph is based on IDOC's Quarterly Report dated April 23, 2021.

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** VII(a) contains two requirements. The first is "any offender requiring on-going outpatient, inpatient or residential mental health services **shall** (emphasis added) have a mental health treatment plan." The second is "such plans will be prepared collectively by the offender's treating mental health team." The following is a discussion of the first requirement of VII(a):

A thorough analysis of IDOC's response to VII(a) requires a review of the treatment planning backlog data for the reporting period. The following is a sampling of the actual number of treatment plans that have been backlogged from June 2020 through April 2021:

| | total plans backlogged | plans backlogged greater than 14 days |
|---|---|---|
| 6/12 | 302 | 222 |
| 7/17 | 70 | 17 |
| 8/14 | 92 | 31 |
| 9/18 | 185 | 90 |
| 10/16 | 159 | 77 |
| 11/13 | 210 | 133 |
| 12/11 | 207 | 131 |
| 1/15 | 273 | 152 |
| 2/12 | 225 | 149 |
| 3/12 | 401 | 282 |
| 4/16 | 210 | 149 |
| 5/21 | 256 | 145 |

As I have reported in previously, these backlog numbers document that all class members do not have an up-to-date treatment plan. This is a serious deficiency on the part of IDOC. This data also strongly suggests that IDOC does not employ enough mental health staff.

To evaluate the second requirement of VII(a), the monitoring team reviewed 389 treatment plans from 28 different facilities. This review included 62 outpatient plans, 64 RTU plans, 35 segregation plans, 224 crisis watch plans, and 4 inpatient plans.

1. Outpatient plans: Of the 62 outpatient plans reviewed, only seven showed evidence of true multidisciplinary planning. The treatment plans were generally prepared by the QMHPs. Some of the plans omitted involvement by the psychiatric practitioner and many of them were signed by the psychiatric practitioner days, weeks or even months after the date of preparation. During my site visit to Pontiac, I was informed that there is some confusion about signing the plans, which may have resulted in some of these dating issues. Even taking this into consideration, most of these plans were not prepared in a multidisciplinary manner. This is a serious deficiency on the part of IDOC.

2. RTU plans: Of the 64 RTU treatment plans reviewed, 57 showed evidence of multidisciplinary planning[8].

3. Segregation plans: The Monitor reviewed 35 segregation treatment plans. Of these 35 plans, only 18 showed evidence of multidisciplinary treatment planning.[9]

4. Crisis watch: In 220 treatment plan documents, 50% likely had multidisciplinary input, based on signatures, a note concerning participation, or the institution's well-established pattern; this group had signatures on the same date or close enough in time to suggest real-time participation.[10] In almost one-quarter of the plans, psychiatric participation was unlikely; with signatures well after discharge, including for many *admission* plans, these were suggestive of a provider reviewing the plan to update him- or herself, but not a process in which the caregivers exchanged information that informed the plan of care. The remaining one-quarter were signed by an MHP alone and there was no mention of any other participation, and a small number of cases showed multiple MHPs conferring.

5. Inpatient plans: These plans demonstrated multidisciplinary involvement. No problems were noted with the inpatient treatment plans.

Defendants assert that there is no need for psychiatrists to participate in treatment planning for patients who are not already on psychotropic medication. This approach fails to meet the standard of care.. A psychiatric provider should be assessing whether the addition of medication would be beneficial, particularly for patients whose symptoms and/or level of care have changed. Also, the psychiatric provider is the most highly trained member of the team. As such, the psychiatric provider should participate in case discussions on every patient on the mental health case load.

