- Pontiac: During my site visit of March 12, 2021, staff informed me all the RTU patients are offered one hour of structured time per **month** and one hour of unstructured time per week. The staff also stated that Behavioral Management Unit ("BMU") patients receive two rounds per week that occur cell side where in-cell materials are distributed and collected. MTC, Modified Therapeutic Community, patients receive three rounds per week. I must point out that cell-front rounds are not a structured activity. I was also informed by staff that no groups were being offered at the time of my site visit. I have since learned that groups have begun to be offered starting in April. Plaintiffs' counsel disclosed, however, that the few groups offered are often cancelled due to lack of custody staff. Regardless, the RTU patients at Pontiac are not receiving 10 hours of structured and unstructured out-of-cell time per week.

- Dixon: I conducted a virtual site visit to Dixon on July 8, 2020. At that time, staff informed me that in STC, the main RTU, patients were offered six or seven hours of structured out-of-cell time per week and 11 hours of unstructured time per week. X house patients—those in segregation--were offered four hours of structured and five hours of unstructured out-of-cell time per week.

- Menard: there are six BMU beds available at Menard. This program began March 1, 2021. The current census is two. The monitoring team has not had an on-site visit to Menard since that time. The program will be evaluated during the next reporting period.

**Specific requirement:**[27] *Modified RTU (mRTU):* A level of care designation to service patients who previously required RTU level of care but have stabilized and no longer require the intensity of an RTU placement but need more than Outpatient level of care treatment provides. If regression is seen in the patient receiving this level of services, the treatment team may resume RTU level of services without hesitation.

**Findings:** At the writing of this report, there are mRTU patients at Dixon and Joliet. Due to Covid-related travel restrictions, the monitoring team has not evaluated the actual functioning of this program. This requirement will be assigned a rating of "No Rating." A comprehensive review of the mRTU program will be included in the November 2021 Midyear Report.

**(X)(e): Inpatient beds**

**Specific requirement:** Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date.

**Findings:** To the Monitor's knowledge, the necessary construction and improvements were made, and the facility has been in use since April 2018 but chronically low occupancy, compounded by pandemic restrictions, and despite substantial need in the patient population, mean

---

[27] This level of care was added to the Corrected Second Amended Settlement Agreement. It appears in the Definitions section but does not have a corresponding section/subsection number in the Settlement Agreement. So, the monitoring team has determined that it is most logically related in this sequence of requirements.

that IDOC is not making 44 beds available as required.

The highest census was 30 patients in 2019, which left fully one-third of beds vacant. IDOC reportedly determined that single-celling was necessary for covid-19 safety, which resulted in an average census of 16 for nearly the entire monitoring year,[28] leaving two-thirds of the beds vacant. Under these conditions, it cannot be said that 44 beds are available for inpatient care.

During this time, referred male patients experienced extremely long waits. Almost half of the men waited 5 to 15 months before they transferred, withdrew the request, or left prison without ever reaching inpatient care. With the other half, however, beginning with referrals initiated in June 2020, staff dramatically improved transfers. A greater diversity of facilities made referrals, and 82% of patients transferred within one month, with two men who remain waiting after two months.

Women's referrals flowed more smoothly throughout; 68% of all referrals in the monitoring year were completed within one month. The longer waits generally were tied to completing covid-19 vaccination where it was available, and the longest wait was 3.5 months. Far fewer women's referrals were withdrawn.[29]

There were also indicia of a large group of patients potentially in need of inpatient care who were *not* referred. While not an exhaustive list, some examples are:

- crisis watches are meant to last up to 10 days, but in 112 of them, patients were not stable enough to discharge for *30* days or more[30]
- 93 patients were in and out of crisis watch with multiple stays that *each* lasted more than ten days
- 16 patients were in restraints for 1 to 6 *weeks*
- 51 patients were in restraints repeatedly, up to *17 times*[31]

Many of these patients live in an RTU, so inpatient care is the only possible higher level of care.

Despite this, referrals were initiated at a low rate – the number of referrals in 2019 dropped by more than half in 2020.[32] There was a meaningful uptick in February and March 2021, which after discharges, brought the census to 20. This is encouraging and the monitoring team supports this continuing.

