II (H): Orders for Restraints

1.  Only a psychiatrist who has conducted a face-to-face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face-to-face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2.  If a psychiatrist, physician or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3.  The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face-to-face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4.  Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b. The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g., the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1.  Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2.  Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3.  Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time

of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4.    Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychologist.

5.    The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6.    Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7.    Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8.    Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be utilized, justification of the care shall be documented in the offender's medical chart.

9.    Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10.    All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings**: After concerted efforts brought improvements in early 2018, IDOC's restraints practice has deteriorated ever since then, unfortunately. The number of uses has doubled. Restraints are applied for extremely unreasonable lengths. There is a huge surge in patients restrained multiple times. These practices compound each other, up to the point that one patient was restrained for 42 full days. Only 6% of these patients were referred to a higher level of care.

These findings are based on a monitoring team review of logs reportedly capturing all uses of restraints for mental health purposes for an eight-month period at the institutions that have not yet shown substantial compliance.[51] Data was analyzed for 118 patients subject to 376 uses of restraints. All patients were at the RTU or inpatient level of care, except a small number at the Stateville institutions.

---

[51] The review consisted of logs covering June 2020 through January 2021 at Dixon, Elgin, Joliet, Logan, Pontiac, Stateville, and Stateville-NRC. Material was also requested for Lawrence, Menard, and Shawnee, but no restraints occurred there during the review period.

***Frequency of use***: In the 2017-2018 period reviewed for the Third Annual Report, there were 196 uses in an eight-month period; in the current monitoring period, there were 376 uses in an even shorter period. Emergency medication evaluation and proper medication intervention can and should be used in place of many of these highly intrusive interventions.

***Length of application***: In standard restraints practice, an application is often only needed for four hours or less, but the rate of this has declined in IDOC during each recent monitoring year. Many uses are extended up to 24 hours and, in the most disturbing cases:

- 90 restraints lasted multiple days
- 7 patients were restrained continuously for more than a week
- one man was restrained for 12 straight days

Where, in 2018, only Pontiac employed multiple-day restraints, the practice has spread, and is now found at each of the five institutions responsible for 92% of the restraints use.[52]

***Multiple applications***: 51 patients were placed in restraints twice in a month or more, and some of them were subjected to this 11, 12, 13, 15, even *17* times. The rate of this practice, also, has more than doubled in the 2020-21 monitoring year over each of the preceding three years.

And this was not only a matter of several short periods – quite a number of patients had multiple episodes of day-long or multi-day restraints.

- Cumulatively, 16 patients were restrained for a week or more
- one-third of them were confined for ***3 to 6 weeks***

Providers clearly see these patients as unstable, if they are ordering lengthy and/or multiple restraint episodes. Yet only 7 of the 112 patients, described above, were referred to inpatient care.[53]

Certainly, there are other components of the restraint care requirement--such as orders practice, limb release, vitals, and criteria for release—and these will be revisited in future Monitor's reports, but the issues above are urgent.

In previous monitoring rounds, institutions were found in Substantial Compliance because of sustained good practices or an extended record of not employing restraints at all. Lawrence, Menard, and Shawnee have now demonstrated this as well, so the total of institutions with this finding comes to 23.[54] The institutions described in the foregoing analysis are responsible for the vast majority of restraint use, however, and remain Noncompliant.

---

[52] There may be a few restraints uses omitted from this total if they occurred at institutions previously found in substantial compliance. Uses there, however, have always been rare.

[53] This is according to a review of referral logs from Elgin. The total number of relevant patients is 112 here (as 6 of the patients in the analysis above were restrained while in residence at Elgin).

[54] Those in Substantial Compliance are: Big Muddy River, Centralia, Danville, Decatur, East Moline, Graham, Hill, Illinois River, Jacksonville, Kewanee, Lawrence, Lincoln, Menard, Murphysboro, Pinckneyville, Robinson, Shawnee, Sheridan, Southwestern, Taylorville, Vandalia, Vienna, and Western Illinois.

