E-FILED
Tuesday, 03 August, 2021  10:44:47 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants | ) | |

**REPORT OF MONITOR CONCERNING COMPLIANCE WITH**

**INJUNCTION ORDERS**

## TABLE OF CONTENTS

BACKGROUND……………………………………………………3

METHODOLOGY/MONITORING ACTIVITIES…………………...3

COMPLIANCE RATINGS…………………………………………...4

EXECUTIVE SUMMARY…………………………………………...5

DETAILED FINDINGS……………………………………………6

STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT
OF CORRECTIONS………………………………………………...8

CLASS MEMBERS WHO ARE PLACED ON A MENTAL………...10
HEALTH CRISIS WATCH

CLASS MEMBERS WHO ARE PLACED IN SEGREGATION…….19

CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC
MEDICATION………………………………………………………24

TREATMENT PLANS……………………………………………...29

COMPLIANCE REQUIREMENTS………………………………...33

CONCLUSIONS……………………………………………………35

## BACKGROUND

The Court has entered several orders regarding the *Rasho* matter. On October 30, 2018, the Court granted Plaintiffs' Motion for Permanent Injunction and entered an Order finding that Defendants have been deliberately indifferent to the mental health needs of mentally ill inmates in custody of the Illinois Department of Corrections in violation of the Eighth Amendment to the United States Constitution. The Court deferred entering specific injunctive relief, instead allowing Defendants an opportunity to submit a proposal to address the constitutional deficiencies.  On November 13, 2018, Defendants submitted their proposed remedy order. On November 20, 2018, Plaintiffs submitted their memorandum in support of their proposed remedy order. On December 4, 2018, Defendants submitted their reply. On December 13, 2018, the above motions and proposed orders came before the Court for oral argument. The Court entered an order on December 20, 2018, specifying five areas of constitutional violation:

- Staffing requirements at the Illinois Department of Corrections
- Treatment for class members who are placed on mental health crisis watch
- Treatment for class members who are placed in segregation
- Treatment for class members who are prescribed psychotropic medication
- Treatment plans and evaluations

The Court also ordered "The appointed independent monitor, Dr. Pablo Stewart, will monitor the Defendants' compliance with this Order consistent with the monitor's existing duties and functions." This report is submitted to comply with this portion of the Court's Order.

The Court has subsequently entered several Orders regarding this matter: February 26, 2019; March 19, 2019; and March 28, 2019. The Seventh Circuit issued an order on April 15, 2019. Finally, the Court issued an Order on April 23, 2019 "to memorialize the Court's Orders dated October 30, 2018, December 20, 2018, and February 26, 2019." This report follows the requirements listed in the April 23, 2019 Order.

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, and Miranda Gibson, MA.

To accomplish these monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted three virtual site visits of three different IDOC facilities, where interviews of administrators and staff were conducted. During these virtual site visits, the monitoring team would obtain information about staffing, the mental health and psychiatric case load, Covid-related issues, out-of-cell time, and the operations of crisis beds and segregated housing. These virtual site visits would be followed up by chart reviews of class members assigned to crisis beds and segregated housing.

Virtual Site visits:

1.  Danville          January 13, 2021
2.  Big Muddy         February 18, 2021
3.  Centralia         March 17, 2021

The monitoring team also conducted chart reviews for class members housed in crisis beds and segregated housing at an additional eight facilities.[1]

The monitoring team conducted on-site visits to following facilities:

1.  Joliet           March 10, 2021      4. Pontiac      March 12, 2021
2.  Stateville       March 11, 2021      5. Menard       June 28-30, 2021
3.  Stateville-NRC   March 11, 2021

During this activity, the monitoring team met with administration; mental health leadership and staff; regional mental health leadership; nursing, pharmacy, Internal Affairs, education, and counseling staff; and class members. Team members observed crisis watch case conferences, and medication distribution in medication lines and cell side settings, and reviewed medication administration records, medication-related discipline information, and use of force videos.

The monitoring team interviewed class members from five different facilities: Joliet, Pontiac, Stateville, Stateville-NRC, and Menard. The Monitor also reviewed 69 treatment plans and psychiatric progress notes for 88 class members from throughout the Department. The systemwide backlog reports, which are provided weekly, were reviewed. Drawing both on institutions' tracking and on health care charts additional to those above, the monitoring team analyzed the timeliness of evaluations, restrictive housing baseline assessments, and psychiatric contacts; the length of stay in crisis watch; and consideration of, and referrals to, RTU, BMU, and inpatient care. The team has also reviewed the Department's Quality Improvement audits covering the first quarter of 2021 and has integrated those findings where feasible.

## COMPLIANCE RATINGS

Consistent with the obligations specified in the Settlement Agreement, the following compliance ratings will be applied in this report:

- Substantial Compliance: The Defendants will be in Substantial Compliance with the terms of the Court Orders if they perform the essential, material components even in the absence of strict compliance with the exact terms of the Court Orders. Substantial Compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious. Substantial Compliance will be found only for the Department as a whole and not for individual facilities.

- Noncompliance: This rating will be applied if the Defendants do not satisfy the definition of Substantial Compliance.

---

[1] Pontiac, Stateville, Menard, NRC, Sheridan, East Moline, Jacksonville and Taylorville

## EXECUTIVE SUMMARY

This report covers the period from January 1, 2021 through June 30, 2021. The Monitoring Team found the Department to be in noncompliance with the following sections of the Court order:

1. Staffing: The Department has not met its staffing requirements throughout the life of the Court's orders in this matter. The Department's reporting is baffling in that they state that they are exceeding their staffing requirements, but the Wexford staffing report does not support this claim. It remains the opinion of the Monitor that the major impediment preventing the Department from meeting the requirements of the Court's orders is inadequate staffing. This lack of staffing applies to clinical and custody staff.

