**Findings:** As noted in 3(d)(i), above, class members in segregation meet with an MHP every 30-60 days. These sessions are listed as lasting 15-30 minutes. In IDOC's Quality Improvement study, auditors found that these contacts took place as expected in 99% of the reviewed charts.

These infrequent, extremely brief sessions, however, do not satisfy the requirement of "meetings to the extent necessary."

(v): MHP or mental health treatment team recommendations to post-segregation housing.

**Findings:** The Monitor has found that the Department is meeting this requirement. The recent IDOC Quality Improvement study supports this, finding only a handful of omissions at one institution.

(vi): Structured and unstructured out of cell time sufficient to protect against decompensation. Structured out of cell time includes therapeutic, educational and recreational activities that involve active engagement by their participants for the duration of the activity.

**Findings:** A data driven analysis was conducted for out-of-cell time, both structured and unstructured, for the months of January and April 2021. The data is reported in "hours per week." The following is the data for class members in segregation who have been there greater than 16 days but less than 60 days:

|         | Structured         | Unstructured       |
|---------|--------------------|--------------------|
| January | offered – 1.77     | offered – 3.88     |
|         | received – 0.82    | received – 1.10    |
|         |                    |                    |
| April   | offered – 2.06     | offered – 6.4      |
|         | received – 1.17    | received – 3.01    |

This amount of out-of-cell time is not sufficient to protect class members against decompensation.

**3(e): Specific requirement:** Class members in any Control Unit for periods longer than sixty days shall be provided with structured and unstructured out of cell time sufficient to protect against decompensation unless clinically contraindicated. If an inmate refuses out of cell time, an MHP shall follow-up with the inmate to determine whether or not there is a risk of further decompensation.

**Finding:** A data driven analysis was conducted for out-of-cell time, both structured and unstructured, for the months of January and April 2021. The data is reported in "hours per week." The following is the data for class members in segregation who have been there greater than 60 days:

22

|  | Structured | Unstructured |
|---|---|---|
| January | offered – 0.67 | offered – 2.59 |
|  | received – 0.28 | received – 1.05 |
| April | offered – 1.95 | offered – 5.57 |
|  | Received – 1.09 | received – 2.81 |

This paltry amount of structured and unstructured out-of-cell time is not sufficient to protect class members against decompensation.[35]

**3(f): Specific requirement:** Mental health staff shall assess class members in Control Units to determine if a higher level of care is necessary and if so, to make proper recommendations to facility authority.

**Finding:** In general, class members in Control Units are not routinely assessed. The mechanisms in place to assess class members in Control Units are weekly rounds and meetings with an MHP. As noted in 3(c), above, an 11-facility review looked at 104 class member placements in segregation for the presence of weekly rounds. Only 77 of the 104 cases reviewed demonstrated weekly rounds. This represents a completion rate of only 74%. So, weekly rounds don't occur in the required frequency. Also, as noted throughout this report, class members only meet with an MHP every 30-60 days and then for 15-30 minutes. Noting all of this, when class members in Control Units are moved to a higher level of care it usually due to the class member calling for the Crisis Intervention Team. If the Crisis Intervention Team responds to this request, then the class member is usually placed on a crisis watch. It is also my experience as Monitor that the Department keeps very seriously mentally ill class members in Control Units when in fact they should be moved to a higher level of care.

**3(g): Specific requirement:** Continued treatment by mental health professional and/or psychiatric provider to the extent clinically indicated.

**Finding:** IDOC remains unable to provide continued treatment by a mental health professional and/or a psychiatric provider to the extent clinically indicated. Their deficiencies are noted in sections 3(a), 3(b), 3(c), 3(d)(i), 3(d)(ii), 3(d)(iii), 3(d)(iv), 3(d)(vi), 3(e) and 3(f).

---

[35] The IDOC Quality Improvement system does not assess 3(e), 3(f), and 3(g) of this Court's order.

