IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION


| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants | ) | |


**MIDYEAR REPORT OF MONITOR PABLO STEWART, MD**

TABLE OF CONTENTS

BACKGROUND …………………………………………………………….…….3

METHODOLOGY/MONITORING ACTIVITIES …………………………………3

EXECUTIVE SUMMARY …………………………………………………………4

DETAILED FINDINGS …………………………………………………………...7

V: MENTAL HEALTH EVALUATION AND REFERRALS ……………………8

VII: TREATMENT PLAN AND CONTINUING REVIEW …………………………..13

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT
  SETTINGS………………………………………………………………………19

IX: ADDITIONAL MENTAL HEALTH STAFF…………………………………………20

X: BED/TREATMENT SPACE …………………………………………………22

XI: ADMINISTRATIVE STAFFING …………………………………………….....31

XII: MEDICATION.…………………………………………………………….....32

XIII: OFFENDER ENFORCED MEDICATION …………………………………41

XV: SEGREGATION ……………………………………………………………45

XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES …………….55

XIX: CONFIDENTIALITY ……………………………………………………….....59

XXII: PARTICIPATION IN PRISON PROGRAMS ……………………………62

XXIV: USE OF FORCE AND VERBAL ABUSE ………………………………66

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS ……………..75

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ……………………..84

XXVII: MONITORING ……………………………………………………..85

XXVIII: REPORTING AND RECORDKEEPING …………………………………85

CONCLUSION ……………………………………………………………………86

## BACKGROUND

**IDOC:** IDOC consists of 29 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and one additional facility for women. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Four of the facilities--Logan, Joliet, Pontiac and Dixon--have Residential Treatment Units. The RTUs at Dixon and Logan have been operating throughout the life of the Settlement Agreement. The Joliet Treatment Center began receiving offenders on October 4, 2017. The RTU at Pontiac officially opened on January 6, 2020. I particularly point out the Department's RTUs as they play an extremely integral function within the IDOC, and they have been chronically underutilized throughout my tenure as Monitor. All facilities have crisis care beds as well as some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement was approved May 23, 2016. The Corrected Second Amended Settlement Agreement was approved June 9, 2020. In March 2021, the parties reached agreement on removing some items from court oversight and continuing the Court's jurisdiction over 45 provisions for an additional year; the Court so ordered on March 10, 2021.[1] In this report, these documents will be referred to, individually and collectively, as the Settlement Agreement.

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish these monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 11 site visits of 10 different IDOC facilities, where interviews of administrators and staff[2] were conducted. During these site visits, the monitoring team would obtain information about staffing, the mental health and psychiatric case

---

[1]  The global pandemic caused Defendants to invoke the *force majeure* provision of the Settlement Agreement. While the parties agreed that *force majeure* was appropriate, there were disputes, and court filings, about the effect of that invocation. By the parties' March 2021 agreement, the Court ordered those disputes to be moot.

[2]  Throughout this report, "staff" is used to indicate employees and contractors with IDOC or Wexford

load, medication delivery and management, use of force, access to programming, referrals, crisis intervention, Covid-related issues, out-of-cell time, and the operations of crisis beds and segregated housing.

Site visits:

| | | |
|---|---|---|
| Menard | June 28-30 | Ms. Morrison |
| Pinckneyville | July 1-2 | Ms. Morrison |
| Joliet | July 22-23 | Dr. Stewart |
| Dixon | August 2-4 | Ms. Morison |
| Sheridan | August 5-6 | Ms. Morrison |
| Pontiac | August 18-19 | Dr. Stewart |
| Logan | August 30-September 1(day) | Ms. Morrison |
| Graham | September 1 (evening)-3 | Ms. Morrison |
| Hill | September 7-8 | Ms. Morrison |
| Illinois River | September 9-10 | Ms. Morrison |
| Dixon | October 20-21 | Dr. Stewart |

The Monitor reviewed systemwide backlog reports provided weekly. Drawing upon tracking provided by each institution, the team analyzed the timeliness of evaluations and psychiatric contacts; the length of stay in crisis watch; the locations where patients in crisis watch were housed; crisis watch follow-up appointments; and referrals to RTU, Behavior Modification Units, and inpatient care. The team reviewed health care records and other IDOC documents concerning assessment upon placement in restrictive housing, use of restraints for mental health purposes, use of force, response to patients' medication noncompliance, medication-related discipline, and enforced medication, as well as Quality Improvement audits.

## EXECUTIVE SUMMARY

IDOC continues to struggle to meet the requirements of the Corrected Second Amended Settlement Agreement. In some ways, the findings of this report are not materially different from those of the Fifth Annual Report. With access to greater information, however, the monitoring team has discovered several practices that have either deteriorated or are not as strong as previously thought. These include the timeliness of evaluations, the confidentiality of mental health encounters, response to medication noncompliance, and some aspects of the ability of the

Department to ensure that class members treated with psychotropic medications receive them as prescribed. There are many reasons for this lack of progress and backsliding on the part of IDOC. The most glaring reason is the critically low level of staffing for mental health providers, nurses, and custody officers.

On the other hand, there is meaningful improvement in reducing the longest stays in crisis watch; the rate of housing crisis patients in non-crisis cells; and the rate of patients experiencing multiple and lengthy times in restraints; as well as increasing the timeliness of transfers to higher levels of care and, to some extent, initiating those referrals.

A summary of compliance findings follows:

| Requirement | Compliance Status |
|---|---|
| **V: MENTAL HEALTH EVALUATION AND REFERRALS**<br><br>(V)(a), (d), (f), (g) | Overall: Noncompliance<br><br>Subfindings supporting overall finding: Noncompliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW**<br><br>(VII)(a), (b),(c),(d) | Overall: Noncompliance<br><br>Subfindings supporting overall finding: Noncompliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS**<br><br>(VIII)(b)(i) | Overall: Noncompliance<br><br><br><br>Noncompliance for 16 institutions<br>Substantial compliance for 14 institutions |
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>(IX)(a), (b), (f) | Overall: Noncompliance<br><br>Subfindings supporting overall finding: Noncompliance |
| **X: BED/TREATMENT SPACE**<br><br>(X) (b)(ii), (d),(e),(f),(g) | Overall: Noncompliance<br><br>Subfindings supporting overall finding: Noncompliance |
| **XI: ADMINISTRATIVE STAFFING**<br><br>(XI)(c) | <br><br>Noncompliance |
| **XII: MEDICATION** | Overall: Noncompliance |

| Requirement | Compliance Status |
|---|---|
| (XII)(b), (c)(i)<br>(XII)(c)(iv)<br>(XII)(c)(vi) | Subfindings supporting overall finding:<br>Noncompliance<br>Substantial compliance<br>Noncompliance |
| **XIII: ENFORCED MEDICATION** | Overall: Noncompliance<br><br>Noncompliance for 10 institutions<br>Substantial compliance for 20 institutions |
| **XV: SEGREGATION**<br><br>(XV)(a)(ii)<br>(XV)(a)(iii)<br>(XV)(a)(iv)<br><br>(XV)(a)(v)<br>(XV)(a)(vi) (first)<br>(XV)(a)(vi) (second)<br>(XV)(c)(ii),(iii),(iv);(d);(e) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance<br>Noncompliance<br>Noncompliance for 8 institutions<br>Substantial compliance for 22 institutions<br>Noncompliance<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| **XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES**<br><br>(XVII)(a) | Overall: Noncompliance<br><br><br>Noncompliance for 7 institutions<br>Substantial Compliance for 23 institutions |
| **XIX: CONFIDENTIALITY**<br><br>(XIX)(b), (c) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| **XXII: PARTICIPATION IN PRISON PROGRAMS** | Substantial Compliance |
| **XXIV: USE OF FORCE AND VERBAL ABUSE** | Overall: Noncompliance<br><br>Noncompliance for 7 institutions |

| Requirement | Compliance Status |
|---|---|
| | Substantial compliance for 22 institutions[3] |
| **XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS** | |
| (XXV)(a) | Noncompliance |
| **XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM** (XXVI)(a), (b) | Overall: Substantial compliance |
| **XXVII: MONITORING** | Overall: Substantial compliance |
| **XXVIII: REPORTING AND RECORDKEEPING** | Overall: Substantial compliance |

## DETAILED FINDINGS

This Section details the Monitor's findings for each provision of the Settlement Agreement.

**Overall structure:** This Section is organized along the same structure as the Settlement Agreement; each major section below corresponds with a substantive section of the Settlement Agreement.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement Agreement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement Agreement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement Agreement. For example, it is in the ADs and the Manual that one finds detailed requirements on suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement Agreement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that noncompliance is, nonetheless may be in substantial compliance with the provision of the Settlement Agreement.

**Compliance ratings:** The team applies "Substantial Compliance" and "Noncompliance"

---

[3] Recent documented practices render two of these uncertain, but the rating will remain in place pending ongoing review and the dispute resolution process.

ratings for each provision, as specified in the Settlement Agreement. In actual fact, these may mask IDOC's true performance. IDOC has made substantial progress on a number of requirements, which possibly could be more accurately described as "partially compliant." The terms of the Settlement Agreement, however, only allow for the use of "Substantial Compliance" and "Noncompliance."

Section II (u) of the Settlement Agreement defines "Substantial Compliance" as follows: "The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious."

Substantial Compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this report, most compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement Agreement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the Monitor of this seismic shift for IDOC, I continue to feel that it is more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. It is important to note that during the first four years of implementing the Settlement Agreement, IDOC has improved the overall quality of psychiatric and mental health services offered to the offender population. More than 60% of the original provisions were found in Substantial Compliance and were removed from the Settlement Agreement in March 2021 by agreement of the parties and the Monitor. IDOC still has a long way to go to fully meet the requirements of the Settlement Agreement, especially in terms of staffing.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary:** There remains a department-wide problem with timeliness of the mental health evaluations. The data shows that class members who are transferred between institutions experience significant delays in receiving a mental health evaluation. Stateville NRC has implemented changes in their policies to improve practice on mental health evaluations. Although these changes are beginning to improve the completion and timeliness of completing mental health evaluations, they still fall short of the 14-day requirement. Finally, it remains the firm opinion of the Monitor that the Crisis Intervention Team is not always contacted when a request is made by a class member. It also appears that the performance of this measure varies among the facilities.

(V)(a): **Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** To assess timeliness of mental health evaluations, the monitoring team is informed by paragraph V(f) of the Settlement Agreement, which states: "Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (see IDOC Administrative Directives 04.04.100 section II(G)(2)(b) and 04.04.101 section II(F)(2)(c))."

As noted in the Monitor's Fifth Annual Report, the team recently learned of a practice that greatly affects whether IDOC is meeting the timeliness requirements of V(a) and V(f). The team has now confirmed that IDOC resets the deadline for everyone with a pending evaluation when he or she transfers between institutions. This means that:

- if an evaluation was not completed before transfer, the record of that disappears from the oversight system
- there is no record of the actual time from referral to completed evaluation for those persons
- for those evaluations, the oversight system calculates timeliness from a date that has no basis in the Settlement Agreement[4]

The result is that Defendants' system of "backlog reports," which they use for oversight and status reports, and upon which the Monitor's previous analyses rely, are calculated inaccurately. The monitoring team's current analysis shows that this affects hundreds of individuals each month, and that compliance with this requirement is far worse than previously understood.

The monitoring team tracked a sample of 422 evaluations, initiated at all four reception centers, from date of referral to date of completion.[5] ***Only 21% were completed by the Settlement Agreement's standard of timeliness.*** None of the four reception centers was in compliance.

Another 32% of evaluations were completed within an additional two weeks, double the requirement. The largest number – 47% -- took longer to complete, up to 3.5 *months*. A few may not have been completed at all.[6]

---

[4]   In recent quarterly reports, Defendants argue that resetting the deadline is more clinically appropriate. While that may be a change they wish to negotiate with Plaintiffs' counsel, and/or seek Court approval for it, the Monitor can only assess compliance based on the existing requirement.

[5]   This sample concentrates on reception centers as the most likely source of evaluations, and of persons requiring an evaluation who then transfer. This best enables calculations of time to completion whether performed at the original location or after transfer. While it is possible that persons may be identified for evaluation at one parent facility and transfer to another before the evaluation is completed, that is not likely to be a large population.

The sample was chosen by first identifying all persons shown on June and July MHP Databases as having an evaluation due in July 2021. The set includes all such cases on the databases from Graham and Logan, and all such cases at Menard and Stateville-NRC that were not identified by IDOC as persons assigned to the parent facility. It is possible that the sample includes other persons assigned to these institutions (not reception center status).

Dates of referral and completion were captured from these logs. Where there were no dates of completion and the person did not appear in subsequent reception center MHP Databases, the reviewer employed the online Inmate Locator to identify the institution to which the persons transferred and captured the date of completion from the MHP Databases at those receiving facilities. Where a key fact could not be discerned, or an evaluation was *not* required by policy, because one had been completed in the preceding 60 days, that individual was removed from the analysis. The sample then totaled 422 evaluations.

[6]   The 47% includes evaluations that were already more than 14 days late but had not been completed as of the time of analysis, so the actual longest terms are yet to be determined. This set also includes persons who paroled or

As Stateville-NRC is responsible for the largest number of evaluations, IDOC initiated changes in early spring 2021 to improve practice there. Defendants report they have implemented aspects of the plan, including making available additional office space, both centralized and in cellhouses; utilizing procedures to expedite transfers of persons likely to join the mental health caseload; and dedicating an MHP to conducting evaluations. Other plan elements are anticipated.[7] In the monitoring team's review, it appears these practices are bearing fruit; more evaluations are being completed and, while still far short of the standard, an increasing number of them are timely.[8]

The monitoring team also analyzed a similar-sized sample of evaluations that were due at parent institutions.[9] For **systemwide practice** then, integrating practice at reception center and mainline institutions, the compliance percentages were:

- of the 871 sampled evaluations, only 43% were timely
- 28% were completed within an additional two weeks, double the requirement
- 29% took longer to complete
    - the longest time at reception centers was 3.5 months or more
    - for cases that arose within or between mainline institutions, the longest times were generally shorter, with the longest approximately 2.5 months, and were concentrated at five institutions
    - as described above, within the 29%, a small number may not have been completed at all (22 people, or 3% of all cases reviewed)

Defendants' most recent quarterly report indicates that 2021 Quality Improvement audits found 92 untimely evaluations and that this was a substantial improvement over the previous year. Defendants do not indicate how many audited charts had an evaluation due, so it is not possible to discern whether this is a low or high rate.[10] Additionally, it seems likely that the auditors employed

---

discharged from IDOC; their evaluations were already overdue by more than 14 days when they left IDOC, and tracking does not reflect whether an evaluation was completed. For that latter group of 22 persons (5% of the sample), it is possible that their evaluations were not only late but missed altogether.

[7] Defendants' quarterly report dated October 25, 2021

[8] Until 2021, Defendants did not track the evaluations due at this institution, so it is not possible to make comparisons. However, staff routinely told the monitoring team that they did not conduct evaluations. Once tracking began in January 2021, the monitoring team analyzed samples in February and July. In July, the number of evaluations clearly completed onsite (87) had more than doubled, and half of those were timely, which is also a much higher percentage. Far more evaluations were greatly overdue onsite, or when the patients transferred, but the progress is worthwhile.

[9] The method was similar. Here, the reviewer analyzed all persons shown on June and July MHP Databases as having an evaluation due in July 2021, drawing on all institutions that do not have a reception center, as well as those cases at Menard and at Stateville-NRC whom IDOC legal counsel identified as housed outside of reception center at those facilities. The reviewer recorded the timeliness of completion as shown in the July through September databases. Where a key fact could not be discerned or an evaluation was *not* required because of policy or the inadvertent result of the database's operation, that individual was removed from the analysis. The reception center and mainline samples were compared to ensure there were not duplicates. The sample then totaled 449 persons due for evaluation.

[10] Quarterly report dated October 25, 2021. These numbers likely precede the current monitoring period, as there are no audits of evaluations in the audits covering June and July practice that were provided to the monitoring team, and it is our understanding that audits covering August, September, and October are not yet due to be completed.

Defendants mention "thousands of charts" audited overall, but this is quite different from the number of charts in which an evaluation is due. Evaluations are a relatively rare occurrence for a patient, and Defendants do not select

the reset date in reaching their timeliness findings, so it is unclear whether the audits recorded all evaluations that were late in relation to the original referral date. .

IDOC is noncompliant with subsection V(a).[11]

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** To date, the Department has never provided a demonstration of a targeted examination to determine whether individuals in custody with a known history of mental illness are automatically referred for services.[12] In the absence of that showing, this provision remains noncompliant.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** This requirement may be considered to include routine referrals for a full mental health evaluation and routine referrals for an MHP or psychiatry appointment. The monitoring team analysis of referrals for a full mental health evaluation is detailed in V(a) above.

As for referrals for an MHP or psychiatry appointment, the monitoring team interviewed 49 patients, 24 mental health staff, and 15 nurses. Among patients who had used the referral system, in most facilities, the experience was mixed. Only patients at Pinckneyville and Sheridan consistently described response times that comply with the standard, but the majority of patients did so at three other institutions. In nearly every site, even those where patients had poor experiences with written referral response, patients often reported confidence in accessing mental health staff by conveying oral requests through officers or BHTs on rounds, asking MHPs when they are in the building, or during MHP office hours. During the pandemic, MHPs and BHTs have used these methods to increase their presence in the housing units, a sensible adaptation that appears to be effective in increasing access and more quickly addressing patient needs.

