E-FILED
Friday, 11 February, 2022 02:39:50 PM
Clerk, U.S. District Court, ILCD

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF ILLINOIS

3

4   ASHOOR RASHO, et al.,          )
                                   )
5             Plaintiffs,          )
                                   )   Civil No. 1:07-01298
6        vs.                       )
                                   )
7   DIRECTOR ROB JEFFREYS and      )
    DR. MELVIN HINTON, in          )
8   their official capacities,     )
                                   )
9             Defendants.          )

10

11        TRANSCRIPT OF PROCEEDINGS - VOLUME I
          BEFORE THE HONORABLE MICHAEL M. MIHM
                    MOTIONS HEARING
12          FEBRUARY 1, 2022; 8:59 A.M.
             (VIRTUAL CONFERENCE ROOM)

13

14

15

16

17

18

19

20

21

22

23        Jennifer E. Johnson, CSR, RMR, CRR
              U.S. District Court Reporter
24            Central District of Illinois

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer

1   **<u>APPEARANCES:</u>**

2

3   For the Plaintiffs:     HAROLD C. HIRSHMAN, ESQUIRE
                            Dentons U.S. LLP
                            233 S. Wacker Drive, Suite 5900
4                           Chicago, Illinois 60606

5                           AMANDA C. ANTHOLT, ESQUIRE
                            Equip for Equality, Inc.
6                           20 N. Michigan Ave., Suite 300
                            Chicago, Illinois 60602

7
                            ALAN MILLS, ESQUIRE
8                           NICOLE RAE SCHULT, ESQUIRE
                            Uptown People's Law Center
9                           4413 N. Sheridan
                            Chicago, Illinois 60640

10

11  For the Defendants:     R. DOUGLAS REES, ESQUIRE
                            ISAAC FREILICH JONES, ESQUIRE
12                          Office of the Attorney General
                            100 W. Randolph Street
13                          12th Floor
                            Chicago, Illinois 60601

14
                            LAURA K. BAUTISTA, ESQUIRE
15                          Office of the Attorney General
                            500 S. Second Street
16                          Springfield, Illinois 62706

17

18

19

20

21

22

23

24

25

3

1                           INDEX

                                            PAGE
2

3

PLAINTIFFS' OPENING STATEMENT                10
4   DEFENDANTS' OPENING STATEMENT                14

5

WITNESSES FOR THE PLAINTIFFS:
6

PABLO STEWART, M.D.
7

   DIRECT EXAMINATION                        19
8    CROSS-EXAMINATION                         99
   REDIRECT EXAMINATION                      157
9    RECROSS-EXAMINATION                       168
   COURT EXAMINATION                         169
10   FURTHER REDIRECT EXAMINATION              177
   FURTHER RECROSS-EXAMINATION               180

11

JUSTIN WILKS (Adverse)
12

   DIRECT EXAMINATION                        190
13   CROSS-EXAMINATION                         219
   REDIRECT EXAMINATION                      240
14   RECROSS-EXAMINATION                       248
   COURT EXAMINATION                         248
15   FURTHER REDIRECT EXAMINATION              253

