E-FILED
Friday, 20 May, 2022  11:04:58 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS,
PEORIA DIVISION**

| | | |
|---|---|---|
| ASHOOR RASHO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:07-CV-1298-MMM-JEH |
| | ) | |
| v. | ) | Judge Michael M. Mihm |
| | ) | |
| ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**

On January 13, 2022, Plaintiffs moved this Court to extend its jurisdiction over the Rasho

Settlement Agreement ("RSA") due to Defendants' failure to comply with several substantive

terms of the Agreement. ECF No. 3484. In response, Defendants filed papers arguing for the first

time in the more than six-year history of the RSA that what the parties entered into was a consent

decree, rather than a private settlement agreement, for purposes of the Prison Litigation Reform

Act (PLRA). ECF No. 3537. Plaintiffs moved to strike the response (ECF No. 3539), Defendants

responded to that motion (ECF No. 3547), and Plaintiffs filed a reply (ECF No. 3556).

On May 4, 2022, following oral argument, the Court reached a preliminary conclusion

that the RSA is a consent decree under the PLRA based on several of the RSA's terms that allow

for contractual interpretation, modification, and oversight by the Court. However, the Court also

ordered the parties to submit proposed findings regarding the appropriate classification of the

RSA as well as the consequences of the PLRA's distinction between private settlements and

consent decrees in this case. Pursuant to that order, Plaintiffs propose the following findings.

## **Background**

1.      In 2011, the parties agreed to a process in which independent consultants would examine the Illinois prison system and give recommendations to be used in settlement negotiations which, at that time, were geared toward the development of a consent decree. ECF Nos. 98, 261. The parties spent more than a year negotiating a consent decree, but negotiations broke down and an agreement was not reached at that time.  In 2013, the parties agreed to a new process, wherein IDOC agreed to preliminary reforms while the parties again attempted to negotiate a consent decree. A near-final consent decree was filed with the Court in January 2015. ECF No. 208-1.

2.      Negotiations once again broke down when new state leadership declared that they would not enter **_any_** consent decrees. ECF No. 261. At a status during this time, this Court asked Defendants' counsel directly whether they would be able to agree to a consent decree. Defense counsel told the Court that they would not. The case was then set for discovery and trial.

3.      Settlement negotiations subsequently resumed, and in December 2015, the parties filed the proposed settlement agreement that became the RSA at issue. ECF No. 696 ("Rasho Settlement Agreement"). Consistent with the position taken by Defendants earlier that year, neither the parties nor the Court understood the RSA to be a consent decree.

4.      Several terms in the RSA indicate that the parties did not intend to enter a consent decree. For example, the RSA explicitly prohibits Plaintiffs from seeking contempt for mere violations of the Agreement's terms. Unlike a consent decree, the RSA is not an order and was not entered with findings of federal law violations. Instead, the RSA requires Plaintiffs to make a showing that Defendants are currently in violation of federal law (not just the RSA) in order to

obtain court-ordered relief and requires the Court to craft relief that meets the PLRA's needs-narrowness-intrusiveness requirements. Section §XXIX(g).

5.      In the second year following the settlement, Plaintiffs moved for preliminary and then permanent injunctive relief based on ongoing constitutional violations that correlated with violations of the RSA. ECF Nos. 1559and 3176. The parties and the Court followed the procedures laid out in Section XXIX(g), which resulted in this Court's issuance of preliminary injunction (ECF No. 2070) and a permanent injunction (ECF No. 2633). In each set of proceedings, it was agreed that the terms of the RSA could not be enforced by this Court as a consent decree or court order, but instead Plaintiffs were required to litigate issues on their underlying merits—that is, by showing a current violation of federal law, not just a violation of the Settlement Agreement.

