## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| **ASHOOR RASHO, et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07-1298** |
| | ) | |
| **ROGER E. WALKER,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction ECF No. 3417. For the reasons stated below, the Motion for Preliminary Injunction is DENIED.

## PROCEDURAL BACKROUND

This case is a class action brought under 42 U.S.C § 1983 alleging violations of the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs challenge the adequacy of the delivery of mental health services to mentally ill prisoners in the physical custody and control of the Illinois Department of Corrections ("IDOC" or "Department"). In the motion before the Court, Plaintiffs argue that the lack of out of cell time at Dixon and Pontiac Correctional Centers amounts to cruel and unusual punishment in violation of the Eighth Amendment and that the lack of out of cell time at Pontiac also constitutes a violation of the Americans with Disabilities Act ("ADA").

This case has been ongoing since 2007. The facts relevant to the present motion began in August 2015 when this Court certified a class for purposes of litigation, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, and defined the class as persons in custody of IDOC who

"are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association." ECF No. 252 at 7. The order clarified that a "diagnosis of alcoholism or drug addiction, developmental disorder, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purpose of this class definition." *Id.*

On December 17, 2015, the parties announced they had entered into a comprehensive settlement agreement resolving the action set forth in Plaintiffs' Third Amended Complaint, the operative complaint in this matter. Minute Entry dated 12/17/2015; ECF No. 260. The Court found the agreement to be fair and reasonable over objections from class members. The current operative agreement is the Second Amended Settlement Agreement found at ECF No. 3051.[1]

As part of the Settlement Agreement, the Parties agreed to the appointment of a monitor. ECF No. 3051 at 9. Dr. Pablo Stewart was selected as the Court appointed monitor. *Id.* at 27. Dr. Stewart submits regular reports evaluating whether Defendants are meeting the standards set forth under the Settlement Agreement. *See* ECF Nos. 3515; 3451; 3343.

In October 2017, Plaintiff filed a Motion for Enforcement of the Settlement Agreement. ECF No. 1559. After additional motions practice and evidentiary hearings, the Court ultimately issued a preliminary injunction to enforce the settlement agreement and later converted the preliminary injunction to a permanent injunction. Defendants' lack of adequate mental health staff was an important consideration in the Court's decision. The Court entered an injunction outlining certain staffing standards and other measurable standards Defendants needed to meet. *See* ECF

---

[1] The Seventh Circuit recently stated this agreement is more accurately described as a Consent Decree and this Court is compelled to agree. *Rasho v. Jeffreys*, 22 F.4th 703, 707 n. 2 (7th Cir. 2022). The Court will describe this as the "Settlement Agreement" for the purposes of this motion, which is the manner the parties describe the agreement in their briefs.

No. 2633. On January 12, 2022, the Seventh Circuit vacated the Court's decision, finding that Defendants had made reasonable efforts to mitigate the harm. The Seventh Circuit recently denied Plaintiffs' motion to rehear the case *en banc*, and issued a mandate, officially returning the case to this Court. ECF No. 3560.

Plaintiffs first filed a motion for relief regarding concerns over class members' out of cell time in April 2021 due to concerns that class members had been languishing in their cells for up to 24-hours a day despite few positive COVID cases in IDOC at that time. ECF No. 3288. The parties exchanged discovery and came to an agreement without the Court's intervention. ECF No. 3517 at 5. The parties' agreement required Defendants to continue to report on the structured and unstructured out of cell time at Dixon and Pontiac and the reasons for noncompliance with the Settlement Agreement. Based on these reports, on October 19, 2021, Plaintiffs filed a Motion for Preliminary Injunction due to Defendant's continued failure to provide adequate out of cell time to class members. ECF No. 3417. Plaintiff argues, among other things, that class members at Pontiac have essentially been in solitary confinement for months and that class members at Dixon are also not receiving appropriate out of cell time to meet their mental health needs. On November 16, 2021, Defendants filed their Opposition to the Motion for Preliminary Injunction. ECF No. 3438. Defendants argue, among other things, that staffing issues outside of their control and COVID protocols have prevented them from providing the required out of cell time.

