IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

| | | |
|---|---|---|
| ASHOOR RASHO et al., | ) | |
| | ) | No. 1:07-CV-1298-MMM-JEH |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Judge Michael M. Mihm |
| vs. | ) | |
| | ) | Magistrate Judge Jonathan E. |
| | ) | Hawley |
| DIRECTOR ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants | ) | |

**<u>SIXTH ANNUAL REPORT OF MONITOR PABLO STEWART, MD</u>**

TABLE OF CONTENTS

BACKGROUND ……………………………………………………………….…….3

METHODOLOGY/MONITORING ACTIVITIES ……………………………………3

EXECUTIVE SUMMARY ……………………………………………………………5

DETAILED FINDINGS ………………………………………………………………....5

V: MENTAL HEALTH EVALUATION AND REFERRALS ……………………………9

VII: TREATMENT PLAN AND CONTINUING REVIEW ………………………………17

VIII: TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT
  SETTINGS……………………………………………………………………………24

IX: ADDITIONAL MENTAL HEALTH STAFF…………………………………………..26

X: BED/TREATMENT SPACE …………………………………………………………28

XI: ADMINISTRATIVE STAFFING …………………………………………………......40

XII: MEDICATION.……………………………………………………………….......41

XIII: OFFENDER ENFORCED MEDICATION …………………………………………..51

XV: SEGREGATION …………………………………………………………………58

XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES ………………68

XIX: CONFIDENTIALITY …………………………………………………………......73

XXII: PARTICIPATION IN PRISON PROGRAMS ……………………………………75

XXIV: USE OF FORCE AND VERBAL ABUSE …………………………………………79

XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS …………………88

XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM ………………………97

XXVII: MONITORING …………………………………………………………..100

XXVIII: REPORTING AND RECORDKEEPING …………………………………100

CONCLUSION …………………………………………………………………….101

## BACKGROUND

**IDOC:** IDOC consists of 29 adult correctional facilities. Among these are four maximum security facilities (including a facility for women), and one additional facility for women. Four of the facilities have Reception and Classification units where inmates are received into IDOC. Four of the facilities--Logan, Joliet, Pontiac and Dixon--have Residential Treatment Units. The RTUs at Dixon and Logan have been operating throughout the life of the Settlement Agreement. The Joliet Treatment Center began receiving offenders on October 4, 2017. The RTU at Pontiac officially opened on January 6, 2020. I particularly point out the Department's RTUs as they play an extremely integral function within the IDOC, and they have been chronically underutilized throughout my tenure as Monitor. All facilities have crisis care beds as well as some form of segregation, including administrative detention, disciplinary segregation, and investigative status.

**Settlement:** The original Settlement Agreement was filed with the Court on January 21, 2016. The Amended Settlement Agreement was approved May 23, 2016. The Corrected Second Amended Settlement Agreement was approved June 9, 2020. In March 2021, the parties reached agreement on removing some items from court oversight and continuing the Court's jurisdiction over 45 provisions for an additional year; the Court so ordered on March 10, 2021.[1] In this report, these documents will be referred to, individually and collectively, as the Settlement Agreement.

## METHODOLOGY / MONITORING ACTIVITIES

This report was prepared and submitted by Pablo Stewart, MD, Virginia Morrison, JD, Reena Kapoor, MD, and Miranda Gibson, MA.

To accomplish these monitoring obligations, the monitoring team sought information in a variety of ways. The monitoring team conducted 14 site visits of 10 different IDOC facilities, where interviews of class members, administrators and staff[2] were conducted. During these site visits, the monitoring team would obtain information about staffing, the mental health and psychiatric caseload, medication delivery and management, use of force, access to programming, referrals, crisis intervention, Covid-related issues, out-of-cell time, and the operations of crisis beds and segregated housing.

---

1  The global pandemic caused Defendants to invoke the *force majeure* provision of the Settlement Agreement. While the parties agreed that *force majeure* was appropriate, there were disputes, and court filings, about the effect of that invocation. By the parties' March 2021 agreement, the Court ordered those disputes to be moot.

2  Throughout this report "staff" refer to both Wexford and state employees.

Site visits:

2021:

| | | |
|---|---|---|
| Menard | June 28-30 | Ms. Morrison |
| Pinckneyville | July 1-2 | Ms. Morrison |
| Joliet | July 22-23 | Dr. Stewart |
| Dixon | August 2-4 | Ms. Morison |
| Sheridan | August 5-6 | Ms. Morrison |
| Pontiac | August 18-19 | Dr. Stewart |
| Logan | August 30-September 1(day) | Ms. Morrison |
| Graham | September 1 (evening)-3 | Ms. Morrison |
| Hill | September 7-8 | Ms. Morrison |
| Illinois River | September 9-10 | Ms. Morrison |
| Dixon | October 20-21 | Dr. Stewart |

2022:

| | | |
|---|---|---|
| Joliet | March 23 | Dr. Stewart |
| Pontiac | March 24 | Dr. Stewart |
| Logan | March 25 | Dr. Stewart |

The Monitor reviewed systemwide backlog reports provided weekly. Drawing upon tracking provided by each institution, the team analyzed the length of stay in crisis watch; the locations where patients in crisis watch were housed; out of cell time for patients in restrictive housing; response to self- and staff referrals; and referrals to RTU, Behavior Modification Units, and inpatient care. The team reviewed IDOC tracking and health care records concerning assessment upon placement in restrictive housing, psychiatric contacts, mental health evaluations, crisis watch follow-up appointments, use of restraints for mental health purposes, and response to patients' medication noncompliance. The team reviewed Quality Improvement audits; enforced medication logs and hearing records; use of force logs, records, and videos; and records of medication-related discipline. The monitoring team conducted 16 comprehensive chart reviews at 14 different facilities, evaluating the care provided to 182 class members assigned to restrictive housing and 151 class members in crisis watch. Finally, the monitoring team reviewed Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), Offender Disciplinary reports (DOC 0317), and mental health progress notes for a total of 182 disciplinary infractions adjudicated during March 2022.

## EXECUTIVE SUMMARY

A summary of compliance findings follows:

After six years of monitoring IDOC's efforts to meet the requirements of the Settlement Agreement, significant deficiencies remain. The areas of deficiencies include Mental Health Evaluations and Referrals, Treatment Plan and Continuing Review, Transition from Specialized Treatment Settings, Additional Mental Health Staff, Bed/Treatment Space, Administrative Staffing, Medication, Enforced Medications, Segregation, Physical Restraints for Mental Health Purposes, Confidentiality, Use of Force and Verbal Abuse and Discipline of Seriously Mentally Ill Offenders. Chronic understaffing of both clinical and custody staff is a major contributing factor to the Department's inability to achieve Substantial Compliance with the above-listed areas of the Settlement Agreement.

Even the Continuous Quality Improvement Program, although it remains in Substantial Compliance, needs modification if it is to retain this rating. The Department has also failed to act on the recommendations of Assistant Monitor Dr. Kapoor in the area of Discipline. The Department's current ability to provide the care required by the Settlement Agreement to class members in the RTU level of care, Crisis care and Segregation is greatly compromised.

The Monitoring Team continues to make itself available to the Department as technical assistance consultants to help it achieve Substantial Compliance in the above-listed areas.

A summary of compliance findings follows:

## DETAILED FINDINGS

| Requirement | Compliance Status |
|---|---|
| **V: MENTAL HEALTH EVALUATION AND REFERRALS**<br><br>(V)(a), (d), (f), (g) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| **VII: TREATMENT PLAN AND CONTINUING REVIEW**<br><br>(VII)(a), (b), (c), (d) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| **VIII: TRANSITION FROM SPECIALIZED TREATMENT SETTINGS** | Overall: Noncompliance |

| Requirement | Compliance Status |
|---|---|
| (VIII)(b)(i) | Noncompliance |
| **IX: ADDITIONAL MENTAL HEALTH STAFF**<br><br>(IX)(a), (b), (f) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| **X: BED/TREATMENT SPACE**<br><br>(X) (b)(ii), (d), (e), (f), (g) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| **XI: ADMINISTRATIVE STAFFING**<br><br>(XI)(c) | Overall: Noncompliance<br><br>Noncompliance |

| XII: MEDICATION<br><br>(XII)(b), (c)(i), (c)(vi) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
|---|---|
| XIII: ENFORCED MEDICATION | Overall: Noncompliance |
| XV: SEGREGATION<br><br>(XV)(a)(ii),(iii),(iv),(v)<br>(XV)(a)(vi) (first and second)<br>(XV)(c)(ii), (iii), (iv);(d); (e) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance<br>Noncompliance<br>Noncompliance |
| XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES<br><br>(XVII)(a) | Overall: Noncompliance<br><br><br>Noncompliance |
| XIX: CONFIDENTIALITY<br><br>(XIX)(b), (c) | Overall: Noncompliance<br><br>Subfindings supporting overall finding:<br>Noncompliance |
| XXII: PARTICIPATION IN PRISON PROGRAMS | Overall: Substantial Compliance |
| XXIV: USE OF FORCE AND VERBAL ABUSE | Overall: Noncompliance |
| XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS<br><br>(XXV)(a) | Overall: Noncompliance |
| XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM<br>(XXVI)(a), (b) | Overall: Substantial Compliance |

| XXVII: MONITORING | Overall: Substantial Compliance |
| XXVIII: REPORTING AND RECORDKEEPING | Overall: Substantial Compliance |

This Section details the Monitor's findings for each provision of the Settlement Agreement.

**Overall structure:** This Section is organized along the same structure as the Settlement Agreement; each major section below corresponds with a substantive section of the Settlement Agreement.

**Compliance with specific provisions of policies or law incorporated by reference:** Unlike the Settlement Agreement itself, the report lays out the specific provisions of the various Administrative Directives ("ADs"), administrative code ("Code"), or the Mental Health Standard Operating Protocol Manual ("Manual" or "SOP Manual") that are incorporated by reference in the Settlement Agreement. This significantly lengthens the report, but it is critical that the monitoring team evaluates these substantive requirements, especially given that many of them are central to providing the kind of treatment, out-of-cell opportunities, conditions, and protection from harm contemplated in the Settlement Agreement. For example, it is in the ADs and the Manual that one finds detailed requirements on use of force, as well as suicide prevention, including crisis placement, crisis intervention teams, and suicide reviews. However, the team will apply the compliance/non-compliance rating only to the provision of the Settlement Agreement, not to individual provisions of ADs or the Manual or Code incorporated by reference. In this way, IDOC may be out of compliance with one or two provisions of the cited AD, for example, but, depending on the severity (including the importance of the particular provision of the AD) or how widespread that noncompliance is, nonetheless may be in substantial compliance with the provision of the Settlement Agreement.

**Compliance ratings:** The team applies "Substantial Compliance" and "Noncompliance" ratings for each provision, as specified in the Settlement Agreement. In actual fact, these may mask IDOC's true performance. IDOC has made substantial progress on a number of requirements, which possibly could be more accurately described as "partially compliant." The terms of the Settlement Agreement, however, only allow for the use of "Substantial Compliance" and "Noncompliance."

Section II (u) of the Settlement Agreement defines "Substantial Compliance" as follows: "The Defendants will be in substantial compliance with the terms of this Settlement Agreement if they perform its essential, material components even in the absence of strict compliance with the exact terms of the Agreement. Substantial compliance shall refer to instances in which any violations are minor or occasional and are neither systemic nor serious."

Substantial Compliance can be found for obligations imposed under this Settlement Agreement either IDOC-wide or at specific facilities. For the purposes of this report, most

compliance ratings will be IDOC-wide. This was done because the changes to the mental health delivery system contemplated in the Settlement Agreement represent a major shift in both the clinical care provided to the offenders and the overall culture of the IDOC. As the Monitor of this seismic shift for IDOC, I continue to feel that it is more appropriate to consider system-wide compliance prior to evaluating the compliance of specific facilities. It is important to note that during the first four years of implementing the Settlement Agreement, IDOC improved the overall quality of psychiatric and mental health services offered to the offender population. More than 60% of the original provisions were found in Substantial Compliance and were removed from the Settlement Agreement in March 2021 by agreement of the parties and the Monitor. IDOC still has a long way to go to fully meet the requirements of the Settlement Agreement, especially in terms of staffing, mental health evaluations, treatment planning, referrals to inpatient care, RTU level of care, and out-of-cell time for class members assigned to restrictive housing.

## V: MENTAL HEALTH EVALUATION AND REFERRALS

**Summary:** Mental health evaluations are completed, but only 43% were timely systemwide. There was problematic practice in all four reception centers, which are responsible for the greatest proportion of this responsibility; patients waited as much as six months for this document that underpins all of their treatment. While IDOC has a system for referring for evaluation those persons with a treatment history, IDOC has never shown that it has tested whether the system is working as intended.

IDOC initiated tracking of patient requests and some staff referrals. It does not capture date of referral, so it cannot be discerned whether IDOC is meeting the Settlement Agreement requirement, which is calculated from that date. There were signs that Stateville-NRC had delays in transmitting referrals to mental health staff that lasted as much as a month; those times are not available from other facilities. A majority of referrals received timely response *from receipt*, and almost 10% received no response.

The monitoring team continues to be very concerned about reports that patients' requests for a Crisis Intervention are not acted upon. It was encouraging that patients reported this less often during the second half of the monitoring period.

**(V)(a): Specific requirement:** Mental health evaluation, or an appropriate alternative response in case of emergency, shall be timely provided as required by IDOC Administrative Directives 04.04.100 and 04.04.101.

**Findings:** To assess timeliness of mental health evaluations, the monitoring team is informed by paragraph V(f) of the Settlement Agreement, which states: "Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral (see IDOC Administrative Directives 04.04.100 section II(G)(2)(b) and 04.04.101 section II(F)(2)(c))."

In day-to-day practice, some evaluations are referred and completed within an institution while others are initiated in one institution and completed after the potential patient has transferred to another. The latter scenario affects a significant subset of evaluations and particularly occurs with evaluations initiated at a reception center. Unfortunately, IDOC's systems reset the deadline for each person with a pending evaluation when he or she transfers between institutions. This means that:

- if an evaluation was not completed before transfer, all record of that disappears from all reporting and internal oversight

- there is no record of the actual time from referral to completed evaluation for those persons

- for those evaluations, IDOC's backlog reports and quarterly reports calculate timeliness from a date that has no basis in the Settlement Agreement[3]

- Quality Improvement audits include inaccurate calculations of timeliness in the same way

To determine the actual time to completion, the monitoring team reviewed a sample of 771 evaluations, all of the evaluations initiated at all four reception centers for two months. These included evaluations completed at the reception centers and people who transferred while an evaluation was pending.[4]

- ***Only 23%*** *were completed by the Settlement Agreement's standard of timeliness.*

---

[3] In recent quarterly reports, Defendants argue that resetting the deadline is more clinically appropriate. While that may be a change they wish to negotiate with Plaintiffs' counsel, and/or seek Court approval for, the Monitor can only assess compliance based on the existing requirement.

Defendants assert that it is more clinically appropriate for clinicians to have time to build rapport with patients, which can lead to more accurate diagnoses and plans. This is a correct hypothetical, but the monitoring team has seen no evidence that this is actually taking place. In all the charts the team has reviewed involving patients who had transferred, and all the relevant database entries, the team has never encountered an example of MHPs meeting with patients before the meeting where an evaluation is completed, and Defendants have provided no such examples.

[4] This sample concentrates on reception centers as the most likely source of evaluations, and of persons requiring an evaluation who then transfer. While it is possible that persons may be identified for evaluation at one parent facility and transfer to another before the evaluation is completed, that is not likely to be a large population.

The sample was chosen by first identifying all persons shown on June and July MHP Databases as having an evaluation due in July 2021, and all patients shown in the November 2021 MHP Database as having arrived that month and/or having an evaluation due that month. The set includes all such cases on the databases from Graham and Logan, and all such cases at Menard and Stateville-NRC that were not identified by IDOC as persons assigned to the parent facility. It is possible that the sample includes other persons assigned to these institutions (not reception center status).

Dates of referral and completion were captured from these logs. Where there were no dates of completion and the person did not appear in subsequent reception center MHP Databases, the reviewer employed the online Inmate Locator to identify the institution to which the persons transferred and captured the date of completion from the MHP Databases at those receiving facilities. In a few cases, IDOC Legal Counsel provided additional information by email. Where a key fact could not be discerned, or an evaluation was *not* required by policy, because one had been completed in the preceding 60 days, that individual was removed from the analysis. The remaining sample then totaled 771 evaluations.

▪ In fact, times to completion could be quite lengthy, with 38% of evaluations taking more than a month (double the requirement) to almost 6 months[5]

None of the four reception centers approached being in compliance. IDOC's quarterly reports cite the reduction of a backlog at Stateville-NRC as evidence of greatly improved practice. There is improvement but not to the extent they suggest. In the monitoring team study, this facility completed less than half of the evaluations due. Completing almost half *is* an improvement.

However, this means that the *majority* of the change on the backlog reports is patients transferring out with no evaluation. For that majority, the backlog report does not show that more evaluations were completed timely; it only shows that those overdue evaluations *no longer show as Stateville-NRC's responsibility*.

The monitoring team also reviewed practice at mainline institutions using the methodology described above. Taking into account mainline and reception center institutions, then, in a review of 1,769 evaluations:

▪ **only 43% of evaluations were timely**[6]
▪ mainline institutions showed more evaluations that missed the deadline by a shorter time
▪ the longest times were the same as above, more than one month to more than six months late, and some may have been dropped altogether

Defendants report that 2021 Quality Improvement audits found 176 audited evaluations to have been untimely.[7] For context, it appears that these auditors reviewed evaluations for approximately 1,000 patients.[8] While IDOC quarterly reports mention "thousands of charts," that refers to audits in general and not to audits of evaluations, which is necessarily a subset of the total charts audited. Quality Improvement audits assess timeliness and some aspects of content; it is not their function to determine whether an evaluation was due but missed altogether, so that is absent from their analysis.

---

[5] Of note, the second sampled month, November, was immediately before the Covid/Omicron wave. Presumably, if MHEs were not completed by December, the length of time to completion was extended by quarantines and staff illnesses. IDOC indicates that at one point in January, for example, approximately 10,000 people were testing positive.

[6] The analysis one year ago, in the Monitor's Fifth Annual Report, found a 63% compliance rate, but that relied on Defendants' data without knowing that it resets the deadline contrary to the Settlement Agreement terms.

[7] Additionally, it is not known how many of the charts were found to be timely using the reset deadline, rather than the original deadline that would be required by the Settlement Agreement.

[8] The exact number cannot practicably be determined. IDOC does not keep track of how many patients with evaluations are captured in its Quality Improvement audits. Because auditors do not select charts where it is known that an evaluation was due, the total number reviewed will fluctuate with each audit. The monitoring team has access to Quality Improvement audits completed in Quarter 1 and Quarter 3 of 2021. In them, auditors reviewed 213 charts and 292 charts, respectively, that contained evaluations in the auditing period. *If* the amounts were similar in the other quarters of 2021, and *if* the April quarterly report was summarizing all of 2021 (it mentions "2021 to date," so this is not certain), the total number of reviewed charts with information relevant to this requirement would have been approximately 1,000. As is evident, this number is an informed approximation provided for context.

Covid surges made this and other responsibilities much more difficult and may make some degree of noncompliance understandable in the short term. At the same time, public health authorities indicate that waves will continue to impact the US ongoing. IDOC ultimately will need staffing and practices that accommodate inevitable surges and provide mental health evaluation and treatment in a timeframe that does not unreasonably compromise patients' mental health. While nine institutions had strong performance on this requirement, they accounted for only 137 of the 1,769 evaluations.  The systemic nature of low performance leaves IDOC in Noncompliance on V(a).

**(V)(d): Specific requirement:** In addition to those persons identified by the screening process described in Section IV, *above,* any offender who is transferred into the custody of IDOC with a known previous history of mental illness as reflected in that offender's medical records or as self-reported by the offender shall automatically be referred for services which will include a mental health evaluation and/or referral.

**Findings:** As with all requirements, it is Defendants' burden to demonstrate they have affected the change specified in the Settlement Agreement. In its quarterly reports, IDOC declares that this requirement has been met by having a system for it. While establishing that system was an accomplishment, the Department has never provided any showing that it has tested the system and that the system works as intended.[9] In the absence of that showing, this provision remains noncompliant.

**(V)(f): Specific requirement:** Evaluations resulting from a referral for routine mental health services shall be completed within fourteen (14) days from the date of the referral.

**Findings:** This requirement may be considered to include routine referrals for a full mental health evaluation and routine referrals for an MHP or psychiatry appointment. The monitoring team analysis of referrals for a full mental health evaluation is detailed in V(a) above and what follows is an analysis of self-referrals and some staff referrals. In addition to the Settlement Agreement's requirement for a response within 14 days, IDOC policy calls for mental health staff to triage referrals and respond more quickly to those determined to be emergent or urgent.

The monitoring team interviewed 49 patients, 24 mental health staff, and 15 nurses at eight institutions[10] about this topic. Among patients who had used the referral system, in most facilities, the experience was mixed. Only patients at Pinckneyville and Sheridan consistently described response times that comply with the standard; at three other institutions, the majority of patients agreed. At two other institutions, most patients thought responses exceeded the deadline.

In nearly every site, even those where patients had poor experiences with written referral response, patients often reported confidence in accessing mental health staff by conveying oral

---

[9]  The Department's quarterly reports state, in general terms, that the screening process identifies and refers these persons. However, V(d) specifically contemplates others ("In addition to those persons identified by the screening process" …). Additionally, Defendants' broad claim *assumes* that the screening process catches all persons with a mental health history, but IDOC has never shown that it has *tested that assumption* – that is, that staff has checked into whether persons with a mental health history have been missed.

[10]  Dixon, Graham, Hill, Illinois River, Logan, Menard, Pinckneyville, and Sheridan

requests through officers or BHTs on rounds, asking MHPs when they are in the building, or during MHP office hours. During the pandemic, MHPs and BHTs have used these methods to increase their presence in the housing units, a sensible adaptation that appears to be effective in increasing access and more quickly addressing patient needs.

Among mental health and nursing staff, most reported that patients do *not* complain about having to submit multiple self-referrals before being seen. The results of a monitoring team study were consistent with this.[11] This is a large improvement over previous years.

Several people described systems that convey patient oral and written requests quickly; some said that if the mail system is used, it adds one to two days, but others cited examples of referrals that did not reach the Mental Health Department.[12] It is the monitoring team's understanding that IDOC oversight systems do *not* examine the time it takes to deliver referrals to mental health staff. Documents provided to the monitoring team have clear indications of extreme delays at Stateville-NRC – as much as 36 days before mental health staff logged receiving the referral.[13] An examination of the causes is warranted at that facility, and it is likely worthwhile at other institutions to ensure such problems do not go undetected. IDOC tracking does not capture the information necessary for a monitoring team review of this, nor for internal oversight, so staff would need to give thought to an effective oversight method.

MHPs currently say that the level of self-referrals is manageable, and they now feel able to respond by the deadline, and often within a few days. A few MHPs and nurses noted that their own referrals to psychiatry are often handled through direct conversation, as they have at least daily contact with onsite providers and weekly contact with telepsych, or through email.

IDOC has instituted tracking and the monitoring team analyzed two months of practice.[14] The tracking is not designed to be comprehensive of all referrals or requests to be seen, but does capture a large segment; this period reflected referrals by or about 3,349 patients, indicating that referrals are in use for a substantial portion of the caseload. The emphasis in the tracking is on self-referrals from patients. Some staff referrals are recorded, but IDOC informed the monitoring team that nursing referrals for medication noncompliance are *not* included, and various staff in site visits have noted that many referrals from custody staff, between mental health staff, and from nursing

---

[11]  Study method will be detailed below. It appeared that, in about 8% of referrals, someone would submit additional request(s) before the patient was seen. In most cases, however, the multiple requests were sent within the response time allowed for the original request; it was rare to see an additional request after the patient had waited more than two weeks.

[12]  The timeliness information comes from BHTs responsible for tracking written referrals and from MHPs' general impressions.

[13]  Logs begin with the date mental health staff receive the referral and do not capture the date the referral was sent. However, for 82 patients, Stateville-NRC's November log shows that they left the facility before their referral was even logged as received. Many had been gone for *weeks*. Since the referral necessarily was sent before the patient left, this shows a multi-week breakdown in the process before logging receipt of referral for a substantial number of patients. The monitoring team reviewed only through November, so the scope of the issue is unknown.

[14]  Since summer 2021, all institutions have maintained spreadsheets titled Mental Health Referral and Request Tracker. The monitoring team received the first of those spreadsheets in February 2022 and all institutions have since provided them monthly. For this analysis, the monitoring examined trackers containing referrals staff received in October and November 2021. For referrals pending at the end of November, the reviewer pulled outcomes from subsequent logs, if available.

staff are most practically handled orally and, of course, it is not practical to try to record all such informal communications in this log. Similarly, there are some entries of Emergent referrals, but there are some indications that others may not be included.[15]

There are a number of unknowns in the way the information is kept; the monitoring analysis attempted to control for those. Timeliness was calculated from receipt because that is the information available, but ultimately, Defendants must show that they are responding within 14 days *from the date of referral,* as required by the Settlement Agreement. For these reasons, the analysis findings should be taken as illustrative and not a precise compliance percentage.[16] The analysis found:

- 78% of responses were timely, using the more generous standard that calculates from receipt
- a modest number took place in a reasonable time shortly thereafter (3%)[17]

---

[15] Ten institutions, including some with very large mental health populations and sometimes acutely ill patients, did not record any Emergent referrals (Dixon, Elgin, Graham, Illinois River, Joliet, Lincoln, Logan, Stateville-NRC, Vienna, and Western Illinois) and others recorded only a handful (Hill, Menard, Pontiac). Nearly all of these facilities have a high rate of crises, but it is unknown how many are captured in written referrals rather than being handled orally.

[16] There are several ways in which entries could reflect unique referrals or duplicates, depending on the individual's situation. Referrals close in time, including referrals from staff and the patient, and referrals with different "referral types," could concern the same topic or different topics for example. Multiple referrals from staff could be custody or nursing staff referring to and MHP multiple times, or one such referral to an MHP and then the MHP referring to psychiatry, as another example.

The following are the assumptions chosen for this analysis. The referral type "Other" reportedly is sometimes mental health information and sometimes not; the reviewer retained all Other entries in the analysis to give credit for mental health staff responses, even though some may more properly be "not applicable" but cannot be discerned. The referral type "Information" reportedly is designed to capture material submitted only to inform mental health staff and does not require a response; 480 of those entries were removed from the analysis. However, an additional set of referral type Information entries suggest a response was made, so they were retained in the analysis so that all responses are captured.

Each referral source (Individual in Custody, Staff, etc.) and referral type (Emergent, Routine, Information, etc.) was treated as a unique referral, even if it contained the same or similar dates as another referral from a different source or of a different type. Additionally, if the same person/referral source submitted more than one referral within the 14 days allowed for response, that was treated as a duplicate (there was no obligation to respond to it separately and credit was not given multiple times for the same response appointment). The time to response was calculated from the receipt of the first referral to the first response date among that set of referral and duplicates. With these methods, then, the analysis encompassed 5,501 referrals.

For this first analysis, timeliness was calculated according to IDOC policy: Emergent referral responses were timely if conducted the day of receipt; Urgent referrals required response by the next day; and referrals from the Routine and Other referral sources were considered timely if a response occurred within 14 days of receipt.

Occasionally, response dates were *earlier* than the date of receipt. It was explained that this occurs when the contact takes place while the referral is being transmitted, and thus the issue has already been addressed by the time the referral is received. The reviewer considered these entries timely if the responses were one or two days preceding the day of receipt – because IDOC informs the monitoring team that prisoner mail can take one to two days for delivery – or three or four days where that is the next business day. Dates earlier than that cannot be said to be responses to these referrals and were treated as missed contacts. Also, the reviewer accepted the recorded response dates even if they appeared out of sequence in a series of referrals.

