### THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| **PATRICE DANIELS, GERRODO FORREST, JOSEPH HERMAN, HENRY HERSMAN, RASHEED MCGEE, FREDRICKA LYLES, CLARA PLAIR,** | **No. 1:07-CV-1298-MMM-JAG** |
| **Plaintiffs,** | **Judge Michael M. Mihm** |
| **v.** | |
| **ROB JEFFREYS, Director of IDOC; GOVERNOR J.B. PRITZKER; DR. MELVIN HINTON, Chief of Mental Health; and DR. WILLIAM PUGA, Chief of Psychiatry, in their official capacities,** | |
| **Defendants.** | |

### <u>FOURTH AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs, Patrice Daniels, Gerrodo Forrest, Joseph Herman, Henry Hersman, Rasheed McGee, Fredricka Lyles, and Clara Plair, currently incarcerated in correctional centers of the Illinois Department of Corrections (the "IDOC"), on their own behalf and on behalf of all people with mental illness who are now or will be incarcerated in IDOC correctional centers and are in need of mental health treatment, complain as follows:

### I.      FACTUAL ALLEGATIONS

1.      This is a class action lawsuit brought pursuant to 42 U.S.C. § 1983 to redress violations of Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free of cruel and unusual

punishment while they are incarcerated in IDOC facilities; to redress violations of their

liberty interests under the Due Process Clause of the Fourteenth Amendment; to redress

violations of the equal protection clause of the Fourteenth Amendment; and, pursuant to

the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131 *et seq.*, and the

Rehabilitation Act (the "Rehab. Act"), 29 U.S.C. § 794, to address their right to be free of

discrimination on account of their disabilities.

2.      Plaintiffs seek a judgment declaring that the Defendants' treatment of the

class is in violation of the Constitution and the federal disability rights laws. Plaintiffs

further seek an injunction against Defendants' unlawful conduct to prevent further harm

to the class as set forth below.

### A. The Significant Mental Health Treatment Needs of the Class

3.      More than 43% of people incarcerated in Illinois state prisons have been

identified as needing mental health treatment, with more than 12,000 currently on IDOC's

mental health caseload. Of that caseload, IDOC has designated more than 3,900

individuals in custody as currently having serious mental illness ("SMI"), which

according to IDOC protocols means that the individual, as a result of a diagnosed mental

illness, "exhibits impaired emotional, cognitive, or behavioral functioning that interferes

seriously with his or her ability to function adequately except with supportive treatment

or services."[1]

---

[1] Unless otherwise specified, all data referenced in this Fourth Amended Complaint is taken from
the most recent production by IDOC in this case and is up to date as of May or June 2022.
Defendants opposed providing more up-to-date data at this stage in the litigation.

2

4. The State of Illinois and the IDOC Defendants are well aware of the significant treatment needs of the many people with mental illness in their custody. And they are just as aware that the Department is not meeting those needs. Since this case was filed in 2007, three separate independent experts have assessed the system repeatedly and not one of them has found the care IDOC is providing to be adequate to meet the needs of those in custody.

5. In March 2012, the first team of experts, hired by the IDOC, issued their findings on the system as a whole and as to eight specific facilities. The report gave recommendations to address deficiencies in the system. The contents of that report, known as "the Cohen Report," remain under seal.

6. In 2014, Dr. Raymond Patterson, an independent court appointed expert, submitted a report to this Court finding numerous deficiencies with the IDOC's mental health system including failure to triage and treat patients in crisis, lack of staffing to adequately evaluate and provide care, and failure to provide care at all levels, including the lack of an inpatient hospital.

7. The Department agreed, committing in 2014 to fill the staffing shortages by October 2015 with a Remedial Plan that identified the needed clinical, security and administrative staff necessary to provide constitutionally adequate mental health treatment at all levels of care throughout IDOC systems.

8. Eight years and a failed "settlement agreement" later, Defendants still do not provide adequate treatment or conditions to the class. The Independent Monitor appointed in 2016 to review Defendants' compliance with the failed settlement

3

consistently found that Defendants failed to provide: timely mental health evaluations and responses to referrals; urgently needed crisis interventions; individualized treatment planning; enhanced care for those needing a referral to residential treatment units or inpatient units; therapeutic treatment conditions; and confidential treatment. The Monitor further found that the Department failed to properly take mental illness into account when using force and imposing discipline, that enforced medications and restraints were used inappropriately or for longer than clinically justified, and that the Department consistently lacked the necessary mental health staffing to provide adequate care.

