## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| PATRICE DANIELS, GERRODO FORREST, JOSEPH HERMAN,  HENRY HERSMAN, RASHEED MCGEE, FREDRICKA LYLES, CLARA PLAIR, | No. 1:07-CV-1298-MMM |
| Plaintiffs, | Judge Michael M. Mihm |
| v. | |
| ROB JEFFREYS, Director of IDOC; GOVERNOR J.B. PRITZKER; DR. MELVIN HINTON, Chief of Mental Health; and DR. WILLIAM PUGA, Chief of Psychiatry, in their official capacities, | |
| Defendants. | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFFS' FOURTH AMENDED CLASS ACTION COMPLAINT

Defendants, Rob Jeffreys, Dr. Melvin Hinton, and Dr. William Puga, in their official

capacities, for their Answer to Plaintiffs' Fourth Amended Complaint [d/e 3632], state:

1.      This is a class action lawsuit brought pursuant to 42 U.S.C. § 1983 to redress
violations of Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments
to the U.S. Constitution to be free of cruel and unusual punishment while they are incarcerated in
IDOC facilities; to redress violations of their liberty interests under the Due Process Clause of the
Fourteenth Amendment; to redress violations of the equal protection clause of the Fourteenth
Amendment; and, pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§
12131 *et seq.*, and the Rehabilitation Act (the "Rehab. Act"), 29 U.S.C. § 794, to address their right
to be free of discrimination on account of their disabilities.

**ANSWER:** Defendants admit that Plaintiffs filed a class action lawsuit alleged violations

of Plaintiffs' Eighth and Fourteenth Amendment rights to the U.S. Constitution, the Americans

with Disabilities Act, and the Rehabilitation Act. Defendants deny that they violated any of

Plaintiffs' rights.

2.      Plaintiffs seek a judgment declaring that the Defendants' treatment of the class is in violation of the Constitution and the federal disability rights laws. Plaintiffs further seek an injunction against Defendants' unlawful conduct to prevent further harm to the class as set forth below.

**ANSWER:** Defendants admit that Plaintiffs seek a judgment declaring Defendants'

conduct unconstitutional and in violation of the ADA and Rehabilitation Act, and that Plaintiffs

seek injunctive relief. Defendants deny that they violated any of Plaintiffs' rights and deny that

Plaintiffs are entitled to any relief.

3.      More than 43% of people incarcerated in Illinois state prisons have been identified as needing mental health treatment, with more than 12,000 currently on IDOC's mental health caseload. Of that caseload, IDOC has designated more than 3,900 individuals in custody as currently having serious mental illness ("SMI"), which according to IDOC protocols means that the individual, as a result of a diagnosed mental illness, "exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with his or her ability to function adequately except with supportive treatment or services." [FN1]

> [FN1] Unless otherwise specified, all data referenced in this Fourth Amended Complaint is taken from the most recent production by IDOC in this case and is up to date as of May or June 2022. Defendants opposed providing more up-to-date data at this stage in the litigation.]

**ANSWER:** Defendants deny that they opposed providing more up-to-date data.

Defendants admit the remaining allegations in paragraph 3.

4.      The State of Illinois and the IDOC Defendants are well aware of the significant treatment needs of the many people with mental illness in their custody. And they are just as aware that the Department is not meeting those needs. Since this case was filed in 2007, three separate independent experts have assessed the system repeatedly and not one of them has found the care IDOC is providing to be adequate to meet the needs of those in custody.

**ANSWER:** Defendants deny the allegations in paragraph 4.

5.      In March 2012, the first team of experts, hired by the IDOC, issued their findings on the system as a whole and as to eight specific facilities. The report gave recommendations to address deficiencies in the system. The contents of that report, known as "the Cohen Report," remain under seal.

**ANSWER:** Defendants admit the allegations in paragraph 5.

6.      In 2014, Dr. Raymond Patterson, an independent court appointed expert, submitted a report to this Court finding numerous deficiencies with the IDOC's mental health system including failure to triage and treat patients in crisis, lack of staffing to adequately evaluate and provide care, and failure to provide care at all levels, including the lack of an inpatient hospital.

**ANSWER:** Defendants admit the allegations in paragraph 6.

7.      The Department agreed, committing in 2014 to fill the staffing shortages by October 2015 with a Remedial Plan that identified the needed clinical, security and administrative staff necessary to provide constitutionally adequate mental health treatment at all levels of care throughout IDOC systems.

**ANSWER:** Defendants admit that the Department committed in 2014 to a Remedial Plan

for staffing. Defendants deny the remaining allegations in paragraph 7.

8.      Eight years and a failed "settlement agreement" later, Defendants still do not provide adequate treatment or conditions to the class. The Independent Monitor appointed in 2016 to review Defendants' compliance with the failed settlement consistently found that Defendants failed to provide: timely mental health evaluations  and responses to referrals; urgently needed crisis interventions; individualized treatment planning; enhanced care for those needing a referral to residential treatment units or inpatient units; therapeutic treatment conditions; and confidential treatment. The Monitor further found that the Department failed to properly take mental illness into account when using force and imposing discipline, that enforced medications and restraints were used inappropriately or for longer than clinically justified, and that the Department consistently lacked the necessary mental health staffing to provide adequate care.

**ANSWER:** Defendants deny the allegations in paragraph 8.

9.      Throughout the decade since the Cohen report, the Department has built new buildings, reconfigured space, created a plethora of new forms and policies, and budgeted for treatment staff. But what was created is a mental health "system" in name only. It does not meaningfully meet the treatment needs of members of the plaintiff class.

**ANSWER:** Defendants admit that since the Cohen report, the Department has built new

buildings, reconfigured space, created new forms and polices, and budgeted for treatment staff.

Defendants deny the remaining allegations in paragraph 9.

