**THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| PATRICE DANIELS, et al., | |
| Plaintiffs, | |
| v. | No. 1:07-CV-1298-MMM-JAG |
| ROB JEFFREYS, Director of IDOC, et al., | Judge Michael M. Mihm |
| Defendants. | |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION FOR URGENT
RELIEF FOR CLASS MEMBERS HELD AT THE NORTHERN RECEPTION CENTER
AND IN NEED OF A HIGHER LEVEL OF MENTAL HEALTH CARE**

Plaintiffs move this Court for a preliminary injunction to redress ongoing and irreparable harm to Class Members.

## Introduction

During a planned visit to the Northern Reception Center (NRC) on July 24, Plaintiffs' experts witnessed Class Members with serious mental illness suffering severe harm due to prolonged placement in appalling conditions. Approximately 25 or more individuals in dire need of mental health treatment are being held in solitary confinement—locked in their cells 23-24 hours a day—without the care they vitally need. They are known by IDOC to be need of placement or consideration for "residential treatment unit" (RTU) level of care. But, instead of expediting their transfer to facilities that can accommodate their needs, IDOC is holding them at the reception center for months—far longer than they are holding people without disabilities at the reception center. Their situation is both urgent and a clear violation of the ADA and the Eighth Amendment.

Dr. Sharen Barboza, a correctional mental health expert with more than 25 years' experience, was "extremely troubled" to witness the "prolonged placement of mentally ill individuals in alarming conditions receiving inadequate treatment" during her visit to NRC on July 24, 2023. Ex. A, Barboza Decl. at 1. Dr. Barboza believed the "clear and evident harm... being done to mental health patients" was "so alarming" as to warrant bringing these shocking conditions to the Court's attention without delay. *Id.* Her observations are detailed in Exhibit A, describing the harm being inflicted by the absence of appropriate mental health treatment and the "filthy, dank, and isolating" living environment.

Mr. Daniel Pacholke, a correctional operations expert with 35 years' experience retained by plaintiffs in this case explains:

> Disturbed by what I saw and heard, I urged counsel to take steps to immediately address these problems because what I witnessed at NRC is very problematic, contrary to good correctional practices for prisoner intake, and, in my opinion, after decades of interacting with and managing prisoners with serious mental illness, extremely detrimental to their well-being.

Ex. B, Pacholke Decl. at 1. This immediate and irreparable harm is being done to these patients despite the fact that numerous beds in the RTU at Joliet Treatment Center, located just a few miles from the Northern Reception Center, are open and unused.

By delaying their transfer out of the reception center to correctional center where an appropriate level of care could be provided, IDOC is subjecting these Class Members to discrimination based on their mental health disabilities in violation of the Americans with Disabilities Act, denying them accommodation required by law, and subjecting them to cruel and unusual punishment in violation of the Eighth Amendment of the Constitution. Over the course of two to six month stays at the NRC, Class Members are suffering irreparable harm that cannot wait for the resolution of the entirety of this class action. Urgent Court intervention is needed to

ensure that steps are taken to transfer these Class Members to an appropriate setting and to prevent the harm caused by letting prisoners in need of treatment languish at the Northern Reception Center.

## Background

On Monday, July 24, 2023, Plaintiffs toured the Northern Reception Center (NRC) with their correctional practices and mental health treatment experts. NRC is where the overwhelming majority of individuals enter the state's prison system. Each week, NRC screens hundreds of newly "received" individuals for custody, processes them for security classification and other placement considerations, and then transfers them to correctional centers around the state to serve their time. The facility is not a "correctional center" in the IDOC system, meaning it is not meant for long-term housing.

At the NRC, there are no windows in or around the cells for natural light; there are no electrical outlets in the cells, no television, radio, and out of cell movement is severely restricted. Meals are delivered to the cells. Both visits and phone calls are severely restricted, as are commissary and other activities. NRC residents are basically confined to their cells for 23-24 hours a day. *See* Ex. B at 5-6 (describing conditions). These highly restrictive conditions are generally dictated by IDOC policy for reception centers. *See* Ex. C, AD 05.07.102. The average length of stay is reported to be around two weeks, although that has not been the case for these class members. *See Richard v. Pfister,* No. 17-CV-04677, 2021 WL 3033543, at *1 (N.D. Ill. July 16, 2021) (describing that reception status prisoners "typically stay for one to two weeks before being transferred" and describing restrictive conditions "resembling disciplinary segregation").

