THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| PATRICE DANIELS, GERRODO FORREST, JOSEPH HERMAN, HENRY HERSMAN, RASHEED MCGEE, FREDRICKA LYLES, CLARA PLAIR, | No. 1:07-CV-1298-MMM-JAG |
| Plaintiffs, | Judge Michael M. Mihm |
| v. | |
| LATOYA HUGHES, Director of IDOC; GOVERNOR J.B. PRITZKER; DR. MELVIN HINTON, Chief of Mental Health; and DR. WILLIAM PUGA, Chief of Psychiatry, in their official capacities, | |
| Defendants. | |

## EXCERPTS FROM MONITOR REPORT REGARDING NRC

At argument yesterday there was a discussion about Dr. Stewart's report to the Court about NRC. What follows is what we believe are a complete excerpting of Dr Stewart's reports on NRC. Emphasis has been added to a sentence in the Third Report.

**First Annual Report:**

This report has no direct mention of NRC.

**Second Annual Report:**

"'Evaluations of Suicide Potential' were being properly administered to offenders transferred from an R&C facilities, including offenders transferred back to NRC on write." (pp. 16)

NRC met specific requirement (IV)(a), that all persons in IDOC custody shall receive mental health screening upon admission and in a timely manner. "16 of 17 offenders reviewed had their screening accomplished within the 24-48 hours requirement at the NRC." (pp. 17)

Regarding specific requirement (IV)(b), concerning who is responsible for administering mental health screenings, "All of the reception centers were fulfilling this requirement. At the NRC, for example, 17 of 17 screenings reviewed confirmed that IDOC Form 0372 was being used and that the screenings were conducted by MHPs or unlicensed staff that were being supervised by licensed MHPs." (pp. 17)

"Throughout the monitoring period, however, the reception centers have not been able to consistently meet the requirements of this subsection. That is, bridge orders are inconsistently written for those offenders who arrive with a verifiable prescription. At NRC, delays of three weeks and a delay of two months were noted in initiating the bridge orders." (pp. 18)

Regarding special requirement (IV)(f): "At NRC, there were numerous examples where the offenders' medications had been changed by the prescribers. In none of these cases were the reason(s) for the changes documented in the medical record. There was also no documentation that the prescribers discussed with the offenders the reason for these changes, what the new medication was expected to do, what alternative treatments were available and what, in general, are the side effects of the new medication." (pp. 19)

"Also, of note, is the overall poor quality of the medical records at NRC, Menard and Graham, making it difficult to follow the clinical course of an offender." (pp. 19)

"…due to the large volume of mentally ill offenders processed by NRC, only those offenders who have previously been designated SMI receive a mental health referral and evaluation." (pp. 22-23)

NRC has outstanding MHP vacancies (pp. 37)

"Some progress is being made in other institutions in that more staff offices and interviewing rooms are being constructed where staff are able to see their patients in a confidential setting. IDOC reports that different institutions—including Stateville NRC, Pontiac, and Menard--have carried out construction to create confidential clinical space or improve existing space for this purpose." (pp. 89)

At the time of the report, Stateville NRC had a backlog of one "New" case to address and 22 "Follow Up" cases to address, totaling 23 for the entire facility. (pp. 140)

**Third Annual Report:**

In two visits to NRC, monitor observed that mental health screenings upon admission "were occurring within 24 hours of arrival... IDOC is in substantial compliance with this specific requirement." (pp. 16)

"Firstly, it is important to note that mental health evaluations are not routinely completed at the NRC. This is due to their tremendous workload of new intakes and having to house a large number of offenders on writs… it is a significant compliance issue. Report states that offenders stay at the NRC for an average of 18 days if they do not have pending court or medical matters. What it does not say is that those exceptions involve hundreds of people." (pp. 18-19)

"169 people had been at NRC longer than the stated average that week, and staff said there was nothing unusual about the population at the time. Over a year's time, of course, this total would multiply. *Staff appropriately attempted to prioritize higher acuity patients for evaluations, to mitigate these circumstances, but were only successful in a slight majority of such cases onsite at the time*… team included those patients onsite and on the caseload 3 weeks or more—not the 2-week requirement—to allow for short delays in evaluation practice, filing, and/or data entry. Thus, the 169 total is reached using these more flexible criteria." (pp. 19)

Regarding requirement (V)(d) concerning automatic referrals to services for people admitted with known histories of illness: "… mental health evaluations are not routinely being done at the NRC. Referrals are being made, however, which fulfills the requirements of this subsection." (pp. 20)

"Treatment planning backlogs still plague the Department. As of 5/24/19, there were 440 backlogged treatment plans within IDOC with the majority of them, 62%, being greater than 30 days late… Regardless of how one defines collectivity, significant numbers of treatment plans only being prepared by MHP or psychiatric providers were discovered during site visits. Menard, Stateville, NRC, Western, Vandalia and Danville were facilities where this was noted." (23)