IDOC will receive a rating of noncompliance for (VII)(a). This is due to the outpatient, segregation, and crisis watch plans not being completed in a multidisciplinary manner. Finally, the treatment planning backlog, although it is relatively small compared to the overall mental health case load, is a serious problem for those affected class members. A backlogged treatment plan means that there is no updated document directing the class member's mental health and psychiatric treatment.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), IDOC Form 0546 (Mental Health Treatment Plan Update) or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

---

[8] 89%

[9] 51%

[10] In this review, the monitoring team examined an accidental sample of plans from 116 crisis watches; these included plans on admission, weekly updates, and discharge plans, for a total of 224 documents offered as plans (either in treatment plan format or progress notes referring to the treatment planning decisions). In a few instances, clinician participation could not be discerned, so this is an analysis of 220 documents. These were drawn from 28 institutions in November and December 2020 (all except Kewanee and Murphysboro, which reported no crisis watches during the months studied, and rarely, if ever, have crisis watches).

**Findings:** The treatment plans reviewed were recorded on the correct forms. The plans, especially the outpatient and segregation plans, were generally generic in nature and not individualized to the needs of the patient. The RTU and inpatient plans were better in this regard. Treatment plan reviews were also noted to be completed on the correct forms. A rating of substantial compliance is assigned due to IDOC utilizing the appropriate forms. This rating does not speak to the quality of the treatment plans.

**(VII)(c): Specific requirement:** Where the IDOC provides crisis care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** In a 14-facility[11] review of 129 crisis admissions, 105 or 81% had evidence of a treatment plan being reviewed and updated upon admission. A review of 128 crisis discharges revealed that 108 or 84% had evidence of a treatment plan reviewed and updated upon discharge. These findings are similar to those reported in the Midyear Report of November 30, 2020. That is, 79% completed treatment plans upon admission and 86% upon discharge. This review also demonstrated that treatment plans were updated weekly for those staying longer than seven days.

IDOC informed the monitoring team that Elgin does *not* update plans to coincide with crisis watch admission and discharge. Staff believes that, because they update treatment plans frequently, there is no need to create one specific to crisis watch.[12] It was also clear that Illinois River has a routine of issuing only one treatment plan during crisis watches, contrary to the Settlement Agreement.[13]

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated. Reviews shall assess the progress of the documented treatment goals and be documented on the DOC 0284, DOC 0546 or the equivalent and shall include the date of the review and the date on which the next review will be performed.

**Findings:** In an analysis of segregation treatment plans referenced in XV(a)(v), below, only 54.1% of the plans reviewed had evidence of being reviewed and updated within the first week of placement. Of those plans reviewed and updated, these reviews were documented using the proper forms.

None of the reviewed patients had been in segregation long enough to assess the requirement of updates every 90 days. It is likely that such placements will occur relatively rarely after a November 2020 change in policy that encourages very short segregation terms, used in progressive discipline, up to 28 days, and only permits longer terms for specified offenses

---

[11] Menard, Stateville, Big Muddy, Centralia, Danville, Dixon, Graham, Hill, Illinois River, Joliet, Lawrence, Logan, Pontiac and Western.

[12] This was apparent in treatment plans provided for November 2020 and this explanation was provided via legal counsel. The monitoring team compared treatment plans and crisis watch logs for November 2020 through March 2021 and found that this practice continues.

[13] In the 142 crisis watches appearing on its log, 89% had the same date for the admission treatment plan and the discharge treatment plan.

(essentially, violence, certain kinds of contraband, drugs, gang leadership, escape, and sexual misconduct).

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)    For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)   For offenders at a residential or mRTU level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)  Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** To review this provision for **outpatients**, the monitoring team analyzed contacts for 731 psychiatric patients, drawn from across IDOC, for whom the timeliness of at least three appointments in the monitoring period could be discerned.[14] The vast majority of follow-up contacts *are* ordered for 30 days, but it was very rare for a patient to be seen *every* 30 days, or

---

[14]   IDOC does not maintain a data system that can show a series of contacts, but relevant data can be extracted from its "Psych Database." The monitoring team controls for the known difficulty of some contacts being displaced. Defendants would prefer that the monitoring team work exclusively with patient charts, but in a population of more than 9,000, and a minimum of 12 to 40 pages per patient for this one requirement, it is not viable for IDOC staff or the monitoring team to identify, scan, transmit, and review this material for a reasonable-sized sample. Data is essential.