The foregoing demonstrates that the inpatient census has not been at 16 because there is no

---

[28] IDOC provides an average census monthly and on request.

[29] The foregoing analysis is based on referral logs provided by Elgin, monthly from June 2020 through March 2021, supplemented by information emailed by IDOC legal counsel. There were 61 referrals open during that period (either initiated then or referred earlier with a disposition during this timeframe), 33 men and 28 women.

[30] This does not suggest that all stays less than 30 days are acceptable. Predictably, many patients who had stays lasting 11 to 29 days also needed a higher level of care than a crisis watch can provide.

The 30-day mark is merely illustrative, a point at which it cannot reasonably be disputed that a higher level of care is warranted.

[31] There is overlap among these four groups.

[32] The Elgin referral log shows 113 referrals initiated in 2019, but only 43 initiated in 2020.

need for the 44 required beds. The beds are needed but patients do not have sufficient access; IDOC cannot be said to be making the required beds available. Defendants are in Noncompliance on this requirement.

### (X)(f): Crisis beds

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

**Findings:** IDOC facilities have established crisis beds as required. While the practice of conducting crisis watches in segregation had been nearly eliminated, there has been a substantial resurgence in 2020-2021. The monitoring team is informed that this is an effect of the pandemic. When there is an outbreak, the entire potentially affected unit is required to remain in place, including those who go on crisis watch. Prisoner separation can cause resources to fill more quickly and lead to the need for overflow resources. In the case of crisis watch, this meant that 16 institutions used segregation for a total of 146 watches in the monitoring team's study (7% of those reviewed).[33] The Settlement Agreement allows segregation placements in exigent circumstances for three days or less, but 73% of these placements exceeded that length. Some lasted 1 to almost 4 *months*.

Since the pandemic began, it was also apparent that IDOC was housing some patients outside of crisis beds in general population cells, presumably for the same reasons. The exact number is difficult to discern, but there appeared to be at least 79 such cases (4% of those reviewed). Clearly, the purpose of section X(f) is for all crisis watches to take place in cells designed for crisis watch, and/or the infirmary; this expectation is so high that, if a bed in one of those two locations is not available, Defendants are directed to transfer the patient to another institution. Defendants argue that section X(f) solely concerns segregation, but that is simply not correct. Observations about all crisis watches outside of crisis watch cells must be included in an analysis of compliance with this requirement.

Despite these obstacles, the compliance rate with this requirement is fairly high, and perhaps understandable under the circumstances. The trajectory away from compliance in recent years militates against finding substantial compliance yet.

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless

---

[33] The monitoring team relied upon the cell locations provided on crisis watch logs by all IDOC institutions, except Elgin and Murphysboro, for June, September, and November 2020 and January 2021. These were cross-referenced with lists of each institution's segregation cells and crisis watch cells that IDOC previously provided.

clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: The "aggressive mental health treatment to reduce acute symptoms and stabilize the patient" consists of brief, daily checks with a QMHP, treatment planning upon admission and discharge and possibly a visit from a psychiatric provider. The results from a 15-facility[34] review of treatments available to patients assigned to crisis care follows:

- Daily checks with a QMHP: 121 of 137 crisis watches – 88%
- Treatment planning:
    - Upon admission: 116 of 137 crisis watches – 85%
    - Upon discharge: 116 of 136 crisis watches – 85%
- Seen by a psychiatric practitioner: 95 of 137 crisis watches – 69%
- Additional treatments:
    - Pontiac – in-cell workbooks
    - Graham – additional cell front contacts by BHTs
    - Logan – psychoeducational meetings with BHTs
    - Centralia – 2 hours/day unstructured OOC time if in crisis > 10 days
    - Big Muddy - 2 hours/day unstructured OOC time if in crisis > 10
    - NRC – class members participate in the "Alive" curriculum once per week

Additionally, logs suggest that, for a substantial number of patients, the care is not serving to stabilize them within ten days or effecting a transfer to a more intensive care setting. Crisis watch logs show: [35]

- 22% of crisis watches exceeded the expected ten days

- disturbingly, 112 stays were at least **triple** this expected length

- several stays stretched to 7 to 14 *months*

- 93 patients had *multiple* extended stays, further indication that they are not stable at their current level of care

Extended lengths of stay were observed at 24 institutions, though it continued to be most prevalent at Dixon, Joliet, and Pontiac.