## XIX: CONFIDENTIALITY

**Summary**: The Covid pandemic has significantly impaired IDOC's ability to provide mental health and psychiatric services in a confidential manner. The Department has created a plan, however, to address these issues moving forward. A serious confidentiality issue exists at Joliet. Custody Treatment Officers are allowed to be present in the room when individual and group treatment activities are occurring. The Department needs to address this issue if they wish to continue receiving a Substantial Compliance rating for this section.

**XIX(b): Specific requirement:** Within six (6) **months** after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** As I reported in the Midyear Report of November 30, 2020 "While policies have been developed, the Covid crisis has had a devastating effect on the Department's ability to follow them and provide confidential mental health and psychiatric services. Based on my virtual site visits, it became clear to me that most of the clinical contacts during the reporting period have occurred at cell front. For example, a nine-facility[55] review of 212 daily crisis checks revealed that only 99 (47%) were conducted in a confidential setting with the remaining 113 (53%) occurring at cell front. IDOC has written that in some locations, officers accompany clinicians during cell front contacts, and patients must request a contact in a private space at that time. Some institutions indicated that crisis watch contacts were temporarily made cell front but have since resumed in a private setting.

Additionally, IDOC has written that services have been adapted at one or more facilities in ways that increase COVID safety but decrease confidentiality. Group therapies, in some institutions, are run with fewer patients, spaced further apart, with the door open. This increases the possibility for ventilation but may cause patients to speak more loudly to bridge the distance and they likely are more easily overheard by nearby officers. On the other hand, some groups reportedly have been moved outside, and some rooms previously used for groups provide sufficient space for social distancing for one-on-one contacts, so reportedly are in use for that substitute purpose, and plexiglass has been installed in some locations.

It is my experience as a Correctional Psychiatrist practicing in the Covid era that although, it is more difficult, confidential meeting between patient and clinician are possible and highly preferable to cell front meetings. IDOC was previously found in Substantial Compliance, but this is a significant and material decline in practice. As per Section XXVIII(o), Defendants were advised to develop and submit to me, by March 15, 2021, a timely and appropriate proposed

---

[55] Pontiac, Menard, Lawrence, Logan, Pinckneyville, Graham, Western, Stateville and Joliet

remedy."

I received the corrective action plan from IDOC on March 24, 2021. This plan addresses the majority of the monitoring team's concerns about confidentiality in the time of Covid. The one glaring exception is the fact that Joliet allows their CTOs (Custody Treatment Officers) to be present in the room where individual and group treatment session are occurring. I sent an email to Director Jeffreys on February 11, 2021, about this issue and received a response on February 23, 2021. I was reminded that the CTOs are part of the treatment team and as such are covered by the confidentiality umbrella. Regardless, their presence has a stifling effect on the ability of the class members to have free and open communications during a given treatment session. In my opinion this is a serious problem and IDOC warrants a rating of noncompliance but will continue to receive a rating of substantial compliance per the requirements of the Settlement Agreement. Under the provisions of Section XXVIII(o), however, Defendants are directed to develop and submit to me, by June 15th, a timely and appropriate proposed remedy.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible.

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** IDOC is in substantial compliance with this requirement.

## XXII: PARTICIPATION IN PRISON PROGRAMS

> **Summary: This requirement was previously found in substantial compliance. Plaintiffs have raised concerns that RTU patients may not be receiving educational and vocational programming on the same terms as other prisoners and have limited or no access to jobs. The Monitoring Team has initiated conversation with IDOC to investigate these potential issues.**

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** This requirement was previously rated as in Substantial Compliance. Based on contacts from class members, Plaintiffs' counsel has raised the following concerns about whether this requirement is being met for patients at the RTU level of care:

Pontiac: It is unclear whether RTU patients are receiving "mandatory education" related to a GED, any other educational or vocational programming, or jobs, but no interviewed class members have reported participation.

Dixon: Dixon reportedly *is* offering mandatory education in the main RTU, but not in the segregation-status RTU, and it is unclear whether access is on the same, or different, terms as for other Dixon offenders. There *may* not be any other educational or vocational programming. Jobs are reportedly limited to a few categories.