2. Crisis watch: The number of crisis watches decreased substantially, For the most part, crisis watch is used for the appropriate types of patients. IDOC continues to manage care through short daily contacts with MHPs, and some reviewed facilities provided additional types of care. Care was reevaluated in treatment plans and psychiatry appointments. In all these types of care, there were gaps between the intended amount and the actual amount delivered; the highest consistency was in the presence of treatment plans. Psychiatry was not available as much as it should be. There was a lower than acceptable rate of contacts occurring in a confidential, out of cell location, often because of Covid-19 precautions. Taken together, these treatments were not sufficient to stabilize the symptoms and protect against decompensation, demonstrated in part by the very long crisis watches in which the patients presumably were not stable.

   Stays are *not* for the shortest duration possible, though IDOC has made some improvement in lengthier stays. Defendants assert that they routinely consider a higher level of care in such cases, but a large, diverse study found almost no documentation describing the reasons such a placement was not warranted. Women were referred to a higher level of care at a rate of 50%, while less than 4% of men were referred.

3. Segregation: IDOC is delivering, to some extent, each of the elements in the Court's orders concerning restrictive housing (segregation). Compliance rates for the different responsibilities vary greatly, and only the continuation of the previous treatment plan, and recommendations for post-segregation housing, are performed sufficiently.

   The amounts of counseling and out of cell structured and unstructured time are far below what is needed and sufficient to protect against decompensation. Taken together, all of the care provided is less than is clinically indicated.

4. Medication: The parties will argue, and the Court will decide, the frequency of contact that is consistent with constitutional standards. To inform that, the monitoring team assessed whether psychiatry maintains the schedule specified in the Settlement Agreement – a reasonable standard of care – and found that psychiatric evaluations can take place at reasonable intervals, but not on a consistent, sustained basis, and confidentiality is not preserved often enough, generally because of Covid-19 limitations.

Psychiatric providers do consistently ascertain side effects, document efficacy and side effects, and record having informed patients about their medications and the possible effects. Lab work is ordered at a moderate rate, not yet sufficient for substantial compliance.

Defendants have well-established medication distribution systems but have offered no demonstration of whether IDOC practices provide reasonable assurance that psychotropic medications consistently are delivered to patients as planned. Quarterly reports respond to only 1 of the 9 issues the monitoring team has raised as common impediments. Neither have Defendants demonstrated the effectiveness of their policies concerning patients' nonadherence to medication regimens.

5. Treatment plans: All class members do not have a treatment plan that is individualized and particularized based on the patient's specific needs. This is due to the persistent backlog of treatment plans throughout the Department and the low completion rate of treatment plan reviews and updates when a class member is placed into restrictive housing. The treatment plans for class members assigned to the RTU and inpatient levels of care were of much better quality than those for class members assigned to outpatient and restrictive housing levels of care. The Department still struggles to meet its requirements for completing mental health evaluations in a timely manner. Finally, the Department doesn't consistently review and update class members' treatment plans per the requirements set out in the Settlement Agreement, a reasonable time frame for this requirement.

The results of the monitoring indicate that the Department's performance is as follows:

| Requirement | Compliance Status |
|---|---|
| **1: STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT OF CORRECTIONS**<br><br>1(a)<br>1(b)<br>1(c)<br>1(d) | Overall: Noncompliance<br><br>Subfindings supporting overall findings:<br><br>Noncompliance<br>Substantial compliance<br>Substantial compliance<br>No rating |
| **2:  CLASS MEMBERS WHO ARE PLACED ON A MENTAL HEALTH CRISIS WATCH**<br><br>2(a), (b), (c), (d), (e), (f), (g) | Overall: Noncompliance<br><br>Subfindings supporting overall findings:<br><br>Noncompliance |
| **3:  CLASS MEMBERS WHO ARE PLACED IN SEGREGATION** | Overall: Noncompliance<br>Subfindings supporting overall findings: |

| | |
|---|---|
| 3(a), (b), (c) | Noncompliance |
| 3(d)(i) | Substantial compliance |
| 3(d)(ii), (d)(iii), (d)(iv) | Noncompliance |
| 3(d)(v) | Substantial compliance |
| 3(d)(vi), (e), (f), (g) | Noncompliance |
| **4:  CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC MEDICATION** | Overall: Noncompliance<br><br>Subfindings supporting overall findings: |
| 4(a), (b)(i) | Noncompliance |
| 4(b)(ii), (iii) | Substantial compliance |
| 4(b)(iv) | Noncompliance |
| 4(b)(v) | Substantial compliance |
| 4(b)(vi) | Noncompliance |
| **5: TREATMENT PLANS** | Overall: Noncompliance<br>Subfindings supporting overall findings: |
| 5(a) | Noncompliance |
| 5(b) | Noncompliance |
| 5(c) | Noncompliance |
| **6: COMPLIANCE REQUIREMENTS** | Overall: Substantial compliance<br>Subfindings supporting overall findings: |
| 6(a) | Substantial compliance |
| 6(b) | Substantial compliance |
| 6(c) and 6(d) | Not subject to compliance ratings |

## 1: STAFFING REQUIREMENTS AT THE ILLINOIS DEPARTMENT OF CORRECTIONS

**Summary: The Department has not met its staffing requirements throughout the life of the Court's orders in this matter. Their reporting is baffling in that they state that they are exceeding their staffing requirements, but the Wexford staffing report does not support this claim. It remains the opinion of the Monitor that the major impediment preventing the Department from meeting the requirements of the Court's orders is inadequate staffing. This lack of staffing applies to clinical and custody staff.**

**1(a):  Specific requirement**:  Within 90 days of this order, Defendants must employ additional staff necessary to have the following system-wide levels in the following positions: 7 Site Mental Health Service Directors; 12 Mental Health Unit Directors; 16 Staff Psychologists; 142.5 Qualified Mental Health Professionals; 102 Behavioral Health Technicians; 54.5 Registered Nurses – Mental Health; 24 Staff Assistants; 85.5 Psychiatric Providers; 1 Director of Nursing – Psychiatric; 5 Recreational Therapists.