23

### 4: CLASS MEMBERS WHO ARE PRESCRIBED PSYCHOTROPIC MEDICATION

> **Summary:** The parties will argue, and the Court will decide, the frequency of contact that is consistent with constitutional standards. To inform that, the monitoring team assessed whether psychiatry maintains the schedule specified in the Settlement Agreement – a reasonable standard of care – and found that psychiatric evaluations can take place at reasonable intervals, but not on a consistent, sustained basis, and confidentiality is not preserved often enough, generally because of Covid-19 limitations.
>
> Psychiatric providers do consistently ascertain side effects, document efficacy and side effects, and record having informed patients about their medications and the possible effects. Lab work is ordered at a moderate rate, not yet sufficient for substantial compliance.
>
> Defendants have well-established medication distribution systems but have offered no demonstration of whether IDOC practices provide reasonable assurance that psychotropic medications consistently are delivered to patients as planned. Quarterly reports respond to only 1 of the 9 issues the monitoring team has raised as common impediments. Neither have Defendants demonstrated the effectiveness of their policies concerning patients' nonadherence to medication regimens.

**4(a): Specific requirement:** Class members who are prescribed psychotropic medication shall be evaluated by a psychiatric provider at regular intervals consistent with constitutional standards.

**Finding:** The Monitor reviewed 88 psychiatric progress notes to assess the adequacy of the class members visits with a psychiatric provider. These progress notes are of good quality in that they provide for a history of present illness, review medication compliance and side effects, arrive at a diagnosis, prescribe the appropriate psychotropic medications for the given diagnosis and obtain informed consent from the patient. The Department has tremendously improved in this area over the past five years of the Settlement Agreement.

To review the adequacy of the frequency of contact, the monitoring team used as a guide the related Settlement Agreement requirements, as they are consistent with psychiatric standards of care, and the Court may determine that they are also consistent with constitutional standards.

For **outpatients**, the monitoring team analyzed contacts for 451 psychiatric patients, drawn from across IDOC, for whom the timeliness of at least three appointments in the monitoring period could be discerned.[36] The review method employed both IDOC databases and sections of

---

[36] IDOC does not maintain a data system that can show a series of contacts, but relevant data can be extracted from its "Psych Database." The monitoring team reviewed a Psych Database from each institution with an outpatient psychiatric caseload for each month from December 2020 through April 2021. A sample was chosen generally by random selection method of every 10 patients, though there were exceptions if the caseload was small or for a few other reasons.

24

health care records.

It was rare for a patient to be seen *every* 30 days, or consistently within a longer interval the provider designated if the patient was more stable. Only 29% of reviewed patients were seen within those intervals every time. However, it was common for contacts to miss the mark only by a short time. The monitoring team considers a contact within an additional week to be reasonable. If that standard were to be adopted, compliance within the sample jumps to 63%. These percentages are similar to previous analyses.

Where there were longer times between contacts, two to four additional weeks was common and fewer than 20 appointments appeared to exceed that.[37] Appointments delayed two weeks, or more were concentrated at just eight institutions.

Practice was better with **RTU** patients. In a 40-patient study using the same method, 55% were seen consistently as planned – almost always at 30-day intervals – and 83% were consistently seen by that point or within an additional week.

Psychiatric care in crisis watch is discussed in Section 2 above. As for **inpatients**, IDOC reports that all Elgin patients see a psychiatric provider at least three times per week. The monitoring team did not review this practice, apart from noting the three-day follow-up plans indicated throughout Elgin's Psych Database.

As another source, IDOC's Quality Improvement system audited psychiatry practices, including whether appointments took place on the timeframe ordered by the provider. Auditors found that, in the 766 charts reviewed, 86% of the patients were seen according to the provider's expectations during the first quarter of 2021.[38] While the providers' plans may or may not be equivalent to constitutional standards, this is additional information to take into account.

---

A contact was counted as timely if it occurred within 30 days, even if the provider had ordered a return to clinic in a shorter period, because the Settlement Agreement only requires patients to be seen within 30 days (that is, the reviewer assessed whether the contact met the Settlement Agreement requirement, *not* whether the patient was seen within the time the psychiatric provider specified). If a provider ordered an appointment *more* than 30 days hence, the contact was counted as timely if completed within that time, and not exceeding 90 days. If a patient's series of contacts were timely or only one day late, that case was also counted as timely.

The monitoring team controls for the known difficulty of some contacts being displaced in the databases. For 117 of the patients, the reviewer cross-referenced a portion of the patient's health care record with the database information. Otherwise, where it was difficult to confidently discern the interval between two contacts, the contact in question was eliminated from this analysis. If there were not at least three contacts on which to make a judgment, the case was removed from the analysis; this may occur at some institutions more frequently than others, so the number of cases per institution is not always strictly proportionate to the caseload. Occasionally, where the patient was to be seen at extended intervals and it was not possible to have three contacts in the monitoring period, a case with two contacts was retained; it is unknown whether these cases would continue have a pattern of timeliness with a longer period of contacts reviewed.