Among mental health and nursing staff, most reported that patients do *not* complain about having to submit multiple self-referrals before being seen. This is a large improvement over previous years. Several people described systems that convey patient oral and written requests

---

charts that they know should have a recent evaluation, so there is no reason to believe that the number of evaluations audited is the same as the overall number of charts audited.

[11]   Although five institutions were previously found in substantial compliance, this was premised, in part, on inaccurate information provided (the deadlines resetting upon movement). This issue is a systemwide responsibility, not only that of reception centers. For this reason, institutions cannot be found in substantial compliance under current conditions.

[12]   The Department's quarterly reports state, in general terms, that the screening process identifies and refers these persons. However, V(d) specifically contemplates others ("In addition to those persons identified by the screening process" …). Additionally, Defendants' broad claim *assumes* that the screening process catches all persons with a mental health history, but IDOC has never shown that it has *tested that assumption* – that is, that staff has checked into whether persons with a mental health history have been missed.

quickly; some said that if the mail system is used, it adds one to two days or there are examples of referrals that did not reach the Mental Health Department.[13] MHPs currently say that the level of self-referrals is manageable and they now feel able to respond by the deadline, and often within a few days. A few MHPs and nurses noted that their own referrals to psychiatry are often handled through direct conversation, as they have at least daily contact with onsite providers and weekly contact with telepsych, or through email.

This information is one window into the topic, but more systemic information is needed. IDOC recently implemented a system to track and demonstrate responses to these referrals. Data will be available to the monitoring team, for the first time, after the close of the analysis period for the instant report. Until there is a demonstration of meeting this requirement, IDOC is rated noncompliant.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** My opinion is that the facility Crisis Intervention Teams are not routinely contacted immediately for offenders with serious or urgent mental health problems. The Department continues to deny the presence of this problem. Most recently in their Quarterly Report of 10/25/21, the report states "(the Monitor's allegations of gatekeeping by the custody staff) lack supporting facts or data." My "supporting facts or data" is my interviews with many hundreds of class members over the tenure of my monitorship, reviewing court filings and reports of gatekeeping from the counsel for the plaintiffs. I have integrated all of this data as the basis of my opinion regarding this requirement.

In my interviews of class members assigned to the BMU at Menard, several of them report problems with gatekeeping. One stated that custody officers act as gatekeepers, even if they self-harm. Another BMU member stated that he has to "cut up" in order for the custody officers to call for a Crisis Intervention Team Member. The final class member that interviewed stated he can't see a Crisis Intervention Team Member due to gatekeeping. Another class member from Pontiac also stated that the custody staff act as gatekeepers from the Crisis Intervention Team.

In a letter sent to me by a class member housed at Dixon, the class member explained the difficulties he has experienced in speaking with the Crisis Intervention Team. In summary when the class member asked for a Crisis Intervention Team member, the custody officer asked him why. The class member responded, "I have a serious mental health issue." The custody officer continued his query of the class member by asking if he was going to hurt himself or others. When the class member responded no, the custody officer informed him "well you don't have a crisis."

Counsel for the plaintiffs provided the monitoring team and counsel for the defendants two examples of serious self-harm incidents occurring for class members when they were refused a visit from the Crisis Intervention Team. The emails were dated June 11, 2021 and September 28, 2021.

---

[13]  The timeliness information comes from BHTs responsible for tracking written referrals and from MHPs' general impressions.

In addition, Assistant Monitor Ms. Morrison spoke with 45 patients and 14 mental health staff about this topic during her site visits. Patients at Dixon, Illinois River, Logan, Menard, and Sheridan consistently expressed experiencing and/or witnessing officers calling a crisis team member as required or felt confidence that they could rely on officers to do so. For patients at Graham, Hill, and Pinckneyville, the experience was more mixed; some found the system operated as it should, while a significant minority said their own requests, or those they could overhear, were sometimes rejected. The comments of mental health staff at Dixon, Illinois River, Pinckneyville, and Sheridan were consistent with their patients' views.[14]

In their Quarterly Report dated October 25, 2021, the Department listed the efforts being undertaken to address this issue. IDOC will continue to receive a rating of noncompliance until this issue is resolved.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**: The monitoring team reviewed 188 treatment plans and found that the majority of them were not "prepared collectively by the offender's treating mental health team." Also, there remains a department-wide backlog of timely treatment plan completions. The treatment plans are prepared utilizing the authorized forms. Crisis Care treatment plans are prepared at a rate of 92% upon admission and 87% upon discharge. Only 53% of class members placed into segregation receive a treatment plan review and update within their first week of segregation placement.

To assess the timeliness of psychiatric contacts for outpatients, the monitoring team analyzed contacts for 401 psychiatric patients, drawn from across IDOC, for whom the timeliness of at least three appointments in the monitoring period could be discerned. The review method employed both IDOC databases and sections of health care records. This review found that the required frequency of psychiatric contacts was met in a minority of cases. The Department fared slightly better for the required frequency of psychiatric contacts in the RTU and seemed to meet the requirement for the Inpatient population.

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** VII(a) contains two requirements: 1) "any offender requiring on-going outpatient, inpatient or residential mental health services **shall** (emphasis added) have a mental health treatment plan"; 2) "such plans will be prepared collectively by the offender's treating mental health team."

---

[14]  This topic was not covered in staff interviews during other site visits.

A thorough analysis of IDOC's response to VII(a) requires a review of the treatment planning backlog data for the reporting period. The following is a sampling of the actual number of treatment plans backlogged from June – November 2021:

|  | total plans backlogged | plans backlogged greater than 14 days |
|---|---|---|
| 6/11 | 314 | 168 |
| 7/9 | 404 | 246 |
| 8/13 | 352 | 228 |
| 9/10 | 327 | 167 |
| 10/8 | 328 | 117 |
| 11/5 | 253 | 138 |

As I have reported numerous times, these backlog numbers document that all class members do not have an up-to-date treatment plan. This is a serious deficiency on the part of IDOC. The number of backlogged cases is relatively small when compared to the overall mental health caseload. This fact is of little consolation to those class members that do not have an up-to-date document which directs their mental health and psychiatric care. This persistent backlog also strongly suggests that IDOC does not employ a sufficient number of mental health and custody staff.

To evaluate the second requirement of VII(a), the monitoring team reviewed 84 outpatient treatment plans, five inpatient treatment plans, 25 segregation treatment plans, 50 crisis care plans and 24 RTU treatment plans.

1. Outpatient plans: Only one facility, Lincoln, was fully compliant in creating treatment plans collectively (at least an MHP, psychiatric provider, and offender) with members signing the treatment plan on the same day.

   Fourteen facilities were noncompliant in creating treatment plans collectively. This group of facilities did attempt to document collective planning (at least an MHP, psychiatric provider, and offender). These facilities include Big Muddy River, Centralia, Danville, Decatur, Dixon, East Moline, Graham, Kewanee, Lawrence, Menard, Robinson, Shawnee, Vandalia, and Vienna. However, these facilities did not demonstrate that the members of the multidisciplinary team signed the treatment plan on the same day. Typically, this was due to the psychiatric provider signing the treatment plan later than its completion date. A psychiatric provider signed the treatment plan at least one week after it was completed in the following facilities: Dixon, East Moline, Graham, Menard, Robinson, Shawnee, Vandalia, and Vienna. The time between treatment plan completion and psychiatric provider signature was greatest for Dixon (18 days, 9 days, and 42 days) and Graham (21 days, 27 days, and 14 days). The late signing by the psychiatric provider demonstrates that the plans were put together by the QMHP without any timely clinical input on the part of the psychiatric provider.

   Thirteen facilities were additionally noncompliant in creating treatment plans in a collective manner (at least an MHP, psychiatric provider, and offender). These facilities include Jacksonville, Logan, Stateville NRC, Pinckneyville, Pontiac, Sheridan, Stateville, Southwestern, Taylorville, Illinois River, Western Illinois, Hill, and Murphysboro.

2. Inpatient plans: Five treatment plans from Elgin were reviewed to assess inpatient treatment planning. Each of these plans were created, or attempted to be created, in a collective manner. In one case, the offender attended the multidisciplinary meeting but refused to sign the treatment plan. In addition to the offender, at least one MHP, a psychiatric provider, and a member of the medical team signed off on the treatment plan. Aside from one incidence of an offender refusing to sign, each of the plans were signed by the core members of the team (at least MHP, psychiatric provider, and offender) on the same day.

3. Segregation plans: 25 segregation treatment plans were reviewed and only 2 (Western and Pinckneyville) demonstrated collective planning (at least MHP, psychiatric provider and offender) all signed on the same day. In 10 cases, the psychiatric practitioner signed the treatment plans from 3 days to 4 weeks late (Graham, Vandalia, Western and Pinckneyville). In 13 cases, the psychiatric provider failed to sign the treatment plan at all (Jacksonville, Vandalia, Western and Pinckneyville).

4. Crisis care plans: Only 13 of the 50 reviewed plans demonstrated that they were prepared collectively by the offenders' treating mental health team. 11 of the plans did not include input from a psychiatric provider. In the remaining 26 plans, the psychiatric provider signed the treatment plan from 1 – 23 days late. In this last cohort, I found signature pages that weren't signed by the psychiatric provider and then found a different signature page containing the psychiatric provider's signature. I understand that these two signature pages may be an artifact of telepsychiatry. Even so, there is no reason why the psychiatric provider should date his or her signature after the date of the treatment plan if in fact the plan was prepared collectively.

5. RTU plans: Of the 24 RTU treatment plans reviewed, 7 showed evidence that they were prepared collectively. 12 plans were clearly not prepared collectively as the psychiatric provider signed the plan from 1 – 13 days late. For the final 5 plans reviewed, the psychiatric practitioners' handwriting was illegible, and the exact date of the signing could not be accurately determined.

The Defendants continue to assert that there is no need for a psychiatric practitioner to participate in treatment planning for patients who are not already prescribed psychotropic medications. This is a dangerous practice that falls below the standard of care and places class members at a substantial risk of serious harm. This practice means that non-medical staff are acting as gatekeepers for psychiatric care. Also, in the case of psychiatrists, they are the most highly trained members of the treatment teams. As such, they should be involved with every class member who requires a treatment plan.

IDOC will receive a rating of noncompliance for VII(a). This is due to the fact that the majority of the treatment plans reviewed did not have evidence that the plans were prepared collectively by the treating mental health team. Also, even though the absolute number of backlogged treatment plans is relatively small, the class members affected are placed at a substantial risk of serious harm.

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), IDOC Form 0546 (Mental Health Treatment Plan Update) or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** The treatment plans reviewed were recorded on the correct forms. As previously reported, the plans, especially the outpatient and segregation plans, were generally generic in nature and not individualized to the needs of the patient and, as such, did not genuinely enter some of the key elements that section VII(b) requires. The inpatient plans were better in this regard. A rating of noncompliance is assigned due to the overall poor quality of the Department's treatment plans.

**(VII)(c): Specific requirement:** Where the IDOC provides crisis care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** In an eight-facility[15] review of 53 crisis admissions and discharges, 49 or 92% had evidence of a treatment plan being reviewed and updated upon admission. A review of the discharges, 45 or 87% had evidence of a treatment plan reviewed and updated upon discharge. These findings are an improvement over those reported in the Fifth Annual Report. That is, 81% completed treatment plans upon admission and 84% upon discharge. The current performance, although improved since the Fifth Annual Report, is not enough to warrant a rating of substantial compliance.

There was an insufficient number in this eight-facility sample of class members in crisis care longer than one week to arrive at an opinion regarding treatment plans being reviewed and updated weekly.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated. Reviews shall assess the progress of the documented treatment goals and be documented on the DOC 0284, DOC 0546 or the equivalent and shall include the date of the review and the date on which the next review will be performed.

**Findings:** In an eight-facility analysis of segregation treatment plans referenced in XV(a)(v), below, only 53% of the segregation admissions had evidence of treatment plans being reviewed and updated within the first week of placement. Of those plans reviewed and updated, the correct forms were being used. Of note, none of the reviewed segregation admissions lasted 90 days; facility mental health staff confirm that stays of 90 days or more have become uncommon since IDOC implemented, one year ago, a policy change favoring short segregation terms. So, no opinion about the 90-day reviews is being offered.

---

[15] East Moline, Graham, Jacksonville, Pinckneyville, Shawnee, Taylorville, Vandalia and Western.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)     For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)    For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)   Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

**Findings:** To assess timeliness for **outpatients**, the monitoring team analyzed contacts for 401 psychiatric patients, drawn from across IDOC, for whom the timeliness of at least three appointments in the monitoring period could be discerned. The review method employed both IDOC databases and sections of health care records.[16]

A minority of outpatients were seen *every* 30 days, or consistently within a longer interval the provider designated if the patient was more stable. Only 39% of reviewed patients were seen within those intervals every time. However, it was common for contacts to miss the mark only by a short time. The monitoring team considers a contact within an additional week to be reasonable. If that standard were to be adopted, compliance within the sample is 71%.

Where there were longer times between contacts, two to four additional weeks was common, and the longest time appeared to be five weeks. Appointments delayed two weeks or more were concentrated at just seven institutions, which generally had large mental health

---

[16]     The monitoring team reviewed a Psych Database from each institution with an outpatient psychiatric caseload for each month from June through September 2021. A sample was chosen generally by random selection method of every 20 patients, though there were exceptions if the caseload was small or for a few other reasons. In most cases, the last contact from before the monitoring period was also identified from previous databases (usually May or April), so as to be able to calculate the timeliness of June contacts.

A contact was counted as timely if it occurred within 30 days, even if the provider had ordered a return to clinic in a shorter period, because the Settlement Agreement only requires patients to be seen within 30 days (that is, the reviewer assessed whether the contact met the Settlement Agreement requirement, *not* whether the patient was seen within the time the psychiatric provider specified). If a provider ordered an appointment *more* than 30 days hence, the contact was counted as timely if completed within that time, and not exceeding 90 days. If a patient's series of contacts were timely or only one day late, that case was also counted as timely. To determine whether a patient is seen *every* 30 days (or a different ordered interval), the reviewer usually assessed whether there were three or more timely contacts; occasionally, the determination was based on two contacts if the follow-up intervals were too long for three contacts to have been completed in the monitoring period, or at Stateville-NRC, where many patients are not onsite long enough for three contacts.

Where it was difficult to confidently discern the interval between two contacts, the monitoring team generally reviewed the relevant portion of the patient's health care record.

17

populations.

Practice was better with **RTU** patients. In a 45-patient study using the same method, 56% were seen consistently as planned – almost always at 30-day intervals – and 91% were consistently seen by that point or within an additional week.

In terms of the appropriateness of extending appointments, a large majority of follow-up appointments – in a recent sample, 69% to 75% for outpatients and at least 96% for RTU patients -- are maintained at no more than 30 days.[17] The monitoring team did not review for whether the stability of the other patients was sufficient to warrant longer follow-up intervals, but the modest rate of these appointments is one indicator of reasoned decisionmaking. Virtually no patients had planned follow-up or completed contacts that exceeded the maximum time allowed.[18]

As for **inpatients**, IDOC's databases show a plan for all Elgin patients to see a psychiatric provider every three days. It has always been the monitoring team's impression that Elgin far exceeds minimum Settlement Agreement requirement, and no information to the contrary came to the attention of the team.

Defendants' Quality Improvement audits covering the monitoring period did not review this requirement, as review topics alternate, and psychiatric practice is due for review later in 2021.

Defendants do not yet reach substantial compliance on this requirement, and therefore must be rated noncompliant.

---

[17]  As a sample, the monitoring team reviewed all planned follow-up appointments indicated in the Psych Databases for June and September 2021. These included all institutions except Murphysboro, which does not have a psychiatric caseload.

[18]  Among completed contacts in that study, only 5 of more than 1,400 contacts exceeded the 90-day outpatient maximum; these were completed in an additional eight days or less. None of the RTU contacts exceeded the maximum time.

In the study of planned follow-up, one outpatient and one RTU appointment were ordered for an interval beyond that allowed. A handful of other contacts gave that appearance but employed a code ("99") that indicates the patient is outside of IDOC and cannot be seen, according to IDOC legal counsel.

## VIII:   TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

**Summary:** Systemwide, practice is moderate, at 76% compliance, but many contacts are completed within an additional week. At 8% of contacts missed altogether, the rate is too high, but is improved over the previous period.

The noncompliant institutions are responsible for the vast majority of crisis watch follow-ups, so the systemwide rating in Noncompliant. However, 14 institutions have sustained strong practice and are now in substantial compliance.

**(VIII)(b)(i): Specific requirement (**as it appears in the Corrected Second Amended Settlement Agreement): For offenders transitioning from Crisis placement, the treating MHP will see the offender for an individual session within five (5) working days from the crisis discharge to assess their stability and progress and to provide therapeutic counseling or interventions as clinically appropriate. An MHP will conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender every two months for six months or as scheduled in the individual treatment plan. Findings shall be documented in the offender's medical record.