16

17

18

19

20

21

22

23

24

25

4

```
 1                         EXHIBITS
                                              PAGE
 2

 3   PLAINTIFFS' EXHIBITS:

 4     Plaintiffs' Exhibit Number 3              97
       Plaintiffs' Exhibit Numbers 5, 6, 7, 41  98
 5     and 30
       Plaintiffs' Exhibit Number 9             96
 6     Plaintiffs' Exhibit Numbers 14 and 26   254

 7

 8   DEFENDANTS' EXHIBIT NUMBERS:

 9   Defendants' Exhibit Number 3               97
     Defendants' Exhibit Numbers 34A-34F       239
     Defendants' Exhibit Number 44              98
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (Proceedings held in open court.)

2        THE COURT:  As I said, this is going to be a

3    great adventure.  We'll see how it works.  I've got

4    a full tabletop here of exhibit books.

5        I did want to make a comment before we go any

6    further.  My clerk's office has indicated that she

7    needs a copy of the exhibits with evidence stamps

8    on the exhibits.  I believe the defendant submitted

9    those, and I have those copies, so I will provide

10   those to the clerk so she'll have that.

11       The plaintiffs did not put evidence stickers

12   on theirs.  I'd like you to prepare a copy that has

13   the stickers on it and just send that to the

14   clerk's office.  Okay?

15       MS. ANTHOLT:  Your Honor, I believe our

16   electronic copies were marked with exhibit numbers.

17   Did you want --

18       THE COURT:  Actually an evidence stamp.

19       MS. ANTHOLT:  An actual -- so it says

20   Plaintiffs' Exhibit as opposed to --

21       THE COURT:  Yes.

22       MS. ANTHOLT:  -- Exhibit Number.

23       THE COURT:  Yes.  Okay?

24       MS. ANTHOLT:  Okay.  Thank you.

25       THE COURT:  If they have that by the end of

 1  the week, I think we're okay.

 2      MS. ANTHOLT:  Thank you.

 3      THE COURT:  I've read -- I haven't read all

 4  the exhibits.  I've read several of them.  I've

 5  also read the filings that you made concerning the

 6  course of the hearing.

 7      I know the defendant raises several arguments

 8  suggesting that we don't need an evidentiary

 9  hearing, and with all due respect, I'm going to

10  deny those, so we are going to go ahead with the

11  hearing.

12      I did want to make a comment at the beginning.

13  At the present time -- and maybe forever -- the

14  *Rasho* opinion that we received a couple weeks ago

15  is the controlling authority for this case, and I

16  read that over a couple of times over the weekend.

17      The primary thing that I took away from it was

18  that I think our focus on this hearing -- certainly

19  there will be testimony about harm, and that's

20  fine.  That's appropriate.

21      But from my point of view, reading *Rasho*, it

22  seems to me the questions that I need to answer,

23  that you need to answer for me, What else could or

24  should have been done that wasn't, and, perhaps

25  most importantly, If what has been done constitutes

1 a reasonable response to the situation, then

2 there's no deliberate indifference even if the

3 efforts were unsuccessful.  That's how I read

4 *Rasho*.

5      Is there any dispute about that before we

6 begin this process?

7      MR. HIRSHMAN:  Your Honor, this is Harold

8 Hirshman.  In general, I agree with your reading.

9 The one thing that *Rasho* did not deal with -- at

10 least on its face, it did not address the length of

11 time that can transpire between a failed effort and

12 the problem persisting because it said that the

13 solution -- Your Honor said the solution of

14 overtime was not a sufficient solution.  The Court

15 of Appeals instead chose to focus on, A, the

16 statement that they were providing were providing

17 overtime to solve the problem and several other

18 measures that they said were going to solve the

19 problem.

20      In this case, we're faced with a situation

21 where the problem persists.  There is no actual

22 solution.  The problem will continue to persist for

23 an indefinite time, and that is where we say that

24 the Department has fallen down.

25      It is as though someone comes in to a doctor

8

ill, and the doctor says, *Come back in a year, and by then maybe I'll know what I'm going to do to help you.*

     That is, in our view, still deliberate indifference in *Rasho*.  It's not a solution, and the problem persists.

     THE COURT:  Well, Judge Ripple talked about this to some extent in his dissent, but it's fair to say that the majority opinion simply didn't -- did not place any, any weight on that at all, and so I still think, at the end of the day, in the context of *Rasho*, I have to decide, under all the circumstances, what -- is what the defendant has done here reasonable or not.

     MR. HIRSHMAN:  I agree, and we intend to show you that what they've done is unreasonable, and they knew that it was -- and this is a direct quote from the majority opinion -- knew was insufficient to prevent the harm.

     THE COURT:  All right.  Mr. Rees, do you have any quick comment to make on that?

     MR. REES:  Your Honor, I think you have it right, and, you know, we will intend, if necessary, to discuss *Rasho* more, you know, in final closing argument.

1       THE COURT:  Right.

2       MR. REES:  I wasn't intending to get into that

3   detail this morning during opening.

4       I will say that there is some nuance in that I

5   think that it -- under *U.S. vs. Farmer*, the Supreme

6   Court test, it is clearly true that if a

7   Department's response is reasonable, then per se it

8   cannot be criminally reckless.  So, if the

9   Department's response is reasonable, then there

10  cannot be liability.

11      There is some room that the actual test,

12  though, for liability is a standard of criminal

13  recklessness.  So, what Mr. Hirshman's saying is if

14  Your Honor determines that in some circumstance the

15  response drops below even a standard of

16  reasonableness, which is really the negligence

17  standard, we know that negligence is also not the

18  standard for deliberate indifference, so the

19  question for Your Honor then would be to say, if

20  the response is so bad, so lacking that it amounts

21  to criminal recklessness.

22      So, I think that's the only thing I would add

23  with respect to your two questions.

24      I'd probably add a third, which is if you

25  determine that in some circumstance it falls below

1  a level of reasonableness, then the final question
2  is, Is the response so bad that it amounts to
3  criminal recklessness?
4      THE COURT:  Okay.  Because I think I'm pretty
5  familiar with the issues that we're looking at
6  here, I think we could probably forego opening
7  statements, but if you want to take five minutes or
8  so to highlight something for me, I'm willing to
9  listen to that.
10      Mr. Hirshman?
11      MR. HIRSHMAN:  Certainly.  With respect -- one
12  other issue on the law.  We have an ADA claim with
13  respect to Pontiac.  It does not apply to Dixon,
14  but it does apply to Pontiac, and we've laid out
15  why there is a valid ADA claim which does not
16  require intent.
17      We can hold off on arguing the nuances of the
18  ADA claim, just as Mr. Rees said, until closing,
19  but I, I don't want the Court to -- remind the
20  Court that there are two legal arguments with
21  respect to Pontiac, ADA and --
22      THE COURT:  I'm trying to remember, in the
23  *Rasho* case, do they -- do they even mention ADA?
24      MR. HIRSHMAN:  They do not.
25      THE COURT:  Okay.

1      MR. REES:  Your Honor's -- Your Honor's order

2   -- permanent injunction order did not either.

3      THE COURT:  Oh, that's right.  You're right.

4   Okay.  Thank you.

5      All right.  Mr. Rees, any -- anything briefly?

6      MR. REES:  Is there any additional argument

7   from Mr. Hirshman?

8      MR. HIRSHMAN:  Yes, I have about three points

9   I'd like to make.

10      First of all, at Pontiac today, by agreement,

11   there are 77 SMI who, I think, also by agreement

12   have not been getting either out-of-cell structured

13   or unstructured time, and we think the evidence is

14   that that happened well before Omicron, at a time

15   when, you know, the virus was not raging at, at

16   Pontiac.

17      And that at Dixon, there are 600 -- 600 SMI in

18   the RTU.  So, we're dealing in total with just

19   under 700 of the approximately 6,000 SMI here.

20      And I think it's important to, to focus on

21   these two prisons because the -- they were taken --

22   these prisoners were selected because of mental

23   illness, not only -- because their mental illness

24   was even worse and, consequently, needed

25   residential treatment unit -- they needed to be

1    placed in residential treatment units which the

2    Department itself says requires enhanced care.

3         Now, the defendants seem to think that this is

4    all about the Settlement Agreement and ten and ten,

5    and if they can show that, you know, the people are

6    getting ten hours of structured time out of cell,

7    that's all -- that's the ball game.  But it isn't

8    the ball game.  The ball game here is the

9    constitutional requirement under *Estelle vs. Gamble*

10   to provide mental health care to people who need

11   it, and we believe that the evidence really is

12   undisputed that their plan has nothing to do with

13   providing mental health care.  It has to do with

14   taking people to the gym to shoot basketballs and

15   stuff that has never been considered by the

16   Department itself to be mental health care.

17        And so that's why we say that they haven't

18   responded to the problem, which is the problem of

19   failing to provide mental health care.

20        They also haven't gotten people out of cells,

21   and we're certainly at Pontiac in a situation where

22   effectively these people have been in solitary

23   confinement for months and months.

24        And the -- the mental health office itself,

25   you will not see a document where the mental health

1  office specifically endorses and says what these

2  plans are are sufficient under our own guidelines.

3  And I think Dr. Stewart is going to testify that

4  they're simply not sufficient.

5      And we know that people with mental illness

6  are at an increased risk of harm from isolation,

7  and that's what we have.

8      And the source of the problem at Pontiac is

9  remarkably too few guards.  The solution -- the

10  solution at Pontiac is, A, to empty two wings, East

11  and West, where the mentally ill are not, and move

12  600 people, and then negotiate with the union, and

13  then finally, sometime in the future at an unknown

14  date, as they all acknowledge, they will have an

15  experiment as to whether the people left behind,

16  the 55 can sit for four hours at a time in cages.

17      It's not a solution.  It's not a plan.

18      And, remarkably, there are hundreds of empty

19  beds -- RTU beds within the system that they could

20  simply move people to, but they haven't, and they

21  aren't planning to, and instead they've created

22  this Rube Goldberg monster instead of simply moving

23  the people.

24      Thank you.

25      THE COURT:  Thank you.

1    By the way, just parenthetically, I saw a

2  headline the other day that said that 34 Illinois

3  DOC institutions were on lockdown.  Is that an

4  accurate statement?

5    MR. REES:  Your Honor, the term is "medical

6  quarantine."  We'll talk about that during the

7  hearing.  But they are on full medical quarantine

8  that does restrict movement.

9    THE COURT:  Okay.  Thank you.

10    All right.  Go ahead, Mr. Rees.

11    MR. REES:  Your Honor, I have five points, and

12  some we've already covered.

13    Number one is that our argument is in our

14  opening brief, that's ECF 3438; our brief on the

15  scope of the hearing, that's ECF 3487; and the

16  Seventh Circuit opinion in *Rasho*.

17    Point number two, and I think Your Honor hit

18  on it, we think this case is about efforts, and the

19  Seventh Circuit made clear it's not about all

20  efforts; it's not about best efforts; it's not

21  about efforts that Dr. Stewart or the plaintiffs

22  might prefer.  It's about the standard that we

23  discussed earlier this morning.

24    Number three, though, given that the

25  constitutional level really -- standard focuses on

1    minimal efforts, I do want to emphasize that you're

2    going to hear evidence that the Department is

3    absolutely committed to doing the best it possibly

4    can under the circumstances not just to provide the

5    out-of-cell time required under the Settlement

6    Agreement that we think exceeds any constitutional

7    minimum but to provide appropriate care to protect

8    prisoners from harm.

9         As Your Honor noted, under *Farmer*, even if the

10   harm is not averted, that's not the test, if harm

11   exists or occurs, but the question is the efforts

12   again.  What efforts have been made?

13        And on that, Your Honor, we're going to

14   present substantial evidence -- and I want to be

15   clear on this -- about concrete actions and

16   concrete plans.  Not highest hopes, but real

17   actions and real plans that have been approved and

18   that either have already been implemented or are in

19   the process of being implemented, and some will be

20   ready to go when the COVID restrictions are lifted.

21   And those will include adding treatment space at

22   both Dixon and Pontiac, adding security staff where

23   we can and reallocating our existing security

24   staff, which you'll hear, Your Honor, is essential

25   for safe movement within the prisons, for example,

1 | to go out to the yard, to go to groups, and --

2 |     THE COURT: Let me interrupt. Can I interrupt

3 | for a second there?

4 |     MR. REES: Yes.

5 |     THE COURT: I'm trying to remember, in the

6 | material that I read over -- tried to read as much

7 | as I could over the weekend -- somebody indicated

8 | that -- yes, here, I think it was Warden Burle, he

9 | filed a declaration on November 16th. And in that,

10 | if I'm reading correctly, 313 vacancies out of 790;

11 | is that correct?

12 |     MR. REES: I don't know if that's the current

13 | number. That would have been the number as of

14 | then.

15 |     And, Your Honor, we will be presenting

16 | evidence from Warden Burle -- so you pronounce his

17 | name Burle, by the way. I also was saying Burle.

18 | You're going to be hearing evidence about actions

19 | under way at Pontiac in particular to transfer

20 | individuals out of Pontiac, so that will improve

21 | the ratios so that they'll be able to dedicate the

22 | more existing security staff to the remaining

23 | individuals which will include these, you know,

24 | relatively -- the small group that's in the RTU at

25 | Pontiac relatively -- relatively. I think, you

know, Mr. Hirshman said it's around 77.  I think we
don't dispute that number.  I think we came to an
agreement on that number.  It's about -- you'll
hear, Your Honor, I think it's about 40 in the BMU
-- that's called the Behavioral Modification Unit
-- at Pontiac and usually about another 20 to 30
that are in what's called the Modified Treatment
Community at Pontiac.

THE COURT:  Okay.  Do you have anything --

MR. REES:  So, Your Honor, really the last
point I was going to make is that we are -- you
will hear evidence about multiple actions the
Department is taking to mitigate the risk of harm.

We recognize that this -- these COVID -- and
you'll hear language, Your Honor, about what's the
difference between a quarantine and isolation, and
you'll hear about partial quarantines and full
quarantines, but the bottom line is we recognize
that when people have to be isolated, that that is
not ideal.  But you'll hear that we're doing that
to not only comply with CDC guidance but also the
Illinois Department of Public Health and direct
guidance and instructions from our Office of Health
Services that work closely with the Operations
staff to determine when we can take people off

1   those quarantines.

2       But in the meantime, when people are

3   quarantined, you'll be hearing evidence about what

4   actions the Department is taking to mitigate the

5   risk of harm when that happens.

6       So, Your Honor, while, of course, as you know,

7   we've -- maybe it would be out of the ordinary to

8   deny a motion on the paper, and we respect that, we

9   will, at the end of the hearing -- and we expect

10  that you want to hear from our witnesses and

11  question them yourself.  And so at the end of the

12  hearing, we'll be back to ask Your Honor to deny

13  the motion.

14      THE COURT:  All right.  Thank you very much.

15      So, I think we're ready now for Dr. Stewart.

16      Annie, would you swear the witness?

17      MR. HIRSHMAN:  I'm going to move and leave

18  this to Mr. Mills.

19      THE COURT:  Okay.

20      Annie, can you hear me?

21      COURTROOM DEPUTY:  Yes.

22      **(Witness sworn by the clerk.)**

23      THE COURT:  All right.

24              **PABLO STEWART, M.D.,**

25  called as a witness, was examined and testified

 1  upon his oath as follows:

 2  **DIRECT EXAMINATION**

 3  BY MR. MILLS:

 4  Q.   Good morning, Dr. Stewart.  It must be very

 5  early for you in Hawaii.

 6  A.   A little bit, yeah.

 7  Q.   You are -- you were appointed as the monitor

 8  in this case by Judge Mihm several years ago,

 9  correct?

10  A.   Yes, in May of '16.

11  Q.   And how do you view your role as a monitor?

12  A.   My role as a monitor is to gather data,

13  through a variety of means, and to render opinions

14  and report to the Court whether or not the

15  defendants are in compliance with certain -- with

16  the requirements of the corrected Second Amended

17  Settlement Agreement.  And I also have -- given

18  what I see on my site visits, I also have a

19  technical assistance component to that to help the

20  staff when they have questions about how they

21  should proceed.

22  Q.   In response to Your Honor -- to His Honor's

23  request, you prepared a special report for this

24  hearing related to the RTUs at Dixon and Pontiac;

25  is that correct?

1   A.   Yes.

2   Q.   And that was the letter that has been marked

3   as Plaintiffs' Exhibit 9, Your Honor, and we're

4   going to see if we can figure out how to do a

5   screen share here so we can all see the same

6   document at the same time, I hope.

7        As you say, this is a little bit of *Star Trek*

8   to figure out how this works, but I think we can do

9   this.

10        MS. ANTHOLT:   It's just a little slow.

11        MR. MILLS:   Very slow here.   There you go.

12   BY MR. MILLS:

13   Q.   All right.   Dr. Stewart, I'm showing you

14   what's marked as Plaintiffs' Exhibit Number 9.

15   That is the letter that you sent to Judge Mihm?

16   A.   Exactly, yes.

17   Q.   I want to take you through some of this and

18   ask you to expand on your -- I guess I should start

19   off, Are the conclusions of this letter still the

20   conclusions that you hold regarding the provision

21   of mental health care at the RTUs at Dixon and

22   Pontiac?

23   A.   Yes, they are.

24   Q.   All right.   Let me start by asking you about

25   -- you start off with talking about the RTUs and

1    levels of care, but I want to back up a little bit
2    and talk about what exactly are the levels of care.
3    What does that mean in the -- in the prison context
4    or in the world in general?
5    A.   Well, levels of care generally imply that
6    based on the severity of someone's mental health
7    issues, they would be placed at an appropriate
8    level that would provide them care to address their
9    particular types of mental illness.  And so that
10   carries over in the real world and is paralleled in
11   the Department of Corrections where you have an
12   outpatient level of care where people are able to
13   function well enough with psychiatric and mental
14   health services provided to them on an outpatient
15   basis, like come into a clinic or make sure you get
16   medications, these sorts of things.

17        And then in the community, as we have in the
18   Department of Corrections, is that the next level
19   of care above outpatient is residential care.  And
20   in the Department of Corrections, it's referred to
21   as the RTUs -- residential treatment units -- and
22   this is where people have serious mental illness
23   but with the caveat that it impairs their ability
24   to function at the outpatient level.  So, they
25   require enhanced mental health treatment.

1    Then from there, the, the next level of care
2    would be inpatient unit.  So, residential unit --
3    residential treatment is located somewhere between
4    outpatient and inpatient care, but it's fair to say
5    that people in residential care have serious -- are
6    seriously mentally ill, that require a level of
7    care not available at the outpatient level.
8    Q.  And in the Department of Corrections,
9    inpatient care is provided currently at Elgin
10   Correctional Center; is that correct?
11   A.   That's correct.
12   Q.  And there are only about 50 or 60 residents
13   there at the current time?
14   A.   Less than that.
15   Q.  Okay.  So, leaving aside that small number of
16   people that are at Elgin, the people that are
17   housed in the RTUs at the Illinois Department of
18   Corrections are the sickest people in the entire
19   system; is that correct?
20   A.   Yes.
21   Q.  All right.  You go on to talk about the Mental
22   Health SOP Manual.  That's a document that the
23   Department of Corrections prepares for its own
24   internal use; is that correct?
25   A.   Yes.

1  Q.  All right.  And, for the record, this is
2  Plaintiffs' Exhibit 3.
3       And you're quoted here so I don't need to
4  switch exhibits.
5       MR. REES:  Alan, I'm sorry, just to -- I think
6  you said Plaintiffs' Exhibit.  I think you meant
7  Defendants' Exhibit.
8       MR. MILLS:  You're right.  I'm sorry.
9  Defendants' Exhibit 3.  Thank you, Doug.
10      MR. REES:  Oh, I'm sorry, it may be both.
11      MR. MILLS:  May be each.  I think it's the
12 same thing; it's the same exhibit.
13      MR. REES:  I'm sorry about that.
14      MR. MILLS:  That's okay.  It's either party's
15 Exhibit 3, which means we both think it's
16 important.
17 BY MR. MILLS:
18 Q.  So, but you quote it here in your report so we
19 won't switch exhibits; we'll just use the quote
20 you've given here.  I want you to talk about the
21 various portions of this you've highlighted here.
22      The first thing you talk about is based on
23 clear clinical evidence.  What, what does that mean
24 to those of us that are not mental health
25 professionals?

A.   Well, clear clinical evidence would be, based

on mental health evaluations, assessments,

empirical treatment, that it's obvious that a

person suffers from a mental illness.

So, it's from the clinical experience that the

staff would have with a particular patient.

Q.   It goes on to say that the clinical evidence

of significant functional impairment.

Again, if you could translate that for us that

are not mental health professionals?  What does

that generally mean?

A.   Well, it, it depends on which context we're

talking about, but in the prison context, a

functional impairment possibly could be not being

able to have a cellmate, inability to be in a less

restrictive housing area, not being able to eat

without supervision, not being able to basically

perform the activities of daily living without

close supervision.  That would significantly impair

an individual.

In the community setting, a functional

impairment may be a person's inability to be out in

public, to be in groups, to work, these sorts of

things.

Q.   So, it goes on to say these are people who

 1  cannot successfully reside in a general population

 2  housing unit?

 3  A.   Exactly.  Yes.

 4  Q.   And that's not necessarily a particular

 5  diagnosis.  It has to do with diagnosis plus

 6  functional impairment, correct?

 7  A.   Correct.  The functional impairment needs to

 8  be secondary to their psychiatric impairment, yes.

 9  Q.   But it could be -- basically any psychiatric

10  impairment could be serious enough that they would

11  have a functional impairment as well?

12  A.   Right.  It's not diagnosis-specific.

13  Q.   Okay.  It goes on to say an RTU level of care

14  includes placement in an RTU setting that only

15  houses offenders requiring a similar level of care.

16       What does that mean to you?

17  A.   That means that, based on the clear clinical

18  evidence, people that have serious mental illness

19  with associated functional impairment would all be

20  housed in the same general area.  It would be --

21  you would call it sheltered housing; that only

22  these people would be there as opposed to people at

23  the outpatient level or anything else.

24  Q.   So, it's not just that they're getting the

25  care; it's where they're housed as well matters in

1  this situation?

2  A.   Yes, based on the SOP Manual.

3  Q.   Okay.  And is that reflective of general -- of

4  general best practices or general practices that

5  are accepted in the mental health field?

6  A.   Yes.  We tend to -- not tend to, but we

7  separate patients based on the severity of their

8  mental illness and functional impairments into

9  certain cohorts, and we wouldn't necessarily mix

10 those.  So, you have a person that requires a

11 residential level of care; you're not going to have

12 a more high-functioning individual who's able to be

13 treated at the outpatient level.

14 Q.   All right.  Then is this your bolding?  I

15 don't know if this is your bolding or from the SOP,

16 but it says -- Enhanced Mental Health Treatment is

17 bolded here?

18 A.   That's my bolding.

19 Q.   Okay.  I take it you bolded it because you

20 thought it was important.  Can you tell us what

21 that means to you and why it's important?

22 A.   Well, you know, again, as we -- as the SOP

23 Manual has defined this particular patient cohort,

24 they state that they -- that these people in

25 residential treatment require enhanced mental

1  health treatment.  So, I think that is pretty

2  obvious to me, but the way I see that is they have

3  more frequent visits with mental health

4  professionals; they have additional treatments

5  available to them; they have more close -- their

6  medications are more closely supervised by

7  psychiatric providers; and they're in this milieu

8  therapy which you're housing all these people in

9  the same housing area.  Just the fact that they're

10  all there and mental health staff are available,

11  the milieu is part of the treatment.

12  Q.  Tell us a little bit about what you mean when

13  you say the "milieu" of the treatment.

14      Does that just mean the hours that they're

15  actually getting treatment, or do you mean

16  something beyond that?

17  A.  Well, in the community -- and this is

18  paralleled in IDOC -- is that you have all these

19  people in one unit.  So, let's take Dixon for a

20  second.  And you have one of the -- well, the STC

21  would be a good example, where people live in these

22  housing units where they share day time -- day room

23  time together.  They all go to the same -- they

24  have activities within the housing unit.  That

25  would be considered milieu therapy.

1  Q.  All right.  And then the next part you have

2  bolded is Structured Therapeutic Activities.  What

3  does that mean to you?

4  A.  Well, a structured therapeutic activity is

5  pretty much what the words imply, is that it's a

6  therapeutic activity which means that there would

7  be mental health professionals leading it.  Like a

8  -- like a group activity, a group therapy would be

9  a structured therapeutic activity.

10       And individual therapy with your mental health

11  professional or your psychiatric provider would be

12  a structured activity.

13  Q.  Well, you said a mental health professional

14  leading it, but suppose -- Harold, I think, in his

15  opening statement said something about playing

16  basketball.  Suppose there was a -- the coach of

17  the team happened to be a QMHP.  Would that make it

18  a therapeutic activity?

19  A.  It would certainly be an activity, and it

20  wouldn't hurt the individual to do that, but it's

21  not -- I don't think anyone would define that as a

22  structured therapeutic activity.

23  Q.  And why not?

24  A.  Well, you have to look at a lot of factors.

25  One, is it confidential?  Are people encouraged to

1    talk about their true feelings and then have it

2    reflected back by the therapist, and that you have

3    input from the other members that are in the same

4    group?

5        I don't see where, you know, a gym outing

6    would necessarily fulfill those requirements.

7    Q.   So, the milieu would include -- if I can try a

8    different phrasing, it has to be in a group setting

9    then where people are interacting with each other,

10   et cetera.  Is that fair?

11   A.   For the structured therapeutic activities?

12   Q.   Yes.

13   A.   Well, that's an example.  They also could be

14   -- individual meetings would be structured

15   therapeutic activities.

16   Q.   Individual with a therapist, not just alone?

17   A.   Yes.  Correct.

18   Q.   And you say -- you then go on to say generally

19   in group setting.  Is that true in general, or is

20   that just the way the Department of Corrections

21   works?  What does that mean?

22   A.   No, in general, group activities are used at

23   least in residential type settings in the

24   community.  There's a lot of value to have group

25   therapy because the person is able to get feedback

1   from the other group members as well as the
2   therapist and finds that the, the therapeutic
3   aspect of it is, is enhanced.
4   Q.   All right.   The Standard Operating Procedure
5   -- and I'm going to put the actual manual up on the
6   screen as soon as we can figure that out -- goes on
7   to describe some of those group therapies, and I'm
8   going to particularly point you to page 40 of that
9   document as soon as we get it up on the screen.
10       This is, again, I think both parties', but
11   it's Plaintiffs' Exhibit Number 3.
12       Amanda can take us to page 40, I think.
13       Okay.   So, on page 40, it gives some -- sorry.
14       MR. REES:   Alan?
15       MR. MILLS:   Yes.
16       MR. REES:   If you don't mind, what I found, if
17   you're able on the PDF to use the "search" function
18   at the top, you can plug in 40, and that way you
19   can go right to the page without scrolling through.
20       You know, just a tip as we go through these
21   bigger documents.   I've found that that's a good
22   way to negotiate these bigger documents.
23       MR. MILLS:   Great.
24       MR. REES:   I don't know if you're -- mine
25   shows it up in the bar at the left.

1       MR. MILLS:  Yes, I see it.  Okay.  We're
2   there, though, so --
3   BY MR. MILLS:
4   Q.   In the first little white dot in the middle of
5   the page, it says Group Therapy Outcome Assessment?
6   A.   Yes.
7   Q.   What, what does this mean in terms of -- why,
8   why do you have to have an outcome assessment for
9   group therapy, and what does such an assessment
10  look like?
11  A.   Well, the outcome assessment would be a way to
12  measure whether or not the structured therapeutic
13  activity resulted in the patient -- patient
14  improvement, remained the same, or actually
15  deteriorated over the course of the group therapy.
16  Q.   And why is that important for structured
17  therapeutic activities to include an assessment
18  component?
19  A.   Well, I mean, it's just important for every
20  sort of structured activity -- structured
21  therapeutic activity because you don't just
22  randomly put someone in a structured therapeutic
23  activity and hope they get better.
24      The therapeutic activity should be designed to
25  address a particular need of the patient.  And then

1    to be able to tell if it is effective, you need to

2    measure the improvement over the course of the

3    therapy.

4         That's the same thing you do with, with the

5    use of psychotropic medication.  You just don't

6    randomly throw a med at a person.  You pick a

7    medication that's specific to the person's needs,

8    and then you measure over the course of time

9    whether they're improved.

10   Q.  The very -- you talk about appropriate groups.

11   The next white dotted paragraph is titled Group

12   Placement Criteria.

13        Tell us a little more about what that means.

14   A.  So, at -- based on, you know, a comprehensive

15   assessment of a particular patient, the therapist

16   will -- in this case, hopefully it will be a

17   treatment team -- would identify certain issues

18   that they felt important to be addressed to help

19   the patient improve.

20        This is all about improving and addressing

21   their underlying serious mental illness and

22   hopefully to improve their ability to function so

23   that they could be returned back to a lower level

24   of care.

25        But as you identify issues for a particular

1    patient, you would then craft a treatment plan

2    based on the patient's needs.  So -- and if you're

3    going to use a group modality to address that, then

4    the group would necessarily need to be specific for

5    the patient's needs.

6         And then the patient would be assigned to that

7    group.  And as we just talked about, the

8    improvement, the lack of improvement or the

9    deterioration would necessarily have to be measured

10   over the course of the group therapy.

11        Then --

12   Q.   I'm sorry.

13   A.   No, please.

14   Q.   I cut you off.

15   A.   I was done.

16   Q.   Oh, sorry.  And you talked about having to

17   assess whether or not it works.  And what happens

18   if you assess it, and you see that it's either not

19   working or it's -- or people are getting worse?

20   What should the next step be?

21   A.   Well, then you would -- then the clinicians

22   would say, *Well, this, this therapeutic modality*

23   *isn't, isn't working, so we need to modify the*

24   *therapy* -- not modify the patient -- *modify the*

25   *therapy to address what would be beneficial*.

1  Q.  So, just sending everybody in a particular

2  unit to a particular -- to one group saying, *Okay,*

3  *this is the SMI group,* for example, would that

4  qualify under your -- under the structure you just

5  laid out?

6  A.  Well, I don't know if that example is

7  necessarily a good one because you could have a

8  group with everyone in it having serious mental

9  illness, and then the group could be designed to

10  help people accept, educate, et cetera, about

11  serious mental illness.

12      But let's say you have a trauma-based group.

13  Not everyone in prison necessarily would have

14  trauma-based issues.  So, just to randomly assign

15  everyone to a trauma group would be an example

16  where this -- what is stated here in the SOP Manual

17  is not being followed.

18  Q.  And I understand what you're saying with the

19  SOP Manual, but I want to back off from the manual

20  itself and just talk about what is good mental

21  health practice.

22  A.  Okay.  And do you have a question in

23  particular, please?

24  Q.  Yes.  In general, you, you talked about it's

25  not in compliance with the SOP.  Is it in

1  compliance with general practices in the mental

2  health care field?

3  A.   No.

4       MR. REES:  Object to the form, Your Honor.

5       I'm sorry.  Object to the form.

6       Judge, you're muted.

7       THE COURT:  Overruled.  Thank you.

8  BY MR. MILLS:

9  Q.   I think you've already answered, Dr. Stewart.

10 You said it was not in line with the mental health

11 practices in general?

12 A.   It is not.  You're not going to just assign

13 all patients to generic treatment because that's

14 not necessarily going to be effective.

15 Q.   All right.  Then the very next paragraph talks

16 about how most offenders or patients can function

17 in a group that is heterogeneous, but it suggests

18 that some cannot.

19      Why is that, and what do you do about it if

20 they can't?

21 A.   Well, you would -- again, based on your

22 initial assessment, you would feel that this person

23 could be in a heterogeneous group, and in a prison

24 setting, it would be different races, different

25 ages, different diagnoses.  Any sort of

1  differences, that would be a heterogeneous group.

2      And then you would find that based on the --

3  your measurement of a particular patient's progress

4  or lack thereof, you would see they're not doing

5  well in this type of group, and maybe they need to

6  be in a group that's more, more closely defined,

7  like schizophrenic group or a group for seniors or

8  something like that.  And so then you would change

9  the modality.

10 Q.  And if we can just scroll down to the top of

11 the next page, it gives some examples -- not at all

12 an exhaustive list -- of people who may not be

13 appropriate.

14     Do you agree that this list makes sense to

15 you?

16 A.  Yes.

17 Q.  And why is that?

18 A.  Well, you know, we talk about groups as if

19 they're the -- you know, the answer to everything.

20     There are patients that, based on their mental

21 illness and based on their backgrounds, et cetera,

22 are not amenable to group therapy.  So -- and so

23 you need to be able to make that assessment.  And

24 maybe the only way you can make that assessment is

25 assigning them to a group and see how they're doing

1  in it.

2      And so these are examples of, of individuals

3  who may not benefit from group therapy.

4  Q.  And if they don't benefit from group therapy,

5  then you have to try something else?

6  A.  You have to try a different treatment

7  modality, and it would be -- you know, individual

8  therapy would be a way to fill in that time.

9  Q.  So, at least as written, are the procedures

10  that are --

11      MR. REES:  Your Honor -- Alan, excuse me --

12  says internet unstable.  We missed what Dr. Stewart

13  said.  I don't know if that answer can be read

14  back.

15      THE COURT:  Jennifer, can you read the answer

16  back?

17      (The preceding answer was read back by the

18  reporter.)

19      MR. REES:  Thank you.

20  BY MR. MILLS:

21  Q.  At least as written, are the procedures we've

22  just gone through that are outlined in the Standard

23  Operating Procedural Manual, do they comply with

24  generally accepted mental health standards?

25  A.  Yes.

1    MR. REES:  Object -- object to the form, Your

2  Honor.  No foundation.

3    THE COURT:  Overruled.

4    THE WITNESS:  Yes.

5    Well, can you ask the question again so I make

6  sure I have it?

7  BY MR. MILLS:

8  Q.  Yes.  As written -- we'll talk about as

9  applied later.  But as written, do the standards

10  that we just went through that are laid out in the

11  Standard Operating Procedure Manual, do they comply

12  with the generally accepted way that mental health

13  care is provided in the community?

14  A.  Yes.  Yes, generally.

15  Q.  Okay.  Now, Illinois Department of Corrections

16  has four RTUs; is that correct?

17  A.  That's correct.

18  Q.  At Logan, Joliet, Pontiac and Dixon?

19  A.  Correct.

20  Q.  And you visited, during the course of your

21  monitoring in general -- not particularly this

22  hearing, but in general, you've visited all four of

23  those RTU units?