6.      The Court notes that the Seventh Circuit later vacated the permanent injunction. *Rasho v. Jeffreys,* 22 F.4th 703 (7th Cir. 2022). In so doing, the Seventh Circuit observed in a footnote that the RSA was "more accurately described as a consent decree rather than a private settlement agreement" for purposes of the Prison Litigation Reform Act (PLRA), 18 USC §3626. *Rasho*, 22 F.4th at 707 fn 2, citing *Doe v. Cook County, Ill.*, 798 F.3d 558, 565-66 (7th Cir. 2015). The Seventh Circuit did not comment on the lack of PLRA findings in the RSA nor did it conclude that the RSA was an invalid or impermissible consent decree.[1]

_____

[1] That the Seventh Circuit left the underlying settlement agreement in place, without disturbing or commenting upon the validity of the District Court's jurisdiction over it, is similar to *Doe v. Cook County.* There, the Seventh Circuit rejected court-ordered relief that had not been based on proper PLRA findings, but did *not* vacate the underlying settlement agreements between the parties, despite also finding that the underlying settlements did not contain findings of federal law violations or that the terms of those settlement met the PLRA's needs-narrowness-intrusiveness requirements. *Doe v. Cook County, Ill.*, 798 F.3d 558, 565-66 (7th Cir. 2015) (concluding simultaneously that the parties' 2002 and 2006 settlements did not contain PLRA findings of federal law violations or needs-narrowness-intrusiveness, but also explaining that

7.      This conclusion is perplexing because, as the Seventh Circuit also explained in *Doe,* this Court would not have needed to make any PLRA findings to support the permanent injunction that was the subject of the recent appellate decision if the RSA had been a consent decree from the start. *Doe v. Cook County, Illinois,* 798 F.3d 558, 564 (7th Cir. 2015) ("Simple enforcement of a consent decree does not require a new round of findings under § 3626."). But here, because the RSA had not functioned as a consent decree, the parties agreed that simple enforcement was precluded and that federal law violations had to be litigated on their merits for the Court to enter relief to address the federal rights of the class.

8.      Other aspects of the RSA further demonstrate that the parties did not intend to enter a consent decree when they entered the Agreement. The RSA does not include findings by the Court or explicitly stipulated to by the parties that are required by the PLRA whenever prospective relief is entered. For example, the PLRA requires a finding of ongoing federal law violations as well as findings that the relief ordered by the Court is narrowly tailored to those violations, does not extend any further than necessary to correct the violation, and is not overly intrusive. Neither party asked this Court to make such findings, nor did this Court believe such findings were necessary, as all parties and the Court were operating under the belief that the RSA was not a consent decree and therefore not prospective relief under the PLRA.

9.      Over 17 months ago, Plaintiffs moved to extend jurisdiction over the RSA. ECF No. 3239. The Defendants' 2021 response, ECF No. 3254, made no argument that the RSA was a consent decree for purposes of the PLRA or that it was subject to the PLRA's requirements

---

"[n]othing in this opinion should be read to undermine the original settlement in 2002 or the follow-up settlements in 2006." Here, the Seventh Circuit held that this Court's injunction did not comply with the PLRA and vacated it, but did not suggest that the underlying Agreement was invalid or that it ran afoul of the PLRA in any way.

for extension of prospective relief. The parties later came to an agreement to terminate several terms with which Defendants were in substantial compliance and to extend jurisdiction over the remaining terms for which Defendants had not reached substantial compliance. The Court then entered an agreed order extending jurisdiction for one year, until April 22, 2022, for all substantive terms for which Defendants had not reached substantial compliance. ECF No. 3266. The Court did not, however, order any prospective relief as to those terms.

10.     On January 13, 2022, Plaintiffs again moved this Court to extend its jurisdiction over the RSA, citing to the Monitor's continued findings that Defendants were not in substantial compliance with most of the remaining substantive terms. ECF No. 3484. The parties later agreed to extend jurisdiction to July 22, 2022. ECF No. 3508.