Between February 1, 2022, and February 4, 2022, the parties presented testimony and evidence regarding the Motion for Preliminary Injunction and the Court heard Closing Arguments on February 23, 2022. On March 3, 2022, after the Seventh Circuit ordered Defendants to respond to Plaintiffs request that the Seventh Circuit rehear the appeal related to a previously entered injunction *en banc*, Plaintiffs requested the Court reserve ruling until after the Seventh Circuit

decided whether to rehear the case. The Seventh Circuit denied that request on April 25, 2022. This Order follows.

## **FACTUAL BACKGROUND**

Plaintiffs bring this motion for a preliminary injunction against Pontiac and Dixon Correctional Center. Class members are seriously mentally ill inmates housed in IDOC's Residential Treatment Units ("RTUs"). The Settlement Agreement defines a Residential Treatment Unit as a "housing unit within the prison system for offenders with mental illnesses who do not need inpatient treatment . . . but who do require the therapeutic milieu and full range of service and variable security available in the RTU." ECF No. 3051 at 10. The IDOC Administrative Directive defines the RTU level of care as a "level of care for offenders who, based on clear clinical evidence have a serious mental illness associated with significant functional impairments, rendering the offender unable to successfully reside in a general population housing unit." ECF No. 3417 at 8.

For all RTUs, the Settlement Agreement requires ten hours of structured therapeutic activities and ten hours unstructured out of cell time activities per week. ECF No. 3051 at 10. Plaintiffs describe the class members at Pontiac as essentially being in solitary confinement for months, with no immediate relief in sight. ECF No. 3417 at 23 The majority of inmates at Dixon receive at least 10 hours of unstructured out of cell time, but Plaintiffs complain that Defendants do not provide sufficient structured out of cell time and that the structured time that is provided is not sufficiently therapeutic to meet the mental health needs of the class members. Plaintiffs also allege that many class members in X-house[2] in Dixon do not receive sufficient out of cell time.

---

[2] Dixon's Residential Treatment Unit is divided into two separate programs based on security classifications: the Special Treatment Center ("STC") for general population and X-house for maximum security general population, restrictive housing and crisis watch. ECF No. 3417 at 9.

**a. Class Members have serious mental illness requiring treatment and accommodation.**

For incarcerated individuals who have been designated as mentally ill, IDOC provides three levels of care: outpatient, residential, and inpatient. ECF No. 3051 at 9–10; 3509 at 21–22. IDOC provides a residential level of care at RTUs located at Dixon, Pontiac, Logan, and the Joliet Treatment Center. ECF No. 3051 at 15–17; ECF No. 3509 at 21–22. To be placed at the RTU level of care, individuals must have been found to have "significant functional impairments" that make them unable to reside in the general prison population. PX-4, Administrative Directive 04.04.100. This means that secondary to their psychiatric conditions, they have impairment in functioning, such as with performing daily activities of living, caring for themselves, or living with other people. ECF Nos. 3509 at 24–25; 3510 at 283–84.

**b. IDOC's compliance with the Settlement Agreement has varied over time.**

Under the Settlement Agreement, IDOC agreed to provide RTU patients with at least 10 weekly hours of structured therapeutic out of cell time and 10 hours a week of unstructured recreational time. ECF No. 3051 at 16. Plaintiffs acknowledge that prior to the pandemic that began in March 2020, the Court Monitor's Fourth Annual Report found that the Department was meeting the minimal out of cell time for RTU inmates at Joliet, Logan, Pontiac, and Dixon's Special Treatment Center. ECF No. 3038 at 36–37. At Dixon, inmates had the option to be out of their cells for 48.5 hours of unstructured time and had 12 to 13 hours of structured time available. The monitor found that in Dixon's X-house, they only had 5 hours of structured out of cell time. *Id*.

In March 2020, IDOC placed all facilities on "administrative quarantine" to try to mitigate the spread of COVID-19. ECF No. 3511 at 38–39; PX-5. IDOC's mitigation efforts involved limiting movement of incarcerated individuals within and between facilities, stopping visitation,

stopping intakes of new prisoners, requiring at least six feet of distancing for group activities and other measures. ECF No. 3511 at 94. IDOC determined that limitations on movement and group activities were necessary because many facilities did not have space to allow social distancing to try to stop the spread of COVID-19. ECF No. 3511 at 645. At the time of the February 2022 hearing, both Dixon and Pontiac were on medical quarantine due to COVID outbreaks. *See* ECF Nos. 3518 at 11; 3510 at 45.