Responses were considered timely, as above, or late up to one month after the deadline (six weeks after receipt). Any date after that, or the absence of a recorded date, were treated as a missed response.

[17] In the monitoring team's opinion, one additional work week could be considered a reasonable time.

- 5% of referrals received a significantly late response, up to six weeks after receipt (three times the requirement, calculated generously)
- 9% of referrals did not receive a response[18]

As to the last point, the logs do confirm some patients' complaints that they wait lengthy periods and are compelled to submit multiple requests before they are seen. The logs reflect instances where patients submit a request, are not seen by the two-week point, and then submit further requests. While this represents a small percentage of the referral pool captured in the logs, it did affect 113 patients in that two-month period. There were instances of this at 21 institutions; far and away, it occurred most at Menard, and Illinois River and Western Illinois also had events in the double digits.

As noted at the beginning of this discussion, this requirement may apply to both routine referrals for a full mental health evaluation and routine referrals for contacts by MHPs and psychiatry. Defendants' Quality Improvement audits reviewed timeliness of mental health evaluation and that is reported in section V(a) above. Their April quarterly report indicates that an internal check of the February 2022 logs found that 85% of responses occurred within 14 days after receipt of the referral.

Defendants took useful steps forward during this monitoring year, but overall the practice remains Noncompliant.

**(V)(g): Specific requirement:** As required by IDOC AD 04.04.100, section II (G)(4)(a)(2), the facility Crisis Intervention Team shall be contacted immediately for offenders with serious or urgent mental health problems.

**Findings:** The monitoring team has closely surveyed this issue throughout the current reporting period. The following are the Monitor's opinions expressed in the midyear report of December 6, 2021:

"My opinion is that the facility Crisis Intervention Teams are not routinely contacted immediately for offenders with serious or urgent mental health problems. The Department continues to deny the presence of this problem. Most recently in their Quarterly Report of 10/25/21, the report states '(the Monitor's allegations of gatekeeping by the custody staff) lack supporting facts or data.' My "supporting facts or data' are my interviews with many hundreds of class members over the tenure of my monitorship, and reviewing court filings and reports of gatekeeping from the counsel for the Plaintiffs. I have integrated all of this data as the basis of my opinion regarding this requirement.

In my interviews of class members assigned to the BMU at Menard, several of them report problems with gatekeeping. One stated that custody officers act as gatekeepers, even if they self-harm. Another BMU member stated that he has to 'cut up' in order for the custody officers to call for a Crisis Intervention Team Member. The final class member that interviewed stated he can't see a Crisis Intervention Team Member due to gatekeeping. Another class member from Pontiac also stated that the custody staff act as gatekeepers from the Crisis Intervention Team.

---

[18]   The remaining 5% did not contain all the information necessary to calculate time to response.

In a letter sent to me by a class member housed at Dixon, the class member explained the difficulties he has experienced in speaking with the Crisis Intervention Team. In summary when the class member asked for a Crisis Intervention Team member, the custody officer asked him why. The class member responded, 'I have a serious mental health issue.' The custody officer continued his query of the class member by asking if he was going to hurt himself or others. When the class member responded no, the custody officer informed him 'well you don't have a crisis.'

Counsel for the plaintiffs provided the monitoring team and counsel for the defendants two examples of serious self-harm incidents occurring for class members when they were refused a visit from the Crisis Intervention Team. The emails were dated June 11, 2021, and September 28, 2021.

In addition, Assistant Monitor Ms. Morrison spoke with 45 patients and 14 mental health staff about this topic during her site visits. Patients at Dixon, Illinois River, Logan, Menard, and Sheridan consistently expressed experiencing and/or witnessing officers calling a crisis team member as required or felt confidence that they could rely on officers to do so. For patients at Graham, Hill, and Pinckneyville, the experience was more mixed; some found the system operated as it should, while a significant minority said their own requests, or those they could overhear, were sometimes rejected. The comments of mental health staff at Dixon, Illinois River, Pinckneyville, and Sheridan were consistent with their patients' views.[19]

In their Quarterly Report dated October 25, 2021, the Department listed the efforts being undertaken to address this issue. IDOC will continue to receive a rating of noncompliance until this issue is resolved."[20] IDOC's February and April 2022 quarterly reports carry forward the same information.

Plaintiffs' counsel, in an email to Defendants and the Monitoring Team, describe a case at Pontiac where a class member's request to speak with the Crisis Intervention Team was apparently ignored. This failure to have him seen in a timely matter resulted in his self-injuring by burning his leg. This is an extremely serious incident which requires immediate investigation.

Since publishing the midyear report of December 6, 2021, the monitoring team has encountered complaints from class members about custody staff acting as gatekeepers to the Crisis Intervention Team, but less so as compared to other reporting periods. Hopefully this very unscientific survey reflects increased training and supervision of line custody staff by Departmental and facility leadership. Although this trend is encouraging, it does not raise the Department to a Substantial Compliance rating for the current reporting period.

---

[19] This topic was not covered in staff interviews during other site visits.
[20] Monitor's midyear report of December 6, 2021, pages 12-13.

## VII: TREATMENT PLAN AND CONTINUING REVIEW

**Summary**: The Department continues to struggle to meet the requirements of this section. There remains a chronic backlog of uncompleted treatment plans.

Outpatient, segregation, crisis and mRTU treatment plans are completed collectively by the offender's mental health team at only a 28% rate. Even the RTU plans, which have previously been removed from monitoring, are only prepared collectively at a 70% rate.

The treatment plans utilized the correct forms. The outpatient plans were generic in nature and not particularly specific to the individual patients' mental health and psychiatric needs. Of note, the inpatient treatment plans from Elgin and the RTU plans from Joliet and Logan were demonstrably better than the outpatient and segregation plans. For class members assigned to crisis care, treatment plans were prepared upon entry and discharge at a rate of 83%. For class members assigned to segregation, treatment plans were prepared upon admission at a rate of only 50%. Finally, compliance rates are markedly lower, and the delays greater, than in past analyses regarding the frequency of psychiatric follow up appointments.

**(VII)(a): Specific requirement:** As required by IDOC AD 04.04.101, section (II)(F)(2)(c)(4), any offender requiring on-going outpatient, inpatient or residential mental health services shall have a mental health treatment plan. Such plans will be prepared collectively by the offender's treating mental health team.

**Findings:** As previously reported, VII(a) contains two requirements: 1) "any offender requiring on-going outpatient, inpatient or residential mental health services **shall** (emphasis added) have a mental health treatment plan"; 2) "such plans will be prepared collectively by the offender's treating mental health team."

A year-long analysis of IDOC's response to the first requirement of VII(a) reveals a chronic backlog of incomplete treatment plans. The following is a sampling of the actual number of treatment plans backlogged from June 2021 through May 2022:

| | total plans backlogged | plans backlogged greater than 14 days |
|---|---|---|
| 6/11/21 | 314 | 168 |
| 7/9 | 404 | 246 |
| 8/13 | 352 | 228 |
| 9/10 | 327 | 167 |
| 10/8 | 328 | 117 |
| 11/5 | 253 | 138 |
| 12/17 | 428 | 222 |
| 1/28/22 | 563 | 367 |
| 2/18 | 642 | 460 |
| 3/18 | 510 | 359 |
| 4/8 | 443 | 329 |
| 5/4 | 447 | 297 |

As I have reported numerous times, these backlog numbers document that not all class members have an up-to-date treatment plan. This is a serious deficiency on the part of IDOC. While these backlog reports show the number of plans that are late at a given moment, there is no IDOC oversight mechanism that captures how many plans were late, and by how much, over a quarter or a year. This does not permit IDOC to review whether problematic practice is an anomaly or a trend requiring attention. The number of backlogged cases on a given day may be relatively small when compared to the overall mental health caseload. This fact is of little consolation to those class members that do not have an up-to-date document that directs their mental health and psychiatric care. This persistent backlog also strongly suggests that IDOC does not employ a sufficient number of mental health and custody staff.

To evaluate the second requirement of VII(a), the monitoring team reviewed a total of 274 treatment plans. This analysis concentrates on 97 outpatient treatment plans from 25 different facilities; 50 segregation treatment plans from 19 different facilities; 50 crisis care plans from 14 different facilities; and 12 mRTU treatment plans from four different facilities.

1. Outpatient plans: Only 18 of the 97 reviewed outpatient treatment plans documented that they were prepared collectively by the offender's treating mental health team. This lack of collective planning included the psychiatric provider signing the treatment plan days to weeks after it was completed as well as not participating in the treatment planning for those class members not currently being prescribed psychotropic medications. The Department was inconsistent in this regard in that I found at least two treatment plans where no medications were being prescribed and yet the psychiatric provider participated appropriately in the treatment planning.

   More importantly, there is a section of DOC 0284 titled "Response to medications and other concurrent treatment: (Comment on enforced meds, compliance issues, lab follow-ups, etc.)". This section clearly is the responsibility of the psychiatric provider. Of the 97 plans reviewed, not one contained any information about lab follow ups. This lack of laboratory data, among other things, confirms my observation that the treatment plans are being prepared by a QMHP and signed by the psychiatric provider. This is not collective planning. I did give credit for collective planning in those instances where there was a progress note documenting that a Multidisciplinary Treatment Team meeting occurred, and the treatment team members were listed.

   Finally, I would like to compliment the staff at Danville and Lincoln for documenting that all of their reviewed treatment plans were prepared collectively.

2. Segregation plans: Only 20 of the 50 plans reviewed showed evidence of being prepared collectively by the class members' treating mental health team. Six facilities[21] documented their collective treatment planning with progress notes. I found this to be very helpful to the treatment planning process. I encourage the Department to have all of their facilities employ this method of documentation.

---

[21] Big Muddy, Centralia, Danville, Stateville, NRC and Western

3.  Crisis care plans: Only 13 of the 50 reviewed plans showed evidence that they were prepared collectively by the class members' treating mental health team. 11 of the plans did not include input from a psychiatric provider. In the remaining 26 plans, the psychiatric provider signed the treatment plan from 1 – 23 days late. In this last cohort, I found signature pages that weren't signed by the psychiatric provider and then found a different signature page containing the psychiatric provider's signature.  I understand that these two signature pages may be an artifact of telepsychiatry. Even so, there is no reason why the psychiatric provider should date his or her signature after the date of the treatment plan if in fact the plan was prepared collectively.

4.  mRTU plans: 7 of the 12 plans reviewed showed evidence that they were prepared collectively by the class members' treating mental health team. All of the plans from Dixon (3) and Logan (3) were prepared collectively.

The team also reviewed 15 inpatient treatment plans and 50 RTU treatment plans to ensure that practices remain sufficient, as has previously been found. Inpatient plans were created at the inpatient facility and at four other institutions purporting to provide that level of care. Just over half of the plans showed evidence of being prepared collectively by the class members' treating mental health team and were updated on a weekly basis.[22] Only 70% of reviewed RTU plans showed collective mental health team preparation.

In the April 2022 quarterly report, IDOC asserts that its 2021 Quality Improvement audits found 57 treatment plans that were not prepared collectively. For context, it appears that the auditors may have reviewed about 1,700 relevant charts.[23]

Among the outpatient, segregation, crisis care, and mRTU plans the monitoring team studied, only 58 of the 209 reviewed treatment plans showed evidence that they were prepared collectively by the class members' treating mental health team. This is only a 28% completion rate. Finally, the Defendants continue to contend that the psychiatric provider is not part of the mental health team. This assertion sustains an underlying ignorance of both community and correctional standards of care. A rating of noncompliance will be assigned to VII(a).

**(VII)(b): Specific requirement:** The plan shall be recorded on IDOC Form 0284 (Mental Health Treatment Plan), IDOC Form 0546 (Mental Health Treatment Plan Update) or its equivalent and requires, among other things, entry of treatment goals, frequency and duration of intervention/treatment activities, and staff responsible for treatment activities. Reviews of the

---

[22] All reviewed plans were correctly handled at Elgin and three other facilities. All of the exceptions occurred at Dixon.

[23]  The exact number cannot practicably be determined. IDOC does not keep track of how many patients with treatment plan updates are captured in its Quality Improvement audits. Because auditors do not select charts where it is known that a treatment plan was due, the total number reviewed will fluctuate with each audit. The monitoring team has access to Quality Improvement audits completed in Quarter 1 and Quarter 3 of 2021. In them, auditors reviewed 439 charts and 429 charts, respectively, that contained treatment plans created in the auditing period. *If* the amounts were similar in the other quarters of 2021, and *if* the April quarterly report was summarizing all of 2021, the total number of reviewed charts with information relevant to this requirement would have been approximately 1,700. As is evident, this number is an informed approximation provided for context.

treatment plan shall also be recorded on form 0284 or its equivalent.

**Findings:** The reviewed treatment plans were recorded on the correct forms. The outpatient plans were generic in nature and not individualized to the needs of the patient, as such, did not genuinely enter some of the key elements that section VII(b) requires. For example, all four outpatient charts reviewed from Illinois River contained the phrases:

- "Compliant with mental health staff and medications."  Only two of the four class members involved were prescribed medications.
- "I want to learn how to deal with difficult situations to make better decisions in the future." This statement was found in the section of the treatment plan titled: "Client long-term goals: (**use client direct quote).**" (emphasis added). I find it hard to believe that all four class members involved had the same quote.

The inpatient treatment plans from Elgin and the RTU plans from Joliet and Logan were demonstrably better than the outpatient and segregation plans. Overall, however, the Department is noncompliant with this requirement.

**(VII)(c): Specific requirement:** Where the IDOC provides crisis care to an SMI offender, treatment plans shall be reviewed and updated upon entrance and thereafter once weekly, or more frequently if clinically indicated, and upon discharge.

**Findings:** In a 14 facility[24] review of 151 crisis admissions, 126 had evidence of a treatment plan being reviewed and updated upon admission to crisis. This is a completion rate of 83%. This same cohort had 125 treatment plans reviewed and updated upon discharge from crisis. This is also a completion rate of 83%. The numbers in the Monitor's midyear report of December 6, 2021, were 92% upon admission and 87% upon discharge. So, there was a drop off in the completion rates during the reporting period. These crisis care treatment plans play a critical role in the "aggressive" treatment that class members are required to receive when placed on crisis. The absence of an updated treatment plan is a serious failing on the part of the Department.

Within the sample, there was an insufficient number of class members in crisis care longer than a week to arrive at opinion regarding treatment plans being reviewed and updated weekly.

**Specific requirement:** For mentally ill offenders on segregation status, treatment plans shall be reviewed and updated within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated. Reviews shall assess the progress of the documented treatment goals and be documented on the DOC 0284, DOC 0546 or the equivalent and shall include the date of the review and the date on which the next review will be performed.

**Findings:** In the same 14 facility review referenced above, the monitoring team found only

---

[24] East Moline, Jacksonville, Pinckneyville, Graham, Shawnee, Vandalia, Taylorville, Western, Lawrence, Menard, Pontiac, Illinois River, Centralia and Hill.

85 of 170 admissions[25] to segregation status had evidence of a treatment plan reviewed and updated within seven (7) days. This is a completion rate of **50%**. This compares to a 53% completion rate reported in the most recent Monitor's report of December 6, 2021.

The plans were prepared on the correct forms and treatment goals were indicated. The monitoring team, however, did not find any evidence that the "Reviews shall assess the progress of the documented treatment goals." That is, the goals were listed but the progress to achieve these goals was not documented.

The 90-day requirement was not assessed as none of the class members in the sample were in segregation for 90 days. While IDOC is not able to provide aggregate data on the lengths of segregation placements, it is likely that, since a year-end 2020 policy was fully implemented, a minority of placements now exceed 90 days.

Defendants' February and April quarterly reports indicate that Quality Improvement audits "also found some deficiencies," without numbers or percentages, in updating plans upon segregation placement. There was no comment about plans updated at 90-day intervals. The usual format for reporting Quality Improvement results is one collective percentage for all restrictive housing practices; IDOC does not keep measurements by requirement, so these are not available for the Court or internal oversight. The quarterly reports do emphasize that corrective action plans are required "whenever there are significant [Quality Improvement] findings" and that attention has been brought statewide to treatment plan updates upon segregation placement.

IDOC is Noncompliant on VII(c)'s requirements for segregation and crisis care treatment planning.

**(VII)(d): Specific requirement:** Offenders who have been prescribed psychotropic medications shall be evaluated by a psychiatrist at least every thirty (30) days, subject to the following:

(i)     For offenders at the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no follow-up appointment to exceed ninety (90) days.

(ii)    For offenders at a residential level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments to more than a thirty (30) day period may be considered, with no extension to exceed sixty (60) days.

(iii)   Offenders receiving inpatient care shall be evaluated by a psychiatrist at least every thirty (30) days with no extension of the follow-up appointments.

---

[25] The Monitoring Team actually reviewed 182 admissions to segregation but only 170 remained in segregation for seven days, therefore requiring a treatment plan.

**Findings:** Drawing on IDOC databases and sections of health care records, the monitoring team assessed the frequency and consistency of contact for patients for the time period of July 2021 through January 2022.[26] At both outpatient and RTU levels of care, only a minority were seen at the required intervals.

The monitoring team analyzed contacts for 425 psychiatric **outpatients**, drawn from across IDOC. Only **20%** of patients were seen *every* 30 days, or the longer interval the provider designated if the patient was more stable. As for institutions, only Kewanee, with its 10 patients, showed that it met this standard. It was common for contacts to miss the mark only by a short time. If one were to consider as reasonable contacts occurring within an additional week, compliance within the sample improves, but still only applies to about half of the patients.

Unfortunately, 40% of patients experienced multiple delayed appointments where some were quite lengthy. Examples were present at most facilities, but ten institutions[27] had particularly heavy concentrations of long-deferred contacts, with health care records demonstrating a rising number of contacts delayed 3 to 10 weeks beyond the requirement.

These compliance rates are markedly lower, and the delays greater, than in past analyses, suggesting that it is difficult for IDOC to sustain these schedules over longer periods. Certainly, Covid waves have an effect, but progress notes show that illness or quarantines are only a factor in some of these cases. Lockdowns are cited, and staff numbers insufficient to prevent setbacks when there are holidays and vacations also plays a role. Another evident contributor was movement between institutions. In the sample, the transfers of 47 patients were apparent and 64%

---

[26] The monitoring team reviewed a Psych Database from each institution with an outpatient psychiatric caseload for each month from July 2021 through January 2022. Kewanee provided partial data, so one month is omitted. A sample was chosen generally by random selection method of every 20 patients, though there were exceptions if the caseload was small or for a few other reasons. In most cases, the last contact from before the monitoring period was also identified from previous databases (usually May or June), so as to be able to calculate the timeliness of July contacts.

A contact was counted as timely if it occurred within 30 days, even if the provider had ordered a return to clinic in a shorter period, because the Settlement Agreement only requires patients to be seen within 30 days (that is, the reviewer assessed whether the contact met the Settlement Agreement requirement, *not* whether the patient was seen within the time the psychiatric provider specified). If a provider ordered an appointment *more* than 30 days hence, the contact was counted as timely if completed within that time, and not exceeding 90 days. If a patient's series of contacts were timely or only one day late, that case was also counted as timely. To determine whether a patient is seen *every* 30 days (or a different ordered interval), the reviewer usually assessed whether there were three or more timely contacts; occasionally, the determination was based on two contacts if the follow-up intervals were too long for three contacts to have been completed in the monitoring period, or at Stateville-NRC, where many patients are not onsite long enough for three contacts.

Where it was difficult to confidently discern the interval between two contacts, the monitoring team often reviewed the relevant portion of the patient's health care record. The reviewer removed from the sample those patients whose information could not demonstrate the information above.

Where a patient moved between institutions, all activity for that patient appears as an entry at the most recent institution. For that reason, a reader should be cautious in attributing compliance *by institution*. To the extent a facility's sample includes patients who were also treated elsewhere, the prior institution's practice may improve or diminish the appearance of practice at the receiving institution. Conversely, where several patients transferred *out* of an institution, part of its practice is missing from the picture recorded in the analysis. This can also give the appearance of some institutions being over- or underrepresented in relation to the size of their caseloads. The collective, IDOC-wide picture remains sound; it is just that the subparts have been redistributed a bit by the moves.

[27] Big Muddy, Centralia, Graham, Hill, Illinois River, Menard, Pontiac, Shawnee, Sheridan, and Western Illinois

had their contact schedule interrupted for days or weeks afterward. In two cases, the patient was dropped for four to six *months*.[28]

Practice was somewhat better with **RTU** patients. In a 50-patient study using the same method, 36% were seen consistently as planned – almost always at 30-day intervals – and 90% were consistently seen by that point or within an additional week.

As for **inpatients**, IDOC's databases show a plan for all Elgin patients to see a psychiatric provider every three days. It has always been the monitoring team's impression that Elgin far exceeds the minimum Settlement Agreement requirement, and no information to the contrary came to the attention of the team.

In terms of the appropriateness of extending appointments, a large majority of follow-up orders – in a sample, 75% for outpatients and at least 96% for RTU patients -- are maintained at no more than 30 days.[29] Virtually no patients had planned follow-up or completed contacts that exceeded the maximum time allowed.[30]

The monitoring team did not review for whether the stability of patients with longer follow-up intervals was sufficient to warrant it, but the modest rate of these appointments is one indicator of reasoned decision making. One subset of follow-up practice is the typical practice expected of psychiatric providers when a patient discontinues all medication. The monitoring team noted 16 such patients in the sample. It is standard of care for psychiatry to see such a patient 30 days after discontinuation to monitor any adverse effects or changes of heart. This follow up occurred with 63% of the patients in this study, and in some cases, the patients were followed for several months. The remaining 37%, however, were never seen after the medication was discontinued.

Unfortunately, IDOC's oversight mechanism, the backlog report, is not designed to detect whether psychiatry contacts are reliably happening on a routine basis. As discussed in Monitor's reports and IDOC's quarterly reports, the backlog report is meant to show the status at a moment in time, but cannot inform leaders about how many contacts, now completed, were late at the time of completion. Leaders are then disadvantaged in recognizing whether there is an ongoing concern that needs addressing. The difference between the high percentages Defendants assert, based in the backlog report, and the analysis of patterns above, is stark.

Similarly, Quality Improvement is limited in how it can inform internal oversight of this requirement. The usual format for reporting Quality Improvement results is one collective percentage for all psychiatry practices; IDOC does not keep measurements by requirement. The

---

[28] In these examples, one did not see psychiatry and one did not see an MHP.

[29] As a sample, the monitoring team reviewed all planned follow-up appointments indicated in the Psych Databases for September 2021. These included all institutions except Murphysboro, which does not have a psychiatric caseload.

[30] Among completed contacts in that study, only 5 of more than 1,400 contacts exceeded the 90-day outpatient maximum; these were completed in an additional eight days or less. None of the RTU contacts exceeded the maximum time.

In the study of planned follow-up, one outpatient and one RTU appointment were ordered for an interval beyond that allowed. A handful of other contacts gave that appearance but employed a code ("99") that indicates the patient is outside of IDOC and cannot be seen, according to IDOC legal counsel.

method of recording on the audit tool suggests that auditors do not consider enough information to determine whether the patients are seen every 30 days or other ordered interval.[31] In the most recent quarter available to the monitoring team, it appeared such an assessment would only have been *possible* in 129 charts, far too few for a systemwide analysis.

Defendants are noncompliant on this requirement.

## VIII:   TRANSITION OF OFFENDERS FROM SPECIALIZED TREATMENT SETTINGS

> **Summary:** Only 67% of crisis watch follow-up contacts were timely, and some contacts were up to 3.5 months late.
>
> It appeared that 12% of these contacts were never completed. One way this manifests is for this responsibility to be missed after a patient transfers to another prison. IDOC has identified this issue and implemented corrective action.
>
> These compliance rates are significant declines even from the December 2021 Midyear Report.

**(VIII)(b)(i): Specific requirement (**as it appears in the Corrected Second Amended Settlement Agreement): For offenders transitioning from Crisis placement, the treating MHP will see the offender for an individual session within five (5) working days from the crisis discharge to assess their stability and progress and to provide therapeutic counseling or interventions as clinically appropriate. An MHP will conduct an Evaluation of Suicide Potential (IDOC Form 0379) on the offender every two months for six months or as scheduled in the individual treatment plan. Findings shall be documented in the offender's medical record.

**Findings:** The monitoring team studied a sample consisting of all crisis watches at all institutions that had admissions during the two months selected, and a sample of previous crisis watches that were due for follow up during the monitoring period.[32] In this study:

---

[31] Audit tool entries, and communication with Quality Improvement staff, suggest that auditors determine whether *this contact* was timely (the one before them), but not whether contacts happen routinely every 30 days (or other specified interval). Reviewing the audit tools for internal audits (conducted by facility staff) covering July through October 2021, and a contemporaneous set of quarterly external audits (conducted by Quality Improvement staff), 747 patients had psychiatry services, but only 129 of them had entries spanning enough time that a minimal pattern of routine contacts could be discerned.

The monitoring team did not assess whether that pattern *had* been established, only whether such an analysis would be *possible.*

[32] The monitoring team drew all cases from "Crisis Trackers" provided by IDOC for June and August 2021. Additionally, the reviewer drew from February through April 2021 Crisis Trackers to be able to review the contacts required through the six-month point after crisis watch discharge. These drew from all IDOC institutions, although five institutions with small caseloads had no crisis watches in one or more of these sampled months.

The reviewer recorded information about the initial contacts and followed each of these cases for the contacts required at 60-day intervals, drawing on the due dates and dates of contact shown in IDOC's subsequent monthly Crisis Trackers through January 2022. The analysis included only those contacts that had been due by the time of the study. The total number of contacts due and assessed was 2,266.

- Only 67% of follow-up contacts were timely, a significant decline even from the December 2021 Midyear Report
- some late contacts took place within an additional week, but this happened less than in the past
- instead, staff listed a significant subset of contacts as late for more than a week up to 3.5 months late
- it appeared that 12% of the follow-ups were never completed, which also represents a meaningful decline
- there were some signs that this rate of compliance may even be overstated. There were examples of logged contacts that appeared to have no support in the health care record, failed contacts that were logged as completed, and inappropriate other types of contacts being counted as fulfilling this requirement. These examples were in very small numbers, so may or may not be of substantial concern. Neither the monitoring team nor IDOC, to our knowledge, has looked into the possible scope of these practices.

Within this study, it was evident that 147 patients transferred to other facilities during the follow-up period, so the monitoring team assessed IDOC's ability to maintain the follow-up schedule in this circumstance.[33] Where there were concerns, IDOC was given the opportunity to provide health care records demonstrating that compliant contacts took place. Taking together the information from the logs and 63 charts reviewed, a slight majority met the Settlement Agreement requirements, but 48% were missed and did not have benefit of the remaining number of bimonthly contacts with an MHP that includes a detailed evaluation of suicide potential.[34] IDOC reportedly also identified this issue and, early in 2022, added functions to the Crisis Trackers. Staff at a sending institution are expected to mark that they have notified the receiving institution. The monitoring team has observed some of those entries being made, but the team does not currently have enough information to verify whether this system is working. It is, however, a helpful prompt with potential to improve practice.

In the April 2022 quarterly report, IDOC asserts that its 2021 Quality Improvement audits found 106 occasions in which the patient was not seen timely for his or her initial contact. For context, it appears that the auditors may have reviewed about 1,200 relevant charts.[35] They found

---

[33]  Where a Crisis Tracker noted that a patient had transferred to another facility, the reviewer employed the Inmate Locator and continued tracking the remaining follow-up contacts at the receiving institution.

[34]  Locations could not be discerned for 9 patients who moved, so they were removed from the study altogether. Of the 138 other patients who transferred, 16 went back on crisis watch before the next contact was due, so they were removed from subsequent steps in the analysis. Of the remaining 122 patients, 59 did not receive the required follow up after transfer.