9. Throughout the decade since the Cohen report, the Department has built new buildings, reconfigured space, created a plethora of new forms and policies, and budgeted for treatment staff. But what was created is a mental health "system" in name only. It does not meaningfully meet the treatment needs of members of the plaintiff class.

10. IDOC continues to not fully staff its mental health treatment system despite many years of plans, agreed reforms, and even court orders to do so. Year after year IDOC pays Wexford Health Sources, Inc. despite Wexford's failure to meet its contractual obligations to provide the staff needed.

a) In 2017 and 2018 during court proceedings in this case, IDOC admitted that the 115 Qualified Mental Health Professionals ("QMHPs") on staff were not enough to provide the care needed by the more than 12,000 patients on their caseloads. Today, the system has 21 *fewer* QMHPs than it had then. As of a report filed with the Court in April 2022, Wexford was providing only **94** QMHPs to provide care to a caseload of approximately 12,717 patients across IDOC's 30 prisons.

b)      The problem is not limited to certain facilities. Of the 30 IDOC prisons, fourteen (14) have vacancies in more than 50% of their QMHP positions. In fact, as of the most recent data, only four prisons have their budgeted QMHP positions fully staffed (Jacksonville, Murphysboro, Sheridan, Southwestern and Vandalia).

c)      Wexford's practice of understaffing is not limited to QMHPs. Many of the clinical staff positions that IDOC contracts with Wexford to provide are vacant, including 27% of Behavioral Health Technicians ("BHTs") and 13.6% of psychiatric providers across IDOC.

11.     As a result of these staffing deficiencies, class members rarely see their providers, much less receive effective treatment, whether through individual or group therapy. IDOC shifts many treatment responsibilities that should be handled by licensed professionals to bachelor's level staff —BHTs—who cannot provide treatment to anyone, much less the complex patients on IDOC's caseload. Even when mental health staff are available, the Department does not have enough security staff to escort patients to their mental health sessions.

12.     The lack of sufficient mental health staffing is a real impediment to providing constitutionally adequate care. For example, Dixon is one of IDOC's most important facilities for mental health treatment, with a caseload of 809 patients ranging from outpatient to inpatient level of care (as of December 2021). But in any given month, Dixon is short thousands of treatment staff hours. In November 2021, for example, Dixon was short 5,070.55 hours of treatment provider time in that one month alone. In other words, Wexford was providing only 59% of the mental health staff for which IDOC is

5

paying. This problem persists today (with Dixon showing 26 vacancies as of the April 2022 Quarterly Report).

13.     Another example is Menard Correctional Center, a maximum-security prison with one of the biggest mental health caseloads in the state, 1,006 patients, of whom 350 have SMI. Despite the enormous needs of the caseload at Menard, Wexford is staffing only 5 of the 12 contracted-for QMHPs and is short staffed on *every* clinical care position in its staffing plan and has been so for years. As a result of the short staffing of care providers at Menard:

        a)      Class members with known histories of mental illness are not timely evaluated for placement on the caseload, and sometimes not evaluated at all.

        b)      Requests by class members for help are often ignored. When they do get a response, sometimes months later, it is almost always at cell-front without any confidentiality and often by a BHT not qualified to evaluate or provide treatment.

        c)      Treatment groups are routinely canceled, and class members are often restricted in their cells for 22 or more hours a day without access to mental health treatment.

**B.  Individualized Treatment for Mental Illness is Not Provided**

14.     Defendants have admitted that mental health treatment must be individualized to the patient through proper evaluation and regular treatment planning. But that accepted standard of care is not followed in Illinois prisons. Without an effective system for individualized treatment, class members can struggle to maintain stability and,

when they experience instability or exacerbation of the symptoms of their mental illness, they do not receive the treatment or accommodation needed to help them stabilize.

15.     Evaluations of mental health diagnosis and treatment needs are regularly delayed for weeks or months. Even once done, they do not lead to individualized care. Class members are frequently moved from facility to facility, and those transfers lead to arbitrary changes in their level of care, diagnosis, and medications leading to further harm and de-stabilization.

16.     Gaps in medications, lapsed prescriptions and other problems with medication administration are frequent. This includes, for example, running medication passes at irregular hours with not enough time—or too much time—between doses, or at extremely early morning hours when most are sleeping. These problems interfere with medication compliance and efficacy, which can and do lead to exacerbations of symptoms of mental illness.

17.     At many facilities, confidentiality is not provided for mental health assessments, psychiatric care or treatment sessions, rendering them markedly ineffective since they require the patient to disclose their symptoms, worries, and fears to the other prisoners and unit staff around them. As a result, patients— even those who have requested help from mental health —will regularly deny or minimize their problems to avoid revealing their symptoms to those around them.