10.      IDOC continues to not fully staff its mental health treatment system despite many years of plans, agreed reforms, and even court orders to do so. Year after year IDOC pays Wexford Health Sources, Inc. despite Wexford's failure to meet its contractual obligations to provide the staff needed.

a)              In 2017 and 2018 during court proceedings in this case, IDOC admitted that the 115 Qualified Mental Health Professionals ("QMHPs") on staff were not enough to provide

the care needed by the more than 12,000 patients on their caseloads. Today, the system has 21 *fewer* QMHPs than it had then. As of a report filed with the Court in April 2022, Wexford was providing only **94** QMHPs to provide care to a caseload of approximately 12,717 patients across IDOC's 30 prisons.

b)          The problem is not limited to certain facilities. Of the 30 IDOC prisons, fourteen (14) have vacancies in more than 50% of their QMHP positions. In fact, as of the most recent data, only four prisons have their budgeted QMHP positions fully staffed (Jacksonville, Murphysboro, Sheridan, Southwestern and Vandalia).

c)          Wexford's practice of understaffing is not limited to QMHPs. Many of the clinical staff positions that IDOC contracts with Wexford to provide are vacant, including 27% of Behavioral Health Technicians ("BHTs") and 13.6% of psychiatric providers across IDOC.

**ANSWER:** Defendants deny the allegations in paragraph 10, and all subparagraphs.

11.     As a result of these staffing deficiencies, class members rarely see their providers, much less receive effective treatment, whether through individual or group therapy. IDOC shifts many treatment responsibilities that should be handled by licensed professionals to bachelor's level staff —BHTs—who cannot provide treatment to anyone, much less the complex patients on IDOC's caseload. Even when mental health staff are available, the Department does not have enough security staff to escort patients to their mental health sessions.

**ANSWER:** Defendants deny the allegations in paragraph 11.

12.     The lack of sufficient mental health staffing is a real impediment to providing constitutionally adequate care. For example, Dixon is one of IDOC's most important facilities for mental health treatment, with a caseload of 809 patients ranging from outpatient to inpatient level of care (as of December 2021). But in any given month, Dixon is short thousands of treatment staff hours. In November 2021, for example, Dixon was short 5,070.55 hours of treatment provider time in that one month alone. In other words, Wexford was providing only 59% of the mental health staff for which IDOC is paying. This problem persists today (with Dixon showing 26 vacancies as of the April 2022 Quarterly Report).

**ANSWER:** Defendants deny the allegations in paragraph 12.

13.     Another example is Menard Correctional Center, a maximum-security prison with one of the biggest mental health caseloads in the state, 1,006 patients, of whom 350 have SMI. Despite the enormous needs of the caseload at Menard, Wexford is staffing only 5 of the 12 contracted-for QMHPs and is short staffed on *every* clinical care position in its staffing plan and has been so for years. As a result of the short staffing of care providers at Menard:

a)          Class members with known histories of mental illness are not timely evaluated for placement on the caseload, and sometimes not evaluated at all.

b)          Requests by class members for help are often ignored. When they do get a response, sometimes months later, it is almost always at cell-front without any confidentiality and often by a BHT not qualified to evaluate or provide treatment.

c)          Treatment groups are routinely canceled, and class members are often restricted in their cells for 22 or more hours a day without access to mental health treatment.

**ANSWER:** Defendants admit that Menard Correctional Center is a maximum security prison and admit that it has one of the biggest mental health caseloads in the state. Defendants deny the remaining allegations in paragraph 13, and all subparagraphs.

14.     Defendants have admitted that mental health treatment must be individualized to the patient through proper evaluation and regular treatment planning. But that accepted standard of care is not followed in Illinois prisons. Without an effective system for individualized treatment, class members can struggle to maintain stability and when they experience instability or exacerbation of the symptoms of their mental illness, they do not receive the treatment or accommodation needed to help them stabilize.

**ANSWER:** Defendants deny the allegations in paragraph 14.

15.     Evaluations of mental health diagnosis and treatment needs are regularly delayed for weeks or months. Even once done, they do not lead to individualized care. Class members are frequently moved from facility to facility, and those transfers lead to arbitrary changes in their level of care, diagnosis, and medications leading to further harm and de-stabilization.

**ANSWER:** Defendants deny the allegations in paragraph 15.

16.     Gaps in medications, lapsed prescriptions and other problems with medication administration are frequent. This includes, for example, running medication passes at irregular hours with not enough time—or too much time—between doses, or at extremely early morning hours when most are sleeping. These problems interfere with medication compliance and efficacy, which can and do lead to exacerbations of symptoms of mental illness.

**ANSWER:** Defendants deny the allegations in paragraph 16.

17.     At many facilities, confidentiality is not provided for mental health assessments, psychiatric care or treatment sessions, rendering them markedly ineffective since they require the patient to disclose their symptoms, worries, and fears to the other prisoners and unit staff around them. As a result, patients— even those who have requested help from mental health —will regularly deny or minimize their problems to avoid revealing their symptoms to those around them.

**ANSWER:** Defendants deny the allegations in paragraph 17.

18.     This is in contrast to patient privacy protections under the law, and IDOC's own Standard Operating Procedure ("SOP") manual, which recognizes the importance of confidentiality due to the "assumption that a patient will be deterred from seeking care and discussing the important matters relevant to therapy if there is not some guaranteed confidentiality in that relationship."

**ANSWER:** Defendants admit that the quote in paragraph 18 is from IDOC's Standard

Operating Procedure Manual. Defendants deny the remaining allegations in paragraph 18.

19.     Likewise, individualized treatment planning is foundational to providing adequate mental health treatment. Treatment planning is not a single document or form, but a process for targeting treatment to meet the specific mental health needs of the patient, with evaluation of progress and adjustment of treatment approaches as needed.

**ANSWER:** Defendants deny the allegations in paragraph 19.

20.     In IDOC, the treatment plans do not meet these standards of care. In fact, the forms, even if completed, bear little relationship to the treatment provided, and frequently class members are not even aware of their content.

**ANSWER:** Defendants deny the allegations in paragraph 20.

21.     Without effective individualized evaluation and treatment, class members are forced to rely on requests to try to get help when they need it. Requests for care or to see a crisis team member can go hours, days, and even weeks without a response.

**ANSWER:** Defendants deny the allegations in paragraph 21.

22.     Across the system, class members whose symptoms progress to the point that they need urgent mental health interventions are ignored. Named Plaintiffs J. Herman, Clara Plair and Rasheed McGee, and many others, are told by correctional staff to go ahead and harm themselves when they ask for help. While IDOC's own protocols and policies say that IDOC will provide emergency and urgent crisis intervention responses, that is not the reality in the galleries where class members are held.