While the average length of stay for reception at the NRC is supposed to be only a few *weeks*, inexplicably prisoners with mental health disabilities who need the accommodation of RTU-level care are there for *months*. Ex. B at 11-12. With the July visit, Plaintiffs identified approximately 29 individuals in need of RTU placement or consideration, all of whom had been sitting at NRC for more than a month. Of those 29 individuals, 21 had been at NRC for three months or more. *See* Ex. D, data compiled from IDOC.[1]

Under the ADA and the Constitution, these Class Members should be *expedited* for transfer to a correctional center that can provide the appropriate housing and treatment for their mental health needs. *See* Ex. A at 9 ("In my experience working in corrections for over two decades, reception centers typically move all incarcerated individuals to non-reception facilities within the shortest time possible. Transfers of individuals identified as having special mental health needs which exceed what can be provided at a reception center are typically expedited with attempts to provide enhanced services awaiting transfer.") and B at 4 (explaining in detail

---

[1] Exhibit D is information about individuals impacted by the issues in this motion taken from the NRC MHP database provided by IDOC on 7.18.23 in advance of the site visit. While not complete, the database includes information on SMI status, housing placement, level of care, and diagnosis. For the exhibit, some columns of sensitive or identifying information are not included (although they are available to defendants and could be provided to the Court under seal).

For the purpose of this motion, individuals identified include 1) those indicated on the MHP database as "RTU LOC" or "RTU Review" and 2) those identified as placed in Unit H, either as indicated on the 7.18 database or seen during plaintiffs' 7.24 visit. Facility staff identified Unit H as designated for RTU individuals and review of other data provided by IDOC confirmed that these individuals were all noted as being considered for RTU and/or been in RTUs during prior incarcerations in recent years.

Given limitations in the data provided and the urgency of the issue, Exhibit C is not intended to be an exhaustive list of all affected Class Members as of a certain date, but a snapshot to illustrate the scope of the problem based on the information currently available to plaintiffs. Aside from data taken directly from the MHP database, Plaintiffs' counsel added Column A "Admitted to IDOC" based on the most recent Admission Date listed on IDOC's website for each individual in custody. Based on this date, the last three columns list the number of days and months each individual spent in reception status at the NRC.

how IDOC's process is contrary to accepted correctional practices in the reception process to expedite transfer of vulnerable people who may otherwise be harmed).

Instead of expediting the process to appropriately address these patients' treatment needs, IDOC is delaying the transfer and holding them without appropriate treatment in the equivalent of disciplinary segregation for months. This means that these Class Members are not receiving the enhanced treatment and supports they should have in a specialized treatment unit, or even the benefits of the regular, less restrictive, conditions and activities available in general population correctional centers. They are subjected to restrictive and harmful conditions known to exacerbate mental illness. *See generally* ECF No. 3581, Order & Op. at 10 (regarding the impact of similar levels of restriction on RTU Class Members at Pontiac and related caselaw on the impact of isolation on mental illness.) [2]

At the July NRT tour, a housing unit H was identified by NRC as for individuals in need of residential treatment unit (RTU) level of care. At least 21 cells were occupied in unit H with many individuals presenting with significant acute symptoms of mental illness. *See e.g.* Ex. A, Barboza Decl. at 3 (Class Member was "clearly suffering from SMI as evidenced by the perseverative nature of his speech, preoccupation... pacing, tangential speech, unkempt cell... covered with writing and drawings, much of which appeared disorganized."), 5 (describing an unresponsive Class Member "covered in a blanket...his cell was filthy, with empty milk cartons

---

[2] ECF No. 3581 at 10 ("where class members have been confined to their cell 23-24 hours a day for months, the Court agrees that Defendants have failed to provide out of cell time necessary to help manage their serious mental health condition and that the failure to provide treatment in the above areas puts Plaintiffs at a significant risk for further injury and severe unnecessary pain and suffering"). Back in 2018, the then- monitor testified at length in this case about the negative impact of isolation, and the significant risk of cognitive harm to people with serious mental illness. *See, e.g.* ECF No. 2406, ¶¶ 180-84. In that same hearing, witnesses for Defendants agreed that isolation is contra-indicated for most mental illness. (ECF No. 2406 ¶ 186) and, without needed treatment and out-of-cell time, those in segregation will "across the board" get worse. ECF No. 1758 at 349-51.