In a "multi-site chart review" including Stateville NRC among 10 other facilities, "Only 21 of the 80 charts reviewed (26%) confirmed that treatment plans were reviewed and updated within seven days of placement on segregation status." (pp. 26)

"The monthly reviews and updates were assessed with a much smaller cohort because many fewer mentally ill patients in the sample remained in segregation longer than 30 days. Among the 16 relevant charts, none had their treatment plans reviewed and updated on a monthly

basis, though a few had one or two updates." Relevant charts were drawn from Stateville-NRC among four other facilities. (pp. 26)

Monitors conducted a "data-driven analysis of the frequency of psychiatry contacts in general population. This consisted of chart reviews for 138 mentally ill offenders from 10 facilities [including Stateville-NRC] who were prescribed psychotropic medication… Only 74 of the 138 charts reviewed demonstrated that the time parameters were being met." (pp. 27)

In a study of 9 facilities including NRC, "A total of 49 charts were reviewed. Five (5) working day follow ups occurred in 37 of the 49 charts reviewed. This equates to 76% completion rate." (pp. 28)

"IDOC has also brought attention to increasing psychiatry contacts during crisis watch, a welcome addition. The monitoring team reviewed a sample of 664 crisis watches from a two-month period in 2019 that was drawn from across all institutions. In that sample, 40% of patients saw a psychiatric provider by the day after admission, the standard the Monitor would expect for a crisis setting. Another 47% were seen within one week. There was especially good practice at Centralia, Decatur, Robinson, Sheridan, and Stateville-NRC." (pp. 38)

"At the time of the submission of this report, there existed five clinical supervisor vacancies" including at Stateville NRC for the PSA-8k position. (pp. 41)

In a six-institution study [including Stateville-NRC], only 22% of the patients placed in segregation clearly had their treatment plans continued on entry." (pp. 54)

Regarding specific requirement (a)(iv) that an MHP reviews mentally ill offenders no later than 48 hours after initial placement in Administrative Detention or Disciplinary

Segregation: "The following institutions have shown consistent, strong practice on this requirement, or have not have mental health patients in segregation for an extended period, and are found to be in substantial compliance:" including Stateville-NRC (pp. 55)

Regarding specific requirement (a)(vi) that mentally ill offenders in Administrative Detention or disciplinary segregation for periods of 16 days or more receive care that includes listed minimum standards, and specifically about making "rounds" to check in on patients: "Pontiac and Stateville-NRC had the strongest performance; each showed 100% compliance." (pp. 56)

"Additionally, a review of 14 facilities [including Stateville-NRC] determined that the overwhelming majority of daily crisis contacts were conducted in confidential settings." (pp. 79)

12 disciplinary infractions adjudicated during April 2019 involving SMI offenders at Stateville NRC. (pp. 94)

**Fourth Annual Report:**

"IDOC is still not reporting the number of backlogged mental health evaluation from the largest Reception Center, Stateville NRC."

Referring to data given prior: "The above data doesn't include the backlogged mental health evaluations at Stateville NRC, the largest Reception Center which has, by far, the greatest obligation for evaluations. I personally visited NRC of February 1, 2020. At the time of my visit, NRC was backlogged 285 mental health evaluations. Note that this would double the February backlog number cited above. It remains unexplained why these numbers from NRC are not reported on the weekly backlog data that the Monitoring Team receives." (pp. 16)

Regarding Feb 1 2020 visit: "the facility was backlogged 285 mental health evaluations. This backlog is due to NRC's tremendous workload and being severely understaffed for Qualified Mental Health Professionals. NRC processed 2,336 new intakes during the months of December 2019 and January 2020." Ultimately judges IDOC as 'noncompliant' until it "properly staffs NRC and the Mental Health Evaluations are conducted… "This means that 12% of NRC's required evaluations from that period remained backlogged as of February 1. It does not capture whether the completed evaluations were conducted timely or late." Dr. Stewart also states that this number of intakes is common, citing 1,018 intakes in February 2020, 853 in March 2020, and 903 in April 2020. (pp. 17-18)

A five-facility study including NRC found that 51 of 52 observed charts complied with requirement (ii) concerning the regular charting of medication efficacy and side effects (pp. 47)

Visits to Dixon, Stateville, NRC, Pontiac and Joliet since November 30, 2019, including their segregated housing units, did not change his judgement of noncompliance with XV(a)(ii) (pp. 55)

NRC among other facilities reported as "substantially compliant" with requirement XV(a)(iv) (pp. 57)

6 disciplinary infractions adjudicated during April 2020 involving SMI offenders at Stateville NRC (pp. 94)