The monitoring team reviewed a Psych Database from each relevant institution for each month from June 2020 through February 2021, with follow-up in March 2021 where necessary. A sample was chosen generally by random selection method of every 10 patients, though there were exceptions if the caseload was small or for a few other reasons. Cases were chosen from all institutions except Murphysboro, which reported it had no patients on the psychiatric caseload during the period studied, and Elgin, which was analyzed separately. Because Stateville-NRC tends to have a much shorter-term population, cases were instead chosen by going systematically through every case in the June database, comparing them to later databases to identify cases that had three contacts, and retaining all such cases.

A contact was counted as timely if it occurred within 30 days, even if the provider had ordered a return to clinic in a shorter period, because the Settlement Agreement only requires patients to be seen within 30 days (that is, the reviewer assessed whether the contact met the Settlement Agreement requirement, *not* whether the patient was seen within the time the psychiatric provider specified). If a provider ordered an appointment *more* than 30 days hence, the contact was counted as timely if completed within that time, and not exceeding 90 days. Where it was difficult to confidently discern the interval between two contacts, the contact in question was eliminated from this analysis and the cases were only retained if there were at least three *other* contacts on which to make a judgment.

Because this process eliminated many cases from the original sample, additional cases were selected for the institutions with larger caseloads, so that the sample remained roughly proportionate to caseloads.

within a longer interval the provider designated if the patient was more stable. Only 16% of reviewed patients were seen within the required interval every time. IDOC notes that the frequent need for covid 19-related quarantines took a particular toll on psychiatry services, so it may not be surprising that this rate has dropped from previous analyses. IDOC reports that, when quarantine prevented a contact, psychiatrists mitigated the situation by reviewing the charts and writing orders continuing medications until an appointment could take place. This practice, however, fails to meet the standard of care.

It was common for contacts to miss the mark only by a short time. For a monthly requirement, the monitoring team considers a contact within an additional week to be reasonable. If that standard were to be adopted, compliance within the sample jumps to 54%.

In sampled cases where there were longer times between appointments, two to four additional weeks was common, but a handful of contacts appeared delayed up to 13 weeks.[15]

Where psychiatrists ordered follow up at intervals longer than 30 days, the logs did not give any cause for concern. Fewer than half of reviewed patients had at least one such order; appropriately, the practice was almost nonexistent at Dixon and Pontiac, where the patients are generally higher need. No orders exceeded 90 days, and even 90-day orders were uncommon – they were written for fewer than 25% of reviewed patients. In this monitoring round, the monitoring team did not review whether patients were sufficiently stable to warrant these extensions. Late appointments did occur at about the same rate as the rest of the sample, though, which means that some did exceed the maximum allowed under VII(d)(i).

Contacts were much closer to the requirement for **RTU** patients. After reviewing the database for 62 patients, the monitoring team found similarly low compliance for meeting the standard *every* 30 days (or longer if ordered), but 79% of sampled patients had contacts completed within a reasonable, additional week. Where appointments took longer, all but a handful were completed within two extra weeks. There was particularly strong practice at Joliet and Logan.

In RTU, orders were uniformly maintained at 30-day intervals, or more often. Only 11% of patients were thought to be stable enough for extended appointment times. No orders exceeded 60 days, although a very small number of actual appointments did.

As for **inpatient** care, all Elgin databases in the round show that patients were scheduled to see a psychiatrist at three-day intervals. In prior monitoring rounds, the databases showed a routine of meeting patients weekly. During the Monitor's site visits, he also observed that there was frequent psychiatric contact. It appears that IDOC is far exceeding the requirements for frequency of inpatient psychiatric contacts.

Overall, psychiatric providers are not yet seeing patients at the frequency dictated by this requirement (except for inpatient), so practice is rated Noncompliant.

---

[15] One patient had a verified gap in contact of 6.5 months, but every indication is that this is an anomaly.