---

[34] Pontiac, Menard, Lawrence, Logan, Graham, Western, Stateville, Big Muddy, Centralia, Danville, Dixon, Hill, Illinois River, Menard and Joliet.

[35] This analysis is based on all crisis watches on IDOC logs for June, September, and November 2020 and February 2021 from all institutions at which a crisis watch occurred, a total of 2,089 admissions. Murphysboro reportedly had no crisis watches and Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after ten days is not feasible.

While the overall rate of extended stays has remained constant since mid-2019, there was some movement on shortening the longest stays. Both the stays over 30 days and the stays over 90 days decreased significantly as compared with the Fourth Annual Report analysis.[36] The amount of change suggests concerted effort by IDOC staff, which the monitoring team very much appreciates.

For all stays exceeding ten days, only 11% were referred to a higher level of care. The referral numbers were unchanged from previous analyses. While not every patient requires more care at the ten-day point, in the monitoring team's experience, the likelihood is high that many more among the remaining group of 288 *did* need a higher level of care.[37]   IDOC asserts that staff routinely consider this and is gathering material to demonstrate this to the monitoring team.

**(X)(g): Specific requirement:** IDOC shall also ensure that adequate, confidential space is provided within the X-House at Dixon for group therapy sessions; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures.

**Findings:** I was last at Dixon on January 29, 2020. At that time, I found that the X-House did not have adequate and confidential space for the mental health encounters as is called for by the Settlement Agreement. As the conditions in the X-House may have changed since my last in-person visit, I will assign a rating of "No Rating" for this requirement.


## XI: ADMINISTRATIVE STAFFING

> **Summary: Four facilities do not have a dedicated Mental Health Authority. These positions are being covered by facility-assigned staff, which further detracts from the quality of the mental health care provided to class members.**


**(XI)(c): Clinical supervisors**

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of

---

[36]  While the change in percent of overall stays was modest, in absolute numbers:
- patients over 90 days decreased from 22 patients to 15
- patients between 30 and 90 days decreased from 129 to 98

These lengths of stay are far too high, so any occurrences are unreasonable, but the improvement is welcome. The total stays over 10 days remained the same percentage because, while the groups above decreased, the number of stays from 11 to 29 days *increased*.

[37] There were 339 *patients* with stays exceeding ten days, 51 of whom were referred. The number of *stays* is higher because several of these patients has multiple stays of this length.

mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings**: The following facilities have vacancies in this State position, referred to as the "Mental Health Authority":

- Danville – During a virtual site visit to this facility on January 13, 2021, I was informed that this position was being filled by the lone QMHP assigned to the facility. The Regional Supervisor, Dr. Fairless, reported at that time that this QMHP had just recently passed her licensing exam. Also, upon closer questioning, this lone QMHP admitted that she was recently suffering from Covid-19 and been away from work for several weeks. During her absence, two temporary ("PRN") QMHPs were assigned to cover crisis watch, segregation and other high-level duties.
- Logan – This position is currently being filled by a state psychologist.
- Pinckneyville – This position is currently being filled by a Wexford QMHP employee.
- Pontiac – This position is being filled by a state psychologist.

These vacancies in the Mental Health Authority positions not only affect the duties of that position but also detract from the overall staffing at the given facilities. These positions are critical to the provision of mental health care to the class members. Their absence poses a serious problem and places class members at a risk of harm.

## XII: MEDICATION

> **Summary: The frequency of psychiatric visits does not meet the requirements of the Settlement Agreement. Medication distribution times do not support patient compliance. The Department has made great improvements in the timely performance of lab work for the detection of side effects and timely reporting on results.**

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** Please see the analysis in section VII(d), above.

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement** (as reflected in the Corrected Second Amended Settlement Agreement)**:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to offenders and reasonable efforts to ensure the medications are being taken by the offenders as prescribed.