Joliet, on the other hand, reportedly has provided mandatory education, college, and other education, and has permitted RTU patients to work in a wider range of jobs. The monitoring team has not learned about Logan's practices.

If these patient reports are substantiated, and similarly situated offenders do have these types of programs, and the programs are limited or unavailable *because* of RTU status, it would be disadvantaging RTU patients' educational needs and ability to earn good-time credit, as well as

not meeting this Settlement Agreement requirement. The monitoring team has initiated conversation with IDOC to investigate these potential issues.

This rating will remain in Substantial Compliance while information is developed and clarified.

## XXIV: USE OF FORCE AND VERBAL ABUSE

> **Summary: IDOC has established its Deescalation Response Teams, which appear to have a good success rate. Of the ten institutions the monitoring team is reviewing, two make good use of these teams, but the other institutions do not appear to use them. There were some good examples in incident reports of both the teams, and mental health staff, intervening.**
>
> **More than one-third of reviewed reports raised concerns about unnecessary or excessive force, including large quantities of Oleoresin Capsicum spray deployed, using that spray when a patient is already contained.**
>
> **Please note that the Monitoring Team relied upon a review of the "use of force logs" as the foundation of our opinions. Due to Covid-related travel and access issues, the Monitoring Team did not interview class members involved in use of force incidents, review their medical records or view footage from fixed cameras as a check upon the accuracy of the use of force logs. The Monitoring Team reserves the option of modifying its opinions based on any new information obtained during the next monitoring period.**

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[56] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:

a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted purpose.
b) Use of force shall be terminated as soon as force is no longer necessary.
c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.
d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

---

[56] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believes the Settlement contemplated AD 03.02.108(I)(B).

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or 05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.    Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or

higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

> 1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

> 2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

> 3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

> 4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.    Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender

cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to: the warnings to the offender prior to the use of force; the issuance of three direct

orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.        Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender, b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.


**Findings:** To assess this requirement, the monitoring team reviewed logs of all uses of force involving class members from June 2020 through January 2021 at institutions that have not previously been found in substantial compliance. The logs listed 572 events[57] at the relevant institutions, the vast majority of the 624 class member incidents systemwide. These logs do not include calculated uses of force where staff was activated but the incident concluded without force.

Oleoresin Capsicum spray ("OC") was used in a large majority of events, and takedowns were employed in about 20%. Completed cell extractions or other planned uses only constituted 13% of incidents, and Menard, Pontiac, and Stateville fired warning shots for a total of eight times. Most of these rates are highly consistent with those found in the data supporting the Fourth Annual Report analysis.

The monitoring team selected a sample of records that ensured a mix of OC, takedowns, warning shots and planned uses of force; incidents taking place in mental health care settings; full representation at institutions with few incidents; and a larger set from institutions with many

---

[57] The reviewer attempted to control for entries that appeared to be duplicates for the same event, but there may be undetected duplicates that reduce this total somewhat.

incidents. The analysis relies on 50 records.[58] More than one-third raised concerns about unnecessary or excessive force.

***Unnecessary***: In the language of the relevant Administrative Code, it is problematic when uses of force are not employed only as a **last resort** or when other means are unavailable or inadequate. Other means might take the form of de-escalation attempts, allowing a cool-down period, and so on.

Certainly, there is evidence that some of these principles have been put into practice. As noted in previous Monitor's reports, Defendants have trained a corps of officers and supervisors to serve as a Deescalation Response Team ("DRT") and use of force report language suggests that this is a recognized step in the use of force sequence. IDOC provided data on the use of these teams in the last quarter of 2020. Systemwide, teams were called to 84 incidents and were able to conclude more than half of them without force. In the institutions in the monitoring team's study, Joliet and Logan reported using the teams a substantial amount, and their success rate may have been even higher. The use in the other eight institutions studied, however, was negligible, a real missed opportunity.[59] It does *not* appear to be routine to involve mental health staff in deescalating incidents with their patients.