**Finding:** The monitoring team conducted a hand tally of the total number of staff in the various categories required by 1(a). This hand tally was based on the IDOC's, and Wexford's staffing updates contained in Attachment 1 of the Department's Quarterly Report of April 23, 2021. IDOC's staffing update was current as of April 15, 2021, and Wexford's as of March 19, 2021. Of note, the monitoring team's calculations considered Wexford's category of "Hired/Not Started" as vacant. The data follows:

| | Required | Total | Difference |
|---|---|---|---|
| • Site Mental Health Service Directors | 7.0 | 6.0 | -1.0 |
| • Mental Health Unit Directors | 12.0 | 10.0 | -2.0 |
| • Staff Psychologists | 16.0 | 15.0 | -1.0 |
| • QMHP | 142.5 | 163.0 | +20.5 |
| • BHT | 102.0 | 96.0 | -6.0 |
| • RN-Mental Health | 54.5 | 36.75 | -17.75 |
| • Staff Assistant | 24.0 | 61.0 | +37.0 |
| • Psychiatric Providers | 85.5 | 68.438 | -17.062 |
| • Director of Nursing-Psychiatric | 1.0 | 2.0 | +1.0 |
| • Recreation Therapists | 5.0 | 7.0 | +2.0 |

These numbers speak for themselves. The QMHP totals require additional explanation, however. The QMHP totals are based on the combination of Wexford staff, 132.0, and State staff, 31.0 for a total of 163.0, which is 20.5 full-time equivalents above their required minimum. This 163 number, however, flies in the face of the following facts, taken from the Wexford staffing report, current as March 19, 2021:

- Big Muddy          -2.0 QMHPs
- Danville           -1.0 QMHPs
- Dixon              -10.0 QMHPs
- Graham             -1.0 QMHPs
- Hill               -2.0 QMHPs
- Joliet             -1.0 QMHPs
- Lawrence           -2.0 QMHPs
- Logan              -8.0 QMHPs
- Menard             -2.0 QMHPs
- Pontiac            -9.0 QMHPs
- Robinson           -1.0 QMHPs
- Shawnee            -1.0 QMHPs
- Western            -3.0 QMHPs
- Total              **-43.0 QMHPs**

No matter what sleight of hand IDOC attempts to use to demonstrate compliance with 1(a), they remain significantly understaffed in a variety of job categories. A rating of noncompliance will be assigned to 1(a).

**1(b):  Specific requirement:**  Within 120 days of this order, Defendants shall evaluate whether their staffing plan is sufficient to provide mental health treatment consistent with constitutional law in the areas of treatment planning, medication management, mental health care on crisis watches, mental health care in segregation, and mental health evaluations.

**Finding:** As previously reported, the Department did conduct this evaluation. In that regard they are in compliance with this requirement. The Monitor has consistently reported that the Department's staffing plan is grossly inadequate based on objective measures of performance. These measures demonstrate that the staffing is inadequate to provide a constitutional level of care in the areas of mental health evaluations, treatment planning, medication management, mental health care on crisis watches and segregation.

**1(c):  Specific requirement:**  Within 180 days of this order, Defendants shall report their findings and submit a proposed amended staffing plan to the Court, the Monitor and Plaintiffs' counsel.

**Finding:** Department did report their findings to the Court, Monitor and Plaintiffs' counsel.

**1(d):  Specific requirement:** After the report, the Court will consider if any modifications to the Defendants' staffing is necessary.

**Finding:** The Monitor is not aware of whether the Court has considered modifying the Defendant's staffing plan. No rating will be assigned.

## 2: CLASS MEMBERS WHO ARE PLACED ON A MENTAL HEALTH CRISIS WATCH

**Summary:** The number of crisis watches decreased substantially, For the most part, crisis watch is used for the appropriate types of patients. IDOC continues to manage care through short daily contacts with MHPs, and some reviewed facilities provided additional types of care. Care was reevaluated in treatment plans and psychiatry appointments. In all these types of care, there were gaps between the intended amount and the actual amount delivered; the highest consistency was in the presence of treatment plans. Psychiatry was not available as much as it should be. There was a lower than acceptable rate of contacts occurring in a confidential, out of cell location, often because of Covid-19 precautions. Taken together, these treatments were not sufficient to stabilize the symptoms and protect against decompensation, demonstrated in part by the very long crisis watches in which the patients presumably were not stable.

Stays are *not* for the shortest duration possible, though IDOC has made some improvement in lengthier stays. Defendants assert that they routinely consider a higher level of care in such cases, but a large, diverse study found almost no documentation describing the reasons such a placement was not warranted. Women were referred to a higher level of care at a rate of 50%, while less than 4% of men were referred.

**2(a): Specific requirement:** Crisis watches should only be used for patients exhibiting behavior dangerous to self or others as a result of mental illness and may only be ordered upon a finding by an appropriately trained and licensed mental health professional that no other less restrictive treatment is appropriate. When used, crisis watches are to be employed for the shortest duration possible.