[37] One patient had a verified gap in contact of 6.5 months, but every indication is that this is an anomaly. Apart from that, the longest times to appointment appeared approximately 2 months longer than planned.

[38] In a few cases, the auditor noted whether the contact was timely consistent with policy and Settlement Agreement mandates for medication changes; most, however, concerned the provider's return to clinic order. The audit tool entries do not expressly note the patient's level of care, and it is unknown whether all levels of care are represented.

It is a standard expectation that psychiatric contacts be confidential. The monitoring team reviewed 255 psychiatric contacts across different treatment programs. Health care records indicated that 78% of crisis watch contacts, and 83% from other programs, were held in confidential settings.[39]

Because these figures demonstrate that individual appointments can be kept timely, but that is not true on a consistent, sustained basis, it is the Monitor's opinion that this performance does not yet satisfy this Court's order.

**4(b): Specific requirement:** IDOC shall accomplish the following in psychiatric services:

(i): Administer medications to all class members in a manner that provides reasonable assurance that prescribed psychotropic medications are actually being delivered to, and taken by, the persons in custody as prescribed.

**Findings:** The following is an excerpt from the Monitor's Fifth Annual Report regarding the provisions of this requirement. I repeat this information in this report as the situation hasn't changed since the end of May 2021: "From the Monitor's Fourth Annual Report forward, the monitoring team provided the following detail of typical components of 'reasonable efforts to ensure the medications are being taken by the persons in custody as prescribed': it is common for prisons to experience obstacles to patients receiving medication. These can include practices such as medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; security staff preventing nursing staff from accessing housing units, or patients from attending the medication line; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and hoarding or selling medication; and medication errors. These are all potential impediments that IDOC must protect against, and staff must make a showing that these common obstacles are not affecting its medication delivery.

Prior to that writing, in early 2019, IDOC implemented practices intended to reduce "cheeking" and hoarding medication; the monitoring team has not seen studies about whether those practices resulted in improvements. The Monitoring Team was told there was a process study, through the Continuous Quality Improvement program, examining the length of time from a nurse receiving a medication order to the time the medication is dispensed. Defendants have not provided material demonstrating practice on these or any of the other aspects of medication distribution named above.

---

[39] Where the monitoring team pulled health care records for various purposes, those samples were aggregated for this review. This analysis drew from 109 patients' records, from 23 institutions, and from outpatient, RTU, and crisis care, though not in a proportionate fashion. It is unknown whether restrictive housing contacts were included.

Additionally, I am disappointed to note that several of the IDOC facilities with large numbers of class members persist with unacceptably early morning medication distribution times[40]. These include but are not limited to Graham, Logan, Menard, Pinckneyville, Pontiac, Vandalia and Western. The Quarterly Report of April 23, 2021, states "Adjusting the time of the med pass to appease the monitor would disrupt the movement throughout the facility for the entire day." I find this to be a very specious argument. Other IDOC facilities with large class member populations can offer much more reasonable morning medication distribution times without apparently disrupting "the movement throughout the facility for the entire day." These include, but are not limited to Big Muddy-7am, JTC-8am, Dixon-7:15am, Illinois River-6:30am and Stateville-NRC-8am.

These lingering early morning medication distribution times are a significant piece of the medication compliance puzzle. I am willing to consider this aspect resolved if IDOC can demonstrate, through conducting compliance rate studies, that these unacceptably early morning medication distribution times do not negatively affect psychotropic medication compliance.

This rating for this requirement will remain Noncompliant until IDOC demonstrates good practice on the issues outlined above."[41]

It is my opinion that these unacceptably early morning medication distribution times are done for the benefit of the staff as opposed to the class members. It is worth noting that where patients were interviewed at the early-distribution institutions during the monitoring period, most named the timing as a reason they are sometimes noncompliant with medications. Their medication administration records, and that of other patients, showed refusals of the morning dose only, which would tend to support their statements. The observed refusals tended to be intermittent, which undermines the effectiveness of medications that must build up to a therapeutic level, and the refusals would likely go without response because they fall short of the threshold of three consecutive days at which nursing is required to inform the mental health department.