**Findings:** The monitoring team studied a sample consisting of all crisis watches at all institutions that had admissions during the two months selected, and a sample of previous crisis watches that had follow-ups due during the monitoring period.[19] In this study:
- 76% of the follow-up sessions were timely
- a large majority of the late contacts took place within an additional week
- a very small subset was up to four weeks late
- logs indicated that 8% of the follow-ups were not completed, which represents an improvement over the previous analysis

Defendants' most recent quarterly report indicates a somewhat higher percentage when IDOC examined the August Crisis Trackers, which overlaps with the monitoring team's analysis, and a low number of noncompliant cases in previous audits. In these reviews, Defendants analyzed the first contact due but not the bimonthly requirement, excluded persons who transferred to other facilities, and covered a different length of time; these likely account for the different results.[20]

---

[19] The monitoring team drew all cases from "Crisis Trackers" provided by IDOC for June and August 2021. The reviewer recorded information about the initial contacts and followed each of these cases for the contacts required at 60-day intervals, drawing on the due dates and dates of contact shown in IDOC's subsequent monthly Crisis Trackers through September 2021. Additionally, the reviewer examined crisis watches from February through April; all cases where a follow-up contact was due during June through September were included in the sample, and only contacts occurring during June through September were recorded. Where a Crisis Tracker noted that a patient had transferred to another facility, the reviewer employed the Inmate Locator and continued tracking the remaining follow-up contacts at the receiving institution. The total number of contacts due and assessed was 1,221.

[20]  Defendants' quarterly report dated October 25, 2021

Fourteen institutions had very strong practice—from 83% through 100%--that has been sustained and they are in substantial compliance now.[21] Practices were particularly troubling at six institutions.[22]

Because approximately half of the institutions are noncompliant and/or have not sustained compliant practices, and they are responsible for 89% of the contacts in this study, the systemwide rating is Noncompliant for this requirement.

## IX: ADDITIONAL MENTAL HEALTH STAFF

> **Summary:** The Department has never met its staffing requirements as outlined in this section. Neither has the Department negotiated a time extension with the plaintiffs to meet the required staffing levels as required by the Settlement Agreement. Significant staffing shortages exist at all of the facilities with an RTU:
> - Dixon: 11 QMHPs, 4 BHTs & 4.05 Psychiatric Practitioners
> - Logan: 10 QMHPs, 9 RN-MH & 3.8 Psychiatric Practitioners
> - Pontiac: 10 QMHPs
> - JTC: 14 RN-MH

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:** The following data is obtained from the Wexford Health Sources Restructure Plan Staffing Updates as of September 24, 2021:

| • Dixon: | Vacant FTEs 9/24/21 | Vacant FTEs 3/19/21 |
|---|---|---|
| ○ Site MH Services Director | 1.0 | 1.0 |
| ○ MH Unit Director | 1.0 | 1.0 |
| ○ Post-Doc-Psychologist | 1.0 | 1.0 |
| ○ Pre-Doc-Psychologist | 2.0 | 2.0 |
| ○ QMHP | 11.0 | 10.0 |
| ○ BHT | 4.0 | 2.0 |

---

[21] This group is Decatur, East Moline, Elgin, Jacksonville, Kewanee, Lincoln, Murphysboro, Robinson, Shawnee, Sheridan, Stateville, Taylorville, Vandalia, and Vienna.  Vandalia is included although its compliance is only 75%, because the small size of its crisis watch population makes its two deficiencies look disproportionately high. Kewanee and Murphysboro are included as they have virtually no crisis watches and are unlikely to have to perform this requirement in the future. In the Fifth Annual Report analysis, Danville was thought to be substantially compliant, but there has been a steep decline in its practice.

[22] Centralia, Danville, Logan, Menard, Pontiac, and Western Illinois

|  |  |  |
|---|---|---|
| o MH Staff Assistant | 1.0 | 0.0 |
| o Psychiatric Providers | 4.050 | 3.425 |

- Logan:

|  |  |  |
|---|---|---|
| o Site MH Services Director | 1.0 | 0.0 |
| o MH Unit Director | 2.0 | 2.0 |
| o Post-Doc-Psychologist | 2.0 | 2.0 |
| o Staff Psychologist | 3.0 | 2.0 |
| o QMHP | 10.0 | 8.0 |
| o RN-MH | 9.0 | 4.0 |
| o Staff Assistant | 1.0 | 0.0 |
| o Psychiatric providers | 3.8 | 2.025 |

- Pontiac:

|  |  |  |
|---|---|---|
| o MH Unit Director | 1.0 | 1.0 |
| o Post-Doc-Psychologist | 2.0 | 2.0 |
| o Staff Psychologist | 1.0 | 2.0 |
| o QMHP | 10.0 | 9.0 |

The deadline for Dixon and Logan meeting their staffing requirements was February 6, 2018. Pontiac's deadline was July 6, 2018. Of note, the above-listed staffing numbers are for the facility as a whole. Wexford's staffing report does not break the staff down by RTU and outpatient. As the March column makes plain, in all cases, the staffing vacancies have remained the same or increased over the past six months except for the Staff Psychologist positions at Pontiac.

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:**

- Joliet:

| | Vacant FTEs 9/24/21 | Vacant FTEs 3/19/21 |
|---|---|---|
| o MH Training Director | 1.0 | 0.0 |
| o Post-Doc-Psychologist | 1.0 | 1.0 |
| o Pre-Doc-Psychologist | 2.0 | 0.0 |
| o Staff Psychologist | 2.0 | 2.0 |
| o BHT | 1.0 | 0.0 |
| o RN-MH | 14.0 | 5.0 |
| o CNA | 3.0 | 1.0 |
| o Psychiatric Providers | 0.8 | 0.0 |

The deadline for Joliet meeting its staffing requirements was November 22, 2017. As with Dixon, Logan and Pontiac, the staffing vacancies have remained the same or increased over the past six months.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target,

then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** The Defendants have never fulfilled this requirement. That is, as of the date of this report they have not given notice to plaintiffs' counsel and entered into any negotiations regarding any time extensions. As such, a rating of noncompliance will be assigned.

## X: BED/TREATMENT SPACE

**Summary**: RTU bed use has been hundreds below the construction requirements throughout the time those units have been open, and there is unmet need. Also, the RTUs, with the exception of Logan, continue to struggle to meet the out-of-cell requirements of this section. Inpatient beds, too, have been chronically underutilized. For both treatment settings, the difference between utilization and the required beds is so large, so consistent, and a product of policy decisions, that IDOC cannot be said to be making beds available in the numbers required by section X.

Crisis watches continue to occur outside of designated crisis beds but at a much lower rate than previously reported. The requirement to provide "aggressive mental health treatment to reduce acute symptoms and stabilize the patient" is not being met. Class members still remain on crisis status for more than the 10 days without effecting a transfer to a higher level of care though there has been meaningful improvement. Lastly, X-House at Dixon doesn't have adequate space to provide confidential group or individual therapies.

### (X)(b): RTU beds for male offenders

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU beds available at the following facilities on the following schedule:

**(A)** RTU beds and programming space for approximately 626 male offenders at Dixon CC no later than six (6) months after the budget contingent approval date. Additional construction to increase treatment and administrative office space will be completed within twelve (12) months after the budget contingent approval date;

**(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no later than twelve (12) months after the budget contingent approval date; and

**(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet no later than fifteen (15) months after the budget contingent approval date.

**Findings**: The monitoring team is informed that the number of beds constructed exceeds the requirement for Dixon by 50, meets the requirement for Pontiac, and is short of Joliet's requirement by 60. In aggregate, this falls 10 beds short of X(b)'s construction mandates.

22

As has been discussed in previous Monitor's reports, these beds are so chronically underutilized, while need is evident in outpatient facilities, that IDOC cannot be said to be making these RTU beds available.

Joliet practices single celling, which automatically cuts the number of available beds in half.[23] Its average census throughout the monitoring period was just over half of the beds required by X(b)(ii), and this number has never been exceeded. Pontiac filled significantly less than that. Dixon's census also dropped to its lowest point in at least 2.5 years. Taken together, only 63% of the beds required by this subsection were filled during the monitoring period.[24] This has fallen substantially even since the Monitor's report of a few months ago.[25]

At the same time, there are indicia of additional patients who might benefit from RTU care. For example, in a study described in section X(f) below, there were outpatients held in crisis watch from *double* the length anticipated in the Settlement Agreement to as much as 20 *months*. Fewer than half of them were referred to RTU.

To the Department's credit, previous difficulties with delayed transfers have been well-addressed. Of those patients who *were* referred, a large majority reached RTU in one month. The lengthy waits seen earlier in the pandemic affected only 5% of the referrals pending or completed in the monitoring period.[26]

Because utilization falls so far short of the bed construction requirements, it occurs in part because of established practice and/or policy, bed use has been hundreds below the construction requirements throughout the time those units have been open, and there is unmet need, IDOC cannot be said to be making RTU beds available in the numbers required by this subsection, and IDOC is therefore Noncompliant.

**(X)(d): Specific requirement:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10)

---

[23]  There appears to be other good reasons for this practice. The Monitor takes no position about whether the practice should continue. This is merely to acknowledge that, while this practice is in place, this is the practical result.

[24]  This draws on figures provided monthly by IDOC and reflects the average censuses for June through September 2021. Dixon's average census was 458 (626 are to be made available). Pontiac's average census was 71 (169 are to be made available). Joliet's average census was 194 (360 are to be made available).

[25]  In the Fifth Annual Report, utilization was never more than 74%.

[26]  This draws on logs tracking RTU and BMU referrals; all references are to RTU and BMU combined. IDOC provides monthly a log from each institution that had referral activity during that month. This analysis covers all referrals made or pending from June through September 2021. 76% were completed or the patient left IDOC within one month. Other referrals were completed, withdrawn, or were pending up to nine months, though few were at the longer end of that spectrum.

hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

**Findings:**

- Joliet: During my site visit of July 22 and 23, 2021, staff reported that structured out-of-cell time did not meet the 10-hour weekly threshold. They did report that class members routinely enjoyed at least 10 hours of unstructured out-of-cell time weekly. This was confirmed by the class members I interviewed during my visit. In the 5th Annual Report, staff reported that RTU class members were offered five hours of structured and 9-10 hours of unstructured out-of-cell time.

   Joliet does have adequate program space for those class members assigned to the facility.

- Pontiac: IDOC reported the RTU out-of-cell time hours for Dixon and Pontiac in a memo dated September 30, 2021. Pontiac's RTU consists of the BMU and the MTC. Pontiac reported the Behavior Modification Unit ("BMU") and Modified Therapeutic Community ("MTC") structured and unstructured out of cell time for each week in August and September 2021. Structured out of cell time ranged from 0 to 8 hours for the BMU and 0.23 to 3 hours for the MTC. Unstructured out of cell time ranged from 0 to 4 hours for the BMU and 0 to 2.5 hours for the MTC. These calculations are based only on what groups are scheduled and "ran" each week. Of note, the schedules do indicate when scheduled activities are canceled. These calculations are not based on an assessment of individual class members' out-of-cell time participation. It is not clear how many individuals participated in these activities, or which individuals participated. Therefore, it is unclear if the reported numbers accurately reflect all class members' participation.

   Pontiac has significantly increased its program spaces during the life of the Settlement Agreement. My opinion is that the existing space is still not adequate to provide all class members assigned to the MTC and the BMU the treatment expected under this requirement.

- Dixon: IDOC reported the RTU out of cell time hours for Dixon and Pontiac in a memo dated September 30, 2021. Dixon reported the RTU unstructured out-of-cell time as 26 hours for STC (main program) and 19-26 hours for DXP (maximum security) for each week in August and September 2021. It appears that Dayroom and Yard time were considered in the unstructured calculation. These calculations are based only on the activities scheduled and "ran" each week. Of note, the schedules do indicate when scheduled activities are canceled. These calculations are not based on an assessment of individual class members' out of cell time participation. It is not clear how many individuals participated in these activities, or which individuals participated.

   The monitoring team interviewed five patients from the STC and DXP programs; at the time of the interview, their experience was as of late July. Their estimates of unstructured out-of-cell time varied widely, but each STC patient's reports totaled well over the requirement (each

estimated 17 or more hours available each week). In DXP, only 4 hours per week of yard time reportedly was offered, but it was unclear whether dayroom time was also available.

Similarly, Dixon reported the RTU structured out of cell time, including Community Meetings, for STC as 5 hours for each week in August 2021 and 6 weekly hours in September 2021. These calculations also seem to simply be based on a schedule of groups that "ran" and not an individual assessment. The STC report of structured out of cell time does indicate the number enrolled in each group, but not who the individuals are.

Interviewed patients, in both STC and DXP, reported schedules as of late July that would total 10 hours per week or more of groups offered.[27] It is unclear what may have changed in the following months.

It is my opinion that the STC has sufficient space to provide class members with the treatment expected under this requirement. The same is not true for the X-House, the building that houses the DXP program.

- Logan: This facility has historically exceeded its out-of-cell requirements. This facility, however, doesn't report the out-of-cell time for its RTU. Anecdotally, during a site visit, two patients reported being offered 15 to 20 hours per week of structured activity and 6 to 8 hours per week of unstructured activity. Of note, Logan does have sufficient space to provide class members the treatment expected under this requirement.

- Menard: There is a BMU at this facility. I personally interviewed each class member assigned to this BMU on September 2, 2021. At that time, there were only five class members assigned to this program. These class members in the BMU told me that their meetings with the QMHPs lasted 10 to 20 minutes. They did attend groups. These groups are scheduled to be two hours, but they routinely start late and end early. They all confirmed that at most, the groups last for one hour.  They did report having monthly meetings with their psychiatric practitioners. They all stated that they rarely went to yard. The monitoring team reviewed their charts for the month of August to determine exactly how much structured and unstructured time each was receiving.

|    |                | QMHP visits | Groups | Psychiatric visits |
|----|----------------|-------------|--------|--------------------|
| 1. | Class member #1 | 7           | 2      | 2                  |
| 2. | Class member #2 | 5           | 1      | 2                  |
| 3. | Class member #3 | 5           | 6      | 0                  |
| 4. | Class member #4 | 6           | 8      | 1                  |
| 5. | Class member #5 | 7           | 4      | 2                  |

Please note, the above-listed data is for the **month** of August. These class members were clearly not receiving the required 10 and 10 hours of out-of-cell time.

Due to Covid restrictions, I have not visited the RTU at Menard. I am not able to provide an opinion regarding the adequacy of the treatment spaces at this facility.

---

[27] There was one exception where the patient said he attends groups for 6 hours per week to accommodate his school program.

**Specific requirement**:[28] Modified RTU (mRTU): A level of care designation to service patients who previously required RTU level of care but have stabilized and no longer requires the intensity of an RTU placement but need more than Outpatient level of care treatment provides. If regression is seen in the patient receiving this level of services, the treatment team may resume RTU level of services without hesitation.

**Findings:** At the time of this report, Modified RTU (mRTU) programs exist at Dixon, Logan and Joliet. The current census:
- Dixon  eight class members
- Logan  24 class members
- Joliet  eight class members

The facility Mental Health Authorities report that all mRTU class members are receiving five hours of structured out-of-cell time weekly.

**(X)(e): Inpatient beds**

**Specific requirement:** Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date.

**Findings**: To the Monitor's knowledge, the necessary construction and improvements were made, and the facility has been in use since April 2018 but chronically low occupancy, compounded by pandemic restrictions, and despite substantial need in the patient population, mean that IDOC is not making 44 beds available as required.

Past low censuses have been described in previous Monitor's reports. In the current monitoring period, the average census was 18, and Defendants report it reached 20 as of October 1, 2021.[29]

During the monitoring period, there were 47 referrals open, 26 men and 21 women.[30] Among these, 23% were withdrawn, or were denied because there was a need for higher security or more medical care than Elgin provides. IDOC has been able to sustain improved transfer times; most referred patients have transferred, and 81% of transfers or other decisions were completed

---

[28] This level of care was added to the Corrected Second Amended Settlement Agreement. It appears in the Definitions section but does not have a corresponding section/subsection number in the Settlement Agreement. So, the monitoring team has determined that it is most logically related in this sequence of requirements.

[29]  This is drawn from the censuses IDOC provided monthly from June through September, and Defendants' quarterly report dated October 25, 2021.

[30]  This denotes referrals that were initiated during this period or referred earlier with a disposition during this timeframe. This analysis relies upon logs provided by Elgin, monthly from June through September 2021, supplemented by information emailed by IDOC legal counsel.

within one month. The longest wait for decision or transfer appeared to be just over two months.[31] Women generally accessed this level of care more quickly than men did, but the gap between them narrowed substantially.

At the same time, there were patients turned away because there are not beds sufficient to accommodate their high security level, and there are indicia of patients potentially in need of inpatient care who were not referred.[32] For example:

- 19 RTU patients and 3 outpatients had three or more crisis watches close in time but were not referred. In some cases, these added up to very lengthy times in crisis watch as well.

- 9 RTU patients had from 3 to *21* restraints events in a short period. Few of these episodes were short, meaning most of these patients were restrained multiple days

- 33 RTU patients had crisis watches lasting *double* the expected length or more -- some for months or years – and were not referred. The same occurred with 18 outpatients, who might have a better chance to stabilize either in an inpatient or RTU setting.[33]

The foregoing indicates that the inpatient census has not been at 18 or 20 because there is no need for the 44 required beds. The beds are needed but patients do not have sufficient access; IDOC cannot be said to be making the required beds available. The single celling employed for pandemic safety may provide a good rationale for noncompliance temporarily,[34] but the requirement remains in the Settlement Agreement and must be satisfied longer term. Defendants note there is significant progress on constructing a replacement facility, which they project will open in 2022, though they have not reported a date certain.

IDOC is Noncompliant on this requirement.


**(X)(f): Crisis beds**

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an

---

[31]  The time to decision could not be discerned with certainty for two referrals. The analysis assumes the shortest time possible in each case, but it could be that this small number of patients waited significantly longer.

[32]  For descriptions of these analyses, see sections X(f) and XVII(a). These numbers are only for a two-month period.