24  A.  I've been to all four of them many times, yes.

25  Q.  And you've reviewed mental health treatment

1   records, you've interviewed patients, talked to

2   staff, et cetera, correct?

3   A.   Yes.

4   Q.   And, again, is that sufficient, in your mind,

5   to be able to reach conclusions about how well they

6   are operating?

7        MR. REES:  Your Honor, I'm going to object to

8   the leading form of these questions.  If he could

9   ask them in an open-ended way?

10       THE COURT:  Sustained.

11  BY MR. MILLS:

12  Q.   I mean, I'm happy to do it again.

13       What have you done to assess whether or not

14  these RTUs are functioning properly?

15  A.   Well, I've visited all of -- I have visited

16  all of them during the course of my monitorship,

17  and, while there, I sit in on treatment when it's

18  available.  I interview class members.  I interview

19  staff.  I do a lot of observing.  And I also will

20  follow up with reviewing medical records of

21  individuals that I've interviewed.

22  Q.   Has your examination, review of these units

23  changed since COVID back in March of 2020?

24  A.   In some cases, yes.  The Department was never,

25  never really in compliance -- was never in

1   compliance with Item X(d) of the Settlement

2   Agreement, which is the one referred to as for

3   structured therapeutic activities, enhanced mental

4   health care.

5        There were examples at times of one facility

6   or another may have temporarily been in compliance,

7   but overall the Department has never been in

8   compliance.

9        Since COVID -- and I'll date that back to,

10  say, April of 2020 -- the amount of care has

11  significantly dropped off.

12  Q.  And have you ever raised this concern with the

13  executive staff of the Department of Corrections?

14  A.  Yes, I have.

15  Q.  And could you tell us, if you know, who

16  attended that meeting?

17  A.  Well, again, just put -- make sure I get it in

18  the right context.  So, my last site visit before

19  everything got shut down was in March of 2020.  I

20  was at Joliet.  And after that, due to COVID

21  restrictions, travel restrictions, et cetera, I was

22  just doing virtual tours.

23       But it became very clear -- and the Department

24  was very out front with me on these virtual tours

25  -- of how little care they were actually providing

 1  to people --

 2       MR. REES:  Your Honor --

 3  A.   -- in a variety of settings, but in particular

 4  the --

 5       MR. REES:  Your Honor, excuse me.

 6       Dr. Stewart, sorry to interrupt.

 7       I object to this testimony about a visit to

 8  Joliet in March of 2020.  This is about Pontiac and

 9  Dixon.

10       THE COURT:  Sustained.

11  BY MR. MILLS:

12  Q.   Yes.  To clarify, are you talking now about

13  your visit to Joliet, or are you talking about the

14  virtual tours you did elsewhere?

15  A.   Well, I only mentioned Joliet to put it in

16  context that that was the last site -- on-site tour

17  I did during that period of March 2020 through the

18  end of November 2020.

19  Q.   All right.  Have you done any sort of

20  examination of either Pontiac or Dixon since that

21  time, whether it was in person, virtual or anything

22  else?

23  A.   Yes.

24  Q.   And tell us what you've done.

25  A.   I've been to both facilities twice.

1    Q.   In person, you're talking about?

2    A.   Excuse me.  No, I -- I went to Pontiac, yes,

3    prior to COVID.  Since COVID, I've been there at

4    least once, yes.

5    Q.   Have you also done virtual tours of some of

6    these prisons -- or virtual visits, I should say,

7    to one or --

8    A.   Yes.  Yes, I have.

9    Q.   And during those virtual visits, have you

10   discussed anything with the staff at those prisons?

11   A.   Well, during the --

12        MR. REES:  Your Honor -- Your Honor, excuse

13   me, just object to foundation.  We need to know

14   what visit he's talking about so we know what staff

15   he's supposedly talking about.  So, we think we

16   have a foundation objection here.

17        MR. MILLS:  At this point, he's never had that

18   conversation, Your Honor.

19        THE COURT:  Sustained.

20        All right.  Now become more specific.

21   BY MR. MILLS:

22   Q.   Let's start with Dixon.  Do you remember any

23   of the virtual tours you had at Dixon?

24   A.   Yes.

25   Q.   And can you tell us the date of one such tour?

1  A.   Oh, I'm sorry, I --

2       THE COURT:  It would be most helpful to know

3  the last one, the most recent.

4       THE WITNESS:  My most recent tour, Your Honor,

5  of Dixon was in October of '21.

6       THE COURT:  Thank you.

7  BY MR. MILLS:

8  Q.   And was that on-site, or was that virtual?

9  A.   That was on-site.

10 Q.   All right.  And during that tour, were you

11 able to determine anything about the level of care

12 being provided in the RTUs, in the --

13      MR. REES:  Your Honor -- Your Honor, excuse

14 me.  It appears that Dr. Stewart's reviewing a

15 document while he's testifying, and if we confirm

16 that that's the case, then he should be directed

17 not to do that during his testimony.

18      THE COURT:  Technically, I guess that's

19 correct.

20      Are you referring to a document, Doctor?

21      THE WITNESS:  Your Honor, I have some excerpts

22 of documents here, and I, I was, prior to -- when I

23 was getting ready to answer this question, I did

24 refer -- I did glance at it.  But I won't do that

25 if that's the Court's preference.

1          THE COURT:  Well, if you can remember without
2    looking at it, let's do that.  If you need to look
3    at it to refresh your memory, then tell us that you
4    need to do that.  Okay?
5          THE WITNESS:  Yes, Your Honor.
6          MR. REES:  Your Honor, if he does do that,
7    we'd like to know what he's using to refresh his
8    memory.
9          THE COURT:  Are you looking at your notes --
10   your own notes or what?
11         THE WITNESS:  In this particular example, Your
12   Honor, I was looking at an excerpt from the -- my
13   midyear report to the Court of November 2020.
14         THE COURT:  I'm sorry.  What?
15         THE WITNESS:  I was looking at the -- a
16   portion of my report that I had submitted to the
17   Court in November 2020.
18         THE COURT:  Okay.  Thank you.
19         Go ahead.
20   By MR. MILLS:
21   Q.  All right.  So, you were describing an
22   in-person tour that you did of Dixon in October of
23   2020.  Am I right?
24   A.  October '21.
25   Q.  '21.  Okay.  And what did you observe at the

1   RTU -- at the RTUs there?

2   A.   Well, a lot of different things.

3   Q.   Okay.  Let's start with -- and there are

4   various parts of Dixon, correct?

5   A.   Correct.

6   Q.   So, let's start off with the, the -- what I

7   call the cottages, the STC.

8   A.   Yes.

9   Q.   And did you tour those as part of your

10   examination of Dixon?

11   A.   Yes.

12   Q.   And what did you see in terms of enhanced --

13   or in terms of in-person treatment that was being

14   provided?

15   A.   You know, when I was touring, touring these

16   cottages, which is the STC, the first thing that

17   was striking to me is that I didn't observe any

18   treatment going on.  And you figure in a place --

19   at a residential treatment unit that I would just

20   coincidentally run into people that were involved

21   in treatment, groups going on, or different sort of

22   therapeutic activities, and I didn't.  That was the

23   -- that was my first thing that I noticed.

24        That was the same thing that I noticed in the

25   X House because I wanted to sit in and to see what

1    the, the quality of the treatment modalities --

2    treatment was.  So, that was the first thing.

3         And then I toured the spaces.  So, I saw the

4    spaces; I didn't notice any treatment going on.  I

5    went to the gym where -- that's associated with the

6    STC and was informed that there was some

7    construction going on.

8         But that was my overall impression of the STC.

9    I didn't notice any treatment happening.

10   Q.  Did you talk to any of the prisoners in the

11   STC to determine whether or not there was, in fact,

12   treatment that they had been to?

13   A.  Yes.  And if I can summarize what I learned

14   from the different class members, was --

15        MR. REES:  Object.  Objection, Your Honor.

16   There's no question pending.

17        THE COURT:  Overruled.

18        Go ahead.

19        MR. REES:  Your Honor, I would also object to

20   hearsay from what prisoners told Dr. Stewart.

21        THE COURT:  Overruled.

22        Go ahead.

23        MR. REES:  Your Honor, one more:  I'll object

24   to the lack of foundation.  We don't know what

25   prisoners he's talking about.

1       THE COURT:  Well, I assume that he will be as

2   specific as possible.  We know that we're talking

3   about people who are STC on the STC unit at that

4   time.

5       Do you remember names, Doctor?

6       THE WITNESS:  I don't have any names for this

7   particular activity when I was touring, Your Honor.

8   I would -- my method would be just to see if people

9   were out of their cells --

10      THE COURT:  Okay.

11      THE WITNESS:  -- and speak to them in general.

12   Introduce who I was and just speak to them.

13      THE COURT:  All right.  Go ahead, over

14   objection.

15   A.   What I found out generally is that the people

16   -- the class members in the STC were fairly

17   consistent in that they talked about having

18   community meetings every day, although they were

19   often canceled.  That they may be in one and rarely

20   two groups, structured therapeutic groups.  And

21   that they would meet with their MHP monthly, and

22   they would meet with the psychiatric provider

23   monthly.

24   Q.   Did you talk to the staff at the STC at all?

25   A.   You know, I did, but I don't recall the exact

1  content now.

2  Q.  As part of your tour of the STC, did you also

3  go to the classroom building?

4  A.  Yes.

5  Q.  And did you observe any groups or any other

6  therapy happening there?

7  A.  No, I didn't observe -- like I testified

8  previously, I didn't observe any treatment going on

9  while I was there.

10 Q.  All right.  You started to talk about X House.

11 X House is the other part of the RTU at Dixon; is

12 that correct?

13 A.  That's correct.

14 Q.  And did you go there as well during your

15 October of '21 tour?

16 A.  Yes, I did.

17 Q.  And did you observe any treatment going on

18 there?

19 A.  In the X House I did observe a community

20 meeting because I was -- I was being escorted by

21 the warden, and I asked her particularly that I

22 wanted to observe a treatment group going on.  And

23 the one that I was able to see was there was a

24 community meeting on one of the wings, the

25 non-restrictive housing wing.  I don't remember

1    offhand which one it was.

2    Q.   And what did you observe about this community

3    meeting?

4    A.   Well, first of all, I thought it was pretty

5    chaotic.  I mean, it didn't have a discrete

6    starting time and ending time; people just sort of

7    drifted in and out.

8         The next thing that was really obvious to me

9    was that there were numerous custody officers

10   within the community meeting; there was at least

11   two, sometimes there would be a third because

12   they'd be walking through this day room type area.

13        It, it was run by a BHT, and I never really

14   understood what the purpose of it was.  It, it

15   wasn't a community meeting in the sense that I'm

16   very familiar with community meetings in

17   residential treatment units.  It was -- this BHT

18   was reading from a pamphlet about characters from

19   the Walt Disney movies, and then she would ask the

20   individuals if they had -- if they had similar

21   experiences.  And that was the extent of it.

22        And, and there was maybe about a half dozen

23   class members there, but some of them would get up

24   and walk out, would walk around, would leave and

25   then come back.  It was very disorganized.

1    Q.   And in your professional opinion, does that

2    constitute structured therapeutic activity?

3    A.   No.

4    Q.   Why not?

5    A.   Well, one, there was no confidentiality.  The

6    guards were there.  People were walking through

7    that weren't in the group.  There wasn't -- I

8    didn't hear the group leader give any feedback in,

9    in any sort of way that a therapeutic group would

10   be operated.

11        It was -- again, like I was saying, it was

12   very chaotic, and I wasn't sure what was really

13   going on in there.  It was more like just about 20

14   minutes of people sitting in this room together

15   that weren't -- they weren't really interacting

16   with each other and/or the therapist.

17   Q.   You have subsequently reviewed several mental

18   health files of prisoners in the X House?

19   A.   Yes.

20   Q.   And have you ever seen any mental health notes

21   or other records relating to these community

22   meetings?

23   A.   No, I've never seen anything in there about

24   community meetings per se.

25   Q.   And does that matter as far as your opinion as

1  to whether or not this counts as a structured

2  therapeutic activity?

3  A.   Well, yes, I mean, that's one of the aspects

4  of it that I base my opinion that this is not a

5  structured therapeutic activity.

6       As we've gone over earlier this morning, the

7  SOP Manual calls for individual notes taken on each

8  person who attended the group and with reference to

9  whether or not the particular issue that they're

10 trying to deal with is being addressed and if

11 they're improving or not improving or they're

12 deteriorating.  I saw none of that.

13 Q.   Did you talk -- you said -- you testified

14 earlier you talked to prisoners at the STC.

15      Did you do the same thing in X House?

16 A.   Yes.

17 Q.   And do you remember the names of any of the

18 individuals you spoke to there?

19 A.   When I was in the non-restrictive housing wing

20 where I observed the community meeting, several of

21 the group members -- several of the individuals who

22 had attended the community meeting came up and

23 spoke to me afterwards with some particular

24 concerns they had.  And in that group, I don't -- I

25 don't have names of the people that I spoke with.

1  Q.  All right.  And if you could summarize what

2  they told you?

3      MR. REES:  Your Honor, just for the record,

4  same objection.

5      THE COURT:  Sure.  Overruled.

6      Let me ask another clarifying question here,

7  Doctor.  Were you always accompanied by staff when

8  you were going around?

9      THE WITNESS:  Your Honor, I was accompanied by

10  staff to, to -- like, for example, the warden

11  escorted me into this one wing where the community

12  meeting was going on.

13      THE COURT:  Right.

14      THE WITNESS:  And then she was -- she, she and

15  I didn't sit together during the community meeting.

16  I sat there by myself.

17      But overall, I was escorted.  When I do all my

18  site tours, I'm escorted.

19      THE COURT:  All right.  Go ahead with your

20  answer.

21  A.  If I remember the question, it had to do with

22  people that I spoke to at that particular

23  non-restrictive housing wing in the X House.

24  Q.  Yes.

25  A.  The conversations were initiated by the class

1  members, and they were -- they were telling me

2  about serious concerns they had about their

3  treatment, about whether they were getting the

4  right medications.  They had concerns about side

5  effects.

6       So, it -- in this particular case, they were

7  presenting to me concerns they had about their own

8  treatment or lack thereof and asking me if I could

9  do anything about that.

10 Q.  And were you able to gain any information

11 about whether or not more traditional group therapy

12 had been occurring in that wing anyway?

13 A.  And with these individuals, they said that the

14 community meetings were their major source of group

15 activity.

16 Q.  And how long did this tour last of, of the RTU

17 in general at Dixon that day?

18 A.  Well, on that day at Dixon, I was there -- I

19 got there in the afternoon of one day so I spent

20 the afternoon, and then I came back the next day

21 and spent the morning up until the mid-afternoon.

22 Q.  And were you always there during the day

23 shift, or were you there during the evening or

24 overnight shifts as well?

25 A.  No, both times I was there during the day.  I

1  got there real early the second day because I

2  wanted to observe medication pass.  But other than

3  that, it was during the daytime.

4  Q.  When you observed the medication pass --

5  A.  Yes.

6  Q.  -- anything strike you?

7  A.  No, I didn't -- I didn't see anything

8  necessarily untoward about the medication pass.

9  Q.  All right.  Did you have any discussion with

10  the warden or anybody else on the executive staff

11  at Dixon during this tour?

12  A.  Yes.

13  Q.  And, first of all, who was it with?

14  A.  Well, that day at Dixon, the second day where

15  I observed community meeting, Dr. Hinton was there.

16  And again, he was in the periphery.  He wasn't

17  accompanying me necessarily, but he was there

18  moving throughout the facility.

19      Then at the end of my tour, the facilities

20  like me to have an exit interview with them to let

21  them know what I found.  And on the exit interview,

22  that's when the legal counsel for the Department,

23  Melissa Jennings, is on the phone and also other

24  executive -- members of the executive committee.

25  And I couldn't tell you who exactly was on the

1  phone that particular day.

2      But I, I, I mentioned to them that I didn't

3  feel that the community meetings should be counted

4  as structured therapeutic activities for the

5  reasons that I've already stated.

6  Q.  And what response, if any, did you receive?

7  A.  Oh, I, I, I remember Ms. Jennings' statement

8  to me.  She goes, *You know, Dr. Stewart, I, I, I*

9  *really enjoy -- I have --* something about she

10  enjoys telling me when I'm wrong.  And she said,

11  *These are structured therapeutic activities*.

12      And, and, you know, I wasn't going to argue

13  there in the exit interview.

14      I said, *Well, no, I don't feel that they are*,

15  and just left it at that.

16  Q.  Since that tour, have you had any other

17  contact with Dixon, virtual or otherwise?

18  A.  Yes.

19  Q.  And tell us when that occurred.

20  A.  That occurred -- and again, what I'm referring

21  to now are my notes that I took during some virtual

22  interviews, and these, these have been submitted to

23  the Court and to parties.

24      On January 6th of this year, I -- the

25  Department had set up a virtual interview for me,

 1  and so I was able to interview five members from

 2  the RTU at Dixon and then subsequently reviewed

 3  their charts.

 4  Q.  And did you -- was it just interviewing

 5  prisoners, or did you talk to anybody on the staff

 6  at that point?

 7  A.  At that time, it was just interviewing the

 8  class members.

 9  Q.  Okay.  All right.  We'll come back to that, to

10  your most recent review of charts and prisoners in

11  a minute.

12      Other than your tours of the prisons, have you

13  had any either by telephone or in-person meetings

14  with the statewide executive staff since COVID

15  restrictions went into effect?

16  A.  Yes.

17  Q.  And when did that occur?

18  A.  And again, to refresh my memory, I'm looking

19  at an excerpt from the midyear report of November

20  2020, page 9 in particular.  It's the Executive

21  Summary.

22      And I had asked to have a telephone conference

23  with executive leadership, and that occurred on

24  August 31st, 2020.

25  Q.  Which members of the executive staff were

1  there?

2  A.   It was --

3       MR. REES:   Your Honor --

4  A.   -- Directors Hardy, Smith and Simmons as well

5  as --

6       MR. REES:   Your Honor, I just want the record

7  to be clear that, you know, he's, he's reading this

8  from his midyear report.   He really should testify;

9  and if they need to refresh his recollection, they

10 can do that.

11      THE COURT:   Well, under these circumstances --

12 you have the report, correct?

13      MR. REES:   Yes.

14      THE COURT:   All right.   I'm going to allow him

15 to refer to it.

16      Go ahead.

17 A.   So, I mentioned Deputy Directors Hardy, Smith

18 and Simmons as well as the chiefs of -- chief of

19 Programs, Operations and Legal.

20 Q.   And what was the subject matter of this

21 meeting?

22 A.   The subject matter of this meeting was

23 discussing the impact of COVID on the mentally ill

24 class members.

25 Q.   And did you have any particular points you

1  made during that meeting?

2  A.    The points that I made during that meeting

3  was --

4      MR. REES:  Your Honor, I'm sorry to interrupt,

5  but when you asked --

6      THE COURT:  Go ahead.

7      MR. REES:  When you asked if we have this

8  document, it's somewhere.  We have it somewhere.

9  But this was not identified as an exhibit by the

10  plaintiffs, nor us, and so I don't have this handy.

11  I can't look at it.

12      I have no idea -- way to follow along with

13  Dr. Stewart, you know, reading from certain

14  sections of that November 2020 report.

15      THE COURT:  All right.  I understand that.

16  I'm going to allow it anyway, and I hope someone

17  with you can locate that document.

18      You have the document, I believe.

19      MR. REES:  Well, I -- maybe Plaintiffs could

20  give it to us.  But we'll, we'll see if we can find

21  it, Judge.  It's not so easy, given the remote

22  setup we're in.

23      THE COURT:  I know.  Okay.

24      Plaintiffs have that document?

25      MR. MILLS:  We can find it, Your Honor.

1          THE COURT:  All right.  Would you send it to

2    him right away as soon as you do that?

3          MR. MILLS:  As soon as we find it, we will

4    send it to Mr. Rees.

5          THE COURT:  Thank you.

6          Go ahead, Doctor.

7          THE WITNESS:  And, Your Honor, I just want to

8    point out that the only part that I referenced was

9    to get the names of the people that were on the

10   phone call.

11         THE COURT:  Okay.

12         THE WITNESS:  I'm not referring to the

13   document anymore.

14         THE COURT:  All right.

15   A.   So, I believe the question was, What was the

16   content of the discussion?

17   Q.   Right.

18   A.   And so, figure now, this is August of 2020, so

19   there had been several months of scrutiny on the

20   effect of COVID and in the particular area that I

21   was looking at, the effect of COVID on the mentally

22   ill and actually the non-mentally ill.  And --

23         MR. REES:  Your Honor, I'm sorry.

24         Dr. Stewart, I'm sorry to interrupt.  What

25   page are you referring to?

1     THE WITNESS:  I'm not referring to any page

2  now.

3     MR. REES:  Well, when you were referring to

4  the executive meeting, do you mind giving me that

5  page?

6     Judge, I'll let you know that I did pull it

7  up.

8     THE COURT:  Okay.

9     MR. REES:  Could I just get the reference when

10  you were referring to the meeting, page 9?

11     THE WITNESS:  It's Midyear Report November

12  2020, page 9, included in the Executive Summary.

13     MR. REES:  All right.  Thank you.  Sorry for

14  interrupting.

15  BY MR. MILLS:

16  Q.  You were about to tell us what your concerns

17  were that you raised with the executive staff.

18  A.  Well, based on the initial research data, the

19  effects of COVID on mentally ill showed that that

20  was a tremendous stress.  And people with

21  pre-existing mental illness as well as people with

22  non-pre-existing mental illness were

23  decompensating, were deteriorating, where people

24  were developing mental illness because of this

25  overwhelming stress of COVID.

1      And you gotta remember, back then, we didn't

2    really know a lot about it, thought that if you got

3    it, you were absolutely going to die and all these

4    sorts of things.  And people were.

5      So, I conveyed that to the group on the phone

6    call because I had gotten information in some of my

7    virtual visits where their caseloads had increased

8    since COVID started.  And so just mentioned that.

9      And then I remember asking to make sure that

10   we were in agreement about something.  I said, *Can*

11   *we all agree that the less people are taken out of*

12   *their cells* -- we're talking about class members

13   with serious mental illness -- *the more issues*

14   *you're going to have as far as acting-out*

15   *behaviors, self-mutilations, suicide attempts,*

16   *assaults, fights, et cetera?*

17     And everyone on the call agreed to that.  They

18   agreed in principle that the more you keep a

19   mentally ill individual locked in a cell, the worse

20   their condition becomes and that it's manifested in

21   the various things I was saying about self-harm,

22   aggressiveness, assaults, et cetera.

23     And, and I really was trying to appeal to them

24   to say, look, it's to your advantage to do whatever

25   you can to get the class members with serious

1  mental illness out of their cells because it's
2  going to decrease the work for you and your staff.
3      And they were all in agreement, where all
4  said, *Yes, we agree.  The more we can get people*
5  *out of their cells and provide any kind of*
6  *treatment, we're going to decrease the amount of*
7  *acting out.*
8      So, that was the content of the discussion.
9  Q.  And did you have a discussion about whether or
10 not you would need more or less mental health
11 treatment during COVID?
12 A.  I mentioned that because of the tremendous
13 stress of COVID, they would likely need to enhance
14 their care, you know, step it up a little bit.
15 Q.  And was there any reaction by the executive
16 staff to that statement?
17 A.  No.  People were in agreement.
18 Q.  Okay.  Have you had an opportunity to review
19 the administrative quarantine plan that the
20 Department of Corrections issued?
21 A.  Yes.
22 Q.  All right.  If we can show -- share screen,
23 Plaintiffs' Exhibit Number 5, and if we can direct
24 your attention to the top of page 2.
25      And this is a discussion of what the Office of

1  Mental Health Management has defined as primary
2  duties.
3       Do you agree with these as being the things
4  that ought to continue during the COVID crisis?
5  A.   Yes.
6  Q.   And the fourth one -- or the third one is
7  Individual Treatment Planning?
8  A.   Yes.
9  Q.   Why, why does that need to continue?
10 A.   Well, one, individual treatment planning is
11 the basis of treatment.  You have to have a
12 treatment plan, and so that remains important
13 regardless if it's during COVID or not.
14      And, and, and the Office of Mental Health
15 Management has defined that as being a critical
16 task -- well, not a critical task, a primary duty.
17 Q.   The very next line is Group and Individual
18 Psychotherapy?
19 A.   Yes.
20 Q.   And why is that important during COVID?
21 A.   Well, again, I would say it's important all
22 the time, but especially when you have the added
23 stress and restrictions applied to class members
24 during the COVID period.
25 Q.   And the next one talks about Regularly

1  Scheduled Assessment Contacts.

2      Now, first of all, what does an assessment

3  contact mean?

4  A.   I take that to mean the monthly visits that

5  class members have with their MHP, the visits they

6  have with their psychiatric provider, as well as

7  treatment team contacts.

8  Q.   And what sort of assessment is supposed to

9  happen during those contacts?

10  A.   Well, the assessment in general is just to

11  determine how well a person is doing or how poorly

12  a person is doing, and that based on their

13  presentation to you at that particular moment, you

14  may come up with different treatment modalities

15  which are thinking about what's going to be in the

16  best interest of the patient.

17  Q.   All right.  And then have you also had an

18  opportunity to review the medical quarantine

19  policies for Dixon?  Start with Dixon.

20  A.   Yes.

21  Q.   And if you can show us Plaintiffs' Exhibit

22  Number 6, and again taking you to page 2 of that

23  one.

24  A.   Yes.

25  Q.   Think we'll have it on the screen in a minute.

1  Yes.  Okay.

2      And again, on page 2 we're talking about

3  mental health care, I believe -- yes, right, in the

4  middle of the page there.

5  A.  Yes.

6  Q.  Same -- the same thing is repeated here,

7  correct?  Individual Treatment Plans, Group and

8  Individual Therapy and Regularly Scheduled

9  Assessments?

10 A.  Correct.

11 Q.  And they're important during a medical

12 quarantine just as they were during the

13 administrative quarantines, correct?

14 A.  Well, they're, they're important all the time.

15 Q.  And then if we go down one more page, it talks

16 about the RTU, about in the middle of the page

17 there.  And it says, Regular and consistent

18 therapeutic contact shall be maintained.

19     Again, what does that mean to you?

20 A.  That -- I read that as that their treatment

21 should continue as it was prior to the COVID

22 restrictions.

23 Q.  And these are the plans that the Department

24 made for -- during a medical quarantine, correct?

25 A.  Correct.

1  Q.  All right.  Have you seen this similar

2  document, the medical quarantine plan for Pontiac

3  Correctional Center?

4  A.  Yes, I have.

5  Q.  All right.  That's Plaintiffs' Exhibit

6  Number 7, and again, we'll go to page 3 this time

7  under Mental Health.

8      Again, it has the same three requirements of

9  Individualized Treatment Plan, Group and Individual

10  Psychotherapy, and Regularly Scheduled Assessments,

11  correct?

12  A.  Correct.

13  Q.  And I assume it's important at Pontiac for the

14  same reasons as it was important at Dixon and

15  statewide?

16  A.  Yes.

17  Q.  And then one more page down, it again has a

18  section on the RTU in particular.

19      And again, at the bottom of our screen,

20  Regular, consistent therapeutic contact shall be

21  maintained?

22  A.  Yes.

23  Q.  The same thing here at Pontiac as it did when

24  we just discussed it at Dixon?

25  A.  Correct.

1  Q.  And have you seen a schedule that they put
2  together for group therapy at Pontiac Correctional
3  Center?
4  A.  Yes, I have.
5  Q.  And if we could put up on the screen then -- I
6  believe it's Plaintiffs' Exhibit 41 -- Cancellation
7  Chart.  So you can all see it.  There you go.
8       What this --
9       THE COURT:  Excuse me, what facility is this?
10      MR. MILLS:  This is Pontiac Correctional
11 Center, Your Honor.
12      THE COURT:  And what is this?
13      MR. MILLS:  My understanding is this is the
14 schedule of groups that were supposed to happen.
15      THE COURT:  All right.  Thank you.
16 BY MR. MILLS:
17 Q.  Dr. Stewart, have these groups actually
18 occurred?
19 A.  The overwhelming majority of them have not
20 occurred.
21 Q.  And this was the plan that was put together
22 for -- during COVID, correct?
23 A.  Correct.
24 Q.  And looking at it, are the majority of these
25 canceled because of COVID?

1       MR. REES:  Object to the form and foundation.

2       THE COURT:  Sustained as to foundation.

3   BY MR. MILLS:

4   Q.  Well, I guess the document speaks for itself.

5       There are some that indicate on this chart

6   that they are canceled for medical quarantine.  For

7   example, if you look at the Friday chart, the

8   Friday list on the far right, you'll see that there

9   are several there for medical quarantine, correct?

10  A.  Yes.

11  Q.  But the rest of the chart, I see lots of

12  "canceled," but they mostly seem to say "low

13  security staffing."

14      Is that your understanding of what this chart

15  shows?

16  A.  That's my understanding, yes.

17  Q.  So, is it fair to say, therefore, that the

18  reason that they're not providing these -- all of

19  these groups at Pontiac was not because -- at least

20  for this week, in the first week of December, was

21  not because of COVID but was because of staffing?

22      MR. REES:  Object to the form.

23      THE COURT:  Overruled.

24  A.  Well, as you pointed out, there are some that

25  are listed canceled due to medical quarantine, but

1  it appears that the majority of these are due to

2  low security staffing.

3  Q.   Let's switch to Pontiac for a minute in terms

4  of what you've done.

5       Do you recall the last time you were

6  physically at Pontiac Correctional Center?

7  A.   In August of 2021.

8  Q.   And did you tour the RTU at that point?

9  A.   Yes.

10  Q.   And what did you determine in terms of -- or

11  what did you observe in terms of therapy that was

12  going on?

13  A.   I -- when I -- to answer that question fully,

14  when I -- when I got to Pontiac, I, I let people

15  know what I wanted to accomplish, and I let them

16  know that I wanted to sit in on a group therapy in

17  the RTU.

18       So, it was the situation like in Dixon.  I got

19  there for the afternoon of one day, and then I was

20  there the whole next day.

21       So, on the second day I was there, there was a

22  group that they invited me to sit in on.  And when

23  I was sitting in there, the members -- I believe

24  there was three or four class members in the group

25  -- were telling me that this is the first group

1  that they've been in in six weeks, and that -- they

2  said, *It's real clear they just put this on for*

3  *you.*

4      That's what the class members told me.

5  Q.  Have you subsequently looked at medical

6  records or mental health -- the mental health file

7  for some prisoners at Pontiac?

8  A.  Yes.

9  Q.  And did that review indicate that, in fact,

10 there were more groups running than the prisoners

11 had indicated?

12 A.  No.  The prisoners were, were -- based on the

13 review of the records that I have been able to

14 review this last month, what the class members told

15 me back in August was -- is -- was consistent.

16 Q.  After August, have you had any other contact

17 with Pontiac, virtual or in person?

18 A.  No.

19 Q.  Have you attempted to?

20 A.  Yes.

21 Q.  And what happened?

22 A.  Well, I, I wanted to do interviews of class

23 members at Pontiac, as I did with Dixon, and I was

24 told that, due to medical quarantine, that was not

25 possible.

1  Q.   Did you obtain -- did you obtain medical

2  records from anybody at Pontiac?

3  A.   And then the people that I had selected to

4  interview, I requested those records and then

5  subsequently reviewed those charts.

6  Q.   And have you had any discussions with anybody

7  from the defendants' side regarding, regarding

8  Pontiac since the August visit?

9  A.   I had a, a brief discussion with Dr. Hinton a

10  few weeks ago, and I was asking him about what was

11  considered to be structured therapeutic activities

12  both at Dixon and Pontiac.  But that's the extent

13  of it.

14  Q.   And what was your discussion with Dr. Hinton?

15  A.   Well, I was just -- I just asked him what the

16  Department considers a structured therapeutic

17  activity.

18  Q.   And what was his response?

19  A.   His response was that any staff-facilitated

20  activity was considered structured therapeutic

21  activity.

22  Q.   And did he point to any of those at Pontiac

23  that were occurring?

24  A.   No, he didn't point out any particular ones at

25  Pontiac.

1  Q.  Are they doing -- at least to your knowledge,

2  are they doing these sort of community meetings

3  that you discussed at Dixon at Pontiac?

4  A.  I'm not aware that they do community meetings

5  at Pontiac.

6  Q.  Are any sort of out-of-cell activities that

7  they were regularly doing for the people in the RTU

8  at Pontiac?

9  A.  Again, not, not based on my chart reviews.

10  There's a lot of stuff scheduled, but as we saw

11  earlier, most of those -- most of those activities

12  never occurred because -- canceled for a variety of

13  reasons.

14  Q.  Any -- anything at all that you would consider

15  therapeutic happening at Pontiac for the people in

16  the RTU?

17  A.  Not based on my visit or my chart reviews.

18      THE COURT:  Would this be a good place to

19  stop?

20      MR. MILLS:  You mean for a break, I assume,

21  rather than stop?

22      THE COURT:  Yes.

23      MR. MILLS:  Yes, Your Honor, that's fine.

24      THE COURT:  How much direct do you have left?

25      MR. MILLS:  I would say maybe 20 minutes.

1    THE COURT:  Great.  All right.  Well, we'll

2  take a 15-minute break.  Thank you.

3    MR. MILLS:  Thank you, Judge.

4    THE COURT:  15 minutes.

5    (Recess at 10:34 to 10:48 a.m.)

6    THE COURT:  Okay.  Go ahead, Mr. Mills.

7    MR. MILLS:  Thank you, Judge.

8  BY MR. MILLS:

9  Q.  You mentioned exit interviews and the

10  interview -- or the discussion with the executive

11  staff.  I just want to clarify, in all of those

12  discussions you had, someone from IDOC legal

13  counsel is present and participating in those

14  meetings; is that correct?

15  A.  Yes.

16  Q.  And no one has ever -- has shown you minutes

17  or notes or a memorandum based on those meetings,

18  correct?

19  A.  I've never seen any notes from those meetings.

20  Q.  All right.  I want to go back to Dixon here

21  and dig in a little bit deeper.

22    We talked about different parts of Dixon.  I

23  just want to clarify, make sure we're all on the

24  same page here.

25    Did I understand you correctly that a portion

 1    of Dixon comes under the STC which look like the

 2    individual housing units -- cottages, I call them;

 3    is that right?  Is that your understanding?

 4    A.    That's my understanding.

 5    Q.    And then there's X House, which I think you

 6    said has two different parts to it?

 7    A.    Correct.  There's a restrictive housing wing

 8    and three non-restrictive housing wings.

 9    Q.    All right.  And the restrictive housing wing

10    is C and A, B and D; they just give them letters,

11    right?

12    A.    Correct.

13    Q.    And I, I think that the initials that they

14    use -- and, I'm sorry, Your Honor, I really hate

15    these initials, but my understanding is that the A,

16    B and D, the general population part is the DPU; is

17    that correct?

18    A.    I believe so.

19    Q.    And then the DPX is the restrictive housing

20    portion?

21    A.    Yes.

22    Q.    C wing.  Okay.

23          MR. MILLS:  If you would -- Amanda, if we can

24    share the screen for Plaintiffs' Exhibit 30 which

25    is a big spreadsheet.

1    Judge, we've given you various -- this is a

2  PDF, but I think it comes across much clearer on

3  the screen than it does in the PDFs.  It's very

4  hard to make copies of, you know, all of the

5  various pages in a spreadsheet.  We did our best.

6    THE COURT:  That's fine.

7  BY MR. MILLS:

8  Q.  And I want to particularly direct your

9  attention to Building 148 which, my understanding,

10 is X House.  Do you agree?

11 A.  Yes.

12 Q.  All right.  Okay.  Starting at the far left,

13 we have what looks like a schedule; it has Monday

14 and then times, et cetera, going all the way down

15 through Tuesdays and Wednesdays, et cetera, for

16 things that happened.

17    And that's the overall schedule, but what I

18 really want to focus you on is if we scroll all the