11.     In response, Defendants filed papers arguing for the first time in the more than six-year history of the RSA that the Agreement should be treated as a consent decree—rather than a private settlement agreement—for purposes of the Prison Litigation Reform Act (PLRA). ECF No. 3537. In subsequent argument, Defendants have clarified that their position is that the RSA is a "consent decree" for the purposes of requiring needs-narrowness-intrusiveness findings in order to extend jurisdiction, but *not* as to the enforcement. Defendants argue that, in order to extend the term of a consent decree, Plaintiffs must meet the PLRA's requirements for issuing prospective relief, despite that the RSA explicitly allows this Court to continue its jurisdiction based upon a showing that Defendants have failed to comply with the terms of the RSA.

12.     While Defendants ask the Court to treat the Agreement as a consent decree for the purposes of the PLRA's burden on Plaintiffs, Defendants simultaneously contend that it cannot be enforced as a consent decree would be enforced, an argument which itself calls into question whether the RSA can be accurately characterized as a consent decree.

**Conclusions of Law**

13.     The Seventh Circuit's footnote stating that the RSA is "more accurately described as a consent decree" under the Prison Litigation Reform Act is, by its own terms, dicta. The Court specifically noted that this conclusion was "irrelevant" to the issues before it, which is the very definition of dicta. Nonetheless, this Court must take into consideration a clear statement from the Seventh Circuit and its reference to Seventh Circuit precedent in *Doe v. Cook County, Illinois,* 798 F.3d 558 (7th Cir. 2015), and determine the best course forward.

14.     There are essentially four possible routes for the Court to take at this juncture. The first involves concluding that, despite the Seventh Circuit's footnote and Defendants' newly minted position, the RSA is a private settlement agreement and not a consent decree under the PLRA. Path two acknowledges that the parties did not intend to enter a consent decree (rendering the "consent" aspect of the decree lacking), and this Court may employ the contract doctrine of mutual mistake to reform the RSA, editing those portions that this Court finds make it consent decree under the PLRA and maintaining it as a private settlement agreement.

15.     The third and fourth paths branch off from the opposite conclusion, that the RSA is a consent decree; in path three, the Court concludes that while the RSA is a consent decree for purposes of the PLRA, the parties have waived both Plaintiffs' ability to seek simple enforcement (contempt or other equitable relief) for mere violations and Defendants' ability to require PLRA findings to extend this Court's jurisdiction or to seek termination of this Court's jurisdiction based on a lack of PLRA findings. If the parties are not permitted to make such waivers, then we proceed to path four, where the consent decree becomes enforceable by this Court's contempt powers and subject to the PLRA's requirements for prospective relief.

## **Route One: The Rasho Agreement is a Private Settlement Agreement**

16.     A consent decree is fundamentally a court order to which the parties have agreed.
Put another way, a consent decree is both an agreement and injunctive relief. Injunctions, court
orders, and consent decrees are all enforceable by the Court through its inherent contempt power,
and thus they are all "prospective relief."  *See Benjamin v. Jacobson,* 172 F.3d 144, 157 (2d Cir.
1999) ("[C]onsent decrees ... are enforceable through the supervising court's exercise of
its contempt powers, and private settlements [are] enforceable only through a new action for
breach of contract."); *Hazen ex rel. LeGear v. Reagen,* 208 F.3d 697, 699 (8th Cir. 2000) (same);
*see also Healey v. Spencer*, 765 F.3d 65, 75 (1st Cir. 2014) (a consent decree is both a settlement
and an injunction, enforceable upon pain of contempt).

17.     It would be unusual for a Court to issue an injunctive order it did not know it was
issuing. When this Court entered an order approving of the RSA, ECF No. 709, it did not order
Defendants to comply with it, nor did it believe it was entering a consent decree. Rather, this
Court's approval of the RSA was given in accordance with the Court's duty under Rule 23(e)(2)
to ensure that settlements of class action litigation are fair, reasonable, and adequate.