In November 2020, the Monitor found Defendants were not compliant with the out of cell time requirements and further observed that the pandemic had resulted in drastically reduced mental health services. IDOC admitted in its quarterly reports that in the implementation of COVID-19 restrictions, the RTUs had stopped providing the minimum out of cell hours and asserted *force majeure*, under the Settlement Agreement. ECF No. 3177 at 12; ECF No. 3238 at 17; ECF No. 3258 at 14. Plaintiffs observe that Defendants asserted *force majeure* for more than a year after the pandemic began and stopped providing the minimum out of cell time. ECF No. 3417 at 10 (citing ECF Nos. 3177 at 12; 3238 at 17; 3258 at 14). On April 26, 2021, Plaintiffs filed their first motion for relief related to administrative lockdowns and lack of out of cell time for all RTU units, including those at Joliet and Logan. ECF No. 3288. Plaintiffs claim that with an evidentiary hearing date approaching, Defendants made changes to increase out of cell time in the RTUs. ECF No. 3417 at 11. The parties ultimately came to an agreement that involved Defendants providing Plaintiffs a status report on IDOC's compliance with offering out of cell time to RTU patients. ECF No. 3417-2 at 6.

The parties agree about many of the core facts regarding out of cell time. At Pontiac, charts Defendants created indicate that class members had not gotten more than a handful of hours of out of cell time since at least August 2021. *See* PX-2. The parties appear to agree that class members

housed at Dixon were largely receiving appropriate unstructured out of cell time but were only receiving a few hours of structured out of cell time. The parties agree that a violation of the Settlement Agreement alone is not sufficient for an injunction. Instead, according to the Settlement Agreement the Court must find that there has been a violation of a federal right and must tailor any relief narrowly. *See* ECF Nos. 3517 at 3; 3518 3–4.

## LEGAL STANDARD

In order to satisfy the requirements for a preliminary injunction, Plaintiffs must show: (1) without a preliminary injunction, they will suffer irreparable harm before the final resolution of their claims; (2) traditional legal remedies would be inadequate; and (3) that they have some likelihood of succeeding on the merits of their claim. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If Plaintiffs establish the required showing, the Court then must balance the potential harms to the parties and, if appropriate, the public interest. *Id.* This standard applies to each of the claims that Plaintiffs brought under the Eighth Amendment and the ADA. The Court will address each claim in turn.

## DISCUSSION

### A. Deliberate Indifference

To establish an Eighth Amendment violation, Plaintiffs must prove that Defendants have been deliberately indifferent to their serious medical needs, and in this case, their mental health needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted); *see also Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005).

An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and

(2) "the defendants were deliberately indifferent to that risk." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010).

For the objective prong, the medical need must be one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997). A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The Seventh Circuit has agreed with other courts in concluding that the "[t]reatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.'" *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983) (*citing Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir. 1980); *Inmates v. Pierce,* 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir. 1977)).

The subjective component requires a plaintiff to "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original); *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). In order to establish deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur." *Petties*, 836 F.3d at 728 (*citing Farmer*, 511 U.S. at 842). Medical malpractice, negligence, and even gross negligence do not necessarily equate to deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); s*ee also Estelle*, 429 U.S. at 106; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). "Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (citing *Farmer*, 511 U.S. at 844; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)). The

8

bar is high and requires a showing of "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id*. (citing *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

The Seventh Circuit has recognized claims of systemic deficiencies in a prison's health care facility as a second category of deliberate indifference claims. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989). In cases of alleged systemic deficiencies, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman*, 715 F.2d. at 272 (citing *Ramos*, 639 F.2d at 575); *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 554 (7th Cir. 2016)). The Seventh Circuit has concluded "that a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs." *Cleveland-Perdue*, 881 F.2d at 431; s*ee Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974) (affirming a district court decision finding that systemic deficiencies in Alabama prisons including inadequate staffing, treatment by unqualified personnel, incomplete medical records, and lack of written procedures establishing the duties and responsibilities of the medical personnel amounted to deliberate indifference.).