[35]  The exact number cannot practicably be determined. IDOC does not keep track of how many patients requiring crisis watch follow-up are captured in its Quality Improvement audits. In reviewing the Quality Improvement audits from Quarter 3 of 2021, the monitoring team found that auditors reviewed 393 charts that contained a crisis watch in the auditing period. Sample size fluctuates, but *if* the amounts were similar in the other quarters of 2021, the total number of reviewed charts with information relevant to this requirement would have been approximately 1,200. As is evident, this number is an informed approximation provided for context.

seven deficiencies as to bimonthly follow-ups; the number of relevant charts in such an audit would be extremely small.[36]

It may be worthwhile to note that in IDOC's two most recent quarterly reports, Defendants misstate previous findings of Monitors' reports and provide an example of 2 errors in the November 2020 analysis as evidence of "numerous errors" that render all monitoring team analyses of this requirement "unreliable." Although 14 institutions[37] have previously been found in substantial compliance, they were responsible for only 249 of the 2,266 contacts in the instant study. Low compliance rates remain for the vast majority of crisis watch follow up, so the systemwide rating is Noncompliant for this requirement.

## IX: ADDITIONAL MENTAL HEALTH STAFF

**Summary:** The Department has NEVER met its staffing requirements as outlined in this section. Neither has the Department negotiated a time extension with the plaintiffs to meet the expected staffing levels as required by the Settlement Agreement. As of March 25, 2022, significant staffing shortages exist at all of the facilities with an RTU:
- Dixon: 14 QMHPs, 6 BHTs, and 2.275 Psychiatric Practitioners
- Logan: 10 QMHPs, 9 RN-MH, 3 BHTs and 1.55 Psychiatric Providers
- Pontiac: 2 Staff Psychologists, 10 QMHPs and 1.2 Psychiatric Providers.
- Joliet: 2 Staff Psychologists, 2 QMHPs, 3 BHTs, 18 RN-MH, 2 CNAs and 1.3 Psychiatric Providers.

**(IX)(a): Specific requirement:** The Approved Remedial Plan identifies additional staff needed for the operation of IDOC's outpatient and RTU settings. The necessary funding to pay for this hiring is dependent upon additional appropriations. Consequently, IDOC will cause to be hired the appropriate staff no later than the following dates: Dixon Correctional Center and Logan Correctional Center – 6 months from the budget contingent approval date; Pontiac Correctional Center – 12 months from the budget contingent approval date.

**Findings:**

| | 3/25/22 | 9/24/21 | 3/19/21 |
|---|---|---|---|
| • Dixon: Vacant FTEs | | | |
| o Site MH Services Director | 0.0 | 1.0 | 1.0 |
| o MH Unit Director | 1.0 | 1.0 | 1.0 |
| o Post-Doc-Psychologist | 1.0 | 1.0 | 1.0 |
| o Pre-Doc-Psychologist | 1.0 | 2.0 | 2.0 |
| o QMHP | 14.0 | 11.0 | 10.0 |

---

[36] It is not possible to discern how many audited charts were due for this follow up by the time they were audited. However, the charts are pulled based on a crisis watch occurring during the preceding quarter, approximately, so very few would have reached the point of also being due for a bimonthly follow up, and more than one bimonthly period having passed is impossible.

[37] This group is Decatur, East Moline, Elgin, Jacksonville, Kewanee, Lincoln, Murphysboro, Robinson, Shawnee, Sheridan, Stateville, Taylorville, Vandalia, and Vienna.

|  | | | | |
|---|---|---|---|---|
| o | BHT | 6.0 | 4.0 | 2.0 |
| o | MH Staff Assistant | 1.0 | 1.0 | 0.0 |
| o | Psychiatric Providers | 2.725 | 4.050 | 3.425 |

- Logan:

|  | | | | |
|---|---|---|---|---|
| o | Site MH Services Director | 1.0 | 1.0 | 0.0 |
| o | MH Unit Director | 2.0 | 2.0 | 2.0 |
| o | Post-Doc-Psychologist | 2.0 | 2.0 | 2.0 |
| o | Staff Psychologist | 2.0 | 3.0 | 2.0 |
| o | QMHP | 10 | 10.0 | 8.0 |
| o | RN-MH | 9.0 | 9.0 | 4.0 |
| o | Staff Assistant | 0.0 | 1.0 | 0.0 |
| o | Psychiatric providers | 1.55 | 3.8 | 2.025 |
| o | Rec Therapist | 1.0 | 0.0 | 0.0 |
| o | BHT | 3.0 | 0.0 | 0.0 |

- Pontiac:

|  | | | | |
|---|---|---|---|---|
| o | MH Unit Director | 1.0 | 1.0 | 1.0 |
| o | Post-Doc-Psychologist | 2.0 | 2.0 | 2.0 |
| o | Staff Psychologist | 2.0 | 1.0 | 2.0 |
| o | QMHP | 10.0 | 10.0 | 9.0 |
| o | Psychiatric providers | 1.2 | 0.0 | 0.0 |

The deadline for Dixon and Logan meeting their staffing requirements was February 6, 2018. Pontiac's deadline was July 6, 2018. Of note, the above-listed staffing numbers are for the facility as a whole. Wexford's staffing report does not break the staff down by RTU and outpatient. As the March 2022 column indicates, in all cases, the staffing vacancies have generally remained the same over the past year. Dixon, Logan and Pontiac have been understaffed throughout the entire reporting period.

**(IX)(b): Specific requirement:** The Approved Remedial Plan also identified the staff IDOC preliminarily determined to be necessary in order to open and operate the RTU to be located at the former IYC Joliet. IDOC will cause to be hired the appropriate staff no later than eighteen (18) months from the approval of the Settlement Agreement.

**Findings:**

- Joliet: Vacant FTEs

|  | | 3/25/22 | 9/24/21 | 3/19/21 |
|---|---|---|---|---|
| o | MH Training Director | 0.0 | 1.0 | 0.0 |
| o | Post-Doc-Psychologist | 1.0 | 1.0 | 1.0 |
| o | Pre-Doc-Psychologist | 2.0 | 2.0 | 0.0 |
| o | Staff Psychologist | 2.0 | 2.0 | 2.0 |
| o | QMHP | 2.0 | 0.0 | 0.0 |
| o | BHT | 3.0 | 1.0 | 0.0 |
| o | RN-MH | 18.0 | 14.0 | 5.0 |
| o | CNA | 2.0 | 3.0 | 1.0 |
| o | Staff assistants | 1.0 | 0.0 | 0.0 |

| | | | |
|---|---|---|---|
| o   Psychiatric Providers | 1.3 | 0.8 | 0.0 |

The deadline for Joliet meeting its staffing requirements was November 22, 2017. As with Dixon, Logan and Pontiac, the staffing vacancies have remained the same or increased over the past year. As with Dixon, Logan and Pontiac, Joliet has been understaffed throughout the entire reporting period.

IDOC is Noncompliant with this requirement.

**(IX)(f): Specific requirement:** In the event that IDOC has not achieved a staffing target, then, after notice to counsel for Plaintiffs, any necessary time extensions shall be negotiated by the parties. All such extensions shall require the written agreement of counsel for Plaintiffs. This provision is in addition to any mechanism for dispute resolution set out in Section XXIX.

**Findings:** As previously reported, the Defendants have never fulfilled this requirement. That is, as of the date of this report, they have not given notice to Plaintiffs' counsel and entered into any negotiations regarding any time extensions. As such, a rating of Noncompliance will be assigned.

## X: BED/TREATMENT SPACE

**Summary**: RTU bed use has been hundreds below the construction requirements throughout the time those units have been open and continued to drop this year. This occurred despite substantial numbers of patients with indicia of need who were not referred or experienced lengthy barriers to access after they had been approved for transfer. Bed utilization was even worse for inpatient care with only 13 of 44 beds filled as of the most recent data available, and 63 unstable RTU or BMU patients not referred to them. Multi-month transfer delays recurred for those who did transfer. Maximum security patients were particularly subject to a lack of referrals and months-long delays in access to both levels of care. Under these conditions, it cannot be said that RTUs and inpatient care are making available the number of beds required in this section.

Programming falls far short of requirements in each of the RTUs and space for it is particularly insufficient in the X House at Dixon. Dixon has begun some physical plant changes to address this issue. A modified RTU is now running in three prisons, providing some programming, but less than is required.

IDOC has sufficiently addressed the issue of housing crisis patients outside crisis watch. The care provided in crisis watch is not an "aggressive mental health intervention" and the setting is used well beyond a short term intervention to reduce acute symptoms and stabilize the patients. IDOC has, however, made substantial progress on reducing the number and duration of the longest stays (those exceeding 30 days) and some progress on increasing outpatient referrals to RTU or BMU.

**(X)(b): RTU beds for male offenders**

**(ii): Specific requirement:** IDOC will perform the necessary construction to make its RTU

28

beds available at the following facilities on the following schedule:

>  **(A)** RTU beds and programming space for approximately 626 male offenders at
>  Dixon CC no later than six (6) months after the budget contingent approval
>  date. Additional construction to increase treatment and administrative office
>  space will be completed within twelve (12) months after the budget contingent
>  approval date;
>
>  **(B)** RTU beds and programming space for 169 male offenders at Pontiac CC no
>  later than twelve (12) months after the budget contingent approval date; and
>
>  **(C)** RTU beds and programming space for at least 360 male offenders at IYC-Joliet
>  no later than fifteen (15) months after the budget contingent approval date.

**Findings**: The monitoring team is informed that the number of beds constructed exceeds
the requirement for Dixon by 50, meets the requirement for Pontiac, and is short of Joliet's
requirement by 60. In aggregate, this falls 10 beds short of X(b)'s construction mandates.

As has been discussed in previous Monitor's reports, these beds have been chronically
underutilized. Since need is evident in outpatient facilities, it raises questions about whether IDOC
is making the required number of RTU beds available.

Joliet practices single celling, which automatically cuts the number of available beds in
half.[38] Its average census throughout the monitoring period was just over half of the beds required
by X(b)(ii), and this number has never been exceeded. Pontiac filled significantly less than that.
Dixon's census dropped 25% from one year ago and is now at its lowest point in at least three
years. Taken together, only 62% of the beds required by this subsection were filled during the
monitoring period.[39] This has fallen substantially since the Fifth Annual Report.

In monitoring team reviews of three months of crisis watches,[40] a significant number of
candidates for RTU or BMU were evident. These patients were unstable because:

- they incurred three or more crisis watches in a short period, and/or

- they remained in crisis watch 20 days or more, double the time at which the
  Settlement Agreement expects the patient to stabilize in crisis watch or be
  transferred, and

- some outpatients were on crisis watch for months and up to *two years*

---

[38]   There appears to be other good reasons for this practice. The Monitor takes no position about whether the
practice should continue. This is merely to acknowledge that, while this practice is in place, this is the practical
result.

[39]   This draws on figures provided monthly by IDOC and reflects the average censuses for June 2021 through
February 2022. Dixon's average census was 444 (626 are to be made available). Pontiac's average census was 73
(169 are to be made available). Joliet's average census was 196 (360 are to be made available).

[40]   For a description of the method, please see section X(f) below

There were 66 such outpatients[41] and fewer than half were referred to RTU, BMU, or inpatient care. Where patients were not referred, Defendants assert that transfer is always considered and therefore staff would have determined that transfer was not needed. IDOC, however, has never demonstrated this during site visits or in chart samples purportedly supporting this position.

There were 11 institutions where more referrals within this group were likely needed, but the practice was much more concentrated at Menard and Pontiac. Similarly, Menard experienced the greatest number of long waits to access RTU.[42] These facts illustrate how it hurts IDOC to be running Pontiac's maximum security RTU at less than half-capacity, as has been done since its inception.

In addition to the group above, there were 161 men in the study referred to RTU and BMU for other reasons.[43] Their needs were met more quickly; 85% of them transferred within a month. On the other hand, it was common for a patient to be approved quickly, but then the time to transfer was longer than the time to be approved, suggesting barriers to access. This is another area where Covid contributes to some delays but is unlikely to be a complete explanation. While a typical quarantine time may be 2 weeks, there were 37 patients who waited 3 weeks to 11 months *after approval.* Menard's and Stateville's maximum security patients waited the longest, from six months to one year.

Because bed use has been hundreds below the construction requirements throughout the time those units have been open, and substantial numbers of patients with indicia of need are not referred or experience lengthy barriers to access, IDOC cannot be said to be making available anywhere near the required number of beds and is Noncompliant with this requirement.

**(X)(d): Specific requirement:** The facilities and services available in association with the RTU beds provided for in subsections (b) and (c), *above*, shall in all respects comply with the requirements set forth in the section titled "IDOC Mental Health Units," subsections 2 and 3, in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)). All RTU units shall have sufficient beds and program space for all offenders in need of residential level of care services, including the provision to each RTU offender of a minimum of ten (10) hours of structured therapeutic activities per week and a minimum of ten (10) hours of unstructured out of cell activities per week. To the extent that IDOC maintains an RTU in segregation units (e.g., Pontiac) these provisions shall apply regardless of whether the RTU bed is within or outside of a segregation unit.

---

[41] There were no outpatients with concerning physical restraints uses in the monitoring round. There were a great many more patients in crisis watch for 11 to 19 days. For some, this may be a sign that they were also unstable and needed a higher level of care. Additionally, readers should be mindful that there can be signs of this need other than the indicators discussed in this report; these, however, do not generally lend themselves to detection in systemwide analyses. For that reason, this analysis relies on clear-cut lines where one cannot reasonably dispute that the patients remained unstable far longer than crisis watch is designed to treat.

[42] While the Midyear Report noted substantial improvement in the time to access RTU and BMU, the picture was more mixed for this unstable subgroup. Almost half of this group waited more than 1 month to more than 7 months to access care.

[43] This is based on logs of referrals provided monthly from all institutions that had referrals pending. The analysis draws upon the logs from June 2021 through January 2022, with additional information about outcomes from IDOC legal counsel or later monthly logs.

**Findings:** This section has received a lot of attention during the current reporting period. My opinion, as Monitor, was that IDOC was not meeting the requirements of this section during the first half of the reporting period. That is, I assigned the rating of Noncompliance to this section in the midyear report of December 6, 2021.[44]

On January 18, 2022[45] the Defendants sent a letter to Plaintiffs' Counsel acknowledging that the RTUs located at Dixon and Pontiac were not meeting their obligations of providing 10 hours of structured out-of-cell time for those class members assigned to the STC, DXP and RH RTU at Dixon and the BMU and MTC at Pontiac. Also, the Defendants acknowledged that the class members assigned to the BMU and MTC at Pontiac were not receiving the required 10 hours of unstructured out-of-cell time.

I submitted a letter to the Court and parties on January 24, 2022, stating that the RTUs at Dixon and Pontiac were not meeting their obligations under the Settlement Agreement and were not providing "enhanced mental health treatment" to those class members assigned to the RTU level of care.

I testified at a hearing on this matter on February 1, 2022, reiterating the opinions expressed in my letter to the Court of January 24, 2022. I have not been informed of the outcome of this hearing as of the date of this report.

Finally, I personally visited the RTUs at Dixon, Joliet, Pontiac and Logan during the current reporting period. The following is a report from these site visits:

- Dixon: I visited the RTU at Dixon on October 20 and 21, 2021. As reported in the midyear report of December 6, 2021:

"IDOC reported the RTU out of cell time hours for Dixon and Pontiac in a memo dated September 30, 2021. Dixon reported the RTU unstructured out-of-cell time as 26 hours for STC (main program) and 19 to 26 hours for DXP (maximum security) for each week in August and September 2021. It appears that dayroom and yard time were considered in the unstructured calculation. These calculations are based only on the activities scheduled and "ran" each week. Of note, the schedules do indicate when scheduled activities are canceled. These calculations are not based on an assessment of individual class members' out of cell time participation. It is not clear how many individuals participated in these activities, or which individuals participated.

The monitoring team interviewed five patients from the STC and DXP programs; at the time of the interview, their experience was as of late July. Their estimates of unstructured out-of-cell time varied widely, but each STC patient's reports totaled well over the requirement (each estimated 17 or more hours available each week). In DXP, only 4 hours per week of yard time reportedly was offered, but it was unclear whether dayroom time was also available.

---

[44] Please refer to pages 24 & 25 of the Monitor's Midyear Report dated December 6, 2021, for a detailed explanation of the noncompliance rating.

[45] The actual document is dated January 18, 2021, but this date is an obvious typo.

Similarly, Dixon reported the RTU structured out of cell time, including Community Meetings, for STC as 5 hours for each week in August 2021 and 6 weekly hours in September 2021. These calculations also seem to simply be based on a schedule of groups that "ran" and not an individual assessment. The STC report of structured out of cell time does indicate the number enrolled in each group, but not who the individuals are.

Interviewed patients, in both STC and DXP, reported schedules as of late July that would total 10 hours per week or more of groups offered.[46] It is unclear what may have changed in the following months.

It is my opinion that the STC has sufficient space to provide class members with the treatment expected under this requirement. The same is not true for the X House, the building that houses the DXP program."[47]

- Joliet: I stated in the midyear report of December 6, 2021 that the RTU class members were offered five hours of structured and 9 to 10 hours of unstructured out-of-cell time weekly. I subsequently visited Joliet on March 23, 2022. I found for the month of February 2022, RTU class members in the BMU had two scheduled hours of structured out-of-cell time per week and the MTC had three scheduled hours of structured out-of-cell time per week. The hours improved in March to seven scheduled hours of structured of out-of-cell time. The staff at Joliet readily admitted that they were not able to achieve the 10 structured and 10 unstructured thresholds of out-of-cell time. The staff did state, however, that they were providing other service to class members in an attempt to provide "enhanced mental health care." These services included but were not limited to individual therapy, treatment team meetings, psychiatric visits, work assignments and in-cell activities.

- Pontiac: I stated in the midyear report of December 6, 2021, that class members assigned to the RTU level of care were not receiving the required amount of out-of-cell time. At the time of my visit on March 24, 2022, staff informed me that structured out-of-cell activity was limited to individual contacts by the psychiatric provider and QMHP on a monthly basis. I was further informed that these contacts took place in "holding cells" and that groups were to resume the week of my visit. Unstructured out-of-cell time consisted of twice a week yard time of 2.5 hours, for a total of five hours per week.

- Logan: During my site visit of March 25, 2022, I attended a group being provided to class members at the RTU level of care. The group was titled "self-love" and all of the participants reported they really enjoyed the group. I was informed that the group schedule restarted in late February due to the medical quarantine being lifted. Prior to this, the class members informed me that they were not receiving any structured or unstructured out-of-cell time. At the time of my visit, unstructured out-of-cell time consisted of community meeting, gym, yard and dayroom time.

---

[46] There was one exception where the patient said he attends groups for 6 hours per week to accommodate his school program.

[47] Midyear Report, December 6, 2021, pages 24 and 25

- Menard: Due to a variety of covid-related restrictions, I was not able to visit the BMU at Menard during the reporting period. I was able to interview all the members of the BMU via Zoom on September 2, 2021. I reported my findings in the midyear report of December 6, 2021: "There is a BMU at this facility. I personally interviewed each class member assigned to this BMU on September 2, 2021. At that time, there were only five class members assigned to this program. These class members in the BMU told me that their meetings with the QMHPs lasted 10 to 20 minutes. They did attend groups. These groups are scheduled to be two hours, but they routinely start late and end early. They all confirmed that at most, the groups last for one hour. They did report having monthly meetings with their psychiatric practitioners. They all stated that they rarely went to yard. The monitoring team reviewed their charts for the month of August to determine exactly how much structured and unstructured time each was receiving.

|    |                | QMHP visits | Groups | Psychiatric visits |
|----|----------------|-------------|--------|--------------------|
| 1. | Class member #1 | 7 | 2 | 2 |
| 2. | Class member #2 | 5 | 1 | 2 |
| 3. | Class member #3 | 5 | 6 | 0 |
| 4. | Class member #4 | 6 | 8 | 1 |
| 5. | Class member #5 | 7 | 4 | 2 |

Please note, the above-listed data is for the **month** of August. These class members were clearly not receiving the required 10 and 10 hours of out-of-cell time."

By their own admission, confirmed by my interviews, site visits and chart reviews, the Defendants are patently not fulfilling their obligations under this section. A rating of Noncompliance will be assigned.

**Specific requirement**:[48] Modified RTU (mRTU): A level of care designation to service patients who previously required RTU level of care but have stabilized and no longer requires the intensity of an RTU placement but need more than Outpatient level of care treatment provides. If regression is seen in the patient receiving this level of services, the treatment team may resume RTU level of services without hesitation.

**Findings:** As I reported in the Midyear Report of December 6, 2021, "At the time of this report, modified RTU (mRTU) programs exist at Dixon, Logan and Joliet. The current census:
- Dixon  eight class members
- Logan  24 class members
- Joliet   eight class members

The facility Mental Health Authorities report that all mRTU class members are receiving five hours of structured out-of-cell time weekly."

---

[48] This level of care was added to the Corrected Second Amended Settlement Agreement. It appears in the Definitions section but does not have a corresponding section/subsection number in the Settlement Agreement. So, the monitoring team has determined that it is most logically related in this sequence of requirements.

During the second half of the reporting period, Pontiac, Dixon and Joliet all reported having difficulties in providing the required structured out-of-cell time. During my site visit of Logan on March 25, 2022, class members at the mRTU level of care reported that they were receiving the required amount of structured out-of-cell time. This out-of-cell time, however, only began to occur a few weeks before my visit. The remainder of the mRTU requirements such as monthly individual therapy, psychiatric visits every two months and treatment plans prepared every six months were occurring.

Because structured out-of-cell time is an essential component of treatment under this requirement, Defendants are in Noncompliance.

**(X)(e): Inpatient beds**

**Specific requirement:** Consequently, IDOC will perform the construction and improvements to make at least 22 beds available for female offenders within nine (9) months of the budget approval contingent date and to make at least 22 beds available for male offenders within sixteen (16) months of the budget contingent approval date.

**Findings**: To the Monitor's knowledge, the necessary construction and improvements were made, and the facility has been in use since April 2018 but chronically low occupancy, compounded by pandemic restrictions, and despite substantial need in the patient population, mean that IDOC is not making 44 beds available as required.

Past low censuses have been described in previous Monitor's reports. In the current monitoring period, the average census was 18 – far less than half – and there was a dramatic drop to 13 in the most recent two months of data available. The monitoring team is informed that a similar situation continues, months later, because IDOC has only been transferring emergent patients to Elgin in anticipation of the opening of a new facility.

While there were these low censuses, there were patients held continuously for months in restraints waiting for these beds, and dozens who were in and out of crisis beds, and in and out of lengthy episodes of restraints, without even being referred to inpatient care. Two of the RTUs each made *one* referral in the past year. In other prison systems with which the monitoring team has experience, a lack of referrals, despite obvious signs of instability, indicated that those clinicians saw referrals as futile.

IDOC's handling of inpatient transfers appears to go through peaks and valleys and there was a substantial downturn since the December 2021 Midyear Report.[49]

- As described in that report, time to access care had improved for over a year and there was a surge through August in number of referrals.

---

[49] The analysis for X(e) relies upon logs provided by Elgin, monthly from June 2021 through February 2022, supplemented by outcomes information emailed by IDOC legal counsel

- However, since September, only two men accessed care within a month.[50] The remainder waited from **4 to 9 months** – while 21 or more beds stood empty -- before transferring or withdrawing their requests because other institutions' staff ultimately were able to stabilize them.[51]

- Women again fared better, with the great majority reaching care within a week.[52]

Some reasons for denials or delays were apparent. There is a concern that Elgin is not designed for high security patients; that appeared to affect two patients whose referrals were denied. Given that Pontiac and Menard, which house some of the highest security prisoners and have highly unstable populations, have made, between them, a total of three inpatient referrals in more than three years, there is a question about whether security level serves as a chilling effect on even attempting referrals.

Medical concerns – requests for testing or medication adjustment, and concerns about being able to treat co-morbidities -- contributed to the time to access inpatient care, although less than is commonly believed. It affected eight referrals during the monitoring period. In half of these cases, it extended the time to transfer or withdrawal by three to four weeks; the other half of these patients waited only one to two weeks for this concern to be resolved. Only one denial was issued for medical reasons.

Since there were multiple months waits, however, it was common that the medical concerns were not the only cause; that is, patients waited weeks longer after the medical concern had been addressed. Additionally, 37% of men's referrals, men *no* medical issues, were approved quickly but waited an additional two weeks to two months after approval. This was also common in previous monitoring rounds. These scenarios suggest staffing or other constraints as the barrier to making those beds available.

Beyond delayed access for patients who *were* referred, there were substantial numbers of unstable RTU patients who would be strong candidates for inpatient care but were not referred.

- Patients were restrained 3 or more times in a short period up to *49 times* **for one patient** [53]

- Patients were placed in crisis watch 3 to 9 times in a short period[54]

---

[50] While there is no set requirement for length of time to transfer, one month is the outer limit that the monitoring team sees as reasonable given the deep illness in this population.

[51] For men in the entire June through February period, 27 were referred, 6 of whom were denied or stabilized quickly and withdrew their requests. Eleven men transferred within a month. Ten men waited more than a month, up to nine months.

[52] Of the 22 women referred in this monitoring round, 15 accessed Elgin within a week, and four more transferred within a month. In three outlying cases, one transferred in a few days over a month, and two referrals were withdrawn after five weeks and two months, respectively.

[53] There were other patients with multiple restraints events that were not as concerning. These patients were restrained three to six times, but the restraints were for shorter periods and occurred more rarely over an eight-month period.

[54] This excludes some patients whose multiple admissions were of less concern.

- Patients were subject to restraints for longer than a day, up to an 8-day stretch

- Three patients were restrained continuously, or nearly so, for two months, three months, and more than three years because of frequent, severe self-injury whenever they were unrestrained.

- Patients lived in crisis watch for 20 days – double the expected length in the Settlement Agreement -- up to 3.5 years

Taken together, there were 69 evidently unstable patients while receiving RTU or BMU level of care.[55] Only **6 of the 69** were referred to inpatient care.

The foregoing indicates that the low inpatient census has not been because there is no need for the 44 required beds. The beds are needed but patients do not have sufficient access; IDOC cannot be said to be making the required beds available.

Defendants have asserted that some patients who have not been placed at Elgin are nevertheless provided an inpatient level of care in prisons. This simply is not possible. Prisons do not have the staff to provide the frequent, intensive contact of inpatient care. They do not employ the same range of specialists and do not have the same resources available. There are not enough inpatient-designated patients in other facilities to form groups for therapy. Prisons certainly do not provide a therapeutic environment.

IDOC also has written that several limits on care will be addressed by the opening of a new inpatient facility. Several quarterly reports have described that facility as on the verge of opening. The current projected opening date is June 16, two weeks after this report is submitted. A new facility holds the potential for improved care and access, and history shows that good intentions can be overcome by adverse circumstances. Oversight will be essential to ensure that the promise of this facility is actually realized for this severely ill, vulnerable population.

IDOC is Noncompliant on this requirement.


**(X)(f): Crisis beds**

**Specific requirement:** IDOC shall also ensure that each facility has crisis beds which comply with IDOC Administrative Directive 04.04.102, § II(F)(2), IDOC Administrative Directive 04.04.100, § II(G)(4)(b), and IDOC Administrative Directive 04.04.102. These beds shall not be located in Control Units with the exception of Pontiac CC, in which case such cells will be relocated to the protective custody unit no later than twelve (12) months after approval of the Settlement Agreement. To the extent that, as of the approval of this Settlement Agreement, offenders are placed in crisis beds located in a Control Unit (excluding Pontiac CC), they will be

---

[55]  This total controls for the fact that some patients were of concern for more than one of the reasons above. This is 69 unique patients. There were also outpatients meeting these criteria who may have benefitted either from inpatient care or RTU or BMU. Because the appropriate level of them is less straightforward on the information available, they are not included in this analysis.

moved to a crisis bed in general population within the facility, to an infirmary setting within the facility, or, if no such placement is available, transferred to another facility which has an appropriate crisis bed available.