18.     This is in contrast to patient privacy protections under the law, and IDOC's own Standard Operating Procedure ("SOP") manual, which recognizes the importance of confidentiality due to the "assumption that a patient will be deterred from

seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship."

19.     Likewise, individualized treatment planning is foundational to providing adequate mental health treatment. Treatment planning is not a single document or form, but a process for targeting treatment to meet the specific mental health needs of the patient, with evaluation of progress and adjustment of treatment approaches as needed.

20.     In IDOC, the treatment plans do not meet these standards of care. In fact, the forms, even if completed, bear little relationship to the treatment provided, and frequently class members are not even aware of their content.

21.     Without effective individualized evaluation and treatment, class members are forced to rely on requests to try to get help when they need it. Requests for care or to see a crisis team member can go hours, days, and even weeks without a response.

22.     Across the system, class members whose symptoms progress to the point that they need urgent mental health interventions are ignored. Named Plaintiffs J. Herman, Clara Plair and Rasheed McGee, and many others, are told by correctional staff to go ahead and harm themselves when they ask for help. While IDOC's own protocols and policies say that IDOC will provide emergency and urgent crisis intervention responses, that is not the reality in the galleries where class members are held.

23.     When staff designated for crisis intervention do respond, they fail to provide the interventions and problem-solving that could assist the person to stabilize or avoid crisis. Instead, the response is generally limited to a suicide risk screening with staff completing a variety of forms. The class member does not experience help, but a

formulaic set of questions aimed at determining whether or not to place them on "crisis watch."

24.     Without a functional mental health treatment system to help people stabilize, or maintain stability, IDOC fails to intervene until after the crisis has occurred and then over-relies on the types of interventions that, under mental health standards of care, should be rarely utilized, including use of force, emergency enforced medications, four-point restraints and crisis watch placement.

### C. Construction of Buildings That Don't Provide Care

25.     Since the Rasho Settlement Agreement in 2016, the State has devoted significant resources to construction. IDOC has repeatedly pointed to its costly and numerous construction contracts, both to give the appearance of effort to address the well-known treatment failures, and as an excuse for their delay in providing actual care. *See, e.g.*, ECF 2405 at pg. 13 ("To meet this objective, the Department has already invested more than $45 million to build new facilities and rehabilitate existing facilities to provide mental health services to prisoners.") and DX-6 (December 2017 trial exhibit setting out capital projects). This focus on construction over care is another façade of a treatment system.

26.     For example, IDOC boasts the construction of a brand-new, state-of-the art inpatient treatment hospital budgeted at around $150,000,000.  Its stated operational capacity is **202 patients**, but IDOC has chosen to place only a few of the class members

who need hospitalization there. As of this filing, its reported population is only **11 patients**.[2]

27.     Prior to construction of the hospital, following the Rasho Settlement Agreement, IDOC spent millions to create a stop-gap facility at Elgin Mental Health Center with just 40 interim beds, while it constructed the long-promised hospital. Despite the significant need for enhanced care among the population, IDOC never filled those 40 beds at Elgin.

28.     IDOC spent approximately $17 million to build the Joliet Treatment Center, which was supposed to provide Residential Treatment Unit ("RTU") treatment space for 360 SMI class members. Despite this commitment, this RTU only houses 214 residents and has frequently had a much smaller population. Likewise, IDOC often leaves significant RTU bed space at Dixon and Pontiac unfilled.

**D.  Failure to Provide Higher Levels of Care**

29.     IDOC's criteria for transfer to a higher level of care is unclear and transfers appear to be arbitrary. Generally accepted treatment standards to provide higher levels of care for those who do not stabilize or cannot maintain stability with routine care are ignored, as are standards to increase the level of care during periods of suicidality and self-harm. Few class members who are in need are moved to higher levels of care even when experiencing instability, acute symptoms, deterioration of their mental health or other indicia of need for additional treatment.

---

[2] https://www2.illinois.gov/idoc/facilities/Pages/JolietInpatientTreatmentCenter.aspx (last visited September 15, 2022).

30.     Defendants instead continue the harmful practice of keeping class members in isolation on crisis watch for long periods. Class members who have been identified as being in acute distress or at risk of harm are "stripped out"—with no property and only a smock to wear—and locked in a crisis cell with nothing to do for 23.5-24 hours a day for days, weeks, and sometimes months on end. By Defendants' own admission, the conditions in the crisis watch can cause direct harm, often worsening the individuals' symptoms of mental illness.