**ANSWER:** Defendants deny the allegations in paragraph 22.

23.     When staff designated for crisis intervention do respond, they fail to provide the interventions and problem-solving that could assist the person to stabilize or avoid crisis. Instead, the response is generally limited to a suicide risk screening with staff completing a variety of forms. The class member does not experience help, but formulaic set of questions aimed at determining whether or not to place them on "crisis watch."

**ANSWER:** Defendants deny the allegations in paragraph 23.

24.     Without a functional mental health treatment system to help people stabilize, or maintain stability, IDOC fails to intervene until after the crisis has occurred and then over-relies on the types of interventions that, under mental health standards of care, should be rarely utilized, including use of force, emergency enforced medications, four-point restraints and crisis watch placement.

**ANSWER:** Defendants deny the allegations in paragraph 24.

25.     Since the Rasho Settlement Agreement in 2016, the State has devoted significant resources to construction. IDOC has repeatedly pointed to its costly and numerous construction contracts, both to give the appearance of effort to address the well-known treatment failures, and as an excuse for their delay in providing actual care. *See, e.g.*, ECF 2405 at pg. 13 ("To meet this objective, the Department has already invested more than $45 million to build new facilities and rehabilitate existing facilities to provide mental health services to prisoners.") and DX-6 (December 2017 trial exhibit setting out capital projects). This focus on construction over care is another façade of a treatment system.

**ANSWER:** Defendants admit that the State has devoted financial resources to construction as required by the 2016 Rasho Settlement Agreement. Defendants admit that paragraph 25 quotes a portion of ECF 2405 and that DX-6 sets out capital projects. Defendants deny the remaining allegations in paragraph 25.

26.     For example, IDOC boasts the construction of a brand-new, state-of-the art inpatient treatment hospital budgeted at around $150,000,000. Its stated operational capacity is **202 patients**, but IDOC has chosen to place only a few of the class members who need hospitalization there. As of this filing, its reported population is only **11 patients**. [FN2]
    [FN2]  https://www2.illinois.gov/idoc/facilities/Pages/JolietInpatientTreatmentCenter.aspx (last visited September 15, 2022).

**ANSWER:** Defendants admit that IDOC constructed an inpatient treatment hospital that is now open at a cost of approximately $150,000,000. Defendants deny the remaining allegations in paragraph 26.

27.     Prior to construction of the hospital, following the Rasho Settlement Agreement, IDOC spent millions to create a stop-gap facility at Elgin Mental Health Center with just 40 interim beds, while it constructed the long-promised hospital. Despite the significant need for enhanced care among the population, IDOC never filled those 40 beds at Elgin.

**ANSWER:** Defendants admit that as required in the 2016 Settlement Agreement, IDOC previously used Elgin Treatment Center for inpatient care. Defendants deny the remaining allegations in paragraph 27.

28.     IDOC spent approximately $17 million to build the Joliet Treatment Center, which was supposed to provide Residential Treatment Unit ("RTU") treatment space for 360 SMI class members. Despite this commitment, this RTU only houses 214 residents and has frequently had a much smaller population. Likewise, IDOC often leaves significant RTU bed space at Dixon and Pontiac unfilled.

**ANSWER:** Defendants deny the allegations in paragraph 28.

29.     DOC's criteria for transfer to a higher level of care is unclear and transfers appear to be arbitrary. Generally accepted treatment standards to provide higher levels of care for those who do not stabilize or cannot maintain stability with routine care are ignored, as are standards to increase the level of care during periods of suicidality and self-harm. Few class members who are in need are moved to higher levels of care even when experiencing instability, acute symptoms, deterioration of their mental health or other indicia of need for additional treatment.

**ANSWER:** Defendants deny the allegations in paragraph 29.

30.     Defendants instead continue the harmful practice of keeping class members in isolation on crisis watch for long periods. Class members who have been identified as being in acute distress or at risk of harm are "stripped out"—with no property and only a smock to wear— and locked in a crisis cell with nothing to do for 23.5-24 hours a day for days, weeks, and sometimes months on end. By Defendants' own admission, the conditions in the crisis watch can cause direct harm, often worsening the individuals' symptoms of mental illness.

**ANSWER:** Defendants deny the allegations in paragraph 30.

31.     On crisis watch, class members are supposed to be observed by correctional staff for the purpose of preventing them from harming themselves. IDOC requires meticulous documentation by staff in these units, but does not ensure that the purpose of the placement is met. Self-harm is rampant in crisis units, occurring daily in front of the watch officers.

**ANSWER:** Defendants admit that class members on crisis watch are observed by correctional staff. Defendants deny the remaining allegations in paragraph 31.

32.     Even when placed on crisis watch, class members are not provided with the type of treatment or conditions needed to help them, nor are they referred to treatment units that could provide enhanced care. This problem is well known to the Defendants but has not changed.

**ANSWER:** Defendants deny the allegations in paragraph 32.

33.     When Defendants' crisis watch practices were the subject of litigation in the 2017-18 injunctive relief proceedings, Defendants issued a new protocol that required a once daily out-of-cell mental health assessment for 15 minutes. While that policy was grossly insufficient, even that minimal improvement has now been abandoned at multiple facilities—including several with the highest rates of crisis watch placements.

**ANSWER:** Defendants deny the allegations in paragraph 33.

34.     Reductions in the use of four-point restraints—one of the most restrictive and dangerous interventions that can be utilized—following the injunctive relief proceedings were also short lived. Contrary to all standards of mental health care, class members in acute crisis are placed

in four-point restraints without efforts to try other less- restrictive interventions first. Placements in four-point restraints frequently continue for far longer than necessary and without meaningful interventions that should be used to reduce the length of the placement. The result is that class members are left to suffer both physically and mentally in four-point restraints for days, and even weeks, at a time.

**ANSWER:** Defendants deny the allegations in paragraph 34.

35.     The few patients who are referred for higher levels of care by treatment staff at their facilities regularly must wait up to a month before being transferred, and sometimes much longer. For some, particularly patients at some of the maximum-security facilities, wait times can be 6 months to a year for transfer to a higher level of care.