and other trash strewn on the floor...the odor of feces coming from the cell and...layers of what appeared to be cardboard...covering the patient's toilet."), and 7 ("the patient was impaired by serious psychiatric illness...He was psychotic, disoriented, and had limited ability to communicate effectively."). *See also* Ex. B at 7 ("Upon entering Unit H, it smelled of feces, a smell which intensified in front of several cells" and describing unit those in the unit as well as the conditions and staffing issues). As shown in Exhibit D, most of these individuals had been at NRC for three months or longer, with several there since January.

RTU level-of-care individuals were also present in other units, including crisis watch, restrictive housing, and Unit C, which was identified as housing for individuals with "special concerns." *See* Ex. C, showing housing units. *See also e.g.* Ex. A at 6 (Class Member reported previous placement on crisis watch for 39 days without access to shower, phone, or yard.) and Ex. B at 8 (describing unusual behavior of an individual in Unit C and unmet need for immediate mental health intervention to assess the placement: "This type of behavior usually occurs almost exclusively in segregation units and in my experience, is typically found to be a symptom decompensation when assessed by mental health staff. Allowing this to occur in the RNC and not taking action is a horrible practice and against widely accepted correctional practice."

Meanwhile, just across town, at the Joliet Treatment Center (which the expert team also visited last week) an entire dorm is vacant with numerous empty cells. Ex. A at 9-10. Also in Joliet is a new hospital with 150 psychiatric beds, and an operational capacity of 202. IDOC trumpeted this new hospital as evidence that it is not deliberately indifferent to the needs of this class. Astonishingly 138 of the 150 psychiatric beds are vacant and unused while class members identified as needing a higher level of care languish in the harmful conditions at the NRC. *See* Ex. A at 9-10 (describing empty bed space observed at JTC and JITC the same week, "It was shocking to me that patients were suffering without adequate care or housing at NRC when beds

were clearly and evidently available at JTC and JITC."); Ex. B at 9 ("both JTC and JITC had empty beds. There is no reason why prisoners at NRC who need higher levels of care shouldn't be moved to one of these facilities within days of their arrival at NRC rather than months.").

## Expert Declarations

Attached as Exhibits A and B are declarations of two correctional systems experts who visited NRC on July 24, 2023.

Dr. Sharen Barboza is a correctional psychologist with years of experience providing and supervising care in correctional centers; she has been a consultant nationally, including as part of the independent monitoring team over the mental health system in California prisons; and she is highly involved with and frequent trainer for the National Commission on Correctional Health Care. Dr. Barboza's declaration describing her findings regarding IDOC's treatment of reception status prisoners in need of RTU care is attached as Exhibit A.

Daniel Pacholke is a correctional operations expert. He has worked in corrections since 1982, starting as a correctional officer and working his way through the ranks to lead the Washington Department of Corrections. He is now a national consultant in the field, including working with the Department of Justice. Mr. Pacholke's findings regarding how IDOC's handling of reception status individuals in need of enhanced mental health care are contrary to accepted correctional practices is attached as Exhibit B.

## ARGUMENT

### I.     The Legal Standard for a Preliminary Injunction Is Met Here

As this Court is well aware, to satisfy the requirements for a preliminary injunction, Plaintiffs must establish that they have some likelihood of success on the merits; that without the preliminary injunction, they will suffer irreparable harm before the final resolution of the claims;

and traditional legal remedies are inadequate. ECF No. 3581, Order at 7 citing *Girl Scouts of Manitou Council, Inc., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). To establish a likelihood of success on the merits, Plaintiff need not provide proof by a preponderance of the evidence, but instead must make a "strong" showing on the merits. *Ill. Republican Party*, 973 F.3d 760, 763 (7th Cir. 2020). As is discussed in detail in the following section, the evidence from the experts here far exceeds this evidentiary bar.