**Fifth Annual Report:**

"The lack of an adequate number of clinical and custody staff remains the major impediment preventing IDOC from meeting the requirements of the Corrected Second Amended

7

Settlement Agreement. This is reflected in the ongoing backlog of mental health evaluations that exists throughout the Department with the biggest culprit being NRC." (pp. 5)

"Another major area of concern regarding mental health evaluations is the large number of backlogged mental health evaluations at Stateville-NRC. In the Midyear Report of November 30, 2020, the following numbers of backlogged mental health evaluations from NRC were reported: [June 160; July 99; August 169; September 180]" (pp. 12)

Beginning in February 2021, the backlog numbers from Stateville-NRC were reported on the weekly backlog report as follows: (pp. 12)

| Date | Backlogged Evaluations | Greater than 14 days late |
|---|---|---|
| 2/19/21 | 402 backlogged evaluations | 302 (75%) greater than 14 days late |
| 3/19/21 | 384 backlogged evaluations | 268 (70%) greater than 14 days late |
| 4/23/21 | 114 backlogged evaluations | 75 (66%) greater than 14 days late |
| 4/30/21 | 115 backlogged evaluations | 73 (63%) greater than 14 days late |
| 5/21/21 | 86 backlogged evaluations | 43 (50%) greater than 14 days late |

Site visit March 11, 2021, was informed by staff of program to reduce backlogged MH evaluations by making "every effort" to transfer inmates identified as class members by day 10, or else they are referred to a state social worker for a mental health evaluation. Beneficial to move patients quickly; "There is evidence of this in Stateville-NRC's MHP Databases, which suggest at least 295 patients were transferred during March." But also little indication that evaluations are being done timelier. "Among a set of 266 patients onsite in February, who

8

required an evaluation, IDOC's tracking shows: only 33 clearly have an evaluation completed at Stateville-NRC[;] only 5 of those were timely [;] another 111 had no evaluation as of the end of March; these were all overdue one to four months… The remaining 122 patients in that sample appeared to have transferred in March and it is unclear whether an evaluation had been completed before transfer. Each of these was overdue by March 1, so any completed evaluations were late, and 77% of this group was a minimum of 14 days late." (pp. 13)

"NRC staff told the monitor that the best measure of this program's success is the backlog of numbers… The most recent numbers demonstrate that this new "transfer program" is resulting in a reduced backlog of mental health evaluations at Stateville-NRC, but it appears principally to shift the problem of overdue evaluations to the receiving institutions… it is unclear whether the original due date is preserved after a patient transfers." (pp. 13)

Regarding requirement (VIII)(b)(i) concerning evaluations for offenders transitioning from Crisis Placement: "Seven institutions [including Stateville-NRC] had very strong practice—from 82% to 100%--for this initial seven months of implementing this requirement" (pp. 22)

At NRC, class members participate in the "Alive" curriculum once per week as a form of additional treatment (pp. 30)

Dr. Stewart references Stateville-NRC has having an appropriate medication distribution time at 8am (pp. 34)

"Stateville-NRC – The overall condition of the segregation units at this facility was adequate. That is, many of the cells had been freshly painted and I didn't find any non-functioning toilets or sinks. The showers were in reasonable condition, and I didn't elicit any

9

substantive complaints about the overall condition in segregation from my interviews with class members." (pp. 41)

Based on interviews with class members at several sites including NRC, "it is my opinion that mentally ill offenders in segregation continue to receive the treatment specified in their Individual Treatment Plans. The treatment, however, is not clinically sufficient to deal with the stresses that mentally ill offenders experience while in segregation." (pp. 41)

In interviews with class members from Stateville-NRC and 3 other facilities, "These plans and interviews indicated that MHPs did provide individual counseling to class members who were placed in restrictive housing." (pp. 44)

NRC, among other institutions, has "not yet shown substantial compliance" with (XVII)(a) regarding the use of restraints (pp. 51)

4 disciplinary infractions adjudicated during March 2021 involving SMI offenders at Stateville NRC (pp. 67)

"The Adjustment Committee issued segregation time greater than that recommended by the MHP in 10 out of 16 cases. Stateville NRC did not provide the Adjustment Committee reports for review, so I cannot tell whether the facility followed IDOC's policy 05.12.133, Section H.2, which requires a higher level of review by the Chief Administrative Officer and clear documentation of the rationale for deviating from mental health's recommendation. However, the sheer number of cases in which the Adjustment Committee chose a more severe sanction than the MHP is concerning." (70)

Dr. Stewart recommends that Stateville NRC submit SMI discipline documents regarding how infractions were adjudicated, as they did not submit Adjustment Committee reports in March 2021 (pp. 71-72)