## VIII:    TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

**Summary: This relatively new requirement is becoming well established, with 74% compliance demonstrated overall, and as many as 16 institutions poised for a substantial compliance finding if their practice is sustained for one year.**

**Troublingly, about 12% of contacts apparently were not completed and these, along with contacts that were weeks late, tended to be concentrated in four institutions responsible for a large proportion of this responsibility.**

**(VIII)(b)(i): Specific requirement** (as it appears in the Corrected Second Amended Settlement Agreement): For offenders transitioning from Crisis placement, the treating MHP will see the offender for an individual session within five (5) working days from the crisis discharge to assess their stability and progress and to provide therapeutic counseling or interventions as clinically appropriate. An MHP will conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender every two months for six months or as scheduled in the individual treatment plan. Findings shall be documented in the offender's medical record.[16]

**Findings:** The monitoring team studied a sample of 848 crisis watches; this comprised all crisis watches at all 28 institutions that had admissions during the two months selected.[17] In this study:
- 74% of the follow-up sessions were timely
- a large majority of the late contacts took place within an additional week
- a small subset was up to four to five weeks late
- logs indicated that 12% of the follow-ups were not completed.

Since this review was based on tracking documents, the monitoring team also requested chart sections to conduct spot checks of the logs' accuracy.[18] The charts were consistent with almost 90% of the corresponding log entries. A handful had immaterial differences, but 7% were

---

[16] This requirement changed substantially from previous versions of the Settlement Agreement. Thus, previous monitoring analyses will not be comparable.

[17] The monitoring drew all cases from "Crisis Trackers" provided by IDOC for September and November 2020. After the Midyear Report, IDOC informed the Monitor that some of their July logs contain errors, so the Midyear Report analysis, based on the July logs, is not included here.

The reviewer recorded information about the initial contacts and followed each of these cases for the contacts required at 60-day intervals, drawing on the due dates and dates of contact shown in IDOC's subsequent monthly Crisis Trackers through March 2021. Timeliness was assessed on all contacts that were due by the third week of March--to allow for ordinary delays in staff's recording—a total of 1,685 contacts.

[18] The reviewer requested an accidental sample from 26 institutions and received records for 1 to 8 patients per location. The reviewer requested documentation for the dates of contact identified in the Crisis Trackers, or for a date range in an effort to capture contacts that were due but not logged as of the time of providing the logs. The study reviewed 195 contacts from July 2020 through January 2021.

of concern in that no documents were provided to demonstrate the logged contact, or the logs appeared to credit contacts that do not satisfy the requirement.[19]

Seven institutions had very strong practice[20]—from 82% through 100%--for this initial seven months of implementing this requirement; together with strong practice recognized under the previous version of this requirement, this is sufficient to demonstrate a year or more of practice and they are found in substantial compliance now.[21] Another nine institutions performed similarly this round and, if this is sustained through the 2021 midyear report, they will be found in substantial compliance. Another set of institutions did moderately well. Practices were particularly troubling at four institutions,[22] and they were responsible for almost one-third of all crisis watch follow-ups. This substandard practice at these four institutions represents a serious deficiency on the part of IDOC. A rating of substantial compliance will be assigned to VIII(b)(i) when all IDOC facilities are meeting the requirements of this section of the settlement agreement.

## IX: ADDITIONAL MENTAL HEALTH STAFF

> **Summary: The Department has never met its staffing requirements as outlined in this section. Significant shortages of QMHPs exist at Dixon (10), Logan (8) and Pontiac (9). Joliet has a shortage of five mental health nurses.**

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** The following data is obtained from the Wexford Health Sources Restructure Plan Staffing Updates as of March 19, 2021:

| | Vacant FTEs |
|---|---|
| • Dixon: | |
| ○ Site MH Services Director | 1.00 |
| ○ MH Unit Director | 1.00 |
| ○ Post Doc-Psychologist | 1.00 |
| ○ Pre-Doc-Psychologist | 2.00 |
| ○ QMHP | 10.00 |
| ○ BHT | 2.00 |
| ○ Psychiatrist | 3.425 |