**Findings:** From the Monitor's Fourth Annual Report forward, the monitoring team provided the following detail of typical components of "reasonable efforts to ensure the medications are being taken by the offenders as prescribed": it is common for prisons to experience obstacles to patients receiving medication. These can include practices such as medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; security staff preventing nursing staff from accessing housing units, or patients from attending the medication line; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and hoarding or selling medication; and medication errors. These are all potential impediments that IDOC must protect against, and staff must make a showing that these common obstacles are not affecting its medication delivery.

Prior to that writing, in early 2019, IDOC implemented practices intended to reduce "cheeking" and hoarding medication; the monitoring team has not seen studies about whether those practices resulted in improvements. The team was told there was a process study, through the Continuous Quality Improvement program, examining the length of time from a nurse receiving a medication order to the time the medication is dispensed. Defendants have not provided material demonstrating practice on these or any of the other aspects of medication distribution named above.

Additionally, I am disappointed to note that several of the IDOC facilities with large numbers of class members persist with unacceptably early morning medication distribution times[38]. These include but are not limited to Graham, Logan, Menard, Pinckneyville, Pontiac, Vandalia and Western. The Quarterly Report of April 23, 2021, states "Adjusting the time of the med pass to appease the monitor would disrupt the movement throughout the facility for the entire day." I find this to be a very specious argument. Other IDOC facilities with large class member

---

[38] These times range from 3:30 am through 5:30 am.

populations can offer much more reasonable morning medication distribution times without apparently disrupting "the movement throughout the facility for the entire day." These include, but are not limited to Big Muddy-7am, Dixon-7:15am, Illinois River-6:30am and Stateville-NRC-8am. I have worked very closely with the Chief of Psychiatry throughout his tenure to improve the rates of medication compliance.

These lingering early morning medication distribution times are a significant piece of the medication compliance puzzle. I am willing to consider this aspect resolved if IDOC can demonstrate, through conducting compliance rate studies, that these unacceptably early morning medication distribution times do not negatively affect psychotropic medication compliance.

This rating for this requirement will remain Noncompliant until IDOC demonstrates good practice on the issues outlined above.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results.

**Findings:** The Midyear Report noted in a chart review of 50 psychiatric progress notes taken from 10 facilities[39], only 41 of the charts reviewed had evidence of "timely performance of lab work for these side effects and timely reporting on results." This is a compliance rate of 82%. The Monitor initially assigned a rating of Noncompliance to this requirement but subsequently reversed this rating per the requirements of section XXVII(o) of the Settlement Agreement. The Defendants created a corrective action plan to address their deficiencies and it was received by the Monitor on March 24, 2021. A subsequent chart review of 53 psychiatric progress notes taken from five facilities[40] revealed that 50 of the charts reviewed met the requirements of this subsection. This is a compliance rate of 94%, with the yearlong compliance rating being 88%. The Department will continue to receive a rating of Substantial Compliance.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** Throughout the reporting period, the monitoring team has not encountered enough cases described in this requirement to render a cogent opinion. A "No Rating" will be assigned. I invite IDOC to perform their own study on this issue.

---

[39] Pinckneyville, Stateville, Illinois River, Logan, Western, Pontiac, Joliet, Elgin, Lawrence and Menard.

[40] Menard, Joliet, Stateville, Stateville-NRC and Pontiac.

## XIII: OFFENDER ENFORCED MEDICATION

**Summary**: IDOC consistently provides a hearing, staffed by the correct disciplines, with an opportunity for the patient to be heard and a written hearing record. The following have been noted as issues in four Monitor's reports and remain a concern in recent hearings:
- some cases do not present clinical facts that meet the required standard, but the decision is made to enforce
- while all facilities provide notices, one key institution's notices do not contain essential information
- the purpose and function of a Staff Assistant is not fulfilled when one prepares the patient while another participates in the hearing, without any indication that they have shared information
- it is frequently unclear whether witness testimony was gathered and presented in the hearings when requested

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

a) Administration of Psychotropic Medication

    1) Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

    B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

    2) Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2) The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be

36

interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director, or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** In four Monitor's reports, beginning in 2018, the monitoring team identified these issues within enforced medication practice:

- The rationales do not always meet the required standard
- Emergency administration is sometimes kept in place for an extended time
- Some notices were not provided or did not contain essential information
- The purpose and function of a Staff Assistant is not fulfilled when one prepares the patient while another participates in the hearing, without any indication that they have shared information
- Practices with witnesses are uneven and it is unclear whether their testimony is allowed, elicited, and considered

IDOC reports that it has counseled staff about improving documentation of witness testimony, but problematic examples increased in the monitoring team's current study. IDOC has not offered any information about addressing the other identified issues.