In the monitoring team study, there were some good examples both of making use of the DRT and mental health staff. At Dixon, there were four incidents in which mental health staff and a DRT member, or two DRT members, made separate attempts to quiet the incident and prevent the force. These particularly took place in situations where the patient was resisting moving to crisis watch or was slated to receive enforced medication. In these incidents, the contacts were documented as occurring over the space of a half-hour up to 1.5 hours, giving the patient time to adjust. Dixon also seems to have adopted a practice, in cell extractions, of giving five minutes in between the orders as another type of cooling down period. Similarly, Joliet had an incident when officers made three attempts to deescalate, and another where the Director of Nursing, officers, and a DRT member took turns attempting to persuade the prisoner over the course of 1.75 hours and gave him another 2 hours before calling the cell extraction ("TACT") team in a situation of enforced medication. Curiously, mental health staff was not called until after the incident ended. Pinckneyville had a mental health staff member assess a prisoner who was covering up his window and may have been making a shank; after s/he ordered that the patient be placed in crisis watch and he resisted, two DRT members and the MHP made additional attempts to elicit cooperation. These practices are welcome, and it was unfortunate to see them limited to this handful of incidents.

There were also incidents where non-force means were clearly available and appropriate to attempt. One prisoner was safely in his cell, yelling and kicking his door to get the attention of visitors; rather than continuing to walk down the run, leaders had the TACT team extract this man. There were at least three instances where OC and extraction were the response to very minor, non-urgent forms of self-harm, such as tying a string on a body part where it could do

---

[58] The review consisted of 56 records, but force did not take place in six of them.

[59] The data covers November and December 2020 and January 2021, a subset of the period in the monitoring team's study, so the numbers do not directly correspond. Joliet called the team 43 times, and Logan employed them eight times. Joliet's data is uncertain as it is internally inconsistent, but these two facilities may have had a success rate as high as 67%. The other eight institutions deployed a Deescalation Response Team member only seven times, altogether.

minimal damage or scraping an arm with a staple. In OC incidents, there was no indication that OC was given time to take effect, and it was predictable that staff and the patient were then embroiled in a fight, on top of OC exposure, and risked injury to all concerned.

*Excessive*: more troubling were the 24% of incidents where the force appeared excessive. There were four incidents where multiple officers already had a patient under control, including one where he was restrained; with that amount of dedicated manpower, it would be standard to manage subsequent, moderate acting out by standing the man on the wall, or a takedown, and OC use appeared to be an excessive response. At least three incidents showed huge quantities of OC used. Twice, the prisoner suffered severe injuries, sometimes confirmed by a community hospital, and the circumstances were not at all clear in the report.

Other aspects of use of force have been discussed in detail in previous reports of the Monitor. The reader is referred to those reports.

In late April, Plaintiffs asked to engage in the dispute resolution process, citing concerns about force taking place in treatment settings, in response to acting out, or in situations of self-harm; the adequacy of de-escalation; and the sufficiency of data collected. The parties are in discussions about whether to proceed with dispute resolution.

Previously, the monitoring team found 19 institutions in substantial compliance and that finding remains in place.[60] Additionally, Dixon, Logan, and Lincoln have demonstrated sustained good practice, so they will now be found in substantial compliance, bringing the total to 22. The remaining seven institutions – Elgin, Illinois River, Joliet, Menard, Pinckneyville, Pontiac, and Stateville—are in Noncompliance. These seven noncompliant institutions pose a serious threat of needless harm for class members. As such, a rating of noncompliance will be assigned.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary: Once again, Assistant Monitor, Reena Kapoor, M.D., conducted an expert analysis of XXV(a). The same concerns as reported in the Midyear Report of November 30, 2020, persist during the current reporting period. Also, there are five additional sub-requirements of XXV(a). All of them must be found to be in substantial compliance before an overall substantial compliance rating can be assigned.**

**I continue to urge the Department to closely review Dr. Kapoor's analysis of the discipline of seriously mentally ill offenders. Implementing her recommendations would significantly improve the Department's approach to the discipline of mentally ill offenders.**

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and

---

[60] Big Muddy River, Centralia, Danville, Decatur, East Moline, Graham, Hill, Jacksonville, Kewanee, Lawrence, Murphysboro, Robinson, Shawnee, Sheridan, Southwestern Illinois, Taylorville, Vandalia, Vienna, and Western Illinois.

procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHPs opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHPs opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

> (1) Review the recommendations of the reviewing MHP and the Adjustment Committee.