**Finding:** As an initial matter, it is notable that the usage of crisis watch has decreased substantially over the last year.[2] There are reasons to believe this is a positive development. Possible contributors include:

- with mental health personnel providing added cell side rounds during the pandemic, there were more opportunities to discuss mental health concerns before they escalated to a crisis, or before some patients felt the need to request crisis watch as a means to access an MHP

- the restrictive housing (segregation) policies, implemented in November 2020, aim to reduce the number of restrictive housing placements and shorten stays there; this may be resulting in fewer patients claiming they are in crisis as a means to escape, or protest, their restrictive housing placements

- after a year of pandemic quarantines and other limits, patients particularly value time out of their cells, and it may be that the confined conditions of crisis watch are unappealing to those who may previously have requested it for reasons other than crisis

---

[2] In the monitoring team's analysis one year ago, for example, there was an average of **625** crisis watches per month in the sampled IDOC tracking logs, which spanned summer 2019 through spring 2020. In the instant analysis, capturing 2021 practice, the monthly average was **457** crisis watches.

- staff believe that the coordinated efforts to improve crisis care, detailed in the last two Monitor's reports, are having an impact

As to the Court's order concerning the purposes of crisis watch, as indicated in the Monitor's report of January 31, 2021, "It is the Monitoring Team's experience that crisis watches are consistently used for patients exhibiting dangerousness to themselves or others, or who were gravely disabled. An admission is always ordered by an MHP; the monitoring team has not encountered examples of crisis watch being used when less restrictive treatment would have been preferable." This statement remains consistent with the current use of crisis watches with the exception of the phrase "that no other less restrictive treatment is appropriate." It is the opinion of the Monitor that a portion of the crisis watch placements could be avoided by a greater involvement by the psychiatric practitioners. That is, if a class member is beginning to show signs of decompensating, a psychiatric practitioner needs to evaluate the class member prior to crisis placement, if possible, to determine if the use of emergency medications is appropriate. This practice could reduce the use of crisis watches.

For a substantial number of admissions, it does not appear that the duration was the shortest possible. To define this term, the monitoring team first looks to the Settlement Agreement, which employs a threshold commonly used by prison systems for this type of treatment setting. The agreement specifies that crisis beds are designed for short-term stays, which it defines as "generally no longer than ten (10) days." While this is not a firm deadline, the Settlement Agreement definition expects patients needing more care to be transferred to a "more…intensive care setting"; the definition indicates that patients who do not need a more intensive care setting are to be discharged. Thus, if Defendants have determined a patient does not need a higher level of care but the patient is also not discharged, then presumptively the additional time in crisis watch is excessive and not the shortest duration possible.

Crisis watch logs indicate that 19% of crisis watches in the monitoring round exceeded the ten-day threshold,[3] a frequency that is not "minor or occasional." There has been only minor fluctuation in this rate since the Court issued its consolidated Permanent Injunction Order.

There remains a disturbing practice of retaining patients in crisis watch far longer. **47 stays** were at least ***three times*** the length presumed by the Settlement Agreement to be appropriate.[4] The longest stays were found at Pontiac and Joliet:

- more than 3 months
- 4.5 months
- 10 months
- 1 year and 3 months, and continuing

---

[3] This analysis is based on all crisis watches on IDOC logs for February through April 2021 from all institutions at which a crisis watch occurred, except Elgin, a total of 1,372 admissions. Kewanee and Murphysboro reportedly had no crisis watches. Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after ten days is not an option. It is not feasible to assess, at any scale, whether stays less than ten days are the shortest possible for those individuals.

[4] This includes five patients who had multiple stays in this short time, each lasting more than ten days and totaling 30 or more. It does *not* include other patients with multiple stays, some of which were shorter, but may also have totaled 30 or more. These were identified from only three months of logs. The number of stays of this length, per year, would be much higher.

- more than 6 months          - approximately 3 years and continuing
- more than 8 months

Each of these 47 presumptively fails to meet the standard set in 2(a) and are an inappropriate use of this treatment setting.[5] Rather, these patients require more care than can be provided in a crisis watch setting. On the other hand, these figures reflect improvement in that the number of stays over 30 days and over 90 days were meaningfully reduced over prior periods. There are fewer stays of these lengths[6] and it is occurring at fewer institutions.[7] Defendants have described efforts by headquarters and regional staff to guide institution staff in improved crisis care, treatment planning, and attention to patients with multiple or extended stays, and it appears to be having an impact.

IDOC's Quality Improvement system reviews the quality of care in crisis watch, and compliance with policy and the Settlement Agreement, but does not assess whether a less restrictive approach would have been appropriate or whether the stays were of the shortest duration possible.

The Monitor finds that there may have been cases where a less restrictive approach was appropriate, and a meaningful number of stays were not for the shortest duration possible. IDOC is thus Noncompliant with this requirement.

**2(b):  Specific requirement:** IDOC shall provide appropriate mental health treatment to stabilize the symptoms and protect against decompensation.

**Finding:** The consistent components of treatment that IDOC offers to class members placed on a crisis watch are daily, confidential contacts with an MHP; psychiatric evaluation; and treatment planning. Some facilities offer additional treatments. These facilities and the additional treatments they offer will be noted below.

The following data was obtained from a 11-facility[8] review of charts associated with 82 crisis placements:

- Daily, confidential checks with an MHP: Only 69 of the 82 crisis placements had evidence of a daily contact – 84.1%. Of these 69 stays that included daily MHP contacts, only 46 occurred in a confidential setting – 66.7%.

---

[5]  This should not be read to imply that all stays up to 29 days are of the shortest duration possible. This discussion focuses on the longest stays, but many of the 221 stays between 11 and 29 days are also likely exceed the terms of this Court's order.

[6]  The stays of 30 days or more represented 8% of crisis watches in 2019-2020. In 2021, they are 3% of the crisis watches.  A subset of those—stays lasting 90 days or more—reduced from 22 people to 7 people in the instant analysis.

[7]  In 2019-2020, this practice was observed at 16 institutions. In this 2021 review, it was evident at only 9 institutions.