This item will continue to receive a rating of noncompliance.

(ii): The regular charting of medication efficacy and side effects.

**Findings:** A review of 88 psychiatric progress notes from 15 different facilities[42] found 100% compliance with this requirement. IDOC's first quarter Quality Improvement studies of 766 patients on medication also showed 99.4% compliance. This provision is in substantial compliance.

(iii): Take necessary steps to ascertain side effects.

---

[40] These times range from 3:30 am through 5:30 am.
[41] Monitor's Fifth Annual Report, pages 33-34
[42] East Moline, Danville, Graham, Centralia, Kewanee, Robinson, Menard, Big Muddy, Pinckneyville, Lincoln, Joliet, Stateville-NRC, Stateville, Pontiac, and Decatur

**Findings:** The same 15-facility review found 100% compliance with this requirement, and the IDOC Quality Improvement studies found 99.4% compliance. This provision is in substantial compliance.

(iv): The timely performance of lab work for these side effects and timely reporting on results.

**Findings:** This monitoring team's same 15-facility review found 83% compliance with this requirement.[43]

(v): The class members for whom psychotropic drugs are prescribed receive timely explanations from appropriate medical staff about what the medication is expected to do, what alternative treatments are available, and what in general are the side effects of the medication; and have an opportunity to ask questions about this information before they begin taking the medication.

**Findings:** The Monitoring Team's same 15-facility review found 99% compliance with this requirement.[44]

(vi): That class members, including persons in custody in a Control Unit who experience medication noncompliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's medication noncompliance said noncompliance remains unresolved, the MHP shall refer the offender to a psychiatric provider.

**Findings:** The Monitoring Team did not encounter a sufficient number of these types of cases to arrive at an opinion. A rating of "No Rating" will be assigned.

---

[43] In IDOC's Quality Improvement audits, there were double-digit findings of lab work not ordered. However, the audit method does not routinely record which patients were due for lab work, and the cases in which it was handled correctly, so it is not possible to put these findings into context.

[44] In IDOC's Quality Improvement audits, there were double-digit findings of lapses in the demonstration that informed consent took place. However, the audit method does not routinely record the cases in which an informed consent interaction would be expected during the quarter (as distinguished from those that had already taken place in previous contacts), and the cases in which it was handled correctly, so it is not possible to put these findings into context.

28

## 5: TREATMENT PLANS

> **Summary:** All class members do not have a treatment plan that is individualized and particularized based on the patient's specific needs. This is due to the persistent backlog of treatment plans throughout the Department and the low completion rate of treatment plan reviews and updates when a class member is placed into restrictive housing. The treatment plans for class members assigned to the RTU and inpatient levels of care were much better than those for class members assigned to outpatient and restrictive housing levels of care. The Department still struggles to meet its requirements for completing mental health evaluations in a timely manner. Finally, the Department doesn't consistently review and update class members' treatment plans per the requirements set out in the Settlement Agreement, a reasonable time frame for this requirement.

**5(a): Specific requirement:** All class members shall have a treatment plan that is individualized and particularized based on the patient's specific needs, including long and short-term objectives, updated and reviewed with the collaboration of the patient to the fullest extent possible.

**Finding:** To adequately discuss the Department's response to this requirement, a review of the treatment planning backlog for the reporting period is required. The following is a sampling of the actual number of treatment plans that have been backlogged from January through June 2021:

|      | total plans backlogged | plans backlogged greater than 14 days |
|------|------------------------|---------------------------------------|
| 1/15 | 273                    | 152                                   |
| 2/12 | 225                    | 149                                   |
| 3/12 | 401                    | 282                                   |
| 4/16 | 210                    | 149                                   |
| 5/14 | 262                    | 148                                   |
| 6/12 | 302                    | 222                                   |

These backlog numbers document that all class members do not have a current treatment plan. These backlog numbers represent less than 5% of the total mental health caseload. This fact is of little solace to those class members who do not have a written treatment plan which directs their mental health and psychiatric care. This is a very serious problem that warrants a rating of noncompliance.

To further evaluate the Department's response to this requirement, The Monitor reviewed 69 treatment plans from 10 different facilities[45]. This review included 23 outpatient plans, 13 RTU plans, 29 segregation plans and 4 inpatient plans.

---

[45] Centralia, Logan, Big Muddy, Pontiac, Dixon, Danville, Stateville, Elgin, Menard and NRC.