[33]  There is some overlap among the groups described in this bullet-pointed section.

[34]  It may be of note that double-celling is currently employed throughout much of IDOC.

appropriate crisis bed available.

**Findings:** IDOC facilities have established crisis beds as required. As was detailed in previous Monitor's reports, IDOC increased the use of non-crisis cells for crisis watch through much of the pandemic as a means to reduce the risk of spreading Covid-19. Placement outside of crisis cells reduced significantly during this monitoring period.

The monitoring team examined the Crisis Trackers showing all crisis watches in July and September 2021. Those logs showed that 2% of watches took place in segregation longer than the three days allowed under exigent circumstances,[35] or did not occur under exigent circumstances.[36] This took place at four institutions. These placements generally lasted less than one week, although two much longer cases were evident: one lasted 35 days, and one patient appears to have been held in crisis watch for more than three years, with much or all of that time spent in segregation and often in restraints.[37] The frequency of occurrence, number of institutions employing segregation, and length of time are all substantially improved.

Additionally, five institutions housed crisis watch patients in general population cells for longer than three days. The Settlement Agreement does not permit this, but it only amounted to 1% of the reviewed crisis watches and only a few lasted up to a maximum of two weeks.[38]

Another 1% of reviewed crisis watches took place in segregation or otherwise outside of crisis cells for three days or less, as allowed if there were exigent circumstances.[39] This took place in six institutions.[40]

These reductions in placing crisis watch patients outside crisis cells are welcome, especially at Pontiac, which has long struggled to meet this requirement. If IDOC is able to sustain practice at this level it could be found in substantial compliance. It does need to make a showing that this can be sustained, however, so Noncompliance is the rating at this point.

---

[35] The monitoring team relied upon the cell locations provided on Crisis Trackers and cross-referenced them with lists of each institution's segregation cells and crisis watch cells that IDOC previously provided, and/or obtained updated information from IDOC legal counsel by email.

[36] As has been detailed in multiple Monitor's reports, Taylorville has housed a majority of its crisis watches in segregation since June 2019, a period of almost 2.5 years. During this monitoring period, 92% were placed there. This cannot be said to be a practice confined to exigent circumstances.

[37] Recordkeeping for this patient is not always clear, but crisis status, and potentially segregation and restraints, appear to be continuous, or nearly so, since mid-2018 in several institutions that have housed him.

[38] The institutions overlapped with those that housed crisis watch patients in segregation longer than three days. Defendants assert that housing outside of crisis cells is permitted as long as it is not in segregation; the Monitor's Fifth Annual Report details how this is not allowed by the plain language of the Settlement Agreement.

[39] The monitoring team does not have information about whether there were, or were not, exigent circumstances leading to these various types of placements outside of crisis cells. The team takes at face value Defendants' assertion that segregation cells are only used in this event, with the exception of the inference made about Taylorville, above.

[40] Some of these overlap with the institutions that placed patients outside of crisis watch for longer than three days, and others are unique.

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: The "aggressive mental health treatment to reduce acute symptoms and stabilize the patient" consists of brief, daily checks with a QMHP, treatment planning upon admission and discharge and possibly a visit from a psychiatric provider. The results from an eight-facility [41] review of 53 crisis admissions demonstrated:

- Daily checks with a QMHP: 45 of 53 – 85%
- Treatment planning:
    - Upon admission: 49 of 53 – 92%
    - Upon discharge: 46 of 53 – 87%
- Seen by a psychiatric practitioner: 32 of 53 – 60%

It is my opinion that these interventions do not represent "aggressive mental health treatment." Even if they were, IDOC is not consistent in their application. None of the reviewed facilities offer class members in Crisis Beds any additional treatments.

Logs continued to show patients for whom the care is not serving to stabilize them within ten days or effecting a transfer to a more intensive care setting. There were, however, improvements on several measures of this.[42] The efforts of leadership to bring about these changes are much appreciated.

As noted in every previous Monitor's report that addressed this topic, ten days is not a firm deadline, but is an indicator of the need for a higher level of care. It is captured as such in the Settlement Agreement and is used in other prison systems. During this monitoring period, most IDOC institutions continued to have crisis watches longer than ten days, but the rate has reduced.[43]

Importantly, fewer institutions had very long stays (30 days or longer) and those stays took place less often.

- As of the Monitor's Fifth Annual Report, on average, there were 28 very long stays per month; in the current study, there was a monthly average of 17.

---

[41] Western, Vandalia, Taylorville, Shawnee, Pinckneyville, Jacksonville, Graham and East Moline.

[42] This analysis is based on all crisis watches on IDOC logs for July and September 2021 from all institutions at which a crisis watch occurred, a total of 1,013 admissions. Kewanee, Murphysboro, and Southwestern reportedly had no crisis watches in these months and Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after ten days is not feasible.

[43] These stays occurred at 20 of the 25 institutions with crisis watches. As of the Monitor's Fourth Annual Report, the rate of stays exceeding ten days was 22%. It had reduced by the Fifth Annual Report, and reduced further, to 17%, in the instant review.

- There were still 8 patients were remained in crisis watch for extreme lengths – 3 months, 4 months, 7 months, 20 months, and 3 years and 3 months

There were also signs that facilities were beginning to refer more of the patients with very long stays to higher levels of care. Of the 35 patients in this position, 8 were referred to a higher level of care.[44] This was a much higher rate than that found in the Monitor's May 2021 analysis. These referrals were initiated weeks or months past the ten-day benchmark, and likely far more of these patients should have been referred, but this is a significant step forward.

Similar thinking should be brought to more than 100 patients whose stays exceeded ten days but lasted less than 30 days.[45] A few days past the benchmark likely means little about stability. But once the stay goes beyond that, the patient presumptively needs more to stabilize. Among this group, 23 patients were referred to a higher level of care, which is a rate higher than in the monitoring team's May 2021 analysis. It is very likely, however, that more referrals were needed. Defendants assert that this assessment takes place, but the monitoring team has never seen evidence of that, including in chart reviews, site visits, and an extensive study conducted for the Monitor's report submitted in July 2021.

Although IDOC has not yet reached substantial compliance, and must therefore be rated Noncompliant, these steps forward are meaningful progress and are much appreciated.

**(X)(g): Specific requirement:** IDOC shall also ensure that adequate, confidential space is provided within the X-House at Dixon for group therapy sessions; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures.
.

**Findings:** During my recent visit to Dixon on October 20 and/21, I did not find that the X-House had adequate space to provide confidential group or individual therapies. There was some construction going on, but I was unable to determine if this converted space would fulfill the requirements of X(g).

---

[44] This was determined by comparing entries from the above-referenced logs with logs of referrals to RTU, BMU, and inpatient care. The logs are provided to the monitoring team monthly by every institution with referral activity during that month.

[45] The reader is reminded that this number of patients is drawn from only two months of crisis watches. The number per year is likely much higher.

## XI: ADMINISTRATIVE STAFFING

**Summary**: Seven facilities do not have a dedicated Mental Health Authority. These positions are being covered by facility-assigned staff, which further detracts from the quality of the mental health care provided to class members.

### (XI)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV, or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings**: The Department continues to struggle to fill these supervisory positions[46]. The following facilities do not have a Mental Health Authority (MHA) assigned. These vacant positions are filled by "acting MHAs":

- Danville – position filled by a Wexford QMHP
- Elgin – position shared among currently assigned Social Worker IVs
- Menard – position filled by currently assigned Social Worker IV
- Pontiac – position filled by currently assigned Clinical Psychologist
- Sheridan – position filled by Wexford QMHP
- Stateville NRC – position filled by PSA-8K Clinical Psychologist
- Vandalia – position filled by Wexford QMHP

As reported in the Monitor's Fifth Annual Report, these vacancies in the Mental Health Authority positions not only affect the duties of that position but also detract from the overall staffing at the given facilities. These positions are critical to the provision of mental health care to the class members. Their absence detracts from the overall quality and quantity of the mental health services provided to class members and places them at a significant risk of serious harm.

---

[46] Mental Health Authorities, either a PSA-8K Clinical Psychologist, a Social Worker IV or appropriately licensed mental health professional.

## XII: MEDICATION

**Summary:** Psychiatry saw a minority of outpatients, and a slight majority of RTU patients, every 30 days or at a longer interval upon stability. Most follow-up schedules remained at 30 days and relatively few appointments were extended. Virtually no patients had planned follow-up or completed contacts that exceeded the maximum time allowed. There has not yet been a demonstration of whether the required schedule is met for patients on medication new to them. Inpatient follow up far exceeds the requirement.

There appear to be reasonable systems for conveying, noting, and filling medication orders. The formulary and pharmacy processes ensure reasonable access to needed psychotropics. There do not appear to be security-related barriers to accessing medication. On the other hand, several of these processes contribute delays such that there are gaps in medication delivery. Uneven practice in observing whether patients take their medication, and extremely early medication delivery, do not provide reasonable assurance that patients are taking the medication as prescribed. Lab work continues to be substantially compliant.

Response to medication refusals is not operating well, with only a minority of events clearly being addressed.

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.
(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** For an analysis of most aspects of this requirement, please see section VII(d) above. As to the requirement for frequency of contact when there is a medication new to the patient, IDOC does not maintain information in this format and has not provided demonstration of this practice. In the absence of that showing, this provision remains noncompliant.

Defendants are Noncompliant with XII(b).

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement** (as reflected in the Corrected Second Amended Settlement Agreement)**:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to offenders and reasonable efforts to ensure the medications are being taken by the offenders as prescribed;

**Findings:** Because of the complexity of this requirement, this section begins with a summary of the greatest concerns. These center on various practices that result in **gaps in receiving medications** and do not sufficiently assure that the patients are **taking the medication** as prescribed.

Nine percent[47] of the patients studied by the monitoring team did not receive their medication as prescribed for an *extended* period – from 3 days to 5 weeks – and multi-week gaps were present at each institution reviewed. These were caused by relatively small numbers of delays for each of the following reasons: conveying telepsychiatry orders, noting orders, filling new orders, filling change orders, orders expiring, medication being out of stock, nonformulary approval processes, delivery being dropped due to a changed circumstance, and some cases where the causes could not be discerned.

Additionally, more than half of patients' records showed shorter gaps in receiving medication. These lasted from one dose to two days. Some records had only one such gap, but most showed these gaps on multiple days. Some were clearly for the same reasons summarized in the preceding paragraph. For others, the patient may have received the medication and the record merely reflects an absence of documentation; however, at this scale, one cannot make this assumption when one cannot rule out that medications were not delivered.

The other issue of substantial concern is directly observed therapy – the process by which nurses observe whether a medication has been taken -- which is insufficient to support a reasonable assurance that psychotropics are being taken as prescribed. Although the monitoring team observed some very conscientious practices, practices were highly variable by setting and individual. Correspondingly, disciplinary cases show that more than 1,150 psychotropic pills were diverted within eight institutions in eight months and that is one factor to consider in this assessment.

A detailed discussion follows.

---

[47] The occurrence was higher, but this total excludes the cases where the order was not filled for this length of time but a previously ordered medication was clearly given in the interim. While this is not the best practice and not what the provider thought best for the patient, the patient is not experiencing the risks of going unmedicated. It also does not include instances where the medication may have expired but it was not fully clear, and Gabapentin-only orders where the reviewer was not certain if it was prescribed by a physical medicine doctor or a psychiatric provider.

In prison systems, a number of practices commonly interrupt medication delivery such that there is not reasonable assurance that prescribed psychotropic medications are actually being delivered and taken as prescribed. These can include failure to timely order medications; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; security staff preventing nursing staff from accessing housing units, or patients from attending the medication line; medication distribution not occurring for any other reason; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and throwing away, hoarding, or selling medication; and medication errors. These are all potential impediments that IDOC must protect against.

To date, IDOC has described working to improve visibility for in-cell directly observed therapy, and the timing of medication delivery to some extent; no demonstration of the effectiveness of these measures has been provided. IDOC has not made a showing that any of these other common obstacles are not affecting its medication delivery.

The monitoring team examined these topics at eight institutions, most of which house the largest mental health populations in IDOC, by:

- interviewing 26 nurses and nursing or health care administrators, 9 pharmacy technicians, and 7 mental health staff[48]
- interviewing 61 patients, drawn from general population, restrictive housing, and RTU
- reviewing 725 Medication Administration Records ("MARs") and some of the related health care records, and
- observing medication delivery conducted in medication lines and in each type of cell front delivery setting at each of the institutions.[49]

For patients newly arriving at an institution, during interviews and in Defendants' quarterly reports, staff have said that psychiatry writes 30-day orders to continue the medications the patient had been taking at his previous institution ("bridge orders"), they are confident that the system works to fill those prescriptions promptly, and patients do not complain about this. It was not feasible for the monitoring team to test those assertions in this monitoring period.[50]

For care ongoing, staff universally described good systems to convey and note new orders

---

[48] With some questions in the discussion below, a subset of these interviewees answered the question.

[49] To identify the sample, the monitoring team reviewed MARs from June, July, or August, at least 200 at each of the eight institutions. These were drawn from at least three housing units at each institution and from general population, restrictive housing, reception center, and RTU populations, where applicable. Among those records, the monitoring team identified at least 725 records containing at least one psychotropic medication and reviewed those closely for interruptions in medication delivery. The reviewer noted any reasons for the interruptions apparent by comparing the dates to medication orders and transfers noted on the health care record, interviewing nursing leadership, and/or asking staff to research specific questions and provide supporting documents.

[50] A subset of the interviewees made these comments. It was not feasible to test these assertions because interviewed patients were selected for longevity at the institution, so reports of the practice on their arrival may now be outdated, and additional information would have been necessary to select relevant health care documents.

and change orders, and for identifying needed refills and expiring orders and getting them renewed. Only one visited institution struggled with expiring orders, requiring multiple follow-ups and last-minute processing.   There, psychiatric providers do not have consistent caseloads and staff perceive that it is difficult for patients to be seen timely.[51]

The monitoring team studied MARs for support that the practices for ordering medication are effective. For the most part, this is correct. There were examples of delays contributed by the time it takes to receive orders from Telepsychiatrists; for nurses to note orders; and for new, changed, or renewal orders to be filled. In these cases, typically the cumulative delay was a gap in receiving medicine from one dose to two days, but there were longer exceptions. Patient experience was largely consistent with the study, with 74% reporting no medication gaps, a handful saying they faced a gap of two days or less, and an equal number suggesting their gaps were longer. Both nurses and patients say that these issues can often be remedied on the spot or within a few hours at a "make-up" medication line, resulting in no gap at all. Mental health staff said patients complain about missing medication rarely, if at all, and some said they could get this addressed the same day or the next day.

In terms of the availability of medications, staff universally described systems that seem well-designed to timely obtain medications from a centralized pharmacy. Typically, patient-specific blister packs are said to arrive at the institution and be ready for distribution in one to two days, depending on the time of day the request is made. The pharmacy returns requests for questions or problems, and sometimes items are missing from a delivery, but staff indicate that communications to remedy these – both with psychiatry and with the central pharmacy – are quick. Staff reportedly also have access to stock of most psychotropics, which can be used in the short-term if a patient's medication is running low or for dose changes, and there are arrangements with local pharmacies to deliver medicines in the rare event that they are needed the same day. Staff described routines for identifying patients' housing moves to reduce the chance of medication gaps in that event, but patients said this is the primary time they do not receive their medications. When observing medication passes, the monitoring team saw 10 patients who did not have the medications they expected; half were because of moves and the others were for a new arrival, medication changes, and an expiration. Here, too, some were remedied in real time.

The formulary for IDOC makes needed medications available, though it also can introduce some delay. About half of the institutions said nonformulary psychotropic prescriptions are uncommon overall, and they named six medications as those most subject to the nonformulary process. All agreed that no psychotropics are prohibited entirely.

As in many health care systems, if a provider wishes to prescribe a nonformulary drug, he or she must submit a justification initially and every quarter in which the medicine is renewed. Staff at most institutions said that providers are knowledgeable about these submissions and they, or other staff, track the timing for renewals. Reportedly, it is not uncommon to have a decision in one day, and response times are estimated from one day to one week. Some staff said denials are very rare; they were unable to remember one in the last year or more. When it does occur, providers are described as conscientious in either following the appeal process or choosing a substitute

---

[51] This is consistent with the monitoring team's findings on the timeliness of psychiatry contacts for that institution in the study described in section VII(d).

medication. The monitoring team's MAR study captured a few prescriptions that appeared to be nonformulary orders. Consistent with staff's descriptions, some examples showed the time to filling an order was extended by two days. The sample contained only two cases requiring longer than that, but unfortunately those took 2 to 5 *weeks*, and it did not appear that the patients always received that medication, or an alternate, in the interim.

Prisons also potentially have issues with policies or practices that make medication-taking undesirable, and this undermines the objective of patients taking medications as prescribed. A few of the visited institutions pass medication during the limited time that phone calls are available, or during yard or dayroom time, but the monitoring team's observations and patients indicate that delivery does not conflict with meals, work, school, or mental health programming. However, the Department persists in its inappropriately early medication distribution times. I remain firm in my opinion, which is supported by the literature about medication adherence, that these early medication distribution times have a negative impact on class members' ability to take their medications as prescribed. Nurses at Menard and Hill, interviewed by the monitoring team, independently raised concerns about the frequency of morning medication noncompliance because of the time it is distributed.