19 way to the right of that, where it has the

20 individual breakdowns.

21    All right.  What's your understanding of what

22 this section of this spreadsheet shows?

23 A.  My understanding is that this lists the

24 particular class members who attended a particular

25 activity on a given day and time.

1  Q.  And this --

2       MR. REES:  Your Honor, excuse me.  Could we

3  get some foundation, find out if Dr. Stewart's ever

4  seen this document before or used it?

5       THE COURT:  Okay.

6  BY MR. MILLS:

7  Q.  Have you seen this document before,

8  Dr. Stewart?

9  A.  Yes, I have.

10  Q.  I'm sorry?

11  A.  Yes.

12  Q.  And have you reviewed it for the purposes of

13  this hearing?

14  A.  Well, I, I reviewed it for the purposes of

15  this hearing, but I also just reviewed it -- I

16  reviewed a similar document for the last report

17  that I submitted to the Court in December.

18  Q.  This is the sort of spreadsheet that you

19  receive regularly during your monitoring job; is

20  that correct?

21  A.  Well, not during the entire time.  I've gotten

22  at least two of these, and they are the supporting

23  data for the defendants' report about RTU

24  out-of-cell time.

25  Q.  Okay.  And I think you started to explain to

1  us what the section we're now looking at is, the

2  Monday, Tuesday, Wednesday, Thursday, et cetera,

3  sections.  Can you tell us what --

4  A.   Oh, I'm sorry.  It's a listing by class member

5  name for a particular activity that they attended

6  on a given day and time.

7  Q.   Okay.  So, across the top rows here are a

8  series of groups that happened, looks like, daily

9  from 8:30 to 10:30.  Am I reading this correctly?

10      Or can you tell me which wing the top row

11  relates to?

12  A.   The top row is all C wing or the restrictive

13  housing unit.

14  Q.   And have you gone through this to determine

15  how many individual prisoners attended one or more

16  of these groups during this -- in this top section

17  -- or from C wing in general?

18  A.   Yes, I have.  It's 15 -- 15 unique individuals

19  attended these activities.

20  Q.   Okay.  Let's go down to the next section which

21  talks about 9 to 10 and has three little green

22  squares there.  First one, 9 to 10, and the second

23  one, 9:15 to 10:15 on Tuesday, and then on

24  Wednesday, 9:15 to 10:15 again.

25      Which wings do those relate to?

1  A.   The first one is B wing.   The second is

2  A wing.   And the third is D wing.

3  Q.   All right.   And are there other groups that

4  are listed somewhere else on this spreadsheet for

5  A, B and D wings?

6  A.   Not that I'm aware of.

7  Q.   And so how many people attended groups out of,

8  let's say, B wing for this entire week?

9  A.   Four.

10 Q.   And how many hours did they each get, each of

11 those four?

12 A.   It's listed as one hour.

13 Q.   And how about A wing, which is the next

14 column?

15 A.   The same, four people for one hour.

16 Q.   Not the exact same people, but you're saying

17 the same number four?

18 A.   Exactly.

19 Q.   Four different?

20 A.   It's a different wing, so different class

21 members.

22 Q.   Okay.   And then D wing?

23 A.   The same thing.   It's four individual --

24 different individuals for one hour on D wing.

25 Q.   All right.   So, we -- and does that cover the

1  entire chart then, the 15 people you talked about

2  out of C wing and the four individuals out of

3  B wing and the four individuals out of A wing and

4  the four individuals out of D wing?

5      Is there anybody else on this entire chart

6  anywhere else that we're missing?

7  A.   Not, not that I'm aware of.

8  Q.   Okay.  So, what therapy was -- I'm sorry.  I

9  see there's a transgender group as well, an hour

10 there, so there are three additional people who got

11 transgender group in X House?

12 A.   Yes.

13 Q.   Okay.  So, leaving aside those 19 people --

14 I'm sorry, 12 plus 15 -- 27 people plus the 4 --

15 the 3 transgender, so leaving aside those 30 people

16 -- and I believe we stipulated at the beginning

17 that the entire population of X House is about 130

18 people.

19     Is that the right number?

20     143 residents in X House.  So, leaving aside

21 these 30 that we've identified here, what did

22 everybody else get?

23 A.   Well, based on this -- on this spreadsheet,

24 the rest of the people didn't get anything.

25 Q.   So, from B, A and D wing, four people got one

1  hour from each of those wings, and nobody else got

2  anything?

3  A.  Based on this spreadsheet, yes.

4  Q.  Is there any other spreadsheet that you've

5  been given?

6  A.  No.

7  Q.  Any other evidence at all that groups were

8  running other than what's reflected on this

9  spreadsheet?

10 A.  No.

11 Q.  And looking at the various medical charts that

12 you've seen out of Dixon, is there any indication

13 that anybody from B, A and D wing -- other than

14 those four people who got an hour each -- was given

15 any group therapy?

16 A.  Nothing that I reviewed in the records.

17 Q.  So, as far as you can tell from your review,

18 four people from A wing got an hour, and nobody

19 else got anything in terms of group therapy?

20 A.  Exactly.

21 Q.  Now, that does not include one or more

22 psychiatric treatment -- psychiatric visits?

23 A.  It doesn't include psychiatric visits.  It

24 doesn't include any potential individual meetings

25 with their MHP.

1   Q.   And in terms of psychiatric visits, have you

2   reviewed charts to determine how often that

3   happens?

4   A.   Yes.

5   Q.   And can you tell us roughly how often that

6   happens for people in X House?

7        MR. REES:   Object to the form, foundation.

8        THE COURT:   Sustained as to the foundation.

9   BY MR. MILLS:

10  Q.   Which charts -- how did you obtain charts from

11  X House?

12  A.   I got -- I had a list of people that -- class

13  members that were housed there, and I randomly

14  chose some.

15  Q.   And how many did you receive?

16  A.   I had five charts total, and out of those,

17  three were from X House.

18  Q.   All right.  Do you know -- and could you tell

19  from those three charts anyway how often people saw

20  their psychiatrist?

21  A.   They were seeing the psychiatrist about once a

22  month.

23  Q.   And how long did those meetings last, in

24  general?

25  A.   I can't recall exactly.

1  Q.   I mean, are we talking several hours; are we

2  talking an hour; are we talking about less than

3  that?

4  A.   We're talking less than an hour.  I do

5  remember they were 15 minutes or 30 minutes.

6  Q.   Okay.  But in that range of 15 to 30 minutes?

7  A.   Yes.

8  Q.   And it was in those -- they also had those

9  community meetings that you talked about before,

10 correct?

11 A.   In, in wings --

12 Q.   A, B and D?

13 A.   A, B and D, yes.

14 Q.   And again, your opinion is those do not count

15 as therapeutic activities in any way, shape or

16 form?

17 A.   Correct.

18 Q.   Okay.  Now, let's go back to the cottages, the

19 STC portion.

20 A.   Yes.

21 Q.   How many groups were you seeing in those

22 facilities?

23 A.   Based on my interviews and supported by my

24 chart reviews, people were saying that there was

25 community meetings scheduled every day in the STC,

1  but that on any given week, they -- at most they

2  would have three.  And the community meetings

3  lasted maybe 15, 20 minutes.

4  Q.  All right.  And those community meetings, did

5  they suffer from the same deficits that the

6  community meeting you talked about in X House --

7  A.  Yes.

8  Q.  -- suffered from?

9       So, in your opinion, do those community

10  meetings in the STC constitute structured

11  therapeutic activities?

12  A.  I don't believe so.

13  Q.  All right.  What structured therapeutic

14  activities were provided to the seriously mentally

15  ill who were housed in the STC at Pontiac?

16  A.  The STC class members --

17  Q.  I'm sorry, at -- I'm sorry.  I said Pontiac.

18  I meant Dixon.

19  A.  Dixon, yes, excuse me.

20       The class members assigned to the STC RTU

21  housing, again, in addition to these community

22  meetings that were happening, I was told by them

23  that they could sign up for one group, and that the

24  group was a weekly group that occurred over in a

25  classroom area.  And that if there were room, they

1  could sign up for a second group.

2      And in addition, the only other structured

3  therapeutic activities that they had were meetings

4  with their MHP and meetings with the psychiatric

5  provider.

6  Q.  And how often do those occur, and how long did

7  they last?

8  A.  The MHP meetings were monthly, and they were

9  short in duration, you know, at most 15 minutes.

10      And then the treatment team meetings, which

11  was when they met with the psychiatric provider,

12  and those were monthly, and again, in the range of

13  minutes.

14  Q.  And those were for planning purposes rather

15  than actually providing the care?

16  A.  The treatment team meetings were for planning

17  purposes, yes.

18  Q.  Okay.  I believe that Mr. Rees, in his opening

19  statement, talked about other things that they

20  provided, like in-cell activities that people could

21  do.

22      Are you familiar with any of the workbooks or

23  other sorts of paper, paper activities that people

24  are being given?

25  A.  I did review one of the workbooks, and it was

1    about anger management.

2    Q.  All right.  Can we put up -- I believe this is

3    Defendants' Exhibit 44 to make sure we're talking

4    about the same thing?

5        I don't know, just like the second page.  I

6    know it's a very long exhibit.

7        THE COURT:  What is this exhibit number?

8        MR. MILLS:  This is Defendants' 44.

9        THE COURT:  Oh, Defendants' 44.

10       MR. MILLS:  Yes.  Sorry, Your Honor.

11   BY MR. MILLS:

12   Q.  So, the first page we're looking at here, can

13   you describe what this is from a mental health

14   perspective?

15   A.  It's a list -- Top 10 List of Ways to Distract

16   Yourself with Self-Care Activities.

17   Q.  This is something a prisoner is supposed to

18   fill out in his cell in order to, I guess,

19   substitute for group therapy?

20   A.  Well, substitute for -- well, I don't know if

21   it's meant to substitute for anything.  It's just

22   they're asked to list ways to distract yourself

23   with self-care.

24   Q.  Does this constitute, in your mind, a

25   structured therapeutic activity?

1   A.   Not in the least.

2   Q.   All right.  Go down to the next page.

3        All right.  Is this the workbook that you

4   looked at?

5   A.   Yes.

6   Q.   All right.  And can you tell us what -- are

7   you familiar with these workbooks outside of this

8   case?  Have you ever seen them?

9   A.   Yes.  Workbooks are commonly used in

10  psychiatric practice.

11  Q.   And what -- I take it they have a legitimate

12  function, correct?

13  A.   Yes.

14  Q.   And what is that function?

15  A.   Well, workbooks are meant to augment

16  individual therapy or individual group therapy,

17  where you would -- you would have a -- say in a

18  particular group or individual therapy, you would

19  talk about methods in which to deal with, in this

20  case, anger.  And then you'd give the person

21  homework, and they would do that homework and bring

22  it back to the next session where it would be

23  reviewed and discussed with the therapist.

24  Q.   All right.  Did you see anything along those

25  lines in any of the medical records you reviewed at

1  either Dixon or Pontiac?

2  A.   I did not.

3  Q.   Can you tell from the medical records what

4  these books are being used for?

5  A.   You know, I'm -- I can't tell from the record

6  what the purpose was.  They talk about handing out

7  in-cell activities, but there was nothing more than

8  just those references.

9  Q.   Any indication if they were assessed to see

10  whether or not they were being effective?

11  A.   I didn't see any evidence of that.

12  Q.   Any evidence that anybody was reviewing these

13  workbooks with the participants to see whether or

14  not they understood -- they filled them out

15  correctly?

16  A.   Again, based on chart reviews, I didn't see

17  any evidence of that.

18  Q.   Any evidence that they were checked to see

19  whether or not they filled them out at all?

20  A.   Again, based on chart reviews, they're pretty

21  silent in the charts about these workbooks.

22  Q.   So, basically, they hand them out, and that's

23  all there is in the chart, that they handed out a

24  book?

25  A.   Based on the records, yes.

1  Q.   And is that an appropriate way to use these
2  workbooks from a mental health standpoint?
3  A.   Not in my experience.
4       I must point out, though, that this anger
5  management book, in the preface, it said could be
6  used in the absence of a therapist, which I, I
7  didn't understand as I went through, through the
8  book itself.
9  Q.   Given the level of -- the level of mental
10 illness that you've seen in our RTUs, do you think
11 this is an effective treatment for people in the
12 RTUs?
13 A.   The way it's used now, I don't think it's an
14 effective treatment at all.   I think it could be an
15 effective treatment if it's done properly.
16 Q.   But the way they're currently being used, do
17 you have an opinion as to whether or not they're
18 doing anybody any good?
19 A.   Again, based on the documentation of it in the
20 charts, I don't see what benefit is being accrued
21 to anyone based on these -- handing out these
22 workbooks.
23 Q.   All right.   You've now testified to a variety
24 of ways that they're providing or attempting to
25 provide some sort of mental health care, and let me

1  know if I'm missing any:  Psychiatric appointments,

2  monthly appointments with QMHPs, occasional groups,

3  community meetings, other unstructured time that

4  they have, and then the workbooks.

5      Do you have an opinion as to whether or not

6  the full range of activities they are providing is

7  sufficient to provide the people that are

8  clinically determined to need RTU level of care the

9  care that they need?

10  A.   No, it is not.

11  Q.   Or are they providing a level of care that is

12  sufficient to prevent unnecessary suffering?

13  A.   I don't believe so.

14  Q.   Are there any particular prisoners that you

15  can cite to which would illustrate why you don't

16  think it's providing sufficient care?

17      THE COURT:  Excuse me, can I interrupt for a

18  moment?  The clerk has asked me to have it

19  indicated for the record when there's a reference

20  to an exhibit.  We've had several references, for

21  example, to Plaintiffs' exhibits.

22      We need to know whether there's an objection

23  to the exhibit.  I'm assuming that unless I hear an

24  objection, there isn't one.

25      Is that correct?

1    MR. REES:  That's not correct, Your Honor.

2  I've been waiting to see if Plaintiffs were going

3  to move any exhibits into evidence.  You know, my

4  view -- my understanding is it's appropriate, as

5  they've been doing, to use a document to refresh a

6  witness's recollection.  That doesn't mean that

7  they're moving that document in evidence.

8    THE COURT:  No, I understand.

9    MR. REES:  So, just -- so, Your Honor, I don't

10  object to them using the document in the way

11  they've been using it, but depending on the

12  particular exhibit we're talking about, what I

13  suggest is at some point we need to talk about

14  what's going to be admitted in evidence, and, you

15  know, we may object to some of these being

16  admitted.

17    THE COURT:  Well, I'm not talking about

18  exhibits that they're using to refresh

19  recollection.  I'm assuming that those are not

20  being offered.

21    I'm talking about the exhibits that they've

22  specifically referred to so far that are in their

23  exhibit book or your exhibit book.

24    MR. REES:  Well, we'll have to talk about that

25  separately, Your Honor.  I've been writing notes as

1  we go, and I think we'll have to maybe check up and

2  see if we object or not.  And if they're moving --

3  the first step is, I think, to confirm if they're

4  moving for it to be admitted and then find out if

5  we object.

6     MR. MILLS:  Your Honor, my plan had been to

7  move to admit these exhibits at the close of my

8  examination, but if it's easier, I can do that now.

9  I'm happy to do -- go through these right now.

10    THE COURT:  Let's go ahead and finish the

11 direct examination.

12 BY MR. MILLS:

13 Q.  Yes, I'm sorry.  I had asked you whether or

14 not there were particular prisoners you could cite

15 to as examples which would illustrate your opinion

16 that they are not receiving sufficient care to

17 prevent unnecessary suffering?

18 A.  Yes.  Yes.

19 Q.  Can you tell us about some of those?

20 A.  Well --

21 Q.  Start by identifying the name of the prisoner

22 and, if you would, what documents you've reviewed.

23 A.  The first individual that I'll refer to I

24 interviewed on video on January 6th of this year, a

25 class member by the name of George White.  And

1  Mr. White, at the time of my interview, was housed
2  in the STC.
3  Q.  And that's at Dixon, correct?
4  A.  At Dixon, yes, excuse me.
5      And he, he made it very clear -- he
6  volunteered this information; I didn't ask him.  He
7  said -- he was talking about the lack of day room
8  time in particular, but in general the lack of
9  out-of-cell time.  He said that was exceedingly
10 tough on him as well as a lot of people that he was
11 aware of, familiar with there.  And that he said it
12 often results in people cutting, cutting up and
13 doing other acts of self-harm.
14 Q.  Cutting up, you're not talking about it
15 metaphorically.  You're talking about actually
16 cutting into their skin and making themselves
17 bleed, et cetera, correct?
18 A.  Yes, I clarified that with him.  I mean,
19 that's -- it was clear to me when he said they're
20 cutting up, that meant that they were actually
21 cutting themselves.
22     MR. REES:  And, Judge, just for the record, I
23 object to any of this being admitted for the truth,
24 the hearsay statements from prisoners.
25     THE COURT:  All right.  Thank you.  Overruled.

1  BY MR. MILLS:

2  Q.  Go ahead.  Were you finished with Mr. White,

3  or was there something else you wanted to say about

4  him?

5  A.  No, that was Mr. White.

6  Q.  Okay.  Anybody else you want -- you can refer

7  to?

8  A.  Well, in reviewing, prior to this hearing, the

9  declarations that Plaintiff Counsel had obtained

10 from a variety of individuals at both Dixon and

11 Pontiac, there were numerous references to the fact

12 of, based on -- based on their limited out-of-cell

13 time that they were having extreme anxiety, that

14 their underlying mental illness was getting worse.

15     One gentleman referred to his schizophrenia,

16 is that before the medications could adequately

17 treat his auditory hallucinations; he says no

18 longer can they do that because the out-of-cell

19 time helped him do that.

20     So, there was numerous reference in, in all of

21 those -- excuse me -- in, if you want -- I have

22 some examples if you want me to, but they're

23 referring to those declarations.

24 Q.  Okay.  Any other medical charts or people you

25 interviewed in addition to the declarations that

1  you want to highlight?

2  A.   Well, you know, I have to say this in general.

3  It was based on my being there on site visits, you

4  know, Pontiac last summer and then Dixon in the

5  fall -- last fall, that these people are -- the

6  individuals assigned to the RTUs at those

7  facilities are very sick.  These are not your

8  garden-variety mentally ill patients.  These are

9  extremely ill individuals, and I was -- I was

10 impressed by the fact of how symptomatic they were.

11 And these are based on just my overall clinical

12 impressions as I'm going through the facilities and

13 speaking to individuals.

14      And as I have discussed -- testified before in

15 this court before is that just the presence of

16 untreated mental illness is a huge harm because

17 it's, it's -- you know, there's no, no romantic

18 notion about being mentally ill.  It's suffering.

19 People are hearing voices; they're paranoid;

20 they're having, you know, delusions about things;

21 they lose touch with reality.  These are not

22 pleasant states of being.

23      That's the major harm that I can testify to;

24 is that based on the inadequate mental health

25 treatment that these individuals are receiving,

1  they remain highly symptomatic, and their

2  underlying conditions are not being adequately

3  treated.

4  Q.   And are those harms and risks of harms the

5  same, greater or less for people in the RTU as

6  compared to people in general population?

7  A.   They're -- I believe that they're greater than

8  the people in the general population because the

9  people in the RTU have been selected by outpatient

10  staff to require a much higher level of care due to

11  the severity of their underlying mental illness.

12       So, therefore, it's easy to just follow that,

13  to say that they have worse symptoms.  And in my

14  personal experience with these individuals, I agree

15  with that.  So, their suffering is greater.

16       MR. MILLS:  Your Honor, at this time I have

17  exhibits, if you want to do that now, before

18  Mr. Rees does his cross.

19       You're on mute, Your Honor.

20       THE COURT:  Yes.

21       MR. MILLS:  Okay.  At this time, Plaintiffs

22  would move to admit Plaintiffs' Exhibit 9,

23  Plaintiffs' Exhibit Number --

24       MR. REES:  Hold on.  Can we go one at a time?

25       MR. MILLS:  Sure.  Plaintiffs' Exhibit Number

1    9, that is Dr. Stewart's letter to Your Honor.

2        THE COURT:  Okay.  Any objection?

3        MR. REES:  Yes.  Object, hearsay.

4        THE COURT:  Overruled.

5        (Whereupon, Plaintiffs' Exhibit Number 9 was

6    admitted.)

7        MR. MILLS:  Plaintiffs' Exhibit Number 3, the

8    SOP, this manual.

9        MR. REES:  Your Honor, object on completeness.

10   If I -- if I tracked it correctly, I think

11   Plaintiffs' Exhibit 3 is only 15 out of maybe 150

12   pages.  Defendants' Exhibit 3 is complete.  So, we

13   would not object to the admission of Defendants'

14   Exhibit 3 in place of Plaintiffs' Exhibit 3.

15       MR. MILLS:  That's fine.

16       THE COURT:  I think I expressed this before.

17   This 150 pages, now you're not suggesting that all

18   of that is specifically relevant here, are you?

19       Are there -- I guess what I'm saying is, we

20   know what their 3 is.  Are there excerpts from

21   yours that are not included in theirs that are

22   going to be specifically referred to?

23       MR. REES:  I don't know for sure about that,

24   Your Honor, but my only point is that if we're

25   going to, you know, have a document that's in the

1   record as an exhibit, it should be the complete --

2   we're talking about the Department's policies --

3        THE COURT:  I don't agree with that at all,

4   but for our purposes, I'll admit 3 over objection,

5   and I'll admit yours over -- yours, and then we'll

6   have both.

7        MR. REES:  Thank you, Your Honor.

8        (Whereupon, Plaintiffs' Exhibit Number 3 was

9   admitted.)

10       (Whereupon, Defendants' Exhibit Number 3 was

11  admitted.)

12       THE COURT:  From my point of view, it's

13  ridiculous to have the whole 150 pages in there if

14  we're only going to be referring to four or five

15  pages.

16       What's the next one?

17       MR. MILLS:  Plaintiffs' Exhibit 5, the

18  administrative quarantine plan.

19       MR. REES:  No objection.

20       MR. MILLS:  Plaintiffs' Exhibit 6, which is

21  the Dixon medical quarantine plan.

22       MR. REES:  No objection.

23       MR. MILLS:  Plaintiffs' Exhibit 7, which is

24  the Pontiac medical quarantine plan.

25       MR. REES:  No objection.

1        MR. MILLS:  Plaintiffs' Exhibit 41, which was

2   the groups at Pontiac, including the cancellation.

3        MR. REES:  No objection.

4        THE COURT:  Okay.

5        MR. MILLS:  Plaintiffs' Exhibit 30, which was

6   the spreadsheet.

7        MR. REES:  No foundation, but no objection.

8        THE COURT:  All right.  It's admitted.

9        (Whereupon, Plaintiffs' Exhibit Numbers 5, 6,

10  7, 41 and 30 were admitted.)

11       MR. MILLS:  And Defendants' Exhibit 44, the

12  workbook that we just talked about.

13       MR. REES:  No objection.

14       (Whereupon, Defendants' Exhibit Number 44 was

15  admitted.)

16       THE COURT:  All right.  Great.  So, I think

17  from the clerk's point of view, Annie, all of these

18  are -- you're satisfied, right?

19       COURTROOM DEPUTY:  Yes, I am.

20       THE COURT:  Okay.  Thank you.

21       MR. REES:  Your Honor, we'll do our best to

22  keep track of this throughout the hearing so we can

23  coordinate with the clerk, you know, during breaks

24  or as we go.

25       COURTROOM DEPUTY:  That would be good.

1        THE COURT:  All right.

2        Mr. Rees, do you have cross-examination?

3        MR. REES:  Yes.

4                 **CROSS-EXAMINATION**

5    BY MR. REES:

6    Q.   Dr. Stewart, can you hear me?

7    A.   Yes, I can.

8    Q.   You've talked a little bit about your site

9    visits.  I just want to understand the sequence of

10   events leading up to when you do your semi-annual

11   reports.

12       You've been doing reports twice a year since

13   you've been appointed monitor, usually

14   approximately May and then in December of the year;

15   is that correct?

16   A.   May and the end of November, beginning of

17   December, yes.

18   Q.   And the timing of the sequence is generally --

19   tell me if I'm wrong -- that the Department

20   provides a quarterly report.  Then following the

21   quarterly report, you visit the site, as you've

22   indicated during your direct examination; is that

23   correct?

24   A.   Well, not necessarily.  I don't wait for the

25   quarterly report to do my site visits.

1  Q.   But you would -- when you do the site visit,

2  you will have the prior quarterly report from the

3  Department?

4  A.   I will -- I will have received the most

5  current quarterly report during the course of

6  these, yes.

7  Q.   Okay.  Then when you go to the site -- and the

8  site visits are indicated in your report, whether

9  it's you or some other member of the monitoring

10  team visits, and that's indicated in your

11  semi-annual reports, correct?

12  A.   That's correct.

13  Q.   And you said when you're there, you'll talk to

14  a few mentally ill individuals.  I'm trying to

15  understand a little bit better about who you talk

16  to.

17      You understand that in this case individuals

18  from time to time file papers or complaints with

19  the judge -- with Judge Mihm in court, and those

20  are referred to the monitor?

21  A.   Yes.

22  Q.   And you get those referrals?

23  A.   I do.

24  Q.   And does that affect who you talk to when you

25  go visit the prison?

1   A.   There are times when, based on the individual

2   filings of class members, that I will particularly

3   seek these people out to interview.

4   Q.   And then while you're there, sometimes people

5   will seek you out.  Like I think you referred to a

6   group where some people sought you out and wanted

7   to talk to you?

8   A.   Yes.

9   Q.   And then usually -- you know, we can get

10  precise, but two or three months later, some period

11  of time after your visits, you then file your

12  semi-annual report?

13  A.   It depends on the monitor -- on the site visit

14  schedule.  So, sometimes it's several months

15  afterwards; sometimes it's more, more -- closer in

16  time.

17  Q.   All right.  Okay.  And you talked about -- you

18  made some references to standard of care.  Is there

19  a standard of care that applies to providing mental

20  health care in a correctional facility during the

21  COVID-19 pandemic?

22  A.   Well, yes.  The standard of care I have always

23  applied is the community standard.

24  Q.   And are you aware that during the pandemic

25  that hospitals have been required to adopt what's

1  called a crisis standard of care?  Are you familiar

2  with that?

3  A.   Well, yes, I am credentialed at the big

4  hospital here in Honolulu, and so I -- I'm very

5  familiar with that.

6  Q.   And you understand that a crisis standard of

7  care may require that prison -- I'm sorry, the

8  hospital to allocate resources during the pandemic?

9  A.   How do you mean, sir?

10  Q.   That they may have to limit and decide who's

11  going to get care during the pandemic?

12  A.   I, I can speak best about psychiatric patients

13  during, during the pandemic.

14  Q.   Well, you just understand generally that

15  during the pandemic when hospitals have adopted

16  crisis standards, for example, it's required them

17  to cancel elective procedures, for example?

18  A.   Yes, that's one example of having a rationed

19  care during pandemic.

20  Q.   Is another example to randomize who gets care?

21  A.   I'm not familiar with that.

22  Q.   Okay.  And when you talk about a community

23  standard of care --

24       MR. MILLS:  Your Honor, I'm going to object at

25  this point to this whole line of questioning.

1  We're talking about prisons; we're talking about

2  this particular prison, not what happens in the

3  community, not what happens in hospitals, not

4  randomly selecting patients who aren't going to be

5  seen.  This is about -- as Doug pointed out

6  himself, this is about Dixon and Pontiac RTUs.

7      MR. HIRSHMAN:  And there's no foundation for

8  this.

9      THE COURT:  Overruled.

10 BY MR. REES:

11 Q.  During your direct examination, I wrote down

12 where you made several references to what's

13 provided in the community, and so I'm just trying

14 to understand, when you refer to a community

15 standard of care, what's the relevant -- what

16 community are you talking about?

17 A.  I'm speaking about the psychiatric community

18 in general across the United States as I understand

19 it.

20 Q.  So, it's not the community related to the care

21 that's being provided in Lee County or in

22 Livingston County, for example?

23 A.  Not exclusively.

24 Q.  Well, but have you done any study to compare

25 the type of mental health care that prisoners are

1   receiving at Pontiac and Dixon to the type of

2   residential care that individuals are receiving in

3   Lee and Livingston County generally?

4   A.   No.

5       MR. MILLS:  I would object again, Your Honor.

6   I don't know what the relevance is of what a

7   particular community --

8   BY MR. REES:

9   Q.   The answer is no, right?  You said no?  Did I

10  get that correct?

11      MR. MILLS:  This is an objection, Your Honor.

12      You're muted again, Your Honor.

13      THE COURT:  I'm going to allow a little --

14  give him an opportunity to do some background.

15  Hopefully you're going to limit that.

16  BY MR. REES:

17  Q.   I just want to be clear for the record, was

18  the answer no, Dr. Stewart?

19  A.   The answer was no.

20  Q.   And is it true that the opinions that are

21  expressed in your reports are your opinions of

22  compliance during normal conditions, without regard

23  to any changes that may be imposed because of the

24  pandemic?

25  A.   Okay, can you ask that again, please?

1  Q.   The opinions that you express in your

2  monitoring reports, those are your opinions about

3  the Department's compliance under normal

4  conditions; you don't make adjustments based on

5  changes required during the pandemic?

6       MR. MILLS:  Again, I'll object, Your Honor.

7  Which reports, since clearly the report we're

8  talking about today was all about what happened

9  during the pandemic?

10      THE COURT:  Overruled.

11  A.   If I understand your correction -- your

12  question correctly, Mr. Rees, the Settlement

13  Agreement is the basis of my reports to the Court.

14  And the Settlement Agreement says that the

15  Department will do these certain activities.  And

16  if they're not doing them, they're not doing them.

17  And that's what I report on.

18  Q.   Okay.  And I know that during your testimony

19  there was some discussion of both the hours

20  requirement of out-of-cell time, and then there

21  were other discussions about more general mental

22  health care, so I understand the difference.

23      You understand that the Settlement Agreement,

24  Section X(d) talks about ten hours of unstructured

25  time and ten hours of structured therapeutic time,

1  correct?

2  A.  Yes.

3  Q.  And in your -- when you have provided your

4  reports -- your semi-annual reports to report on

5  whether the Department has been providing ten hours

6  of structured time and ten hours of unstructured

7  time at the RTU facilities, correct?

8  A.  Yes, based on X(d).

9  Q.  And, and are you aware that published

10  standards, for example, the National Commission on

11  Correctional Health Care, that they don't have a

12  ten-hour requirement?

13  A.  I'm, I'm not aware of that in particular.

14  Q.  You're not aware of an hourly requirement in

15  those standards?

16  A.  Correct.

17  Q.  And are you also aware that the ACA -- the

18  American Correctional Association -- also does not

19  identify an hourly requirement for out-of-cell

20  care?

21  A.  I'm aware that they do not have an hourly

22  requirement.

23  Q.  And you also do monitoring with respect to the

24  Court's permanent injunction order entered in this

25  case?

1  A.   I had until the decision from the Seventh

2  Circuit, yes.

3  Q.   And you understand that in that order, part of

4  what you've been monitoring has been, at least with

5  respect to restrictive housing, whether the

6  Department is providing certain out-of-cell

7  activities, correct?

8  A.   Yes.

9  Q.   And you're aware that, as part of that

10  monitoring, with respect to structured time, that

11  the Court's order defined structured time, correct?

12  A.   I, I can't recall the exact section where it

13  defines it, so if would help me on that.

14  Q.   I will help you, and I could just tell you,

15  just if people want to look at it, it is ECF 2633.

16  That's the Court's permanent injunction order at

17  page 57.

18       It may be -- take me a minute if I need to

19  share the screen, but let me read the language to

20  you, and you can tell me if it's accurate.  All

21  right?

22       So, I'm reading from page 57 of the Judge's

23  permanent injunction order and section -- on page

24  57, it's Section (d) and then Roman VI.

25       It says, Structured and unstructured

1  out-of-cell time sufficient to protect against

2  decompensation.  Quote --

3  A.   Yes.

4  Q.   -- structured out-of-cell time includes

5  therapeutic, educational, and recreational

6  activities that involve active engagement by their

7  participants for the duration of the activity.

8       You understand that's the Judge's definition

9  of structured out-of-cell time?

10      MR. MILLS:  Your Honor, I'm going to object

11  because Mr. Rees is asking about something that the

12  Seventh Circuit has declared to be null and void

13  and not to have been properly entered.  I don't see

14  how he can rely on a portion of an injunction that

15  has been thrown out at Defendants' insistence.

16      THE COURT:  You just hurt my feelings.

17      I'll let him make the point, but don't dwell

18  on it, please.

19  BY MR. REES:

20  Q.   The point is, Dr. Stewart, that that's the

21  definition that was adopted as providing the

22  constitutional minimum in the Court's order,

23  correct?

24  A.   In the order that's no longer valid, yes.

25  Q.   Well, we can debate -- we'll let other judges

109

1  decide what's valid or not, okay?  We don't need to

2  debate that.

3      But you know that that language was proposed

4  by Plaintiffs' Counsel?  Did you know that?

5  A.  I did not know.

6      MR. MILLS:  Objection to foundation, Your

7  Honor.

8  BY MR. REES:

9  Q.  All right.

10     THE COURT:  Overruled.  Let's move on, please.

11  BY MR. REES:

12  Q.  Dr. Stewart, your monitoring activity -- and I

13  think you talked a little bit about this during

14  your direct.  You've been monitoring the Department

15  since the Settlement Agreement, and that includes

16  the period before the pandemic.

17     And can we just agree that the pandemic

18  started in approximately March of 2020?

19  A.  Yes.

20  Q.  So, the report that I have from you is, on

21  June 1, 2020, you provided a -- on June 20 -- I'm

22  sorry, June 1, 2020, you filed your -- I think it

23  was your fourth annual report, and that is

24  Defendants' Exhibit 14.

25     THE COURT:  Is there an answer -- or a

1  question?

2      MR. REES:  I'm just establishing that that's

3  what we're talking about.

4      THE COURT:  Okay.

5  BY MR. REES:

6  Q.  You recall that, right?

7  A.  I, I recall submitting an annual report at the

8  end of May, beginning of June 2020.  I don't

9  remember if it's the third or fourth or fifth.

10  Q.  If we need to, I'll share it with you and show

11  you specific pieces of it, but as part of that, you

12  did assess whether before the pandemic the RTUs

13  were providing the ten hours of unstructured and

14  ten hours of structured time, correct?

15  A.  Yes.

16  Q.  And before the pandemic, you confirmed that

17  both Logan and JTC were meeting the requirements of

18  Section X(d)?

19  A.  Yes.

20  Q.  And at Dixon, you reported that the reports

21  there were consistent with what the Department had

22  provided in its quarterly report prior to your

23  report on April 20th of 2020; do you recall that?

24  A.  Not necessarily, sir.

25      Can you repeat that, please?

1  Q.  Yes.  My question is, with respect to Dixon,

2  is it your recollection that when you visited Dixon

3  and when you gave your report in June of 2020 about

4  what you observed at Dixon with respect to

5  out-of-cell time, you found that it was consistent

6  with what the Department had previously reported?

7  A.  I believe so.

8  Q.  Okay.  And, again, I'm happy to show you this

9  if we need to take the time to do it, but the

10 Department reported that at the STC, that Dixon was

11 providing 48.5 hours a week of unstructured time?

12 A.  That's correct.

13 Q.  And plus 12 to 13 hours of structured time?

14 A.  In the STC, yes.

15 Q.  Right.  So, that's over 60 hours, three times

16 what the Settlement Agreement required?

17 A.  Well, it, it was -- I don't know if you can

18 look at it that way.  In one case, the unstructured

19 out-of-cell time was significantly greater than

20 what was -- the minimum required.  And in the

21 structured, it was over the minimum, just barely

22 over the minimum.

23 Q.  Okay.  And, and at the -- and at X House, the

24 Department was also providing more structured --

25 unstructured time than was required.  And at the

1  time, in that report, they were providing
2  approximately five hours of structured time?
3  A.   That's correct.
4  Q.   Okay.  And with respect to Dixon X House in
5  particular, your report at that time commented on
6  Dixon X House having insufficient space.  Do you
7  recall that?
8  A.   Yes.
9  Q.   That was the concern that you raised in your
10  report about the RTU care at Dixon?
11  A.   Yes.
12  Q.   Okay.  And we'll probably get to this later,