18.     After approving the RSA and at the request of the parties, this Court retained
jurisdiction while functionally staying the case. Following the well-reasoned logic of *Disability
Law Center v. Massachusetts Dept. of Corrections*. 960 F.Supp.2d 271 (D. Mass. 2012), neither
the parties nor this Court believed that this retention of jurisdiction would convert the RSA from
a private settlement agreement into a consent decree under the PLRA because this Court was not
ordering the parties to do anything. Rather, the purpose of retaining jurisdiction was so that this
Court could continue to provide a forum for interpretation of the RSA when conflicts arose and

to hear litigation on the underlying merits, if and when Plaintiffs moved for relief based on a current federal law violation.

19. Not only did this Court not intend to issue a decree, but the RSA explicitly does not allow for simple enforcement by this Court, meaning that this Court cannot hold Defendants in contempt or issue any other equitable prospective relief based merely on Defendants' failure to comply with the substantive terms. Again, court enforceability is the crux of a consent decree. *See Healey*, 765 F.3d at 75; *Hazen,* 208 F.3d at 699; *Benjamin,* 172 F.3d at 157.

20. Rather, this Court's ability to enter remedial relief is limited to situations where Plaintiffs can prove a current federal law violation (as is required under the PLRA in order to issue prospective relief of any kind), which is essentially the same as litigation on the merits. *See* Section XXIX. Even upon a showing of federal law violations, this Court is not permitted to simply order Defendants to comply with the RSA but must instead craft relief that meets the PLRA's needs-narrowness-intrusiveness requirements.

21. Notably, Defendants argue both that the RSA is a consent decree, and that it is *not* enforceable by contempt because this Court did not make PLRA findings. Defendants are correct that the Court did not make PLRA findings in the RSA, nor was it asked to do so by either party. This point merely underscores that nobody intended the RSA to be a consent decree. And, it would be an untenable result, after all this time, to interpret the RSA as a consent decree that lacks the enforcement authority inherent in consent decrees *because* it is a consent decree.

22. The PLRA explicitly permits parties to create a private settlement agreement that contracts around the PLRA's requirements regarding prospective relief, so long as the terms of the agreement "are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled." 28 USC §3626 (c)(2). The Seventh Circuit in *Doe*

reiterated this statutory language, stating that, "if an agreement is judicially enforceable—that is, if a violation means anything other than restarting the litigation on the merits—the agreement must be treated as a "consent decree." *Doe,* 798 F.3d at 563. Functionally, what the RSA does in § XXIX is require the parties to litigate the merits of any potential federal law violation before Plaintiffs can obtain prospective relief. This approach complies with the intent and purpose of the PLRA with respect to limiting court involvement in prison administration.

23.     The Ninth Circuit's decision in *Armstrong v. Davis*, 215 F.3d 1332, 2000 WL 369622 (Table) (9th Cir. 2000), while unpublished, is helpful here. In that case, the parties developed a comprehensive remedial plan to resolve violations of disability rights laws through a combination of negotiation and litigation. *Id.* at *1. Some aspects of the parties' dispute were resolved by the Court, with the result that those aspects of the remedial plan were supported by PLRA findings, while other portions of the remedial plan were negotiated by the parties and did not have PLRA findings. *Id.* The plaintiffs moved to enforce, and the Court granted injunctive relief that included enforcement of the negotiated portions, without making PLRA findings. *Id.* at *2-3. The Ninth Circuit concluded that the district court had erred in ordering injunctive relief based on violations of the negotiated aspects of the plan that had not been supported with initial PLRA findings. In so doing, the Court explained:

> The CDC and the inmates entered into a settlement agreement under which the CDC has agreed to remedy various violations. If the CDC fails to live up to the agreement and violations persist, the plaintiffs may return to court and seek appropriate redress, including an enforceable injunction in conformity with the PLRA if appropriate. This approach is consistent with the purpose of the PLRA, which is to minimize judicial involvement in prison administration unless the requisite findings can be made.

*Id.* At *3 (internal citations omitted).