As explained below, for those class members in Pontiac and Dixon's X-house who are essentially locked in solitary confinement, Plaintiff has demonstrated that those class members are at risk of substantial harm and that Defendants are aware of that risk of harm. For class members housed at Dixon, it is not clear that the lack of structured out of cell time subjects them to a substantial risk of harm. Regardless, Plaintiffs have not shown that Defendants' response to that risk of harm was unreasonable, particularly in light of the recent Seventh Circuit decision. *See*

9

*Rasho,* 22 F.4th at 706. Instead, Defendants outlined steps that they have taken to mitigate the harm and indicated at the hearing that once COVID restrictions lift, they have a concrete plan for swiftly addressing their failures to provide out of cell time.

> **i. Pontiac's lack of out of cell time presents a serious risk of substantial harm to inmate safety.**

Pontiac is primarily a maximum-security prison that houses about 807 maximum security individuals, and about 330 medium security individuals are housed in a unit just outside Pontiac's walls. ECF No. 3510 at 225. Due to its status as a maximum-security facility, two guards must escort each individual to and from structured and unstructured out of cell time. ECF No. 3510 at 198–199. Defendants point to the guard shortage and difficulty transporting inmates to and from their cells as the primary obstacle to providing sufficient out of cell time at Pontiac. At the time of the hearing, Pontiac was authorized for 790 security officers but only 451 of those positions were filled. ECF No. 3511 at 109. While John Burle, the Warden of Pontiac, testified that the mental health staff would be able to provide sufficient structured programming, he claimed that out of cell activities have been regularly cancelled due to security staffing shortages. ECF No. 3510 at 256; 263–270.

In Pontiac, where class members have been confined to their cell 23-24 hours a day for months, the Court agrees that Defendants have failed to provide out of cell time necessary to help manage their serious mental health condition and that the failure to provide treatment in the above areas puts Plaintiffs at a significant risk for further injury and severe unnecessary pain and suffering.

As Plaintiffs describe, class members were placed in the Pontiac RTU for treatment, but instead are locked in their cells around the clock. ECF No. 3517 at 40–41. Inmates describe becoming more anxious the more that they spend time in their cell with nothing to do. PX-12.

Class Member McTizic describes that he feels that he is getting worse that the "wall are closing in on him" and that he sometimes hits the wall or hurts himself. *Id*. Inmates describe excruciating experiences feeling trapped in their cells, self-harming just to have the opportunity to get out of their cell, overdosing on pills, and setting themselves on fire due to the anxiety, frustrations, and increased impulsivity from the isolation of being locked in their cell all day for weeks on end. Others described feeling trapped, hopeless, and "doomed." *Id.* The affidavits from class members describe the intense emotional pain this isolation inflicts on these severely mentally ill inmates.

In addition to the compelling accounts from class members, the Seventh Circuit has outlined the mental harm that solitary confinement can inflict on inmates. The Seventh Circuit does not believe it is a mystery that solitary confinement can psychologically damage inmates stating, "the record shows, what anyway seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total." *Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988). The Seventh Circuit observed in *Davenport*, "there is plenty of medical and psychological literature concerning the ill effects of solitary confinement." *Id*. (citing Grassian, *Psychopathological Effects of Solitary Confinement*, 140 American Journal of Psychiatry 1450 (1983)). The Seventh Circuit again reiterated that there is "extensive literature" on the substantial risk of harm of isolation on severely mentally ill inmates. *Scarver v. Litscher*, 434 F.3d 972, 975 (7th Cir. 2006). In *Sanders*, the Seventh Circuit found that a seriously mentally ill inmate housed at Pontiac plausibly pleaded that he was under imminent danger of serious physical injury due to his history of mental illness and self-harming behaviors being exacerbated by solitary confinement. *Sanders v. Melvin*, 873 F.3d 957 (7th Cir. 2017). The Seventh Circuit has also stated that "a judge who, on an adequate record, requires [at least five hours] of exercise opportunity has not exceeded

11

the outer bounds of permissible interpretation of the Eighth Amendment." *Davenport v. DeRobertis*, 844 F. 2d 1310, 1315–16 (7th Cir. 1988) (citing *French v. Owens*, 777 F.2d 1250, 1255–56 (7th Cir.1985)); *see also Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir.1980) (found violations when detainees only released from their cells three times per week for fifteen to thirty minutes); *Spain v. Procunier*, 600 F.2d 189, 199–200 (9th Cir. 1979) (found Eight Amendment violation to completely deny some prisoners exercise); *Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854, 865–66 (4th Cir.1975).