**Findings:** IDOC facilities have established crisis beds as required and, pre-Covid, made substantial strides toward housing crisis watches in them. The purpose of section X(f) is for all crisis watches to take place in cells designed for crisis watch, and/or the infirmary; this expectation is so high that, if a bed in one of those two locations is not available, X(f) directs Defendants to transfer the patient to another institution.

Since the pandemic began, there was an increase in housing some crisis watches in segregation, as well as other non-crisis cells in general population, as a means to reduce movement and exposure and thus reduce the risk of spreading Covid-19. The public health intention is clear and, although both of these housing approaches are contrary to X(f), they may be considered justified in the short-term under *force majeure*. This does not negate the need to fulfill this requirement before the Court's jurisdiction over this requirement is removed.

The monitoring team examined the Crisis Trackers showing all crisis watches in July, September, and November 2021. Those logs showed that, in total, 5% of crisis watches were not in crisis cells. Since X(f) allows such housing for up to three days in exigent circumstances, the noncompliant percentage is reduced to 3%. Most last less than one week, though a handful lasted 25 to 35 days and one appeared to exceed three years.

Given the low percentage of crisis watches outside designated cells, IDOC should be considered in Substantial Compliance on this sub-element of X(f).

**Specific requirement:** Section II (e) of the Settlement Agreement states in part: Crisis beds are available within the prison for short-term (generally no longer than ten (10) days unless clinically indicated and approved by either a Mental Health Professional or the Regional Mental Health Administrator) aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting.

**Findings**: As previously reported, the "aggressive mental health treatment to reduce acute symptoms and stabilize the patient" consists of brief, daily checks with a QMHP, treatment planning upon admission and discharge and possibly a visit from a psychiatric provider. Moreover, the QMHP contacts we have observed usually take the form of an assessment and provide little or no therapy. After reviewing 151 crisis admissions from 14 different facilities,[56] the results demonstrated:

- Daily checks with a QMHP: 133 of 151 cases documented daily checks with a QMHP. This is an 88% completion rate.

---

[56] East Moline, Jacksonville, Pinckneyville (8/21), Graham (8/21), Shawnee, Vandalia, Taylorville, Western, Lawrence, Menard, Pinckneyville (1/22), Pontiac, Graham (4/22), Illinois River, Centralia and Hill.

- Treatment planning:
  - Upon admission: 126 of 151 cases had a treatment plan upon admission. This is an 83% completion rate.
  - Upon discharge: 125 of the 151 cases had a treatment plan upon discharge. This is an 83% completion rate.
- Seen by a psychiatric practitioner: 91 of the 151 cases documented that the class member was seen by a psychiatrist during their stay in crisis. This is a 60% completion rate.

My opinion is that these interventions do not represent "aggressive mental health intervention designed to reduce the acute, presenting symptoms and stabilize the offender prior to transfer to a more or less intensive care setting." Even if they were, IDOC is not consistent in their application. None of the reviewed facilities offer class members in crisis beds any additional treatments, such as additional individual or group therapies.

It is also worth noting that use of force videos appeared to show some harmful lapses in the practice of watching these patients. In one event the patient, who was on continuous watch status, intentionally fell on her head from a lying position, and then stood on the bed and dove head first into the floor; it appears possible that the patient lost consciousness. There is no indication that the observing officer responded to these actions. In another event with a different patient on continuous watch, the officer did call for a response; however, officer statements note that, when they arrived, the patient was lying down and shaking and unresponsive, and there were large amounts of blood throughout the cell.[57] This leaves a question as to the promptness of the observing officer's request for intervention.

In terms of length of stay, logs continued to show patients for whom the care is not serving to stabilize them within ten days or effecting a transfer to a more intensive care setting, as specified in the Settlement Agreement.[58] While longer stays occur at the majority of IDOC institutions, and the number of these stays remains unreasonably high, there have been improvements over the last two years in the number of crisis admissions overall, and the percentage of them exceeding ten days.[59] Ten days is not a firm deadline, but is an indicator of the need for a higher level of care captured in the Settlement Agreement and in use in other prison systems. A few days past the benchmark likely means little about stability, but once the stay goes beyond that, the patient presumptively needs more to stabilize, according to the Settlement Agreement definitions.

The longest stays have received particular attention. Some patients remain in crisis watch from ***three months to three and a half years***. This is far from the crisis watch purpose of "short

---

[57] The video shows continued extensive blood loss in the hallway during the intervention, which tends to substantiate the officers' statements about the blood in the cell.

[58] Corrected Second Amended Settlement Agreement, Definitions section. This analysis is based on all crisis watches on IDOC logs for July, September, and November 2021 from all institutions at which a crisis watch occurred, a total of 1,522 admissions. Kewanee, Murphysboro, and Southwestern reportedly had no crisis watches in these months and Elgin was excluded as the highest level of care, such that transferring a patient to a higher level of care after ten days is not feasible.

[59] At the time of the Monitor's Fourth Annual Report, there were an average of 636 admissions per month; in the current monitoring year's study, admissions averaged 507 per month. In the Fourth Annual Report study, 22% of the stays exceeded the 10-day threshold, while 18% did so in the current review.

term…aggressive mental health intervention designed to reduce the acute presenting symptoms and stabilize the offender."[60] However, the number of such patients has been cut in half since two years ago.[61] Moreover, there was a recent increase in referring them to higher levels of care; to their credit, Dixon, Menard, and Pinckneyville referred all of their lengthiest patients to Elgin, RTU, or BMU. Unfortunately, more than half of these patients remained at Joliet and Pontiac, which made **no** referrals.

The handling of the group whose stays lasted 30 days – triple the expected maximum – to 90 days also improved. The number of these stays was cut by almost two-thirds since two years ago.[62] Referrals to higher levels of care were more modest here, but higher than in the past; seven men were referred to RTU or BMU and four men were referred to Elgin, though many of the remaining 35 patients very likely required more than crisis care as well.

Overall, then, there was an increase in RTU or BMU referral for outpatients whose crisis watches exceeded 10 days. In total, 36% of these men were referred to this higher level of care;[63] this is still a minority and very likely misses men who need more treatment, but is a meaningful improvement.

Referrals of existing RTU patients was more problematic; with 154 crisis watches exceeding ten days, only 5% were referred for inpatient care.

Defendants assert that all patients with stays exceeding ten days are assessed for whether a referral is needed, but the monitoring team has never seen evidence of that, including in chart reviews, site visits, and an extensive study conducted for the Monitor's report submitted in July 2021.

Although the above-described progress is noteworthy, IDOC has not yet reached substantial compliance, and is Noncompliant according to Settlement Agreement terms.

**(X)(g): Specific requirement:** IDOC shall also ensure that adequate, confidential space is provided within the X House at Dixon for group therapy sessions; private initial mental health screenings; and such other therapeutic or evaluative mental health encounters as are called for by this Settlement Agreement and IDOC's own ADs, forms, and policies and procedures.
.

**Findings:** Defendants report that they undertook, during the monitoring period, physical plant changes to create dayrooms in the health care unit and in three wings of X House, additional yard and outdoor group space, and two spaces within the gym. Some of these projects reportedly

---

[60]  Corrected Second Amended Settlement Agreement, Definitions section

[61]  In the analysis for the Monitor's Fourth Annual Report, there were 22 patients with crisis watches of this length. In the current review, there were 10 such patients.

[62]  There were 129 stays of this length in the Fourth Annual Report analysis. In the current review, there were 46 such stays.

[63]  Of the 112 outpatients in the study with crisis watches longer than 10 days (including those with the longest stays discussed above), 40 were referred to a higher level of care. Women in IDOC almost never have crisis watches exceeding 10 days.

are complete and others are underway.[64]  IDOC has not indicated whether, or how much, they are in use.

Regardless, the X House at Dixon does not have adequate confidential spaces for all of the requirements of X(g). Some confidential spaces do exist, but they are not sufficient for all of the required clinical activities. The most glaring example of this is that Community Meetings take place in the open dayroom where custody staff are well within earshot of these meetings. Also, daily crisis contacts take place in an area where custody staff are present.

Defendants remain Noncompliant on this requirement.

## XI: ADMINISTRATIVE STAFFING

> **Summary**: Seven facilities do not have a dedicated Mental Health Authority, a 23% vacancy rate. These positions are covered by facility-assigned staff. This detracts from the quality of mental health care provided to class members and places them at significant risk of serious harm.

### (XI)(c): Clinical supervisors

**Specific requirement:** Within thirty (30) days after approval of this Settlement Agreement, IDOC shall also designate at least one qualified state employee at each IDOC-operated facility encompassed by this Settlement Agreement to provide supervision and assessment of the State clinical staff and monitoring and approval of the vendor staff involved in the delivery of mental health services. The employee shall be a PSA-8K, Clinical Psychologist, Social Worker IV, or appropriately licensed mental health professional. If the designated employee leaves the facility and the position has not yet been filled, IDOC may designate an interim holder of this position who may be a member either of IDOC or vendor staff.

**Findings**: The Department continues to struggle to fill these supervisory positions.[65] The following facilities do not have a Mental Health Authority (MHA) assigned. This constitutes a 23% vacancy rate, which is substantial. These vacant positions are filled by "acting MHAs" – that is, existing clinical staff who divert some of their time from patient care to cover administrative duties as well:

- Centralia – position covered by a Social Worker III
- Danville – no replacement is listed on Attachment 2 to IDOC quarterly report of April 25, 2022
- Elgin – position shared among currently assigned Social Worker IV and Social Worker II
- Illinois River – no replacement is listed on Attachment 2 to IDOC quarterly report of April 25, 2022

---

[64]  Defendants' Quarterly Report, April 25, 2022

[65]  Mental Health Authorities, either a PSA-8K Clinical Psychologist, a Social Worker IV. or appropriately licensed mental health professional

- Menard – position covered by currently assigned Social Worker IV
- Sheridan – position covered by Wexford QMHP
- Stateville NRC – position filled by currently assigned Clinical Psychologist

As reported since the Monitor's Fifth Annual Report, these vacancies in the Mental Health Authority positions not only affect the duties of that position but also detract from the overall staffing at the given facilities. These positions are critical to the provision of mental health care to the class members. Their absence detracts from the overall quality and quantity of the mental health services provided to class members and places them at a significant risk of serious harm.

IDOC is Noncompliant with this requirement.

## XII: MEDICATION

**Summary:** Psychiatry contacts generally met the standard when medications were new to a patient, but very few maintained the rest of the schedule laid out in this requirement. Compliance rates are lower, and delays longer, than in the past, but did not exceed the maximum times allowed.

Gaps on medication records were frequent, but not all would indicate medication did not reach the patient; 9% of patients studied likely did miss medication for an extended period. Uneven practices to ensure that medication is taken need to be improved. Records do not indicate the medication refusals are followed up as required.

**(XII)(b): Specific requirement:** Within ninety (90) days after the approval of this Settlement Agreement, IDOC shall also comply with the provisions of IDOC AD 04.04.101, section II (F)(5), except that under no circumstances shall a SMI offender who has a new prescription for psychotropic medication be evaluated as provided therein fewer than two (2) times within the first sixty (60) days after the offender has started on the new medication(s).

AD 04.04.101, section II (F)(5) provides: Offenders who are prescribed psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, subject to the following:

(a) For offenders in the outpatient level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for the extension of follow-up appointments may be considered, with no follow up appointment to exceed 90 days.

(b) For offenders at a Special/Residential Treatment Unit level of care, once stability has been observed and documented in the offender's medical record by the attending psychiatrist, consideration for an extension of follow-up appointments may be considered with no extension to exceed 60 days.

**Findings:** Based on previous medication reviews, the Monitor has found that patients prescribed new medications are generally seen every 30 days until stability on this new medication is established.

As detailed in requirement VII(d) above, drawing on IDOC databases and sections of health care records, the monitoring team assessed the frequency and consistency of contact for patients for the time period of July 2021 through January 2022. At both outpatient and RTU levels of care, only a minority were seen at the required intervals.

The monitoring team analyzed contacts for 425 psychiatric **outpatients**, drawn from across IDOC. Only **20%** of patients were seen *every* 30 days, or the longer interval the provider designated if the patient was more stable. As for institutions, only Kewanee, with its 10 patients, showed that it met this standard.

Unfortunately, 40% of patients experienced multiple delayed appointments where some were quite lengthy, with health care records demonstrating a rising number of contacts delayed 3 to 10 weeks beyond the requirement. These compliance rates are markedly lower, and the delays greater, than in past analyses, suggesting that it is difficult for IDOC to sustain these schedules over longer periods. Covid waves were only one of several apparent causes, with the others being within Defendants' control.

Practice was somewhat better with **RTU** patients. In a 50-patient study, 36% were seen consistently as planned and 90% were consistently seen by that point or within an additional week.

In terms of the appropriateness of extending appointments, a large majority of follow-up orders – in a sample, 75% for outpatients and at least 96% for RTU patients -- are maintained at no more than 30 days.[66] The monitoring team did not review for whether the stability of patients with longer follow-up intervals was sufficient to warrant it, but the modest rate of these appointments is one indicator of reasoned decisionmaking. Virtually no patients had planned follow-up or completed contacts that exceeded the maximum time allowed.

IDOC is Noncompliant with this requirement.

**(XII)(c): Specific requirement:** In addition to these requirements, within ninety (90) days after the approval of this Settlement Agreement, IDOC shall accomplish the following:

**(i): Specific requirement** (as reflected in the Corrected Second Amended Settlement Agreement)**:** The timely administration or taking of medication by the offenders, so that there is a reasonable assurance that prescribed psychotropic medications are actually being delivered to offenders and reasonable efforts to ensure the medications are being taken by the offenders as prescribed;

---

[66] As a sample, the monitoring team reviewed all planned follow-up appointments indicated in the Psych Databases for September 2021. These included all institutions except Murphysboro, which does not have a psychiatric caseload.

**Findings:** Because of the complexity of this requirement, this section begins with a summary of the greatest concerns. These center on various practices that result in **gaps in receiving medications** and do not sufficiently assure that the patients are **taking the medication** as prescribed.

Nine percent[67] of the patients studied by the monitoring team did not receive their medication as prescribed for an *extended* period – from 3 days to 5 weeks – and multi-week gaps were present at each institution reviewed. These were caused by relatively small numbers of delays for each of the following reasons: conveying telepsychiatry orders, noting orders, filling new orders, filling change orders, orders expiring, medication being out of stock, nonformulary approval processes, delivery being dropped due to a changed circumstance, and some cases where the causes could not be discerned.

Additionally, more than half of patients' records showed shorter gaps in receiving medication. These lasted from one dose to two days. Some records had only one such gap, but most showed these gaps on multiple days. Some were clearly for the same reasons summarized in the preceding paragraph. For others, the patient may have received the medication and the record merely reflects an absence of documentation; however, at this scale, one cannot make this assumption when one cannot rule out that medications were not delivered.

The other issue of substantial concern is directly observed therapy – the process by which nurses observe whether a medication has been taken -- which is insufficient to support a reasonable assurance that psychotropics are being taken as prescribed. Although the monitoring team observed some very conscientious practices, practices were highly variable by setting and individual. Correspondingly, disciplinary cases show that more than 1,150 psychotropic pills were diverted within eight institutions in eight months and that is one factor to consider in this assessment.

Of note, Quality Improvement audits review this topic in health care records. The usual format for reporting Quality Improvement results is one collective percentage for all psychiatry services; IDOC does not keep measurements by requirement, so these are not available for the Court or internal oversight. The four quarterly reports issued in this monitoring period did not provide any assessment of the performance of this requirement.

A detailed discussion of the monitoring team analysis follows.

In prison systems, a number of practices commonly interrupt medication delivery such that there is not reasonable assurance that prescribed psychotropic medications are actually being delivered and taken as prescribed. These can include failure to timely order medications; delays between an order being written and nursing noting it, and/or the pharmacy filling the order; medications not being on formulary and being delayed in transmission to the facility; medications being restricted by policy and reasonable substitutes not being provided timely; security staff

---

[67] The occurrence was higher, but this total excludes the cases where the order was not filled for this length of time but a previously ordered medication was clearly given in the interim. While this is not the best practice and not what the provider thought best for the patient, the patient is not experiencing the risks of going unmedicated. It also does not include instances where the medication may have expired but it was not fully clear, and Gabapentin-only orders where the reviewer was not certain if it was prescribed by a physical medicine doctor or a psychiatric provider.

preventing nursing staff from accessing housing units, or patients from attending the medication line; medication distribution not occurring for any other reason; unreasonable and preventable disincentives such as distribution during normal sleeping hours or in conflict with essential activities such as meals, work, or school; nurses not consistently conducting directly observed therapy and patients thereafter "cheeking" and throwing away, hoarding, or selling medication; and medication errors. These are all potential impediments that IDOC must protect against.

To date, IDOC has described working to improve visibility for in-cell directly observed therapy, and the timing of medication delivery to some extent; no demonstration of the effectiveness of these measures has been provided. IDOC has not made a showing that any of these other common obstacles are not affecting its medication delivery.

The monitoring team examined these topics at eight institutions, most of which house the largest mental health populations in IDOC, by:

- interviewing 26 nurses and nursing or health care administrators, 9 pharmacy technicians, and 7 mental health staff[68]
- interviewing 61 patients, drawn from general population, restrictive housing, and RTU
- reviewing 725 Medication Administration Records ("MARs") and some of the related health care records, and
- observing medication delivery conducted in medication lines and in each type of cell front delivery setting at each of the institutions.[69]

For patients newly arriving at an institution, during interviews and in Defendants' quarterly reports, staff have said that psychiatry writes 30-day orders to continue the medications the patient had been taking at his previous institution ("bridge orders"), they are confident that the system works to fill those prescriptions promptly, and patients do not complain about this. It was not feasible for the monitoring team to test those assertions in this monitoring period.[70]

For care ongoing, staff universally described good systems to convey and note new orders and change orders, and for identifying needed refills and expiring orders and getting them renewed. Only one visited institution struggled with expiring orders, requiring multiple follow-ups and last-minute processing.  There, psychiatric providers do not have consistent caseloads and staff perceive that it is difficult for patients to be seen timely.[71]

---

[68]  With some questions in the discussion below, a subset of these interviewees answered the question.

[69]  To identify the sample, the monitoring team reviewed MARs from June, July, or August, at least 200 at each of the eight institutions. These were drawn from at least three housing units at each institution and from general population, restrictive housing, reception center, and RTU populations, where applicable. Among those records, the monitoring team identified at least 725 records containing at least one psychotropic medication and reviewed those closely for interruptions in medication delivery. The reviewer noted any reasons for the interruptions apparent by comparing the dates to medication orders and transfers noted on the health care record, interviewing nursing leadership, and/or asking staff to research specific questions and provide supporting documents.

[70]  A subset of the interviewees made these comments. It was not feasible to test these assertions because interviewed patients were selected for longevity at the institution, so reports of the practice on their arrival may now be outdated, and additional information would have been necessary to select relevant health care documents.

[71]  This is consistent with the monitoring team's findings on the timeliness of psychiatry contacts for that institution in the study described in section VII(d).

The monitoring team studied MARs for support that the practices for ordering medication are effective. For the most part, this is correct. There were examples of delays contributed by the time it takes to receive orders from Telepsychiatrists; for nurses to note orders; and for new, changed, or renewal orders to be filled. In these cases, typically the cumulative delay was a gap in receiving medicine from one dose to two days, but there were longer exceptions. Patient experience was largely consistent with the study, with 74% reporting no medication gaps, a handful saying they faced a gap of two days or less, and an equal number suggesting their gaps were longer. Both nurses and patients say that these issues can often be remedied on the spot or within a few hours at a "make-up" medication line, resulting in no gap at all. Mental health staff said patients complain about missing medication rarely, if at all, and some said they could get this addressed the same day or the next day.

In terms of the availability of medications, staff universally described systems that seem well-designed to timely obtain medications from a centralized pharmacy. Typically, patient-specific blister packs are said to arrive at the institution and be ready for distribution in one to two days, depending on the time of day the request is made. The pharmacy returns requests for questions or problems, and sometimes items are missing from a delivery, but staff indicate that communications to remedy these – both with psychiatry and with the central pharmacy – are quick. Staff reportedly also have access to stock of most psychotropics, which can be used in the short-term if a patient's medication is running low or for dose changes, and there are arrangements with local pharmacies to deliver medicines in the rare event that they are needed the same day. Staff described routines for identifying patients' housing moves to reduce the chance of medication gaps in that event, but patients said this is the primary time they do not receive their medications. When observing medication passes, the monitoring team saw 10 patients who did not have the medications they expected; half were because of moves and the others were for a new arrival, medication changes, and an expiration. Here, too, some were remedied in real time.

The formulary for IDOC makes needed medications available, though it also can introduce some delay. About half of the institutions said nonformulary psychotropic prescriptions are uncommon overall, and they named six medications as those most subject to the nonformulary process. All agreed that no psychotropics are prohibited entirely.

As in many health care systems, if a provider wishes to prescribe a nonformulary drug, he or she must submit a justification initially and every quarter in which the medicine is renewed. Staff at most institutions said that providers are knowledgeable about these submissions and they, or other staff, track the timing for renewals. Reportedly, it is not uncommon to have a decision in one day, and response times are estimated from one day to one week. Some staff said denials are very rare; they were unable to remember one in the last year or more. When it does occur, providers are described as conscientious in either following the appeal process or choosing a substitute medication. The monitoring team's MAR study captured a few prescriptions that appeared to be nonformulary orders. Consistent with staff's descriptions, some examples showed the time to filling an order was extended by two days. The sample contained only two cases requiring longer than that, but unfortunately those took 2 to 5 *weeks*, and it did not appear that the patients always received that medication, or an alternate, in the interim.

Prisons also potentially have issues with policies or practices that make medication-taking

undesirable, and this undermines the objective of patients taking medications as prescribed. A few of the visited institutions pass medication during the limited time that phone calls are available, or during yard or dayroom time, but the monitoring team's observations and patients indicate that delivery does not conflict with meals, work, school, or mental health programming. However, the Department persists in its inappropriately early medication distribution times. I remain firm in my opinion, which is supported by the literature about medication adherence, that these early medication distribution times have a negative impact on class members' ability to take their medications as prescribed. Nurses at Menard and Hill, interviewed by the monitoring team, independently raised concerns about the frequency of morning medication noncompliance because of the time it is distributed.

The inappropriately early hours of medication distribution significantly impacts the pharmacological treatment of class members placed in segregated housing. Two class members housed in the BMU at Menard stated that they routinely skip their morning medications due to their being delivered at 2-3 am. One class member stated that this early morning medication delivery forces him to stay up all night to make sure he gets his medications. In the monitoring team study of medication noncompliance described in XII(c)(vi) below, the study was not structured to investigate the question of early morning refusals, but patterns of morning-only refusals were apparent nevertheless at Hill. Additionally, this timing poses a nursing retention issue at a time when the need for nurses is particularly acute. Both the problem and a potential solution greatly increase a nurse's workload and the unpleasantness of a shift. If medications are ordered in the early morning, nurses are responsible for the paperwork associated with many more refusals, while having to complete it with relentlessly tired, angry, uncooperative patients. IDOC has encouraged providers to consider whether once-a-day dosing is appropriate for their patients, which is very helpful to overcome patients' concerns. However, it can have the unintended consequence of putting those nurses under daily pressure to complete passing far more evening medication in the same amount of time because of all the operations activities that must also be accomplished.

There can also be a risk of medication delivery being canceled by security considerations, staff shortages, or for other reasons. Interviewed patients at the eight institutions universally confirmed that medication delivery is never canceled. Nursing, too, confirmed that, giving detail about sending officers to retrieve patients the nurses realized were missing, canceling conflicting operations activities to give medication pass priority, alternate means of medication passes both standard and improvised, and a story of one facility's leadership who joined nurses in passing medication rather than allowing a medication line to slip. Nurses and mental health staff also said they have not heard complaints from patients about being prevented from attending medication line. Several facilities' nurses said it is routine to run a "make-up line" as a second chance for anyone who did not receive medication at the regular line.

On the other hand, during a site visit to Pontiac on August 18 and 19, 2021, the Monitor received several complaints from class members in segregated housing about their not receiving evening medications on August 17. It turned out that, due to a lack of nursing staff, a nurse was not available to distribute the evening medications until after 1 am on the 18th. An administrative decision was made to withhold the evening medications as the morning medications would be distributed at 8 am. I am not sure how frequently this occurs. Interviews with class members confirms that this was not the first-time medications weren't distributed as ordered by the

psychiatric providers. Skipping regularly scheduled doses of psychotropic medications is a serious departure from standard of care and places the class members at a substantial risk of serious harm.

Additionally, in the eight-facility MARs study, more than half of the records showed blanks that would ordinarily indicate a medication had not been received. These gaps ranged from one dose to two days, sometimes multiple times in a month. These could be simple documentation errors, but they raise a concern about how many are actually missed medication, particularly when there is a pattern of blanks for many patients on the same date and time. Nursing leadership at several facilities acknowledged this issue and offered detailed explanations for why they were confident that these were solely documentation issues. They noted that documentation slips when staff are working mandated overtime, or for certain individual-specific reasons. They said that nurses and custody staff routinely contact the nursing leaders after hours for lesser problems, so would have notified them of any risk that a medication pass would not occur, or would do so retroactively. Taken together with descriptions of how the facilities prioritize medication passes, the monitoring team finds these assertions credible, and they give more confidence that prescribed psychotropic medications are actually being delivered. However, the scale of the issue does not allow the team to assume that *none* of these gaps indicate a failure to deliver. More information will be needed over time to demonstrate that any genuine gaps in delivery are kept at a reasonable level.

Patients themselves can divert their medication and IDOC has some responsibility to try to reduce this as one means of providing reasonable assurance that medications are taken as prescribed. As noted above, the monitoring team observed medication passes at each visited institution in medication lines and cell front.[72] In the lines, there was always good visibility. Almost half of the nurses on the lines conducted thorough mouth checks ("directly observed therapy" or "DOT"), but more often practice was uneven and if a patient did not show his mouth, turned away, or made motions that could have been palming the pills, staff did not always correct him and check. In a few locations, the setting was chaotic and demanding on the nurses, and as they tried to meet multiple demands, the risk is higher for staff not to know that a medicine has not been taken. In one observed line, the monitoring team could see an unswallowed pill in the mouth of a patient walking away, and another left a pill on the floor and there was no indication that the nurse noticed.

Cell front passes were quite variable depending on the physical plant. Where staff felt comfortable opening the doors, and with the design of a few doors that remained closed, visibility was very good. In other locations, narrow windows, mesh, and a practice of watching through a waist-high chuckhole made visibility very difficult. Earlier in *Rasho* implementation, IDOC concentrated on mitigation measures for this, but now those are little used; cell lights, for example, are only sometimes turned on and only one nurse used a flashlight. Under these conditions, it would be easy to miss that a patient did not take his medicine as prescribed. Some nursing and custody staff worked hard to do DOT in these settings, but just as many had uneven practice. Patients were about evenly split between believing nurses are consistently thorough and the belief that DOT is highly dependent on which nurse is working.

---

[72] Where a facility has more than one type of physical plant in which medication is delivered cellfront, the monitoring team observed passes at each type.

The risk, if psychotropics are not well controlled in this way, is that patients will be under-medicated because they throw away their medicine or sell it, and that individuals in custody can overdose on stockpiled or purchased medication. Among interviewed patients, a majority said it was easy to "cheek" one's medication and/or common to buy psychotropics from others. Patient views tended to cluster by institution. The opinions of mental health, nursing, and pharmacy staff, who would learn of this primarily through disciplinary cases, also tended to cluster by institution, although some thought the practice of selling is rarer than the patients did.