31.     On crisis watch, class members are supposed to be observed by correctional staff for the purpose of preventing them from harming themselves. IDOC requires meticulous documentation by staff in these units, but does not ensure that the purpose of the placement is met. Self-harm is rampant in crisis units, occurring daily in front of the watch officers.

32.     Even when placed on crisis watch, class members are not provided with the type of treatment or conditions needed to help them, nor are they referred to treatment units that could provide enhanced care. This problem is well known to the Defendants but has not changed.

33.     When Defendants' crisis watch practices were the subject of litigation in the 2017-18 injunctive relief proceedings, Defendants issued a new protocol that required a once daily out-of-cell mental health assessment for 15 minutes. While that policy was grossly insufficient, even that minimal improvement has now been abandoned at multiple facilities—including several with the highest rates of crisis watch placements.

11

34.     Reductions in the use of four-point restraints—one of the most restrictive and dangerous interventions that can be utilized—following the injunctive relief proceedings were also short lived. Contrary to all standards of mental health care, class members in acute crisis are placed in four-point restraints without efforts to try other less-restrictive interventions first. Placements in four-point restraints frequently continue for far longer than necessary and without meaningful interventions that should be used to reduce the length of the placement. The result is that class members are left to suffer both physically and mentally in four-point restraints for days, and even weeks, at a time.

35.     The few patients who are referred for higher levels of care by treatment staff at their facilities regularly must wait up to a month before being transferred, and sometimes much longer. For some, particularly patients at some of the maximum-security facilities, wait times can be 6 months to a year for transfer to a higher level of care.

36.     The RTUs themselves are failing to provide a therapeutic setting or the enhanced treatment and activity that should be inherent to a residential treatment program. The treatment consists only of the same monthly check-ins that are provided at an outpatient level of care. Pontiac, Dixon and JTC have returned to more harsh and restrictive operations that are counter to therapeutic needs, including restricting many RTU level of care class members to isolation in their cells for 22-24 hours a day.

37.     Tragic harm has resulted from IDOC's failure to properly provide a higher level of care, including deaths by suicide. In February 2022, after experiencing repeated instances of decompensation of his mental illness over the course of months, a class member died by suicide. Three months prior to this death, in November, his psychiatric

provider at Shawnee Correctional Center noted that he was "demonstrating a clear manic episode and would be hospitalized if not incarcerated" and that his symptoms were worsening. Neither hospitalization nor a higher level of care were provided. Instead, a few weeks later, he was transferred to Menard, a maximum-security prison, where his file documents no mental health treatment interventions or care in the two months leading to his death despite the fact his decompensation was readily observable and audible to those in cells around him.

38.     In another case, Dixon RTU staff were aware of a 23-year-old class member's increased symptoms and ongoing suicidal ideation. The response, however, was to place him on crisis watch placement without the treatment interventions or out-of-cell activities to help him stabilize and prevent relapse. When he was released from watch, no steps were taken to update his treatment or help him address the stressors that were still causing his symptoms and suicidal thoughts. Within weeks, he successfully executed his suicide plan.

39.     At Pontiac, psychiatric providers and QMHPs check on patients at cell-front in lieu of mental health treatment sessions. Class members might get one or two groups a week, yard is rarely provided, and there is no dayroom. This results in their days-long confinement to cells which are often in considerable disrepair. A plan presented by IDOC to the Court in February 2022 to increase correctional staffing in the RTU by closing other units at Pontiac has not resulted in significant changes for these RTU class members, who continue to suffer. Stress levels are so high that, in August, approximately six class members set fires on their bodies inside their locked cells.

40.     Likewise, improvements that IDOC claimed would be provided in the RTUs at Dixon have not resulted in meaningful change. The lack of enhanced treatment—or any meaningful treatment at all—continues. In the X-house, Defendants have taken steps to make the conditions more restrictive and less therapeutic, even for those not in disciplinary segregation, including installing cages to be used as "dayroom" and covering exterior windows with metal, blocking much-needed natural light.

41.     Placement in IDOC's RTU is usually long-term and segregates class members with mental health disabilities from the general prison population. Because there are only a few RTU locations, these class members do not have access to the same programs, activities and services that IDOC provides in the general population facilities across the system.

42.     The result is that RTU class members are often less able to access—or are excluded entirely from—rehabilitative programming, including jobs, vocational skill development, and education. In this way, RTU class members are also cut off from many opportunities to get program credit which are available to other prisoners. IDOC has not provided program credit to class members for completing their treatment programs.