**ANSWER:** Defendants deny the allegations in paragraph 35.

36.     The RTUs themselves are failing to provide a therapeutic setting or the enhanced treatment and activity that should be inherent to a residential treatment program. The treatment consists only of the same monthly check-ins that are provided at an outpatient level of care. Pontiac, Dixon and JTC have returned to more harsh and restrictive operations that are counter to therapeutic needs, including restricting many RTU level of care class members to isolation in their cells for 22-24 hours a day

**ANSWER:** Defendants deny the allegations in paragraph 36.

37.     Tragic harm has resulted from IDOC's failure to properly provide a higher level of care, including deaths by suicide. In February 2022, after experiencing repeated instances of decompensation of his mental illness over the course of months, a class member died by suicide. Three months prior to this death, in November, his psychiatric provider at Shawnee Correctional Center noted that he was "demonstrating a clear manic episode and would be hospitalized if not incarcerated" and that his symptoms were worsening. Neither hospitalization nor a higher level of care were provided. Instead, a few weeks later, he was transferred to Menard, a maximum-security prison, where his file documents no mental health treatment interventions or care in the two months leading to his death despite the fact his decompensation was readily observable and audible to those in cells around him.

**ANSWER:** Defendants admit that in February 2022, a class member died by suicide.

Defendants deny the remaining allegations in paragraph 37.

38.     In another case, Dixon RTU staff were aware of a 23-year-old class member's increased symptoms and ongoing suicidal ideation. The response, however, was to place him on crisis watch placement without the treatment interventions or out-of- cell activities to help him stabilize and prevent relapse. When he was released from watch, no steps were taken to update his treatment or help him address the stressors that were still causing his symptoms and suicidal thoughts. Within weeks, he successfully executed his suicide plan.

**ANSWER:** Defendants deny the allegations in paragraph 38.

39.     At Pontiac, psychiatric providers and QMHPs check on patients at cell- front in lieu of mental health treatment sessions. Class members might get one or two groups a week, yard is rarely provided, and there is no dayroom. This results in their days-long confinement to cells which are often in considerable disrepair. A plan presented by IDOC to the Court in February 2022 to increase correctional staffing in the RTU by closing other units at Pontiac has not resulted in significant changes for these RTU class members, who continue to suffer. Stress levels are so high that, in August, approximately six class members set fires on their bodies inside their locked cells.

**ANSWER:** Defendants admit Pontiac Correctional Center does not have dayrooms.

Defendants deny the allegations in paragraph 39.

40.     Likewise, improvements that IDOC claimed would be provided in the RTUs at Dixon have not resulted in meaningful change. The lack of enhanced treatment—or any meaningful treatment at all—continues. In the X-house, Defendants have taken steps to make the conditions more restrictive and less therapeutic, even for those not in disciplinary segregation, including installing cages to be used as "dayroom" and covering exterior windows with metal, blocking much-needed natural light.

**ANSWER:** Defendants deny the allegations in paragraph 40.

41.     Placement in IDOC's RTU is usually long-term and segregates class members with mental health disabilities from the general prison population. Because there are only a few RTU locations, these class members do not have access to the same programs, activities and services that IDOC provides in the general population facilities across the system.

**ANSWER:** Defendants deny the allegations in paragraph 42.

42.     The result is that RTU class members are often less able to access—or are excluded entirely from—rehabilitative programming, including jobs, vocational skill development, and education. In this way, RTU class members are also cut off from many opportunities to get program credit which are available to other prisoners. IDOC has not provided program credit to class members for completing their treatment programs.

**ANSWER:** Defendants deny the allegations in paragraph 42.

43.     Defendants have long known that placing people with mental illness in isolation will exacerbate their mental illness. Studies have consistently found isolation to have significant detrimental impact on pre-existing mental illness, including a worsening of systems or onset of new symptoms, such as anxiety, panic, paranoia, depression, and psychosis; they have found severe and traumatic psychological and cognitive injury.  Yet Defendants hold class members in cell-restricted settings that have the same impact without accommodation for their mental health needs. This includes crisis watch, restrictive housing, on extended lockdowns, or simply for operational preferences to keep residents restricted to their cells.

**ANSWER:** Defendants deny the allegations in paragraph 43.

44.    Decompensation due to mental illness is met with punitive measures, such as tactical team extractions from cells, use of force, and disciplinary tickets. These responses are not only harmful during the incident itself but lead to further isolation which causes further harm to the individual's mental functioning.

**ANSWER:** Defendants deny the allegations in paragraph 44.

45.    IDOC is aware that placement in segregation is a red flag for mental illness that must trigger increased mental health treatment assessments and interventions, but at many facilities, it does not. The weekly rounds are little more than paperwork; confidentiality to assess for decompensation and provide treatment is not provided; and policies and plans for out of cell activities are routinely denied.

**ANSWER:** Defendants deny the allegations in paragraph 45.

46.    Use of force is also particularly common in isolated and restrictive settings, such as crisis units, restrictive housing, and higher-security mental health units, where rates of serious mental illness are high. Despite an official policy that requires force to be used only as a last resort, it is common practice for security staff to use pepper spray and mace-ball guns against residents of these units when they do not comply with an order, regardless of their mental health status.

**ANSWER:** Defendants deny the allegations in paragraph 46.

47.    Class members accumulate large amounts of segregation time and/or privilege restrictions for disciplinary infractions caused by their mental illness, but the disciplinary process fails to accommodate their mental health disability and needs. Unless an individual is so decompensated as to not know what they are doing, their mental illness is not viewed as a mitigating factor in their discipline.

**ANSWER:** Defendants deny the allegations in paragraph 47.

48.    Defendants adopted a policy for the stated purpose of reducing punitive disciplinary action for incidents resulting from mental illness and for individuals whose mental health would be harmed by disciplinary segregation. Defendants regularly assess whether the paperwork is filled out but ignore that the purpose of the policy is not being achieved. A class member can be so unstable as to require crisis watch placement, and yet can be disciplined for the same behavior.

**ANSWER:** Defendants deny the allegations in paragraph 48.

49.    These discrepancies between policies as written and as implemented disproportionately impact class members of color in negative ways. Behaviors relating to their mental illness are even less likely to be accommodated. Their moments of crisis are met with racial degradation. There is rampant use of racial epithets by custody staff, which exacerbate the harms

class members experience as a result of their unmet mental health needs while incarcerated.