The significant harm currently being inflicted and the significant and imminent risk of further harm to these Class Members, including decompensation of mental illness, further tips the scales overwhelmingly in the favor of relief. *Koss v. Norwood*, 305 F. Supp. 3d 897, 922 (N.D. Ill. 2018) ("If plaintiffs can show that members of the class face the risk of "be[ing] denied necessary medical care" without a preliminary injunction, "then they may demonstrate that they lack an adequate remedy at law and stand to suffer irreparable injury."); *M.A. by & through Avila v. Norwood*, No. 15 C 3116, 2016 WL 11818203, at *10 (N.D. Ill. May 4, 2016) ("Stated simply, monetary damages after trial will not be an adequate remedy at law to compensate them for the physical, emotional and psychological harm that they may suffer if they are institutionalized or if they suffer a medical incident that could have been prevented or minimized through adequate in-home shift nursing services.").

The question then is that of the public interest. *Ill. Republican Party v. Pritzker,* 973 F.3d 760, 762 (7th Cir. 2020) (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)). This too is easily met in this case as the public's interest favors the protection of federal rights. Additionally, here the harm being done comes at significant cost to the State as it is likely resulting in additional impairment to people with mental illness who will likely continue to require State services for their care.

## II.     Plaintiffs Are Likely to Succeed in Establishing One or More Violations of the Americans with Disabilities Act

Title II of the Americans with Disabilities Act states that:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. This broad language—which goes beyond discrimination arising out of intentional bias—is intended to protect people with disabilities, including serious mental illness, from what the Supreme Court has referred to as "benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985) ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.").

The ADA requires public entities to take "prophylactic steps" to avoid discrimination and prevent the exclusion of, or denial of benefits to, people with disabilities. *See Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) ("By requiring measures that are necessary to avoid discrimination on the basis of disability, … the regulation clearly contemplates that prophylactic steps must be taken to avoid discrimination."). The implementing regulations promulgated by the United States Department of Justice require:

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).[3]

Here, IDOC is discriminating against people with mental health disabilities by not transferring them to correctional centers within the same time frame as those without disabilities.

---

[3] The ADA regulations are binding under the law. *United States v. Morton,* 467 U.S. 822, 834 (1984).

These unreasonable delays are denying people with mental health disabilities the benefits of programs, services and activities of correctional center placement, whether RTU or otherwise. Additionally, IDOC is denying needed modifications required by the ADA in two ways. The first is an *expedited* transfer out of the reception center to a correctional center upon identifying the individuals as having mental health needs that the NRC cannot meet (and to which NRC's conditions are harmful or contrary). The second, and related, needed accommodation for most or all of the individuals at issue here is placement in a correctional center with an RTU or other specialized treatment setting. *See Wisconsin Cmty. Servs., Inc.,* 465 F.3d at 753 (articulating three distinct routes to liability for discrimination under Title II: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.").

This case has significant similarities to *Richard v. Pfister*, in which a jury awarded $750,000 in compensatory damages against IDOC and $75,000 in punitive damages against NRC leadership for keeping a man with physical disabilities at the NRC for eleven months—far longer than those without disabilities are held—in violation of the Americans with Disabilities Act and the Eighth Amendment. As is the situation today, the conditions of confinement at the NRC for Mr. Richard were extremely harsh:

> The parties agree that conditions at NRC are like those in disciplinary segregation. Richard points to several undesirable living conditions he experienced including that his cell was hot, lacked natural light and electrical outlets, was frequently visited by mice and birds, and would occasionally flood. Richard also contends that he was confined to his cell 22-24 hours a day, only received replacement tubing for his oxygen tank once every two to three months, and was deprived of meaningful human contact.

*Richard v. Pfister*, 483 F. Supp. 3d 532, 539 (N.D. Ill. 2020).

In denying Defendants' motion for summary judgment, the district court in *Richard* explained that to establish his ADA claim, the plaintiff "only needs to show that, because of his

disability, Defendants deprived him of accessing IDOC services "on the same basis" as other inmates." *Id.* at 538 citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012); *see also* 28 C.F.R. § 35.130(b)(1)(ii) (a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others"). The court explained that Mr. Richards had to wait 11 months to access the programs, services and activities of regular correctional centers whereas most are transferred to a correctional center right away. *Id.; see also id.* at 538 (quoting an NRC warden as describing that "the whole premise of the NRC [is] to transfer you out). The IDOC's failure to accommodate Mr. Richards' disability-related needs—by failing to provide safe and accessible transportation to a correctional center—was also sufficient to show a violation of the federal disability rights laws. *Id.* at 538 *citing Jaros*, 684 F.3d at 672 ("Refusing to make reasonable accommodations is tantamount to denying access."); *see also Cook v. Illinois Dep't of Corr.*, 2018 WL 294515, at *2-3 (S.D. Ill. Jan. 4, 2018) (delay in transferring disabled inmate to facility with drug treatment program created material issue of fact as to whether he was denied benefit of the program based on his disability).