**Sixth Annual Report:**

Dr. Stewart reports "signs that Stateville-NRC had delays in transmitting referrals to mental health staff that lasted as much as a month", and that "those times are not available from other facilities" – referrals at NRC took significantly longer to process than at other facilities (pp. 9)

Referencing "all such databases" aggregated from Graham, Logan, Menard, and NRC, Dr. Stewart reports that only 23% of mental health evaluations and related referrals met the timeliness standards outlined in the Settlement Agreement (pp. 10). He continues by noting that the IDOC's claims to have had a "reduction in backlog" of outstanding evaluations, which they have presented as "evidence of greatly improved practice", is overstated. Instead, he observes that the facility completed "less than half of the evaluations due", and moreover suggests that "the backlog report does not show that more evaluations were completed timely; it only shows that those overdue evaluations no longer show as Stateville-NRC's responsibility" (pp. 11).

Dr. Stewart attests that IDOC oversight systems "do not examine the time it takes to deliver referrals to mental health staff", and that referrals at NRC have had delays as much as 36 days between when referrals were produced and logged by receiving staff. Additionally, logs from November, 2021 show that, for 82 patients, their referrals were not logged until after their departures from the facility, and in some cases not until weeks after (pp. 13). Further, Dr. Stewart remarks that NRC "did not record any Emergent referrals", and suggests that some of the

11

crisis that should ordinarily be captured in written referrals may be "being handled orally" (pp. 14).

Dr. Stewart then praises NRC, among five other facilities, for documenting "their collective treatment planning with progress notes", which he then encourages the IDOC to adopt universally (pp. 18).

Next, Dr. Stewart discusses that the IDOC "continues to struggle" to fill certain supervisory positions, notably that of a "Mental Health Authority (MHA)"; instead, he records that those vacant positions are filled by "acting MHAs", clinical staff who divert a portion of their time towards administrative duties, including at NRC where the position is "filled by currently assigned Clinical Psychologist" (pp. 40-41).

Dr. Stewart then introduces an email received from Assistant Monitor Reena Kapoor from May 27, 2022 wherein Dr. Kapoor notes three disciplinary infractions adjudicated during March 2022 involving SMI offenders (pp. 91-92).

Lastly, Dr. Stewart states that NRC "continues to routinely exceed MHPs' [Mental Health Professionals'] recommendations for segregation time without providing any justification for doing so." He further observes that the Adjustment Committee issued segregation time greater than what was recommended by the MHP in 6 out of 11 cases during March 2022, 10 out of 16 cases during March 2021, and 2 out of 11 cases during September 2021. Accordingly, he judges that the facility is "clearly not following IDOC's policy 05.12.133, Section H.2, which requires a higher level of review by the Chief Administrative Officer and clear documentation of the rationale for deviating from mental health's recommendation" (pp. 95).

**Other:**

Dr. John Raba, the Medical Monitor for the case Lippert v. Jeffreys, also takes note of NRC's health care insufficiencies in *his* 6th Report.

Dr. Raba charts that, as a percentage of allocated positions as of September 12, 2022, NRC had a 17% vacancy rate for primary care providers, a 31% vacancy rate for its nursing staff, and a 30% vacancy rate for its management staff (pp. 74).

Without naming a specific facility, Dr. Raba notes that "there is little to no documentation of follow up questions to elicit more information or an examination when patients report a physical or mental health condition" *at reception centers*. This included the cases of three personals who "reported taking mental health medications previously and the nurse did not elicit what the medications were or when they were last taken" (pp. 77).

Dr. Raba also observes that NRC, which "[utilizes] UIC for the majority of their specialty care", typically experiences "delayed schedule dates" for their appointments at UIC. Based on this data, he writes that "IDOC should, but does not, track the length of time to complete a scheduled appointment and has no requirement in policy for the expectation for how long it should take to complete a consultation" (pp. 114-115).

Dated: August 18, 2023            /s/ Harold C. Hirshman
                                  One of the attorneys for Plaintiffs

Harold C. Hirshman              Alan Mills
Diane O'Connell                 Nicole Schult
DENTONS US LLP                  Madison Kemker
233 S. Wacker Drive, Suite 7800 Uptown People's Law Center

13

Chicago, IL  60606  
Telephone: (312) 876-8000  
Facsimile:  (312) 876-7934  
harold.hirshman@dentons.com  
diane.oconnell@dentons.com  

4413 N Sheridan  
Chicago, IL  60640  
(773) 769-1410 (phone)  
alan@uplcchicago.org  
nicole@uplcchicago.org  
madison@uplcchicago.org  

Amanda Antholt  
Sophia R. Lau  
Equip for Equality  
20 N. Michigan Ave., Suite 300  
Chicago, IL 60602  
(312) 341-0022 (phone)  
(312) 895-7330 (direct)  
amanda@equipforequality.org  
 sophia@equipforequality.org