---

[19] Generally, these apparent discrepancies were found in small numbers across a range of institutions and were not significant enough to affect the Monitor's Substantial Compliance findings.
[20] Danville, Decatur, Dixon, East Moline, Jacksonville, Joliet, Lincoln, Shawnee, Sheridan, Stateville, Stateville-NRC, Taylorville, Vandalia, and Vienna. Kewanee and Murphysboro will be included in this group, as they have virtually no crisis watches
[21] Danville, Jacksonville, Lincoln, Shawnee, Sheridan, Taylorville, Vandalia
[22] Lawrence, Menard, Pontiac, and Southwestern

- Logan:
  - MH Unit Director                2.00
  - Post-Doc-Psychologist           2.00
  - Staff Psychologist              2.00
  - QMHP                            8.00
  - BHT                             1.00
  - RN – MH                         4.00
  - Psychiatrist                    2.025
- Pontiac:
  - MH Unit Director                1.00
  - Post-Doc-Psychologist           2.00
  - Staff Psychologist              2.00
  - QMHP                            9.00
  - Staff Assistant                 1.00
  - Psychiatrist                    0.250

The deadline for Dixon and Logan meeting their staffing requirements was February 6, 2018. Pontiac's deadline was July 6, 2018. Of note, the above-listed staffing numbers are for the facility as a whole. Wexford's staffing report does not break the staff down by RTU and outpatient.

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:**

|  |  | Vacant FTE |
|---|---|---|
| • | Joliet: |  |
|  | ○ Post-Doc-Psychologist | 1.00 |
|  | ○ Staff Psychologist | 2.00 |
|  | ○ QMHP | 1.00 |
|  | ○ RN – MH | 5.00 |
|  | ○ CNA | 1.00 |

The deadline for Joliet to meet its staffing requirements was November 22, 2017.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** The monitoring team is not aware of the progress, if any, of any negotiations between parties regarding staffing. A "No Rating" will be assigned to this requirement.

## X: BED/TREATMENT SPACE

**Summary: The three men's RTUs report having constructed the required number of beds. However, Joliet has a practice of single celling, which effectively limits the beds to 190 instead of the required 360. Pontiac has had long-term recruiting difficulties, making it infeasible to run even half of its beds. Similarly, inpatient care has had 2/3 of the beds empty through most of the monitoring year. Under these conditions, it cannot be said the required number of RTU and inpatient beds are constructed and made available.**

**These large-scale vacancies pre-date, but were exacerbated by, the pandemic. Some other contributors include a lack of referrals when there are indicia of patient need, and long delays to access the care. RTU referrals greatly improved; inpatient referrals did not. Times to transfer substantially improved for both levels of care by the end of the monitoring round.**

**In terms of programming, the amount of structured and unstructured out-of-cell time varied greatly among the RTUs, but all fell short of requirements. The new Modified RTU level of care was launched. The confidentiality in Dixon's X House will be monitored in the coming round.**

**Covid-19 protection policies have led to an increase in use of segregation, as well as general population cells, for crisis watches in 16 institutions, though not in large numbers. For a substantial number of patients, crisis care is not serving to stabilize them within ten days or effecting a transfer to a more intensive care setting. More than 100 stays lasted from 1 to 14 *months*, though staff had some success shortening the longest stays by monitoring year-end. Only 11% of all extended crisis watches were referred to a higher level of care.**

**(X)(b): RTU beds for male offenders**

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

> **(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date.
> **(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and
> **(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings**:

- Dixon: As of May 13, 2021, the reported census is 451 in the main RTU ("STC") and 144 in the RTU-segregation unit ("DXP"). The total of constructed beds is 676, far exceeding the requirement of 626 (by 50). Dixon also houses 11 class members at the mRTU level of care

- Pontiac: As of May 13, 2021, the reported census is 67 and the reported bed availability is 102. This equates to 169 total beds. This total meets the requirement of 169 constructed beds.