In the instant monitoring round, the monitoring team reviewed an 18% sample of the 105 enforced medication hearings, including three appeals/reviews and two emergency

administrations, drawn from all nine institutions that held such hearings and had not previously been found in substantial compliance.[41]

*Meeting the standard:* it continued to be a concern that some cases did not present clinical facts that met the required standard. Committees sometimes recognized this, but 16% permitted enforced medication where the record did not clearly illustrate meeting the standard.

*Length of emergency administration:* the emergency administrations appeared to be for an allowable length of time.

*Notice*: Most institutions included some description of the reason enforced medications were being sought. Joliet, however, is responsible for a substantial portion of the hearings, and *none* of its notices gave the patients any explanation.[42] This leaves patients unable to judge whether they agree or disagree, and unable to prepare their testimony and gather any facts they would like to offer.

*Staff Assistants:* If the staff member at a hearing has not met with the patient, it is unclear how s/he can interface with witnesses, gather the patient's preferred questions and ask them, and help the patient communicate, when the staff member does not know the patient's position nor the facts s/he wishes to offer. Without being able to fulfill these purposes, it raises the question of whether this person is, in fact, a Staff Assistant. However, this appears to be standard practice. The largest group of hearings involved a staff member where there is no indication s/he had met the patient ahead or learned any content from another staff member who did. In a similar-sized set of hearings, the appointed person had not met the patient ahead, but the Chair of the hearing committee served the notice, so there may have been an opportunity for the Chair to develop the necessary information. The staff member clearly performed as a Staff Assistant in only 22% of the reviewed hearings.

*Witnesses*: There were more requests for witnesses in this sample than in previous reviews; it was a feature in about one-third of these hearings. Of nine witnesses requested,[43] the records only clearly indicate that four were interviewed and one appeared. Across all the records, only one sentence from one witness is included; there is no indication of what any other witness said, whether it was mentioned in the hearing, and whether the committee took it into account.

To the positive, hearing records have long demonstrated that the required mental health disciplines participate, and they produce a written hearing record. The patients almost always appear, and the exchanges captured in the hearing record indicate that patients have the opportunity to speak. These good practices continue.

The monitoring team has previously found 15 institutions to be in Substantial Compliance. Big Muddy River, Murphysboro, Pinckneyville, Shawnee, and Western Illinois have demonstrated sustained good practice, or the absence of enforced medication for years, and will now also be

---

[41] An accidental sample was selected from logs covering June through August 2020; 105 events are shown therein and on logs covering September 2020 through January 2021. Records were chosen to capture all hearings at an institution where few took place, and a subset if an institution held larger numbers of hearings.

[42] This constituted 26% of the records reviewed.

[43] Another two were appropriately excluded as irrelevant, so are not included in this analysis.

found in Substantial Compliance.[44]

While those institutions made progress, the institutions responsible for nearly all enforced medication have *not*. IDOC, then, remains in Noncompliance as these are serious practice deficiencies.

## XV: SEGREGATION

**Summary**: **The living conditions in segregated housing at Pontiac fail to meet the standards called for in XV(a)(ii). Class members do continue to receive the treatment outlined in their Individual Treatment Plans. This treatment, however, is not sufficient to address the stresses associated with segregation placement. The Department has a less than 80% completion rate of assessing newly placed class members in segregation within 48 hours. Only 54.1% of class members assigned to segregation had their treatment plans reviewed and updated within seven days of placement. Medication is provided to class members assigned to segregation. Grossly insufficient out-of-cell time is being offered and received by class members assigned to segregation.**

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** In the Midyear Report of November 30, 2020, I deferred from assigning a rating for this requirement due to my not being able to inspect the various segregation units throughout the Department. Since then, I have been able to inspect the segregation units at Joliet, Stateville, Stateville-NRC and Pontiac. I will address each facility separately:

- Joliet – The segregation units were generally in good condition. That is, I didn't observe any peeling paint, broken light fixtures, water stains or poorly maintained plumbing equipment, such as showers, sinks and toilets. I also didn't elicit any substantive complaints

---

[44] Thus, the institutions in substantial compliance are: Big Muddy River, Centralia, Danville, Decatur, East Moline, Graham, Hill, Jacksonville, Kewanee, Lincoln, Murphysboro, Pinckneyville, Robinson, Shawnee, Sheridan, Southwestern Illinois, Taylorville, Vandalia, Vienna and Western Illinois.

about the conditions in segregation by any of the class members that I interviewed.