> (2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

> (3) Provide his or her final determination. Any deviation from MHPs recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHPs opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating and reviewing MHP, and

65

as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** As in previous reports, I asked Assistant Monitor, Reena Kapoor, M.D. to conduct an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in IDOC. Her findings from her May 24, 2021, letter to me follow:

May 24, 2021

Re: *Rasho v. Jeffreys*

Dear Dr. Stewart:

At your request, I performed an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in the Illinois Department of Corrections (IDOC). The conclusions in this report are based on my review of the following documents:

1. IDOC Administrative Directive 05.12.103, "Administration of Discipline for Offenders Identified as Seriously Mentally Ill."

2. IDOC Quarterly Reports dated April 23, 2021, re: original *Rasho* settlement agreement and court order from December 20, 2018

3. Revised Mid-Year Report of Monitor Pablo Stewart, MD, from November 2020

4. Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), Offender Disciplinary reports (DOC 0317), and mental health progress notes for a total of 115 disciplinary infractions adjudicated during March 2021, representing approximately 20% of incidents involving SMI offenders at the following facilities:

    1. Centralia – three incidents
    2. Danville – one incident
    3. Decatur – two incidents
    4. Dixon – 12 incidents
    5. East Moline – two incidents
    6. Elgin – three incidents
    7. Graham – one incident
    8. Hill – seven incidents
    9. Illinois River – four incidents
    10. Joliet Treatment Center – 10 incidents
    11. Lawrence – 13 incidents
    12. Lincoln – three incidents
    13. Logan – four incidents

66

14. Menard – five incidents
15. Pinckneyville – five incidents
16. Pontiac – 24 incidents
17. Shawnee – one incident
18. Sheridan – one incident
19. Stateville NRC – four incidents
20. Taylorville – one incident
21. Vandalia – two incidents
22. Western Illinois – six incidents

**Overall Findings**

Effective November 1, 2020, IDOC revised several of its policies related to SMI offenders in segregation. The change most relevant to the disciplinary process is that SMI offenders cannot spend more than 28 continuous days in segregation without placement in "Extended Restrictive Housing" status. To that end, I noticed a clear trend in the March 2021 disciplinary reports for mental health professionals (MHPs) to recommend segregation time of 28 days or less on the Disciplinary Review (0443) forms. I still observed significant inconsistencies between recommendations at different facilities and even between different MHPs at the same facility, but overall, the recommendations were for less segregation time than in my review of the September 2020 discipline reports. This is a step in the right direction and consistent with IDOC's assertion in its April 2021 Compliance Report that the new policies cut 225 *years* of segregation time from SMI offenders throughout the IDOC system.

Everything else about the SMI discipline process is essentially the same as it was in November 2020. I continue to have concerns about the process by which MHPs arrive at recommendations about segregation and the documentation of the rationale for their decisions. I remain dissatisfied with two aspects of the SMI disciplinary process that are important to compliance with Section XXV of the Settlement Agreement:

(1) Lack of face-to-face assessments of offenders when MHPs are making recommendations related to discipline; and
(2) Poor documentation of the rationale for MHPs' recommendations related to discipline.

I would note that, by my reading, Section XXV does not technically require IDOC to follow my recommendations about face-to-face assessments and documentation; this is why my previous reports have noted that IDOC is in substantial compliance with the letter of the Settlement Agreement. Section XXV only requires that IDOC implement its own policy, AD 05.12.103, which states, in relevant part (emphasis added):

> b. The facility Mental Health Authority shall **assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator** who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

67

> *(1) **The reviewing MHPs opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.***
>
> *(2) The reviewing MHPs opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and*
>
> *(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.*

The section is silent on whether a face-to-face assessment of the offender occurs, and it is also silent on what specific documentation (other than the completed 0443 form) is required. However, based on my professional experience, it is not possible to arrive at an opinion about how an offender's mental illness contributed (or did not) to the underlying behavior of the offense without actually talking to the offender about the events.