[8]  Pontiac, Stateville, Menard, Stateville-NRC, Sheridan, East Moline, Jacksonville, Taylorville, Danville, Centralia and Big Muddy

- Presence of treatment plans:
  - Upon admission: 77 of 82 – 94%
  - Upon discharge: 81 of 82 – 99%

- Additional treatments:
  - Pontiac – in-cell workbooks
  - Graham – additional cell front contacts by BHTs
  - Pinckneyville – one additional meeting with an MHP per week
  - Logan – psychoeducational meetings with BHTs
  - Stateville-NRC – offers the "ALIVE" curriculum once per week
  - Centralia and Big Muddy – two hours per day of unstructured out of cell time if patient is in crisis watch more than 10 days

- Seen by a psychiatric practitioner: 63 of 82 – 77%

Plaintiffs' counsel have also raised disturbing allegations about the safety of patients on crisis watch at Joliet, Pontiac, and Dixon, and possibly other institutions. Based on patient reports, health care records, video, and investigation records, Plaintiffs have identified patients possessing razors, metal, glass, and a cord in crisis watch cells, which are meant to be protected from access to such items, which the patients swallowed or used to cut themselves. The monitoring team has also noted such cases among incident reports reviewed. Plaintiffs gave five cases as examples and assert that this is more widespread. Some of the cited cases involved serious injury, with visible pooling of blood and/or outside hospital treatment. Plaintiffs also assert that some officers may not be consistently maintaining the observation that would prevent such self-injury, or catch it quickly, including one case where the officer documented he could not see into the cell for at least 40 minutes[9]; the parties disagree about whether real-time action was taken to remedy that.

IDOC describes a number of actions meant to address these issues. IDOC reports that it investigated the incidents noted above, and routinely investigates all self-harm incidents at Dixon and Joliet. Investigations identified at least two means through which patients obtained self-harming materials, leading to practice changes aimed at reducing the flow of such items. Reportedly, investigations examined both prisoner and officer conduct. IDOC indicates that Pontiac has increased the thoroughness of its crisis cell searches, and added more search methods, and Joliet has purchased chairs that should improve line of sight into cells. IDOC asserts that these actions have reduced the frequency of self-harm incidents in crisis watch.   Looking to the future, a working group is considering how to enhance training for officers conducting observation, and Quality Improvement leaders are discussing means of expanding their reviews of crisis observation.

The Monitoring Team appreciates these actions, and because of the severity of this risk, these issues bear watching. If patients repeatedly self-harm in this setting, it cannot be said that the treatment is sufficiently serving to stabilize their symptoms and protect against decompensation.

---

[9] This is a very lengthy time if there are orders for continuous watch, or 10- or 15-minute checks, as is common. In this example, Plaintiffs provided a 40-minute section of the observation log for illustration; they also write that the full log shows this occurring for 1 hour and 50 minutes.

**2(c):  Specific requirement:**  Reevaluations of treatment and medication will occur as needed and mental health treatment shall be determined and any necessary interventions to stabilize individuals shall occur.

**Finding:** As noted above in 2(b), in an 11-facility sample, 94% of class members assigned to crisis care received a reevaluation of their treatment plans on crisis placement.[10]  In the same sample, only 77% of class members were seen by a psychiatric provider who could reevaluate their medication during their crisis watch period.[11] There are also indications that far fewer patients see psychiatry in some institutions; for example, logs show that only 40% of crisis watches at Illinois River, Lawrence, and Robinson included a psychiatry contact.[12] Defendants have expressed a belief that patients not on the psychiatric caseload do not need to see a psychiatrist during crisis watch; this is incorrect based on the evolving community standard.

The treatment planning percentage of 94 is very encouraging. The fact that only 77% of reviewed class members were seen by psychiatric providers is inconsistent with a rating of substantial compliance.

**2(d):  Specific requirement:**  Daily assessment in a confidential setting of the patient's progress to determine if the patient is moving towards stability, whether other or additional treatments are indicated, or if transfer to a higher level of care is required.

**Finding:** Again, as noted in 2(b) above, daily assessments were occurring at a rate of 84.1% in the Monitoring Team's study. Out of this cohort, however, only 66.7% were confidential in nature. The monitoring team understands that this is a setback from previous accomplishments, caused primarily by Covid-19 precautions.[13] Reviewed notes do generally comment on whether the patient is moving towards stability. Much less often, notes discuss whether other or additional treatments are indicated. Consideration of the advisability of transfer to a higher level of care is recorded extremely rarely, as will be discussed in section 2(f) below.

As another resource, IDOC's Quality Improvement system also audited daily contacts, reviewing 165 patients who were on crisis watch in the first quarter of 2021. Their data show that 68% of sampled charts were fully compliant with daily, confidential MHP contacts.[14]

---

[10] Although IDOC's Quality Improvement system audited crisis watch treatment plans, the recorded findings generally did not distinguish between plans on admission, updates, and discharge plans, so there is not additional material to add to this analysis.

[11]  In IDOC's Quality Improvement audits, there were occasional findings that an expected psychiatric contact was absent. However, the audit method does not routinely record who is expected to see a psychiatrist, and who *was* seen, so it is not possible to put these findings into context.

[12]  According to the Crisis Trackers for those institutions for January through April 2021

[13]  In a separate, smaller review, among 21 crisis watch contacts at Joliet, Kewanee, Pontiac, and Shawnee, only 43% were clearly shown as occurring in a confidential setting. This may or may not be generalizable.

[14] The *Rasho* monitoring team calculated this percentage from the Quality Improvement auditors' raw data. Auditors' findings of violations that were of a clerical/administrative nature were NOT counted as noncompliant in the monitoring team analysis. More often, the Quality Improvement auditors' concerns had to do with missed contacts or related issues; confidentiality was found to be preserved well, with only 11% of the patient records showing a confidentiality deficiency.