1. Outpatient plans: Of the 23 outpatient treatment plans reviewed, only two showed evidence of true multidisciplinary planning. These treatment plans were prepared by the QMHPs. A few of these plans omitted involvement by the psychiatrist and many of them were signed by the psychiatrist days or weeks after the date of preparation. The majority of these plans were not individualized to the patients' needs and were generic in nature.

2. RTU plans: Of the 13 RTU treatment plans reviewed, 9 showed evidence of true multidisciplinary planning. These RTU plans were much better than the outpatient plans in that they were more individualized to the patients' needs.

3. Segregation plans: As reported in 3(b), above, in an 11-facility review conducted by the Monitor,[46] only 59 of the 98 class member placements in segregation (60%) had evidence of a mental health professional reviewing and recommending any clinically necessary modifications to a class member's individual treatment plan within seven days of placement, a reasonable measure of timeliness set out in the Settlement Agreement.

   In addition, the Monitor reviewed 29 segregation treatment plans from 9 different facilities.[47] Of these 29 plans, 22 showed evidence of multidisciplinary planning. This multidisciplinary planning was based on the fact that the QMHP, psychiatric provider and patient all signed the plan on the same day. Upon closer scrutiny, however, it is clear to the Monitor that the QMHPs fill out the plan and the psychiatric provider merely signs the completed document. This opinion is based in part on the fact that the "Response to Medication section" was generally not completed. If these plans were truly completed in a multidisciplinary fashion, this section along with other references to medication would be prepared by the psychiatric practitioner. This was not the case. Also, these plans were very generic and not individualized to the patients' needs. For example, the charts reviewed listed meetings with the QMHP every 30-60 days for 15-30 minutes regardless of the diagnosis or clinical condition of the patient. Segregation rounds were routinely listed as a treatment intervention. Overall, these segregation plans were of poor quality.

4. Inpatient plans: These plans showed true multidisciplinary planning. They were individualized to meet the patients' needs. No problems noted with these inpatient plans.

Additionally, IDOC's Quality Improvement system reviewed 144 charts that contained 216 treatment plans created during the monitoring period. There were also indicia that auditors note where a treatment plan was due but appeared not to have been completed. Auditors recorded compliance with the elements of this order in 74% of the inpatient treatment plans and 82% of all other plans.[48] It is not clear whether all levels of care and treatment settings were included in this

---

[46] Danville, Centralia, Big Muddy, Pontiac, Stateville, Menard, Stateville-NRC, Sheridan, East Moline, Jacksonville and Taylorville.

[47] Centralia, Logan, Big Muddy, Pontiac, Dixon, Stateville, Menard and NRC.

[48] The monitoring team derived this from the completed audit tools. The auditing method includes selecting charts at random, as the term is used in everyday language; an entry without description signals a compliant document (for some responsibilities, other than treatment plans, it may indicate a compliant series of documents); and noncompliant documents are recorded with one or more entries showing predefined reasons for noncompliance. The monitoring team counted as noncompliant any findings about essential elements of a plan and multidisciplinary plan creation, but

study.

**5(b): Specific requirement:** Mental health evaluations shall be conducted in a timely manner to ensure that individuals in need of treatment, or re-evaluation of existing treatment, are evaluated without undue delay.

**Findings:** The monitoring team reviewed 619 patients who had a need for an evaluation during the monitoring period.[49] Between 93% and 99% of the evaluations were completed,[50] but a large percentage were untimely.

The Settlement Agreement and IDOC policy call for evaluations to be completed within 14 days; this occurred in only 52% of the reviewed cases. It may be that the Court will employ a different timeframe to determine whether there was undue delay.

Another 16% of the sample was completed within one month of referral, double the Settlement Agreement's requirement.[51] Fully 31% took longer to complete; the *large majority of those were **one to five months later*** than the Settlement Agreement deadline. This was especially true where the need for evaluation arose in reception centers.[52] Where reception center prisoners transferred before an evaluation was conducted, receiving institutions did not appear to take the original referral date into account.

IDOC's Quality Improvement system also audited this responsibility. Reviewers noted 212 individuals with an evaluation in their health care records that was completed in the first quarter

---

did *not* include noncompliance findings about late plans, clerical concerns, or other policy expectations. If there was more than one entry for a date, it was counted as one document, as the monitoring team is not aware of any situations in which more than one plan would be written in a day. If there was more than one entry showing different reasons of noncompliance for a given plan, it was counted as one noncompliant plan.