The inappropriately early hours of medication distribution significantly impacts the pharmacological treatment of class members placed in segregated housing. Two class members housed in the BMU at Menard stated that they routinely skip their morning medications due to their being delivered at 2-3 am. One class member stated that this early morning medication delivery forces him to stay up all night to make sure he gets his medications. In the monitoring team study of medication noncompliance described in XII(c)(vi) below, the study was not structured to investigate the question of early morning refusals, but patterns of morning-only refusals were apparent nevertheless at Hill. Additionally, this timing poses a nursing retention issue at a time when the need for nurses is particularly acute. Both the problem and a potential solution greatly increase a nurse's workload and the unpleasantness of a shift. If medications are ordered in the early morning, nurses are responsible for the paperwork associated with many more refusals, while having to complete it with relentlessly tired, angry, uncooperative patients. IDOC has encouraged providers to consider whether once-a-day dosing is appropriate for their patients, which is very helpful to overcome patients' concerns. However, it can have the unintended consequence of putting those nurses under daily pressure to complete passing far more evening medication in the same amount of time because of all the operations activities that must also be accomplished.

There can also be a risk of medication delivery being canceled by security considerations, staff shortages, or for other reasons. Interviewed patients at the eight institutions universally confirmed that medication delivery is never canceled. Nursing, too, confirmed that, giving detail about sending officers to retrieve patients the nurses realized were missing, canceling conflicting operations activities to give medication pass priority, alternate means of medication passes both standard and improvised, and a story of one facility's leadership who joined nurses in passing medication rather than allowing a medication line to slip. Nurses and mental health staff also said they have not heard complaints from patients about being prevented from attending medication line. Several facilities' nurses said it is routine to run a "make-up line" as a second chance for anyone who did not receive medication at the regular line.

On the other hand, during a site visit to Pontiac on August 18 and 19, 2021, the Monitor received several complaints from class members in segregated housing about their not receiving evening medications on August 17. It turned out that, due to a lack of nursing staff, a nurse was not available to distribute the evening medications until after 1 am on the 18th. An administrative decision was made to withhold the evening medications as the morning medications would be distributed at 8 am. I am not sure how frequently this occurs. Interviews with class members confirms that this was not the first-time medications weren't distributed as ordered by the psychiatric providers. Skipping regularly scheduled doses of psychotropic medications is a serious departure from standard of care and places the class members at a substantial risk of serious harm.

Additionally, in the eight-facility MARs study, more than half of the records showed blanks that would ordinarily indicate a medication had not been received. These gaps ranged from one dose to two days, sometimes multiple times in a month. These could be simple documentation errors, but they raise a concern about how many are actually missed medication, particularly when there is a pattern of blanks for many patients on the same date and time. Nursing leadership at several facilities acknowledged this issue and offered detailed explanations for why they were confident that these were solely documentation issues. They noted that documentation slips when staff are working mandated overtime, or for certain individual-specific reasons. They said that nurses and custody staff routinely contact the nursing leaders after hours for lesser problems, so would have notified them of any risk that a medication pass would not occur, or would do so retroactively. Taken together with descriptions of how the facilities prioritize medication passes, the monitoring team finds these assertions credible, and they give more confidence that prescribed psychotropic medications are actually being delivered. However, the scale of the issue does not allow the team to assume that *none* of these gaps indicate a failure to deliver. More information will be needed over time to demonstrate that any genuine gaps in delivery are kept at a reasonable level.

Patients themselves can divert their medication and IDOC has some responsibility to try to reduce this as one means of providing reasonable assurance that medications are taken as prescribed. As noted above, the monitoring team observed medication passes at each visited institution in medication lines and cell front.[52] In the lines, there was always good visibility. Almost half of the nurses on the lines conducted thorough mouth checks ("directly observed therapy" or "DOT"), but more often practice was uneven and if a patient did not show his mouth, turned away, or made motions that could have been palming the pills, staff did not always correct him and check. In a few locations, the setting was chaotic and demanding on the nurses, and as they tried to meet multiple demands, the risk is higher for staff not to know that a medicine has not been taken. In one observed line, the monitoring team could see an unswallowed pill in the mouth of a patient walking away, and another left a pill on the floor and there was no indication that the nurse noticed.

Cell front passes were quite variable depending on the physical plant. Where staff felt comfortable opening the doors, and with the design of a few doors that remained closed, visibility was very good. In other locations, narrow windows, mesh, and a practice of watching through a waist-high chuckhole made visibility very difficult. Earlier in *Rasho* implementation, IDOC

---

[52] Where a facility has more than one type of physical plant in which medication is delivered cellfront, the monitoring team observed passes at each type.

concentrated on mitigation measures for this, but now those are little used; cell lights, for example, are only sometimes turned on and only one nurse used a flashlight. Under these conditions, it would be easy to miss that a patient did not take his medicine as prescribed. Some nursing and custody staff worked hard to do DOT in these settings, but just as many had uneven practice. Patients were about evenly split between believing nurses are consistently thorough and the belief that DOT is highly dependent on which nurse is working.

The risk, if psychotropics are not well controlled in this way, is that patients will be under-medicated because they throw away their medicine or sell it, and that individuals in custody can overdose on stockpiled or purchased medication. Among interviewed patients, a majority said it was easy to "cheek" one's medication and/or common to buy psychotropics from others. Patient views tended to cluster by institution. The opinions of mental health, nursing, and pharmacy staff, who would learn of this primarily through disciplinary cases, also tended to cluster by institution, although some thought the practice of selling is more rare than the patients did.

Disciplinary cases did not always track the thoughts of interviewees. Several institutions had few disciplinary cases and small quantities of pills recovered. Others had a similar record but did find a cache of 50 or more at least once. Three facilities each issued 30 or more disciplinary cases, and found hundreds of pills, in eight months. One does not always know whether these facilities recover a large quantity because there is a greater problem at those institutions or because there is more effective enforcement. In any event, taken together, the recovery of more than 1,150 psychotropic pills across eight institutions in eight months is one factor to consider in whether the medications are being delivered and taken as prescribed.

About half of patients who commented were familiar with overdose cases, although it wasn't clear whether all involved psychotropics. Where mental health staff had input, they universally thought overdoses were rare and had not occurred in most institutions for an extended period. Logan and Menard staff described concerted effort, for a few years and ongoing, to address a previous problem with overdoses by a stronger program of crushing and floating medications, and they thought they had seen great improvement. Menard patients reinforced this, crediting this program with the reduced availability of medicine for sale, as well.

As summarized above, there appear to be some very good features of IDOC's medication delivery system. Because of the known gaps in medication delivery, the uncertain but potentially large scope of additional interruptions in delivery, and insufficient action to provide reasonable assurance that medications are taken, IDOC is rated Noncompliant at this time.

**(iv): Specific requirement:** The timely performance of lab work for these side effects and timely reporting on results.

**Findings:** The Department continues to meet this requirement. During the current reporting period, a review of 47 psychiatric progress notes from three facilities[53] demonstrated a 96% compliance with this requirement. Of note, the Monitor and Dr. Puga conducted these reviews together. A continued rating of Substantial Compliance will be assigned to XII(c)(iv).

---

[53] Dixon, Joliet and Pontiac

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** To review this requirement, the monitoring team interviewed 19 nurses and 25 mental health staff, drawing from seven institutions, most of which are responsible for the largest mental health populations in IDOC.[54]

All such staff demonstrated their knowledge of the XII(c)(vi) requirements, particularly as operationalized in the Standard Operating Procedural Manual for Mental Health. Nearly all nurses said that they notify the mental health department when a patient misses three consecutive days of medication, and some nurses said they also refer a patient who misses half of his or her medication in a seven-day period.[55] Occasionally, a nurse acknowledged it was only feasible to check compliance records and make referrals weekly or biweekly. They generally said they use a form for this purpose, but communication was not limited to this; they said it was common to also have oral or email contact with MHPs, BHTs, psychiatric providers, and/or a mental health nurse, especially if the medication refusals continue.

Some nurses described conducting their own follow up with the patients as well, to encourage resumption of medication and to develop information to convey to psychiatry. Nurses noticed that psychiatry was often the first to respond to referrals; at two facilities, they saw the response as quick. In the other facilities, the nurses said they submit follow-up referrals, though they described different intervals; in one institution, they said multiple referrals were almost always required before a patient is seen, though they believed response times had recently begun to improve.

Mental health staff's descriptions overlapped with the nurses', but staff also had some different perceptions. At about half of the institutions, staff said they heard frequently about this issue from nurses, while the other half said such communications were uneven or rarely occurred. They confirmed that forms are commonly used and several said these are filed in the patient's chart; none described any alternate means of locating the referral forms. They noted that there are multiple other ways that they learn of medication refusals: a call or face-to-face contact with nurses; patient self-disclosure; from other patients; from custody staff; by psychiatry reviewing the MAR and informing other staff by email, in treatment team meetings, or in meetings adjacent to telepsychiatry sessions; or, conversely, by MHPs, BHTs, or mental health nurses emailing psychiatric providers. Both mental health staff and nurses thought that their medication-noncompliant patients are quite vocal about their needs, and staff was confident that there was no significant problem of isolating, noncompliant patients going undetected. As for referral response, only one program indicated that the MHP is the primary first responder, and another employs a mental health nurse for this purpose; in other

---

[54] Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, and Sheridan

[55] These correctly restate the definitions laid out in the Settlement Agreement. The Settlement Agreement also calls for follow-up when a patient "exhibits a clinically significant pattern of missing medication, as determined by an MHP." Professionals did not mention that portion of the standard and the monitoring team did not apply it in the analysis for this report.

programs, the MHPs and psychiatry might alternate this responsibility or it would primarily be fulfilled by psychiatry.

The monitoring team then identified a sample of 199 events of medication noncompliance and reviewed charts to observe the follow-up.[56] The results differed significantly from staff's perceptions. Written nursing referrals were found extremely rarely – in only 6% of the sample -- and were generally dated well after the referral threshold had been exceeded.

As for response, in the majority of events (58%), the progress notes, written after a referral should have been made, indicated that the clinician was not aware of the medication noncompliance and it was therefore not discussed, or there was no contact at all. Psychiatry met the patient to address the issue in only a minority of events (42%);[57] a bit over half of those contacts were within the time specified by the IDOC manual, while nearly half exceeded that, some as much as four to six weeks later. It was often unclear whether psychiatry learned about the problem ahead, or only spontaneously from the patient, so it was difficult to substantiate that the various information channels were serving to get these patients seen, though ultimately the noncompliance issue was discussed in this 42% of events.

Additionally, the monitoring team interviewed 44 patients, during the same site visits,[58] about this topic. Among those who described having refused medication often enough to have exceeded the referral threshold, and who discussed follow up, 83% confirmed that staff did discuss the issue with them. At most, half of them were seen specifically to address the issue, while the others said it was discussed in the regular schedule of appointments. There was insufficient information to discern the timeliness of these contacts.

Defendants' Quality Improvement audits covering the monitoring period did not review this requirement, as review topics alternate and psychiatric practice is due for review later in 2021.

---

[56] To identify the sample, the monitoring team reviewed MARs from June, July, or August, at least 200 at each of the eight institutions. These were drawn from at least three housing units at each institution and from general population, restrictive housing, reception center, and RTU populations, where applicable. Among those records, the monitoring team identified at least 725 records containing at least one psychotropic medication and reviewed those closely for events of medication noncompliance as defined above. This review identified 144 patients with such events.

Some patients had more than one event on a MAR. Each stretch of three days was counted as an event *if* there were periods of compliance between those stretches. If noncompliance was continuous in a month, or nearly so, it was usually counted as two events, one that should have been referred when it reached the first threshold, and another if the behavior resumed after a mental health response and another referral should have been made. (There is an argument that every three-day stretch requires a referral, and therefore is a separate event, but the reviewer did not adopt that approach.)

The reviewer then examined the MHP and psychiatry contacts in the health care records, generally for a period of six weeks following the initial medication noncompliance. This took place either onsite or by reviewing chart sections provided later by IDOC. If the health care record was unavailable, the events were removed from the study. This resulted in a review of 199 relevant events.

[57] Psychiatry appointments were almost always the first documented in these charts. With only one exception, any MHP contacts that preceded psychiatry appointments did not document any discussion of medication noncompliance. The monitoring team's review applied the most generous interpretation, counting as compliant follow-up those cases that were unclear but compliance seemed more likely than not.

[58] Patients were interviewed at the seven institutions referenced earlier in this section, and also at Menard.

Defendants are Noncompliant with this requirement.

## XIII: OFFENDER ENFORCED MEDICATION

Summary: IDOC consistently provides a hearing, staffed by the correct disciplines, with an opportunity for the patient to be heard and a written hearing record. The following have been noted as issues in five Monitor's reports and remain a concern:

- sometimes the clinical facts appear not to meet the standard, but the decision is made to enforce nevertheless
- one key institution's notices lack essential information
- the purpose and function of a Staff Assistant is not fulfilled when one prepares the patient while another participates in the hearing, without any indication that they have shared information
- patients' right to witness testimony does not always seem to be upheld

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

a) Administration of Psychotropic Medication

1) Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

2) Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication

was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2) The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the

safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director, or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written

decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.


**Findings:** In brief, IDOC consistently provides a hearing, staffed by the correct disciplines. A substantial proportion of the notices are deficient, leaving out facts critical to informing the patient.

While there is an opportunity for the patient to be heard, it is undermined by the standard practice of having a Staff Assistant in the hearing room who does not know the patient's views or questions the patient may want to ask. If the patient is having difficulty expressing herself that day, a Staff Assistant cannot help without any prior knowledge. When a patient requests witnesses, there is indication that sometimes the witness testimony is not introduced.

There is a longstanding pattern of deciding to enforce medication when the documented

clinical facts do not meet the standard.

Each of these concerns has been covered in detail in multiple Monitor's reports. No contrary information has come to the monitoring team's attention. Please see a detailed discussion in the Monitor's Fifth Annual Report.

Although some institutions have previously been found in substantial compliance, the institutions responsible for nearly all enforced medication have *not*. IDOC, then, remains in Noncompliance.

## XV: SEGREGATION

**Summary**: The restrictive housing units at Pontiac continue to fail to meet the minimum requirements of this section. Class members continue to receive the treatment specified in their Individual Treatment Plans. The treatment is unacceptably inadequate to deal with the severity of their pre-existing mental illness let alone the added stress of being housed in segregation.

The Department has improved in its ability to assess each class member assigned to segregation within 48 hours of placement, but some facilities frequently use other types of staff to fulfill this MHP requirement. The Department continues to review and update class members' treatment plans within one week of segregation placement only at a rate of 50%. Weekly rounds in segregation are only occurring at a rate of 63%. Problems exist in providing class members with consistent pharmacological treatment while in segregation. Finally, out-of-cell time is not being provided per the requirements of the Settlement Agreement.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** I was able to inspect the segregated housing units at Joliet, Pontiac and Dixon during the reporting period. The units at Joliet and Dixon met the requirements of this section. That is, the physical plants were in relatively good shape with no obvious plumbing problems noted. The class members assigned to these units did not voice any serious complaints about the

physical plant, hygiene products or ventilation issues. Their major complaint was the lack of adequate out-of-cell time which is addressed in other sections of this report.

The conditions in segregated housing at Pontiac are a different issue altogether. As I reported in the Fifth Annual Report, "The conditions of the segregation housing units at Pontiac did not meet any of the standards established by this requirement."[59] I am aware that the parties have entered into a dispute resolution process regarding this issue. While all of that is being worked out between parties, IDOC will receive a rating of noncompliance for XV(a)(ii). This is based on the seriousness of the issue at Pontiac and the fact that it places class members at a substantial risk of serious harm.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings**: To assess IDOC's compliance with this requirement, the monitoring team reviewed the charts of 76 class members assigned to segregated housing. The Monitor also reviewed 25 treatment plans of class members assigned to segregated housing as well as interviewing class members assigned to segregated housing on his site visits to Joliet, Pontiac and Dixon. As I reported in the Fifth Annual Report, it was my opinion that class members in segregation continue to receive the treatment specified in their Individual Treatment Plans. My opinion has changed during the current reporting period.

Class members assigned to the STC at Dixon and subsequently transferred to segregation in the X-House do not have the treatment specified in their Individual Treatment Plans continued when they are moved to segregation. The treatment plan for these class members calls for 10 hours of structured out-of-cell time while they are assigned to the STC. When they are moved to segregation in the X-House, they get new treatment plans and lose all groups until the 60-day mark.

In addition, the treatment specified in their Individual Treatment Plans continues to be grossly insufficient to address their pre-existing mental illness, such as Bipolar Disorder, Major Depressive Disorder, Schizophrenia, Schizoaffective Disorder or Posttraumatic Stress Disorder. Also, this treatment certainly is not robust enough to address the well-known psychiatric problems that are created by placement in segregated housing.

Based on the fact that class members assigned to the STC and subsequently moved to segregation do not have their treatment plans continued, a rating of noncompliance will be assigned.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

---

[59] Monitor's Fifth Annual Report, page 41.

**Findings:** The monitoring team analyzed 289 placements in restrictive housing for the presence of an MHP review. These were drawn from the 10 institutions that had not reached substantial compliance as of the Monitor's Fifth Annual Report; among this group, the compliance rate was 56% in the current study.[60] Another 4% of the reviews were completed in a reasonable time thereafter.[61]

Centralia and Joliet had very strong performance and will now be considered in substantial compliance. The issues at the remaining institutions were:

- A large proportion of their assessments were completed by a Behavioral Health Technician, nurse, or custody staff, contrary to the plain language that requires assessment by an MHP. This was the primary issue at four institutions.
- A significant percentage were completed much later, up to 2.5 weeks late. This was the primary issue at one institution.
- A substantial proportion of cases did not demonstrate that the required review was completed. This was the primary issue at three institutions.