13  but are you aware of the Department's current
14  efforts and what they've done so far to address
15  space at Dixon?
16  A.   During my last visit, I did -- was shown that
17  they were putting in a caged-in area in the
18  non-restrictive housing wings of the X House, and
19  it was explained to me that that was to facilitate
20  more treatment, yes.
21  Q.   And you think that's a good thing for them to
22  do, I assume?
23  A.   Well, at that time I said, *Well, I don't know*
24  *whether or not that's going to work*.
25        I didn't disagree.  I agreed with the fact

1   that they were making efforts to try to improve

2   out-of-cell time.  I certainly agreed with that.

3   But I didn't --

4   Q.  Are you --

5   A.  But I didn't necessarily think that was going

6   to be the answer to the issue, but I noted it.

7   Q.  And are you aware that the Department has

8   increased the length of community meetings?

9   A.  I'm aware that -- I forget what month, but on

10  a given month on the 1st, they started to require

11  that community meetings last one hour.

12  Q.  Are you aware that they have actually

13  increased the length beyond one hour to try to

14  accommodate more out-of-cell time?

15  A.  No.

16  Q.  Okay.  And are you aware that they've also

17  requested permission, consistent with COVID

18  restrictions, to increase group sizes for the

19  community groups at the STC?

20  A.  For the community --

21  Q.  Are you aware that they have asked for

22  permission to increase the number of people who can

23  participate in the groups?

24  A.  I'm not aware of that.

25      THE COURT:  Can I interrupt?  Can I interrupt

1  for just a moment?  Is that where you're talking

2  about where something I read said the size of the

3  group had to go down to three and then moved up to

4  four?

5      MR. REES:  Your Honor, this one -- I think the

6  one you're referring to may be more specific to

7  Pontiac.  At Pontiac, there are some group rooms

8  that are small, that were limited, and they've

9  increased, I think, from four to five, if I'm -- I

10  need to check my notes.

11      Dixon, this space is a little bit bigger, and

12  there's a request to Office of Health Services --

13  that we'll have one of the other witnesses to

14  testify about -- which is just to increase the

15  sizes of people who could -- the number of people

16  who could participate.

17      I'm just wondering if Dr. Stewart's aware of

18  those.

19      THE WITNESS:  And I think I answered that I'm

20  not aware of that.

21  BY MR. REES:

22  Q.  Okay.  And with respect to -- you understand

23  -- I don't know if you do know this.  You know that

24  when we refer to the "gym" at Dixon, we're talking

25  about Building 137?  Do you know that?

1    A.   I'm familiar with the gym.  I didn't know the

2    building number.

3    Q.   Okay.  That's fine.

4        And are you aware of the Department's proposal

5    to add some -- what they want to have is

6    therapeutic recreational activities in the gym.

7    Are you aware of that proposal?

8    A.   I'm -- when I toured Dixon, the warden was

9    very proud in telling me that they had put a

10   barrier down the middle of the gym so they could

11   run two groups at a given time in hopes of

12   increasing out-of-cell time, yes.  I'm aware of

13   that.

14   Q.   And do you understand that part of the way

15   that the Department is trying to make that

16   therapeutic is to have staff lead -- talk to the

17   individuals about sportsmanship and teamwork?

18   A.   You know, I haven't -- I haven't heard or read

19   the exact details of these leisure activities, so

20   I'm not aware of that, sir.

21   Q.   But you agree that teaching RTU individuals --

22   individuals who are housed in RTUs teamwork and

23   sportsmanship would be important values to allow

24   them to function in their daily lives?

25       MR. MILLS:  Your Honor, I'm going to object in

1   terms of he's not specified whether or not we're

2   talking about mental health professionals being

3   involved or whether or not we're talking about

4   non-mental health professionals as -- he's talking

5   about staff in general as if they were all the

6   same.

7         THE COURT:  Well, you can clarify that.

8   Clarify that with an additional question.

9   BY MR. REES:

10  Q.  Well, I guess I'd like to go back to the

11  question I asked which is -- I think it was simply,

12  you agree that teaching individuals in the RTU

13  about teamwork and sportsmanship are important

14  things to teach them to be able to facilitate their

15  daily lives?

16        THE COURT:  I'll allow that.

17  A.  I think in the most -- in the most general

18  sense those are good things for all of us to be

19  able to practice, but I don't know if that's a

20  particular therapeutic activity designed to address

21  particular concerns of seriously mentally ill

22  individuals.

23  Q.  Right.  You've testified that that may not --

24  sure, that you wouldn't want that to be the only

25  activity because there are also one-on-one

1  meetings, et cetera, correct, other group

2  activities?

3  A.   I don't know if I commented on the

4  leisure-time activities being part of the

5  structured groups.  I don't believe they are.  I

6  think they're good to have as part of the overall

7  milieu treatment, but I wouldn't consider them

8  structured therapeutic activities.

9  Q.   Okay.  And before the pandemic -- and I can

10  show you this if I need to -- but Pontiac was

11  reporting 12 hours of unstructured time and 10 to

12  12 hours of structured time.

13     Do you recall that?

14  A.   When did they report that, Mr. Rees?

15  Q.   They reported that in their quarterly report

16  of April 20th, 2020.

17     It's DX 50F, for the record.

18  A.   What, what I do remember is that in the -- my

19  fourth annual report that you referenced earlier,

20  that I stated that Pontiac was providing three

21  hours of structured time and nine hours of yard

22  time or unstructured time a week.

23  Q.   So, in that case, you disagreed with the

24  Department's report?

25  A.   If they're saying some other number, then I

1  obviously didn't agree with it, yes.

2  Q.  And you base that on -- and again, I think we

3  can show you in your report; I'll have to find the

4  exact page number -- but during your February 20th,

5  '21, visit that some mentally ill offenders told

6  you that they received two 1.5-hour sessions per

7  week?

8  A.  Yes, that was part the basis of it, yes.

9  Q.  So, it's based on what those offenders told

10  you, that that's what caused you to say that that's

11  what you thought they were getting?

12  A.  In part, yes.

13  Q.  You did not do, for your semi-annual reports,

14  your own calculation of the hours that IDOC was

15  providing to its RTU patients?

16  A.  No, because that data -- the data from which I

17  would have done that calculation was never provided

18  to me.

19  Q.  Okay.  And you didn't ask for it either?

20  A.  Well, no.  I think that's an issue that has

21  been discussed here in the court for the last year

22  or so, where I had -- I believe I had testified

23  that in order to do an accurate assessment of

24  what's really going on in the RTU, I need similar

25  data that they provide me -- as they do for

1  restrictive housing in general so I could calculate

2  exactly.  And because of that, the Department

3  started reporting in September of last year the

4  number of -- the actual number of out-of-cell

5  hours.

6  Q.  Your report with respect to out-of-cell time

7  in Exhibit 10 -- I mean, I'm sorry, with respect to

8  Section X of the Settlement Agreement, you don't

9  raise any concerns about not having data that

10  allows you to calculate RTU time?

11  A.  I did not raise any concerns, correct.

12  Q.  And just to finish it, I think with respect to

13  what we were talking about at Pontiac, for the

14  record, that was -- Pontiac is also divided -- we

15  didn't talk as much about Pontiac during your

16  opening, but Pontiac has some RTU patients that are

17  in a -- what's called a BMU, a Behavioral

18  Modification Unit, correct?

19  A.  That's right.

20  Q.  And they have other -- do you know the number?

21     I'm not asking you to guess.  Do you know if

22  it's about 40?  Does that sound right?

23  A.  I think the BMU is around 40.

24  Q.  And do you know that they have about 20 to 30,

25  thereabouts, that are in the -- what's called the

1  MTC, the Modified Treatment Community?

2  A.  That's my understanding.

3  Q.  Okay.  So, much smaller cohort than at Dixon?

4  A.  Yes.

5  Q.  And back before the pandemic, you recall that

6  the Department was reporting that Pontiac was

7  providing 12 hours of unstructured time in the BMU,

8  plus 10 to 12 hours of structured time?

9  A.  That's what the Department was reporting.

10  Q.  And in your report -- and I'm talking about

11  the relevant report there before the pandemic, your

12  December 7, 2020, report, which is DX 14, you

13  didn't disagree or note any disagreement with what

14  the Department reported with respect to the BMU?

15  A.  Okay.  We're talking about a lot of different

16  numbers.

17     What did the Department report again for the

18  BMU for that period?

19  Q.  The Department reported at the BMW (sic) 12

20  hours of unstructured time plus 10 to 12 hours of

21  structured time, and that is in DX 50F, at 14.

22  A.  Well, in, in, in thinking about my -- are you

23  talking about my report of December, I believe, 6th

24  or 7th in 2021, the last report?

25  Q.  I'm sorry.  I'm sorry, I misspoke.  I'm sorry,

1    Dr. Stewart, you're right.  I'm talking about

2    pre-pandemic.  I'm talking about your annual report

3    June 1, 2020, which is DX 14.  I apologize.

4    A.   Okay.  And can you ask the question again,

5    please?

6    Q.   Right.  And so the question is that with

7    respect to Pontiac, your report notes this:  That

8    Pontiac reported, for BMU, that it was providing 12

9    hours of unstructured time plus 10 to 12 hours of

10   structured time?

11   A.   And I think we talked about that already.  I

12   disagreed with that.

13   Q.   No, I'm sorry, what you disagreed with in your

14   report -- and I can show it to you -- is you

15   disagreed with the part about the MTC, and you said

16   that some individuals in the MTC told you that they

17   were getting two 1.5-hour sessions per week.

18   A.   I'm sorry, this is -- this is turning into

19   quite a memory exercise.  I, I don't recall offhand

20   if I broke down in the report that you're

21   referencing BMU --

22   Q.   That's a fair -- that's a fair point.

23        Let me show you what we've pre-marked as

24   Defendants' Exhibit 14, and we'll go to page 37, so

25   we'll show that on the screen.

1   A.   Thank you.

2   Q.   So, you'll see that there's a filing number at

3   the top that was filed with the Court as ECF Number

4   3038.  And on page 37, that includes your

5   commentary on June 1, 2020, about Pontiac.

6        And, you know, you don't have to read the

7   whole thing, but you can read it silently.

8        But you'll see that the first part is, is what

9   you testified about, that some offenders, during

10  your February 2020 visit, told you that at least in

11  the MTC -- the Modified Therapeutic Community --

12  that they claimed they were only getting two 1.5

13  hours of groups per week and 9 hours of yard time?

14       Do you see that in the middle of that

15  paragraph?

16  A.   Yes.

17  Q.   And your report doesn't make any comment

18  disagreeing with what the Department reported with

19  respect to the BMU?

20       MR. MILLS:  I'm going to object, Your Honor.

21  That is not what it says at all.  It specifically

22  says that for everybody he's objecting to counting

23  movie groups as structured out-of-cell time.

24       THE COURT:  Let me take a moment and read it.

25       There's nothing in here that -- in that

 1  paragraph that disputes the hours regarding the RTU
 2  except for the Modified Therapeutic Community part.
 3  That's my reading of it.
 4      MR. MILLS:  Your Honor, respectfully, I
 5  believe that the last sentence about movie groups
 6  refers to both -- to all movie groups, regardless
 7  of which community is going to see them.
 8      THE COURT:  Okay.  It could be.  Let's move
 9  along.
10  BY MR. REES:
11  Q.  We'll move on.  Just on that point,
12  Dr. Stewart, are you aware that movie groups were
13  limited for people that were in restrictive
14  housing?
15  A.  I'm not aware of that.
16  Q.  Okay.  We'll cover that with other witnesses
17  if we need to.
18      With respect to Plaintiffs' Exhibit 9, which
19  was your most recent report, your update that you
20  provided on -- I think it's January 24, 2022 --
21  A.  Yes.
22  Q.  -- I'm not going to go over the whole thing,
23  but you list a few conclusions.
24      The first conclusion is that the Department is
25  not providing structured time pursuant to the

1  agreement.

2      You understand the Department agrees with

3  that; they don't dispute that?

4  A.   That they're not providing the amount of

5  structured time that's listed in the agreement?

6  Q.   Correct.

7  A.   Yes.

8  Q.   Yes.   The Department gave you those numbers?

9  A.   Yes.

10  Q.   And the same thing with respect to

11  unstructured.   The Department gave you the numbers

12  that allowed you to conclude that they're not

13  provided the unstructured time?

14  A.   Correct.

15  Q.   And with respect to your conclusion about the

16  risk of harm, you say that people assigned to the

17  RTU are at a substantial risk of serious harm for

18  not receiving enhanced mental health treatment,

19  correct?

20  A.   Yes.

21  Q.   And are you aware that in your semi-annual

22  reports, you never commented on enhanced mental

23  health treatment with respect to RTU care?

24  A.   I'm aware that I never use that term

25  specifically.

1  Q.   And if we go back to your report, DX 14 that
2  we were looking at, the paragraph the judge read,
3  you comment on the hours.  You don't include any
4  comment about a failure -- you don't raise any
5  alarm about a particular failure to provide
6  enhanced mental health treatment?
7  A.   Well, you're, you're right in that in that
8  paragraph I did not list that, but I would explain
9  that by saying that the overall rating of X(d),
10 which includes that section you were reading
11 earlier, received a rating of non-compliance.  And
12 the requirement itself references the Standard
13 Operating Procedure.
14 Q.   So, the enhanced mental health treatment's
15 actually not discussed explicitly in Section X(d),
16 is it?
17 A.   It's implied by reference.
18 Q.   It's implied by reference to the Department's
19 administrative directives and its Standard
20 Operating Procedure manual?
21 A.   Yes.
22 Q.   So, you understand that the Department's
23 policy is that they -- the Department is committed
24 to providing enhanced mental health treatment?
25 A.   The policy is, yes.

1  Q.  Yes.  It's just not explicitly stated in the

2  Settlement Agreement?

3  A.  Well, by -- it's not explicitly stated, but

4  certainly it's clear by reference that it includes

5  that.

6  Q.  Okay.  And you talked to Mr. Mills a little

7  bit about some of the features of an RTU, and do

8  you agree that the goal of an RTU is to provide a

9  safe environment to teach those patients skills and

10  positive behaviors to allow them to, if possible,

11  to return to the general population?

12  A.  Yes, I agree with you that the goal is to be

13  able to address the person's underlying serious

14  mental illness which is associated with functional

15  impairments to help them return to a general

16  population setting.

17  Q.  And, and do you agree that part of that is

18  that the Department needs to provide a safe

19  environment for the RTU patients?

20  A.  Well, yes.  I mean, you can't have good

21  treatment unless it's safe.

22  Q.  And do you agree that the safety includes

23  protection from COVID-19?

24  A.  Certainly that is included in safety.  No

25  question.

1   Q.   And do you agree that having a safe and

2   supportive milieu or environment in the RTU also

3   includes protecting those patients from assaults

4   that could happen by other patients?

5   A.   Well, yes, I mean, let's be real clear.   You

6   can't have good treatment in a correctional setting

7   unless it's -- unless they're safe.

8   Q.   Okay.   And let me just talk about a few other

9   features and just how the RTU program works in the

10   Department of Corrections.

11       You understand that, that individuals are

12   assessed for whether they're appropriate for an RTU

13   level of care, correct?

14   A.   Yes.

15   Q.   And, and if they are assessed as appropriate

16   -- and does that include whether they would, for

17   example, benefit, say, from the Behavioral

18   Modification Unit at Pontiac?

19       Are these the kind of people who might benefit

20   from that kind of care?

21   A.   Okay, I'm sorry.   I lost the question in

22   there.

23   Q.   I'm just asking if part of the goal is to find

24   patients who would benefit from being in that

25   residential setting?

1    A.   Well, it's not just you're finding patients.

2    You're looking at individuals who have serious

3    mental illness with associated functional

4    impairments that require a higher level of care.

5    Q.   Okay.

6    A.   In your assessment, if you feel that this

7    individual would benefit more from a BMU as opposed

8    to another type of residential treatment, then

9    that's appropriate also.

10   Q.   Okay.  And then after people are assessed,

11   then they -- the Department actually has to

12   physically transfer them to wherever they might be

13   housed within the Department of Corrections and

14   transfer them to the RTU, correct?

15   A.   Correct.

16   Q.   And in your most recent report which is -- I'm

17   talking about your December 6th, 2021, midyear

18   report.  And that's DX 13, for the record.  And

19   I'll -- again, I can show you pieces of that if

20   needed.  But you gave the Department credit, that,

21   you know, they had previously had difficulties with

22   delayed transfers but that those delayed transfers

23   had been well-addressed?

24   A.   Correct.

25   Q.   And that you were saying that, of the people

1  who were transferred, that a large majority were

2  reaching the RTU within a month?

3  A.   Correct.

4  Q.   And, and your conclusion was that the lengthy

5  waits that had been seen earlier in the pandemic

6  had been largely cured and only affected about

7  5 percent of the referrals during your most recent

8  monitoring period?

9  A.   Yes.

10  Q.   Okay.  And are you aware that the Department,

11  in addition to its standard RTU, it's also

12  implemented a modified RTU or sometimes called

13  mRTU?

14  A.   Yes, I was involved in those discussions.

15  Q.   And the Department agreed to provide a

16  modified level of care?

17  A.   Yes.

18  Q.   And what is, just briefly -- we don't need to

19  belabor it, but what is a modified RTU?

20  A.   Well, it's, it's based from the RTU

21  population.  So, you have individuals that have

22  been treated with some degree of success in the RTU

23  setting, that they're not well enough to return to

24  a general population setting, but they're not sick

25  enough to remain in an RTU setting per se.  And so

1  that's why sort of -- the Department and I talked

2  about maybe this middle range.

3  Q.   And the Department's implemented that at

4  Dixon, Logan and Joliet?

5  A.   I believe at Menard also.

6  Q.   Okay.

7      MR. REES:   Judge, it's noon, and I'm about to

8  start on a slightly different topic, so let me ask

9  if you would like to take a break now or --

10     THE COURT:   Well, I thought we were going to

11  go until 12:30.   That's what the -- that's what the

12  program --

13     MR. REES:   That's fine.   I will confess, Your

14  Honor, among the things I've been doing, I haven't

15  spent time looking at the schedule.

16     THE COURT:   Well, let me ask this.   How much

17  do you have left?

18     MR. REES:   I have, you know, some fair amount.

19  You know, I'll look at my notes and see how I can

20  streamline it, but --

21     THE COURT:   Do you think you can pretty much

22  finish in another half hour?

23     MR. REES:   I doubt it, but, you know, I'm

24  happy to go another half hour.   I'm happy to keep

25  going and then assess when we're done at 12:30.

1      THE COURT:  Let's keep going if you don't

2    mind.

3      MR. REES:  Yes, sure.  That's fine.

4    BY MR. REES:

5    Q.  So, let me -- Mr. Mills talked to you about

6    the concept of the BMU.  What's a BMU?

7    A.  Behavioral Management Unit.

8    Q.  And what is -- just tell me how a BMU -- and

9    there's a BMU at Pontiac, JTC and Menard, correct?

10   A.  I believe so.

11   Q.  Okay.  And again, just for clarity, when we're

12   talking about Pontiac, we're talking about 40

13   patients in the BMU at Pontiac?

14   A.  Yes.

15   Q.  Okay.  And when was the BMU added to Pontiac;

16   do you know?

17   A.  You know, Pontiac had a real hard time

18   establishing their RTU so I can't -- I couldn't

19   tell you exactly when the BMU was begun.

20   Q.  Do you know if it was started just before the

21   pandemic, around January 2020?

22   A.  That sounds about right, but I'm not

23   absolutely sure.

24   Q.  I think you note that in your June 20 --

25   June 1, 2020 report, but we can check that.

1     How is a BMU different from an MTC?

2     And again, for the record, we have all these

3  acronyms.  What's an MTC; Modified Treatment

4  Community?

5  A.   Yes.

6  Q.   How is a BMU different from the MTC at

7  Pontiac?

8  A.   Well, by policy, the BMUs are designed for

9  individuals with serious personality disorders that

10  have, again, functional impairments that keep them

11  from being in the general population.  And it's

12  more of an incentive-based program to help deal

13  with people's severe personality issues.

14  Q.   And when you say "incentive based," can you

15  tell us how that works; do you know?

16  A.   You know, generally if a person doesn't

17  assault anyone for a week, they're given a point or

18  something, for example.  Or -- and if they attend

19  their groups, then they're given credit.  And then

20  as you gain credits, you're able to move through

21  the system.

22  Q.   I take it you support the concept of a BMU for

23  people who have personality disorders?

24  A.   The concept of the BMU is a good one, yes.

25  Q.   Okay.  And do you know if for at least BMU

133

1  patients that might be in restrictive housing or

2  who have discipline on their record that they're

3  able to use the BMU to actually earn reductions in

4  their discipline?

5  A.  I believe so, but I'm not 100 percent sure.

6  Q.  And are you familiar with dialectic behavioral

7  therapy?

8  A.  Yes.

9  Q.  What is it?

10  A.  It's just a particular form of therapy that

11  has been found to be helpful in dealing with people

12  with severe personality issues.

13  Q.  And do you -- are you familiar with the Julie

14  Brown program?

15  A.  No, I'm not.

16  Q.  Are you familiar with Lenahan?

17  A.  No, I'm not sure what you're referring to,

18  sir.

19  Q.  These are forms of dialectic behavioral

20  therapy that are provided at the Department.

21      You understand that part of what the

22  Department does in this BMU that provides

23  documentation and that are used in part of the

24  Julie Brown program which is a form of dialectic

25  behavioral therapy?

1          If you don't know that, that's fine.  I'm just
2    asking if you're aware of that?
3          MR. MILLS:  I'm confused, Your Honor.  So far
4    the evidence is they're not providing any therapy
5    at all in the BMU, so are we talking pre-pandemic?
6    Are we talking currently?  What are we talking
7    about in terms of these programs that Doug is
8    talking about?
9          THE COURT:  Well, let's find out.
10          MR. REES:  I'm trying to lay the foundation of
11    whether Dr. Stewart even knows what the Julie Brown
12    program is.
13          THE COURT:  That's fine.
14    BY MR. REES:
15    Q.  I think the answer is -- is the answer no?  I
16    don't mean to beat this horse.
17          THE COURT:  Is this a program that the defense
18    is saying is presently in existence?
19          MR. REES:  Yes.
20          THE COURT:  Okay.  Let's move ahead then.
21    BY MR. REES:
22    Q.  I'm just asking if you understand that Julie
23    Brown program is a simplified -- a modified,
24    simplified form of dialectic behavioral therapy
25    that helps people in the BMU reinforce positive

1  behavior?

2  A.   Sir, you know, I believe I said I'm not

3  familiar with it.   And if I'm not, then it's never

4  come up in my discussions with staff; it's never

5  come up in my discussions with the class members;

6  and it's never come up in my review of medical

7  records.   So --

8  Q.   Okay.   That's fine.

9  A.   I just want to be clear that I'm not

10  disagreeing with you that that's what it says, but

11  I've never seen Julie Brown or Lenahan or whatever

12  the person's name that you mentioned in all of my

13  review to date.

14  Q.   So, you don't know, for example, if the

15  documents Mr. Mills showed you at Defendants'

16  Exhibit 44 include documents that are part of the

17  Julie Brown program?   You don't know that?

18  A.   I'm not aware of the existence of a Julie

19  Brown program.

20  Q.   Okay.   That's fine.   We'll have other

21  witnesses testify about it.

22       And, again, just to provide the context, going

23  back to Dixon, that you testified that at Dixon

24  there's an STC?

25       And, again, for the record, STC stands for

1   specialized treatment community?

2   A.   I believe Special Treatment Community,

3   something like that, yes.

4   Q.   And you described the housing in the STC?  You

5   described the housing at the STC?

6   A.   Well, it's not -- I'll tell you what it's not.

7   It's not like a traditional prison wing with tiers

8   and cells like that, but they are -- it is a unit

9   with cells.  It has a day room.  And it was

10  existent -- in existence prior to the Settlement

11  Agreement.  They just sort of changed the title

12  once the Settlement Agreement came into.  That, in

13  the best of times, it allows for people to be out

14  of their cell the majority of the day,

15  participating in treatment activities.

16  Q.   Okay.  And again, I'm not holding you to this

17  as a memory test; I think the parties have

18  stipulated to these numbers.  But if I tell you

19  that currently at the STC in Dixon there are about

20  284 patients, would that seem about right to you?

21  A.   Yeah, I always thought it was around 300.

22  Yes, you're right.

23  Q.   And about -- at Dixon X House, about 143?

24  A.   Something like that, yes.

25  Q.   And those people at X House are divided; I

1    think as you testified earlier, some are in
2    restrictive housing, and then the other three wings
3    are -- are those maximum security at X House?
4    A.   Yes.
5    Q.   Okay.  You understand that at the RTUs, the
6    psychiatric care is provided on-site, not by
7    telepsychiatry?
8    A.   Based on my recent visits to Dixon and
9    Pontiac, I'm aware that at least the people that I
10   reviewed and the charts that I reviewed showed
11   evidence of face-to-face contact with the
12   psychiatric provider.
13   Q.   Is it the Department now outpatient facilities
14   might be able to use telepsychiatry?
15   A.   I'm sorry, the question again?
16   Q.   You understand that at the Department that
17   outpatient facilities, individuals who are at an
18   outpatient level of care, they might be seen by a
19   psychiatrist through a telepsychiatry visit?
20   A.   Yes.
21   Q.   But at the RTU level, it's on-site,
22   face-to-face?
23   A.   Again, based on my reviews.  I can't testify
24   to in every case in the RTU it's done face-to-face
25   visit with the psychiatric provider.  But in the

1    cases that I reviewed and the people I spoke to,

2    they refer to face-to-face visits with their

3    psychiatric provider.

4    Q.   Okay.  And I think you testified that people

5    in the RTU, as far as -- based on your assessment

6    are generally being seen by their psychiatrist, you

7    know, every 30 days?

8    A.   Generally, yes.

9    Q.   Well, isn't it true that you found that

10   91 percent were seen consistently within 30 days or

11   within an additional week?

12   A.   In the -- when a person is placed in the RTU?

13   Q.   I'm just asking that when you reviewed

14   psychiatric care that you confirmed that, that they

15   were seen -- the psychiatrists were seeing the

16   patient within 30 days, or 91 percent of those

17   visits were consistently within an additional week?

18       MR. MILLS:  Objection as to vague, Your Honor.

19   Are we talking about the RTU unit, or are we

20   talking about the entire system?

21   BY MR. REES:

22   Q.   Let me go to Defendants' Exhibit 13 at page

23   18.

24       So, this is -- for the record, the Defendants'

25   Exhibit 13 is your most recent semi-annual report,

1  December 7, 2021.  Okay?

2  A.  Okay.

3  Q.  And you're talking about -- if you need --

4      Laura, if we need to scroll up.

5      You can see you're talking about psychiatric

6  care in this section of your report.

7  A.  Okay.

8  Q.  You're talking about VII(d), about people who

9  are prescribed psychotropic medications.  They're

10 supposed to be seen by a psychiatric every 30 days?

11 A.  Yes.

12 Q.  And then on page 18, you say the practice was

13 better with RTU patients.  "In a 45-patient study

14 using the same method, 56 percent were seen

15 consistently as planned and almost always at 30-day

16 intervals, and 91 percent were consistently seen by

17 that point or within one additional week," correct?

18 A.  Yes.

19 Q.  That was during the pandemic?

20 A.  Correct.

21 Q.  You also understand that, as currently

22 operating, even during the pandemic, that

23 individuals housed in the RTUs participate in

24 school programs at a higher rate than their

25 outpatient counterparts?

1  A.   I am not familiar with that, sir.

2  Q.   Look at DX 13 at page 65, please.  We'll show

3  it to you.   65.

4      And I'm looking -- if you look at the bottom

5  of the page -- and we can, you know, if you need

6  more context, please, but at the bottom of the page

7  65 is the footnote 79.

8      I'm sorry, that one was general employment.

9  Hold on.  First I'm talking about education.  Note

10  73 -- I'm sorry.

11      First I'm talking about footnote 73 on page

12  64.  Sorry.

13      You note that RTU patients participated in

14  school at a higher rate than their outpatient

15  counterparts?

16  A.   Yes.  Yes.

17  Q.   Based on the sampling that you did, you didn't

18  know if that was a representative sample because

19  you only talked to a few people, right?

20  A.   Correct.

21  Q.   And then with respect to -- so, that's with

22  respect to education, it's being offered to RTU

23  patients during the pandemic.

24      You understand that during the pandemic, RTU

25  patients are also allowed to have jobs or work

1  assignments?

2  A.   Yes.

3  Q.   And you interviewed nine RTU patients about

4  their employment for your last report, correct?

5  A.   Correct.

6  Q.   And you found that five of them had jobs?

7  A.   Yes.

8  Q.   Right?

9  A.   Yes.

10 Q.   And is it -- is it your view that the jobs and

11 their work jobs should count as a structured

12 therapeutic activity?

13 A.   No, it's not a structured therapeutic

14 activity.

15 Q.   Do you agree that an individual having a job

16 could help them develop a high rate of

17 self-fulfillment and self-confidence?

18 A.   There's a lot of good things that could happen

19 when people -- when an individual, a mentally ill

20 individual has a job, but it's not a structured

21 therapeutic activity.

22 Q.   And do you -- based on the limited study that

23 you did -- the study that you did, you said that as

24 for education that the RTU patients had a higher

25 rate of employment than their outpatient

 1  counterparts.  Is that true?

 2  A.   That's what my report states, yes.

 3  Q.   That's not just what your reports state.

 4  That's what you found, right, based on your study?

 5  A.   Yes.

 6  Q.   And you talked on, on direct examination about

 7  community meetings, and I think you even talked

 8  about attending a meeting during your visit at the

 9  Dixon STC?

10  A.   Correct.

11  Q.   Right?  Do you remember that testimony?

12  A.   Yes.

13  Q.   Let me find my notes on that.

14       One of your criticisms was that it was --

15  there were some staff that walked through the

16  meeting?

17  A.   Well, there were staff in the meeting and

18  staff that were walking through the meeting.

19  Q.   And isn't it true that you found that meeting

20  to be very clinical?

21  A.   What are you referring to, sir, where I stated

22  that?

23  Q.   That meeting -- that meeting that you

24  attended, you described it in your report as having

25  been very clinical.

1      MR. MILLS:  Can I have the citation he's

2  referring to, Your Honor?

3  BY MR. REES:

4  Q.  Well, I'm asking him first if that's your

5  recollection.  I have to find your testimony

6  because I think you pooh-poohed it in your

7  testimony.  I'm trying to find it in my notes.

8      Yes, you said that you observed one community

9  meeting.  You noted that there were two or three

10  custody officers who walked through.  And you said

11  that a BHT was leading the meeting and that you

12  couldn't understand the purpose of the meeting.

13      That's what you said on direct examination.

14  A.  Correct.

15  Q.  Okay.  And I'm asking you, is it actually --

16  did you -- you recall -- I'll show you, but isn't

17  it true that you reported that meeting as having

18  been -- was very clinical?

19      MR. MILLS:  Again, Your Honor, I'm asking for

20  where Mr. Rees is claiming that's what was said.

21      THE COURT:  Well, let him start with that

22  question.

23      Go ahead, answer that question if you can.

24  A.  I don't recall the exact reference.  It's very

25  likely that I would have said that, but I don't --

1  Q.  Okay.  Let's go to page 60 of DX 13.  And down

2  -- three paragraphs down, the paragraph starting

3  with, "Likewise."  You can take a minute and read

4  that to yourself and tell us if that's the meeting

5  that you testified about during your direct

6  examination.

7      (A pause was had in the record.)

8  A.  Yes, that's the meeting that I was referring

9  to during my direct exam.

10 Q.  And then your last sentence, you said it was a

11 very clinical discussion, correct?

12 A.  Yes.

13 Q.  And your concern was that you thought it might

14 have been inhibited by the presence of the custody

15 officers, but -- and you noted that even if it was

16 the Department that might have thought it wasn't so

17 clinical, but you thought it was a clinical

18 meeting?

19 A.  Thought it was attempted to be a clinical

20 meeting, yes, that's what I observed.  But I

21 believe I testified to on direct also --

22 Q.  Right.  I'm sorry to interrupt.

23 A.  -- that a BHT was reading stories about

24 characters from Disney movies and was asking the

25 members if they had ever experienced similar

1  emotions.

2  Q.   Right.

3  A.   It -- in that sense, it was a clinical

4  meeting.

5  Q.   Okay.  She was trying to get them to engage

6  and discuss their emotions and their feelings,

7  right?

8  A.   Correct.

9  Q.   Are you aware that in the RTUs during the

10 pandemic that the Department has increased rounds

11 that were previously once every seven days to twice

12 a week?

13 A.   I'm aware that rounds have increased during

14 the pandemic.

15 Q.   Right.  And do you agree that that's a good

16 thing?

17 A.   I agree that more frequent contact with

18 patients is a good thing, but these rounds are, are

19 always done at cell front with no confidentiality.

20 Q.   Well, during the, the visits that you made for

21 your December 7, '21, report, your most recent

22 report --

23 A.   Yes.

24 Q.   -- when you talked to individuals, to patients

25 during your visits, didn't they tell you that they

1    were confident that they could get access to mental
2    health staff during the pandemic?
3    A.   I would like to be refreshed on where I might
4    have said that.
5    Q.   All right.  Let's look at DX 13 at page 11.
6         The big paragraph in the middle under
7    Findings, you talked about referrals from MHP and
8    appointments.  And then you say, "In nearly every
9    site, even those where patients had poor
10   experiences with written referral responses,
11   patients often reported confidence in accessing
12   mental health staff by conveying oral requests
13   through officers or BHTs on rounds, asking MHPs
14   when they were in the building, or during MHP
15   office hours.  During the pandemic, MHPs and BHTs
16   have used these methods to increase their presence
17   in the housing units, a sensible adaptation that
18   appears to be effective in increasing access and
19   more quickly addressing patient needs."
20   A.   Yes.
21   Q.   That's what you --
22   A.   That's stated there, yes.
23        THE COURT:  Could I interrupt and have you ask
24   the witness what is meant by "rounds," what that
25   involves?

1    MR. REES:  Sure.

2  BY MR. REES:

3  Q.  Can you explain that, Dr. Stewart, please?

4  A.  Your Honor, a round as is used by the

5  defendants is that there is an individual, usually

6  a BHT, that literally walks a tier and looks into

7  each cell and has a quick check-in, say, *How you*

8  *doing?*

9    And they'll say good or bad or whatever.  It's

10  that -- that is a round, Your Honor.

11    THE COURT:  All right.  Thank you.

12  BY MR. REES:

13  Q.  And let me just move on to risk of harm.  You

14  haven't performed any study, have you, showing that

15  there's a higher rate of decompensation for RTU

16  patients who are not getting out-of-cell time

17  compared to RTU patients who are getting

18  out-of-cell time?

19  A.  I have not done that particular study, but I

20  would say that I'm not aware of any RTU patients

21  that are getting sufficient out-of-cell time.

22  Q.  Oh, they are at Logan, right?

23  A.  Well, among Dixon and Pontiac, excuse me.

24  Q.  And have you done any, any analysis or study

25  showing that RTU patients are -- have a high rate

1  of decompensation compared to anyone else?

2  A.   I have not done that study.

3  Q.   And you recall that you've previously rated

4  the Department in substantial compliance with

5  respect to suicide prevention, correct?

6  A.   I have stated that the Department was in

7  compliance in that they were following their

8  written procedures and administrative directives

9  regarding the completion of an administrative

10  review and a psychological autopsy within the time

11  frames mandated in their own policy.

12  Q.   And have you done any study to compare rates

13  of suicide at the Illinois prisons compared to

14  other prisons?

15  A.   I have not.

16       THE COURT:   I think we're getting close now.

17  You can pick a point in the next five minutes where

18  you can stop, okay?