24.     The RSA is akin to the negotiated aspects of the settlement agreement in *Armstrong,* and the outcome in *Armstrong* suggests strongly that it is acceptable under the PLRA

for a district court to maintain jurisdiction over a settlement agreement that does not include initial PLRA findings, so long as the required findings are made prior to the Court ordering any prospective relief. Notably, the Ninth Circuit did not conclude that the negotiated portions of the settlement constituted a consent decree unenforceable by contempt or other equitable relief—the result urged by the Defendants in this case—nor did they conclude that those portions had to be vacated because they did not contain PLRA findings. Rather, the negotiated agreement lived on, with Plaintiffs able to pursue injunctive relief in the future if federal law violations were shown.

25.     Defendants argue that this Court's retention of jurisdiction alone converts the RSA into a consent decree under Seventh Circuit law in *Doe v. Cook County*, despite the intent of the parties and this Court and despite the express limitation of this Court's enforcement powers. This Court does not find persuasive Defendants' argument that retention of jurisdiction over the RSA converts it to a consent decree that nobody intended, nor does the Court read *Doe* to hold as much. Simply maintaining jurisdiction and continuing to provide a forum for the adjudication of potential federal law violations is not, in and of itself, "relief" or "enforcement," nor is it the same as ordering the parties to comply with their private agreement. *See Disability Law Center v. Massachusetts Dept. of Corrections*. 960 F.Supp.2d 271 (D. Mass. 2012).

26.     This case is dissimilar to *Doe* in many respects, and Defendants overstate is application here. In *Doe*, the issue before the Seventh Circuit was the district court's appointment of an administrator who was effectively running a juvenile detention center, including by making decisions around hiring and firing that ran afoul of an existing labor contract. There, the district court had never made findings of federal law violations, nor did it find that appointing an administrator to run the center met the needs-narrowness-intrusiveness requirement. The Seventh Circuit concluded that, without making such PLRA findings, the court did not have authority to

10

order the detention center to comply with the parties' agreement, nor did it have authority to appoint an administrator with such broad-reaching powers.

27.     Defendants further argue that any *extension* of this Court's jurisdiction over the RSA amounts to an entry of prospective relief and argue that this Court must make PLRA findings before it can extend jurisdiction over the parties' agreement. For the same reasons that the Court's initial approval of the RSA and retention of jurisdiction did not convert the RSA into a consent decree, merely extending jurisdiction to continue to provide a forum for litigation on the merits of federal law violations does not constitute prospective relief.

28.     Defendants also argue that eight provisions in the RSA provide "avenues" for the Court to issue prospective relief, in that they allow this Court to interpret, modify, and oversee the agreement. ECF No. 3571 at 8; ECF No. 3547 at 4-5. They are § XXIX (d, f, and g) (allowing Court to enter orders enforcing settlement terms based on federal law violations), § XXIX (i) (allowing Court to enter orders of contempt and other equitable relief for failure to comply with orders issued under § XXIX (d, f, and g); § XXIX(j) (authorizing Court to consider Plaintiffs' motions to "abrogate" the RSA); § XXXI (b, d) (allowing Court to modify the RSA's terms on a motion of either party, even if the other party objects, and to reject agreed proposals for modifications of the RSA even if the parties agree; § XXVII(q) (approving or denying requests to dismiss monitor); §XXIX(e) (extending Court's jurisdiction over agreement past the initial date agreed to by the Parties if the Court finds that Defendants have failed to effect substantial compliance with the substantive terms); § XXX (allowing this Court to resolve disputes about interpretation of the RSA's force majeure provision, and § XXXII(b)(i) (indicating that the RSA cannot go into effect unless and until the Court approves it).

29.     Before addressing these, the Court notes that providing "avenues" for prospective relief is not the same as issuing prospective relief. The fact that the parties agreed to a contract that would allow the Court to decide certain issues related to that contract does not convert the parties' private agreement into a court order.

30.     As discussed above, the RSA provisions in § XXIX allowing this Court to issue orders enforcing the settlement terms does not convert the RSA into a consent decree because, in order to issue any orders that would constitute prospective relief, this Court must first make fresh findings of federal law violations. Once federal law violations are found, this Court must craft relief that meets the needs-narrowness-intrusiveness requirements of the PLRA, which may or may not match the requirements set out by the RSA.