Given this evidence, and considering the standard outlined in *Wellman*, this Court finds the Defendants' inadequate staffing levels creates a systemic problem at Pontiac that has effectively denied the mentally ill inmates access to adequate and constitutionally required care. The record here and extensive comments from the Seventh Circuit confirm that persistent isolation can be excruciating, particularly for those with severe mental illness.

### ii.     Plaintiffs failed to prove that the out of cell time at Dixon presents a serious risk of substantial harm.

At Dixon, Defendants are violating the terms of the Settlement Agreement regarding structured out of cell time. However, Defendants are providing additional unstructured out of cell time, with class members in the Special Treatment Center receiving up to 26 hours of unstructured out of cell time per week. Dixon also appears to have a plan in place to increase structured out of cell time.

At the hearing, there was a great deal of debate regarding the appropriateness of the structured out of cell time that Dixon offered. At issue were the community meetings and the use of what Defendants describe as "therapeutic recreational activities." ECF No. 3518 at 15. Plaintiffs complained that the community meetings and recreational activities were not sufficiently therapeutic to qualify as structured out of cell time. Dr. Stewart criticized one community meeting

that he described as not sufficiently structured or confidential. ECF No. 3509 at 48-52. He complained that security officers were meandering through the meeting in such a way that would not provide confidentiality, which he described as a necessity for therapeutic treatment. He also complained that individuals not participating were wandering in an out of the meeting and that it was generally chaotic. *Id*. at 48-52. Ultimately, the Court is not answering the question of whether Defendants strictly complied with the Settlement Agreement or if Defendants are utilizing the most effective form of mental health treatment. The question is whether Defendants are deliberately indifferent to class members' serious mental health needs. Regardless of the manner in which the recreational activities and community meetings are appropriately classified, it appears that Defendants are making a reasonable effort with the resources available to them such that they are not subjecting class members to cruel and unusual punishment. Moreover, as explained below, Defendants are taking additional steps to increase the available space to host additional structured out of cell time.

As to residents in Dixon X-house, it appears that individuals housed there for more than 60 days receive out of cell time even if they do not receive sufficient structured out of cell time. Those housed less than 60 days appear to spend nearly all of their day in a cell. In *Davenport,* however, the Court limited the out of cell time requirements to individuals held in segregation for 90 or more consecutive days. *See Davenport*, 844 F.2d at 1311. The Court also allowed the facility to deny an inmate out of cell time for a reasonable period of time if the inmate violated prison rules during the exercise or shower period. *Id*. The short length of stay suggests that the isolation does not rise to the level of a constitutional violation since the inmates there will likely soon rejoin the STC population where they would enjoy additional out of cell time or else be eligible for additional out of cell time while in the X-house.

### iii.   Defendants have taken sufficient steps to attempt to alleviate the harm caused by isolation.

Defendants claim that they have not been deliberately indifferent because the conditions of the COVID-19 pandemic have frustrated their ability to hire additional security staff and the restrictions on group size have thwarted the facilities' ability to hold groups. Defendants also claim they took steps to avoid decompensation while inmates were confined to their cells and have a plan to offer appropriate out of cell time soon.

#### a.  Hiring Efforts

At both facilities, staffing shortages were a significant barrier to providing out of cell time. This was particularly true at Pontiac where each inmate needs to be escorted by two guards to travel to and from out of cell activities. Defendants explain that Pontiac has filled only 451 of the 790 positions that it is allotted. ECF 3511 at 109.