Disciplinary cases did not always track the thoughts of interviewees. Several institutions had few disciplinary cases and small quantities of pills recovered. Others had a similar record but did find a cache of 50 or more at least once. Three facilities each issued 30 or more disciplinary cases, and found hundreds of pills, in eight months. One does not always know whether these facilities recover a large quantity because there is a greater problem at those institutions or because there is more effective enforcement. In any event, taken together, the recovery of more than 1,150 psychotropic pills across eight institutions in eight months is one factor to consider in whether the medications are being delivered and taken as prescribed.

About half of patients who commented were familiar with overdose cases, although it wasn't clear whether all involved psychotropics. Where mental health staff had input, they universally thought overdoses were rare and had not occurred in most institutions for an extended period. Logan and Menard staff described concerted effort, for a few years and ongoing, to address a previous problem with overdoses by a stronger program of crushing and floating medications, and they thought they had seen great improvement. Menard patients reinforced this, crediting this program with the reduced availability of medicine for sale, as well.

As summarized above, there appear to be some very good features of IDOC's medication delivery system. Because of the known gaps in medication delivery, the uncertain but potentially large scope of additional interruptions in delivery, and insufficient action to provide reasonable assurance that medications are taken, IDOC is rated Noncompliant at this time.

**(vi): Specific requirement:** That offenders, including offenders in a Control Unit, who experience Medication Non-Compliance, as defined herein, are visited by an MHP. If, after discussing the reasons for the offender's Medication Non-Compliance said Non-Compliance remains unresolved, the MHP shall refer the offender to a psychiatrist.

**Findings:** To review this requirement, the monitoring team interviewed 19 nurses and 25 mental health staff, drawing from seven institutions, most of which are responsible for the largest mental health populations in IDOC.[73]

All such staff demonstrated their knowledge of the XII(c)(vi) requirements, particularly as operationalized in the Standard Operating Procedural Manual for Mental Health. Nearly all nurses said that they notify the mental health department when a patient misses three consecutive days of medication, and some nurses said they also refer a patient who misses half of his or her

---

[73] Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, and Sheridan

medication in a seven-day period.[74] Occasionally, a nurse acknowledged it was only feasible to check compliance records and make referrals weekly or biweekly. They generally said they use a form for this purpose, but communication was not limited to this; they said it was common to also have oral or email contact with MHPs, BHTs, psychiatric providers, and/or a mental health nurse, especially if the medication refusals continue.

Some nurses described conducting their own follow up with the patients as well, to encourage resumption of medication and to develop information to convey to psychiatry. Nurses noticed that psychiatry was often the first to respond to referrals; at two facilities, they saw the response as quick. In the other facilities, the nurses said they submit follow-up referrals, though they described different intervals; in one institution, they said multiple referrals were almost always required before a patient is seen, though they believed response times had recently begun to improve.

Mental health staff's descriptions overlapped with the nurses', but staff also had some different perceptions. At about half of the institutions, staff said they heard frequently about this issue from nurses, while the other half said such communications were uneven or rarely occurred. They confirmed that forms are commonly used, and several said these are filed in the patient's chart; none described any alternate means of locating the referral forms. They noted that there are multiple other ways that they learn of medication refusals: a call or face-to-face contact with nurses; patient self-disclosure; from other patients; from custody staff; by psychiatry reviewing the MAR and informing other staff by email, in treatment team meetings, or in meetings adjacent to telepsychiatry sessions; or, conversely, by MHPs, BHTs, or mental health nurses emailing psychiatric providers. Both mental health staff and nurses thought that their medication-noncompliant patients are quite vocal about their needs, and staff was confident that there was no significant problem of isolating, noncompliant patients going undetected. As for referral response, only one program indicated that the MHP is the primary first responder, and another employs a mental health nurse for this purpose; in other programs, the MHPs and psychiatry might alternate this responsibility, or it would primarily be fulfilled by psychiatry.

The monitoring team then identified a sample of 199 events of medication noncompliance and reviewed charts to observe the follow-up.[75] The results differed significantly

---

[74] These correctly restate the definitions laid out in the Settlement Agreement. The Settlement Agreement also calls for follow-up when a patient "exhibits a clinically significant pattern of missing medication, as determined by an MHP." Professionals did not mention that portion of the standard and  the monitoring team did not apply it in the analysis for this report.

[75] To identify the sample, the monitoring team reviewed MARs from June, July, or August, at least 200 at each of the eight institutions. These were drawn from at least three housing units at each institution and from general population, restrictive housing, reception center, and RTU populations, where applicable. Among those records, the monitoring team identified at least 725 records containing at least one psychotropic medication and reviewed those closely for events of medication noncompliance as defined above. This review identified 144 patients with such events.

Some patients had more than one event on a MAR. Each stretch of three days was counted as an event *if* there were periods of compliance between those stretches. If noncompliance was continuous in a month, or nearly so, it was usually counted as two events, one that should have been referred when it reached the first threshold, and another if the behavior resumed after a mental health response and another referral should have been made. (There is an argument that every three-day stretch requires a referral, and therefore is a separate event, but the reviewer did not adopt that approach.)

from staff's perceptions. Written nursing referrals were found extremely rarely – in only 6% of the sample -- and were generally dated well after the referral threshold had been exceeded.

As for response, in the majority of events (58%), the progress notes, written after a referral should have been made, indicated that the clinician was not aware of the medication noncompliance and it was therefore not discussed, or there was no contact at all. Psychiatry met the patient to address the issue in only a minority of events (42%);[76] a bit over half of those contacts were within the time specified by the IDOC manual, while nearly half exceeded that, some as much as four to six weeks later. It was often unclear whether psychiatry learned about the problem ahead, or only spontaneously from the patient, so it was difficult to substantiate that the various information channels were serving to get these patients seen, though ultimately the noncompliance issue was discussed in this 42% of events.

Additionally, the monitoring team interviewed 44 patients, during the same site visits,[77] about this topic. Among those who described having refused medication often enough to have exceeded the referral threshold, and who discussed follow up, 83% confirmed that staff did discuss the issue with them. At most, half of them were seen specifically to address the issue, while the others said it was discussed in the regular schedule of appointments. There was insufficient information to discern the timeliness of these contacts.

Of note, Quality Improvement audits provide little in the way of oversight of this topic. While auditors are tasked with reviewing this responsibility, they do not select charts based on whether the patient has been refusing medication. Because this behavior occurs in a minority of patients, this selection method means that samples could easily contain few charts with this issue, or none at all. IDOC does not keep track of how many times medication noncompliance was present in its Quality Improvement audits, so there is no way to discern whether staff are reviewing a sufficient number to reach conclusions about this requirement. Backlog reports also do not examine staff's response to these events specifically.  The four quarterly reports issued in this monitoring period did not provide any assessment of the performance of this requirement.

Defendants are Noncompliant with this requirement.

---

The reviewer then examined the MHP and psychiatry contacts in the health care records, generally for a period of six weeks following the initial medication noncompliance. This took place either onsite or by reviewing chart sections provided later by IDOC. If the health care record was unavailable, the events were removed from the study. This resulted in a review of 199 relevant events.

[76] Psychiatry appointments were almost always the first documented in these charts. With only one exception, any MHP contacts that preceded psychiatry appointments did not document any discussion of medication noncompliance. The monitoring team's review applied the most generous interpretation, counting as compliant follow-up those cases that were unclear but compliance seemed more likely than not.

[77] Patients were interviewed at the seven institutions referenced earlier in this section, and also at Menard.

## XIII: OFFENDER ENFORCED MEDICATION

**Summary**: IDOC has a routine for convening hearings and having the required disciplines present. No instances of medication being enforced without a hearing have come to the monitoring team's attention, except for short-term emergency administration.

Previous concerns with notices were addressed. Of much greater concern is that psychiatry is requesting, and committees are adopting, decisions to enforce medication where the stated facts do not meet the standards and support such an intrusive measure. Additionally, cases surfaced where professionals sought to enforce antipsychotic medication for patients whose primary diagnosis is a personality disorder; this is almost never clinically indicated, so this would be intrusive for little or no benefit.

The Staff Assistant system continues to limit their ability to perform the functions. The committees make good efforts to include the patient and patients almost always participate. The handling of witnesses showed some improvement. Hearings are summarized in a written record and some patients participated in an appeal system.

**Specific requirements:** IDOC shall ensure that its policy and practice as to involuntary administration of psychotropic medication continues to fully comply with 20 Ill. Admin. Code § 415.70. The cited provision of the Administrative Code is lengthy and includes numerous detailed provisions:

    a)  Administration of Psychotropic Medication

        1)  Psychotropic medication shall not be administered to any offender against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18, unless: A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that: i) The offender suffers from a mental illness or mental disorder; and ii) The medication is in the medical interest of the offender; and iii) The offender is either gravely disabled or poses a likelihood of serious harm to self or others; and

        B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section). However, no such approval or hearing shall be required when the medication is administered in an emergency situation. An emergency situation exists whenever the required determinations listed in subsection (a)(1)(A) of this Section have been made and a psychiatrist, or in the absence of a psychiatrist a physician, has determined that the offender poses an imminent threat of serious physical harm to self or others. In all emergency situations, the procedures set forth in subsection (e) of this Section shall be followed.

        2)  Whenever a physician orders the administration of psychotropic medication to an offender against the person's will, the physician shall document in the offender's medical file the facts and underlying reasons

supporting the determination that the standards in subsection (a)(1) of this Section have been met and: A) The Chief Administrative Officer shall be notified as soon as practicable; and B) Unless the medication was administered in an emergency situation, the Chairperson of the Treatment Review Committee shall be notified in writing within three days.

b) Treatment Review Committee Procedures

The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

1) The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved that has been approved by the Agency Medical Director.

2) The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

3) The offender shall have the right to attend the hearing unless the Committee determines that it is likely that the person's attendance would subject the person to substantial risk of serious physical or emotional harm or pose a threat to the safety of others. If such a determination is made, the facts and underlying reasons supporting the determination shall be documented in the offender's medical file. The staff assistant shall appear at the hearing whether or not the offender appears.

4) The documentation in the medical file referred to in subsection (a)(2) of this Section shall be reviewed by the Committee and the Committee may request the physician's personal appearance at the hearing.

5) Prior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender as to appropriate questions to ask. Any such questions shall be asked by the staff assistant unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

6) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee and may submit written questions for witnesses to the Chairperson of the Committee. These questions shall be asked by the Committee unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility. If any witness is not interviewed, a written reason shall be provided.

7) Prior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing. Any such request shall include

an explanation of what the witnesses would state. Reasonable efforts shall be made to have such witnesses present at the hearing, unless their testimony or presence would be cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility, or for other reasons including, but not limited to, unavailability of the witness or matters relating to institutional order. In the event requested witnesses are unavailable to appear at the hearing but are otherwise available, they shall be interviewed by the Committee as provided for in subsections (b)(6) and (9) of this Section.

8) At the hearing, the offender and the staff assistant may make statements and present documents that are relevant to the proceedings. The staff assistant may direct relevant questions to any witnesses appearing at the hearing. The offender may request that the staff assistant direct relevant questions to any witnesses appearing at the hearing and the staff assistant shall ask such questions unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

9) The Committee shall make such investigation as it deems necessary. The staff assistant shall be informed of any investigation conducted by the Committee and shall be permitted to direct relevant questions to any witnesses interviewed by the Committee. The staff assistant shall consult with the offender regarding any statements made by witnesses interviewed by the Committee and shall comply with requests by the offender to direct relevant questions to such witnesses unless cumulative, irrelevant, or a threat to the safety of individuals or the security of the facility.

10) The Committee shall consider all relevant information and material that has been presented in deciding whether to approve administration of the medication.

11) A written decision shall be prepared and signed by all members of the Committee that contains a summary of the hearing and the reasons for approving or disapproving the administration of the medication. Copies of the decision shall be given to the offender, the staff assistant, and the Chief Administrative Officer. Any decision by the Committee to approve involuntary administration of psychotropic medication must be unanimous. The Chief Administrative Officer shall direct staff to comply with the decision of the Committee.

12) If the Committee approves administration of the medication, the offender shall be advised of the opportunity to appeal the decision to the Agency Medical Director by filing a written appeal with the Chairperson within five days after the offender's receipt of the written decision.

c) Review by Agency Medical Director

1) If the offender appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

2) The Chairperson of the Committee shall promptly forward the written notice of appeal to the Agency Medical Director, or a physician designated by the Agency Medical Director.

3) Within five working days after receipt of the written notice of appeal, the Agency Medical Director shall: A) Review the Committee's decision, make such further investigation as deemed necessary, and submit a written decision to the Chief Administrative Officer; and B) Provide a copy of the written decision to the offender, the staff assistant, and the Chairperson of the Committee.

4) The Chief Administrative Officer shall direct staff to comply with the decision of the Agency Medical Director.

d) Periodic Review of Medication

1) Whenever any offender has been involuntarily receiving psychotropic medication continuously or on a regular basis for a period of six months, the administration of such medication shall, upon the offender's written request, be reviewed by the Treatment Review Committee in accordance with the procedures enumerated in subsections (b) and (c) of this Section. Every six months thereafter, for so long as the involuntary medication continues on a regular basis, the offender shall have the right to a review hearing upon written request.

2) Every offender who is involuntarily receiving psychotropic medication shall be evaluated by a psychiatrist at least every 30 days, and the psychiatrist shall document in the offender's medical file the basis for the decision to continue the medication.

e) Emergency Procedures

Subsequent to the involuntary administration of psychotropic medication in an emergency situation:

1) The basis for the decision to administer the medication shall be documented in the offender's medical file and a copy of the documentation shall be given to the offender and to the Agency Medical Director for review.

2) A mental health professional shall meet with the offender to discuss the reasons why the medication was administered and to give the offender an opportunity to express any concerns he or she may have regarding the medication.

f) Copies of all notifications and written decisions shall be placed in the offender's medical file.

g) Grievances

An offender may submit a grievance concerning the involuntary administration of psychotropic medication directly to the Administrative Review Board in accordance with 20 Ill. Adm. Code 504.Subpart F. In considering the grievance, the Board shall confer with the Agency Medical Director.

**Findings:** IDOC reports there are 259 patients subject to enforced medication status; the institutions that are *not* in substantial compliance are responsible for 96% of these patients.

The Monitor reviewed the list of class members on enforced medication status during the current reporting period. He discovered that the several of the cases listed a personality disorder as justification for employing enforced medications. It is important to note that antipsychotic medication is almost never indicated in the treatment of personality disorders. The following is a discussion of each of these cases:

- Class member diagnosed with Borderline Personality Disorder, Antisocial Personality Disorder and PTSD. The enforced medication was the antipsychotic, Zyprexa 10 mg QHS. A chart review revealed that he "engages in self harm that requires placement in 4 pts" and that he reports experiencing auditory hallucinations. A further review of the chart strongly suggests that the patient is actually suffering from a serious mood disorder with psychotic features, such as Schizoaffective Disorder, bipolar type. The class member clearly requires medication treatment. The diagnosis in this case requires clarification and a new Treatment Review Committee hearing should be scheduled based on this more accurate diagnosis.

- A class member whose primary diagnosis is listed as Antisocial Personality Disorder and is being enforced with a long-acting injectable antipsychotic medication. The use of long-acting injectable antipsychotic medication is contraindicated in the treatment of Antisocial Personality Disorder and should be immediately discontinued. A chart review documented "meds have helped him improve his clinical behavior." Several other diagnoses are listed in the chart such as Autism Spectrum Disorder, PTSD and Schizophrenia. This is another case that requires diagnostic clarification and a new Treatment Review Committee hearing based on the more accurate diagnosis.

- A class member diagnosed with Borderline Personality Disorder and enforced with the antipsychotic Geodon. A chart review revealed that he is also diagnosed with Major Depressive Disorder with psychotic features. The enforced medication with Geodon is appropriate in this case, given the diagnosis of Major Depressive Disorder with psychotic features.

- A class member whose current diagnosis is "Cluster B." This is a designation that implies the patient's primary problem is a personality disorder. He is currently on "Conditional Enforced" status and is being treated with an antipsychotic and an antidepressant medication. "'Conditional Enforced' status is used when a patient shows insight and is aware that he/she suffers from a mental illness and that medication is necessary for the treatment of his/her mental illness. 'Conditional Enforced' status could be considered a 'step-down', but it is still enforced none-the-less. It is a way to allow suspension of forced injection in response to refused medication."[78] As it stands, this is an inappropriate use of enforced medication. This case demands that the diagnostic assessment be modified to justify the use enforced medication with an antipsychotic.

- A class member whose current diagnoses are "Cluster B" and "ADHD by history" and is being treated with an antipsychotic and an antidepressant. The prescribed medications are not clinically indicated by the diagnoses. A review of the diagnoses should occur, and a new Treatment Review Committee hearing be convened if the practitioner wishes to proceed with enforced medications.

- A class member whose current diagnoses are "Cluster B, Gender Dysphoria & Learning Disability" and is being treated with an antipsychotic. As with the previous case, the prescribed medications are not clinically indicated by the diagnoses. A review of the

---

[78] TRC training manual, pages 46.

diagnoses should occur, and a new Treatment Review Committee hearing be convened if the practitioner wishes to proceed with enforced medications.

I should point out that the above-listed clinical examples represent a minority of enforced medication cases. Although these examples of the inappropriate use of enforced medications are small in number, each represents a serious misuse of enforced medications.

Additionally, the monitoring team reviewed a large sample of the hearings that took place during the monitoring round.[79] Most concerned new requests to enforce, while three involved patients already in enforced status asking a committee to reassess that decision some months later.

It continues to be clear that IDOC has a routine for convening hearings and that the required disciplines are represented in the hearings. Because the monitoring reviews begin with known hearings, it has not been definitively shown that medications have not been given without a hearing or the patient's consent, but no such events have come to the monitoring team's attention and IDOC's well-established routines make that possibility unlikely.

It is routine to begin with notice to the patient, as required. In the past, one institution's notices failed to describe the reason for the hearing, but that appears to have been addressed. Only two notices in the sample were problematic—one merely said enforcement was needed because the patient had stopped taking medication, and the other gave a rationale from four years earlier—so notices are generally complying with the applicable Administrative Code.[80]

It is of much greater concern that psychiatric providers are requesting, and committees are adopting, decisions to enforce medication where the stated facts do not support such an intrusive measure. While such a measure is only supportable where the patient is gravely disabled or likely poses a risk of serious harm to himself or others, there were examples of enforcement granted based on no more than verbal aggression, agitation, or arguing for different medication; actions years in the past with little or nothing recent; or for "Cluster B" conditions that are generally not thought to respond to medication. Some requesting provider notes directly say the patient "must be referred [for enforced medication]…*before* he becomes aggressive" or "he does *not* appear to pose a risk for self-harm or harm to others" but a decision to enforce was made nevertheless. This has been a longstanding concern contained in the Monitor's reports and it occurred even more frequently in the current review – more than 30% of the current cases.

Another concern is those instances where a Staff Assistant may be named but the functions cannot be fulfilled. The Staff Assistant met with the patient before and during the hearing in only

---

[79]  Logs show that 102 such hearings took place at the institutions not in compliance from June 2021 through January 2022. From those logs, the monitoring team drew an accidental sample of 32 hearings, constituting a 31% sample, drawing from all institutions not yet in compliance except Stateville, which reported it held no hearings in this period. The team sought to include decisions for and against enforcement and initiated by different psychiatry providers. Providers had ordered emergency medication administration, before the hearing, for four of the patients. Two patients appealed a new enforcement decision and IDOC's response to that appeal was included. Three other patients initiated the hearings to seek the removal of enforced status that had been in place for several months.

[80]  Notices also generally use technical, diagnostic language that is difficult for a patient—particularly one decompensated enough to required enforced medication—to understand and prepare to defend against. It would be much better to communicate more clearly about the hearing, but the Administrative Code has no plain language requirement.

25% of reviewed cases.[81] In the absence of an advance meeting, there is no indication of how the Staff Assistant would know the questions the patient wants to ask the witnesses—a right delineated in the Administrative Code—nor how to describe the patient's beliefs about the medication decision, in the event the patient is not well enough to express them during the hearing. Additionally, there was one hearing in the sample where no Staff Assistant attended; another where that may have occurred; and a third where the Staff Assistant gave her own opinions, adverse to the patient, as though she were a fact witness.

To its credit, IDOC has consistently shown that patients attend these hearings and, if the patient refuses, staff make multiple attempts to convince or accommodate him or her.[82] The hearing records show staff engaging the patients and giving them an opportunity to be heard. The Administrative Code gives the patient the right to call witnesses; there has been uneven practice on this over time, but it appears improved recently. In the current review, few patients requested witnesses. While no witnesses appeared in the hearing, the records indicated that staff had interviewed at least some of the witnesses, though it was unclear whether the patients specified questions and whether those were used. Sometimes the hearing record summarized what the witnesses said, sometimes it did not. Where the decisionmakers excluded some witnesses as irrelevant, that seemed well-founded.

As indicated, staff consistently generates a hearing record and signatures indicate that patients receive a copy. Two of the patients in this review took advantage of the appeal process and IDOC's Chief of Psychiatry reviewed the cases and responded within two and a half weeks, upholding the decisions in both instances.

Of note, Quality Improvement audits are unlikely to provide oversight of this topic. While auditors are tasked with reviewing this responsibility, they do not select charts based on knowing enforced medication was at issue. Because enforced medication affects approximately 2% of the mental health caseload,[83] this selection method makes it extremely unlikely that this issue is covered in any sample, and IDOC does not keep track of how many times the issue was present in Quality Improvement audits. Backlog reports, understandably, also do not examine this topic.  The four quarterly reports issued in this monitoring period did not provide any assessment of the performance of this requirement.

On balance, IDOC remains Noncompliant on this requirement, particularly because a substantial minority of cases allow enforcement when the facts do not show that the patient's condition meets the standards for such an intrusive practice.

---

[81] In the large majority of cases, one staff member serves notice on the patient and collects witness names and another appears in the hearing. Despite the monitoring team raising this concern repeatedly, IDOC has never offered any indication that these two staff members share information, which could mitigate these issues.

[82] There was one such refusal in the sample reviewed this round. There was only one case in which it was not clear whether the patient participated.

[83] According to a spreadsheet with the heading Enforced Medications Status, provided by IDOC legal counsel on March 16, 2022, compared to spreadsheet with the file name IDOC-MH Data by Facilities Dec 2021. The total number of patients subject to a hearing would be greater than the number where a decision is in effect (the latter is what is shown on the Enforced Medications Status document), but there are not so many additional hearings that it would increase the percentage appreciably.

## XV: SEGREGATION

**Summary**: The restrictive housing units at Pontiac fail to meet the minimum requirements of XV(a)(ii). The class members assigned to the main RTU at Dixon do not have their treatment plans continued when they are transferred to restrictive housing. The remainder of the class members who are transferred to restrictive housing have their treatment plans continued. These treatment plans, however, are grossly insufficient to address their pre-existing mental illnesses, such as Bipolar Disorder, Major Depressive Disorder, Schizophrenia, Schizoaffective Disorder or Posttraumatic Stress Disorder. At most, class members are seen by an MHP every four to six weeks for sessions lasting 15 to 30 minutes. This amount of treatment certainly is not robust enough to address the well-known psychiatric problems that are created by placement in segregated housing.

The 48-hour-MHP assessments are not consistently occurring within the required timeframe. The Department continues to review and update class members' treatment plans within one week of segregation placement only at a rate of 50%. Weekly rounds in segregation are only occurring at a rate of 70%. Problems exist in providing class members with consistent pharmacological treatment while in segregation. Finally, out-of-cell time is not being provided per the requirements of the Settlement Agreement.

**XV(a)(ii): Specific Requirement:** Standards for living conditions and status-appropriate privileges shall be afforded in accordance with 20 Ill. Admin. Code §§ 504.620, 504.630 and 504.670. Section 504.620 is detailed and covers a number of issues regarding conditions in segregation: double celling, secure fastening of the bed, clean bedding, running water, lighting, placement above ground with adequate heat and ventilation, food passage and visual observation, use of restraints inside the cell, cleaning materials, showers and shaves, toiletries, clothing and laundry, dentures, glasses and other hygienic items, property and commissary, food, visits, medical, chaplain and correctional counselor visits, programs, exercise, phone calls, mail privileges and reading materials. Section 504.630 provides for the same conditions and services in investigatory status as in segregation status. Section 504.670 addresses recreation, including requiring five hours of recreation for inmates who have spent 90 or more days in segregation, yard restrictions, and related documentation.

**Findings:** Nothing has changed regarding this requirement from the Midyear Report of December 6, 2021. The Monitor revisited the segregation units at Joliet, Pontiac and Dixon since publishing the most recent Midyear Report and found the situation unchanged. That is, the units at Joliet and Dixon continue to meet the requirements of this section. The segregation units at Pontiac persist in not meeting the requirements of this section. The deficiencies of the segregation units at Pontiac are very serious and place class members at a substantial risk of serious harm.

**XV(a)(iii): Specific requirement:** Mentally ill offenders in segregation shall continue to receive, at a minimum, the treatment specified in their Individual Treatment Plan (ITP). Treating MHPs and the Warden shall coordinate to ensure that mentally ill offenders receive the services required by their ITP.

**Findings**: To assess IDOC's compliance with this requirement, the monitoring team reviewed the charts of 182 class members assigned to segregated housing. The Monitor also reviewed 50 treatment plans of class members assigned to segregated housing. Additionally, the Monitor interviewed class members assigned to segregated housing during my site visits to Dixon, Logan, Pontiac and Joliet.

As reported in the Midyear Report of December 6, 2021, serious problems exist for those class members assigned to the STC at Dixon and subsequently transferred to the X House. The treatment plans of these class members all call for 10 hours of structured out-of-cell time. When they are transferred to the X House, they do not receive this structured out-of-cell time for the first 60 days. This lack of structured out-of-cell time is a serious violation of this section of the Settlement Agreement and places these class members at substantial risk of serious harm.

In addition, the treatment specified in class members' Individual Treatment Plans at facilities other than Dixon continues to be grossly insufficient to address their pre-existing mental illnesses, such as Bipolar Disorder, Major Depressive Disorder, Schizophrenia, Schizoaffective Disorder or Posttraumatic Stress Disorder. At most, class members are seen by an MHP every four to six weeks for sessions lasting 15 to 30 minutes. This amount of treatment certainly is not robust enough to address the well-known psychiatric problems that are created by placement in segregated housing. This lack of adequate treatment is only made worse by the fact that class members in segregated housing do not receive the required 10 hours of structured and unstructured out-of-cell time weekly.

Due to the serious nature of the fact that class members assigned to the STC and subsequently moved to segregation do not have their treatment plans continued and the inadequacy of the treatment offered to class members in segregation, a rating of noncompliance will be assigned.

**XV (a)(iv): Specific requirement:** An MHP shall review any mentally ill offender no later than forty-eight (48) hours after initial placement in Administrative Detention or Disciplinary Segregation. Such review shall be documented.

**Findings:** The monitoring team analyzed 427 placements in restrictive housing for the presence of an MHP review. These were drawn from the seven institutions that had not reached substantial compliance; the compliance rate for this group was 50%.[84] Another 6% of the reviews

---

[84] For this analysis, IDOC provides records of SMI patients placed in control units. Where an institution has few placements, IDOC provides all SMI cases; among larger control unit populations, IDOC has been asked to provide a random selection of every 4th placement or every 10th placement of SMI patients. IDOC provides an evaluation form or another document demonstrating an MHP's first contact after placement, and the document is labeled with the date of placement. These cases were drawn from seven institutions – Dixon, Hill, Illinois River, Lawrence, Menard, Pinckneyville, and Pontiac -- for the months of July, September, and November 2021, and January and February 2022. Documents were not drawn from institutions already found to be in substantial compliance.