### E.  Punitive Responses to Mental Illness

43.     Defendants have long known that placing people with mental illness in isolation will exacerbate their mental illness. Studies have consistently found isolation to have significant detrimental impact on pre-existing mental illness, including a worsening of systems or onset of new symptoms, such as anxiety, panic, paranoia, depression, and psychosis; they have found severe and traumatic psychological and cognitive injury. Yet

14

Defendants hold class members in cell-restricted settings that have the same impact without accommodation for their mental health needs. This includes crisis watch, restrictive housing, on extended lockdowns, or simply for operational preferences to keep residents restricted to their cells.

44.    Decompensation due to mental illness is met with punitive measures, such as tactical team extractions from cells, use of force, and disciplinary tickets. These responses are not only harmful during the incident itself but lead to further isolation which causes further harm to the individual's mental functioning.

45.    IDOC is aware that placement in segregation is a red flag for mental illness that must trigger increased mental health treatment assessments and interventions, but at many facilities, it does not. The weekly rounds are little more than paperwork; confidentiality to assess for decompensation and provide treatment is not provided; and policies and plans for out of cell activities are routinely denied.

46.    Use of force is also particularly common in isolated and restrictive settings, such as crisis units, restrictive housing, and higher-security mental health units, where rates of serious mental illness are high. Despite an official policy that requires force to be used only as a last resort, it is common practice for security staff to use pepper spray and mace-ball guns against residents of these units when they do not comply with an order, regardless of their mental health status.

47.    Class members accumulate large amounts of segregation time and/or privilege restrictions for disciplinary infractions caused by their mental illness, but the disciplinary process fails to accommodate their mental health disability and needs. Unless

15

an individual is so decompensated as to not know what they are doing, their mental illness is not viewed as a mitigating factor in their discipline.

48.     Defendants adopted a policy for the stated purpose of reducing punitive disciplinary action for incidents resulting from mental illness and for individuals whose mental health would be harmed by disciplinary segregation. Defendants regularly assess whether the paperwork is filled out but ignore that the purpose of the policy is not being achieved. A class member can be so unstable as to require crisis watch placement, and yet can be disciplined for the same behavior.

49.     These discrepancies between policies as written and as implemented disproportionately impact class members of color in negative ways. Behaviors relating to their mental illness are even less likely to be accommodated. Their moments of crisis are met with racial degradation. There is rampant use of racial epithets by custody staff, which exacerbate the harms class members experience as a result of their unmet mental health needs while incarcerated.

50.      In particular, Black class members are even more likely to experience punitive responses to behaviors resulting from their mental illness. While IDOC's policies regarding security level, discipline, use of force, and housing placement are facially neutral, they are imposed and enforced such that class members of color are more likely to spend time in segregation, have force used against them, and be placed in more restrictive and/or higher security mental health units.

51.     Class members with SMI are, across the board, more likely to be placed in segregation, but the disparity is far greater for Black class members whose behavior

resulting from mental illness is less likely to be forgiven or excused. In June 2022, about 69% of individuals placed in restrictive housing were Black, while only 54% of IDOC's overall population during that month was Black. Meanwhile, only about 16% of the restrictive housing population was White, as compared with 32% of the overall IDOC population.

52.     Within RTU settings, Black class members are also more likely to be held in other more restrictive settings. For example, in the Dixon RTU, 71% of class members in the more restrictive unit, X-house, are Black and 21% are White, but in the STC, 57% are Black and 32% are white. In the BMUs at Pontiac and JTC , 87% of the population is Black—over *30% more* than the overall population, while only 10-20% of the BMU populations are White. Thus, in less restrictive RTU settings, the population breakdown is much closer to the breakdown of the overall population.

53.     The significant use of disciplinary and other punitive responses to class members negatively impacts both their placement and their access to programs, family visits, commissary, yard time, and even their release date. All of these restrictions detrimentally impact their mental health, limiting their ability to cope and recover, and making their periods of incarceration significantly more difficult.

**F.  The Named Plaintiffs**

54.     Plaintiff Patrice Daniels is currently incarcerated at Joliet Treatment Center, which is an RTU. He has previously been housed at Pontiac, Tams supermax, Stateville, Menard, Lawrence and Dixon Correctional Centers. His mental health diagnoses include bipolar disorder. Mr. Daniels has spent many years in segregation,

17

where he regularly cut himself in order to cope with the stress of isolation. At JTC, Mr.

Daniels does not receive the "enhanced treatment" that should be provided in an RTU.

He receives little therapy: as do those in outpatient care, he sees his assigned QMHP and

psychiatric providers monthly, and he long ago completed the rotation of treatment

groups that JTC offers. The facility has become more restrictive and Mr. Daniels now

experiences the placement as more injurious than helpful.

     55.     Plaintiff Gerrodo Forrest is currently incarcerated at Pinckneyville

Correctional Center. He has previously been at Menard and Pontiac Correctional Centers.