**ANSWER:** Defendants deny the allegations in paragraph 49.

50.     In particular, Black class members are even more likely to experience punitive responses to behaviors resulting from their mental illness. While IDOC's policies regarding security level, discipline, use of force, and housing placement are facially neutral, they are imposed and enforced such that class members of color are more likely to spend time in segregation, have force used against them, and be placed in more restrictive and/or higher security mental health units.

**ANSWER:** Defendants deny the allegations in paragraph 50.

51.     Class members with SMI are, across the board, more likely to be placed in segregation, but the disparity is far greater for Black class members whose behavior resulting from mental illness is less likely to be forgiven or excused. In June 2022, about 69% of individuals placed in restrictive housing were Black, while only 54% of IDOC's overall population during that month was Black. Meanwhile, only about 16% of the restrictive housing population was White, as compared with 32% of the overall IDOC population.

**ANSWER:** Defendants deny the allegations in paragraph 51.

52.     Within RTU settings, Black class members are also more likely to be held in other more restrictive settings. For example, in the Dixon RTU, 71% of class members in the more restrictive unit, X-house, are Black and 21% are White, but in the STC, 57% are Black and 32% are white. In the BMUs at Pontiac and JTC , 87% of the population is Black—over ***30% more*** than the overall population, while only 10-20% of the BMU populations are White. Thus, in less restrictive RTU settings, the population breakdown is much closer to the breakdown of the overall population.

**ANSWER:** Defendants deny the allegations in paragraph 52.

53.     The significant use of disciplinary and other punitive responses to class members negatively impacts both their placement and their access to programs, family visits, commissary, yard time, and even their release date. All of these restrictions detrimentally impact their mental health, limiting their ability to cope and recover, and making their periods of incarceration significantly more difficult.

**ANSWER:** Defendants deny the allegations in paragraph 53.

54.     Plaintiff Patrice Daniels is currently incarcerated at Joliet Treatment Center, which is an RTU. He has previously been housed at Pontiac, Tams [sic] supermax, Stateville, Menard, Lawrence and Dixon Correctional Centers. His mental health diagnoses include bipolar disorder. Mr. Daniels has spent many years in segregation, where he regularly cut himself in order to cope with the stress of isolation. At JTC, Mr. Daniels does not receive the "enhanced treatment" that should be provided in an RTU. He receives little therapy: as do those in outpatient care, he sees his

assigned QMHP and psychiatric providers monthly, and he long ago completed the rotation of treatment groups that JTC offers. The facility has become more restrictive and Mr. Daniels now experiences the placement as more injurious than helpful.

**ANSWER:** Defendants admit that Patrice Daniels is currently incarcerated at Joliet Treatment Center, which is an RTU. Defendants admit that Mr. Daniels was previously incarcerated at Pontiac, Tamms, Stateville, Menard, Lawrence, and Dixon Correctional Centers and previously spent time in disciplinary segregation. Defendants admit that Mr. Daniels' mental health diagnoses include bipolar disorder. Defendants deny the remaining allegations in paragraph 54.

55.     Plaintiff Gerrodo Forrest is currently incarcerated at Pinckneyville Correctional Center. He has previously been at Menard and Pontiac Correctional Centers. He has a history of mental illness including auditory hallucinations, thought process disturbances, and repeated suicide attempts. He is considered SMI, but he receives little mental health treatment. He is scheduled to see his QMHP once a month but only for a check-in. He has repeatedly asked to get into programming, such as school or a job, but is always denied. He spends most of his time in his cell, with only a few hours of dayroom or recreation a week. He was recently placed on crisis watch for eight days without mental health treatment or activities. He has also been held in segregation on "investigatory status" for extended periods without any mental health interventions he needed.

**ANSWER:** Defendants admit that Gerrodo Forrest is currently incarcerated at Pinckneyville Correctional Center, and that he was previously incarcerated at Menard and Pontiac Correctional Centers. Defendants admit that Mr. Forrest has a history of mental illness. Defendants admit that Mr. Forrest has been designated as SMI. Defendants deny the remaining allegations in paragraph 55.

56.     Plaintiff J. Herman is a transgender woman currently incarcerated at Dixon Correctional Center. She has previously been placed at Pontiac, Tams [sic] supermax, and Joliet Treatment Center. She has a long history of psychiatric distress and self-harm, and is diagnosed with bipolar disorder, schizophrenia, and depression. She is RTU level of care, but her placement in X-house is not a therapeutic setting. She receives no treatment groups (other than her transgender support group) and no confidential therapy. Even her psychiatric provider sees her out in the open where others can overhear. Since being transferred to the X-house from JTC approximately six months ago, she has been placed on crisis watch five times and has had to be taken to the outside hospital for urgent treatment on multiple occasions. While on crisis watch, she has had no out-of-cell treatment or activity --even the daily mental health assessments are at cell front.

**ANSWER:** Defendants admit that Ms. Herman is currently incarcerated at Dixon Correctional Center, and that she has previously been placed at Pontiac, Tamms, and Joliet Correctional Centers. Defendants admit that Ms. Herman has a history of mental illness. Defendants admit the Ms. Herman is RTU level of care. Defendants admit that Ms. Herman has a history of crisis watch placements. Defendants deny the remaining allegations in paragraph 56.

57.     Plaintiff Henry Hersman is currently incarcerated at Jacksonville Correctional Center, a minimum-security facility, and was previously placed at Graham and Hill Correctional Center, as well as the Dixon RTU.  He has been diagnosed with schizophrenia, bipolar disorder, and post-traumatic stress disorder.  In the past, he has swallowed razor blades, and attempted to commit suicide by driving a car into a house. In recent years, symptoms of his mental illness worsened during a period of restriction and in-cell isolation. Having already served twenty years of incarceration, he is now preparing for his release in 2025. His primary mental health treatment in IDOC is medication management; he also has check-ins with his QMHP every thirty days.

**ANSWER:** Defendants admit that Henry Hersman is currently incarcerated at Jacksonville Correctional Center, and that he was previously placed at Graham, Hill, and Dixon Correctional Centers. Defendants admit that Mr. Hersman has a history of mental illness. Defendants admit that Mr. Hersman is projected to be released in 2025. Defendants deny the remaining allegations in paragraph 57.