While the accommodation needed here is different than in the *Richard* case, the application of the ADA to the delayed transfer out of NRC is exactly the same. Defendants are excluding these Class Members from the "services, programs and activities" of correctional center placement—including specifically those of RTU care—by holding them for prolonged periods at the NRC.

The other elements of an ADA claim are easily established and unlikely to be disputed in this case. First, Class Members with SMI and/or at the RTU level of care have been found by IDOC to have functional impairments because of diagnosed mental illness, making them people

with disabilities under the law by definition. IDOC AD 04.04.100, § II(E)(2); *see also* 42 U.S.C. § 12102(2) (defining disability as having a physical or mental impairment that substantially limits "major life activities.").[4] Likewise, there can be no question that any Class Members are "otherwise qualified" for the programs, services and activities of IDOC as to placement in a correctional center in general or an RTU in particular, given that IDOC has designated them as RTU level of care, and many of them have been placed in RTUs previously. 42 U.S.C. § 12131(2) (defining "otherwise qualified individual" as "an individual with a disability who, with or without reasonable modifications … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."). *See also Oconomowoc Residential Programs, Inc., v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (A "program or activity" under Title II "applies to anything a public entity does.").

Exceptions to the ADA's requirement to provide reasonable modifications to accommodate are narrow; they are required "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* at 751 quoting 28 C.F.R. § 35.130(b)(7). Here, plaintiffs are simply requesting that defendants expedite transfer for these Class Members in a manner that is consistent with IDOC's operation of the reception center as well as its policy calling for RTU placement when a facility cannot meet the needs of a person with a mental health disability. See *Pierce v. County of Orange,* 761 F.Supp.2d 915, 953 (C.D. Cal. 2011) ("county failed to establish that

---

[4]The regulations give examples of "major life activities" including "but...not limited to, caring for oneself, performing manual tasks, … eating, sleeping, … learning, reading, concentrating, thinking, communicating, and working." Major life activities are also bodily functions, and the type of mental health conditions that would give rise to an SMI diagnosis are predictably considered disabilities because they substantially impair brain function. *See* Notes to 29 CFR § 1630.2 ("For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated… major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function.").

accommodations requested by detainees would require fundamental alteration or produce undue burden, or that current conditions were reasonably related to the facilities' legitimate interests.").

The Seventh Circuit explained that the fact-specific assessment of reasonableness in disability cases such as this "require that the court demonstrate a good deal of wisdom in appreciating the intangible but very real human costs associated with the disability in question."). *Wisconsin Cmty. Servs., Inc.*, 465 F.3d at 752. By virtue of their SMI and RTU designations, the group of patients at NRC who need enhanced care are particularly vulnerable to harm from the restrictive conditions that are inherent to NRC's operations. *See* Sect. IV, below, on irreparable harm; and Ex. A at 9 ("[Class Members] were being harmed by the inadequate care being provided despite having been identified as requiring more intensive care and by the isolating, non-stimulating environment in which they were housed."). Thus, providing a readily available accommodation that can prevent very significant and potentially long-lasting psychiatric harm is reasonable under the law.