- Joliet: As of May 13, 2021, the reported census is 189 and the reported bed availability is 1. This equates to 190 total beds. This total is 170 short of meeting the bed requirement of 360. Joliet also houses 8 class members at the mRTU level of care.

  While, during my site visit to Joliet on March 10, 2021, I was informed that the RTU bed capacity was 300, IDOC Legal Counsel Ms. Jennings informed me that there is a 190-bed capacity due to the facility single-celling all the RTU patients, as the original facility was designed for juveniles and reportedly is not suitable for two adult men.

While these bed availability numbers are IDOC's stated position, this does not appear to be the actual practice. In some months of 2020-2021, RTU transfers were greatly restricted by pandemic precautions. In other months, there was a major surge, with as many as 46 patients transferring in. And yet, no matter the circumstance, IDOC has maintained the men's RTU population at no more than 74% of the constructed bed requirement.

As has been detailed in previous Monitor's reports, there are two key issues that contribute to IDOC's not making these beds available: (1) not transferring patients who have been referred, and (2) not initiating referrals for patients with demonstrated need.

IDOC has made great improvements on the first issue. While there has been a concern about delayed transfers longer term, this became acute when IDOC needed to protect against the spread of covid-19. With movement limited, RTU transfers[23] fell to single digits each month from April through July. From August forward, however, IDOC has clearly worked to facilitate these transfers, with double-digit transfers nearly every month, and sometimes as many as 45 to 46. There was a particular emphasis on moving patients out of reception centers, which have the least resources to support this level of need. While this result is very welcome, the cost to patients during the year was high: 36% of referrals waited 4 months to *17 months* before transferring, withdrawing the referral, or leaving prison without receiving RTU care.[24]

---

[23] Throughout this section, RTU and BMU referrals and transfers are aggregated

[24] The analysis for this requirement is based on logs from every institution that made RTU and BMU referrals, provided monthly from June 2020 through March 2021

As for initiating referrals, in addition to the patients referred above, there were still significant numbers of patients who were *not* referred while there were indicia of potential need. While not an exhaustive list, some examples are:

- In a sample, there were 29 patients in general population prisons whose stays in crisis watch were at least *double* the expected length of stay and as much as 2.5 *months*[25]

- In the same sample, there were 32 outpatients with a pattern of crisis watches that suggested instability.[26] The majority of these are in the Pontiac outpatient program, underlining the need to staff and provide any other resources necessary to making its unused beds available.

Given the importance of these beds to the Department's mental health system, this chronic lack of RTU access is a serious problem and places class members at risk for harm. While the required beds may have been constructed, if operational needs limit Joliet to using just over half of its beds on a continuous basis, and Pontiac has yet to use even half of its required beds, in fact, far fewer than the required number of beds can be made available. A rating of Noncompliance will be assigned for this requirement.

**(X)(d): Specific requirement:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:**

- Joliet: During my site visit of March 10, 2021, staff informed me that all the RTU patients are offered 5 hours of structured out-of-cell time and 9 to 10 hours of unstructured time per week. Upon interviewing several RTU patients, however, I was told that at most they are offered 3.5 hours of structured time per week. They went on to state that the groups are frequently cancelled due to a lack of custody staff. These same RTU patients did go on to report that they regularly receive 10 or more hours of unstructured time per week.

---

[25] This analysis is based on all crisis watches on logs from every institution that had crisis watches in the months of June, September, and November 2020 and February 2021. As a sample, it covers 4 of 10 months in the monitoring round, so 6 months of additional crisis watches would very likely increase this number. This calculation of 20-day and higher stays does not include any outpatients who live at Dixon, Logan, or Pontiac, so this might also increase the total.

[26] These are unique from the 29 patients with very extended stays, with only one person experiencing both. These are patients with 4 to 7 crisis watches in a few months, or 3 crisis watches, longer than a *de minimis* time, in a few months