- Pontiac – The conditions of the segregation housing units at Pontiac did not meet any of the standards established by this requirement. In the West-House, galleries 1,3,5 and 7, I encountered filthy showers, severely chipped and peeling paint and leaking and non-functioning plumbing. A class member in the West-House showed me that the water coming out of the sink was contaminated by a variety of black particles. Class members complained about the lack of cleaning supplies, hygiene products including toilet paper and a consistent supply of fresh bedding. I encountered similar conditions in the South-House.

- Stateville – The segregation units at Stateville are old but they appeared to be kept in reasonable condition. The Warden told me that they experience plumbing problems due to the age of the facility but that they are repaired in real time. I did find that many of the cells needed to be repainted and that the showers required cleaning. I did not elicit any substantive complaints about the conditions of the segregation unit from the class members that I interviewed.

- Stateville-NRC – The overall condition of the segregation units at this facility was adequate. That is, many of the cells had been freshly painted and I didn't find any non-functioning toilets or sinks. The showers were in reasonable condition, and I didn't elicit any substantive complaints about the overall condition in segregation from my interviews with class members.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings**: To assess IDOC's compliance with this requirement, the I reviewed 35 treatment plans of class members assigned to segregated housing. I also interviewed class members assigned to segregated housing during my site visits of Joliet, Stateville, Stateville-NRC and Pontiac. Based upon these endeavors combined with my almost five years of experience with the operations of the IDOC, it is my opinion that mentally ill offenders in segregation continue to receive the treatment specified in their Individual Treatment Plans. The treatment, however, is not clinically sufficient to deal with the stresses that mentally ill offenders experience while in segregation. A typical treatment plan calls for an individual session with an MHP every 30-60 days. These sessions are listed as lasting from 15-30 minutes. Also, in many of the reviewed cases, weekly rounds are listed as a treatment. To be clear, weekly segregation rounds are not a treatment but rather a brief check on the psychiatric condition of mentally ill offenders in segregation. Having said all of that, I must assign a rating of substantial compliance due solely to the fact that the activities listed in the Individual Treatment Plans are continued while the patient is assigned to segregation.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** The monitoring team analyzed a total of 582 placements of class members in restrictive housing for the presence of an MHP review no later than 48 hours after initial placement.

The monitoring team analyzed 461 placements in restrictive housing for the presence of an MHP review. The compliance rate was 68%, or 81% if one includes the reviews completed by a Behavioral Health Technician, nurse, or custody member of the Crisis Intervention Team (non-QMHPs).[45] Another 4% were completed in a reasonable time thereafter.[46] Three percent of the reviews were completely unreasonably late, up to 13 days after placement. Twelve percent of the cases did not demonstrate that the required review was completed, and this was particularly prevalent at Dixon and Menard.

In a separate, but complementary 14-facility[47] analysis, 121 medical records of class members' placements in restrictive housing revealed that 94 had evidence that an MHP or BHT reviewed them within 48 hours. This equates to a 77.7% timely completion rate.

Some institutions had much stronger practice than is indicated by the collective numbers. Previously, 19 institutions have been found in substantial compliance; Graham has shown sustained, high-level practice and will now join that list.[48]

These MHP reviews are a serious component of the care of class members who are placed in restrictive housing. A rating of noncompliance will be assigned until such time as all of the IDOC facilities can demonstrate close to a 100% completion rate.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) or IDOC Form 0546 (Mental Health Treatment Plan Update), or

---

[45] For this analysis, IDOC provides records of mental health caseload patients placed in control units. Where an institution has few placements, IDOC provides all SMI cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement of SMI patients. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. These cases were drawn from 10 institutions – Centralia, Dixon, Graham, Hill, Illinois River, Joliet, Lawrence, Menard, Pinckneyville, and Pontiac -- for the months of July, August, November, December 2020, and February 2021. Documents were not drawn from institutions already found to be in substantial compliance.