My overall recommendation remains simple: Evaluate the offenders face-to-face to ask them about the circumstances leading to the disciplinary infraction, and then document that interaction and the rationale for any recommendations to the Adjustment Committee. I think this is a reasonable approach to SMI offender discipline, and I once again ask IDOC to comply.

**IDOC's Strengths**

The positive findings during this reporting period are fairly similar to my November 2020 report:

1. Most IDOC facilities continue to conduct meaningful, individualized reviews of disciplinary infractions. During the current reporting period, MHPs found that mental illness contributed to the offense in 15 out of 115 cases that I reviewed, or 13% of cases. These findings indicate that MHPs are considering the substantive issue of whether mental illness contributed to the offense behavior.



When compared with previous reports, Dixon and Pontiac have slightly improved in this regard. For the first time in three years, each facility actually found that mental illness contributed to an offense, which would be expected, given how many SMI offenders are housed at the facilities. I will continue to monitor Dixon and Pontiac over time to determine whether this new finding is an outlier or part of a trend.

2.  I found no cases in which offenders were punished for self-injurious behavior, and I found no cases in which segregation was used as a punishment (for SMI offenders) for 300- and 400-level infractions.

3.  The Adjustment Committee at each IDOC facility consistently received input from MHPs regarding SMI inmates in a timely manner. In reviewing 115 infractions, I found that an MHP completed the DOC 0443 form and submitted it to the Adjustment Committee within 72 hours in all cases.

4.  In the vast majority of cases, the Adjustment Committee follows IDOC's policy 05.12.133, Section H.2, which states, in relevant part:

    *If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.*

    *If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

    During this reporting period, I did find one notable exception, which is documented in the *Areas of Concern* section below.

**Areas of Concern**

I continue to have concerns about these issues noted in previous reports:

1. The quality of mental health evaluations documented on the DOC 0443 form remains variable, and the accompanying progress notes from the medical chart do not improve the situation. In cases where the 0443 form contains "boiler plate" language, I had hoped to find richer clinical assessments in the mental health progress notes. This was true in a few cases, most notably at Shawnee, Vienna, and Vandalia. However, the majority of the progress notes simply documented that the offender's disciplinary infraction had been reviewed and an 0443 form had been completed. No rationale for the recommendation was documented anywhere.

2. MHPs at most facilities are not performing face-to-face assessments of SMI offenders after they are charged with disciplinary infractions; the 0443 forms are completed based on a chart review and/or discussion amongst the mental health staff. As noted above, I still do not understand how an MHP can arrive at a conclusion about whether mental illness contributed to an offender's behavior without actually asking the offender about the events in question. In my November 2020 report, I asked IDOC to clarify what they mean when they assert that "recommendations can be made based on a chart review when warranted." To my knowledge, no clarification has been provided.

I also have some new concerns that I will continue to monitor:

3. Stateville NRC provided detailed documentation for 4 disciplinary infractions for me to review, and it also provided a table listing the outcome of all 16 SMI disciplinary proceedings that occurred in March 2021. Based on that table, the Adjustment Committee issued segregation time greater than that recommended by the MHP in 10 out of 16 cases. Stateville NRC did not provide the Adjustment Committee reports for review, so I cannot tell whether the facility followed IDOC's policy 05.12.133, Section H.2, which requires a higher level of review by the Chief Administrative Officer and clear documentation of the rationale for deviating from mental health's recommendation. However, the sheer number of cases in which the Adjustment Committee chose a more severe sanction than the MHP is concerning.

4. Between November 2017 and November 2020, Pontiac CC exhibited a steady decrease in the overall number of disciplinary proceedings involving SMI offenders. In March 2021, however, this number jumped up again, from 6 incidents to 24 incidents (representing approximately 20% of disciplinary infractions in one month). I am not sure what to make of this finding, and I will continue to monitor the trends over time.