Of note, the monitoring team found that only seven facilities among those in the team's study were offering any additional treatment to class members assigned to crisis care. This fact is demonstrative of a lack of uniformity in the Department's approach to providing appropriate services to class members assigned to crisis care.

**2(e):  Specific requirement:**  Prior to discharge from crisis watch, a multidisciplinary team (with the patient) shall review and update the treatment plan.

**Finding:**  This requirement was removed in the February 2019 order.

**2(e):  Specific requirement:** *No later than at the time of discharge from crisis watch*, an appropriate mental health professional (with the patient) shall review and update the treatment plan which will apply after discharge from crisis watch. The updated treatment plan will address causes which led to the deterioration and the plan for risk management to prevent relapse.

**Finding:** As noted in 2(b), 81 of the 82 (99%) crisis placements reviewed had evidence of a treatment plan being prepared upon discharge from crisis care.[15] This is not a comment on whether those plans meaningfully addressed causes which led to the deterioration and the plan for risk management to prevent relapse.

**2(f):  Specific requirement:**  For anyone who does not stabilize sufficiently to be discharged from crisis watch, the treatment team must establish a plan to provide a higher level of care, which may include transfer to a higher level of care facility or explain in writing why establishing such a plan is not appropriate.

**Finding:** Crisis watch logs indicate that 19% of the stays[16] exceeded ten days. As discussed above, ten days is an approximate measure established in the Settlement Agreement to signal the timing for stability or a higher level of care decision.

Defendants assert in each quarterly report that, for every patient in crisis watch ten days or more, mental health staff assess whether a higher level of care is needed and document this decisionmaking in the health care record. Defendants have not provided any studies demonstrating this and the Quality Improvement system does not assess this requirement. The monitoring team sought to substantiate this by reviewing relevant health care records sections.

The monitoring team collected this data within the 11-facility review referenced above. Additionally, the team conducted a second study whose characteristics were:
- 115 extended crisis watches experienced by 83 patients
- chosen from all 16 institutions that had very lengthy crisis watches
- sampled crisis watches lasted from 14 days to 15 months

---

[15] Although IDOC's Quality Improvement system audited crisis watch treatment plans, the recorded findings generally did not distinguish between plans on admission, updates, and discharge plans, so there is not additional material to add to this analysis.

[16] As  described above, this is based on a review of the lengths of stay for all patients in crisis watch, except at Elgin, as shown on IDOC logs for February, March, and April 2021.

- the vast majority lasted one month or more
- each facility was asked to provide all "pages from the chart that show the consideration of a higher level of care" in the months in which these crisis watches took place.

Taking the studies together, ten extended crisis watches resulted in a referral to a higher level of care, and only 6 explained in writing why establishing such a plan is not appropriate, by, or not long after, ten days.[17] At a 13% compliance rate, IDOC is far from compliance with this Court order. There were also instances of weeks elapsing between decision and generating the referral, and further delays from approval to transfer.

A similar number of records showed a positive consideration of a higher level of care, but it was weeks or months later in the crisis watch[18] and almost half do not appear to have been finalized.

The monitoring team undertook a more comprehensive review of referrals made for this population, as well. Referrals to a higher level of care were the norm for women with extended crisis watches, but very rare for men. The latter *declined* during the current monitoring period.[19] Referrals might appropriately be made either to RTU, BMU, or inpatient care, depending on the patient's needs.

In this analysis:

| | Patients with 1 or more crisis watches longer than 10 days | Patients referred to RTU or BMU | % Referred to RTU or BMU | | Patients Referred to Inpatient | % Referred to Inpatient |
|---|---|---|---|---|---|---|
| Outpatients | 81 | 9 | 12% | | 2 | 2% |
| RTU patients | 112 men | | | | 2 | <2% |
| | 10 women | | | | 5 | 50% |

The patients with the longest stays were concentrated at the institutions with RTUs and one additional,[20] so it bears separate discussion of the referral practices at each one.

---

[17]  These include all cases where the discussion and/or referral was recorded by Day 20 of crisis watch – double the length contemplated by the Settlement Agreement – and cases where a referral had already been initiated before the particular crisis watch.

[18]  In 12 cases, the first mention occurred in Week 3 or later – up to 4.5 *months* into the crisis watch.

[19]  While the Monitor's Fifth Annual Report notes a surge in RTU transfers in late 2020 and early 2021, these were *not* patients referred because of lengthy crisis watches. It appears that staff usually make RTU referrals for other reasons, but not in recognition of the insufficiency of crisis watch for extended care.

[20]  Five other institutions each had one stay exceeding 30 days

**Logan**:

- Logan had only 13 stays exceeding ten days. Most were RTU patients, with only two outpatients in this position.
- There were *none* exceeding 30 days
- The longest stay was 19 days
- Among the extended stays, 5 were referred to higher level of care, and nearly all of the others had returned from inpatient care in recent months

**Pontiac**: Pontiac had the highest numbers, on all measures, of patients housed in crisis watch when more was needed, and only 1 referral.

- Pontiac had 76 stays exceeding ten days. There were about equal numbers of RTU patients and outpatients in this position.
- There were 17 stays exceeding 30 days
- An additional 5 patients had multiple lengthy stays totaling more than 30 days in the three months analyzed
- Of the above, 5 patients remained in crisis watch more than 90 days
- The longest stay was 1 year and 3 months[21]
- These included patients in restraints for lengthy periods and/or multiple episodes[22]
- Among all of these, only 1 patient was referred to a higher level of care

**Joliet**:

- Joliet had 51 stays exceeding ten days. All of its patients are RTU status.
- There were 8 stays exceeding 30 days
- Among those, 2 patients remained in crisis watch more than 90 days
- The longest stay was approximately 3 years[23]
- These included patients in restraints for lengthy periods and/or multiple episodes[24]
- Joliet made *no* referrals to higher level of care

**Dixon**:

- Dixon had 66 stays exceeding ten days. Most were RTU patients, with only six outpatients in this position.
- There were 8 stays exceeding 30 days
- The longest stay was 87 days

---

[21] That patient remained in crisis watch as of the time of analysis, so the actual length of stay is very likely greater

[22] The monitoring team does not have restraints use information for the entire monitoring period. However, in January alone, Pontiac had 2 patients held in restraints for more than 4 days, and 7 days, respectively.