The IDOC sample included outpatient and RTU plans, and may have included crisis watch and restrictive housing plans, but this is unclear. It is not possible to determine whether those programs were proportionately represented within the sample. The expected frequency of inpatient plans is much higher, so they were analyzed separately so as not to skew the overall numbers. There was clear over- and underrepresentation of different institutions, in relation to their proportion of the system's caseload, so the collective compliance percentage may or may not be accurate.

[49] The auditor reviewed all cases that "MHP Databases" showed as referred and/or due during February 2021. This encompassed all institutions except Kewanee and Elgin, which showed no evaluations due that month. Most conclusions were drawn from the entries in the databases. Where an evaluation appeared not to have been completed, IDOC was given the opportunity to explain and provide documentation. Some cases were removed because an unintended effect of the database programming incorrectly showed an evaluation due when one had already been completed, and in a handful of cases where clear information could not be discerned. The remaining cases reviewed were a total of 619.

Among these, the reviewer tracked a large sample of those patients who came into a reception center but transferred to a parent facility before an initial evaluation was completed. Those cases require calculation combining information from the reception center database and the receiving institution database.

[50] Definitively, 1% of these evaluations were not completed. Databases do not record completion of another 6%; some or all of those may have been conducted, but those prisoners have paroled and IDOC does not provide archived records, so practice could not be verified.

[51] This is also a measure that IDOC employs in its backlog reports, determining whether a responsibility is overdue less than 14 days.

[52] Initial evaluations at Logan and Menard were generally timely. Evaluations at Stateville-NRC tended to be quite delayed, as were those at Graham, to a lesser extent.

31

of 2021. Reviewers audited according to a detailed "problem list," which guides them to check for good clinical practice, Settlement Agreement requirements for content and timelines, other policy requirements, and administrative accuracy and completeness. The method does not assess whether an evaluation should have been completed and is absent. The audit data showed 71% compliance for the content and timeliness of the evaluations.[53]

NRC has not been able to complete mental health evaluations by the standard set in the Settlement Agreement. During a site visit to NRC on March 11, 2021, staff informed me of a new effort to complete the mental health evaluations in a timely manner. They began reporting the backlog numbers on February 19, 2021. The NRC staff informed me that the mental health evaluation backlog numbers would be the best indicator of their new program's success. The following are the mental health evaluation backlog numbers from NRC for the period of February 19 through June 8, 2021:

| | | |
|---|---|---|
| 2/19/21 | 402 backlogged evaluations | 302 (75%) greater than 14 days late |
| 3/19/21 | 384 backlogged evaluations | 264 (69%) greater than 14 days late |
| 4/16/21 | 171 backlogged evaluations | 115 (67%) greater than 14 days late |
| 5/21/21 | 86 backlogged evaluations | 43 (50%) greater than 14 days late |
| 6/8/21 | 74 backlogged evaluations | 33 (45%) greater than 14 days late |

Progress in eliminating the mental health evaluation backlog at NRC is being made. Of note, the numbers for July are as follows:

| | | |
|---|---|---|
| 7/16/21 | 96 backlogged evaluations | 42 (44%) greater than 14 days late |

Based on the numbers reported, the Department in not in compliance with 5(b).

**5(c): Specific requirement:** Treatment plans shall be reviewed and updated at regular intervals as clinically necessary to assess the progress of the documented treatment goal and update the plan accordingly.

**Finding:** There still remains a significant number of treatment plans that are backlogged. Please see 5(a), above, for details about this backlog of treatment plans. Also, as reported in 3(b), above, "In an 11-facility review conducted by the Monitor,[54] only 59 of the 98 class member placements in segregation (60%) had evidence of a mental health professional reviewing and recommending any clinically necessary modifications to a class member's individual treatment plan within seven days of placement."

---

[53] The *Rasho* monitoring team calculated this percentage using the Quality Improvement auditors' raw data, removing those cases that were outside the monitoring period, and counting as compliant any cases where the auditor found solely administrative violation(s).

[54] Danville, Centralia, Big Muddy, Pontiac, Stateville, Menard, Stateville-NRC, Sheridan, East Moline, Jacksonville and Taylorville.