The total of substantially compliant institutions is now 22. The eight institutions who remain noncompliant include those with by far the largest number of restrictive housing placements in the state, and thus the systemwide rating is Noncompliant.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) or IDOC Form 0546 (Mental Health Treatment Plan Update), or its equivalent of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated.

**Findings:** Using data from the 8-facility analysis referenced in XV(a)(iv), 36 of 68, 52.9%, of the segregation charts reviewed had evidence of an MHP review and updated treatment plan within seven days of placement on segregation status.

The 90-day component of this requirement could not be evaluated. None of the class

---

[60] For this analysis, IDOC provides records of SMI patients placed in control units. Where an institution has few placements, IDOC provides all SMI cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement of SMI patients. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. These cases were drawn from 10 institutions – Centralia, Dixon, Graham, Hill, Illinois River, Joliet, Lawrence, Menard, Pinckneyville, and Pontiac -- for the months of July and September 2021. Documents were not drawn from institutions already found to be in substantial compliance.

Timeliness was calculated from the date of physical arrival in restrictive housing; if a patient went to crisis watch within the first two days, timeliness was calculated based on his/her date of return to restrictive housing. Cases were omitted from the analysis if the patients were not present in restrictive housing for at least three or four days at the end of the month, as there may not have been sufficient time to complete and log a review. Documents completed while the patient was not in restrictive housing (for example, in crisis watch) were counted as noncompliant. Documents that were essentially blank were counted as noncompliant if they did not contain information available to the reviewer (for example, the reviewer's observations).

[61] Because this review is meant to protect against the high risk of suicide that is present very soon after restrictive housing placement, the timeframe is very short. While the requirement has a deadline of two days, this calculation of a "reasonable time thereafter" doubles that, allowing up to an additional two days.

members whose charts were reviewed had been placed in restrictive housing for 90 days.

This current completion rate of 52.9% is consistent with the Monitor's previous two reports. That is, the Fifth Annual Report found a completion rate of 54.1% and the Midyear Report from November 2020 found a completion rate of 50%. The most obvious explanation for this persistently poor performance is a lack of an adequate number of mental health and custody staff. The Department will continue to receive a rating of noncompliance for XV(a)(v).

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.
B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.
C) Pharmacological treatment (if applicable).
D) Individual counseling by an MHP at least monthly, or more frequently if clinically indicated;
E) Participation in multidisciplinary team meetings once teams have been established.
F) MHP or mental health treatment team recommendation for post-segregation housing.
G) Documentation of clinical contacts in the medical record.
**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

A) *Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* Please refer to XV(a)(iii), above, for a discussion of continuation of the class members' treatment plans. Class members assigned to segregated housing **certainly** are not provided "with enhanced therapy as necessary to protect from decompensation that may be associated with segregation."

B) *Rounds*: In an eight-facility analysis referenced in XV(a)(iv), a review of 75 cases of class members assigned to segregation revealed that only 47 of them had evidence of rounding. This equates to a 62.6% completion rate.

C) *Pharmacological treatment*: Pharmacologic treatment does occur when class members are placed in segregated housing. During a site visit to Pontiac on 8/18 & 8/19/2021, the Monitor received several complaints from class members in segregated housing about their not receiving their evening medications on 8/17. It turned out that, due to a lack of nursing staff, a nurse was not available to distribute the evening medications

until after 1 am on the 18th. An administrative decision was made to withhold the evening medications as the morning medications would be distributed at 8 am. I am not absolutely sure how frequently this occurs. Interviews with class members confirm that this was not the first-time medications weren't distributed as ordered by the psychiatric providers. Skipping regularly scheduled doses of psychotropic medications is a serious departure from the standard of care and places the class members at a substantial risk of serious harm. Also, the inappropriately early hours of medication distribution significantly impacts the pharmacological treatment of class members placed in segregated housing. Two class members housed in the BMU at Menard stated that they routinely skip their AM meds due to their being delivered at 2-3 am. One class member stated that this early morning medication delivery forces him to stay up all night to make sure he gets his AM meds.

D) *Individual counseling by an MHP at least monthly, or more frequently if clinically indicated*: I reviewed 25 treatment plans of class members who were placed in segregation as well as interviewing class members assigned to segregation during my site visits of Joliet, Pontiac and Dixon. These plans and interviews indicated that MHPs do provide individual counseling to class members who are placed in segregation. These individual counseling sessions would occur every 30 to 60 days and would last from 15 to 30 minutes.

E) *Participation in multidisciplinary team meetings once teams have been established:* A chart review of class members assigned to segregation revealed that only 2 of 25 treatment plans reviewed had evidence of multidisciplinary team involvement.

F) *MHP or mental health treatment team recommendation for post-segregation housing:* This is occurring throughout the Department.

G) *Documentation of clinical contacts in the medical record:* As previously reported, there is no absolute way to measure if this is occurring for all clinical contacts. It is my opinion that clinical contacts are documented in the medical record. This opinion is based on the review of hundreds, if not thousands, of medical records for class members assigned to segregation.

H) *Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* A comprehensive, data driven analysis of out-of-cell time offered to this particular cohort of class members was conducted for the months of June, July, August and September 2021. The data was analyzed for mentally ill offenders in segregated housing for <60 days. The results follow:

| | | |
|---|---|---|
| June 2021 unstructured out-of-cell time: | offered | 8.42 hours per week |
| | received | 1.74 hours per week |
| July 2021 unstructured out-of-cell time: | offered | 6.06 hours per week |
| | received | 2.64 hours per week |

August 2021 unstructured out-of-cell time:    offered    8.69 hours per week
                                               received   2.65 hours per week

September 2021 unstructured out-of-cell time:  offered    7.87 hours per week
                                               received   3.42 hours per week



Of note, Pinckneyville was not included in this data analysis. Pinckneyville reports its out-of-cell time for class members in segregated housing as less than 29 days and more than 29 days. This 29-days number may be a product of the Department's November 2020 segregation policies, which call for providing out of cell time as of 29 days, earlier than the Settlement Agreement does. The Settlement Agreement, however, still calls for reporting out-of-cell time as less than, or greater than, 60 days. Pinckneyville's data for less than 29 days follows:

There was no reporting for the months of June and July. Rather, this statement was provided, "no longer facilitated due to restrictive housing guidelines."

August 2021 unstructured out-of-cell time:    offered    10.0 hours per week
                                               received   10.0 hours per week

September 2021 unstructured out-of-cell time:  offered    10.0 hours per week
                                               received   10.0 hours per week

The validity of this data is questionable. The offered number is based on 9 hours of yard and 1 hour of showers per week. The received number was not based on individual class members' participation. The offered number was just carried forward to imply that all class members in this sample received 10 hour per week of unstructured time.

**XV(a)(vi):[62] Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d) below.

**Findings:** The Second Amended Settlement Agreement requires that mentally ill offenders assigned to segregated housing **shall** (emphasis added) receive 10 hours each of structured and unstructured out-of-cell time per week. The monitoring team conducted a comprehensive data driven analysis of out-of-cell time for this cohort for the months of June, July, August and September 2021. The data was analyzed for mentally ill offenders in segregated housing for >60 days. The results follow:

|  | offered | received |
|---|---|---|
| June structured out-of-cell time | 5.59 | 1.97 |
| June unstructured out-of-cell time | 7.39 | 3.30 |
| July structured out-of-cell time | 2.83 | 1.41 |
| July unstructured out-of-cell time | 5.89 | 2.77 |
| August structured out-of-cell time | 2.27 | 0.90 |
| August unstructured out-of-cell time | 6.62 | 2.83 |
| September structured out-of-cell time | 2.39 | 1.03 |
| September unstructured out-of-cell time | 7.25 | 2.98 |



---

[62] This numbering from the Settlement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement.



Of note, Pinckneyville was not included in this data analysis. Again, Pinckneyville reports its out-of-cell time for class members in segregated housing as less than 29 days and more than 29 days. This 29-days number may be a product of the Department's November 2020 segregation policies, which call for providing out of cell time as of 29 days. This potentially makes Pinckneyville's numbers more inclusive, but not parallel to, the reports of other institutions. The Settlement Agreement, however, still calls for reporting out-of-cell time as less than, or greater than, 60 days. Pinckneyville's data for more than 29 days follows:

|  | offered | received |
|---|---|---|
| June structured out-of-cell time | 9.15 | 5.5 |
| June unstructured out-of-cell time | 10.0 | 10.0* |
| July structured out-of-cell time | 8.75 | 4.95 |
| July unstructured out-of-cell time | 10.0 | 10.0* |
| August structured out-of-cell time | 10.56 | 5.63 |
| August unstructured out-of-cell time | 10.0 | 10.0* |
| September structured out-of-cell time | 9.17 | 3.97 |
| September unstructured out-of-cell time | 10.0 | 10.0* |

* The validity of this data is questionable. The offered number is based on 9 hours of yard and 1 hour of showers per week. The received number was not based on individual class members' participation. The offered number was just carried forward to imply that all class members in this sample received 10 hours per week of unstructured time.

Additionally, during site visits at the monitoring team interviewed 16 patients in restrictive housing. Perceptions of available programming varied significantly between, and sometimes

within, institutions, but only two people described being offered 10 hours per week of structured out of cell time. Others described very specific schedules that fall well short of this (typically ranging from 4 to 7 hours per week). This is unsurprising in that group size is very limited as a covid-19 precaution and it reportedly is common practice, therefore, for patients participate on a rotating basis. This necessarily means that each patient is offered only part of the schedule of groups.[63]

Among those who discussed unstructured time, most said 10 hours *were* offered weekly, and a few thought even more was available. Patients at Hill said that time was sometimes reduced to about half of the requirement, generally because of cancellations.

**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** Please see the analysis in section XV(a)(iv), above, for a discussion about this requirement.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.
2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.
3) Pharmacological treatment (if applicable).
4) Supportive counseling by an MHP as indicated in the ITP.
5) Participation in multidisciplinary team meetings once teams have been established.
6) MHP or mental health treatment team recommendation for post-segregation housing.
7) Documentation of clinical contacts in the medical record.
**8)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

---

[63] Dixon and Hill patients reported this practice and its effects on how frequently they participate. The monitoring team is informed by IDOC legal counsel that these practices have been typical in restrictive housing units throughout IDOC.

**Findings:** It is the monitoring team's understanding that class members in Investigatory Status/Temporary Confinement are treated no differently from those in segregation. Please see XV(a)(vi), above, for a discussion of this requirement.

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d), below.

**Findings:** It is the monitoring team's understanding that class members in Investigatory Status/Temporary Confinement are treated no differently from those in segregation. Please see XV(a)(vi), above, for a discussion of this requirement. Notably, this is likely a small population as, predictably, few prisoners would be in this status for as long as 60 days.

**XV(d): Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i.   For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii.  For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii. For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv.  For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:** Please see XV(a)(vi), above, for a discussion of this requirement.

**XV(e): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: This date, May 22, 2020, has passed, so the Department is in Noncompliance with XV(e)

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary:** Staff followed face-to-face assessment protocols for initial orders; some, but perhaps not all, patients were seen at the time of extensions. Records almost never reflected the less restrictive measures attempted or considered. Criteria for release were often, but not universally, present and it was not evident often enough whether staff assessed whether the criteria had been met, and the patient could safely be released, before the maximum time of the orders. There was very limited documentation of limb releases and vital signs.

Lengthy and multiple uses of restraints continued to be a significant concern at men's institutions, but the frequency of each was meaningfully reduced from previous analyses. Referral to inpatient care remains underutilized for these patients.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1.  Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

    a.  Under no circumstances shall restraints be used as a disciplinary measure.

    b.  Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of restraints for mental health purposes. (2) The nurse shall then immediately contact the psychiatrist within one hour of the offender being placed into restraints and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall contact the physician or the licensed clinical psychologist.

2.  Crisis treatment shall be initiated in accordance with AD 04.04.102.

    a.  The initial order for the use of restraints shall not exceed four hours.

    b.  Should subsequent orders become necessary, the time limit may be extended, but

no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

c.  If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1.  Only a psychiatrist who has conducted a face-to-face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face-to-face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2.  If a psychiatrist, physician, or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3.  The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician, or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face-to-face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4.  Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b.      The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g., the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours. The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring
1.  Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2. Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3. Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4. Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychologist.

5. The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6. Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7. Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8. Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be utilized, justification of the care shall be documented in the offender's medical chart.

9. Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10. All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings**: The monitoring team reviewed logs of the application of restraints from June through August 2021. Restraints were used with 45 patients, a frequency similar to past monitoring periods. The monitoring team reviewed the records of 18 applications.

Records almost never reflected the less restrictive measures attempted or considered. While in some cases, continuing self-harm, even without access to any tools, made the rationale obvious, in other cases, it appeared less restrictive measures could have been effective. Anecdotally, Dixon staff told the monitoring team that a protocol has been in place at their site for about one year, in

which staff are always to offer patients chemical restraints first.

During mental health staff working hours, it appears that orders were generally issued after face-to-face assessment by an MHP or psychiatry. Many of the events were initiated after-hours and it appears the protocol for a nurse to manage the face-to-face contact, in consultation with MHPs or psychiatry by phone, was followed. During the daytime extension orders that followed, some involved MHPs or psychiatry then making face-to-face contact, but that was not clear in all cases. The recording method was not always clear, especially for patients with very extended times in restraints, but it appears the expectation was met to issue the first order for no more than four hours and extensions for no more than 16 hours, though there were rare instances in which an extension order appeared to be issued late, up to three hours late in one case. Justifications for the extensions were always recorded.

In the chart sample, only 28% clearly documented offering limb release at the required intervals; on a detailed log provided by the institution with by far the most restraints use, staff recorded an even lower rate. Taking that log and the chart sample together, only 3 of 82 applications had vital signs documented at the required interval.

Criteria for removing the restraints was absent or unclear in one-third of the records. Moreover, it appeared rare for staff to consider reducing the amount of restraint as soon as possible to the level of least restriction necessary or to determine that there is no longer cause to utilize restraints. Rather, it appeared that mental health and nursing staff considered removing restraints only at the end of each order, in a majority of cases.[64] In a significant minority, nursing notes reflected patient behavior and state of mind that might have been consistent with satisfying the criteria and should have been considered and/or discussed.

Lengthy and multiple uses of restraints continued to be a significant concern, but the frequency of each was meaningfully reduced from previous analyses. The women's institution continued to keep restraints to a maximum of four hours. Troubling practices that remain at the men's institutions include:

- Nine patients had from 3 to *21* restraints events in a short period. Few of these episodes were short, meaning most of these patients were restrained multiple days.[65]
- Seven patients were subject to restraints for longer than a day
- The worst among these are a patient who was restrained almost continuously for at least 84 days, and another who seems to have been restrained much or all of three years and three months.[66]

---

[64] In 7 of 18 cases, the patient was released one to three hours before an order expiring. In the remaining 61%, there was no documented consideration, or, in rare cases, the nurse considered whether the criteria were met but an official decision whether to change the order was not evident.

[65] These ranged from three in three weeks to 21 in two months.

[66] Both of these restraints were continuing as of the most recent information available to the monitoring team. The Monitor has written in previous reports about the patient who has been on crisis status for more than three years. Provided restraint and housing records are not always clear, but it appears that the patient has been housed in segregation for much of that period and is restrained except for approximately one hour per day in recent months, and potentially for much or all of nearly three and a half years with no end in sight.

- These concerning issues affected 25% of the patients restrained during the quarter examined.

Equally concerning is that staff did not take these as indications that a higher level of care was needed. All of these men were in RTU but clearly were not stable, and only one was referred to inpatient care.[67] One case may be illustrative of the benefit afforded by inpatient care: when treated at the inpatient facility early in the summer, this patient was restrained for less than four days over a six-week period; as soon as she[68] returned to RTU, staff have restrained her more than twice as long -- nine days -- in a shorter period.

IDOC conducted Quality Improvement audits of restraints use during the monitoring period. Auditors documented review of restraints occurring on 52 days,[69] with 63% of them fully compliant. Concerns were noted about not using, or recording, less restrictive measures; lack of limb releases; restraints continuing beyond the expiration of an order; and insufficient documentation of orders, including releases.

Previously, 23 institutions have been found in substantial compliance, as nearly all of them do not manage patients with restraints. The remaining institutions, discussed in this section, are responsible for nearly all the therapeutic restraints systemwide and thus, based on the facts above, IDOC is Noncompliant with requirement XVII.

## XIX: CONFIDENTIALITY

> **Summary**: The provision of confidential mental health care has deteriorated over the reporting period. A large number of clinical contacts occur at cell front which doesn't allow for confidentiality. Custody staff are stationed in and near clinical activities, which deprives class members from being able to speak openly and honestly with their treatment providers. Due to the egregious nature of these confidentiality violations, I will be assigning a rating of noncompliance and, per section XXVII(o) of the Settlement Agreement, I am directing the Defendants to address these issues in a corrective action plan which must be fully implemented by March 1, 2022.

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on

---

[67] Additionally, that referral was not initiated until after the patient had been restrained for almost three months and potentially more.

[68] The patient is housed at men's facilities, but as a transgender individual, prefers feminine pronouns.