19       MR. REES:   Your Honor, if you don't mind, let

20  me look at my notes here and --

21       THE COURT:   Absolutely.   Go ahead.

22       MR. REES:   What I'd like to do, Your Honor, if

23  you don't mind, is I think I could be close to

24  finishing.   I could take a couple minutes here, if

25  you don't mind --

1       THE COURT:  Certainly.

2       MR. REES:  I'd like to maybe take a short

3    break and see because I don't know if we have a

4    chance to call him back after lunch, but I'd like

5    to be done if I can, and I think I'm close.

6       THE COURT:  Okay.

7       MR. REES:  Let me ask --

8       THE COURT:  He's scheduled to be here after

9    lunch.

10       THE WITNESS:  I'm scheduled to be here all

11    day, Your Honor.

12       THE COURT:  Anyway, what were you going to

13    say, Mr. Rees?

14       MR. REES:  Well, what I'd like to do, Your

15    Honor, is I'd like to -- maybe I can finish up for

16    now, but I'd like to maybe see if we can resume

17    after lunch and see, you know, what more I might

18    have.  I'm not telling you that I'll have a lot,

19    but I'd like to have the opportunity to look at my

20    notes.

21       THE COURT:  No, that's fine.  Absolutely.

22       MR. REES:  Maybe, Your Honor, given the time,

23    can we just break now?  And I think then I'll

24    probably have to come back and just ask some

25    questions.

1      THE COURT:  Okay.  So, we'll be in recess

2  until 1:30.  Okay?

3      MR. MILLS:  Your Honor, I want to note that

4  the schedule we had all agreed on anticipated a

5  three-hour cross by Mr. Rees so we'll have to bump

6  some other witnesses forward; otherwise, we're

7  going to have some empty time here.

8      THE COURT:  Well, let me ask, Mr. Rees, what

9  would you estimate you have left?  How much time?

10      MR. REES:  Your Honor, maybe at most a half

11  hour.

12      THE COURT:  Oh, okay.

13      MR. REES:  It may be shorter than that, Judge.

14  I think -- so, what we'll need to do -- I'm looking

15  over to Laura.  We're looking to see the

16  availability of the next witnesses.

17      THE COURT:  And then how about redirect?

18      MR. MILLS:  I would guess 15 minutes,

19  depending, of course, on what Mr. Rees --

20      THE COURT:  Maybe we could possibly have the

21  next witness available at 2:30 if that's possible?

22      MR. REES:  We'll shoot for that, Your Honor.

23      THE COURT:  That would be Dr. Wilks?

24      MR. MILLS:  The director.  The warden.

25      THE COURT:  Warden Wilks.

1     Okay.  Thank you.  1:30.

2     MR. REES:  Thank you, Your Honor.

3     THE COURT:  Bye.

4     (Recess at 12:28 to 1:31 p.m.)

5     THE COURT:  Do we have everyone we need to get

6  started, or do you want to wait?

7     MR. MILLS:  We are ready, Your Honor.

8     MR. REES:  We're good on our end.

9     THE COURT:  All right.

10     MR. MILLS:  We should point out, I think we

11  have a witness problem this afternoon, which I know

12  Laura and Amanda have been working on, but I'm not

13  sure we have enough to fill the afternoon.

14     THE COURT:  All right.  Well, we'll do what's

15  possible.

16     Okay.  All right.  Why don't you go ahead,

17  Mr. Rees.

18     MR. REES:  All right.  Thank you.

19  BY MR. REES:

20  Q.  Dr. Stewart, can you hear me?

21  A.  Yes, I can.  Thank you.

22  Q.  Thank you.

23     You understand you're still under oath?

24  A.  Yes.

25  Q.  During your direct examination, I think early

1  on you talked about your role as monitor and that

2  part of that role is that you give the Department,

3  when you can, advice?

4  A.   Yes.

5  Q.   And you also testified -- Mr. Mills asked you

6  about -- I think it was an August 31, 2020, meeting

7  that you had with senior staff, and I don't -- my

8  notes aren't completely detailed.  I can't remember

9  if you testified that that was a meeting that

10 included Directors Hardy, Smith and Simmons?

11      Do you remember that meeting?

12 A.   Yes.

13 Q.   And that was a meeting that was apart from one

14 of your site visits, correct?

15 A.   Yes, it was -- it was separate from any

16 particular site visit.

17 Q.   Right.  It was a special meeting set up, and

18 it was set up to discuss, in particular, what the

19 Department might be able to do during COVID?

20 A.   Well, that was what I hoped would happen

21 because of this call.  I just wanted to make sure

22 that we were -- that we, meaning myself and the

23 Department leadership were on the same page

24 regarding the need for not just maintaining the

25 level of mental health care but possibly even

1   increasing it because of COVID.

2   Q.   And Mr. Mills, I think, showed you your

3   midyear report for 2020 which, I think, was a

4   November 2020 report.  And in that 2020 report, you

5   described this meeting, and you described that

6   meeting as being a very productive meeting with

7   Department leadership.

8        Do you recall that?

9   A.   I thought the meeting was productive, yes.

10  Q.   And do you recall that during that meeting,

11  the Department officials asked you what else they

12  could be doing during COVID?  Do you remember them

13  asking you that question?

14  A.   I believe that was some of the questions,

15  yeah.

16  Q.   And do you remember at the time you said you

17  didn't know what else they could be doing?  That's

18  what you said to them during the meeting?

19  A.   Well, I don't know if I just said that.  I

20  might have said that but also was suggesting to

21  them that they utilize any available open space to

22  bring people out of their cells.  So, it wasn't

23  just I said, *Well, I don't know what to do.  You*

24  *guys have to figure it out*.

25  Q.   Well, whether you said that during that

1  meeting or not, you did then include in your

2  November report that then you came up with the idea

3  and reflected in your November report that one --

4  an example, if there's an empty room, that they may

5  even just have the person sit there to just get

6  them some space out of their cell and that that

7  would be beneficial.

8      Do you recall that?

9  A.  Yes.

10 Q.  Okay.  And you said that even small efforts

11 like that could be just the thing that keeps a

12 fragile, mentally ill offender from requiring the

13 crisis watch placement referral to an RTU?

14 A.  Yes.

15 Q.  And with respect to your report, I think you

16 also testified that you give opinion as to whether

17 the Department has achieved what's defined in the

18 Settlement Agreement as substantial compliance,

19 correct?

20 A.  Correct.

21 Q.  And in your report, it's a binary rating.  You

22 either rate the Department in substantial

23 compliance or you give them a rating of

24 non-compliance?

25 A.  Correct.

1  Q.   And you understand by rating the Department in

2  any category non-compliant that that may mask the

3  Department's true performance in meeting the

4  requirements?

5  A.   No.

6  Q.   You don't agree with that, that it masks their

7  true performance?

8  A.   No.

9  Q.   I want to make sure you understand my

10  question.

11      You agree that a rating of non-compliance may

12  mask the Department's true performance in meeting

13  the requirements of the Settlement Agreement?

14  A.   No, I don't agree with that.

15  Q.   Okay.  Let's turn to Defendants' Exhibit 14

16  and, in particular, page 13.

17      THE COURT:  What is this document again?

18      MR. REES:  This is, Judge, exhibit --

19      Scroll down just a little bit.

20      This, Your Honor, is Defendants' Exhibit 14.

21      THE COURT:  Right.

22      MR. REES:  Which is Dr. Stewart's June 1,

23  2020, midyear report.

24      THE COURT:  Okay.  Thank you.

25  BY MR. REES:

1    Q.   And at the top of page 13, Dr. Stewart, you

2    comment about compliance ratings.  And you say in

3    that report, In previous reports, the team, meaning

4    the monitoring team, applied the, quote,

5    substantial compliance, close quote, and, quote,

6    non-compliance, close quote, ratings for each

7    provision as specified in the settlement.  In

8    actual fact, these may mask IDOC's true performance

9    in meeting the requirements of the settlement.

10        That's what you said in that report, correct?

11   A.   Yes.  Okay.

12   Q.   And it's also true that it was your view then

13   that IDOC has made substantial progress on a number

14   of requirements that could possibly be more

15   accurately described as partially compliant,

16   correct?

17   A.   I have stated that, yes.

18   Q.   So, it's true that if you give the Department

19   a rating of substantial -- of non-compliance -- I'm

20   sorry.

21        If you give the Department a rating of

22   non-compliance that they could still be making

23   substantial progress toward complying with that

24   provision?

25   A.   Yes, I agree with that.

 1      MR. REES:  I have no further questions at this
 2  time, Your Honor.
 3      THE COURT:  All right.  Thank you.
 4      Redirect.
 5      MR. MILLS:  I'm muted.  Sorry, Your Honor.  I
 6  just wanted to make sure -- do you want me to go
 7  before you ask any questions you may have?  I know
 8  prior --
 9      THE COURT:  Yes, I want both sides to be done
10  before I question.
11      MR. MILLS:  No problem.
12              **REDIRECT EXAMINATION**
13  BY MR. MILLS:
14  Q.  I guess I want to start with a general
15  question:  At any time in the last six, eight
16  months, has the Department told you that they're
17  invoking force majeure because -- in the RTUs'
18  out-of-cell time?
19  A.  Not in the last six to eight months.
20  Q.  Mr. Rees started asking you questions about
21  the NCCHC standards and indicating that they did
22  not require any particular number of hours.
23      I'd like to look at those standards.  I'm
24  particularly referring to Defendants' Exhibit
25  Number 1 and pages 96 to 98 which has --

1       THE COURT:  What is this document?

2       MR. MILLS:  This is the national commission on

3    health care standards that I started his

4    examination with.

5       THE COURT:  Okay.

6    BY MR. MILLS:

7    Q.  One of the standards for mental health

8    programs in residential units is that mental health

9    programs or residential units meet the serious

10   mental health needs of patients?

11       (Counsel conferred off the record.)

12       MS. ANTHOLT:  I'm sorry, can we have one --

13       MR. MILLS:  Sorry, we're trying to find the

14   right page, Your Honor.  I have the quote written

15   out, but I don't have the exact citation here.

16       THE WITNESS:  You just had it.

17       MS. ANTHOLT:  Sorry.

18   BY MR. MILLS:

19   Q.  There you go.  So, there is a standard for

20   residential units, and in looking at "B" under

21   paragraph 3, it says that one of the requirements

22   is that it meet the mental health needs of patients

23   on the unit.

24       Do you agree that is an appropriate standard?

25   A.  Yes.

1  Q.   And do you have an opinion as to whether or

2  not in the Dixon and Pontiac RTUs that they are

3  meeting that standard?

4  A.   It's my opinion that they are not meeting that

5  standard.

6  Q.   So, looking again at -- a little higher up

7  with the more basic standards, under paragraph

8  2(d), it says that -- this is not just RTUs; this

9  is general compliance -- you need to have

10  individual and group counseling as clinically

11  indicated.

12      Do you agree that that is a requirement in

13  general for correctional health care?

14  A.   Yes.

15  Q.   And is that also true for the RTUs?

16  A.   Yes.

17  Q.   And are the RTUs at Pontiac and Dixon meeting

18  that aspect of the NCCHC standards?

19  A.   No, they are not.

20  Q.   We've talked about --

21      Sorry, Judge, we took it down too soon.

22      Yes, paragraph four, right below that.  See,

23  Basic mental health services as clinically

24  indicated but not less than every 90 days?

25  A.   Yes.

1   Q.   And following a treatment plan; you agree that

2   that is also required?

3   A.   Yes.

4   Q.   And are they doing that in the RTUs at Pontiac

5   and Dixon, leaving aside, again, those 15 patients

6   we talked about before that are getting regular

7   services?

8        I'm sorry, Your Honor, Pontiac.

9   A.   So, can you repeat the question?

10  Q.   Sorry.  Is the RTU at Pontiac providing mental

11  health services that are clinically indicated not

12  less than every 90 days?

13  A.   No.

14  Q.   Okay.  Right.  And particularly as -- it goes

15  on to say "as prescribed in their individual

16  treatment plans."

17       Are those being followed at the Pontiac RTU?

18  A.   No.

19  Q.   You talked about the use of community space,

20  the community meetings, and Mr. Rees asked you

21  questions based on your report where you said that

22  the -- I think it was the BHT who was leading it

23  was attempting to have a clinically appropriate

24  meeting.

25       Are you disagreeing that she was trying to do

1    that, or are you disagreeing that she succeeded in

2    doing that?

3    A.   I disagree that she was succeeding in doing

4    that.  And -- well, there's more to that whole set

5    of opinions than your question implies.

6    Q.   Tell us about the opinion in general.

7    A.   Well, I -- having observed the community

8    meeting and saw where there was guards within the

9    meeting, guards walking through the meeting from

10   one part of the wing -- one part of the tier to the

11   other, other class members that weren't part of the

12   meeting were wandering in and out, and then based

13   on the lack of confidentiality, I felt that it was,

14   although heavy clinically oriented -- attempted to

15   be clinically oriented, it wasn't achieving that

16   goal.

17       And that elicited a discussion -- better

18   described as an argument -- with legal counsel for

19   the Department when I said, *You really can't count*

20   *community meetings as structured therapeutic*

21   *activities because of the lack of confidentiality*

22   *at a minimum.*

23       And her response was, *Well, they're not*

24   *clinical meetings so, therefore, we can still count*

25   *them.  But they're not clinical; therefore, there's*

1  *no requirement for confidentiality.*

2  Q.  And do you agree that it makes sense to make a

3  distinction between the clinical and therapeutic

4  that the legal counsel was making?

5  A.  I, I, I really didn't understand her logic

6  behind that, and I wasn't going to argue that with

7  her.  I just let -- that's something that I felt

8  the Court needed to decide.

9  Q.  Mr. Rees also asked you about basketball as

10  building sportsmanship, and you said, like many

11  things, that it's a good thing.

12      Is it a therapeutic intervention that is

13  appropriate for SMI people in terms of treating

14  their underlying mental illness?

15  A.  You can't say that across the board.  There

16  may be a subset of those people that could benefit

17  from this if it's been identified that their

18  problems exist in lack of teamsmanship, lack of

19  good relationships, these sorts of things,

20  following the rules.  And then if you have that

21  kind of group, then you can measure it.  But that's

22  not what was going on.

23  Q.  And have you read a treatment plan that ever

24  suggests that basketball is something that is

25  prescribed for an individual patient?

163

1  A.  I've never seen a treatment plan that refers
2  to that.
3  Q.  And if you're going to include that in a
4  treatment plan, would an assessment be an important
5  part of that activity?
6  A.  Well, as in all structured therapeutic
7  activities, before you assign a treatment, you have
8  to get a proper assessment and identify those
9  issues that the person has and that they may be
10  best addressed in a particular type of structured
11  therapeutic activity.
12  Q.  So, you're saying it could be useful if there
13  was a treatment plan that said, *This is something*
14  *we have to work on,* this is what was prescribed,
15  they did it, and then they did an assessment to see
16  if it was working and discussed it and had a
17  follow-up with a patient?
18  A.  Then it could be considered more structured
19  therapeutic activity.
20  Q.  And have you ever seen that sort of -- that
21  sort of -- that full range of activities done in
22  relation to something like a basketball program or
23  any of these other things that Mr. Rees talked
24  about, sweeping the floor outside of your cell, the
25  jobs, et cetera?

1    A.   No, I've never seen that type of analysis

2    based on, on those type of activities.

3    Q.   Would increasing the number of people that

4    attended a community meeting help make it more

5    therapeutic?

6    A.   Not necessarily.

7    Q.   Mr. Rees asked you if you were aware of the

8    plans that the Department had to increase the

9    number of people who would attend one of these

10   community meetings.

11        Just increasing the number of people is not

12   going to make it any more therapeutic, is it?

13   A.   No.

14   Q.   They also talked about increasing the length

15   of the community meetings, moving them from one

16   hour to two hours.  Would that cure any of the

17   concerns you have about the non-therapeutic nature

18   of these community meetings?

19   A.   No, not at all.  And, in fact, in my

20   interviews and chart -- my interviews of the people

21   at Dixon, especially in the STC, they -- some

22   people talked about not getting any benefit out of

23   the community meetings, and they just stopped

24   going.

25   Q.   Can we see Defendants' Exhibit 13, page 11?

1    Believe that's where you talked about

2    assessments -- access, I'm sorry.  Access.

3    Yes, you said that even where there were

4    problems -- even where there were problems --

5    people had problems with the actual QMHPs, they

6    didn't have a problem accessing them, with a couple

7    exceptions.

8    That's a finding regarding the entire state,

9    correct?

10   A.   Right.  That was not particular to the RTU.

11   Q.   And so you're not expressing any opinion right

12   here as to whether or not people in the RTUs at

13   Dixon and Pontiac have ease of access to mental

14   health care?

15   A.   Well, in that it's part of the Department, and

16   this was a more general statement about the

17   Department it's included, but it's not particular

18   to Dixon or Pontiac.

19   Q.   You also mentioned rounds that are done

20   regularly.  Does treatment occur during those

21   rounds?

22   A.   No, they're, they're check-ins.

23   Q.   Mr. Rees asked you about whether or not you

24   had ever done a study of people in the RTUs

25   decompensating as compared to everybody else, and

1  you said you hadn't done a personal study.

2      Have you ever -- have you reviewed the

3  literature regarding the effect of solitary

4  confinement on people with serious mental

5  illnesses?

6  A.  Yes, I'm very familiar with that literature.

7  Q.  And what does the literature conclude in terms

8  of -- and that literature includes some other

9  people who have done those studies, correct?

10  A.  There have been multiple studies and multiple

11  articles written in peer-reviewed journals about

12  the deleterious effects of solitary confinement for

13  seriously mentally ill.

14  Q.  And are the effects of solitary confinement on

15  people who are seriously mentally ill worse,

16  better, or exactly the same as it is on people

17  without a serious mental illness?

18  A.  Well, in a person -- everyone has problems in

19  solitary confinement, whether they had a

20  pre-existing mental illness or not.  It's

21  especially difficult for the people with

22  pre-existing mental illness because not only do

23  they develop problems associated just with the

24  confinement, but confinement itself causes their

25  pre-existing mental illness to become worse.

1  Q.   And is it your testimony that that's what the

2  literature generally establishes?

3  A.   The literature is very clear on that.

4  Q.   And do you agree with that conclusion?

5  A.   Yes.

6  Q.   I think my final question is, Mr. Rees ended

7  by asking about small things, like moving somebody

8  to an empty room, and I believe he said that your

9  conclusion was that was a good way to avoid

10  transfers to RTUs.  Is that what you said?

11  A.   Yes.

12  Q.   Is it your testimony that those small things

13  that are avoiding RTUs, is that a substitute for

14  the structured therapeutic activities once somebody

15  is in an RTU?

16  A.   No, it was -- it was a comment meant to

17  address the larger population because although the

18  RTU system is fairly large, it is small in

19  comparison to the overall mental health caseload.

20      And, and my suggestion to the people I was

21  speaking to was to encourage any type of

22  out-of-cell activity for these individuals to

23  prevent them from decompensating to the point where

24  they needed to be referred to an RTU.

25      MR. MILLS:  All right.  If I may have one

 1  second, Your Honor?

 2      THE COURT:  Sure.

 3      (A pause was had in the record.)

 4  BY MR. MILLS:

 5  Q.  And to clarify, that opinion was given at the

 6  height of COVID, where everybody was locked down in

 7  the system 24 hours a day essentially; is that

 8  correct?

 9  A.  That was done during the summer of 2020, yes.

10  Q.  And that is no longer true in the Department

11  of Corrections; everybody is not locked in their

12  cells 24 hours a day?

13  A.  Not to the extent that they were back then.

14      MR. MILLS:  Nothing further, Your Honor.

15      THE COURT:  Mr. Rees?

16                **RECROSS-EXAMINATION**

17  BY MR. REES:

18  Q.  Dr. Stewart, to the extent that you're

19  offering any opinions on the current status of the

20  conditions at the Department, that's based on your

21  most recent reviews of charts from Dixon?

22  A.  Review of charts, interviewing class members,

23  and site visits to both Dixon and Pontiac.

24  Q.  I'm talking about the current status.  The

25  most recent information that you have is from your

1    January 2022 review, correct?

2    A.   Oh, yes, yes, and that is the interviews at

3    Dixon, the chart reviews at Dixon, and chart

4    reviews at Pontiac.

5    Q.   And those, I think, chart reviews at Dixon,

6    you identified that you reviewed -- or was it you

7    interviewed five RTU patients?

8    A.   Yes.

9    Q.   And that's 5 out of 427 that are currently

10   housed at the RTU at Dixon?

11   A.   Yes, that's five people.

12        MR. REES:  Okay.  Nothing further, Your Honor.

13        THE COURT:  All right.  Mr. Mills?

14        MR. MILLS:  No follow-up from that, Your

15   Honor.

16        THE COURT:  All right.  I just have a couple

17   questions.

18                    **EXAMINATION**

19   BY THE COURT:

20   Q.   So, you testified about visiting Dixon, the

21   STC, the cottages.  You said you didn't observe

22   treatment going on.  What did you observe going on?

23   What was going on?

24   A.   You know, really nothing, Your Honor.  The --

25   there were a few, I mean literally a handful at

most class members out in the day room, but other
than that, I didn't see anything else going on.
Q.   Was it your understanding that all of the
people in that area had access to the day room?
A.   It was my understanding that the day room can
be used for the entire cottage.  A particular
cottage had one day room, but there were just a
limited number of people out during the course of
my, you know, my tour.
Q.   Is it your understanding that there's
presently a medical quarantine at Dixon and
Pontiac?
A.   I understand that there's medical quarantine
at Pontiac, Your Honor.  I couldn't speak as of now
what the status of the medical quarantine is at
Dixon.
Q.   I may have miswritten here, but did you say
that in terms of the therapeutic RTU at Pontiac,
you saw no indication of structured or unstructured
out-of-cell time?
A.   When I visited in August, Your Honor, I did
attend one group, so there was evidence of at least
that one activity.

     The members of the group, the class members
informed me that was the first group they'd had in

several weeks.

Q.   Is it your understanding that at both of these facilities the inmates are getting a monthly one-on-one with the psychiatrist and mental health professional?

A.   Yes, Your Honor.

Q.   And is that in a confidential setting?

A.   It depends.   Some -- in the chart reviews, there's a box to say what type of setting it is, confidential or not.   So, I can only go on that. And so it's mixed.   There are some that are confidential, some that are cell front.

And then in my interviews of the class members, they confirm that.   That sometimes they meet with a psychiatrist in a confidential setting; other times the psychiatrist does a cell-front visit.

Q.   Where would they meet in a confidential setting?

A.   In some sort of office in that -- in the general housing area.

Q.   So, would the -- would the inmate be able to go unescorted from his cell to that meeting?

A.   I couldn't answer that, Your Honor.

Q.   All right.   I don't think there's any question

1  that COVID has had an impact on the conditions

2  within the prison; is that correct?

3  A.   That's correct, Your Honor.

4  Q.   And there are multiple aspects to that,

5  separating out those who are infected and -- did I

6  understand that your opinions about the care that's

7  being provided or not provided is not -- those are

8  not made in the context of the COVID reality?

9  A.   Well, when Mr. Rees asked me that question, my

10 answer was based on the requirements in the

11 Settlement Agreement, I measured that, and

12 certainly that doesn't take into consideration

13 COVID or not COVID.

14 Q.   That's true.  But having said that, have you

15 said or filed anything with the parties or the

16 Court that reflects the reality of COVID?

17 A.   I have not submitted anything formally, Your

18 Honor.

19 Q.   Would you be surprised if it did have an

20 impact on the ability to provide structured and

21 unstructured out-of-cell time?

22 A.   No, I'm, I'm very aware, Your Honor, that

23 COVID has impacted the ability to provide

24 structured and unstructured out-of-cell time.

25 Q.   I guess -- and I mentioned this at the

1    beginning.  It seems to me that one of the focuses

2    here is not just, *Here is the situation,* but in

3    terms of the plaintiffs' complaints, what should --

4    could or should the defendants have been doing that

5    they're not doing?

6         And we're not -- again, I think it was pointed

7    out, we're not necessarily -- we're not talking

8    here about best practices.  We're talking about

9    what's realistically possible under the

10   circumstances.

11   A.   Your Honor, it remains my opinion from being

12   in the facilities and seeing what they have to work

13   with that they could do more to get the seriously

14   mentally ill people out of their cells more than

15   they're doing.

16        And like at Pontiac, for example, they do less

17   than an hour -- and this is the defendants' report

18   -- less than an hour of structured time a week.

19   And even given their staffing issues, which aren't

20   always -- which aren't solely based on COVID

21   issues, I believe they can do more of getting

22   people out of their cells for either structured or

23   unstructured activities, and they're not doing

24   that.

25   Q.   That's pretty general.  Can you be more

1  specific?

2  A.  Well, Your Honor, they -- if, if, for example,

3  that there's an issue of the number of individuals

4  that can be in a particular group at a given time,

5  well, then what you would need to do is do

6  increased individual contacts.  And I haven't seen

7  evidence of that going on.  It --

8  Q.  Is it your belief that they have the staff to

9  do that?

10  A.  Based on my visit to Pontiac, Your Honor, they

11  don't have enough custody staff to do that.

12       But in speaking with the leadership during my

13  August visit, it wasn't due to staff being out

14  because of COVID.  It was just due to the fact that

15  they don't have enough staff to start with, and

16  then they're down because COVID even further

17  impaired their ability to get people out.

18  Q.  So, does that assume that they could and

19  should have done more to replace the staff who

20  left?

21  A.  Well, it implies that, Your Honor, but it

22  also, you know, implies that they might be more

23  creative with the limited number of staff they have

24  identifying the most vulnerable patients -- and

25  these are RTU patients that are most seriously

1    mentally ill -- to get them out of their cells more
2    frequently.  And they're not doing that.
3    Q.   In your view, have they taken -- say in the
4    last six months, have they taken any steps or
5    measures that you would say are a positive response
6    to the situation?
7    A.   Not based on the data that's available to me,
8    you know, my site visits, chart reviews and
9    interviews, Your Honor.
10   Q.   Going back to the period of time before COVID
11   started, to what extent were they meeting the ten
12   and ten at Pontiac and Dixon?
13   A.   Prior to COVID, Your Honor, we considered
14   Dixon first where they have the STC and then the
15   X House.  The STC was meeting the minimum
16   requirements.  The X House was not.
17   Q.   When you say they -- the X House was not, what
18   does that mean?
19   A.   They were not meeting the ten and ten minimum
20   requirements, Your Honor.
21   Q.   Do you know what they were providing?
22   A.   I believe I reported that it was around half
23   of the minimum they were able to do.
24   Q.   All right.  That's Dixon?
25   A.   That's Dixon.

1     And then with Pontiac, Pontiac has -- neither
2  in the BMU or the STC has never been able to meet
3  the minimum requirements for structured out-of-cell
4  time.
5  Q.  We keep referring to this number ten.  That's,
6  I think, set out in the Settlement Agreement.
7     There's nothing particularly magical about
8  that, is there, ten?
9  A.  Well --
10 Q.  I mean, I assume some people need more than
11 that, and some people need less.
12 A.  Well, given the patient population, the
13 seriously mentally ill with functional impairments,
14 the ten structured out-of-cell time basically means
15 that people are getting two groups a day over a
16 five-day period.  So, they're getting treatment
17 every day.  I believe that's the basis of the ten.
18 Q.  Okay.
19 A.  But to answer your question further, Your
20 Honor, there are some people that require more, and
21 certainly some people who may be able to get by on
22 less.
23 Q.  If I understand it, what you've said, if you
24 have a community meeting with security people
25 there, that's going to significantly impact the

1  ability or the willingness of people to speak

2  candidly; is that correct?

3  A.   Yes, Your Honor.

4  Q.   In terms of the community meeting that you've

5  told us about, were you aware of any specific

6  reason why those people were there?

7  A.   The custody staff, Your Honor?

8  Q.   Yes.

9  A.   My understanding was that this is how

10 community meetings are run.  I wasn't given any

11 further explanation besides that.

12     THE COURT:  Okay.  Thank you.  Those are my

13 questions.

14     Mr. Mills, any follow-up questions?

15             **FURTHER REDIRECT EXAMINATION**

16 BY MR. MILLS:

17 Q.   I just wanted to make sure I understood your

18 -- you said you're drawing a distinction between

19 COVID-related issues and staffing issues; is that

20 correct?

21     Am I reading your testimony correctly, that

22 you think they're two different causes, and they're

23 separate -- at least to some extent separate?

24 A.   You're asking me?

25 Q.   Yes.

1  A.   I'm sorry.  Yes.

2  Q.   And which of those two is the larger impact on

3  their ability to provide care to the RTUs at Dixon

4  and Pontiac at this point?

5  A.   Again, based on my site visits, I felt that it

6  was just the fact that on any given day they just

7  don't have enough guards to move people around and

8  that COVID only made that worse.

9  Q.   And we sort of set aside, but on C wing at

10  Pontiac, there are 15 people who are getting close

11  to eight hours a day of structured therapeutic

12  activities, correct --

13  A.   Well --

14  Q.   -- a week?

15  A.   At Dixon?

16  Q.   Yes, at Dixon in C wing in X House.

17  A.   Yes.

18  Q.   So, it's not an inability to hold those

19  groups.  Is there anything special about C wing

20  that makes that population less subject to COVID as

21  compared to the other three wings?

22  A.   No, has nothing to do with COVID.

23  Q.   So, if they had the staff, they can do the

24  same thing for everybody in X House?

25  A.   It certainly appeared that way to me.

1  Q.  And at Pontiac, we showed earlier the colored

2  graph that had a bunch of -- you know, a bunch of

3  groups laid out, most of which had been canceled.

4      Do you remember that exhibit?

5  A.  Yes.

6  Q.  And that was a schedule that was done by the

7  Department of Corrections taking into account

8  COVID, correct?

9  A.  Right.  I believe they called that their COVID

10 group schedule.

11 Q.  But the Department itself has come up with

12 ways at both Dixon and Pontiac that they think they

13 could deliver this -- the required hours of

14 therapeutic activity even under COVID, correct?

15 A.  Well, the -- based on the examples that you

16 gave, yes.

17 Q.  They're just not doing it?

18 A.  Correct.

19 Q.  Who is it who decides where these RTUs are

20 going to be located?

21 A.  I, I thought it was part of the Settlement

22 Agreement.

23 Q.  And particular people are assigned to them by

24 the Department of Corrections, though, correct, to

25 decide whether somebody goes to Pontiac or goes to

 1  Joliet or goes to Dixon?  Those are Department
 2  decisions, correct?
 3  A.   Those are Departmental decisions, yes.
 4  Q.   And are all the --
 5       MR. REES:  Your Honor, I'm going to -- Your
 6  Honor, at this point I'm going to object as beyond
 7  the scope of your own questions and certainly
 8  beyond the scope of the cross.
 9       THE COURT:  I'll allow this question, and
10  that's it.
11  BY MR. MILLS:
12  Q.   Okay.  Is Joliet being fully used?
13  A.   It's not being fully -- given its bed
14  capacity, it's not being fully utilized.
15  Q.   And are you aware of anything that would stop
16  them from simply moving the people at Pontiac who
17  are not getting care to Joliet where they could get
18  the care?
19  A.   I'm not aware of anything in particular.
20       MR. MILLS:  Nothing further, Your Honor.
21       THE COURT:  Okay.
22       Mr. Rees?
23                **FURTHER RECROSS-EXAMINATION**
24  BY MR. REES:
25  Q.   You're aware that at Joliet, Dr. Stewart, that

1  people are housed in single rooms, correct?

2  A.  Yes.

3  Q.  The original, you know, thought under the

4  Settlement Agreement or hope was to double-cell

5  them at Joliet?

6  A.  I understand that there was a shift made from

7  double-celling to single-celling, yes.

8  Q.  Right.  And you understand that single cell is

9  even more imperative under COVID, where people can

10 spread communicable disease to one another?

11 A.  Yes, generally.

12      MR. REES:  That's it, Your Honor, from me.

13      THE COURT:  All right.  Thank you, Doctor.

14      I do have a question or comment for counsel

15 before we go on.  Obviously, part of the focus here

16 is the level of staffing, some of it apparently

17 COVID related, some of it not.

18      But again, thinking back to the *Rasho* opinion,

19 and there was a lot of time spent in our earlier

20 proceedings talking about what was done, what was

21 attempted to hire sufficient staff, including both

22 correctional officers and mental health experts, I

23 don't recall one word in the *Rasho* decision that

24 criticizes the Department concerning its attempts

25 to hire staff or the fact that they don't have

1  enough staff.

2      Am I misreading *Rasho*?

3      MR. MILLS:  Well, I think you're maybe overly

4  broadly reading *Rasho,* is my reading of it.   In

5  particular what they said -- my reading of what the

6  Seventh Circuit said was that they had tried some

7  things which were reasonable, and they were

8  relatively new, and that the mistake -- I'm sorry,

9  Your Honor -- that Your Honor made or perhaps we as

10  the plaintiffs made was not giving them enough time

11  to see if those plans worked.

12      Our contention is that we are now two or three

13  or more years later, and they're still trying the

14  same thing, and they still haven't done it.

15  There's a whole line of Seventh Circuit cases,

16  including *Petties*, which says that the --

17  continuing to do the same thing over and over

18  again, knowing that it's not working, is, in fact,

19  evidence of deliberate indifference.

20      So, I think to the extent that they are still

21  trying to increase the number of staff four years

22  later after our last hearing when they testified

23  they were trying to increase the number of staff,

24  and that is still the problem, puts us in a very

25  different situation than we were four years ago

1  when they were just starting that process.

2        THE COURT:  All right.  Thank you.

3        Mr. Rees?

4        MR. REES:  I would probably go back to the

5  question that Your Honor asked at the beginning

6  which is what else should the Department be doing,

7  Your Honor.

8        And I think the fact is that Dr. Stewart,

9  during his entire tenure as monitor, as far as I

10  know, has never come up with any suggestion for --

11  that the Department should be doing more about

12  staffing than what it's already doing.

13        THE WITNESS:  (Shaking head.)

14        THE COURT:  Okay.  All right.  So, we're done

15  with Dr. Stewart.

16        Does either side anticipate the need to

17  re-call him?

18        MR. MILLS:  It's hard to say without knowing

19  what the defendants -- their treatment staff is

20  going to say.

21        But I do note that Dr. Stewart was vigorously

22  shaking his head *no* as Mr. Rees said that

23  Dr. Stewart had never made such recommendations, so

24  I don't know if you want to hear what

25  recommendations he has made about staffing since

1    that seems to be an issue.

2         THE COURT:  Dr. Stewart?

3         THE WITNESS:  Well, Your Honor, during the

4    course of my, my monitorship, it became apparent

5    very early that the lack of proper staffing in both

6    custody and mental health people was a major

7    impediment keeping the Department from being in

8    substantial compliance with requirements of the

9    Settlement Agreement.

10        And so I forget if it was the second year or

11   the third year that I had contacted the Department,

12   suggesting that they allow me to hire a staffing

13   expert as part of the monitoring team to look at

14   the, the staffing issues and come up with

15   recommendations.  I was denied that request.

16        But then the Department then hired an outside

17   firm to do similar type of staffing analysis, and

18   that firm came back and -- with their findings,

19   which I then strongly encouraged the Department to

20   employ the firm to help them deal with their

21   staffing shortages.

22        I believe -- just a summary of what they found

23   is they were afraid the Department was going to