31.     Nor do the provisions allowing this Court to interpret some of the contract's terms (e.g., force majeure), constitute prospective relief. To this point, Defendants argue that a private settlement agreement may *only* be interpreted by a state court, but the PLRA contains no such requirement. Instead, it states that nothing within the PLRA shall prevent a party from bringing an action in state court for breach of a private settlement agreement. 18 USC 3626(c)(2)(B). If Congress had intended to *require* private settlement agreements to *only* be interpreted and enforced in state court, it could have done so explicitly. It did not, and Defendants have not cited any authority that requires private settlement agreements to be interpreted only by state courts.

32.     Moreover, the RSA's provisions allowing this Court to modify the RSA's terms and requiring Court approval of parties' agreed modifications are explained by the fact that the RSA arose out of a class action, and this Court has a duty under Federal Rule of Civil Procedure 23 to ensure that any settlement is fair and reasonable to the class that was properly certified in this Court. That includes future modifications to the RSA, even ones that the parties agree on.

Similarly, the provisions allowing this Court to hear disputes about the monitor ensures that the monitor is not dismissed without good cause, which ensures continued fairness to the interests of the class. Unlike in *Doe,* the monitor here has not been imbued with any authority to dictate how the prisons are run, nor would this Court be interfering with prison administration simply by adjudicating a motion to terminate the monitor.

33.     This same logic applies to Section XXXII(b)(i), which required this Court to approve the RSA before it went into effect. This Court's approval of the RSA was not equivalent to entering the RSA as prospective relief—rather, it was merely a determination that the private agreement was fair, reasonable, and adequate to address the claims of the class. In its definition of "relief," the PLRA states, "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." This Court's approval of a private settlement under Rule 23 does not meet the PLRA's definition of relief.

34.     Finally, since the RSA is not itself a court order and is not prospective relief, merely extending this Court's jurisdiction over it is not prospective relief, either. Extending jurisdiction does nothing but continue to provide a forum that this Court believed and still does believe is necessary to ensure that the RSA is fair, reasonable, and adequate to protect the rights of the class. Besides, even if this Court did not extend its jurisdiction over the RSA, the class would be free to bring further federal litigation on the merits to vindicate their rights under federal law, and this Court would again have jurisdiction to adjudicate those claims. By retaining and extending jurisdiction over the RSA, this Court maintains its ability to manage its docket.

## Route Two: The RSA Must Be Reformed to Fit the Parties' Intent

35.     In the alternative, if the Court finds that certain non-substantive provisions in the RSA allow for prospective relief that is impermissible under the PLRA without prior findings of federal law violations, the Court still need not conclude that the RSA is a consent decree.

36.     This Court has concluded that the parties intended the RSA to be a private settlement agreement and not a consent decree for purposes of the PLRA. At the time that the document was executed, all parties and the Court believed it was a legally sound private settlement that complied with the requirements of the PLRA and Seventh Circuit precedent. Thus, the Court must consider how the contract doctrine of mutual mistake would apply.

37.     The contract doctrine of mutual mistake applies where the parties have entered a contract premised on an erroneous belief about a fact. *See* Rstmt. 2nd of Contracts, §151(a). "Fact" in this context includes a party's erroneous belief with respect to the law. *Id.* §151(b). Where the writing evinces an agreement of the parties but fails to express the true agreement due to a mistake of both parties, the Court may reform the writing to match the parties' intent. *See* Rstmt. 2nd of Contracts, §155; *People v. Taylor*, 2015 IL 117267, ¶ 26, 25 N.E.3d 627, 635 ("A mutual mistake on the part of contracting parties may be rectified by reforming the contract when the parties are in actual agreement and their true intent may be discerned.")

38.     The parties' intent to enter a private settlement agreement is easily discerned, but certain terms in the RSA may require the Court by law to view the RSA as a consent decree rather than the intended private settlement. In particular, the Court is concerned about terms that allow it to modify the parties' agreement and to adjudicate disputes about the Monitor.