 Multiple Defense witnesses testified about the difficulty hiring staff during the pandemic. John Eilers, the former chief of Operations for IDOC and incident commander for COVID response, testified that the Department had hired a class of correctional officers in March 2020 and the officers were sent home or back to prior facilities to job shadow. ECF No. 3511 at 98. He explained that they brought the class back to the academy in small, staggered classes which ultimately put them behind in hiring and training. *Id*. He estimated that due to COVID outbreaks and related restrictions, IDOC lost out on hundreds of new hires by the end of 2021. *Id*.

Jason Brewer, the acting manager of Employee Services, testified about the recruiting obstacles IDOC faced since the pandemic began in March 2020. *Id*. at 150–160. He explained that IDOC holds 400 – 500 recruitment events annually all over the state. *Id*. at 152. He says that a lot of them are virtual, post-COVID. *Id*. Then, those that had expressed interest either at a recruiting event or online, are invited to a screening event where they take a basic education test and complete

certain physical tests. *Id*. at 153. Before March 2020, they would often have 80-100 people come to each screening event. *Id*. at 167. He testified that recently, they consider 30 people a good turnout for a screening event. *Id*. at 168. He says that part of the response to the hiring difficulties was to eliminate the education test for applicants with at least 15 college credit hours. *Id*. Previously, if applicants passed the education test, but failed other portions, then applicants had to retake the education test. *Id.* Now, they have a certificate that indicates they passed education test so they do not have to retest that portion if they attend a different screening day. *Id*.

Brewer explained that it appeared that part of the problem is that in certain parts of the state working in law enforcement has been a deterrent for some applicants due to the negative press. *Id*. at 167–68. He said that they have also gotten feedback that the vaccination mandates serve as a deterrent for some applicants. *Id*.

Brewer also testified that IDOC recently raised salaries $3,000-$4,000 a year and that their compensation is in the top five highest correctional officers in the United States. *Id*. at 162. He also said that including medical, retirement, pension packages and deferred compensation benefits, the total compensation package was competitive for the minimum requirements of being 18 years old with a high school degree, and a valid driver's license. *Id*. at 162-63. He also outlined increased outreach with the Urban League in Chicago, recruitment events at churches, and trying to reach out to more diversified candidates. *Id*. at 172.

### b. Pontiac's Specific Response to Lack of Adequate Out of Cell Time

Pontiac officials blame their inability to provide adequate out of cell time on their lack of security officials, stating that they have sufficient mental health staff to provide programming. ECF No. 3511 at 85; ECF No. 3510 at 263–68. In response to the lack of security staff, in May 2021, IDOC initiated a plan to close certain maximum-security wings and transfer those

individuals to Lawrence Correctional Center so they could reallocate staff. DX-41; ECF No. 3511 at 105–106. Defendants' witnesses explained that they initially expected to be able to transfer inmates in August 2021, but the process of converting Lawrence to a maximum-security facility experienced significant and expensive delays. ECF No. 3511 at 104–105. There was a difficulty with the locking mechanism that will cost $7.8 million to fix. ECF No. 3511 at 109; DX-40. However, Defendants provided evidence that the process to upgrade Lawrence is in motion with some money already spent on the project. Defendants explain that once they move the other maximum-security inmates without mental health issues, the remaining staff will be available to assist with the remaining mental health class members.

Defendants also claim that given the time it will take to retrofit Lawrence, there is a plan to move medium security inmates to other facilities once COVID related restrictions allow for the transfers to take place. Defendants also claimed that it would not be feasible to move the mental health inmates as there was not space at other RTUs for inmates that required a maximum-security facility.

### c. Dixon's Specific Response to Lack of Adequate Out of Cell Time

Defendants produced witnesses and other evidence to support its assertion that Dixon has provided significantly more than 10 hours unstructured time during the pandemic and that at the time of the hearing, patients in the STC have 26 unstructured hours of available out of cell time each week and that certain X-house residents have 18-26 unstructured hours available between dayroom and yard. Plaintiffs counter that class members in X-house for less than 60 days get little to no out of cell time.