Timeliness was calculated from the date of physical arrival in restrictive housing; if a patient went to crisis watch within the first two days, timeliness was calculated based on his/her date of return to restrictive housing. Cases were omitted from the analysis if the patients were not present in restrictive housing for at least three or four days at the end of the month, as there may not have been sufficient time to complete and log a review. Documents completed while the patient was not in restrictive housing (for example, in crisis watch) were counted as noncompliant. Documents

were completed in a reasonable time thereafter.[85] Concerns included:

- A large proportion of their assessments were completed by a Behavioral Health Technician, nurse, or custody staff, contrary to the plain language that requires assessment by an MHP. This improved later in the monitoring round at Graham, Illinois River, and Pinckneyville, but remained a substantial concern at Hill.

- A significant percentage were completed much later, up to 2.5 weeks late. This was the primary issue at Pontiac.

- A substantial proportion of cases did not demonstrate that the required review was completed. This was the major issue at Dixon, was significant at Pontiac and Menard, and was evident at other institutions.

In a separate review, the Monitor examined 182 class member placements in segregation from 14 facilities.[86] 152 cases had evidence of a MHP reviewing the mentally ill offender no later than 48 hours after initial placement in segregation. This is an 83% completion rate.

The total of substantially compliant institutions is 23. The seven institutions who remain noncompliant – Dixon, Hill, Illinois River, Lawrence, Menard, Pinckneyville, and Pontiac -- include those with by far the largest number of restrictive housing placements in the state, and thus the systemwide rating is Noncompliant.

**XV (a)(v): Specific requirement:** As set forth in Section VII(c) above, an MHP shall review and update the treatment plans (form 284) or IDOC Form 0546 (Mental Health Treatment Plan Update), or its equivalent of all offenders on segregation status within seven (7) days of placement on segregation status and thereafter every 90 days or more frequently if clinically indicated.

**Findings:** Using data from the 14-facility analysis referenced in XV(a)(iv), 85 of the 170[87]

---

that were essentially blank were counted as noncompliant if they did not contain information available to the reviewer (for example, the reviewer's observations).

    The monitoring team reviewed two additional sets of cases that are not included in these summary findings. There were seven cases in the sampling described in this footnote that were found to be not applicable. Additionally, the team reviewed practice at Graham. Graham was previously in substantial compliance but began deploying non-MHPs to this responsibility during the monitoring round. The reviewer examined all 33 cases, identified under the same sampling method, for July, September, November, and December 2021 and January 2022. These cases confirmed that staff resumed the correct practice in early December and sustained it, and the team has determined that Graham will maintain its substantial compliance rating.

[85] Because this review is meant to protect against the high risk of suicide that is present very soon after restrictive housing placement, the timeframe is very short. While the requirement has a deadline of two days, this calculation of a "reasonable time thereafter" doubles that, allowing up to an additional two days.

[86] East Moline, Jacksonville, Pinckneyville, Graham, Shawnee, Vandalia, Taylorville, Western, Lawrence, Menard, Pontiac, Illinois River, Centralia and Hill. Half of these institutions had previously been found in substantial compliance and half have not.

[87] The Monitoring Team actually reviewed 182 admissions to segregation but only 170 remained in segregation for seven days, therefore requiring a treatment plan.

segregation cases reviewed had evidence of an MHP review and updated treatment plan within seven days of placement on segregation status. This represents a 50% completion rate.

The 90-day component of this requirement could not be evaluated. None of the class members whose charts were reviewed had been placed in segregation for 90 days.

The current completion rate of 50% is basically unchanged since the Midyear Report of November 2020. As detailed above, Defendants' February and April quarterly reports also confirm that Quality Improvement audits "also found some deficiencies," without numbers or percentages, in this responsibility and did not comment about plans updated at 90-day intervals.

Again, the most obvious explanation for this persistently poor performance is the lack of adequate numbers of clinical and custody staff.

**XV(a)(vi): Specific requirement:** IDOC will ensure that mentally ill offenders who are in Administrative Detention or disciplinary segregation for periods of sixteen (16) days or more receive care that includes, at a minimum:

A) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation.

B) Rounds in every section of each segregated housing unit, at least once every seven (7) calendar days, by an MHP, documented on IDOC Form 0380.

C) Pharmacological treatment (if applicable).

D) Individual counseling by an MHP at least monthly, or more frequently if clinically indicated;

E) Participation in multidisciplinary team meetings once teams have been established.

F) MHP or mental health treatment team recommendation for post-segregation housing.

G) Documentation of clinical contacts in the medical record.

**H)** Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:**

A) *Continuation of ITP with enhanced therapy as necessary to protect from decompensation that may be associated with segregation:* Please refer to XV(a)(iii), above, for a discussion of continuation of the class members' treatment plans. As I reported in the most recent Midyear Report, class members assigned to segregated

housing **certainly** are not provided "with enhanced therapy as necessary to protect from decompensation that may be associated with segregation." This fact is only exacerbated by the lack of structured and unstructured out-of-cell time class members assigned to segregation receive.

B) *Rounds*: In a 14-facility analysis referenced in XV(a)(iv), a review of 182 cases of class members assigned to segregation revealed that only 128 of them had evidence of rounding. This is a completion rate of 70%.

C) *Pharmacological treatment*: As reported in the most recent Midyear Report "Pharmacologic treatment does occur when class members are placed in segregated housing. During a site visit to Pontiac on 8/18 & 8/19/2021, however, the Monitor received several complaints from class members in segregated housing about their not receiving their evening medications on 8/17. It turned out that, due to a lack of nursing staff, a nurse was not available to distribute the evening medications until after 1 am on the 18th. An administrative decision was made to withhold the evening medications as the morning medications would be distributed at 8 am. I am not absolutely sure how frequently this occurs. Interviews with class members confirm that this was not the first-time medications weren't distributed as ordered by the psychiatric providers. Skipping regularly scheduled doses of psychotropic medications is a serious departure from the standard of care and places the class members at a substantial risk of serious harm. Also, the inappropriately early hours of medication distribution significantly impacts the pharmacological treatment of class members placed in segregated housing. Two class members housed in the BMU at Menard stated that they routinely skip their AM meds due to their being delivered at 2-3 am. One class member stated that this early morning medication delivery forces him to stay up all night to make sure he gets his AM meds."[88]

D) *Individual counseling by an MHP at least monthly, or more frequently if clinically indicated*: After reviewing 50 treatment plans from 19 different facilities of class members assigned to segregation, I discovered that individual counseling by an MHP occurs every 30 to 60 days for 15 to 30 minutes a session. This fact was confirmed through my interviews of class members assigned to segregation during the reporting period.

E) *Participation in multidisciplinary team meetings once teams have been established*: A chart review of 50 treatment plans of class members assigned to segregation revealed that only 20 demonstrated multidisciplinary team involvement.

F) *MHP or mental health treatment team recommendation for post-segregation housing:* This is occurring throughout the Department.

G) *Documentation of clinical contacts in the medical record:* As previously reported, there is no absolute way to measure if this is occurring for all clinical contacts. It remains my

---

[88] Monitor's Midyear Report of December 6, 2021, pages 48 & 49.

opinion that clinical contacts are documented in the medical record. Again, this is based on my six years of experience as the Monitor.

H) *Weekly unstructured out-of-cell time for mentally ill offenders who are in Administrative Detention or disciplinary segregation:* A comprehensive, data driven analysis of out-of-cell time offered to this particular cohort of class members was conducted for the months of June, July, August, September, October, November and December 2021 and January and February 2022. The data was analyzed for mentally ill offenders who were placed in segregated housing for less than 60 days. The results follow:

| | | |
|---|---|---|
| June 2021 unstructured out-of-cell time: | offered<br>received | 8.42 hours per week<br>1.74 hours per week |
| July 2021 unstructured out-of-cell time: | offered<br>received | 6.06 hours per week<br>2.64 hours per week |
| August 2021 unstructured out-of-cell time: | offered<br>received | 8.69 hours per week<br>2.65 hours per week |
| September 2021 unstructured out-of-cell time: | offered<br>received | 7.87 hours per week<br>3.42 hours per week |
| October 2021 unstructured out-of-cell time: | offered<br>received | 6.17 hours per week<br>2.36 hours per week |
| November 2021 unstructured out-of-cell time: | offered<br>received | 6.21 hours per week<br>2.35 hours per week |
| December 2021 unstructured out-of-cell time: | offered<br>received | 6.79 hours per week<br>6.29 hours per week |
| January 2022 unstructured out-of-cell time: | offered<br>received | 5.69 hours per week<br>1.99 hours per week |
| February 2022 unstructured out-of-cell time: | offered<br>received | 5.96 hours per week<br>2.66 hours per week |



XV(a)(vi):[89] **Specific requirement:** IDOC will ensure that, in addition to the care provided for in subsection (a)(v), *above,* mentally ill offenders who are in Administrative Detention or Disciplinary Segregation for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d) below.

**Findings:** The Second Amended Settlement Agreement requires that mentally ill offenders assigned to segregated housing **shall** (emphasis added) receive 10 hours each of structured and unstructured out-of-cell time per week. The monitoring team conducted a comprehensive data driven analysis of out-of-cell time for this cohort for the months of June, July, August, September, October, November and December 2021 and January and February 2022. The data was analyzed for mentally ill offenders placed in segregated housing for longer than 60 days. The results follow:

|  | offered | received |
|---|---|---|
| June structured out-of-cell time | 5.59 | 1.97 |
| June unstructured out-of-cell time | 7.39 | 3.30 |
| July structured out-of-cell time | 2.83 | 1.41 |
| July unstructured out-of-cell time | 5.89 | 2.77 |
| August structured out-of-cell time | 2.27 | 0.90 |
| August unstructured out-of-cell time | 6.62 | 2.83 |
| September structured out-of-cell time | 2.39 | 1.03 |
| September unstructured out-of-cell time | 7.25 | 2.98 |
| October structured out-of-cell time | 1.41 | 0.58 |

---

[89] This numbering from the Settlement is in error but this report will continue to use it to remain consistent with the numbering in the Settlement.

| | | |
|---|---|---|
| October unstructured out-of-cell time | 5.14 | 1.93 |
| | | |
| November structured out-of-cell time | 2.07 | 0.8 |
| November unstructured out-of-cell time | 7.22 | 2.3 |
| | | |
| December structured out-of-cell time | 2.09 | 0.78 |
| December unstructured out-of-cell time | 6.02 | 3.72 |
| | | |
| January structured out-of-cell time | 1.45 | 0.89 |
| January unstructured out-of-cell time | 3.63 | 1.46 |
| | | |
| February structured out-of-cell time | 0.95 | 0.21 |
| February unstructured out-of-cell time | 4.45 | 1.28 |





**XV(c)(ii): Specific Requirement:** An MHP shall review any mentally ill offender being placed into Investigative Status/Temporary Confinement within forty-eight (48) hours of such placement. Such review shall be documented. This obligation will begin twelve (12) months after the budget contingent approval date.

**Findings:** Please see the analysis in section XV(a)(iv), above, for a discussion about this requirement.

**XV(c)(iii): Specific Requirement:** IDOC will ensure that mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods of sixteen (16) days or more receive care that includes, at a minimum:

1) Continuation of their ITP, with enhanced therapy as necessary to protect from decompensation that may be associated with segregation. Therapy shall be at least one (1) hour or more of treatment per week, as determined by the offender's individual level of care and ITP.

2) Rounds in every section of each segregated housing unit, at least once every seven (7) days, by an MHP, documented on IDOC Form 0380.

3) Pharmacological treatment (if applicable).

4) Supportive counseling by an MHP as indicated in the ITP.

5) Participation in multidisciplinary team meetings once teams have been established.

6) MHP or mental health treatment team recommendation for post-segregation housing.

7)  Documentation of clinical contacts in the medical record.

**8)**  Weekly unstructured out-of-cell time, which may include time for showers or yard time, of an amount equivalent to the out-of-cell time afforded to all segregation offenders at the relevant facility, unless more unstructured out-of-cell time is indicated by the offender's ITP. Instances where mentally ill offenders in segregation refuse out-of-cell unstructured time shall be appropriately documented and made available to the offender's mental health treatment team.

**Findings:** It is the monitoring team's understanding that class members in Investigatory Status/Temporary Confinement are treated no differently from those in segregation. Please see XV(a)(vi), above, for a discussion of this requirement.

**XV(c)(iv): Specific Requirement:** IDOC will ensure that, in addition to the care provided for in subsection (b)(iii), *above,* mentally ill offenders who are in Investigatory Status/Temporary Confinement for periods longer than sixty (60) days will receive out-of-cell time in accordance with subsection (d), below.

**Findings:**  It is the monitoring team's understanding that class members in Investigatory Status/Temporary Confinement are treated no differently from those in segregation. Please see XV(a)(vi), above, for a discussion of this requirement. Notably, this is likely a small population as, predictably, few prisoners would be in this status for as long as 60 days.

**XV(d): Specific Requirement:** Mentally ill offenders in a Control Unit setting for longer than sixty (60) days shall be afforded out-of-cell time (both structured and unstructured) in accordance with the following schedule:

i.  For the first year of the Settlement Agreement, four (4) hours out-of-cell structured and four (4) hours out-of-cell unstructured time per week for a total of eight (8) hours out-of-cell time per week.

ii.  For the second year of the Settlement Agreement, six (6) hours out-of-cell structured and six (6) hours out-of-cell unstructured time per week for a total of twelve (12) hours out-of-cell time per week.

iii.  For the third year of the Settlement Agreement, eight (8) hours out-of-cell structured and eight (8) hours out-of-cell unstructured time per week for a total of sixteen (16) hours out-of-cell time per week.

iv.  For the fourth year of the Settlement Agreement, ten (10) hours out-of-cell structured and ten (10) hours out-of-cell unstructured time per week for a total of twenty (20) hours out-of-cell time per week.

**Findings:** Please see XV(a)(vi), above, for a discussion of this requirement.

**XV(e): Specific Requirement**: The provisions of this Section shall be fully implemented no later than four (4) years after the approval of this Settlement Agreement.

**Findings**: This date, May 22, 2020, has passed. The Department is in noncompliance with XV(e).

## XVII: PHYSICAL RESTRAINTS FOR MENTAL HEALTH PURPOSES

**Summary:** Restraints records almost never reflected the less restrictive measures attempted or considered, and in about 18%, it appeared less restrictive measures had the potential to be effective and should have been tried. Elgin and Joliet clinicians do not often assess a patient in person when initiating restraints as required, even during working hours, but other facilities generally do. Orders are consistently written for no longer than the permitted lengths of time.

Very little documentation of limb releases and checks of vital signs were provided. Providing criteria for release was problematic. It appeared rare for staff to consider reducing the amount of restraint as soon as possible to the level of least restriction necessary or to determine that there is no longer cause to utilize restraints, even when nurses recorded facts consistent with the criteria having been met, though there were some instances when patients were released before the end of an order.

Lengthy and multiple uses of restraints continued to be a significant concern – with one patient restrained 49 times -- but the frequency of each was meaningfully reduced.

**(XVII)(a): Specific requirements:** IDOC shall comply with its policies and procedures on the use of restraints, as documented in IDOC AD 04.04.103. These policies and procedures require documentation using IDOC Form 0376 ("Order for the Use of Restraints for Mental Health Purposes"). Records of restraint used on SMI offenders shall be maintained in log form at each facility and entries shall be made contemporaneously with the use of restraints.

IDOC AD 04.04.103 provides for:

II (G):  Requirements

1. Restraints for mental health purposes shall be applied under medical supervision and shall only be used when other less restrictive measures have been found to be ineffective.

    a. Under no circumstances shall restraints be used as a disciplinary measure.

    b. Restraint implementation shall be applied by order of a psychiatrist, or if a psychiatrist is not available, a physician or a licensed clinical psychologist. (1) If a psychiatrist or a physician or a licensed clinical psychologist is not physically on site, a Registered Nurse (RN) may initiate implementation of

restraints for mental health purposes. (2) The nurse shall then immediately contact the psychiatrist within one hour of the offender being placed into restraints and obtain an order for the implementation. If the psychiatrist is not available, the nurse shall contact the physician or the licensed clinical psychologist.

2. Crisis treatment shall be initiated in accordance with AD 04.04.102.

   a. The initial order for the use of restraints shall not exceed four hours.

   b. Should subsequent orders become necessary, the time limit may be extended, but no subsequent order for restraint extension shall be valid for more than 16 hours beyond initial order. Documentation of the justification for extension of the restraint order shall be recorded in the offender's medical chart.

   c. If further restraint is required beyond the initial order and one extension, a new order must be issued pursuant to the requirements provide herein.

II (H): Orders for Restraints

1. Only a psychiatrist who has conducted a face-to-face assessment, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, who has conducted a face-to-face assessment, may order the use of restraints for offenders in a crisis treatment supervision level of continuous watch or suicide watch when the current crisis level does not provide adequate safeguards.

2. If a psychiatrist, physician, or licensed clinical psychologist is not physically on site, and the Crisis Team Member, after consultation with the on-call Crisis Team Leader or Mental Health Professional, in accordance with AD 04.04.102, has recommended the use of restraints, a RN may obtain an order from a psychiatrist or a physician or a licensed clinical psychologist via telephone.

3. The offender must be assessed, face to face by a psychiatrist, or in the absence of a psychiatrist, a physician, or a licensed clinical psychologist within one hour of being placed in restraints. If a psychiatrist, or in the absence of a psychiatrist, a physician or a licensed clinical psychologist is not physically on site within the hour time limit, a RN shall conduct a face-to-face assessment, and present that assessment to the psychiatrist, the physician or the licensed clinical psychologist via a telephone consultation, and document accordingly in the medical chart. Verbal orders shall be confirmed, in writing, by the ordering individual within 72 hours.

4. Orders for restraints shall be documented on the Order for Use of Restraints for Mental Health Purposes, DOC 0376, and shall include: a. The events leading up to the need for restraints, including efforts or less intrusive intervention; b.       The type of restraints to be utilized; c. The length of time the restraints shall be applied; d. The criteria required for the offender to be taken out of restraints (e.g., the offender is no longer agitated or combative for a minimum of one hour, etc.; and e. The offender's vital signs, checked by medical staff, at a minimum of every four hours.

The frequency of vital signs checks for offenders with serious chronic health conditions may be required more frequently during the restraint period.

II (I) Implementation and Monitoring

1. Restraints shall be applied in a bed located in a crisis care area, or similar setting that is in view of staff. Immediately following the placement of an offender in restraints for mental health purposes, medical staff shall conduct an examination of the offender to ensure that: a. No injuries exist; b. Restraint equipment is not applied in a manner likely to result in injury; and c. There is no medical contraindication to maintain the offender in restraints.

2. Monitoring and documentation of visual and verbal checks of offenders in restraints for mental health purposes shall be performed as a continuous watch status or a suicide watch status in accordance with AD 04.04.102. All checks shall be documented on the Crisis Watch Observation Log, DOC 0378.

3. Two hours after application of restraints, and every two hours thereafter, an offender may be allowed to have movement of his or her limbs. Movement shall be accomplished by freeing one limb at a time from restraints and for a period of time of approximately two minutes. Movement shall only be allowed if the freeing of the limb will not pose a threat of harm to the offender being restrained, or others. Limb movement shall be documented in the offender's medical chart and by the watch officer on the DOC 0378. Denial of free movement and explanation for the denial shall be documented in the offender's medical chart by medical staff.

4. Release from restraints for short periods of time shall be permitted as soon as practical, as determined by a psychiatrist, or in the absence of a psychiatrist, a physician or clinical psychologist.

5. The amount of restraint used shall be reduced as soon as possible to the level of least restriction necessary to ensure the safety and security of the offender and staff.

6. Clothing shall be allowed to the extent that it does not interfere with the application and monitoring of restraints. The genital area of both male and females, and the breast area of females shall be covered to the extent possible while still allowing for visual observation of the restraints. Females shall not be restrained in a position where the legs are separated.

7. Restraints shall be removed upon the expiration of the order, or upon the order of a psychiatrist, or in the absence of a psychiatrist, a physician or licensed clinical psychologist, or in the absence of one of the approved aforementioned professionals being physically on site, an RN who, based upon observation of the offender's behavior and clinical condition, determines that there is no longer cause to utilize restraints. Observation of the offender's behavior and clinical condition shall be documented in the medical chart.

8. Offenders shall remain in, at minimum, close supervision status for a minimum of 24 hours after removal of restraints. Should any other crisis level or care status be utilized, justification of the care shall be documented in the offender's medical chart.

9. Documentation of the use of restraints for mental health purposes shall be submitted to the Agency Medical Director and shall include the DOC 0376 and subsequent nursing and mental health notes.

10. All events whereby the use of restraints has been issued shall be reviewed during quality improvement meetings in accordance with AD 04.03.125.

**Findings**: The monitoring team reviewed logs of the application of restraints from June 2021 through January 2022. Restraints were used with 91 patients. The monitoring team reviewed the records of 39 applications.

Records almost never reflected the less restrictive measures attempted or considered. While in some cases, continuing self-harm, even without access to any tools, made the rationale obvious, in about 18% of sampled records, it appeared less restrictive measures had the potential to be effective and should have been tried. Plaintiffs have raised a question about the possibility that patients who require continuous watch at Joliet routinely are put in restraints instead because of custody staffing shortages. This has not been answered to date but, if true, would be very serious.

During mental health staff working hours, it appears that orders were generally issued after face-to-face assessment by an MHP or psychiatry at several institutions, but this was rarely honored in the samples from Elgin and Joliet. Many of the events were initiated after-hours and it appears the protocol for a nurse to manage the face-to-face contact, in consultation with MHPs or psychiatry by phone, was followed. It appears the expectation was met to issue the first order for no more than four hours and extensions for no more than 16 hours, though there were rare instances in which an extension order appeared to be issued late, up to three hours late in one case.[90] Justifications for the extensions were always recorded.

Only 24% of the health care records documented offering limb release at the required intervals and only 14% had vital signs documented at the required interval. IDOC legal counsel noted that this is an issue already subject to a corrective action plan at Joliet, which is a welcome step.

Criteria for removing the restraints was absent or unclear in 21% of the records and this was an improvement. Almost 30% listed criteria but they were vague or overbroad, which can have the effect of keeping patients restrained far longer than is therapeutically necessary or reasonable. Moreover, it appeared rare for staff to consider reducing the amount of restraint as soon as possible to the level of least restriction necessary or to determine that there is no longer cause to utilize restraints.

- In a majority of cases, it appeared that mental health and nursing staff considered removing restraints only at the end of each order. In a significant minority, nursing notes reflected patient behavior and state of mind that might have been consistent with satisfying the criteria and should have been considered and/or discussed.

- There were exceptions. MHPs or psychiatry did release patients before the end of an order in about one-third of the applications, though it was common for 10 to 16 hours to have elapsed before this decision was considered.

Plaintiffs' counsel made similar observations during an April 2022 site visit to Joliet, where by far

---

[90] There was one case at Elgin that spanned four days, and an entire day of records within that span was not provided. It is not clear whether orders and other activities did not take place during that time, or if there was an issue when transmitting copies.

the most restraints take place.

Lengthy and multiple uses of restraints continued to be a significant concern, but the frequency of each was meaningfully reduced from the practice reflected in the Monitor's Fifth Annual Report. IDOC reports that it has been consulting with Southern Illinois University, which may have contributed to some of these improvements. However, substantial troubling practices remain at men's institutions[91] and include:

- Patients were restrained 3 or more times in a short period up to ***49 times* for one patient**. There were 17 such patients with strong indications they were unstable.[92]
- Patients were subject to restraints for longer than a day, up to an 8-day stretch
- Three patients were restrained continuously, or nearly so, for two months, three months, and more than three years because of frequent, severe self-injury whenever they were unrestrained.

Equally concerning is that staff did not take these as indications that a higher level of care was needed. Taking into account both frequent and lengthy restraints uses, there were 22 evidently unstable patients while receiving RTU or BMU level of care.[93] Only **2 of the 22** were referred to inpatient care.[94]

- To compound that, one of the referrals was not made until the patient had been restrained continuously for almost three months. Then he was restrained another 14 times during a multi-month wait to access inpatient care. He was never placed there.

IDOC provided Quality Improvement audits of restraints use conducted during the monitoring period. Auditors documented review of restraints occurring on 52 days,[95] and found only 63% of them fully compliant. Concerns were noted about not using, or recording, less restrictive measures; lack of limb releases; restraints continuing beyond the expiration of an order; and insufficient documentation of orders, including releases.

Previously, 23 institutions have been found in substantial compliance, as nearly all of them

---

[91] For the first time in the monitoring reviews, there was also extensive use of restraints of a woman while she was treated both at Logan and Elgin. The monitoring team reviewed about a month of these records, which showed significant need for extended restraint. The woman frequently jumps or falls on her head, sometimes minutes after promising to keep herself safe. During the episode reviewed, this resulted in multiple neck fractures and the woman had to be kept still until her neck was sufficiently stable that she did not risk paralysis or death.

[92] There were another 61 patients with multiple restraints events that were not as concerning. These patients were restrained three to six times, but the restraints were for shorter periods, occurred more rarely over an eight-month period, sometimes involved BMU patients, and/or resulted in a transfer to RTU or BMU where the frequency of restraint lessened.

[93] This total controls for the fact that some patients were of concern both for lengthy and multiple restraints events.

[94] Some of the others may have been designated as inpatient level of care, but as explained elsewhere in this report, that cannot be delivered effectively outside an actual inpatient facility.

[95] Auditors reviewed 24 patients who were restrained. The audit tools record findings on 52 days for these patients. It is not clear whether these are all separate uses of restraints, or whether some are recording findings for multiple days of the same restraint event. For this reason, this Monitor's report uses the term "days" instead of "restraint uses."

do not manage patients with restraints. The remaining institutions, discussed in this section, are responsible for nearly all the therapeutic restraints systemwide and thus, based on the facts above, IDOC is Noncompliant with requirement XVII.

## XIX: CONFIDENTIALITY

**Summary**: The Department continues to provide psychiatric and mental health care in nonconfidential settings. This includes cellfront contacts and, by policy, the filming of clinical contacts after a use of force.

In the Midyear Report of December 6, 2021, I requested the Department to create a corrective action plan to address these problems and they did not respond to my request. This lack of confidentiality places class members at a substantial risk of serious harm.

**XIX(b): Specific requirement:** Within six (6) months after the approval of this Settlement Agreement, IDOC shall develop policies and procedures on confidentiality requiring mental health service providers, supervisory staff, and wardens to ensure that mental health consultations are conducted with sound confidentiality, including conversations between MHPs and offenders on the mental health caseload in Control Units. Training on these policies and procedures shall also be included in correctional staff training, so that all prison staff understand and respect the need for privacy in the mental health context.

**Findings:** The ability of the Department to meet the requirements of XIX(b) has deteriorated over the course of the reporting period.

Due to a variety of lapses in confidentiality documented in the Monitor's midyear report of December 6, 2021,[96] the Monitor requested the defendants produce a corrective action plan regarding confidentiality. **The Defendants did not reply to this request.** In their most recent quarterly report, the Defendants refer to a "Corrective Action" dated March 24, 2021. This corrective action was in response to a request made in the Revised Midyear Report of November 2020.

In addition, IDOC has informed the monitoring team that policy requires the recording of tactical cell extractions continuously until the individual in custody is placed in the cell where s/he will remain, and that this includes filming mental health contacts to determine the person's stability and whether s/he needs to go on crisis watch. The monitoring team observed one such recorded contact and all conversation could be heard clearly.

A rating of noncompliance will once again be assigned based on persistent problems with confidentiality and the Department's lack of a response to my request for a corrective action plan per section XVII(o) of the Settlement Agreement.

---

[96] The reader is referred to pages 60 & 61 of the midyear report of December 6, 2021.

**(XIX)(c): Specific requirement:** Confidentiality between mental health personnel and offenders receiving mental health services shall be managed and maintained as directed in the section titled "Medical/Legal Issues: 1. Confidentiality" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101, section II (E)(2)).