He has a history of mental illness including auditory hallucinations, thought process

disturbances, and repeated suicide attempts. He is considered SMI, but he receives little

mental health treatment. He is scheduled to see his QMHP once a month but only for a

check-in. He has repeatedly asked to get into programming, such as school or a job, but is

always denied. He spends most of his time in his cell, with only a few hours of dayroom

or recreation a week. He was recently placed on crisis watch for eight days without

mental health treatment or activities. He has also been held in segregation on

"investigatory status" for extended periods without any mental health interventions he

needed.

     56.     Plaintiff J. Herman is a transgender woman currently incarcerated at

Dixon Correctional Center. She has previously been placed at Pontiac, Tams supermax,

and Joliet Treatment Center. She has a long history of psychiatric distress and self-harm,

and is diagnosed with bipolar disorder, schizophrenia, and depression. She is RTU level

of care, but her placement in X-house is not a therapeutic setting. She receives no

treatment groups (other than her transgender support group) and no confidential therapy. Even her psychiatric provider sees her out in the open where others can overhear. Since being transferred to the X-house from JTC approximately six months ago, she has been placed on crisis watch five times and has had to be taken to the outside hospital for urgent treatment on multiple occasions. While on crisis watch, she has had no out-of-cell treatment or activity --even the daily mental health assessments are at cell front.

57.     Plaintiff Henry Hersman is currently incarcerated at Jacksonville Correctional Center, a minimum-security facility, and was previously placed at Graham and Hill Correctional Center, as well as the Dixon RTU. He has been diagnosed with schizophrenia, bipolar disorder, and post-traumatic stress disorder. In the past, he has swallowed razor blades, and attempted to commit suicide by driving a car into a house. In recent years, symptoms of his mental illness worsened during a period of restriction and in-cell isolation. Having already served twenty years of incarceration, he is now preparing for his release in 2025. His primary mental health treatment in IDOC is medication management; he also has check-ins with his QMHP every thirty days.

58.     Plaintiff Rasheed McGee is currently incarcerated at Pontiac Correctional Center. He is RTU level of care and has previously been placed at Elgin Treatment Center, Joliet Treatment Center, and Dixon, Pontiac and Tams Correctional Centers. Mr. McGee's diagnoses include schizoaffective and bipolar disorders; he regularly experiences paranoia, delusions and hallucinations that are not controlled despite being on enforced psychotropic medications. He is not receiving the enhanced treatment that IDOC policy states should be provided in an RTU. He has infrequent contact with his

QMHP and psychiatric provider, and it is typically at cell front. He is frequently disciplined for his mental illness, including numerous tickets while on crisis watch. He recently received a ticket for "insolence" for an incident in which he was attempting to hang himself and the officer O.C. sprayed him.  Mr. McGee has a history of traumatic brain injury, which has been worsened by multiple beatings by correctional staff throughout his incarceration, including when officers entered his cell and slammed his head into the wall.

59.     Fredricka Lyles is currently incarcerated at Logan Correctional Center. She has a significant history of trauma and struggled with severe mental illness since childhood. The symptoms she experiences remain poorly controlled even after years in Logan's RTU. She regularly has flashbacks, nightmares, paranoia, insomnia, and auditory and visual hallucinations. Although she is classified as minimum security and is housed in the mental health unit, she does not receive adequate mental health treatment. When she sees her QMHP, it is not confidential. She is scheduled to see a psychiatrist once a month, but these follow-ups have been inconsistent and resulted in gaps in much-needed medications. These gaps have serious consequences for Ms. Lyles—in June she was not given her anti-psychotic medication for over a week and in that time suffered a serious self-harm incident requiring hospitalization for the second time this spring. Ms. Lyles tried to call for help before self-harming, but no one responded for two hours.

60.     Plaintiff Clara Plair is currently incarcerated at Logan Correctional Center. She has a diagnosis of PTSD. Currently Ms. Plair is designated as having SMI, she is outpatient level of care in a general population housing unit. Out-of-cell dayroom time in

her housing unit has been reduced in recent months to just 90 minutes in the morning and in the evening, leaving Ms. Plair restricted to her cell for long hours. She previously spent 14 years in segregation and this type of restriction has a significant impact on her mental health stability. From her cell, she has a hard time getting help when she needs it. When she was placed on crisis watch for ten days earlier this summer, she did not receive any help for her mental health problems but was kept in a cell alone with no property – at first not even a mattress—for nearly 24 hours a day. The only mental health treatment she received were two-minute daily assessments. Ms. Plair has suffered from gaps in her medications due to inconsistent psychiatric care, causing significant mental distress.