58.     Plaintiff Rasheed McGee is currently incarcerated at Pontiac Correctional Center. He is RTU level of care and has previously been placed at Elgin Treatment Center, Joliet Treatment Center, and Dixon, Pontiac and Tams [sic] Correctional Centers.  Mr. McGee's diagnoses include schizoaffective and bipolar disorders; he regularly experiences paranoia, delusions and hallucinations that are not controlled despite being on enforced psychotropic medications. He is not receiving the enhanced treatment that IDOC policy states should be provided in an RTU. He has infrequent contact with his QMHP and psychiatric provider, and it is typically at cell front. He is frequently disciplined for his mental illness, including numerous tickets while on crisis watch. He recently received a ticket for "insolence" for an incident in which he was attempting to hang himself and the officer O.C. sprayed him.  Mr. McGee has a history of traumatic brain injury, which has been worsened by multiple beatings by correctional staff throughout his incarceration, including when officers entered his cell and slammed his head into the wall.

**ANSWER:** Defendants admit that Rasheed McGee is currently incarcerated at Pontiac Correctional Center, and has previously been placed at Elgin Treatment Center, Joliet Treatment

1:07-cv-01298-MMM  # 3656  Page 15 of 27

Center, and Dixon, Pontiac, and Tamms Correctional Centers. Defendants admit that Mr. McGee

has a history of mental illness. Defendants deny the remaining allegations in paragraph 58.

59.     Fredricka Lyles is currently incarcerated at Logan Correctional Center. She has a
significant history of trauma and struggled with severe mental illness since childhood. The
symptoms she experiences remain poorly controlled even after years in Logan's RTU. She
regularly has flashbacks, nightmares, paranoia, insomnia, and auditory and visual hallucinations.
Although she is classified as minimum security and is housed in the mental health unit, she does
not receive adequate mental health treatment. When she sees her QMHP, it is not confidential. She
is scheduled to see a psychiatrist once a month, but these follow-ups have been inconsistent and
resulted in gaps in much- needed medications. These gaps have serious consequences for Ms.
Lyles—in June she was not given her anti-psychotic medication for over a week and in that time
suffered a serious self-harm incident requiring hospitalization for the second time this spring. Ms.
Lyles tried to call for help before self-harming, but no one responded for two hours.

    **ANSWER:** Defendants admit that Fredricka Lyles is currently incarcerated at Logan

Correctional Center. Defendants admit that Ms. Lyles has a history of mental illness. Defendants

deny the remaining allegations in paragraph 59.

60.     Plaintiff Clara Plair is currently incarcerated at Logan Correctional Center. She has
a diagnosis of PTSD. Currently Ms. Plair is designated as having SMI, she is outpatient level of
care in a general population housing unit. Out-of-cell dayroom time in her housing unit has been
reduced in recent months to just 90 minutes in the morning and in the evening, leaving Ms. Plair
restricted to her cell for long hours. She previously spent 14 years in segregation and this type of
restriction has a significant impact on her mental health stability. From her cell, she has a hard
time getting help when she needs it. When she was placed on crisis watch for ten days earlier this
summer, she did not receive any help for her mental health problems but was kept in a cell alone
with no property – at first not even a mattress—for nearly 24 hours a day. The only mental health
treatment she received were two-minute daily assessments. Ms. Plair has suffered from gaps in her
medications due to inconsistent psychiatric care, causing significant mental distress.

    **ANSWER:** Defendants admit that Clara Plair is currently incarcerated at Logan

Correctional Center. Defendants admit that Ms. Plair has a history of mental illness. Defendants

admit that Ms. Plair has been in disciplinary segregation in the past. Defendants deny the remaining

allegations in paragraph 60.

61.     The court has jurisdiction of this cause pursuant to 28 U.S.C. §§ 1331 and
1343(a)(3) and (4). Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b)
because at least one of the Defendants resides in the District and a substantial part of the events
and omissions giving rise to Plaintiffs' claims occurred in the District.

Case No. 07-cv-1298-MMM-JEH                                                      Page **15** of 27

**ANSWER:** Defendants admit the allegations in paragraph 61.

62.     A class action is proper pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure. The class was previously certified on August 14, 2015 as all persons now or in the future in the custody of the IDOC who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association except that a diagnosis of alcoholism or drug addiction, development disorder, or any form of sexual disorder shall not, by itself render an individual mentally ill for purposes of this class definition.

**ANSWER:** Defendants admit that a class was previously certified for settlement purposes on August 14, 2015 and that paragraph 62 provides the class definition. Defendants deny the remaining allegations in paragraph 62.

## COUNT I

**Deliberate Indifference to the Serious Risk of Harm in Violation of the Eighth and Fourteenth Amendment Rights (Against All Defendants)**

63.     Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as if fully set forth herein.

**ANSWER:** Defendants restate and incorporate by reference their answers to the proceeding paragraphs of the Fourth Amended Complaint.

64.     Defendant Rob Jeffreys is the Director of the IDOC; as such, he has overall responsibility for IDOC's policies and procedures and the administration of all correctional facilities in the State. Director Jeffreys is sued in his official capacity. [FN3]
[FN3] Director Jeffreys is automatically substituted for John Baldwin, the former director of the IDOC, pursuant to Rule 25(d).

**ANSWER:** Defendants admit the allegations in paragraph 64.

65.     Defendant J.B. Pritzker is the Governor and Chief Executive Officer of the State of Illinois. Pursuant to the Illinois Constitution, Article V, Section 8, he has "the supreme executive power, and shall be responsible for the faithful execution of the laws." Governor Pritzker has the ultimate authority for ensuring that all executive agencies, including the IDOC, function in compliance with state and federal law. As such, Governor Pritzker is ultimately responsible for ensuring the provision of adequate mental health treatment to individuals in the custody of the sate [sic]. Governor Pritzker is sued in his official capacity.

**ANSWER:** JB Pritzker has separately moved to dismiss the claims against him. To the

extent a response is deemed necessary, Defendants admit that JB Pritzker is the Governor and

Chief Executive Officer of the State of Illinois. Defendants admit that paragraph 65 quotes the

Illinois Constitution, Article V, Section 8. Defendants deny the remaining allegations in paragraph

65.