### III.   Plaintiffs Are Likely to Succeed on Merits of Eighth Amendment Violations for RTU Class Members Held at the NRC for Prolonged Periods of Time

The experts in correctional practices, Dr. Barboza and Mr. Pacholke, in their declarations, demonstrate the IDOC is subjecting SMI Class Members to harmful conditions of isolation, filth, and deprivation. IDOC's own data shows that these Class Members are being held in those harmful conditions for far longer than they should. These placements and the length of the stay at NRC are contrary to IDOC's operational and mental health directives. Correctional practices relating to operations of a reception center dictate that these individuals should be transferred quickly to a correctional center, as do mental health standards of care. *See* Ex. A at 2 ("There is no reasonable excuse for delaying the transfer of patients with serious mental illness who have been identified as needing enhanced care.") and B at 3 (concluding that "IDOC is holding

13

vulnerable prisoners at the NRC longer than necessary or advisable; and This practice is detrimental to vulnerable prisoners and to the overall operation of the facility.), 4 and 9-10 (explaining further how this is contrary to accepted correctional practices). The harm that results from isolated confinement such as this is well known to defendants, and indeed has been the subject of numerous expert and monitor reports, as well as litigation in this very case for many years. *See*, *e.g*., FN 2 above. More specifically, the decompensation of mental health that was plainly visible to the experts on the NRC tours is likewise well known to defendants.

Under our Constitution, prisoners "retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 562 U.S. 493, 510 (2011). It is respect for that dignity that "animates the Eighth Amendment prohibition against cruel and unusual punishment." *Id.* Incarcerated persons are entitled to humane conditions that provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To establish an Eighth Amendment violation, plaintiff must establish both an objective component—that the conditions are "sufficiently serious" such that they deny the individual "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health and safety—and a subjective showing that defendants were aware of the harm or risk of harm, but knowingly failed to take responsible steps available to ameliorate that harm or risk of harm. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (*citing Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017)).

According to the experts, these vulnerable Class Members are not only held in appalling conditions —filth and waste, dysfunctional plumbing, and more—but they are restricted to their cells for most or all of the day, every day. That in-cell confinement cannot be disputed; it is inherent to the NRC's design and operation. Ex. C, AD 05.07.102 (eff. 8/1/21). IDOC's policy

requires yard time in the reception centers to be provided at an equivalent level to that required

for disciplinary segregation, which would be 8 hours per week (Ex. C at pg.3, sect. G (8) and pg.

5). However, these Class Members report that yard is frequently cancelled, leaving them with

only short showers three times a week, without any additional out of cell time.

Confinement to one's cell for up to 24 hours a day is the definition of solitary

confinement. [5] While the conditions at NRC are frequently compared to disciplinary segregation,

they are in fact far more harsh. For example, IDOC policies require exposure to natural light in

disciplinary segregation, as well as enhanced out of cell time and increased mental health

treatment activities for those on the caseload (regardless of level of care), none of which exist in

the NRC. *See* Ex. C (setting forth restrictions on reception status). That these Class Members are

subjected to these conditions for no legitimate or justifiable penological purpose establishes the

likelihood of success on the merits of the Eighth Amendment claim.

The Seventh Circuit has recognized that "prolonged confinement in administrative

segregation may constitute a violation of the Eighth Amendment ... depending on the duration

and nature of the segregation and whether there were feasible alternatives to that confinement."

*Rice ex rel. Rice v. Corr. Med. Servs*., 675 F.3d 650, 666 (7th Cir. 2012) (citing *Walker v.*

*Shansky*, 28 F.3d 666, 673 (7th Cir. 1994)). Courts consider whether the totality of the conditions

at issue "have a mutually enforcing effect that produces the deprivation of a single, identifiable

---

[5] The Nelson Mandela Rules define "solitary confinement" as confinement in one's cell for 22 hours per day or more without meaningful human contact. See Rule 44, U.N. Standard Minimum Rules for the treatment of Prisoners (2015). Rule 44 further defines "prolonged solitary confinement" as time periods in excess of 15 consecutive days, and prohibit it as "cruel, inhuman, or degrading treatment." The American Correctional Association defines "extended solitary confinement" as more than 29 days. Standard 4-RH-0027, Restrictive Housing Standards (2016). The National Commission on Correctional Health Care (NCCHC) states that, "Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health." Position Paper, available at: https://www.ncchc.org/solitary-confinement.

human need, such as food, warmth, or exercise." *Davenport v. DeRobertis,* 844 F.2d 1310, 1315 (7th Cir. 1988) (upholding finding that Constitution *requires* even maximum-security prisoners to receive at least five hours per week of outdoor exercise if kept in segregation for over 90 days). (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). Prolonged lack of exercise, on its own, is one such deprivation that can rise to the level of a constitutional violation. Here, the duration and nature of the conditions are such that Class Members have been deprived any opportunity for activity that is essential to their mental and physical well-being. *See Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001) ("Given current norms, exercise is no longer considered an optional form of recreation, but is instead a necessary requirement for physical and mental well-being."). *See also Wilson*, 501 U.S. at 307-308 (recognizing that 24-hour confinement in small cells requires access to regular outdoor exercise).