Timeliness was calculated from the date of physical arrival in restrictive housing; if a patient went to crisis watch within the first two days, timeliness was calculated based on his/her date of return to restrictive housing. Cases were omitted from the analysis if the patients were not present in restrictive housing for at least three or four days at the end of the month, as there may not have been sufficient time to complete and log a review. Documents completed while the patient was not in restrictive housing (for example, in crisis watch) were counted as noncompliant. Documents that were essentially blank were counted as noncompliant if they did not contain information available to the reviewer (for example, the reviewer's observations).

[46] Because this review is meant to protect against the high risk of suicide that is present very soon after restrictive housing placement, the timeframe is very short. While the requirement has a deadline of two days, this calculation of a "reasonable time thereafter" doubles that, allowing up to an additional two days.

[47] Western, Stateville, Pontiac, Menard, Logan, Lawrence, Joliet, Illinois River, Hill, Graham, Dixon, Danville, Centralia and Big Muddy.

[48] Institutions substantially compliant for this requirement are Big Muddy River, Danville, Decatur, East Moline, Elgin, Graham, Jacksonville, Kewanee, Lincoln, Logan, Murphysboro, Robinson, Shawnee, Sheridan, Southwestern, Stateville proper and NRC, Taylorville, Vandalia, Vienna, and Western Illinois.

its equivalent of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated.

**Findings:** Using data from the 14-facility analysis referenced in XV(a)(iv), 66 of 122, 54.1%, of the charts reviewed had evidence of an MHP review and updated treatment plan within seven days of placement on segregation status.

The 90-day component of this requirement could not be evaluated. None of the class members whose charts were reviewed had been placed in restrictive housing for 90 days.

Although this 54.1% completion rate is a slight improvement over the 50% completion rate noted in the Midyear Report, it still falls in the noncompliance range.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Individual counseling by an MHP at least monthly, or more frequently if clinically indicated.
E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

A) *Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* Please refer to XV(a)(iii), above, regarding a discussion of continuation of the patient's ITP. Class members assigned to segregation are not provided with "enhanced therapy as necessary to protect from decompensation that may be associated with segregation."

B) *Rounds:* The monitoring team conducted two studies of this requirement – one as part of the 14-facility analysis referenced in XV(a)(iv), and a second sample drawn from the out-of-cell tracking documents from 16 institutions.[49]

---

[49] IDOC provides spreadsheets documenting the out-of-cell time offered to each mental health caseload member in restrictive housing. From the November log, the monitoring team chose an accidental sample from all institutions that

In total, the team reviewed the records of 190 class members in restrictive housing. The records for 159 had evidence of weekly rounds, an 83.7% rate of compliance. In the second study, noncompliant cases were concentrated at Dixon and Joliet.

C) *Pharmacological treatment*: Pharmacologic treatment does occur when class members are placed in restrictive housing.

D) *Individual counseling by an MHP at least monthly, or more frequently if clinically indicated*: I personally reviewed 35 treatment plans of class members who were placed in restrictive housing as well as interviewing class members assigned to segregation during my site visits of Joliet, Stateville, Stateville-NRC and Pontiac. These plans and interviews indicated that MHPs did provide individual counseling to class members who were placed in restrictive housing. These individual counseling sessions would occur every 30 to 60 days and would last from 15 to 30 minutes.

E) *Participation in multidisciplinary team meetings once teams have been established:* A chart review of class members assigned to restrictive housing revealed that only 51% of the cases had evidence of multidisciplinary team involvement.

F) *MHP or mental health treatment team recommendation for post-segregation housing:* This is occurring throughout the Department.

G) *Documentation of clinical contacts in the medical record:* As previously reported, there is no absolute way to measure if this is occurring for all clinical contacts. It is the opinion of the Monitor that clinical contacts are documented in the medical record. This opinion is based on the review of hundreds, if not thousands, of medical records for class members placed in restrictive housing.