5. At Western CC, an offender (Savion Long) had three separate disciplinary reports written about him after incidents that occurred within 6 minutes of each other on March 14, 2021. Some of the documentation refers to the offender's statements about wanting to kill himself or cut himself – to be fair, among many threats to harm others – without any notation of a mental health assessment. Although the offender was not

technically punished for self-injury, as would be prohibited by the Settlement Agreement, the facts of the case did suggest that a mental health intervention was warranted rather than (or in addition to) the Adjustment Committee's decision to place him in segregation for a total of 95 days and initiate a disciplinary transfer. The warden did review the case and appropriately document the rationale for the Adjustment Committee's decision, but I was concerned about the lack of attention paid to the offender's mental health.

## Recommendations

Based on the information noted above, I recommend that IDOC take the following steps. These recommendations are largely unchanged from my November 2020 report:

1. Adopt a policy of requiring face-to-face assessment of offenders by MHPs prior to making recommendations on the DOC 0443 form. These assessments need not be lengthy or labor-intensive, but they should at least include a basic inquiry about the offender's symptoms at the time of the offense and his/her account of what happened.

2. Clarify what is meant by the assertion that "recommendations [about SMI discipline] can be made based on a chart review when warranted," specifying the circumstances in which such a strategy would be appropriate.

3. If not already done, provide the Monitoring Team with IDOC's guidelines and/or training scheme for mental health professionals to complete the DOC 0443 form and mental health progress notes related to SMI offenders and discipline.

4. Monthly submissions of SMI discipline documents to the Monitoring Team should continue to include any relevant progress notes from the offender's medical chart. The following facilities did not include progress notes in their March 2021 reports:

   1. Danville
   2. Joliet
   3. Lawrence
   4. Logan
   5. Sheridan
   6. Western

5. Similarly, monthly submission of SMI discipline documents to the Monitoring Team should include Adjustment Committee Final Summary Reports that document how the infraction was ultimately adjudicated. The following facilities did not submit Adjustment Committee reports in March 2021:

   1. Danville
   2. Decatur
   3. Elgin
   4. Sheridan

     5.   Stateville NRC

Please do not hesitate to contact me with questions or concerns about the information I conveyed in this report.

Respectfully submitted,

Reena Kapoor, MD
Associate Professor of Psychiatry
Yale School of Medicine

**Additional Requirements:**

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

**Findings:** Please refer to section XV(a)(vi)(B), above, for a discussion about this requirement.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

   **Findings:** As reported in the Midyear Report of November 30, 2020 "Two issues prevent IDOC from receiving a rating of Substantial Compliance with this sub-requirement: the persistent backlog of mental health evaluations and the ongoing issue of custody staff acting as gatekeepers to the Crisis Intervention Teams." Nothing has changed regarding these two issues.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

   **Findings:** Prior to the Covid pandemic, the monitoring team regularly observed mentally ill offenders in segregation who have already deteriorated and/or are demonstrating signs and symptoms of mental deterioration. During the current monitoring period, the Monitor was only able to observe class members in segregation at Pontiac, Stateville, NRC and JTC. This limited review found several class members whose continued placement in

segregation poses an imminent risk of substantial deterioration. Due to the relatively small number of class members in segregation observed, however, no rating will be assigned to this requirement.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

**Findings:** The Department is meeting this requirement.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** The Department is meeting this requirement.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

> **Summary: IDOC is in Substantial Compliance with this Section.**

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** IDOC is in Substantial Compliance with this requirement.

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** IDOC is in Substantial Compliance with this requirement.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data which shall be provided to IDOC and Plaintiffs. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** IDOC is in substantial compliance with this requirement.

## XXVIII: REPORTING AND RECORDKEEPING

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following: a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: IDOC is in Substantial Compliance with this requirement.

## CONCLUSION

IDOC is noncompliant with most of the requirements of the Corrected Second Amended Settlement Agreement. Substantial Compliance won't be obtained until such time as sufficient mental health, psychiatric and custody staff are deployed throughout the Department.

Respectfully submitted,

*/s/ Pablo Stewart, M.D.*                    Dated: May 31, 2021

Pablo Stewart, MD