[23] It appeared that that patient remained in crisis watch as of the time of analysis, so the actual length of stay is very likely greater

[24] The monitoring team does not have restraints use information for the entire monitoring period. However, in January alone, Joliet had 6 patients held in restraints for 1 to 2.5 days each.

- These included patients in restraints for lengthy periods and/or multiple episodes[25]
- Only 1 patient was referred to a higher level of care

*Menard*:

- Menard had 13 stays exceeding ten days. All were outpatients.
- There were 4 stays exceeding 30 days
- The longest stay was 61 days
- Menard referred 3 of these patients to RTU or BMU. The referrals did not always correspond to the longest stays

The foregoing indicates that there were substantial numbers of patients who did not stabilize sufficiently to be discharged from crisis watch, but no plan was established to provide a higher level of care, and explanations were limited as to why this would not be appropriate. Meanwhile, average censuses showed fewer than half of the inpatient beds were filled. This may be primarily because that facility adopted single-celling as a covid protection, though even single-celling would have permitted 2 to 7 more patients at different points in the monitoring period. Similarly, approximately half of the men's RTU beds required by the Settlement Agreement for Pontiac and Joliet stand empty.[26]

IDOC is Noncompliant with this provision of the Court's orders.

**2(g):  Specific requirement:**  Out of cell time for confidential counseling and groups, psychiatric care, therapeutic activities, and recreational or leisure activities, *unless contraindicated.*

**Finding:** During the reporting period, the monitoring team discovered that although 84.1% of class members received daily counseling checks, only 66.7% of them occurred in an out-of-cell, confidential setting. A separate monitoring team study of crisis watch contacts by psychiatry and MHPs was similar, finding only 61% of reviewed contacts were clearly out of cell and confidential.[27] The IDOC Quality Improvement study, described above, found that 89% of the sampled patients had confidential counseling contacts.

Also, among the reviewed facilities, only Centralia and Big Muddy offered out-of-cell unstructured time to class members. IDOC asserts that it is policy to provide two hours per day for

---

[25] The monitoring team does not have restraints use information for the entire monitoring period. However, in January alone, Dixon had 4 patients held in restraints for more than 1 day to more than 5 days.

[26] The average census, based on numbers IDOC provides monthly to the monitoring team, shows a 47% vacancy rate in the beds required at Joliet and Pontiac. There were also empty beds at Dixon, but IDOC reported that the tracking was in error for some months, so a precise number could not be discerned. This discussion focuses on men because it has been established that Logan has constructed many more RTU beds than required, and that access to them and to the women's inpatient beds has been effective.

[27] This review consisted of 44 contacts from an accidental sample of 2021 crisis watches provided by Centralia, Dixon, Graham, Joliet, Kewanee, Lawrence, Pinckneyville, Pontiac, and Shawnee.

longer term crisis watches, and that the threshold was recently lowered so that unstructured time would begin on the seventh day in crisis watch.[28]

## 3:  CLASS MEMBERS WHO ARE PLACED IN SEGREGATION

> **Summary:** IDOC is delivering, to some extent, each of the elements in the Court's orders concerning restrictive housing (segregation). Compliance rates for the different responsibilities vary greatly, and only the continuation of the previous treatment plan, and recommendations for post-segregation housing, are performed sufficiently.
>
> The amounts of counseling and out of cell structured and unstructured time are far below what is needed and sufficient to protect against decompensation. Taken together, all of the care provided is less than is clinically indicated.

**3(a):  Specific requirement:**  Promptly after placement into segregation, a mental health professional shall assess the class member to establish a baseline against which any future decompensation can be measured. Such review shall be documented in the patient's mental health records in a manner that facilitates access and review by subsequent treatment staff.

**Findings:** The monitoring team analyzed 321 placements in restrictive housing in 2021 for the presence of an MHP review. The Settlement Agreement specifies that such an assessment must take place within two days. Some other corrections systems require this within one day—the highest risk period for suicide—so the Settlement Agreement's two-day threshold may be a reasonable measure of promptness. Applying that measure, the compliance rate in these studies was 70%, or 81% if one includes the reviews completed by a Behavioral Health Technician, nurse, or custody staff member (not MHPs, as required by this order and the Settlement Agreement).[29]

---

[28]  See *Rasho v. Jeffreys* July 2021 Quarterly Report – Order, and previous quarterly reports

[29]  This analysis aggregates two separate studies. Altogether, they reviewed 321 placements in restrictive housing from 17 institutions.

   The first study reviewed chart sections from 103 charts of patients known to have been in restrictive housing, drawn from 11 facilities: Big Muddy, Centralia, Danville, East Moline, Jacksonville, Menard, Pontiac, Sheridan, Stateville proper, Stateville-NRC, and Taylorville.

   For the second study, IDOC provides records of mental health caseload patients placed in control units. Where an institution has few placements, IDOC provides all SMI cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement of SMI patients. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. These cases were drawn from 9 institutions – Centralia, Dixon, Hill, Illinois River, Joliet, Lawrence, Menard, Pinckneyville, and Pontiac -- for the months of February and April 2021. Documents were not drawn from institutions already found to be in substantial compliance with the Settlement Agreement.