[69] Auditors reviewed 24 patients who were restrained. The audit tools record findings on 52 days for these patients. It is not clear whether these are all separate uses of restraints, or whether some are recording findings for multiple days of the same restraint event. For this reason, this Monitor's report uses the term "days" instead of "restraint uses."

the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** As previously reported, the Department has developed policies regarding confidentiality. In a review of 186 crisis contacts at eight separate facilities[70], the monitoring team found that 171 of them were documented to have occurred in a confidential setting. This 92% completion rate is a big improvement from the 53% completion rate reported in the Fifth Annual Report. This finding, however, must be compared to the overall confidentiality of mental health care within the Department. When reviewing psychiatry and MHP notes, the monitoring team encountered numerous examples of contacts being conducted cell front. These occurred in multiple institutions and took place in crisis watch, segregation, and other treatment settings. The cited reasons included not only Covid-19 precautions, but also custody staffing insufficient to provide escorts and unspecified security reasons.

During my site visits to Pontiac, Dixon and Joliet, I encountered many serious examples where the Department's policies on confidentiality are not being followed. At Pontiac I accompanied an MHP while she was making her daily crisis contacts. These contacts all occurred at cell front with several custody staff within earshot. Also at Pontiac, I participated in a group therapy for class members housed on South Mental. Although the door of the group room was closed the chuckhole was open and a custody officer was stationed immediately outside the room. The custody officer could clearly hear what was going on in the room. Also, multiple custody staff were walking in the hallway outside of the room. This group was not conducted in a confidential manner. Similarly, an interviewed patient in Pinckneyville restrictive housing said that officers are posted so close to group therapy sessions that one officer commented to the patient afterward about what the patient had said in group.

Likewise, during my site visit to Dixon, I observed daily crisis contacts occurring at cell front with multiple custody staff within earshot of the encounter. Finally, I attended a community meeting in the X-House, the housing unit for higher security RTU patients. During this meeting, I observed multiple custody staff actually standing around in the area where this meeting was taking place. Also, other custody staff were walking through the meeting area while the meeting was taking place. There was absolutely **no** confidentiality during this meeting. When I reported this egregious violation of confidentiality during my exit interview, I was informed that Community Meetings are "non-clinical" and are not meant to be confidential. The Community Meeting I attended consisted of a BHT reading a document about emotions and feelings and was trying to engage the members in a discussion about their emotions and feelings. It was a very clinical discussion which was inhibited by the presence of numerous custody officers. If the Department persists in their frankly ridiculous position about Community Meetings being "non-clinical," then they cannot be counted as structured out-of-cell time.

During my site visit of Joliet, I observed staff performing their daily crisis checks. These checks occurred in a confidential setting. The staff informed me, however, that if custody determines there is a "safety risk" then the crisis check occurs at cell front. Custody staff do not have the authority to interfere with mental health staff's ability to conduct confidential contacts

---

[70] Western, Vandalia, Taylorville, Shawnee, Pinckneyville, Jacksonville, Graham and East Moline.

with class members.

Finally, I received information from attending the dispute resolution meeting regarding confidentiality, that for groups that occur in the segregated housing units at Menard, the custody staff are actually posted in the group room. Also, at Menard, general population groups take place in the dining hall within earshot of custody staff.

The examples I encountered at Pontiac, Dixon, Joliet and Menard are serious lapses in confidentiality and represent a material decline in practice. Per section XVII(o), I am directing the Defendants to develop and implement a timely and appropriate remedy to the violations I pointed out at Pontiac, JTC, Dixon and Menard. As there is not sufficient time to properly respond to this request during the current reporting period, a rating of noncompliance will be assigned for this requirement for the purposes of this report. The Department will receive a rating of substantial compliance for the sixth annual report if these deficiencies are addressed to the Monitor's satisfaction by March 1, 2022.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible.

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** As noted in XIX(b), this requirement is currently not being met. The Department has until March 1, 2022, to address these lapses if it expects to receive a rating of substantial compliance for the sixth annual report.

## XXII: PARTICIPATION IN PRISON PROGRAMS

**Summary:** This section was previously found in Substantial Compliance and additional information was developed during this monitoring period as the parties have entered the dispute resolution process.

Based on staff and patient interviews, and waiting lists, at eight institutions, the automatic nature of the criteria for most education suggests that mental health patients would access courses in the same way as other individuals in custody. All education staff, mental health staff, and interviewed patients said they had not heard of, seen, or experienced exclusion on the basis of mental health.

There are fewer *sessions* of the most basic education course offered to Dixon's RTU patients than its general population, while there are more people on the RTU waiting list. The proportions of STC and DXP patients on the waiting list, relative to their total populations, are essentially the same. Pontiac reportedly is not offering general education programming to its RTU or any other maximum security prisoners until teachers are hired.

The work assignment process has both standardized and discretionary elements. A multidisciplinary leadership group approves assignments, including MHP input for SMI patients. In interviews, the RTU patients had a higher rate of assignments than did the outpatients, but no interviews were conducted with non-caseload individuals. All said they had not been told that their mental health status would exclude them from any jobs. Plaintiffs' counsel recently raised a concern about limits on accessing work release, which one RTU patient confirmed, but the monitoring team was not able to develop further information at this time.

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** This provision was previously found to be in Substantial Compliance, and more recently, the parties have been discussing it in the dispute resolution process. For this reason, the monitoring team gathered related information during site visits to eight institutions, most of which have the largest mental health populations in the state, and two of which host RTUs.[71]

The monitoring team interviewed staff from the Education, Clinical Services, and Mental Health departments (22 in total) and 49 patients from the RTU, restrictive housing, and outpatient programs.[72] Responsible staff described the mechanics of selecting participants for educational programs and work assignments.

For educational programs, institutions typically offer ABE (a basic education class that is mandatory for certain incarcerated people), Advanced ABE, and preparation for a high school equivalency test (commonly termed GED). Some institutions also offer vocational programs, sometimes run by universities, and/or university academic courses. Institutions are expected to administer a test to all individuals in custody (a "TABE" test) to determine their initial level of academic knowledge, although at least some institutions suspended administering the test for extended periods for pandemic safety.

As for access to the courses, interviewed education leaders or specialists universally described the following system. For ABE, the course that is mandatory for many individuals, eligibility is determined solely by the TABE test score and access is determined by the length of time the potential student is likely to remain in custody, with the shortest times given priority. A computerized list is maintained and it automatically sorts based on these factors; it can re-sort frequently as new names are added, goodtime shortens time to serve, and other conditions change, and any given person may move up or down in priority repeatedly in relation to other people. There reportedly is no way to apply other criteria or make adjustments to the list, which reduces the possibility for unequal access on the basis of mental health or psychotropic medication status.

Access to Advanced ABE and GED preparation courses reportedly apply the same criteria and, as voluntary courses, require the potential student to express interest. Similar lists are maintained, though they are typically much shorter as far fewer people tend to be eligible academically. Where universities administer programs, they reportedly issue the eligibility criteria and sometimes conduct interviews. Education staff generally said mental health patients are integrated into classes for which they qualify, although Dixon maintains separate ABE classes for RTU patients.

All education staff, mental health staff who commented, and all interviewed patients said they saw no reason that mental health patients could not participate in any of the education programs, and had not heard of, seen, or experienced exclusion on that basis. One education leader said she would only exclude someone from the mental health caseload if the patient's MHP said it was contraindicated; in that event, the patient would maintain her priority on the list and staff would revisit participation about six weeks later. The same leader said they provide for pausing and later resuming in-progress education if needed for mental health reasons.

---

[71] Dixon, Logan, Graham, Hill, Illinois River, Menard, Pinckneyville, Sheridan

[72] Most patients commented on education and work assignments, though some discussed only one of those topics.

Among the patients interviewed, 9 were participants in Logan's RTU, Dixon's STC program, or Dixon's DXP program. Three of the patients were in school, or had completed it; the remaining patients said they had no interest in the classes or had long sentences yet to serve. Similarly, 8 of 40 interviewed outpatients were in or had completed school, and the others remained on wait lists or were not interested.[73]

It appears that access is more commonly limited by the number of class sessions, which appears modest in relation to the need. As of the time of interview, these seven institutions[74] could offer ABE, Advanced ABE, or GED classes to about 475 individuals, while waiting lists are more than double that number and will grow substantially as institutions resume "TABE" testing.[75] The length of classes means a minimum of nine weeks, and as much as two years, until a class slot becomes open.[76]

There are several contributing factors. During the worst of the pandemic, the pace of classes was slower due to a pause and then conducting them in a limited fashion with in-cell, self-study packets. When in-person instruction could resume, class sizes were reduced from a normal range of 15 to 25, to as few as 5 people, and were generally running at 9 or 10 as of late summer 2021. Additionally, not all sessions are available as IDOC is in the process of rehiring teachers for whom there was insufficient work under the pandemic interruptions.

RTU patients at Dixon do seem to have less access than general population prisoners in that there are fewer sessions offered to RTU and there are more people on its waiting list.[77] Within the RTU group, the proportions of STC and DXP patients on the waiting list, relative to their total populations, are essentially the same. On the other hand, education staff noted that higher-security DXP patients tend to have longer sentences, so their wait times for education are likely to be longer on that basis; they would have the same experience if housed in general population. These difficulties do not exist at the higher levels of education; RTU wait lists are much shorter than general population for Advanced ABE and GED classes. In dispute resolution communications, Plaintiffs' counsel have advocated an urgent need for education access for six RTU patients, housed at Pontiac, Dixon, or Menard, and whose potential release dates span October 2021 through December 2023.

Plaintiffs' counsel also assert that GED classes are not available at Pontiac, which puts Pontiac's RTU patients at a disadvantage and potentially forces a choice between educational and mental health needs. Defendants assert that education is not offered to any maximum security prisoner at Pontiac as hiring more teachers would first be necessary. In terms of similar conflicts between essential activities, the monitoring team interviewed education, clinical services, and

---

[73]  In this accidental sample then, RTU patients participated in school at a higher rate than their outpatient counterparts. It is not possible to know whether this is representative of the larger populations.

[74]  It was not feasible to interview relevant staff at one of the eight institutions referenced above

[75]  Additionally, the monitoring team did not request waiting lists at all visited institutions, and some staff were asked to estimate their numbers, so all totals are approximate.

[76]  Unless another student drops out before completion

[77]  This discussion focuses on Dixon, since Logan reported wait lists that include RTU patients and general population, but does not separate them.

mental health staff (a total of 7) and 20 RTU and general population patients at seven institutions other than Pontiac.[78] There, staff gave specific examples of ways they coordinate mental health programming with that of other departments or allow patients to prioritize mental health appointments before returning to work or school. The great majority of patients said there was no conflict between their activities. The exceptions were participants in Sheridan's full-time substance abuse program, who said they could attend school but not hold a job, and an mRTU patient who was allowed to continue mental health treatment but had to choose between a job and school.

As for work assignments, relevant staff described that there are categories of assignments and each individual is assessed and his or her eligibility for that category is determined. Staff with a job opening review the list of prisoners qualified for that category of work and make a hiring request, or a prisoner can ask an employer to do so. A multidisciplinary committee, including the Wardens and several departments, and a Mental Health representative if the candidate is SMI, confers about safety and security, the candidate's experience, and other factors, and the committee makes a joint decision.

Among the 9 RTU patients the monitoring team interviewed, 5 had jobs and there were a variety of settings: health care unit, commissary, passing food trays, sanitation, porter. For almost all who lacked a job, it was because of a recent disciplinary history. All said they had not been told that their mental health status would exclude them from any jobs; the only limit was that the job must be in an RTU housing unit -- is a restriction common in prison systems and meant to protect intermediate care patients from general population individuals – and one man noted they are ineligible for work release. Plaintiffs' counsel raised that concern more recently, but the monitoring team did not have further opportunity to look into that issue.

Among outpatients interviewed, 10 of 40 were working.[79] The other interviewees were following the process to obtain an assignment, were participants in a full-time substance abuse program, did not wish to work, or were temporarily ineligible because of a recent disciplinary history. They expressed frustration with the time required to receive a job, but they, too, said that they had never been told that mental illness or taking psychotropic medication was a barrier to hiring.

---

[78]  Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, Sheridan

[79]  As with education, in the site visit cohort, RTU patients had a rate of employment *greater* than their outpatient counterparts.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**: In the current review of reports and videos, as well as staff and patient interviews, there were mixed signs about use of force. Of concern, there continued to be a significant minority of cases (about 20%) that went against policy by *not* appearing to be conducted as a last resort or when other means are unavailable or inadequate. Another group of about 20% did *not* appear executed only to the degree reasonably necessary, and some bore signs of potential corporal punishment.

It did appear that force terminated when no longer necessary and that medical screening and care took place, although documentation was uneven. Those logistics of the tactical team process that the team has reviewed appear to continue to comply with policy.
.
Logs indicate the rate of use of force is one-third lower in this period than it was in 2019. Staff reported very little exposure to use of force, as did a large majority of interviewed patients. Similar to the documentation review, about 20% of an accidental sample of patients believed they had experienced or witnessed troubling use of force and gave specific examples.

The parties have entered the dispute resolution process concerning this section and the first discussions are set for shortly after this report is submitted.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[80] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:
   a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted purpose.
   b) Use of force shall be terminated as soon as force is no longer necessary.
   c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.
   d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

---

[80] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believes the Settlement contemplated AD 03.02.108(I)(B).

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or 05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.    Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the

chemical agents. In addition, the following procedures shall be followed whenever tear gas or other chemical agents are used to compel a committed person to leave his cell:

1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.      Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall

designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.      Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical

70

Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings:** As a sample, IDOC provided use of force tracking for June and July, which listed 126 incidents involving the mentally ill.[81] The monitoring team concentrated on force during site visits at eight institutions during the monitoring period. These facilities were responsible for nearly half of those uses, though not all of the institutions with the greatest frequency of use of force are included.

To examine these questions, the monitoring team interviewed 56 prisoners across all eight institutions, all treatment programs, and all security levels.[82] The team included use of force questions in interviews of 21 mental health staff and three nurses. The team reviewed 45 incident reports and viewed 27 videos.[83] As always, the monitoring team analysis focuses on the essentials

---

[81] Tracking lists separately each prisoner involved in an incident. This total removes those entries, counting every set of incidents in the same place at the same time as one incident. Reportedly, these logs do not include calculated uses of force where Tactical Team staff was activated but the incident concluded without force.

[82] Interviewees included 19 in Restrictive Housing; 3 in general population Maximum Custody; 6 presently or recently in Dixon's X House; 6 in other RTU buildings; and 22 in general population, some of whom had prior experience in restrictive housing.

[83] Incidents were chosen to include crisis watch, enforced medication, anything suggestive of a decompensated mental state, and some of each major type of force (OC, takedown, warning shot). Where there were few incidents at a facility, the reviewer attempted to examine all of them; where force was more frequent, the reviewer attempted to examine numbers equivalent to a majority. As the site visits were early in the monitoring round, some incidents and videos were chosen from preceding months.

This number of videos was part of a larger request for videos. In other cases, cameras had not been installed as of the incident or it is possible that the continuously running video overwrote earlier video when digital memory limits

of appropriate use of force under the Administrative Code: (a) force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary, (b) use of force shall be terminated as soon as force is no longer necessary, (c) medical screening and/or care shall be conducted following any use of force, which results in bodily injury, and (d) corporal punishment is prohibited.

*Necessary*: throughout *Rasho*, this has been the primary area of concern among the use of force requirements. In the current records and video review, about 20% did *not* appear to be a **last resort or when other means were unavailable or inadequate**. These included using Oleoresin Capsicum ("OC") on a patient already in four-point restraints, employing a takedown when the patient was not following an order but not leaving and not aggressive, employing a takedown in response to minor resistance by an already handcuffed patient under multiple-officer escort, OC use when the incident was already deescalating, minor incidents where self-harm was planned but serious injury was not so imminent that mental health staff could not be called, and forceful cell extraction when OC had been deployed but not given time to take effect.

There are some hopeful indications as well. For example, the monthly average of incidents with mentally ill prisoners is one-third lower in this period than it was in 2019, one factor suggestive of a reduction in unnecessary force. Mental health staff in Dixon's DXP and one RTU building at Logan say they are routinely called to deescalate potential force situations, and staff at Illinois River and Graham are sometimes called. All other interviewed staff at seven institutions,[84] including those covering crisis bed care, said they rarely see force, nearly all have not learned of injuries, and patients do not complain about force. Logan and Graham staff believe that officers have become more skillful at deescalation. For several monitoring periods, IDOC has had in place a Deescalation Response Team, whose members reportedly have undergone training. The expectation is that a member is to be called if force is anticipated, although it appears there is not a universal expectation that this be reflected in reports and/or video. Almost half of relevant reviewed incidents[85] clearly captured deescalation attempts by custody staff, and/or significant cooling off periods, and mental health involvement was shown twice. While the monitoring team is informed that IDOC no longer tracks Tactical Team activations that conclude without force, it was evident since early in *Rasho* implementation that this was the outcome in 38% or more of activations, and the monitoring team has not received any information that suggests this has changed.

*Excessive*: The monitoring team has also observed incidents over time that raised concerns that force may *not* have been used **only to the degree reasonably necessary** and that continued with another 20% of cases in the current records and video review. These included events resulting in severe injuries to the prisoner requiring outside hospital treatment; injuries whose explanation in force reports seems very unlikely; OC use in very large quantities, including using a pepperball launcher in cell; and an incident that had indicia of retaliatory violence when a prisoner assaulted

---

were reached, as happens in the ordinary course unless staff know a segment needs to be saved. In four instances, Internal Affairs found that the camera or digital file had malfunctioned.