24   lose 100 mental health experts over the course of

25   the next year for a variety of reasons, and they

1  had come up with a variety of solutions to that.

2      The Department never fully embraced that

3  report and went on with business as usual.

4      So, I think it's unfair to say that I have not

5  been actively involved in trying to suggest ways to

6  improve staffing.

7      THE COURT:  All right.  Thank you.

8      All right.  Are you going to be available, if

9  necessary, later this week?

10      THE WITNESS:  I made myself available for

11  today and tomorrow, Your Honor.  I wasn't aware

12  that it was going to go on more than tomorrow.

13      THE COURT:  Okay.  Well, we'll see.  We'll

14  assess that tomorrow.

15      THE WITNESS:  And if I do need to come back

16  Thursday or Friday, I'll do my best to be present.

17      THE COURT:  All right.  Thank you very much,

18  Doctor.  So --

19      MR. REES:  We do have one matter, then, that I

20  think pertains to this issue.

21      THE COURT:  Sure.

22      MR. REES:  At this point, we move to exclude

23  Dr. Stewart from participating in the hearing under

24  Rule of Evidence 615.  Under that rule, exclusion

25  of a witness is mandatory if requested by a party.

1    I'm reading the rule, Rule of Evidence 615.

2        Quote, At the request of a party, the judge

3    shall order witnesses excluded so that they cannot

4    hear the testimony of other witnesses, and he may

5    make the order on his own motion, meaning Your

6    Honor.

7        So, we think that's mandatory.  We have

8    Seventh Circuit case law confirming that it's

9    mandatory, and so he should be excluded.

10        THE COURT:  Well, did that apply to people in

11    the -- like expert witnesses because I've had a

12    number of situations over the years where I've said

13    that the expert witness, because of the opinions

14    that they're giving, should hear everything that's

15    being said.

16        MR. REES:  Yes, it does, Your Honor.  The case

17    that we have is *U.S. vs. Olofson*, O-l-o -- it's

18    O-l-o-f, as in Frank, s-o-n.  563 F.3d 652, 660,

19    Seventh Circuit 2009, Seventh Circuit affirming the

20    bar of an expert where the plaintiff, just like --

21    or the party -- I don't know if it was a plaintiff

22    or defendant.  But the party, like here, they

23    wanted to have the expert around so that he or she

24    could provide additional information or provide

25    rebuttal.  That was barred, and the Seventh Circuit

1  affirmed that was proper under Rule 615.  And the

2  Seventh Circuit reiterated the word "shall" as

3  mandatory under the rule.  When the party requests

4  it, it's mandatory.

5      MR. MILLS:  Your Honor, if I can respond, I

6  think it's important to note that in this case it

7  is different because Mr. -- Dr. Stewart is not a

8  witness called by either party.  Dr. Stewart is

9  someone who's appointed by Your Honor to advise

10  Your Honor using his expertise.  So, I think Your

11  Honor can have his expert do whatever he --

12  whatever Your Honor wishes in terms of an opinion.

13      Dr. Stewart is a neutral witness in this case.

14  He is your expert to provide recommendations and

15  advice to you, not to either party.

16      MR. HIRSHMAN:  We have that case, and I

17  don't --

18      MR. REES:  Your Honor, as you know -- I think

19  we talked about this before, I think a week ago --

20  Dr. Stewart is not a court-appointed expert.  He's

21  not hired by the Court.  He was -- the parties

22  agreed that he could monitor the Settlement

23  Agreement, and then Your Honor asked him to monitor

24  the compliance with Your Honor's order.  That's it.

25  He's not here in that capacity.

1    He's here really related to the Settlement
2  Agreement focused on Section X(d), and, you know,
3  so he's not -- absolutely not a court-appointed
4  expert, so he's not neutral.  He's called in their
5  case to give testimony on their behalf.

6    And so we think, you know, if -- we can go on,
7  if we want to, to talk about bias and other things
8  with respect to Dr. Stewart if we want to prolong
9  this testimony, but the bottom line is, under the
10 rule, he has to be excluded, and we think it's
11 mandatory.  It's mandatory under the rule, and it's
12 mandatory under Seventh Circuit precedent.

13    THE COURT:  All right.  Well, I don't like
14 doing this.  I think he should be present.  But I
15 yield to the authority that was cited, so I'll ask
16 Dr. Stewart not to remain on the line.

17    MR. MILLS:  Your Honor, could we -- could
18 Mr. Rees just read the citation again so we have a
19 chance to read it ourselves on a break here?

20    MR. REES:  Sure.  *United States vs. Olofson*,
21 O-l-o-f-s-o-n, 563 F.3d 652, 660, Seventh Circuit,
22 2009.

23    THE COURT:  So, if the plaintiffs come up with
24 something other than that, I'm happy to consider
25 it, but for now I'll ask Dr. Stewart to sign off.

1          Thank you, Doctor.

2          MR. MILLS:  Thank you, Your Honor.

3          THE COURT:  Okay.

4          MR. REES:  Your Honor, if we could -- I don't

5     know what your schedule is with an afternoon break,

6     but we're going to switch lawyers here, and I don't

7     know if we need to switch some technology or not.

8     I think -- okay.  I think we're good actually.

9          So, I think we can either get started or, Your

10    Honor, we'll defer to you, I guess, with respect to

11    the afternoon schedule.  Looks like we've got the

12    witness available, and Ms. Bautista is ready to go

13    if you want to start now or later.

14         THE COURT:  Well, if we could, I'd like to

15    just start now.

16         MR. MILLS:  Mr. Hirshman is moving.

17         THE COURT:  Who's going to question this

18    witness?

19         MR. MILLS:  Mr. Hirshman will.  He's moving as

20    we speak.  He'll be on camera.

21         THE COURT:  Okay.  I think we're ready.

22         Annie, would you swear the witness, please?

23         COURTROOM DEPUTY:  Yes, Judge.

24         **(Witness sworn by the clerk.)**

25         THE COURT:  Okay.

1    **JUSTIN WILKS,**

2    called as an adverse witness, was examined and

3    testified upon his oath as follows:

4    **DIRECT EXAMINATION**

5    BY MR. HIRSHMAN:

6    Q.   Would you tell us your name, sir, and who

7    you're employed by, and what you're doing?

8    A.   My name's Justin Wilks.  I'm employed by the

9    Illinois Department of Corrections at Dixon

10   Correctional Center.

11   Q.   What's your title there?

12   A.   Assistant warden of Operations.

13   Q.   And as assistant warden of Operations, you

14   have nothing to do with the delivery of mental

15   health services, right?

16   A.   Correct.

17   Q.   And the person who would know about that is a

18   Ms. Andrea Tack, right?

19   A.   Yes.

20   Q.   And with respect to grievances with respect to

21   mental health care, you don't look at those

22   yourself; isn't that right?

23   A.   That's correct.

24   Q.   And you know that you don't have enough

25   guards; isn't that right?

1        MS. BAUTISTA:  Object to form.

2        THE COURT:  Well, be a little more specific if

3   you can.

4        MR. HIRSHMAN:  Certainly.

5   BY MR. HIRSHMAN:

6   Q.   Does Dixon have as many guards as they are

7   supposed to have, according to the plans of the

8   system, or not?

9   A.   No, sir.

10   Q.   How many guards are you short, sir?

11   A.   Approximately 150.

12   Q.   And you're supposed to have 510, right?

13   A.   Approximately, yes.

14   Q.   And how long have you been short 150 guards or

15   thereabouts?

16   A.   I don't recall how long it's been.

17   Q.   One year, two years, three years?

18   A.   I would say one year.

19   Q.   And before that year, you had as many guards

20   as you needed?

21   A.   No, sir.

22   Q.   How many were you short two years ago?

23   A.   Our head count fluctuates based on numbers

24   that Springfield gives us so it's hard to say how

25   many staff we were short at any one given time with

1  the allocation and staff retirements, resignations

2  and promotions.

3  Q.   There are records, aren't there, of what your

4  allocation was and how many you're short kept in

5  your office; isn't that right?

6  A.   There are records, yes, sir.

7  Q.   And they're kept in your office, aren't they?

8  A.   No, sir.

9  Q.   Where are they kept?

10  A.   In the warden's office.

11  Q.   Aren't you the warden?

12  A.   I've been the day-to-day warden up until

13  today.  A warden was appointed today.

14  Q.   So, yesterday it was your office, but today

15  it's not.  Is that it?

16  A.   Yes, sir.

17  Q.   And you know that being down the number of

18  guards that you've been down for a year affects

19  your ability to deliver mental health care; isn't

20  that right?

21  A.   I would say that there are times that it

22  affects our ability to deliver mental health care,

23  yes.

24  Q.   And do you keep track of that, how many times

25  that's happened in the last year, or not?

1   A.   We do keep records of how often it's been

2   based on security staff, yes.

3   Q.   As you sit here today, you can't tell us how

4   often it's been, right?

5   A.   No, sir.  Correct.

6   Q.   And you also -- you know you've got, what,

7   about 470, give or take, people in the RTU, right?

8   A.   Yes.

9   Q.   And -- but you don't know why they're there,

10  right?

11  A.   Correct.

12  Q.   But you do know they can't be in general

13  population, right?

14  A.   Right.

15  Q.   And you're not familiar with what I think is

16  Exhibit 1, the Mental Health Protocol Manual,

17  right?

18  A.   Correct.

19  Q.   I'm sorry, it's 3.  Both of our 3s.

20       But the Mental Health Protocol Manual is not

21  something you've read as a part of your job

22  responsibility, right?

23  A.   Correct.

24  Q.   And you don't know what type of care the

25  people in the RTU are supposed to receive, right?

1    A.   Correct.

2    Q.   That's somebody else's responsibility, right?

3    A.   Right.

4    Q.   And you don't know how many hours of therapy

5    -- out-of-cell or in-cell -- are being given to the

6    prisoners under your responsibility as acting

7    warden for the last year, right?

8    A.   Can you rephrase that?  Or repeat it?

9    Q.   Happy to.

10        For the last year, you cannot tell me what

11   kinds or amounts of therapy are being provided to

12   the people in the RTU, right?

13   A.   Right.

14   Q.   And you know that even on the mental health

15   side they are not fully staffed; isn't that right?

16   A.   Right.

17   Q.   Do you know how long they haven't been fully

18   staffed?

19   A.   I don't know.

20   Q.   Do you know what the shortfall is?

21   A.   No, sir.

22   Q.   How did you learn that they weren't fully

23   staffed?

24   A.   Well, we have regular meetings about what we

25   are providing in the RTU, and they regularly say

1  that they're short-staffed.

2  Q.  And that's why they can't provide the care

3  they need to provide, right?

4      MS. BAUTISTA:  Objection to form.

5      THE COURT:  Overruled.

6      If you know.

7  A.  I don't know if that's a reason why that they

8  can or can't meet their requirements.

9  Q.  Well, you know they've told you time and again

10 that's the reason why; isn't that right?

11     MS. BAUTISTA:  Objection to foundation.

12     THE COURT:  Overruled.

13 A.  I regularly hear that mental health staff are

14 short-staffed.  I can't speak to whether or not

15 that's a reason why they're unable to meet their

16 requirements.

17 Q.  They don't tell you why they're bothering you

18 with the fact that they're short-staffed and what

19 the significance of it is?

20 A.  No.

21 Q.  And you don't ask the question, right?

22 A.  Correct.

23 Q.  You don't say, *How come you're telling me*

24 *you're short-staffed when you can't tell me the --*

25 *when you don't tell me the consequences?*

A.   I, I don't understand the question.  I'm
sorry.
Q.   I want to know as you -- as a responsible
acting warden, when you're told by one of the
significant groups under -- within your prison that
they're short-staffed why you didn't ask them
whether that had an effect on the care that they
were supposed to be delivering to the people in
your prison?
A.   I, I don't know.
Q.   As you sit here today, you wish you had asked;
isn't that right?
A.   I don't know.
Q.   And they talked to you about the numbers,
about how much short staff they were, right?
A.   No, I don't know the numbers of how many staff
they are short.
Q.   But you do know that they're down significant
staffing; isn't that right?
A.   I know that they're down staffing.  I don't
know if it's significant.
Q.   You had your deposition taken, didn't you?
A.   Yes, sir.
Q.   And you chose not to review that deposition,
right?

1    A.   Correct.

2    Q.   And at page 12, line 24 you were asked the

3    following question:  Well, how do you know then

4    that they're not fully staffed?

5         Your answer, on page 13:  We have meetings

6    with Mental Health where they report they're down

7    on their head count in different areas -- BHPs,

8    QMHPs, psychiatrists and psychologists -- and they

9    talk about the numbers, and that they're down

10   significant staffing, but I just can't speak to

11   that number of staffing they're down.

12        I asked you that question, and you gave that

13   answer; isn't that right?

14   A.   If you say so.  I didn't review it.

15   Q.   Well, I'm reading it, and we can put it up on

16   the screen if you want to see whether I read it

17   right.

18   A.   No, I, I don't need it -- I believe you.

19   Q.   And your words were, "they're down significant

20   staffing," in that answer; isn't that correct?

21   A.   Yes, sir.

22   Q.   And how many meetings over how long a time did

23   they tell you this?

24   A.   We meet monthly specifically about RTU

25   out-of-cell time, so I would say every meeting that

1    I've had, they've talked about being short-staffed.

2    Q.   That's at least a year, right?

3    A.   Nine months.

4    Q.   I'm sorry, you only took over the job nine

5    months later -- nine months ago; is that right?

6    A.   Yes, sir.

7    Q.   And you didn't look back to see what the

8    situation was before you took on the job, right?

9    And by "the situation," I mean the short staffing

10   of the mental health staff.

11   A.   That's correct.

12   Q.   So, for all you know, this could have been

13   going on for five years, right?

14   A.   Yes.

15   Q.   And you know that this is impacting the

16   delivery of care to the people in the RTU, right?

17   A.   I, I don't know what they're able to do.

18   Q.   At page 14, line 2, you were asked the

19   following question:  But based on your knowledge

20   with respect to the mental health side being down

21   staff, has that impacted the delivery of care, to

22   the best of your knowledge, to the people in the

23   RTU, for instance?

24        And you gave the following answer at line 7:

25   To the best of my knowledge, it is affecting the

1  delivery of services.

2     Do you remember that testimony?

3  A.  Yes, sir.

4  Q.  So, you did say that it was affecting the

5  delivery of services to the people in the RTU,

6  right?

7  A.  Yes, sir.

8  Q.  And you've heard from the prisoners; they've

9  complained about the lack of mental health care

10  service.  Isn't that right?

11  A.  Yes, sir.

12  Q.  But you don't know whether the RTU exists to

13  provide adequate mental health care; isn't that

14  right?

15     MS. BAUTISTA:  Objection, asked and answered.

16     THE COURT:  Overruled.

17  A.  Can you ask the question again?  I'm sorry.

18  Q.  Sure.  You don't know whether the RTU exists

19  to provide adequate mental health care, right?

20  A.  I think it does exist for that reason.

21  Q.  Well, when I asked you that question at your

22  deposition, at page 15, line 23:  And you would

23  agree with me that, based on your understanding,

24  the DXP and the STC and the RTU in general exist to

25  provide adequate mental health care, right?

1    And your answer was:  I don't feel qualified
2 to answer that.
3    And I said:  Okay.
4    And you said:  I don't know.
5    And that's page -- that's line 8.
6    Now you know that is their purpose, right?
7 A.  Yes.
8 Q.  And they're not fulfilling that purpose,
9 right?
10 A.  I don't know.
11 Q.  And you know that there's been some effort to
12 take people to the DPU STC gym, right?
13 A.  Yes, sir.
14 Q.  But you don't know what the content is of
15 what's happening in that gym, right?
16 A.  Correct.
17 Q.  But you know, for instance, that -- what's an
18 LTS?
19 A.  Leisure Time Services.
20 Q.  And is Leisure Time Services staffed by
21 psychologists and mental health experts or not, to
22 your knowledge?
23 A.  No.
24 Q.  Do you know -- do you know whether there's
25 been any training of the Leisure Time Services to

1    bring them up-to-date on dealing with seriously
2    mentally ill people?
3    A.    I don't know.
4    Q.    And what is Clinical Services Education, if
5    you know?
6    A.    Clinical Services and Education are two
7    different departments.
8    Q.    What are Clinical Services?
9    A.    Clinical Services are counselors that provide
10   different types of group counseling, typically for
11   the GP population.
12        And Education is the state school district
13   that provides education to individuals in custody
14   and residents at Dixon.
15   Q.    Doesn't sound like mental health care to me.
16   Does it to you?
17   A.    No.
18   Q.    You started to use the STC and DXP gym on
19   November 29th in Building 137, right?
20   A.    Yes, sir.
21   Q.    And that was supposed to be a trial; is that
22   right?
23   A.    We had a schedule set up, and it was a -- we
24   were going to do it for a month and see how it
25   worked and then tweak it after that.

1    Q.   Did you, after a month, receive a report which

2    talked about the therapeutic value of the groups

3    that were taking place in the gym?

4    A.   No, sir.

5    Q.   Did you receive a note from the -- who was the

6    head of Mental Health in your prison?

7    A.   Dr. Chess.

8    Q.   Did you receive a note from Dr. Chess saying,

9    *I have analyzed the effects of these meetings in*

10   *the gym, and this is what it is*?

11   A.   No, sir.

12   Q.   As you sit here today, you don't know whether

13   it's good care, bad care, or no care for seriously

14   mentally ill people, right?

15   A.   Correct.

16   Q.   And originally, this Warden Tack, who was not

17   your Mental Health person, was doing the

18   scheduling, right?

19   A.   Yes, sir.

20   Q.   And now Dr. Chess has taken over the

21   scheduling, but that's just a clerical function,

22   right?

23   A.   Correct.

24   Q.   November 29 there wasn't such a thing as

25   structured recreational activity at Dixon, to your

1  knowledge, right?

2  A.   Correct.

3  Q.   And you started to build fenced-in areas in

4  some of the X Houses, right?

5  A.   Yes, sir.

6  Q.   That's -- is that finished?  Do all the X

7  Houses have their fences put in?

8  A.   Yes, sir.

9  Q.   Were they designed, those fenced-in areas, to

10  be used for individual mental health activity?

11  A.   They weren't designed for that, but they could

12  be used for that.

13  Q.   But ideally what they were designed for was

14  day room time, right?

15  A.   Yes, sir.

16  Q.   But if there were adequate staff, do you think

17  maybe they could be used for mental health group

18  activities, right?

19  A.   Yes, sir.

20  Q.   You don't know of any plans to do that, do

21  you?

22  A.   There are no plans at this time that I'm aware

23  of.

24  Q.   Of course, you don't look at people's mental

25  health treatment plans so you don't know whether

204

1   they're being fulfilled, not fulfilled; that's
2   somebody else's responsibility, right?
3   A.   Right.
4   Q.   And we'll get to that in a minute.
5        You're not responsible for reporting, under
6   the injunction, with respect to what kind of mental
7   health activity is going on at Dixon while you were
8   acting warden, right?
9        Do you want me to rephrase that?
10  A.   Yes, please.
11  Q.   You knew that prior to Judge Mihm's injunction
12  being overruled there were periodic reports that
13  were coming out of Dixon with respect to mental
14  health activity, right?
15  A.   Yes.
16  Q.   But you weren't responsible for the content of
17  those reports, right?
18  A.   Correct.
19  Q.   Now, we've heard a lot about COVID, and there
20  have been times when there have been lockdowns
21  because of COVID, right?
22  A.   Medical quarantine would be the term we were
23  using.
24  Q.   Fine.  You keep track of the medical
25  quarantines; isn't that right?

1    A.   Yes, sir.

2    Q.   And it's a fact, isn't it, that at Dixon in

3    the last year, Dixon has not been shut down for a

4    whole year by medical quarantine; isn't that right?

5    A.   That's correct.

6    Q.   And it's a fact, isn't it, that essentially

7    for -- until a few weeks at the end of December,

8    it's been how long since you had a medical

9    quarantine?

10   A.   I don't recall the exact amount of time.

11   Q.   But a long time; months?

12   A.   Months, yes.

13   Q.   And the reality is -- try to rack your brain

14   and see whether you would agree with me -- that

15   there was no medical quarantine at Dixon from May

16   till the last two weeks of December?

17   A.   I don't remember when we came off medical

18   quarantine.

19   Q.   But there's a record if you want --

20   A.   Yes.  Yes, sir.

21   Q.   Well, you believe that since November 29th

22   you've increased your structured out-of-cell time,

23   right?

24   A.   Yes.

25   Q.   But you know it hasn't even gotten up to nine

1  hours, right?

2  A.   Right.

3  Q.   And with respect to yards, you're trying to

4  build some new yards, right?

5  A.   Yes.

6  Q.   Those aren't done yet, are they?

7  A.   Not yet.

8  Q.   And they aren't due to be done until after

9  spring, right?

10  A.   No, they, they should be done either the end

11  of February or first of March, weather permitting.

12  Q.   You've got all the materials?

13  A.   Yes, sir.

14  Q.   And that -- you're not intending to hold --

15  you have no idea about intending to hold mental

16  health groups outside in those yards, right?

17  A.   Right.

18  Q.   That isn't what they were being built for --

19  A.   No.

20  Q.   -- to hold mental health groups outside?

21       What were they built for?

22  A.   We're building the yards so that the DXP and

23  the STC no longer have to share a yard, and so

24  there should -- it should allow for more

25  unstructured out-of-cell time for both the STC and

1   the DXP.

2   Q.   But right now, because they have to share

3   their space, that limits the amount of out-of-cell,

4   unstructured time for gym -- I'm sorry, for being

5   outside, right?

6   A.   Yes.

7   Q.   September 18, 2020, Leonta -- I'm sorry,

8   that's not you.

9        There is a document that I assume you're

10  familiar with called Dixon Correctional Center

11  Medical Quarantine.  It's a plan with respect to

12  medical quarantine.

13  A.   Yes, sir.

14  Q.   And this tells what is supposed to happen when

15  there is quarantine, right?

16  A.   Yes.

17  Q.   And, Amanda, do you have that?  Can we put it

18  up?  I think Exhibit 6.  Okay.  If we go to page 3.

19       Can you see that there's a paragraph that

20  talks about residential treatment unit level of

21  care?

22  A.   Yes, sir.

23  Q.   And it says, does it not, that, "Regular,

24  consistent therapeutic contact shall be maintained.

25  As these offenders have an elevated level of care,

1  efforts must be made to increase the frequency of

2  MH presence and the availability of staff for

3  intervention and assessment."

4      Do you see that?

5  A.  Yes, sir.

6  Q.  Do you know whether or not that section was

7  implemented?

8  A.  Yes, it was.

9  Q.  I'm sorry?

10  A.  Yes, it was.

11  Q.  And how do you know that?

12  A.  We get reports from mental health staff --

13  emails, I'm sorry, not reports -- emails each day

14  from mental health staff when they do their rounds

15  in the buildings that they're assigned.

16  Q.  But you don't know what the elevated level of

17  care is, right?

18  A.  Correct.

19  Q.  And these are the rules -- why don't we look

20  at page 2.

21      Go down, Amanda, to the almost bottom of the

22  page.

23      It says, "The Office of Mental Health

24  Management has defined essential or primary duties

25  that must be delivered throughout the medical and

1  administrative quarantine process."

2      Do you see that?

3  A.  Yes, sir.

4  Q.  And one of the things is groups and individual

5  psychotherapy, right?

6  A.  Yes.

7  Q.  Do you get a report on how many groups were

8  being actually done during quarantine?

9  A.  I don't recall.

10  Q.  Do you know whether you get a report as to how

11  much individual psychotherapy was going on during

12  quarantine?

13  A.  I, I don't recall.

14  Q.  But those things were supposed to happen,

15  according to the Office of Mental Health

16  Management, right?

17  A.  Yes, sir.

18  Q.  And this was part of the crisis plan, to be

19  sure that even during medical quarantine these

20  vital services were delivered, right?

21  A.  Yes, sir.

22  Q.  You weren't supposed to just blow off group

23  and individual psychotherapy because there was a

24  quarantine, right?

25  A.  Correct.

1  Q.  And you know that group and individual
2  psychotherapy is critical to the seriously mentally
3  ill people who are in the RTU, right?
4  A.  Correct.
5  Q.  And it makes perfectly good sense that you'd
6  do your very best to maintain that even during
7  quarantine.  You agree with that, right?
8  A.  Yes, sir.
9  Q.  Now, there came a time when you met with a
10 Patrick Horn, right?
11 A.  Yes, sir.
12 Q.  And Patrick Horn had a plan, right?
13 A.  Yes, sir.
14 Q.  And he wanted to talk to you about his plan,
15 right?
16 A.  Yes, sir.
17 Q.  He didn't call it a plan; he called it a
18 proposal.  And he did talk to you about that,
19 right?
20 A.  Yes, sir.
21 Q.  And the proposal was to increase the RTU
22 structured out-of-cell time to ten hours, right?
23 A.  Yes, sir.
24 Q.  And your responsibility was to find some space
25 where this proposal might be actualized, right?

1   A.   Yes, sir.

2        MR. HIRSHMAN:   And can we put this up, Amanda,

3   the November 1 one?   This is our Exhibit 14.

4        MS. ANTHOLT:   Yes.

5   BY MR. HIRSHMAN:

6   Q.   So, you met with -- you and Ms. Tack met with

7   Dr. Horn and Dr. Woods and some Dixon MH

8   supervisors on November 1st, right?

9   A.   I think that this was a phone call, if I

10  remember right.

11  Q.   Okay.   But you think it was about the 1st,

12  right?

13  A.   Yeah.

14  Q.   And, ultimately, had you already received this

15  memorandum when you --

16  A.   I don't remember.

17  Q.   -- spoke with Dr. Horn, or did you get this

18  afterward?

19  A.   I don't recall.

20  Q.   Okay.   If you look on -- why don't we go to

21  the second page.   I just have a couple questions.

22       And here we see that, on five, LTS would lead

23  six activities of two hours in length in the gym

24  with six different groups of DPU residents per

25  week.   Thus, all residents of A, B and D wing would

1  be offered this gym time once per week.

2      Do you see that?

3  A.  Yes, sir.

4  Q.  Then the next thing that goes on to say, To

5  ensure that these activities are -- in quotes --

6  therapeutic, the following contingencies will be

7  put into place.

8      Do you see that?

9  A.  Yes, sir.

10  Q.  And you don't know why *therapeutic* is in

11  quotes, do you?

12  A.  No.

13  Q.  And you didn't ask Dr. Horn or anybody else

14  why it was in quotes, right?

15  A.  Correct.

16  Q.  And the first thing is that this intervention

17  will be added to each DPU resident's mental health

18  treatment plan.

19      Do you see that?  Number six.

20  A.  What number?

21  Q.  6(a).

22  A.  Okay.  Yes, yes, I see that.

23  Q.  And you don't know whether that happened or

24  not, right?

25  A.  Correct.

1  Q.  And then (b) is, The LTS staff will meet
2  briefly with the group prior to the activity and
3  discuss aspects of teamwork and sportsmanship
4  expected during the activity that are consistent
5  with the principles of Modified Therapeutic
6  Community.
7      Do you see that?
8  A.  Yes.
9  Q.  And you don't know what a modified therapeutic
10 community's principles are with respect to teamwork
11 and sportsmanship, right?
12 A.  Right.
13 Q.  And the therapeutic activities will be
14 structured so that the more each community member
15 succeeds in the task, it has a positive impact on
16 the community.
17     How does that work?
18 A.  I don't know.
19 Q.  Have you ever seen a report from the LTS staff
20 which record how many members of a particular wing
21 shot at least 30 percent of their free throws?
22 A.  No.
23 Q.  Do you know whether this sum of how many hit
24 30 percent of their free throws was actually
25 compared to other DPU groups?

1   A.   I don't know.

2   Q.   Do you know whether the winning DPU group ever

3   got a certificate from the mental health staff?

4   A.   I don't know.

5   Q.   Do you know whether there were any community

6   meetings that discussed this, quote, therapeutic,

7   unquote, activity?

8   A.   No.

9   Q.   Did you ever get a memo from Dr. Hinton which

10  said he endorses shooting free throws as a

11  therapeutic out-of-cell activity?

12  A.   I don't recall receiving one.

13  Q.   Wouldn't it be important to have the head of

14  Mental Health tell you that this really is a

15  therapeutic activity?

16  A.   We -- I, I don't know.

17  Q.   But you never thought to say, *Gee, this sounds*

18  *like basketball to me, not therapy, and I'd really*

19  *like somebody in authority to tell me it's really*

20  *therapy*?  You never -- that didn't cross your mind,

21  did it?

22  A.   No, sir.

23  Q.   You gave some affidavits to the Court, one in

24  May -- May 21st, 2021, and then again on

25  November 16, 2021.

1    Do you remember creating -- do you remember
2  signing an affidavit?
3  A.   Yes, sir.
4  Q.   Now, you didn't sit down and write these
5  affidavits yourself, did you?
6  A.   No.
7  Q.   You got them from the lawyers, right?
8  A.   Yes.
9  Q.   And I just want to talk to you about the
10  second affidavit.
11    Can we have it up?
12    MS. ANTHOLT:  Is this the -- what's the date
13  on it?
14    MR. HIRSHMAN:  November 16th, 2021.
15    MS. ANTHOLT:  Yes, this is Plaintiffs' Exhibit
16  26.
17  BY MR. HIRSHMAN:
18  Q.   And at paragraph five, you talk about before
19  the COVID-19 pandemic, Dixon was consistently
20  providing at least ten hours of structured and
21  unstructured out-of-cell time with the exception of
22  those in the DXP.
23    You didn't know that from your own knowledge,
24  did you?
25  A.   Yes.

1  Q.  You knew it from your own knowledge?

2  A.  Yes, we got -- we get weekly reports on how

3  many hours we're conducting each week.

4  Q.  Well, this is talking about a period, say,

5  before March of 2020.  What was your responsibility

6  in 2020?

7  A.  Assistant warden of Operations.

8  Q.  And you got a report in that job about

9  structured and unstructured out-of-cell time?

10  A.  Yes, sir.

11  Q.  And did you review that report in -- when you

12  got this affidavit?

13  A.  No.

14  Q.  So, you just -- well, who -- which lawyer sent

15  you this document with that fact in it?

16  A.  I don't recall.

17  Q.  And you didn't check that fact against the

18  records, right?

19  A.  I -- it's just common knowledge here that,

20  prior to the pandemic, we reached our hours.

21  Q.  But not at DXP, right?

22  A.  No, right.  Not at the DXP.

23  Q.  What's DXP?

24  A.  The Dixon psychiatric unit.

25  Q.  And why didn't you reach your hours in the

1  Dixon psychiatric unit?

2  A.  I don't recall.

3  Q.  That isn't part of common knowledge, right?

4  A.  Oh, why we didn't?

5  Q.  Yes.

6  A.  Yeah, not to my knowledge, no.

7  Q.  And you told the Court that the Department --

8  this is on page 2 at the top -- had developed a

9  plan to resume providing at least ten hours of

10  structured out-of-cell time to all Dixon's RTU

11  patients.

12      Do you see that?

13  A.  Yes, sir.

14  Q.  That's the Horn plan, right, that we just

15  talked about?

16  A.  Yes.

17  Q.  And you talk about getting approval from the

18  Office of Health Services with respect to having 10

19  to 20 patients with the right distancing, right?

20  A.  Yes, sir.

21  Q.  You don't mention anything about the approval

22  of the mental health people, do you?

23  A.  I'm sorry, I, I don't -- can you repeat that?

24  Q.  Of course.  You don't say anything about

25  receiving approval from Dr. Hinton or people who

1  are responsible for mental health care that

2  approved the Horn plan; is that right?

3  A.   That's right.

4  Q.   And you talk, at page 10 -- I'm sorry, at

5  paragraph ten that Leisure Time Services will

6  provide the structured therapeutic activities in

7  accordance with each patient's treatment plan.

8      How is Leisure Time Services supposed to even

9  examine a patient's treatment plan?  They don't

10  have any right to look at the mental health records

11  of a patient, do they?

12  A.   I don't know if they do.

13  Q.   Well, here you're telling the Court that

14  that's what Leisure Time Services is going to do?

15      MS. BAUTISTA:   Objection to form.  That's not

16  what this says.

17  BY MR. HIRSHMAN:

18  Q.   Well, who is the other staff who's supposed to

19  do this if it's not Leisure Time Services?  Who are

20  you talking about?

21  A.   That would be Clinical Services, Education,

22  Chaplaincy.

23  Q.   And all of them have gone over the patient

24  treatment files; is that right?

25  A.   I don't think that's what that says.

1   Q.   What do you think -- how are they going to

2   know whether the structured therapeutic activities

3   throughout the week are in accordance with each

4   patient's treatment plan unless they've read the

5   treatment plan?

6   A.   I view that as being Mental Health sharing

7   what -- the service that needs to be provided.  I

8   don't see access to their plan.

9   Q.   Oh, I see.  So, it shouldn't say "Leisure Time

10  Services or other staff."  It should say Mental

11  Health will review each patient's treatment plan

12  and be sure that the structured therapeutic

13  activity meets that plan, right?  That's what it

14  should have said?

15  A.   I don't know.

16  Q.   That's because you didn't write it; isn't that

17  right?

18  A.   I don't know.

19  Q.   You did declare under penalty of perjury that

20  this document was true and correct, right?

21  A.   Yes, sir.

22       MR. HIRSHMAN:  I have no further questions.

23       MS. BAUTISTA:  Judge Mihm, you're muted.

24       THE COURT:  I'm sorry.  Please go ahead.

25                    **CROSS-EXAMINATION**

1  BY MS. BAUTISTA:

2  Q.  Mr. Wilks, can you please describe your

3  background with the Illinois Department of

4  Corrections?

5  A.  Yeah.  I hired in October of 1994 as a

6  correctional officer.  In July of 2000, I promoted

7  to parole agent.  In 2013, I promoted to parole

8  supervisor.  In 2015, I promoted to deputy

9  commander of Investigations.  And in 2017, I

10  promoted to the assistant warden of Operations.

11  Q.  And specifically how long have you been at

12  Dixon?

13  A.  Since April of 2017.

14  Q.  You mentioned earlier that you are currently

15  in the role of assistant warden of Operations.

16  What are your duties and responsibilities in that

17  role?

18  A.  I oversee security, maintenance, dietary,

19  barber services and laundry services.

20  Q.  Are those separate departments within Dixon

21  Correctional Center?

22  A.  Yes, ma'am.

23  Q.  Are there other departments that are overseen

24  by other people?

25  A.  Yes, ma'am.

1  Q.  And what are the other departments, and who
2  oversees them?
3  A.  Assistant Warden Tack oversees Clinical
4  Services, Education, Mental Health, Medical.  I'm
5  drawing a blank.  I think that might be it.
6  Q.  You also mentioned that you had been assigned
7  the duties of the day-to-day warden for a
8  nine-month period of time?
9  A.  Yes, ma'am.
10  Q.  What does that mean?  What are the duties of
11  the day-to-day warden?
12  A.  So, I'm responsible for just the monitoring of
13  the day-to-day operations of the facility, so I --
14  there's only certain things that the warden can
15  sign for, can approve.  Those things came across
16  the desk for me to review and sign.
17      I was the point person for contact from
18  Springfield when something was relative to Dixon
19  Correctional Center.
20  Q.  Are you trained as a mental health
21  professional?
22  A.  No.
23  Q.  Can you describe the type of facility that
24  Dixon Correctional Center is?
25  A.  Yeah, it's a multisecurity facility.  We have

222

1   minimum security, a medium security, maximum

2   security.  We have Dixon general population, Dixon

3   STC, and Dixon psychiatric unit.  It's 1414

4   individuals in custody in residence here.

5   Q.   There's been some discussion regarding the

6   staff at Dixon.  Can you describe for us the types

7   of duties and responsibilities for the security

8   staff such as the correctional officers?

9   A.   Yes.  They man towers.  They man housing

10  units.  They escort individuals in custody in

11  residence within the facility.  They escort them

12  outside the facility for medical writs and -- I'm

13  sorry, medical furloughs and court writs.  They

14  work in our health care unit.  They man our

15  dietary, chaplaincy services, education.  Yeah.

16  That's it.

17  Q.   And you mentioned that correctional officers

18  will escort individuals in custody within a

19  facility.  Can you describe what that means?

20  A.   Yes.  So, we -- when they go to the dietary to

21  eat, when they go to the health care unit for

22  medical treatment, when they go to RTU meetings,

23  when they go to the chaplaincy, they get escorted

24  by staff just to make sure that the individuals in

25  custody are going where they're supposed to go.

1  Q.  I guess I should back up just a minute to make

2  sure our terminology's correct.  I think we've used

3  a few different terms to refer to people housed at

4  Dixon Correctional Center, individual in custody or

5  prisoner or inmate.  Do those all refer -- or

6  patients or residents.

7       Do those all refer to the people who are

8  housed at Dixon?

9  A.  Yes.

10  Q.  Have there been any changes since you've been

11  at Dixon Correctional Center regarding the

12  population in terms of the buildings that they're

13  housed in?

14  A.  We did -- in June of 2021, we did close five

15  living units due to agency reorganization and

16  restructuring.  Since then, one of those buildings

17  has been re-opened, due to COVID restrictions, for

18  guys with CPAP machines so that they could meet the

19  COVID guidelines for their living.  That was all in

20  June of 2021.

21  Q.  Now, you mentioned that part of the duties of

22  correctional officers is to man housing units.  Did

23  the closing of these buildings in June 2021 change

24  how you assigned staff at Dixon Correctional

25  Center?

1   A.   Yes.   The post that those housing units