39.     Plaintiffs maintain their position that these provisions of the RSA do not convert it from its intended use as a private settlement agreement into a consent decree because they are

not substantive (they do not relate to the mental health treatment required for the class), and so any orders issued by the Court pursuant to them do not run afoul of the PLRA's limitations on prospective relief  because they do not amount to court interference with prison administration.

40.    The Court agrees that mere contract interpretation does not constitute prospective relief under the PLRA. However, the Court is concerned that terms allowing the Court to issue court orders without first finding federal law violations, may inadvertently convert the RSA into an unintended consent decree.

41.    In order to reform the contract and preserve it as a private settlement agreement, this Court may simply add a provision to the RSA that limits this Court's ability to issue any orders for prospective relief without first make the appropriate findings under the PLRA with respect to subsections XXXI(b), (d), and XXVII(q). This addition would not apply to requests for mere interpretation of the contract or to the extension of this Court's jurisdiction but would require the parties to litigate disputes alleging breach of contract in the state court unless correlating federal law violations can be shown. This Court's jurisdiction could continue if the Court makes findings that Defendants have not reached substantial compliance with any substantive terms, and this Court would continue to provide a forum for the adjudication of claims that Defendants have violated federal law.

## Route Three: A Consent Decree That Waives Simple Enforcement and PLRA Limitations

42.    As discussed previously, this Court's approval of the parties' agreement was not, in and of itself, an entry of prospective relief. If Defendants are correct that retaining jurisdiction over the RSA makes it a consent decree under Seventh Circuit law, the question then becomes whether the decree must be subject to the PLRA's requirements for extension of the Court's jurisdiction or whether it can be terminable based on a lack of initial PLRA findings.

43.     A consent decree is fundamentally a contract subject to contract principles.

*Holmes v. Godinez,* 991 F.3d 775, 780 (7th Cir. 2021) (explaining that, under Illinois law, "the court's primary objective in construing a contract is to give effect to the intent of the parties.") The Court finds that Plaintiffs waived their ability to seek simple enforcement of the RSA based merely on violations of the RSA and promised instead to only seek court-ordered relief if findings of current federal law violations were made. In turn, Defendants waived their ability to require PLRA findings to extend this Court's jurisdiction, promising instead to allow the Court's jurisdiction to continue based on findings of lack of substantial compliance.

44.     To give effect to the intent of the parties, this Court may find that the waivers by both sides are valid and enforceable even if the RSA is a consent decree. In so doing, the Court clarifies that extending its jurisdiction based on findings of Defendants' noncompliance is not the same as ordering prospective relief, because the RSA still is not subject to simple enforcement.

45.     This is distinct from the situation in *Hallet v. Morgan,* cited by Defendants, because the parties there had a consent decree that was enforceable by the Court through simple enforcement, and therefore was prospective relief. 296 F.3d 732 (9th Cir. 2002). Notably, the stipulation in *Hallet* was entered into prior to the PLRA, whereas here the parties had the benefit of the PLRA prior to entering their agreement. The fact that the parties were aware of the PLRA's termination provisions and limitations on prospective relief yet chose to craft the RSA in the manner they did, indicates their intent to craft an agreement that waived those provisions.

**<u>Route Four: The Rasho Agreement is a Consent Decree Enforceable by the Court</u>**

46.     Alternatively, if this Court concludes that the RSA is a consent decree because it constitutes a judicially enforceable agreement, then the provisions of the RSA which purport to limit this Court's ability to find Defendants in contempt for noncompliance must be invalid.

16

47.     Contempt power belongs to the courts, not the parties. *Shillitani v. United States*, 384 U.S. 364, 370 (1966)) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.") (internal citations omitted).