Defendants appear to concede that Dixon has not providing sufficient structured out of cell time for class members since the pandemic. ECF No. 3518 at 15. However, they point to evidence

that they have progressively added structured out of cell time. ECF No. 3510, at 425–26. They say that in April 2020, Dixon resumed treatment team meetings. ECF No. 3297-11 at 1. Then, in September 2020, Dixon resumed offering a limited number of groups to STC patients. *Id.* Defendants point to evidence that in addition to providing out of cell time, Dixon used in-cell activities when out of cell time is limited. ECF No. 3510 at 156, DX-44. The activities include handouts that Defendants' witnesses described as appropriate for those who might struggle with complex topics or for those with reading difficulties. ECF No. 3510 at 156–62. Defendants did not provide a clear idea of how often these worksheets were distributed or what follow up happened after the inmates completed the worksheets. However, there was some testimony and evidence that there was an attempt to provide in-cell activities.

Finally, Defendants point to the changes that they plan to make to Dixon's facilities to accommodate more out of cell time. In June 2021, Dixon closed five buildings after it transferred medium security inmates to other facilities. ECF No. 3509 at 223–225. The facility was then able to reallocate security staff to other areas. Dixon also modified the gym by installing fencing which allowed Dixon to use that space for additional out of cell activities. ECF No. 3511, at 100–101. Dixon also installed new fencing in the RTU dayrooms to provide increased structured and unstructured out of cell time and the project will be complete once the phones and kiosks are relocated within the fencing. ECF No. 3509 at 228–29. Dixon has also started construction on an outdoor pavilion to accommodate more structured out of cell activities. *Id.* DX 34(a). The Department also issued a memorandum with a proposal to provide 10 hours of structured out of cell time to those in Dixon's RTU when COVID-19 restrictions lift. ECF No. 3509 at 210–12; PX-14.

**d. Defendants' efforts to mitigate the effects of isolation due to COVID-19 undermine a finding of deliberative indifference.**

While Plaintiffs have argued that the Department could have taken different action, such as offering higher salaries or transferring Pontiac RTU patients to other facilities, deliberate indifference does not depend on whether official could have taken better actions. *See Rasho*, 22 F.4th at 710. Given the restraints that COVID has placed on facilities in terms of group size, as well as the obstacles that it has created in terms of hiring, Plaintiff is unable to demonstrate a likelihood of success on the merits that would entitle them to a preliminary injunction because Defendants' actions do not show "something approaching a total unconcern for the prisoner's welfare in face of serious risks." *Rasho*, 22 F.4th at 710 (quoting *Rosario v. Brown*. 670 F.3d 816, 821 (7th Cir. 2012)). In light of the unique strain that COVID has placed on the facilities, the Court is unable to find deliberate indifference based on the record currently before it.

**B. Plaintiffs did not prove a violation of the Americans with Disabilities Act.**

Plaintiffs also argue that class members at Pontiac have established a violation of the ADA. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.10. Title II of the ADA applies to prisons, as "[s]tate prisons fall squarely within the statutory definition of 'public entity'" under the ADA. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

To succeed on a claim under the ADA, a plaintiff must establish "that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th

Cir. 2015) (internal citations and quotations omitted). Plaintiffs may establish discrimination in one of three ways: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington Ind. High Sch. Athletic Ass'n Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). Plaintiffs claim they have proven their claims in two ways: (1) the lack of reasonable accommodation and (2) disparate impact.

Plaintiffs state that the regulations implementing Title II of the ADA require that a public entity:

> Make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). Plaintiffs argue they have requested the accommodations that class members in segregation be given out of cell time and the minimal standards of treatment, and that without these accommodations, class members have, and will continue to suffer. ECF No. 2407 at 21.

Second, Plaintiffs argue they have established a disparate impact claim under the ADA. In order to establish a disparate impact claim, a plaintiff must prove the defendant adopted a policies or practices that are "'facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977).). Plaintiffs assert that the evidence presented at the hearing demonstrates the facially neutral treatment of prisoners in segregation causes greater harm to people with mental illness.

i. **Plaintiff failed to prove causation.**

The Seventh Circuit has explained that regardless of a plaintiff's theory of liability the ADA requires proof of causation, meaning that a plaintiff must be able to prove that "'but for' his disability, he would have been able to access the services or benefits desired." *H.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 961 (7th Cir. 2018) (citing *A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018)); *see also Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) ("to prove causation under the ADA, plaintiffs must show that they were not hired because of their disabilities, not because of a delay in medical clearance, even if that delay was caused by their disabilities."). In *Naperville Community*, the Seventh Circuit explained that the plaintiff, a high school student claiming she was disabled, was disallowed from attending her preferred school because of the residency policy, not because of plaintiff's alleged disability. *Id*. The Seventh Circuit emphasized that the residency policy was unrelated to the plaintiff's disability. *Id*. Accordingly, the Court rejected the plaintiff's claims under the ADA for want of causation. *Id*.