This section Medical/Legal Issues: 1. Confidentiality in the IDOC Mental Health Protocol Manual provides:

Confidentiality of the clinician-offender relationship is grounded in ethical and legal principles. It rests, in part, on the assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship. ⌜SEP⌝Clinicians should clearly specify any limits of confidentiality of the offender-clinician relationship. This disclosure should occur at the onset of treatment, except in emergencies. Notwithstanding these necessary limits on confidentiality, relevant guidelines should be adhered to, to the greatest degree possible.

Requests from outside organizations for Mental Health-related information about offenders shall be referred to the Treating Mental Health Professional. The release of any Confidential Mental Health Records must be accompanied by a consent form or release of confidential information form signed by the offender on an Authorization for Release of Offender Mental Health or Substance Abuse Treatment Information, (DOC 0240). In addition, the CAO shall be notified of this request.

Offender disclosures made to a Mental Health Professional in the course of receiving Mental Health Services are considered to be confidential and privileged, with the following exceptions: Threats to physically harm self-and/or others; Threats to escape or otherwise disrupt or breach the security of the institution; Information about an identifiable minor child or elderly/disabled person who has been the victim of physical or sexual abuse; All other information obtained by a Mental Health Professional retains its confidential status unless the offender specifically consents to its disclosure;

In addition, when confidential offender mental health information is required to be disclosed to other correctional personnel as indicated in that section, such information shall be used only in furtherance of the security of the institution, the treatment of the offender, or as otherwise required by law, and shall not otherwise be disclosed.

**Findings:** As one looks at this issue, the monitoring team reviewed documented contacts in its possession for whether those contacts were confidential. These were drawn from 23 institutions and a variety of contexts: general population, restrictive housing, crisis watch, and RTU care, and MHP individual contacts, psychiatry contacts, screening, group therapy, suicide evaluation, and treatment team meetings.[97]  In the 227 contacts that mentioned confidentiality, only 66% were confidential. Practice was particularly disturbing at Pontiac, where clinicians almost uniformly recorded that contacts occurred at cell front; only 3 of 35 were recorded as being

---

[97] This was an accidental sample of health care records requested to review for other requirements. Where the writer explicitly mentioned confidentiality, that was noted. Where there was no mention, that record was excluded from the analysis.

confidential. This is a snapshot and is not a representative, proportionate sample. So, while the *percentage* may or may not be indicative of general practice, it does suggest that there are substantial gaps in preserving confidentiality. This lack of confidentiality is a serious lapse in practice and places class members at a substantial risk of serious harm.

## XXII: PARTICIPATION IN PRISON PROGRAMS

**Summary:** This section was previously found in Substantial Compliance and additional information was developed during this monitoring period as the parties have entered the dispute resolution process.

Based on staff and patient interviews, and waiting lists, at eight institutions, the automatic nature of the criteria for most education suggests that mental health patients would access courses in the same way as other individuals in custody. All education staff, mental health staff, and interviewed patients said they had not heard of, seen, or experienced exclusion on the basis of mental health.

There are fewer *sessions* of the most basic education course offered to Dixon's RTU patients than its general population, while there are more people on the RTU waiting list. The proportions of STC and DXP patients on the waiting list, relative to their total populations, are essentially the same. Pontiac reportedly is not offering general education programming to its RTU or any other maximum security prisoners until teachers are hired.

The work assignment process has both standardized and discretionary elements. A multidisciplinary leadership group approves assignments, including MHP input for SMI patients. In interviews, the RTU patients had a higher rate of assignments than did the outpatients, but no interviews were conducted with non-caseload individuals. All said they had not been told that their mental health status would exclude them from any jobs. Plaintiffs' counsel recently raised a concern about limits on accessing work release, which one RTU patient confirmed, but the monitoring team was not able to develop further information at this time.

**(XXII)(a): Specific requirement:** Unless contraindicated as determined by a licensed MHP, IDOC shall not bar offenders with mental illness from participation in prison programs because of their illness or because they are taking psychotropic medications. Prison programs to which mentally ill offenders may be given access and reasonable accommodations include, but are not limited to, educational programs, substance abuse programs, religious services, and work assignments. Offenders will still need to be qualified for the program, with or without reasonable accommodations consistent with the Americans with Disabilities Act and the Section 504 of the Rehabilitation Act, under the IDOC's current policies and procedures.

**Findings:** This provision was previously found to be in Substantial Compliance, but in 2021, the parties discussed it in the dispute resolution process. For this reason, the monitoring team

gathered related information during site visits to eight institutions, most of which have the largest mental health populations in the state, and two of which host RTUs.[98]

The monitoring team interviewed staff from the Education, Clinical Services, and Mental Health departments (22 in total) and 49 patients from the RTU, restrictive housing, and outpatient programs.[99] Responsible staff described the mechanics of selecting participants for educational programs and work assignments.

For educational programs, institutions typically offer ABE (a basic education class that is mandatory for certain incarcerated people), Advanced ABE, and preparation for a high school equivalency test (commonly termed GED). Some institutions also offer vocational programs, sometimes run by universities, and/or university academic courses. Institutions are expected to administer a test to all individuals in custody (a "TABE" test) to determine their initial level of academic knowledge, although at least some institutions suspended administering the test for extended periods for pandemic safety.

As for access to the courses, interviewed education leaders or specialists universally described the following system. For ABE, the course that is mandatory for many individuals, eligibility is determined solely by the TABE test score and access is determined by the length of time the potential student is likely to remain in custody, with the shortest times given priority. A computerized list is maintained, and it automatically sorts based on these factors; it can re-sort frequently as new names are added, goodtime shortens time to serve, and other conditions change, and any given person may move up or down in priority repeatedly in relation to other people. There reportedly is no way to apply other criteria or make adjustments to the list, which reduces the possibility for unequal access on the basis of mental health or psychotropic medication status.

Access to Advanced ABE and GED preparation courses reportedly apply the same criteria and, as voluntary courses, require the potential student to express interest. Similar lists are maintained, though they are typically much shorter as far fewer people tend to be eligible academically. Where universities administer programs, they reportedly issue the eligibility criteria and sometimes conduct interviews. Education staff generally said mental health patients are integrated into classes for which they qualify, although Dixon maintains separate ABE classes for RTU patients.

All education staff, mental health staff who commented, and all interviewed patients said they saw no reason that mental health patients could not participate in any of the education programs, and had not heard of, seen, or experienced exclusion on that basis. One education leader said she would only exclude someone from the mental health caseload if the patient's MHP said it was contraindicated; in that event, the patient would maintain her priority on the list and staff would revisit participation about six weeks later. The same leader said they provide for pausing and later resuming in-progress education if needed for mental health reasons.

---

[98] Dixon, Logan, Graham, Hill, Illinois River, Menard, Pinckneyville, Sheridan

[99] Most patients commented on education and work assignments, though some discussed only one of those topics.

Among the patients interviewed, 9 were participants in Logan's RTU, Dixon's STC program, or Dixon's DXP program. Three of the patients were in school or had completed it; the remaining patients said they had no interest in the classes or had long sentences yet to serve. Similarly, 8 of 40 interviewed outpatients were in or had completed school, and the others remained on wait lists or were not interested.[100]

It appears that access is more commonly limited by the number of class sessions, which appears modest in relation to the need. As of the time of interview, these seven institutions[101] could offer ABE, Advanced ABE, or GED classes to about 475 individuals, while waiting lists are more than double that number and will grow substantially as institutions resume "TABE" testing.[102] The length of classes means a minimum of nine weeks, and as much as two years, until a class slot becomes open.[103]

There are several contributing factors. During the worst of the pandemic, the pace of classes was slower due to a pause and then conducting them in a limited fashion with in-cell, self-study packets. When in-person instruction could resume, class sizes were reduced from a normal range of 15 to 25, to as few as 5 people, and were generally running at 9 or 10 as of late summer 2021. Additionally, not all sessions are available as IDOC is in the process of rehiring teachers for whom there was insufficient work under the pandemic interruptions.

RTU patients at Dixon do seem to have less access than general population prisoners in that there are fewer sessions offered to RTU and there are more people on its waiting list.[104] Within the RTU group, the proportions of STC and DXP patients on the waiting list, relative to their total populations, are essentially the same.  On the other hand, education staff noted that higher-security DXP patients tend to have longer sentences, so their wait times for education are likely to be longer on that basis; they would have the same experience if housed in general population. These difficulties do not exist at the higher levels of education; RTU wait lists are much shorter than general population for Advanced ABE and GED classes. In dispute resolution communications, Plaintiffs' counsel have advocated an urgent need for education access for six RTU patients, housed at Pontiac, Dixon, or Menard, and whose potential release dates span October 2021 through December 2023.

Plaintiffs' counsel also assert that GED classes are not available at Pontiac, which puts Pontiac's RTU patients at a disadvantage and potentially forces a choice between educational and mental health needs. Defendants assert that education is not offered to any maximum security prisoner at Pontiac as hiring more teachers would first be necessary. In terms of similar conflicts between essential activities, the monitoring team interviewed education, clinical services, and mental health staff (a total of 7) and 20 RTU and general population patients at seven institutions

---

[100]  In this accidental sample then, RTU patients participated in school at a higher rate than their outpatient counterparts. It is not possible to know whether this is representative of the larger populations.

[101]  It was not feasible to interview relevant staff at one of the eight institutions referenced above

[102]  Additionally, the monitoring team did not request waiting lists at all visited institutions, and some staff were asked to estimate their numbers, so all totals are approximate.

[103]  Unless another student drops out before completion

[104]  This discussion focuses on Dixon, since Logan reported wait lists that include RTU patients and general population, but does not separate them.

other than Pontiac.[105] There, staff gave specific examples of ways they coordinate mental health programming with that of other departments or allow patients to prioritize mental health appointments before returning to work or school. The great majority of patients said there was no conflict between their activities. The exceptions were participants in Sheridan's full-time substance abuse program, who said they could attend school but not hold a job, and an mRTU patient who was allowed to continue mental health treatment but had to choose between a job and school.

As for work assignments, relevant staff described that there are categories of assignments, and each individual is assessed and his or her eligibility for that category is determined. Staff with a job opening review the list of prisoners qualified for that category of work and make a hiring request, or a prisoner can ask an employer to do so. A multidisciplinary committee, including the Wardens and several departments, and a Mental Health representative if the candidate is SMI, confers about safety and security, the candidate's experience, and other factors, and the committee makes a joint decision.

Among the 9 RTU patients the monitoring team interviewed, 5 had jobs and there were a variety of settings: health care unit, commissary, passing food trays, sanitation, porter. For almost all who lacked a job, it was because of a recent disciplinary history. All said they had not been told that their mental health status would exclude them from any jobs; the only limit was that the job must be in an RTU housing unit -- is a restriction common in prison systems and meant to protect intermediate care patients from general population individuals – and one man noted they are ineligible for work release. Plaintiffs' counsel raised that concern more recently, but the monitoring team did not have further opportunity to look into that issue.

Among outpatients interviewed, 10 of 40 were working.[106] The other interviewees were following the process to obtain an assignment, were participants in a full-time substance abuse program, did not wish to work, or were temporarily ineligible because of a recent disciplinary history. They expressed frustration with the time required to receive a job, but they, too, said that they had never been told that mental illness or taking psychotropic medication was a barrier to hiring.

---

[105]  Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, Sheridan

[106] As with education, in the site visit cohort, RTU patients had a rate of employment *greater* than their outpatient counterparts.

## XXIV: USE OF FORCE AND VERBAL ABUSE

**Summary**: In the current review of reports and videos, as well as staff and patient interviews, there were mixed signs about use of force. Of concern, there continued to be a significant minority of cases (almost 20%) that went against policy by *not* appearing to be conducted as a last resort or when other means are unavailable or inadequate. Another group of nearly 20% did *not* appear executed only to the degree reasonably necessary, and some bore signs of potential corporal punishment. Some very disturbing practices are described in the section below.

It did appear that force terminated when no longer necessary and that medical screening and care took place, although documentation was uneven. Those logistics of the tactical team process that the team has reviewed appear to continue to comply with policy.
.
Logs indicate the rate of use of force is one-third lower in this period than it was in 2019. Staff reported very little exposure to use of force, as did a large majority of interviewed patients. Similar to the documentation review, about 20% of an accidental sample of patients believed they had experienced or witnessed troubling use of force and gave specific examples.

**Specific requirements:** IDOC agrees to abide by Administrative Directives 05.01.173 and 03.02.108(B)[107] and 20 Ill. Admin. Code § 501.30

Section 501.30 of the code, "Resort to Force," provides:
   a) Force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary to achieve a permitted purpose.
   b) Use of force shall be terminated as soon as force is no longer necessary.
   c) Medical screening and/or care shall be conducted following any use of force, which results in bodily injury.
   d) Corporal punishment is prohibited.

AD 05.01.173, "Calculated Use of Force Cell Extractions" provides:

F. General Provisions

1. Use of force shall be terminated as soon as the need for force is no longer necessary.

2. Nothing in this directive shall preclude staff from immediately using force or applying restraints when an offender's behavior constitutes a threat to self, others, property, or the safety and security of the facility.

3. Restraints shall be applied in accordance with Administrative Directive 04.04.103 or

---

[107] AD 03.02.108(B) does not appear to be the correct citation. The monitoring team believes the Settlement contemplated AD 03.02.108(I)(B).

05.01.126 as appropriate.

4. Failure by the offender to comply with the orders to vacate is considered a threat to self, others, and the safety and security of the institution and may result in the use of chemical agents in accordance with Department Rule 501.70

5. Unless it is not practical or safe, cell extractions shall be video recorded from the time circumstances warrant a cell extraction until the offender is placed in the designated cell.

NOTE: Any interruption in recording, including but not limited to changing a video tape or battery shall orally be documented on the video tape.

6. Use of force cell extractions shall be performed by certified Tactical Team members as designated by the Tactical Team Commander. The Tactical Team Commander shall designate one or more members who may function as the Tactical Team Leader.

G.      Equipment

1. The following equipment items shall be available to and used by Tactical Team members when conducting a calculated use of force cell extraction. a. Orange jump suits; b. Protective helmets and full-face shields; c. Knife resistant vests; d. Protective gloves; e. Restraints minimally including hand cuffs and leg irons; f. Protective convex shields; g. Batons (36-inch length by 1.5 inches in diameter of oak or hickory); h. Gas masks; i. Leather boots, purchased by the employee, a minimum of 8 inches high for ankle protection; and j. Video camera with a minimum of two batteries and a video tape.

2. Chemical agents shall be available and may be used in accordance [with] Department Rule 501.70.

501.70: Use of Chemical Agents in Cells (Consent Decree) provides:

a) This Section applies only to the transfer of a committed person who has refused to leave his cell when so ordered. The transfer of a committed person shall be undertaken with a minimal amount of force. Only when the individual threatens bodily harm to himself, or other committed persons or correctional officers may tear gas or other chemical agents be employed to remove him.

b) Prior to the use of tear gas or other chemical agents, the committed person shall be informed that such tear gas or other chemical agents will be used unless he complies with the transfer order.

c) The use of tear gas or other chemical agents may be authorized only by an officer the rank of Captain or above. (For purposes of this rule, the shift supervisor or higher authority in the Juvenile Division may authorize the use of tear gas or other chemical agents.)

d) Precautionary measures shall be taken to limit the noxious side effects of the chemical agents. In addition, the following procedures shall be followed whenever

tear gas or other chemical agents are used to compel a committed person to leave his cell:

> 1) If circumstances allow, ventilation devices, such as windows and fans, shall be readied prior to the use of tear gas or other chemical agents. In any event, these devices shall be employed immediately after tear gas or other chemical agents are used. The purpose of this procedure is to minimize the effect of tear gas or other chemical agents upon other committed persons located in the cell house.

> 2) Gas masks shall be available for use by correctional officers at the time the tear gas or other chemical agent is used.

> 3) When a gas canister is placed inside a committed person's cell, the gas will quickly take effect and correctional officers shall enter the cell as soon as possible to remove the individual.

> 4) The committed person shall be instructed by the correctional officer to flush his eyes and skin exposed to the chemical agent with water. If the individual appears incapable of doing so, a member of the medical staff present shall perform this task. If no member of the medical staff is present, the correctional officer shall undertake this procedure.

e) An incident report shall be prepared immediately after the use of the chemical agent. This report shall be signed by each correctional officer involved in the transfer, who may indicate disagreement with any fact stated in the report.

f) The Chief Administrative Officer shall examine these incident reports to ensure that proper procedures were employed. Failure to follow proper procedures will result in disciplinary action.

g) Before Section 501.70 is modified, legal staff must be consulted. This Section was promulgated pursuant to Settlement litigation by order of the court. It may not be modified without approval of the court.

3. The following equipment items may be used by Tactical Team members when conducting a calculated use of force cell extraction. a. Throat protectors (cut resistant); and b. Elbow, groin, knee, and shin protectors

H.     Tactical Team Structure for Calculated Use of Force Cell Extractions

The Tactical Team shall consist of six certified Tactical Team members for a single offender cell extraction and seven certified Tactical Team members for a multiple offender cell extraction. One member of the team shall serve as the Tactical Team Leader; however, the team leader shall not be the person responsible for video recording the incident.

1. For a single offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield

person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the offender against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. Two members (also known as Number 2 and 3 persons) shall secure the offender's arms and hands and place restraints on the offender's wrists and ankles. c. A member (also known as Number 4 person) shall secure the doorway with a baton to prevent the offender from escaping, and if necessary, to assist in the application of restraints. d. A member (also known as Number 5 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; remain outside of the cell with a baton in the event the offender should attempt to escape from the cell; and deploy chemical agents if necessary. e. The video recording member (also known as Number 6 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

2. For a multiple offender cell extraction, the Tactical Team Commander shall designate members who shall be responsible for following functions. a. The shield person (also known as Number 1 person) shall use a shield and be the first member to enter the cell; secure the first offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. b. The assistant shield person (also known as Number 2 person) shall use a shield; secure the second offender encountered against the wall, bed, or floor; secure the offender's head and upper body; and orally communicate with the offender. c. A member (also known as Number 3 person) shall provide immediate back-up to the team member in most need of assistance by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. d. A member (also known as Number 4 person) shall provide immediate back-up to the team member with the other offender by securing the offender's arms and hands and placing restraints on the offender's wrists and ankles. e. A member (also known as Number 5 person) shall provide immediate back-up to the team members with the most combative offender by securing the offender's arms and hands for placement of restraints. f. A member (also known as Number 6 person) shall provide direct orders to the offender prior to the extraction; open the cell door to initiate the extraction; secure the doorway with a baton to prevent an offender from escaping, and if necessary, deploy chemical agents and assist in the application of restraints. g. The video recording member (also known as Number 7 person) shall remain outside of the cell and video record the extraction including but not limited to:  the warnings to the offender prior to the use of force; the issuance of three direct orders to vacate the cell; the notification that failure to comply constitutes a threat to self, others, and the safety and security of the institution; removal of the offender from the cell; escorting the offender for and treatment of medical care; and placement of the offender in a designated area.

I.      Calculated Use of Force Cell Extraction Procedures

1. Once an officer has ordered an offender to move from the cell and the offender refuses, the officer shall report the refusal through the chain of command.

2. The Lieutenant or above shall again order the offender to vacate the cell. If the offender refuses, the Lieutenant or above shall report the refusal through the chain of command.

3. On site personnel shall begin video recording the offender's actions.

4. When time and circumstances permit, the Shift Commander shall obtain the approval of the Chief Administrative Officer for calculated use of force cell extractions. In all other situations, the Shift Commander or above shall approve the cell extraction.

5. If the decision is made to proceed with a cell extraction, the Shift Commander shall activate the Tactical Team.

6. The Zone Lieutenant or above shall: a. Secure the area by removing all non-involved staff and non-secured offenders; b. Ensure the video camera is present and recording the offender's actions; and c. Notify medical staff of the pending cell extraction.

7. Upon notification of a pending cell extraction, Health Care staff shall check the offender's medical file for pertinent medical information and be present in a secure area that is close to, but not in the immediate vicinity of the cell extraction.

8. Upon arrival of the Tactical Team, the Zone Lieutenant or above shall: a. Brief the Tactical Commander of pertinent information; b. Ensure the transfer of the video tape to a designated Tactical Team member to continue recording; c. Notify the Duty Administrative Officer of the incident, pending cell extraction, and other information as it becomes available; and d. Be available, if needed, but remain out of the immediate area of the cell extraction.

9. Prior to the use of force, the Tactical Team leader shall: a. Orally attempt to obtain the offender's voluntary compliance to vacate the cell or area prior to the use of force. In cells or areas with two or more offenders, each offender shall be given the opportunity to comply and be voluntarily removed. Whenever possible, offenders who comply shall be placed in restraints and removed prior to action being taken. b. Issue three direct orders for the offender to comply. c. Advise the offender that failure to comply with the orders to vacate may result in the use of chemical agents.

10. If the offender does not vacate the cell voluntarily, the Tactical Team shall remove the offender from the cell.

11. Following removal from the cell, the Tactical Team shall escort the offender to a designated area to be examined by Health Care staff.

12. Following the completion of the cell extraction including medical care, the Tactical

Team member who video recorded the incident shall: a. Label the video tape with the date and location of the incident, offender name(s) and number(s), and the name of the employee who recorded the incident; b. If available, activate any security measures such as breaking the security tab on the VHS (Video Home System) video tape to prevent the video tape from being erased or recorded over; c. Tag the video tape as evidence and process it in accordance with Administrative Directive 01.12.112.

13. Unless otherwise directed to maintain longer, the video tape shall be retained in a secure area designated by the Chief Administrative Officer for three years following the date of the extraction.

14. Each employee who participated in the cell extraction or who was otherwise involved shall complete an Incident Report and other appropriate reports documenting the incident in its entirety. When necessary, the incident shall be reported in accordance with Administrative Directive 01.12.105. (AD 01.12.105 provides general instructions on the reporting of "unusual incidents.")

15. The Shift Commander shall ensure: a. A search of the involved area is completed after removal of the offender; b. The area is decontaminated if chemical agents were used; and c. Appropriate reports are completed and processed.

16. The Shift Commander or above shall debrief with the Tactical Team.

**Findings**: Use of force tracking indicates that, on average, there are about 60 force incidents per month in IDOC.[108] For this assessment, the team reviewed documentation of 74 incidents and viewed 47 videos.[109]  The team interviewed 56 patients drawn from all treatment programs and all security levels across eight institutions. The team spoke with Internal Affairs staff at those institutions and included use of force questions in interviews of 21 mental health staff and three nurses.

---

[108] IDOC provided systemwide logs of use of force for June and July 2021 and, at the monitoring team's request, those same logs for August 2021 through January 2022 for the institutions that have not been found in substantial compliance. The systemwide numbers were a little over 60 per month; the noncompliance group's average was a little under 60 per month. These generally exclude those incidents where Tactical Team staff was activated but the incident concluded without force; where the occasional institution *did* seem to include those cases as well, the reviewer attempted to remove them from the analysis for consistency.

   Tracking lists separately each prisoner involved in an incident. This total removes those entries, counting every set of incidents in the same place at the same time as one incident

[109] Incidents were drawn from 13 institutions and were chosen to include crisis watch, enforced medication, anything suggestive of a decompensated mental state, and some of each major type of force (OC, takedown, warning shot). Where there were few incidents at a facility, the reviewer attempted to examine all of them; where force was more frequent, the reviewer attempted to examine a substantial proportion of the events.

   This number of videos was part of a larger request for videos. In other cases, cameras had not been installed as of the incident or it is possible that the continuously running video overwrote earlier video when digital memory limits were reached. In a few instances, the camera or digital file reportedly had malfunctioned. By the second round of analysis, all institutions were able to provide footage from stationary cameras, with only one institution unable to provide any. Another institution did not provide the requested TACT team videos for unknown reasons.

As always, the monitoring team analysis focuses on the essentials of appropriate use of force under the Administrative Code section cited in the Settlement Agreement: (a) force shall be employed only as a last resort or when other means are unavailable or inadequate, and only to the degree reasonably necessary, (b) use of force shall be terminated as soon as force is no longer necessary, (c) medical screening and/or care shall be conducted following any use of force, which results in bodily injury, and (d) corporal punishment is prohibited.

*Necessary*: throughout *Rasho*, this has been the primary area of concern among the use of force requirements. In the current records and video review, nearly 20% raised significant questions about whether the force used was a **last resort or when other means were unavailable or inadequate**.[110] These included using Oleoresin Capsicum ("OC") on a patient already in four-point restraints, employing a takedown when the patient was not following an order but not leaving and not aggressive, employing a takedown in response to minor resistance by an already handcuffed patient under multiple-officer escort, OC use when the incident was already deescalating, and forceful cell extraction when OC had been deployed but not given time to take effect.

One practice is evident as a pattern. In some institutions, it has become habitual to use OC in situations of self-harm, even when the issue is only a threat, serious injury is not imminent, or the risk has abated. In each of those scenarios, there are multiple other means that are available and adequate, including calling mental health staff to work with the individual in custody. Other effective means are evident in some of Joliet's responses in the incidents reviewed this monitoring period. Instead, it seems common at some institutions to follow a routine while losing sight of the purpose: protecting the patient from self-harm. In reports, one does not see effort being put to finding and removing the method of harm or connecting the patient with treatment related to the self-harm. Instead, for the officers, the focus becomes enforcing the order to be handcuffed and too often, that is all that is achieved. The patient, often on crisis watch, is exposed to OC, subjected to violence to subdue him or her, cuffed, cleaned up, and returned to his or her cell.

On the other hand, there are some positive indicators. The monthly average of incidents with mentally ill prisoners is one-third lower in this period than it was in 2019, one factor suggestive of a reduction in unnecessary force. Mental health staff in Dixon's DXP and one RTU building at Logan say they are routinely called to deescalate potential force situations, and staff at Illinois River and Graham are sometimes called. All other interviewed staff at seven institutions,[111] including those covering crisis bed care, said they rarely see force, nearly all have not learned of injuries, and patients do not complain about force.

Logan and Graham staff believe that officers have become more skillful at deescalation. For several monitoring periods, IDOC has had in place a Deescalation Response Team, whose members reportedly have undergone training. The expectation is that a member is to be called if force is anticipated, although it appears there is not a universal expectation that this be reflected in

---

[110]   It is of note that the percentage of cases of concern, both regarding necessary force and proportionate force, remained steady from the Midyear Report to the current, expanded sample.

[111] Dixon, Graham, Hill, Illinois River, Logan, Pinckneyville, and Sheridan. Notably, staff interviews did not take place at Menard.

reports and/or video. Almost half of relevant reviewed incidents[112] clearly captured deescalation attempts by custody staff, and/or significant cooling off periods, and mental health involvement was shown three times. It is worth noting, however, that some contacts, identified as deescalation in reports, are perfunctory at best on video; some appear well done, but others take place for one minute or less, do not use language meant to persuade, and/or consist only of issuing orders to comply, which is a different officer's role.  Logs show that Joliet calls for the team frequently, and other institutions appear to employ it modestly, but well over half of the interventions avoided the use of force.[113]

*Excessive*: The monitoring team has also observed incidents over time that raised concerns that force may *not* have been used **only to the degree reasonably necessary** and that continued with almost 20% of cases in the current records and video review. These included events resulting in severe injuries to the prisoner requiring outside hospital treatment; injuries whose explanation in force reports seems very unlikely; OC use in very large quantities, including using a pepperball launcher in a cell and aimed directly at a patient's naked body at short range; and an incident that had indicia of retaliatory violence when a prisoner assaulted staff, was restrained on camera without injury, was escorted into a health care room, as is common, that does not have camera coverage, and had documented bleeding head wounds by the end of the incident.

*Termination*: All indications in the current review, and in the previous two, were that force was terminated when it was no longer necessary.

*Medical*: In the monitoring team's reviews over time, there are indications that nursing routinely checks patients after use of force, sometimes provides treatment for OC exposure,[114] and provides or arranges for treatment for injuries. It has also been the case that reports and videos unevenly document this.

*Corporal punishment*: In several previous monitoring team reviews, corporal punishment has not been evident. Patients routinely assert, in interviews and court filings, that this occurs, and in all prison systems it is often difficult to substantiate. In the current monitoring period, two incidents had indicia of being corporal punishment. There were also a few incidents where it appeared an unreasonably lengthy time elapsed before the patient was offered relief from OC exposure – in one videoed case, it was approximately 15 minutes – which could be seen as corporal punishment. Several incidents from earlier periods are integrated into the Monitor's Fifth Annual Report analysis and detailed in the Midyear Report submitted in December 2021.

---

[112] The subset of incidents where force was planned, or it otherwise appeared to be not so urgent that time could be taken to attempt deescalation

[113] According to the spreadsheet titled DRT Activations, Joliet called for a deescalation team member for 203 incidents from August 2021 through January 2022. The document shows 67 such engagements for the same time period throughout the rest of IDOC. 63% of these activations were recorded as preventing the need to use force. These numbers, of course, are far lower than if this team was called for every incident with time to call them, as IDOC has said is its expectation. It is unknown whether all activations have been recorded.

[114] In reports and videos, sometimes nurses perform this function, sometimes custody staff manages it, sometimes a patient refuses this offer, and sometimes it is not mentioned.

In addition to interviewing some patients known to be involved in specific incidents, the monitoring team interviewed a cross-section of 51 patients for their experience with use of force. Among them, three men at one institution said they had been subject to different kinds of excessive force. Another eight said they had witnessed punitive tactics or inappropriate restraint, or visible injuries that they were told resulted from use of force, and a small handful of others said they had heard of such incidents. The majority (28) said they had not experienced or witnessed force, and another nine said they had seen no incidents in recent years, or they occasionally experience or witness it and they believe the level of force was justified. Sometimes this was accompanied with an observation that officers at that institution were generally reasonable in their dealings with individuals in custody.

As for the requirements related to Tactical Team activations detailed in the Administrative Directive cited in the Settlement Agreement, after reviewing reports and videos, the results were consistent with those described in the Monitor's Second Annual Report:

> "In terms of the specific Administrative Directive requirements governing tactical teams …, these appear well-executed. The tactical teams are constituted as required, and members are assigned to and perform the specified roles. A review of videos indicates the specified equipment is available and in use. The monitoring team did not examine the chain of command authorizations, notifications, and preparations preceding and after the incidents, but the fact that other aspects of the reports and filmed procedures hue closely to the requirements suggests that these are also being conducted.

> Videos were available for all but one of the monitoring team's requests and were labeled consistent with the provisions of 501.70, suggesting this is common practice. In a small number of cases … the lighting, or where the camera was placed, did not allow the viewer to see the activity for some portions of the incident. The offender was always given direct orders and told what to expect if he did not follow them. Many of the incidents were undertaken with a minimal amount of force [with] exceptions … The monitoring team did not examine cell decontamination practices, but it appeared routine to offer and provide eye wash to flush offenders' eyes, again with [a] few exceptions … Incident reports are routinely prepared. The monitoring team did not examine the administration's system for review of incident reports, though review signatures were noted."

In the current review, there were also examples of the kinds of problematic practices that lead to use of force being included in mental health-focused settlement agreements and consent decrees. These included:

- Despite training, officers at two institutions observing clear signs and symptoms of mental illness impairing a person's functioning, and having that confirmed by mental health staff, but interpreting the patient as in control of his/her actions and willfully resistant and in violation of rules, heightening the risk of staff seeing the need to use violence to contain the person
- A patient was decompensated enough to require enforced medication but was disciplined for refusing to be handcuffed for the procedure

- When there was a one-on-one fight between individuals in custody, at least 16 officers stood around the outside of the yard fence and made no movement toward intervening.[115]
- Because it occurred shortly after a use of force, officers filmed an entire mental health therapeutic contact with a patient, all of which can be heard clearly on the video. IDOC informs the monitoring team that this is by policy.

Defendants' filings with the Court on this topic bear a brief mention. Defendants' quarterly reports often lay out disagreements with the monitoring team, sometimes mischaracterizing the team's findings. As a non-party, the team generally does not engage in responsive written argument. Defendants' comments on use of force, however, are particularly egregious, and can leave the Court with a particularly inaccurate impression of the team's methods, scope of inquiry, and experience.

Defendants object that the Monitor's December 2021 report had insufficient basis because it was based solely on documents; that report, however, details that findings were based on documents, videotape, and staff and patient interviews. The scope of the monitoring team's findings are formed not by personal preference, but by the Settlement Agreement term that Defendants are to abide by two administrative directives and 20 Ill. Admin. Code § 501.30. The monitoring team assesses whether that has been accomplished, employing the elements of that administrative code section. Finally, Defendants assert that the monitoring team is unqualified to make this assessment required of us, without ever having inquired into the team's background. The team member responsible for recent force analyses, for example, has monitored use of force since 1992, principally in the two largest state corrections systems in the US, including their supermax prisons. This report is not the forum for going into greater detail, but Defendants are encouraged to ask about the team's experience rather than putting conclusions on record without having any facts.

As some of the practices described above are contrary to 20 Ill. Admin. Code § 501.30 and are not minor or occasional, IDOC is Noncompliant with this requirement.

## XXV: DISCIPLINE OF SERIOUSLY MENTALLY ILL OFFENDERS

**Summary:** Once again, Assistant Monitor Reena Kapoor, M.D. conducted an expert analysis of the requirements contained in XXV(a). The results of this particular analysis are basically the same as she has found over the last several report cycles. The Department has consistently ignored her findings and recommendations. Once again, a rating of noncompliance will be assigned. I'm once again requesting that departmental leadership arrange a series of meetings with Dr. Kapoor to address this very serious issue.

---

[115] These were not officers deployed to the scene; these were people walking by who stopped to watch. Other officers were attempting intervention by firing a warning shot and shooting OC from a distance, but neither of these actions was having an effect for some time. There were seven other individuals in custody on the yard and they all distanced themselves from the fight.

**XXV(a): Specific requirement:** IDOC has implemented system-wide policies and procedures governing the disposition of disciplinary proceedings in which SMI offenders face potential segregation terms as a result of a disciplinary hearing for a major offense as defined in 20 Ill. Admin. Code section 504.50(d)(3). Those policies and procedures are contained in AD 05.12.103.

AD 05.12.103 provides:

G. Requirements

The Chief Administrative Officer of each facility that houses SMI offenders shall:

1. Establish and maintain a list of offenders identified as SMI. This list shall be made available to the Adjustment Committee upon request.

2. Ensure all members of the Adjustment Committee receive training on administration of discipline and hearing procedures.

H. Disciplinary Process

1. When an offender, who has been identified as SMI, is issued an Offender Disciplinary Report, DOC 0317, for a major offense where the disciplinary action may include segregation time:

a. The shift commander shall, within 24 hours, notify the facility's Office of Mental Health Management.

b. The facility Mental Health Authority shall assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:

(1) The reviewing MHPs opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.

(2) The reviewing MHPs opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any reason why placement in segregation status would be inadvisable, such as the offender appearing acutely psychotic or actively suicidal, a recent serious suicide attempt or the offender's need for immediate placement in a Crisis Treatment Level of Care; and

(3) Based on clinical indications, recommendations, if any, for a specific term of segregation, including no segregation time, or specific treatment during the term of segregation.

2. In accordance with Department Rule 504: Subpart A, all disciplinary hearings shall be convened within 14 days of the commission of the offense; however, if the MHP provides the offender is unable to participate due to mental health reasons, a stay of continuance shall be issued until such time the reviewing MHP determines the offender available to participate.

a. The Adjustment Committee shall take into consideration all opinions provided on the DOC 0443 and may request the reviewing MHP to appear before the committee to provide additional testimony, as needed.

b. If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.

c. If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chef Administrative Officer (CAO). The CAO shall:

> (1) Review the recommendations of the reviewing MHP and the Adjustment Committee;

> (2) Consult with the reviewing MHP regarding the appropriateness of the disciplinary action recommended by the Adjustment Committee; and

> (3) Provide his or her final determination. Any deviation from MHPs recommendation shall be documented in writing on the Adjustment Committee Summary, DOC 0319, and shall be maintained as a permanent part of the offender's disciplinary file.

d. In accordance with Department Rule 504.80, a copy of the DOC 0317 and DOC 0319 shall be forwarded to the CAO for review and final determination. If the Adjustment Committee's final disposition recommends a term of segregation, the CAO shall compare the recommendation to that of the 0443.

e. All information, including the recommendation of the reviewing MHP and disciplinary action imposed, shall be documented in the Disciplinary Tracking System.

3. No later than the last day of the month following that being reported, the Adjustment Committee shall compile and submit to the respective Deputy Director a summary of the Adjustment Committee hearing of offenders identified as SMI, who were issued a DOC 0317 for a major offense for which the disciplinary action included segregation time.

a. The summary shall include the offense for which the DOC 0317 was issued, reviewing MHPs opinions and recommendations, and outcome and disciplinary action imposed by the Adjustment Committee.

b. Any recommendations by the Deputy director to change imposed disciplinary action shall be discussed with the Chief Administrative Officer, treating, and reviewing MHP,

and as necessary, the Adjustment Committee. Approved adjustments shall be made accordingly.

4. A copy of the DOC 0319 shall be provided to the offender.

**Findings:** As in previous reports, Assistant Monitor, Reena Kapoor, M.D., conducted an updated review of the disciplinary process for seriously mentally ill (SMI) class members in IDOC. Her findings from her May 27, 2022, letter to me follow:

May 27, 2022

Re: *Rasho v. Jeffreys*

Dear Dr. Stewart:

At your request, I performed an updated review of the disciplinary process for seriously mentally ill (SMI) offenders in the Illinois Department of Corrections (IDOC). The conclusions in this report are based on my review of the following documents:

1. IDOC Administrative Directive 05.12.103, "Administration of Discipline for Offenders Identified as Seriously Mentally Ill."

2. IDOC Quarterly Report dated April 25, 2022, re: compliance with settlement agreement

3. Mid-Year Report of Monitor Pablo Stewart, MD, dated December 6, 2021

4. Adjustment Committee reports, Mental Health Disciplinary Review (DOC 0443), Offender Disciplinary reports (DOC 0317), and mental health progress notes for a total of 182 disciplinary infractions adjudicated during March 2022, representing approximately 20% of incidents involving SMI offenders at the following facilities:

   1. Centralia –  two incidents
   2. Danville –  one incident
   3. Decatur – two incidents
   4. Dixon –  44 incidents
   5. East Moline –  one incident
   6. Elgin –  one incident
   7. Graham –  two incidents
   8. Hill – 14 incidents
   9. Illinois River –  two incidents
   10. Jacksonville – four incidents
   11. Joliet Treatment Center – 25 incidents
   12. Lawrence – six incidents
   13. Lincoln – five incidents
   14. Logan – six incidents
   15. Menard – 11 incidents

16. Pinckneyville – 11 incidents
17. Pontiac – 28 incidents
18. Robinson – one incident
19. Shawnee – two incidents
20. Sheridan – four incidents
21. Stateville NRC – three incidents
22. Taylorville – one incident
23. Vandalia – one incident
24. Western Illinois – five incidents

*I note that the documentation from several facilities was incomplete, with missing Adjustment Committee reports, mental health progress notes, and/or 0443 forms, which limited the scope of my analysis.*

5. Email communication from Ginny Morrison dated May 25, 2022

## Overall Findings

There has been no improvement in IDOC's SMI disciplinary procedures since my last review. I remain dissatisfied with two aspects of the SMI disciplinary process that are important to compliance with Section XXV of the Settlement Agreement:

(1) Lack of face-to-face assessments of offenders when MHPs are making recommendations related to discipline; and
(2) Poor documentation of the rationale for MHPs' recommendations related to discipline.

IDOC believes that its current procedures are compliant with the terms of the settlement agreement, and it simply disagrees with my recommendation that face-to-face evaluations should be conducted. As noted in the April 2022 IDOC Quarterly Report, "face-to-face assessments by MHPs are not required in this situation and IDOC believes recommendations can be made based on a chart review when warranted." I acknowledge that Section XXV of the Settlement Agreement is silent on the matter, requiring only that IDOC implement its own policy, AD 05.12.103, which states, in relevant part (emphasis added):

*b. The facility Mental Health Authority shall **assign a reviewing MHP who shall review the offender's mental health record and DOC 0317 and, within 72 hours of the original notification, provide a completed Mental Health Disciplinary Review, DOC 0443 to the hearing investigator** who shall consider the report during his or her investigation in accordance with Department Rule 504. The DOC 0443 shall, at a minimum, provide:*

*(1) **The reviewing MHPs opinion if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense for which the DOC 0317 was issued.***
*(2) The reviewing MHPs opinion of overall appropriateness of placement in segregation status based on the offender's mental health symptoms and needs; including, potential for deterioration if placed in a segregation setting or any*

>    *reason why placement in segregation status would be inadvisable, such as the*
>    *offender appearing acutely psychotic or actively suicidal, a recent serious suicide*
>    *attempt or the offender's need for immediate placement in a Crisis Treatment*
>    *Level of Care; and*
>
> (3) *Based on clinical indications, recommendations, if any, for a specific term of*
>     *segregation, including no segregation time, or specific treatment during the term*
>     *of segregation.*

As I have noted before, I do not understand how an MHP can arrive at an opinion about "if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense" without actually asking the offender about said behavior.  Furthermore, during the current assessment, I found that in just 3 out of 182 cases of SMI discipline did IDOC's documentation contain ***any*** rationale for the MHP's opinion, either on the 0443 form or in the progress notes.  Accordingly, I remain concerned about the seemingly random recommendations made by MHPs to the facilities' Adjustment Committees.

Thus, my overall recommendation is unchanged: Please evaluate the offenders face-to-face to ask them about the circumstances leading to the disciplinary infraction, and then document that interaction and the rationale for any recommendations to the Adjustment Committee.

## Other Significant Findings

1. There was a substantial increase in the number of disciplinary infractions that were adjudicated in March 2022 when compared with May 2018 through November 2021, assuming that I reviewed approximately 20% of the total infractions.  The significance of this finding is unknown, as I could not discern any trends that would help explain the increase.



2. During the current reporting period, MHPs found that mental illness contributed to the offense in 7 out of 171 that I reviewed, or 4% of cases.  (11 infractions from Menard were excluded from this analysis because the MHP's documentation was confusing, stating

in all 11 cases both that mental illness contributed to the inmate's behavior but also that the inmate was stable at the time of the offense).  This continues a downward trend, as depicted in the graph below.  However, because the overall numbers are fairly small, the differences are not statistically significant, so no action is warranted at this time.



As noted in my November 2021 report, Dixon and Pontiac continue to opine that mental illness never contributes to offense behavior; this was true in all cases at Dixon and Pontiac during the current review.  This is a counterintuitive finding, given that those two facilities have the highest proportion of mentally ill offenders (excluding JTC).  Thus, I continue to have concerns about MHP fatigue or blindness to the effects of mental illness on behavior in the facilities with large volumes of disciplinary infractions to review.

3.  I found no cases in which offenders were punished for self-injurious behavior, and I found no cases in which segregation was used as a punishment (for SMI offenders) for 300- and 400-level infractions.  However, Ms. Morrison alerted me to one case where an RTU inmate was issued a ticket for refusing to be handcuffed for a forced medication injection.  This incident was similar to two others at Dixon that I documented in my November 2021 report.  In my opinion, it is not an appropriate to issue a ticket for refusing enforced medication, and the situation would be better handled as a clinical matter.  By definition, inmates are resistant to enforced medications, so a refusal to cooperate with the process should be expected and taken in stride, not made into a disciplinary matter.

4.  The Adjustment Committee at each IDOC facility consistently received input from MHPs regarding SMI inmates in a timely manner. In reviewing 182 infractions, I found that an MHP completed the DOC 0443 form and submitted it to the Adjustment Committee within 72 hours in all cases.

5.  In the majority of cases, the Adjustment Committee follows IDOC's policy 05.12.133, Section H.2, which states, in relevant part:

*If the MHP recommended, based on clinical indications, a specific segregation term, that no segregation time be served, or that a specific treatment during segregation is necessary, the committee shall adopt those recommendations.*

*If the Adjustment Committee disagrees with the recommendation of the reviewing MHP and recommends a more restrictive disciplinary action, the Adjustment Committee shall submit an appeal to the Chief Administrative Officer (CAO).*

Despite overall good compliance with the policy, Stateville NRC continues to routinely exceed MHPs' recommendations for segregation time without providing any justification for doing so. In March 2022, Stateville NRC provided detailed documentation for three disciplinary infractions for me to review, and it also provided a table listing the outcome of all 16 SMI disciplinary proceedings that occurred during the month. Based on that table, the Adjustment Committee issued segregation time greater than that recommended by the MHP in 6 out of 11 cases (March 2021 = 10 out of 16, September 2021 = 2 out of 11). The facility is clearly not following IDOC's policy 05.12.133, Section H.2, which requires a higher level of review by the Chief Administrative Officer and clear documentation of the rationale for deviating from mental health's recommendation.

6. The quality of mental health evaluations documented on the DOC 0443 form remains poor, containing standard language about whether mental illness contributed to an offense and a warning that extended segregation time can cause psychiatric decompensation. The progress notes are no better, also containing formulaic language about a disciplinary report being reviewed and arriving at a conclusion like "no mitigating factors were present" without any explanation. No substantive assessment of the offender is documented anywhere.

7. IDOC has still not clarified what they mean when they assert that "recommendations [about SMI discipline] can be made based on a chart review when warranted." I asked for this clarification – what does "when warranted" mean? – in May and November 2021, but no explanation has been proffered.

8. As I noted in November 2021, several facilities continue to issue disciplinary infractions to SMI offenders who refused to leave their segregation cells. Once again, I urge IDOC to change this practice by attempting to understand why the offender would prefer to stay in 23-hour lockdown rather than issuing disciplinary infractions. The behavior may indicate untreated psychiatric symptoms (e.g., paranoia, PTSD) or a psychosocial problem that can be addressed by the appropriate staff.

## **Recommendations**

Based on the information noted above, I recommend that IDOC take the following steps. These recommendations are unchanged from my May and November 2021 reports:

1. Adopt a policy of requiring face-to-face assessment of offenders by MHPs prior to making recommendations on the DOC 0443 form. These assessments should at least

include a basic inquiry about the offender's symptoms at the time of the offense and his/her account of what happened.

2.  Clearly delineate the rationale for the MHPs opinion regarding the disciplinary infraction in a mental health progress note.  Do not just document that the form was completed, as this created unnecessary paperwork and is clinically meaningless.

3.  Clarify what is meant by the assertion that "recommendations [about SMI discipline] can be made based on a chart review when warranted," specifying the circumstances in which such a strategy would be appropriate.

4.  Provide the Monitoring Team with IDOC's guidelines and/or training scheme for mental health professionals to complete the DOC 0443 form and mental health progress notes related to SMI offenders and discipline.

5.  Provide complete SMI discipline documents to the Monitoring Team for each offense, including:

    a.  Adjustment Committee Final Summary reports;
    b.  disciplinary reports;
    c.  0443 forms; and
    d.  mental health progress notes for each offense.

Unfortunately, we continue to receive partial information from many facilities, which limits my capacity to analyze the data and provide feedback to the court.

Please do not hesitate to contact me with questions or concerns about the information I conveyed in this report.

Respectfully submitted,

Reena Kapoor, MD
Associate Professor of Psychiatry
Yale School of Medicine

**Additional Requirements:**

I. Observation and Follow-up

1. Observation of offenders in segregation shall be conducted in accordance with existing policies and procedures.

**Findings:** Please refer to section XV(a)(vi)(B), above, for a discussion about this requirement.

2. Referrals for mental health services and response to offenders with serious or urgent mental health problems, as evidenced by a sudden or rapid change in an offender's behavior or behavior that may endanger themselves or others if not treated immediately, shall be handled in accordance with AD 04.04.100.

**Findings:** As reported since the Midyear Report of November 2020, two issues prevent IDOC from receiving a rating of substantial compliance for this sub-requirement. They are the persistent backlog and untimeliness of mental health evaluations and the ongoing issues of custody staff acting as gatekeepers to the Crisis Intervention Team. Nothing has significantly changed regarding these two issues during the current reporting period.

3. If, at any time, clinical indications suggest continued placement in segregation status poses an imminent risk of substantial deterioration to the an [sic] offender's mental health, the information shall be reviewed by the facility mental health authority.

**Findings:** Prior to the Covid pandemic, the monitoring team regularly observed class members in segregation who had already deteriorated and/or were demonstrating signs and reporting symptoms of mental deterioration. During the current reporting period, the Monitor was able to observe class members in segregation at Pontiac, Logan, Dixon and Joliet. This limited review found several class members who were demonstrating signs and reporting symptoms of mental deterioration. Due to the relatively small number of class members observed in segregation, however, I am unable to arrive at an authoritative opinion. Therefore, no rating will be assigned for this sub-requirement.

4. Any recommendations by the mental health authority for reduction in segregation time or termination of segregation status shall be discussed with the CAO.

**Findings:** The Department is meeting this requirement.

5. The CAO shall adjust the segregation term in accordance with the recommendations or, if the CAO does not agree with the recommendation of the mental health authority, he or she shall submit the issue to the respective Deputy Director for final determination.

**Findings:** The Department is meeting this requirement.

## XXVI: CONTINUOUS QUALITY IMPROVEMENT PROGRAM (CQI)

> **Summary:** IDOC is in Substantial Compliance with this Section, but with some significant recommendations for improvement.

**(XXVI)(a): Specific requirement:** IDOC shall fully implement the requirements of IDOC Administrative Directive 04.03.125 (Quality Improvement Program), together with the program described in the section entitled "Mental Health Quality Assurance/Continuous Quality Improvement Program" in the IDOC Mental Health Protocol Manual (incorporated by reference into IDOC AD 04.04.101 (Eff. 8/1/2014), section II (E)(2)) and the process described in the section entitled "Peer Review Process" in the IDOC Mental Health Protocol Manual. As part of this implementation, there will be particular focus on ensuring that any deficiencies identified by the required information-gathering and committee review become the basis of further actions to improve the quality of mental health services at each facility throughout IDOC.

**Findings:** IDOC remains in Substantial Compliance with this requirement and it is worth noting the purposes it can, and cannot, serve. The audits are a useful tool to get snapshots of mental health practices. They allow leaders to spot practices they would like to change, whether these be clinical responsibilities, documentation, or some aspects of custody support of mental health functions. The audits provide a routine avenue for onsite and regional leaders to keep an eye on mental health practices and to initiate problem-solving.

What the Quality Improvement Program cannot do, as it is currently designed, is produce accurate compliance percentages. This has been detailed in various Monitor's reports, but it bears summarizing here. The key reasons are:

- With the exception of crisis watch and restrictive housing, the audited charts are not selected with the knowledge that they can answer the questions being reviewed. It is left to chance whether the charts contain some of the requirements that apply to only some patients, or apply infrequently, such as mental health evaluations, new medications, enforced medication, and various others. Auditors are not required to pull charts with any specified length of stay in crisis watch and restrictive housing, so requirements that apply only to longer stays may not be present in those charts. These selection practices mean that conclusions may be reached based on few charts, or even no charts, and miss issues. This applies to a significant number of requirements.

- Charts are not selected to ensure that the different levels of care at an institution are included proportionately. This can mean that some programs are not examined sufficiently. It can also mean that if a smaller, intensive program has more charts in an audit than its proportion of the onsite mental health population, and this is aggregated with other types of patients on a requirement, this can result in a higher overall compliance percentage than in actual practice, and the opposite can happen if there are too few charts from the intensive program.

- Random selection method – in the sense of systematically choosing a sample at a regular interval, such as every 5th case or every 10th case – is generally thought to yield a more reliable picture of any population. It is unknown whether the Quality Improvement Program's selection approach has an effect on whether the charts audited show results similar to the overall population at a facility.

- When the same number of charts is audited at each institution, that necessarily skews systemwide percentages because facilities with small mental health populations are

overrepresented in the total and large programs are underrepresented in the total. This is compounded by the selection method not guaranteeing how many charts will include the requirements that happen occasionally.

In one 2021 quarterly set of audits, for example, the systemwide percentage included 20 charts from East Moline (mental health population under 200) and 3 charts from Dixon (mental health population more than 900) on a particular requirement.[116]

- ▪ Auditors use some correct measures and some incorrect ones, such as resetting deadlines for psychiatry appointments and mental health evaluations when a patient moves between prisons.

- ▪ IDOC combines all requirements of a given treatment area – such as restrictive housing or psychiatry – into one percentage that IDOC offers as a compliance percentage. It does not report by requirement, such as separate assessments of the level of performance of evaluations upon restrictive housing placement, weekly rounds, treatment plan updates, and so on. The frequency with which some requirements occur can take on outsized weight in a percentage that combines all requirements, and lower performance on some items can unintentionally be obscured.

The Quality Improvement Program remains valuable, and this discussion should not be read to imply otherwise. It is merely to highlight the purposes that the program best serves and that, to be able to establish a compliance picture sufficiently accurate for ongoing oversight, other methods are needed,

**XXVI(b): Specific requirement:** The statewide CQI Manager (Section XI(b), *above*) shall have the responsibility of ensuring that the steps identified in subsection (a), *above,* are taken.

**Findings:** IDOC is in Substantial Compliance with this requirement.

---

[116] This same issue can apply if an institution routinely has a high or low volume of a particular requirement. So, a reception center, for example, may have a low caseload but is tasked with completing many screenings and evaluations, so should have a higher number of charts included in a systemwide sample of those requirements.

## XXVII: MONITORING

Only three specific requirements of this section will be discussed in detail.

**XXVII(d): Specific requirement:** Should IDOC, during the life of this Settlement Agreement, deny any request of the Monitor relating either to the budget or staff he believes are required for the monitoring, IDOC shall notify the Monitor and Plaintiffs' counsel of the denial.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(iv): Specific requirement:** The Monitor may make recommendations for modifications or improvements to IDOC operations, policies and procedures related to the provision of adequate mental health care to class members. Such recommendations should be justified with supporting data which shall be provided to IDOC and Plaintiffs. IDOC shall accept such recommendations, propose an alternative, or reject the recommendation.

**Findings:** IDOC is in substantial compliance with this requirement.

**XXVII(f)(v): Specific requirement:** The Monitor shall strive to minimize interference with the mission of IDOC, or any other state agency involved, while at the same time having timely and complete access to all relevant files, reports, memoranda, or other documents within the control of IDOC or subject to access by IDOC; having unobstructed access during announced on-site tours and inspections to the institutions encompassed by this Settlement Agreement; having direct access to staff and to offenders; and having the authority to request private conversations with any party hereto and their counsel.

**Findings:** IDOC is in Substantial Compliance with this requirement.

## XXVIII: REPORTING AND RECORDKEEPING

**Specific requirement:** Beginning with the first full calendar quarter after the approval of the Settlement Agreement, IDOC shall submit to Plaintiffs' counsel and the Monitor, within thirty (30) days after the end of each calendar quarter during the life of this Settlement Agreement, a quarterly progress report ("quarterly report") covering each subject of the Settlement Agreement. This quarterly report shall contain the following:  a progress report on the implementation of the requirements of the Settlement Agreement, including hiring progress as indicated in Section IX (d), *supra*; a description of any problems anticipated with respect to meeting the requirements of the Settlement Agreement; and any additional matters IDOC believes should be brought to the attention of the Monitor.

**Findings**: IDOC is in Substantial Compliance with this requirement.

## CONCLUSION

The Department remains in noncompliance with 13 major areas of the Settlement Agreement. Inadequate number of clinical and custody staff is the prime reason for these areas of noncompliance. The Monitoring Team is available to the Department as technical assistance consultants if requested.

Respectfully submitted,

*/s/ Pablo Stewart, M.D.*                    Dated: May 31, 2022

Pablo Stewart, MD