## II.    Jurisdiction and Venue

61.    The court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b) because at least one of the Defendants resides in the District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District.

## III.   Class Action

62.    A class action is proper pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure. The class was previously certified on August 14, 2015 as all persons now or in the future in the custody of the IDOC who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association except that a diagnosis of alcoholism or drug addiction, development disorder, or any form of sexual

disorder shall not, by itself render an individual mentally ill for purposes of this class definition.

## COUNT I

### Deliberate Indifference to the Serious Risk of Harm in Violation of the Eighth and Fourteenth Amendment Rights (Against All Defendants)

63.     Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as if fully set forth herein.

64.     Defendant Rob Jeffreys is the Director of the IDOC; as such, he has overall responsibility for IDOC's policies and procedures and the administration of all correctional facilities in the State. Director Jeffreys is sued in his official capacity.[3]

65.     Defendant J.B. Pritzker is the Governor and Chief Executive Officer of the State of Illinois. Pursuant to the Illinois Constitution, Article V, Section 8, he has "the supreme executive power, and shall be responsible for the faithful execution of the laws." Governor Pritzker has the ultimate authority for ensuring that all executive agencies, including the IDOC, function in compliance with state and federal law. As such, Governor Pritzker is ultimately responsible for ensuring the provision of adequate mental health treatment to individuals in the custody of the sate. Governor Pritzker is sued in his official capacity.

66.     Defendant Dr. Melvin Hinton reports to Defendant Jeffreys and is the Chief of Mental Health Services for the IDOC. As such, he has immediate responsibility

---

[3] Director Jeffreys is automatically substituted for John Baldwin, the former director of the IDOC, pursuant to Rule 25(d).

for the mental health care of individuals in the custody of the IDOC. Dr. Hinton is sued in his official capacity.[4]

67.     Defendant Dr. William Puga reports to Defendant Jeffreys and is the Chief of Psychiatric Services for the IDOC.  As such, he has immediate responsibility for the psychiatric care needs of individuals in the custody of the IDOC. Dr. Puga is sued in his official capacity.

68.     Named Plaintiffs and the class have been deprived of and continue to be deprived of their rights under the Eighth Amendment and Fourteenth Amendment by Defendants' failure to provide them with adequate mental health care and treatment during their custody, which places them at substantial risk of harm. Defendants are aware of the substantial risk of harm from the deprivations and treatment set forth herein but have failed to take reasonable measures to address the risk of harm and prevent further harm.

69.     Defendants' failure to take reasonable steps to address the deprivations to the class that they have long been aware of, and their continued reliance on methods that they know have not and will not prevent the harm to the class demonstrates deliberate indifference in violation of the Eighth Amendment and Fourteenth Amendment.

70.     Defendants know of and disregard a serious risk of harm to people with mental illness in their custody. As a result of Defendants' actions and inactions, Plaintiffs and the class have experienced and will continue to experience mental, emotional, and

---

[4] Dr. Wendy Navarro, the former Chief of Mental Health and Psychiatric Services, was named in previous versions of this complaint. Since the filing of this case, the IDOC has split this official role into two positions—Chief of Psychiatry and Chief of Mental Health Services. Thus, Defendants Hinton and Puga are substituted for Wendy Navarro.

physical pain and injury, including by causing avoidable pain, mental suffering, and deterioration of their health.

71.     Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## COUNT II
### (Violation of Equal Protection Under the Fourteenth Amendment for Declaratory and Injunctive Relief against All Defendants)

72.     Plaintiffs reallege and incorporate by reference the foregoing Paragraph as if fully stated herein.

73.     Punitive responses against Class Members who act out or violate rules as a result of their mental illness are more likely to be experienced by class members of color. Defendants' policies and procedures are enforced in such a way that leads class members of color, and particularly those who are Black, to be treated differently from their White counterparts when subjected to punitive responses to their mental illness. Specifically, Defendants' policies and procedures regarding security levels, discipline, use of force, and placement are employed in such a way that Black and Brown class members who are experiencing mental illness are more likely to be placed in settings that are more restrictive and less therapeutic, and more likely to be the subjects of use of force, than their White peers who are similarly situated.

74.     The selective enforcement and application of these policies results in disparate and discriminatory treatment of Black and Brown class members in violation of their right to Equal Protection under the Fourteenth Amendment.

24

75.     In addition to the statistically disproportionate racial impact, rampant use of racial epithets and racially degrading statements and behaviors by staff demonstrate the racially discriminatory motivation behind this unequal application of facially neutral policies and procedures.

76.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## COUNT III

**Violation of Liberty Interest Under the Due Process Clause of the Fourteenth Amendment (Against All Defendants)**

77.     Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as if fully set forth herein.

78.     Defendants' acts or omissions cause Plaintiffs and the class to be subjected to punishment and discipline that due to their mental illness imposes an atypical and significant hardship in relation to the ordinary incidents of prison life.

79.     Defendants' acts and/or omissions, set forth in more detail above, which fail to consider mental illness and impose additional punishment violate the liberty interests and due process rights of the Plaintiffs and the class secured under the Fourteenth Amendment of the U.S. Constitution.

25

80.     As a proximate result of Defendants' conduct, Plaintiffs and the class have suffered, and will continue to suffer a deprivation of the rights secured under the Constitution and laws of the United States.

81.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## COUNT IV

### Disability Discrimination in Violation of Title II of the Americans with Disabilities Act (Against Defendant Jeffreys as Director of IDOC)

82.     Plaintiffs reallege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

83.     Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

84.     IDOC is a public entity covered by Title II of the ADA as set forth in 42 U.S.C. § 12131.

85.     Plaintiffs and Members of the class are individuals with disabilities within the meaning of the ADA in that they have mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Major life activities of class members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself,

eating, sleeping, concentrating; as well limitations of brain function that result from psychological conditions.

86.     As individuals incarcerated in the custody of the IDOC, Plaintiffs and members of the class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

87.     Defendants discriminate against the Plaintiffs and class members on the basis of their disabilities by:

  a)     Subjecting them to isolative confinement that disparately impacts them due to their mental illness without providing needed reasonable modifications;

  b)     Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings and denial of privileges, as a result of their mental illness;

  c)     Segregating RTU level of care class members in conditions that are harmful to their mental illnesses and deny them equal access to programs, services and activities that are available to those without disabilities.

88.     In the manner alleged above, Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the ADA.

89.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

27

## COUNT V

**Disability Discrimination in Violation of Section 504 of the Rehabilitation Act
(Against Defendant Jeffreys as Director of IDOC)**

90.     Plaintiffs reallege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

91.     Section 504 provides that "[]no otherwise qualified individual with a disability in the United States …shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794

92.     The IDOC is subject to the Rehabilitation Act as a state agency that receives federal financial assistance. 29 U.S.C. §794(b); C.F.R. § 27.1.

93.     Plaintiffs and members of the class are individuals with disabilities within the meaning of the Rehabilitation Act and its implementing regulations in that they have mental impairments that substantially limit one or more major life activities. Major life activities of class members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself, eating, sleeping, concentrating; as well limitations of brain function that result from psychological conditions.

94.     As individuals incarcerated in the custody of the IDOC, Plaintiffs and members of the class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

95.     Defendants discriminate against the Plaintiffs and class members on the basis of their disabilities by:

28

a)      Subjecting them to isolative confinement that disparately impacts them due to their mental illness without providing needed reasonable modifications;

b)      Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings and denial of privileges, as a result of their mental illness;

c)      Segregating RTU level of care class members in conditions that are harmful to their mental illness and deny them equal access to programs, services and activities that are available to those without disabilities.

In acting in the manner alleged above, the Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the Rehabilitation Act.

96.      As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

## REQUEST FOR RELIEF:

Wherefore, Plaintiffs and the class members request that this Court:

(a)      Declare that Defendants' actions and inactions are unlawful and unconstitutional for the reasons specified above;

(b)      Enter a preliminary and permanent injunction directing Defendants to provide constitutionally adequate mental health treatment and to avoid discrimination on the basis of mental health disability;

29

(c)    Award Plaintiffs and the class members their costs and reasonable

attorneys' fees pursuant to 28 U.S.C. § 1988 and 42 U.S.C. § 12205;

(d)    Award any such further relief as the Court may deem just.

RESPECTFULLY SUBMITTED,

_/s/ Amanda Antholt_
One of the attorneys for Plaintiffs

Harold C. Hirshman
Samantha R. Reed
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
harold.hirshman@dentons.com
samantha@equipforequality.org

Amanda Antholt
Barry C. Taylor
Laura J. Miller
Equip for Equality,
Suite 300
20 N. Michigan Ave.
Chicago, IL 60602
(312) 341-0022 (phone)
(312) 895-7330 (direct)
barryt@equipforequality.org
laura@equipforequality.org
amanda@equipforequality.org

Alan Mills
Nicole Schult
Uptown People's Law Center
4413 N Sheridan
Chicago, IL 60640
(773) 769-1410 (phone)
alan@uplcchicago.org
nicole@uplcchicago.org

30