66.     Defendant Dr. Melvin Hinton reports to Defendant Jeffreys and is the Chief of
Mental Health Services for the IDOC. As such, he has immediate responsibility for the mental
health care of individuals in the custody of the IDOC. Dr. Hinton is sued in his official
capacity.[FN4]
      [FN4] Dr. Wendy Navarro, the former Chief of Mental Health and Psychiatric Services,
was named in previous versions of this complaint. Since the filing of this case, the IDOC has split
this official role into two positions—Chief of Psychiatry and Chief of Mental Health Services.
Thus, Defendants Hinton and Puga are substituted for Wendy Navarro.

      **ANSWER:** Defendants deny that Dr. Hinton reports to Director Jeffreys. Defendants

admit that Dr. Hinton is the Chief of the Mental Health Services for IDOC. Defendants admit that

Dr. Hinton is sued in his official capacity. Defendants admit that Dr. Hinton, along with Dr. Puga,

is the successor to Dr. Navarro. Defendants admit that Dr. Hinton oversees IDOC's mental health

system. Defendants deny that Dr. Hinton has immediate responsibility for the mental health of

individuals in the custody of IDOC.

67.     Defendant Dr. William Puga reports to Defendant Jeffreys and is the Chief of
Psychiatric Services for the IDOC.  As such, he has immediate responsibility for the psychiatric
care needs of individuals in the custody of the IDOC. Dr. Puga is sued in his official capacity.

      **ANSWER:** Defendants deny that Dr. Puga reports to Director Jeffreys. Defendants admit

that Dr. Puga is the Chief of Psychiatric Services for IDOC. Defendants admit that Dr. Puga is

sued in his official capacity. Defendants deny that Dr. Puga has immediate responsibility for the

psychiatric needs of individuals in the custody of IDOC.

68.     Named Plaintiffs and the class have been deprived of and continue to be deprived
of their rights under the Eighth Amendment and Fourteenth Amendment by Defendants' failure to
provide them with adequate mental health care and treatment during their custody, which places
them at substantial risk of harm. Defendants are aware of the substantial risk of harm from the
deprivations and treatment set forth herein but have failed to take reasonable measures to address

the risk of harm and prevent further harm.

    **ANSWER:** Defendants deny the allegations in paragraph 68.

    69.    Defendants' failure to take reasonable steps to address the deprivations to the class that they have long been aware of, and their continued reliance on methods that they know have not and will not prevent the harm to the class demonstrates deliberate indifference in violation of the Eighth Amendment and Fourteenth Amendment.

    **ANSWER:** Defendants deny the allegations in paragraph 69.

    70.    Defendants know of and disregard a serious risk of harm to people with mental illness in their custody. As a result of Defendants' actions and inactions, Plaintiffs and the class have experienced and will continue to experience mental, emotional, and physical pain and injury, including by causing avoidable pain, mental suffering, and deterioration of their health.

    **ANSWER:** Defendants deny the allegations in paragraph 70.

    71.    Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

    **ANSWER:** Defendants deny the allegations in paragraph 71.

**COUNT II**
**(Violation of Equal Protection Under the Fourteenth Amendment for Declaratory and Injunctive Relief against All Defendants)**

    72.    Plaintiffs reallege and incorporate by reference the foregoing Paragraph [sic] as if fully stated herein.

    **ANSWER:** Defendants restate and incorporate by reference their answers to the

proceeding paragraphs of the Fourth Amended Complaint.

    73.    Punitive responses against Class Members who act out or violate rules as a result of their mental illness are more likely to be experienced by class members of color. Defendants' policies and procedures are enforced in such a way that leads class members of color, and particularly those who are Black, to be treated differently from their White counterparts when subjected to punitive responses to their mental illness. Specifically, Defendants' policies and procedures regarding security levels, discipline, use of force, and placement are employed in such a way that Black and Brown class members who are experiencing mental illness are more likely to be placed in settings that are more restrictive and less therapeutic, and more likely to be the subjects of use of force, than their White peers who are similarly situated.

    **ANSWER:** Defendants have separately moved to dismiss Count II of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants deny the

allegations in paragraph 73.

74.     The selective enforcement and application of these policies results in disparate and discriminatory treatment of Black and Brown class members in violation of their right to Equal Protection under the Fourteenth Amendment.

**ANSWER:** Defendants have separately moved to dismiss Count II of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants deny the

allegations in paragraph 74.

75.     In addition to the statistically disproportionate racial impact, rampant use of racial epithets and racially degrading statements and behaviors by staff demonstrate the racially discriminatory motivation behind this unequal application of facially neutral policies and procedures.

**ANSWER:** Defendants have separately moved to dismiss Count II of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants deny the

allegations in paragraph 75.

76.     As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:** Defendants have separately moved to dismiss Count II of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants deny the

allegations in paragraph 76.

## COUNT III

**Violation of Liberty Interest Under the Due Process Clause of the Fourteenth Amendment
(Against All Defendants)**

77.     Plaintiffs reallege and incorporate by reference each of the proceeding paragraphs as if fully set forth herein.

**ANSWER:** Defendants restate and incorporate by reference their answers to the

proceeding paragraphs of the Fourth Amended Complaint.

78.    Defendants' acts or omissions cause Plaintiffs and the class to be subjected to punishment and discipline that due to their mental illness imposes an atypical and significant hardship in relation to the ordinary incidents of prison life.

**ANSWER:** Defendants have separately moved to dismiss Count III of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 78.

79.    Defendants' acts and/or omissions, set forth in more detail above, which fail to consider mental illness and impose additional punishment violate the liberty interests and due process rights of the Plaintiffs and the class secured under the Fourteenth Amendment of the U.S. Constitution.

**ANSWER:** Defendants have separately moved to dismiss Count III of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 79.

80.    As a proximate result of Defendants' conduct, Plaintiffs and the class have suffered, and will continue to suffer a deprivation of the rights secured under the Constitution and laws of the United States.

**ANSWER:** Defendants have separately moved to dismiss Count III of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 80.

81.    As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:** Defendants have separately moved to dismiss Count III of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 81.

## COUNT IV

**Disability Discrimination in Violation of Title II of the Americans with Disabilities Act
(Against Defendant Jeffreys as Director of IDOC)**

82.     Plaintiffs reallege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

**ANSWER:** Defendants restate and incorporate by reference their answers to the proceeding paragraphs of the Fourth Amended Complaint.

83.     Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants admit that paragraph 83 quotes a portion of 42 U.S.C. § 12132.

84.     IDOC is a public entity covered by Title II of the ADA as set forth in 42 U.S.C. § 12131.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants admit the allegations in paragraph 84.

85.     Plaintiffs and Members of the class are individuals with disabilities within the meaning of the ADA in that they have mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). Major life activities of class members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself eating, sleeping, concentrating; as well limitations of brain function that result from psychological conditions.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 85.

86.    As individuals incarcerated in the custody of the IDOC, Plaintiffs and members of the class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 86.

87.    Defendants discriminate against the Plaintiffs and class members on the basis of their disabilities by:

a)    Subjecting them to isolative confinement that disparately impacts them due to their mental illness without providing needed reasonable modifications;

b)    Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings and denial of privileges, as a result of their mental illness;

c)    Segregating RTU level of care class members in conditions that are harmful to their mental illnesses and deny them equal access to programs, services and activities that are available to those without disabilities.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 87 and all subparagraphs.

88.    In the manner alleged above, Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the ADA.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 88.

89.    As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:** Defendants have separately moved to dismiss Count IV of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 89.

## COUNT V

**Disability Discrimination in Violation of Section 504 of the Rehabilitation Act (Against Defendant Jeffreys as Director of IDOC)**

90.    Plaintiffs reallege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

**ANSWER:** Defendants restate and incorporate by reference their answers to the

proceeding paragraphs of the Fourth Amended Complaint.

91.    Section 504 provides that "[]no otherwise qualified individual with a disability in the United States …shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants admit that

paragraph 91 quotes a portion of 29 U.S.C. § 794.

92.    The IDOC is subject to the Rehabilitation Act as a state agency that receives federal financial assistance. 29 U.S.C. §794(b); C.F.R. § 27.1.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants admit the

allegations in paragraph 92.

93.    Plaintiffs and members of the class are individuals with disabilities within the meaning of the Rehabilitation Act and its implementing regulations in that they have mental impairments that substantially limit one or more major life activities. Major life activities of class members that are substantially limited include thinking, sleeping, interacting with others, caring for oneself, eating, sleeping, concentrating; as well limitations of brain function that result from psychological conditions.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth

Amended Complaint. To the extent a response is deemed necessary, Defendants deny the

allegations in paragraph 93.

94.    As individuals incarcerated in the custody of the IDOC, Plaintiffs and members of the class are "otherwise qualified" for the programs, activities, and services that IDOC provides to those in its prisons.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 94.

95.    Defendants discriminate against the Plaintiffs and class members on the basis of their disabilities by:
        a)    Subjecting them to isolative confinement that disparately impacts them due to their mental illness without providing needed reasonable modifications;
        b)    Disproportionally subjecting them to discipline and punishment, both formal and informal, including placement in more restrictive settings and denial of privileges, as a result of their mental illness;
        c)    Segregating RTU level of care class members in conditions that are harmful to their mental illness and deny them equal access to programs, services and activities that are available to those without disabilities.
In acting in the manner alleged above, the Defendants have unlawfully discriminated against Plaintiffs and the class members in violation of the Rehabilitation Act.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 95 and all subparagraphs.

96.    As a proximate result of Defendants' wrongful conduct, Plaintiffs and the class members have suffered, and will continue to suffer immediate and irreparable harm and injury, including physical, psychological, and emotional injury. Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

**ANSWER:** Defendants have separately moved to dismiss Count V of Plaintiffs' Fourth Amended Complaint. To the extent a response is deemed necessary, Defendants deny the allegations in paragraph 96.

Defendants deny each and every allegation in Plaintiffs' Fourth Amended Complaint not previously admitted or otherwise qualified.

## RELIEF REQUESTED

Defendants deny that Plaintiffs are entitled to any relief whatsoever.

## JURY DEMAND

Defendants demand a trial by jury in this matter for any and all claims that can be tried by a jury.

## AFFIRMATIVE DEFENSES

1.    The Eleventh Amendment to the United States' Constitution prohibits the Plaintiffs from obtaining injunctive or declaratory relief, except to the extent necessary to stop an ongoing violation of the Plaintiffs' constitutional rights.

2.    Plaintiffs have filed suit concerning prison conditions while in the custody of the Illinois Department of Corrections. For any claims that Plaintiffs did not properly exhaust administrative remedies, those claims are barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

3.    Plaintiffs' claims are barred in full or in part under the doctrines of issue and claim preclusion in light of the Seventh Circuit's decision in *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022).

4.    Defendants have moved to dismiss Plaintiffs' ADA claim, but to the extent the Court determines that Plaintiffs have stated an ADA claim it is barred by the Eleventh Amendment. To the extent the conduct alleged violated Title II of the ADA but did not violate the Fourteenth Amendment, Congress's purported abrogation of sovereign immunity as to that class of conduct is not valid. *See United States v. Georgia*, 546 U.S. 151, 159 (2006).

Dated: October 31, 2022

Defendant ROB JEFFREYS, et al.

By: KWAME RAOUL,
    Illinois Attorney General

    */s/ Laura K. Bautista*, #6289023

R. Douglas Rees
Deputy Attorney General, Civil
Litigation
Office of the Illinois Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
Tel. 312-814-3000
*richard.rees@ilag.gov*

Assistant Chief Deputy Attorney General
Office of the Illinois Attorney General
500 South Second Street
Springfield, Illinois 62701
Tel. 217-782-5819
*laura.bautista@ilag.gov*

## **CERTIFICATE OF SERVICE**

       The undersigned certifies that on October 31, 2022, she caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record

                           */s/ Laura K. Bautista*, #6289023
                           Assistant Chief Deputy Attorney General
                           Office of the Illinois Attorney General
                           500 South Second Street
                           Springfield, Illinois 62701
                           Tel. 217-782-5819
                           *laura.bautista@ilag.gov*