The severity of the deprivations at the NRC is worsened for this population because they have been identified as requiring more supportive accommodations in their housing, including enhanced out of cell time, as a part of their mental health treatment needs. *See* IDOC AD 04.04.100, § II(E)(2). By virtue of their placement at RTU level of care, IDOC has already made the determination that these individuals have "a serious mental illness associated with significant functional impairments, rendering the offender unable to successfully reside in a general population housing unit." *Id.*

In contrast, defendants are holding RTU level of care patients in conditions that are blatantly inappropriate and contrary to their need for care. *See* Ex. A at 2-3 ("There was nothing about the unit that was therapeutic, which would be expected for a unit designated as housing patients identified as needing a residential level of care."). The stark contrast between IDOC's own protocols of supportive care and environment required for this population and the practice

of holding them at NRC for months on end is sufficient to demonstrate deliberate indifference. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) ("Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." (internal citations omitted).

As to the factor of "feasible alternatives" to the restrictive placements in the Eighth Amendment inquiry, *Rice*, 675 F.3d at 666, several alternatives exist for the very purpose of preventing SMI class members from being held in exactly this harmful manner. Defendants have long pointed to their dedication of millions of dollars in construction for treatment facilities just across town from the NRC. Both the JTC (RTU) and the JITC (hospital) have ample open and unused bed space for this entire population and more. That space should be used. Correctional expert Dan Pacholke explains, "There is no reason why prisoners at NRC who need higher levels of care shouldn't be moved to one of these facilities within days of their arrival at NRC rather than months. It would be more effective, provides appropriate treatment, and reduce the likelihood of deterioration that seems to be occurring at NRC." Ex. B at 9.

## IV.    Irreparable Harm and No Adequate Remedy at Law

Plaintiffs must demonstrate that they are likely to suffer irreparable harm absent obtaining preliminary injunctive relief. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044–45 (7th Cir. 2017). This requires more than a mere possibility of harm, but the harm need not actually occur before injunctive relief can be issued. *Id.*; *Girl Scouts of Manitou Council, Inc., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) (irreparable harm means that the plaintiff cannot be "prevented or fully rectified by the final judgment after trial"); *see also*

17

*Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (irreparable harm is that which "cannot be repaired and for which money compensation is inadequate" (internal quotations omitted)).

SMI RTU Class Members have endured and are continuing to experience irreparable harm from continued deprivations in the NRC. Because of the urgency of the detrimental impact of these conditions on SMI class members, adjudication cannot wait until the full case proceeds to trial. See Ex. A at 6-8, (detailing examples of harm to Class Members "because of lack of adequate mental health treatment and a delay in transfer to an appropriate mental health setting...includ[ing] suffering exacerbated symptoms."); Ex. B at 9 (describing Class Member who suffered significant deteriorations resulting in self-harm and hospitalization as a result of the three-month placement at NRC). These Class Members all have pre-existing conditions that are worsening due to the extreme restrictions and lack of treatment or recreation inherent in reception center placement. Individuals are subjected to these harms over the course of 2-5 month-long stays at NRC. It will take far longer than that for this full class action case to reach trial and then the remedy stage. In that time, countless more individuals will be subjected to the deprivation of needed care and experience resulting injuries. As with situations involving the denial of other types of medical services which once denied cannot be repaired, plaintiffs here have demonstrated that they stand to suffer irreparable harm and lack any other adequate remedy at law. *See Koss*, 305 F. Supp. 3d at 922; *M.A.,* 2016 WL 11818203, at *10.

As this Court is aware, both scientific literature and the case law have found significant harm is done to people with mental illness who are placed in solitary confinement. *See* ECF 3581, Order & Op. (6/2/22) at 11-12 (reviewing cases in the Seventh Circuit finding significant mental harm caused by solitary confinement). The scientific research has demonstrated "strikingly consistent" results showing that the deprivation of meaningful social contact and

environmental stimulation arising from solitary confinement imposes grave psychological and physiological harms.[6] Psychological injuries from solitary confinement include cognitive dysfunction, severe depression, memory loss, anxiety, paranoia, panic, hallucinations, and stimuli hypersensitivity. *See* Craig W. Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 Crime & Delinquency 124, 130-31, 134 (2003) (collecting studies); Terry A. Kupers, Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?, in Routledge Handbook of International Crime and Justice Studies 213, 216 (Bruce Arrigo & Heather Bersot eds., 2013); Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the literature, 34 Crime & Just. 441, 488–90 (2006). Self-injurious behavior, such as self-mutilation and suicidal behavior is also prevalent among prisoners in solitary confinement. Stuart Grassian, Psychopathological Effects of Solitary Confinement, 140 Am. J. Psychiatry 1450, 1453 (2006); Grassian, Psychiatric Effects, supra, 22 Wash. U. J. L. & Pol'y at 334.

## V.    Public Interest

The "public interest" under consideration here refers to the interests of people and institutions that are not parties to the case. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). In general, the public has a significant interest in preserving federally protected rights. *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely upholding

---

[6] *See* Craig Haney, The Psychological Effects of Solitary Confinement: A Systematic Critique, 47 Crime & Justice 365, 367-68, 370-75 (2018) (collecting studies); *see also* Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J. L. & Pol'y 325, 335-38 (2006). Indeed, experts have recognized that the chronic stress imposed by such isolation "can be as clinically distressing as physical torture." Jeffrey L. Metzner & Jamie Fellner, Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010); United Nations, Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment ¶ 76 (Aug. 2011) ("Special Rapporteur reiterates that, in his view, any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment or punishment ….").

constitutional rights serves the public interest"); *Foster v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013) ("Illinois taxpayers have a vested interest in ensuring that the constitutional rights of its citizens are protected."). In this case the public interest favors taking the reasonable steps available to prevent further harm and decompensation to people with serious mental illness who cannot otherwise avail themselves of the treatment and activity that they require. Not only does doing so uphold the values and laws mandating humane care for those who cannot protect themselves, but also serves the interest of the public by preventing further harm to the functioning of people who will be remaining in the state's custody.

## VI.   The PLRA

The PLRA mandates that where courts find federal violations, the relief ordered must "extend no further than necessary to correct the violation," be "narrowly drawn," and be "the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A). In issuing injunctive relief, the Seventh Circuit has repeatedly warned against "conflat[ing] what is constitutionally *adequate* ... with what is constitutionally *required.*" *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir. 2012) (emphasis in original). *Howe v. Hughes,* No. 22-1368, 2023 WL 4701985, at *6 (7th Cir. July 24, 2023).

Most recently, the Seventh Circuit pointed to "two dimensions to the PLRA's mandate against overbreadth" under the Court's jurisprudence. The first, not at issue here, relates to numeric requirements and the second is "that such relief may not be too prescriptive" such that the prison administrators must maintain "substantial discretion and flexibility." *Howe v. Hughes*, No. 22-1368, 2023 WL 4701985, at *6 (7th Cir. July 24, 2023).

These limitations on relief are easily met here. Plaintiffs simply seek an order requiring IDOC to take immediate action to ensure that the Class Members at NRC in need of RTU or

20

other higher level of mental health care be placed at a facility within its existing system that can provide that care. IDOC can and should have a great deal of discretion in determining how to achieve that requirement, whether by enhancing care and conditions at the NRC itself or transferring these individuals with disabilities—in an equivalent manner as it transfers those without mental health disabilities—to proper correctional centers.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter a preliminary injunction with the relief necessary to protect the federal rights of SMI Class Members at NRC by requiring Defendants to immediately take steps to ensure the timely transfer out of the NRC and to proper correctional centers of individuals considered for RTU placement who have completed the reception process.

RESPECTFULLY SUBMITTED,


  /s/ Amanda Antholt
One of the attorneys for Plaintiffs


Harold C. Hirshman
Diane O'Connell
DENTONS US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL  60606
Telephone: (312) 876-8000

Alan Mills
Nicole Schult
Madison Kemper
Uptown People's Law Center
4413 N Sheridan
Chicago, IL  60640
Telephone: (773) 769-1410

Amanda Antholt
Sophia Lau
Megan Grenville
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
Telephone: (312) 895-7330