H) *Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* A comprehensive analysis of out-of-cell time offered to this particular cohort of class members was conducted for the months of June, July, August, October, November, December 2020 and January 2021. The data was analyzed for mentally ill offenders in segregated housing for <60 days. The results follow:

| | | |
|---|---|---|
| June 2020 unstructured out-of-cell time: | offered | 8.38 hours per week |
| | received | 3.51 hours per week |
| July 2020 unstructured out-of-cell time: | offered | 6.11 hours per week |
| | received | 3.94 hours per week |

---

listed patients in that month (Big Muddy, Danville, Decatur, Dixon, Hill, Illinois River, Joliet, Lawrence, Menard, Pinckneyville, Pontiac, Shawnee, Stateville proper and NRC, and Western Illinois). The sample selected patients whose placements lasted at least three weeks in November (with two exceptions); it totaled five per institution, or all patients if an institution had fewer than five in that month. IDOC provided rounds paperwork from the sampled patients' charts.

August 2020 unstructured out-of-cell time:    offered    3.91 hours per week
  received    2.43 hours per week

October 2020 unstructured out-of-cell time:    offered    5.93 hours per week
  received    1.78 hours per week

November 2020 unstructured out-of-cell time:    offered    5.99 hours per week
  received    2.15 hours per week

December 2020 unstructured out-of-cell time:    offered    5.93 hours per week
  received    1.78 hours per week

January 2021 unstructured out-of-cell time:    offered    3.88 hours per week
  received    1.10 hours per week



**XV(a)(vi):[50] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d) below.

**Findings:** The Second Amended Settlement Agreement requires that mentally ill offenders assigned to segregated housing **shall** (emphasis added) receive 10 hours each of structured and unstructured out-of-cell time per week. The monitoring team conducted a comprehensive data driven analysis of out-of-cell time for this cohort for the months of June, July, August, October, November, December 2020 and January 2021. The data was analyzed for mentally ill offenders in segregated housing for >60 days. The results follow:

---

[50] This numbering from the Settlement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement.

|  | offered | received |
|---|---|---|
| June structured out-of-cell time | 2.42 | 1.61 |
| June unstructured out-of-cell time | 7.11 | 3.45 |
| July structured out-of-cell time | 3.14 | 1.95 |
| July unstructured out-of-cell time | 5.01 | 3.13 |
| August structured out-of-cell time | 2.51 | 1.89 |
| August unstructured out-of-cell time | 3.48 | 2.36 |
| October structured out-of-cell time | 1.48 | 1.10 |
| October unstructured out-of-cell time | 3.77 | 1.62 |
| November structured out-of-cell time | 1.34 | 0.81 |
| November unstructured out-of-cell time | 3.76 | 1.62 |
| December structured out-of-cell time | 1.48 | 1.10 |
| December unstructured out-of-cell time | 3.77 | 1.42 |
| January structured out-of-cell time | 0.67 | 0.28 |
| January unstructured out-of-cell time | 2.59 | 1.05 |





**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** Please see XV(a)(iv), above, for a discussion about this requirement.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
8) Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** It is the monitoring team's understanding that class members in Investigatory Status/Temporary Confinement are treated no differently from those in segregation. Please see XV(a)(vi), above, for a discussion about this requirement.

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d), below.

**Findings:** Please see XV(a)(vi), above, for a discussion about this requirement.

**XV(d): Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i.    For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii.   For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii.  For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv.   For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:** Please see XV(a)(vi), above, for a discussion about this requirement.

**XV(e): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: This date, May 22, 2020, has passed, so the Department is in Noncompliance with XV(e).

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary: IDOC's restraints practice has deteriorated ever since 2018. The number of uses has doubled. Restraints are applied for extremely unreasonable lengths. There is a huge surge in patients restrained multiple times. These practices compound each other, up to the point that one patient was restrained for 42 full days. Only 6% of these patients were referred to a higher level of care.**

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1.   Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

   a.   Under no circumstances shall restraints be used as a disciplinary measure.

   b.   Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately contact the psychiatrist within one hour of the offender being placed into restraints and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall contact the physician or the licensed clinical psychologist.

2.   Crisis treatment shall be initiated in accordance with AD 04.04.102.

   a.   The initial order for the use of restraints shall not exceed four hours.

   b.   Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

   c.   If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.