   Timeliness was calculated from the date of physical arrival in restrictive housing; if a patient went to crisis watch within the first two days, timeliness was calculated based on his/her date of return to restrictive housing. Cases were omitted from the analysis if the patients were not present in restrictive housing for at least three or four days at the end of the month, as there may not have been sufficient time to complete and log a review. Documents completed while the patient was not in restrictive housing (for example, in crisis watch) were counted as noncompliant.  Documents

This latter practice was found at six institutions.[30]

Among the noncompliant cases, some assessments were completed later; the lengths of time have improved over 2020. Other cases did not demonstrate that the required review was completed, and this was particularly prevalent at Dixon and Pontiac.

IDOC's Quality Improvement system reviewed the charts of 569 patients placed in restrictive housing during this monitoring period; their audits recorded a 91% compliance rate with this responsibility.[31]

**3(b):  Specific requirement:**  A mental health professional shall review and recommend any clinically necessary modifications to the prisoner's individual treatment plan.

**Finding:** In an 11-facility review conducted by the Monitor,[32] only 59 of the 98 class member placements in segregation (60%) had evidence of a mental health professional reviewing and recommending any clinically necessary modifications to a class member's individual treatment plan within seven days of placement.

In the IDOC Quality Improvement audits referenced above, the reviewers found 89% of the charts compliant with restrictive housing treatment planning.[33]

**3(c):  Specific requirement:**  Rounds shall be conducted by appropriate mental health staff, which may include behavioral health technicians.

**Finding:** This 11-facility review looked at 104 class member placements in segregation for the presence of weekly rounds. Only 77 of the 104 cases reviewed demonstrated weekly rounds. This represents a completion rate of 74%.

In the IDOC Quality Improvement audits referenced above, the reviewers found 90% of

---

that were essentially blank were counted as noncompliant if they did not contain information available to the reviewer (for example, the reviewer's observations).

[30]  This appeared to be a pattern at Hill, Illinois River, and Pinckneyville; there were also instances at Joliet, Menard, and Taylorville.

[31]  Some key differences, which likely contribute to the difference in results are: (1) the inclusion of all institutions (where the monitoring team studies employed a subset), and (2) the proportionate representation of institutions differed between the monitoring team's and IDOC's studies. While neither study strove to hue closely to each institution's proportion of the caseload, some institutions in each study were likely over- or underrepresented to an extent it could affect the outcome. The monitoring team's study underrepresented the omitted institutions and a couple of other institutions. The results of the IDOC study likely underrepresent Menard, Illinois River, and Hill, and overrepresent several institutions with smaller caseloads and fewer patients in restrictive housing.

[32]  Danville, Centralia, Big Muddy, Pontiac, Stateville, Menard, Stateville-NRC, Sheridan, East Moline, Jacksonville and Taylorville.

[33]  The monitoring team derived this from the audit tools, which record the violations that auditors detect. In these, auditors found a substantive concern – either a treatment plan was not updated or there was a problem in the contents – for 11% of the patients. The monitoring team did not include in this analysis any findings that were clerical concerns, and did not include more than one violation per person. That is, the calculation is *per patient* (the file is compliant or noncompliant), *not per treatment plan.*

the charts compliant with rounds being conducted weekly.[34]

**3(d):  Specific requirement:**  Class members who are in a Control Unit for periods of sixteen days or more shall receive care that includes, at a minimum:

(i):  Continuation of their mental health treatment plan with such treatment as necessary to protect from any decompensation

**Findings:**  The following is an excerpt from the Fifth Annual Report to the Court dated May 31, 2021, page 41 "To assess IDOC's compliance with this requirement, the I reviewed 35 treatment plans of class members assigned to segregated housing. I also interviewed class members assigned to segregated housing during my site visits of Joliet, Stateville, Stateville-NRC and Pontiac. Based upon these efforts combined with my five years of experience with the operations of the IDOC, it is my opinion that mentally ill offenders in segregation continue to receive the treatment specified in their Individual Treatment Plans. The treatment, however, is not clinically sufficient to deal with the stresses that mentally ill offenders experience while in segregation. A typical treatment plan calls for an individual session with an MHP every 30-60 days. These sessions are listed as lasting from 15-30 minutes. Also, in many of the reviewed cases, weekly rounds are listed as a treatment. To be clear, weekly segregation rounds are not a treatment but rather a brief check on the psychiatric condition of mentally ill offenders in segregation. Having said all of that, I must assign a rating of substantial compliance due solely to the fact that the activities listed in the Individual Treatment Plans are continued while the patient is assigned to segregation."

The situation in the current reporting period is unchanged from that reported in the Fifth Annual Report to the Court. That is, the mental health treatment plans are continued, but the treatment offered is grossly insufficient to protect the class member from decompensation.

(ii):  Rounds in every section of each Control Unit at least every seven days by appropriate mental health staff

**Findings:**  Please refer to the findings of 3(c), above.

(iii):  Pharmacological treatment (if applicable)

**Findings:**  Pharmacologic treatment does occur in segregation. The same problematic medication issues that affect the Department exist with class members in segregation. These issues will be discussed in Section Four, below. In general, there are inconsistent psychiatric follow-ups and extremely early medication distribution times, which contributes to poor medication adherence. Other issues are more fully discussed in section 4(b).

(iv):  Meeting with MHP or multidisciplinary team meetings to the extent necessary

---

[34]  The monitoring team derived this from the audit tools, calculating *per patient* (the file is compliant or noncompliant), *not* the number of times in which rounds did not occur timely. This calculation counted as noncompliant those instances when rounds reportedly did not occur and/or were not documented in the health care record; the analysis did *not* include omissions of signing a log.

21