[84] Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, Sheridan. Notably, staff interviews did not take place at Menard.

[85] The subset of incidents where force was planned, or it otherwise appeared to be not so urgent that time could be taken to attempt de-escalation

staff, was restrained on camera without injury, was escorted into a health care room, as is common, that does not have camera coverage, and had documented bleeding head wounds by the end of the incident.

*Termination*: All indications in the current review, and in the previous two, were that force was terminated when it was no longer necessary.

*Medical*: In the monitoring team's reviews over time, there are indications that nursing routinely checks patients after use of force, sometimes provides treatment for OC exposure,[86] and provides or arranges for treatment for injuries. It has also been the case that reports and videos unevenly document this. That continued during the instant reviews, although one institution included a standardized form and a nurse's statement in report packets for the most recent month. It appears this may be a new practice, which is common in other prison systems and is most welcome.

*Corporal punishment*: In several previous monitoring team reviews, corporal punishment has not been evident. Patients routinely assert, in interviews and court filings, that this occurs, and in all prison systems it is often difficult to substantiate. In the current review, two incidents, noted in the paragraphs above, had indicia of being corporal punishment. There were also a few incidents where it appeared an unreasonably lengthy time elapsed before the patient was offered relief from OC exposure – in one videoed case, it was approximately 15 minutes – which could be seen as corporal punishment. In a very severe incident outside the monitoring period, whose details have come to the monitoring team's attention only recently, a class member suffered a punctured colon and many other internal injuries, which led to his death; two officers are facing trial for this and a third pled guilty.[87] There are also two cases, integrated into the Fifth Annual Report's analysis, which bear earmarks of potential excessive force and/or corporal punishment, for which questions are pending. The issue of corporal punishment bears watching.

As for the requirements related to Tactical Team activations detailed in the Administrative Directive above, after reviewing reports and videos, the results were consistent with those described in the Monitor's Second Annual Report:

> "In terms of the specific Administrative Directive requirements governing tactical teams …, these appear well-executed. The tactical teams are constituted as required, and members are assigned to and perform the specified roles. A review of videos indicates the specified equipment is available and in use. The monitoring team did not examine the chain of command authorizations, notifications, and preparations preceding and after the incidents, but the fact that other aspects of the reports and

---

[86] In reports and videos, sometimes nurses perform this function, sometimes custody staff manages it, sometimes a patient refuses this offer, and sometimes it is not mentioned.

[87] This incident took place in 2018. Reportedly, IDOC placed the officers on administrative leave.

The monitoring team asked for information at the time, and periodically since then, and has been told each time that information cannot be released because the investigation is pending. The team did not have any identifying details and only recently discovered some in media coverage, and it is important that the court be aware even though the incident is outside the monitoring period. It is important to recognize both that this can occur despite no indication in reports, and that IDOC took serious action in response. https://khqa.com/news/local/trial-date-set-for-mt-sterling-prison-guards https://www.justice.gov/usao-cdil/pr/illinois-prison-guard-pleads-guilty-inmate-assault-resulted-death https://patch.com/illinois/springfield-il/inmates-death-altercation-prison-staff-ruled-homicide

filmed procedures hue closely to the requirements suggests that these are also being conducted.

Videos were available for all but one of the monitoring team's requests and were labeled consistent with the provisions of 501.70, suggesting this is common practice. In a small number of cases … the lighting, or where the camera was placed, did not allow the viewer to see the activity for some portions of the incident. The offender was always given direct orders and told what to expect if he did not follow them. Many of the incidents were undertaken with a minimal amount of force [with] exceptions … The monitoring team did not examine cell decontamination practices, but it appeared routine to offer and provide eye wash to flush offenders' eyes, again with [a] few exceptions … Incident reports are routinely prepared. The monitoring team did not examine the administration's system for review of incident reports, though review signatures were noted."

In addition to interviewing some patients known to be involved in specific incidents, the monitoring team interviewed a cross-section of 51 patients for their experience with use of force. Among them, three men at one institution said they had been subject to different kinds of excessive force. Another eight said they had witnessed punitive tactics or inappropriate restraint, or visible injuries that they were told resulted from use of force, and a small handful of others said they had heard of such incidents. The majority (28) said they had not experienced or witnessed force, and another nine said they had seen no incidents in recent years, or they occasionally experience or witness it and they believe the level of force was justified. Sometimes this was accompanied with an observation that officers at that institution were generally reasonable in their dealings with individuals in custody.

Plaintiffs have invoked the dispute resolution process and discussions are planned for December 2021. They emphasize these concerns based on interviews of, and court filings by, patients, and review of reports and videos:

- focus is needed on Pontiac, Dixon, Joliet, Menard
- limiting use of force to a last resort and increasing use of deescalation, especially by involving mental health staff and separating that function from tactical teams
- use of force in response to threats of self-harm
- excessive and/or unnecessary use of OC, such as use on already-restrained individuals; bursts in rapid succession, without giving time for compliance; and shooting pepper ball launchers directly at class members
- effectiveness of eye-wash stations for decontamination

Defendants disagree with Plaintiffs' concerns, and criticize findings in previous Monitor's reports, but have not as yet provided support for most of their positions.

As is often the case, IDOC's use of force with mentally ill prisoners contains a mix of good and bad methods. It would most accurately be described as partially compliant. Some of the

practices are quite serious and are not minor or occasional. Given the ratings allowed under the Settlement Agreement, IDOC must be found Noncompliant.


## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary:** Once again, Assistant Monitor, Reena Kapoor, M.D. conducted an expert analysis of the requirements contained in XXV(a). The results of this particular analysis are basically the same as she has found over the last several report cycles. The Department has consistently ignored her findings and recommendations. Once again a rating of noncompliance will be assigned. I'm requesting that departmental leadership arrange a series of meetings with Dr. Kapoor to address this very serious issue.

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHPs opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHPs opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

(1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

(2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

(3) Provide his or her final determination. Any deviation from MHPs recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare

the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHPs opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating, and reviewing MHP, and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.


**Findings:** As in previous reports, I asked Assistant Monitor, Reena Kapoor, M.D., to conduct an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in IDOC. Her findings from her November 23, 2021, letter to me follow:

November 23, 2021

Re: <em>Rasho v. Jeffreys</em>

Dear Dr. Stewart:

At your request, I performed an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in the Illinois Department of Corrections (IDOC). The conclusions in this report are based on my review of the following documents:

1. IDOC Administrative Directive 05.12.103, "Administration of Discipline for Offenders Identified as Seriously Mentally Ill."

2. IDOC Quarterly Reports dated October 25, 2021, re: original *Rasho* settlement agreement and court order from December 20, 2018

3. Fifth Annual Report of Monitor Pablo Stewart, MD, from May 2021

4. Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), Offender Disciplinary reports (DOC 0317), and mental health progress notes for a total of

140 disciplinary infractions adjudicated during September 2021, representing approximately 20% of incidents involving SMI offenders at the following facilities:

1. Big Muddy River – one incident
2. Centralia –  three incidents
3. Danville –  one incident
4. Dixon –  20 incidents
5. East Moline –  one incident
6. Elgin –  one incident
7. Graham –  two incidents
8. Hill – 36 incidents
9. Illinois River –  four incidents
10. Joliet Treatment Center – 12 incidents
11. Lawrence – seven incidents
12. Logan – three incidents
13. Menard – six incidents
14. Pinckneyville – five incidents
15. Pontiac – 23 incidents
16. Robinson – one incident
17. Shawnee – one incident
18. Sheridan – two incidents
19. Stateville NRC – three incidents
20. Taylorville – one incident
21. Vandalia – two incidents
22. Vienna – one incident
23. Western Illinois – three incidents

*I note that the documentation from several facilities was incomplete, with missing Adjustment Committee reports and mental health progress notes.*

5. Letter from Maurice Shaw to Amanda Antholt dated September 8, 2021

**Overall Findings**

To put things succinctly, not much has changed since my last review of IDOC's SMI disciplinary procedures in May 2021.  I remain dissatisfied with two aspects of the SMI disciplinary process that are important to compliance with Section XXV of the Settlement Agreement:

(1) Lack of face-to-face assessments of offenders when MHPs are making recommendations related to discipline; and
(2) Poor documentation of the rationale for MHPs' recommendations related to discipline.

It is fair to say that IDOC and I are at an impasse about whether these two elements are necessary.  As noted in the October 2021 Quarterly Report, IDOC believes that assessments about discipline can be made without a face-to-face evaluation, and it also believes that the Settlement Agreement does not mandate such evaluations.  I acknowledge that Section XXV of

the Settlement Agreement is silent on the matter, requiring only that IDOC implement its own policy, AD 05.12.103, which states, in relevant part (emphasis added):

> b. The facility Mental Health Authority shall **assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and**, *within 72 hours of the original* **notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator** *who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:*
>
> > (1) **The reviewing MHP's opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.**
> >
> > (2) *The reviewing MHP's opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and*
> >
> > (3) *Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.*

I still do not understand how an MHP can arrive at an opinion about "if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense" without actually asking the offender about said behavior. Thus, my overall recommendation is unchanged: Please evaluate the offenders face-to-face to ask them about the circumstances leading to the disciplinary infraction, and then document that interaction and the rationale for any recommendations to the Adjustment Committee.

## Other Significant Findings

1. During the current reporting period, MHPs found that mental illness contributed to the offense in 7 out of 140 cases that I reviewed, or 5% of cases. This is a decrease from previous reviews, as depicted in the graph below. However, because the overall numbers are fairly small, I doubt that this difference is statistically significant, so I will continue to monitor over time. Overall, I found that MHPs did consider the substantive issue of whether mental illness contributed to the offense behavior in most cases, even though the procedures and documentation were lacking.



Unfortunately, Dixon and Pontiac reverted to their earlier pattern of finding that mental illness never contributes to offense behavior; this was true in 20 cases at Dixon and 23 cases at Pontiac during the current review.  Thus, I have renewed concerns about MHP fatigue or blindness to the effects of mental illness on behavior in the facilities with high volumes of disciplinary infractions to review.

2.  I found no cases in which offenders were punished for self-injurious behavior, and I found no cases in which segregation was used as a punishment (for SMI offenders) for 300- and 400-level infractions.

3.  The Adjustment Committee at each IDOC facility consistently received input from MHPs regarding SMI inmates in a timely manner. In reviewing 140 infractions, I found that an MHP completed the DOC 0443 form and submitted it to the Adjustment Committee within 72 hours in all cases.

4.  In the majority of cases, the Adjustment Committee follows IDOC's policy 05.12.133, Section H.2, which states, in relevant part:

> *If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.*

> *If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

During this reporting period, I did find two cases where IDOC did not follow this policy: one at Stateville NRC and one at Taylorville.  In both cases, the Adjustment Committee gave segregation time to offenders in excess of that recommended by MHPs on the 0443 form. Although this is permissible according to IDOC's policy, it requires some explanation by the

Chief Administrative Officer of the rationale, which was not completed in these two cases, at least not in the documentation with which I was provided.

5. The quality of mental health evaluations documented on the DOC 0443 form remains poor, containing standard language about whether mental illness contributed to an offense and a warning that extended segregation time can cause psychiatric decompensation. The progress notes are no better, also containing formulaic language about a disciplinary report being reviewed and arriving at a conclusion like "no mitigating factors were present" without any explanation. No substantive assessment of the offender is documented anywhere. This is a real shame, as MHPs are now generating volumes of paperwork related to disciplinary offenses that is essentially meaningless.

6. I repeat verbatim what I said in May 2021 about face-to-face assessment, as it still applies:

> MHPs at most facilities are not performing face-to-face assessments of SMI offenders after they are charged with disciplinary infractions; the 0443 forms are completed based on a chart review and/or discussion amongst the mental health staff. As noted above, I still do not understand how an MHP can arrive at a conclusion about whether mental illness contributed to an offender's behavior without actually asking the offender about the events in question. In my [previous] report, I asked IDOC to clarify what they mean when they assert that "recommendations can be made based on a chart review when warranted." To my knowledge, no clarification has been provided.

7. During my last evaluation, I expressed concerns about Stateville NRC routinely exceeding MHPs' recommendations for segregation time. In September 2021, Stateville NRC provided detailed documentation for 4 disciplinary infractions for me to review, and it also provided a table listing the outcome of all 11 SMI disciplinary proceedings that occurred during the month. Based on that table, the Adjustment Committee issued segregation time greater than that recommended by the MHP in 2 out of 11 cases, which is a notable decrease from March 2021, when 10 out of 16 cases exceeded the MHPs recommendations. Still, Stateville NRC did not provide the Adjustment Committee reports for review, so I cannot tell whether the facility followed IDOC's policy 05.12.133, Section H.2, which requires a higher level of review by the Chief Administrative Officer and clear documentation of the rationale for deviating from mental health's recommendation.

8. Compared with previous reports, Dixon issued an unusually high number of disciplinary infractions for drug-related offenses, raising suspicion about a systemic problem at the facility. I noted offenses for possession of cocaine, alcohol, K2 (synthetic marijuana), and unidentified pills during September of 2021. I mention this so that IDOC and Dixon leadership can take a closer look at their procedures for minimizing access to illicit substances.

9. Also at Dixon, an offender was issued two disciplinary infractions for refusing forced medication (technically, for refusing a direct order). In my opinion, this is not a disciplinary matter, but rather a clinical one. The "punishment" for refusing enforced medication should

be the administration of intramuscular medication, per a physician's order, not a disciplinary proceeding.

10. Finally, I note that several facilities issued disciplinary infractions to SMI offenders who refused to leave their segregation cells.  Although this procedure is not new, I did not find any evidence in the documents provided that a mental health professional or disciplinary officer had attempted to understand why the offender would prefer to stay in 23-hour lockdown – which most "normal" people find unpleasant – rather than return to general population.  I urge IDOC to undertake this inquiry before routinely issuing disciplinary infractions for refusing to leave a segregation cell, as the behavior may indicate untreated psychiatric symptoms (e.g., paranoia, PTSD) or a psychosocial problem that can be addressed.

## Recommendations

Based on the information noted above, I recommend that IDOC take the following steps.  These recommendations are largely unchanged from my May 2021 report:

1. Adopt a policy of requiring face-to-face assessment of offenders by MHPs prior to making recommendations on the DOC 0443 form.  These assessments should at least include a basic inquiry about the offender's symptoms at the time of the offense and his/her account of what happened.

2. Clearly delineate the rationale for the MHPs opinion regarding the disciplinary infraction in a mental health progress note.  Do not just document that the form was completed, as this created unnecessary paperwork and is clinically meaningless.

3. Again, clarify what is meant by the assertion that "recommendations [about SMI discipline] can be made based on a chart review when warranted," specifying the circumstances in which such a strategy would be appropriate.

4. Provide the Monitoring Team with IDOC's guidelines and/or training scheme for mental health professionals to complete the DOC 0443 form and mental health progress notes related to SMI offenders and discipline.

5. Provide complete SMI discipline documents to the Monitoring Team, including Adjustment Committee Final Summary reports, disciplinary reports, 0443 forms, and mental health progress notes for each offense.  The following facilities did not submit complete documentation for September 2021:

   1. Danville
   2. East Moline
   3. Elgin
   4. Hill
   5. Illinois River
   6. Joliet

    7.  Lawrence
    8.  Logan
    9.  Menard
    10. Pontiac
    11. Robinson
    12. Sheridan
    13. Taylorville

Please do not hesitate to contact me with questions or concerns about the information I conveyed in this report.

Respectfully submitted,

Reena Kapoor, MD
Associate Professor of Psychiatry
Yale School of Medicine

**Additional Requirements:**

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

**Findings:** Please refer to section XV(a)(vi)(B), above, for a discussion about this requirement.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

**Findings:** As reported in the Midyear Report of November 2020 and the Fifth Annual Report, two issues prevent IDOC from receiving a rating of substantial compliance for this sub-requirement. They are the persistent backlog and untimeliness of mental health evaluations and the ongoing issue of custody staff acting as gatekeepers to the Crisis Intervention Team. Nothing has changed regarding these two issues during the current reporting period.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the

information shall be reviewed by the facility mental health authority.

**Findings:** Prior to the Covid pandemic, the monitoring team regularly observed class members in segregation who had already deteriorated and/or were demonstrating signs and reporting symptoms of mental deterioration. During the current reporting period, the Monitor was able to observe class members in segregation at Pontiac, Dixon and Joliet. This limited review found several class members who were demonstrating signs and reporting symptoms of mental deterioration. Due to the relatively small number of class members observed in segregation, however, I am unable to arrive at an authoritative opinion. Therefore, no rating will be assigned for this sub-requirement.

4.  Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

     **Findings:** The Department is meeting this requirement.

5.  The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

     **Findings:** The Department is meeting this requirement.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

**Summary:** IDOC is in Substantial Compliance with this Section.

   **(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

     **Findings:** IDOC is in Substantial Compliance with this requirement.

   **XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** IDOC is in Substantial Compliance with this requirement.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data which shall be provided to IDOC and Plaintiffs. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** IDOC is in substantial compliance with this requirement.

## XXVIII: REPORTING AND RECORDKEEPING

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following:  a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: IDOC is in Substantial Compliance with this requirement.

**CONCLUSION**

The Department continues to struggle to meet all of the requirements of the Corrected Second Amended Settlement Agreement. This is due in large part to inadequate staffing of both qualified mental health professionals and custody staff. The Monitoring Team is available to answer any questions about this report.

Respectfully submitted,

*/s/ Pablo Stewart, M.D.*                  Dated: December 6, 2021

Pablo Stewart, MD