2   covered did reduce our authorized head count, but

3   all that did was allow us to not mandate staff to

4   fill those posts.   It didn't provide us with extra

5   staff.

6   Q.   So, what do you mean it changed your need to

7   mandate staff?   What does that mean, "mandate"?

8   A.   So, each day there's a minimum number of staff

9   needed to run the facility.   If we don't meet that

10  number going into a shift with the staff that we

11  have coming in, then we mandate the staff from the

12  shift prior to stay on to the current shift to man

13  those positions.

14  Q.   So, when you say "mandate staff," could

15  another term for that be "overtime"?

16  A.   Right.   It's mandated overtime, yes.

17  Q.   Did closing those buildings, did Dixon's

18  population in terms of the individuals in custody

19  housed there, did your population change?

20  A.   Yes, it dropped approximately 500.

21  Q.   Where did those prisoners go?

22  A.   We had a couple weeks where we transferred

23  three to four busloads to minimum-security

24  facilities.   They were reclassed as minimum

25  security, and they were transferred out.

1    Some of the ones in the buildings that we

2  closed were able to be absorbed into some of the

3  buildings that we had open bed space for.

4  Q.   Was this done in accordance with the plan that

5  was created by the Department of Corrections,

6  meaning the building closures?

7  A.   Yes, ma'am.

8  Q.   And when did you receive that plan?

9  A.   We had a wardens retreat in April of 2021

10  where that plan was rolled out.

11  Q.   And was Dixon Correctional Center able to

12  fully implement the plan of the Department of

13  Corrections in regards to closure of buildings?

14    MR. HIRSHMAN:  Objection.  First of all, this

15  isn't the best evidence of what the plan was, and

16  so that's A.  And, B, it's leading.  And C, it's

17  irrelevant.

18    THE COURT:  Overruled.

19  BY MS. BAUTISTA:

20  Q.   You can answer, Mr. Wilks.

21  A.   Can you repeat the question?  I'm sorry.

22    MS. BAUTISTA:  Could the court reporter read

23  it back, please?

24    (The preceding question was read back by the

25  reporter.)

1   A.   Yes, ma'am.

2   Q.   So, you mentioned some of the duties

3   previously regarding correctional officers.   Are

4   correctional officers necessary to provide

5   unstructured out-of-cell time to individuals in the

6   RTU?

7   A.   Yes.

8   Q.   And when I say the word "unstructured"

9   out-of-cell time, what does that mean to you?

10  A.   To me, it means they're out of their cell not

11  for mental health treatment but things like the

12  yard, day room, shower, barber services.

13  Q.   And why is it necessary -- why is security

14  staff necessary to provide that out-of-cell time,

15  the unstructured out-of-cell time?

16  A.   We, we have to have an officer on the yard for

17  security reasons.   We have to have an officer

18  monitoring the day rooms for safety and security

19  reasons.   Anywhere they go, it requires a security

20  officer to oversee it.

21  Q.   Have there been incidents at Dixon, for

22  example, on the yard that required security to

23  respond?

24  A.   Yes, ma'am.

25  Q.   Have any of those occurred during the

227

1  pandemic?

2     MR. HIRSHMAN:  Objection.  Do you mean the

3  pandemic shutdown or between March of 2020 and now?

4     THE COURT:  Be more specific, please.

5  BY MS. BAUTISTA:

6  Q.  Yes.  I mean since March of 2020, have there

7  been any incidents on the yard at Dixon that

8  required a security response?

9  A.  Yes, ma'am.

10  Q.  And can you just briefly describe that?

11     MR. HIRSHMAN:  Objection, relevance.

12     THE COURT:  Sustained.

13  BY MS. BAUTISTA:

14  Q.  Are correctional officers also necessary in

15  order to provide structured out-of-cell time to

16  individuals in the RTU?

17  A.  Yes.

18  Q.  And why is that?

19  A.  They have -- they're responsible for the

20  security of both staff and the individuals in

21  custody in residence at Dixon.  So, when a group is

22  meeting, there will be a mental health staff member

23  there, and security needs to be there for the

24  safety and security of both.

25  Q.  Going back for just one second to the

1  unstructured out-of-cell time, I believe with

2  Mr. Hirshman there was mention of some

3  modifications made to day rooms in a certain area

4  of the RTU.  Do you recall that?

5  A.   Yes, ma'am.

6  Q.   And what part of the RTU day rooms were

7  modified?

8  A.   The DXP.

9  Q.   What -- how were they modified?

10 A.   So, we put fencing in A wing

11 upstairs/downstairs, B wing, and D wing upstairs

12 just to provide a more secure area for day rooms to

13 happen.

14 Q.   Has that changed the ability to provide

15 out-of-cell time in the DXP?

16 A.   We, we haven't implemented it yet because

17 we're waiting on the phones and the GTL kiosk to be

18 moved, relocated into the day room area so they can

19 have access to that during day room.

20 Q.   So, what is the plan in regards to the DXP and

21 the day rooms?

22 A.   Well, the plan will be that we will move --

23 currently, we allow ten residents into the day room

24 at a time.  We'll allow five in each one of these

25 secured areas which will do a couple things.  It

1  will allow the residents to be safely in day room.

2  It will also allow other services to continue,

3  whether it be a community meeting or mental health

4  staff doing rounds where the officer can escort

5  them around safely while day rooms are going on

6  inside the secure area.

7  Q.  So, is the fencing then separating a larger

8  area into smaller areas?

9  A.  Yes, ma'am.

10  Q.  Do you know if, once this plan can be in

11  effect, whether that's going to increase

12  out-of-cell time in the DXP?

13  A.  It should increase both structured and

14  unstructured.

15  Q.  You were shown a document earlier by

16  Mr. Hirshman regarding the Dixon medical quarantine

17  plan, and I was just confused by some terms.  I've

18  heard the term administrative quarantine and

19  medical quarantine.

20      Can you explain to us what those terms mean?

21  A.  I, I can't.  I don't recall the specifics.

22  Q.  What status is Dixon under now, if you know?

23  A.  A medical quarantine.

24  Q.  And do you know why Dixon is under a medical

25  quarantine currently?

230

1    A.   We had a spike in positive tests, both with

2    staff and individuals in custody, and Springfield

3    Incident Command gave us the direction to go onto a

4    medical quarantine.

5    Q.   And prior to going on a medical quarantine, do

6    you know what status Dixon Correctional Center was

7    in?

8    A.   Administrative quarantine.

9    Q.   Do you know whether Dixon has provided

10   out-of-cell time to individuals in the RTU during

11   the medical quarantine?

12   A.   Yes, ma'am.

13   Q.   And what do you know about that?

14   A.   I know that we are allowed to run ten

15   residents at a time for community meetings.  I know

16   that our Building 137 has remained open for the

17   structured out-of-cell time there.  I know that in

18   our Building 65, which sometimes houses -- or,

19   excuse me, runs mental health group, has not been

20   opened during medical quarantine.

21   Q.   Just to back up, Building 137, is that also

22   sometimes referred to as the gym?

23   A.   The gym, yes.

24   Q.   Is it used for a specific part of the RTU

25   population at Dixon?

1  A.   Currently right now, we only use it for the
2  DXP.
3  Q.   Do you recall generally when Dixon was first
4  placed under this medical quarantine?
5  A.   First, meaning like March of 2020 or --
6  Q.   I mean this medical quarantine that you're on
7  right now.
8  A.   Oh, I don't remember the specific date, but I
9  do know it was the last week of December of 2021.
10 Q.   During the time -- since the last week of
11 December to now, do you know if Dixon has always
12 been providing the same out-of-cell time to
13 individuals in the RTU, or has it been different
14 during the course of this medical quarantine?
15 A.   It's been different.  We had at least a week,
16 maybe a little bit longer when we first started
17 noticing a spike in positives that we took a pause
18 to try to regroup and make sure that we were
19 following the COVID protocols to make sure it
20 didn't spread any worse.
21 Q.   And then what happened after that first week?
22 A.   They -- everything has opened back up.
23 Q.   Do you know when you will no longer be on
24 medical quarantine?
25 A.   No.

1    Q.   What is the plan in terms -- is there a plan
2    in terms of out-of-cell time once you are no longer
3    on a medical quarantine?
4    A.   Well, when -- the guidelines that dictate the
5    medical quarantine only allow us to have ten
6    residents out at a time for any type of day room or
7    community meeting or group, and so administrative
8    quarantine, we did get permission from OHS to go up
9    to 20.  And so we will be increasing the numbers of
10   residents out for any type of community meeting to
11   at least 20 as long as social distancing allowed.
12   Q.   So, Mr. Hirshman discussed an exhibit with
13   you, a memorandum from a Dr. Patrick Horn.
14        Do you know who Dr. Horn is?
15   A.   Yes, ma'am.
16   Q.   And can you explain to the Court who Dr. Horn
17   is?
18   A.   He's our regional mental health authority for
19   the facilities in Region 1.
20   Q.   So, does that mean he's a -- where is he in
21   terms of the chain of command in terms of
22   Dr. Chess?
23   A.   Dr. Chess reports to him, and then he --
24   Q.   I'm sorry, my video got interrupted when you
25   answered.  Can you please say that again?

1    A.   Yes.  So, Dr. Chess reports to Dr. Horn, and

2    Dr. Horn reports to Dr. Hinton.

3    Q.   You may have already said this:  Were you able

4    to implement the plan that was described in

5    Dr. Horn's November 1st memo?

6    A.   Yes, ma'am.

7    Q.   And do you know -- and that was when that you

8    implemented that?

9    A.   November 29th of 2021.

10   Q.   Was -- did you get a report regarding how --

11   or how many hours were provided as a result of

12   implementing that plan?

13   A.   Yes.

14   Q.   And what were you informed?

15   A.   That we had --

16        MR. HIRSHMAN:  That's not the best evidence.

17   If there's a written document -- unless he says he

18   remembers what it says, which he has so far not

19   been able to do, at least there should be some kind

20   of foundation.

21        THE COURT:  Well, do you recall?

22        THE WITNESS:  Yeah, I recall emails that go

23   out weekly on our out-of-cell structured and

24   unstructured time.

25        THE COURT:  What was the -- what was the

1    number?

2        THE WITNESS:  So, we were -- prior to

3    implementation of this November 29th use of

4    Building 137, we were -- we were averaging four to

5    six hours of structured out-of-cell time, and it

6    increased to six to eight.

7    BY MS. BAUTISTA:

8    Q.   Were any adjustments made to the plan after

9    you received those reports?

10   A.   Yes.  The first week of January, we added

11   another -- an amount of time -- I can't remember

12   specifically amount of time to each community

13   meeting to allow us to get to the ten hours.

14   Q.   Now, you've mentioned that community meetings

15   currently are at 10 residents.  Once you're off

16   medical quarantine, you'll be able to have 20

17   residents in those meetings.

18       Have those groups always been that same size

19   since March of 2020?

20   A.   Yes, ma'am.

21   Q.   Meaning ten?

22   A.   There was a period of time -- I don't recall

23   how long -- that we were on -- we went from a

24   medical quarantine to administrative quarantine

25   back to medical quarantine.  In that interim,

235

1   somewhere around the end of August 2021, we were

2   allowed to increase our numbers to 20.

3   Q.   Okay.  So, I'm going to show you --

4        THE COURT:  Could I interrupt?  How much do

5   you have left?

6        MS. BAUTISTA:  I think, Your Honor, I probably

7   have maybe five to ten minutes.

8        THE COURT:  Okay.  Why don't you go ahead, and

9   then we'll take a break.  Okay?

10       MS. BAUTISTA:  Yes, Your Honor.

11   BY MS. BAUTISTA:

12   Q.   So, I'm going to show you what's been marked

13   as Defendants' Exhibit -- hold on; I need to figure

14   out which one I'm going to start with -- 34B.

15       Can you see that?

16   A.   Yes, ma'am.

17   Q.   And what is that?

18   A.   That's our Building 137 gym.

19   Q.   And, you know, I see a fence here with, with

20   barbed wire on it.  Has that always been in place

21   there?

22   A.   No.

23   Q.   When was that installed?

24   A.   Somewhere between August and November.  We had

25   been working on this plan to implement this

1   Building 137 for structured out-of-cell time.

2   Q.   And by sometime between August and November,

3   which year do you mean?

4   A.   Oh, I'm sorry, 2021.

5   Q.   So, this is the building -- so, you said it's

6   Building 137.   What else is it called?

7   A.   The DXP/STC gym.

8   Q.   And I'm going to show you what's been marked

9   as Defendants' Exhibit 34C.   What are we looking at

10  here?

11      I can zoom in a little bit for you.

12  A.   I can see it.   It's the -- it's still the

13  Building 137 DXP/STC gym.   On the left side you see

14  the residents.   In between the two fences, you see

15  the person in the hat is LTS.   And then the other

16  two people are correctional officers.

17  Q.   So, what have you been able to do -- or, or,

18  I'm sorry, let me ask a different question.

19      Why did you install this fencing in the gym

20  between August and November of 2021?

21  A.   So, there had been a series of staff assaults

22  at Dixon where we needed to provide some safer

23  spaces for operations of our facility where, in

24  this specific case, we wanted to be able to provide

25  safe space for the DXP and STC.

1        So, the ultimate goal is to have one half of

2    the gym being used by DXP residents and the other

3    half to be used by STC residents with the ability

4    for staff to be in between providing any type of

5    service that we can, and everybody's in a safe

6    space.

7    Q.   So, you also discussed with Mr. Hirshman some

8    changes that were being made to the yard at Dixon.

9    A.   Yes, ma'am.

10   Q.   I'm going to show you what's been marked as

11   Defendants' Exhibit 34D.

12        Do you recognize this picture?

13   A.   Yes, ma'am.

14   Q.   And can you describe what it is?

15   A.   So, this would be on the east side of the DXP,

16   the sidewalk.

17        What you can't see, what would be to the right

18   of the sidewalk here is the building.

19        What you see straight ahead is the framework

20   going up of the new fencing for the two new yards

21   that we're building outside of the DXP.

22   Q.   Okay.  I'm going to show you what's been

23   marked as Defendants' Exhibit 34E.

24        And what are we seeing in this picture?

25   A.   The same thing, just from a different view.

1    So, you see -- that sidewalk that you see

2 running along the fence, that didn't exist.  We put

3 that in so that the staff and residents could walk

4 safely to the entrances to both of the yards.  And

5 that's -- you can see the two -- the framework for

6 the two yards being constructed.

7 Q.   And then we have Defendants' Exhibit 34F.

8    And what are we seeing here?

9 A.   The same thing.  So, this is the -- they

10 worked on two yards at two separate times.  This

11 one has all of the footings poured and the fence

12 and posts up, so this would be the yard number one.

13 Q.   When these are complete, will that increase

14 your ability to provide out-of-cell time to

15 individuals in the RTU?

16 A.   Yes, ma'am.

17 Q.   Okay.  And then I -- have you been making

18 other efforts, other changes to Dixon to increase

19 out-of-cell time for RTU individuals?

20 A.   Yes.  So, we also built or are in the process

21 of building a pavilion that's on the DXP property,

22 and the idea of that is to give out-of-cell

23 structured outside time.  So, they'll be outside in

24 the fresh air.

25    It should be big enough to have two groups,

1    probably small groups.  I don't know exactly the,

2    the size of it yet.  I can't remember the size of

3    it, but we should be allowed to have unstructured

4    -- I'm sorry, structured, out-of-cell, outside,

5    supervised with Mental Health, and secure.

6    Q.   So, let me show you Defendants' Exhibit 34A.

7         What's in this picture?

8    A.   That -- that's the framework to the pavilion.

9    Since then, we have the trusses and part of the

10   roof up.  Weather permitting, we'll get that done

11   hopefully by the beginning of March.

12        MS. BAUTISTA:  Your Honor, I move to admit

13   into evidence Defendants' Exhibits 34A, B, C, D, E

14   and F.

15        THE COURT:  Any objection?

16        MR. HIRSHMAN:  No, Your Honor.

17        THE COURT:  Okay.  It's admitted.

18        (Whereupon, Defendants' Exhibit Numbers 34A,

19   B, C, D, E and F were admitted.)

20        MS. BAUTISTA:  Your Honor, I have nothing

21   further at this time.

22        THE COURT:  Okay.  We are going to take a

23   break.

24        You have some redirect or re-questioning,

25   Mr. Hirshman?

1       MR. HIRSHMAN:  I do, Your Honor.

2       THE COURT:  And then let me ask you this:

3  Will this be the last witness for today?

4       MS. BAUTISTA:  Yes, Your Honor.

5       MR. HIRSHMAN:  Yes, I don't believe there is

6  another witness available so --

7       THE COURT:  Okay.  So, we'll take a 15-minute

8  break and come back.  Thank you.

9       (Recess at 3:46 to 3:59 p.m.)

10       THE COURT:  Okay.  We're ready to go?

11       MS. BAUTISTA:  Yes, Your Honor.  I am.

12       THE COURT:  Mr. Hirshman?

13       MS. BAUTISTA:  Harold, you're muted if you're

14  trying to talk to us.

15       You're still muted, Mr. Hirshman.  There you

16  go.

17                **REDIRECT EXAMINATION**

18  BY MR. HIRSHMAN:

19  Q.  All right.  I kept touching it, but it didn't

20  -- anyway, the effect of cutting up these day rooms

21  is to make them smaller, right, with the fencing

22  and what have you?

23  A.  No.

24  Q.  They're the same size?  Aren't they cut in

25  half at least?

1   A.   No.   They're smaller, but that wasn't the

2   intent.

3   Q.   That was the effect, not the intent?

4   A.   Yes.

5   Q.   And it used to be that like 20 folks could be

6   out at a time, and now it's 10, right?

7   A.   Well, COVID restrictions require 10.

8   Q.   Before they were chopped up into halves, there

9   were 20 people out at a time, weren't there?

10   A.   Not for day room, not in the DXP.

11   Q.   And you talked about these community meetings.

12   Did you ever attend one?

13   A.   No, sir.

14   Q.   And you talked about these -- this basketball

15   activity.   Did you ever watch them shoot baskets?

16   A.   No, sir.

17   Q.   And I notice that double fence and the barbed

18   wire.   Be awful hard to drive it down the length of

19   the court, wouldn't it?

20   A.   Yes, sir.

21   Q.   There is a classroom building, isn't there?

22   A.   In STC there is a classroom building, yes.

23   Q.   But that isn't being used now, right?

24   A.   Correct, not during medical quarantine.

25   Q.   Why not?

1  A.   The rooms can't meet the requirements for the
2  social distancing under the medical quarantine
3  guideline.
4  Q.   Couldn't they be used for like four people or
5  six?
6  A.   Yes.
7  Q.   So, there's no reason why smaller groups
8  couldn't meet in those classrooms, right?
9  A.   Correct.
10  Q.   That's assuming, of course, you have enough
11  guards to take people there, right?
12  A.   Yes, sir.
13  Q.   Now, you talked about this mandating --
14  essentially mandating overtime when you have too
15  few people who call in on the first shift, right?
16  A.   Yes.
17      MS. BAUTISTA:   Object to form.
18  BY MR. HIRSHMAN:
19  Q.   Well, that is --
20      THE COURT:   Well --
21  BY MR. HIRSHMAN:
22  Q.   That is your problem, isn't it?   Your first
23  shift, which has a lot of responsibilities, a lot
24  of people to move around, that's when you're short
25  people, right?

1  A.   Yes, sir.

2  Q.   And this -- you have limits on how many people

3  you can mandate; isn't that right?

4  A.   Yes, sir.

5  Q.   There's a deal with the union about mandating,

6  isn't there?

7  A.   Yes, sir.

8  Q.   And that deal was reached in 2019, some kind

9  of memorandum of understanding, right?

10  A.   Yes, sir.

11  Q.   So, to say you can mandate isn't exactly right

12  because people could turn you down; isn't that

13  right?

14  A.   Yes, sir.

15  Q.   You can't order unlimited overtime, can you,

16  with respect to guards?

17  A.   No, sir.

18  Q.   And you mentioned administrative quarantine

19  and then medical quarantine, and I showed you

20  Exhibit 6 which deals with medical quarantine.

21      Is there a comparable document that deals with

22  administrative quarantine?

23  A.   I don't recall.

24  Q.   Did anyone ever ask you to get those emails

25  you talk about which tell you how many people were

1  in groups and so forth, how many hours?  Anyone

2  ever ask you to collect them?

3  A.   The emails?

4      MS. BAUTISTA:   Objection, Your Honor, to the

5  relevance of this.

6      THE COURT:   Overruled.

7  A.   Nobody asked me to collect them.

8  Q.   But if you had, we'd have a paper --

9  contemporaneous paper record of exactly what was

10  going on over time; isn't that right?

11  A.   Yes.

12  Q.   And now, are you -- were you aware that in May

13  of 2021 Dr. Hinton suggested looking for

14  therapeutic outdoor spaces that could be used?

15  A.   I don't recall that.

16  Q.   So, where did you get the go-ahead to build

17  your pagoda?

18  A.   We had a group of executive staff from

19  Springfield come and tour in August about all the

20  proposals of the yards, the Building 137 gym, the

21  health care unit we had, and it came out of that

22  meeting.

23  Q.   So, who were the guys who came from

24  Springfield -- and ladies?  I don't mean to exclude

25  them.

A.   Director Jeffreys, Chief of Operations Eilers,
Deputy Director Marcus Hardy, and Dr. Hinton.
Q.   Did you get a memo after that telling you what
you were supposed to do?
A.   We got -- there was a -- what they called a
Critical Incident Review Report.
Q.   And I assume the critical incident was some
kind of staff assault, right?
A.   It was a series of staff assaults.
Q.   So, they didn't come out to help you solve the
problem of delivering mental health care to RTU
people, did they?
A.   That wasn't why they were here, no.
Q.   Did anyone tell you that at least a part of
the reason that there were these staff assaults was
because people weren't getting out of their cells
enough?
A.   I, I don't remember the content of the report
at this time.
Q.   Well, you met with those people face-to-face,
didn't you?
A.   Yes, sir.
Q.   And you don't recall that a single one of them
said that perhaps these staff assaults were because
people weren't getting out of their cells?

1  A.  No, I don't recall that.

2  Q.  Do you deny that anyone said that to you?

3  A.  I don't deny it.

4  Q.  With respect to -- so, tell me why it took so

5  long to build the pagoda, which isn't finished,

6  right?  You heard about it in August.

7  A.  We heard about it in August.  We immediately

8  started procuring the lumber and the concrete and

9  started working on the landscaping to build to pour

10  the concrete.  It just took awhile.

11     The procurement process isn't easy, and if I

12  remember right, there were some trouble -- there

13  was some trouble getting the lumber.

14  Q.  You remember we talked a bit about the

15  affidavit you submitted to the Court, your

16  declaration on November 16, 2021, and, you know,

17  and how you told the Court that it was truthful,

18  right?

19  A.  Yes.

20  Q.  Of course, the first sentence says, "I'm the

21  warden of Dixon Correctional Center," and that's

22  not true, right?

23  A.  Correct.

24  Q.  And the second part of that says, "And in that

25  capacity, I'm familiar with Dixon's and plans

1  regarding RTU out-of-cell time."

2       Do you see that?

3  A.   Yes.

4  Q.   And your familiarity was based on this meeting

5  two weeks before with Mr. Horn -- or Dr. Horn?

6  A.   Well, we had been communicating about a plan

7  before the call with Dr. Horn.

8  Q.   When did those communications start?

9  A.   In August when we had our walk-through with

10  the executive staff.

11  Q.   And what did they tell you about what was

12  necessary in order to create out-of-cell time?

13  A.   I don't recall if they told us what was

14  necessary.

15  Q.   They did say you had a problem, didn't they?

16  A.   I, I don't recall if they said we had a

17  problem.  I know that we need to create more space

18  so that we can reach our out-of-cell time.

19  Q.   You knew that you were breaching the agreement

20  that settled the *Rasho* case in August; isn't that

21  right?

22  A.   Yes.

23  Q.   And the top brass knew that, too; isn't that

24  right?

25  A.   Yes, sir.

 1        MR. HIRSHMAN:  I have no further questions.

 2        THE COURT:  All right.  Miss Bautista, do you

 3   have any other questions?

 4        MS. BAUTISTA:  Yes, Your Honor.

 5                 **RECROSS-EXAMINATION**

 6   BY MS. BAUTISTA:

 7   Q.  Mr. Wilks, so, you testified you weren't the

 8   warden in November of 2021.  What was your

 9   position?

10   A.  I was the day-to-day warden.

11        MS. BAUTISTA:  Nothing further.

12        THE COURT:  All right.  I have a few

13   questions.

14                    **EXAMINATION**

15   BY THE COURT:

16   Q.  Do you know what the present numbers are

17   concerning authorized staff and how many you're

18   short?

19   A.  I don't know the exact numbers.

20   Q.  Who would have that number?

21   A.  Our human resource person.

22   Q.  How often is that number updated?

23   A.  At least annually.

24   Q.  I'm looking at Plaintiffs' Number 26, your

25   declaration, November of '21.

1    Do you have that in front of you?

2        MS. ANTHOLT:  I can share it on the screen.

3        THE COURT:  All right.  Thank you.

4  BY THE COURT:

5  Q.  So, I want to be sure I understand this.

6        As of the date that you signed this, in terms

7  of STC, those people were getting 26 hours of

8  unstructured out-of-cell time a week?

9  A.  Yes, sir.

10  Q.  That number sounds way too high.  Am I missing

11  something?

12  A.  So, in November, we were offering day rooms,

13  yards, and seven days a week those are offered.

14  So, you have --

15  Q.  Okay.

16  A.  -- six to eight hours a day and then two to

17  four hours a week with yard.

18  Q.  So, if yard was offered and they didn't use

19  it, they would still be counted?

20  A.  Correct.

21  Q.  Okay.  And regarding DXP, 19 to 26 hours, same

22  thing?

23  A.  Yes, sir.

24  Q.  So, you're saying that for the STC and the

25  DXP, a considerable amount of yard time and day

1  room time were available in November?

2  A.   Yes, sir.

3  Q.   Okay.   Then the next paragraph talks about STC

4  in terms of structured out-of-cell time, right?

5  A.   Yes, sir.

6  Q.   And by the way, these community meetings that

7  we've heard referred to, is that structured or

8  unstructured?

9  A.   That's structured.

10  Q.   Okay.   So, STC, six hours.   What type of

11  activities?

12  A.   That would be -- back then we had our school

13  building, our Building 65, our classroom setting

14  was open, and the community meetings which are held

15  in, in the housing unit, in the day rooms.

16  Q.   All right.   What about the Dr. Horn program;

17  when did that begin?

18  A.   November 29th.

19  Q.   So, that wouldn't be picked up here?

20  A.   No, sir.

21  Q.   All right.   Let's see.   So, four to five hours

22  DXP, six to eight hours in restrictive housing.

23  Okay.

24       And then in paragraph five, you say, Before

25  COVID --

251

1      And do you have a date for that, "before
2  COVID"?
3  A.   Anything prior to March of 2020.
4  Q.   -- Dixon consistently providing at least ten
5  hours of structured and unstructured with the
6  exception of DXP.
7      And you believe that to be correct?
8  A.   Yes, sir.
9  Q.   You talked some about correctional officers.
10  These community meetings, was it your understanding
11  that correctional officers would have to be present
12  in those community meetings?
13  A.   That's not my understanding.  They just have
14  to be present in the area for security reasons.
15  Q.   But not in the meeting itself?
16  A.   Correct.
17  Q.   So, who would tell them what they're supposed
18  to do?
19      Dr. Stewart testified that the one he
20  attended, there were two COs there in the meeting
21  and one or more that wandered in and out.
22      Would that be your understanding of
23  appropriate conduct?
24  A.   From, from my understanding, a community
25  meeting is not a confidential setting, and the

1  areas where they're conducted are in a day room

2  that there's not -- there's space enough to social

3  distance, but there's not a lot of space for the

4  security staff to be that far away.  And so --

5  Q.  Okay.  All right.  You talked about Dr. Horn's

6  program, and I think you said it resulted in

7  out-of-cell time increasing from four to six hours

8  up to six to eight hours?

9  A.  Yes, sir.

10  Q.  And how is that recorded?

11  A.  Our mental health psych administrator,

12  Dr. Chess, reports in a report, and an email is

13  sent out weekly.

14  Q.  Okay.  And she would have specifically

15  identified Dr. Horn's program, the basketball

16  program?

17  A.  I, I don't know if it specifically speaks to

18  that.

19  Q.  Splitting up from one yard into two, that

20  process is not completed?

21  A.  Right.  We're actually splitting one yard

22  that's shared with DXP and STC into one STC yard

23  and two DXP yards.  And no, it's not done.  Weather

24  -- the weather has interfered with it.  It should

25  be done the end of February or first of March.

1  Q.  And when that's done, what is the purpose of

2  that?  Just to give them outdoor time?

3  A.  Yeah.  Yes, so it will --

4  Q.  They're not getting structured -- they're not

5  getting programming during that time?

6  A.  No, sir.

7  Q.  Okay.  And this pavilion is scheduled for

8  March?

9  A.  Yes, sir.

10  Q.  The gymnasium, that's completed?

11  A.  Yes, sir.

12  Q.  Any other initiatives that you're aware of to

13  try to address this situation?

14  A.  Not that I'm aware of.

15      THE COURT:  All right.  Thank you.  Those are

16  my questions.

17      Mr. Hirshman, any questions?

18      MR. HIRSHMAN:  One.

19              **FURTHER REDIRECT EXAMINATION**

20  BY MR. HIRSHMAN:

21  Q.  With respect to these community meetings, you

22  know that the guards who are there can overhear the

23  conversations, don't you?

24  A.  Yes, sir.

25      THE COURT:  Okay.  Miss Bautista?

1       MS. BAUTISTA:  Nothing further, Your Honor.

2       THE COURT:  All right.  Thank you very much.

3   Does either side anticipate needing to re-call this

4   witness?

5       MS. BAUTISTA:  No, Your Honor.

6       MR. HIRSHMAN:  No, Your Honor.

7       THE COURT:  All right.  Thank you.  Then

8   you're excused.  Thank you very much.

9       THE WITNESS:  Thank you.

10       MR. HIRSHMAN:  Your Honor, I do want to offer

11   Plaintiffs' Exhibits 14 and 26.

12       THE COURT:  I'm sorry?

13       MR. HIRSHMAN:  I would like to offer into

14   evidence Exhibit 14 and 26.

15       THE COURT:  Okay.  Any objection?

16       MS. BAUTISTA:  Are those Plaintiffs' or

17   Defendants' exhibits?

18       MR. HIRSHMAN:  Plaintiff.

19       MS. BAUTISTA:  I'm sorry, say that again, 14

20   and which one?

21       MR. HIRSHMAN:  26.

22       MS. BAUTISTA:  No objection.

23       THE COURT:  All right.  Those are admitted.

24       (Whereupon, Plaintiffs' Exhibit Numbers 14 and

25   26 were admitted.)

1     THE COURT:  Annie, do you show any others that

2   are pending?

3     COURTROOM DEPUTY:  I have a question about

4   Defendants' 14, 13 and 1.  Are we admitting those?

5     THE COURT:  Is there any objection to those?

6     MR. HIRSHMAN:  I'm checking, Your Honor.

7     THE COURT:  I'm sorry?

8     MS. BAUTISTA:  Yes, Your Honor, we're not

9   moving to admit those.

10     THE COURT:  Okay.  Then we'll show them as not

11   admitted at this point.

12     So, looking to tomorrow morning, the agenda

13   says we have Dr. Chess at 9, Michelle Ruelas at

14   11:15, Warden Burle at 1, and Dr. Howell at 3.

15     Is that still the plan?

16     MR. HIRSHMAN:  Your Honor, I'd like to spend

17   at least two minutes talking because I am not sure

18   that we need Ms. Ruelas as a witness; and if it's

19   possible to move up the warden, I would prefer

20   that.  I'm responsible for both those witnesses,

21   and I would say that I would put her to the end of

22   the day, if that's possible.  If it's not possible,

23   we'll deal with it.

24     THE COURT:  Ms. Bautista, could Warden Burle

25   be available at 11:15?

1      MS. BAUTISTA:  Your Honor, we can contact the

2   warden certainly.

3      THE COURT:  Okay.  And then while you're doing

4   that, also contact Ms. Ruelas, and once we know if

5   the -- if the warden can't testify then, you still

6   want to go ahead with her?

7      MR. HIRSHMAN:  Yes, I'll take her.

8      THE COURT:  So, we need -- you two can talk

9   about that, okay?

10     MS. BAUTISTA:  So, it sounds like -- you know,

11  we'll confirm with the warden.  It sounds like,

12  though, we're not striking Michelle Ruelas as a

13  witness, that Plaintiffs are moving her to later in

14  the day?

15     MR. HIRSHMAN:  We may very well strike her as

16  a witness, but I don't want to make that commitment

17  on my own.  I want to talk to my colleagues and

18  decide whether that's -- that's my inclination

19  right now, but I don't want to make -- say that.

20     THE COURT:  Okay.

21     MS. BAUTISTA:  Can we take a break, Your

22  Honor, so that they can decide so that we can tell

23  the witnesses what the plan is?

24     THE COURT:  No, we're not going to take a

25  break now.  You two confer about that and work that

1   out.

2        MR. HIRSHMAN:  We will.

3        THE COURT:  Now, if I understand correctly, it

4   appears then at the end of the day that Plaintiffs

5   would rest?

6        MR. HIRSHMAN:  That's correct, Your Honor.

7        THE COURT:  And then we'd start with the

8   defense witnesses Thursday morning.

9        MS. BAUTISTA:  Yes, Your Honor.

10       THE COURT:  Okay.  All right.  I think this

11  worked really well today.  I want to find some wood

12  to knock on.  But I think it worked better than I

13  thought it would.

14       MR. REES:  Your Honor, this is Doug Rees.

15  Could we get a number -- a phone number for your

16  clerk or someone at your office because I think --

17  it's our full intention to start as scheduled at 9,

18  but with the weather event as scheduled, I think,

19  you know, we would like someone we can contact for

20  the Court if we run into some trouble.

21       THE COURT:  Sure.  Melissa, are you still on?

22       LAW CLERK:  Yes, Judge.  You can reach me at

23  any time.  I'll have the phone line for Judge

24  Mihm's chambers transferred to my cell.  Call me at

25  any time.  And that number is 309-671-7113.

1      MR. REES:  I'm sorry, can you repeat the last

2  four?

3      LAW CLERK:  7113.

4      MR. REES:  Thank you.

5      MR. HIRSHMAN:  Can we spend a minute on the

6  Pablo exclusion?  We have now had a chance to look

7  at the case and look at the rule, and Mr. Mills

8  will take over if Your Honor wants to listen at

9  this time.

10      THE COURT:  Okay.

11      MR. MILLS:  Good morning, Your Honor -- good

12  afternoon.  So, 615 is not quite as explicit as

13  Mr. Rees read to you.  It includes 615(c), which is

14  an exception to the automatic exclusion for a

15  person whose presence a party shows to be essential

16  to presenting the party's claim or defense.

17      And as Your Honor had suggested, the Seventh

18  Circuit has repeatedly held that in the case of an

19  expert, that is left to the broad discretion of the

20  Court as to whether or not the expert's ability to

21  hear other testimony would, in fact, aid that

22  expert in his opinions.

23      The case that Mr. Rees cited was one where

24  there were two firearms experts, one by the

25  government, one by the defense attorney.  The judge

1    did exclude the defense expert from the testimony
2    and over defendant's objection.
3        The Seventh Circuit affirmed what the judge
4    did, saying that because the state or the
5    government's expert had submitted a report, there
6    was nothing beyond the report, it was no harm, no
7    foul, who cares whether or not he was excluded, he
8    wasn't necessary.
9        But if you look at the annotations, all of
10   them say that unless there's a clear showing and
11   the judge denies it, that the court's not going to
12   overrule the judge's discretion because you're in
13   the best position to determine whether or not the
14   expert's -- the expert's listening to the rest of
15   the testimony is useful for their testimony,
16   citing, just from the annotations here, *Morvant* --
17   M-o-r-v-a-n-t -- *vs. Construction Aggregates Corp*,
18   570 F.2d 626.  Also looking at *United States vs.*
19   *Burgess*, 691 F.2d 1146.  One where they excluded
20   both parties' -- or refused to exclude both
21   parties' experts of psychologists in particular,
22   that was -- see if I got the right case -- that was
23   *Mayo vs. Tri-Bell Industries, Inc.*, 787 F.2d 1007.
24   And it goes on.
25       But essentially what it says is we're not

 1   going to overrule the judge's discretion.  Here,

 2   the judge is given broad discretion to determine

 3   whether or not that testimony's important -- or

 4   listening to that testimony is important.  The

 5   purpose of the rule is to ensure that a fact

 6   witness does not tailor their testimony by hearing

 7   some other fact witness and, therefore, making sure

 8   that their testimonies line up with each other.

 9       It has nothing to do with whether or not an

10   expert can rely on what's said during court as the

11   basis of their opinions.

12       THE COURT:  All right.  Well, I want to take a

13   look at this, these citations.

14       Melissa, do you have those now?

15       LAW CLERK:  Yes, Judge.

16       THE COURT:  Okay.

17       LAW CLERK:  Sorry, I was muted.

18       THE COURT:  That's all right.  I will give you

19   a final decision tomorrow morning at the beginning.

20   I would like you to perhaps have Dr. Stewart on

21   call or available if I change my mind.  I have no

22   idea at this point whether I will or not.  So, I'll

23   announce that tomorrow morning.

24       MR. MILLS:  Thank you, Your Honor.

25       THE COURT:  Anything else today?

1        MR. MILLS:  No, Your Honor, not from us.

2        THE COURT:  Thank you all very much.  Be safe.

3        MR. REES:  Thank you, Your Honor.

4        THE COURT:  Everyone be safe.  See you

5    tomorrow morning.

6        MR. REES:  Thank you.

7        THE COURT:  Bye-bye.

8        (Proceedings concluded at 4:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25