48.     A court's ability to hold a party in contempt for noncompliance is a fundamental characteristic of a consent decree. It is, in fact, the distinguishing characteristic between a private settlement and a consent decree, not whether the Court retains jurisdiction. *See Benjamin v. Jacobson,* 172 F.3d 144, 157 (2d Cir.1999) ("[C]onsent decrees ... are enforceable through the supervising court's exercise of its contempt powers, and private settlements [are] enforceable only through a new action for breach of contract."); *Hazen ex rel. LeGear v. Reagen,* 208 F.3d 697, 699 (8th Cir. 2000) (same); *see also Healey v. Spencer*, 765 F.3d 65, 75 (1st Cir. 2014) (a consent decree is both a settlement and an injunction, enforceable upon pain of contempt).

49.     The RSA represents a bargain struck between the parties after lengthy negotiations. Plaintiffs initially pressed for a consent decree, which would carry with it the ability to enforce its terms through the Court's contempt powers. Defendants would not agree to such a decree. In bargaining away contempt as an enforcement mechanism, Plaintiffs no doubt expected and negotiated for benefits in return. At least one of those benefits was the ability to maintain the Court's jurisdiction over the RSA based on findings that Defendants have not reached substantial compliance, as opposed to the higher burden imposed by the PLRA. In approving the RSA, this Court expressed its belief that maintaining jurisdiction over the RSA was necessary to render the RSA fair and reasonable to the class. ECF No. 709.

50.     As the Second Circuit observed in *Benjamin v. Jacobson,* 172 F.3d 144, 157 (2d Cir. 1999):

> A plaintiff willing to settle constitutional claims by way of a consent decree seeks the assurance that, if the defendant fails to fulfill its agreed obligations, those obligations will be enforceable through the court's exercise of its contempt power. We are not aware of any practice whereby the plaintiffs,

17

> especially in institutional litigation involving constitutional claims for injunctive relief, agree to a consent decree and also agree—either in the same document or in a separate document—to give up their claims unconditionally in exchange for undertakings by the defendants that would not be enforceable except through the commencement of a new lawsuit for breach of contract.

51.     Defendants have not cited any cases, nor has this Court found any, where parties to a consent decree attempted to bargain away the Court's ability to enforce its own order. Such a bargain, if even permissible, would have rendered the RSA fundamentally unfair to the class. The Court therefore concludes that contempt must be an available remedy if the RSA is to be considered a consent decree subject to the PLRA's limitations on prospective relief.

52.     Moreover, Defendants have not moved to terminate the RSA or challenged its current validity, so if this Court accepts Defendants' position that the RSA is a consent decree, it may issue orders to enforce the consent decree as long as it remains in effect. *See Jones–El v. Berge,* 374 F.3d 541, 545 (7th Cir. 2004).

## CONCLUSION

53.     Regardless of the Court's determination as to whether the RSA operates as a consent decree or private settlement agreement, this Court's jurisdiction will not terminate until a determination is made regarding the proper legal characterization of the RSA and what showing Plaintiff must make to continue the Court's jurisdiction over the RSA. If the Court concludes that Plaintiffs must demonstrate ongoing violations of federal law to continue this Court's jurisdiction over the RSA, this Court will grant Plaintiffs leave to amend or refile their prior motion seeking an extension of this Court's jurisdiction and will order a period of formal discovery. Consistent with the Ninth Circuit's decision in *Hallett,* this Court will extend its jurisdiction in the interim.

RESPECTFULLY SUBMITTED,

/s/ Samantha Reed
*One of the Attorneys for Plaintiffs*

Harold C. Hirshman
Samantha R. Reed
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL  60606
Telephone: (312) 876-8000
harold.hirshman@dentons.com
samantha@equipforequality.org

Alan Mills
Nicole Schult
Uptown People's Law Center
4413 N Sheridan
Chicago, IL 60640
(773) 769-1410 (phone)
alan@uplcchicago.org
nicole@uplcchicago.org

Amanda Antholt
Equip for Equality
200 N. Michigan Ave, #300
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 541-7544 (fax)
amanda@equipforequality.org

### CERTIFICATE OF SERVICE

I, Samantha R. Reed, an attorney, hereby certify that on May 18, 2022, I caused a copy of the foregoing document to be served on all counsel of record via the CM/ECF system.

/s/ Samantha R. Reed