Here, similarly, Plaintiffs have not demonstrated that the lack of out of cell time is due to their disability. Instead, Defendants have demonstrated that Pontiac's lack of out of cell time is due to security issues as the maximum-security facilities and the inability to hire adequate numbers of guards despite their efforts. It is also not clear from the record that other maximum-security inmates at Pontiac have been able to receive different access to services that mentally ill patients are being denied. Accordingly, while Defendants are failing to meet the terms of the Settlement Agreement, it is not clear whether class members are being denied services that were offered to non-class members during the same time period.

ii.     **Reasonable Accommodation**

The ADA laws "require that a government entity do more than provide a program on equal terms to those with and without disabilities; they require 'affirmative accommodations to ensure that facially neutral rules do not in practice discriminate against individuals with disabilities.'" *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846–47 (7th Cir. 1999). The failure to provide reasonable accommodations is an independent basis for liability. *Wisconsin Cmty. Servs., Inc., v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

Defendants argue that the only suggested accommodations were transferring the Pontiac patients to another facility or doubling the salary of the guards. Witnesses testified that as the class members at Pontiac need to be in a maximum-security facility and there were no other RTUs with available space that could accommodate these class members. The suggestion that Defendants raise salaries, apparently in the hopes that then Defendants could hire more guards, is too tenuously connected to the alleged violation. Accordingly, Plaintiffs do not point to concrete steps that Defendants could take to reasonably accommodate class members that would directly remedy the alleged violations.

iii.     **Disparate Impact**

Disparate impact claims under the ADA involve "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016). The challenged practice must not be "required by the necessities of the business or activity in question." *Matthews v. Cmmw. Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997).

In *Matthews*, the Seventh Circuit further clarified that the disparate impact must be due to discrimination. *Id*. The Seventh Circuit gave the hypothetical example of an employer hiring a

prospective employee that was able to read more quickly over a prospective employee with dyslexia who reads very slowly. The Seventh Circuit explained that if the job required a lot of reading, the employer could give the job to the employee who could read more quickly and thus, do the job better. However, if the employee could demonstrate that there was no business necessity, then the hiring decision could qualify as discriminatory. *Id*.

Here, even assuming that there was a disparate impact on class members, the reason for the policy was not discriminatory. Defendants have demonstrated that there was a valid institutional necessity that for the sake of the safety of the guards and class members, Pontiac had to cancel out of cell activities when there was not sufficient security staff.

C. **The balance of harms and the public interest weigh against Plaintiffs.**

In determining whether a preliminary injunction is appropriate, a plaintiff must compensate for a low likelihood of success on the merits by "showing the balance of harms tips decidedly in [their] favor." *Boucher v. Sch. Bd.*, 134 F.3d 821, 830, n.5 (7th Cir. 1998). Courts also must consider whether a preliminary injunction would cause harm to the public interest and violate principles of federalism and comity. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). Solving the problem of out of cell time, particularly among the maximum-security inmates at Pontiac, is a complicated issue. Plaintiffs have not offered a solution that would readily provide significant out of cell time. Defendants have offered up a plan that would allow them to make additional guards available to transport class members at Pontiac to out of cell time once they are able to transfer inmates to different facilities. The Court is limited in its ability to craft injunctive relief that would swiftly and directly address the issue while still ensuring safety for class members and the guards that work at Pontiac. Accordingly, a preliminary

injunction is also not appropriate due to concerns about the public interest and the lack of a clear solution to the complex issues found at the maximum-security facility.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction [3417] is DENIED.

ENTERED this 2nd day of June, 2022.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge
